# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JESSIE J. BARNES,

                                    Plaintiff,

       v.                                           9:19-CV-109
                                                    (ECC/MJK)

DONALD UHLER, *et al.*,

                                   Defendants.

JESSIE J. BARNES, Plaintiff, pro se
THOMAS A. CULLEN, Asst. Attorney General, for Defendant

MITCHELL J. KATZ, U.S. Magistrate Judge

TO THE HONORABLE ELIZABETH C. COOMBE, U.S. DISTRICT JUDGE:

## **ORDER and REPORT-RECOMMENDATION**

       This matter has been referred to me for Report and Recommendation by United States District Judge Elizabeth C. Coombe, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). Plaintiff, a prolific pro se litigant in this district, commenced this action by filing a civil rights complaint on January 28, 2019, alleging various constitutional violations that occurred while he was incarcerated at Upstate Correctional Facility ("Upstate C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). ( . No. 1).

       The procedural history of this case is lengthy and complex. The original filed 77-page complaint named 106 individuals as defendants, and plaintiff sought to proceed in

1

forma pauperis. ("IFP").  (Dkt. Nos. 1, 2).  On April 8, 2019, the court issued a decision

and order granting plaintiff's IFP application and accepting plaintiff's complaint for

filing with respect to some claims and dismissing the remainder of the claims asserted.

(Dkt. No. 14).  On October 15, 2019, defendants filed a partial motion to dismiss, which

the court granted on May 5, 2020.  (Dkt. Nos. 95, 130). On October 28, 2020, plaintiff

filed an amended complaint.  (Dkt. No. 166) (Amended Complaint ("AC")).  Named

defendant Annucci filed a motion to dismiss on March 4, 2021, and the non-moving

defendants filed answers to the amended complaint. (Dkt. Nos. 206, 230). The court

granted Annucci's motion to dismiss on October 20, 2021. (Dkt. No. 260).  The

remaining defendants and claims in this action are as follows:

1.    Eighth Amendment excessive force and/or failure to intervene claims:

(a) February 8, 2016, as to defendants Dustin Hollenbeck ("CO
Hollenbeck"), Austin Helms ("CO Helms"), and Ronald Pryce ("CO
Pryce");

(b) March 23, 2016, as to defendants Scott Santamore ("Sgt. Santamore"),
Justin Russell ("CO Russell"), and CO Hollenbeck;

(c) March 26, 2016, as to defendants Jon Ayers ("CO Ayers"), Corey Law
("CO Law"), CO Hollenbeck, Benjamin Page ("CO B. Page"), Richard
Scott ("CO Scott"), and Bruce Dimick ("CO Dimick");

(d) April 12, 2016, as to defendants Bruce Truax ("Sgt. Truax"), B. Fleury
("CO Fleury"), Garth Stephen ("CO Stephen"), CO Helms, CO Pryce,
James Lord ("CO Lord"), Jessica Page ("CO J. Page"), and Kevin St.
Mary ("CO St. Mary");

(e) February 13, 2017, as to defendants Nathan Locke ("CO Locke"),

Jarrod Cook ("CO Cook"), Robert Lamica, III ("CO Lamica"), CO Ayers, Mark Baily ("CO Baily"), Wes Lincoln ("CO Lincoln"), William Hoffnagle ("Sgt. Hoffnagle"), and Brett Derouchie ("Sgt. Derouchie");

(f) June 21, 2018, as to defendants CO Hollenbeck, Sgt. Fletcher, and Stephen Salls ("Lt. Salls"); and

(g) June 22, 2018, as to defendants Lt. Salls, Robert Barkman ("Lt. Barkman"), Jaime Burroughs ("CO Burroughs") Barry Burdette ("CO Burdette"), Cory King ("CO King"), Eric Marshall ("CO Marshall"), Marshall Bush ("Sgt. Bush"), and Thomas Smith ("CO Smith").

2.    Eighth Amendment conditions of confinement claims against defendants CO Hollenbeck, Sgt. Fletcher, and Lt. Salls related to plaintiff's placement in a cell near incarcerated individual Raszell Reeder.

3.    Eighth Amendment conditions of confinement claims against defendants Sgt. Fletcher, CO Hollenbeck, Donald Uhler ("Superintendent Uhler"), Earl Bell ("Superintendent Bell"), and Paul Woodruff ("DSS Woodruff") related to Fixed Protective Hatch Covers and Retention Straps.

4.    First Amendment retaliation claims:

(a) February 8, 2016, as to defendants CO Hollenbeck and Roxanne Leclerc ("ORC Leclerc");

(b) October 14, 2016, October 19, 2016, and November 17, 2016, as to defendant Randal Smith ("Sgt. Smith");

(c) February 13, 2017, as to defendants Sgt. Derouchie and CO Baily;

(d) March 14-15, 2018, as to defendant Sgt. Fletcher;

(e) June 20-21, 2018, as to defendants Jonathan Howell ("CO Howell"), CO Hollenbeck, Lt. Salls, Albert Gravlin, Jr. ("Capt. Gravlin") and Sgt. Fletcher; and

(f) June 22, 2018, as to defendants CO Marshall and Lt. Salls.

3

     5.     Fourteenth Amendment due process claims against defendants Superintendent Uhler, Superintendent Bell and DSS Woodruff related to the implementation of restraint orders.

(*See* Dkt. Nos. 165 at 23; 245; 257; 260).

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the amended complaint in its entirety. (Dkt. Nos. 380, 382, 383, 384). Plaintiff did not file a response to the defendants' motion, despite the court affording him multiple extensions of time to do so. (Dkt. Nos. 387, 388, 389, 390, 391, 392, 393, 395). For the reasons set forth below, the court recommends granting defendants' motion for summary judgment in part and denying defendants' motion in part.

I. Summary Judgment ................................................................................. 6

II. Excessive Force/Failure to Intervene ...................................................... 9

   A.   Legal Standard ................................................................................. 9

   B.   Analysis ......................................................................................... 11

      1.    February 8, 2016 – Hollenbeck, Helms and Pryce ........................ 11

      2.    March 23, 2016 – Santamore, Russell, and Hollenbeck ................ 22

      3.    March 26, 2016 – Ayers, Law, Hollenbeck, Page, Scott, and Dimick .......... 27

      4.    April 12, 2016 – Truax, Fleury, Stephen, Helms, Pryce, Lord, Page, St. Mary ................................................................................................ 30

      5.    February 13, 2017 .......................................................................... 34

          i. Return to Cell - Locke ............................................................... 34

          ii. Lower Holding Pen - Locke, Cook, Lamica, Ayers, Baily, Hoffnagle, Derouchie ................................................................................... 38

6.    June 21, 2018 – Hollenbeck, Fletcher, Salls.................................................... 43

7.    June 22, 2018 – Salls, Barkman, Burroughs, Burdette, King, Marshall, Bush, Smith ................................................................................................................ 46

   i.  Cell Extraction with Chemical Agent............................................. 46

   ii. Forcing Plaintiff's Hands Inside Cell ............................................ 49

III.    Conditions of Confinement ................................................................................ 51

   A.    Legal Standards.......................................................................................... 51

   B.    Analysis...................................................................................................... 53

   1.    Noise Complaint – Hollenbeck, Fletcher, Salls......................................... 53

   2.    Fixed Protective Hatch Cover and Retention Straps – Fletcher, Hollenbeck, Uhler, Bell, Woodruff .............................................................................. 56

IV.    Retaliation ........................................................................................................... 59

   A.    Legal Standard ........................................................................................... 59

   B.    Analysis...................................................................................................... 61

   1.    February 8, 2016 ....................................................................................... 61

      i.    Leclerc ................................................................................... 61

      ii.    Hollenbeck ............................................................................ 66

   2.    October 14, October 19, and November 17, 2016 – R. Smith ..................... 70

      i.    October 14, 2016 Misbehavior Report ……………………………..71

      ii.    October 19, 2016 Misbehavior Report ................................. 73

      iii.    November 17, 2016 Misbehavior Report............................. 76

   3.    February 13, 2017 – Baily, Derouchie ....................................................... 77

   4.    March 14-15, 2018 – Fletcher ................................................................... 80

   5.    June 20-21, 2018 ....................................................................................... 84

      i.    Howell ................................................................................... 84

      ii.    Hollenbeck, Salls, Gravlin, Fletcher ................................... 86

   6.    June 22, 2018 ............................................................................................ 90

      i. Lt. Salls .................................................................................... 90

      ii. Marshall ............................................................................... 93

V.     Fourteenth Amendment Due Process - Uhler, Bell, Woodruff ....................95

   A.   Procedural Due Process ..................................................................... 96

   B.   Substantive Due Process ................................................................... 98

VI.    Qualified Immunity........................................................................... 100

## I.   <u>**Summary Judgment**</u>

"Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *ING Bank N.V. v. M/V TEMARA, IMO*, 892 F.3d 511, 518 (2d Cir. 2018). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," *Costello v. City of Burlington,* 632 F. 3d 41, 45 (2d. Cir. 2011), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Kessler v. Westchester County Dep't of Social Services,* 461 F.3d 199, 206 (2d Cir. 2006). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue

for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"The moving party bears the initial burden of 'showing that there is no genuine dispute as to a material fact.'" *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (*quoting Vivenzio v. City of Syracuse,* 611 F.3d 98, 108 (2d Cir. 2010). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.,* 475 U.S. at 586. "The nonmoving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145,149 (2d Cir. 1998).

"If the defendant in a run-of-the-mill civil case moves for summary judgment . . ., the judge must ask [him or herself] not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook,* 691 F.3d 226, 230 (2d Cir. 2012).

When a party moves for summary judgment against a *pro se* litigant, the Second Circuit requires that "*pro se* litigants have actual notice, provided in an accessible manner, of the consequence of the *pro se* litigant's failure to comply with the requirements of Rule 56." *Irby v. New York City Transit Auth.,* 262 F.3d 412, 414 (2d Cir. 2001). When such notice is given[1], courts in this district have routinely held that if a *pro se* plaintiff fails to respond to a motion for summary judgment, the Court may accept defendant's factual assertions in the Statement of Material Facts as true to the extent they are supported by the evidence in the record. *See, Jackson v. Moore,* No. 9:21-CV-1001 (GTS/ATB), 2023 WL 4710869, at *2 (N.D.N.Y. Apr. 14, 2023), *report and recommendation adopted*, 2023 WL 4711091 (N.D.N.Y. July 24, 2023); *Price v. Oropallo,* No. 9:13-CV-563 (GTS/TWD), 2014 WL 4146276, at *5 (N.D.N.Y. 2014); *Ahmed v. Frazer & Jones, Co*., No. 5:13-CV-573, 2015 WL 470648 at *2 (N.D.N.Y. 2015); *see also* Local Rule 56.1(b).

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Salaam v. Stock*, No. 9:19-CV-00689(AMN/TWD), 2023 WL 3853811, at *2 (N.D.N.Y.  Feb.  27, 2023), *report and recommendation adopted,* 2023 WL 3579770 (N.D.N.Y. May 22, 2023) (citing

---

[1] The Notice of Due Date to Respond to Motion for Summary Judgment was served upon the plaintiff by regular mail. Dkt. No. 381.

*Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)); *Meagher v. State Univ. Constr. Fund*, No. 1:17-CV-0903 (GTS/C.F.H), 2020 WL 5504011, at *16 (N.D.N.Y. Sept. 11, 2020) ("where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*"). "This requirement is not a mere formality; rather 'this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties.'" *Id.*, citing *Cao-Bossa v. New York State Dep't of Lab.,* No. 1:18-CV-0509 (GTS/TWD), 2021 WL 3674745, at *1 (N.D.N.Y. Aug. 19, 2021). The Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Id*. (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted)).

**II**. **Excessive Force/Failure to Intervene**

      **A.**    **Legal Standard**

      Incarcerated individuals enjoy Eighth Amendment protection against the use of excessive force and may recover damages under 42 U.S.C. § 1983 for a violation of

those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain a claim of excessive force, a plaintiff must establish both the objective and subjective elements of an Eighth Amendment claim. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999); *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be "inconsistent with the contemporary standards of decency." *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a *per se* Eighth Amendment violation, regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' . . . or 'significant' injury, . . . provided that the amount of force used is more than '*de minimis*,' or involves force that is 'repugnant to the conscience of mankind.' " *Hudson*, 503 U.S. at 7-10.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to

10

maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.*
(quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a
malicious or wanton manner, the Second Circuit has identified five factors to consider:

> the extent of the injury and the mental state of the defendant; the
> need for the application of force; the correlation between that
> need and the amount of force used; the threat reasonably
> perceived by the defendants; and any efforts made by the
> defendants to temper the severity of a forceful response.

*Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

To prevail on a claim of failure to intervene under Section 1983, a plaintiff must
show that the defendant saw and had reason to know that: (1) excessive force was being
used, or a person was being wrongfully arrested, or a constitutional violation was being
committed; and (2) the officer had a realistic opportunity to intervene and prevent the
harm from occurring. *Universal Calvary Church v. City of N.Y.*, No. 96-CV-4606, 2000
WL 1538019, at *9 (S.D.N.Y. Oct. 17, 2000) (citing *Anderson v. Branen*, 17 F.3d 552
(2d Cir. 1994)); *see also O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)
(affirming grant of summary judgment with respect to a claim based on excessive force
an officer "had no realistic opportunity to attempt to prevent").

### B.    Analysis

#### 1.    February 8, 2016 – Hollenbeck, Helms and Pryce

Plaintiff alleges that on the morning of February 8, 2016, he was removed from
his cell by CO Helms and CO Hollenbeck and placed "on [the] wall." (AC at ¶ 35).
Plaintiff's transfer was due to maintenance work taking place on the recreation pen door
in his cell. (*Id.* at ¶ 36). Plaintiff alleges that he was initially handcuffed behind his
back with a retention strap applied to his handcuffs, and that the retention strap was

11

removed once he was placed on the wall. (*Id.* at ¶ 35). Plaintiff alleges that CO Hollenbeck then "pat-frisked" plaintiff, "purposely grabb[ing]" plaintiff's genitals and buttocks "very rough" to "provoke a confrontation." (*Id.*).

Plaintiff further alleges that upon later being returned to his cell, he placed his cuffed hands with retention strap out of the tray slot for the restraints to be removed. (AC at ¶ 37). Plaintiff asserts that CO Hollenbeck began to "maliciously and sinisterly bend [plaintiff's] fingers back inflicting extreme outrageous intense shock of pain unnecessarily without any probable cause or justification." (*Id.* at ¶ 38). Plaintiff asserts that his reaction to the "excruciating pain" caused by CO Hollenbeck was to "instinctively [pull] out of [CO Hollenbeck's] death grip on his fingers[.]" (*Id.* at ¶ 39). At this point, plaintiff alleges that CO Hollenbeck and CO Helms pulled plaintiff's arm out of the tray-slot and fixed protective hatch cover. (*Id.*). He further alleges that they were "joined by" CO Pryce. (*Id.*). According to plaintiff, the incident caused his hands to go numb with pain for "many many months." (*Id.*).

At his deposition, plaintiff provided additional detail surrounding these alleged instances of excessive force. Plaintiff described the pat-frisk by CO Hollenbeck as follows:

> He was roughhousing me, grabbing my buttocks and stuff like, you know, going up at me, you know, going up to my private parts. He was . . . really roughhousing me.

(Plaintiff's Deposition Transcript ("Pl. Dep.") at 108)[2] (Dkt. No. 383-2). Plaintiff testified that CO Hollenbeck's hands remained on the outside of plaintiff's pants

---

[2] Citations to the deposition transcript and documentary evidence refer to the pagination generated by CM/ECF at the headers of the page, not to the pagination of the individual documents.

throughout the pat-frisk.  (*Id.* at 109-110).  Plaintiff described the incident as a "grab-frisk[.]"  (*Id.* at 111).  He did not sustain any bruising or other physical injuries.  (*Id.*).  The pat-frisk lasted "maybe a minute or two." (*Id.*). Other than the "roughhousing" and "grab-frisking," CO Hollenbeck did not use any other means of force during the pat-frisk.  (*Id.* at 112).

With respect to the subsequent use-of-force incident, plaintiff testified that there was no force used on him during his escort back to his cell.  (Pl. Dep. at 115).  He further testified that upon placing his hands in the tray slot, the defendants did not take his cuffs off right away, but "just . . . started bending [his] fingers and stuff."  (*Id.*).  Plaintiff asserts that the cuffs were "real tight," and the defendants were pulling down on plaintiff's cuffs until plaintiff could not feel his hands anymore.  (*Id.*).  When asked if he tried to pull his hands into the tray slot, plaintiff responded "I don't – I don't – no, I don't – no, I didn't."  (*Id.* at 118).

In support of their motion for summary judgment, defendants have submitted the sworn declaration of CO Hollenbeck, who denies using excessive force by grabbing plaintiff's genitals and buttocks to provoke a confrontation on the morning of February 8, 2016. (Hollenbeck Decl. at ¶ 12) (Dkt. No. 380-18).

CO Hollenbeck further describes the circumstances surrounding the subsequent use of force, upon plaintiff's later return to his cell, as follows:

> After the mechanical restraints were removed from plaintiff's right hand, plaintiff turned around and grabbed my left arm with both hands and pulled my arm into the cell.  COs Pryce, Helms, and I used body holds to pull plaintiff's arm out of the cell, releasing plaintiff's grip on my left arm.  CO Pryce removed the mechanical restraints, and the feed-up hatch was secured.

13

(*Id.* at ¶ 8). Defendants have also submitted video evidence depicting plaintiff's return to his cell on the morning of February 8th, and use-of-force incident that ensued. (Cullen Aff. Ex. P-1).  Additionally, defendants have submitted various incident reports documenting the subsequent incident.[3]  (Cullen Aff. Ex. C) (Dkt. No. 383-3).

With respect to the pat-frisk, the Second Circuit Court of Appeals has provided specific, albeit changing, guidance regarding the application of Eighth Amendment standards to cases involving searches of incarcerated individuals. In *Boddie v. Schnieder*, Plaintiff alleged that he was physically and sexually harassed by a female corrections officer, who on one occasion touched his penis and called him a "sexy black devil," and then 15 days later, pinned him to a door and pressed "her whole body . . . against [his] penis." 105 F.3d 857, 860 (2d Cir. 1997). The Second Circuit ruled that the alleged limited conduct, even if true, did not violate the Eighth Amendment. *Id.* at 862. The Second Circuit did acknowledge that sexual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment. *Id.* at 860-61. ("There can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation."). However, the Second Circuit held that the "small number of incidents in which [Boddie] allegedly was verbally harassed, touched, and pressed against without his consent . . . do not involve a harm of federal constitutional proportions." *Id.* at 861.

---

[3] The court would take this opportunity to remind the parties that, although not required by the statute, it is usually best practice to authenticate business records provided in support of a motion for summary judgment whenever possible.

That decision remained the guiding law in the Second Circuit until August 11, 2015, when the Circuit re-examined the issue in *Crawford v. Cuomo,* 796 F.3d 252 (2d Cir. 2015). In that case two incarcerated individuals, plaintiffs Crawford and Corley, claimed that the defendants fondled their genitals during facility pat-frisks, and that other defendants who were present were deliberately indifferent to the incarcerated individuals' plight. *Crawford*, 796 F.3d at 255. As to Plaintiff Corley, Defendant Prindle allegedly told him that he was going to make sure Corley did not have an erection, and thereafter ordered him to stand against the wall and spread his legs, and when he did so, Defendant Prindle paused to fondle and squeezed Corley's penis. *Id.* As to Crawford, it was alleged that Correction Officer Prindle grabbed and held his penis, and asked, "what is that?" Upon the response, "that's my penis, man," Prindle pushed him to the wall, continued to squeeze and fondle the area and roamed his hands down Crawford's thigh. *Id.*

The district court dismissed the Plaintiffs' claims of an Eighth Amendment violation based upon *Boddie. Crawford v. Cuomo*, 2014 WL 897046, at *5 (N.D.N.Y. Mar. 6, 2014). Upon review, the Second Circuit reversed the district court's decision, calling into question the continued application of *Boddie* to circumstances such as that presented in the case. *Crawford,* 796 F.3d at 254. The Circuit noted that contemporary standards of decency had evolved since *Boddie* was decided 15 years earlier, and that the outcome in *Boddie* may have been different if decided in 2015. *Id.* at 259-60. In particular, the Court noted that while there was no allegation of repetitive conduct, there was also no penological interest that was being served by Defendant's conduct. *Id.* at 258. ("There is no penological justification for checking to see if an inmate has an

erection."). Further, the timing of the search (in the middle of defendant Corley's visit with his wife), together with the defendant's statements, were sufficient to suggest that the frisk was a pretext for sexual abuse. *Id.* Similarly, as to Crawford, the squeezing and fondling of Plaintiff's genitalia, together with the roaming of the COs hands and simultaneously taunting comments, was not done in pursuit of, or in the course of, any legitimate duties. *Id.* at 258-59. In sum, the Second Circuit noted that the application of *Boddie* "must change as the basic mores of society change." *Id.* at 260. To this end, the Second Circuit held that "[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Id.* at 257.

Here, plaintiff's assertions as to the pat-frisk by CO Hollenbeck on February 8, 2016 are insufficient to sustain a claim for excessive force/sexual abuse even under the evolving standards as expressed in *Crawford* and its progeny. At the outset, the court seriously questions whether the evidence presented by plaintiff is sufficient to show that CO Hollenbeck's conduct was objectively serious for purposes of establishing an Eighth Amendment violation. Although plaintiff describes the pat-frisk as "rough" and involved the "grabbing" of his genitals and touching of his buttock, he also avers that it left no physical injuries or bruising, that CO Hollenbeck's hands remained on the outside of plaintiff's clothes, and that the incident in total lasted "maybe a minute or two."

Moreover, the evidence is insufficient to establish that CO Hollenbeck acted with a sufficiently culpable state of mind. Plaintiff does not contest that a legitimate

16

penological purpose existed for the pat-frisk, to the extent he was being transferred to another cell due to maintenance work in his cell.  Moreover, plaintiff does not allege that CO Hollenbeck made any verbal comments, or inappropriate gestures, during the pat-frisk that would indicate a non-penological purposes or intent to gratify the officer's sexual desire/humiliate plaintiff.  Even in post-*Crawford* cases, the courts in this district have awarded summary judgment in the absence of such evidence, and under similar circumstances suggesting a "run-of-the-mill pat down" insufficient to support an Eighth Amendment claim. *Cole v. Suffolk Cnty. Corr. Facility*, No. 20-CV-1883, 2020 WL 2113205, at *4 (E.D.N.Y. May 4, 2020) (dismissing Eighth Amendment claim because two instances of officer groping inmate's genitals were not "particularly lengthy or violent" and were "too similar to the type of incidental contact accompanying a run-of-the-mill pat down to reasonably infer any inappropriate touching or malicious intention"); *see Carzoglio v. Abrams*, No. 18-CV-04198, 2022 WL 2193376, at *8 (S.D.N.Y. June 17, 2022) (dismissing Eighth Amendment claim that was based on corrections officer groping of inmate's buttocks for "no more than three seconds on two different occasions" during appropriately ordered pat frisks); *Lynch v. Cnty. of Herkimer*, No. 9:20-CV-63, 2022 WL 866745, at *12-14 (N.D.N.Y. Feb. 16, 2022) (granting summary judgment against pretrial detainee where corrections officer's "routine pat search" of detainee was "undisputedly warranted," supported by "a legitimate penological basis," and caused no pain or other injury to detainee other than humiliation and shame, despite search including officer "rubb[ing] [detainee's] chest and squeez[ing] his right buttock for between five to ten seconds"); *Vann v. Sudranski*, No. 16-CV-7367, 2020 WL 3001072, at *6 (S.D.N.Y. June 4, 2020) (no Eighth

Amendment claim where corrections officer made only brief contact with inmate's fully clothed genital area during "routine and necessary pat frisk" to search for contraband); *Washington v. Piper*, No. 18-CV-7783, 2019 WL 6343516, at *5 (S.D.N.Y. Nov. 26, 2019) ("Plaintiff's bare allegations of a poke to the groin while he was . . . inside . . . his housing unit fail to assert sufficient facts" to establish "an act which is sufficiently severe and serious" under the Eighth Amendment); *Dozier v. Franco*, No. 17-CV-3348, 2018 WL 3094935, at *3 (S.D.N.Y. June 22, 2018) (no Eighth Amendment claim where inmate alleged "a single incident that took place during a routine pat frisk to which all inmates were subjected on their way to the . . . recreation area," and where inmate failed to allege "facts that would demonstrate that the conduct was undertaken to humiliate him or to sexually gratify [corrections officer]") (internal quotation marks omitted)).

Plaintiff alleges that CO Hollenbeck had a history of being "aggressive" and "confrontational" toward him. (AC at ¶ 31). Plaintiff also asserts that between January 28, 2016 and February 1, 2016, he submitted grievances concerning sexually harassing comments made by CO Hollenbeck. (AC at ¶ 33). Of note is copy of a February 1, 2016 grievance submitted by plaintiff in support of his amended complaint, in which plaintiff complains of, among other things, CO Hollenbeck threatening to "shove something up [plaintiff's] ass . . . ." (Dkt. No. 166-2 at 24). However, even assuming the truth of plaintiff's assertions, the court does not find that such non-contemporaneous comments raise a material question of fact as to whether CO Hollenbeck's "rough" pat-frisk on February 8, 2016 - which was conducted pursuant to a transfer out of plaintiff's cell, left no physical injuries, and did not involve any sexually harassing comments - rose to the level of an Eighth Amendment violation. *See Joseph v. Annucci*, No. 18-

18

CV-7197, 2020 WL 409744, at *8 (S.D.N.Y. Jan. 23, 2020) (The Court recognizes that "a pat frisk, involving some physical contact, is a standard procedure inside a prison."). Accordingly, the court recommends granting summary judgment on plaintiff's Eighth Amendment claim arising out of CO Hollenbeck's pat-frisk on February 8, 2016.

Turning to the latter use-of-force incident alleged to have occurred on February 8th, there is no dispute, and the video evidence substantiates, that plaintiff was not subject to any force during his escort to his cell, or while being placed inside of his cell. Notably, the video evidence shows that, without any apparent physical provocation, plaintiff was screaming vulgarities and being openly hostile to the defendant corrections officers during the approximate one-minute period during which he was escorted down the hall and placed in his cell. (Cullen Aff. Ex. P-1 at 10:08:21-10:09:08). The video evidence, although not ideal in quality, also contradicts plaintiff's allegations as set forth in his initial grievance concerning this incident – in which he states that CO Hollenbeck "rough housed" plaintiff outside of his cell door, and that CO Hollenbeck further "jerked" plaintiff back and "pushed" plaintiff up against the wall while "screaming, 'I ain't tell you to go in the cell.'" (*See* Cullen Aff. Ex. C at 27).

In his amended complaint, plaintiff alleges that excessive force was applied once he placed his cuffed hands out of the tray slot for his mechanical restraints to be removed, at which time Defendant Hollenbeck "ben[t]" plaintiff's fingers back. (AC at ¶ 39). At his deposition, plaintiff also described the force as "pulling down on the cuffs" and "twisting" his hands/fingers. (Pl. Dep. at 119-20). Even viewing the evidence in a light most favorable to plaintiff, courts have held that force like that allegedly used by CO Hollenbeck in pulling, bending, and/or twisting plaintiff's hands

19

in conjunction with removing his handcuffs constitutes a *de minimus* use of force. *See Smith v. Fischer*, No. 13-CV-6127, 2016 WL 3004670, at *13 (W.D.N.Y. May 23, 2016) ("The force used here, which amounts to a pull of an arm, was *de minimis*."); *Montrond v. Spencer*, No. 17-CV-10505, 2024 WL 1115937, at *17 (D. Mass. Mar. 14, 2024) ("unnecessary twists, squeeezes, and excessive force on [plaintiff's] wrists and hands, including excessive squeezes on his arms" did not rise to the level of an Eight Amendment excessive force violation).

Plaintiff's allegations are inconsistent as to what transpired next. In his initial grievance, plaintiff asserted that "without provocation," CO Helms and CO Hollenbeck began bending his fingers and then pulled plaintiff's "left arm to shoulder" out of his cell. (Cullen Aff. Ex. C at 26). In his amended complaint, plaintiff admits that he instinctively pulled out of CO Hollenbeck's grip due to the pain caused by the twisting/bending of his hand/fingers. (AC at ¶ 39). However, at his deposition, plaintiff denied trying to pull his hands away from the defendant corrections officers. (Pl. Dep. at 118). The defendants' account is consistent with the allegations in plaintiff's amended complaint, establishing that while the defendants were in the process of removing the mechanical restraints on plaintiff's wrist, plaintiff pulled his hand, and consequently CO Hollenbeck's arm, into the cell. (Hollenbeck Decl. ¶ 9; Cullen Aff. Ex. C at 33-38, 42-45, 51). In response to this conduct, which plaintiff does not plausibly dispute was in violation of a direct order, defendants aver, as is reflected in the video evidence, that they "used body holds to pull plaintiff's arm out of the cell," at which time they were able to remove the mechanical restraints. (Cullen Aff. Ex. P at 10:09:20-10:09:45; Pryce Decl. at ¶ 7, Dkt. No. 380-31).

On this record and considering the plaintiff's undisputed resistance to the corrections officers and their order to keep his hands out, no reasonable juror could conclude that the defendants' pulling on plaintiff's arm to remove his mechanical restraints was objectively unreasonable. *See Casiano v. Ashley,* 515 F. Supp. 3d 19, 26 (W.D.N.Y. 2021) ("Given plaintiff's steadfast refusal to comply with the deputies' directives, it was objectively reasonable for them to enter the room and to use some force to get her to comply with their commands."); *Jackson v. Fiorini*, No. 5:20-CV-1215(GTS/ML), 2024 WL 942367, at *18 (N.D.N.Y. Mar. 5, 2024) (force applied by defendant, which consisted primarily of holding plaintiff's abdomen and left arm to keep him in place and his hands away from his pants and helping to bring him to the ground with the assistance of other officers when plaintiff continued to resist, was "objectively reasonable under the circumstances known to defendant at the time the altercation occurred."); *Berman v. Williams*, No. 17-CV-2757, 2019 WL 4450810, at *6 (S.D.N.Y. Sept. 17, 2019) ("The defendants' use of force during the Intake Search Area incident was objectively reasonable because it was proportionate to the plaintiff's resistance. The plaintiff refused to comply with orders to remove his clothing in the Intake Search Area, which was a legitimate command"). Plaintiff has not proffered any evidence raising a material question of fact in this regard.  Accordingly, the court recommends granting summary judgment as to the excessive force/failure to intervene claims against CO Hollenbeck, CO Helms and CO Pryce concerning the plaintiff's placement in his cell on February 8, 2016.

## 2. March 23, 2016 – Santamore, Russell, and Hollenbeck

Plaintiff alleges that on March 23, 2016, Sgt. Santamore approached plaintiff's cell after lunch and informed plaintiff that he would be "returning to pull [plaintiff] out to speak to an investigator from the Inspector General's office[.]" (AC at ¶ 44). Plaintiff alleges that Sgt. Santamore returned to plaintiff's cell at approximately 1:15 p.m. with CO Hollenbeck and CO Russell, to escort plaintiff to the interview. (*Id.* at ¶ 45). CO Hollenbeck proceeded to place mechanical restraints on plaintiff's wrists "extremely tight," about which plaintiff complained to Sgt. Santamore prior to being removed from the cell. (*Id.* at ¶¶ 46-47). Plaintiff alleges that Sgt. Santamore stated that he would check the restraints when plaintiff came out of his cell. (*Id.* at ¶ 48).

Plaintiff then alleges that, while restrained behind his back with a retention strap attached, he was removed from his cell and placed on the wall to be pat-frisked. (*Id.* at ¶¶ 49-50). At this time, plaintiff alleges that CO Hollenbeck "rough-house pat-frisked" plaintiff, "grabbing [plaintiff's] penis and testic[les] as well as jabbing his hand between [plaintiff's] 'buttocks.'" (*Id.* at ¶ 50). Plaintiff alleges that when he complained about "this outrageous conduct," Sgt. Santamore abruptly stated, "Oh put him back in his cell now." (*Id.* at ¶¶ 51-52). Plaintiff was placed back in his cell, at which time CO Hollenbeck proceeded to "bend [plaintiff's] fingers and without any justification began to . . . pull" on the retention strap with CO Russell, as Sgt. Santamore watched. (*Id.* at ¶ 53).

At his deposition, plaintiff denied being threatened by any of the defendants when he was first told about the interview with the Inspector General's office. (Pl. Dep. at 138). Plaintiff further denied that CO Hollenbeck used any other force on plaintiff

22

while applying the mechanical restraints, other than applying them "awful tight." (*Id.* at 140). Contrary to his initial allegations, plaintiff also testified that he was "never pat frisked" on March 23, 2016 by CO Hollenbeck, or any of the other purportedly involved defendants. (*Id.* at 141). Instead, plaintiff testified that when he asked for his mechanical restraints to be loosened, the defendants put him back in his cell. (*Id.* at 140-41). Plaintiff recalls that one of the defendants, upon placing him back in the cell, "was like bending [his] fingers," and "did pull the retention strap a little bit." (*Id.* at 141-42).

In moving for summary judgment as to this claim, CO Hollenbeck denies placing mechanical restraints on plaintiff "extremely tight." (Hollenbeck Decl. at ¶ 18) (Dkt. No. 380-18). CO Hollenbeck submits that the pat-frisk conducted in conjunction with removing plaintiff from his cell on March 23, 2016 was "in accordance to set policy and procedure," and did not involve aggressive sexual conduct as described by plaintiff. (*Id.* at ¶¶ 16, 18). Defendants further contend that during the pat-frisk, plaintiff would not comply with staff direction and was becoming boisterous and refused to follow staff directions. (Hollenbeck Decl. at ¶ 15; Santamore Decl. at ¶ 7, Dkt. No. 380-36). For this reason, plaintiff was sent back into his cell. (Santamore Decl. at ¶ 7). CO Hollenbeck also denies twisting plaintiff's hands while removing plaintiff's mechanical restraints. (Hollenbeck Decl. at ¶ 16).

Plaintiff testified that he did not break any bones or sustain any bruising as a result of this incident. (Pl. Dep. at 142). He does allege that it "re-injured" his wrists, with respect to numbness, tingling, burning sensations. (Pl. Dep. at 143). According to the evidence submitted by defendants, Plaintiff was seen by medical staff that day with

complaints that defendants had "squeezed" his hands while in mechanical restraints, however a contemporaneous assessment of plaintiff by the medical staff revealed no signs or symptoms of injury, and that plaintiff exhibited full range of motion. (Cullen Aff. Ex. B at 167) (Dkt. No. 384).

At the outset, plaintiff's claim against CO Russell relative to March 23, 2016 should be dismissed. Plaintiff has failed to overcome the defendants' evidence establishing that CO Russell was not in the employ of Upstate C.F. until 2017. (Russell Decl. at ¶ 4, Ex. A). Accordingly, no reasonable factfinder could conclude that he was personally involved in the asserted constitutional violations.

Moreover, even assuming the truth of plaintiff's allegations with respect to the way mechanical restraints were applied and removed from his wrists on March 23, 2016, plaintiff has failed to establish a claim of constitutionally cognizable proportion. To be sure, overly tight handcuffing can in some circumstances constitute excessive force. *See Kerman v. City of New York*, 261 F.3d 229, 239-40 (2d Cir. 2001). "In evaluating the reasonableness of handcuffing, the Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (citation, quotation marks, and alteration omitted). "The injury requirement is particularly important." *Towns v. Stannard*, No. 1:16-CV-01545 (BKS/DJS), 2017 WL 11476416, at *3 (N.D.N.Y. Dec. 20, 2017) (quoting *Usavage v. Port Auth. Of N.Y. & N.J.*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. Mar. 26, 2013) (internal quotation marks omitted)). "These injuries need not be 'severe or permanent,' but must be more than merely '*de*

24

*minimis.*' " *Id.* (quoting *Vogeler v. Colbath*, No. 04-CV-6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005)). Furthermore, "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch*, 567 F. Supp. 2d at 468; *see also Gonzalez*, 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000) ("[I]f the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force.").

Here, it is undisputed that immediately upon complaining of the tightness of his handcuffs, Sgt. Santamore stated that he would check the cuffs when plaintiff came out of his cell. It is also undisputed that due to plaintiff's conduct when he came out of the cell, the corrections officers decided to place him back in his cell, where they removed his handcuffs and the retention strap. Plaintiff has offered no evidence to establish that any of the defendants applied or removed the restraints "maliciously and sadistically [to] cause[] harm," or that his complaints were ignored. Courts in this district "routinely dismiss claims of excessive force based on tight handcuffing where an inmate asserts only a *de minimis* injury without plausible allegations of wantonness or maliciousness." *Livingston v. Hoffnagle,* No. 9:19-CV-0353 (GLS/C.F.H), 2019 WL 7500501, at *4 (N.D.N.Y. Nov. 8, 2019) (listing cases); *see also Burroughs v. Mitchell*, 325 F. Supp.3d 249, 265 (N.D.N.Y. 2018) (dismissing pro se inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist") (internal quotation marks omitted); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (dismissing excessive force claim based on tight handcuffing where the complaint alleged, without more, that the handcuffs caused

25

"pain, swelling, and bruising") (internal quotation marks and brackets omitted).

Last, the court recommends summary judgment dismissing plaintiff's claim of sexual abuse/excessive force relative to a pat-frisk conducted by CO Hollenbeck on March 23, 2016. Credibility assessments and the choice between conflicting versions of a story are generally for a jury to resolve. *Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir. 1996). However, the Second Circuit recognized an exception to this rule in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). In *Jeffreys*, the court held that summary judgment may be granted in the rare case, "where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that 'no reasonable person' could credit . . . his testimony." *Quick v. Quinn*, No. 9:12-CV-1529 (DNH/DEP), 2014 WL 4627106, at *4 (N.D.N.Y. Sept. 11, 2014) (quoting *Jeffreys*, 426 F.3d at 54-55). In order for the court to apply the *Jeffreys* exception, the defendant must satisfy each of the following: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' " (2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Id.* (quoting *Benitez v. Ham*, No. 04-CV-1159 (NAM/GHL), 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (adopting report and recommendation) (quoting *Jeffreys*, 426 F.3d at 554)).

In this case, plaintiff's claim arising from the pat-frisk by CO Hollenbeck on March 23, 2016 is based solely on plaintiff's allegations. Furthermore, plaintiff's testimony as to what occurred during the pat-frisk is contradictory, to the extent that, at his deposition, he insisted that he has "no claims against Hollenbeck for the pat frisk . .

26

.,'" and that his only complaint was the manner in which the defendants applied and removed the mechanical restraints to his wrists. (Pl. Dep. at 141-42). To this end, the defendants have produced party affirmations and documentary evidence substantiating their contention that the pat-frisk conducted by CO Hollenbeck on March 23rd was performed in accordance to set policy and procedure, and did not involve aggressive sexual conduct. Accordingly, plaintiff's testimony alone, which is replete with inconsistencies as to what occurred during the pat-frisk on March 23rd, does not give rise to a genuine dispute of material fact.

### 3. March 26, 2016 – Ayers, Law, Hollenbeck, Page, Scott, and Dimick

Plaintiff alleges that on March 26, 2016, he was escorted to a holding pen for a search to be conducted of his cell. (AC at ¶¶ 54-57). When it came time for plaintiff to be escorted back to his cell, plaintiff was removed from the holding pen with his hands restrained behind his back, with CO Ayers "as his primary handler[.]" (*Id.* at ¶ 63). Plaintiff alleges that a retention strap was applied to his mechanical restraints. (*Id.*). At his cell, plaintiff was instructed to "turn and enter [his] cell[.]" (*Id.* at ¶ 64). Plaintiff alleges that at that time, "without any provocation," COs Ayers, Dimick, Law, Hollenbeck, Page, and Scott "pull[ed plaintiff's] cuffed hands needlessly and senselessly with retention strap causing excruciating intense pain and suffering and further damage to nerves in [plaintiff's] wrists and hands." (AC at ¶ 64).

At his deposition, plaintiff elaborated that he initially refused to come out of his cell at the direction of CO Hollenbeck. (Pl. Dep. at 146-47). Plaintiff eventually,

27

voluntarily left his cell when CO Page and CO Ayers came to his cell.  (*Id.* at 147-48).

Upon later being returned to his cell by CO Hollenbeck and "a bunch" of other

corrections officers, plaintiff was placed inside the cell, the door was closed, and he put

his hands through the slot to get the restraints off, without incident.  (*Id.* at 154-55).

Plaintiff further testified that, at this point, "they" started pulling on the cuffs with the

retention strap.  (*Id.* at 155-56).  Plaintiff testified that he could not recall any other

force being used other than the pulling on the retention strap.  (*Id*. at 156).  He could not

estimate how long the pulling lasted. (*Id.*).  He alleged the "reaggravat[ion]" of his hand

injuries, and that he "couldn't feel his hands for a long time . . . . [and] had that stinging

numb burning sensation in [his] hand for a long time for some months [sic]."  (*Id.* at

157).

     In moving for summary judgment as to plaintiff's excessive force claim premised

on the March 26th incident, defendants maintain that once plaintiff was inside of his

cell, plaintiff "pulled the mechanical restraints into the cell. At which time force became

necessary."  (Cullen Aff. Ex E at 77) (Dkt. No. 383-5).  Defendants assert that only an

appropriate amount of force was used to maintain control of the retention strap and

remove the mechanical restraints from plaintiff, which included pulling rearward on the

retention strap with both hands, gaining control of plaintiff's hand and arms, and then

removing the mechanical restraints from plaintiff's wrists, at which time all force

ceased.  (Law Decl. at ¶¶ 7-8, Dkt. No. 380-24; Page Decl. ¶¶ 7-8, Dkt. No. 380-30;

28

Dimick Decl. ¶¶7-8, Dkt. No. 380-13; Scott Decl. ¶ 8, Dkt. No. 380-37; Hollenbeck
Decl. ¶¶ 19-20, Dkt. No. 380-18). Defendants maintain that this is evidenced from the
video footage provided as an exhibit to their motion, as well as the contemporaneous
reports prepared in response to the incident. (*See* Cullen Exs. E; P-2 at 18:51:40-
18:52:40). Defendants have also submitted evidence that plaintiff was seen by a nurse
following the incident, at which time it was noted that plaintiff had a ¼ inch abrasion on
his right hand over the second knuckle without any bleeding, and good range of motion
to his hands and fingers. (Cullen Aff. Ex. E at 21, 78, 80). No swelling or bruising was
noted, and no further treatment was indicated. (*Id.*).

As with plaintiff's prior excessive force claims premised on general allegations
that the defendants pulled on his retention strap and/or twisted his hands in the context
of applying/removing plaintiff's handcuffs, such conduct is insufficiently serious to
support plaintiff's Eighth Amendment claim. The video evidence establishes that no
more than approximately 30 seconds transpired between the time plaintiff was placed in
his cell and the termination of any force by the defendants used in the process of
removing plaintiff's mechanical restraints. As discussed, the general pulling of a
retention strap in the context of removing mechanical restraints, coupled with a *de
minimus* injury, does not amount to an Eighth Amendment violation. Accordingly, the
court recommends granting summary judgment to the defendants as to plaintiff's

excessive force and failure to intervene claims premised on the events of March 26, 2016.

### 4.    April 12, 2016 – Truax, Fleury, Stephen, Helms, Pryce, Lord, Page, St. Mary

Plaintiff alleges that on April 12, 2016, he was escorted to the facility barber by CO Fleury, CO Stephens, and Sgt. Truax. (AC at ¶ 24).  The barber, who plaintiff refers to as a "cadre," was an incarcerated individual from general population who was given a work assignment in the facility.  (Pl.'s Dep. at 150-51).  Plaintiff was handcuffed behind his back during the escort, and remained handcuffed when he sat down in the barber's chair.  (AC at ¶¶ 24-25).  Plaintiff alleges that the barber "placed the barbercloth around [his] neck so tight it was practically choking [plaintiff.]"  (*Id*. at ¶ 25).  Plaintiff proceeds to allege that the barber "used his right hand to literally choke [plaintiff] with his fingers in [plaintiff's] neck cutting of [plaintiff's] air circulation completely[,]" as Sgt. Truax, CO Helms, CO Fleury, CO Stephens, CO Pryce and CO Lord "all intently watched laughing hilariously at the . . . physical abuse of plaintiff[.]" (*Id.* at ¶ 25).  The barber proceeded to take his hand off of plaintiff's neck, and then "put his hand in a round vice-grip c-cup and wantonly slammed [the] palm of his hand into [plaintiff's] throat," then "gripped [plaintiff's] neck with his finger tips squeezing madly choking [plaintiff] relentlessly" as the previously named corrections officers "persisted to laugh hysterically . . . ." (*Id.* at ¶ 26).  Plaintiff then alleges that Sgt. Truax

"finally stepped up and stated 'If you do not stop choking him right now Rasta I will have to take you down because you are choking him to[o] much and to[o] hard." (*Id.* at ¶ 27). There were no reports prepared concerning the use of force by the barber on plaintiff. (*Id.* at ¶ 27). Plaintiff's deposition testimony is mostly consistent with the allegations in his complaint concerning this incident. Plaintiff alleges that he was sitting in the chair when the barber grabbed him around the throat and choked him "right in front of all the police[,]" while they were laughing. (Pl. Dep. at 160).

Defendants proffer a much different description of the events surrounding plaintiff's haircut on April 12, 2016. According to the sworn declaration of Sgt. Truax, the barber "use[d] his free hand to control plaintiff's head by placing it under the chin of plaintiff so he could cut plaintiff's hair safely." (Truax Decl. ¶ 8, Dkt. No. 380-41; Cullen Aff. Ex. F at 10, Dkt. No. 383-6). Sgt. Truax purports to have observed the barber cut hair several time prior to this incident, always using the same technique of controlling the head so the hair cut can be done safely and correctly. (Truax Decl. ¶ 10; Cullen Aff. Ex. F at 10). On this occasion, Sgt. Truax observed plaintiff to "grow agitated, and . . . beg[in] to move his head backwards" when the barber placed his hand under plaintiff's chin. (Truax Decl. ¶ 9; Cullen Aff. Ex. F at 10). Upon seeing plaintiff grow agitated, Sgt. Truax terminated the haircut and sent plaintiff back to his cell "to avoid an incident," to which the plaintiff complied. (*Id.*).

31

In seeking summary judgment, defendants first argue that no liability for failure to intervene can attach to the defendant-corrections officers in this instance, because the barber was not a "state actor," and thus there is no underlying constitutional violation. (*See* Def. MOL at 17).  While the defendants correctly state this general premise, they miss the point.  "In order to establish liability on the part of a defendant under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual." *Lewis v. Mollette*, 752 F. Supp. 2d 233, 244 (N.D.N.Y. 2010).  The courts in this Circuit have consistently recognized Eighth Amendment violations premised on an officer's failure to intervene in an ongoing attack by another incarcerated individual.  *See Staton v. Farrell*, No. 1:20-CV-01120, 2023 WL 10354380, at *7 (W.D.N.Y. Sept. 29, 2023), *report and recommendation adopted*, 2024 WL 1051986 (W.D.N.Y. Mar. 11, 2024) ("Indeed, an officer's failure to intervene when an inmate is attacked can constitute a violation of the inmate's rights under the Eighth Amendment.") (citing *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)).

To establish liability on the part of a defendant under a failure to intervene theory under these circumstances, plaintiff must establish that (1) the officer observed or had reason to know that plaintiff was involved in a physical altercation with another incarcerated individual; (2) the officer had reasonable opportunity to intervene; (3) the officer failed to intervene; and (4) the officer's failure to intervene was the proximate cause of injuries sustained by the plaintiff. *Rosen v. City of N.Y.*, 667 F. Supp. 2d 355,

355 (S.D.N.Y. 2009); *accord Williams v. Russo*, 01-CV-6401, 2009 U.S. Dist. LEXIS 5086 (W.D.N.Y. Jan. 26, 2009). Stated another way, a corrections officer can be held liable for failure to intervene in an attack on an incarcerated individual if the officer "displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *Rosen*, 667 F. Supp. at 360.

Here, the competing narratives present a genuine issue of material fact as to whether the event as described by plaintiff took place and whether at least some of the named defendants had a reasonably opportunity to intervene if it did. Crediting plaintiff's version of the events, a reasonable jury could conclude that these defendants exhibited deliberate indifference to a serious threat against plaintiff as they sat, observed, and laughed at plaintiff being assaulted. Moreover, the court is not prepared, on this summary judgment record, to conclude that plaintiff's injuries were so *de minimus* to render plaintiff's claim inactionable.

Notwithstanding this court's recommendation that plaintiff's failure-to-intervene claim survive summary judgment, plaintiff has failed to establish a material question of fact as to whether CO Lord and CO Pryce were personally involved in the purported failure to intervene. When defense counsel asked plaintiff at his deposition whether James Lord was present, plaintiff responded "I don't know him." (Pl. Dep. at 162). Likewise, when plaintiff was asked if Ronald Pryce was present, he stated "I can't

remember. He might have been. I just can't recall." (*Id.*).  CO Lord and CO Pryce have both submitted sworn declarations stating that they were not present during the alleged incident on April 12th.  (Lord Decl. ¶ 6, Dkt. No. 380-28; Pryce Decl. ¶ 12, Dkt. No. 380-31).  Moreover, plaintiff did not identify these defendant corrections officers as being involved in the April 12th incident in his underlying grievance complaining of said events.  (Cullen Aff. Ex. F at 6).  Accordingly, plaintiff has failed to demonstrate that a genuine dispute of material fact exists as to CO Lord and CO Pryce's personal involvement in the alleged failure-to-intervene, and summary judgment should be granted to these defendants as to this claim.

### 5.    February 13, 2017

Plaintiff alleges two separate incidents of excessive force/failure to intervene occurring on February 13, 2017.

### i.    Return to Cell - Locke

Plaintiff alleges that on February 13th he was being returned to his cell by CO Locke and CO Trombley after a disciplinary hearing, during which time a search of plaintiff's cell had been conducted.  (AC at ¶¶ 78-83).  As plaintiff was being escorted to his cell, he "noticed" his cell was "totally ravaged" and " 'only' repeatedly requested to speak with dut[y] seargent." (*Id.* at ¶ 84).  Plaintiff alleges that despite the fact he was restrained, and that he only requested to speak with the sergeant on duty, CO Locke "screamed 'Take him down,' and proceeded to body slam plaintiff to [the] floor where

[CO Locke] struck [plaintiff] in [the] face maliciously and sadistically several times with a closed fist then heartlessly took his fist with a finger bent knuckle sticking out and viciously jabbed his finger in [plaintiff's] temple repeatedly twisting it to intensify pain and suffering as well as jabbing [plaintiff] in [his] []neck and choking [plaintiff]." (*Id.* at ¶ 85).

At his deposition, plaintiff testified that after he asked to see a sergeant, CO Locke told plaintiff to go into his cell. (Pl. Dep. at 185). Plaintiff replied "no, I'm – I'm going to stay right here on the wall until the sergeant come." (*Id.* at 185-86). Then, as plaintiff "stood there," CO Locke told CO Trombley to take plaintiff to the ground. (*Id.* at 186). Plaintiff testified that he was jabbed in the neck, and "one of them" was twisting his handcuffs. (*Id.* at 186). Plaintiff stated that "maybe" he was punched in the back, but that he was not hit in the face. (*Id.* at 186-87).

In support of their motion for summary judgment, defendants confirm that CO Locke and CO Trombley were escorting plaintiff to his cell from a disciplinary hearing on February 13, 2017. (Locke Decl. at ¶ 6) (Dkt. No. 380-27). Defendants also confirm that plaintiff refused to enter his cell until he spoke with a sergeant, and that plaintiff was "yelling loudly and turning towards [CO Locke] aggressively." (*Id.* at ¶ 7). CO Locke proceeded to "force[d] plaintiff to the floor using both of [his] hands on [plaintiff's] upper torso area." (*Id.* at ¶ 8). CO Locke "then gained control of [plaintiff's] right arm using both [his] hands." (*Id.*). Defendants aver that plaintiff

35

continued resisting and attempted to bite CO Trombley and CO Locke. (*Id.*).
According to CO Locke, once compliance was gained, he assisted plaintiff to his feet
and all force ceased. (*Id.*). Defendants have submitted video evidence depicting the
underlying incident. (Cullen Aff. Ex. P-3 at 14:30:30-14:32:40).

In this instance, the record evidence, even considered in the light most favorable
to plaintiff, demonstrates no dispute of material fact as to whether the force used by CO
Locke can satisfy either the objective or subjective components of an excessive force
analysis. To be sure, plaintiff's allegations with respect to this claim are replete with
inconsistencies. With respect to the objective component, plaintiff testified that the
injuries he suffered from this incident included a sore rib, neck, and hands. (Pl. Dep. at
188). Although plaintiff alleges in his amended complaint that he was "struck . . . in
[the] face . . . several times with a closed fist" (AC at ¶ 85), he conceded at his
deposition that he was not hit in the face during this incident (Pl. Dep. at 187-88).

Moreover, as plaintiff conceded at his deposition, CO Locke used force only
because of plaintiff's explicit refusal to obey orders. The video evidence submitted by
defendants substantiates their argument that plaintiff was yelling as he was being
escorted to his cell, and shows plaintiff pulling away from the officers, exclaiming,
"Nah man, I ain't going in there, man." The video evidence further substantiates the
defendants' position that, in response to plaintiff's refusal to obey and resistance to the
corrections officers, CO Locke assisted with forcing plaintiff to the ground to gain

36

compliance.  Defendants contend, and the video evidence corroborates, that plaintiff continued to be argumentative and noncompliant as the two officers attempted to subdue him, and even directed him to "stand up."  All force ceased, and plaintiff was assisted up from the ground, after approximately forty-five seconds.  (Cullen Aff. Ex. P3 at 14:30:30-14:32:00).

Considering all this evidence together, no rational factfinder could conclude that force was used against plaintiff in a malicious or sadistic manner, or that the force used was not in a "good faith effort . . . to restore discipline." *Hudson,* 503 U.S. at 6; *see also Bradshaw v. City of New York*, 855 F. App'x 6, 9 (2d Cir. 2021) ("[The plaintiff] clearly failed to prove the culpability of [the defendants'] states of mind when they tackled and restrained him. It is uncontroverted that [the plaintiff] refused to interlace his fingers behind his head when [the defendant] ordered him to do so, and the split-second decision to bring [the plaintiff] to the ground and subdue him to eliminate the security risk that the officers believed he posed was not excessive. Thus, the district court properly granted summary judgment on [the plaintiff's] excessive force claim as it relates to the initial tackle."); *Bermudez v. Waugh,* No. 9:11-CV-0947(MAD/DEP), 2013 WL 654414, at *5 (N.D.N.Y. Jan. 29, 2013), *report and recommendation adopted*, 2013 WL 654401 (N.D.N.Y. Feb. 21, 2013) (finding allegations that defendant "charged" plaintiff like a football player, hitting or punching plaintiff in the chest, upon his explicit refusal to obey multiple orders insufficient to support an excessive force

claim); *Gillard v. Hamel,* No. 09–CV–0431, 2012 WL 967064, at *4–6 (N.D.N.Y. Feb. 24, 2012) *report and recommendation adopted*, 2012 WL 960967 (N.D.N.Y. Mar. 21, 2012) (finding allegations that a defendant took the plaintiff's hands, twisted his wrists, placed his knee on his neck, and rubbed his face on the ground while trying to subdue him in the course of an altercation with a fellow incarcerated individual insufficient to establish an Eighth Amendment cruel and unusual punishment claim). Accordingly, the court recommends granting defendants' motion for summary judgment to the extent it seeks dismissal of the excessive force claim against CO Locke premised on the use-of-force incident that occurred as plaintiff was being escorted back to his cell on February 13, 2017.

### ii.    Lower Holding Pen - Locke, Cook, Lamica, Ayers, Baily, Lincoln, Hoffnagle, Derouchie

Plaintiff alleges that after the initial use of force on February 13th, he was escorted to the lower holding pen where he was "held in [the] corner facing [the] wall," by CO Cook on his left side and CO Lamica on his right side. (AC at ¶ 88). Plaintiff alleges that his hands were restrained in handcuffs locked to a waist chain. (*Id.* at ¶ 89). According to plaintiff, CO Lamica used excessive force "by choking [plaintiff] . . . with [plaintiff's] shirt and striking [plaintiff] with a closed fist several times." (*Id.*). Plaintiff alleges that CO Cook observed this conduct and failed to intervene. (*Id.* at ¶ 90). Plaintiff alleges that Sgt. Derouchie also observed CO Lamica's conduct, and stated,

> Jessie you are delusional he is not doing that to you and whining to me will not do you any good to be frank with you, you know I owe you Jessie for those two lawsuits you filed against me. The one you settled and the one you got pending against me now as we speak so you are gonna get what you got coming from me.

(*Id.* at ¶ 91). "After several more minutes" CO Lamica "ceased his . . . assault" on plaintiff. (*Id.* at ¶ 92). Plaintiff then contends that, as his left handcuff restraint was removed, during which time CO Cook held plaintiff's handcuffed right hand, CO Lamica "struck" plaintiff in the eye. (*Id.* at ¶¶ 93-94). Plaintiff was "then slammed to [the] floor" by CO Lamica, CO Cook, and CO Ayers as CO Baily and CO Lincoln "charged" into the holding cell, at which time they "pounced" on plaintiff. (*Id.* at ¶ 95). Plaintiff alleges that all five defendant corrections officers were "repeatedly kicking, stomping, and punching plaintiff." (*Id.*). Sgt. Hoffnagle then walked over and "kicked plaintiff in his face as [he] lay on the floor with [five] other officers on top of [plaintiff] pummeling [him]." (*Id.* at ¶ 97). Plaintiff alleges that he was screaming in pain, yelling "Oh my finger they are going to br[eak] it [sic] I am not resisting." (*Id.* at ¶¶ 96, 98).

At his deposition, plaintiff reiterated that CO Lamica was "choking him with [his] shirt, twisting it," and "punching [plaintiff] in the back and the ribs." (Pl. Dep. at 190-91). Plaintiff explained that Sgt. Derouchie was "standing outside the pen, and [plaintiff] was talking to him." (*Id.* at 192). Plaintiff then testified that after some period of time the corrections officers "went to remove" his hands from the mechanical restraints. (Pl. Dep. at 193). Plaintiff admits that he "tried to hit" CO Lamica at that

39

point, because CO Lamica had been choking him and plaintiff was "upset." (Pl. Dep. at 193-95). Plaintiff denies that he actually made contact with CO Lamica. (*Id.* at 194). Plaintiff testified that there was not any force being used on him at the time that he attempted to hit CO Lamica. (*Id.* at 195). Plaintiff testified that CO Lamica proceeded to "punch [plaintiff] in the face," and then the defendant corrections officers "jumped" on plaintiff and "took [him] down." (*Id.* at 195-97).

In seeking summary judgment, defendants have submitted sworn declarations, documentary evidence, and video evidence as support for their contention that the degree of force used by the corrections officers in the lower holding cell was, as a matter of law, appropriate to restore discipline. (Cullen Aff. Exs. P-3, H at 131, 158-169, Dkt. No. 383-8; Baily Decl. ¶¶ 7, 8, Dkt. No. 380-5; Lamica Decl. ¶ 6, Dkt. No. 380-23; Cook Decl. ¶ 6, Dkt. No. 380-11). Notably, the evidence proffered by defendants, including CO Lamica's sworn declaration and the reports prepared contemporaneously with the February 13, 2017 incident, suggests that plaintiff did in fact strike CO Lamica in the mouth/jaw area with a closed left hand blow. (Lamica Decl. at ¶¶ 6-7; Cullen Aff. Ex. H at 20).

Notwithstanding the undisputed fact that plaintiff at least attempted, if not actually succeeded, to assault CO Lamica, the parties' competing narratives preclude a finding of summary judgment as to whether the totality of the defendants' use of force in the holding cell was reasonable as a matter of law. With respect to plaintiff's

complaints that CO Lamica was initially choking plaintiff and punching him in the back and the ribs, defendants have failed to proffer any evidence showing that there is no genuine dispute as to material facts concerning the amount of force used. The video evidence submitted by the defendants, which does not include audio, merely shows that CO Lamica held plaintiff by the neck area, with plaintiff's face held against the holding pen wall, for over seven minutes. Otherwise, the video evidence provides no greater insight into what amount of force CO Lamica was applying to plaintiff's neck during this period of time, whether CO Lamica was in fact choking plaintiff with the collar of his shirt, or what CO Lamica was doing with his right hand. Nor have the defendants submitted evidence explaining what penological reason existed for CO Lamica to exert the degree of force alleged by plaintiff for such a period of time.

Furthermore, although there is no dispute that some degree of force was appropriate to restrain plaintiff and restore discipline after plaintiff attempted to/succeeded in assaulting CO Lamica, a reasonable jury could conclude, based on plaintiff's allegations, that the defendants maliciously used force against plaintiff after he was subdued. *See, e.g., Griffin v. Crippen*, 193 F.3d 89, 90-92 (2d Cir. 1999) (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against

41

him after he was subdued and handcuffed); *Sims v. Artuz*, 103 Fed. App'x 434, 437 (2d Cir. 2004) (plaintiff's allegations that he was kicked and punched while being removed from his cell after causing a disruption, corroborated in part by documented minor injuries were sufficient to withstand a summary judgement motion); *Dallio v. Sanatamore*, 9:06-CV-1154 (GTS/DRH), 2010 WL 125774, at *9 (N.D.N.Y. Jan. 7, 2010) (because the court should not weigh the evidence or make credibility determinations, summary judgment would be denied where plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, notwithstanding the relatively minor injuries the plaintiff suffered and the substantial contrary evidence proffered by the defendants); *Cicio v. Lamora*, 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *7-8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on plaintiff's claim that defendant correction officer hit inmate several times after he was subdued and helpless, despite "seemingly overwhelming" contradictory evidence, including the fact that plaintiff suffered only a minor bruise). Moreover, the competing narratives as to Sgt. Derouchie's involvement in, and knowledge of, the use-of-force precludes a finding of summary judgment.

Accordingly, the court recommends denying summary judgment as to plaintiff's excessive force claim premised specifically on the events taking place in the lower-holding cell on February 13, 2017.

### 6.     June 21, 2018 – Hollenbeck, Fletcher, Salls

Plaintiff alleges that on June 21, 2018, he learned he was going to be transferred to a cell "one (1) cell away" from Raszell Reeder, another incarcerated individual who plaintiff had previously encountered "kicking . . . steel door or banging on steel desk, stool . . . desk, bed, sink or door to recreation pen all night every night for over two (2) consecutive years." (AC at ¶ 114). Plaintiff alleges that Upstate C.F. staff "encourages" this individual's compulsions by putting other incarcerated individuals "they do not like or desire to abuse next to or a cell away" from him, and "rewarding" him "with extra food to bang more persistently." (*Id.* at ¶ 115).

According to plaintiff, there came a time when Capt. Gravlin approached plaintiff's cell to "reconvene" a disciplinary hearing. (*Id.* at ¶116). Plaintiff then alleges that, at 11:30 a.m., Capt. Gravlin, CO Salls and Sgt. Fletcher approached plaintiff's cell and "propel[ed] chemical aerosol in [plaintiff's] cell causing fear of death, cutting off [plaintiff's] ability to breath, head-aches, [and extreme] chest pains . . . ." (*Id.* at ¶ 118).

Plaintiff's deposition testimony provides additional facts surrounding this incident, somewhat inconsistent with the allegations in his amended complaint. Plaintiff testified that the incident on June 21st was based on accusations that plaintiff was inappropriately disposing of certain garbage from his cell. (Pl. Dep. at 212-17). Sgt. Fletcher was eventually called to plaintiff's cell, and he informed plaintiff that

43

plaintiff that he was going to be removed from his cell for a search. (*Id.* at 217). Plaintiff initially testified that he could not recall whether he refused to come out of his cell (*Id.* at 218), however subsequently conceded that he "told them [he] wasn't going" to be transferred to a different cell (*Id.*). Plaintiff specifically testified, "I wasn't going to let them move me in that cell." (*Id*. at 219). At this point, the cell extraction team was called to plaintiff's cell, and plaintiff was sprayed which chemical agents. (*Id.* at 221). Plaintiff alleges that in addition to the chemical agents, he was subject to tight handcuffs and being "drowned" in the shower while they were decontaminating him. (*Id*. at 222, 229).

The defendants' submissions, including sworn declarations, documentary evidence, and video footage, render summary judgment appropriate as to this claim, as there is no genuine dispute whether the defendants conduct constituted excessive force. Specifically, the video evidence substantiates the undisputed fact that plaintiff refused to exit his cell, despite multiple orders to do so. This resulted in an extraction team responding to plaintiff's cell, at which time plaintiff was given additional orders to exit his cell. Plaintiff refused to comply. At that time, Lt. Salls directed Sgt. Fletcher to apply one application of chemical agents consisting of two one-second bursts of spray to plaintiff. (Cullen Aff. Ex. P-4; Ex. J at 19, Dkt. No. 383-10). After Sgt. Fletcher administered the chemical agent, plaintiff complied with further orders and exited the cell without incident. (*Id.*). The video evidence does not otherwise support plaintiff's

44

contentions that he was subject to excessive force in the manner that his handcuffs were subsequently applied, or that he was "drowned" during the decontamination shower.

In the context of the Eighth Amendment, courts in this district have consistently found that the use of a chemical agent to restore discipline and subdue an incarcerated individual, who refuses to comply with orders, does not constitute excessive force. *Reeder v. Hogan*, No. 9:09-CV-520 (NAM/ATB), 2013 WL 2632600, at *5 (N.D.N.Y. June 11, 2013) (use of chemical agent by cell extraction team to remove noncompliant plaintiff from his cell did not constitute excessive force); *Boomer v. Lanigan*, No. 00-CV-5540, 2002 WL 31413804, at *5-6 (S.D.N.Y. Oct. 25, 2002) (correction officer did not use excessive force when he sprayed "chemical agent" at pre-trial detainee, after detainee refused to follow repeated orders to remove his arm from food slot in his cell); *Beauvoir v. Falco*, 345 F. Supp. 3d 350, 369 (S.D.N.Y. 2018) (granting defendants summary judgment in a § 1983 case because the "use of the pepper spray . . . was permissible in the context of needing to maintain a baseline of order in the prison system," where "Plaintiff repeatedly resisted multiple officers' orders"); *Alston v. Butkiewicus,* No. 3:09-CV-207, 2012 WL 6093887 (D. Conn. Dec. 7, 2012) (use of chemical agent did not constitute excessive force when incarcerated individual refused to comply with direct orders).[4]

---

[4] Courts have also declined to find similar uses-of-force objectively unreasonable in the context of the Fourteenth Amendment, which presents a stricter standard for assessing excessive force claims under

In this case, plaintiff disregarded repeated orders and efforts of the corrections staff to exit his cell, and the defendants' evidence establishes that, after deploying one application of the chemical agent which resulted in plaintiff voluntarily exiting his cell, corrections staff ceased the use of the chemical agent. Accordingly, defendants have demonstrated an absence of a genuine issue of material fact as to this incident, as no reasonable juror could find from the record evidence that defendants violated plaintiff's Eighth Amendment rights. The court therefore recommends granting summary judgment as to plaintiff's excessive force claim premised on the June 21, 2018 cell extraction.

### 7. June 22, 2018 – Salls, Barkman, Burroughs, Burdette, King, Marshall, Bush, Smith

#### i. Cell Extraction with Chemical Agent

According to the amended complaint, plaintiff was returned to his cell from a separate "suicide watch" room on the morning of June 22, 2018, at which time he observed "over 100,000 page[s] of [his] legal documents . . . demolished." (AC at ¶¶

---

the due process clause. *See, e.g., Taylor v. Nieves*, No. 17-CV-07360, 2020 WL 7028907, at *3 (S.D.N.Y. Nov. 30, 2020) (granting summary judgment on qualified immunity grounds in Fourteenth Amendment excessive force case where pepper spray was used against an uncooperative detainee); *Quinones v. Rollison*, No. 18-CV-01170, 2020 WL 6420181, at *4 (S.D.N.Y. Nov. 1, 2020) (granting summary judgment on a Fourteenth Amendment excessive force claim where "the amount of force used was small" and defendant "used only a two-second burst of pepper spray" against plaintiff); *Vazquez v. Spear*, No. 12-CV-06883, 2014 WL 3887880, at *5 (S.D.N.Y. Aug. 5, 2014) ("[T]he . . . single burst of a chemical agent, which is not a dangerous quantity, is not an unacceptable means of controlling an unruly or disruptive inmate." (internal quotation marks omitted))

124, 126).  At approximately 12:00 p.m., Lt. Salls approached plaintiff's cell and stated "close your recreation pen door right now you piece of shit and don't pussy out when I come to ex[tract] you from cell [sic]." [5]  (*Id.* at ¶ 134).  At approximately 12:45 p.m., Lt. Salls, Sgt. Bush, CO Marshall, Sgt. Smith, CO King, CO Burroughs and CO Burdette approached plaintiff's cell dressed in riot gear.  (*Id.* at ¶ 135).  Sgt. Bush proceeded to administer "blasts of chemical agent" in the plaintiff's cell, at the direction of Lt. Salls and Lt. Barkman, "to extract" plaintiff from his cell.  (*Id.* at ¶ 135). Plaintiff was thereafter handcuffed behind his back, removed from his cell, and escorted to decontamination and a medical examination.  (*Id.* at ¶ 136).  He alleges injuries including "cutting off his ability to breath," extreme intense pain and suffering, headaches and chest pains.  (*Id.* at ¶135).

At his deposition, plaintiff explained that there came a time that morning around 11:00 a.m. that he refused to close his recreation pen door.  (Pl. Dep. at 235).  He admitted this was in response to the corrections officers' intention to transfer him to a cell next to incarcerated individual Reeder.  (*Id.* at 235, 295).  Plaintiff could not recall at his deposition whether he was told that he would be extracted if he didn't close his recreation pen door.  (*Id.* at 236-37).  He confirmed that he was given orders to comply before an extraction occurred, and that he eventually closed it – however could not

---

[5] Plaintiff alleges that this interaction occurred on June **15**, 2018, however read in the context of the claim it appears that this is a typographical error, and this interaction actually occurred immediately prior to the cell extraction on Jun **22**, 2018.

testify whether he closed it before or after the chemical agent was administered.  (*Id.* at 239-40).  He further testified that after the chemical agent was deployed, the defendants were "roughhousing" plaintiff, applying handcuffs "real tight" and "pulling down" on them with their body weight.  (*Id.* at 240-41).  He also alleges that the defendants "tried to drown [him] again" in decontamination.  (*Id.* at 241).

The defendants' submissions, including sworn declarations, documentary evidence, and video footage, render summary judgment appropriate as to this claim, as there is no genuine dispute whether the defendants conduct constituted excessive force. (Cullen Aff. Exs K; P-6; Salls Decl. at ¶¶ 21-25, Dkt. No. 380-34; Barkman Decl. at ¶¶ 6-9, Dkt. No. 380-6; Burroughs Decl. at ¶¶ 6-9, Dkt. No. 380-9; Burdette Decl. at ¶¶ 6-9, Dkt. No. 380-8; King Decl. at ¶¶ 6-9, Dkt. No. 380-22; Marshall Decl. at ¶¶ 6-9, Dkt. No. 380-29; Bush Decl. at ¶¶ 6-9, Dkt. No. 380-10).  Video evidence substantiates the undisputed fact that plaintiff refused to comply with the orders of the defendant corrections officers, to the extent he refused to close his rec pen door.  The video evidence further establishes that plaintiff defied multiple orders to exit his cell voluntarily.  Plaintiff has not put forward any plausible evidence that suggests the application of chemical spray was done in a way other than to restore discipline and compel plaintiff's compliance, and the video evidence establishes that any force used on plaintiff after he was extracted from the cell, i.e. pulling on his handcuffs, was *de*

*minimus,* at most.  Accordingly, the court recommends granting summary judgment as to plaintiff's excessive force claim premised on the June 22, 2018 cell extraction.

### ii.    Forcing Plaintiff's Hands Inside Cell

After plaintiff's physical examination and decontamination post-cell extraction, he was escorted back to his cell by Lt. Salls, Sgt. Bush, Lt. Barkman, and CO Smith, who were accompanied by CO King, CO Marshall, CO Burroughs, and CO Burdette. (AC at ¶ 137).  Plaintiff states that upon his placement in his cell, his handcuff restraints were removed, and he held his hands inside of the "fixed protective hatch cover security box on his cell which is pure steel and once it is closed it neutralizes any or all threats" of plaintiff coming into physical contact with staff.  (*Id.* at ¶ 138). Nevertheless, CO Marshall, "without any legitimate reason, justification or provocation . . . abruptly grabbed" plaintiff's right ring finger and bent it repeatedly until plaintiff "heard it crack . . . ." (*Id.* at ¶ 139).  Plaintiff then alleges that CO King "began to slam the sliding door of [the] tray slot on [plaintiff's] forearm[,]" while the other defendants watched.  (*Id.* at ¶ 140).

At his deposition, plaintiff testified as follows:

Q: What happened when you got back to your cell?

A: They took me back to my cell and they took the cuffs off me and I just – I had my hands in the box, and I said, I want to see somebody.

Q: Your hands were in the fixed prot[ective] hatch?

A: Yea. And [CO Marshall] just grabbed my hand and started twisting my finger,

49

pop, and I heard my finger crack . . . you can hear it, my finger went – it cracked, and it's been bent ever since.

(Pl. Dep. at 243-44).  When asked if he was refusing to put his hands in his cell, plaintiff testified: "I didn't have time to before I can say anything . . . he just grabbed me, didn't give me a chance . . . . [T]here wasn't no warning, no nothing."  (*Id.* at 246).

CO Marshall has submitted a sworn declaration in support of the defendants' motion for summary judgment, in which he avers that plaintiff failed to comply with orders to bring his hands in his cell after CO Marshall removed his mechanical restraints.  (Marshall Dec. at ¶ 7).  CO Marshall was then "ordered to force plaintiff's hands in the cell."  (*Id.*).  With his right hand, CO Marshall "attempted to force plaintiff's right arm in the cell[,]" but was unsuccessful.  (*Id.*).  CO King was able to force plaintiff's left arm into the cell, and Lt. Salls subsequently ordered force to stop and to close the fixed protective hatch cover.  (*Id.*).  Defendants have also submitted video evidence in support of their motion. (Cullen Aff. Ex. P-6).

On this record, the court recommends granting summary judgment as to this incident, as no reasonable juror could conclude that plaintiff's Eighth Amendment rights were violated.  Plaintiff does not meaningfully dispute that he did not remove his hands from the fixed protective hatch cover, despite continued orders from the corrections officers to do so.  This is corroborated by the video evidence submitted by defendants, showing plaintiff screaming "I don't give a fuck" and "I ain't doing it" in

response to the correction's officers repeated orders to "put [his] hands in." (Cullen Ex. P-6 at 18:00). Considering the degree of force alleged to have been applied in the context of pushing plaintiff's hands in his cell, the undisputed penological justification the defendants had in forcing plaintiff's hands inside his cell in order to shut the feed-up hatch, and plaintiff's failure to show that the defendants used more force than was necessary to gain his compliance, plaintiff has failed to establish a violation of his Eighth Amendment rights in this instance.

**III**. **Conditions of Confinement**

    **A.**   **Legal Standards**

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an incarcerated individual's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and

(2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298)). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992)) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. For a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an incarcerated individual's health or safety. *Hathaway*, 37 F.3d at 66. The

52

official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

### B. Analysis

#### 1. Noise Complaint – Hollenbeck, Fletcher, Salls

Plaintiff alleges that CO Hollenbeck, Sgt. Fletcher, and Lt. Salls intermittently moved plaintiff either next to or "one cell away" from incarcerated individual Reeder who was "kicking [the] steel door or banging on steel desk, stool of desk [sic], sink or door to recreation pen all night every night for over two (2) consecutive years." (AC at ¶¶ 114, 189-91, 209-15). Plaintiff alleges that the defendants intentionally moved him because they knew that Reeder "has been in [SHU] over twenty-three (23) years and he bangs[.]" (*Id.* at ¶ 115). Plaintiff further alleges that "all Upstate staff encourages [this inmate's] compulsion by putting people they do not like or desire to abuse next to or a cell away from [him] and officer[s] on gallery rewarding him [sic] with extra food to bang more persistently." (*Id.* at ¶ 115, 205). Plaintiff claims that, as a result of his exposure to the noise generated by Reeder, he suffered.

> sleeplessness, nightmares, anxiety, weight-loss, rectal bleeding, worriation [sic], gastro-intestinal complications, head-aches, ringing in ears, mental anguish, mental confusion, extreme outrageous gross negligent infliction of emotional distress, stomach pains, lack of energy, paranoia, frustration, mental duress stress and strain, body aches and pains.

(*Id.* at ¶ 209).

At his deposition plaintiff testified that he was kept "like a cell away from" Reeder for around three years. (Pl. Dep. at 88). He "never got a full two or three hours of sleep ever on the company while [Reeder] was there, period" (*Id.* at 95), and testified that he would have to have been separated by "a lot" of cells from Reeder to not have been as affected by the noise as he was. (*Id.* at 94). Plaintiff conceded that Reeder did not do anything else other than "banging." (*Id.* at 102-103).

Defendants maintain that the decision to move an incarcerated individual from one cell to another is communicated by a corrections officer to the sergeant in charge, who ultimately approves or denies the request. (Hollenbeck Decl. at ¶ 24; Salls Decl. at ¶ 12). Defendants further explain that incarcerated individuals are moved for many reasons, including the transitioning of incoming and outgoing inmates, cell maintenance and changing Progressive Inmate Movement System ("PIMS") levels. (Hollenbeck Decl. at ¶ 26; Fletcher Decl. at ¶ 8; Salls Decl. at ¶ 11). According to the defendants, Reeder

> was a known disruptive individual who was moved similarly to other incarcerated individuals. He was known to repeatedly kick the plate on his cell door which would require maintenance, or if he broke his door, parts would need to be fixed or replaced, requiring Reeder to be moved to an available cell.

(Hollenbeck Decl. at ¶ 27; Fletcher Decl. at ¶ 9). CO Hollenbeck, Sgt. Fletcher, and Lt. Salls each deny ever having transferred plaintiff to a cell next to or near Reeder for the

54

purpose of punishing or torturing plaintiff. (Hollenbeck Decl. at ¶ 25; Fletcher Decl. at ¶ 7; Salls Decl. at ¶¶ 10, 14).

It has been stated that sleep is "critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) (citing cases); *see also See Rhem v. Malcolm,* 371 F. Supp. 594, 607–08, 628 (S.D.N.Y.), *supplemented*, 377 F. Supp. 995 (S.D.N.Y. 1974), *aff'd and remanded*, 507 F.2d 333 (2d Cir. 1974) (finding Eighth Amendment was violated where volume of noise was "intolerable"). Here, with respect to the objective element, plaintiff has alleged, and defendants do not dispute for purposes of summary judgment, that he was subjected to constant noise at a level so persistent that it caused him significant sleep deprivation for three years.  Accordingly, as to this issue there remains a question of material fact precluding summary judgment.[6]

Moreover, with respect to the subjective element, defendants' affirmation that they did not put plaintiff in proximity to Reeder to intentionally harm or punish him

---

[6] The court notes that noise generated by Reeder at Upstate C.F. has been the subject of at least one other Eighth Amendment conditions of confinement claim in this district.  *See White v. Smith,* No. 9:17-CV-1094 (LEK/ATB), 2021 WL 5989600, at *4 (N.D.N.Y. Oct. 15, 2021), *report and recommendation adopted,* 2021 WL 5988626 (N.D.N.Y. Dec. 17, 2021).  The district court in *White* dismissed the plaintiff's conditions of confinement claim at the summary judgment stage, on the basis that (1) plaintiff's general allegations of the effect of Reeder's noise level were insufficient to satisfy the objective element, and (2) there was no indication that defendant was responsible for plaintiff's cell placement, nor that defendant was deliberately indifferent to a serious risk to plaintiff's health as a result of his placement near Reeder.  Here, the court does not find that the summary judgment record compels the same outcome.

does not speak to, nor does it eliminate a question of material fact as to, whether they were *deliberately indifferent* to the alleged conditions imposed on plaintiff.  Defendants concede that they were aware that Reeder was disruptive and imply their knowledge that he generated ongoing noise that was significant enough to cause damage to his cell that required repeated attention.  There is also evidence that plaintiff complained about Reeder during the period in question.  Thus, the issue of whether the defendants knew of, and disregarded, an excessive risk to plaintiff's health and safety also remains a question of material fact that precludes summary judgement.

Accordingly, the court recommends denying defendants motion for summary judgment on plaintiff's Eighth Amendment conditions of confinement claim premised on the volume of noise generated by Reeder.

### 2.    Fixed Protective Hatch Cover and Retention Straps - Fletcher, Hollenbeck, Uhler, Bell, Woodruff

Plaintiff alleges that he was exposed to "extreme unconstitutional conditions" because of the enforcement of a retention strap ("RS") and fixed protective hatch cover ("FPHC") orders in place for "eight consecutive years."  (AC at ¶ 216).  A FPHC is a metal box placed over the tray slot, also referred to as a feed-up hatch, on a cell door.  (Cullen Aff. Ex. Q at 17-21, Dkt. No. 383-20; Woodruff Decl. at ¶ 30, Dkt. No. 380-46; Pl. Dep. at 31-32).  According to DOCCS, the purpose of the FPHC is to act as a protective measure in the Special Housing Unit ("SHU"), for staff engaging with

56

"disruptive inmates who . . . engage in misbehavior and capitalize on the vulnerability of staff when the hatch is open." (Cullen Aff Ex. Q at 17). Examples of such misbehavior through the feed-up hatch include throwing of objects, grabbing or striking staff, and refusing to keep hands inside cell. (*Id.*). The FPCH allows staff to safely deliver food and other items to incarcerated individuals without the risk of assault. (Woodruff Decl. at ¶ 31). To deliver food and other items to an incarcerated individual when a FPHC is in place, items are placed inside the FPHC, and the lid closed and secured before the feed-up hatch is opened and the incarcerated individual can remove items from the FPHC. (Cullen Aff. Ex. Q at 18-19; Woodruff Decl. at ¶ 30; Pl. Dep. at 32-33).

Likewise, an RS is a mechanism placed on restraint equipment, such as handcuffs, utilized in cases "where an inmate has displayed a history of refusing to return restraint equipment and/or presents a threat to the safety or security of himself, other persons or state property." (Cullen Aff. Ex. Q at 16; Pl. Dep. at 39-40). According to DOCCS, incarcerated individuals confined to SHU placed on an RS order "will have the retention strap placed on the restraints prior to being removed or returned to their cell. The retention strap will be immediately removed following the inmate exiting the cell and will not be used while the inmate is being escorted." (Cullen Aff. Ex. Q at 16).

57

Plaintiff's Eighth Amendment conditions of confinement claim arises out of the orders for implementation of a FPHC and RS on plaintiff and/or his cell that he alleges were imposed over the course of eight years. (AC at ¶ 230). Accordingly, to prevail on this claim, plaintiff must establish that the defendants were deliberately indifferent to a substantial harm. Moreover, courts have held that under the deliberate indifference standard, "[t]he imposition of a restraint order only violates Eighth Amendment protections if imposed restraint is 'totally without penological justification, grossly disproportionate, or involves the unnecessary and wanton infliction of pain.' " *Walker v. LaValley*, 2014 WL 47447835, at *16 (quoting *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998)). "This is because prison officials are granted wide latitude to place restraints on inmates." *Id.*

Here, even considering the specific manner in which plaintiff alleges the FPHC and RS orders were applied to him, plaintiff has failed to establish a material question of fact as to this claim. Plaintiff enjoyed a lengthy assignment to the Upstate C.F. SHU due to his substantial disciplinary history. The record evidence demonstrates that, while in the Upstate C.F. SHU, plaintiff was, at times, subject to restraint orders due to his "assaultive behavior or the threat he posed to the safety or security of himself and staff." (Uhler Decl. at ¶ 37) (Dkt. No. 380-42). Defendants have submitted significant documentation outlining the dates on which various restraint orders were imposed on plaintiff and the basis for said orders – which included refusing to bring his hands in

58

from the feed-up hatch, breaking the lower hatch of the cell door, and attempting to pull the mechanical restraints into his cell resulting in injury to staff. (Cullen Aff. Ex. L) (Dkt. No. 383-12). Notably, there is undisputed evidence in the summary judgment record evidencing incidents of plaintiff engaging in the same conduct giving rise to the bases for several of the restraint orders, including his refusal to pull his hands out of the feed-up hatch, and assaulting staff. The record also reflects that these restraint orders were withdrawn when plaintiff was determined to have "become compliant" and demonstrated "a willingness to [follow] staff direction." (*Id.*).

Plaintiff has not submitted any plausible evidence to raise a material question of fact as to whether the FPHC and RS orders were imposed without penological justification, were grossly disproportionate, or involved the unnecessary and wonton infliction of pain, other than his general and conclusory allegations. Accordingly, the court recommends granting defendants' motion for summary judgment as to plaintiff's conditions of confinement claim premised on the FPHC and RS orders.

## IV. **Retaliation**

### A.    **Legal Standard**

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord*,

758 F.3d 215, 225 (2d Cir. 2014) (citations omitted). "Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care." *Rivera v. Goord*, 119 F. Supp. 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), *abrogated on other grounds, Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

**B.    Analysis**

**1.    February 8, 2016**

**i.    Leclerc**

Plaintiff alleges that on February 1, 2016, while conducting her rounds, ORC Leclerc conducted a quarterly review report on plaintiff.  (AC at ¶ 17).  During the review, plaintiff "informed [ORC] Leclerc of sexual harassment by [CO] Hollenbeck committed . . . between January 27-29, 2016." (*Id.*).  ORC Leclerc allegedly responded, "Are you sure you want to report this to me, because you will pay for getting me involved and I am going to get you for doing it." (*Id.*).  Plaintiff then alleges that on February 8, 2016, ORC Leclerc filed a "premeditated fraudulent" sexual harassment misbehavior report in retaliation for him reporting CO Hollenbeck's conduct to her. (*Id.*).

According to ORC Leclerc, she took plaintiff's allegations of sexual harassment seriously, and included them in her quarterly review report.  (Leclerc Decl. ¶ 6) (Dkt. No. 380-25).  ORC Leclerc also notes that she had received letters from plaintiff prior to February 1st that "contained accusations about [her] conduct with other individuals." (*Id.* ¶ 7).  On February 8, 2016, ORC Leclerc was conducting a "routine round" in plaintiff's gallery, and advised plaintiff "that his concerns were unfounded and to discontinue writing letters of such nature to" her.  (*Id.* ¶ 8).  Plaintiff responded, "I know what you did, you told those officers that I was jerking off to you." (*Id.* ¶ 9).

61

ORC Leclerc informed plaintiff that she had "no idea what he was talking about[.]" (*Id.*). She then observed plaintiff "with his hands down his pants and his right arm stroking his penis." (*Id.*). ORC Leclerc gave plaintiff a direct order to put his hands on the window, but plaintiff refused. (*Id.*). Plaintiff "became belligerent yelling insults and obscenities." (*Id.*). ORC Leclerc "walked away from his cell and he continued to yell obscenities" at her. (*Id.*). ORC Leclerc filed a misbehavior report against plaintiff on February 8, 2016 because his actions were in violation of the Inmate Standards of Behavior. (*Id.* ¶ 10; Cullen Aff. Ex. C at 116). Plaintiff denies that he engaged in the conduct giving rise to the misbehavior report. (Pl. Dep. at 131).

Defendants have not established that they are entitled to summary judgment as to plaintiff's claim of retaliation against ORC Leclerc. As to the first element, "[a]lthough not all oral speech by an inmate constitutes protected activity, some courts within the Second Circuit have determined that verbal or oral complaints about the conduct of prison officials or conditions of confinement may constitute protected speech in the context of a First Amendment retaliation claim." *Id.; see, e.g., Mazyck v. Keller*, No. 6:20-CV-06055, 2021 WL 1201224, at *8 (W.D.N.Y. Mar. 31, 2021) (finding that the plaintiff "plausibly alleged that he engaged in protected activity for purposes of his First Amendment claim" where the plaintiff alleged to have verbally reported an assault by a correctional officer to a supervisor, and as a result, faced retaliation); *Smith v. Woods*, No. 03-CV-480 (DNH), 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006) (noting

62

that "the First Amendment protects, not only the filing of written grievances and complaints, but under some circumstances, the making of oral complaints to correction officers."), *aff'd*, 219 F. App'x 110 (2d Cir. 2007) (summary order) (citation omitted). Here, defendants do not dispute that plaintiff reported instances of sexual assault to ORC Leclerc. Thus, at the very least, a question of material fact remains as to whether plaintiff's report of sexual harassment to ORC Leclerc, which she described as "PREA[7] concerns" (Cullen Aff. Ex. C at 94), was protected conduct.

With respect to adverse action, the filing of a false misbehavior report that results in some form of punishment that cannot be labeled as *de minimis* has been found sufficient to constitute adverse action. *See, e.g.*, *Reed v. Doe No. 1*, No. 9:11-CV-250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action). Here, the record evidence establishes that plaintiff was found guilty of the disciplinary charges asserted in ORC Leclerc's misbehavior report, with a resulting penalty of "a

---

[7] The Prison Rape Elimination Act ("PREA") creates a relaxed exhaustion requirement for allegations concerning incidents of sexual assault. *See* 7 N.Y.C.R.R. § 701.3(i).

seven-day restricted diet." (Cullen Aff. Ex. C at 160). Upon finding plaintiff guilty of the charges, the hearing officer explained that the imposition of additional SHU time would serve no purpose, because at the time plaintiff had already accumulated over six years of SHU time still to be served, due to prior disruptive behavior. (*Id.* at 160-61). Thus, the restricted diet was chosen to "impress upon [plaintiff] that behavior that he presents to staff will not be tolerated." (*Id.* at 161). Defendants do not argue that a false misbehavior report resulting in a seven-day restricted diet cannot constitute adverse action for purposes of a plaintiff's retaliation claim. Because it is plausible that such a penalty "would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), summary judgment is not warranted on this basis.

As to third element of plaintiff's retaliation claim, in determining whether a causal connection exists between a plaintiff's protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements

by the defendant concerning his motivation."[8] *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872–73 (2d Cir. 1995)).

Here, the court acknowledges the evidence of record referencing plaintiff's significant disciplinary record, as well as the fact that plaintiff was ultimately found guilty of all charges brought against him in the subject misbehavior report. However, the court also notes that the temporal proximity between plaintiff's complaint to ORC Leclerc and the issuance of the subject misbehavior report is circumstantial evidence of a retaliatory motive. This is particularly true considering plaintiff's allegation that ORC Leclerc threatened him for getting her involved with his complaints. *See Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (reversing grant of summary judgment on retaliation claim where inmate alleged that correction officers confronted him directly about his practice of filing grievances before they issued an allegedly false misbehavior report against him).

The court recognizes defendants' argument that, notwithstanding any retaliatory animus, summary judgment is warranted because ORC Leclerc would have issued the misbehavior report regardless. However, ORC Leclerc issued the misbehavior report based on plaintiff's inappropriate conduct on February 8th, which plaintiff denies ever

---

[8] The court notes that factors (ii) and (iii) are generally employed when an inmate claims a prison disciplinary or administrative action is taken in retaliation, *see, e.g., Faulk v. Fisher*, 545 F. App'x 56, 59 (2d Cir. 2013); *Morris v. Rabsatt*, 2012 WL 976035, at *7 (N.D.N.Y. 2012), and are of dubious relevance when an inmate claims security officers have physically assaulted him.

65

having occurred.  Thus, the competing evidence as to this issue is sufficient to create a material issue of fact, as "court cannot conclude that [ORC Leclerc] would have issued the misbehavior report regardless of any retaliatory animus [s]he may have had against plaintiff." *Santos v. Schroeder*, No. 9:19-CV-1610 (BKS/TWD), 2023 WL 9377500, at *3 (N.D.N.Y. Nov. 3, 2023).  Because plaintiff has raised an issue of fact as to whether retaliatory animus was the but-for cause of ORC Leclerc's actions, the court recommends denying summary judgment as to plaintiff's retaliation claim against her.

### ii.    Hollenbeck

Plaintiff alleges that on January 27 and 28, 2016, CO Hollenbeck "persisted to belittle, degrade, bully and assail" plaintiff "with racial or sexually charged derogatory comments . . . together with promotion of inmate violence against [plaintiff.]"  (AC ¶ 32).  Between January 28, 2016 and February 1, 2016, plaintiff submitted grievances pursuant to the PREA, as well as made a verbal report to ORC Leclerc, concerning CO Hollenbeck's sexual harassment.  (AC ¶ 33).

Plaintiff alleges that on February 8, 2016, CO Hollenbeck stated to him: "Jessica you rat snitch, I got something special for your today when you come out."  (*Id.* ¶ 34).  Plaintiff proceeds to allege that CO Hollenbeck physically and sexually assaulted him (*see, supra*, Part II.B.1. of this Report and Recommendation), and filed a misbehavior report against him, in retaliation for his complaints.  (AC ¶¶ 35-41).

Because plaintiff has failed to raise a material question of fact as to whether CO Hollenbeck's alleged conduct constitutes adverse action, summary judgment is warranted as to this claim. Physical assault may, depending on its severity, constitute an adverse action for purposes of a First Amendment retaliation claim. *See Flemming v. King*, No. 14-CV-316, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016), *report and recommendation adopted*, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016); *see also Baskerville v. Blot*, 224 F. Supp. 2d 723, 731-32 (S.D.N.Y. 2002) (holding that a "retaliatory assault" sufficiently described an adverse action for purposes of a retaliation claim). Notably, "the alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis." *Flemming*, 2016 WL 5219995, at *5. However, even considering this lower standard, CO Hollenbeck's alleged conduct is still insufficient to constitute an adverse action.

First, assuming that a correction officer's "rough" conduct during a pat-frisk of an incarcerated individual can constitute adverse action for purposes of a retaliation claim,[9] courts in this circuit have concluded that conduct described at a similar level of

---

[9] Several district courts seem to conclude that a pat-frisk cannot constitute adverse action as required to support a First Amendment retaliation claim, regardless of whether plaintiff was physically or sexually assaulted during the pat-frisk, because prisoners have no legitimate expectation of privacy. *See Houston v. Coveny*, No. 14-CV-6609, 2020 WL 1151345, at *6 (W.D.N.Y. Mar. 9, 2020); *see also Joseph v. Annucci*, No. 18-CV-7197, 2020 WL 409744, at *5 (S.D.N.Y. Jan. 23, 2020) (holding a "pat frisk . . . in which [officer] 'squeez[ed]' and 'pok[ed]' [plaintiff's] chest, arms, legs, and 'private parts'

force is *de minimis* for purposes of a retaliation claim, and is not sufficient to satisfy the adverse action element. *See Morgan v. Luft*, No. 15-CV-0024, 2017 WL 3511158, at *8 (N.D.N.Y. June 22, 2017) (allegations that the defendant conducted "a rough pat frisk" are not sufficient); *see also Flynn v. Ward*, No. 15-CV-1028, 2018 WL 3195095, at *9 (N.D.N.Y. June 7, 2018) (concluding that the plaintiff's allegations that the defendant "push[ed] him around" were de minimis and does not constitute adverse action); *Sloane v. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *13-14 (S.D.N.Y. Oct. 31, 2006) (concluding that throwing a food tray at the plaintiff does not constitute adverse action); *Rivera v. Goord*, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) ("[The plaintiff] states only that [the defendants] 'shoved' him while taking him to the . . . Special Housing Unit . . . . . Such actions, even if proven at trial, would not chill a person of ordinary firmness from continuing to engage in First Amendment activity.").

---

was not retaliatory); *Amaker*, 2014 WL 8663246, at *8 (holding an officer's pat frisk consisting of "rubbing plaintiff's penis, fondling and squeezing plaintiff's buttocks and running his index finger across plaintiff's anus" was not retaliatory). However, a recent, unpublished decision from the Second Circuit raises some doubt as to this conclusion. *Hundley v. Frunzi*, No. 23-581-PR, 2024 WL 3886996, at *3 (2d Cir. Aug. 21, 2024) (commenting, in the context of reconciling jury verdicts as to excessive force and retaliation claims surrounding a pat-frisk, during which plaintiff alleged he was assaulted and suffered a broken rib, that "the jury could have found . . . that the pat-frisk of Hundley, immediately prior to the use of force, was performed solely to retaliate against Hundley for filing grievances about inappropriate and unwarranted pat-frisks in the Facility, and would deter a similarly situated individual from exercising his First Amendment rights, thereby providing a basis for liability on the retaliation claim.).

For the same reasons, the court reaches a similar conclusion with respect to CO Hollenbeck's alleged conduct in returning plaintiff to his cell on February 8, 2016. "The cases in which courts have recognized assault as a form of adverse action have involved markedly more violent conduct than that alleged here[,]" where the allegations are limited to bending and twisting of hands and fingers in the course of removing mechanical wrist restraints.  *George v. Cnty. Of Westchester*, No. 20-CV-1723, 2021 WL 4392485, at *8 (S.D.N.Y. Sept. 24, 2021) (listing cases recognizing the level of force sufficient to constitute adverse action).

With respect to the purportedly false misbehavior report, which could constitute adverse action if it resulted in more than a *de minimus* form of punishment, defendants have met their burden of showing by a preponderance of the evidence that CO Hollenbeck would have issued the misbehavior report notwithstanding the existence of any retaliatory animus. *Mount Healthy*, 429 U.S. at 287.  Plaintiff admits in his amended complaint, and the video evidence corroborates, that he pulled his hands into his cell while his mechanical restraints were being removed, in violation of the defendants' direct orders.  This undisputed conduct was the basis for CO Hollenbeck's issuance of a misbehavior report against plaintiff.  Thus, because "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report" *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at *12 (N.D.N.Y. June 7, 2018) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)) he cannot sustain a First

Amendment retaliation claim on this basis. *See Logan v. Graham*, No. 9:18-CV-0291 (DNH/ML), 2019 WL 8015209, at *14 (N.D.N.Y. Nov. 26, 2019), *report and recommendation adopted,* 2020 WL 871197 (N.D.N.Y. Feb. 21, 2020) (defendants met burden to show that they would have taken alleged adverse action even in the absence of the protected conduct where plaintiff admitted some of the allegations contained in the misbehavior report); *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (where plaintiff admitted to committing the most serious, if not all, of the prohibited conduct charged in the misbehavior report, "defendants met their burden of demonstrating proper, non-retaliatory reasons for filing the misbehavior report."). Accordingly, the court recommends granting summary judgment as to plaintiff's retaliation claim against CO Hollenbeck concerning the events of February 8, 2016.

### 2. October 14, October 19, and November 17, 2016 – R. Smith

Plaintiff alleges that he filed a flurry of grievances against Sgt. Smith in 2016. (AC at ¶ 165). Plaintiff attached many of these grievances to his amended complaint as exhibits, suggesting that plaintiff filed at least four grievances against Sgt. Smith between August and September of 2016. (*See* Dkt. No. 166-2 at 107, 110, 113, 114). In addition, plaintiff filed a grievance against Sgt. Smith on October 14, 2016, alleging that Sgt. Smith "accosted" plaintiff while conducting a grievance investigation. (Cullen Aff. Ex. G at 133) (Dkt. No. 383-7).

70

Plaintiff alleges that Sgt. Smith filed three "copy cat" misbehavior reports against plaintiff on October 14, October 19, and November 17, 2016, in retaliation for the grievances he filed against Sgt. Smith.  (AC ¶ 165-68).  The court will address each instance of alleged retaliation in turn.

### i.    October 14, 2016 Misbehavior Report

On October 14, 2016, Sgt. Smith came to plaintiff's cell to investigate a separate grievance filed against another member of DOCCS' staff related to complaints concerning sexual harassment.  (Pl. Dep. at 168; Smith Decl. ¶ 6, Dkt. No. 380-38).  According to Sgt. Smith, plaintiff began to yell racial slurs and threats at Sgt. Smith, and "pull[ed] his penis out in . . . full view of the cell door window, looked directly at [Sgt. Smith] and started masturbating."  (Smith Decl. ¶ 6).  Sgt. Smith "gave plaintiff several orders" to stop, but plaintiff refused to comply.  (*Id.*).  Sgt. Smith then "terminated the interview[,]" however plaintiff "continued to yell out racial slurs, obscenities, and create a disturbance."  (*Id*).  Sgt. Smith prepared a misbehavior report that day detailing the incident and citing plaintiff for multiple violations.  (Cullen Aff. Ex. G at 10).  At the disciplinary hearing held in relation to the October 14th misbehavior report, plaintiff was found guilty of all charges, and issued penalties including 180 days of SHU time.  (*Id.* at 5).

For purposes of this Report and Recommendation, the court assumes that the record contains sufficient evidence with respect to the first two prongs of plaintiff's

71

retaliation claim.  Specifically, plaintiff's grievances constituted protected conduct, *see Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001) (holding that a grievance is constitutionally protected conduct), and the filing of a false misbehavior report is considered an adverse action where it results in some form of punishment that cannot be labelled *de minimis*, *see Tafari v. McCarthy,* 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

Nevertheless, the court agrees that plaintiff's retaliation claim as to the October 14, 2016 misbehavior report fails on the third element.  "To satisfy the causal element of a retaliation claim, a plaintiff must 'introduce evidence sufficient to support the inference that the speech played a substantial part in the adverse action.' " *Morrow v. Bauersfeld*, No. 21-2928-CV, 2022 WL 17097590, at *2 (2d Cir. Nov. 22, 2022) (quoting inter alia *Brandon*, 938 F.3d at 40). In the absence of direct evidence, circumstantial evidence may satisfy a plaintiff's burden if it is "sufficiently compelling." *Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003).  In this case, the temporal proximity between plaintiff's grievances against Sgt. Smith and the October 14th misbehavior report favors plaintiff's claim, however as previously discussed the Second Circuit has "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017).  To this end, plaintiff has failed to proffer any

further direct or circumstantial evidence of retaliatory intent on the part of Sgt. Smith as of October 14, 2016.  In consideration of the remaining factors suggesting retaliatory animus, the summary judgment record evidences plaintiff's significant disciplinary record, and the notable amount of SHU time - over five years - he has accumulated during his incarceration as a result of his disciplinary history.  In addition, plaintiff was found guilty of five out of the six offenses cited in the October 19th misbehavior report, presumably because the conduct cited did not rise to the level of the sex offense violation that was "removed at review."  (Cullen Aff. Ex. G at 5-8, 10, 73-74).  Moreover, plaintiff has failed to allege statements made by Sgt. Smith concerning any retaliatory motivation he had for issuing plaintiff the misbehavior report.  Plaintiff's conclusory allegations in his amended complaint, and at his deposition, that Sgt. Smith's conduct as of October 14th was retaliatory is insufficient evidence on which to proceed.   Accordingly, the court recommends granting defendants' motion for summary judgment as to plaintiff's retaliation claim premised on the October 14, 2016 misbehavior report.

### ii.    October 19, 2016 Misbehavior Report

According to Sgt. Smith, on October 19, 2016, he was conducting rounds when he had to stop at plaintiff's cell and order plaintiff to "again remove the strings from his ceiling vent."  (Smith Decl. ¶ 9).  Plaintiff began "yelling in a loud voice" and directing "racial slurs" at Sgt. Smith.  (*Id.*).  Plaintiff's yelling continued, "gaining the attention

of other incarcerated individuals on the gallery, and causing a disturbance." (*Id.*).

Plaintiff then proceeded to "balance on the end of his bottom bunk, pull his penis out in

full view of the cell door window, look directly at [Sgt. Smith] and started

masturbating." (*Id.*). Plaintiff then stated, "[I]f I get a chance I'm gonna fuck you in

the ass" and "suck my dick cracker." (*Id.*). Sgt. Smith gave plaintiff "several orders to

stop" engaging in the referenced conduct, however plaintiff "refused to comply[.]"

(*Id.*). At that time, Sgt. Smith "terminated contact with plaintiff," as plaintiff

"continued" to create a disturbance. (*Id.*). The misbehavior report authored by Sgt.

Smith reflects these facts and indicates that Sgt. Smith ultimately charged plaintiff with

the following rule violations: sex offense, lewd conduct, refusing a direct order, threats,

creating a disturbance, and harassment. (Cullen Aff. Ex. G at 31). After a Tier III

disciplinary hearing was held, plaintiff was found not guilty of the sex offense violation,

and guilty of the remaining violations. (Cullen Aff. Ex. G at 86, 129). Plaintiff's guilty

dispositions resulted in penalties including 180 days of SHU time and loss of certain

privileges. (*Id.*). Plaintiff denies engaging in the conduct alleged in the October 19th

misbehavior report. (Pl. Dep. at 174-75).

     Once again, the first and second elements of plaintiff's retaliation claim are not

reasonably disputed by defendant for purposes of the summary judgment motion.

However, as to the third element, the direct and circumstantial evidence surrounding

Sgt. Smith's alleged retaliatory animus for filing the October 19, 2016 misbehavior

report presents a closer call. In particular, the court notes the substantive similarities between the October 14th and October 19th misbehavior reports, as well as the fact that the October 19th report appears to have initially been dated October 14, 2016, but was later corrected. (*Compare* Cullen Aff. Ex. G at 10 *with Id.* at 31). Of some further, potential relevance is the fact that the November 17, 2016 misbehavior report, which also bears substantive similarities to the October 14th and October 19th misbehavior reports, was erroneously dated as October 14, 2016. (*Id.* at 197). It is also undisputed that as of October 19, 2016, Sgt. Smith was aware of the October 14th grievance plaintiff filed against him, if not those filed in August and September as well. (Smith Decl. ¶ 18).

"The fact that there is no evidence that [Defendant] made a statement of retaliatory intent is a factor to consider, but that Plaintiff cannot adduce evidence of such a statement is not fatal to his claim." *Young v. Shipman*, 18-CV-0782, 2020 WL 1329159, at *5 (N.D.N.Y. Mar. 23, 2020) (citing *Gayle v. Gonyea*, 313 F.3d 677, 684 (2d Cir. 2002)) (rejecting defendants' argument that plaintiff "failed to meet his evidentiary burden because he has failed to submit direct evidence that the [misbehavior] report was filed as a retaliatory measure"); *see also Vaher v. Town of Orangetown*, 133 F. Supp. 3d 574, 596 (S.D.N.Y. 2015) ("Direct evidence of retaliatory intent is not required" to overcome summary judgment on a First Amendment retaliation claim)). Otherwise, the court considers the circumstantial evidence of

75

retaliatory animus in this instance, including the temporal proximity, defendant's

knowledge of the grievance(s) filed against him, and plaintiff's consistent denial in

engaging in the almost identical conduct alleged to have occurred on October 14th and

October 19th. On this record, the court finds a genuine issue of material fact as to

whether Sgt. Smith filed the October 19, 2016 misbehavior report in retaliation for

plaintiff filing grievances against him. Accordingly, the court recommends denying

defendants' summary judgment motion as to this claim.

### iii. November 17, 2016 Misbehavior Report

Sgt. Smith filed a third misbehavior report against plaintiff, dated October 14,

2016, citing to plaintiff's conduct during an incident that took place on November 17,

2016. (Cullen Aff. Ex. G at 197). According to Sgt. Smith, the misbehavior report

"was not properly dated" and was ultimately dismissed as untimely. (Smith Decl. ¶ 15).

It is undisputed that this misbehavior report was never processed, and thus had no

disciplinary effect on plaintiff. (Pl. Dep. at 177-78; Smith Decl. ¶¶ 15, 16). Because

plaintiff has failed to establish that he suffered any adverse consequences because of

this misbehavior report, it is recommended that defendants' motion for summary

judgment as to this retaliation claim be granted. *See Gilmore v. Blair*, No. 9:18-CV-463

(GLS/DJS), 2020 WL 5792467, at *6 (N.D.N.Y. June 30, 2020), *report and*

*recommendation adopted*, 2020 WL 5775203 (N.D.N.Y. Sept. 28, 2020) ("[T]he mere

filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action.") (listing cases).

### 3.    February 13, 2017 – Baily, Derouchie

As discussed (*see supra* Part II.B.5.ii. of this Report and Recommendation), plaintiff alleges that he was subject to excessive force on February 13, 2017, while being held in the lower holding pen at Upstate C.F. following a use-of-force incident occurring earlier that day.  (AC ¶¶ 78-100).  In conjunction with this incident, plaintiff alleges that Sgt. Derouchie and CO Baily's conduct constituted retaliation.

Specifically, plaintiff alleges that Sgt. Derouchie failed to intervene while CO Lamica was choking and punching plaintiff in the lower holding cell, in retaliation for prior lawsuits plaintiff filed against him.  (AC ¶ 91).  Defendants do not reasonably dispute that the first and second elements of retaliation are established for purposes of the summary judgment motion.  In seeking summary judgment, the defendants argue that the "video evidence demonstrates that [Sgt.] Derouchie did not observe any excessive force being used against plaintiff on February 13, 2017, and did not observe any actions that would lead a reasonable corrections official to believe that excessive force was being used on an inmate."  (Def. MOL at 43).  The court disagrees that the video evidence, without more, eliminates any question of fact as to whether Sgt. Derouchie failed to intervene in an alleged use of force taking place.  Furthermore, plaintiff has alleged circumstantial evidence, including contemporaneous statements

made by Sgt. Derouchie of his retaliatory intent. (*See supra* Part II.B.5.ii. of this Report and Recommendation). Accordingly, defendants' motion for summary judgment should be denied as to plaintiff's retaliation claim against Sgt. Derouchie.

With respect to CO Baily, plaintiff alleges that CO Baily used force on plaintiff in the holding pen on February 13, 2017, in retaliation for grievances plaintiff had previously filed against CO Baily. Specifically, plaintiff refers to Grievance No. UST 60176, dated January 15, 2017 and filed on January 20, 2017, (AC ¶ 78, Dkt. No. 166-2 at 167-68), and Grievance No. UST 60192-17, dated January 19, 2017 and filed on January 23, 2017 (AC ¶ 78, Dkt. No. 166-2 at 169). With respect to CO Baily's purportedly retaliatory conduct, plaintiff alleges that after plaintiff attempted to strike CO Lamica in the holding cell on February 13, 2017, which prompted CO Lamica to "maliciously and sadistically" strike plaintiff in the face, CO Lamica "slammed" plaintiff to the floor and CO Baily, among other corrections officers, "charged from around [the] corner on [the] outside of [the] holding pen where they [were] positioned and pounced on the [plaintiff.]" (AC ¶¶ 94-95). Plaintiff alleges that CO Baily and other corrections officers repeatedly kicked, stomped, and punched plaintiff as he was screaming in pain. (*Id.* at ¶¶ 94-96).

Once again, plaintiff's claim hinges on the third element of his retaliation claim. Defendants move for summary judgment on the grounds that plaintiff has failed to demonstrate that CO Baily knew about the relevant grievances, and that in the face of

78

CO Baily's sworn declaration "denying knowledge of the grievances," plaintiff cannot overcome summary judgment. However, the court's review of CO Baily's declaration does not reveal any such denial by this defendant. (*See Generally* Baily Decl.). His declaration does, however, establish that he was required to respond with force to plaintiff striking CO Lamica in the holding pen on February 13th. (Baily Decl. ¶ 7). CO Baily asserts that he then entered the holding pen from the holding pen door, where he had been positioned, and once plaintiff was on the floor, "assisted in maintaining control of plaintiff by placing both hands on his lower back until mechanical restraints were in place." (*Id.* ¶ 8). CO Baily further denies using excessive force to physically assault plaintiff during the incident, as well as denies retaliating against plaintiff for filing grievances. (*Id.* ¶¶ 13, 15).

Conversely, plaintiff offers no evidence to corroborate his claim that CO Baily's use of force was motivated by retaliatory intent, as opposed to his duty to respond to plaintiff's assault on another correction officer. Assuming plaintiff has established a temporal proximity between the filing of his grievances against CO Baily and the alleged use of force, this alone is insufficient evidence of retaliatory intent at the summary judgment stage. Otherwise, plaintiff does not allege that CO Baily made any contemporaneous statements concerning his motivation during the use of force, nor does he proffer any other evidence of motivation other than his vague assertion that CO Baily was "always" at his cell, threatening him "all the time" about grievances. (Pl.

Dep. at 206). Thus, because no reasonable factfinder could conclude on this record that CO Baily's actions were substantially motivated by an intent to retaliate for his participation in protected conduct, summary judgment is recommended as to this claim.[10]

### 4.    March 14-15, 2018 – Fletcher

Plaintiff alleges that Sgt. Fletcher transferred plaintiff to the cell neighboring incarcerated individual Reeder in retaliation for the grievance plaintiff previously filed against Sgt. Fletcher and other corrections officers at Upstate C.F. (AC ¶¶ 208, 210).

As to the second element of plaintiff's retaliation claim, courts have found that a cell transfer can constitute "adverse action" for the purposes of a retaliation claim. *See Phillips v. Roy*, 2011 WL 3847265, at *11 (*citing Holmes v. Grant*, 03 Civ. 3426, 2006 WL 851753, at *15 (S.D.N.Y. Mar. 31, 2006) (a transfer to SHU, which the plaintiff alleged to be noisy and unhygienic, could serve as the basis for a retaliation claim); *Phillips v. LeCuyer,* No. 9:08-CV-878 (FJS/ATB), 2013 WL 1024667, at *30 (N.D.N.Y. Feb. 19, 2013), *report and recommendation adopted*, 2013 WL 1021599 (N.D.N.Y. Mar. 14, 2013) (assuming that a cell transfer within the same SHU unit can

---

[10] The court does not find this outcome to be inconsistent with its contemporaneous recommendation that the excessive force claim arising from the events that took place in the holding cell on February 13, 2017, in which CO Baily is a named defendant, proceed to trial. There are material questions of fact as to whether the defendants subjected plaintiff to an unreasonable degree of force in the holding cell on February 13, 2017, once plaintiff was subdued and on the ground. There is, however, no indicia of retaliatory animus in this circumstance on the part of CO Baily in responding to plaintiff's assault on a CO Lamica, whether or not the degree of force used was unreasonable.

80

constitute "adverse action" for the purposes of a retaliation claim). Defendants argue, however, that plaintiff's transfer in this case did not constitute adverse action, because plaintiff has proffered no evidence as to how the transfer adversely affected him. The court agrees. It is undisputed that during the approximately two-hour time period during which plaintiff was housed next to Reeder in this instance, Reeder did not create any noise disturbance and plaintiff was not subjected to any unreasonable conditions. (Plt. Dep. at 210; Fletcher Decl. ¶ 10, Dkt. No. 380-14). *See Tripathy v. Brotz*, No. 6:22-CV-06469, 2023 WL 4032831, at *8 (W.D.N.Y. June 15, 2023), *aff'd,* 103 F.4th 106 (2d Cir. 2024) ("The transfer of a prisoner is not considered an adverse action unless it results in the prisoner being subjected to more onerous conditions.") (citing *Coleman v. Sutton*, 530 F. Supp. 2d 451, 453 (W.D.N.Y. 2008)); *see also Roman v. Cnty. of Chester,* No. CV 23-1662, 2024 WL 4844792, at *12 (E.D. Pa. Nov. 20, 2024) ("[C]ell transfers that result in only '[t]emporary inconveniences . . . do not meet [the adverse action] standard.") (citation omitted). On this basis, the court recommends granting defendant's motion for summary judgment as to plaintiff's retaliation claim against Sgt. Fletcher premised on the March 2018 cell transfer.

Plaintiff also claims that Sgt. Fletcher conducted a "reign of terror" cell search in retaliation for plaintiff protesting his cell transfer – i.e. refusing to close his rec pen door notwithstanding the officers' direct orders to do so. (AC at ¶ 212). At the outset, this court has not been presented with any caselaw suggesting that plaintiff's "protest" of his

cell transfer constituted protected conduct for purposes of a retaliation claim. "[W]here a prisoner's conduct violates a reasonable prison rule or regulation, he has not engaged [in] protected conduct and cannot state a constitutional claim if he is disciplined for violating that rule or regulation by engaging in such prohibited conduct." *Aiello v. Lamitie*, No. 9:16-CV-53 (MAD/CFH), 2020 WL 918989, at *15 (N.D.N.Y. Feb. 26, 2020) (quoting *Bacon v. Phelps*, No. 9:15-CV-1508, 2017 WL 4220465, *4 (N.D.N.Y. July 6, 2017)); *see also Shaheen v. McIntyre*, No. 9:05-CV-0173, 2007 WL 3274835, at *10 (N.D.N.Y. Nov. 5, 2007) ("[I]t is rather well settled that '[t]he violation of a prison regulation . . . is not protected conduct.' ") (citation omitted). Here, plaintiff chose to disobey staff directions and violate facility rules, rather than utilize the grievance process available to him, to make his complaints known. Thus, plaintiff was not engaging in any protected conduct on which to base his First Amendment claim.

Even if plaintiff had established protected conduct, his claim also fails at the adverse action inquiry. Several courts within the Second Circuit have held that wrongful conduct occurring during a retaliatory cell search can constitute an adverse action for purposes of a First Amendment retaliation claim if that conduct would meaningfully deter an incarcerated individual from engaging in a protected activity. *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 239–40 (S.D.N.Y. 2005) (explaining that, although the plaintiff "had no constitutional right to be free from cell searches of any kind, including retaliatory searches," he could maintain a retaliation claim for the

82

defendant's allegedly retaliatory conduct "*in conjunction* with the cell search" (emphasis added)); *Phelan v. Thomas*, No. 9:10-CV-11 (GLS/DJS), 2017 WL 519246, at *3 (N.D.N.Y. Feb. 8, 2017) ("Adverse action, as it relates to a retaliatory cell search, requires more than a search alone . . . . Indeed, the plaintiff must demonstrate a search and 'other wrongful conduct,' such as the destruction or confiscation of property, that evinces the requisite deterrent of a similarly situated inmate of ordinary firmness from exercising his or her constitutional right." (citation omitted)); *Stewart v. Richardson*, No. 15 CV 9034, 2016 WL 7441708, at *5 (S.D.N.Y. Dec. 27, 2016) (holding that a plaintiff stated a retaliation claim arising from the defendant's allegedly retaliatory cell search and destruction of personal property).

In this case, defendants have submitted evidence establishing that, several hours after Reed transferred cells on March 14, 2018, a search of plaintiff's cell was conducted, and a "dragline" was confiscated and disposed of. (Fletcher Decl. ¶ 19). Defendants have also submitted evidence that incarcerated inmate's cells were subject to both unannounced, as well as routine periodic, searches to eliminate the presence of contraband within the facility and ensure the safety of inmates, employees, visitors, and the community. (*Id.* ¶¶ 13-15). Plaintiff has failed to allege some sort of adverse action in conjunction with the purportedly improper cell search for purposes of his retaliation claim, including any facts surrounding the "reign of terror" cell search indicating that he was put at an enhanced risk of harm, or that any actual harm resulted, in conjunction

83

with the search. *C.f. Wright v. Snyder*, No. 3:21-CV-104, 2023 WL 6379451, at *10 (D. Conn. Sept. 30, 2023) (finding genuine dispute of material fact regarding adverse action element of retaliation claim where plaintiff "demonstrated more than just a retaliatory cell search; he also attests that Defendant left his cell in disarray and drenched his personal items—such as his boombox, clothes, mattress, and legal materials—in water, which effectively destroyed the boombox."); *Stewart v. Richardson*, No. 15-CV-9034, 2019 WL 719638, at *4 (S.D.N.Y. Feb. 20, 2019) ("While courts in this district have concluded that a retaliatory cell search does not constitute adverse action sufficient to support a First Amendment retaliation claim, the destruction of a 'substantial amount' of permissible personal property can qualify as an adverse action.") (internal citations omitted).

 Accordingly, the court alternatively recommends granting defendant's motion for summary judgment as to plaintiff's retaliation claim against Sgt. Fletcher based on the purportedly improper cell search for failure to establish an adverse action sufficient to sustain the §1983 claim.

### 5.    June 20-21, 2018

#### i.    Howell

Plaintiff alleges that on June 20, 2018, CO Howell threatened to "get [plaintiff]" for the grievances plaintiff previously filed against other Upstate C.F. officials.  (AC ¶ 107).  Plaintiff further alleges that the next day, on June 21, 2018, CO Howell falsely

accused plaintiff of disposing of feces in a trash bag, which triggered a search of plaintiff's cell that involved the use of force. (AC ¶¶ 108-10, 118).

According to the defendants, CO Howell was collecting feed-up trays following morning chow on June 21, 2018. (Howell Decl. at ¶ 6) (Dkt. No. 380-19). Upon reaching plaintiff's cell, CO Howell received a "Sahor bag"[11] through the feed-up protective hatch cover. (*Id.*). Once CO Howell opened the bag to check for all the mess-hall items that had to be returned, he observed feces in the bag. (*Id.*). According to CO Howell,

> Plaintiff had placed his own feces in several of the mess-hall containers and on top of the other trash that was in the bag. He had then closed the bag so [CO Howell] would have to open it to check for the mess-hall items and find the feces.

(*Id.*). CO Howell authored a Misbehavior Report detailing this incident on June 21, 2018. (*Id.* at ¶ 7; Cullen Aff. Ex. J at 34, Dkt. No. 383-10).

Defendants do not advance any argument as to whether plaintiff has or has not established the requisite elements of his retaliation claim. (*See* Def. MOL at 45-46). However, even assuming plaintiff had met his burden in this regard, defendants have

---

[11] Although the parties to this action do not provide such clarification, other courts have taken judicial notice that "sahur" is the "light pre-dawn meal eaten by Muslims during Ramadan." *Shakur v. Graham*, No. 9:14-CV-00427, 2015 WL 1968492, at *9 n. 2 (N.D.N.Y. May 1, 2015). Other courts have also recognized that a sahur bag, also referred to as a sahor bag, in the prison setting context, "contain[s] a meal [for an incarcerated individual] to be consumed in the early morning prior to the daily fast[.]" *Eleby v. Graham*, No. 9:14-CV-1468 (GTS/ATB), 2016 WL 11480167, at *1 (N.D.N.Y. Sept. 21, 2016), *report and recommendation adopted*, 2016 WL 6157887 (N.D.N.Y. Oct. 24, 2016).

demonstrated that CO Howell issued the subject misbehavior report because of plaintiff's undisputed act of putting feces and toilet paper in the Sahor bag, photographs of which are included as exhibits to the defendants' motion. (Cullen Aff. Ex. J at 22-26). Plaintiff did not deny putting such "garbage" into the Sahor bag at his deposition (Pl. Dep. at 214-15), nor has plaintiff produced any evidence to refute CO Howell's description of the events leading him to issue the misbehavior report. Accordingly, because defendants have established that CO Howell would have taken the action complained of regardless of any retaliatory animus he may have held against plaintiff, it is recommended that plaintiff's First Amendment retaliation claim against CO Howell be dismissed.

### ii.    Hollenbeck, Salls, Gravlin, Fletcher

Plaintiff alleges that CO Hollenbeck approached plaintiff's cell as CO Howell discovered the feces in plaintiff's Sahor bag and stated, among other things,

> You are one stupid nigger, you are gonna pay I will get you this time for those crappy grievance you keep filing [sic] Sergeant Fletcher is investigating on me everyday Jessie Barnes.

(AC at ¶ 111). Plaintiff then alleges that Sgt. Fletcher approached his cell and stated,

> Oh Jessie Barnes will [sic] be searching your cell you spook rat, are you com[]ing out if you refuse I get the chance to take care of you myself you piece of shit because I am sick of investigating your bullshit grievances everyday you file on staff in this block. The [one] I had yesterday had my name on it and today I received a grievance with more of your delusional lies on staff and I am fed up with you and your shit.

86

(*Id.* ¶ 112).  Plaintiff further alleges that Lt. Salls subsequently approached his cell and stated,

> Jessie Barnes I want to search your cell and I can see an apple contraband now and I do not care about your lawsuit it do not mean nothing to me. When I get finished with you today you will have a reason to file another lawsuit if we do not kill you first because I can do whatever I want to do to you nigger you are an inmate.

(AC at ¶ 113).  Plaintiff also alleges that Lt. Salls and Sgt. Fletcher expressed their intention to move plaintiff "one (1) cell away from" Reeder.  (AC ¶ 114-15; Pl. Dep. at 218).

Plaintiff's allegations as to why he was eventually ordered to come of out his cell on June 21st are inconsistent.  In his amended complaint, plaintiff alleges that Capt. Gravlin approached plaintiff's cell to "reconvene" plaintiff's previously adjourned disciplinary hearing on a separate matter.  (*Id.* at ¶ 116).  However, at his deposition, plaintiff testified that Sgt. Fletcher and CO Hollenbeck approached his cell and informed him he was "coming out" for a cell search.  (Pl. Dep. at 217).  When they further informed plaintiff that they were going to move him one cell away from Reeder, plaintiff told them he "wasn't going to go down there."  (Pl. Dep. at 218-19).  Based on plaintiff's response, "they went and got a cell extraction team."  (Pl. Dep. at 219).  Plaintiff was ultimately extracted from his cell by use of a chemical agent, as previously discussed (*see supra*, Part II.B.6 of this Report and Recommendation).  Plaintiff alleges

that the defendants released the chemical agent into his cell in retaliation for the

lawsuits and/or grievances plaintiff had previously filed against them.

Even assuming plaintiff had raised a material question of fact as to each element

of this retaliation claim, defendants have established that they would have taken the

adverse action – extracting plaintiff from his cell by way of the application of a

chemical agent – notwithstanding the existence of any retaliatory animus. *See Lewis v.

Hanson*, No. 9:18-CV-0012 (LEK/DJS), 2022 WL 991729, at *27 (N.D.N.Y. Mar. 31,

2022) ("[I]f taken for both proper and improper reasons, state action may be upheld if

the action would have been taken based on the proper reasons alone.") (quoting

*Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  Here, notwithstanding plaintiff's

inconsistent accounts for why he was ordered to exit his cell – whether due to a cell

search because of the Sahor bag incident, or to attend a disciplinary hearing - the

defendants have established, and plaintiff does not dispute, that he refused to do so.[12]

(Hollenbeck Decl. at ¶¶ 2-3; Cullen Aff. Ex. J at 31, 35; Pl. Dep. 218).  In his sworn

declaration, Supt. Uhler, who authorized the extraction of plaintiff on June 21st by use

---

[12] The defendants' papers suggest that plaintiff was being ordered to exit his cell for a "cell frisk and move."  (Cullen Aff. Ex. J at 31).

of chemical agent, asserts that such force was "justified and necessary" under the circumstances, pursuant to DOCCS directives.[13]  (Uhler Decl. ¶ 16, Ex. B).

The burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation].' " *Dillion v. Suffolk County Dept. of Health Servs.*, 917 F. Supp. 2d 196, 204 (E.D.N.Y. 2013) (quoting *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004)). "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where [courts] have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (quoting *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994)).

As previously noted, it is undisputed that plaintiff refused to exit his cell on June 21st, despite DOCCS staff's repeated orders that he do so.  Considering plaintiff's failure to present any argument in opposition to the defendants' motion, and because plaintiff has failed to present evidence which would allow a juror to conclude that defendant's reasons for extracting him from his cell were pretextual, the court

---

[13] In addition, this court has previously recognized that DOCCS Directive 4903 "authorizes the use of chemical agents when necessary to remove an inmate from his cell."  *Reeder v. Bell*, No. 9:15-CV-01078 (MAD/TWD), 2019 WL 2997513, at *2 (N.D.N.Y. May 7, 2019), *report and recommendation adopted*, 2019 WL 2264990 (N.D.N.Y. May 28, 2019).

recommends granting summary judgment as to the retaliation claim arising from the June 21st cell extraction.

### 6.    June 22, 2018

Plaintiff alleges that CO Marshall and Lt. Salls used excessive force against him during his extraction from, and return to, his cell on June 22, 2018, in retaliation for previously filed grievances and lawsuits. (AC at ¶ 142). Of note, defendants have established that plaintiff was refusing to comply with directives and orders to shut his exercise pen door, and plaintiff does not meaningfully dispute this fact. (*See* Pl. Dep. at 238-40).

### i.    Lt. Salls

Plaintiff alleges that within an hour prior to being extracted from his cell on June 22nd, Lt. Salls approached plaintiff's cell and stated, "close your recreation pen door right now you piece of shit and don't pussy out when I come to ex[tract] you from cell [sic]." (AC at ¶ 134). Less than 45 minutes later, Lt. Salls and other DOCCS staff extracted plaintiff from his cell by use of chemical agent. (*Id.* at 135).

When asked to explain the basis for his retaliation claim against Lt. Salls, plaintiff testified that he was

> the same person that they keep gassing me out or forcing me to move next to this dude Reeder so he can bang me out. I mean, they all together actively . . . participated in the same pattern of conduct on many occasions. And he threatened me. I just can't remember what he said.

90

(Pl. Dep. at 248).

Lt. Salls avers that he responded to plaintiff's cell on June 22, 2018 in an effort to gain compliance from plaintiff to secure the exercise pen door. (Salls Decl. at ¶ 21). Upon Capt. Barkman's final order to plaintiff to comply, which plaintiff refused, Capt. Barkman directed the use of necessary force to gain compliance. (*Id.*). At that time, Lt. Salls directed Sgt. Bush to apply chemical agents into plaintiff's cell. (*See supra* Part II.B.7.i. of this Report and Recommendation).

Defendants do not meaningfully challenge whether plaintiff engaged in a protected activity or whether the use of chemical agents on plaintiff constituted adverse action. The linchpin is whether plaintiff has raised a triable issue of fact as to a causal connection between plaintiff's prior lawsuit and the use of force on June 22nd. With respect to temporal proximity, plaintiff alleges that a decision denying summary judgment to Lt. Salls in a separate federal lawsuit was issued on March 16, 2018, approximately three months prior to the June 22nd extraction. (AC at ¶ 142, *citing Barnes v. Fischer,* No. 9:13-CV-164 (GLS/DJS)). Lt. Salls does not deny having knowledge of plaintiff's ongoing litigation against him.

Even assuming plaintiff has established temporal proximity, and (at least) a question of fact as to whether Lt. Salls was aware of plaintiff's lawsuit, plaintiff has failed to advance any other circumstantial or direct evidence of a retaliatory motivation, other than his general allegation that the staff at Upstate C.F. was collectively taking

91

retributive action against him.  *See Vogelfang*, 889 F. Supp. 2d at 517 (holding that

"repeatedly assert[ing] that [the plaintiff's] perceived mistreatment is a result of

retaliatory animus on the part of the defendants," without "any specific and detailed

factual allegations to support that assertion," is insufficient to establish a causal

connection (quoting *Friedl v. City of New York*, 210 F.3d 79, 85–86 (2d Cir. 2000) ) ).

Indeed, Lt. Salls's verbal "threat" cited by plaintiff in his amended complaint, while

perhaps hostile, makes no reference to plaintiff's lawsuit, nor can it be construed to

infer any retaliatory animus.

Even assuming plaintiff had established a question of fact as to the elements of

his retaliation claim against Lt. Salls, defendants have satisfied their burden of offering

a legitimate, non-discriminatory reason for the adverse action. It is undisputed that

plaintiff refused to shut his recreation pen door, despite numerous orders and directives

to do so.  Based on these circumstances, authorization was obtained through the

appropriate chain of command to use force to extract plaintiff from his cell.  As

discussed, and as evidenced by the documentary and video evidence, there is nothing to

suggest that the cell extraction exceeded the degree of force necessary to obtain

plaintiff's compliance.  Plaintiff has failed to advance any evidence of pretext in

response to the defendant's evidence to survive summary judgment.  Accordingly, the

court recommends granting summary judgment to Lt. Salls as to the June 22, 2018

retaliation claim against him.

### ii.    Marshall

To the extent plaintiff alleges that CO Marshall's involvement in plaintiff's cell extraction on June 22nd was in retaliation for grievances plaintiff filed against CO Marshall and/or CO Marshall's "wife" (*See* Pl. Dep. at 247), for the reasons previously stated summary judgment is recommended to CO Marshall.  Defendants have satisfied their burden of offering a legitimate reason for plaintiff's cell extraction, and the summary judgment record does not plausibly support the existence of any pretext such that a question of material fact remains.

However, plaintiff also alleges that when CO Marshall retrieved plaintiff from the infirmary on the morning of June 22nd, CO Marshall "rough house pat-frisk[ed] plaintiff, and then while applying restraints to plaintiff, CO Marshall "mumbled under his breath or whispered: 'I got your grievance today your lying rat bitch and I am going to get you.' "  (AC at ¶ 124).  Later that morning, Sgt. Bush "approached plaintiff's cell to conduct an investigation" of the grievance.  (*Id.* at ¶ 128).

Sometime after this interaction, plaintiff was extracted from his cell.  Plaintiff alleges that after the extraction, he was eventually escorted back to his cell.  (AC at ¶ 137).  Plaintiff alleges that upon being placed in his cell and placing his hands in the fixed protective hatch cover, CO Marshall "grabbed," "twisted," and/or "bent" plaintiff's right ring finger.  (AC at ¶ 139).  Plaintiff heard a crack and screamed "Marshall you are br[ea]king my finger." (*Id.*).  As discussed, it is undisputed that

plaintiff did not immediately remove his hands from the fixed protective hatch cover, despite continued orders from the corrections officers to do so. Plaintiff admits that he had his hands in the fixed protective hatch cover because he "want[ed] to see somebody" (Plt. Dep. at 243-44), and the video evidence shows plaintiff screaming "I don't give a fuck" and "I ain't doing it" in response to the correction's officers orders to "put [his] hands in." (Cullen Ex. P6 at 18:00).

In his sworn declaration submitted in support of defendants' motion for summary judgment, CO Marshall states that upon escorting plaintiff back to his cell, he removed the mechanical restraints and ordered plaintiff to bring his hands in the cell, but "plaintiff did not comply." (Marshall Decl. ¶ 7). CO Marshall then attempted to "force plaintiff's right arm in the cell," but was unsuccessful. (*Id.*). Eventually, Lt. Salls "ordered force to stop and to close the fixed protective hatch cover." (*Id.*). CO Marshall denies ever having assaulted, harassed, threatened, or used racial slurs against plaintiff, and denies retaliating against plaintiff for any reason. (*Id.* ¶¶ 15, 18).

On this record, the court recommends granting defendants' motion for summary judgment as to the retaliation claim premised on the force used by CO Marshall to push plaintiff's hands into his cell on June 22nd. As discussed, adverse action taking the form of physical assault need not rise to the level of an Eighth Amendment excessive force violation for purposes of a retaliation claim. *See Flemming v. King*, No. 14-CV-316, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016), *report and recommendation*

94

*adopted*, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016).  However, to be considered an adverse action, the force must be more than *de minimis*.  For example, courts have found that shoving an inmate, or comparable conduct, is insufficient to constitute an adverse action.  *George v. Cnty. Of Westchester*, No. 20-CV-1723, 2021 WL 4392485, at *8 (S.D.N.Y. Sept. 24, 2021) (listing cases).  On this record and based on the caselaw previously cited in this Report-Recommendation, the court seriously questions whether the force used by CO Marshall in pushing plaintiff's hands into the feed-up hatch amounted to more than *de minimis* force.

Moreover, CO Marshall has established a non-retaliatory basis for pushing plaintiff's hands inside the feed-up hatch, as plaintiff was undisputedly violating the corrections officers' directions to place his hands inside to be locked in.  Accordingly, the court recommends granting defendants' motion for summary judgment as to the retaliation claim against CO Marshall stemming from the June 22, 2016 incident.

## V.     __Fourteenth Amendment Due Process – Uhler, Bell, Woodruff__

As the district court previously noted with some skepticism, the amended complaint provides "a marginally more cogent basis for plaintiff's due process challenges concerning the FPHC and retention strap orders imposed on him during his confinement at Upstate C.F." than what was alleged in plaintiff's original complaint. (*See* Dkt. No. 165).  Nevertheless, plaintiff was afforded the opportunity to proceed on his due process claims, which the court liberally construes to assert both a substantive

95

and procedural due process violation. (AC ¶¶ 217-23). For the following reasons, the court recommends granting defendants summary judgment on both plaintiff's substantive and procedural due process claims.

### A.    Procedural Due Process

Plaintiff's procedural due process claim appears to be premised on his allegation that the policy in place at Upstate C.F. governing the implementation of retention strap and FPHC orders is "devoid of a legitimate process of notification, review or appeal," and that all of plaintiff's "complaints, appeals, grievances, and lawsuits" challenging these orders were "ignored" over the course of eight years. (AC at ¶¶ 218-223; Pl. Dep. 46-47, 53).

In response to plaintiff's motion, defendants have proffered substantial evidence showing that review and appeal processes was not only available to plaintiff with respect to his restraint orders, but that plaintiff readily availed himself of these processes throughout his incarceration at Upstate C.F. Defendants submit that, in compliance with DOCCS Directive 4933, any inmate assigned to SHU who has a history of assaultive behavior and/or who presents a threat to the safety or security of himself and staff may be placed under a restraint order by the Deputy Superintendent for Security or, in his/her absence, the Officer of the Day or other higher-ranking authority. (Cullen Aff. Ex. N3 at 14) (Dkt. No. 383-16). Directive 4933 further states that a restraint order will be valid for no more than seven days and may be renewed by

the DSS or, in his/her absence, the Officer of the Day or a higher-ranking authority.

(*Id.*).  To this end, defendants have submitted documentation indicating that plaintiff's

restraint orders were subject to weekly reviews in compliance with Directive 4933.

(*See, e.g.,* Cullen Aff. Ex. L at 5).  They have also submitted sworn declarations

indicating that restraint orders could be appealed internally through the prison grievance

system.  (Woodruff Decl. ¶ 37, Dkt. No. 380-46; Uhler Decl. ¶ 42, Dkt. No. 380-42).

Plaintiff admittedly filed multiple grievances relative to the implementation of his

restraint orders.  (*See* Pl. Dep. at 54, 60-61; Cullen Aff. Ex. T, Dkt. No. 383-23).[14]

Plaintiff has failed to advance any evidence sufficient to raise a material question

of fact as to whether he was denied due process.  There is no evidence in the summary

judgment record suggesting that plaintiff's restraint orders were not reviewed in

compliance with Directive 4933, or that plaintiff was without any opportunity to grieve

his restraint orders.  Consequently, the court finds that plaintiff was provided with

sufficient due process and recommends granting defendants summary judgment as to

this claim.  *See Dawes v. Coughlin*, 964 F. Supp. 652, 658 (N.D.N.Y. 1997) ("It has

been held that the daily review of deprivation orders, the availability of the inmate

---

[14] Specifically, grievance UST-0615-22 "retaliation/fixed protective hatch cover" (Cullen Aff. Ex. T at 3); grievance CL-0473-21 "cell shield/retention strap orders unjust" (*Id.* at 4); UST-0722-20 "harassment/retaliation/hatch order" (*Id.* at 6); UST-0429-20 "retaliation/fixed protective hatch cover/retention strap" (*Id.* at 7); UST-260-20 "change directive regarding FPHC/retention strap orders" (*Id.*); UST-65395-19 "remove FPHC" (*Id.* at 8); UST-62522-18 "wants FPHC removed/retaliation" (*Id.* at 10); UST-61080-17 "retaliation FPHC/retention strap" (*Id.*).

grievance program, and the fact that an inmate has a judicial remedy to challenge

deprivation orders, and restraining orders, under CPLR article 78 clearly provide due

process of law."), *aff'd,* 159 F.3d 1346 (2d Cir. 1998); *see also Black v. Goord,* No. 03-

CV-6155, 2007 WL 3076998, at *5 (W.D.N.Y. Oct. 19, 2007) (dismissing procedural

due process claim involving restraint orders where plaintiff had an extensive record of

violence, his restraint status was reviewed on a weekly basis, he was entitled to write to

the DSS to argue for the removal of the full restraints, and he maintained the option of

filing an Article 78 proceeding); *Kemp v. LeClaire*, No. 03-CV-844S, 2007 WL

776416, at *8 (W.D.N.Y. Mar. 12, 2007).

## B.    Substantive Due Process

Defendants contend that plaintiff's substantive due process claims should be

dismissed as they complain of the same conduct underlying his conditions of

confinement claim brought under the Eighth Amendment regarding the implementation

of retention strap and FPHC orders. The court agrees.  "Where another provision of the

Constitution provides an explicit textual source of constitutional protection, a court

must assess a plaintiff's claims under that explicit provision and not the more

generalized notion of substantive due process." *Conn v. Gabbert*, 526 U.S. 286, 293

(1999).  Accordingly, where a plaintiff pleads both a substantive due process claim and

a more specific constitutional claim based on the same occurrence, the substantive due

process claims must be dismissed as duplicative. *See Garraway v. Smith,* No. 12-CV-

924S, 2019 WL 2135479, at *5 (W.D.N.Y. May 16, 2019) (dismissing due process claim premised on allegation that conditions of confinement while in SHU constituted a deprivation of liberty interest as duplicative of conditions of confinement claim); *see also Kavanagh v. Vill. of Green Island*, No. 14-CV-01244, 2016 WL 7495813, at *5 (N.D.N.Y. Dec. 30, 2016) (substantive due process claims dismissed as duplicative of excessive force claim).

Even if plaintiff's substantive due process claims were not duplicative, his allegations surrounding the effects of the restraint orders on his PIMS level do not rise to the level of a Fourteenth Amendment claim. "PIMS is a security classification that affords more or less privileges based upon proper adjustment or behavior, like any security classification, it does not create a liberty interest protected by due process." *Cicio v. Williams*, No. 11-CV-1196, 2013 WL 3101692, at *5 (N.D.N.Y. June 18, 2013); *see also White v. Marinelli*, No. 9:17-CV-1094 (LEK/ATB), 2017 WL 11849516, at *14 (N.D.N.Y. Nov. 17, 2017) (dismissing due process claim premised on denial of PIMS classification level due to absence of protected liberty interest); *Rucano v. Annucci*, No. 9:18-CV-218 (GTS/C.F.H), 2021 WL 3293504, at *27 (N.D.N.Y. May 19, 2021), *report and recommendation* adopted, 2021 WL 3292394 (N.D.N.Y. Aug. 2, 2021) (same).

Accordingly, the court recommends granting defendants' motion for summary judgment as to plaintiff's substantive due process claim.

## VI.    Qualified Immunity

In the final section of their motion, defendants advance that they are entitled to

qualified immunity.  (Def. MOL at 52-53).  After reciting the applicable law, they

present the following argument:

> Based upon the above discussions of law and the uncontroverted
> facts, Defendants are entitled to qualified immunity and
> Plaintiff's claims against them must be dismissed. XXX

(Def. MOL at 53).

"The Second Circuit has made clear that defendants bear the burden of

'adequately develop[ing]' and 'proving' a qualified immunity defense.  *Soley v. Cnty. of*

*Nassau*, No. 18-CV-377, 2024 WL 1494383, at *16 (E.D.N.Y. Mar. 4, 2024) (quoting

*Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995)).  Here, defendants fail to even

reference the specific claims at issue in their discussion of qualified immunity, much

less "develop" or "prove" an argument for it.  Although the court recognizes the

magnitude of plaintiff's claims, and the defendants' summary judgment motion in

general, the court finds that defendants' conclusory argument fails to meet their burden

of establishing an entitlement to qualified immunity.  *See Shechter v. Comptroller of*

*N.Y.C.*, 79 F.3d 265, 270 (2d Cir. 1996) (concluding that a "bald assertion" of qualified

immunity "provides no basis for a ruling" and fails to meet defendant's burden);

*Crawford v. Coughlin*, No. 94-CV-494, 1996 WL 227864, at *4 (W.D.N.Y. Apr. 26,

1996) (finding that a "cursory analysis of qualified immunity clearly fails to meet

defendants' burden of proof on the affirmative defense"); *Murray v. Coleman*, No. 08-CV-6383L, 2014 WL 2993748, at *7 (W.D.N.Y. July 2, 2014) ("It is not this Court's responsibility to do counsel's work for them by scouring the record to determine whether counsel's conclusory arguments hold water.").

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment be **GRANTED** in part and **DENIED** in part, and it is further

**RECOMMENDED,** that defendants' motion for summary judgment be **DENIED** as to the following claims:

1. Eighth Amendment failure to intervene claim against defendants Truax, Fleury, Stephen, Helms, Page, and St. Mary premised on the alleged assault by another incarcerated individual on April 12, 2016,

2. Eighth Amendment excessive force claim against defendants Cook, Lamica, Ayers, Baily, Lincoln, Hoffnagle, and Derouchie premised on the alleged incident in the lower holding cell on February 13, 2017,

3. Eighth Amendment conditions of confinement claim against defendants Hollenbeck, Fletcher, and Salls premised on alleged noise pollution,

4. First Amendment retaliation claim against defendant Leclerc premised on the issuance of a false misbehavior report on February 8, 2016,

5. First Amendment retaliation claim against defendant Smith premised on the issuance of a false misbehavior report on October 19, 2016, and

6. First Amendment retaliation claim against defendant Derouchie premised on his alleged failure to intervene/protect plaintiff on February 13, 2017; and it is further

**RECOMMENDED,** that defendants' motion for summary judgment otherwise be **GRANTED,** and the remaining claims and defendants be **DISMISSED** from this action with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: February 21, 2025

Mitchell J. Katz
U.S. Magistrate Judge

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

2023 WL 4710869
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dumar JACKSON, Plaintiff,

v.

N. MOORE, Defendant.

9:21-CV-1001 (GTS/ATB)
|
Signed April 14, 2023

**Attorneys and Law Firms**

DUMAR JACKSON, Plaintiff, pro se.

RACHAEL S. OUIMET, Assistant Attorney General, for
Defendant.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** In this pro se civil rights action, plaintiff alleges
that the defendant violated his Eighth Amendment rights
when he failed to protect plaintiff from another inmate.
Presently before the court is defendant Correctional Officer
("C.O.") Moore's motion for summary judgment. (Dkt. No.
16). This matter has been referred to me for Report and
Recommendation by United States District Judge Glenn T.
Suddaby, pursuant to 28 U.S.C. § 636(b) and Local Rule
N.D.N.Y. 72.3(c). For the reasons set forth below, this court
will recommend granting defendant's motion and dismissing
the complaint in its entirety.

### I. Background

#### A. Procedural History

In this civil rights action, plaintiff alleges a constitutional
violation occurred while he was incarcerated at Clinton
Correctional Facility ("Clinton C.F."), in the custody
of the New York State Department of Corrections and
Community Supervision ("DOCCS"). Plaintiff filed the
original complaint on September 10, 2021. (Dkt. No. 1). On
October 25, 2021, the court issued a Decision and Order
granting plaintiff's application to proceed in the action in
forma pauperis ("IFP"), and conditionally dismissing the
original complaint because it failed to state a claim upon

which relief may be granted pursuant to 28 U.S.C. § 1915 and
28 U.S.C. § 1915A. (Dkt. No. 4). The court granted plaintiff
leave to amend his complaint to "correct[ ] the pleading
defects" identified with his original complaint. (*Id.* at 10).
Plaintiff availed himself of the opportunity to amend, and
the court received plaintiff's amended pleading on or about
November 18, 2021. (Dkt. No. 6, "Am. Compl.").

On February 9, 2022, I determined, pursuant to my initial
review of the complaint, that plaintiff's amended complaint
was accepted for filing and that the only active defendant was
C.O. Moore. (Dkt. No. 7 at 3). C.O. Moore filed an answer
to the amended complaint on April 14, 2022. (Dkt. No. 12).
On December 15, 2022, defendant filed this instant motion
for summary judgment (Dkt. No. 16), to which plaintiff
responded on February 16, 2023 (Dkt. No. 20).

#### B. Summary of Complaint

The complaint alleges that on September 6, 2018, while
plaintiff was confined in Clinton C.F., he was attacked by
another inmate when they were released from their keep-
lock cells at the same time. (Am. Comp. at 4). Although
facility policies and procedures prohibited C.O. Moore from
releasing the other inmate "until [plaintiff] was ... back in
general population," C.O. Moore nevertheless released both
inmates simultaneously, knowing that plaintiff did not have
an escort at the time. *Id.* C.O. Moore also "knew there was a
race war going on in [Clinton C.F.] with the bloods and the
Spanish gangs and let [plaintiff] out of [his] cell with a known
gang member posed [sic] a substantial risk of serious harm
to [him]." *Id.* Although C.O. Moore observed the inmate run
into plaintiff's cell and attack him, C.O. Moore "did nothing
to prevent it from happening." Plaintiff was returned to keep-
lock after the incident and remained there for an additional 70
days, until November 15, 2018. (Dkt. No. 16-3, Pl.'s Dep. at
18, 27, 79, 88, 95; Internal Movement History, Dkt. No. 20-1
at 31).

### II. Summary Judgment

**\*2** Summary judgment is appropriate where there exists no
genuine issue of material fact and, based on the undisputed
facts, the moving party is entitled to judgment as a matter of
law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263,
272-73 (2d Cir. 2006). Rule 56(b) provides that a party may
file a motion for summary judgment "at any time until 30
days after the close of all discovery." Fed. R. Civ. P. 56(b).
Thus, a party may move for summary judgment in lieu of
an answer. *See, e.g., Anderson v. Rochester-Genesee Reg'l*

**Jackson v. Moore, Not Reported in Fed. Supp. (2023)**
2023 WL 4710869

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 104 of 830

*Transp. Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *1-2 (N.D.N.Y. Mar. 31, 2014).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272. "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the non-movant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Although plaintiff received proper notice of his obligation to respond to defendant's summary judgment motion in accordance with Local Rules, the plaintiff did not file a Statement of Material Facts that addressed many of the factual allegations in defendant's Statement, as required by Local Rule 7.1(a)(3).[1] Consequently, the court may accept the properly supported facts contained in the defendants' Rule 7.1 statement (Dkt. No. 16-2) as true for purposes of this

motion. *See Govan v. Campbell*, 289 F. Supp. 2d 289, 295-96 (N.D.N.Y. 2003).

[1]    Defense counsel specifically advised plaintiff of the consequences of failing to respond to the summary judgment motion. (Dkt. No. 16). Counsel forwarded, to plaintiff, a copy of the court's form Notification of the Consequences of Failing to Respond to a Summary Judgment Motion, which provided in pertinent part:

> If you do not file a proper response to this motion, the Court may grant the motion and dismiss some or all of your claims. Under Local Rules 7.1(b) and 56.1(b), to file a proper response to this motion, you must submit the following papers:
>
>> (1) A response to the defendants' statement of material facts that admits and/or denies each of the defendants' assertions in matching numbered paragraphs, 1 and that supports each denial with citations to record evidence.
>
> * * *
>
> WARNING: If you do not submit a proper response to the defendants' statement of material facts, the Court may deem you to have admitted the defendants' factual statements.

(Dkt. No. 16 at 4).

### III. Exhaustion of Administrative Remedies

#### A. Legal Standards

**\*3** The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), *abrogated on other grounds, Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the court

2023 WL 4710869

held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Incarcerated [2] Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Incarcerated [3] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) and (I), 701.5.

[2]    This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

[3]    The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

Prior to *Ross v. Blake, supra,* the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross,* the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of

"special circumstances." *Ross v. Blake,* 578 U.S. 632, 640 (2016). "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Riles v. Buchanan,* 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross,* 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross,* 578 U.S. at 642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must also consider whether those remedies were "available" to the inmate. *Id.*; *see also Riles,* 2016 WL 4572321 at *2.

**B. Analysis**

*4  Defendant C.O. Moore argues that plaintiff's failure-to-protect claim is subject to dismissal, for failure to exhaust administrative remedies, because plaintiff did not file an initial grievance prior to bringing suit, nor did he appeal the denial of any grievance concerning this claim to CORC. (Dkt. No. 16-1, Defendant's Memorandum of Law at 14). In support of his position, defendant has attached to his motion papers the sworn declarations of Rachael Seguin ("Seguin Decl.") (Dkt. No. 16-7), the Director of the IGP for DOCCS, and Christine Gregory, the IGP Supervisor at Clinton C.F. ("Gregory Decl.") (Dkt. No. 16-6). These declarations, and the evidence attached as exhibits thereto, indicate that plaintiff neither filed an initial grievance related to his claim that C.O. Moore failed to protect him from another inmate on September 6, 2018, nor did plaintiff submit an appeal to CORC. (*See* Gregory Decl. ¶¶ 16-20; Seguin Decl. ¶¶ 12-14, Ex. A).

In opposition to defendant's motion, plaintiff alleges that, while confined in his keep-lock cell, he attempted to file a grievance relating to the incident with C.O. Moore by putting a sealed letter on the gate for mail pickup. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89). Plaintiff testified that he remembered the grievance being picked up by an unnamed officer, but does not remember the exact day he mailed the grievance. [4] (Dkt. No. 16-3, Pl.'s Dep. at 87-89, 93). Plaintiff speculates that an unnamed officer on duty threw his grievance away. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 106 of 830
Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

4    Plaintiff testified that he filed the grievance "it was in like the same – I want to say around like the 22 nd or so." (Pl.'s Dep. at 87-88).

Plaintiff acknowledged that he never followed up with respect to his grievance for the 70 days after the incident when he was confined on keeplock; but he alleges that he asked sergeants, officers, and counselors about the status of his grievance and they told plaintiff "they'll get back to you." (Pl.'s Dep. at 93-94). Plaintiff admitted that he did not retain any copies of the purported grievances relative to his complaints against C.O. Moore. (*Id.* at 88). 5

5    Plaintiff alleges that he was told "it was a code 49 and that it had to go to the superintendent office." (Dkt. No. 20 at 3).

Plaintiff further testified that he not only understood the grievance process, but also that he participated in an orientation program at Clinton C.F. about how the grievance process works at the facility. (*Id.* at 85-86). He admitted that he filed "a couple" of grievances after the incident concerning other matters, while still residing at Clinton C.F. (*Id.* at 90).

The record before this court clearly established that the defendant did not exhaust administrative remedies with respect to the failure-to-protect claim against C.O. Moore. Given that an initial grievance was never filed, nor was the claim ever appealed to CORC, the question becomes whether plaintiff's failure to exhaust should be excused.

The defendant has satisfied his initial burden of "establishing ... that a grievance process exist[ed] and applie[d] to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dep't,* 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted). 6 Thus, plaintiff assumes the burden of producing evidence that one of the exceptions to the administrative exhaustion requirement applies, excusing his failure to exhaust and permitting his claim to survive summary judgment. *Id.* ("If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors ... rendered a nominally available procedure unavailable as a matter of fact.") 7

6    IGP Supervisors Gregory and Seguin stated Clinton C.F. had a fully functioning IGP program at all times relevant to the complaint. (Gregory Decl.

¶ 16; Seguin Decl. ¶ 11). Plaintiff also testified that he filed a grievance for an unrelated matter after the incident and received an unfavorable decision and appealed that decision. (Pl.'s Dep. 90-91).

7    I agree with Magistrate Judge Peebles' cogent analysis that, while the burden of production may shift to a plaintiff with respect to certain aspects of the exhaustion issue, "the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant." *See, e.g., Bailey v. Fortier,* No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4, 2012), *report and recommendation adopted,* 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); *Nelson v. Plumley,* No. 9:12-CV-422 (TJM/DEP), 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14, 2015), *report and recommendation adopted,* 2013 WL 1305338 (N.D.N.Y. Mar. 18, 2013).

**\*5** Liberally construed, plaintiff appears to argue that administrative remedies were unavailable to him as a result of C.O. Moore trying "to cover his mistakes up". (Dkt. No. 20 at 2-3). Plaintiff does not offer any support for his claim other than his statement "officers talk like inmates talk. So knowing the incident, knowing I put in a grievance, they wanted to be nosey [sic], and they opened it and never let it get to where it was supposed to go once it was read." (Pl.'s Dep. at 89). During his deposition, plaintiff specifically stated that C.O. Moore was not the person who picked up the grievance. (Pl.'s Dep. at 88-89). Furthermore, plaintiff testified the alleged grievance was sealed, so the unnamed C.O. would have no way of knowing what conduct the grievance was referring to unless (s)he opened the envelope. (Pl.'s Dep. at 92).

As noted above, plaintiff was on keep-lock status when he allegedly attempted to submit a grievance relating to the claim in this action by leaving a sealed envelope for C.O.s to deliver. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6. While "[k]eep-lock is similar to serving time in a Special Housing Unit ... [with the inmate] remain[ing] in their assigned cell" (Dkt. No. 16-5, Terry Allen Declaration ¶ 7), plaintiff acknowledged that keep-lock status is "not like if you were in the SHU" (Pl.'s Dep. at 35).

In *Williams v. Priatno,* 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative

2023 WL 4710869

remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in a SHU, he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126.[8] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

8    My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

Some district court cases in the Second Circuit suggest that *Williams* should be limited to its particular facts, *e.g.*, by not applying its holding to plaintiffs who are not confined in a SHU.[9] *See, e.g., Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) ("the factual scenario here is different from that in *Williams* where the Second Circuit found that part of the IGP's regulatory scheme was 'so opaque and so confusing that ... no reasonable prisoner c[ould] use' it.") (citing *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y.

July 19, 2016) (finding that the Second Circuit's decision in *Williams* "hinged on the 'extraordinary circumstances' specific to the case before it")); *Blake v. Porlier*, No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *6 (N.D.N.Y. Oct. 4, 2019) ("Courts have taken an inmate's housing and level of segregation from the general population into account when determining the availability of grievance procedures.") (citing *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (holding that a plaintiff in keeplock was not entitled to an exhaustion exception when he alleged that his grievance had not been filed due to mail tampering, and subsequently never inquired about it), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017)).

9    In *Medina v. Napoli*, 725 F. App'x at 53-54, the Second Circuit followed *Williams* in a case involving a SHU inmate, but absent the additional circumstance of a transfer to a different facility, which might have further complicated the inmate's ability to file a grievance.

**\*6** In any event, unsupported assertions that a plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *Blake v. Porlier*, 2019 WL 7484052, at *5 ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross*, 2017 WL 2791063, at *5); *Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report and recommendation adopted*, 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2017); *Engles v. Jones*, No. 6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

Moreover, courts in this Circuit have granted summary judgment for failure to exhaust administrative remedies, even for a prisoner confined to a SHU whose ability to directly file a grievance or make a copy may be limited, when the plaintiff

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 108 of 830
Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

provided no documentation or minimal corroborative details. *See, e.g., Sankara v. Montgomery*, No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at \*8 (N.D.N.Y. June 25, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office[.]"), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018); *Simpson v. Price*, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at \*9 (N.D.N.Y. Dec. 29, 2021) (in the absence of any documentary evidence to corroborate plaintiff's alleged attempt to file a grievance from the SHU, the court concludes that plaintiff's completely unsupported, unclear, and vague implication that the grievance was not properly processed does not suffice to avoid summary judgment), *report and recommendation adopted*, 2022 WL 336540 (N.D.N.Y. Feb. 4, 2022); *Ozzborn v. Cornell*, No. 9:17-CV-1039 (MAD/ATB), 2021 WL 2227829, at \*5 (N.D.N.Y. June 2, 2021) (Plaintiff claimed that he filed a grievance from the SHU by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect; but, because he never received a response, he presumed that the grievance was never submitted. Because plaintiff never followed up on his grievance and successfully filed numerous other grievances in the recent past, he has failed to demonstrate that his administrative remedies were unavailable to him).[10]

[10]    District Judge D'Agostino distinguished *Williams v. Priatno* by noting the various ways in which the plaintiff in *Williams* specified how he followed up with respect to the grievance that he left for delivery from the SHU, which was never filed with the IGP. *Id.* at \*4.

Here, the court does not merely rely on plaintiff's lack of direct evidence, such as copies of the relevant grievances, in finding that he has failed to establish a genuine issue of material fact as to unavailability. Plaintiff in this case has done nothing more than allege in conclusory fashion that he attempted to file a grievance concerning a September 6, 2018 incident. Plaintiff's testimony about when he attempted to submit the grievance was vague and he did not identify the officer who allegedly collected it. Likewise, he has not supported his claim that unnamed sergeants, officers, and counselors told

him "not to worry" with any documentary evidence. *See, e.g., Belile v. Griffin*, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at \*8 (N.D.N.Y. Feb. 12, 2013) ("Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances, are insufficient to excuse his failure to comply with the IGP [process]"), *report and recommendation adopted*, 2013 WL 1291720 (N.D.N.Y. Mar. 27, 2013).

\*7  For the above reasons, the court concludes that plaintiff's completely unsupported and vague claim that a grievance he attempted to file against C.O. Moore relative to the September 6, 2018 incident was not properly processed does not suffice to avoid summary judgment. Accordingly, the court recommends that C.O. Moore be granted summary judgment and the second amended complaint be dismissed against him, on the ground that plaintiff failed to exhaust his administrative remedies.

Dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust. *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004). Here, plaintiff's time to file the relevant grievance to CORC in accordance with the rules and regulations has already passed,[11] rendering his failure to exhaust his administrative remedies incurable at this time. As a result, I recommend that plaintiff's complaint be dismissed with prejudice as to these claims. *See Livingston v. Hoffnagle*, No. 17-CV-1158 (MAD/DEP), 2019 WL 409366, at \*7 (N.D.N.Y. Feb. 1, 2019) (dismissing without leave to amend, where the exhaustion error would not be cured by permitting the plaintiff leave to amend).

[11]    "Ordinarily, an inmate must first submit 'a complaint,' or grievance, to the facility's IGP clerk within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a). Relief from the twenty-one day time limit may be granted by the IGP supervisor based upon mitigating circumstances, provided, however, that '[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence.' " *Nelson v. Plumley*, 2015 WL 4326762, at \*2 (citing N.Y.C.R.R. § 701.6(g)(1)(i) (a)).

## IV. Eighth Amendment Failure to Protect Claim

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 109 of 830
Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

Defendant also seeks summary judgment on the merits of plaintiff's failure to protect claim, arguing, among other things, that plaintiff has failed to establish C.O. Moore was acting with deliberate indifference to conditions that posed a substantial risk of serious harm to plaintiff. For the following reasons, the court agrees that summary judgment is warranted, in the alternative, on the merits of plaintiff's Eighth Amendment claim.

### A. Legal Standards

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970 (1994). The plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. *Id.* at 837, 114 S. Ct. 1970. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

The failure of corrections officers to employ reasonable measures to protect an inmate from violence by other inmates may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) (citing *United States v. Bailey*, 444 U.S. 394, 423 (1980)). "Reckless disregard" of plaintiff's right to be free from attacks by other inmates may be shown by the existence of a "pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221-22 (S.D.N.Y. 1995) (citing *Rucco v. Howard*, No. 91 Civ. 6762, 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993); *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984)).

**\*8** An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord*, No. 99 Civ. 1674, 2000 WL 1372834, at *4 (S.D.N.Y. Sept. 25, 2000) (citing *Ayers v. Coughlin*, 780 F.2d at 209). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43).

### B. Analysis

With due regard for plaintiff's status as a pro se litigant, plaintiff has failed to establish that C.O. Moore knew of a particular risk to plaintiff's safety or that C.O. Moore was deliberately indifferent for failing to protect plaintiff. Plaintiff merely offers conclusory, general allegations that C.O. Moore knew about an alleged gang and/or race war happening at Clinton C.F. (Dkt. No. 20 at 2). However, C.O. Moore has, in his sworn declaration, denied having any knowledge about a race war at Clinton C.F. or having any access to information regarding an inmate's gang status. (Moore Decl. ¶¶ 21, 23). Even if C.O. Moore did have access to such records, plaintiff testified that he is not a member of a gang. (Jackson Dep. at 19). Thus, there is nothing in the record other than plaintiff's conclusory allegations establishing that C.O. Moore knew plaintiff was at a substantial risk of harm because of an alleged gang war.

Plaintiff's claim is further undermined by his sworn testimony admitting that he had not had any prior interactions with the inmate who attacked him before the underlying incident. (Jackson Dep. at 19-20); *Gillard v. Jarvis*, No. 9:11-CV-1021 (LEK/ATB), 2012 WL 7037734, at *7 (N.D.N.Y. Nov. 6, 2012), *report and recommendation adopted*, 2013 WL 474384 (N.D.N.Y. Feb. 7, 2013) ("If plaintiff did not know the inmate who assaulted him, he cannot claim that defendants "knew" and disregarded the serious risk that plaintiff would be assaulted at Clinton by this unknown individual."). Plaintiff has not alleged that he was threatened by the other inmate, or any member of the other inmate's race or gang, prior to this incident. Additionally, neither inmate was in protective custody when they were released from their cells. (Moore Decl. ¶ 14). Plaintiff also testified he never asked for protective custody before or after the incident. (Jackson Dep. at 73).

"Courts routinely deny deliberate indifference claims based upon surprise attacks." *Zimmerman v. Macomber*, No. 95 Civ. 0882, 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001) (granting summary judgment in favor of the defendants where the plaintiff failed to carry his burden to establish that the defendant had knowledge of a substantial risk to plaintiff's health or safety from an inmate attacker). Here, plaintiff has failed to allege defendants knew of a prior altercation between the plaintiff and his attacker, or of any threats that had been made against the plaintiff. *Fernandez v. N.Y.C. Dep't of Corr.*, No. 08 Civ. 4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010); *Clark v. Gardner*, 256 F. Supp.3d

2023 WL 4710869

154, 168 (N.D.N.Y. 2017). Because plaintiff has alleged no facts suggesting that C.O. Moore knew of a particular risk to the plaintiff's safety, he has failed to raise a material question of fact as to whether C.O. Moore was deliberately indifferent, and summary judgment is warranted. *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp.2d 354, 363 (S.D.N.Y. 2013).

**\*9 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 16) be **GRANTED,** and the complaint be **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4710869

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4711091

2023 WL 4711091
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dumar JACKSON, Plaintiff,

v.

Officer MOORE, Corr. Fac. Ofcr.,
Clinton Corr. Fac., Defendant.

9:21-CV-1001 (GTS/ATB)
|
Signed July 24, 2023

**Attorneys and Law Firms**

DUMAR JACKSON, 18-A-2746, Plaintiff, Pro Se, Five Points Correctional Facility, Caller Box 19, Romulus, New York 14541.

HON. LETITIA A. JAMES, Attorney General for the State of New York, RACHEL OUIMET, ESQ., Assistant U.S. Attorney, Counsel for Defendant, The Capitol, Albany, New York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Dumar Jackson ("Plaintiff") against Correctional Officer Moore ("Defendant"), are (1) Defendant's motion for summary judgment, (2) United States Magistrate Judge Andrew T. Baxter's Report-Recommendation recommending that Defendant's motion be granted and Plaintiff's Complaint be dismissed, and (3) Plaintiff's Objection to the Report-Recommendation. (Dkt. Nos. 16, 21, 22.) Because Plaintiff's one-page (four-sentence) Objection fails to specifically challenge any portion of the Report-Recommendation, the Court need review that Report-Recommendation for only clear error.[1] After carefully reviewing the relevant filings in this action, the Court can find

no clear error in the Report-Recommendation: Magistrate Judge Baxter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein, and Plaintiff's Complaint is dismissed with prejudice.

[1]    When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 21) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 16) is **GRANTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED** with prejudice.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4711091

2014 WL 4146276

KeyCite Yellow Flag - Negative Treatment

Distinguished by Sheffer v. Fleury,   N.D.N.Y.,   September 18, 2019

2014 WL 4146276
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Chris PRICE, Plaintiff,

v.

J. OROPALLO, Sergeant, Upstate Corr. Facility;
Norman H. Bezio, Dir. of Shu, Inmate Disciplinary
Program, Nys Docs; and Phillip Battiste, Dir.
of Security Staff, Nys Docs, Defendants.

No. 9:13–CV–0563 (GTS/TWD).
|
Signed Aug. 19, 2014.

**Attorneys and Law Firms**

Chris Price, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Keith J. Starlin, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil
rights action filed by Chris Price ("Plaintiff") against the three
above-captioned New York State correctional employees
("Defendants"), are Defendants' motion for summary
judgment, and United States Magistrate Judge Therese
Wiley Dancks' Report–Recommendation recommending that
Defendants' motion be granted. (Dkt.Nos.25, 28.) Plaintiff has
not filed an Objection to the ReportRecommendation, and
the deadline by which to do so has expired. (*See generally*
Docket Sheet.) After carefully reviewing the relevant filings
in this action, the Court can find no clear error in the Report–
Recommendation: Magistrate Judge Dancks employed the
proper standards, accurately recited the facts, and reasonably
applied the law to those facts. (Dkt. No. 28.) To that analysis,
the Court would add only two points.

First, with regard to Plaintiff's claims against Defendants
Battiste and Bezio, the Court notes that the verified Complaint
does not allege facts plausibly suggesting, or adduce
admissible evidence establishing, that Plaintiff sent letters to
Battiste or Bezio at an appropriate address *and* by appropriate
means. (Dkt. No. 1, at ¶ 6.) In any event, even if he had
done so, the Complaint alleges facts plausibly suggesting, or
adduces admissible evidence establishing, that a response by
officials at his correctional facility followed the sending of
the letters. (*Id.*)

Second, as an alternative ground for the dismissal of the
Complaint, the Court accepts Defendants' failure-to-exhaust
argument because, even assuming Plaintiff was in fact told
that his complaint was not grievable, he filed the grievance
and knew he was "suppose[d] to ... receive[ ]" a response to it.
(Dkt. No. 1, at 4.) More important, he could have, and should
have, filed an appeal from his non-response (which he did not
do). 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within
the time limits may be appealed to the next step."); *see also
Smith v. Kelly,* 985 F.Supp.2d 275, 281–82 (N.D.N.Y.2013)
(collecting cases). Such an appeal could have proved fruitful,
given that the issue was indeed grievable. (Dkt. No. 25,
Attach. 5. at ¶ 3 [Hale Decl.].)

For all of these reasons, Defendants' motion is granted, and
Plaintiff's Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–
Recommendation (Dkt. No. 28) is *ACCEPTED* and
*ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 25) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is
*DISMISSED* in its entirety.

### ORDER and REPORT–RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

*Pro se* Plaintiff Chris Price, an inmate currently confined
in the Auburn Correctional Facility, has commenced this
action pursuant to 42 U.S.C. § 1983 alleging Defendants

failed to protect him in violation of his Eighth Amendment rights by placing a member of a rival gang in his cell. (Dkt. No. 1.) Plaintiff has sued Corrections Sergeant Jon Oropallo ("Oropallo"); Phillip Battiste ("Battiste"), New York State Department of Corrections and Community Supervision ("DOCCS") Director of Security Staff; and Norman R. Bezio ("Bezio"), DOCCS Director of Special Housing/ Inmate Disciplinary Program *Id.* at 1.

**\*2** Defendants filed an Answer to Plaintiff's Complaint (Dkt. No. 12) and have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 25.) Plaintiff has not opposed the motion or sought additional time within which to do so. For the reasons set forth below, the Court recommends that Defendants' motion for summary judgment be granted.

## I. BACKGROUND

While Plaintiff was confined at the Upstate Correctional Facility ("Upstate"), his membership in the Crips gang was known to prison officials. (Dkt. No. 1 at ¶ 7.) Plaintiff expressed concerns for his safety to officials at Upstate, at least in part because according to Plaintiff, Defendant Oropallo had previously forced him to fight with members of the Bloods, a rival gang. *Id.* at 6. In a Declaration submitted in support of Defendants' motion for summary judgment, Oropallo denies ever having forced Plaintiff to fight with another inmate. (Dkt. No. 25–4 at ¶ 4.)

The evidence shows that Oropallo did issue a misbehavior report on Plaintiff on December 8, 2011, after observing Plaintiff and his cell mate Williams fighting. (Dkt. No. 25–4 at ¶ 8 and p. 23.) [1] The fight investigation form reveals that Plaintiff did not want protection and neither he nor Williams wanted to press charges in connection with the fight. *Id.* at p. 24. Donald Uhler ("Uhler"), Deputy Superintendent of Security at Upstate, reviewed Plaintiff's security file and found no request by him for protective custody. (Dkt. No. 25–3 at ¶ 10.)

[1]    Page numbers cited herein are those assigned by the Case Management/Electronic Case File (CM/ECF) system.

Plaintiff claims that as a result of being forced to fight members of the Bloods gang, he filed a grievance and began speaking with officials at Upstate regarding his safety in the fall of 2011. (Dkt. No. 1 at ¶ 6.) Plaintiff's file from Upstate contains a December 12, 2011, "To Whom it May Concern"

letter in which Plaintiff disclosed that he had been forced to fight on December 8, 2011, and had been threatened with a scalpel by members of the Bloods. (Dkt. No. 25–3 at ¶ 4 and p. 6.) In his December 12, 2011, letter Plaintiff indicated that he was writing to create a paper trail regarding safety issues he had raised with corrections officers and sergeants. (Dkt. No. 25–3 at p. 6.) Plaintiff wrote:

> I used to be a well known crip gang member. The bloods still label me as being a crip gang member. So to back myself up, I'm [writing] to all people that I think should be notified of my situation of safety. On the 8th of this month for this particular reasons I stated above, I was [threatened] and forced to fight. I fear for my life while I'm here [incarcerated]. I just wanna do the time that I have and hopeful[ly] get a reversal on my appeals. Are there any ways that, I can be bunked up with someone who isn't labeled a bloods gang member, because I was threatened with a scalpel. I notified the proper personnel and I wasn't taken serious [ly] until I started kicking the cell door I was in, I was taken out to be forced to fight in another cell. I fear I'm a get hurt or I'm a hurt someone. Can you help me? Thank you for your time and [patience].

**\*3** *Id.*

According to Uhler, Lt. Lumbard ("Lumbard") investigated the letter on December 21, 2011. *Id.* at ¶ 5. Lumbard reported that Plaintiff told him that he was a member of the Crips gang and had been having trouble with members of the Bloods gang. *Id.* at p. 5. When asked about being threatened with a scalpel, Plaintiff refused to provide any information. *Id.* Plaintiff did tell Lumbard that he was getting along well with his current cell mate, and that they had no issues. *Id.* Lumbard indicated that the cell block staff had been notified about the situation and advised to leave Plaintiff with his cell mate and, if possible, to move the cell mate with him when he was moved upstairs. *Id.*

Plaintiff was dissatisfied with the resolution of his grievance and claims to have written to Defendants Battiste and Bezio about his safety concerns. *Id.* Plaintiff was subsequently told by Upstate officials that the safety issues of which he had complained would be handled, and he would not have to worry about being placed in the same cell with known members of the Bloods. *Id.* Nonetheless, on August 9, 2012, inmate Adams, a member of the Bloods, was brought in to bunk with Plaintiff. (Dkt. No. 1 at ¶ 6 .) Plaintiff and Adams got into what both described as a gang related fight in the cell within minutes after the officer placing Adams in the cell left, and Plaintiff sustained a non-displaced fracture of his nose and a laceration on his nose which required stitches. *Id .;* Dkt. Nos. 25–3 at 12; 25–4 at 8–9; 26 at 8–12.

Prior to Adams being placed in the cell with Plaintiff, Oropallo had no personal knowledge or information that would have led him to believe that Adams was gang related or would pose a threat to Plaintiff. (Dkt. No. 25–4 at ¶ 7.) Adams had never told Oropallo he was in a gang, and nothing about the December 8, 2011, fight between Plaintiff and Williams led Oropallo to believe Adams would be a threat to Plaintiff. *Id.* at ¶ 10. Furthermore, the assignment of inmates for double cell housing was not within the scope of Oropallo's authority. *Id.* at ¶ 9.

DOCCS maintains an "enemies" list for inmates based upon information provided by the inmate and from his disciplinary record. *Id.* at ¶ 6. Uhler has explained in his Declaration that DOCCS does not recognize street gangs, and inmates frequently do not disclose gang affiliations to prison officials, although if there is information of gang affiliation, a notation might appear on the inmate's personal characteristics screen, his security file, or be made by a counselor during intake. *Id.* at ¶ 7. Uhler reviewed the DOCCS files on Adams and found no notations indicating that he was gang affiliated. *Id.* at ¶ 8; *see also* Adams' Personal Characteristics Form and Inmate Security Classification Form, neither of which identifies him as a member of the Bloods gang. *Id.* at pp. 9–10.

A misbehavior report was filed against Plaintiff as a result of the August 9, 2012, fight. (Dkt. No. 25–4 at 8.) Plaintiff was found guilty of violent conduct and assault and was given four months in the Special Housing Unit, loss of packages, commissary, ear phones, recreation, and good time, with two months suspended as an incentive for Plaintiff to improve his behavior. *Id.* at 5–6.

## II. APPLICABLE LEGAL STANDARDS

### A. General Legal Standards for Summary Judgment Motions

**\*4** Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [2] *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

[2]   Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable

Price v. Oropallo, Not Reported in F.Supp.3d (2014)

2014 WL 4146276

inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at *3, 1999 U .S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). [3]

[3]    Copies of unpublished decisions cited herein will be provided to Plaintiff in accordance with *Lebron v. Sanders,* 557 F.3d 76, 79 (2009) (*per curiam*). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### B. Summary Judgment When a *Pro Se* Plaintiff Fails to Oppose the Motion

Plaintiff has not opposed Defendants' summary judgment motion. N .D.N.Y. L.R. 56.2 requires the moving party to notify a *pro se* litigant of the consequences of failing to respond to the summary judgment motion. [4] Where a party has been given satisfactory notice of the consequences of failing to respond to a motion for summary judgment, the nonmovant's failure to respond to the movant's statement of material facts will result in the facts set forth in the statement being accepted as true to the extent they are supported by the evidence in the record. [5] *See* L.R. 7.1(a) (3) (*"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* ) (emphasis in original).

[4]    A Notice of the Consequences of Failing to Respond to a Summary Judgment Motion was served with Defendants' motion papers in this case. (Dkt. No. 25 at 3.)

[5]    *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to

evidence in the record supports the assertion.") (citation omitted).

**\*5** A *pro se* plaintiff's failure to oppose a summary judgment motion does not mean that the defendant's motion is to be granted automatically. An unopposed summary judgment motion may properly be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (internal quotes and citations omitted).

A district court has no duty to perform an independent review of the record to find proof of a factual dispute where the nonmovant fails to respond to a summary judgment motion. *See Amnesty America. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2000). This is so even where a plaintiff is appearing *pro se* because even *pro se* plaintiffs must obey the Court's procedural rules. *See McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). Although not obligated to do so, the Court has elected to conduct a review of the entire record in this case. *See Monahan v. New York City Dept. of Corrections,* 214 F.3d 275, 292 (2d Cir.2000) (a court may, in its discretion, "choose to conduct an assiduous review of the record" even when a party has failed to file a statement of material facts). Because Plaintiff's Complaint is verified, the Court will treat it as an affidavit in opposition to Defendants' motion. *See Colon,* 58 F.3d at 872.

### III. ANALYSIS

#### A. Administrative Exhaustion

Defendants argue that they are entitled to summary judgment based upon Plaintiff's failure to exhaust his administrative remedies with regard to Defendants' alleged failure to protect him from a Bloods gang member in violation of his Eighth Amendment rights. (Dkt. No. 25–6 at 5–6.)

1. *Exhaustion Under The Prison Litigation Reform Act*

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997(e). The PLRA requires "proper exhaustion" of prison administrative remedies, which includes compliance with agency deadlines and procedural rules. *See Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378,

165 L.Ed.2d 368 (2006). "[P]roper exhaustion ... means using all steps that the agency holds out and doing so properly (so that the agency addresses the issues on the merits)." *Id.* Exhaustion is mandatory, and an inmate cannot satisfy the PLRA's exhaustion requirement by filing an untimely or administratively defective grievance or appeal. *Id.* at 84–85.

The DOCCS Inmate Grievance Procedure ("IGP") has three stages which prison inmates must complete. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5; *see also Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir.2009). First a grievance complaint must be submitted to the Inmate Grievance Resolution Committee ("IGRC") for an initial determination within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a). Next, if the IGRC decision is adverse to the inmate, he has seven calendar days to appeal to the prison superintendent. *Id.* at § 701.5(c). If dissatisfied with the superintendent's decision, the inmate has another seven calendar days to appeal the superintendent's decision to the Central Office Review Committee ("CORC"). *Id.* at § 701 .5(d).

**\*6** An inmate must follow through on all three steps to complete the exhaustion process. *See Morrison v. Stefaniak,* 523 F. App'x 51 (2d Cir.2013) (summary order) (upholding dismissal of complaint because plaintiff failed to appeal IGRC's decision); *Belile v. Griffin,* No. 9:11–CV0092 (TJM/DEP), 2013 WL 1776086, at *3–4, 7, 2013 U.S. Dist. LEXIS 47137, at *10, 22–23 (N.D.N.Y. Feb.12, 2013) (plaintiff failed to exhaust his administrative remedies because he had not followed through on all of the steps, *i.e.,* he did not appeal to the superintendent of the facility or appeal any unfavorable decision of the superintendent to CORC).

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at * 16 (N.D.N.Y. Mar.31, 2010). If a defendant meets that burden, however, a plaintiff's failure to exhaust does not end the review. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray,* 2010 WL 1235591, at *4. *Hemphill* sets forth a three-part

inquiry for district courts.[6] First, courts must determine if administrative remedies were in fact available to plaintiff. In *Hemphill,* the Second Circuit stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill,* 380 F.3d at 688.

[6] Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense) (internal quotation marks omitted).

Second, courts must determine if the defendants are estopped from presenting nonexhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by conduct such as " 'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.' " *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray,* 2010 WL 1235591, at *5 & n. 26 (collecting cases); *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at * 12, 2008 U.S. Dist. LEXIS 124388, at *44 (N.D.N.Y. Apr. 15, 2008) (Lowe, M.J.) ("None of those documents allege facts plausibly

suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question."). Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a nonexhaustion defense, the inmate's failure to exhaust may be justified. *Hemphill,* 380 F.3d at 686.

### 2. *Exhaustion Analysis*

**\*7** In his Complaint, Plaintiff has alleged that he asked to file a grievance with regard to the placement of a known Bloods gang member in his cell. (Dkt. No. 1 at ¶ 4.) According to Plaintiff, he was told by the grievance officer that the issue was not grievable and, as a result, never received a response to his grievance. *Id.* Jeffrey Hale ("Hale"), Assistant Director for the DOCCS IGP, has stated in his Declaration that the IGP is the appropriate vehicle for inmates to use to address issues regarding the person with whom they are housed and complaints against staff. (Dkt. No. 25–5 at ¶ 3.) Defendants have not, however, submitted evidence disputing Plaintiff's claim that he was told his complaint was not grievable.

Instead, Defendants have focused on a grievance filed by Plaintiff with regard to the medical care he received for the injuries he sustained in the fight with Adams and have relied upon Plaintiff's failure to appeal from the denial of that grievance as evidence of failure to exhaust the claim asserted in this lawsuit. (Dkt. Nos. 25–3 at ¶ 9 and pp. 11–13; 25–6 at 6.) In Grievance No. UST–50552, Plaintiff referenced the fight in his cell but only in the context of the fight as the cause of his broken nose. *Id.* at p. 11. Plaintiff's complaint was that it took five days for the medical staff at Upstate to send him out for x-rays. *Id.* The investigative report on the grievance references only the medical care given Plaintiff, and the grievance was denied solely on the grounds that there was no urgent need for an x-ray. *Id.* at p. 13. In short, the grievance has no direct relevance to Plaintiff's exhaustion of the failure to protect claim asserted in this lawsuit.

The relevant exhaustion issue on this motion is whether the allegation in Plaintiff's Complaint regarding his unsuccessful attempt to grieve the failure to protect issue is sufficient by itself to raise an issue of fact under any of the *Hemphill* considerations. A number of district courts in the Second Circuit have found either that the IGP is unavailable to an inmate who has been told by a prison official that his complaint was not grievable, or that the misinformation constitutes a special circumstance excusing exhaustion under

*Hemphill.* [7] *See, e.g., Partee v. Goord,,* No. 06–15528, 2007 WL 2164529(SAS), at \*4, 2007 U.S. Dist. LEXIS, at \*14 (S.D.N.Y. July 25, 2007) (excusing exhaustion requirement because plaintiff was told in reply to his grievance that his claim was outside the purview of the IGRC, and he reasonably understood this to mean his dispute was not grievable); *Lewis v. Cunningham,* No. 05–9243(GBD), 2007 WL 2412258, at \*2, 2007 U.S. Dist. LEXIS 62346, at \*5 (S.D.N.Y. Aug.23, 2007) (finding special circumstances justifying failure to exhaust remedies because a supervisor told plaintiff that filing a grievance was not the proper way to address a complaint, and to instead write a letter to the Chief Medical Officer at the Department of Health, which he did); *Jeffers v. Goord,* No. 9:99–CV–0335 (FJS/GHL), 2005 WL 928628, at \*6, 2005 U.S. Dist. LEXIS 39309, at \*16–17 (N.D.N.Y. Apr.4, 2005) ("[p]rison official may prevent a prisoner from utilizing a remedy by incorrectly representing to the prisoner that his complaint is not grievable, or that it is grievable only through another avenue.").

[7]    Courts have noted that there is significant overlap in the three *Hemphill* considerations. *See, e.g., Barksdale v. Frenya,* No. 9:10–CV–00831 (MAD/DEP), 2012 WL 4107805, at \*6 n. 11, 2012 U.S. Dist. LEXIS 134738, at \*21 n. 11 (N.D.N.Y. Sept.19, 2012) ("In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap."). A failure to exhaust as a result of being given false information on whether a complaint was grievable by a non-defendant could arguably fit within either the first or third consideration.

**\*8** Defendants' failure to submit evidence refuting or explaining Plaintiff's claim that he was told his complaint was not grievable leaves material issues of fact regarding the applicability of one or more of the *Hemphill* considerations. Therefore, the Court recommends that Defendants' request for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies be denied without prejudice.

### B. Battiste and Bezio

The Eighth Amendment to the United States Constitution "requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996). Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate

2014 WL 4146276

indifference to the inmate's safety. *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988) ("[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983."); *see also Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991) ("[A]n inmate's claim that prison officials failed, as a result of their deliberate indifference, to protect [the inmate] from the violent actions of other inmates may state a viable § 1983 cause of action."); *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment"); *Wassmann v. County of Ulster,* 528 F. App'x 105, 106 (2d Cir.2013) ("Officers at correctional facilities have a duty to protect inmates from violence at the hands of other inmates.") (citing *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

To prevail on a failure to protect claim, an inmate must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm; and (2) prison officials exhibited deliberate indifference. *Farmer,* 511 U.S. at 837. In order to establish deliberate indifference where a prison official has failed to protect an inmate from violence by another inmate, a plaintiff must prove that the defendant official actually knew of and disregarded an excessive risk of harm to the plaintiff's safety. *Hayes,* 84 F.3d at 620. Even assuming that the allegations in Plaintiff's Complaint are sufficient to satisfy, or at least raise a question of fact on the issue of substantial risk of harm, the summary judgment record is devoid of evidence that Battiste and Bezio exhibited deliberate indifference to Plaintiff's safety in placing Adams in his cell.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919,

at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (citing *Ayers,* 780 F.2d at 210). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered ." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*9** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. [8]

[8]    The Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law.

Plaintiff claims that he wrote to Defendants Battiste and Bezio with respect to his safety concerns with regard to sharing a cell with a Bloods gang member after he was dissatisfied with the response of Upstate officials to his complaints in the fall or winter of 2011. (Dkt. No. 1 at ¶ 6.) According to Plaintiff after he sent the letters to Battiste and Bezio he was told by Upstate officials that his safety issue had been addressed. *Id.*

Battiste and Bezio did not submit evidence regarding whether they received letters from Plaintiff and, if so, took any action in response. Instead, they rely upon an attorney's declaration stating upon information and belief that a search was made of records in the DOCCS Central Office and no correspondence to or from Plaintiff was found. (Dkt. No. 25–2 at ¶ 3.) The

source of counsel's information and belief appears to be the July 25, 2013, unsworn letter from a DOCCS senior attorney annexed as an exhibit. *Id.* at p. 4.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997); *see also Salahuddin,* 467 F.3d at 272–73 (movant bears the initial burden of showing through the production of admissible evidence that he is entitled to judgment as a matter of law). An attorney's affidavit that is not based upon personal knowledge and relies upon an attached letter not sworn as required by Rule 56(e) is not admissible evidence and not properly considered on a summary judgment motion. [9] *See Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986); *see also Sepanski v. Jani–King, Inc.,* No. 10–CV–518S, 2013 WL 4455412, at *2–3, *8, 2013 U.S. Dist. LEXIS 116437, at *8 (W.D.N.Y. Aug.16, 2013) (holding that three unsworn letters submitted by plaintiff could not be considered in connection with a motion for summary judgment).

[9]    Statements in Defendants' Statement Pursuant to Rule 7.1(a)(3) are deemed admitted on an unopposed summary judgment motion only to the extent they are supported by admissible evidence. *See Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001) ("court may not rely solely upon statement of undisputed facts in determining whether movant has met this burden of showing the absence of a genuine issue for trial; court must be satisfied that the citation to evidence in the record supports the assertion). Paragraph 13 of Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 25–1), stating that "[t]here is no evidence to demonstrate that Defendants Bezio or Battiste received correspondence from Plaintiff," relies upon an attorney's declaration that is not based upon personal knowledge and an unsworn letter, neither of which constitutes admissible evidence. *See Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986).

A movant's burden of demonstrating the absence of a question of material fact remains the same where the motion is unopposed. *See Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is

presented.") (citation and internal quotation marks omitted). Defendants have not satisfied their burden of production with respect to Plaintiff's claim that he wrote to Battiste and Bezio regarding his concerns about Bloods.

**\*10** Nonetheless, because Plaintiff has not alleged facts in his Complaint showing that Battiste or Bezio had knowledge of, or personal involvement in, Adams being placed in a cell with him, or that they were aware of Adams' Bloods affiliation, he has failed to state an Eighth Amendment claim against the two supervisory officials for failure to protect him from the injuries he sustained in the fight with Adams. *See McKinnon,* 568 F.2d at 934 (personal involvement in constitutional deprivation is a prerequisite to an award of damages under § 1983); *Hayes,* 84 F.3d at 620 (defendant official must actually have known of and disregarded an excessive risk of harm to the plaintiff's safety to establish deliberate indifference).

Therefore, the Court recommends that Battiste and Bezio be granted summary judgment dismissing the Complaint as against them.

### C. Oropallo

Even assuming, *arguendo,* that the allegations in Plaintiff's Complaint are sufficient to satisfy, or at least raise a question of fact, on the issue of substantial risk of harm, the evidence in the summary judgment record establishes that Defendant Oropallo did not know of and disregard an excessive risk of harm to Plaintiff's safety in connection with Adams being placed in Plaintiff's cell. *See Hayes,* 84 F.3d at 620. The prison files on inmate Adams contained no notations indicating that he was gang related. (Dkt. No. 25–3 at ¶ 8.) The DOCCS "enemies" list did not identify Plaintiff and Adams as enemies. *Id.* at ¶ 6. Moreover, Plaintiff's security file contained no requirements for protective custody. *Id.* at ¶ 10.

According to Oropallo, prior to the altercation between Plaintiff and Adams, he had no personal knowledge or information that would have led him to believe that Adams was gang affiliated or would pose a threat to Plaintiff. (Dkt. No. 25–4 at ¶ 7.) Adams had not told Oropallo he was in a gang before being placed in Plaintiff's cell. *Id.* at ¶ 10. Moreover, the assignment of inmates in double cell housing was not within Oropallo's authority. *Id.* at ¶ 9.

Since Plaintiff has failed to submit opposition to Defendants' motion, the Court can look only to his verified Complaint for evidence demonstrating that a genuine issue of material

fact exists as to whether Oropallo knew of and disregarded an excessive risk of harm to the plaintiff's safety. *Id.* Mere allegations in Plaintiff's Complaint, especially conclusory allegations or conjecture and speculation, are insufficient to create a genuine issue of fact. *See Matsushita,* 475 U.S. at 585–86; *Kerzer,* 156 F.3d at 400.

None of the allegations in Plaintiff's verified Complaint contradicts Defendants' evidence that prison records did not identify Adams as a member of the Bloods gang, that Oropallo had no knowledge that Adams was a member of the Bloods gang at the time he was placed in Plaintiff's cell, and that Oropallo had no authority with regard to the assignment of inmates in double cells. Therefore, Plaintiff has failed to raise a question of fact as to whether Oropallo was deliberately indifferent to his safety, a necessary element of proof on an Eighth Amendment claim for cruel and inhuman punishment based upon a failure to protect. *See Farmer,* 511 U.S. at 837. Therefore, the Court recommends that Oropallo's motion for summary judgment be granted.

**\*11 ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892F.2d 15 (2d Cir.1989) (per curiam); 28 U.S.C. § 636(b) (1); Federal Rules of Civil Procedure 72, 6(a).

Filed June 18, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4146276

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 470648
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Yousif AHMED, Plaintiff,

v.

FRAZER & JONES COMPANY, Defendant.

No. 5:13–CV–0573 (GTS/TWD).
|
Signed Feb. 4, 2015.

**Attorneys and Law Firms**

Yousif Ahmed, Syracuse, NY, pro se.

Bond, Schoeneck & King, PLLC, Thomas G. Eron, Esq., Kerry W. Langan, Esq., of Counsel, Syracuse, NY, for Defendant.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this employment discrimination action filed *pro se* by Yousif Ahmed ("Plaintiff") against Frazer & Jones Company ("Defendant") pursuant to Title VII of the Civil Rights Act of 1964, is Defendant's unopposed motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 18.) For the reasons set forth below, Defendant's motion is granted.

## I. RELEVANT BACKGROUND

### A. Summary of Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint claims that, in September of 2011, Defendant discriminatorily suspended then terminated his employment based on his race/color and national origin in violation of Title VII of the Civil Rights Act of 1964. (Dkt. No. 1.) Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id.*)

### B. Undisputed Material Facts

The following material facts were asserted and supported by Defendant in its Local Rule 7.1 Statement and not controverted by Plaintiff in any Local Rule 7.1 Response, despite the fact that he was twice given specific notice of the consequences of failing to so respond (and the fact that he previously received a courtesy copy of both the Court's Local Rules of Practice and *Pro Se* Handbook). (Dkt. No. 18, Attach. 3 [Def.'s Rule 7.1 Statement]; Dkt. No. 18, Attach. 4 [First Notification of Consequences]; Dkt. No. 21 [Second Notification of Consequences]; Dkt. No. 3 [Notice of *Pro Se* Handbook and Local Rules].)

1. Defendant is a high-quality ductile and malleable iron foundry that has been in business for over 150 years in Syracuse, New York.

2. Plaintiff was hired on November 11, 2006, to work as a Hard Iron Sorter at Defendant's manufacturing facility in Syracuse, New York.

3. Plaintiff was a member of the Communication Workers of America, Local 81300 ("Union").

4. On September 2, 2011, Defendant suspended Plaintiff, pending investigation, for pushing and threatening a co-worker.

5. On September 6, 2011, Defendant terminated Plaintiff for his conduct on September 2, 2011.

6. Pursuant to the collective bargaining agreement between Defendant and the Union, the Union was promptly notified of Plaintiff's termination and represented him throughout the termination process.

7. On October 4, 2012, Plaintiff filed a complaint with the New York State Division of Human Rights ("Division") claiming that he was discriminated against because of an alleged disability.

8. On October 10, 2012, the Division dismissed Plaintiff's complaint for untimeliness because it was not filed within one year of the alleged discrimination.

9. Plaintiff's Division complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC").

10. On February 26, 2013, the EEOC issued a Dismissal and Notice of Rights.

11. The EEOC Dismissal and Notice of Rights stated that Plaintiff's charge was dismissed for lack of jurisdiction because the charge was not timely filed.

**\*2** 12. On April 28, 2014, Defendant was served with a Summons and Complaint, later filed by Plaintiff with this Court on May 17, 2013, alleging that Defendant discriminated against him based on his race/color and national origin.

### C. Briefing on Defendant's Motion

Generally, in support of its motion for summary judgment, Defendant argues that Plaintiff's Complaint must be dismissed as untimely for the following reasons: (1) an individual may not maintain a cause of action pursuant to Title VII unless he has first filed a claim with the EEOC or an equivalent state agency within 300 days of the alleged discriminatory act; (2) a discriminatory termination is considered a "discrete act"; (3) here, Plaintiff was terminated on September 6, 2011, 300 days after which was July 2, 2012; and (4) however, he did not file with the Division until October 4, 2012. (Dkt. No. 18, Attach. 1 [Def.'s Memo. of Law].)

Plaintiff did not file an opposition memorandum of law (or any opposition paper), despite having been twice given specific notice of the consequences of failing to do so (Dkt. No. 18, Attach. 4 [First Notification of Consequences]; Dkt. No. 21 [Second Notification of Consequences] ); and the deadline by which to do so expired more than seven-and-a-half months ago (*see generally* Docket Sheet).

## II. RELEVANT LEGAL STANDARD

Because Defendant, in its memorandum of law, accurately summarizes the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard. (Dkt. No. 18, Attach. 1, at Part I [Def.'s Memo. of Law].) To that summary, the Court would add only two brief points.

First, implied in the burden-shifting standard referenced by Defendant is the fact that, where a nonmoving party fails to adequately respond to a properly supported Statement of Material Facts, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se*.[1] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond

to the motion for summary judgment.)[2] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[3] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's properly supported Statement of Material Facts to have been admitted where the nonmoving party has failed to properly respond to that statement[4]—even where the nonmoving party is proceeding *pro se* in a civil rights case.[5]

| | |
|---|---|
| 1 | *Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.209) (Suddaby, J.) (citing cases). |
| 2 | *Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases). |
| 3 | *Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases). |
| 4 | Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3). |
| 5 | *Cusamano,* 604 F.Supp.2d at 427 & n. 6 (citing cases). |

Second, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in a properly filed memorandum of law (submitted in support of a motion for summary judgment), the movant's burden with regard to that argument is lightened such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v.. Gensini,* 07–CV–0279, 2009 WL 3672105, at *1, n. 1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL2473509, at *2 & nn. 2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases). Again, this rule applies even to *pro se* litigants, especially ones who have received notice of the consequence of that failure to respond.[6]

6

Alternatively, the court can deem the challenged claim abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Federal Exp.,* No. 12–1475, 2014 WL 4412333, at *6 (2d Cir.2014)* ("Where a partial response to a motion is made—i.e., referencing some claims or defenses but not others—a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

## III. ANALYSIS

**\*3** After carefully considering the matter, the Court finds, for the reasons stated in Defendant's memorandum of law, that Defendant has met its modest burden of showing the facial merit of its argument that Plaintiff's Complaint must be dismissed as untimely. (*See, supra,* Part I.C. of this Decision and Order.)

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 18) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED.*

*The Clerk is directed to enter judgment for Defendant and close this action.*

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 470648

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Salaam v. Stock, Not Reported in Fed. Supp. (2023)

2023 WL 3853811

2023 WL 3853811
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rashad SALAAM, Plaintiff,

v.

Gordon STOCK and Travis M. Zehr, Defendants.

9:19-cv-00689-AMN-TWD
|
Signed February 27, 2023

**Attorneys and Law Firms**

RASHAD SALAAM, Plaintiff, pro se, 14-A-3363, Clinton
Correctional Facility, P.O. Box 2001, Dannemora, NY 12929.

LETITIA JAMES, Attorney General of the State of New
York, STEVE NGUYEN, ESQ., Assistant Attorney General,
Attorney for Defendants, The Capitol, Albany, NY 12224.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**I. INTRODUCTION**

**\*1** This matter has been referred for a report and
recommendation by the Hon. Anne M Nardacci, United States
District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule
72.3(c). On May 30, 2019, *pro se* Plaintiff Rashad Salaam
("Plaintiff"), an inmate in the custody of the New York
State Department of Corrections and Community Supervision
("DOCCS"), commenced this action pursuant to 42 U.S.C.
§ 1983 ("Section 1983"). (Dkt. No. 1.) Plaintiff's fourth
amended complaint was accepted for filing on August 11,
2021, and alleged Fourteenth Amendment equal protection
and Eighth Amendment failure to protect claims against
Correction Officer ("CO") Gordon Stock and CO Travis M.
Zehr. (Dkt. No. 83.)

Currently before the Court is Defendants' motion for
summary judgment. (Dkt. No. 108.) For the reasons set forth
below, the Court recommends Defendants' motion be granted
in part and denied in part.

**II. LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment is warranted if "there is no genuine
dispute as to any material fact and the movant is entitled
to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see*
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986).
The moving party bears the initial burden of demonstrating
"the absence of a genuine issue of material fact." *Celotex*
*Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v.*
*Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006). A fact is
"material" if it "might affect the outcome of the suit under the
governing law," and is genuinely in dispute "if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." *Anderson*, 477 U.S. at 248; *see Jeffreys*
*v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The
movant may meet this burden by showing that the nonmoving
party has "fail[ed] to make a showing sufficient to establish
the existence of an element essential to that party's case, and
on which that party will bear the burden of proof at trial."
*Celotex*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party
must move forward with specific facts showing there is a
genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that
context, the nonmoving party must do more than "simply
show that there is some metaphysical doubt as to the material
facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*
*Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations,
conjecture and speculation ... are insufficient to create a
genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396,
400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment
motions, "[t]he mere existence of a scintilla of evidence in
support of the plaintiff's position will be insufficient; there
must be evidence on which the jury could *reasonably* find
for the plaintiff." *Jeffreys*, 426 F.3d at 554 (emphasis in
original). In other words, "a nonmoving party must offer
some hard evidence showing that [his] version of the events
is not wholly fanciful." *Id.* (citation and internal quotation
marks omitted). Accordingly, statements "that are devoid of
any specifics, but replete with conclusions, are insufficient to
defeat a properly supported motion for summary judgment."
*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

**\*2** In determining whether a genuine issue of material
fact exists, the court must resolve all ambiguities and draw
all reasonable inferences against the moving party. *Major*
*League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290,
309 (2d Cir. 2008). Where a party is proceeding *pro se*, the

2023 WL 3853811

court is obligated to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/ Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment").

## III. DEFICIENCIES IN PLAINTIFF'S OPPOSITION SUBMISSION

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen*, 351 F.3d at 50. In opposing Defendants' motion for summary judgment, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under Local Rule 56.1(b). [1] (*See* Dkt. No. 110.) "This requirement is not a mere formality; rather 'this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties.' " *Cao-Bossa v. New York State Dep't of Lab.*, No. 1:18-CV-0509 (GTS/TWD), 2021 WL 3674745, at *1 (N.D.N.Y. Aug. 19, 2021).

[1]     Local Rule 56.1(b) requires the opposing party to file a Response to the movant's Statement of Material Facts. Under the rule, the Response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 56.1(b).

Nevertheless, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary

judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).

In deference to Plaintiff's *pro se* status, the Court has reviewed the entire record. *See Parker v. Fantasia*, 425 F. Supp. 3d 171, 176 n.2 (S.D.N.Y. 2019) (noting that special solicitude afforded to *pro se* litigants suggests that courts should review the record when *pro se* plaintiff fails to appropriately respond to defendants' properly supported statement of material facts).

## IV. BACKGROUND

Plaintiff's claims stem from two specific incidents: the first on July 22, 2017, and the second on July 25, 2017. Plaintiff alleges on July 22, 2017, CO Stock was overlooking the gallery as he opened the cells for breakfast around 7:30AM and during that time, another inmate, Jason Williams ("Williams"), was able to enter Plaintiff's cell and sexually assault him. (Dkt. No. 83 at 3; Dkt. No. 108-4 at 22-23, 25; Dkt. No. 110 at 2-3.) The incident lasted around 3 minutes. (Dkt. No. 108-4 at 25.) Williams threatened to kill Plaintiff if he told anyone about the attack. (Dkt. No. 108-4 at 25-27.) Plaintiff alleges he would not have been assaulted if CO Stock would have made his rounds on time or pulled a pin during the attack. (Dkt. No. 83 at 1.)

**\*3** Plaintiff alleges CO Stock knew he was at serious risk of harm due to his background. Plaintiff was sexually assaulted at other facilities and previously identified as transgender. (Dkt. No. 83 at 2-3; Dkt. No. 108-4 at 48.) This information had supposedly spread throughout his block and the prison. (Dkt. No. 83 at 2-3; Dkt. No. 108-4 at 48.) As a result, other inmates loudly taunted him, but the COs did nothing about it. *Id.* Plaintiff claims CO Stock would overhear the inmates in other tiers harassing him and would then walk past Plaintiff's cell grinning at him "in a childlike manner" while he continued his rounds. (Dkt. No. 83 at 2-3.)

On July 25, 2017, CO Zehr was opening cells for the inmates after recreation at or around 10PM. (Dkt. No. 83 at 3-4; Dkt. No. 108-4 at 36.) The same inmate who assaulted Plaintiff three days prior, Williams, came up behind Plaintiff and cut his face with a razor. (Dkt. No. 108-4 at 35.) Plaintiff went back into his cell, but Williams followed him and cut Plaintiff's right arm before returning to his own cell. (Dkt. No. 108-4 at 35, 39-40.) The incident lasted about a minute and a half. (Dkt. No. 108-4 at 38.) CO Zehr allegedly stood at the end of the gallery watching as this occurred. (Dkt. No.

2023 WL 3853811

83 at 3-4.) According to Plaintiff, CO Zehr did not pull a pin or give attention to the situation. *Id.* Plaintiff also claims CO Zehr walked by his cell "smiling in a childish way" four to five minutes after the incident while Plaintiff was bleeding from his arm and face. (Dkt. No. 108-4 at 35-36, 40.) Plaintiff alleges he had to call CO Zehr back and ask him to go to the infirmary. (Dkt. No. 108-4 at 35-36.) CO Zehr allegedly told Plaintiff to wait, did his rounds, and then sent Plaintiff to the infirmary. (Dkt. No. 108-4 at 36.) Plaintiff still has scars on his face and arm from the incident. (Dkt. No. 108-4 at 46.)

Plaintiff claims as a result of the attacks on July 22 and July 25, 2017, other inmates have "tried" [2] him in the shower and while using the phone; spit in his food at every meal; took his commissary and packages; and extorted his mother for money —resulting in the police being called. (Dkt. No. 83 at 4.)

[2]    The Court interprets "tried" to mean other inmates attempted to assault or start an altercation with Plaintiff.

## V. DISCUSSION

Plaintiff claims COs Stock and Zehr failed to protect him from the July 22, 2017, and July 25, 2017, incidents, violating his Eighth Amendment rights. (Dkt. No. 83 at 1-4.) Plaintiff also claims COs Stock and Zehr treated him differently because he previously identified as transgender and because he murdered someone related to a CO, violating his Fourteenth Amendment equal protection rights. (Dkt. No. 83 at 3.) Defendants assert Plaintiff's claims fail as a matter of law because (1) COs Stock and Zehr were unaware of Plaintiff's risk of harm at the time of the two incidents; (2) Plaintiff was not a member of a protected class or treated differently from others similarly situated; and (3) Defendants' actions were not discriminatory. (Dkt. 108-5 at 7-14.) In the alternative, Defendants claim they are entitled to qualified immunity. (Dkt. 108-5 at 15.)

### A. Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause "bars the government from selective adverse treatment of individuals

compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish faith the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment." *Id.* (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.

**\*4** When a suspect classification is not at issue, the Equal Protection Clause still requires that individuals be treated the same as "similarly situated" individuals. *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012). Thus, a plaintiff may bring a "class of one" equal protection claim "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook*, 528 U.S. at 564. In the Second Circuit, class of one plaintiffs "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted). A high level of similarity between the plaintiff and comparators provides "an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose— whether personal or otherwise—is all but certain." *See Witt v. Vill. of Mamaroneck*, No. 12-CV-8778 (ER), 2015 WL 1427206, at \*5 (S.D.N.Y. Mar. 27, 2015), *aff'd*, 639 F. App'x 44 (2d Cir. 2016).

To summarize, to state a class of one claim, a plaintiff must allege (1) that he was intentionally treated differently from other similarly situated individuals; and (2) that the disparate treatment was either (a) "irrational and wholly arbitrary" or (b) motivated by animus. *Assoko v. City of New York*, 539 F. Supp. 2d 728, 735 (S.D.N.Y. 2008).

### 1. Suspect Class

Plaintiff claims COs Stock and Zehr "neglected" to protect or "ignored" Plaintiff because he had previously identified as transgender and because he murdered someone related to a CO. (Dkt. No. 83 at 3.) To start, Plaintiff has not demonstrated he was a member of a suspect class due to his gender identity. This Circuit has previously grappled with what level of scrutiny to apply to transgender individuals and whether transgender individuals are a suspect class for equal protection purposes. *See Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015); *White v. City of New York*, 206 F. Supp. 3d 920 (S.D.N.Y. 2016). However, Plaintiff no longer identified as transgender by the time the incidents occurred. (Dkt. No. 108-4 at 19-20.) Plaintiff testified he identified as transgender from 2009 to 2011. *Id.* In 2011, he began to identify as a cisgender [3] man again. *Id.* Because Plaintiff no longer identified as transgender at the time the incidents occurred in 2017, the Court need not determine which level of scrutiny applies to transgender individuals or whether transgender individuals are a suspect class. *See generally Adkins*, 143 F. Supp. 3d at 134; *White*, 206 F. Supp. 3d at 920. Alternatively, Plaintiff has not demonstrated any of the criteria needed to qualify "individuals who previously identified as transgender" as a suspect class. [4]

[3]      Cisgender means "of, relating to, or being a person whose gender identity corresponds with the sex the person had or was identified as having at birth." Cisgender, Merriam-Webster, https://www.merriam-webster.com/dictionary/cisgender (last accessed Feb. 27, 2023.)

[4]      In *Adkins*, the court used the four factors outlined in *Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012) in its determination that transgender individuals are a quasi-suspect class: (1) the group has suffered a history of persecution and discrimination; (2) the group has sufficiently discernable characteristic(s); (3) the group's characteristic(s) have no relation to ability to contribute to society; (4) the group is politically weakened or powerless. *Adkins*, 143 F. Supp. 3d at 139-40.

Moreover, Plaintiff was not a member of a suspect class as someone convicted of murder. *Lee v. Governor of State of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("prisoners either in the aggregate or specified by offense are not a suspect class"); *Mathie v. Dennison*, No. 06 CIV. 3184(GEL), 2007 WL 2351072, at *8 (S.D.N.Y. Aug. 16, 2007), *aff'd*, 381 F. App'x 26 (2d Cir. 2010) ("Prisoners are not a suspect class.... Nor are violent prisoners a suspect class." A history of violent crime is the very opposite of a morally irrelevant, immutable trait: it reflects a voluntary choice by the offender to commit a dangerous and harmful criminal act when he could have complied with the law); *Scott v. Dennison*, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) ("neither violent felons nor non-violent felons are a 'suspect class' under the United States Constitution.") Therefore, Plaintiff has not demonstrated he was a member of a suspect class at the time the incidents occurred.

### 2. Class of One

**\*5** Plaintiff has also not sufficiently demonstrated he is a class of one for equal protection purposes. Plaintiff must demonstrate both (1) he was intentionally treated differently from other similarly situated individuals; and (2) the disparate treatment was either (a) "irrational and wholly arbitrary" or (b) motivated by animus. *Assoko*, 539 F. Supp. 2d at 735. Plaintiff has provided no examples of similarly situated individuals for use of comparison. *Ruggiero v. Fischer*, 807 F. App'x 70, 74 (2d Cir. 2020) (finding the district court properly granted summary judgment on an equal protection claim when Plaintiff "made no showing at all that he was treated differently from SHU inmates at other institutions" and "did not attempt to identify a specific comparator at [his facility] or another facility with whom he had a high degree of similarity."); *Rasheen v. Adner*, 356 F. Supp. 3d 222, 242 (N.D.N.Y. 2019) (dismissing complaint when Plaintiff failed "to allege any facts suggesting how he was treated differently than any similarly situated inmate" and "Plaintiff's vague and conclusory allegations [were] insufficient to plausibly suggest an equal protection violation."); *Ippolito v. Goord*, No. 05-CV-6683 MAT, 2012 WL 4210125, at *19 (W.D.N.Y. Sept. 19, 2012) ("Plaintiff has offered no evidence that he was treated differently from other, similarly situated inmates. Accordingly, his 'class of one' equal protection claim fails as a matter of law and is dismissed."). As a result, the Court cannot determine if disparate treatment existed, and Plaintiff has not demonstrated he was a class of one for equal protection purposes. Therefore, the Court recommends granting Defendants' motion as to Plaintiff's Fourteenth Amendment equal protection claim. (Dkt. No. 108-5 at 10-16.)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 128 of 830

Salaam v. Stock, Not Reported in Fed. Supp. (2023)
2023 WL 3853811

## B. Eighth Amendment Failure to Protect Claims

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, and requires prison officials to take "reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)). In particular, prison officials "have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988) ("[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under [Section] 1983.").

To prevail on a failure to protect claim, a plaintiff must demonstrate two elements, one objective and one subjective. To satisfy the objective prong, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. That is, the deprivation "must be, in objective terms, 'sufficiently serious.' " *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The standard "contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Id.* (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990)). Under this standard, the plaintiff "must demonstrate that this grave harm was 'actual or imminent.' " *Dublin v. New York City Law Dep't*, No. 10 Civ. 2971 (LAP), 2012 WL 4471306, at *5 (S.D.N.Y. Sept. 26, 2012) (quoting *Benjamin v. Fraser*, 343 F.3d 35, 51 (2d Cir. 2003)).

As to the second prong, "[t]o prove deliberate indifference, the plaintiff must show that the 'official [knew] of and disregard[ed] an excessive risk to inmate health or safety.' " *Celestin v. Premo*, No. 9:12-cv-301 (GLS/RFT), 2014 WL 272443, at *5 (N.D.N.Y. Jan. 24, 2014) (quoting *Farmer*, 511 U.S. at 836) (alterations in original). Indeed, "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis in original). Mere negligence by a prison official will not suffice.

*Hayes*, 84 F.3d at 620; *Hathaway*, 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

In this case, Defendants do not deny the lacerations Plaintiff received constitute a serious harm for purposes of the objective prong. (Dkt. No. 108-5 at 7.) However, they do argue Plaintiff offered no evidence to satisfy the subjective prong of the test as to CO Stock or CO Zehr. *Id.*

### 1. CO Stock

**\*6** There is no indication CO Stock was aware of facts from which an inference could be drawn that Plaintiff was at a substantial risk of serious harm during the July 22, 2017, attack. CO Stock stated in his declaration on July 22, 2017, at 7:30AM, the First Officer went around to each company in A-Block and let the residents out for breakfast. (Dkt. No. 108-2 at 2). CO Stock served as Second Officer and followed behind the First Officer to inspect every A-Block cell to confirm it was vacant. *Id.* This is known as the "chow run." *Id.* CO Stock started from the fifth floor and made his way down to the second floor, where Plaintiff was housed in A-9. *Id.* CO Stock states he did not observe, encounter, or interact with Plaintiff on chow run that day. (Dkt. No. 108-2 at 3.) He further states he did not witness Williams enter Plaintiff's cell or assault him at any point on July 22, 2017. *Id.*

Plaintiff alleges the July 22, 2017, attack occurred sometime between 7 and 7:30AM. (Dkt. No. 108-4 at 23.) Plaintiff testified CO Stock was not nearby during the attack but was above him on "[the] second or third floor." (Dkt. No. 108-4 at 28.) Additionally, the summary judgment record does not demonstrate CO Stock was present in A-9 between 7 and 7:30AM on July 22, 2017. (Dkt. No. 108-2 at 2-3; Dkt. No. 108-4 at 28.) If CO Stock was not in A-9 during the attack, it does not appear it would have been possible for him to see or hear the attack, as companies on the same floor face away from each other and companies on separate floors are separated by concrete floors and walls. (Dkt. No. 108-2 at 2-3.) Therefore, it appears CO Stock was not and could not have been aware of a substantial risk of serious harm to Plaintiff during the attack.

Nor is there any evidence suggesting CO Stock was aware of a substantial risk of serious harm to Plaintiff prior to the attack. Plaintiff alleges CO Stock was aware of Plaintiff's risk of harm prior to the incident on July 22, 2017, due

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    5

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 129 of 830

Salaam v. Stock, Not Reported in Fed. Supp. (2023)

2023 WL 3853811

to the other inmates' loud taunting of Plaintiff about his gender identity and the sexual assaults at other prisons. (Dkt. No. 83 at 2-3; Dkt. No 108-4 at 47-48.) Plaintiff further claims CO Stock and other COs neglected him because he previously identified as transgender and because he murdered a CO's relative. (Dkt. No. 83 at 3.) However, the record evidence does not demonstrate CO Stock had any prior altercations with Plaintiff or had any prior knowledge of Plaintiff's gender identity or prior crimes; the sexual assaults at other prisons; or the other inmates' taunting of Plaintiff. (Dkt. No. 108-2 at 2; Dkt. No. 108-4 at 34.) Plaintiff offers no proof to the contrary beyond the conclusory allegation that CO Stock knew this information. (Dkt. No. 83 at 2-3.) "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Therefore, the Court recommends granting Defendants' motion on Plaintiff's Eighth Amendment failure to protect claim against CO Stock. (Dkt. No. 108-5 at 7-9.)

### 2. CO Zehr

The Court comes to a different recommendation with regard to the Eighth Amendment claim against CO Zehr. According to Plaintiff, on July 25, 2017, CO Zehr was opening cells for the inmates after recreation at or around 10PM. (Dkt. No 83 at 3-4; Dkt. No. 108-4 at 36.) During that time, Williams came up behind Plaintiff and cut his face with a razor. (Dkt. No. 108-4 at 35-36.) Plaintiff went back into his cell, but Williams followed him and cut Plaintiff's right arm before returning to his own cell. (Dkt. No. 108-4 at 35, 39-41.) The incident lasted about a minute and a half. (Dkt. No. 108-4 at 38.) CO Zehr allegedly stood at the end of the gallery watching as this occurred. (Dkt. No. 83 at 4.) According to Plaintiff, CO Zehr did not pull a pin or give attention to the situation. *Id.* As with CO Stock, Plaintiff claimed CO Zehr ignored or neglected him due to his prior gender identity and because he murdered someone related to a CO. (Dkt. No. 83 at 3.)

**\*7** CO Zehr states in his declaration that on the evening of July 25, 2017, he was assigned to A-9. (Dkt. No 108-3 at 2.) At approximately 10:05PM, the A-9 residents returned to their cells from recreation by walking up a stairwell. *Id.* CO Zehr was stationed between the stairwell and the front of the company, which is closest to Cell 1, directing residents to their respective cells. *Id.* He further states because he was the only officer in A-9 he could not leave his post. *Id.* At one point he observed Williams' "outstretched arm through [Plaintiff's]

cell bars" but "could not determine whose cell it belonged to" at the time. *Id.* He could not "observe who was inside or what Williams was doing with his extended hand." *Id.* However, he claims at the time he "believed Williams was trying to pass a pack of cigarettes or something similar." (Dkt. No. 108-3 at 3.) He confirmed Plaintiff's "cell bars were already closed" but "[s]hortly afterward" he "observed another incarcerated individual obstruct[ing] [his] view of the company." *Id.* CO Zehr then instructed Williams and the other inmate "to return to their cells, and they complied." *Id.* When all of the A-9 residents were locked in their cells, CO Zehr conducted the count at 10:10PM. *Id.* When he approached Plaintiff's cell, he observed Plaintiff "was bleeding from his face and arm," "immediately" notified his sergeant of the incident, and escorted Plaintiff to medical. *Id.* CO Zehr issued an Inmate Misbehavior Report to Williams as a result of the incident and testified at his August 8, 2017, disciplinary hearing. *Id.*

CO Zehr claims he had no prior altercations with Plaintiff or prior knowledge of his gender identity or previous crimes. (Dkt. No. 108-3 at 2.) He further claims he was not deliberately indifferent because "at no point on July 25, 2017, did [he] witness Williams cut [Plaintiff];" he did not have reason to suspect Plaintiff was at risk of being harmed; and he was unaware Plaintiff had been assaulted until he approached his cell. (Dkt. No. 108-3 at 3-4.)

However, CO Zehr's testimony at Williams' August 8, 2017, disciplinary hearing calls into question what he actually saw and inferred at the time of the July 25, 2017, incident. [5] (Dkt. No. 108-3 at 16, 17.) At the hearing, CO Zehr testified he saw Williams walking toward 21 cell and watched as Williams "stop[ped], talk[ed], reach[ed] his hand in [Plaintiff's cell] and *start[ed] making violent swinging motions inside the cell.*" (Dkt. No. 108-3 at 20 (emphasis added).) While he testified he could see down the company, he claimed he could not see a weapon from where he was positioned. (Dkt. No. 108-3 at 19-20.) While this was occurring, another inmate was acting as a "look out" and was watching CO Zehr "to see if [he] was paying attention to ... what was going on." (Dkt. No. 108-3 at 20.) Interestingly, at this point of the hearing, the hearing officer seemingly misstates CO Zehr's prior testimony by replying "now you couldn't see what was happening inside the cell, you saw his arm kind of moving" to which CO Zehr replied "[y]up." CO Zehr then went on to testify he did not know what was happening in the cell at the time; he did not see a weapon; and he "thought maybe [Williams] was trying to pass a pack of cigarettes or something." (Dkt. No. 108-3 at 24-25.) When asked what he normally does if he sees an

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 130 of 830

Salaam v. Stock, Not Reported in Fed. Supp. (2023)
2023 WL 3853811

inmate being assaulted or someone attempting to assault an inmate, CO Zehr testified "[u]sually I will call a response on my radio or if I have to yell to another officer. And then I wait for additional staff to arrive to properly deal with the situation. Then, as soon as that happens, we notify the supervisor and he also responds." (Dkt. No. 108-3 at 23.)

5      Defendants provide the August 8, 2017 disciplinary hearing transcript as Exhibit D of their Motion for Summary Judgment. (Dkt. No. 108-3 at 15.)

Plaintiff asserts CO Zehr watched as he was attacked by Williams the night of July 25, 2017, and did nothing. (Dkt. No. 83 at 3-4.) CO Zehr testified both that he believed Williams was handing Plaintiff cigarettes or something similar *and* that he saw Williams "making violent swinging motions inside [Plaintiff's] cell." (Dkt. No. 108-3 at 20, 24-25.) Crediting Plaintiff's claims and CO Zehr's hearing testimony, a reasonable jury could find CO Zehr knew of and disregarded an excessive risk to inmate health and safety upon observing Williams' and the other inmate's actions —rendering CO Zehr deliberately indifferent. *See Mills v. Fenger*, 216 F. App'x 7, 10 (2d Cir. 2006) ("[T]he state of the defendant's knowledge is normally a question of fact to be determined after trial.") (internal quotation marks omitted); *see also Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y. 1997), *aff'd sub nom. Heisler v. Rockland Cnty.*, 164 F.3d 618 (2d Cir. 1998) (denying defendant's motion for summary judgment where the plaintiff alleged that another inmate, whom plaintiff had no alleged previous altercations with, attacked him while he was being held as a pretrial detainee, and officers witnessed the assault but failed to intercede to stop it); *Stewart v. Schiro*, No. 13-CV-3613 (NGG)(VMS), 2015 WL 1854198, at *8 (E.D.N.Y. Apr. 22, 2015) ("[U]nder certain circumstances, the commencement of an inmate-to-inmate altercation could put a prison official on sufficient notice to render the prison official deliberately indifferent if he or she then fails to intervene in an appropriate manner"); *Candelaria v. Coughlin*, No. 91 Civ. 2978, 1996 WL 88555, at *9 (S.D.N.Y. Mar. 1, 1996) (inaction by a correction officer to intercede and halt an attack by a fellow prisoner is sufficient basis for deliberate indifference).

 **\*8**  In short, the record evidence provides differing accounts of what transpired on the night of the July 25, 2017, incident and resolving what happened is a question for the jury. "While the weight of the evidence may favor [Defendants], the evidence is not so conclusive that a reasonable jury could not believe Plaintiff's assertions." *Lewis v. Hanson*, No. 18-CV-0012 (LEK/DJS), 2022 WL 991729, at *9 (N.D.N.Y.

Mar. 31, 2022) (citing *Franklin v. Oneida Corr. Facility*, No. 03-CV-1452 (LEK), 2008 WL 2690243, at *9 (N.D.N.Y. July 1, 2008) ("As tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted.")); *see, e.g., Cicio v. Lamora*, No. 08-CV-431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), *report-recommendation adopted by* 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) ("Plaintiff's testimony that he was beaten by [Defendant] stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact.").

Relatedly, the Court finds CO Zehr is not entitled to qualified immunity at this stage of the proceeding. *See Villante v. Vandyke*, No. 9:04CV759 FJS DRH, 2008 WL 163596, at *3 (N.D.N.Y. Jan. 15, 2008) ("Since [p]laintiff has raised an issue of fact about whether [d]efendants stood by and allowed other inmates to attack him ... [d]efendants are not entitled to qualified immunity"); *Decayette v. Goord*, No. 9:06-CV-783, 2009 WL 1606753, at *12 (N.D.N.Y. June 8, 2009) (finding defendant should not be entitled to summary judgment on qualified immunity claim because triable issues of fact existed as to whether she was deliberately indifferent to a serious medical need of Plaintiff's and as to whether she was liable for failing to intervene during the alleged beating of Plaintiff); *Rosen v. City of New York*, 667 F. Supp. 2d 355, 362 (S.D.N.Y. 2009) (denying summary judgment on defendants' qualified immunity claim where genuine issue of material fact existed as to whether it was reasonable for city corrections officer to believe that shouting at inmates to stop beating pretrial detainee fulfilled his duty to protect detainee).

In sum, as to the July 25, 2017, incident, Defendants have not met their burden of showing there is no genuine issue of material fact as to Plaintiff's Eighth Amendment failure to protect claim against CO Zehr. Accordingly, the Court recommends denying Defendants' motion for summary judgment as to this claim.

## VI. CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 108) be **GRANTED** in part and **DENIED** in part as follows: (1) the Fourteenth Amendment equal protection claim against both Defendants be dismissed; (2) the Eighth Amendment failure to protect claim against Defendant CO Stock be dismissed; and (3) the Eighth Amendment failure to protect claim against Defendant CO Zehr proceed to trial; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[6] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[6]    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**\*9  SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3853811

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 132 of 830

Salaam v. Stock, Not Reported in Fed. Supp. (2023)

2023 WL 3579770

2023 WL 3579770
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rashad SALAAM, Plaintiff,

v.

Gordon STOCK and Travis M. Zehr, Defendants.

9:19-cv-00689 (AMN/TWD)
|
Signed May 22, 2023

**Attorneys and Law Firms**

RASHAD SALAAM, 14-A-3363, Clinton Correctional
Facility, P.O. Box 2001, Dannemora, NY 12929, Plaintiff, pro
se.

LETITICA JAMES, Attorney General of the State of New
York, STEVE NGUYEN, ESQ., The Capitol, Albany, NY
12224, Attorney for Defendant, Assistant Attorney General.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci, United States District Judge:

**I. INTRODUCTION**

 **\*1**  On May 30, 2019, plaintiff *pro se* Rashad Salaam
("Plaintiff"), an inmate in the custody of the New York
State Department of Corrections and Community Supervision
("DOCCS"), commenced this action pursuant to 42 U.S.C. §
1983. *See* Dkt. No. 1. Plaintiff sought and was granted leave
to proceed *in forma pauperis*. Dkt. Nos. 11 & 15. Plaintiff's
fourth amended complaint ("FAC") was accepted for filing
on August 11, 2021, in which Plaintiff alleged Fourteenth
Amendment equal protection and Eighth Amendment failure
to protect claims against Corrections Officer ("CO") Gordon
Stock and CO Travis Zehr (collectively, "Defendants").
*See* Dkt. No. 83. On July 20, 2022, Defendants filed a
motion for summary judgment seeking dismissal of the
FAC. *See* Dkt. No. 108. This matter was referred to
United States Magistrate Judge Thérèse Wiley Dancks, who,
on February 27, 2023, issued a Report-Recommendation
and Order ("Report-Recommendation"), recommending that
Defendants' motion for summary judgment, Dkt. No. 108,
be granted in part and denied in part. *See* Dkt. No. 115
at 19. Magistrate Judge Dancks advised that under 28
U.S.C. § 636(b)(1), the parties had fourteen days within

which to file written objections and that failure to object
to the Report-Recommendation within fourteen days would
preclude appellate review. *Id.* Plaintiff timely filed a response
to the Report-Recommendation. Dkt. No. 116.

For the reasons stated herein, the Court adopts the
recommendations in the Report-Recommendation.

**II. BACKGROUND** [1]

[1]     Plaintiff's factual allegations are detailed in the
        Report-Recommendation. *See* Dkt. No. 115 at 5-6.

Plaintiff alleges that he [2] was sexually assaulted on July
22, 2017, and physically assaulted on July 25, 2017, by
another inmate, Jason Williams ("Williams"), while he was
incarcerated at Auburn Correctional Facility ("Auburn C.F.").
*See* Dkt. No. 83. According to Plaintiff, at approximately 7:30
a.m. on July 22, 2017, Williams entered Plaintiff's cell and
sexually assaulted him for approximately three minutes while
CO Stock was overlooking the gallery and opening the cells
for breakfast in Plaintiff's cell block. Dkt. No. 83 at 3; Dkt.
No. 108-4 at 22-23, 25. [3] Plaintiff did not report the attack
at the time because Williams threatened to kill him if he told
anyone about the attack. Dkt. No. 108-4 at 25-27. Plaintiff
contends that he would not have been assaulted if CO Stock
had made his rounds on time or pulled a pin during the attack.
Dkt. No. 83 at 1.

[2]     Because Plaintiff has alleged and testified that he
        no longer identifies as transgender, the Court will
        refer to Plaintiff as "he" or "him" herein.

[3]     Citations to Court documents utilize the pagination
        generated by CM/ECF docketing system and not
        the documents' internal pagination.

Plaintiff alleges that he was physically assaulted on July 25,
2017, by Williams, when CO Zehr was opening cells for
inmates after recreation at or around 10 p.m. Dkt. No. 83 at
3-4; Dkt. No. 108-4 at 36. According to Plaintiff, Williams
came up behind him and cut his face with a razor. Dkt. No.
108-4 at 35. Plaintiff went back into his cell, but Williams
followed him and cut Plaintiff's right arm before returning to
his own cell. Dkt. No. 108-4 at 35, 39-40. Plaintiff contends
that CO Zehr stood at the end of the gallery watching as
Williams assaulted him. Dkt. No. 83 at 3-4. Plaintiff alleges
that CO Zehr did not pull a pin or otherwise give attention to
the situation. *Id.* Plaintiff also claims CO Zehr walked by his
cell "smiling in a childish way" four to five minutes after the

2023 WL 3579770

incident while Plaintiff was bleeding from his face and arm. Dkt. No. 108-4 at 35-36, 40. Plaintiff further alleges he had to call CO Zehr back and ask him to go to the infirmary. Dkt. No. 108-4 at 35-36. CO Zehr allegedly told Plaintiff to wait, completed his rounds, and then sent Plaintiff to the infirmary. Dkt. No. 108-4 at 36. Plaintiff still has scars on his face and arm from the incident. Dkt. No. 108-4 at 46.

**\*2** Plaintiff contends that he was "neglected" or "ignored" by CO Stock and CO Zehr because he previously identified as transgender and because he was convicted of murdering someone who was related to a CO. Dkt. No. 83 at 3. Plaintiff further contends that the fact that he previously identified as transgender and had a history of being sexually assaulted in other DOCCS facilities had spread throughout his block and the prison. Dkt. No. 83 at 2-3; Dkt. No. 108-4 at 48. As a result, other inmates loudly taunted him, and thus the Auburn C.F. COs had knowledge of Plaintiff's background. *See* Dkt. No. 83 at 2-3.

## III. STANDARD OF REVIEW

### A. Summary Judgment

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (emphasis in original). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Moreover, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *See Chambers*, F.3d at 36-37 (quotation and other citation omitted). Any assessments of credibility and all choices between available inferences are matters to be left for a jury, not matters to be decided by the Court on summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (citing Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable factual inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing, *inter alia*, *Anderson*, 477 U.S. at 255).[4] Where a party is proceeding *pro se*, like here, the court must "read his supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). "However, a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

> [4] Where, as here, the non-movant fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n. 5 (2d Cir. 2003) (holding that not verifying in the record the assertions in a motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### B. Review of Report-Recommendation

A district court reviews *de novo* those portions of a magistrate judge's report-recommendations that have been properly preserved with a specific objection. 28 U.S.C. § 636(b)(1)(C). "To be 'specific,' the objection must, with particularity, 'identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection.' " *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012) (alteration in original) (quoting N.D.N.Y. Local Rule 72.1(c)). When a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [previously] presented to the magistrate judge," the district court reviews a magistrate judge's report-recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322 (TJM) (DRH), 2011 WL 933846, at \*1 (N.D.N.Y. Mar. 16, 2011) (citations omitted); *accord Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) (a "statement, devoid of any reference to specific findings or recommendations to which [the plaintiff] objected and why, and unsupported by legal authority, was not sufficient to preserve" a claim).

**\*3** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289

Salaam v. Stock, Not Reported in Fed. Supp. (2023)

2023 WL 3579770

F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (additional citations omitted). The Second Circuit has held that courts are obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan*, 289 F. Supp. 2d at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). That said, "even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal ...." *Machicote v. Ercole*, No. 06 Civ. 13320 (DAB)(JCF), 2011 WL 3809920, at *2, (S.D.N.Y. Aug. 25, 2011) (citation omitted); *accord Caldwell v. Petros*, No. 1:22-cv-567 (BKS/CFH), 2022 WL 16918287, at *1 (N.D.N.Y. Nov. 14, 2022). After appropriate review, "the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]." 28 U.S.C. § 636(b)(1)(C).

## IV. DISCUSSION

Defendants did not file objections to the Report-Recommendation. In response to the Report-Recommendation, Plaintiff submitted a document docketed as an objection. Dkt. No. 116. However, Plaintiff's submission restates certain of the allegations in the FAC, *compare* Dkt. No. 116, *with* Dkt. No. 83, and does not reference the Report-Recommendation or identify any objection to the analysis in the Report-Recommendation.[5] Plaintiff has thus failed to preserve an objection. Therefore, the Court reviews the Report-Recommendation for clear error.

[5]    Although it is titled "Written Objection," Plaintiff's document presents as more akin to a settlement demand than as an objection to the Report-Recommendation. *See* Dkt. No. 116. Instead of the $100,000 in monetary damages initially sought, Plaintiff states that he now seeks $5,000 in monetary damages to resolve his Eighth Amendment failure to protect claim against CO Zehr. *See id.*

### A. Plaintiff's Equal Protection Claim

Magistrate Judge Dancks recommended that Plaintiff's Fourteenth Amendment equal protection claim against Defendants be dismissed. Dkt. No. 115 at 19. For the reasons stated below, the Court adopts Magistrate Judge Dancks' recommendation.

### i. Legal Standard

"The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citations omitted). Where there are no allegations of membership in a suspect or protected class, the plaintiff may still prevail on an equal protection claim under either a selective enforcement or a class of one theory.[6] *See Cobb v. Pozzi*, 363 F.3d 89, 109-11 (2d Cir. 2004); *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013); *see also Emblen v. Port Authority of New York/New Jersey*, No. 00 Civ. 8877 (AGS), 2002 WL 498634, at *7 (S.D.N.Y. Mar. 29, 2002) (allowing plaintiff's equal protection claim under the class of one theory to proceed where the plaintiff was not homosexual but alleged that he was perceived and discriminated against as such) (citing *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)).

[6]    The Second Circuit treats claims under the selective enforcement theory and the class of one theory as separate claims. *See Casciani v. Nesbitt*, 392 F. App'x. 887, 888 (2d Cir. 2010) (summary order); *Gentile v. Nulty*, 769 F. Supp. 2d 573, 579 (S.D.N.Y. 2011) (noting that courts in the Second Circuit "have generally treated selective enforcement and class of one theories as distinct theories with distinct elements of proof." (citations and internal quotation marks omitted)).

**\*4** To state a claim under the selective enforcement theory, "a plaintiff must allege facts supporting a conclusion that 1) he was 'treated differently from other similarly situated' comparators, and 2) 'that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Missere v. Gross*, 826 F. Supp. 2d 542, 560 (S.D.N.Y. 2011) (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (internal quotation marks omitted)). Finally, a plaintiff can state an equal protection claim under the "class of one" theory by alleging that he has been intentionally and "irrationally singled out." *Engquist v. Or. Dep't of Agric.*, 553

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 135 of 830

Salaam v. Stock, Not Reported in Fed. Supp. (2023)

2023 WL 3579770

U.S. 591, 601 (2008). A plausible class of one claim requires the plaintiff to demonstrate an "extremely high degree of similarity" with the person to whom he is comparing himself to. *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (citation and internal quotation marks omitted).

### ii. Application

Plaintiff contends that his Fourteenth Amendment rights were violated on two separate occasions by two different DOCCS corrections officers. [7] *See* Dkt. No. 83. Plaintiff alleges that CO Stock violated his Fourteenth Amendment rights when he failed to protect him from being sexually assaulted by Williams on July 22, 2017. *Id.* at 1. Plaintiff also alleges that CO Zehr failed to protect him from being physically assaulted by Williams on July 25, 2017. *Id.* at 3-4. Plaintiff contends that Defendants failed to protect him from being assaulted for two reasons: (1) because he was convicted of murdering someone related to a CO; and (2) because he previously identified as transgender. *Id.* at 3.

[7]     Plaintiff uses the words "neglected" and "ignored" to describe the basis for his equal protection claim against Defendants. Dkt. No. 83 at 3. Construing Plaintiff's submissions and arguments liberally, the Court understands Plaintiff to be alleging that Defendants failed to protect him from being sexually and physically assaulted by Williams.

### 1. CO Stock

As an initial matter, Plaintiff has no legally cognizable claim under the Fourteenth Amendment against CO Stock. It is undisputed that CO Stock was not physically present for, involved in, or a witness to Plaintiff's alleged sexual assault by Williams on July 22, 2017. *See* Dkt. No. 108-2 at 2-3; Dkt. No. 108-4 at 27-28. The summary judgment record, including Plaintiff's testimony, demonstrates that CO Stock was not present at the time the sexual assault occurred. [8] *Id.* Therefore, the evidence before the Court fails to establish that CO Stock treated Plaintiff differently than those similarly situated—he simply was not present in Plaintiff's cell block at the time of the alleged assault and thus could not have engaged in any treatment of Plaintiff whatsoever with respect to the alleged assault. *Id.* Therefore, the Court adopts

Magistrate Judge Dancks' recommendation that Plaintiff's equal protection claim against CO Stock be dismissed.

[8]     Plaintiff alleges that he was sexually assaulted by Williams because CO Stock failed to pull a pin and/or failed to timely complete his rounds. Dkt. No. 83 at 1. Plaintiff's allegations are refuted by the summary judgment record. First, CO Stock could not have pulled a pin because he was not present—and was not supposed to be present—on Plaintiff's cell block at the time the alleged assault occurred, and second, CO Stock performed his duties consistent with his established schedule. *See* Dkt. No. 108-2 at 2-3; Dkt. No. 108-4 at 27-28.

### 2. CO Zehr

The Court also adopts Magistrate Judge Dancks' recommendation that Plaintiff's equal protection claim against CO Zehr be dismissed. Magistrate Judge Dancks correctly found that Plaintiff's equal protection claim against CO Zehr fails as a matter of law. *See* Dkt. No. 115 at 7-10.

**\*5** The Court will first address whether Plaintiff is a member of an identifiable or suspect class. Plaintiff alleges two different bases for his equal protection claim, which the Court will analyze separately. Beginning with Plaintiff's contention that CO Zehr failed to protect him because he was convicted of murdering someone related to a corrections officer—Plaintiff is not a member of a suspect class because he was convicted of murdering someone related to a corrections officer. *See Lee v. Governor of State of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("prisoners either in the aggregate or specified by offense are not a suspect class"); *Mathie v. Dennison*, No. 06 CIV. 3184 (GEL), 2007 WL 2351072, at \*8 (S.D.N.Y. Aug. 16, 2007), *aff'd*, 381 F. App'x 26 (2d Cir. 2010) ("Prisoners are not a suspect class .... Nor are violent prisoners a suspect class. A history of violent crime is the very opposite of a morally irrelevant, immutable trait: it reflects a voluntary choice by the offender to commit a dangerous and harmful criminal act when he could have complied with the law."); *Scott v. Dennison*, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) ("neither violent felons nor non-violent felons are a 'suspect class' under the United States Constitution").

The Court next addresses Plaintiff's contention that CO Zehr failed to protect him because he previously identified as transgender. Defendants argue that Plaintiff is not a member

2023 WL 3579770

of a suspect class because Plaintiff did not identify as transgender at the time the alleged assaults occurred. *See* Dkt. No. 108-5 at 12-13. Defendants also argue that even if Plaintiff was transgender at the time the alleged assaults occurred, Plaintiff would not be entitled to heightened scrutiny because there is no Supreme Court or Second Circuit case addressing whether transgender individuals are members of a protected or suspect class. *See id.* at 12.

First, Defendants are correct that Plaintiff is not a member of a protected or suspect class because he previously identified as transgender. Plaintiff testified that he was born a male and currently identifies as male. Dkt. No. 108-4 at 18. Plaintiff also testified that he identified as transgender from 2009 to 2011 but ceased to do so when he was incarcerated in 2011. *Id.* at 19. Thus, for purposes of resolving CO Zehr's motion for summary judgment as to Plaintiff's equal protection claim, the Court need not determine whether transgender persons are members of a protected or suspect class because Plaintiff in this action does not currently identify as transgender.[9]

[9]    The Court notes that Plaintiff need not be a member of a protected or suspect class to proceed with an equal protection claim under a selective enforcement or class of one theory. The Court assesses the sufficiency of such claims *infra*.

However, the Court notes that Defendants are correct in that neither the Supreme Court nor the Second Circuit has provided guidance on this point. Moreover, there is a lack of uniformity among the district courts in this Circuit that have addressed the question of whether transgender plaintiffs are members of a protected class whose equal protection claims are entitled to heightened scrutiny. *Compare Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2016) (concluding that transgender persons are a quasi-suspect class and are thus entitled to intermediate scrutiny) *with White v. City of New York*, 206 F. Supp. 3d 920, 933 (S.D.N.Y. 2016) (concluding that neither the Supreme Court nor the Second Circuit has held that transgender persons are members of a protected class whose claims are entitled to heightened scrutiny). The *Adkins* court relied on the four-factor test set forth in *Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012), in which the Second Circuit held that homosexual persons are a quasi-suspect class and are entitled to intermediate scrutiny. 143 F. Supp. 3d at 139-140. The *Adkins* court acknowledged that although transgender individuals and homosexual individuals are not identical, they are "similarly situated with respect to each of *Windsor's* four

factors[,]" because transgender individuals have "suffered a history of persecution and discrimination," "transgender status bears no relation to the ability to contribute to society," "transgender status is a sufficiently discernable characteristic to define a discrete minority class," and "transgender people are a politically powerless minority."[10] *Id.* at 139. Thus, the *Adkins* court held that *Windsor* clearly established equal protection rights for not only homosexual individuals, but also transgender individuals. *Id.* at 139-140; *see also Johnson v. Padin*, No. 3:20-CV-637 (CSH), 2020 WL 4818363, at *3 (D. Conn. Aug. 16, 2020). By contrast, in *White*, which was decided approximately a month later than *Adkins*, the court declined to extend the holding in *Windsor* to transgender plaintiffs. *White*, 206 F. Supp. 3d at 933 ("While there is certainly an argument to be made that the *Windsor* holding should be expanded to transgender persons ... it [is] not the clearly established law of this Circuit ..."); *see Shtilman v. Makram*, No. 14-CV-6589 (NSR), 2018 WL 3745670, at *7 (S.D.N.Y. Aug. 6, 2018) (stating that neither the Supreme Court nor the Second Circuit has held that transgender individuals are members of a protected class).

[10]    Although *Adkins* found that the plaintiff established a violation of the Fourteenth Amendment, the court granted the individual defendants' motion to dismiss because qualified immunity applied. *Adkins*, 143 F. Supp. 3d at 140. The court held that qualified immunity applied because plaintiff's rights were not clearly established at the time of his arrest, which occurred a year prior to the decision in *Windsor v. United States*. *Id.*

**\*6** Even assuming *arguendo* that Plaintiff still identified as transgender at the time of the alleged assaults and adequately alleged intentional or purposeful discrimination on the part of CO Zehr, Plaintiff's equal protection claim against CO Zehr would be dismissed because CO Zehr is entitled to qualified immunity. Qualified immunity shields government officials from liability for money damages for violation of a right under federal law if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It allows government officials to make reasonable judgments and is said to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Qualified immunity bars a plaintiff's claim unless (1) the official violated a statutory or constitutional right, and (2) that right was clearly established at the time of the challenged

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 137 of 830

Salaam v. Stock, Not Reported in Fed. Supp. (2023)

2023 WL 3579770

conduct." *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023) (citing *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019)). A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011). "To determine whether a law is clearly established, this Court considers 'the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law.' " *Matzell*, 64 F.4th at 434 (quoting *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)). Because it was not (and still is not) the clearly established law of this Circuit that transgender plaintiffs are members of a protected or suspect class whose equal protection claims are entitled to heightened scrutiny, CO Zehr "could not be expected to anticipate that [his] actions would be subject to any standard more stringent than rational basis review," *see White*, 206 F. Supp. 3d at 933, and is therefore entitled to qualified immunity on Plaintiff's equal protection claim. *See id.* (holding that qualified immunity applied to the individual defendants because plaintiff's rights were not clearly established at the time of the alleged discrimination occurred); *Adkins*, 143 F. Supp. 3d at 140 (same).

The Court next considers whether Plaintiff has alleged a cognizable equal protection claim under either a selective enforcement or a class of one theory. The Court finds that Plaintiff has failed to do so. Plaintiff's claim under these theories fails because he does not allege any facts from which the Court can discern that he was treated differently from similarly situated inmates. *See Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011) ("There are two types of equal protection claims that require similarly situated comparators ... selective enforcement or selective treatment claims ... [and] 'class of one' claims ..."); *see also Ruggiero v. Fischer*, 807 F. App'x 70, 74 (2d Cir. 2020) ("[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and persons to whom they compare themselves.") (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). Plaintiff only alleges that he was "ignored" and "neglected" by CO Zehr because he previously identified as transgender and/or because he was convicted of murdering someone related to a CO. Dkt. No. 83 at 3. He identifies no comparators. *See generally* Dkt. No. 83. These factual allegations are insufficient to demonstrate disparate treatment from those similarly situated, even with recognition of

Plaintiff's *pro se* status. Accordingly, the Court adopts Magistrate Judge Dancks' recommendation that Defendants' motion for summary judgment be granted as to Plaintiff's Fourteenth Amendment equal protection claim against CO Zehr.

**B. Plaintiff's Failure to Protect Claim**

Magistrate Judge Dancks recommended that Plaintiff's Eighth Amendment failure to protect claim against CO Stock be dismissed, but that Plaintiff's Eighth Amendment failure to protect claim against CO Zehr proceed to trial. Dkt. No. 115 at 19. For the reasons stated below, the Court adopts these recommendations.

To prevail on a failure to protect claim, a plaintiff must demonstrate two elements, one that is subjective, and one that is objective. *See Farmer v. Brennan*, 511 U.S. 825, 828-34 (1994). To satisfy the objective prong, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. To satisfy the subjective prong, the plaintiff must prove deliberate indifference on the part of the official. *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 833). That is, "the plaintiff must show that the 'official [knew] of and disregard[ed] an excessive risk to inmate health or safety.' " *Celestin v. Premo*, No. 9:12-cv-301 (GLS/RFT), 2014 WL 272443, at *5 (N.D.N.Y. Jan. 24, 2014) (quoting *Farmer*, 511 U.S. at 836) (alterations in original). Moreover, the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis in original). Mere negligence by a prison official will be insufficient to establish deliberate indifference. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

**\*7** Magistrate Judge Dancks correctly concluded that Plaintiff cannot satisfy the elements of a failure to protect claim against CO Stock. *See* Dkt. No. 115 at 12-14. As a threshold matter, Plaintiff's failure to protect claim against CO Stock fails for the same reason his equal protection claim against CO Stock fails. As discussed in Section IV.A.ii.1 *supra*, there is simply no evidence that CO Stock was on Plaintiff's cell block at the time Plaintiff alleges the sexual assault occurred. *See* Dkt. No. 108-2 at 2-3; Dkt. No. 108-4 at 28. As such, CO Stock could not have prevented Williams from allegedly sexually assaulting Plaintiff on July 22, 2017.

2023 WL 3579770

Moreover, Plaintiff has not adequately alleged that CO Stock was aware prior to (or at the time of) the sexual assault that Plaintiff previously identified as transgender and that he had been sexually assaulted at previous DOCCS facilities, such that there was a substantial risk of serious harm to Plaintiff to which CO Stock was deliberately indifferent. [11] In sum, Plaintiff has failed to allege facts sufficient to establish a failure to protect claim against CO Stock. Accordingly, the Court adopts Magistrate Judge Dancks' recommendation that Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment failure to protect claim against CO Stock be granted.

[11]     In the FAC, Plaintiff simply refers to "he" in the sentences in which he describes his bases for why he believes that the COs "allowed" him to be assaulted by Williams. *See* Dkt. No. 83 at 2 ("*He* overheard inmates from the other tiers harassing me about my sexuality and everything else. *He* knew this were (sic) an ongoing issue of mine, where I have been raped on several occasions at other facilities." (emphasis added)). Even with recognition of Plaintiff's *pro se* status and the solicitude afforded therewith, the Court cannot speculate as to who "he" is—"he" could be CO Stock, CO Zehr, or some unnamed CO. *See also* Dkt. 115 at 13-14.

In addition, Magistrate Judge Dancks correctly concluded that Plaintiff's Eighth Amendment failure to protect claim against CO Zehr should proceed to trial because a reasonable jury could find that CO Zehr was deliberately indifferent to an excessive risk to inmate health and safety when he failed to intervene at the time that he saw Williams "making violent swinging motions" inside Plaintiff's cell during the alleged assault on July 25, 2017. Dkt. No. 115 at 15 (citing Dkt. No. 108-3 at 20). The Court adopts Magistrate Judge Dancks' recommendation that Defendants' motion for summary judgment be denied as to Plaintiff's Eighth Amendment failure to protect claim against CO Zehr. *See, e.g.*, *Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y. 1997), *aff'd sub nom.* *Heisler v. Rockland Cnty.*, 164 F.3d 618 (2d Cir. 1998) (denying defendant's motion for summary judgment where the plaintiff alleged that another inmate, whom plaintiff had no alleged previous altercations with, attacked him while he was being held as a pretrial detainee, and officers witnessed the assault but failed to intercede to stop it); *Stewart v. Schiro*, No. 13-CV-3613 (NGG)(VMS), 2015 WL 1854198, at *8 (E.D.N.Y. Apr. 22, 2015) ("under certain circumstances, the

commencement of an inmate-to-inmate altercation could put a prison official on sufficient notice to render the prison official deliberately indifferent if he or she then fails to intervene in an appropriate manner"); *Candelaria v. Coughlin*, No. 91 Civ. 2978, 1996 WL 88555, at *9 (S.D.N.Y. Mar. 1, 1996) (inaction by a correction officer to intercede and halt an attack by a fellow prisoner is sufficient basis for deliberate indifference). Additionally, the Court agrees with Magistrate Judge Dancks' finding that CO Zehr is not entitled to qualified immunity, *see* Dkt. No. 115 at 18, because Plaintiff has raised a question of fact with respect to this claim. *See, e.g.*, *Decayette v. Goord*, No. 9:06-CV-783, 2009 WL 1606753, at *12 (N.D.N.Y. June 8, 2009) (finding defendant was not entitled to summary judgment on qualified immunity grounds because triable issues of fact existed as to whether she was deliberately indifferent to a serious medical need of Plaintiff's and as to whether she was liable for failing to intervene during the alleged beating of Plaintiff).

Having reviewed the Report-Recommendation for clear error, and found none, the Court adopts the recommendations in the Report-Recommendation.

## V. CONCLUSION

**\*8**  Accordingly, the Court hereby

**ORDERS** that the recommendations in the Report-Recommendation, Dkt. No. 115, are **ADOPTED** for the reasons stated herein; and the Court further

**ORDERS** that Defendants' motion for summary judgment, Dkt. No. 108, is **GRANTED** in part and **DENIED** in part. The motion is granted in that the following claims are **DISMISSED**: the Fourteenth Amendment equal protection claim against both Defendants and the Eighth Amendment failure to protect claim against Defendant CO Stock. The motion is **DENIED** as to the Eighth Amendment failure to protect claim against Defendant CO Zehr; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Case 9:19-cv-00109-ECC-MJK     Document 410     Filed 02/21/25     Page 139 of 830

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3579770

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

2020 WL 5504011
United States District Court, N.D. New York.

Terese MEAGHER, Plaintiff,
v.
STATE UNIVERSITY CONSTRUCTION
FUND; Robert Haelen, in his official and
individual capacity; and Joanne Di Stefano, in
her official and individual capacity, Defendants.

1:17-CV-0903 (GTS/CFH)
|
Signed 09/11/2020

**Attorneys and Law Firms**

TABNER, RYAN & KENIRY, LLP, Counsel for Plaintiff,
18 Corporate Woods Boulevard, Albany, NY 12211, OF
COUNSEL: THOMAS R. FALLATI, ESQ.

HON. LETITIA JAMES, Attorney General for the State of
New York, Counsel for Defendants, The Capitol, Albany,
NY 12224, OF COUNSEL: BRIAN W. MATULA, ESQ.,
Assistant Attorney General

GIRVIN & FERLAZZO, P.C., Co-Counsel for Defendants,
20 Corporate Woods Boulevard, Albany, NY 12211, OF
COUNSEL: PATRICK J. FITZGERALD III, ESQ.

**DECISION and ORDER**

Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this employment
discrimination action filed by Terese Meagher ("Plaintiff")
against the State University Construction Fund ("Fund"),
Robert Haelen, and Joanne Di Stefano ("Defendants"), is
Defendants' motion for summary judgment. (Dkt. No. 59.)
For the reasons set forth below, Defendants' motion is
granted.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Second Amended Complaint**
Generally, in her Second Amended Complaint, Plaintiff
asserts the following seven claims against all Defendants
(unless otherwise indicated): (1) a claim for gender
discrimination in violation of Title VII of the Civil Rights Act

of 1964 ("Title VII"); (2) a claim for retaliation in violation
of Title VII; (3) a claim that Defendants Haelen and Di
Stefano violated her right to equal protection pursuant to
the Fourteenth Amendment of the United States Constitution
and 28 U.S.C. § 1983; (4) a claim that Defendants Haelen
and Di Stefano retaliated against her in violation of the First
Amendment of the United States Constitution and 28 U.S.C.
§ 1983; (5) a claim that Defendants Haelen and Di Stefano
violated her substantive due process rights pursuant to the
Fourteenth Amendment of the United States Constitution and
28 U.S.C. § 1983; (6) a claim for gender and familial status
discrimination in violation of the New York State Human
Rights Law ("NYSHRL"); and (7) a claim for retaliation in
violation of the NYSHRL. [1] (Dkt. No. 42 [Pl.'s Compl.].)

[1]     As Plaintiff acknowledges in her Second Amended
        Complaint, the first, third, fourth, fifth, and sixth
        of these claims were dismissed by the Court in its
        Decision and Order of June 21, 2018.

As a result of the Court's Decision and Order of June 21, 2018,
only the following claims survive at the time of this motion
for summary judgment: (1) Plaintiff's claim for retaliation
pursuant to Title VII; (2) Plaintiff's claim for discrimination/
hostile work environment pursuant to the NYSHRL based
on her familial status; and (3) Plaintiff's claim for retaliation
pursuant to the NYSHRL. (Dkt. No. 17 [Decision and Order
filed June 21, 2018].)

**B. Undisputed Material Facts on Defendants' Motion
for Summary Judgment**
The following facts were asserted and supported with
accurate record citations by Defendants in their Statement of
Material Facts and either expressly admitted by Plaintiff or
denied without appropriate record citations in her response
thereto. (*Compare* Dkt. No. 59, Attach. 1 [Defs.' Rule 7.1
Statement] *with* Dkt. No. 66 [Pl.'s Rule 7.1 Resp.].)

1. The Fund is a New York public benefit corporation which
oversees the construction of projects for the State University
of New York system.

2. Plaintiff was hired in June 2009 as an Associate Counsel in
the Fund's legal department.

3. Plaintiff's primary job responsibilities were advising the
Fund regarding legal issues, particularly those involving
construction contracts and insurance, and handling pending

and threatened litigation involving the Fund, which included assisting the New York State Attorney General's office.

**\*2** 4. Bill Barczak, the Fund Counsel at the time Plaintiff was hired, was Plaintiff's direct supervisor and was the only other attorney in the Fund's legal department from the time Plaintiff was hired until his retirement in March 2015.

5. Shortly after becoming employed by the Fund, Plaintiff went on maternity leave from July to November 2009 for the birth of her first child.

6. After her maternity leave, Plaintiff returned to the Fund part-time, working an 80% schedule until November 2011.

7. In November 2011, Mr. Barczak told Plaintiff that she would need to work full-time to be considered for advancement, and Plaintiff accordingly began working full-time.

8. With Mr. Barczak's retirement in March 2015, Plaintiff became the only attorney in the Fund's legal department, but retained the title of Associate Counsel.

9. After Mr. Barczak retired, Plaintiff was appointed to his former role as Secretary of the Fund's Board of Trustees.

10. When Mr. Barczak retired, he told Defendant Haelen that Plaintiff should not be promoted to his position as Fund Counsel because she was not ready for that role. [2]

[2]    Plaintiff argues that this statement is inadmissible hearsay and thus should not be admitted. (Dkt. No. 66, at ¶ 10 [Pl.'s Rule 7.1 Resp.].) However, because it is not apparent that this evidence could not be presented in a form admissible at trial, the Court declines to exclude this evidence for the purposed of Defendants' motion for summary judgment. *See Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) (finding that the Court did not need to review whether the relevant evidence met one of the hearsay exceptions because "material relied on at summary judgment need not be admissible in the form presented to the district court. Rather, so long as the evidence in question 'will be presented in admissible form at trial,' it may be considered on summary judgment' ") (quoting *Santos v. Murdock*, 243 F.3d 681, 683 [2d Cir. 2001]). For example, setting aside whether

the statement is offered for the truth of the matter asserted for the purposes of Fed. R. Evid. 801(c)(2) or merely the effect on the listener, the Court has no reason to believe that Mr. Barczak would not be available to testify at trial.

11. After Mr. Barczak retired, Plaintiff struggled to keep up with the workload.

12. After Mr. Barczak retired, the legal department fell behind on its work, and Defendant Haelen received complaints from the legal department's constituents about the legal department taking too long to complete tasks. [3]

[3]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) As an initial matter, the Court is not convinced that this statement would be inadmissible hearsay if it is presented to establish merely that Defendant Haelen received such complaints, rather than to establish that the legal department was indeed taking too long to complete tasks. *See* Fed. R. Evid. 801(c) (" 'Hearsay' means a statement that: [1] the declarant does not make while testifying at the current trial or hearing; and [2] a party offers in evidence to prove the truth of the matter asserted in the statement."). Additionally, as discussed above in note 2 of this Decision and Order, it is not apparent that this evidence could not be presented in a form admissible at trial. *Smith*, 697 F. App'x at 89. For example, the Court has no reason to believe that none of the legal department's constituents would be available to testify at trial, or that none of these complaints survive in written form.

**\*3** 13. In the summer of 2015, Plaintiff initiated a conversation with Defendant Haelen to discuss her difficulties with her workload.

14. In this conversation, Plaintiff stated that she wanted to spend more time with her children and that her workload was interfering with this goal.

15. In this conversation, Defendant Haelen told Plaintiff that he would confer with the human resources department regarding providing the legal department with staffing to help reduce Plaintiff's workload.

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

16. Mary Jo Lais, the Fund's Director of Human Resources, also had conversations with Plaintiff during the summer of 2015 regarding the legal department's workload.

17. On August 7, 2015, Defendant Haelen informed Plaintiff that he had selected Defendant Di Stefano (the Fund's Corporate Integrity and Ethics Officer) to join the legal department as Deputy Counsel, and that Plaintiff would not be promoted.

18. Defendant Haelen also advised Plaintiff that Defendant Di Stefano would be taking over the role of Secretary for the Board of Trustees.

19. Plaintiff responded that, due to the hiring of Defendant Di Stefano, she wished to return to an 80% schedule.

20. Defendant Haelen explained to Plaintiff that he would have to consult with Defendant Di Stefano about her request for a part-time schedule.

21. Plaintiff reiterated that her current workload was too burdensome.

22. Defendant Haelen acknowledged Plaintiff's concern and reassured her that he did not want her to "burn out."

23. Defendant Haelen explained that adding Defendant Di Stefano to the legal department would serve to reduce Plaintiff's workload and enable Plaintiff to focus more exclusively on litigation.

24. In her new role as Deputy Counsel of the legal department, Defendant Di Stefano was tasked by Defendant Haelen with addressing the department's backlog of work.

25. At various times, different employees at the Fund have had different authorizations to sign documents on behalf of the Fund. Between Mr. Barczak's retirement in March 2015 and Defendant Di Stefano's appointment to the role of Deputy Counsel in August 2015, Plaintiff was the only attorney in the Fund's legal department and thus was given greater signatory authority after Mr. Barczak's retirement. That signatory authority was later reduced after Defendant Di Stefano became Deputy Counsel. [4]

[4]    The Court finds that portions of Defendants' asserted fact are properly disputed by Plaintiff's denial. (Compare Dkt. No. 59, Attach. 1, at ¶

26 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 66, at ¶ 26 [Pl.'s Rule 7.1 Resp.].) The Court has reformulated the asserted fact to reflect the undisputed facts that could be gleaned from the evidence cited by Defendants and Plaintiff.

26. In her role as Deputy Counsel in the legal department, Defendant Di Stefano became Plaintiff's direct supervisor.

27. In her role as Deputy Counsel in the legal department, Defendant Di Stefano was given the authority to assign and review Plaintiff's work.

28. In her role as Deputy Counsel in the legal department, Defendant Di Stefano had no ownership interest in the Fund and lacked any authority to hire or fire Fund employees. [5]

[5]    Plaintiff objects to this asserted fact, arguing that it sets forth a legal conclusion rather than a factual assertion. (Dkt. No. 66, at ¶ 29 [Pl.'s Rule 7.1 Resp.].) However, whether Defendant Di Stefano had an ownership interest or the authority to hire and fire employees are clearly factual issues that can be proven or disproven by evidence. Defendants have cited evidence supporting the asserted fact, while Plaintiff has not adduced evidence to establish a genuine dispute of material fact regarding Defendant Di Stefano's ownership interest or authority to hire and fire employees. As a result, this asserted fact is deemed admitted.

**\*4** 29. Plaintiff had conversations with Defendant Di Stefano shortly after Defendant Di Stefano became Deputy Counsel regarding Plaintiff's ongoing struggles with her current workload.

30. In these conversations, Plaintiff noted that she had frequently been working on nights and weekends and expressed her desire for a decreased workload that would enable her to spend more time with her family.

31. In one of these conversations, Plaintiff complained about a recent instance in which she had done work at home on a weekend after her children had gone to bed.

32. In these conversations, Defendant Di Stefano assured Plaintiff that she would help alleviate Plaintiff's workload by taking on some of the responsibilities that Plaintiff had been handling.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 143 of 830

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

33. Defendant Di Stefano personally took on much of the legal department's day-to-day transactional work.

34. Defendant Di Stefano frequently spent in excess of 70 hours per week (including nights and weekends) on her responsibilities to the Fund.

35. In another meeting with Defendant Di Stefano in November 2015, Plaintiff again expressed her desire to work fewer hours.

36. Plaintiff also reiterated a request she had made to Defendant Haelen in July 2015 for compensatory time off for "excess" work hours.

37. Following the meeting on November 10, 2015, Defendant Di Stefano conferred with the Fund's human resources department and determined that Plaintiff was not entitled to compensatory time under the Fund's then-current policies.

38. On December 7, 2015, Defendant Di Stefano and Ms. Lais met with Plaintiff to confirm that she was not entitled to receive compensatory time.

39. Plaintiff approached Defendant Di Stefano on December 23, 2015, with a new proposal for reducing her work hours.

40. On December 23, 2015, Plaintiff asked Defendant Di Stefano for approval of a part-time work schedule consisting of two hours off every other Tuesday plus a full day off every other Thursday, and noted that she wanted to spend this time with her children.

41. On January 7, 2016, Defendant Di Stefano asked Plaintiff for a workload analysis to enable her to evaluate Plaintiff's request for a part-time schedule.

42. On January 11, 2016, Plaintiff gave Defendant Di Stefano a handwritten page containing notations related to tasks for various matters being handled by the legal department.

43. This page did not include any details such as deadlines or estimates of the amount of time Plaintiff would need to complete the listed tasks.

44. Upon receiving this page, Defendant Di Stefano was greatly frustrated because it lacked the critical details that she felt were necessary for her to gain a meaningful understanding of Plaintiff's current workload.

45. Defendant Di Stefano also felt that the page showed very little effort on Plaintiff's part to provide the information Defendant Di Stefano had requested.

46. Defendant Di Stefano emailed Plaintiff that same day, requesting a more thorough analysis, including more detailed project descriptions, timeframes for completion of projects, and deadlines.

47. Defendant Di Stefano believed at that time that Plaintiff's submission of January 11, 2016, reflected Plaintiff's disinterest in collaborating with her to find a solution for the workload problem.

**\*5** 48. In a meeting on January 28, 2016, after Plaintiff had returned from a vacation, Defendant Di Stefano remarked that she was "personally and professionally offended" by Plaintiff's submission.

49. Plaintiff protested that she had spent a lot of time trying to prepare the workload analysis.

50. Plaintiff offered to provide Defendant Di Stefano with copies of her timesheets and a litigation log of pending lawsuits, but Defendant Di Stefano stated that these items were not helpful to gain a full understanding of Plaintiff's current workload. [6]

> [6]  Plaintiff denies this asserted fact, but the evidence that she cites in opposition does not dispute the fact that Defendant Di Stefano told Plaintiff that the proffered documents would not be helpful. (Dkt. No. 66, at ¶ 54 [Pl.'s Rule 7.1 Resp.].) This asserted fact is therefore deemed admitted.

51. On February 3, 2016, during a meeting with Plaintiff, Defendant Di Stefano reiterated that she still wanted a thorough written workload analysis.

52. Plaintiff requested a template to guide her in preparing an analysis of her workload.

53. Defendant Di Stefano responded that she did not have a template for Plaintiff to use, but she reiterated what information she wanted included in the analysis. [7]

> [7]  Plaintiff denies this asserted fact, but the evidence she cites in opposition does not dispute the fact

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

that Defendant Di Stefano did not have a format to give Plaintiff. (Dkt. No. 66, at ¶ 54 [Pl.'s Rule 7.1 Resp.].) In her affidavit, Plaintiff states that Defendant Di Stefano specifically said, "I won't even comment on that," in response to her request for a format, but Plaintiff's notes (to which she refers in the cited paragraph of her affidavit) indeed state that "JD said she does not have a format." (Dkt. No. 59, Attach. 31, at 3.) The Court finds nothing in Plaintiff's purported denial that actually denies the asserted fact and thus the asserted fact is deemed admitted.

54. As of early 2016, the legal department's constituents, including the Attorney General's office and other Fund personnel who relied on the legal department for advice and support, were continuing to express dissatisfaction with Plaintiff. [8]

[8]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) As discussed in note 3 of this Decision and Order, these statements would not be hearsay if they were offered to establish that complaints were made about Plaintiff's performance, rather than to establish the truth of the substance of those complaints. Alternatively, the Court has no reason to believe that the complainants would be unavailable to testify at trial. As a result, the Court finds that it may consider this evidence on this motion for summary judgment.

55. At some point around January 2016, Defendant Di Stefano (without Plaintiff) met with Bruce Feldman, an attorney from the Attorney General's office, to discuss issues relating to their offices' joint handling of litigation. [9]

[9]    Plaintiff denies this asserted fact, but she fails to cite admissible evidence to support her denial. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) In Plaintiff's own deposition, she testified that her "understanding of the meeting was to discuss with the Office of Attorney General the handling of Fund litigation by the AG's Office." (Dkt. No. 59, Attach. 4, at 95 [Pl.'s Dep.].) The Court also rejects Plaintiff's assertion that this asserted fact contains hearsay. This asserted fact is therefore deemed admitted.

**\*6** 56. Mr. Feldman raised serious concerns about Plaintiff's involvement in lawsuits in which the Attorney General's office was representing the Fund. [10]

[10]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) The Court rejects this argument for the reasons discussed in note 8 of this Decision and Order.

57. Mr. Feldman complained that, among other things, Plaintiff was requesting excessive extensions, was uncooperative with the Attorney General's office in handling cases, and was not timely in responding to issues. [11]

[11]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) The Court rejects this argument for the reasons discussed in note 8 of this Decision and Order.

58. Due to these concerns, Mr. Feldman conveyed that the Attorney General's office no longer wanted to work with Plaintiff. [12]

[12]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) As discussed above in note 2 of this Decision and Order, it is not apparent that this evidence could not be presented in a form admissible at trial. *Smith*, 697 F. App'x at 89.

59. Pursuant to her meeting with Mr. Feldman, as well as other previous and subsequent requests by the Attorney General's office for her personal assistance with litigation matters, Defendant Di Stefano began taking a more active role in the department's litigation work. [13]

[13]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) The Court rejects this argument for the reasons discussed in note 8 of this Decision and Order. Additionally, as discussed above in note 2 of this Decision and Order, it is not apparent that this evidence could not be presented in a form admissible at trial. *Smith*, 697 F. App'x at 89.

60. Defendant Di Stefano became involved with a lawsuit entitled *Sano-Rubin* at the specific request of the Attorney

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

General's office after Mr. Feldman expressed displeasure with Plaintiff's unwillingness to prioritize a time-sensitive task. [14]

[14]     Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) The Court rejects this argument for the reasons discussed in note 8 of this Decision and Order. Additionally, as discussed above in note 2 of this Decision and Order, it is not apparent that this evidence could not be presented in a form admissible at trial. *Smith*, 697 F. App'x at 89.

61. During a meeting with Plaintiff on February 9, 2016, Defendant Di Stefano remarked on the legal department's ongoing backlog of time-sensitive work and reiterated her continuing need for a workload analysis so that she could consider Plaintiff's request for a part-time schedule. [15]

[15]     Plaintiff denies the asserted fact, arguing that the "backlog" was not of her own litigation work. (Dkt. No. 66, at ¶ 67 [Pl.'s Rule 7.1 Resp.].) However, the asserted fact specifically refers to "the department's" backlog, not merely Plaintiff's litigation work, and Plaintiff cites no evidence to establish that the department as a whole did not have a backlog. (Dkt. No. 59, Attach. 1, at ¶ 67 [Defs.' Rule 7.1 Statement].) This fact is therefore deemed admitted.

**\*7** 62. As of February 9, 2016, Plaintiff had still not prepared a workload analysis that was satisfactory to Defendant Di Stefano.

63. In response to Defendant Di Stefano's statement that she was still determining whether Plaintiff could be switched to a part-time schedule that permitted Plaintiff to take time off on Tuesdays and Thursdays as she had requested, Plaintiff indicated that she wanted to spend more time with her children in the immediate future because her younger daughter was starting school that fall.

64. Defendant Di Stefano responded by observing that she was herself working extremely long hours to the detriment of her personal and family time due to the department's very heavy workload.

65. At other times during conversations with Plaintiff, Defendant Di Stefano discussed the difficulties of balancing work demands and parenthood, and mentioned that at one

time she had taken a less demanding, lower-paying job to be able to spend more time with her daughter. In making these statements, Defendant Di Stefano felt that she was being empathetic to Plaintiff based on her own personal experiences in her career. [16]

[16]     Plaintiff denies this asserted fact. (Dkt. No. 66, at ¶ 71 [Pl.'s Rule 7.1 Resp.].) However, Plaintiff does not cite any evidence to support her denial of the portion of the fact related to Defendant Di Stefano's feelings or motivations, and the Court does not feel that Defendants' characterization of Defendant Di Stefano's words is inaccurate or misleading. This asserted fact is therefore deemed admitted.

66. As a result of the meeting of February 9, 2016, Defendant Di Stefano repeated her request for a detailed workload analysis, which she now asked Plaintiff to complete by February 19, 2016.

67. On February 12, 2016, Defendant Di Stefano (without Plaintiff) attended a meeting on a lawsuit entitled *Christa v. Fund*.

68. When Plaintiff and Defendant Di Stefano met again on February 16, 2016, Plaintiff presented a log of her workload.

69. Defendant Di Stefano noted that the log (although appreciably more detailed than Plaintiff's previous submission) still did not include the time estimates she had requested; she asked Plaintiff to add this information.

70. In mid-February 2016, Defendant Di Stefano directed Plaintiff to complete a litigation analysis for Defendant Haelen so that he could evaluate several important lawsuits involving the Fund, and she set a deadline of February 26, 2016, for Plaintiff to complete that analysis.

71. Defendant Di Stefano and Plaintiff both attended a meeting with other Fund staff regarding the *Christa* case on February 29, 2016.

72. Defendant Di Stefano felt that Plaintiff had been grossly unprepared for the meeting, and subsequently expressed concern about Plaintiff's lack of preparation. [17]

[17]     Plaintiff denies this asserted fact, but provides no evidence that would create a genuine dispute of material fact as to whether this was indeed what

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

Defendant Di Stefano felt. (Dkt. No. 66, at ¶ 78 [Pl.'s Rule 7.1 Resp.].) This asserted fact is therefore deemed admitted.

73. Meanwhile, also on February 29, 2016, Plaintiff received an email from a SUNY attorney complaining about a default judgment that had been entered in a lawsuit entitled *Green Depot v. SUNY* after the Fund's failure to answer the complaint in that case. [18]

[18]   Plaintiff denies this asserted fact, but her denial is based entirely on a denial of the implied fact that the Fund was responsible for answering the complaint in that matter. (Dkt. No. 66, at ¶ 78 [Pl.'s Rule 7.1 Resp.].) *See also Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts). However, Plaintiff has not denied the actual asserted fact, and thus that fact is deemed admitted.

**\*8** 74. Plaintiff told Defendant Di Stefano that, due to other work, she could not address *Green Depot* immediately, so Defendant Di Stefano took the *Green Depot* file to handle the issue herself.

75. On March 7, 2016, Defendant Haelen extended a written apology to SUNY for "how poorly the Green Depot matter was handled by the Fund."

76. As of February 29, 2016, Plaintiff had not completed the litigation analysis which had been due on February 26, 2016.

77. During a meeting on March 1, 2016, Defendant Di Stefano further commented on Plaintiff's performance at the February 29 meeting, stating that she felt that Plaintiff was not efficient in how she approached her workload and assignments.

78. Defendant Di Stafano asked Plaintiff to make an effort to complete more tasks more efficiently.

79. Defendant Di Stefano advised that, in light of the legal department's demanding workload, Plaintiff might have to work long hours, including nights and weekends on an as-needed basis, just as Defendant Di Stefano had been doing.

80. Plaintiff protested that Defendant Di Stefano had already approved her request for a part-time schedule.

81. Defendant Di Stefano stated that she had not approved a part-time schedule as requested by Plaintiff because she did not have the information she felt that she needed to determine if a part-time schedule was compatible with the legal department's obligations.

82. At this point in the meeting, Plaintiff began crying and looked away.

83. Defendant Di Stefano responded by leaning towards Plaintiff from the opposite side of the conference room table and asking Plaintiff to look at her so that she could confirm that Plaintiff had heard her. [19]

[19]   Plaintiff disputes that the purpose of Defendant Di Stefano's actions was to confirm that Plaintiff understood her, but Plaintiff cites no evidence to support that denial. (Dkt. No. 66, at ¶ 78 [Pl.'s Rule 7.1 Resp.].) This asserted fact is therefore deemed admitted.

84. Defendant Di Stefano followed up on this strained meeting by sending emails to all of the legal department's employees on March 2 and March 5, 2016, indicating that those employees were required to make advance written requests for time off for the purposes of accountability and to ensure that Fund staff could be reached if needed.

85. Defendant Di Stefano granted Plaintiff's request to take a day off on Thursday, March 3, 2016, but asked Plaintiff to cover a meeting on Tuesday, March 8, 2016.

86. When Plaintiff indicated that she did not have childcare arranged for March 8 because she had planned to take time off that morning, Defendant Di Stefano approved Plaintiff's request for time off on that date.

87. On March 5, 2016, Defendant Di Stefano assigned Plaintiff an insurance procedure drafting project and set a deadline of March 14, 2016, for its completion.

88. On March 7, 2016, Defendant Di Stefano asked Plaintiff to complete the litigation analysis assignment for Defendant Haelen by March 14, 2016; that analysis had initially been due by February 26, 2016, but had not been completed.

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

89. On March 8, 2016, Plaintiff informed Defendant Di Stefano that she "[did] not expect to meet" the March 14 deadline for the insurance project assignment.

 **\*9** 90. On the evening of Friday, March 11, Plaintiff then requested an extension of the March 14 deadline for the litigation analysis assignment, stating that she could not work on it that weekend because her daughter had a birthday celebration that would span the entire weekend.

91. Defendant Di Stefano replied that they should meet on the morning of Monday, March 14 to discuss the deadline extension.

92. Defendant Di Stefano was unable to make that meeting on time, but thereafter asked Plaintiff to give her what Plaintiff had so far on the litigation assignment and her workload log.[20]

> [20]
>
> The Court notes that Defendants' assertion that Defendant Di Stefano "advised Plaintiff to keep working on the project" does not appear to be supported by the evidence cited by Defendants. (Dkt. No. 59, Attach. 1, at ¶ 98 [Defs.' Rule 7.1 Statement].)

93. On March 14, 2016, Plaintiff sent a series of emails from her work email address to her personal email address containing successive drafts of a journal which chronicled her experience at the Fund.

94. On the morning of March 14, 2016, Defendant Di Stefano commented that Plaintiff had not proposed an alternative deadline by which she would have the litigation assignment completed, informed Plaintiff that she would be reviewing the assignment before giving the materials to Defendant Haelen, expressed concern whether there would be adequate time to review the assignment before a Thursday meeting, and asked Plaintiff to print an update "of where you are with the litigation analysis assignment as soon as possible."

95. Plaintiff emailed Defendant Di Stefano a draft of only one of the three case analyses that had been assigned to her.

96. Later that day, Defendant Di Stefano asked Plaintiff to attend a quarterly meeting with other State agencies that Defendant Di Stefano was unable to attend. Plaintiff did not attend and instead asked Defendant Di Stefano by email whether she could "take this off my calendar due to workload"

because another Fund employee (who was not part of the legal department) was attending the meeting; Defendant Di Stefano did not see this email until after the meeting had already taken place.[21]

> [21]
>
> Plaintiff disputes the asserted fact, but her denial is merely an attempt to state additional disputed facts, which more properly belong in a Statement of Additional Material Facts that she contends are in dispute pursuant to Local Rule 7.1(a)(3). (Dkt. No. 66, at ¶ 102 [Pl.'s Rule 7.1 Resp.].) This asserted fact is therefore deemed admitted.

97. In January, February, and March 2016, Defendant Di Stefano continued to receive complaints from constituents about Plaintiff's failures to complete tasks in a timely manner.[22]

> [22]
>
> Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) The Court rejects this argument for the reasons discussed in note 8 of this Decision and Order.

98. As of early March 2016, Defendant Di Stefano and Ms. Lais were having discussions regarding their options for addressing the alleged issues with Plaintiff's performance, including the preparation of a performance improvement plan ("PIP").

99. It was decided that a PIP would be prepared for Plaintiff.

100. Ms. Lais emailed Defendant Di Stefano a rough draft of the PIP on March 8, 2016, that reflected their previous discussions.

 **\*10** 101. Defendant Di Stefano added more detailed descriptions to the PIP throughout the month of March.

102. Defendant Di Stefano's March 29, 2016, version of the draft PIP set forth numerous issues with Plaintiff's performance.

103. Plaintiff and Defendant Di Stefano met again on March 16, 2016.

104. Defendant Di Stefano expressed her frustration with Plaintiff's tardiness as to the completion of work assignments

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 148 of 830

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)
2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

and the substance of Plaintiff's work product on the litigation analysis project.

105. Defendant Di Stefano also advised Plaintiff at that meeting that she could not grant Plaintiff's request for a part-time schedule in the face of the legal department's workload and its need to meet its obligations.

106. When Plaintiff asked whether she was expected to work nights and weekends, Defendant Di Stefano responded that Plaintiff's responsibilities could sometimes require that, and stressed that Plaintiff needed to find a way to get her work done.

107. Plaintiff met with Defendant Haelen on March 17, 2016, and discussed her difficulties working with Defendant Di Stefano.

108. Defendant Haelen advised Plaintiff that he agreed with Defendant Di Stefano that Plaintiff's responsiveness and handling of her workload were not up to par and that Plaintiff needed to become more efficient.

109. Defendant Haelen noted that struggles with balancing work and family time were part of the nature of fast-paced jobs, and he shared that he, as a parent himself, had sometimes had to sacrifice parenting time for work.

110. On March 18, 2016, Plaintiff left a voicemail for Ms. Lais in which she stated that she felt "the need to make a complaint on the anti-bullying policy."

111. Plaintiff confirmed at her deposition that she had referenced the Fund's "Bullying in the Workplace" policy when she made her complaint to Ms. Lais.

112. Plaintiff also testified that she was specifically aware of the "Bullying in the Workplace" policy due to an update sent out by the human resources department around December 2015 when the policy was added to the Fund's Employee Handbook.

113. The Employee Handbook also includes an anti-discrimination policy that is separate from the "Bullying in the Workplace" policy.

114. Ms. Lais responded to Plaintiff's voicemail by sending an email to Plaintiff on March 18, 2016.

115. Ms. Lais' email confirmed receipt of Plaintiff's voicemail and invited Plaintiff to schedule a time for them to discuss the complaint.

116. Ms. Lais' email also notified Plaintiff that Ms. Lais, Defendant Di Stefano, and Defendant Haelen had been developing a PIP "for the past several weeks" based on "on-going discussions for the past several months regarding [her] performance."

117. Ms. Lais assured Plaintiff that there would be a separate meeting to discuss the PIP and the issues raised therein.

118. On March 21, 2016, after a senior staff meeting during which Defendant Di Stefano had been unaware of certain communications between Plaintiff and another Fund employee related to contract changes, Defendant Di Stefano directed Plaintiff that "[p]er previous discussions, please send me an email or copy/forward to me emails regarding your dealings with staff on various matters or when approached for new work/questions so that we keep on the same page and don't work at cross purposes in providing advice to the Fund."

*11 119. Plaintiff and Ms. Lais met on March 30, 2016, to discuss Plaintiff's bullying complaint.

120. Ms. Lais advised Plaintiff that the PIP would not be implemented until Plaintiff's complaint had been addressed.

121. Ultimately, the PIP was never implemented because Plaintiff went on medical leave before Ms. Lais finished investigating her complaint.

122. During their meeting on March 30, 2016, Plaintiff presented Ms. Lais with an eight-page document that chronicled various interactions between herself, Defendant Di Stefano, and Defendant Haelen.

123. During their meeting on March 30, 2016, Plaintiff explained to Ms. Lais that the document set forth the basis for her bullying complaint against Defendant Di Stefano.

124. Pursuant to a Board resolution drafted by Defendant Haelen's staff on or prior to March 17, 2016, Defendant Di Stefano was appointed as the Secretary of the Fund's Board of Trustees in April 2016 at its first meeting following Defendant Di Stefano's appointment as Deputy Counsel.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 149 of 830

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)
2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

125. In her deposition, Plaintiff admitted that she was excluded from some meetings before she made her complaint.

126. After she made her complaint, Plaintiff continued to be included in some meetings, but not others.

127. In her deposition, Plaintiff admitted that some of her responsibilities were taken before she made her bullying complaint to Ms. Lais.

128. Throughout the spring of 2016, Plaintiff remained involved in a variety of litigation and non-litigation matters, and Defendant Di Stefano continued to solicit input and participation from Plaintiff.

129. As of June 2016, Plaintiff had enough work remaining that she was still struggling to juggle competing projects.

130. In her deposition, Plaintiff could not identify any requests for time off (other than her longstanding request for a part-time schedule) that Defendant Di Stefano had denied.

131. In mid-June 2016, Defendant Di Stefano approved a request from Plaintiff to take a week off for a family vacation.

132. Ms. Lais completed her investigation of Plaintiff's complaint on June 20, 2016.

133. Ms. Lais' investigation report found insufficient evidence to establish bullying by Defendant Di Stefano, but acknowledged the existence of a "dysfunctional work environment" and a "lack of communication and cooperation" between Plaintiff and Defendant Di Stefano.

134. The last day on which Plaintiff reported to work at the Fund was June 17, 2016.

135. On June 17, 2016, Plaintiff left work early and later notified Ms. Lais that she was taking medical leave.

136. Plaintiff never returned to work, and she remained on medical leave for more than two years.

137. Plaintiff received sick leave benefits during her medical leave.

138. Plaintiff provided the Fund with successive doctor's notes indicating that she was unable to work.

139. The Fund eventually terminated Plaintiff in October 2018 (after she had been out on medical leave for more than two years with no anticipated date for her to return to work) so that it could hire another candidate to fill her position.

140. Every member of the legal department throughout the time period relevant to this litigation was a parent, including Plaintiff, Defendant Di Stefano, and the department's two non-attorney administrative staff employees.

## C. Parties' Briefing on Defendants' Motion for Summary Judgment

### 1. Defendants' Memorandum of Law

**\*12** Generally, in their motion for summary judgment, Defendants makes seven arguments. (Dkt. No. 59, Attach. 2 [Defs.' Mem. of Law].) First, Defendants argue that Plaintiff did not engage in any protected activity for the purposes of her Title VII retaliation claim. (*Id.* at 20-22.) More specifically, Defendants argue that Plaintiff could not have had an objectively reasonable belief that she was reporting gender discrimination because there is no admissible evidence of any comments suggestive of gender-based discrimination, and because Plaintiff specifically brought her complaint pursuant to the Fund's anti-bullying policy (rather than the Fund's anti-discrimination policy) and did not reference anything about that bullying conduct being motivated by her gender. (*Id.*)

Second, Defendants argue that Plaintiff did not put Defendants on notice that she was making a discrimination complaint. (*Id.* at 22-23.) More specifically, Defendants argue that Plaintiff never identified any relationship between Defendant Di Stefano's conduct towards her and her gender, and thus there was no basis for Defendants to construe her complaint as raising an issue of discrimination. (*Id.*)

Third, Defendants argue that Plaintiff has not shown that she was retaliated against for her complaint. (*Id.* at 23-27.) More specifically, Defendants argue that Plaintiff has not shown that she suffered any adverse action because the actions she complains of are either not supported by the evidence or are not sufficiently serious to qualify as an adverse action. (*Id.* at 23-24.) Defendants also argue that Plaintiff has not shown that her complaint was the but-for cause of any of the actions taken against her because some of these actions had also occurred before she made her complaint or were a mere continuation of policies or decisions made before she made her complaint

(such as excluding her from certain meetings, taking work from her, declining to grant her an ongoing part-time work schedule, having her keep them apprised of her workload, and preparing the PIP). (*Id*. at 24-27.)

Fourth, Defendants argue that, if the Court grants summary judgment and dismisses Plaintiff's Title VII claim, the Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims because those claims involve state-law matters. (*Id*. at 27.)

Fifth, Defendants argue that Plaintiff's retaliation claims under the NYSHRL should be dismissed for substantially the same reasons as her Title VII claim should be dismissed because she has not adduced evidence to support her claim that she complained about discrimination based on either gender or familial status, much less that a retaliatory action was taken against her based on such discrimination. (*Id*. at 27-28.)

Sixth, Defendants argue that, as to her discrimination claim pursuant to the NYSHRL, Plaintiff has failed to establish that she was discriminated against based on her familial status. (*Id*. at 28-37.) More specifically, Defendants argue as follows: (a) any actions taken by Defendants before January 19, 2016, cannot be considered because that is the date on which the amendment of the NYSHRL adding "familial status" as a protected class became effective; (b) the NYSHRL explicitly does not require an employer to provide accommodations based on familial status including those related to "an individual's particular needs relative to childrearing," but merely must not discriminate against a parent specifically based on their status as a parent, and thus Plaintiff's argument that Defendants denied her a part-time shift to spend more time with her children cannot establish a claim for familial status discrimination; (c) it is not clear that the NYSHRL amendments related to familial status allow for hostile work environment claims; (d) even if a hostile work environment claim can be brought, the conduct Plaintiff has shown does not rise to level of a hostile work environment; (e) Plaintiff has also not shown that the alleged hostile conduct was causally related to her status as a parent, particularly because there is ample evidence that Plaintiff had demonstrated problems managing her workload and dealing with her work efficiently and effectively; and (f) there is no evidence that Defendants raised the issue of Plaintiff's familial status, but rather it was Plaintiff who brought up her children and her desires as a parent, and there is no evidence that Defendants treated

childless employees different than employees with children. (*Id*.)

**\*13** Seventh, Defendants argue that Defendant Di Stefano cannot be held liable under the NYSHRL because (a) she has no ownership in the Fund, (b) she lacks the ability to hire and fire employees, and (c) given that Plaintiff's accusations related to conduct taken by Defendant Di Stefano, she cannot be held liable as an "aider or abettor" because she is not facilitating the discriminatory acts of another individual. (*Id*. at 37.)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in her opposition memorandum of law, Plaintiff makes seven arguments. (Dkt. No. 67 [Pl.'s Opp'n Mem. of Law].) First, Plaintiff argues that she has sufficiently shown that she had a belief that she was reporting conduct that is outlawed by Title VII to survive a motion for summary judgment. (*Id*. at 21.) More specifically, Plaintiff argues that the evidence adduced sufficiently shows that Defendants made comments about her being a mother with young children and that she felt that she needed to choose between being a mother and working at the Fund, both of which establish a basis for believing Defendants' actions violated VII despite her reliance on the bullying policy. (*Id*. at 22-23.)

Second, Plaintiff argues that Defendants had notice that she was reporting protected activity based both on her reports to Ms. Lais in the bullying complaint itself and on the knowledge of Defendants Di Stefano and Haelen from their participation in the relevant events. (*Id*. at 23-24.)

Third, Plaintiff argues that there is a genuine dispute of material fact remaining as to whether Defendants retaliated against her for her complaint. (*Id*. at 24-31.) More specifically, Plaintiff argues as follows: (a) the threat of a PIP and slights about her job performance constitute an adverse action because (i) PIPs were rarely issued, (ii) the poor performance noted in the PIP is inconsistent with the previously positive reports Plaintiff had been receiving about her work, and (iii) having the PIP "hanging over her head" during the pendency of the investigation of her complaint negatively impacted Plaintiff's ability to act; (b) the increased supervision by Defendant Di Stefano (i.e., Defendant Di Stefano's request that she be copied on all of Plaintiff's correspondences with Fund staff) was a deviation from previous practice and constituted an adverse action; (c) the reduction of Plaintiff's

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 151 of 830

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

responsibilities constituted an adverse action; (d) Defendant Di Stefano's exclusion of Plaintiff from meetings and actions in isolating Plaintiff from others in the Fund (for example, by telling her she could no longer use a conference room to do her litigation work) constituted adverse actions; and (e) Defendants' various reactions to her filing of a complaint (including Defendant Haelen telling her that it would be "painful" if she filed a complaint, the warning about the PIP, the fact that Defendants and Ms. Lais all met the day following Plaintiff's indication that she would file a complaint, and the failure to conduct the investigation into her complaint in a timely manner) also serve as evidence of retaliation. (*Id.* at 24-28.)

Plaintiff also argues that she has sufficiently shown causation based on the timing of various conduct relative to the filing of her complaint, as well as based on direct evidence. (*Id.* at 28-29.) Plaintiff additionally argues that Defendants' proffered reason is pretextual based on (a) the long history of positive performance reviews of Plaintiff's work, (b) the fact that Defendant Di Stefano was involved in the conduct and "was obviously laboring in February and March 2016 to create a paper trail," and (c) the lack of evidence corroborating Defendants' version of events. (*Id.* at 29-30.) Further, Plaintiff argues that her termination of employment clearly constitutes an adverse action that occurred after she filed her complaint and after she filed an EEOC complaint in December 2016. (*Id.* at 30-31.)

**\*14** Fourth, Plaintiff argues that, even if her Title VII claim is dismissed, the Court should exercise supplemental jurisdiction over her NYSHRL claims because they do not raise any novel issues of state law. (*Id.* at 32.)

Fifth, Plaintiff argues that there is no basis to dismiss her retaliation claim based on the NYSHRL for the same reasons as argued related to her Title VII retaliation claim. (*Id.* at 32-33.)

Sixth, Plaintiff argues that she has established a hostile work environment claim based on familial status under the NYSHRL. (*Id.* at 33-35.) More specifically, Plaintiff argues as follows: (a) she is not raising a failure to accommodate claim; (b) because other protected classes listed in the NYSHRL allow hostile work environment claims and the amendment does not include anything to suggest such claims would be excluded for a claim based on familial status, Defendants' argument on this point is unsupported; (c) Plaintiff has provided sufficient evidence to establish a hostile work

environment on the basis of her familial status; and (d) there is no requirement for Plaintiff to show that other employees with a similar familial status were also treated in a hostile manner to establish her claim. (*Id.*)

Seventh, Plaintiff argues that there is no basis for dismissing the NYSHRL claims against Defendant Di Stefano because Defendant Di Stefano was an "employer" based on the fact that she was a supervisor who actually participated in the conduct giving rise to the alleged discrimination, and thus she can be held liable under the NYSHRL as a principal actor. (*Id.* at 36.) In the alternative, Plaintiff argues, Defendant Haelen is undisputedly an "employer" for the purposes of the NYSHRL and was alleged to have participated in the discriminatory actions, and therefore Defendant Di Stefano can, at the very least, be held liable as an aider and abettor. (*Id.* at 36-37.)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants make six arguments. (Dkt. No. 72 [Defs.' Reply Mem. of Law].) First, Defendants argue that Plaintiff did not engage in protected activity because she has failed to show that she held an objectively reasonable belief that the "bullying" conduct she was reporting was in violation of Title VII or the NYSHRL, and has failed to adduce any evidence to support her assertions that she believed she was targeted based on her gender. (*Id.* at 4-6.)

Second, Defendants argue that they were not on notice that Plaintiff was reporting conduct proscribed by Title VII because Plaintiff's complaint and reports to Ms. Lais and Defendants Di Stefano and Haelen merely indicate that Plaintiff was expressing that she desired more time off to spend with her children, but did not reasonably indicate that Plaintiff was asserting that her requests were denied specifically because she was a woman or a parent. (*Id.* at 6-7.)

Third, Defendants argue that the admissible evidence fails to show retaliation against Plaintiff. (*Id.* at 8-13.) More specifically, Defendants argue as follows: (a) the overwhelming evidence shows that, in context, the actions taken against Plaintiff were not related to her bullying complaint; (b) the request to copy Defendant Di Stefano on emails was based on conversations that occurred before Plaintiff made her complaint and on a meeting regarding which Defendant Di Stefano was "out of the loop"; (c) her eventual phase-out from the Board of Trustees began before

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 152 of 830

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

her complaint and she continued to be involved for some time after her complaint; (d) Plaintiff has offered no evidence as to how her signatory authority changed and admits that the signatory authority is updated only annually, and thus the timing of the alleged change in her signatory authority does not provide an inference of retaliation; (e) she has offered no evidence to establish that she was excluded from more meetings after her complaint and acknowledges that she did not attend every meeting even before her complaint; (f) the PIP was being prepared before Plaintiff made her complaint and thus it cannot constitute evidence of retaliation for that complaint, and withholding any negative feedback from Plaintiff during the pendency of the investigation does not constitute an adverse action, particularly because Plaintiff was already aware of most of the instances included in the PIP; (g) any delay by Ms. Lais in investigating Plaintiff's complaint cannot constitute an adverse action because it did not change the circumstances of Plaintiff's employment in any way; and (h) Plaintiff's termination in October 2018 was not an adverse action because it occurred more than two years after she made her complaint and only after she had been out on medical leave for two years with no expectation of returning. (*Id.*)

**\*15**  Fourth, Defendants argue that the Court should decline to exercise supplemental jurisdiction if it dismisses her Title VII claim because family status was so recently added to the NYSHRL that claims based on that new protected class present a matter of first impression that should be decided by the state court. (*Id.* at 14.)

Fifth, Defendants argue that Plaintiff was not subjected to a hostile work environment based on her familial status, but rather was lawfully denied accommodations to care for her children in the way she desired to, and that the mere fact that she made those requests for reasons that implicate her familial status does not transform Defendants' actions into a negative bias against employees who are parents. (*Id.* at 14-16.) Additionally, Defendants argue that Plaintiff's own admissions that the workload of the legal department had increased during the relevant time shows that Defendants' reason that there was simply too much work to grant Plaintiff's request for a part-time schedule was not pretextual. (*Id.* at 15-16.)

Sixth, Defendants argue that Defendant Di Stefano cannot be held liable under the NYSHRL because (a) she did not have the power to make personnel decisions, and (b) Plaintiff has not shown that Defendant Haelen was a principle actor such that Defendant Di Stefano's actions could be considered to aid and abet his conduct. (*Id.* at 16.)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[23] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[23]    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[24]

[24]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 153 of 830

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

**\*16** Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*. [25] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [26] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules. [27]

[25]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[26]     *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[27]     *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [28] – even where the non-movant was proceeding *pro se*. [29]

[28]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any

denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[29]     *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [30] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[30]     *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, 1999 WL 325378, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

### III. ANALYSIS

#### A. Whether Plaintiff's Retaliation Claim Pursuant to Title VII Must Be Dismissed

**\*17** After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 59, Attach. 2, at 20-22, 23-27 [Defs.' Mem. of Law].); Dkt. No. 72, at 4-6,

8-13 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment ... to discriminate against any individual ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show the following four things: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 14 (2d Cir. 2018) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 [2d Cir. 2013]). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa*, 708 F.3d at 125. "If the employer demonstrates such a reason, the burden shifts back to the plaintiff to adduce evidence from which a rational finder of fact could infer 'that the desire to retaliate was the but-for cause of the challenged employment action.' " *Russell*, 753 F. App'x at 14 (quoting *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 [2d Cir. 2015]).

As to whether Plaintiff participated in protected activity,[31] Plaintiff has provided evidence that she raised her concerns about Defendant Di Stefano's treatment of her to Defendant Haelen on March 17, 2016, and it is undisputed that Plaintiff called Ms. Lais on March 18, 2016, to make a complaint about conduct that she had been subjected to in the workplace. Defendants argue that this complaint does not constitute protected activity because Plaintiff made it under the auspices of Defendant Fund's "anti-bullying policy" rather than its anti-discrimination policy, and thus she could not have reasonably believed that she was reporting conduct that was unlawful under Title VII; they also argue that Plaintiff has not adduced evidence to support that she had an objectively reasonable belief that Defendants' alleged conduct towards her was based on a class protected by Title VII (in this case, her sex). *See Summa*, 708 F.3d at 126 ("To establish that she engaged in protected activity, Summa need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under

that statute."); *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 240 (N.D.N.Y. 2010) (Hurd, J.) (noting that, in order to meet the protected activity prong, the plaintiff need only show that she had a "good faith, reasonable belief that she was opposing an employment practice made unlawful by Title VII"). Whether a belief is reasonable is an objective standard that is "to be evaluated from the perspective of a reasonable similarly situated person." *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 16-17 (2d Cir. 2013).

[31]   To the extent that Plaintiff argues that Defendants retaliated against her for making requests for time off and for schedule changes, such requests do not constitute a protected activity that can be the basis for a retaliation claim. Protected activities under Title VII include opposition to a discriminatory employment practice or participation in an investigation, hearing, or proceeding under Title VII. *Hubbard v. Total Communications, Inc.*, 347F. App'x 679, 680-81 (2d Cir. 2009) (citing 42 U.S.C. § 2000e-3[a]). There is no evidence establishing that Plaintiff's requests for time off were in any way related to opposing a discriminatory practice. Rather, the evidence shows that they were rooted in her desire to spend more time with her children and to return to the part-time schedule she had before she voluntarily went to a full-time schedule in 2011. A request for a change of schedule or other accommodation for purely personal reasons like a desire to spend more time at home with children does not constitute protected activity. *See Taylor v. Family Residences and Essential Enterprises, Inc.*, 03-CV-6122, 2008 WL 268801, at *13 (E.D.N.Y. Jan. 30, 2008) (finding that refusing to accept a certain shift because it would interfere with the plaintiff's ability to get to his second job on time did not constitute protected activity). As a result, any retaliatory actions in response to her requests for time off are not actionable under Title VII.

**\*18** The Court is not convinced that the fact that Plaintiff explicitly referenced the anti-bullying policy when making her complaint to Ms. Lais is *by itself* sufficient to merit a finding that she did not have a good faith, reasonable belief that the conduct that she was reporting was a violation of Title VII. A plaintiff is not required to cite to Title VII (or any specific statute) in order to make a complaint that constitutes protected activity. Title VII also applies to harassment and

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 155 of 830

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

thus Title VII can apply to conduct that would be covered by the anti-bullying policy. The Court will therefore focus on the substance of what Plaintiff reported as part of that complaint rather than any bare statement of what policy it might fall under.

In her deposition, Plaintiff testified that, at the time she was speaking with Ms. Lais regarding her complaint, she "felt that [she] was being now asked to make a choice between being a mother spending time with her child and having a job at the Fund." (Dkt. No. 59, Attach. 4, at 151 [Pl.'s Dep.].) She also testified that she felt that Defendant Di Stefano had become hostile towards her after she made her request to spend time with her daughter (i.e., to move to the equivalent of an 80% work schedule). (*Id.* at 152.) The notes that Plaintiff submitted to Ms. Lais as part of her complaint reflect instances in which her status as a parent was the subject of work tensions, but do not contain any indication from which a reasonable factfinder could conclude that Plaintiff believed that this treatment was based specifically on her sex. (Dkt. No. 59, Attach. 31.) In her affidavit submitted in opposition to Defendants' motion, Plaintiff raises many of the same parental-related concerns, specifically stating that, by February 2016, "Di Stefano had become increasingly hostile and belittling towards me," and "[i]t was evident to me that she was using my desire to spend time with my daughters as the rationale for this hostile behavior." (Dkt. No. 64, at ¶ 63 [Pl.'s Aff.].) Notably, of all the specific statements that Plaintiff asserts Defendants Di Stefano and Haelen made to her about work-life balance and being parents (e.g., that working long hours impacted their personal lives and required sacrifice, that they made choices about their careers in order to spend more time with their children, that Plaintiff had longstanding problems with work-parenting balance, and "wouldn't it be nice if we could go home and eat dinner with our families"), none of them directly implicate anything about Plaintiff's sex. (Dkt. No. 64, at ¶¶ 56, 76, 82 [Pl.'s Aff.].) In her deposition, Plaintiff testified that she did not know whether Defendant Di Stafano's conduct would have been different if she had been a father asking to spend more time with his children, but that she thought that Defendant Di Stefano "probably" would have treated a father in the same situation the same way that she treated Plaintiff, stating specifically that she thought "this [would] have happened if a parent-child issue was in front of [Di Stefano], whether it was a mom or dad." (Dkt. No. 59, Attach. 4, at 39-40, 202 [Pl.'s Dep.] [attaching errata sheet changing "wouldn't" to "would" in the above quote].) When asked whether she had any evidence to support a belief that a father would have been treated differently, she further stated, "No, I

am talking about being a parent, whether it is a mom or dad, this is parent-child." (*Id.* at 40.)

It is well established that parental status is not a protected characteristic for the purposes of Title VII. *Rotondo v. Best Buy Stores LLC*, 17-CV-0522, 2019 WL 4805374, at *8 n.8 (N.D.N.Y. Oct. 1, 2019) (Hurd, J.). As noted above, the evidence (including Plaintiff's own notes about the situation) indicates that she was reporting discrimination and/or harassment based on her status as a "mother." However, even if Plaintiff believed that she was being discriminated against or harassed because she is a mother, she has not adduced any admissible evidence from which a reasonable factfinder could conclude either that (a) she believed that the treatment was based specifically on her status as a mother (as opposed to a father) and thus on her status as a woman, or (b) any belief that she was targeted as a mother/woman specifically was an objectively reasonable belief. [32]

[32]    On June 18, 2020, Plaintiff filed a letter, citing to the Supreme Court's recent decision in *Bostock v. Clayton Cnty., Georgia*, 140 S.Ct. 1731 (June 15, 2020), as supplemental authority supporting her argument that she has sufficiently shown that Defendants' conduct was based on her sex. However, *Bostock* is inapposite. In particular, the Court has no doubt that an individual's reporting that she is being discriminated against because she is a mother can, under the right circumstances, be sufficient to show a reasonable belief that she is being discriminated against based on her sex. However, those are not the circumstances here. As discussed above, Plaintiff has not provided any evidence that Defendants' treatment of her was related to her sex in any way, but rather her gender-neutral status as a parent. Notably, unlike being gay or transgender (which, as the Supreme Court found, cannot be defined or considered without reference to sex), being a parent does not have inherent gender implications. Although Plaintiff reported that she felt like she was being forced to choose between being a mother and her job, her specific use of the term "mother" does not automatically mean that she believed her sex was implicated in Defendants' conduct because Plaintiff herself testified that it was her status of being a parent that was at issue and she thought that Defendant Di Stefano would probably have treated a father the same way under the same circumstances. (Dkt.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 156 of 830

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

No. 59, Attach. 4, at 39-40 [Pl.'s Dep.].) Thus, unlike in a situation involving an individual's status as a gay or transgender person, Plaintiff's own evidence indicates that the conduct here was, even in Plaintiff's subjective mind, truly gender-neutral. There is simply no evidence to support Plaintiff's argument that she reasonably believed that she was reporting discrimination based on her sex merely because she referred to herself as a mother.

**\*19** Plaintiff argues that she has sufficiently shown that she reasonably believed that her conduct was covered by a "gender-plus" theory (with the "plus" being her parental status), whether or not she can sustain a claim on that basis. (Dkt. No. 67, at 21-22 [Pl.'s Opp'n Mem. of Law].) However, Plaintiff's argument ignores the fact that, even in a "gender-plus" case, she must still show that her gender played some role. As already discussed, although Plaintiff frames it as her feeling that she was required to choose between being a mother and her job, there is no admissible evidence to establish that she believed that it was the fact that she was a *mother specifically* (and thus a woman) as opposed to that she was a parent that caused Defendants to act in the ways that they did. *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004) ("The relevant issue is not whether a claim is characterized as 'sex plus' or 'gender plus,' but rather, whether the plaintiff provides evidence of *purposefully sex-discriminatory* acts.") (emphasis added). In particular, none of the evidence (including the statements by Defendants Di Stefano and Haelen) reasonably indicate that their treatment of Plaintiff was based on the fact that Plaintiff was a woman or on any kind of stereotype about working mothers, or that they would have treated a male father in a different manner. The fact that Plaintiff subjectively felt that the long hours she was being asked to work were interfering with her ability to spend more time with her children (and thus to be a parent) does not turn Defendants' treatment of her into gender-based discrimination, nor does it show that she reasonably believed that Defendants' conduct was motivated by the fact that she is a woman specifically. The Court therefore rejects Plaintiff's argument that she has sufficiently shown that she reasonably believed she was reporting "gender-plus" discrimination or harassment.[33]

[33]     The cases Plaintiff cites in support of her gender-plus theory are inapposite, because there is no admissible evidence to show that Plaintiff was subjected to any of the stereotypes about the incompatibility of motherhood and full-time

work that were found to constitute gender-plus discrimination in those cases. *Back*, 365 F.3d at 118-21. Rather, in this case, Defendants wanted Plaintiff to work a full-time schedule, and it was Plaintiff who was consistently seeking to work less due to her parental obligations.

In the alternative, the Court finds that, even if it were to find that Plaintiff's complaint constituted protected activity, no reasonable fact finder could conclude, based on the admissible evidence, that any adverse action she suffered was causally connected to her complaint. As an initial matter, the Court notes that it is axiomatic that an action taken against an individual before he or she engaged in protected activity cannot constitute an adverse action for the purposes of a retaliation claim. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (finding that an inference of retaliation could not arise where the plaintiff's termination was the end result of "an extensive period of progressive discipline" that began five months before he engaged in protected activity); *Doroz v. Columbia Place Assocs., LLC*, 13-CV-1135, 2014 WL 5475289, at *7 (N.D.N.Y. Oct. 29, 2014) (Hurd, J.) (finding that the plaintiff's termination a year before his protected activity could not show retaliation); *Grant v. New York State Office for People with Developmental Disabilities*, 12-CV-4729, 2013 WL 3973168, at *9 (E.D.N.Y. July 30, 2013) (finding that the plaintiff could not establish a causal connection between any protected activity and the adverse action where all of the alleged adverse actions occurred before the plaintiff ever engaged in the protected activity). As a result, Plaintiff cannot rely on any actions that were taken against her before her March 17, 2016, meeting with Defendant Haelen, which, as discussed above, was the first apparent instance when Plaintiff reported feeling like Defendant Di Stefano was forcing her to "choose between being employed at the Fund and being a mother." (Dkt. No. 64, at ¶ 81 [Pl.'s Decl.].)

As Defendants argue, many of the specific types of conduct that Plaintiff asserts as adverse actions began before she made her complaint. Specifically, it is undisputed that (a) the resolution to name Defendant Di Stefano as Secretary of the Fund's Board of Trustees was made before Plaintiff made her complaint, even if she was not appointed until after;[34] (b) Defendant Di Stefano and Ms. Lais began preparing the PIP before Plaintiff made her complaint; (c) Defendant Di Stefano expressed dissatisfaction with Plaintiff's work completion and work product before she made her complaint; (d) Defendants Haelen and Di Stafano engaged in delays in responding to and approving her requests for time off, including her request

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 157 of 830

**Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)**

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

for a return to an 80% schedule or a schedule with time off on various Tuesdays and Thursdays before she made her complaint; (e) Defendant Di Stefano cancelled meetings with Plaintiff frequently both before and after she made her complaint; (f) Defendant Di Stefano worked with members of the other Departments without consulting Plaintiff both before and after she made her complaint, including an instance in or before February 2016 when Plaintiff asserts Defendant Di Stefano unilaterally drafted language for a contract that "undermined" Plaintiff's relationship with that Department; and (g) Defendant Di Stefano sent an email indicating that requests for time off needed to copy all Counsel's Office staff before Plaintiff made her complaint. (*See, supra,* Part II of this Decision and Order, at ¶124; Dkt. No. 59, Attach. 6, at 5-6, 10-12; Dkt. No. 64, at ¶¶ 38-39, 41-42, 45-55, 59, 61, 65, 68, 72.) Because all of this conduct was occurring before her complaint, the fact that some of it merely continued to occur after she made her complaint does not reasonably suggest that Defendants retaliated against her.

34    Notably, in her deposition, Plaintiff testified that, although Defendant Di Stefano became Secretary officially in April 2016, Defendant Haelen had told Plaintiff "that he didn't expect [Plaintiff] to continue in that role as [S]ecretary" as early as the summer of 2015. (Dkt. No. 59, Attach. 4, at 22-23 [Pl.'s Dep.].)

**\*20**  The Court also agrees with Defendants that it is logically inconsistent for Plaintiff to argue that Defendants retaliated against her by taking work away from her and diminishing her responsibilities and also argue that Defendant Di Stefano had acted in an inappropriate manner by "loading up her workload" with more work than she could handle around the beginning of March. (Dkt. No. 64, at ¶¶ 70.) Specifically, there is no evidence to suggest that her responsibilities were diminished so much that a reasonable factfinder could conclude that the lessening of her work load rose to the level of an adverse action.

The remaining asserted retaliatory actions include the following: (a) an email on March 21, 2016, in which Defendant Di Stefano requested that Plaintiff copy her on or forward to her emails between Plaintiff and staff on work matters or work questions so that she was aware of what was going on and they would not be working at "cross-purposes"; (b) the fact that Defendant Di Stefano took over various responsibilities that used to be Plaintiff's without telling her, including cancelling or not inviting her to meetings or not including her on emails, independently drafting contract

language behind Plaintiff's back or changing Plaintiff's work product without telling her, and taking over various litigation matters; (c) the fact that Defendant Di Stefano excluded her from any involvement with the Board of Trustees, even though the previous Fund Counsel had her assist him with Board matters when he was the Secretary; (d) the fact that she was excluded from a Counsel's Office Staff meeting around June 10, 2016; (e) the fact that she was told she could not work in the Counsel's Office conference room and was told to instead do that work in the file room; (f) the fact that, on June 8, 2016, she was notified that her signatory authority had been reduced to vendor responsibility forms; 35 and (g) the fact that Defendants disputed her right for a waiver related to her health benefits in September 2017 and terminated her employment in October 2018. (Dkt. No. 64, at ¶¶ 109-10, 112-24, 126-32, 140, 142, 144, 163-64.)

35    Plaintiff admitted in her deposition that, although she did not receive notice in the change of signatory authority until June 2016, she does not know when that authority was actually changed. (Dkt. No. 59, Attach. 4, at 124-25 [Pl.'s Dep.].)

The Court is not convinced that a reasonable factfinder could conclude, based on the admissible evidence, that these alleged actions rose to the level of adverse actions. 36 Rather, they are more in line with "petty slights or minor annoyances" than materially adverse actions, whether or not Plaintiff subjectively felt humiliated and excluded. *See Ziyan Shi v. New York Dep't of State, Division of Licensing Servs.*, 393 F. Supp. 3d 329, 337-39 (S.D.N.Y. 2019) (finding that assigning the plaintiff a challenging workload, giving the plaintiff a counseling memorandum without adverse consequences, yelling and screaming at the plaintiff, and failing to include the plaintiff on an email to all the other investigators did not rise to the level of an adverse employment action); *Lyman v. New York State OASAS*, 928 F. Supp. 2d 509, 523 (N.D.N.Y. 2013) (D'Agostino, J.) (finding that actions including requiring the plaintiff to call into the office and inform them of his whereabouts when he was working outside the office, communicating with the plaintiff's estranged ex-wife, harassing the plaintiff at work, reassigning certain assignments from the plaintiff without decreasing his pay or position, informing plaintiff that he was being laid off for budgetary reasons, and placing a memorandum in the plaintiff's file did not constitute adverse actions to show retaliation).

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 158 of 830

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)
2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

36      The exception to this finding is Defendants' alleged actions related to Plaintiff's health benefits and her termination, both of which would arguably dissuade a reasonable worker from making a charge against her employer. However, these actions occurred more than a year after she made her complaint and there were numerous intervening circumstances (most notably, Plaintiff's being on leave for a significant portion of time without any indication of when she would return to work) that would break any causal connection between her complaint and these actions. *See Placide-Eugene v. Visiting Nurse Service of New York*, 86 F. Supp. 3d 132, 150 (E.D.N.Y. 2015) (noting that an "intervening event dispels an inference of a causal relationship between the protected activity and Plaintiff's termination, thus defeating Plaintiff's prima facie case of unlawful retaliation").

**\*21** Additionally, even if these actions did constitute adverse actions when considered together, Plaintiff cannot show that those actions are causally connected to her complaint of March 18, 2016. Although the above actions are somewhat different conduct than what Plaintiff dealt with before she made her complaint, they represent a variation on the same theme: there is nothing in the admissible evidence to show that Defendant Di Stefano or Defendant Haelen treated Plaintiff worse than they had before she made her complaint. Without any such worsening, Plaintiff cannot show that Defendants' post-complaint actions were retaliation for her complaint, as opposed to a mere continuation of Defendants' previous pattern of conduct towards her. *See Chamberlin v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007) (noting that, "where, as here, timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff ever engaged in any protected activity, an inference of retaliation does not arise," and finding that, because the facts "document a pattern of attempts to undermine and exclude him that began well before the filing of the first EEOC complaint and that continued after the complaint was filed," no causal connection was shown between those acts and the protected activity); *Hardy v. Rochester Genesee Regional Transp. Auth.*, 906 F. Supp. 2d 178, 185 (W.D.N.Y. 2012) (noting that "temporal proximity alone does not create an inference of retaliation when the adverse action is part of, or the culmination of, a disciplinary process that was already underway prior to the protected activity").

For all of the above reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's Title VII retaliation claim. The Court also finds that Plaintiff's claim for retaliation under the NYSHRL must be dismissed because the standards for liability under Title VII and NYSHRL are the same. Specifically, even if Plaintiff's complaint about discrimination or a hostile work environment based on her parental status would constitute protected activity under NYSHRL (because parental status is a protected classification under that statute and thus she had a good faith reasonable belief that she was reporting conduct that violated the statute), the same deficiencies in her ability to prove an adverse action or a causal connection between any adverse action and her protected activity apply to her NYSHRL claim. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 413 (S.D.N.Y. Mar. 10, 2014) (finding it appropriate to exercise supplemental jurisdiction over NYSHRL claim despite having dismissed the Title VII claims because "the standards of liability under the two statutes are coterminous," and thus it was in the interests of judicial economy, convenience, fairness, and comity to dismiss those claims together).

**B. Whether the Court Should Exercise Supplemental Jurisdiction Over Plaintiff's Remaining NYSHRL Claim**

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 59, Attach. 2, at 27 [Defs.' Mem. of Law]; Dkt. No. 72, at 11-12 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

A district court "may decline to exercise supplemental jurisdiction over a claim" if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). In deciding whether to exercise supplemental jurisdiction, the court should balance "values of judicial economy, convenience, fairness, and comity." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). However, as a general rule, "when the federal claims are dismissed, the state claims should be dismissed as well," and the ordinary case "will point toward declining jurisdiction over the remaining state-law claims." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998).

The Court notes that Plaintiff's NYSHRL claim for discrimination and/or hostile work environment based on her familial status remains to be decided. As discussed above in Part I of this Decision and Order, Plaintiff's

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

discrimination/hostile work environment claim under Title VII was dismissed on a previous motion due to her failure to state a claim, in particular based on her failure to allege facts plausibly suggesting that she was discriminated against based on her sex. However, because Title VII does not include familial status as a protected class, the Court has not had the opportunity to reach the merits of Plaintiff's claim for discrimination based on her familial status. Additionally, because familial status is protected under New York law only (and not also federal law), any decision on that claim would involve a deeper assessment of New York state law, even if the general analytical framework is the same as that used under federal law.

**\*22** Because the Court has already dismissed the remaining federal law claim in this action and was not required to make a determination on the merits of any Title VII discrimination and/or hostile work environment claim on this motion for summary judgment, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL claim for familial status discrimination. In particular, the Court finds that this is the typical case in which the relevant factors point towards that conclusion, as any decision will require an assessment of primarily state law given that Title VII has no equivalent protection based on familial status.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 59) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's retaliation claims under Title VII and the NYSHRL are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's discrimination claim based on familial status under the NYSHRL is **DISMISSED without prejudice** to refiling in state court within the applicable time limits; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

### All Citations

Not Reported in Fed. Supp., 2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3674745

KeyCite Yellow Flag - Negative Treatment

Supplemented by   Cao-Bossa v. New York State Dep't of Labor,   N.D.N.Y.,
November 16, 2021

2021 WL 3674745
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Weili CAO-BOSSA, Plaintiff,
v.
NEW YORK STATE DEPARTMENT
OF LABOR, Defendant.

1:18-CV-0509 (GTS/TWD)
|
Signed 08/19/2021

**Attorneys and Law Firms**

WEILI CAO-BOSSA, Plaintiff, Pro Se, 1912 East Country
Club Drive, Schenectady, NY 12309.

HON. LETITIA JAMES, Attorney General for the State of
New York, Counsel for Defendant, 300 South State Street,
Suite 300, Syracuse, NY 13202, OF COUNSEL: AIMEE
COWAN, ESQ., Assistant Attorney General.

**DECISION and ORDER**

Glenn T. Suddaby, Chief U.S. District Judge

 **\*1**  Currently before the Court, in this employment
discrimination action filed by Weili Cao-Bossa ("Plaintiff")
against the New York State Department of Labor
("Defendant"), are the following two motions: (1)
Defendant's motion for summary judgment; and (2)
Defendant's letter-motion to strike Plaintiff's sur-reply. (Dkt.
Nos. 58, 70.) For the reasons set forth below, Defendant's
motion for summary judgment is granted, and its motion to
strike Plaintiff's sur-reply is denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Second Amended Complaint**
Generally, in her Second Amended Complaint, Plaintiff
claims that Defendant discriminated against her based on
her national origin and age in violation of Title VII of the
Civil Rights Act of 1964 and the Age Discrimination in
Employment Act ("ADEA"). (Dkt. No. 25 [Pl.'s Second
Am. Compl.].) In support of her claims, Plaintiff alleges that
Defendant discriminated against her by (a) refusing to hire
her for a position for which she interviewed in March 2016,
and (b) terminating her employment in another position after
six months. (*Id.*) More specifically, Plaintiff, who is Chinese
and was 45 years old at the time of her termination, alleges
that she received unfairly poor performance reviews based
on a few sporadic mistakes that resulted in her termination,
but that other American and/or younger employees did not
receive similar negative performance reviews and were not
terminated. (*Id.*)

**B. Undisputed Material Facts on Defendant's Motion
for Summary Judgment**
Under N.D.N.Y. Local Rule 56.1 (formerly Local Rule
7.1[a][3]), a party opposing summary judgment must file a
response to the moving party's Statement of Material Facts
that "shall mirror the movant's Statement of Material Facts
by admitting and/or denying each of the movant's assertions
in a short and concise statement, in matching numbered
paragraphs," supported by "a specific citation to the record
where the factual issue arises." N.D.N.Y. Local R. 56.1(b).
This requirement is not a mere formality; rather "this and
other local rules governing summary judgment are essential
tools intended to relieve the district court of the onerous
task of hunting through voluminous records without guidance
from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL
921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting
*Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y.
2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's
statement of material facts streamlines the summary judgment
analysis 'by allocating responsibility for flagging genuine
factual disputes on the participants ostensibly in the best
position to do so: the litigants themselves.' " *LaFever*, 2021
WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018
WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).
"The Court may deem admitted any properly supported facts
set forth in the Statement of Material Facts that the opposing
party does not specifically controvert." N.D.N.Y. Local R.
56.1(b).

In this case, Plaintiff entirely failed to provide any response
to Defendant's Statement of Material Facts, much less one
that complies with Local Rule 56.1. Where a party has failed
to respond to the movant's statement of material facts in the
manner required under Local Rule 56.1, the facts in the
movant's statement will be accepted as true (1) to the extent
that they are supported by evidence in the record, and (2)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 161 of 830

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).[1] Here, Defendant served on Plaintiff the standard form for this District entitled "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," which includes a specific notification of the requirement to respond to the defendant's statement of material facts in matching numbered paragraphs with citation to supporting evidence as well as a warning that failure to do so could result in the Court deeming facts to be true that are not properly disputed. (Dkt. No. 58, Attach. 2.) Moreover, four days later, the Court served Plaintiff with a duplicate copy of that Notification. (Dkt. No. 59.) Eight days later, Plaintiff requested an extension of the response deadline. (Dkt. No. 60.) Plaintiff has therefore received sufficient notice of the possible consequences of her failure to respond to Defendant's Statement of Material Facts.

[1]    Notably, although "courts are required to give due deference to a plaintiff's *pro se* status, that status 'does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.' " *Salaam v. Stock*, 19-CV-0689, 2021 WL 2367123, at *2 (N.D.N.Y. May 12, 2021) (Dancks, M.J.) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 [2d Cir. 2003]), report-recommendation adopted by 2021 WL 2102242 (N.D.N.Y. May 24, 2021) (Sannes, J.).

**\*2** Although the Court has ensured that Defendant's asserted facts are supported by the cited record evidence, it does not have the duty to scour the record for any and all evidence that may contradict those asserted facts. *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 291 (2d Cir. 2000) (noting that the Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out") (internal quotation marks and citations omitted). As a result, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts and deemed admitted by Plaintiff due to her failure to respond and failure to provide any evidence

to dispute the asserted facts. (Dkt. No. 66 [Def.'s Rule 56.1 Statement].)

1. Plaintiff was born on September 21, 1972.

2. Plaintiff is of Chinese national origin.

3. Plaintiff obtained a bachelor's degree in Agriculture in 1996 from Ocean University of China.

4. Plaintiff also received a certificate from Austin Community College in Austin, Texas, in 2012 for "professional accountant with high technology."

5. Plaintiff did not have her Certified Public Accountant ("CPA") license at the time of her deposition.

6. In 2016, Plaintiff did not have the requisite one year of accounting experience, supervised by a CPA, required for CPA licensing.

7. Plaintiff testified that she passed her CPA examinations in 2014.

8. Plaintiff did not have any formal accounting experience before she immigrated from China to the United States in 2008.

9. The first accounting position Plaintiff held after arriving in the United States in 2008 was her position with Defendant in 2016.

10. Defendant is an executive agency of the State of New York, established pursuant to Article 2 of the New York State Labor Law.

11. Defendant's Administrative Finance Bureau ("AFB") is responsible for the budgeting, fiscal management, accounting, and expenditure of all department funds.

12. The AFB also maintains and ensures the accuracy of Defendant's payroll system, provides support operations services, including all procurement and payment activities, and provides property management services covering leasing, space planning, project oversight, and building maintenance.

13. Additionally, the AFB is responsible for the management of Defendant's federal grant funding and ensuring compliance with state and federal reporting requirements.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 162 of 830
Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)
2021 WL 3674745

14. The AFB is divided into multiple sub-units, each with managers who reported to Kathleen Elfeldt when she was the Director of Finance from 2014 until January 2018.

15. The Financial Management Unit ("FMU") is one of the sub-units of the AFB.

16. In March 2016, Defendant posted a job vacancy announcement for an Accountant Trainee 1 & 2 (Grades 14 and 16) and Senior Accountant (Grade 18) position within the AFB's FMU.

17. In order to be eligible for the Accountant Trainee position, a candidate must pass a Civil Service examination and possess a bachelor's degree in accounting, auditing or taxation, or a bachelor's degree or higher degree with 24 semester credit hours of accounting, auditing or taxation courses.

18. A list of candidates who meet these requirements is provided to Defendant by the New York State Department of Civil Service.

19. Plaintiff was the fourth candidate on the Accountant Trainee list, with a score of 90, and thus she was eligible for an interview.

20. On July 12, 2016, Plaintiff was interviewed for the open Accountant Trainee position, and then was interviewed by Director Elfeldt the following day.

21. During the second interview, Director Elfeldt explained that the position for which Plaintiff was interviewing was within the AFB's FMU, which manages Defendant's finances related to federal grants and federal programs.

**\*3** 22. Director Elfeldt informed Plaintiff that federal requirements made the FMU position unique, but that in the future she expected that there would be open positions in the Accounting Office that could be a better fit for Plaintiff's skills and experience.

23. At the time of her interview, Plaintiff did not have any experience reviewing federal guidance or regulations and was not familiar with federal grant funding and guidance requirements.

24. Plaintiff emailed Director Elfeldt after the interview, asking "[W]hy you set such an interview if government working experience is a necessity to this job?"

25. Director Elfeldt responded that government work experience was not a job requirement for the position, but that the federal grant funding and reporting requirements made the Department of Labor different than a typical state agency, and the position Plaintiff interviewed for was not in the accounting office and would not be entering data into an accounting system.

26. Director Elfeldt indicated that Plaintiff's work experience did not make her a good fit for the position.

27. Plaintiff alleges that she did not receive this position because she was discriminated against based on her age and national origin.

28. Plaintiff does not know the basis for her belief that Director Elfeldt discriminatorily denied her the position based on her age and national origin, other than that "there is no other explanation."

29. Plaintiff admitted at her deposition that she did not have the right experience for this position.

30. On July 15, 2016, Defendant posted another job vacancy for an Accountant Trainee 1 & 2 and Senior Accountant, this one in the Accounting Unit.

31. Plaintiff was again reachable for this position on the Civil Service list.

32. Plaintiff claims that Director Elfeldt had her assistant call Plaintiff to let her know that there was another position open.

33. On July 19, 2016, Plaintiff interviewed for the position in the Accounting Unit.

34. On September 13, 2016, Margaret "Peg" Farrell, the Project Director for the State Financial System ("SFS") Project in the Accounting Unit at the time, requested that Plaintiff be hired for a Senior Accountant Trainee position.

35. Plaintiff's hiring was approved by Michelle Daly, the Director of the Accounting Office, and Director Elfeldt.

2021 WL 3674745

36. Plaintiff accepted the offer, and her employment began on October 6, 2016.

37. Plaintiff was hired as a trainee on a probationary basis and her salary grade was equivalent to a Grade 14.

38. Plaintiff's probationary period was to run concurrently with her two-year traineeship.

39. After she was hired, Plaintiff was assigned to the Accounting Office's SFS Project Team.

40. Plaintiff's direct supervisor was Project Assistant Lindsay Pulcher and the team manager was Ms. Farrell.

41. Ms. Farrell was Ms. Pulcher's direct supervisor.

42. Ms. Pulcher was the Project Assistant for the SFS Project Team from April 2014 to April 2017.

43. Supervisors for probationary trainees such as Plaintiff are required to present trainees with an Individual Development Plan and quarterly probationary evaluations, as well as traineeship evaluations at six-month intervals during the traineeship.

44. On October 26, 2016, Plaintiff met with Ms. Pulcher and was provided an Individual Development Plan that listed the activities, tasks, and performance standards that were expected of her in her position.

*4  45. However, during the month of November 2016, Plaintiff had many issues completing basic tasks and assignments that were required in her position.

46. On or about December 5, 2016, Ms. Pulcher and Ms. Farrell met with Plaintiff to review her Individual Development Plan to ensure that Plaintiff understood the requirements of her position and what was expected of her.

47. During the meeting, Plaintiff was reminded about the tasks she needed to complete as part of her position and she was reminded as to how she should be completing her assignments.

48. Plaintiff was also reminded during this meeting that her position was a two-year traineeship during which she was on probation and could be terminated for poor performance.

49. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed during this meeting that she needed to choose her wording carefully in emails and on the telephone.

50. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she is not entitled to "flex time" and was not allowed to leave early if she arrived to work early.

51. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she needed to complete her assignments in the format that her supervisor had requested.

52. At no point during the meeting did either Ms. Pulcher or Ms. Farrell discuss Plaintiff's age or national origin.

53. At no point during the meeting did Plaintiff raise any concerns about discrimination.

54. However, following the meeting of December 5, 2016, Plaintiff continued to have issues with her job performance.

55. On January 6, 2017, Plaintiff received a three-month performance evaluation which indicated that she needed to improve in almost all aspects of her job performance.

56. The three-month evaluation was completed by Ms. Pulcher and reviewed by Ms. Farrell.

57. A meeting was held with Plaintiff on January 6, 2017, in which Ms. Pulcher and Ms. Farrell gave the three-month evaluation to Plaintiff.

58. Ms. Pulcher took notes of the meeting, indicating what was reviewed with Plaintiff and Plaintiff's responses.

59. Plaintiff admits that she made mistakes during the first three months of her probationary term.

60. During the meeting, Ms. Pulcher showed Plaintiff an example of an email in which Plaintiff used a harsh, inappropriate tone.

61. Plaintiff testified at her deposition that she disagrees with Ms. Pulcher's assessment of her performance.

62. Following receipt of her three-month evaluation, Plaintiff met with Lin Arbab, a Human Resources Specialist for Defendant.

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

63. During this meeting, Ms. Arbab explained to Plaintiff that managers and supervisors may appropriately issue evaluations that accurately reflect the quality of an employee's performance.

64. Ms. Arbab explained that sometimes an employee's performance will be rated as "needs improvement" in certain areas, and that it is not unusual for an employee to receive an evaluation that indicates performance areas that need improvement.

65. Ms. Arbab explained that Plaintiff's three-month evaluation reflected her supervisor's assessment of her performance and included examples of the noted performance deficiencies.

**\*5** 66. At the time, Plaintiff did not express to Ms. Arbab any belief that the three-month evaluation was the result of discrimination.

67. On January 12, 2017, Plaintiff wrote an email to Ms. Pulcher and Ms. Farrell, in which she stated that she "appreciate[d] you letting me know your concerns about my performance in the first quarter evaluation," and that she "enjoys very much working" with Ms. Pulcher and Ms. Farrell and "can learn something new every day with [their] help."

68. In the email of January 12, 2017, Plaintiff also listed her plans to improve her performance, including promising to review her emails before sending them to other people, pay attention to formatting details for biweekly downloading and monthly queries, submit a summary of the work she performed that day before she left work every day, take notes so she can stop "asking the same stupid questions," and charge personal time whenever she has to use work time.

69. Plaintiff also asked Ms. Pulcher to remind her if she asks the "same stupid questions" and stated, "Please help me improve my management skills of work assignments. I will improve my quality of work and other virtues required for my work."

70. In the email of January 12, 2017, Plaintiff did not complain about feeling like she was being discriminated against, and did not express disagreement with the three-month performance evaluation.

71. Following the three-month performance evaluation, Plaintiff continued to have job performance issues.

72. Ms. Farrell kept a log of some of the performance issues that Plaintiff exhibited for approximately nine weeks after her three-month evaluation:

a. On January 23, 2017, Ms. Pulcher noted that Plaintiff downloaded the wrong NHRP files.

b. On February 1, 2017, Plaintiff's Monthly Mod Accrual and Stat Ledger queries were for December 2015 rather than December 2016.

c. On February 6, 2017, Ms. Farrell notified Plaintiff that she had made mistakes on the monthly query, to which Plaintiff responded, "[S]orry for the negligence. Will be more careful in the future."

d. Also on February 6, 2017, Ms. Pulcher was forced to remind Plaintiff to download the NHRP522 and NHRP530 files despite the fact that this had been a recurring task for several pay periods.

e. On February 22, 2017, Ms. Pulcher spoke with Plaintiff about her failure to prioritize assignments correctly.

f. On February 27, 2017, Ms. Pulcher emailed Plaintiff to inform her that she

was enrolled in mandatory training courses, but that those courses were not a priority since they did not need to be completed for eight months, and to identify which assignments were a priority. However, Plaintiff completed these training courses before the priority assignments despite Ms. Pulcher's directions.

g. On Mar h 1, 2017, Ms. Farrell asked Plaintiff to complete an assignment immediately, but Plaintiff submitted the assignment the following day, incorrectly. The assignment was still incorrect the second time Plaintiff submitted it.

h. On March 3, 2017, Ms. Farrell asked Plaintiff to create a tab with a pivot table for each ledger on an Excel spreadsheet. Plaintiff submitted the assignment incorrectly and Ms. Farrell was forced to follow up.

**\*6** i. Also on March 3, 2017, Ms. Pulcher contacted Plaintiff regarding an assignment that she submitted incorrectly the previous day. Plaintiff responded, "You

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 165 of 830
Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)
2021 WL 3674745

are right ... I guess I was kind of in a hurry. Sorry for the abbreviation."

j. On March 8, 2017, Ms. Pulcher requested that Plaintiff provide a summary of an accounting training class Plaintiff had attended; however, Plaintiff did not provide that summary and Ms. Pulcher was forced to follow up on March 21, 2017, at which time Plaintiff still had not completed the assignment.

73. Ms. Farrell recorded at least 13 separate instances between January 11, 2017, and March 20, 2017, on which Plaintiff submitted an incorrect or incomplete assignment or needed to be reminded to complete an assignment.

74. On April 3, 2017, Plaintiff received a six-month evaluation from Ms. Pulcher.

75. Ms. Pulcher recommended that Plaintiff be terminated based on her unsatisfactory performance.

76. Ms. Farrell approved Ms. Pulcher's recommendation for Plaintiff's termination.

77. Director Elfeldt also agreed with the recommendation for termination.

78. Ultimately, termination decisions are made by the Personnel Department.

79. The recommendation was forwarded to Lisa Burrell, Associate Director of Human Resources for Defendant, who made the final determination approving Plaintiff's termination.

80. Plaintiff was presented with the six-month evaluation at a meeting, during which Ms. Pulcher indicated the main reasons why her employment was being terminated, including the fact that her assignments were often not completed per instructions and follow-up was often required, the fact that she needed to be reminded of the same issues repeatedly, and the fact that she did not make the best use of her time or exert a consistent effort.

81. Plaintiff signed the evaluation that recommended her termination.

82. When she received her six-month evaluation, Plaintiff did not complain that her evaluation was the result of discrimination.

83. On April 13, 2017, Plaintiff emailed Director Elfeldt, stating "[T]here were errors in my work because of careless [sic] and inexperience, but they had nothing to do with working abilities."

84. At her deposition, Plaintiff acknowledged that she admitted she was careless and inexperienced during her six months working for Defendant.

85. Plaintiff did not allege in her email of April 13, 2017, that she felt discriminated against.

86. She did, however, thank Director Elfeldt for giving her a chance "to see how unique and complicated the DOL accounting could be."

87. The first time Plaintiff ever expressed that she felt discriminated against while working for Defendant was in an email to Ms. Arbab on April 10, 2017.

88. At no point during her employment with Defendant did anyone make any remarks about Plaintiff's national origin or age.

89. There were "many" employees in Plaintiff's specific unit who were Plaintiff's age or older.

90. On July 17, 2017, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR").

91. Her complaint was amended on or about August 2, 2017, and in it she alleged that she was subjected to discrimination based on her age and national origin in violation of the New York State Human Rights Law, Title VII, and the ADEA.

**\*7** 92. On December 20, 2017, the NYSDHR issued a Determination and Order After Investigation, in which it determined that there was no probable cause to believe that Defendant engaged in or was engaging in the unlawful discriminatory practices Plaintiff alleged.

93. On January 26, 2018, the Equal Employment Opportunity Commission ("EEOC") adopted the findings of the NYSDHR.

94. Plaintiff alleges in her Second Amended Complaint that two or three other employees were treated more favorably than her because of their national origin.

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

95. Specifically, Plaintiff alleges that Richard Deitz was treated more favorably than her because of his national origin. However, Plaintiff does not know what position Mr. Dietz held or who he is, and she admits that his job responsibilities were different than her job responsibilities. She also "guesses" that he is "American."

96. According to Mr. Deitz's evaluation in the record, his supervisor was Michelle Daly, not Ms. Pulcher, and Ms. Pulcher has never supervised or evaluated Mr. Deitz.

97. The basis for Plaintiff's belief that Mr. Deitz was treated differently than her is that he was praised for "taking initiative" while she was not.

98. Plaintiff also alleges that Frank Shavel was treated more favorably than her because of his national origin. However, Plaintiff is unaware of where Mr. Shavel worked within Defendant's organization, she did not know what position he held, she did not know who supervised him, she has never worked with him and has never seen him in person, she does not know what his salary grade is, and she does not know whether he was a permanent or probationary employee. Plaintiff also does not know his ethnic background.

99. The only basis for Plaintiff's belief that Mr. Shavel was treated more favorably than her is that he was given a counseling memorandum about failing to complete a mandatory training rather than being terminated, while she did not receive any memoranda before her termination.

100. However, Plaintiff does not know whether Mr. Shavel failed to complete other tasks or training beyond the one related to the counseling memorandum.

101. Plaintiff also alleges that Kayla O'Hara was treated more favorably than her because of her national origin. However, Plaintiff admitted that she does not know Ms. O'Hara's national origin (but she guesses that it is American), she has never worked with Ms. O'Hara or observed her work performance, she has never spoken with anyone who worked with or supervised Ms. O'Hara, she does not know whether Ms. O'Hara made similar mistakes to the ones that are detailed in Plaintiff's own evaluations, and she does not know whether Ms. O'Hara was ever counseled about her time or attendance. Additionally, unlike Plaintiff, who was hired as a Grade 14 Accountant Trainee, Ms. O'Hara was hired as a Grade 18 Senior Budget Analyst effective September 21, 2017.

102. The only basis for Plaintiff's belief that Ms. O'Hara was treated differently than her is because there is no mention of "one-time incident[s]" or "learning process" on Ms. O'Hara's evaluation. Ms. O'Hara's performance evaluation shows that she met performance expectations for her position.

103. Plaintiff also alleges that these employees were treated more favorably than her based on her age.

*8 104. However, Plaintiff admits that Mr. Shavel and Mr. Deitz are both as old or older than her: Mr. Deitz was 45 years old in 2017, and Plaintiff testified that Mr. Shavel is "older than sixty, in his sixties or something .... He's older than me." Mr. Shavel was in fact 61 years old in 2017.

105. Ms. O'Hara was 27 years old in 2017.

106. Ms. Pulcher was not aware of either Ms. O'Hara's or Plaintiff's ages in 2017.

107. The basis for Plaintiff's belief that she was treated differently because of her age was "some clues from [Ms. Pulcher]," such as when Ms. Pulcher "mentioned something about older people. She just didn't believe older people could do good job."

108. Specifically, Plaintiff alleges that Ms. Pulcher commented that a receptionist, Donna, who is around retirement age, "didn't know what she was doing."

109. Plaintiff also alleges that Ms. Pulcher made a comment about a "guy who's doing payroll" and how he needs to retire.

110. Ms. Pulcher denies ever making any comments about "Donna" or "a guy who's doing payroll" with respect to their age or ability to perform their job, and denies making any comments to Plaintiff during her employment about any employees' ages or how their ages impact their ability to perform their jobs.

111. Director Elfeldt was 57 years old at the time of Plaintiff's termination.

112. Assistant Director Cathryn Piccirillo was 51 years old at the time of Plaintiff's termination.

113. Ms. Farrell was 50 years old at the time of Plaintiff's termination.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 167 of 830

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

114. Associate Director of Human Resources Ms. Burrell was 48 years old at the time of Plaintiff's termination.

115. Plaintiff was not the only employee of Asian descent in the AFB at the time Plaintiff was employed there, and there are currently employees of Asian descent employed in Defendant's Finance Bureau.

116. On April 7, 2017, Ms. Burrell sent a letter to Plaintiff indicating that she concurred with the termination recommendation effective close of business April 14, 2017.

117. On April 10, 2017, Plaintiff emailed Ms. Burrell and stated that she felt Ms. Pulcher was an "inexperienced and inapt [sic] supervisor" who was not qualified and who did not provide her with proper training and help, as well as that she felt that Ms. Pulcher was mean to her and that she had been discriminated against.

118. Nowhere in the email of April 10, 2017, does Plaintiff mention that she felt discriminated against specifically based on her age or national origin.

119. At no point during her employment with Defendant did Plaintiff ever complain to Director Elfeldt that she believed she was being discriminated against in any way.

### C. Parties' Briefing on Defendant's Motion for Summary Judgment

#### 1. Defendant's Memorandum of Law

Generally, in its motion for summary judgment, Defendant makes three arguments. (Dkt. No. 58, Attach. 1, at 12-43 [Def.'s Mem. of Law].) First, Defendant argues that Plaintiff's discrimination claims should be dismissed as untimely to the extent they are based on Defendant's failure to hire her for a position with the FMU in July 2016. (*Id.* at 12-15.) Specifically, Defendant argues that this alleged act of discrimination occurred more than 300 days before Plaintiff filed her complaint with the NYSDHR on July 17, 2017, and thus any portion of her claims based on that alleged act of discrimination must be dismissed. (*Id.*) Defendant additionally argues that, timeliness notwithstanding, Defendant's actions in not hiring her for that position in July 2016 were not based on discrimination, but rather because she lacked experience with federal grants and

other regulatory considerations that were a feature of that specific position. (*Id.*)

**\*9** Second, Defendant argues that Plaintiff's national origin discrimination claim pursuant to Title VII should be dismissed. (*Id.* at 15-33.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she was not qualified for her position in that she did not meet legitimate employer expectations of job performance as evidenced by the job evaluations showing unsatisfactory performance, and (ii) the circumstances of her termination do not give rise to an inference of discriminatory intent given that there was evidence that Plaintiff did many things wrong and there have been no comments alleged to have been made about her ethnic group, and, in particular, the other employees identified by Plaintiff are not sufficiently similarly situated to her to raise such an inference; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment, namely her repeated poor performance despite having meetings and reviews in which she was informed of the ways in which she was not meeting expectations; and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because she has no evidence that her national origin was even a factor in that decision, and her own subjective belief that it is is not sufficient to sustain her claim. (*Id.*)

Third, Defendant argues that Plaintiff's age discrimination claim pursuant to the ADEA should be dismissed. (*Id.* at 33-43.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she cannot show that she was performing her job satisfactorily (as already discussed), and (ii) she cannot show that her termination occurred under circumstance giving rise to an inference of discrimination based on her age given that the only alleged co-employee who was younger than her is not sufficiently comparable, and any comments that may have been made by Ms. Pulcher about the ages of other employees were merely stray remarks and Ms. Pulcher was nonetheless not the ultimate decisionmaker as to Plaintiff's termination; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment (as discussed above); and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because her subjective belief that she was discriminated against and a few stray remarks about employees other than Plaintiff do not

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 168 of 830

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

show that her age was the but-for cause of her termination. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

In her response to Defendant's motion, Plaintiff requests that the Court deny that motion, noting the reasons she had needed to request an extension in the past to file her response, and noting that, "[w]hile preparing Plaintiff's Memorandum of Law, I found out Defendant's Memorandum of Law did not follow L.R. 7.1. It was 36 pages in length, and it was 45 pages in total with Table of Contents and the cover page." (Dkt. No. 67, at 1-2 [Pl.'s Opp'n Mem. of Law].) Plaintiff does not address any of the substantive arguments made by Defendant, nor does she submit any response to Defendant's Statement of Material Facts, as already discussed above in Part I.B. of this Decision and Order.

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply, Defendant makes three arguments. (Dkt. No. 68 [Def.'s Reply].) First, Defendant argues that it did not violate the Local Rules of Practice for this Court by filing an overlong brief because the pages for the cover page, the table of contents, and the signature block do not count toward the overall page count, and Defendant's substantive brief was 35 pages as allowed by this Court's Text Order of December 21, 2020. (*Id.* at 4.)

Second, Defendant argues that the Court should accept its asserted facts as true due to Plaintiff's failure to respond to its Statement of Material Facts as required by Local Rule 56.1 because, even though Plaintiff is *pro se*, she was twice provided notice of the consequences of failing to do so. (*Id.* at 5-6.)

Third, Defendant argues that Plaintiff's claims should be deemed to have been abandoned because Plaintiff failed to address or oppose any of Defendant's legal arguments. (*Id.* at 6-7.)

### 4. Plaintiff's Sur-Reply

 **\*10**  Plaintiff also submitted a sur-reply without the permission of the Court. (Dkt. No. 69 [Pl.'s Sur-Reply].) In this sur-reply, Plaintiff asserts that she was not informed

that Defendant had requested or been granted permission to file an overlong brief with 10 additional pages, and that, because she was not aware of this, she "filed the motion of rejection and was waiting for the Judge's further directions about the allowable length." (*Id.* at 1.) She argues that Defendant's brief exceeds the extended page limit because the Conclusion section was on page 36 of that brief and that Conclusion section is "substantive enough to be counted." (*Id.* at 2.) Plaintiff again requests that the Court deny Defendant's motion for being improperly overlong, noting that she "completed [her] response to Defendant's Material Facts Not in Dispute before [she] filed [her] rejection" and indicating that "I will submit my response in whole when Defendant submit [sic] proper memorandum of law or as further directed by the court if otherwise." (*Id.*)

### 5. Defendant's Letter-Motion to Strike Plaintiff's Sur-Reply

Defendant filed a motion to strike Plaintiff's sur-reply because such responses are not permitted without permission under the Local Rules of this Court, but that, even if the Court considers the sur-reply, Plaintiff was provided with a copy of Defendant's request for additional pages for its memorandum and the Court's order granting that request was served on Plaintiff by regular mail, and thus she has no basis for claiming she was not reasonably made aware of Defendant's increased page limit. (Dkt. No. 70.)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [2] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

---

[2]    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 169 of 830

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e). [3]

[3]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*. [255] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.). [4] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules. [5]

[4]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[5]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

 **\*11**  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,*

76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [6] – even where the non-movant was proceeding *pro se*. [7]

[6]    Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

[7]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [8] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[8]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 170 of 830

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III. ANALYSIS

### A. Whether Plaintiff's Sur-Reply Should Be Stricken

Although Defendant is correct that sur-replies are not permitted under Local Rule 56.1 without permission from the Court, the Court finds that whether or not it considers Plaintiff's sur-reply is immaterial to the ultimate outcome of Defendant's motion because the arguments Plaintiff makes within that sur-reply are not meritorious.

**\*12**  Plaintiff's argument that she never received the Court's Text Order of December 21, 2020, is unpersuasive. As Defendant argues, there is sufficient evidence that Plaintiff was reasonably apprised of the Court's Text Order granting Defendant's request for 10 additional pages for its memorandum. (Dkt. No. 48 [noting specifically that a copy of the Text Order was served upon Plaintiff via regular mail].) There is no indication that Plaintiff had changed mailing addresses, that the Text Order had been returned as undeliverable, or that there has been any difficulty with her receiving mail throughout the course of this litigation. (*See* Dkt. No. 1 [Pl.'s Comp.] [listing her address at the time of filing in April 2018 as the same address on file with the Court as her current address].) As a result, there is no reason that Plaintiff should not have reasonably known about the request for (and grant of) the additional pages.

Similarly, Plaintiff's argument that Defendant's motion should be denied because the non-substantive portions of Defendant's memorandum were in excess of 35 pages is unavailing. Non-substantive matter such as cover page, table of contents, and signature block do not count toward the substantive page limit. *See Moore v. Syracuse City Sch. Dist.*, 05-CV-0005, 2009 WL 890576, at *2 n.8 (N.D.N.Y. Mar. 31, 2009) (Scullin, J.) (noting that it repaginated plaintiff's memorandum by starting page one following the Table of

Contents and Authorities); *In re Marina Dev., Inc.*, 05-CV-1349, 2007 WL 9752855, at *1-2 (N.D.N.Y. Jan. 11, 2007) (Hurd, J.) (noting that the Local Rules applied to brief format in bankruptcy cases, and concluding that the appellees' briefs should therefore not exceed 25 pages, "exclusive of pages containing the table of contents, table of citations or similar material"). Additionally, although Plaintiff argues that Defendant's one-sentence conclusion is "substantive enough to be counted," the Court disagrees because that conclusion is merely a brief restatement of Defendant's request that the Court grant its motion to dismiss Plaintiff's Second Amended Complaint that contains no additional substantive argument. (Dkt. No. 58, Attach. 1, at 44 [Def.'s Mem. of Law].) Even if the conclusion were considered to be substantive, the proper course of action in this case would be to merely not consider any pages beyond the allowed amount, not to strike the entire motion as Plaintiff requests. *See Helen Cross v. Colvin*, 16-CV-0111, 2016 WL 7011477, at *4 n.3 (N.D.N.Y. Dec. 1, 2016) (Suddaby, C.J.) (noting that, "[b]ecause Plaintiff has exceeded the page limit, the Court will not consider the arguments contained in pages eleven through fifteen of her counsel's reply affidavit"). The Court therefore finds that there is no basis for Plaintiff's arguments that Defendant's motion should be denied based on the length of its memorandum of law.

Also unpersuasive is Plaintiff's argument that she has prepared a more detailed substantive response to Defendant's motion (including a response to Defendant's Statement of Material Facts), but has not yet filed her "response in whole" because she has been waiting for this Court's "further directions about the allowable length" of Defendant's memorandum of law. (Dkt. No. 69 [Pl.'s Sur-Reply].) Even considering Plaintiff's *pro se* status, there is no justification for Plaintiff's blatant failure to comply with the Local Rules by essentially ignoring the Court's imposed deadlines and manufacturing her own procedure that she now expects the Court to follow. Plaintiff was provided with notice that her response to Defendant's motion for summary judgment was due by February 19, 2021, a notice that she received because she subsequently requested (and was granted) two separate 60-day extensions of time on that deadline, such that her response was not ultimately due until June 21, 2021. (Dkt. Nos. 59, 60, 61, 62, 64.) The Notification of the Consequences of Failing to Respond to a Summary Judgment form that was filed along with Defendant's motion clearly states that a failure to file a proper response to the motion including a response to the Statement of Material Facts, copies of all pertinent record evidence, and a response memorandum

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 171 of 830

containing legal arguments could result in dismissal of some or all of the claims. (Dkt. No. 58, Attach. 2.)

**\*13** Despite being made aware of the need to respond fully and despite being granted multiple lengthy extensions to do so, Plaintiff, without any permission or direction from the Court, chose to instead file a brief "motion" to dismiss Defendant's memorandum due to an alleged failure to comply with the page limits in the Local Rules and seemingly expected (again, without any permission or direction from the Court) that such counter-motion held the deadline for submitting a substantive response to Defendant's motion in abeyance. However, Plaintiff's misunderstanding of the rules of procedure based on her *pro se* status do not excuse her failure to comply with those rules of procedure. *See Alzawahra v. Albany Medical Ctr.*, 546 F. App'x 53, 54 (2d Cir. 2013) (noting that, "[a]lthough a *pro se* litigant is entitled to a liberal construction of his filings, ... his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules"). This is particularly so given that Plaintiff was informed of what she was required to submit in response to Defendant's motion, and the consequences for failing to do so.

Finally, the Court finds that it would not serve the interests of judicial efficiency to allow Plaintiff to submit any further substantive filings in response to Defendant's motion for summary judgment at this point. As already noted, Plaintiff was granted an additional 120 days in which to file her response. In granting her second request to extend that deadline, the Court stated that no more extensions would be granted without documentary evidence that extension was warranted due to medical issues, and noted that this case has been pending for more than three years. (Dkt. No. 64 [Text Order filed Apr. 19, 2021].) Because Plaintiff's response and sur-reply indicate that her failure to file a full response by the deadline was due to her decision to wait to see what the Court ruled as to the propriety of the length of Defendant's memorandum rather than due to any medical or other issue, there is no basis for allowing Plaintiff additional time to submit a full and proper response. Notably, allowing Plaintiff to do so would require Defendant to expend additional time and effort to prepare yet another reply memorandum despite having already filed a reply and a motion to strike in response to Plaintiff's sur-reply. Lastly, the Court notes that, having reviewed the record on this motion, it is unlikely that providing Plaintiff with additional opportunity to respond to Defendant's motion would result in a different outcome on that motion.

As a result, the Court denies Defendant's motion to strike the sur-reply because the sur-reply offers Plaintiff no relief even if considered.

### B. Whether Plaintiff's Discrimination Claim Based on the July 2016 Failure to Hire Must Be Dismissed as Untimely

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

"To sustain Title VII or ADEA claims, a plaintiff must file administrative charges with the EEOC within 300 days of the alleged act of discrimination." *Betterson v. HSBC Bank USA, N.A.*, 661 F. App'x 87, 89 (2d Cir. 2016) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 [2d Cir. 1996]; *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 328 [2d Cir. 1999]). Thus, any conduct that occurred more than 300 days before the charge is filed is barred in a federal lawsuit unless an exception applies. *Betterson*, 661 F. App'x at 89.

Here, Plaintiff filed her complaint with the NYSDHR on July 14, 2017. (Dkt. No. 58, Attach. 12, at 1, 23.) As a result, only alleged acts of discrimination that occurred on or after September 17, 2016, are covered under that complaint. Because the failure to hire that Plaintiff alleges occurred in July 2016, any claim related to that alleged action is barred unless Plaintiff meets one of the defined exceptions to the 300-day requirement.

**\*14** Recognized exceptions to the 300-day requirement include waiver, estoppel, equitable tolling, or the existence of a continuing violation. *Barr v. Bass Pro Outdoor World, LLC*, 17-CV-0378, 2019 WL 6828987, at \*9 (N.D.N.Y. Dec. 13, 2019) (Sannes, J.). None of these exceptions are applicable here. There is no apparent basis for applying waiver or estoppel.

As to equitable tolling, a plaintiff must show that (1) she has been pursuing her rights diligently, but (2) some extraordinary circumstance stood in the way and prevented timely filing. *Barr*, 2019 WL 6828987, at \*9 (citing *Bolarinwa v. Williams*, 593 F.3d 226, 231 [2d Cir. 2010]). There is no indication of any circumstances between July 2016 and September 2016 that would have prevented her from filing a charge as to the

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 172 of 830

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

allegedly discriminatory failure to hire in July 2016, much less an extraordinary one.

There is also no basis for applying the continuing violation doctrine here. "Under the continuing violation exception to the ... limitations period, if a ... plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of discrimination under the policy would be timely even if they would be untimely standing alone." *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 156 (2d Cir. 2012). However, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). A discrete act is one that "necessarily 'constitutes a separate actionable unlawful employment practice' " that would be individually actionable, such as "termination, failure to promote, denial of transfer, or refusal to hire." *Chin*, 685 F.3d at 157 (citing *Morgan*, 536 U.S. at 114). It is well recognized that discrete acts that fall outside the limitations period "cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin*, 685 F.3d at 157). Because the alleged failure to hire is a discrete act that was actionable in its own right, the continuing violation doctrine cannot be used to make it timely.

For all of the above stated reasons, the Court finds that the portions of Plaintiff's discrimination claims that are based on the failure to hire her in July 2016 are barred due to her failure to file a timely charge as to that act and must be dismissed.

### C. Whether Defendant's Motion Should Be Granted as to Plaintiff's Title VII Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

Claims for discrimination under Title VII are subject to the *McDonnell Douglas* burden-shifting standard. *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014). As an initial matter, the plaintiff must proffer sufficient evidence to state a prima facie case of discrimination. *Kirkland*, 760 F.3d at 225. If the plaintiff can make a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant does so, the burden shift back to the plaintiff

to show that the defendant's explanation is a pretext for discrimination. *Id.* As to this last step, "once the [defendant] has made a showing of a neutral reason for the complained of action, to defeat summary judgment ... the [plaintiff's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [defendant's] employment decision was more likely than not based in whole or in part on discrimination." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 [2d Cir. 2003]).

**\*15** "To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate [the following four elements]: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App.'x 54, 56 (2d Cir. 2016). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that (a) she had satisfactory job performance, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

As to the second element, "[i]n determining whether an employee's job performance is satisfactory, courts may— as they often must—rely on the evaluations rendered by supervisors," because "job performance cannot be assessed in a vacuum" and "the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations.' " *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985); *see Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 477 (S.D.N.Y. 2008) (noting that "courts routinely rely on evaluations from the plaintiff's supervisors in determining satisfactory job performance"). Whether performance is satisfactory "depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Publishers*, 104 F.3d 26, 29 (2d Cir. 1997). "Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process, ... they must also allow employees 'to show that the employer's demands were illegitimate or arbitrary.' " *Meiri*, 759 F.2d at 995.

Here, it is undisputed that Plaintiff was a probationary trainee employee during the relevant time period, and thus subject to termination if she did not meet employer expectations. (Dkt. No. 58, Attach. 3, at ¶ 5 [Arbab Decl.]; Dkt. No. 58, Attach. 9.) Under the terms of this probationary trainee employment, her supervisors were

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

required to provide an Individual Development Plan and quarterly probationary evaluations as well as traineeship evaluations at six-month intervals during the traineeship period. (Dkt. No. 58, Attach. 3, at ¶ 6 [Arbab Decl.].) Plaintiff was provided with her Individual Development Plan (which she acknowledged with a signature) on October 25, 2016; this document outlined activities and performance standards for her Grade 14 position. (Dkt. No. 58, Attach. 5.) On January 6, 2017, Plaintiff was provided with a three-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which Plaintiff was rated as "needs improvement" in all listed areas except "relationships," with details related to those areas written in the comments section that highlight the specific tasks and ways in which Plaintiff was noted to not be performing up to expected standards. (Dkt. No. 58, Attach. 6.) On April 3, 2017, Plaintiff was provided with a six-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which it was noted that Plaintiff was rated as "unsatisfactory" in the areas of management of work assignments, quality of work, productivity, personal work characteristics, and problem solving/decision-making, "needs improvement" in the areas of attendance and communications, and "meets expectations" in the area of relationships; again, the evaluation includes written comments regarding the specific tasks and ways in which Plaintiff was not performing up to specific expectations. (Dkt. No. 58, Attach. 7.) Plaintiff was also provided with a six-month performance evaluation, in which concerns about her performance as to the activities and tasks outlined in the Individual Development Plan were noted. (Dkt. No. 58, Attach. 8.)

**\*16** Based on the evidence, it is clear both what the standards of Plaintiff's position were and the reasons that Plaintiff's performance did not meet those standards. As discussed above in Part I.B. of this Decision and Order, Plaintiff herself acknowledged that she made some mistakes in the course of her performance of her duties, and additional evidence from Ms. Pulcher and Ms. Farrell substantiates multiple specific mistakes. (Dkt. No. 58, Attachs. 28-33, 44, 47-54.) Additionally, there is nothing in the record to show that these expectations were in any way illegitimate or arbitrary. Plaintiff has offered no evidence to support her claim but her own subjective belief that her performance was not as bad as her supervisors stated. In an email to Ms. Arbab on April 10, 2017, Plaintiff stated that she believed Ms. Pulcher provided inadequate training or communication to her; however, there is no evidence to substantiate this subjective belief and the undisputed record reflects that both Ms. Pulcher and Ms.

Farrell provided fairly significant feedback and reminders to Plaintiff about her tasks and duties. (Dkt. No. 58, Attachs. 28-33, 39-41, 43, 45-54.) Based on the record before the Court, no reasonable factfinder could conclude that Plaintiff performed her job satisfactorily.

In the alternative, the Court finds that Plaintiff also has not shown that the circumstances surrounding her termination give rise to an inference of discrimination. Notably, the record is devoid of any indication that any of Defendant's employees ever referenced Plaintiff's national origin during her employment or made any kind of disparaging remarks about her national origin. Additionally, the three employees that Plaintiff holds out as comparators who received better treatment because they were not terminated are not sufficiently similar to her to give rise to an inference of discrimination based on national origin for two reasons. First, Plaintiff's deposition makes clear that she is not even certain what the national origins of these individuals are, but she merely assumes that they are "American." (Dkt. No. 58, Attach. 15, at 102-03, 105-06, 109 [Pl.'s Dep.].) Second, there is no evidence to show that these individuals were in comparable positions with comparable responsibilities and that they made comparable mistakes to those made by Plaintiff. To raise an inference of discrimination from more favorable treatment towards similarly situated individuals outside of the protected group, "a plaintiff 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.' " *De Jesus-Hall v. New York Unified Court Sys.*, 2021 WL 1259581, at *1 (2d Cir. 2021) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]).

As to Ms. O'Hara, although her job tasks and objectives are similar to Plaintiff's, the evidence shows that Ms. O'Hara was hired as Grade 18 Senior Budget Analyst/Senior Accountant (while Plaintiff was a Grade 14 Senior Accountant Trainee) and her performance reviews show that she overwhelmingly performed tasks up to expectations, with the exception of "needs improvement" on her three-month probation evaluation in the areas of managing work assignments and problem solving/decision-making, where it was noted that she needed to improve on working more efficiently to complete her assignments in a timely manner and in completing analyses and problem solving more independently, and "needs improvement" on her six-month probation evaluation in the area of problem solving/decision-making, where it was noted she needed to improve on completing analyses and problem solving more independently; it was noted that she

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 174 of 830

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

had improved in these areas and was meeting expectations by the time of her nine-month probation evaluation. (Dkt. No. 58, Attach. 58.) The evidence therefore shows that, even if Plaintiff and Ms. O'Hara performed the same or similar jobs, Ms. O'Hara did so with fewer mistakes and she gradually improved her performance over the course of the documented time, whereas Plaintiff's evaluations showed that she made far more extensive mistakes and did not show improvement. As a result, the Court finds that Ms. O'Hara is not sufficiently similar and thus the disparate treatment between her and Plaintiff would not allow a reasonable fact finder to infer discrimination.

**\*17** As to Mr. Deitz, he was a Grade 18 Senior Accountant in a different section or unit than Plaintiff, and his listed tasks and objectives are not similar to those listed in Plaintiff's Individual Development Plan. (*Compare* Dkt. No. 25, at 21-24 *with* Dkt. No. 58, Attach. 5, at 1-2; *see* Dkt. No. 58, Attach. 15, at 111-12 [Pl.'s Dep.] [testifying that she did not do many of the tasks listed on Mr. Deitz's tasks and objectives list and admitting that his responsibilities were "different" than hers].) Additionally, Mr. Deitz was supervised by Melinda Hansen and Michelle Daly, not Ms. Pulcher and Ms. Farrell, and a summary of his performance completed by Ms. Daly indicates that Mr. Deitz performed his job satisfactorily in all noted respects. (Dkt. No. 25, at 24, 26-27.) Because there is no evidence that Mr. Deitz was a trainee, the evidence shows that he had different job responsibilities and different supervisors than Plaintiff, and there is no evidence of ongoing job performance issues, the Court finds that no reasonable fact finder could conclude that the treatment Mr. Deitz received raises an inference of discrimination.

As to Mr. Shavel, there is little evidence about the details of his employment. Plaintiff's only allegation regarding Mr. Shavel is that he was given a counseling memorandum for failing to complete mandatory training, but did not have his employment terminated. (Dkt. No. 25, at 31.) However, there is no evidence to suggest that Mr. Shavel had engaged in any other actions that made his job performance unsatisfactory, much less that he committed mistakes similar to those documented related to Plaintiff's job performance. Additionally, there is no evidence to suggest that Mr. Shavel was a trainee employee or that he worked in a similar position or with similar tasks and objectives as Plaintiff's position, and the counseling memorandum suggests that Mr. Shavel was supervised in some way by Ms. Hansen, not Ms. Pulcher or Ms. Farrell. (Dkt. No. 25, at 31.) Based on the evidence, the Court finds that no reasonable fact finder could conclude

that the treatment Mr. Shavel received raises an inference of discrimination.

Because Plaintiff has not provided evidence which can prove a prima facie case of national origin discrimination under Title VII and because there is no outstanding issue of material fact evident from the parties' submissions, the Court grants Defendant's motion for summary judgment on this claim.

### D. Whether Defendant's Motion Should Be Granted as to Plaintiff's ADEA Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

" 'In order to establish a prima facie case of age discrimination,' the plaintiff 'must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination.' " *Green v. Town of East Haven*, 952 F.3d 394, 403 (2d Cir. 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 [2d Cir. 2010]). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that she (a) was qualified for the position, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

Regarding whether Plaintiff was qualified, under the law of this Circuit, "a plaintiff only needs to demonstrate that she possesses the basic skills necessary for performance of the job." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006) (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 [2d Cir 1991]). Notably, although misconduct is not a basis for finding an employee lacks the basic qualifications for a position, evidence of performance based on evaluations of an employee's work is appropriate evidence for making that determination. *Owens*, 934 F.2d at 409 (clarifying that it is the ability to perform job duties that is important, not whether the conduct is inappropriate or offensive); *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 998 (E.D.N.Y. 1999) (finding summary judgment appropriate on the issue of whether the plaintiff was qualified for the position because there was no "competing evidence" against the unsatisfactory performance evaluations to create an issue of fact about the plaintiff's performance,

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 175 of 830

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

and no evidence that the negative evaluations were unfair or incorrect). Here, Plaintiff has offered no evidence that the performance evaluations were inaccurate other than her own general assertions at her deposition that she does not believe they accurately reflect her performance. Because her unsubstantiated assertions and beliefs cannot outweigh the other evidence, the Court finds that Plaintiff has not sufficiently shown that there is a genuine dispute of material fact about whether she was qualified for her position as that term is defined by the law.

**\*18** Regarding whether Plaintiff has raised an inference of discrimination, as already discussed above in Part III.C. of this Decision and Order, Plaintiff's attempt to show that she was treated less favorably than younger similarly situated individuals is unavailing. Notably, it is undisputed that Ms. O'Hara was the only individual of the three named that was not as old or older than Plaintiff. However, as discussed previously, Ms. O'Hara is nonetheless not sufficiently similarly situated to Plaintiff because there is no evidence that Ms. O'Hara made the same or similar mistakes as Plaintiff did at the level and frequency at which Plaintiff made those mistakes. Rather, the evidence shows that Ms. O'Hara was reported to have made fewer overall mistakes and that she improved with each probation evaluation that was conducted. It is undisputed that Plaintiff is not personally familiar with Ms. O'Hara or her work abilities, and that Plaintiff has no knowledge as to how well or not Ms. O'Hara performed her job on a day-to-day basis. As a result, disparate treatment here does not give rise to an inference of discrimination based on Plaintiff's age any more than it does related to her national origin.

The Court also acknowledges Defendant's correct argument that many courts recognize that "an allegation that a decision is motivated by age animus is weakened when the decisionmakers are of the protected class," and also where "Plaintiff was well within the protected age group when she was hired." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 25 (E.D.N.Y. 2015) (collecting cases). However, these factors are not dispositive. *Ehrbar*, 131 F. Supp. 3d at 26. Here, Plaintiff was within the protected age group when she was hired, and Ms. Farrell, who was 50 at the relevant time, approved her termination, as did Ms. Burrell, who was 48 at the relevant time. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.; Dkt. No. 58, Attach. 25, at ¶¶ 5, 29 [Farrell Decl.].) Ms. Pulcher, however, was not in the protected age group. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.].) Additionally, "where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 [2d Cir. 1997]); *see also Downey v. Adloox, Inc.*, 789 F. App'x 903, 907 (2d Cir. 2019) (affirming district court's dismissal of age discrimination claim based in part on the fact that plaintiffs were hired and fired by the same executives within a short period of time). Here, Plaintiff's hiring was prompted by a request from Ms. Farrell, and Ms. Farrell also was one of the persons who approved her termination approximately six months later. (Dkt. No. 58, Attach. 25, at ¶¶ 5, 27 [Farrell Decl.].) Although it is unclear who precisely had the last authoritative say about Plaintiff's termination, Ms. Farrell's involvement in both Plaintiff's hiring and firing is a factor to consider in determining whether the evidence can be reasonably interpreted as raising an inference of discrimination based on age.

Unlike the national origin claim, which is unsupported by any evidence of statements made by Plaintiff's supervisors about her or other employee's national origins, there is a genuine dispute of material fact as to whether Ms. Pulcher made comments to Plaintiff about certain other employees being too old to do their jobs effectively. Plaintiff asserts that Ms. Pulcher made such comments, while Ms. Pulcher denies making such comments. It is undisputed that the two employees about whom Ms. Pulcher allegedly made the comments were at, near, or beyond retirement age, while Plaintiff was 45 at the time she was employed by Defendant. (Dkt. No. 58, Attach. 15, at 114-18 [Pl.'s Dep.] [testifying that Ms. Pulcher said that the employees in question did not know what they were doing and should have retired].) However, even if a fact finder were to accept Plaintiff's testimony that Ms. Pulcher made these comments, it would be insufficient to raise an inference of discrimination in light of all of the other evidence, including the fact that Ms. Farrell (who was not alleged to have made any comments about age) was personally aware of Plaintiff's work performance through working directly with her, and also signed Plaintiff's probationary evaluations and recommended her termination. Put another way, even if Ms. Pulcher had made comments suggesting possible age bias, those comments and any inference of discrimination on her part cannot be imputed to Ms. Farrell in the absence of evidence she was aware of any bias Ms. Pulcher may have held, particularly given that Ms. Farrell was directly and independently familiar with Plaintiff's performance issues. As a result, the Court finds that Plaintiff has not established that a reasonable fact finder could

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 176 of 830

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

conclude there was an inference of discrimination even if they resolved the issue about Ms. Pulcher's comments in Plaintiff's favor.

**\*19** In the alternative, even if a reasonable fact finder could conclude that Plaintiff was qualified and Ms. Pulcher's statements raised an inference of discrimination, denial of summary judgment is inappropriate here because Plaintiff cannot meet her ultimate burden to show that Defendant's proffered non-discriminatory explanation (i.e., that Plaintiff's performance was poor) was a pretext for discrimination. To establish a claim for discrimination under the ADEA, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Green*, 952 F.3d at 403 (citing *Gorzynski*, 596 F.3d at 106). In other words, Plaintiff's age does not need to have been the only consideration, but rather she still must show that she would not have been terminated without her age being considered. *Perez v. Cnty of Rensselaer, New York*, 14-CV-0950, 2018 WL 3420014, at \*4 (N.D.N.Y. July 13, 2018) (Sharpe, J.) (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 [2d Cir. 2014]). A few isolated comments that were not even directed at Plaintiff are insufficient to allow a reasonable fact finder to conclude that Plaintiff's age was the but-for cause of her termination in light of all of the

evidence discussed above related to Plaintiff's failure to show an inference of discrimination. No reasonable fact finder could conclude that Plaintiff would not have been terminated despite her performance reviews if not for her age.

Because Plaintiff cannot establish a prima facie case and cannot show that her age was the but-for cause of her termination, the Court grants Defendant's motion for summary judgment on this claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims for national origin and age discrimination pursuant to Title VII and the ADEA are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 25) is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3674745

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1538019

2000 WL 1538019
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNIVERSAL CALVARY CHURCH, et al., Plaintiffs,

v.

CITY OF NEW YORK, et al., Defendants.

No. 96CIV.4606(RPP)99CIV, 99CIV.9228,
99CIV.9227, 99CIV.12193, 99CIV12182,
99CIV.12236, 99CIV.12247, 99CIV.9230.
|
Oct. 17, 2000.

**Attorneys and Law Firms**

Rheingold, Valet, Rheingold & Shkolnik, P.C., New York, By
Paul D. Rheingold, Esq., Terrence McCartney, Esq., The Law
Office of Ronald L. Kuby, New York, By Ronald L. Kuby,
Esq., Daniel M. Perez, Esq., Counsel for Plaintiffs.

Michael D. Hess, Corporation Counsel for the City of New
York, New York, By Norma Kerlin, Esq., Charles Horn,
Counsel for Defendants.

OPINION

PATTERSON, D.J.

**\*1** This Opinion rules on in limine summary judgment
motions made in eleven separate cases, all of which are
grouped together and identified as Group A–1 cases for the
purposes of trial. [1] The original action, *Universal Calvary
Church, et al. v. The City of New York, et al.,* 96 Civ. 4606, was
commenced as a class action encompassing numerous claims
concerning events that occurred on August 20 and August 21,
1995 between over two hundred Plaintiffs, all members of the
Universal Calvary Church ("UCC"), and Defendants, twenty-
two individually named police officers, officials of the City
of New York, and a number of unidentified defendants. [2] The
parties have completed discovery.

[1]    Keith Williams was originally designated as a
       Plaintiff in Group A–1 but has since been
       reassigned to an as yet undetermined group.

[2]    The twenty-two named Defendants are as
       follows: Chief Louis Anemone ("Anemone"),

Officer Charles Barberi ("Barberi"), Deputy
Chief George Brown ("Brown"), Officer
Kevin Brunner ("Brunner"), Chief Wilbur
Chapman ("Chapman"), Officer Kevin Craig
("Craig"), Officer Dominick De Lorenzo
("De Lorenzo"), Deputy Inspector Patrick
Devlin ("Devlin"), Officer Richard Difede
("Difede"), Officer Chris Lesiewicz ("Lesiewicz"),
Deputy Commissioner Jack Maple ("Maple"),
Officer Michael Moloney ("Moloney"),
Officer Brian O'Connor ("O'Connor"), Officer
James O'Hagan ("O'Hagan"), Officer Alex
Papagiannis ("Papagiannis"), Sergeant Phillip
Parrish ("Parrish"), Officer Patrick Prendergast
("Prendergast"), Sergeant Walter Picht ("Picht"),
Officer Eric Single ("Single"), Detective Joanne
Toole ("Toole"), Officer John Webber ("Webber"),
and Detective Denis Wiencko ("Wiencko"). For
the purposes of this opinion, all of the Defendants'
names have been spelled according to the master
list dated October 10, 2000, that Corporation
Counsel provided to the Court.

On January 9, 1998, the Court denied the UCC's motion
for class certification and ordered each individual Plaintiff
to file individual complaints. After some delay, Plaintiffs'
counsel filed individual complaints and, for some individuals,
amended complaints, ending on or about December 21, 1999.
All the complaints, rather than constituting individualized
complaints, by and large, contain the same causes of action
and name all the same Defendants as did the proposed
class action complaint. Defendants have now moved for
summary judgment with respect to each of the complaints
filed. [3] Most of the complaints contain some or all of the
following claims against various Defendants: 1) excessive
force (physical acts and noxious gas) under 42 U.S.C. § 1983,
in violation of the Fourth and Fourteenth Amendments; 2)
false arrest and imprisonment under 42 U.S .C. § 1983, in
violation of the Fourth and Fourteenth Amendments; 3) denial
of medical treatment under 42 U.S.C. § 1983 in violation
of the Fourteenth Amendment; 4) failure to intervene or
protect Plaintiffs under 42 U.S.C. § 1983 in violation of the
Fourth and Fourteenth Amendments; 5) failure to properly
supervise under 42 U.S .C. § 1983 in violation of the Fourth
and Fourteenth Amendments; 6) unlawful retaliation under
42 U.S.C. § 1983 for exercise of Plaintiff's right to free
exercise of his religion in violation of the First Amendment;
7) municipal liability for policies, customs, and practices
causing the aforesaid unconstitutional conduct; 8) malicious
prosecution under State common law; 9) assault and battery

(physical acts and noxious gas) under State common law; 10) false arrest and imprisonment under State common law; 11) intentional infliction of emotional distress under State common law; 12) negligent infliction of emotional distress under State common law; 13) conspiracy under State common law; 14) negligence under state common law; 15) negligence by City of New York in hiring, screening detention, and supervision under State law; 16) respondeat superior liability against the City for state law violations; and (17) prima facie tort. The liability of the City of New York for state and federal constitutional violations and negligent hiring, screening, retention, supervision, and training has been severed and is not at issue in this first trial. (Order dated May 31, 2000.) [4] On July 19, 2000, all Plaintiff withdrew all of their prima facie tort claims and withdrew all claims as against Brown. (McCartney Decl. ¶¶ 10–11.)

[3]   The Defendants have made summary judgment motions for almost every Defendant on almost every claim of every Plaintiff. The individual complaints submitted by the Plaintiffs are, in some and substance, a regurgitation of the initial class claim that was denied. They lack the specificity of claims based on their individual factual situation that was the very reason for denying class certification. The extensive summary judgment motions are, therefore, necessary to get the individual complaints into the proper form for the long scheduled trial.

[4]   Upon consent of the parties, the May 31, 2000 Order servered all of the Plaintiffs' *Monell* and negligent supervision etcetera claims. (May 31, 2000 Order ¶ 1.) As to the Plaintiffs' claims of respondeat superior liability of the City for state law violations, the Court held, "In view of defendants' failure to respond to plaintiffs' letter dated April 13, 2000, defendants are deemed to have stipulated that each individual defendant police officer was acting within the scope of his/her employment and that any verdict against any police officer will permit a judgment to be entered against the City of New York on the theory of *respondeat superior.*" (*Id.*)

**\*2**  The general factual section below presents an overview of the case. To the extent that each individual Plaintiff has facts specific to his or her own case, they are outlined separately. [5]

[5]   Voluminous motions, papers, exhibits, and documents have been submitted in this case. This footnote is to explain the various citations used throughout the Opinion. When citing to papers submitted on behalf of all the Plaintiffs, the citation will be to "Pls.' Gen. 56.1 Stmt.¶ 1" or "Pls.' Mot. in Opp. at 1." When citing to papers for the Defendants, the name of the particular Plaintiff will also be designated, as in "Defs.' Mem. in Supp. Bennett at 1" or "Defs.' Reply Mem. Bennett at 1."

In referencing the 56.1 statement, the Defendants' Statements are cited when they are admitted by Plaintiffs or not properly denied by Plaintiffs together with reference to evidentiary support. (For example, "Defs.' 56.1 Stmt. Bennett ¶ 1." is cited as an admission of the statement if both sides agree.) If the Plaintiff denies a statement in accordance with R. 56.1, then the citation to the denial is, "Bennett's Resp. to Defs.' 56.1 Stmt. ¶ 1." A citation to the Plaintiff's separate 56.1 Statements is "Bennett's 56.1 Stmt. ¶ 1." The same is true for citations to exhibits attached to the submitted statements. (For example, "Defs.' 56.1 Stmt. Bennett, Ex. 1, at 1" or "Bennett's 56.1 Stmt., Ex. 1, at 1.") It was often necessary to look to the exhibits directly for support because the parties, at times, misstated the evidence in their 56.1 Statements.

Statement of Background Facts [6]

[6]   Federal Rule of Civil Procedure 56(e) states:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Furthermore, the Southern District of New York Local Rule 56.1 states:

(a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine

issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

(b) The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

(c) All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

(d) Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

In this case, Plaintiffs' papers are woefully short of specific facts and evidence to support their various claims. Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts. In a majority of the allegations, rather than citing to a particular paragraph of the Plaintiff's individual 56.1 statements or citing to a particular exhibit, Plaintiffs simply cite to "Plaintiffs' General Rule 56.1 Statement and Exhibits." Given that the General Rule 56.1 Statement is nonspecific and designed to be a general description for all 21 of the Group A Plaintiffs, and given that 116 exhibits are attached to this general statement, a vague cite to all of the exhibits is simply unacceptable. This places an immense burden on the Court to sift through enormous amounts of evidence without any guidance or direction from the Plaintiffs as to what evidence in particular, if any, supports their claims. Furthermore, the inadequacy of citations by the Plaintiffs is a main reason for both the problems in sorting out the disputed facts and the difficulty in deciding the motions. Overall, Plaintiffs have failed to satisfy the requirements of responding to a summary judgment motion as defined by Fed.R.Civ.P. 56 and Local R. 56.1.

In addition, as Defendants point out in their September 13, 2000 Letter from Norma Kerlin ("Kerlin Letter, 9/13/00"), an answer that "Plaintiff can neither admit nor deny this

statement based upon the factual record" is not a sufficient response to establish a disputed fact. Local Rule 56.1 clearly states that the moving party's 56.1 statement "will be deemed to be admitted unless controverted," Rule 56.1(c), and requires that such denials be supported by a specific citation to admissible evidence, Rule 56.1(d). As such, any of the Defendants' 56.1 Statements that Plaintiffs do not specifically deny and support such denial with specific evidence, and any of Plaintiffs' 56.1 Statements not supported by reference to specific evidence, will be deemed admitted for purposes of this summary judgment motion. See Fed.R.Civ.P. 56; Local Civ. R. 56.1; see also Millus v. D'Angelo, No. 00–7001, 2000 WL 1283747, at *1 (2d Cir. Sept. 12, 2000) (noting that the district court properly "granted summary judgment in favor of defendants following Millus's failure to deny, in accordance with Rule 56.1 of the court's local rules" various allegations of the defendants); Cooper v. Gottlieb, No. 95 Civ. 10543(JGK), 2000 WL 1277593, at *4 (S.D.N.Y. Sept. 8, 2000) (holding that a denial without evidence to support the denial is "conclusory" and "wholly inadequate under Local Civil Rule 56.1(d)"); Wenzhou Wanli Food Co., Ltd., v. Hop Chong Trading Co., Inc., No. 98 Civ. 5045(JFK), 2000 WL 964944, at *3 (S.D.N.Y. July 11, 2000) (noting that "[u]nsupported allegations will not suffice" in responding to a motion for summary judgment); Aztar Corp. v. N.Y. Entertainment, LLC, 15 F.Supp.2d 252, 254 n. 1 (E.D.N.Y.1998) (noting that "Defendants' 56.1 Statement is replete with responses of 'lack knowledge or information sufficient to either admit or deny.' Defendants have not created any issue of fact through this artifice."), aff'd 210 F.3d 354 (2d Cir.2000).

The Plaintiffs in this case are some of a large number of persons who attended an outdoor revival meeting at the Universal Calvary Church, an evangelical fundamentalist church, on Sutphin Boulevard in Queens County, New York, on August 20, 1995. During the service, a physical altercation arose when a retired police detective named Clifford Warsop, tried to enter the church grounds. [7] During the altercation with several church ushers, Warsop's gun was taken, and he was injured.

7      Warsop is the estranged common law husband of a UCC member, Ms. Angela Pennicooke. (Pls.' Gen. 56.1 Stmt., Ex. 27A, ¶ 3; Defs.' 56 .1 Stmt. Bennett, Ex J, ¶ 3.) Warsop attempted to enter the revival to visit his children. (Pl.s' Gen. 27A, ¶ 3; Defs.' 56.1 Stmt. Bennett, Ex. J, ¶ 2.) Warsop apparently is not and has never been a UCC member. (Pls.' Gen. 27A, ¶ 3; Defs.' 56.1 Stmt. Bennett, Ex. J, ¶ 3.) He is not a party to this or any other lawsuit in connection with the events of August 20–21, 1995.

A member of the congregation called 911 and reported "man with a gun." Defendants Barberi and Difede responded to the 911 call in a police car, called an ambulance for Warsop, retrieved the gun, tried to find out what happened, and called for supervisory assistance. A supervisory sergeant arrived and was denied interview with the church ushers, as the revival meeting was still going on. The sergeant and his supervisor determined that no arrests should be made at that time.

Barberi accompanied Warsop in the ambulance to the Mary Immaculate Hospital, and then returned to his precinct. He was ordered to give a report of the incident to detectives for investigation. He did that, and defendants Detectives Toole and Wiencko were assigned to the case. They went with Barberi to the hospital where Toole conducted an interview of Warsop. Warsop was discharged from the hospital and expressed a desire to identify the persons he said had participated in the attack on him. He had twenty-three stitches around one of his eyes.

Toole, Wiencko, Barberi, and Warsop went back to the church. It was about 11:20 p.m., and the revival meeting had just ended. The detectives' car went around the block, and Warsop identified Nedley Walters, a plaintiff in a related case, as one who head-butted him and plaintiff Horace Gordon as the man who had taken his gun.

Detectives Toole and Wiencko approached Gordon and an altercation occurred. When they attempted to arrest Gordon, a large number of persons from the congregation came to his assistance, and another altercation occurred. The officers made radio calls for assistance and many police arrived. Also, a police mobilization alert was announced. Plaintiffs Gordon, Cornelius Caliz, Oneil Thompson, Michael Bennett, Woodrow Campbell, and two men who are not plaintiffs in this trial, were arrested. Several other plaintiffs were injured. During the altercation, blows were struck and mace or pepper spray was used. More police arrived, and the members of the congregation ran back into the church grounds, which were

fenced and had a gate which was closed. During this time, mace was used by the police around the gate. A helicopter hovered overhead.

Thereafter, Anemone, Maple, Chapman, and Devlin from the Police Department arrived, and the pastor of the church had several talks with one or more of the police executives. The pastor and police executives finally reached an agreement that remaining members of the congregation and the police force could leave. They left around 4 a.m.

**\*3** Because of the similar legal claims made by each of the eleven Plaintiffs, this opinion will outline the elements of each cause of action and analyze the law in the claims for the initial Plaintiffs. As the opinion progresses to later Plaintiffs, it will present the specific factual situations of that Plaintiff and then refer to the legal analysis conducted in previous sections.

Discussion

Summary Judgment Standards

Rule 56(c) requires summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Transco Prods., Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 555 (2d Cir.1994). The moving party has the burden of clearly establishing the absence of any triable issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). Pointing to the absence of necessary evidence can satisfy the movant's burden on summary judgment. *See id.* at 325; *Goenaga,* 51 F.3d at 18. Once the moving party offers specific evidence or identifies the lack of evidence to support his or her motion, the burden shifts to the opposing party to offer some evidence beyond the initial pleadings. *See Celotex,* 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred."); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) ("When, however, a party moves for summary judgment, and documents his motion, setting forth specific facts denying the claims, the opposing party must, 'set forth specific facts showing that there is a genuine issue for trial.' Mere conclusory allegations or denials will not suffice." (internal quotations omitted)).

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 181 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

To survive summary judgment, the nonmoving party must identify specific evidence that shows a genuine issue of material fact, not simply any factual dispute. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.,* 984 F.2d 1182, 1184–85 (2d Cir.1993). All inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party, *see Transco,* 38 F.3d at 555, and summary judgment will be precluded "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *Cas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1560 (2d Cir.1991).

Horace Gordon's Claims

*I. Excessive Force Claims (physical acts)*

In his Complaint, Plaintiff Gordon alleges, "The conduct and actions of defendants Barberi, Parrish, Toole, Wiencko, and Moloney, acting individually and in concert with each other, acting under color of law, in assaulting plaintiff by pushing, hitting, striking, grabbing, dragging, choking him with a nightstick, was done intentionally, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of his acts, was done without lawful justification or reason, and was designed to and did cause specific and serious harm, pain and suffering in violation of plaintiff's Constitutional rights as guaranteed under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution." (Gordon Compl. ¶ 101.) Defendants move for summary judgment on Gordon's claim of excessive force. The motion for summary judgment is denied as to Defendants Barberi, Toole, Wiencko, and Moloney, and the motion for summary judgment is granted as to Defendant Parrish.

**\*4** It is undisputed that Gordon's claims of excessive force originate from actions he alleges the Defendants took in an effort to arrest him. Therefore, Gordon's claims for excessive force arise under the Fourth Amendment of the Constitution. *See Graham v. Connor,* 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). The test for excessive force under the Fourth Amendment is "whether the officers'

actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397.

Here, Gordon's deposition testimony raises a genuine issue of material fact as to whether the arresting officers, [8] particularly Barberi and Toole, used excessive force and whether the other arresting officers either used excessive force themselves or should have intervened to prevent Barberi's and Toole's excessive use of force to effect the arrest. In his deposition, Gordon testified that the officers approached him from behind and did not identify themselves. (Gordon's 56.1 Stmt. ¶ 8.) Gordon has made specific allegations of the use of excessive force against Toole, Barberi, Wiencko, and Moloney. (*Id.* ¶¶ 8–13.) Crediting the Plaintiff's version of events for the purpose of summary judgment motions, a genuine dispute exists regarding the way in which these Defendants arrested Gordon and the amount of force they used.

[8]    Toole is listed as the official arresting officer on the police paperwork. The other Defendants, with the exception of Parrish, were involved in restraining and apprehending Gordon. Plaintiff offers no evidence that Parrish was involved in or present during the arrest of Gordon.

The question of whether or not these Defendants' actions, from an objective point of view, were so unreasonable as to constitute excessive force is a question for the jury. Summary judgment is denied as to Barberi, Toole, Wiencko, and Moloney on the claim of excessive force. Summary judgment is granted as to Defendant Parrish. Plaintiffs do not offer any evidence connecting Parrish with the arrest or allegations of force. There is no showing that he was involved in or even present at the time the arrest or use of force occurred. [9] Given the absence of evidence connecting Parrish to the use of excessive force against Gordon, summary judgment is granted on Gordon's excessive force claim as to Parrish.

[9]    According to Parrish's deposition, when he arrived at the scene at 11:20 p.m., four arrests were already made. (Pls.' Gen. 56.1 Stmt ., Ex. 19, at 102–03, 09.) Plaintiffs point to no evidence to the contrary.

*II. False Arrest and False Imprisonment Claim*

In his Complaint, Gordon alleges, "The conduct and actions of defendants Parrish, Toole, Wiencko, Barberi, and Moloney, acting individually and in concert with each other, acting under color of law, in arresting and imprisoning plaintiff without probable cause, was done intentionally, maliciously,

with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of his acts, was done without lawful justification or reason, and was designed to and did cause specific and serious harm, pain and suffering in violation of plaintiff's Constitutional rights as guaranteed under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution." (Gordon Compl. ¶ 104.) Defendants argue that Gordon's claim of false arrest and imprisonment must be dismissed against Toole, Wiencko, Barberi, Moloney, and Parrish because Toole, who initiated the arrest of Gordon, had probable cause to arrest and detain him and because the other police officers, who participated in the arrest of Gordon, assisted her in the lawful exercise of her duties. Gordon argues that Defendants lacked probable cause to arrest him because Warsop's account of an assault and robbery was not sufficiently trustworthy, and the Defendants were not reasonable in relying on it.

**\*5** The Second Circuit has held that a false arrest claim arising under § 1983 is "substantially the same" as a false arrest claim arising under state law. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citations omitted); *Hygh v. Jacobs,* 961 F.2d 359, 366 (2d Cir.1992); *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991); *Dukes v. City of New York,* 879 F.Supp. 335, 340 (S.D.N.Y.1995). Gordon's false arrest claim is therefore governed by New York State law. [10] To establish a claim for false arrest under New York law, the plaintiff must show that " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (quoting *Broughton v. State,* 373 N.Y.S.2d 87, 93 (1975)). Defendants assert that Plaintiff has not presented any evidence to show the fourth element and that, because Toole had probable cause to arrest Gordon, the confinement was privileged.

[10]    Because a claim of false arrest is the same as a claim of false imprisonment, Gordon's claims will be analyzed under the same standard as one claim. *See Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991) (citations omitted); *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995).

It is clearly established in the Second Circuit that an arrest is justified if there was probable cause to arrest. *See Weyant,* 101 F.3d at 852 ("The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action

for false arrest,' whether that action is brought under state law or under § 1983." (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994))). Thus, if the police had probable cause to arrest Gordon, his claim for false arrest must fail against all Defendants. *See Singer,* 63 F.3d at 118; *Bernard,* 25 F.3d at 102–03. The burden of establishing the existence of probable cause for an arrest is on the Defendants. *See Raysor v. Port Auth.,* 768 F.2d 34, 39–40 (2d Cir.1985); *Broughton,* 373 N.Y.2d at 94–95; *Williams v. Moore,* 602 N.Y.S.2d 199, 201–202 (2d Dep't 1993).

The police have probable cause to arrest a person "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant,* 101 F.3d at 852; *Singer,* 63 F.3d at 118–19. Whether or not an officer had probable cause to make an arrest is a question of what the officer knew at the time of the arrest and whether she or he was reasonable in relying on that knowledge. *See Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997) (account of complaining witness and officer's personal observations sufficient to establish probable cause). Probable cause is not dependent on the ultimate accurateness and truthfulness of that knowledge. *See Bernard,* 25 F.3d at 102 ("[P]robable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." (citing *Colon v. City of New York,* 468 N.Y.S.2d 453 (1983)); *Haussman v. Fergus,* 894 F.Supp. 142, 147 (S.D.N.Y.1995) ("[I]t should be noted that the validity of an arrest does not depend upon an ultimate finding of guilt or innocence. Rather, the soundness of the arrest hinges on the existence of probable cause at the time the arrest was made." (citing *Pierson v. Ray,* 386 U.S. 547, 555 (1967))). The Second Circuit has recently reiterated that a police officer may have probable cause to make an arrest based on the statement of a complainant. *See Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) ("Moreover, 'it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness.' " (quoting *Miloslavsky v. AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd,* 993 F.2d 1534 (2d Cir.1993)); *Ricciuti,* 124 F.3d at 128 (finding that officer was entitled to believe visibly injured complainant despite protestations of innocence from arrestee); *see also Welch v. City of New York,* No. 95–Civ. 8953, 1997 WL 436382 (S.D.N.Y. Aug. 4, 1997), *aff'd.* 166 F.3d 1203 (2nd Cir.1998) (holding officer

reasonably relied on witness's complaint, despite plaintiff's denial and contrary explanation).

 **\*6** Gordon acknowledges that Toole was assigned to investigate the alleged robbery (Defs.' 56.1 Stmt. Gordon ¶ 36; Gordon's Resp. to Defs.' 56.1 Stmt. ¶ 36), and has offered no evidence contradicting the following facts as to how Toole conducted her investigation and made the arrest of Gordon.

At about 10:20 p.m., on August 20, 1995, Toole listened to Barberi recount his findings of the alleged assault and robbery of Warsop. (Toole Dep., 2/19/97, at 58.) She did not read his draft report of the incident. (*Id.* at 60.) Toole discussed the case with her supervisor, Moynahan, as to whether the case should be assigned as a robbery to the Robbery Investigation Project ("RIP") or as an assault to the other detectives. Moynahan approved Toole's suggestion that she interview Warsop at the hospital. (*Id.* at 68–69.) Toole, accompanied by Wiencko and Barberi, found Warsop at Mary Immaculate Hospital. She observed that Warsop had blood over his eye and his shirt. The doctor informed her Warsop had received ten stitches inside his left eyebrow and thirteen stitches outside his left eyebrow wound, as well as contusions to the left cheek and a superficial cut of the right eye. (*Id.* at 81; Pls.' Gen. 56.1 Stmt., Ex. 27A.) Toole then proceeded to conduct an interview of Warsop in the emergency room.

According to Warsop, [11] he went to the UCC to visit his two children, but when he arrived, a man at the gate refused him entry. Warsop told Toole that this man summoned several other men from inside the tent, who then started shoving and punching him. In the course of the scuffle, Warsop claims that one of the men surrounding him took his gun from his waistband. (Toole Dep., 2/19/97, at 83–84.)

[11]    All of the Plaintiffs, especially the Group A–1 Plaintiffs who were arrested, focus their argument on discrediting Warsop's account of events and establishing their own. Although Plaintiffs' accounts may be completely accurate, Plaintiffs fail to realize that what actually happened when Warsop attempted to enter the UCC gate is not controlling on the issue of probable cause. Rather, what information the arresting police had when she approached Gordon is what establishes whether or not there was probable cause to arrest him. If a complainant tells the police a version of events that later turns out to be factually inaccurate, there is still probable cause for the arrests if, based

on what the complainant told the police, the police had probable cause. Similarly the facts that the charges against all five arrested Plaintiffs were later dismissed, that Warsop was criminally prosecuted, and that there was an Order of Protection, which was issued but not served on Warsop at the time of the UCC incident, do not effect the issue of whether Toole had probable cause to make the arrests based on the information she had at the time they made the arrests. If Warsop told Toole that Gordon and Walters assaulted and robbed him, she had probable cause to arrest them if she was reasonable in believing Warsop.

In the course of her interview, Toole asked Warsop if his wife had an order of protection against him, and Warsop stated that there was no order of protection. [12] He also disclosed that he was on "three quarters," meaning he was retired from the police department due to a line of duty injury. (*Id.* at 86–87.)

[12]    Although an order of protection had been issued against Warsop, the order was never served on him. The reasons for this oversight are not revealed in the motion papers.

Warsop expressed a belief that he could identify his attackers and stated that he wanted to return to the UCC area and canvass to see if the perpetrators were still present. (*Id.* at 88.) Warsop explained that this was the last night of the revival, after which the tent was coming down, therefore the perpetrators would soon be dispersed. (*Id.*) According to Toole, she found Warsop's story believable when coupled with his visible injuries and Barberi's verbal report. (*Id.* at 87–89.) She felt she had probable cause to arrest. (*Id.* at 88–92.) Toole, Wiencko, Barberi, and Warsop then proceeded to leave the hospital to return to the UCC to look for perpetrators, and it was Toole's intent to arrest any perpetrators identified to her by Warsop. (*Id.*) [13]

[13]    Plaintiffs focus much of their argument for false arrest, as well as for their case in general, on the allegation that Toole, Wiencko, and Barberi used poor judgment in returning to the scene and attempting to arrest Gordon in view of the congregation. What Plaintiffs fail to realize is that whether or not Defendants used poor judgment is really inapposite for purposes of their claims here. The existence of probable cause is determined by examining whether or not

Defendants had sufficient information to believe that Plaintiffs committed a crime. If they had sufficient information and, therefore, probable cause to effect arrests, the fact that they may have used poor judgment in doing so does not create a false arrest claim.

When they arrived in the vicinity of Sutphin Boulevard and Ferndale Avenue, Warsop pointed out Walters and stated, "That's the one who head-butted me" (*id.* at 100) and, after their unmarked car circled the block, pointed out Gordon and stated, "That's the one who took my gun and—and either beat me or—something like that" (*id.*). At this point, Toole stopped the car, got out, and approached Gordon.

**\*7** According to Gordon, the UCC revival had ended, and he was standing outside his parked car at the corner of Ferndale and Sutphin, using his keys to unlock the driver-side door, when three unidentified people approached him from behind and began attacking him. (Gordon Dep., 5/16/97, at 189–95.) Gordon claims that they never identified themselves as police. Gordon testified to a variety of specific acts of force used against him, including that Toole grabbed his hands and penis, Wiencko slapped him, and Barberi choked and kicked him. (*Id.*) Gordon acknowledges that Toole attempted to handcuff him. [14] The Defendants agree that it was Toole who made the arrest of Gordon. (Defs.' 56.1 Stmt. Gordon ¶ 4.)

[14]    Both Plaintiff Gordon's account and the testimony of the Defendants suggest that Toole was the officer who initiated the arrest of Gordon, although Gordon maintains that Toole, Wiencko, and Barberi approached him simultaneously. (Gordon Dep., 5/16/97, at 191, 197; Toole Dep., 2/19/97, at 101–02.)

Section 160.05 of the Penal Law of New York reads as follows:

A person is guilty of robbery in the third degree when he forcibly steals property. Robbery in [sic] the third degree is a class D felony.

Section 160.10 of the Penal Law of New York reads as follows:

A person is guilty of robbery in the second degree when he forcibly steals property and when:

1. He is aided by another person actually present; or

2. In the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime:

(a) Causes physical injury to any person who is not a participant in the crime; or ....

Robbery in the second degree is a class C felony.

At the time Toole arrested Gordon, she had reason to believe that Warsop had been criminally assaulted and his gun taken from him. There is no evidence that she was aware that, as Gordon maintains, he had taken the gun for safekeeping and, thus, that there had been no larcenous intent. [15] Gordon has not presented evidence showing that there is a genuine issue of material fact as to whether Toole had probable cause to arrest Gordon for criminal assault or robbery in violation of 160.10 or 160.05 of the Penal Law of New York. *See People v. Jones,* 556 N.Y.S.2d 579 (1st Dep't 1990) (affirming guilty verdict against defendants for a violation of New York Penal Law § 160.05 for theft of headset and radio during physical confrontation in subway). [16]

[15]    Gordon claims that he took the gun from Warsop for safety reasons and gave it to Barberi as soon as he saw the police approach. (Gordon Dep., 5/16/97, at 159–175.) Barberi admits that he recovered the gun from Gordon, but he claims that Gordon turned over the gun only after three or four demands for production of the gun were made by Barberi. (Barberi Dep., 2/5/97, at 57–65.)

[16]    Plaintiff asserts that his experts will testify that " 'the standard of proof for probable cause for the arrest for robbery, riot and assault was not met,' and that 'the officers involved gave Mr. Warsop preferential treatment with malicious intent." ' (Gordon's Mem. in Opp. at 17.) This evidence is inadmissible. *See Peterson v. City of Plymouth,* 60 F.3d 469, 475 (8th Cir.1995) (the proffered expert opinions regarding Fourth Amendment standards are conclusory and would not " 'assist the trier of fact to understand the evidence or to determine a fact in issue' " (quoting

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 185 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

Fed.R.Evid. 702)); *DiBella v. Suffolk County,* 574 F.Supp. 151 (E.D.N.Y.1983), *aff'd.,* 762 F.2d 990 (2d Cir.1985).

Warsop's account of events to Toole and his identification of Walters and Gordon was sufficient to give Toole reason to believe that Walters and Gordon had committed a crime. Warsop's account of events, coupled with his visible injuries and Barberi's account of events, gave Toole reason to find Warsop's account trustworthy. Plaintiff's unsupported allegation that Warsop received special treatment from the Defendants because he was a retired police officer is speculation and is insufficient to establish that Toole acted in bad faith.

Because Toole had probable cause to believe that an assault and robbery had taken place and that Gordon had participated in it, she had probable cause for the arrest, and the arrest is privileged. Toole is entitled to qualified immunity for that action. As governmental officials performing a discretionary function, police officers are entitled to qualified immunity, which shields them from civil damages and liability, so long as their conduct " 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Simms v. Village of Albion,* 115 F.3d 1098, 1106 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The doctrine provides protection "to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). The relevant inquiry is "whether a reasonable official could have believed [his or her conduct] to be lawful, in light of clearly established law and the information the [ ] officers possessed." *Anderson v. Creighton,* 483 U.S. 635, 641 (1987). Qualified immunity may be decided before trial. *See Blisset v. Coughlin,* 66 F.3d 531, 538 (2d Cir.1995) ("[Q]ualified immunity may provide a defense from suit altogether where a defendant can show, in a motion for summary judgment, that 'he could, as a matter of law, reasonably have believed [his conduct] was lawful." ' (quoting *Anderson,* 483 U.S. at 641)). Toole and the officers who assisted her in enforcing her decision to arrest—Barberi, Wiencko, and Moloney—are protected from liability under 42 U.S.C. § 1983 for violation of Horace Gordon's Fourth Amendment right to be free of unlawful seizure. *See Bernard,* 25 F.2d at 102.

**\*8** Plaintiffs papers do not include any facts specific as to Defendant Parrish. Whatever their theory of his liability, [17] Parrish's participation in Gordon's arrest, if any, is also privileged under the above analysis. Since Toole had probable cause for the arrest, Gordon's false arrest claims fails.

Summary judgment is granted for all of the Defendants on the claim of false arrest and imprisonment.

[17]    Plaintiffs' General Statement of Facts allege that Parrish is liable because he encouraged Barberi to disobey Betts' orders. (Pls.' Gen. 56.1 Stmt. ¶ 8.) The Plaintiffs do not offer specific evidence to show the exact order Barberi allegedly disobeyed or how Parrish encouraged him to do this. Parrish testified that approximately four arrests had been made before he arrived at Sutphin and Ferndale. (Pls.' Gen. 56.1 Stmt., Ex. 19, at 109.) Regardless, the issue is mute because there was probable cause for the arrest of Gordon.

### III. Denial of Medical Treatment

Gordon's next claim alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied medical assistance and aid to Gordon in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment by refusing to provide prompt medical treatment to Gordon after he was arrested. (Gordon Compl. ¶ 110.) Defendants moved for summary judgment on the grounds that Gordon did not have a serious medical need, and he was not denied treatment.

A custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official (1) denied treatment needed to remedy a serious medical condition and (2) did so because of his deliberate indifference to that need. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996); *Farmer v.. Brennan,* 511 U.S. 825, 833–34 (1994). Although there is a factual dispute as to the extent of Gordon's injuries and whether or not he had a serious medical injury, [18] Gordon has offered no evidence that any of these Defendants denied him medical assistance and aid. The undisputed evidence shows that: the officers attempted to arrest Gordon at about 11:25 p.m. on August 20, 1995; during the arrest a considerable physical altercation involving a large crowd occurred; Gordon was brought to the precinct at 12:10 a.m. on Monday, August 21, 1995; he left for Queens General Hospital at 12:40 a.m. (Defs.' 56.1 Stmt. Gordon, Ex. M); and he was examined at 1:10 a.m. at the hospital (*Id.* at Ex. O). There is no showing that Gordon was in the custody of any of the Defendants after he was transported from the scene.

18    Gordon testified that his injuries include bleeding from his mouth, forehead, upper lip, and elbow (Gordon Dep., 5/20/97, at 256–57); scratches on his hand (*id.* at 256); swollen wrist (*id* . at 258); and eventually a loss of consciousness (*id.* at 277–78).

Gordon does point to evidence supporting his need for medical treatment, but he points to no evidence that, once evidenced, the necessary treatment was denied. In fact, all of the evidence suggests that Gordon received the necessary medical attention. To establish a claim under § 1983, Plaintiff must show a denial of medical treatment because of deliberate indifference to a serious medical need.

"The deliberate indifference standard embodies both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, 'sufficiently serious,' [and] [s]econd, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (internal citations omitted). To meet the objective prong, plaintiffs must show a serious medical need, which is one that "contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' ' *Id.* (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting). To meet the subjective prong, plaintiffs must show that a specific defendant was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the defendant drew the inference. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The subjective element of deliberate indifference "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835.

**\*9** Here, Gordon offers no evidence to support that any Defendant denied him treatment or that any delay in treatment was the result of deliberate indifference by any Defendant. Gordon received medical attention within one and one-half to two hours of his injuries. (Defs.' 56.1 Stmt. Gordon, Exs. M, O.) To the extent that he was visibly injured at the time of the arrest, his visible injuries were not so urgent as to require immediate attention, particularly considering there is no evidence that he requested treatment. When he got to the precinct and loss consciousness, he was taken to the hospital. (Gordon Dep., 5/20/97, at 277–82.)

There is no evidentiary showing of deliberate indifference to Gordon's medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 105–106 (1976); *Hathaway v. Coughlin,* 99 F.3d 550 (2d Cir.1996); *Rivera v. State of New York,* 1999 U.S. Dist.

Lexis 129 \*20 (S.D.N.Y. January 12, 1999) (an hour and a half between the time plaintiff was shot and taken to the hospital not sufficient to assert claim of denial of medical attention). [19] Summary judgment is granted to all Defendants on Gordon's claim of denial of medical treatment.

19    Indeed, Plaintiff Michael Bennett testified that Gordon's injuries to his arm, which is the most serious injury Gordon claims, occurred in the van during a sharp turn as they arrived at the precinct, not before he was put in the van. (Bennett's 56.1 Stmt., Ex. 1, at 84.)

*IV. Failure to Intervene and Protect Claim*

Gordon's next § 1983 claim against Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Burner, and Papagiannis alleges failure to intervene and protect Plaintiff from unjustified and unreasonable treatment at the hands of other Defendants. Defendants argue that Plaintiff has failed to show evidence supporting a specific failure to intervene by any Defendant.

Under *Anderson v. Branen,* 17 F.3d 552 (2d Cir.1994), an officer is not liable for preventable harm caused by another officer unless the officer observes and has reason to know that: (1) excessive force is being used; (2) a citizen has been unjustifiably arrested; or (3) a constitutional violation has been committed; and (4) the officer had a realistic opportunity to intervene and prevent the harm from occurring. *See id.* at 557. Plaintiff's own evidence fails to show that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Difede, Webber, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Burner, and Papagiannis were even present at the scene at the time Gordon was allegedly subjected to excessive force and arrested. [20] Summary judgment is granted as to all those Defendants because Gordon has presented no proof that any of them were present at the time of such alleged treatment, were aware of such alleged unauthorized, unjustified, and unreasonable treatment, or had a reasonable opportunity to intervene and prevent that treatment. [21]

20    As Plaintiff cites in his own memorandum of law (Gordon's Mem. in Opp. at 23), "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to

Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). Although a failure to intervene and protect claim does not require a showing of presence, it does require the officer to have observed or have reason to know of the alleged violation. *See Anderson* at 557. Gordon has identified evidence demonstrating neither.

21    Gordon tries to base a failure to intervene claim on the evidence that the supervisors did not prevent Barberi, Toole, and Wiencko from returning to the scene to make arrests. Plaintiff's evidence, however, does not show that there was an order not to make any later arrests in regard to the Warsop incident. All admissible evidence shows an order to make no summary arrests, meaning no arrests at the initial scene. (Pls.' Gen. 56.1 Stmt., Exs. 13, 17.) Furthermore, even if Plaintiff had evidence suggesting that a supervisor knew the officers were returning to the scene when there was a direct order not to return, that is not sufficient to show that they had knowledge that constitutional violations would occur. To the extent that Plaintiff's may have evidence to support a claim that one or more of Betts, Picht, or Parrish were negligent in their supervision in that they failed to clarify orders (Betts, Picht) or follow them (Parrish), there is no evidence presented that this negligence rose to the level required for a claim of failure to intervene or protect as outlined in *Anderson v. Branen.* To the extent that such evidence supports a common law negligent supervision claim, the parties are reminded that this claim has been severed, along with *Monell* claims, and is not at issue in this trial.

As for the remaining Defendants—Toole, Wiencko, Barberi, and Moloney—Plaintiff's evidence supports individual claims of excessive force, not a failure to intervene or prevent a constitutional violation. Summary judgment is granted as to all Defendants.

*V. Unlawful Retaliation for First Amendment Conduct Claim*
 **\*10**  Gordon alleges that "the conduct of defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis, acting individually and

in concert with each other, in arresting, assaulting, detaining, imprisoning, failing to protect, conspiring against, subjecting to harassing comments and maliciously prosecuting and intentionally inflicting emotional distress upon the plaintiff, was a direct result of defendants' animus toward plaintiff and/ or as a direct result of plaintiff's having exercised his First Amendment rights to free exercise of his religion ... [and] was therefore an unlawful, oppressive and malicious attempt to harass, intimidate, and punish plaintiff for exercising his constitutional rights, in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983." (Gordon Compl. ¶ 113.) Defendants move for summary judgment.

To establish a claim of unlawful retaliation for First Amendment conduct, Plaintiff must show that (1) his conduct was protected by the First Amendment and that (2) Defendants' conduct was "motivated by or substantially cause by" this protected conduct. *Gagliardi v.. Village of Pawling,* 18 F.3d 188, 194–95 (2d Cir.1994). If Plaintiff shows this, the burden shifts to the Defendants to show that they would have engaged in the same conduct even in the absence of Plaintiff's protected conduct. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977).

There is no evidence that Plaintiff was engaged in a First Amendment activity when he was allegedly assaulted and arrested. Plaintiff apparently bases his claim on the facts that he had recently left a religious service prior to his arrest and that during or after the ensuing melee several individuals heard unidentified officers make derogatory religious comments not to Gordon but to other UCC members. Furthermore, there is no showing that any of the Defendants who interacted with Gordon—Toole, Wiencko, Barberi, and Moloney—engaged in the conduct they did because of any First Amendment activity.[22] As to the other named Defendants, Plaintiff has offered no evidence connecting them to any activities relating to this specific Plaintiff.

22    According to Plaintiff's own papers, his theory for the officer's return to the UCC and arrest of Gordon was not that Gordon was a member of the UCC but that Warsop was a retired police officer. (Gordon's Mem. in Opp. at 17.)

Plaintiff has offered no evidence, direct or circumstantial, showing any of the Defendants' acts were a direct result of Defendants' animus toward Plaintiff for having exercised

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 188 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

his First Amendment rights to free exercise of his religion. Summary judgment is granted as to all Defendants.

*VI. Malicious Prosecution Claim*
Plaintiff claims Defendants Parrish, Wiencko, Barberi, and Moloney maliciously prosecuted him in violation of his statutory and common law rights under New York State law. (Gordon Compl. ¶ 145.) Defendants move for summary judgment on the grounds that Gordon cannot establish two of the necessary elements of such a claim.

**\*11** To state a claim of malicious prosecution under New York law,[23] a plaintiff must show: (1) commencement or continuation of a criminal proceeding by the defendants against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the criminal proceeding; and (4) malice. *See Brown v. City of New York,* 459 N.Y.S.2d 589, 590 (1st Dep't 1983); *Howland v. State of New York,* 487 N.Y.S.2d 956, 957 (Ct.Cl.1985). Plaintiff presents no evidence of Defendants Parrish, Wiencko, Barberi, or Moloney taking any action to commence the proceedings against the Plaintiff that were brought by the Queens District Attorney's office. Plaintiff also presents no evidence of any of these four Defendants taking any action to continue the proceedings against him. Gordon offers no evidence that these four Defendants signed a criminal complaint or in any way participated in his criminal prosecution. To the extent that they were involved in his arrest, they had probable cause. *See False Arrest Section above.* Thus, summary judgment is granted on Gordon's claim of malicious prosecution as against Defendants Parrish, Wiencko, Barberi, and Moloney.

[23]    It is undisputed that New York law is applicable to Plaintiff's malicious prosecution claim.

The analysis for Toole is different. Toole signed two separate criminal complaints against Gordon, one pertaining to the alleged robbery and assault of Warsop and one pertaining to Gordon's actions when he was arrested.[24] By signing criminal complaints against Gordon, Toole did commence criminal proceedings against Gordon. All charges from both criminal complaints were eventually dismissed by the District Attorney. (Certificate of Disposition for Gordon, Nos. 14657, 14658, Dated 12/06/96.) Each criminal complaint must be analyzed separately to determine whether or not there was an absence of probable cause for the proceedings.

[24]    The criminal complaint pertaining to the initial Warsop incident charges Gordon, along with Bennett and Walters, with assault in the second and third degree. (Pls.' Gen. 56.1 Stmt., Ex. 27(I).) The criminal complaint pertaining to activities during Gordon's arrest charges Gordon, along with Campbell, with assault in the second degree (two counts), riot in the fist degree, inciting to riot, obstructing governmental administration in the second degree, and resisting arrest. (*Id.,* Ex. 27(H).) Both criminal complaints were signed by Toole on August 21, 1995 and filed with the Criminal Court of the State of New York in the County of Queens.

Toole had probable cause for initiating the criminal proceeding against Gordon relating to the initial Warsop incident. The reasoning outlined in the section on false arrest applies here. Toole signed the criminal complaint against Gordon based on the allegations of Warsop. Toole was entitled to rely on Warsop's allegations and, thus, had probable cause for the arrest. Plaintiff offers no evidence that Toole had received evidence to the contrary by the time she signed the complaint. Thus, summary judgment is granted as to Gordon's claim of malicious prosecution based on the criminal complaint charging Gordon with the assault of Warsop.

Summary judgment is denied as to Toole for Gordon's claim of malicious prosecution based on the criminal complaint Toole signed charging Gordon with assault in the second degree (two counts), riot in the first degree, inciting to riot, obstructing governmental administration in the second degree, and resisting arrest. (Pls.' Gen. 56.1 Stmt., Ex. 27H.) There is conflicting evidence as to whether or not Toole had probable cause to initiate criminal proceedings against Gordon based on his actions during the arrest. Toole testifies that, after identifying herself as police, Gordon resisted arrest, assaulted Toole, and incited other UCC members to help him resist arrest. (Toole Dep., 2/19/97, at 105–12.) Gordon's deposition denies this account of events and claims that neither Toole nor any of the other officers involved identified themselves as police. (Gordon Dep., 5/16/97, at 193.) He also maintains that he did not shove, kick, hit, or in any other way assault Toole or the other police and that he was the one assaulted. (Gordon Dep., 5/20/97 at 242–43.) Because plaintiff's version is credited as true for the purposes of deciding summary judgment motions, Toole's testimony showing that she had probable cause to file this criminal complaint against Gordon cannot be deemed correct. If a jury credits Gordon's account of the arrest and his claims

of excessive force, it could find that Toole did not have probable cause to file the criminal complaint that commenced proceedings against Gordon for his actions allegedly taken in the course of his arrest. [25] Summary judgment is denied as to Gordon's claim of malicious prosecution against Toole based on this criminal complaint.

[25]      The fact that Gordon admits to struggling with the individuals he later discovered were police does not alter this analysis. In order to maintain a charge of resisting arrest against an individual, that individual must have been aware that he was being arrested. *See People v. Saitta,* 434 N.Y.S.2d 719, 720 (2d. Dep't 1981) (reversing a conviction for resisting arrest because testimony supported defendant's version of events that he was not informed of the police's identity and that "without being aware of the fact that he was being arrested, defendant could not have intentionally resisted arrest"). Whether or not the police identified themselves before attempting to arrest Gordon is a question of fact for the jury.

*VII. Intentional Infliction of Emotional Distress*

**\*12**  Plaintiff's alleges intentional infliction of emotion distress against Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis for their "extreme and outrageous conduct, conduct utterly intolerable in a civilized community, which intentionally caused severe emotional distress to plaintiff." (Gordon Compl. ¶ 147.) Defendants move for summary judgment on the grounds that Gordon offers no evidence to support this claim.

Summary judgment is granted for Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Difede, Webber, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis because Gordon has offered no evidence of these defendants taking any action against him.

Summary judgment is also granted on the claims against Toole, Wiencko, Moloney, and Barberi because the allegations against them do not meet the stringent test required under New York law. To maintain a claim for intentional infliction of emotional distress, a plaintiff must show: (1) extreme and outrageous conduct; (2) with the intent to cause, or with reckless disregard of the substantial

probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress. *See Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996) (citing *Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993)). The standard is very high, and the law requires that the conduct must be "so outrageous ... and so extreme ... as to go beyond all possible bounds of decency." *Id.* Under the circumstances here, Gordon's claim for intentional infliction of emotional distress is subsumed under his excessive force claim. *See Bender v. City of New York,* 78 F.3d 787, 790, 791–92 (2d Cir.1996) (acknowledging that traditional torts may encompass claims for emotional distress); *Fischer v. Maloney,* 43 N.Y.2d 553, 553 (1978) ( "Indeed, it may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability."); *Anatsui v. Food Emporium,* No. 99 Civ. 1337(JGK), 2000 WL 1239068, at *7–*8 (S.D.N.Y. Sept. 1, 2000) (holding that derogatory comments and termination are "insufficient to constitute intentional infliction of emotional distress under New York law" (citations omitted)); *Muhlrad v. Mitchell,* No. 96 Civ. 3568(DLC), 1997 WL 182614, at *8 (S.D.N.Y. Apr. 14, 1997) (holding that allegations were insufficient to satisfy the element of outrageous conduct and noting "the New York Court of Appeals has never upheld a claim for intentional infliction of emotional distress"). Gordon's emotional distress resulting from the circumstances of his apprehension will be an element the jury may take into account in awarding any damages on the other claims. [26]

[26]      Gordon's testimony does present evidence of what might be outrageous conduct. Specifically, Gordon testified to numerous acts of excessive force by Barberi, Toole, Wiencko, and Moloney, and testified that Barberi referred to Gordon as a "nigger" and "fucker" in the course of his arrest. (Gordon Dep., 5/16/97, at 205.) To the extent that such actions support a claim for intentional infliction of emotional distress, this Court finds that they are covered under Gordon's excessive force claim. Gordon will be able to present any evidence of emotional damages in connection with this event if he succeeds on the excessive force claim. The emotional damages Gordon claims includes post traumatic stress disorder, post traumatic headaches, cognitive disorder, sexual difficulties, flashbacks,

fear, and guilt. (Gordon's Resp. to Defs.' 56.1 Stmt. ¶¶ 25–26.)

*VIII. Claims of Negligent Infliction of Emotional Distress and Negligence*

**\*13** Plaintiff's claims for negligent infliction of emotional distress and for negligence are dismissed against all Defendants because Plaintiff's testimony about Toole, Wiencko, Barberi, and Moloney does not bespeak of negligence but of intentional conduct.[27] Under the law in New York, once intentional conduct has been established, the actor is liable for assault and not negligence, even when physical injuries have been inflicted inadvertently. *See Mazzaferro v. Albany Motel Enterprises, Inc.,* 515 N.Y.S.2d 631, 633 (3d Dep't 1987) (negligence and assault and battery claims are mutually exclusive); *Pranda v. City of Albany,* 956 F.Supp. 174, 183 (N.D.N.Y.1997). Furthermore, Plaintiff has failed to identify any evidence suggesting either a bystander or a direct duty theory of negligent infliction of emotional distress as is required under New York law. *See Mortise v. United States,* 102 F.3d 693, 696 (2d Cir.1996). As for the claims against supervisors, Plaintiff has offered no specific evidence that each of the individual supervisors were present or aware of the arrest of Gordon or use of excessive force by officers.[28] Summary judgment is granted for all Defendants.

[27]    Even Plaintiff's own motion papers do not support claims of negligence. Plaintiff's argument addresses failure to take action after imprisoning parishioners inside the fence. (Gordon's Mem. in Opp. at 34, 38.) It is undisputed that Gordon was arrested and in the police van and was never imprisoned inside the fence.

[28]    Plaintiff bases his claim of negligence against the supervisors on the allegation that Barberi "maliciously convinced his colleagues to return to the Church against the express order of Captain Betts." (Gordon's Mem. in Opp. at 37–38.) The evidence Plaintiff cites for this, however, is an expert report, which is not admissible for this purpose. In addition, even if Plaintiff had evidence to support this theory, it should still be intentional conduct as to Barberi. As for his supervisors, Plaintiff offers the theory that they should have known of Barberi's intentions and were negligent in failing to prevent his return. However, Plaintiff cites to no specific part of any admissible evidence to support this allegation. Furthermore, the cause of

action for negligent supervision has been severed and is not an issue in this trial. (May 31, 2000 Order.)

*IX. Conspiracy*

Plaintiff alleges that Defendants "conspired together and maliciously and willfully entered into a scheme to deprive plaintiff of his rights, liberty, well-being and to commit the above-alleged unlawful acts." (Gordon Compl. ¶ 153.) Defendants move for summary judgment on the grounds that Plaintiff offers no evidence to support such a claim. Plaintiff's claim for conspiracy is dismissed as to all Defendants. Plaintiff has presented no proof that the acts of Defendants flowed from a common scheme or plan. *See Schlotthauer v. Sanders,* 545 N.Y.S.2d 196, 197 (2d Dep't 1989). In addition, Plaintiff's Memorandum of Law does not even address his conspiracy claim, and his 56.1 Statement in response to Defendants' claim that there is no evidence to support conspiracy simply cites to all of the general statements and exhibits without providing specific evidence. (Gordon's Resp. to Defs.' 56.1 Stmt. ¶ 60.) Summary judgment is granted for all Defendants on Gordon's conspiracy claim.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.) In his Complaint, Gordon failed to plead any common law claim for assault and battery. Gordon moves to amend the Complaint to allow for the addition of this claim, citing " ' law office error' " as the reason for the omission. (Letter from Paul Rheingold, Dated 10/10/2000.) Because Gordon clearly plead excessive force under § 1983 and the same facts establish a common law assault and battery claim, Gordon's motion to amend is granted. Therefore, Gordon also has a New York State common law claim for assault and battery (physical acts) against Barberi, Toole, Wiencko, and Moloney.

Conclusion

**\*14** Summary judgment is denied on the following claims by Gordon:

1. § 1983 excessive force against Barberi, Toole, Wiencko, Moloney

2. § 1983 malicious prosecution against Toole on the basis of the criminal complaint alleging assault in the second degree (two counts), riot in the first degree, inciting to riot, obstructing governmental administration in the second degree, and resisting arrest

Summary judgment is granted on the remaining claims by Gordon:

1. § 1983 excessive force against Parrish

2. § 1983 false arrest against all Defendants

3. § 1983 refusal to address serious medical needs against all Defendants

4. § 1983 failure to intervene or protect against all Defendants

5. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

6. common law malicious prosecution against Parrish, Barberi, Wiencko, Moloney, and Toole on the criminal complaint filed pertaining to Warsop's assault

7. common law intentional infliction of emotional distress against all Defendants

8. common law negligent infliction of emotional distress against all Defendants

9. common law conspiracy against all Defendants

10. common law negligence against all Defendants

Michael Bennett's Claims

On August 20, 1995, Michael Bennett was arrested and charged with assault in the second and third degrees. (Bennett's 56.1 Stmt. ¶ 19; Defs.' 56.1 Stmt. Bennett ¶ 14.) He was apprehended by an unidentified uniformed officer. (Pls.' Gen. 56.1 Stmt., Ex. 27A; Toole Dep., 2/19/97, at 172–79.) The official arresting officer on the paperwork was Toole. (Id.) Upon motion of the District Attorney, the Queens County Criminal Court, Judge Griffin dismissed all charges against Plaintiff on February 5, 1996 (Bennett's 56.1 Stmt. ¶ 22; Defs.' 56.1 Stmt. Bennett ¶ 15.)

The identity of the uniformed police officer who apprehended Bennett has not been established by either party. Defendants Toole, Wiencko, Barberi, and Moloney were all in the vicinity and participating in Gordon's arrest around the same time Bennett was arrested, but Bennett has not identified any of them, either in his deposition, his CCRB complaint, in an affidavit in opposition, or in any other way. In addition, none

of the named Defendants claim involvement with the Bennett arrest, even though they did offer information that they were involved in the arrests of other Plaintiffs. Defendants' explanation for Bennett's arrest is that Warsop pointed out Bennett, who he claims was involved in his attack, to an uniformed officer and that this uniformed officer arrested Bennett on the basis of Warsop's identification. (Defs.' 56 .1 Stmt. Bennett, Warsop Aff. ¶¶ 4–5 ("Sometime before 11:15 p.m. on August 20, 1995, I observed a male black individual at or near the corner of Sutphin and Ferndale, and recognized this person as one of the individuals who had assaulted me several hours earlier. I pointed this male black out to an uniformed police officer. The officer handcuffed the individual I had identified and removed him from the location where I was.");Pls.' Gen. 56.1 Stmt., Ex. 27A.) The next day, Toole showed Warsop a picture of Bennett, and Warsop identified the man in the picture as "one of the individuals who had participated in the assault upon me the previous evening ... [and] the same male black that I identified to the uniformed police officer on August 20, 1995." (Defs.' 56.1 Stmt. Bennett, Warsop Aff. ¶ 7.) On the basis of this post-arrest confirmatory identification, Toole signed a criminal complaint against Bennett for the assault of Warsop. (Pls.' Gen. 56.1 Stmt., Ex. 27A; Toole Dep., 2/19/97, at 176–81.)

**\*15** Bennett denies any involvement in the effort to prevent Warsop from entering the UCC grounds. (Bennett's 56.1 Stmt. ¶ 3.) Bennett maintains that he was in the tent area and nowhere near the gate when the altercation occurred and that his only involvement with the police was when they returned to the UCC the second time. (Id.) According to Bennett, after the UCC service had ended, a woman from the congregation ran into the gated area yelling, "They are going to kill him." (Defs.' 56.1 Stmt. Bennett, Ex. B, at 71.) Bennett walked out the gate and approached several individuals whom he observed beating Gordon and inquired, "What did he do?" (Bennett's 56.1 Stmt. ¶¶ 4–5.) Bennett alleges that, in response, officers, whom he cannot identify, attacked and arrested him. (Id. ¶¶ 5–6; Defs.' 56.1 Stmt. Bennett ¶¶ 3–6.) Specifically, Bennett testified that he was hit from behind with an object that felt like a bat or a stick (Bennett's 56.1 Stmt., Ex. 1, at 72), that he was thrown against a fence (id.), hit in the shoulder and thrown against a police car, and he was handcuffed (id. at 73; Bennett's 56.1 Stmt. ¶ 6). Bennett was then placed in the police van with Gordon, transported to the precinct, and detained until his arraignment.

The identity of the officers who attacked and apprehended Bennett is unknown to the Plaintiff and Defendants. The

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 192 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

only physical description Bennett can give is that the people attacking Gordon were "four guys" (Defs.' 56.1 Stmt. Bennett, Ex. B, at 69) in plainclothes, none in uniform (*id.* at 70), all in jeans, and one in a gray t-shirt (*id.*). They were "tall, big ... white guys," one of whom had a nightstick and one of whom had short blond hair. (*Id.* at 71.) When asked, "Do you know who the four guys or any of them were that were holding Horace Gordon?" he answered no. (Bennett's 56.1 Stmt., Ex. 1, at 69.) When asked, "Do you know who it was that hit you from behind either by physical description or any other identifying characteristics?" Bennett answered no. (*Id.* at 73.) Bennett described the officer who cuffed him as "a plainclothes officer, other [sic] gray shirt and jeans" (Defs.' 56.1 Stmt. Bennett, Ex. B, at 74), and that this was one of the four that had previously been with Gordon (*id.*). It is unclear how many officers Bennett is alleging used force against him and whether or not one of those officers is also the one who cuffed him. It is also unclear whether or not the officers who used force against him are the same ones who were arresting Gordon. [29]

[29]    Plaintiff continues to cite Bennett's 56.1 Stmt. ¶¶ 5–6 for the proposition that Bennett was hit and arrested by one of the officers who was involved in the Gordon arrest. The cited deposition, however, is not supportive. Bennett never testified that he was hit by the same officers who arrested Gordon, nor does he offer an opposing affidavit containing such a claim.

*I. § 1983 Excessive Force Claim*

In his Amended Complaint, Bennett alleges that, "The conduct and actions of defendants Barberi, Parrish, Toole, Wiencko, and Moloney, acting individually and in concert with each other, acting under color of law, in assaulting plaintiff by repeatedly striking his body with a nightstick, was done intentionally, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of his acts, was done without lawful justification or reason, and was designed to and did cause specific and serious harm, pain and suffering in violation of plaintiff's Constitutional rights as guaranteed under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution." (Bennett Am. Compl. ¶ 93.) Defendants move for summary judgment because Bennett cannot identify any Defendant and because any force used was reasonable. The legal elements of this claim are discussed in the Gordon section above.

**\*16** Because Bennett's claim of excessive force occurred in the course of his arrest, his claim arises under the Fourth Amendment. *See Graham v. Connor,* 490 U.S. 386, 394 (1989). The testimony of Bennett raises a genuine issue of material fact regarding the manner in which he was arrested and the force that was used, therefore, his excessive force claim should survive summary judgment and go before a jury. Summary judgment is granted for all Defendants, however, because Bennett offers no evidence identifying or in any other way connecting any of the named officers as the ones that used force against him.

Bennett cannot show the required direct or personal involvement necessary to hold a defendant liable in his or her individual capacity for a § 1983 claim. [30] Plaintiff acknowledges that personal involvement is necessary for a finding of liability under § 1983 and maintains that he has satisfied this requirement by pointing to facts that show the named Defendants were personally present at the scene of the incident. For certain Defendants, Plaintiff's sole showing of personal involvement is evidence of the Defendant's presence at the scene of the incident at some point in time on the night in question. (Pls.' Gen. 56.1 Stmt.) For other Defendants, Plaintiff offers evidence that they were involved in specific acts. Bennett, however, has never identified any of the Defendants by name, description, or in any other way.

[30]    This analysis applies to all of the Plaintiffs' § 1983 claims.

In order to survive the motion for summary judgment on the § 1983 claims, there must be some evidence of the personal involvement of each Defendant. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). Whether a Defendant is a supervisor or not, the Plaintiff must allege some form of personal involvement for each Defendant. Without evidence supporting a Defendant's personal involvement, the motions for summary judgment on the § 1983 claims must be granted. If there is evidence to support personal involvement, any dispute is a question of fact for the jury. *See Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *Moffitt,* 950 F.2d at 886. However, there still must be a supported allegation of personal involvement. Plaintiff must allege "a tangible connection between the acts of a defendant and the injuries suffered ." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986)

Plaintiff continuously argues that defendants cannot show non-involvement and, therefore, a factual dispute about personal involvement exists, and it must go to a jury. (Pls.' Mem. in Opp. at 3–9; Letter from Daniel Perez, Dated July 31, 2000 ("Perez Letter, 7/31/00").) Although Plaintiff is correct that the burden of identifying by name and badge number every police officer who allegedly participated in the incident cannot be placed on Plaintiff, it does not follow that the burden shifts to each and every individually named Defendant to prove his or her non-involvement. In arguing for a burden shift, plaintiff relies in part on the case of *Williams v. Smith*, 781 F.2d 319 (2d Cir.1986), and cases following it, and in part on a series of cases adopting the RESTATEMENT (SECOND) OF TORTS § 433 (1965).

**\*17** Contrary to Plaintiff's insinuation, *Williams* does not stand for the proposition that Defendants must submit affidavits of non-involvement, nor does it suggest that a plaintiff is relieved from showing personal involvement. Rather, *Williams* addresses the extent to which plaintiffs must respond to defendants' motions for summary judgment based on a lack of personal involvement. Once the defendant "documented his assertion of no personal involvement" by specifying in a summary judgment motion the extent of his involvement and denying involvement in ways alleged, the defendant had made a motion sufficient to require response by the plaintiff. *Williams,* 781 F.2d at 324.

Here, the parties agree that Toole's involvement in the arrest was only after the actual apprehension. Bennett does not even mention a woman in his testimony regarding the incident. There is no evidence to support Toole's involvement on an excessive force claim. With respect to Barberi, Wiencko, Moloney, and Parrish, Bennett testified that the police officers he observed with Gordon and the officers who arrested and put handcuffs on him were in plain clothes. (Defs.' 56.1 Stmt. Bennett, Ex. B, at 70–77.) Barberi, Moloney, and Parrish all wore uniforms on August 20, 1995. (Defs.' 56.1 Stmt. Bennett ¶ 8.) [31] At the time of Gordon's arrest, Wiencko was the only male officer in plain clothes. (Defs.' 56.1 Stmt. Bennett ¶ 9.) Although Defendants assert that Detectives do not carry nightsticks, the citation they offer does not support that assertion. (*Id.* ¶ 10.)

[31]    Plaintiff's response to this statement is, "Plaintiff can neither admit nor deny this statement based upon the factual record. Defendants may have changed clothes at various times on August 20,

1995." (Bennett's Resp. to Defs.' 56.1 Stmt. ¶ 8.) This is not a denial supported by specific, admissible evidence as is required under Rule 56.1. As such, it is deemed admitted.

Plaintiff is correct that, in certain situations, the burden must shift to each defendant to disprove his or her involvement. Here, Bennett has not offered facts showing that such a situation exists. The cases Bennett relies on hold that, once plaintiff has proven each defendant acted tortiously, the burden of proving which tortious defendant caused the particular harm or what part of the particular harm shifts to each tortious defendant. Each defendant then has the burden of proving his or her tortious conduct did not cause the harm or only caused part of the harm. The burden of proving that each defendant acted tortiously, however, remains on the plaintiff. For example, in *Rutherford v. Berkeley,* 780 F.2d 1444, 1448 (9th Cir.1986), the plaintiff could identify the three defendant officers as among the five or six surrounding him while he was assaulted, although he could not clearly state they had assaulted him. The Ninth Circuit found that this was sufficient evidence to go to a jury for consideration. *See id.* Similarly, in *Grandstaff v. City of Borger,* 767 F.2d 161, 168 (5th Cir.1985), the Fifth Circuit held that the plaintiff did not need to prove which officer, of the four officers who fired shots at plaintiff, fired the bullet that actually killed plaintiff in order to be found liable under § 1983. The court found each defendant "as much at fault as the others, and all are liable for the foreseeable consequences." *Id.; see also* RESTATEMENT (SECOND) OF TORTS § 433B, cmt. g (1965) (stating that the burden shifting rule "has no application to cases of alternative liability, where there is no proof that the conduct of more than one actor has been tortious at all. In such a case the plaintiff has the burden of proof both as to the tortious conduct and as to the causal relation.").

**\*18** In his § 1983 claim, Bennett makes specific allegations of the use of force by one or more specific persons. He has not shown that any of the named Defendants were the ones that either used force or stood by and watched as others did. He has not shown that they were aware of his particular situation. He has not identified them as the officers who were present. Although the Court understands that, in a chaotic situation such as this one, it is difficult to observe and remember every detail, all of the Plaintiffs in the various UCC cases have been through extensive discovery lasting several years. The Plaintiff attorneys have photographs of all of the named Defendants. In addition, many of the Plaintiffs engaged in CCRB proceedings in which they also had the opportunity to identify the Defendants. Bennett has never identified

any of the named Defendants, either by name, description, photograph, or witness testimony at any time in the course of this lawsuit. Bennett has not filed an opposing affidavit stating that he recognizes any of the named Defendants as an officer who used force against him. In the motion papers, Bennett's attorneys have failed to point to specific evidence that identifies any of the named Defendants as being involved in Bennett's arrest. The closest the attorneys offer is the fact that Barberi was carrying a flashlight and was "using it in the vicinity of Bennett's arrest." (Bennett's 56.1 Stmt. ¶ 6.)

Contrary to Plaintiffs' assertion, this Court is not requiring Plaintiffs "to recite from memory the name of his or her assailant." (Pls.' Mem. in Opp. at 9.) Plaintiff argues that "Plaintiffs similarly situated have reconstructed the events giving rise to their claims from an amalgam of police records, statements and testimony from police officers, and statements and testimony of witnesses." (*Id.*) Plaintiffs have failed to do this, and the Court is not responsible for the Plaintiffs' failure. The 56.1 Statements and motion papers lack the recitation of evidence that supports, circumstantially or otherwise, the personal involvement of any Defendant. The best Plaintiffs offer with respect to some Defendants is a time at which they arrived. For other Defendants, they do not even offer this. Aside from the claims against the supervisors, which will be addressed separately under the appropriate sections, mere presence at the site of a melee involving hundreds of people is not evidence of personal involvement for the purpose of holding individual defendants liable for constitutional violations.

Bennett does not offer any evidence connecting any of the Defendants to his attack or arrest. Without any evidence linking any of the Defendants to the use of force in any way, this Court cannot allow the charge to go to trial when the Defendants are being held personally liable for constitutional violations. Summary judgment is granted for all Defendants on Bennett's excessive force claim.

## II. *§ 1983 False Arrest & Imprisonment Claim*

**\*19** In his Amended Complaint, Plaintiff alleges that "The conduct and actions of defendants Parrish, Toole, Wiencko, Barberi, and Moloney, acting individually and in concert with each other, acting under color of law, in arresting and imprisoning plaintiff without probable cause, was done intentionally, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of his acts, was done without lawful justification or reason, and was designed to and

did cause specific and serious harm, pain and suffering in violation of plaintiff's Constitutional rights as guaranteed under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution." (Bennett Am. Compl. ¶ 96.) Defendants move for summary judgment on the grounds that Toole had probable cause to arrest Bennett and that Bennett has failed to identify any of the other named Defendants and, therefore, cannot sustain an action under § 1983. The elements for a false arrest claim are outlined in the Gordon section above.

Toole signed the criminal complaint based on Warsop's confirmation that the individual in the picture was the individual who assaulted him the night before and the individual whom he had then identified to the uniformed officer. Based on this statement, Toole had probable cause to sign the criminal complaint against Bennett for the arrest of Gordon. Summary judgment is therefore granted for Toole on Bennett's false arrest claim.

As discussed above, Toole was Bennett's official arresting officer, but she was not the one who apprehended Bennett and detained him initially. For Bennett's arrest to be privileged, the Defendants must show that this apprehending officer, who is not identified, had probable cause to arrest. The Defendants' evidence for probable cause is Warsop's affidavit stating that he identified Bennett to the officer. Warsop's affidavit, however, does not state exactly what he told the unidentified apprehending officer. His affidavit simply states, "I pointed this male black out to an uniformed officer. The officer handcuffed the individual I had identified and removed him from the location where I was." (Defs.' 56.1 Stmt., Warsop Aff. ¶ 4.) Furthermore, as Bennett describes the events, there would have been little opportunity for Warsop to identify him to anyone because he was arrested soon after he approached Gordon.[32]

[32]    The Court notes that Plaintiff Andre Pierre's testimony contradicts both Warsop's and Bennett's version of events. Pierre testified that, when he observed Plaintiff Cornelius Caliz get arrested, he also saw Bennett and heard Bennett ask the police, " 'Why are you arresting Caliz?' ... 'can I come down to the precinct with him' and [the officer] says, 'Oh you want to come with him." ' (Pierre's 56.1 Stmt., Ex. 1, at 53.)

On the basis of this evidence, it is not clear what Warsop told the unidentified officer or whether or not this information

was sufficient to give that officer probable cause to arrest Bennett. Despite this fact, Plaintiff has offered no evidence in any way tying any of the named Defendants to the officer who cuffed him. As discussed above, there must be a showing of personal involvement to make a claim under § 1983. Therefore, summary judgment is granted for all Defendants on Bennett's § 1983 false arrest and imprisonment claim.

### III. § 1983 Denial of Medical Treatment

**\*20** Bennett alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis unlawfully denied him medical treatment by "refusing to take any steps to provide plaintiff with medical care to address a serious medical need, despite having full knowledge that it was necessary and warranted under the circumstances, and in refusing to allow plaintiff to seek prompt medical treatment for his injuries." (Bennett Am. Compl. ¶ 99.) Defendants move for summary judgment on the basis that Bennett did not have apparent medical injuries and did not seek medical assistance, despite his knowledge that it was available. Bennett maintains that he did have serious injuries and was denied treatment. The relevant law is presented in the Gordon section above.

While Bennett has offered evidence of injuries, [33] he has failed to offer evidence showing that he was denied treatment. The basis of Bennett's claim that the Defendants denied him medical treatment is that he told an officer at the precinct that he was in need of medical care, and the officer responded that if he sought medical attention, he would not be able to see the judge that day. Bennett testified that he replied, "[O]kay, I don't mind if I die in here, I just want to see the judge so I get out of here." (Bennett's 56.1 Stmt., Ex. 1, at 109.) This does not constitute a denial of medical treatment. Bennett offers no evidence that he was visibly injured, and he does not testify that he was told he could not receive medical treatment. In fact, his testimony suggests that he decided he would rather forego immediate treatment and see the judge as quickly as possible. [34] In addition, Bennett admits that Plaintiff Caliz, who was in the same cell as Bennett, accepted an offer of medical treatment from the police. (Bennett's 56.1 Stmt., Ex. 1, at 86.) In addition, Bennett admits that he was in the same cell as Gordon (*id.*), and the evidence suggests that he was therefore present when the police took Gordon to the hospital.

[33]    Bennett testified that he had the following injuries: back pain, pain in his left hand, and tightness in his thighs. (Bennett's 56.1 Stmt., Ex. 1, at 118–19.)

[34]    The statement that receiving medical attention would result in a delay in going before a judge is not a threat but a statement of fact. Because going to the hospital to receive medical treatment takes time, it often increase the time between arrest and arraignment. Such a delay does not constitute unnecessary delay for purposes of Fed.R.Crim.P. 5(a). *See United States v. Isom,* 588 F.2d 858, 862 (2d Cir.1978) (denying motion to suppress statements made after arrest but before arraignment because "The period during which appellant received medical treatment (at his request) and overnight lodging at the MCC should not be counted in computing unnecessary delay" (citing *United States v. Marrero,* 450 F.2d 373, 378 (2d Cir.1971)).

Summary judgment is granted for all Defendants on Bennett's claim of denial of medical treatment.

### IV. § 1983 Failure to Intervene or Protect

Bennett's claim for failure to intervene or protect alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed "to take any steps to intervene or protect plaintiff from the unauthorized, unjustified, and unreasonable treatment at the hands of the other defendants herein." (Bennett Am. Compl. ¶ 102.) Defendants move for summary judgment on the grounds that there is no evidence showing that any Defendant had knowledge of or reason to know of what happened to Bennett. The relevant law is presented in the Gordon section above.

**\*21** Bennett offers no evidence that any of the supervisory Defendants were present when Bennett was arrested or that they had knowledge of his arrest or the use of force against him. The point in time at which Bennett was arrested appears to be during the beginning of the melee, before ranking supervisors were on the scene or in control. As to the officers who were at the scene initially—Toole, Barberi, Wiencko, and Moloney—Bennett offers no evidence identifying any of them or in any way connecting them to his arrest.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 196 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

Summary judgment is granted for all Defendants on Bennett's failure to intervene or protect claim.

### V. § 1983 Failure to Properly Supervise

Bennett's next claim alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, and Prendergast failed to properly supervise Toole, Wiencko, Barberi, Difede, Parrish, Webber, Moloney, Single, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis and "failed to exercise appropriate command functions, thereby acquiescing to and acknowledging the improper actions of the defendants." (Bennett Am. Compl. ¶ 105.)

Bennett does not offer evidence of a failure to supervise that is specific to the facts of his situation. Bennett admits that he was arrested before Anemone, Maple, Chapman, and Brown arrived on the scene (Bennett's Resp. to Defs.' 56.1 Stmt. ¶¶ 41–42) and admits Prendergast was not a supervisor (*id.* ¶ 43). As for Devlin and Parrish, Bennett has failed to identify evidence showing either personal wrongdoing or knowledge of or an opportunity to prevent violations of his rights. Bennett has not connected any of the supervisor Defendants to him, and he has not connected any of the subordinate Defendants to him.

Summary judgment is granted for all Defendants on Bennett's claim for failure to supervise.

### VI. § 1983 Unlawful Retaliation for First Amendment Conduct

Bennett claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis actions were "a direct result of defendants' animus toward plaintiff and/or [ ] a direct result of plaintiff's having exercised his First Amendment rights to free exercise of his religion." (Bennett Am. Compl.¶ 108.) Defendants move for summary judgment on the grounds that there is no evidence showing Bennett was engaged in First Amendment activity at the time of his arrest or that any of the Defendants were connected to Bennett's arrest or knew his religion. The elements of the cause of action are outlined in the Gordon section above.

As evidence of his unlawful retaliation claim, Bennett alleges that after his arrest several officers made derogatory religious

comments (Bennett's 56.1 Stmt. ¶¶ 8–9) and that one non-UCC member was arrested but released for the commission of a crime (*id* . ¶ 13). This evidence does not support a claim for unlawful retaliation under the relevant standard. Bennett failed to offer evidence showing that the Defendants' conduct—arresting and using excessive force against him—was motivated by whatever First Amendment activity he was engaged in. Plaintiff's assertion that the arrest and release of a non-UCC member establishes that he was arrested simply because he was a church member is without merit. According to Bennett's own evidence, Officer Lefebure, who is not named as a defendant here, arrested a man for disorderly conduct because he was being loud and refused to leave. (Bennett's 56.1 Stmt ., Ex. 4, at 10–11.) This individual was issued a summons and released because "he met the parameters of being released on the scene" (*id.* at 15); that is, his proof of identification was valid, and he was only charged with a violation (*id.* at 15–16, 18).

**\*22** Bennett offers no evidence of any UCC member arrested for a similar charge—a violation—who had valid identification and was not released. All of the arrested UCC members, including Bennett, were arrested for and charged with, among other things, the crime of assault. The fact that a non-UCC member who was charged with the violation of disorderly conduct was issued a summons and released does not show animus or retaliation by any Defendant. Summary judgment is granted for all Defendants on Bennett's claim of unlawful retaliation for First Amendment conduct.

### VII. Common Law Assault and Battery

Bennett alleges that Defendants Toole, Wiencko, Barberi, Parrish, and Moloney engaged in conduct constituting assault and battery. (Bennett Am. Compl. ¶ 136.) Defendants move for summary judgment on the grounds that Bennett "cannot identify anyone who assaulted him. Therefore, he cannot prove intent." (Defs.' Mem. In Supp. Bennett at 9.)

Defendants have not cited any law supporting the position that intent cannot be proved without identification of the perpetrator of an assault and battery. Assault is "an intentional placing of another person in fear of imminent harmful or offensive contact." *United Nat'l Ins. Co. v. Waterfront New York Realty Corp., 994 F .2d 105, 108 (2d Cir.1993).* Battery is "an intentional wrongful physical contact with another person without consent." *Id.* (citations omitted). Intent is an element of both torts, but the plaintiff need only offer evidence that "there was bodily contact; that such contact was offensive; and that the defendant intended to make the

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 197 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

contact." *Masters v. Becker,* 254 N.Y.S.2d 633, 635 (2d Dep't 1964). Plaintiffs need only show that a defendant intended the contact, not that they intended the specific harm. *See Rivera v. Puerto Rican Home Attendants Servs. Inc.,* 930 F.Supp. 124, 133 (S .D.N.Y.1996) (recognizing that "the intent requisite to an assault under New York law is the intent either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact. To prove battery, the required intent is merely that the defendant intentionally made bodily contact and that the intended contact was itself offensive or without consent." (internal citations omitted)). The question of intent is a question of fact for the jury. *See Casimir v. Hoffman,* 213 N.Y.S.2d 499, 500 (2d Dep't 1961).

Crediting Bennett's version of events, there is sufficient evidence that an assault and battery occurred. Plaintiff did not consent to any touching and, based on the evidence he presents, the acts resulting in the physical contact were intentional, not accidental.

Summary judgment is granted on Bennett's assault and battery claim against Defendants Toole and Parrish. Bennett's own testimony does not support a claim that Toole or Parrish were involved in the use of force. In addition, summary judgment is granted for Defendants Barberi, Wiencko, and Moloney. Bennett has not identified these Defendants as the ones who assaulted and battered him. To deny summary judgment and allow the claim to proceed against these Defendants simply because Bennett names them in his Amended Complaint would only be inviting the jury to speculate without sufficient evidence. Summary judgment is granted for all named Defendants.

**\*23** Defendants do not cite any law holding that a plaintiff may not proceed on this claim as against unidentified defendant police officers. The police officers on the scene were the authorized agents of the City of New York. Bennett's testimony supports a claim of assault and battery. A principal is generally liable for the acts of its agents acting within the scope of their authority. Therefore, Bennett may proceed with his common law claim of assault and battery against unidentified police officers. [35]

[35]    The parties are reminded of the Court's Order stating, "[D]efendants are deemed to have stipulated that each individual defendant police officer was acting within the scope of his/her employment and that any verdict against any police officer will permit a judgment to be entered against

the City of New York on the theory of *respondeat superior.*" (May 31, 2000 Order ¶ 1.) Given this stipulation, the Plaintiff could receive a judgment against the City if the jury finds that an unidentified officer assaulted and battered him, even though he could not receive judgment against any particular defendant.

### VIII. Common Law False Arrest & Imprisonment

Bennett alleges that Defendants Parrish, Toole, Wiencko, Barberi, and Moloney acted to falsely arrest and imprison him without probable cause. (Bennett Am. Compl. ¶ 139.) Defendants move for summary judgment. The elements of a false arrest claim are presented in the Gordon section above. The standard for false arrest is the same under § 1983 and common law. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996.)

Summary judgment is granted for Toole on Bennett's claim for false arrest and imprisonment. Toole had probable cause to arrest Bennett based on the post-arrest identification by Warsop. *See* Bennett's § 1983 section above. Summary judgment is granted for Parrish. The evidence suggests that Parrish did not arrive on the scene until after approximately four arrests. (Pls.' Gen. 56.1 Stmt., Ex. 19, at 109.) Summary judgment is also granted for Defendants Barberi, Wiencko, and Moloney. There is no showing that any of these Defendants were involved with the arrest of Bennett. Summary judgment is granted for all named Defendants.

Based on the analysis in Bennett's § 1983 false arrest claim above, the Defendants have not established that the unidentified officer who arrested Bennett had probable cause to do so. Defendants have not cited any law holding that a plaintiff cannot proceed with a false arrest claim against an unidentified defendant police officer. Therefore, Bennett will be allowed to present his claim that an unidentified officer falsely arrested him because he lacked probable cause.

### IX. Common Law Malicious Prosecution

Bennett claims that Defendants Parrish, Toole, Wiencko, Barberi, and Moloney are liable for maliciously prosecuting him. (Bennett Am. Compl. ¶ 142.) Defendants move for summary judgment. The elements of a malicious prosecution claim are explained in the Gordon section above.

Summary judgment is granted for all Defendants on Bennett's claim for malicious prosecution. There is no evidence

2000 WL 1538019

connecting Bennett, Wiencko, Parrish, or Moloney to the criminal prosecution of Bennett. The only Defendant who is connected to the prosecution of Bennett is Toole, who signed the criminal complaint against him. (Pls.' Gen. 56 .1 Stmt., Ex. 271.) As discussed above, Toole had probable cause for the arrest of Bennett based on the post-arrest identification of him by Warsop. Plaintiff does not point to evidence that Toole received information contradicting this basis for probable cause by the time she signed the criminal complaint. Therefore, Toole had probable cause to sign the complaint and initiate criminal proceedings against Bennet. Summary judgment is granted for all Defendants.

*X. Common Law Intentional Infliction of Emotional Distress*
 **\*24**  Bennett alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis acted to intentionally inflict emotional distress on him. (Bennett Am. Compl. ¶ 145.) Defendants move for summary judgment. The relevant law is identified in the Gordon section above.

Summary judgment is granted for all Defendants on Bennett's claim for intentional infliction of emotional distress. Bennett fails to offer evidence to support the claim.

*XI. Common Law Negligent Infliction of Emotional Distress*
Bennett alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis acted to negligently inflict emotional distress on him. (Bennett Am. Compl. ¶ 148.) Defendants move for summary judgment. The relevant law is identified in the Gordon section above.

Summary judgment is granted for all Defendants on Bennett's claim for negligent infliction of emotional distress. Bennett fails to offer evidence to support the claim.

*XII. Common Law Conspiracy*
Bennett alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against him to violate his rights. (Bennett Am.

Compl. ¶ 151.) Defendants move for summary judgment. The relevant law is identified in the Gordon section above.

Summary judgment is granted for all Defendants on Bennett's claim for conspiracy. Bennett fails to offer evidence to support the claim.

*XIII. Common Law Negligence*
Bennett alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused him severe injuries and emotional distress. (Bennett Am. Compl. ¶ 154.) Defendants move for summary judgment. The relevant law is identified in the Gordon section above.

Summary judgment is granted for all Defendants on Bennett's claim for negligence. Bennett fails to offer evidence to support the claim.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion
Summary judgment is denied on the following claims by Bennett:

1.  common law assault and battery against unidentified police officers

2.  common law false arrest & imprisonment against unidentified police officers

Summary judgment is granted on the remaining claims by Bennett:

1.  § 1983 excessive force (physical acts) against all Defendants

2.  § 1983 false arrest and imprisonment against all Defendants

 **\*25**  3.  § 1983 denial of medical treatment against all Defendants

4.  § 1983 failure to intervene or protect against all Defendants

5. § 1983 failure to properly supervise against all Defendants

6. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

7. common law assault and battery against Defendants Toole, Wiencko, Moloney, Barberi, Parrish

8. common law false arrest and imprisonment against Defendants Toole, Wiencko, Molorey, Barberi, Parrish

9. common law malicious prosecution against all Defendants

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

Cornelius Caliz's Claims

Cornelius Caliz arrived at the UCC for the revival around 6:30 p.m. on August 20, 1995. (Caliz' 56.1 Stmt. ¶ 1.) There is no evidence that he was involved in the initial Warsop incident. Caliz testified that as he was leaving the service, he observed several people beating Gordon. (*Id.* ¶ 4.) Caliz approached the group, asked "what's the matter," and did not receive a response. (*Id.* ¶ 5.) At this point, Caliz attempted to return to the gated entrance to the UCC, but he was pushed, sprayed, beaten, and handcuffed. (*Id.* ¶ 6.) Caliz was not able to identify any of the people who attacked him (*Id.*, Ex. 1, at 67.), but Officers Single and Lesiewicz have admitted participating in the arrest (Defs .' 56.1 Stmt. ¶¶ 6–12.)

### I. § 1983 Excessive Force (physical acts)

In his Complaint, Caliz alleged that "unnamed defendant police officers" used excessive force against him in the course of his arrest. (Caliz Compl. ¶ 125.) Caliz failed to amend his complaint to name any specific Defendants as having used force against him. In his deposition, Caliz testified that he could not identify the officers who he alleges used force against him. (Caliz 56.1 Stmt., Ex. 1, at 65–67.) Caliz has not shown the personal involvement of any officer in using

excessive force against him.[36] However, Single testified that his arrest of Caliz was a struggle in which the two of them fought over his baton and fell to the ground. (Defs.' 56.1 Stmt. Caliz, Ex. D.) Single also admits to using his pepper spray. Lesiewicz also testified that he was involved in the arrest. (*Id.*, Ex. E.) Caliz claims he was hit from behind and attacked. (Caliz's 56.1 Stmt., Ex. 1, at 65.) Based on this evidence, summary judgment is denied as to Single and Lesiewicz, the apprehending officers. Summary judgment is granted for all Defendants.

[36]  Although discovery revealed that both Single and Lesiewicz participated in the arrest, neither admit to using excessive force (physical acts) against Caliz. Furthermore, after Plaintiff discovered the identity of some of the officers involved in the arrests, he did not file an amended complaint, submit an affidavit, or in any other way indicate that he now could identify the officers who used excessive force against him.

### II. § 1983 Excessive Force (noxious gas)

Caliz alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against him in the form of noxious gas. (Caliz Compl. ¶ 128.) Defendants move for summary judgment.

**\*26** Caliz has identified evidence showing that Single used pepper spray on him in the course of the arrest. (Defs.' 56.1 Stmt. Caliz ¶¶ 7–8, 12.) Caliz has therefore the shown personal involvement of Single sufficient to survive a summary judgment motion. Whether or not the use of pepper spray constitutes excessive force is a question for the jury. Summary judgment is denied on Caliz's excessive force claim for pepper spray against Single. Because Caliz offers no other evidence supporting the personal involvement of any Defendant in spraying him, summary judgment is granted for all other Defendants.

### III. § 1983 False Arrest and Imprisonment

Caliz alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely arrested and imprisoned him. (Caliz Compl. ¶¶ 131, 146.) Defendants move for summary judgment. The elements

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 200 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

of a false arrest claim are outline in the Gordon and Bennett sections above.

Defendants have the burden of showing probable cause for the arrest. Defendants claim that Single had probable cause to arrest Caliz because Caliz assaulted him by head butting him. Defendants argue that "Single's account should be credited, and Caliz's claim for false arrest dismissed." (Defs.' Mem. in Supp. Caliz at 4.) Caliz's version of events is contrary to Defendants. Caliz claims he was walking toward the gate when he was hit from behind and attacked. (Caliz' 56.1 Stmt. ¶ 6.) For the purposes of a summary judgment motion, Plaintiff's version of events must be credited as true. According to Caliz's account, he did not assault Single, and there was no probable cause for his arrest. Which version of events to believe is a credibility determination for the jury. Caliz identifies evidence showing the personal involvement of Single and Lesiewicz in his arrest and imprisonment. (Defs.' 56.1 Stmt. Caliz ¶ 43.) Summary judgment is denied on Caliz's false arrest claim against Single and Lesiewicz. Summary judgment is granted for all other Defendants because there is no showing of their personal involvement.

### IV. § 1983 Failure to Intervene and Protect; § 1983 Failure to Supervise
Caliz alleges that Defendants are liable for failure to intervene and protect and failure to supervise. (Caliz Compl. ¶¶ 134, 137.)

Summary judgment is granted for all Defendants. Caliz, who was arrested early on in the melee, does not show that any Defendants other than Single and Lesiewicz were on the scene, aware of the incident, or in a position to supervise.

### V. § 1983 Denial of Medical Treatment; § 1983 Unlawful Retaliation for First Amendment Conduct
Caliz alleges Defendants are liable for denying him necessary medical treatment and for unlawfully retaliating against him. (Caliz Compl. ¶¶ 140, 143.)

Summary judgment is granted for all Defendants on Caliz's denial of medical treatment and unlawful retaliation claims. Caliz has not identified any evidence of a Defendant who denied him medical treatment. He has not shown that any Defendant retaliated against him for his religious conduct. Summary judgment is granted on both claims.

### VI. Common Law Assault and Battery (physical acts)
**\*27** Caliz alleges that unidentified police officers who "tackled [him] from behind and struck him with nightsticks" are liable for assault and battery. (Caliz's Compl. ¶ 178.) Defendants move for summary judgment. The elements are set forth in the Bennett section above.

Caliz has alleged sufficient physical acts to support a claim for assault and battery. The evidence shows that Single and Lesiewicz were involved in Caliz's apprehension and alleged attack. Caliz also testified that there were other officers who were involved, but he has not presented evidence to establish their identities. Summary judgment is denied as to Single, Lesiewicz, and unidentified police officers. Summary judgment is granted to all other Defendants.

### VII. Common Law Assault and Battery (noxious gas)
Caliz alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin inflicted assault and battery on him by spraying him with noxious gas. (Caliz Am. Compl. ¶ 181.) Defendants move for summary judgment.

Single admits to spraying Caliz with pepper spray. (Defs.' 56.1 Stmt. Caliz ¶ 7.) Such action can constitute assault and battery. Summary judgment is denied as to Single.

Summary judgment is granted on Caliz's assault and battery claim for noxious gas against all other Defendants. Caliz offers no evidence that any of the other Defendants sprayed him or authorized the spraying of noxious gas on him.

### VIII. Common Law False Arrest and Imprisonment
Caliz alleges that Defendants Single, Parrish, Barberi, and Lesiewicz acted to falsely arrest and imprison him. (Caliz Compl. ¶ 187.) [37] Defendants moved for summary judgment. The relevant law is set forth in the Gordon and Bennett sections above.

[37]    In his Complaint, Caliz makes two claims for false arrest and imprisonment: one specifically against Single, Parrish, Barberi, and Lesiewicz for falsely arresting and imprisoning him (Caliz Compl. ¶ 187) and one against Defendants Anemone, Maple, Chapman, Brown, Devlin,

Picht, Parrish, Prendergast, Toole, Wiencko,, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis specifically for false imprisonment (*Id.* ¶ 184). The later claim appears to refer to the mass imprisonment of the UCC members during the surrounding of the UCC grounds. Because Caliz was already arrested prior to that alleged imprisonment, the Court grants summary judgment as to this claim. To the extent that Caliz has a false arrest claim against the specific Defendants who participated in his apprehension and arrest, it is considered above.

Caliz has shown the personal involvement of Single and Lesiewicz in his arrest. *See* § 1983 false arrest claim above. A common law and § 1983 claim have the same elements. Therefore, summary judgment is denied for Single and Lesiewicz.

Summary judgment is granted for Defendants Parrish and Barberi. Caliz does not shown that either Defendant was involved in apprehending him.

### IX. Common Law Malicious Prosecution
Caliz alleges malicious prosecution against Defendants Single, Parrish, Barberi, and Lesiewicz. (Caliz Compl. ¶ 190.) Defendants move for summary judgment. The elements of the tort of malicious prosecution are outlined in the Gordon and Bennett sections above.

The only evidence Caliz offers connecting any of the Defendants to his prosecution is Single, who initiated the arrest and signed the criminal complaint against him. Crediting Caliz's version of the facts, there was no probable cause for his arrest or prosecution. Therefore, there was no probable cause to sign a criminal complaint to initiate criminal proceedings. Summary judgment is denied as to Single.

Caliz offers no evidence that any other Defendant was connected with his criminal prosecution. Summary judgment is granted for Defendants Parrish, Barberi, and Lesiewicz.

### X. Common Law Intentional Infliction of Emotional Distress
**\*28** Caliz alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

engaged in conduct that constitutes intentional infliction of emotional harm. (Caliz Compl. ¶ 193.) Plaintiff fails to offer evidence sufficient to meet the stringent test required under New York law. Summary judgment is granted for all Defendants.

### XI. Common Law Negligent Infliction of Emotional Distress
Caliz claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner and Papagiannis negligently caused him severe emotional distress. (Caliz Compl. ¶ 196.) Caliz offers no evidence of any negligent acts resulting in severe emotional distress. Summary judgment is granted for all Defendants.

### XII. Common Law Conspiracy
Caliz alleges that the Defendants conspired together to deprive him of his rights. (Caliz Compl. ¶ 199.)

Caliz's claim for conspiracy is dismissed as to all Defendants. Caliz offers no evidence of any conspiracy. Summary judgment is granted for all Defendants.

### XIII. Common Law Negligence
Caliz alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner and Papagiannis "negligently caused severe physical injuries, and caused extreme emotional distress." (Caliz Compl. ¶ 202.) Caliz has failed to offer evidence to establish this claim. Summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

### Conclusion
Summary judgment is denied on the following claims by Caliz:

1. § 1983 excessive force (physical acts) against Single, Lesiewicz

2. § 1983 excessive force (noxious gas) against Single

3. § 1983 false arrest and imprisonment against Single, Lesiewicz

4. common law assault and battery (physical acts) against Single, Lesiewicz unidentified officers

5. common law assault and battery (noxious gas) against Single

6. common law false arrest and imprisonment against Single, Lesiewicz

7. common law malicious prosecution against Single

Summary judgment is granted on the following claims by Caliz:

1. § 1983 excessive force (physical acts) against all Defendants other than Single, Lesiewicz

2. § 1983 excessive force (noxious gas) against Barberi, Webber, Craig, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin

3. § 1983 false arrest and imprisonment against Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, O'Hagan, De Lorenzo, Brunner, and Papagiannis

*29 4. § 1983 failure to intervene or protect against all Defendants

5. § 1983 failure to supervise against all Defendants

6. § 1983 denial of medical treatment against all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

8. common law assault and battery (noxious gas) against Barberi, Webber, Craig, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin

9. common law false arrest as to Parrish, Barberi

10. common law malicious prosecution against Parrish, Barberi, Lesiewicz

11. common law intentional infliction of emotional distress against all Defendants

12. common law negligent infliction of emotional distress against all Defendants

13. common law conspiracy against all Defendants

14. common law negligence against all Defendants

Woodrow Campbell's Claims

Woodrow Campbell arrived at the UCC between 6:30 and 7 p.m. on August 20, 1995. (Campbell's 56.1 Stmt. ¶ 1.) The parties offer no evidence that Campbell was involved in the initial Warsop incident. Campbell testified that, after the service ended, he heard a commotion at the corner of Sutphin and Ferndale, and he went to take pictures. (Id. ¶¶ 4–5.) At some point, an officer told Campbell to stop taking pictures. (Id. ¶ 6; Defs.' 56.1 Stmt. Campbell ¶ 3.) When Campbell, who was standing on the hood of a car, did not stop taking pictures, the officer struck him on the leg numerous times (Campbell's 56.1 Stmt. ¶ 7; Defs.' 56.1 Stmt. Campbell ¶ 3) and also hit him in the chest and knee (Defs.' 56.1 Stmt. Campbell ¶ 6.) Campbell testified that he was pushed against a car, handcuffed, arrested, and dragged to a police car. (Campbell's 56.1 Stmt. ¶ 9; Defs.' 56.1 Stmt. Campbell ¶¶ 7–12 .) Campbell also testified that he was struck in the head, neck, and back. (Defs.' 56.1 Stmt. Campbell ¶¶ 12–18.) It is unclear exactly how many officers were involved. Campbell's testimony suggests that at least two officers used force against him and that more participated in his handcuffing and arrest. (Campbell 56.1 Stmt ., Ex. 1, at 128–51.)

I. § 1983 Excessive Force (physical acts)
Campbell alleges that Defendants Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig used excessive force against him in the course of his false arrest. (Campbell Compl. ¶¶ 121.) Defendants move for summary judgment on the grounds that Campbell has not been able to identify any of the named Defendants and, therefore, cannot show the necessary personal involvement for a § 1983 claim against those Defendants. The relevant law is presented in the Gordon and Bennett sections above.

Campbell does not identify, by name, photograph, description, or otherwise, any Defendant sufficient to

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 203 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

establish a showing of personal involvement. *See* Bennett section on § 1983 excessive force claims and personal involvement above. Campbell could not describe the officer who told him to stop taking pictures except to say that he was a male in uniform. (Defs.' 56.1 Stmt. Campbell ¶ 4 .) In addition, he was not able to identify any of the involved officers from photographs that he had viewed prior to his deposition. (Campbell's 56.1 Stmt., Ex. 1, at 129.) He also admits that he does not allege that a female assaulted him. (Defs.' 56.1 Stmt. Campbell ¶ 29; Campbell's Resp. to Defs.' 56.1 Stmt. ¶ 29.) The only other testimony Campbell offers is that one of the officers who hit him in the chest was tall. (Campbell's 56.1 Stmt., Ex. 1, at 134.) The exact number of officers Campbell claims were involved in the attack and arrest is also unclear from his deposition. Campbell does not point to any evidence or opposing affidavit establishing the personal involvement of any named Defendant in the use of excessive force against him; therefore, summary judgment is granted on his claim of excessive force for all Defendants. [38]

[38]    The only evidence connecting any Defendant to Campbell appears to be from the Defendants. In her deposition, Toole testified that she was in physical contact with Campbell in that he was punching and kicking her. (Toole Dep., 2/19/97, at 116; Pls.' Gen. 56.1 Stmt., Ex. 27 A, E, H.) Although this evidence supports the claim that Toole was in contact with Campbell, it does not show Toole's personal involvement for the excessive force claim because it does not support the allegation that she used force of any kind against Campbell; in fact, it supports the opposite. Furthermore, Campell's own deposition never mentions Toole or any woman officer in describing the use of force against him, and his testimony suggests that he did not interact with Toole until she questioned him the day after his arrest. (Defs.' 56.1 Stmt. Campbell, Ex. C, at 159–160.)

## II. § 1983 *False Arrest*

**\*30**  Campbell also alleges that Defendants Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig falsely arrested him without probable cause. (Campbell Comp. ¶ 142.) Defendants move for summary judgment. The relevant law is outlined in the Gordon and Bennett sections above.

Because Campbell does not show personal involvement for Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney,

and Craig, summary judgment is granted for those Defendants.

Summary judgment is denied on the false arrest claim against Toole. Campbell has filed an affidavit in opposition stating that he did not commit a crime or strike a police officer. (Campbell's 56.1 Stmt., Ex. 6.) In addition, it is undisputed that Toole was Campbell's official arresting officer. (Pls.' Gen. 56.1 Stmt., Ex. 27 A, E, H.) Furthermore, Defendants do not contest that there are material facts in dispute as to Toole's involvement in Campbell's arrest. (Defs.' 56.1 Stmt. Campbell ¶ 42.)

## III. § 1983 *Failure to Intervene or Protect*

Campbell alleges that Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for failure to intervene and protect him against the unauthorized and unjustified acts of other officers. (Campbell Compl. ¶ 130.) Defendants move for summary judgment. The relevant law is explained in the Gordon section above.

Campbell fails to offer evidence supporting this § 1983 claim. He does not offer evidence showing that any of these Defendants had knowledge or reason to know of the alleged excessive force, false arrest, or any other violation, or that there was an opportunity to intervene. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994.) Campbell's own testimony establishes that the excessive force and arrest occurred during the melee when everything was chaotic. He states that the forced used against him occurred in a matter of seconds. (Campbell's 56.1 Stmt., Ex. 1, at 145.) He has not shown awareness or opportunity for any Defendant to intervene. Under the circumstances, Campbell has not made a prima facie case against any of the named Defendants. Summary judgment is granted for all Defendants.

## IV. § 1983 *Failure to Supervise*

Campbell alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, and Prendergast failed to properly supervise Defendants Toole, Wiencko, Barberi, Difede, Webber, Moloney, Single, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis. (Campbell Compl. ¶ 133.) Defendants move for summary judgment. The relevant law is presented in the Bennett and Abraham sections.

Plaintiff admits that the excessive force and false arrest occurred before Anemone, Maple, Chapman, and Brown arrived on the scene (Defs.' 56.1 Stmt. Campbell ¶ 30) and that Prendergast was not a supervisor in August of 1995 (Id ¶ 31). Although Plaintiffs deny Defs.' 56.1 Stmt. ¶ 32 that "There is no evidence in the record demonstrating that Picht or Parrish had any knowledge of the alleged assault of Woodrow Campbell," they cite only to Pls.' Gen. 56.1 Stmts. and Exhibits and do not identify specific evidence contradicting this statement. (Campbell's Resp. to Defs.' 56.1 Stmt. ¶ 32.) Under Local Rule 56.1, this is an insufficient response to Defendants' 56.1 Statement. Campbell has not shown the personal involvement of any of these supervisors in the ways required by *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) and *Blyden v. Mancusi,* 186 F.3d 252, 264–65 (2d Cir.1999). Summary judgment is granted for all Defendants.

### V. *§ 1983 Denial of Medical Treatment*

**\*31** Campbell alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied him necessary medical treatment. (Campbell Compl. ¶ 136.) Defendants move for summary judgment on the grounds that Campbell did not have a serious medical condition and that Campbell was aware of the availability of, but did not seek, medical treatment. (Defs.' 56.1 Stmt. Campbell, Ex. C, at 161.) The elements of a denial of medical treatment claim are presented in the Gordon section above.

Campbell testified that he did not seek medical treatment because he was afraid and did not want to remain in jail. (Campbell 56.1 Stmt., Ex. 1, at 161.) He did seek treatment a number of times after his release, and each time he was told he had bruises, no broken bones. (*Id.* at 167–77.) Campbell maintains that he suffered a number of injuries as a result of the incident. (Campbell's 56.1 Stmt. ¶ 17.)

This Court cannot assess the seriousness of Campbell's injuries on the evidence before it. Campbell does not demonstrate that his injuries were obvious. [39] Campbell did testify about the general nature of his injuries (Campbell's 56.1 Stmt., Ex. 1, at 161–72), but he has not shown that his injuries were brought to the attention of any Defendant and that that Defendant acted with deliberate indifference and denied him medical treatment. Plaintiff offers no evidence

that his injuries were visible or that any of the named Defendants had reason to know of them. Campbell did not ask for treatment. (Campbell 56.1 Stmt., Ex. 1, at 161.) He testified that he heard an officer in the precinct say that going to the hospital for medical treatment would delay the amount of time for which the arrestees would be held and that this made him afraid to ask for medical treatment. (Campbell's Response to Defs.' 56.1 Stmt. ¶ 35.) [40] The police officer's statement does not rise to the level of showing deliberate indifference. Furthermore, Plaintiff has not identified the person who made the statement. The evidence presented by Campbell in support of this claim does not amount to a prima facie case against any named Defendants.

[39]     Campbell testified to injuries including pain in his chest (Campbell 56.1 Stmt, Ex. 1, at 167), breathing problems (*Id.*), headaches (*Id.* at 168), pain in his knee (*Id.*), and stated that he regularly visits a physical therapist for the pains in his knee and back (*Id.* at 173–75).

[40]     The statement that receiving medical attention would result in a delay in going before a judge is not so much a threat as a statement of fact. Because going to the hospital to receive medical treatment takes time, it often increase the time between arrest and arraignment. Such a delay does not constitute unnecessary delay for purposes of Fed.R.Crim.P. 5(a). *See United States v. Isom,* 588 F.2d 858, 862 (2d Cir.1978) (denying motion to suppress statements made after arrest but before arraignment because "The period during which appellant received medical treatment (at his request) and overnight lodging at the MCC should not be counted in computing unnecessary delay" (citing *United States v. Marrero,* 450 F.2d 373, 378 (2d Cir.1971)).

Summary judgment is granted for all Defendants.

### VI. *§ 1983 Unlawful Retaliation for First Amendment Conduct*

In his Complaint, Campbell claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in retaliatory conduct because of animus toward his exercise of the right to free exercise of religion. (Campbell Compl. ¶ 139.)

Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

Defendants move for summary judgment. The elements of the claim are presented in the Gordon and Bennett sections above. For the reasons stated in those sections, Campbell has failed to identify sufficient evidence to support this claim. Summary judgment is granted for all Defendants.

### VII. Common Law Assault and Battery (physical acts)

**\*32** Campbell alleges that Defendants Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig are liable for assault and battery because they struck him with nightsticks. (Campbell Compl. ¶ 174.) Defendants move for summary judgment on the grounds that Campbell identifies no evidence connecting any of the above Defendants to his assault and battery. The elements of assault and battery are outlined in the Bennett section.

Defendants do not address the common law assault and battery claim in their Supporting Memorandum of Law; they first address it in their Reply papers. Defendants focus on the argument that any contact between Campbell and the police was justified or privileged because it occurred in the course of a lawful arrest. (Defs.' Reply Mem. Campbell at 16–17.) Whether there was a lawful arrest and whether the force used to effect it was reasonable are issues for the jury to resolve.

Campbell has identified sufficient evidence to support a claim of assault and battery. His testimony describing his arrest and attack show intentional, physical contact by a number of officers, some of which could be found by a jury to be excessive. Defendants are correct that Campbell does not identify any particular Defendant as the officer who came into physical contact with him. On a summary judgment motion, however, the Defendants have the burden of showing the plaintiff has no claim as a matter of law. Here, Plaintiff claims that the assaults and batteries were by uniformed police officers. Since these officers were the authorized agents of the City of New York, Campbell has a claim for assault and battery based on physical acts against unidentified police officers.

Because Campbell has not offered any evidence or a supporting affidavit identifying any of the named Defendants as his attackers, summary judgment is granted against all named Defendants, but Campbell will be allowed to proceed with his assault and battery against unidentified police officers.

### VIII. Common Law False Arrest

In his Complaint, Campbell alleges that Defendants Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig falsely arrested and imprisoned him. (Campbell Compl. ¶ 183.) Defendants move for summary judgment on the grounds that the only Defendant Campbell can connect to his arrest is Toole. The relevant law is outlined in the Gordon and Bennett sections above.

The elements of false arrest are the same under both § 1983 and common law. The Defendants have the burden of establishing probable cause for the arrest. Crediting Campbell's version for the purpose of summary judgment, there is a genuine dispute of material fact over whether or not there was probable cause for the arrest of Campbell. Campbell claims that he was simply taking pictures when he was assaulted and arrested. (Campbell 56.1 Stmt. ¶¶ 5–8.) Toole claims that Campbell was involved in the altercation surrounding Gordon and that Campbell physically assaulted her. (Toole Dep., 2/19/97, at 114–18.) Defendants concede that there is a material factual dispute with respect to Toole on this claim. (Defs.' 56.1 Stmt. Campbell ¶ 47.) Summary judgment is therefore denied on Campbell's false arrest claim against Toole and unidentified police officers who assisted in his apprehension. Because Campbell does not offer evidence identifying any of the other named Defendants as being involved in his arrest, summary judgment is granted as to the remaining named Defendants.

### IX. Common Law Malicious Prosecution

**\*33** Campbell alleges that Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig are liable for malicious prosecution. (Campbell Compl. ¶ 186.) Defendants move for summary judgment. The elements of malicious prosecution have been set forth the Gordon section above.

The only Defendant shown by any evidence to have been involved in the prosecution of Campbell is Toole, who signed a criminal complaint alleging that he assaulted her. (Pls.' Gen. 56.1 Stmt., Ex. 27H.) Campbell does not offer any evidence that any of the other named Defendants were involved in his prosecution. Accordingly, summary judgment is granted for Defendants Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig.

There is a genuine dispute of material fact with regard to Defendant Toole. Toole signed the criminal complaint that initiated the prosecution of Campbell. (*Id.*) Crediting Campbell's version of events, Toole did not have probable cause to arrest him or to initiate criminal proceedings against

him. Defendants agree that this is in dispute. (Defs.' 56.1 Stmt. Campbell ¶ 47.) Furthermore, Campbell has offered sufficient evidence of malice to survive summary judgment. Plaintiffs are not required to show direct evidence of malice. If the jury finds Campbell's testimony credible, they may find that Toole initiated the criminal prosecution for the improper motive of covering up his false arrest.[41] Juries may infer malice from a lack of probable cause. *See id.* ("New York courts have held that the existence of malice may be inferred from a finding that defendants lacked probable cause to initiate criminal proceedings." (citing *Maxwell v. City of New York,* 554 N.Y.S.2d 502, 505–506 (1st Dep't 1990)).

[41]    *See Rounseville v. Zahl,* 13 F.3d 625, 631 (2d Cir.1994) (noting that "New York courts traditionally consider the issue of malice to be a jury question" (citations omitted)).

Summary judgment is denied on Campbell's malicious prosecution claim against Toole.

### X. Common Law Intentional Infliction of Emotional Distress

Campbell alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for intentionally inflicting emotional distress on him. (Campbell Compl. ¶ 189.) Campbell's claims of emotional distress include insomnia, headaches, loss of appetite, fearfulness, flashbacks, and nightmares. (Campbell 56.1 Stmt. ¶ 17.) The elements of this tort are outlined in the Gordon section above.

However, Campbell does not offer evidence sufficient to support this claim. There is no showing that any Defendant intentionally engaged in "extreme and outrageous conduct." To the extent that Campbell suffered emotional distress, he may present evidence of these injuries in the damages phase of his claims for false arrest and assault and battery.

Summary judgment is granted for all Defendants.

### XI. Common Law Negligent Infliction of Emotional Distress

Campbell alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for negligently inflicting emotional

distress on him. (Campbell Compl. ¶ 192.) Defendants move for summary judgment. The elements of this tort are discussed in the Gordon section above.

**\*34** Campbell does not show negligent acts resulting in severe emotional distress. The acts he testifies to are intentional, not negligent. Summary judgment is granted for all Defendants.

### XII. Common Law Conspiracy

In his Complaint, Campbell claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against him. (Campbell Compl. ¶ 195.) Defendants move for summary judgment.

Campbell presents no evidence of a conspiracy. Summary judgment is granted for all Defendants.

### XIII. Common Law Negligence

Campbell alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for negligently causing severe physical injuries and extreme emotional distress. (Campbell Compl. ¶ 198.) Defendants move for summary judgment.

Campbell's claims are for intentional acts against him. He has failed to offer evidence to support a claim of negligence. Summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Campbell:

1. § 1983 false arrest against Toole

2. common law assault and battery (physical acts) against unidentified officers

3. common law false arrest against Toole and unidentified officers

4. common law malicious prosecution against Toole.

Summary judgment is granted on the following claims by Campbell:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 false arrest against Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, Craig

3. § 1983 failure to intervene or protect against all Defendants

4. § 1983 failure to properly supervise against all Defendants

5. § 1983 denial of medical treatment against all Defendants

6. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

7. common law assault and battery (physical acts) against Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, Craig

8. common law false arrest against Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, Craig

9. common law malicious prosecution against Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, Craig

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

Oniel Thompson's Claims

Oniel Thompson arrived at the UCC to attend the revival around 10 p.m. on August 20, 1995. (Thompson's 56.1 Stmt. ¶ 1.) He was not present at the UCC at the time the

Warsop incident occurred. (Id. ¶ 3.) After the service ended, Thompson was standing outside the gate on Sutphin, talking with Campbell, when Sister Jewel Fraser ran toward them screaming, "They are beating on Horace ." (Thompson's 56.1 Stmt., Ex. 1, at 57–58.) In his deposition, Thompson testified that he approached the corner of Ferndale and Sutphin and observed someone hitting Gordon. (Id. at 59–60.) He described this person as a white male, between six foot five and six foot six, in plain clothes with a walkie-talkie and a flashlight. (Id. at 61–62.) He also testified that this person was Barberi. (Id. at 127–28.) In his CCRB interview, which occurred a little over three months before his deposition, he described this individual as a white male, approximately six foot five, two hundred fifty pounds, in his twenties. (Defs.' 56.1 Stmt. Thompson, Ex. J, at 3–4.)

*35  According to Thompson, as he and others approached Barberi and Gordon, Barberi told everyone to move back, and then he started spraying mace at everyone. [42] (Thompson's 56.1 Stmt., Ex. 1, at 63.) Thompson testified that he got sprayed in the eyes. (Thompson's 56.1 Stmt. ¶ 5.)

[42]    Barberi testified that he sprayed mace into the crowd assembling around Gordon in order to defend himself from their attacks. (Barberi Dep., 2/5/97, at 136.)

At this point, Thompson started to go back to the church when an officer grabbed him and threw him to the ground (Thompson's 56.1 Stmt. ¶ 6; Defs.' 56.1 Stmt. Thompson ¶ 21.) Thompson testified that he was then punched and kicked, he was thrown against the windshield of a car, hitting his head, he was slammed against a police van, and he was handcuffed and taken to a police car. (Thompson's 56.1 Stmt. ¶ 7; Defs.' 56.1 Stmt. Thompson ¶¶ 21–27).

There is a dispute over the number and identities of officers involved in this alleged excessive force and false arrest. According to Thompson's testimony, it appears that at least two and as many as six officers were involved. (Defs.' 56.1 Stmt Thompson., Ex. J, at 5; Thompson's 56.1 Stmt., Ex. 1, at 64–78.) Thompson cannot offer descriptions for some of the officers, but for others he describes race, weight, and height. (Defs.' 56.1 Stmt. Thompson ¶¶ 22, 25, 28, 29, 30, 31, 32, 37; Thompson's 56.1 Stmt. ¶¶ 5–7.) In addition, Plaintiff Brian Abraham testified that he observed Barberi use physical force against Thompson. [43] (Abraham 56.1 Stmt., Ex. 1, at 84–85, 90–93, 97.) The only other officer Thompson identifies is Toole, who he claims did not participate in the attack but

2000 WL 1538019

was standing near Gordon, Barberi, and himself. (Defs.' 56.1 Stmt., Ex. J, at 7–8, 15.)

43     Abraham testified, "I observed this Officer Barberi, I'm not sure of his name. He had a young man with his arm twisted up in the back, and he slammed him up against the car, and then he slammed him on the hood of the car. He slammed him down on the ground." (Abraham's 56.1 Stmt., Ex. 1, at 84.) He later identifies the "young man" as Oniel Thompson. (*Id.* at 85.) Although Abraham originally, stated he was unsure of Barberi's name, both he and the attorney asking the questions continue to refer to him as Barberi.

According to Toole, she was in the course of attempting to arrest Gordon when a mob of people came at her. (Toole Dep., 2/19/97, at 112–18.) She testified that Thompson tried to take her gun, at which point she pushed him. (*Id.*) She also testified that Thompson and Campbell were punching and kicking her. (*Id.*) Although Thompson identifies Toole as being at the scene, he does not claim that she used excessive force against him. (Defs.' 56.1 Stmt. Thompson, Ex. J, at 15 ("Did O'Toole [sic] ever put her hands on you?" "No.").) Thompson told the CCRB interviewer that he may have bumped into Toole while trying to get away from the macing but that he did not try to take her gun. (Defs.' 56.1 Stmt. Thompson, ¶ 16.)

I. *§ 1983 False Arrest*[44]

44     In his Complaint, Thompson makes two claims for false arrest and imprisonment: one specifically against Parrish, Toole, Wiencko, Barberi, O'Connor, and Moloney for falsely arresting and imprisoning him (Thompson Compl. ¶ 117) and one against Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko,, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis specifically for false imprisonment (¶ 126). The later claim appears to refer to the mass imprisonment of the UCC members during the surrounding of the UCC grounds. Because the evidence shows that Thompson was already arrested before that imprisonment occurred, the Court grants summary judgment as to this claim. To the extent that Thompson has a false arrest claim

against the specific Defendants who participated in his apprehension and arrest, it is considered above.

In his Complaint, Thompson alleges that Defendants Parrish, Toole, Wiencko, Barberi, O'Connor, and Moloney falsely arrested and imprisoned him. (Thompson Compl. ¶ 117.) Defendants moved for summary judgment on the grounds that only Toole was involved in Thompson's arrest and that she had probable cause because Thompson tried to grab her gun. The elements of false arrest are outlined in the Gordon and Bennett sections above.

Although Thompson testified that several officers participated in his apprehension and arrest, the only Defendants shown by the evidence presented on this motion to have had personal involvement in Thompson's arrest are Toole and Barberi. Therefore, summary judgment is granted on Thompson's false arrest claim for Parrish, Wiencko, O'Connor, and Moloney.

**\*36** Summary judgment is denied on Thompson's false arrest claim against Toole. Crediting Thompson's version of events, Toole did not have probable cause to arrest him. Thompson testified that he was attempting to get away from Barberi, who was spraying him with mace, when he was identified by Toole as "He's the one," and the officers and arrested. (Defs.' 56.1 Stmt. Thompson ¶ 17.) There is a conflict between Toole's and Thompson's testimony. Whether or not Thompson attempted to take Toole's gun and assaulted her is an issue of fact for the jury to decide. Summary judgment is denied as to Toole.

Summary judgment is granted on Thompson's false arrest claim against Barberi. The evidence supplied by Abraham is sufficient to show that Barberi was personally involved in his arrest. Nonetheless, the evidence is insufficient to support a false arrest claim against Barberi. Thompson testified that he was attacked and arrest by unidentified police officers after Toole identified Thompson by stating, "He's the one." (Defs.' 56.1 Stmt. Thompson, Ex. G, at 64–76, Ex. J, at 7.) The arrest and assault on Thompson occurred after his identification by Toole. (Defs.' 56.1 Stmt. Thompson, Ex. J, at 7.) Barberi, an apprehending officer, was entitled to rely on the statement of his fellow officer in arresting Thompson in the same way that police are entitled to rely on the statements of civilian complaining witnesses. See *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (holding that officers "are also entitled to rely on the allegations of fellow police officers" (citing *Bernard v. United States,* 25 F.3d 98, 102–03 (2d Cir.1994)). Any involvement he had in the arrest is privileged. Summary

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 209 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

judgment is granted for Barberi on Thompson's false arrest claim.

## II. *§ 1983 Excessive Force (physical acts)*

In his complaint, Thompson alleges that "The conduct and actions of the unnamed defendant police officers, acting under color of law, in assaulting Oniel Thompson, by hitting and pushing him into two parked vehicles, was done intentionally, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of their acts." (Thompson Compl. ¶ 120.) Defendants move for summary judgment stating that Thompson was not able to identify any Defendants who used physical force against him and, even if he could, their actions were objectively reasonable. The law of excessive force used in the course of an arrest is outlined in the Gordon section above.

Defendants acknowledge that Thompson testified to numerous actions of physical force used against him. (Defs.' 56.1 Stmt. Thompson ¶¶ 21–39; Thompson 56.1 Stmt. ¶¶ 5–7.) This testimony describes actions sufficiently serious, and the Court cannot find that, as a matter of law, they were objectively reasonable. Whether the degree of force used was reasonable in arresting Thompson is a question for the jury.

Based on the record on this motion, there is evidence that Barberi participated in the physical attack against him; therefore, summary judgment is denied as to Barberi. Because Thompson has not offered evidence identifying any other officer who participated in the use of force against him, no other officers are liable in his § 1983 action for excessive force based on physical acts. A § 1983 action cannot be maintained against unknown defendants. *See* the Bennett section on excessive force above. Summary judgment is granted for "unnamed defendant police officers" on this claim.

## III. *§ 1983 Excessive Force (noxious gas)*

**\*37**  Thompson also brings an excessive force claim against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin on the allegation that they, "acting individually and in concert with each other" assaulted Thompson by spraying him with and exposing him to noxious gas. (Thompson Compl. ¶ 123.) Defendants move for summary judgment on the grounds that, in his deposition, Thompson testified that he was sprayed by an officer in plain clothes and that, of the named Defendants, only Maple was

in plain clothes. Defendants also argue that any use of force was justified.

Thompson testified that one officer who was approximately six foot six sprayed him (and the crowd) with mace. Barberi is the only Defendant who fits Thompson's description. [45]  At one point in his testimony, Thompson identified the officer who sprayed him as Barberi. Although he does not admit to spraying Thompson in particular, Barberi does admit that he sprayed mace into the crowd gathering around Gordon's arrest. In addition, Thompson's description of the officer who maced him and who he later identified as Barberi is not entirely inconsistent. Thompson has presented no evidence that any other individual sprayed him with mace. Thompson's factual account of events does not support a claim for excessive force based on noxious gas against anyone but Barberi. Summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin.

[45]   Thompson's description of the sex, race, weight, height, and age of the officer are consistent with a description of Barberi. In addition, Barberi admits to being present and involved in the struggle with Gordon and admits to spraying mace on the approaching crowd. Thompson's description of the officer as being in plain clothes instead of uniform is not inconsistent with a description of Barberi.

Summary judgment is denied on Thompson's claim of excessive force based on noxious gas against Barberi.

## IV. *§ 1983 Failure to Intervene or Protect*

Thompson alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for failing to intervene or protect him from the unauthorized, unjustified, and unreasonable treatment he was subjected to by the various Defendants. (Thompson Compl. ¶ 129.) Defendants move for summary judgment on the basis that no named Defendant was involved in or aware of what happened to Thompson. The law on failure to intervene claims is outlined in the Gordon section above.

Summary judgment is granted for all Defendants on this claim. Thompson, like Campbell and the other arrested

Case 9:19-cv-00109-ECC-MJK     Document 410     Filed 02/21/25     Page 210 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

Plaintiffs, has not identified evidence supporting this claim. He has not offered any evidence to show that any Defendant was in a position to intervene. *See* Campbell section above. Summary judgment is granted for all Defendants.

### V. § 1983 Failure to Properly Supervise

Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast are liable for failing to supervise their subordinate officers, Defendants Toole, Wiencko, Barberi, Difede, Webber, Moloney, Single, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis. (Campbell Compl. ¶ 132.) Defendants move for summary judgment because Thompson has not submitted any evidence to show that any supervisory personnel who were or should have been aware of Thompson's arrest and assault.

**\*38** Like Campbell, Thompson has not shown facts sufficient to make this claim. Although Thompson need not show direct participation by each Defendant, he must make some showing of personal involvement as explained in *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) and *Blyden v. Mancusi,* 186 F.3d 252, 264–65 (2d Cir.1999). Plaintiff has failed to do so. Summary judgment is granted for all Defendants.

### VI. § 1983 Denial of Medical Treatment

In his Complaint, Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied him necessary medical treatment. (Thompson Compl. ¶ 135.) Defendants move for summary judgment on the grounds that Thompson did not have injuries and did not seek treatment. The relevant law is explained in the Gordon and Bennett sections above.

In his deposition, Thompson testified that, when he arrived at the precinct after his arrest, he asked an officer for treatment for the effects of the noxious gas, and that the officer said nothing. (Thompson's 56.1 Stmt., Ex. 1, at 108–09.) In addition, in his CCRB interview, Thompson testified that when he was in the patrol car after he was arrested, he asked the officer who closed the door if he could get medical treatment " ' so I can get this mace out of my eyes,' " and that the officer just looked at him and closed the car door. (Defs.' 56.1 Stmt. Thompson, Ex. J, at 20.) On the basis of

this evidence, crediting either version, Thompson does show that he requested but was denied medical treatment. This is not, however, the test for the constitutional claim of denial of medical treatment. As is discussed in the Gordon and Bennett sections above, a plaintiff must show that a named defendant denied him medical treatment for a serious medical condition due to deliberate indifference. *See Weyant v. Okst,* 101F.3d 845, 856 (2d Cir.1996).

Thompson has not offered evidence to support his claim that any injuries he sustained were serious. Plaintiff does not offer evidence of any medical treatment before the date of July 25, 1996, eleven months after the incident. (Thompson 56.1 Stmt., Ex. 5.) In response to the question "Were there any medical conditions for which you required immediate attention that evening?" he answered "No." (Thompson's 56.1 Stmt., Ex. 1, at 109.) Furthermore, Thompson has not identified evidence suggesting that he was visibly injured or that he had any immediate injuries other than that his eyes were burning from the mace. Summary judgment is granted for all Defendants.

### VII. § 1983 Unlawful Retaliation for First Amendment Conduct

Thompson alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis unlawfully retaliated against him because he exercised his right to freedom of religion. (Thompson Compl. ¶ 138.) Defendants move for summary judgment. The relevant law is outlined in the Gordon section above.

**\*39** Thompson fails to provide evidentiary support for his claim of unlawful retaliation for his participation in a First Amendment activity. Summary judgment is granted for all Defendants.

### VIII. Common Law Assault and Battery (physical acts)

Thompson makes a claim for assault and battery against "the unidentified defendant police officers who hit and pushed [him] into two parked vehicles." (Thompson Compl. ¶ 170.) Defendants move for summary judgment on the grounds that the force used was "reasonable and not actionable." (Defs.' Mem. in Supp. Thompson at 9.) The law of assault and battery is outlined in the Bennett section above.

Thompson offers evidence of the use of force by Barberi and several other unidentified officers who participated in his apprehension. *See* § 1983 excessive force section for Thompson above. He has presented sufficient evidence to survive a motion for summary judgment. Summary judgment is denied for Barberi and unidentified police officers on Thompson's claim of assault and battery for physical acts.

### IX. Common Law Assault and Battery (noxious gas)

Thompson also brings an assault and battery claim against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin for spraying him with or exposing him to noxious gas. (Thompson Compl. ¶ 173.) Defendants move for summary judgment.

Thompson testifies that Barberi sprayed him with mace. He does not offer any evidence that he was sprayed by anyone else or that he felt the effects of mace in the air. Because Thompson does not present evidence of the use of mace by anyone but Barberi, summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin.

Evidence of the direct spraying of mace is sufficient to make out an assault and battery claim. *See* Abraham section above. Summary judgment is denied for Barberi.

### X. Common Law False Arrest

Thompson alleges that Defendants Parrish, Toole, Wiencko, Barberi, O'Connor, and Moloney falsely arrested and imprisoned him without probable cause. (Thompson Compl. ¶ 176.) Defendants move for summary judgment and argue that Toole had probable cause to arrest Thompson.

A claim for false arrest is the same under § 1983 and common law. Based on the analysis in Thompson's § 1983 claim, summary judgment is granted for Defendants Parrish, Wiencko, Barberi, O'Connor, and Moloney, and summary judgment is denied for Defendant Toole.

### XI. Common Law Malicious Prosecution

In his Complaint, Thompson alleges that Defendants Parrish, Toole, Wiencko, Barberi, O'Connor, and Moloney maliciously prosecuted him. (Thompson Compl. ¶ 179.) Defendants move for summary judgment on the grounds that

Thompson cannot prove the elements of lack of probable cause and malice. The relevant law is outlined in the Bennett section above.

**\*40** Thompson does not show that Defendants Parrish, Wiencko, Barberi, O'Connor, and Moloney were involved in his prosecution. Summary judgment is granted for those Defendants.

Summary judgment is denied for Toole. If the jury credits Thompson's testimony, they could find that Toole did not have probable cause to arrest Thompson and that she signed participated in his criminal prosecution out of malice. *See* Campbell section above.

### XII. Common Law Intentional Infliction of Emotional Distress

Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for intentional infliction of emotional distress. (Thompson Compl. ¶ 185.) Defendants move for summary judgment.

Thompson has not presented sufficient evidence to support this claim. Summary judgment is granted for all Defendants.

### XIII. Common Law Negligent Infliction of Emotional Distress

Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently inflicted emotional distress on him. (Thompson Compl. ¶ 188.) Defendants move for summary judgment.

Thompson has not presented evidence of negligent conduct. Summary judgment is granted for all Defendants.

### XIV. Common Law Conspiracy

Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against him to deprive him of his

Constitutional and common law rights. (Thompson Compl. ¶ 191.) Defendants move for summary judgment.

Thompson offers no evidence to support his claim of a conspiracy. Summary judgment is granted for all Defendants.

*XV. Common Law Negligence*

Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for damages he alleges he sustained as a result of their negligent conduct. (Thompson Compl. ¶ 194.) Defendants move for summary judgment.

Thompson does not offer evidence of negligent conduct. Summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Thompson:

1. § 1983 false arrest against Toole

2. § 1983 excessive force (physical acts) against Barberi

3. § 1983 excessive force (noxious gas) against Barberi

   **\*41** 4. common law assault and battery (physical acts) against Barberi and unidentified police officers

5. common law assault and battery (noxious gas) against Barberi

6. common law false arrest against Toole

7. common law malicious prosecution against Toole

Summary judgment is granted on the remaining claims by Thompson:

1. § 1983 false arrest against Defendants Parrish, Wiencko, O'Connor, Moloney, Barberi

2. § 1983 excessive force (physical acts) against unnamed Defendants

3. § 1983 excessive force (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin

4. § 1983 failure to intervene for all Defendants

5. § 1983 failure to supervise for all Defendants

6. § 1983 denial of medical treatment for all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct for all Defendants

8. common law assault and battery (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin

9. common law false arrest against Defendants Parrish, Wiencko, O'Connor, Moloney, Barberi

10. common law malicious prosecution against Defendants Parrish, Wiencko, O'Connor, Moloney, Barberi

11. common law intentional infliction of emotional distress for all Defendants

12. common law negligent infliction of emotional distress for all Defendants

13. common law conspiracy for all Defendants

14. common law negligence for all Defendants

Brian Abraham's Claims

Abraham arrived at the UCC to attend the revival around 7 p.m. on August 20, 1995. (Abraham's 56.1 Stmt. ¶ 1.) After the service, Abraham and his wife walked to their car to leave when they noticed a commotion at the corner of Sutphin and Ferndale Avenues. (*Id.* ¶ 2.) According to Abraham, he observed Barberi using force against Thompson. (*Id.* ¶ 3; Defs.' 56.1 Stmt. Abraham ¶ 2.) Abraham testified that as he approached Barberi, Barberi shoved him in the chest, and he stumbled back. (Abraham 56.1 Stmt. ¶ 4; Defs.' 56.1 Stmt. Abraham ¶ 3.) As a result of this contact, Abraham suffered "minor bumps and bruises." (Abraham 56.1 Stmt. ¶ 5.)

Abraham was also one of the numerous UCC members who was contained within the fence following the general melee. He asserts that he was detained against his will and was unable to leave until the morning of August 21, 1995. (Abraham 56.1 Stmt. ¶ 11; Abraham Resp. to Defs.' 56.1 Stmt. ¶ 16.) Abraham also claims that he experienced a burning sensation as a result of the pepper spray. (Defs.' 56.1 Stmt. Abraham ¶ 9.) It is unclear whether or not he was directly sprayed. In his deposition, Abraham testified only that he saw Barberi spraying pepper spray at the gate and that he later felt pepper spray in the air. (Defs.' 56.1 Stmt. Abraham, Ex. B, at 119.)[46]

[46]    Abraham denies Defs.' 56.1 Stmt. ¶ 8 that he was not sprayed directly, stating, "Defendants did not ask plaintiff if he had been directly sprayed during his deposition. Plaintiff was directly sprayed." (Abraham's Resp. to Defs.' 56.1 Stmt. ¶ 8.) The exhibit cited in support, however, is Abraham's Response 33 to Defs.' Second Set of Interrogatories, which states, "Yes. I was sprayed twice by Officer Barberi. I was near the Sutphin Boulevard gate the first time, and in the fenced in area, halfway between the Sutphin Boulevard gate and Ferndale Avenue the second time." Although answers to interrogatories are generally admissible under Federal Rule of Civil Procedure 56(c), Abraham's answers are not signed by him in accordance with the requirements of Rule 33(a)(2). Therefore, the responses to the interrogatories are not admissible evidence and cannot be considered by the Court on these motions for summary judgment.

### I. § 1983 Excessive Force (physical force)

 **\*42**  Abraham alleges that Barberi used excessive force against him by pushing him in violation of his constitutional rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the Constitution. (Abraham Compl. ¶ 98.) Barberi moves for summary judgment on the grounds that the allegation of excessive force did not occur in the context of an arrest or seizure and that the allegation of non-arrest force does not shock the conscience. Abraham argues that the use of force occurred within the context of a seizure, that the Fourth Amendment applies, and that, under any standard, the allegation should survive summary judgment.

According to Abraham's own testimony, Barberi shoved him before he was enclosed in the fenced area. In fact, it appears Abraham was able to enter and exit the fenced area after

Barberi shoved him. Because the physical force Abraham testified about was not in the context of an arrest or seizure, the Fourteenth Amendment applies. *See Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995); *Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998). Thus, the test for excessive force is whether or not Barberi's conduct "shocks the conscience." *See Rodriguez,* 66 F.3d at 477. This Court finds that a single push that caused no more than minor injuries would not shock the conscience of a reasonable jury. Abraham approached an individual whom he knew to be a police officer while that officer was attempting to arrest an individual. Abraham's testimony describing the incident is, "What we are looking at, as if he is the officer, and he is in charge, and he wants a free rein to arrest this guy or whatever. And here I am standing there. He just reached out and pushed me back (indicating) as though to get out of the way and—or whatever the case may be." (Abraham's 56.1 Stmt., Ex. 1, at 96.) Given the chaotic atmosphere at the time and the fact that Abraham approached an officer attempting to arrest an individual, a single shove that caused him to fall either to the ground or against a tree and that resulted in only "minor bumps and bruises" does not shock the conscience.[47] (Abraham's 56.1 Stmt., Ex. 1, at 95–97.) Accordingly, motion for summary judgment is granted for Barberi on Abraham's excessive force claim based on physical acts.

[47]    Even if such conduct would shock the conscience of a reasonable jury, Barberi is evidently entitled to qualified immunity because the conduct occurred before the Second Circuit "clearly established [a] substantive due process right to be free from use of excessive force" for non-arrestees and non-prisoners. *Rodriguez,* 66 F.3d at 477.

### II. § 1983 Excessive Force (noxious gas)

Abraham also makes a claim for excessive force against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin on the grounds that they used excessive force against him "by spraying with or otherwise exposing to each plaintiff a noxious gas, to wit, either mace or pepper spray." (Abraham Compl. ¶ 104.) Defendants move for summary judgment.

Summary judgment is granted for all Defendants. Although Parrish, De Lorenzo, and others acknowledge using pepper spray during an altercation at the gate and Abraham testified that he saw Barberi using pepper spray at the gate (Abraham's 56.1 Stmt., Ex. 1, at 119), Abraham also testified that he was

not at the gate (*Id.* at 103–04). Abraham testified that he later felt pepper spray in the air and that the pepper spray caused burning, especially in his eyes. (Defs.' 56.1 Stmt. Abraham, Ex. B, at 103–04, 119.) [48] Abraham presents no evidence that he was directly sprayed with pepper spray. He also admits that he did not report any injury to the police or EMS or seek medical care for the burning. (Defs.' 56.1 Stmt. Abraham ¶ 32.) Abraham has not presented evidence that he was sprayed by Barberi or another other particular Defendant; he has only testified that he observed Barberi spraying at the gate and that he later felt the effects of mace in the air. This is not a sufficient showing of personal involvement of a defendant for a § 1983 claim of excessive force. *See* the Bennett section above.

[48]    As explained above, Abraham's attorney's Response 33 to Defendants' Second Set of Interrogatories does not comply with the Federal Rules of Civil Procedure and therefore cannot be considered as evidence.

**\*43** Summary judgment is granted for all Defendants.

### III. § 1983 *False Imprisonment*

In his Complaint, Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis imprisoned him against his will. (Abraham Compl. ¶ 107.) Defendants move for summary judgment on the grounds that there is no evidence that Abraham was involuntarily confined. Abraham argues that the police presence surrounding the UCC fence prevented him from leaving. The elements of a claim for false arrest and false imprisonment are the same. *See Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991). The law is analyzed in the Gordon and Bennett sections above.

Because a claim for false arrest is "substantially the same" whether it arises under § 1983 or New York law, both claims will be analyzed under the same standard. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citations omitted); *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991) (noting that, "save for the requirement that the constitutional tort be under color of state law, both torts are 'substantially the same' " (quoting *Raysor v. Port Auth.,* 768 F.2d 34, 39– 40 (2d Cir.1985))). To establish a claim for false arrest or false imprisonment, a plaintiff must show that " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff

was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." ' *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (quoting *Broughton v. State,* 373 N.Y.S.2d 451, 456 (1975)).

Abraham has identified evidence supporting each of these elements. Which Defendants are responsible is a separate question. Abraham offers evidence establishing the arrival times of several supervisory officers and shows that they were present for part of the time of the alleged imprisonment. Specifically, Anemone, Maple, Chapman, Devlin, and Parrish were all present and in charge during at least part of the police deployment and mobilization during when the UCC was surrounded by police. [49] (Pls.' Gen. 56.1 Stmt. ¶¶ 3, 4, 5, 6, 8.) Plaintiff has shown that all of these supervisors were in charge at some point in time during the period he testified he believed that he was not free to leave. In particular, Parrish has testified that he was the ranking officer on the scene until he was relieved by Devlin and that he proceeded immediately to the mouth of the gate and gave the order to spray mace at the people. (*Id.,* Ex. 20, at 130–38.) Summary judgment is therefore denied on Abraham's false imprisonment claim against Defendants Anemone, Maple, Chapman, Devlin, and Parrish.

[49]    This activity apparently initiated the ensuing false imprisonment period which ended some four hours later.

Summary judgment is granted for the remaining Defendants. To the extent that Plaintiff can establish any of these Defendants even participated in the false imprisonment, there is no evidence that they were doing anything other than following orders from superiors and could not have left the scene had they wanted to. Therefore these individual acts did not amount to false imprisonment and the remaining Defendants are entitled to qualified immunity for any participation in the false imprisonment.

### IV. § 1983 *Failure to Intervene*

**\*44** Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed to intervene or protect him from "the unauthorized, unjustified, and unreasonable treatment at the hands of the other defendants." (Abraham Compl. ¶ 110.) Defendants move for summary judgment on the grounds that

Abraham has not offered specific evidence showing a failure to intervene by any Defendant. The relevant law is identified in the Gordon section above.

Summary judgment is denied for Defendants Anemone and Maple. Abraham has offered evidence to show a genuine dispute of material fact for those Defendants. Abraham has presented evidence that these Defendants were present at the time of his alleged false imprisonment, were aware of such alleged unauthorized, unjustified, and unreasonable treatment, and had a reasonable opportunity to intervene and prevent that treatment. This is sufficient to meet the standard of *Anderson v. Branen,* 17 F.3d 552, 559 (2d Cir.1994) with respect to his claim of false imprisonment. Summary judgment is denied for Defendants Maple and Anemone. [50]

[50]    Abraham may proceed with his claim of failure to intervene and protect against Anemone and Maple only as it relates to their failures to intervene in the false imprisonment. There is no evidence that these Defendants were present or in a position to intervene during the general melee. Plaintiff may not present evidence of this claim as it relates to events other than false imprisonment.

Summary judgment is granted for all other Defendants. Abraham identifies no specific evidence that any other Defendant who was present was in an authoritative position, was aware of the imprisonment and failed to intervene.

*V. Unlawful Retaliation for First Amendment Conduct*

Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis unlawfully retaliated against him for his First Amendment conduct. (Abraham Compl. § 113.) Defendants move for summary judgment. The relevant law is identified in the Gordon section above.

Abraham has offered no evidence that shows any of the Defendants' actions were a result of the Defendants' animus toward Abraham for having exercised his First Amendment rights to free exercise of his religion. Summary judgment is granted against all Defendants.

*VI. § 1983 Failure to Supervise*

Abraham claims Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, and Prendergast "failed to exercise appropriate command functions, thereby acquiescing to and acknowledging the improper actions" of Toole, Wiencko, Barberi, Difede, Webber, Moloney, Single, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis. (Abraham Compl. ¶ 116.) Defendants moved for summary judgment.

Supervisors may be liable for the constitutional violations of their subordinates if there is a showing of personal involvement. A supervisor can be personally involved by: (1) directly participating in a violation, *see Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886–87 (2d Cir.1991) (citations omitted); (2) learning of a violation and failing to correct it, *see Williams,* 781 F.2d at 323–24; (3) creating or allowing the continuance of a policy or custom under which violations occur, *see id.;* (4) grossly negligent management, *see id.;* or (5) demonstrating "gross negligence" or "deliberate indifference" by "failing to act on information indicating that unconstitutional practices are taking place," *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). As the Second Circuit has defined personal involvement, Plaintiff must show that a supervisor participated in the violation, had knowledge of the violation, or should have had knowledge of a violation in order to be personally liable under § 1983. *See Blyden v. Mancusi,* 186 F.3d 252, 264–65 (2d Cir.1999). Holding a high position in the administration alone is not enough. *See Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995). Likewise, there is no respondeat superior liability for supervisors in § 1983 claims. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). Knowledge alone, however, can be enough for liability. *See, e.g., Rivera v. Coughlin,* No. 92 Civ. 3404(SS), 1994 WL 263417, at *5 (S.D.N.Y. June 13, 1994) (noting that "[a]n informed official who knows of an illegal policy or custom and permits it to continue is liable under § 1983" (citations omitted)). Whether the defendant is a supervisor or not, a plaintiff must allege some form of personal involvement for each defendant.

**\*45** Summary judgment is denied for Defendants Anemone and Maple on Abraham's claim of failure to supervise as it related to the alleged false imprisonment violation. As explained in the failure to intervene and protect section above, Abraham has offered sufficient evidence that Anemone and Maple failed to properly supervise their subordinates and that this contributed to the false imprisonment.

Summary judgment is granted for all other Defendants as it relates to the false imprisonment claim and for all Defendants for any failure to supervise relating to the physical acts against Abraham by Barberi. There is no evidence showing that any specific Defendant was present and aware of that act.

### VII. § 1983 Denial of Medical Treatment

Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis "refus[ed] to take any steps to provide [him] with medical care to address a serious medical need, despite having full knowledge that it was necessary and warranted under the circumstances." (Abraham Compl. § 119.) Defendants move for summary judgment on the grounds that Abraham did not seek medical treatment and was not injured. The elements of the cause of action are outlined in the Gordon section above.

To establish a claim of denial of medical treatment, a plaintiff must show both that an official denied him treatment needed to remedy a serious medical condition and that he did so because of his deliberate indifference to that need. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). To be liable for deliberate indifference, the charged official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Here, there is a showing that Abraham was denied medical treatment for the time while he was imprisoned in the church yard. Abraham may be able to show deliberate indifference based on the evidence that police officers were spraying mace in a crowd of people, after which the people were not allowed to leave for a period of time, and during which medical attention has not been shown to have been made available. Although the extent of injuries from mace may vary from person to person, the fact that the Defendants were aware that mace had been sprayed puts them on notice that people may be injured, specifically when those people were denied access from leaving. Under the circumstances, a denial of opportunity to leave to obtain medical treatment may constitute an unconstitutional denial of rights.

Although there may be enough to show a denial of treatment, in Abraham's case there is no showing of a need or a serious

medical condition. Abraham testified that he did not report the burning he felt from the mace or any other injuries to the police or EMS. (Defs .' 56.1 Stmt. Abraham, Ex. B, at 119–20.) In addition, he testified that he took his wife to the hospital following the incident on August 21, 1995, but he did not seek treatment for himself. (*Id.* at 116–17.) Abraham offers no evidence that he ever sought medical treatment or that he suffered serious injuries. Summary judgment is granted to all Defendants on Gordon's claim of denial of medical treatment

### VIII. Common Law Assault and Battery (physical acts)

**\*46** Abraham alleges that Barberi "did inflict assault and battery upon [him] by pushing him." (Abraham Compl. ¶ 151.) Barberi moves for summary judgment. The elements of assault and battery are explained in the Bennett section above.

Abraham testified that Barberi hit him in the chest, causing him to fall backward. Abraham has offered sufficient evidence of the elements of both assault and battery. Summary judgment is denied against Barberi on Abraham's assault and battery claim for physical acts.

### IX. Common Law Assault and Battery (noxious gas)

Abraham alleges Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin committed assault and battery "by spraying with or otherwise exposing to each plaintiff a noxious gas." (Abraham Compl. ¶ 157.) Defendants move for summary judgment. The elements of assault and battery are outlined in the Bennett section above.

Abraham has presented evidence that he felt burning from mace sprayed by the police and that mace that was "in the air." As to the mace that was "in the air," Abraham has shown a battery by his testimony that the act of spraying mace by Barberi and other officers was intentional. Abraham need not show that a particular Defendant sprayed him directly with mace. He has shown that officers intentionally sprayed mace and that he came into physical contact with the mace, causing burning. The doctrine of transferred intent applies to the torts of assault and battery. If Plaintiff can show that the act of spraying mace was intentional, the fact that the mace made physical contact with him rather than the intended target does not foreclose his battery claim. *See American Ins. Co. v. Saulnier,* 242 F.Supp. 257, 261 (D.Conn.1965) (" 'If the defendant intends to commit an assault or a battery upon a third person, but succeeds instead in causing an unintended

harmful or offensive contact with the person of the plaintiff, the latter may recover as though the act were intended to affect him.... The intent is said to be 'transferred' to the victim.' ' (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, at 33 (2d ed.1955)); RESTATEMENT (THIRD) OF TORTS § 1 (1999). Thus, if Abraham can show that he came into physical contact with the mace sprayed by Defendants, he has a claim for battery.

Summary judgment is denied on Abraham's battery claim against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish. Plaintiffs have shown evidence that each of these Defendants sprayed mace around the church yard during the night. (Pls.' Gen. 56.1 Stmt., Exs. 21, 22, 37, 47, 51, 55, 68, 71.) Because Abraham offers evidence only of physical contact and not of apprehension of such contact, summary judgment is granted for all Defendants on Abraham's assault claim.

Because Abraham offers no evidence that Defendants Anemone, Maple, Chapman, or Devlin sprayed mace or authorized that spraying, summary judgment is granted for those defendants.

### X. Common Law False Imprisonment

 **\*47** Abraham alleges common law false imprisonment against Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis on the same facts alleged in his § 1983 false imprisonment claim. (Abraham Compl. ¶ 160.) Because a claim for false arrest is analyzed under the same standard for both a § 1983 and a common law claim, the above § 1983 analysis applies. Summary judgment is denied on Abraham's false imprisonment claim against Defendants Anemone, Maple, Chapman, Devlin, and Parrish, but granted for the remaining Defendants.

### XI. Common Law Intentional Infliction of Emotional Distress

Abraham alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in conduct that constitutes intentional infliction of emotional harm. (Abraham Compl. ¶ 163.) Defendants move

for summary judgment. The relevant law is presented in the Gordon section above.

Plaintiff fails to offer evidence sufficient to meet the stringent test required under New York law. [51] Summary judgment is granted for all Defendants.

[51]     To the extent that Abraham claims emotional damages from the assault and false imprisonment, he may testify as to these damages in the course of his testimony for the specific torts. This may include any emotional damages he suffered from hearing derogatory comments directed at him while he was imprisoned, as well as emotional damages resulting from the acts of battery and false imprisonment themselves.

### XII. Common Law Negligent Infliction of Emotional Distress

Abraham claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently cause severe emotional distress to him. (Abraham Compl. ¶ 166.) Defendants move for summary judgment.

Abraham offers no evidence of any negligent acts resulting in severe emotional distress. Summary judgment is granted for all Defendants.

### XIII. Common Law Conspiracy

Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired together to deprive him of his rights. (Abraham Compl. ¶ 168.) Defendants move for summary judgment.

Abraham's claim for conspiracy is dismissed as to all Defendants. He has offered no proof of a common plan or scheme, *Schlotthauer v.. Sanders,* 545 N.Y.S.2d 196, 197 (2d Dept.1989), and did not even address the claim in his motion papers other than to offer a general denial.

### XIV. Common Law Negligence

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 218 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis "negligently caused severe physical injuries, and caused extreme emotional distress." (Abraham Compl. ¶ 171.) Defendants move for summary judgment.

**\*48** Abraham's testimony of the use of physical force and false imprisonment are not evidence of negligence but of intentional acts. Thus, summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion
Summary judgment is denied on the following claims by Abraham:

1. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

2. § 1983 failure to intervene and protect against Anemone, Maple

3. § 1983 failure to supervise against Anemone, Maple

4. common law assault and battery (physical acts) against Barberi

5. common law battery (noxious gas) against Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish

6. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

Summary judgment is granted on the remaining claims by Abraham:

1. § 1983 excessive force (physical acts) against Barberi

2. § 1983 excessive force (noxious gas) against all Defendants

3. § 1983 false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

4. § 1983 failure to intervene against Chapman, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

5. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

6. 1983 failure to supervise against Chapman, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

7. § 1983 denial of medical treatment against all Defendants

8. common law assault (noxious gas) against Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish

9. common law assault and battery (noxious gas) against Anemone, Maple, Chapman, Devlin

10. common law false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

11. common law intentional infliction of emotional distress against all Defendants

12. common law negligent infliction of emotional distress against all Defendants

13. common law conspiracy against all Defendants

14. common law negligence against all Defendants

Gerald Bloomfield's Claims

Gerald Bloomfield arrived at the UCC between 7 and 8 p.m. on August 20, 1995 to attend the revival. (Bloomfield's 56.1 Stmt. ¶ 1.) The parties offer no evidence to suggest that Bloomfield was involved in the initial incident with Warsop. After the service had ended, Bloomfield noticed people running outside the gate, at which point he and Keno Reefer also ran out the gate. (Defs.' 56.1 Stmt. Bloomfield ¶¶ 3–4.) According to his testimony, Bloomfield and Reefer ran to the corner of Ferndale and Sutphin where they saw an officer choking Gordon. (*Id.* ¶¶ 4–5.) Bloomfield

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 219 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

asked the officer why he was choking Gordon. (*Id.* ¶¶ 4–6.) Although Bloomfield testified that he had trouble remembering everything, it appears that next Reefer grabbed Gordon around his chest (*Id.* ¶¶ 7–10), and Bloomfield helped to protect Gordon from other officers who were around them (*Id.* ¶ 12). Bloomfield and Reefer both got directly sprayed in the face and neck with pepper spray by a police officer. (*Id.* ¶ 13; Bloomfield's 56.1 Stmt. ¶ 4.) Bloomfield then jumped on top of a car, and the same officer who sprayed him with pepper spray struck him repeatedly in the leg, causing Bloomfield to fall off the car onto the ground. (Bloomfield's 56.1 Stmt. ¶¶ 5–6; Defs.' 56.1 Stmt. Bloomfield ¶¶ 17–20.) Some church members then took Bloomfield back into the church yard. (Defs.' 56.1 Stmt. Bloomfield ¶ 21.) It is undisputed that Bloomfield testified that it was Barberi who sprayed him and that he was not told the identity of Barberi until the next day. (Defs.' 56.1 Stmt. Bloomfield ¶¶ 22–23.) [52]

[52]   In his deposition, Bloomfield described the officer who sprayed him and hit him with flashlight as follows: "He was tall, extremely tall, he's the tallest one that I could see out there, he had on a police uniform." (Defs.' 56.1 Stmt. Bloomfield, Ex. B at 139.) When asked if he ever learned the name of the officer who hit and sprayed him, he replied "I was told his name was Barberi." (*Id.*)

### I. *§ 1983 Excessive Force (physical acts)*

**\*49** Bloomfield alleges Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against him in that they physically hit him. (Bloomfield Am. Compl. ¶ 96.) Defendants move for summary judgment. The relevant law is set forth in the Gordon and Abraham sections above.

Bloomfield offers evidence showing the personal involvement of Barberi in the use of force against him. His testimony, however, only states that he was struck in the leg. (Bloomfield's 56.1 Stmt. ¶¶ 5–6.) This action did not occur within the course of an arrest. Given that Bloomfield admits that he was approaching and attempting to interfere with an officer making an arrest, this Court finds that such action does not shock the conscience. Summary judgment is granted for Barberi on Bloomfield's claim of excessive force for physical acts.

Bloomfield offers no other evidence showing the personal involvement of any of the remaining named Defendants.

Therefore, summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin on Bloomfield's claim of excessive force for physical acts.

### II. *§ 1983 Excessive Force (noxious gas)*

Bloomfield alleges Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against him by spraying him with or exposing him to noxious gas. (Bloomfield Am. Compl. ¶ 99.) Defendants move for summary judgment. The relevant law is outlined in the Caliz section above

Bloomfield offers evidence showing the personal involvement of Barberi; therefore, summary judgment is denied on Bloomfield's claim of excessive force as to Barberi for spraying him in the face and neck with noxious gas. Bloomfield offers no evidence showing the personal involvement of any of the other named Defendants. Summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin on Bloomfield's claim of excessive force with noxious gas.

### III. *§ 1983 False Imprisonment*

In his Complaint, Bloomfield alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis acted to falsely imprison him against his will. (Bloomfield Am. Compl. ¶ 102.) Defendants move for summary judgment. The elements of this claim are explained in the Gordon and Abraham sections above.

Summary judgment is denied as to Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted as to all other Defendants. *See* Abraham section above.

### IV. *§ 1983 Failure to Intervene or Protect*

Bloomfield claims Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed to intervene or protect him from the unjustified

actions of other Defendants. (Bloomfield Am. Compl. ¶ 105.) Defendants move for summary judgment.

**\*50**  Summary judgment is denied as to Defendants Anemone and Maple with respect to Bloomfield's claim for false imprisonment. Summary judgment is granted as to all other Defendants. *See* Abraham section above.

### V. *§ 1983 Failure to Supervise*

Bloomfield claims Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, and Prendergast failed to properly supervise Defendants Toole, Wiencko, Barberi, Difede, Webber, Moloney, Single, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis. Defendants move for summary judgment.

Summary judgment is denied as to Defendants Anemone and Maple on Plaintiff's false imprisonment claim. Summary judgment is granted for all other Defendants as it relates to the false imprisonment and for all Defendants as it relates to Plaintiff's other claims.

### VI. *§ 1983 Denial of Medical Treatment*

Bloomfield alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied him medical treatment in violation of his rights. (Bloomfield Am. Compl. ¶ 111 .) Defendants move for summary judgment.

Although Bloomfield does claim he sustained some injuries, [53] he has not shown a deliberate indifference. There is no evidence that he attempted to seek medical treatment from any Defendant. Bloomfield has failed to show that any defendants showed deliberate indifference to his medical condition. Summary judgment is granted for all Defendants on Bloomfield's denial of medical treatment claim.

[53]    Bloomfield testified that "[M]y eyes was [sic] burning, my chest was scarred up, my face was itching, burning, whatever the spray had done, I believe my shirt was open or torn, I was in pain. I remember kind of limping around. I was breathing heavy." (Defs.' 56.1 Stmt. Bloomfield, Ex. B, at 170; Bloomfield 56.1 Stmt. ¶ 7 (inquires to leg, back, hand).)

### VII. *§ 1983 Unlawful Retaliation for First Amendment Conduct*

Bloomfield alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis unlawfully retaliated against him for his First Amendment conduct. (Bloomfield Am. Compl. ¶ 114.) Defendants move for summary judgment.

Bloomfield has offered no evidence that shows any of the Defendants' actions were a result of their animus toward Bloomfield for having exercised his First Amendment rights to free exercise of his religion. Summary judgment is granted against all Defendants.

### VIII. *Common Law Assault and Battery (physical force)*

Bloomfield claims Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin engaged in acts constituting assault and battery. (Bloomfield Am. Compl. ¶ 146.) Defendants move for summary judgment on the grounds that he was not seriously injured, he was simply attempting to rescue Gordon, and that his claims "are frivolous" and an example of "raw vigilantism." (Defs.' Mem. in Supp. Bloomfield at 9.)

Summary judgment is granted on Bloomfield's assault and battery claim against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin. Bloomfield presents no evidence connecting these Defendants to any attack on him. Summary judgment is denied on his claim against Barberi and unidentified police officers. *See* the Bennett section above.

### IX. *Common Law Assault and Battery (noxious gas)*

**\*51**  Bloomfield claims Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin engaged in acts constituting assault and battery. (Bloomfield Am. Compl. ¶ 149.) Defendants move for summary judgment.

Summary judgment is denied on the noxious gas assault and battery claim against Defendant Barberi. Summary judgment is granted for Anemone, Maple, Chapman, Brown, Devlin, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, and

Papagiannis since there is no evidence that their actions caused Bloomfield to be the victim of assault and battery.

*X. Common Law False Imprisonment*

Bloomfield claims Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned him. (Bloomfield Am. Compl. ¶ 152.) Defendants move for summary judgment.

A false imprisonment claim is analyzed in the same way under § 1983 and common law. *See* Abraham section above. Therefore, Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish, and summary judgment is granted for the remaining Defendants.

*XI. Common Law Intentional Infliction of Emotional Distress*

Bloomfield alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in conduct that constitutes intentional infliction of emotional harm. (Bloomfield Am. Compl. ¶ 155.) Plaintiff fails to offer evidence sufficient to meet the stringent test required under New York law. Summary judgment is granted for all Defendants.

*XII. Common Law Negligent Infliction of Emotional Distress*

Bloomfield claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently cause severe emotional distress to him. (Bloomfield Am. Compl. ¶ 158.) Bloomfield offers no evidence of any negligent acts resulting in severe emotional distress. Summary judgment is granted for all Defendants.

*XIII. Common Law Conspiracy*

Bloomfield's claim for conspiracy is dismissed as to all Defendants. (Bloomfield Am. Compl. ¶ 161.) He has offered no proof of a common plan or scheme, *Schlotthauer v. Sanders,* 545 N.Y.S.2d 196, 197 (2d Dept.1989), and did not

even address the claim in his motion papers other than to offer a general denial.

*XIV. Common Law Negligence*

Bloomfield alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis "negligently caused severe injuries, and caused extreme emotional distress." (Bloomfield Am. Compl. ¶ 164.) Bloomfield has not presented evidence to support a claim of negligence. Summary judgment is granted for all Defendants. *See* Abraham section above.

**\*52** Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Bloomfield:

1. § 1983 excessive force (noxious gas) against Barberi

2. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

3. § 1983 failure to intervene against Anemone, Maple

4. § 1983 failure to supervise as to the false imprisonment against Anemone, Maple

5. common law assault and battery (physical acts) against Barberi, unidentified police officers

6. common law assault and battery (noxious gas) against Barberi

7. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

Summary judgment is granted on the remaining claims by Bloomfield:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 excessive force (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner,

Papagiannis, Parrish, Anemone, Maple, Chapman, and Devlin

3. § 1983 false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

4. § 1983 failure to intervene against Chapman, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

5. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

6. 1983 failure to supervise against Chapman, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

7. § 1983 denial of medical treatment against all Defendants

8. common law assault and battery (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Devlin

9. common law false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

Jason Parke's Claims [54]

[54]    Unlike the other Group A–1 Plaintiffs, Parke does not specify individual defendants for each claim. Rather, he alleges each cause of action against "defendants." The Court will assume for purposes of this motion that Parke is alleging each cause of action against each of the twenty-two named Defendants.

Jason Parke arrived at the UCC for the revival between 6 and 7 p.m. on August 20, 1995. (Parke's 56.1 Stmt. ¶ 1.) Neither party offers evidence that Parke was involved in the initial Warsop incident. After the service, Parke went to his car and was driving on Ferndale toward Sutphin when he observed Barberi and two or three other officers around Gordon. (Id. ¶¶ 3–4; Defs.' 56.1 Stmt. Parke ¶ 3.) Parke testified that he observed Barberi drag Gordon with a nightstick to a patrol car. (Parke's 56.1 Stmt., Ex. 1, at 128–133.) According to Parke, at this point in time police were jumping on and trampling people. (Id. at 133.) Parke then jumped out of his car and ran toward the church because his family was supposed to be waiting by the church gate for him to pick them up. (Id.) Before Parke got to the gate, Barberi took his nightstick and shoved him against a tree, causing him to slip and fall and fracture his finger. (Id. at 137–41.) Parke also testified that, during this confrontation, Barberi's nightstick and fists came into contact with Parke's chest. (Defs.' 56.1 Stmt. Parke ¶¶ 8–9.) According to Parke, after he fell to the ground, he ran into the church yard. (Id. ¶ 10.)

*53  Parke also testified that he was sprayed with mace twice, once in the back (Defs.' 56.1 Stmt. Parke, Ex. B, at 170), and once directly on his face (Id. at 170). Parke has not identified who sprayed him either time. (Defs.' 56.1 Stmt. Parke ¶ 20.) In addition to the allegations of force, Parke claims that he was imprisoned in the UCC yard. (Parke's 56.1 Stmt. ¶¶ 10, 11, 14.)

I. § 1983 Excessive Force (physical acts)
Parke alleges that defendants used excessive force against him by "assaulting [him] by striking [his body] with nightsticks and fists, shoving [him], and causing [him] to fall to the ground." (Parke Compl. ¶ 75.) Defendants move for summary judgment and argue that the alleged conduct does not shock the conscience.

Barberi is the only Defendant who Parke testified made physical contact with him; therefore, summary judgment is granted for all other Defendants. [55]

[55]    Defendants argue that the Court should dismiss Parke's claims against Barberi because they are not plausible. In support of this argument, Defendants claim that Parke "suddenly" identified Barberi during his deposition even though he had failed to do so in his CCRB complaint and his interview with the Queens District Attorney. (Defs.' Mem. in

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 223 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

Supp. Parke at 4; Defs.' 56.1 Stmt. Parke ¶¶ 11–12.) Parke denies this allegation as to the CCRB complaint. (Parke's Resp. to Defs.' 56.1 Stmt. ¶ 12.) Parke neither admits nor denies as to the DA interview. (*Id.* at ¶ 11.) Parke's credibility is not a matter to be decided by the Court on a summary judgment motion. It is an issue for determination by the jury.

According to Parke's testimony, he was not under arrest or seized by the police when Barberi shoved him with his nightstick held between his fists. (Defs.' 56.1 Stmt. Parke, Ex. B, at 146–47.) Because the alleged excessive force did not occur within the context of an arrest or seizure, the Fourteenth Amendment applies. *See* Abraham and Bloomfield sections above. Given Parke's own account of event, UCC members and police officers were running everywhere at the time when he was shoved by Barberi. During such a chaotic event, this Court does not find that the actions of Barberi against Parke were sufficiently heinous for a reasonable jury to find that they shock the conscience. Furthermore, since the event occurred prior to *Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995), Barberi is entitled to qualified immunity for those acts. Summary judgment is granted for Barberi.

## II. § 1983 *Excessive Force (noxious gas)*

In his Complaint, Parke claims that Defendants deliberately sprayed his face and head with a noxious gas. (Parke Compl. 78.) Defendants move for summary judgment.

It is undisputed that Parke was sprayed in the back and face. (Defs.' 56.1 Stmt. Parke ¶¶ 18–19.) It is also undisputed that Parke has not identified who sprayed him. (*Id.* at ¶ 20.) Because Parke has not shown the personal involvement of any Defendant in the spraying of mace, Parke cannot maintain an action under § 1983. *See* Bennett section above. Summary judgment is granted for all Defendants.

## III. § 1983 *False Imprisonment*

Parke alleges that Defendants imprisoned him within the church yard without probable cause. (Parke Compl. ¶ 81.) Defendants move for summary judgment on the ground that Parke was not confined. The elements of false imprisonment are explained in the Gordon and Abraham sections above.

In support of their argument that Parke was not falsely imprisoned, the Defendants cite evidence that Parke was able to go outside the gate twice during the four hour period that he

was allegedly imprisoned. (Defs.' 56.1 Stmt. Parke ¶¶ 22–24.) Parke disputes this evidence. (Parke's 56.1 Stmt. ¶ 10; *id.,* Ex. 1, at 189–91; Parke's Resp. to Defs.' 56.1 Stmt. ¶¶ 22–24.)

**\*54** Parke has presented sufficient evidence of false imprisonment to survive this summary judgment motion. Parke and all of the non-arrested Group A–1 Plaintiffs have presented evidence that the there was a large police response to the UCC and that the police were deployed at the exits to the church premises. *See* Abraham section above. Whether or not Parke was imprisoned for a period of time or whether he felt free to leave the UCC premises is a question of fact for the jury. For the reasons stated in the Abraham section above, summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all other Defendants.

## IV. § 1983 *Failure to Intervene and Protect*

Parke brings a claim against supervisory officer Defendants for failing to intervene and protect him from the unlawful conduct of the subordinate defendants. (Parke Compl. ¶ 90.) Defendants move for summary judgment.

Summary judgment is denied for Defendants Anemone and Maple on Parke's claim that they failed to intervene and protect him during the alleged false imprisonment. Summary judgment is granted for all other Defendants and for any claims relating to the use of force by Barberi. *See* Abraham section above.

## V. § 1983 *Failure to Supervise*

Parke brings a claim against supervisory officer Defendants for failing properly to supervise the subordinate defendants. (Parke Compl. ¶ 90.) Defendants move for summary judgment.

Summary judgment is denied for Defendants Anemone and Maple on Parke's claim that they failed properly to supervise Defendants who were in authority during the false imprisonment. Summary judgment is granted for all other Defendants and for any claims for failure to supervise the claimed use of force by Barberi. *See* Abraham section above.

## VI. § 1983 *Denial of Medical Treatment*

Parke alleges that the Defendants denied him necessary medical treatment for his injuries. (Parke Compl. ¶ 84.) Defendants move for summary judgment on the grounds that

Parke had no serious medical injuries. The relevant law for this claim is outlined in the Gordon and Abraham sections above.

Parke testified that he experienced burning from the mace (Parke's 56.1 Stmt., Ex. 1, at 170) and that he sustained other injuries, including a swollen finger, pains in his back, chest, and neck (Defs.' 56.1 Stmt. Parke, Ex. B, at 206–09). However, Parke admits that he did not seek medical treatment on August 20 or 21, 1995. (Defs.' 56.1 Stmt. Parke ¶ 36.) Based on the evidence before the Court, it appears Parke did not seek any medical treatment until June 27, 1996 (Parke's 56.1 Stmt., Ex. 5 (report from Greater Metropolitan Medical Services) and September 12, 1996 (Parke's 56.1 Stmt., Ex. 3 (psychological evaluation)). The seriousness of Parke's injuries is not clear.

Although Parke has offered evidence supporting his claim of injuries, he has not shown that he was denied medical treatment by the any of Defendants' deliberate indifference to his visible injuries. Summary judgment is granted for all Defendants.

### VII. § 1983 Unlawful Retaliation for First Amendment Conduct

**\*55** Parke alleges that the Defendants' conduct constitutes unlawful retaliation for his First Amendment conduct. (Parke Compl. ¶ 95.) Defendants move for summary judgment.

Parke fails to offer evidence to support this claim. The only evidence he cites is that he was properly on church property at the time of the incident and that an unidentified officer said to him, "Let your God feed the baby." (Parke's 56.1 Stmt. ¶ 14.) This is insufficient to show that any Defendants' conduct was motivated by animus for Parke's exercise of his right to freedom of religion.[56] Summary judgment is granted for all Defendants.

[56]  To the extent that Parke is alleging emotional and psychological damages from this comment and several other comments containing racial epithets, Parke may offer evidence of the comments and the distress they caused in presenting the damages he has suffered from any false imprisonment or from any assault and battery against him.

### VIII. Common Law Assault and Battery (physical acts)

Parke alleges that the Defendants "did inflict assault and battery upon [him]." (Parke Compl. ¶ 109.) Defendants move for summary judgment on the grounds that Parke has failed to show intent and injury.

Parke testified that Barberi shoved him with his nightstick. There is no evidence to suggest that this was not an intentional act. Parke has offered sufficient evidence of an assault and battery. Summary judgment is denied as to Barberi. Summary judgment is granted for all other Defendants.

### IX. Common Law Assault and Battery (noxious gas)

Parke also asserts an assault and battery claim against Defendants for the spraying of noxious gas. (Parke Compl. ¶ 109.) Defendants move for summary judgment on the grounds that Parke has not identified who sprayed him. The relevant law for this claim is outlined in the Abraham and Bloomfield sections above.

It is undisputed that Parke was twice sprayed with mace. There is no evidence to suggest that these were not intentional acts. Evidence has been presented on the motion that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish discharged their mace canisters during the August 20–21 incident. Many of these officers admit to discharging mace at the gate, where Parke has testified he was maced in the face. Parke is allowed to proceed with his assault and battery claim against these Defendants. Summary judgment is granted for all other Defendants.

### X. Common Law False Imprisonment

Parke alleges that Defendants falsely imprisoned him without cause by surrounding the UCC grounds. (Parke Compl. ¶ 112.) Defendants move for summary judgment. The relevant law is outlined in the Abraham section above.

A claim for false imprisonment is the same under § 1983 and common law. Summary judgment is denied as to Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all other Defendants.

### XI. Common Law Intentional Infliction of Emotional Distress

Parke brings a cause of action against Defendants for intentional infliction of emotional distress. (Parke Compl. ¶ 115.) Defendants move for summary judgment.

Parke fails to present sufficient evidence of this claim. *See* sections above. To the extent that Parke claims emotional distress from the use of force, the use of mace, and the false imprisonment, his claim is subsumed under those specific causes of action. To the extent that Parke claims emotional distress from the comments unidentified Defendants made to him while he was falsely imprisoned, he may present evidence of any comments and the distress they caused him during his testimony on false imprisonment.

*XII. Common Law Negligent Infliction of Emotional Distress*
 **\*56** Parke alleges that Defendants negligently caused him severe emotional distress. (Parke Compl. ¶ 118.) Defendants move for summary judgment.

Parke's testimony shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

*XIII. Common Law Conspiracy*
Parke alleges that the Defendants conspired against him to deprive him of his rights. (Parke Compl. ¶ 121.) Defendants move for summary judgment.

Parke does not present evidence of a conspiracy. Summary judgment is granted for all Defendants.

*XIV. Common Law Negligence*
Parke alleges that Defendants negligently caused him injuries and distress. (Parke Compl. ¶ 124.) Defendants move for summary judgment.

Parke's testimony shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion
Summary judgment is denied on the following claims by Parke:

1. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

2. § 1983 failure to intervene and protect during the false imprisonment against Anemone, Maple

3. § 1983 failure to supervise during the false imprisonment against Anemone, Maple

4. common law assault and battery (physical acts) against Barberi

5. common law assault and battery (noxious gas) against Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish

6. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish
Summary judgment is granted on the following claims by Parke:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 excessive force (noxious gas) against all Defendants

3. § 1983 false imprisonment against remaining Defendants

4. § 1983 failure to intervene and protect against remaining Defendants

5. § 1983 failure to supervise against remaining Defendants

6. § 1983 denial of medical treatment against all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

8. common law assault and battery (physical acts) against remaining Defendants

9. common law assault and battery (noxious gas) against remaining Defendants

10. common law false imprisonment against remaining Defendants

11. common law intentional infliction of emotional distress against all Defendants

12. common law negligent infliction of emotional distress against all Defendants

13. common law conspiracy against all Defendants

14. common law negligence against all Defendants

Elisha Williams' Claims

Elisha Williams arrived at the UCC for the revival around 7:15 p.m. on August 20, 1995. (Williams' 56.1 Stmt. ¶ 1.) After the revival ended, Williams saw a crowd of people including both UCC members and police officers gathering outside the gate around Gordon, and, as he moved toward the crowd, he observed police officers pulling Gordon. (Williams' 56.1 Stmt., Ex. 1, at 42–45.) Williams testified that he saw the police handcuff Gordon and put him in a squad car, at which point the police returned to the crowd and started grabbing people. (*Id.* at 45.) According to Williams, "the tall police officer" whom he was able to identify as Barberi then pushed him to the ground and lifted his nightstick to hit him but did not in fact hit him. (Defs.' 56.1 Stmt. Williams ¶¶ 2–3.) Bloomfield said, "Leave him alone, just leave him alone." (Defs.' 56.1 Stmt. Williams, Ex. 1, at 46.) At this point, Williams tried to return inside the gate. (Williams' 56.1 Stmt., Ex. 1, at 46 .) Before he got to the gate, he observed an officer spraying mace, and Williams' eyes started to burn. (*Id.* at 47.) It is not clear from the testimony whether the officer sprayed Williams directly or was spraying in the air. (*Id.*) Williams cannot identify the officer who sprayed the mace. (Defs.' 56.1 Stmt. Williams ¶¶ 17–18; Williams' Resp. to Defs.' 56.1 Stmt. ¶¶ 17–18.) At this point, Williams ran in the gate and under the tent. (Williams' 56.1 Stmt., Ex. 1, at 48.)

**\*57** According to Williams, during the chaos some people inside the UCC grounds closed the gate. (Defs.' 56.1 Stmt. Williams ¶ 25.) Some UCC members were still outside the gate and had to enter through the Glassboro gate. (Williams' 56.1 Stmt., Ex. 1, at 48–50.) Williams also testified that unidentified officers pushed on the gate, trying to get in, while UCC members pushed back, trying to keep the gate closed. Williams was able to leave the UCC at daylight the next morning. (Defs.' 56.1 Stmt. Williams, Ex. B, at 57.) As he left, Williams testified that he initially went to the ambulances outside the church to receive medical attention but that he left before receiving treatment because he was afraid of being arrested. (*Id.* at 52–53.)

*I. § 1983 Excessive Force (physical acts)*

Williams alleges that unnamed Defendants used excessive force against him by pushing him. (Williams Compl. ¶ 114.) In his deposition, Williams was able to identify this officer as Barberi. Defendants move for summary judgment on the grounds that Williams' identification of Barberi is not credible and that, if true, the actions alleged do not shock the conscience. The relevant law is outlined in the Abraham and Lewis sections above.

Williams does not allege sufficient evidence to make out a claim of excessive force. Although he does identify Barberi sufficiently as the officer who pushed him and raised his nightstick, these actions did not occur in the course of an arrest. The relevant test, therefore, is found in the Fourteenth Amendment. Williams' own description of the event suggests a chaotic scene with both church members and officers running everywhere as officers tried to grab and arrest certain people. In context of the melee, a reasonable jury could not find a push sufficient force to shock the conscience. Furthermore, under the circumstances revealed by the evidence, Barberi would be entitled to qualified immunity for Williams' *§ 1983* claim based on *Rodriguez v. Phillips,* 66 F.3d 470 (2d Cir.1995). Summary judgment is granted for all Defendants.

*II. § 1983 Excessive Force (noxious gas)*

Williams also brings an excessive force claim against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin for spraying him with noxious gas. (Williams Compl. ¶ 123.) Defendants move for summary judgment.

Williams testified that he was affected by noxious gas sprayed by an officer before he went back into the church grounds (Defs.' 56.1 Stmt. Williams, Ex. B, at 46–47), but he was not able to identify the officer. Williams has not presented evidence of the personal involvement of any of the named Defendants sufficient to sustain a *§ 1983* claim. When asked in his deposition if the officer who sprayed him was the same one who pushed him, he answered, "No, no, no, I don't think it was him, no." (Williams' 56.1 Stmt., Ex. 1, at 47.) Williams has presented no other evidence showing the personal involvement of any Defendant.

**\*58** Summary judgment is granted for all Defendants.

2000 WL 1538019

*III. § 1983 False Imprisonment*

Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned him against his will and without probable cause. (Williams Compl. ¶ 126.) Defendants move for summary judgment on the grounds that Williams has not shown that he was involuntarily detained. The relevant law is outlined in the Abraham section above.

Plaintiff has presented sufficient evidence to support a claim of false imprisonment. Williams has testified that, due to the police deployment, he was not able to leave the UCC grounds during the night. When asked in his deposition if he tried to leave before the morning, he answered, "You can't leave, they came in the line there all night, no one could leave, you can't leave." (Defs.' 56.1 Stmt. Williams, Ex. B, at 57.) Defendants are correct that Williams also testified that it was the UCC people, not the police who closed the gate and that people were able to enter the UCC grounds through a different gate on Glassboro. (Defs.' 56.1 Stmt. Williams ¶¶ 25, 29.) Both of these statements, however, appear to be referring to the beginning of the event as to which there is evidence of false imprisonment. It is not sufficient for Defendants to show that Williams was able to leave later on in the evening or at any time before the next morning. If the Plaintiff was imprisoned without reasonable cause for any period of time there is a false imprisonment. The issues of if and why the UCC members enclosed themselves within the fence, and whether or not the police deployment caused them to do so or prevented them from leaving are questions for the jury, as is the period of time and reasonableness of any imprisonment.

Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all remaining Defendants. *See* Abraham section above.

*IV. § 1983 Failure to Intervene and Protect; § 1983 Failure to Supervise*

Like the other non-arrested Group A–1 Plaintiffs, Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed to intervene and protect him from the unjustified treatment he received and that the supervisory officers failed to properly

supervise their subordinates. (Williams Compl. ¶¶ 129, 132.) Defendants move for summary judgment.

Both parties present the same facts as they have for each proceeding Plaintiff. The analysis for Williams is the same as for all of the non-arrested Group A–1 Plaintiffs. Summary judgment is denied for Anemone and Maple as to the failure to intervene or supervise while the Plaintiff was falsely imprisoned. Summary judgment is granted for all remaining Defendants.

*V. § 1983 Denial of Medical Treatment*

**\*59** Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied him necessary medical treatment. (Williams Compl. ¶ 135.) Defendants move for summary judgment on the grounds that medical treatment was available and that Williams did not have a serious medical need. The relevant law is outlined in the sections above.

Williams testified that when he was allowed to leave the church on the morning of August 21, 1995, he initially stopped at the ambulance for treatment to his eyes and shoulder but that he left before receiving treatment. (Defs.' 56.1 Stmt. Williams, Ex. B., at 60–64.) According to Williams, he left without receiving treatment because he heard from other UCC members that the police were arresting people. (*Id.* at 52, 60–64) Williams claims that he needed treatment for injuries to his shoulder and back and for the effects of the mace on his eyes and chest. (Williams' 56.1 Stmt. ¶¶ 7–8.) He does testify that he saw three doctors, including a psychiatrist, for his injuries, but the evidence before the Court does not reveal the dates of these appointments or the diagnoses. (Defs.' 56.1 Stmt. Williams, Ex. B, at 60–72.)

Williams has not presented evidence that any Defendant was aware of his injuries and that the Defendants denied him medical treatment with deliberate indifference. Furthermore, according to his own testimony, medical treatment was, in fact, made available. Williams testified that he did not stay in the ambulance to receive treatment because he heard that UCC members were being arrested. That testimony does not establish that a Defendant denied Williams medical treatment, nor does it show deliberate indifference by a Defendant.

Summary judgment is granted for all Defendants.

*VI. § 1983 Unlawful Retaliation for First Amendment Conduct*

Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis acted in the ways alleged because of their animus toward him and because he was exercising his right to the free exercise of religion. (Williams Compl. ¶ 138.) Defendants move for summary judgment. The elements of this claim are outlined in the Gordon section above.

For the reasons stated in the sections above, this Court finds that Williams has failed to present sufficient evidence to support his claim for unlawful retaliation for First Amendment conduct. Summary judgment is granted for all Defendants.

*VII. Common Law Assault and Battery (physical acts)*

In his Complaint, Williams alleges that an unnamed defendant police officer inflicted assault and battery on him by pushing him. (Williams Compl. ¶ 170.) Defendants move for summary judgment. The law is presented in the Bennett and Abraham sections above.

**\*60** Williams testified that Barberi pushed him to the ground and then raised his nightstick to hit him, but did not actually hit him. For the reasons outlined in sections above, this is sufficient evidence of assault and battery to survive a summary judgment motion. Summary judgment is denied for Barberi.

Williams does not offer any other evidence of physical acts against him; therefore, Summary judgment is granted for all other Defendants.

*VIII. Common Law Assault and Battery (noxious gas)*

Williams also brings an assault and battery claim against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin alleging that they sprayed him with or exposed him to noxious gas. (Williams Compl. ¶ 179.) Defendants move for summary judgment. The law is outlined in sections above.

Williams testified that he observed an officer spraying mace and that, as a result, his eyes and chest began to burn. Although Williams does not identify which officer sprayed the mace, evidence has been submitted on this motion that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish all sprayed mace during the altercation that night. Williams does not have to establish that a Defendant intended to spray him with mace, only that the act of spraying mace by police officers was intentional. Williams has therefore presented sufficient evidence to proceed with a claim of battery.

Summary judgment is denied for Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish. Williams does not present evidence that Defendants Anemone, Maple, Chapman, or Devlin sprayed mace; therefore, summary judgment is granted for these Defendants.

*IX. Common Law False Imprisonment*

Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for falsely imprisoning him against his will without probable cause. (Williams Compl. ¶ 182.) Defendants move for summary judgment.

As is explained in the sections above, a false imprisonment claim is the same under both § 1983 and common law. Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for the remaining Defendants.

*X. Common Law Intentional Infliction of Emotional Distress*

Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in extreme and outrageous conduct that intentionally inflicted emotional distress on him. (Williams Compl. ¶ 185.) Defendants move for summary judgment.

As explained in the sections above, Williams has not presented sufficient evidence of this claim. To the extent that Williams has evidence that he suffered emotional distress, he may present that evidence of damages in conjunction

with his other claims. Summary judgment is granted for all Defendants.

*XI. Common Law Negligent Infliction of Emotional Distress*
**\*61** Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused him severe emotional distress. (Williams Compl. ¶ 188.) Defendants move for summary judgment.

Williams' testimony shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

*XII. Common Law Conspiracy*
Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against him to deprive him of his rights. (Williams Compl. ¶ 191.) Defendants move for summary judgment.

Williams has not presented evidence of a conspiracy. Summary judgment is granted for all Defendants.

*XIII. Common Law Negligence*
Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused him injuries and distress. (Williams Compl. ¶ 194.) Defendants move for summary judgment.

Williams' testimony shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Williams:

1. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

2. § 1983 failure to intervene and protect (as to the false imprisonment) against Anemone, Maple

3. § 1983 failure to supervise (as to the false imprisonment) against Anemone, Maple

4. common law assault and battery (physical acts) against Barberi

5. common law assault and battery (noxious gas) against Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish

6. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

Summary judgment is granted on the remaining claims by Williams:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 excessive force (noxious gas) against all Defendants

3. § 1983 false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

4. § 1983 failure to intervene and protect against Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

5. § 1983 failure to supervise against Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

**\*62** 6. § 1983 denial of medical treatment for all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct for all Defendants

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 230 of 830
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

8. common law assault and battery (noxious gas) against Anemone, Maple, Chapman, Devlin

9. common law false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

Gaye Lewis' Claims

Gaye Lewis arrived at the UCC for the revival around 7:20 p.m. on August 20, 1995. (Lewis' 56.1 Stmt. ¶ 1.) She was preparing to leave after the service when she heard a commotion outside the gate and, staying on the fenced church grounds, went to the corner of Sutphin Boulevard and Ferndale to see what was going on. (*Id.* 2.) She testified that she observed several white, male police officers beating and arresting Gordon. (*Id.* 3.) According to Lewis, she was then sprayed through the fence with pepper spray by Barberi. (Defs.' 56.1 Stmt. Lewis, Ex. B, at 34–35.) Lewis testified that she knew it was Barberi because she was able to see his name plate. [57] (Defs.' 56.1 Stmt. Lewis ¶ 14.) Lewis also testified that later when she was trying to close the gate, she tripped, fell, and hurt her knee. ((Lewis' 56.1 Stmt., Ex. 1, at 54.) Finally, Lewis testified that "Officer Greg" hit the fence when they were trying to close it, causing pain and swelling. (Defs.' 56.1 Stmt. Lewis ¶¶ 2–5.) [58]

[57] Lewis' 56.1 Stmt. ¶ 4 states that she was sprayed not only by Barberi but also by other police officers. Plaintiff presents no admissible evidence to support this. Based on Lewis' deposition, the only Officer she claims sprayed her with mace is Barberi. (Defs.' 56 .1 Stmt. Lewis, Ex. B, at 34–35.)

[58] Defendants argue that Lewis' identification of the officer as "Greg" and not "Craig" casts doubt on her credibility. The Court notes that both names

sound alike when spoken aloud and that this discrepancy could be the result of something as minor as court reporter error. Furthermore, the CCRB report, which the Defendants cite, is not admissible evidence. This report is a summary of the interview, not a transcript of the interview itself. The Court will hear the evidence identifying Defendant Craig.

*I. § 1983 Excessive Force (physical acts)*

In her Complaint, Lewis alleges that Defendant Craig used excessive force against her because, when he hit the fence, her finger was injured. (Defs.' 56.1 Stmt. Lewis, Ex. B, at 55, 60.) Defendants move for summary judgment on the grounds that this act does not constitute excessive force under the Fourteenth Amendment. The law is outlined in sections above.

Lewis does not present sufficient evidence to show that she was seized at the time her injury occurred. According to her own testimony, it was she and other UCC members who were trying to close the gate. She injured her finger and fell when Craig hit the fence. (Lewis' 56.1 Stmt., Ex. 1, at 54–56.) She was not injured in the course of an arrest or a seizure because the officers were trying to keep the gate open, not close the people in. Therefore, the Fourteenth Amendment Due Process Clause applies. Under these circumstances, the Defendants are entitled to qualified immunity. *See Rodriguez v. Phillips, 66 F.3d 470, 477 (2d Cir.1995).* The conduct of Craig does not shock the conscience, given the context of the melee.

Summary judgment is granted for Defendant Craig.

*II. § 1983 Excessive Force (noxious gas)*

**\*63** Lewis alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against her in that they sprayed her with or exposed her to noxious gas. (Lewis Compl. ¶ 130.) Defendants move for summary judgment on the ground that such conduct does not shock the conscience.

Lewis does not present evidence that Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, or Devlin sprayed her with mace. In her deposition, Lewis testified that Barberi sprayed her through the fence. She does not present evidence that she was sprayed by anyone else.

Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

Therefore, summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin.

Summary judgment is denied on Lewis' excessive force claim against Barberi. According to her testimony, Barberi sprayed her and others through the fence near Sutphin and Ferndale. Although there is evidence that the scene was chaotic, there is no evidence that the people who were watching Barberi and Gordon from behind a fence were a danger to Barberi. Whether or not, under the circumstances that the evidence shows Barberi was facing, his spraying of mace on people who were separated from him by a fence shocks the conscience is a question for the jury.

### III. § 1983 False Imprisonment

Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned her against her will. (Lewis Compl. ¶ 133.) Defendants move for summary judgment on the grounds that Lewis was not involuntarily confined.

Lewis' claim is similar to Williams' in that both parties present evidence of voluntary movement at certain points in time and inability to leave the church grounds at other points in time. Whether or not and when Lewis was able to leave the UCC grounds is a question of fact for the jury. Lewis has presented sufficient evidence of a large police deployment to maintain a false imprisonment claim. *See* Abraham and Williams sections above.

Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all remaining Defendants.

### IV. § 1983 Failure to Intervene and Protect; § 1983 Failure to Supervise

Like the other non-arrested Group A–1 Plaintiffs, Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed to intervene and protect her from the unjustified treatment she received and that the supervisory officers failed to properly supervise their subordinates. (Lewis Compl. ¶¶ 136, 139.) Defendants move for summary judgment.

**\*64** Both parties present the same facts as they have for each proceeding Plaintiff. The analysis for Lewis is the same as for all of the non-arrested Group A–1 Plaintiffs. *See* sections above.

Summary judgment is denied for Anemone and Maple as to the failure to intervene and supervise the false imprisonment situation. Summary judgment is granted for all remaining Defendants.

### V. § 1983 Denial of Medical Treatment

Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied her necessary medical treatment. (Lewis Compl. ¶ 142.) Defendants move for summary judgment on the grounds that Lewis did not have a serious medical need. The relevant law is outlined in the sections above.

Lewis has not presented evidence that she was denied medical treatment. Furthermore, she has not shown that her injuries were sufficiently obvious or serious to support a constitutional claim. Lewis testified that she sought medical attention for her knee and finger, but not her eyes. The Plaintiff's evidence does not establish when she sought this treatment.

Lewis has made no showing that a Defendant was aware of her injuries and denied her medical treatment out of deliberate indifference to those injuries. Summary judgment is granted for all Defendants.

### VI. § 1983 Unlawful Retaliation for First Amendment Conduct

Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis acted in the ways alleged because of their animus toward her and because she was exercising her right to the free exercise of religion. (Lewis Compl. ¶ 145.) Defendants move for summary judgment. The elements of this claim are outlined in the Gordon section above.

For the reasons stated in the sections above, summary judgment is granted for all Defendants. Lewis has not identified sufficient evidence to support her claim.

*VII. Common Law Assault and Battery (physical acts)*
Lewis alleges that Defendant Craig is liable for assault and battery because when he hit the fence, her finger was injured. (Lewis Compl. ¶ 180; Defs.' 56.1 Stmt. Lewis, Ex. B., at 54–56.) Defendants move for summary judgment on the grounds that this Lewis' claims are not credible. The law is outlined in sections above.

Lewis presents sufficient evidence of an intentional physical act to proceed with a claim of assault and battery. According to her own testimony, Craig hit the fence, and her finger was injured. (Lewis' 56.1 Stmt., Ex. 1, at 54–56.) She claims that Craig's acts caused her injuries to her finger and knees. (*Id.*) Although this Lewis' account does not support an act sufficiently severe to show a § 1983 violation, she has presented sufficient evidence of a common law assault and battery. Summary judgment is denied for Craig.

*VIII. Common Law Assault and Battery (noxious gas)*
 **\*65**  Lewis alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against her in that they sprayed her with or exposed her to noxious gas. (Lewis Compl. ¶ 186.) Defendants move for summary judgment on the ground that such conduct does not shock the conscience.

Lewis does not present evidence that Defendants Webber, Defendants Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, or Devlin sprayed her with mace. In her deposition, Lewis testified that Barberi sprayed her through the fence. She does not present evidence that she was sprayed by anyone else. Therefore, summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin.

Summary judgment is denied on Lewis' assault and battery with noxious gas claim against Barberi. According to her testimony, Barberi sprayed her and others through the fence near Sutphin and Ferndale. This is sufficient evidence of an assault and battery.

*IX. Common Law False Imprisonment*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned her against her will. (Lewis Compl. ¶ 189.) Defendants move for summary judgment on the grounds that Lewis was not involuntarily confined.

A false imprisonment claim is the same under § 1983 and common law. Based on the analysis above, Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all remaining Defendants.

*X. Common Law Intentional Infliction of Emotional Distress*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in extreme and outrageous conduct that intentionally inflicted emotional distress on her. (Lewis Compl. ¶ 192.) Defendants move for summary judgment.

As explained in the sections above, Lewis has not presented sufficient evidence of this claim. To the extent that Williams has evidence that she suffered emotional distress, she may present that evidence in conjunction with her surviving claims. Summary judgment is granted for all Defendants.

*XI. Common Law Negligent Infliction of Emotional Distress*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused her severe emotional distress. (Lewis Compl. ¶ 195.) Defendants move for summary judgment.

 **\*66**  Lewis presents evidence of intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

*XII. Common Law Conspiracy*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor,

Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against her to deprive her of her rights. (Lewis Compl. ¶ 198.) Defendants move for summary judgment.

Lewis has not presented evidence of a conspiracy. Summary judgment is granted for all Defendants.

*XIII. Common Law Negligence*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused her injuries and distress. (Lewis Compl. ¶ 201.) Defendants move for summary judgment.

The evidence presented by Lewis shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion
Summary judgment is denied on the following claims by Lewis:

1. § 1983 excessive force (noxious gas) against Barberi

2. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

3. § 1983 failure to intervene and protect on the false imprisonment against Anemone, Maple

4. § 1983 failure to supervise on the false imprisonment against Anemone, Maple

5. common law assault and battery (physical acts) against Craig

6. common law assault and battery (noxious gas) against Barberi

7. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

Summary judgment is granted on the remaining claims by Lewis:

1. § 1983 excessive force (physical acts) against Craig

2. § 1983 excessive force (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, Devlin

3. § 1983 false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

4. § 1983 failure to intervene and protect against Anemone, Maple, Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

5. § 1983 failure to supervise on the false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

6. § 1983 denial of medical treatment against all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

*67    8. common law assault and battery (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, Devlin

9. common law false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

Andre Pierre's Claims

Andre Pierre arrived at the UCC to attend the arrival around 6:30 p.m. on August 20, 1995. (Pierre's 56.1 Stmt. ¶ 1.) After the service, Pierre was at the corner of Sutphin on Ferndale when he observed a struggle between Gordon and Barberi and another officer. (Pierre's 56.1 Stmt., Ex. 1, at 45–46.) Pierre testified that he recognized Barberi from the earlier incident with Warsop and that he approached Barberi to ask, "What's going on here? What's the matter?" (Id at 46.) According to Pierre, Barberi said, " 'just get back, get back," ' swung a black object at him, striking him on his elbow and poking him in his stomach. (Id.) It is undisputed that Pierre testified that Barberi hit and poked him "in order to get [him] back from the area where police officers were struggling with Horace Gordon." (Defs.' 56.1 Stmt. ¶ 2; Pierre's Resp. to Defs.' 56.1 Stmt. ¶ 2.)

According to Pierre, after observing Caliz, Bennett, and Campbell get arrested, he and other UCC members went get back into the gated area of the church and tried to close the gate. (Pierre's 56.1 Stmt., Ex. 1, at 58–59.) Next, police surrounded the church, and the members were not allowed to leave. (Id. at 60.) Pierre testified that he specifically said and heard officers tell people that they could not leave. (Id. at 60–61.)

Pierre also testified that he saw two officers at the gate entrance attempting to push open the gate and spraying mace on the people near the gate. (Id. at 64–65.) He recognized one of these officers as Barberi, but he has not identified the other one. (Id.) According to Pierre, "[T]hey were just spraying at random. They were just spraying down the line. I mean, I got sprayed. Everybody next to me, the people in front of me, the side of me. Everybody that was at the fence at that particular moment, you know, got sprayed or affected by the spray." (Id. at 65.) As a result of the spraying mace, Pierre experienced burning his eyes and shoulders. (Id. at 73–74.)

## I. *§ 1983 Excessive Force (physical acts)*

Pierre alleges that Defendant Barberi used excessive force against him when he hit and pushed him. (Pierre Compl. ¶ 134.) Defendants move for summary judgment on the grounds that this act does not constitute excessive force under the Fourteenth Amendment. The law is outlined in sections above.

**\*68** Pierre's own account of the event is that he approached Barberi while Barberi was attempting to arrest Gordon and that Barberi pushed him back in order to get him away from the site of the arrest. This conduct as testified to by Pierre would not be sufficient for a reasonable jury to find it would shock the conscience and thus constitute excessive force under the Due Process Clause.

Summary judgment is granted for Defendant Barberi.

## II. *§ 1983 Excessive Force (noxious gas)*

Pierre alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against him in that they sprayed him with or exposed him to noxious gas. (Pierre Compl. ¶ 143.) Defendants move for summary judgment on the ground that Pierre has not testified that Barberi sprayed him.

Pierre does not present evidence that Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, or Devlin sprayed him with mace. Summary judgment is granted for these Defendants.

In his deposition, Pierre testified that he saw Barberi and another officer spraying mace through the gate. (Pierre's 56.1 Stmt., Ex. 1, at 64.) Pierre also testified that he was sprayed with the mace by Barberi and the other Officer through the gate. (Id. at 65.) Pierre has offered sufficient evidence of excessive force by use of noxious gas to proceed. Summary judgment for Barberi is denied on this claim. *See* Lewis above.

## III. *§ 1983 False Imprisonment*

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned him against his will. (Pierre Compl. ¶ 146.) Defendants move for summary judgment on the grounds that Pierre was not involuntarily confined.

Pierre's claim is similar to that of Williams and Lewis in that both parties present evidence of voluntary movement at certain points in time and inability to leave at other points in time. Pierre has presented sufficient evidence of a police deployment around the perimeter of the church grounds to

maintain a false imprisonment claim. He testified that he heard officers specifically tell people they could not leave. (Pierre's 56.1 Stmt., Ex. 1, at 59–61.) He also testified that the police surrounded the church and were lined up the entire length of Sutphin Boulevard. (*Id.*) Whether or not and for what period of time Pierre was not free to leave the UCC grounds is a question of fact for the jury. *See* Abraham and Williams sections above.

Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all remaining Defendants.

*IV. § 1983 Failure to Intervene and Protect; § 1983 Failure to Supervise*

**\*69** Like the other non-arrested Group A–1 Plaintiffs, Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed to intervene and protect him from the unjustified treatment he received and that the supervisory officers failed to properly supervise their subordinates. (Pierre Compl. ¶¶ 149, 152.) Defendants move for summary judgment.

Both parties present the same facts as they have for each proceeding Plaintiff. The analysis for Pierre is the same as for all of the non-arrested Group A–1 Plaintiffs. *See* sections above.

Summary judgment is denied for Anemone and Maple. Summary judgment is granted for all remaining Defendants.

*V. § 1983 Denial of Medical Treatment*

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied him necessary medical treatment. (Pierre Compl. ¶ 155.) Defendants move for summary judgment on the grounds that Pierre did not have a serious medical need. The relevant law is outlined in the sections above.

Pierre testified that he experienced a burning sensation in his eyes and shoulders. (Pierre's Resp. to Defs.' 56.1 Stmt. ¶¶ 29, 31.) Pierre admits that he never sought medical treatment for this injury from any Defendant and he has not shown that any

Defendant was aware of the extent of his injury or his need for medical treatment. (Defs.' 56.1 Stmt. Pierre ¶ 32.)

Pierre has not presented evidence that he had a serious medical injury that required treatment. Summary judgment is granted for all Defendants.

*VI. § 1983 Unlawful Retaliation for First Amendment Conduct*

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis unlawfully retaliated against him for his religious beliefs. (Pierre Compl. ¶ 158.) Defendants move for summary judgment. The elements of this claim are outlined in the Gordon section above.

For the reasons stated in the sections above, summary judgment is granted for all Defendants. Pierre has not presented sufficient evidence to support his claim.

*VII. Common Law Assault and Battery (physical acts)*

Pierre alleges that Defendant Barberi is liable for assault and battery because he hit and pushed him. (Pierre Compl. ¶ 190.) Defendants move for summary judgment. The law is outlined in sections above.

Pierre has identified sufficient evidence of an intentional physical act to proceed with a claim of assault and battery. According to his testimony, Barberi hit and pushed him. Whether such acts were reasonable under the circumstances is a jury question. Summary judgment is denied as to Barberi.

*VIII. Common Law Assault and Battery (noxious gas)*

**\*70** Pierre alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against him by spraying him with noxious gas. (Pierre Compl. ¶ 199.) Defendants move for summary judgment.

Pierre testified that Barberi and another officer sprayed mace on the people behind the gate. Pierre does not have to establish that either officer specifically intended to spray him to make out an assault and battery claim. *See* Abraham section above.

Pierre identifies Barberi as a police officer who intentionally used mace against the persons behind the gate; therefore, summary judgment is denied for Barberi. Although Pierre has not identified the other officer, the evidence is sufficient to establish that Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish all sprayed mace at some point during the incident. Defendants are correct that this is not enough to establish personal involvement under § 1983, but it is sufficient for a common law claim. Summary judgment is denied for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish.

Because Pierre does not offer evidence that Defendants Anemone, Maple, Chapman, Brown, or Devlin sprayed mace or were present or aware of the macing when it occurred, summary judgment is granted for these Defendants.

### IX. Common Law False Imprisonment

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned him against her will. (Pierre Compl. ¶ 202.) Defendants move for summary judgment on the grounds that Pierre was not involuntarily confined.

A false imprisonment claim is the same under § 1983 and common law. Based on the analysis above, Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all remaining Defendants.

### X. Common Law Intentional Infliction of Emotional Distress

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in extreme and outrageous conduct that intentionally inflicted emotional distress on him. (Pierre Compl. ¶ 205.) Defendants move for summary judgment.

As explained in the sections above, Pierre has not presented sufficient evidence that the Defendants engaged in extreme and outrageous conduct with the intent to inflict emotional distress on him. To the extent that Pierre has evidence that he suffered emotional distress,[59] he may present that evidence

in conjunction with his surviving claims. Summary judgment is granted for all Defendants.

59    Pierre testified that heard some officers make comments taunting the UCC members, such as " '[Y]ou call yourself church people, you are nothing, but a bunch of black savages." ' (Defs.' 56 .1 Stmt., Ex. B, at 58.) He also described feelings of anxiety in dealing with police and stated that he saw a doctor for his emotional condiction. (*Id.* at 82–85.) He did not testify that any of the Defendants engaged in this conduct.

### XI. Common Law Negligent Infliction of Emotional Distress
**\*71**  Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused him severe emotional distress. (Pierre Compl. ¶ 208.) Defendants move for summary judgment.

Pierre presents evidence of intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

### XII. Common Law Conspiracy
Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against him to deprive him of his rights. (Pierre Compl. ¶ 211.) Defendants move for summary judgment.

Pierre has not presented evidence of a conspiracy. Summary judgment is granted for all Defendants.

### XIII. Common Law Negligence
Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused him injuries and distress. (Pierre Compl. ¶ 214.) Defendants move for summary judgment.

The evidence presented by Pierre shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Pierre:

1. § 1983 excessive force (noxious gas) against Barberi

2. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

3. § 1983 failure to intervene and protect (as to the false imprisonment) against Anemone, Maple

4. § 1983 failure to supervise (as to the false imprisonment) against Anemone, Maple

5. common law assault and battery (physical acts) against Barberi

6. common law assault and battery (noxious gas) against Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish

7. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

Summary judgment is granted on the remaining claims by Pierre:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 excessive force (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, Devlin

3. § 1983 false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

4. § 1983 failure to intervene and protect against Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

*72 5. § 1983 failure to supervise against Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

6. § 1983 denial of medical treatment for all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct for all Defendants

8. common law assault and battery (noxious gas) against Anemone, Maple, Chapman, Devlin

9. common law false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

IT IS SO ORDERED.

All Citations

Not Reported in F.Supp.2d, 2000 WL 1538019

End of Document                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 897046

KeyCite Red Flag - Severe Negative Treatment

Reversed and Remanded by Crawford v. Cuomo, 2nd Cir.(N.Y.), August 11, 2015

2014 WL 897046
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James CRAWFORD and Thaddeus Corley, Plaintiffs,

v.

Andrew CUOMO, as Governor of the State of
New York, in his official capacity; Brian Fischer,
Commissioner of Department Of Corrections and
Community Supervision, in his official capacity;
Superintendent William P. Brown, in his personal and
official capacities; Superintendent William Larkin, in
his official capacity; Corrections Officer Simon Prindle;
and John Doe Corrections Officers 1–8, Defendants.

No. 9:13–CV–406 (NAM/CFH).
|
Signed March 5, 2014.
|
Filed March 6, 2014.

**Attorneys and Law Firms**

Office of Adam D. Perlmutter, PC, Adam D. Perlmutter, Esq., of counsel, Office of Zachary Margulis–Ohnuma, Zachary A. Margulis–Ohnuma, Esq., of counsel, New York, NY, for Plaintiffs.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Richard Lombardo, Esq., Assistant New York State Attorney, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

**INTRODUCTION**

**\*1** In this action under 42 U.S.C. § 1983, each of the two plaintiffs claims that, while an inmate at Eastern Correctional Facility ("ECF") in the custody of New York State Department of Corrections and Community Supervision

("DOCCS"), he was sexually abused on a single occasion by a corrections officer. Defendants move (Dkt. No. 9) to dismiss the complaint (Dkt. No. 1). As set forth below, the Court grants the motion and dismisses the complaint.

**COMPLAINT**

At the time of the events alleged in the complaint (Dkt. No. 1), plaintiffs were inmates at ECF. [1] The complaint alleges that on March 12, 2011, defendant Simon Prindle, a corrections officer at ECF, sexually abused plaintiff Thaddeus Corley, and that on March 16, 2011, Prindle sexually abused plaintiff James Crawford. Specifically, the complaint alleges that, on March 12, 2011, while Thaddeus Corley was engaged in a visit with his wife, Prindle ordered him to stop the visit and escorted him out of the visiting room. Prindle stated he was "going to make sure Mr. Corley did not have an erection"; ordered Corley to "put his hands against the wall held high with his feet spread apart"; and pat frisked him. According to the complaint, "[d]uring the pat frisk, Officer Prindle paused to fondle and squeeze Mr. Corley's penis." In response, Corley "jumped off the wall and asked Officer Prindle what he was doing." Prindle responded "by threatening Mr. Corley and telling him to get back on the wall." Corley adds that, upon information and belief, John Doe Officers 2, 3 and 4 personally witnessed the incident but did nothing to intervene.

[1]      According to the complaint, plaintiff James Crawford has recently been released on parole; plaintiff Thaddeus Corley continues in DOCCS custody at ECF.

The complaint further alleges that on March 16, 2011, as James Crawford was exiting the dining mess hall, Prindle stopped him and told him to place his hands on the wall. Prindle began to search Crawford; "ran his hands down Mr. Crawford's chest area and paused around Crawford's crotch"; and "grabbed Crawford's penis, held it, and asked 'what's that?' " When Crawford flinched, Prindle grabbed him tightly around his neck and warned him to remain against the wall. Crawford responded, "That's my penis, man. What the hell are you doing?" Then Prindle "tightened his grip around the hood of the sweatshirt Mr. Crawford was wearing"; "pinned Mr. Crawford to the wall with Officer Prindle's knee in Mr. Crawford's back area"; "reached around Mr. Crawford and grabbed Mr. Crawford's crotch area"; "squeezed and roamed with his hands around Mr. Crawford's penis and down his thigh, stating, 'stay on the fucking wall before I ram your

2014 WL 897046

head into the concrete' "; and, when Crawford flinched again, stated: "That doesn't feel like a penis to me." Prindle then "pulled Mr. Crawford's pants tightly up past Mr. Crawford's waist." Crawford asked, "What are you doing?" and Prindle responded, "Stay on the fucking wall. You wanna go to the box?" Crawford understood this as a threat to place him in solitary confinement. Prindle asked Crawford whether he had on sweat pants. When Crawford responded in the affirmative, Prindle asked, "What are you hiding in there?" According to the complaint, "[d]uring this time, Officer Prindle continued to squeeze and fondle the area around Mr. Crawford's penis." Crawford responded, "I'm not hiding nothing. That's my dick you're holding." Crawford then told Prindle that his search and frisk were not in accordance with the procedures; Prindle responded, "You don't have any rights in here. Any search I conduct is in accordance with the directive's search and frisk policies, now shut the fuck up and face the wall. I'll run my hands up the crack of your ass if I want to." Prindle "then proceeded to run his hands down Mr. Crawford's legs, around the area of Mr. Crawford's ankles, and on the inside of the back of Crawford's boots." Then an unknown officer, John Doe # 3, approached and asked, "What's the problem?" Prindle responded, "Nothing. These bastards are always complaining about being searched around here." When Crawford attempted to look at the unknown officer, Prindle screamed, "Face the fucking wall," and told Crawford that if he moved again Prindle would have him "in 'the box' 'quicker than [he] could blink.' " Prindle ordered Crawford to continue on to his destination and advised him, "Better not look back." Crawford then left the area.

 **\*2**  The complaint sets forth the following causes of action: first, a claim against Prindle under 42 U.S.C. § 1983 ("section 1983") asserting that his conduct towards both plaintiffs violated their Eighth Amendment protection against cruel and unusual punishment; second, a section 1983 Eighth Amendment claim for supervisory liability against defendant Superintendent William P. Brown; third, a section 1983 Eighth Amendment claim against the John Doe defendants for deliberate indifference and failure to intervene in the two incidents alleged; fourth, a section 1983 claim for injunctive relief against all defendants; fifth, a New York common law assault claim against Prindle; sixth, a claim of violation of N.Y. Penal Law § 130.52 against Prindle; seventh, a claim of violation of N.Y. Penal Law § 130.55 against Prindle; and eighth, an aiding and abetting claim against the John Doe defendants. Plaintiffs seek compensatory damages, reasonable attorneys fees, and

an injunction enjoining defendants "from permitting Officer Prindle from having any contact with inmates."

## DISCUSSION

To survive a Rule 12(b)(6) dismissal motion, "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' " *Ruotolo v. City of N.Y.,* 514 F.3d 184, 188 (2d Cir.2008) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 555). A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. *See ATSI,* 493 F.3d at 98. The court is not, however, required to accept a complaint's legal conclusions as true. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Rather, the court must determine whether the factual allegations plausibly give rise to an entitlement to relief. *See id.*

Plaintiffs' first four causes of action are federal claims based on section 1983. "Recovery under 42 U.S.C. § 1983 is premised upon a showing, first, that the defendant has denied the plaintiff a federal constitutional or statutory right and, second, that such denial was effected under color of state law." *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985). The section 1983 causes of action are based on the contention that defendants violated plaintiffs' Eighth Amendment protection against cruel and unusual punishment.

Defendants' primary argument is that, even accepting plaintiffs' allegations as true, the complaint fails to state Eighth Amendment claims. In addressing the Eighth Amendment in the context of an inmate's allegations of sexual abuse by a corrections officer, the Second Circuit explains:

> The Eighth Amendment sets constitutional boundaries on the conditions of imprisonment. The "unnecessary and wanton infliction of pain" on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment. First, the alleged punishment must be, objectively, sufficiently serious. Under the objective standard, conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.

**\*3** Second, the prison official involved must have a sufficiently culpable state of mind. Because sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.

Sexual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm. For this reason, there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can be objectively, sufficiently serious enough to constitute an Eighth Amendment violation. Moreover, like the rape of an inmate by another inmate, sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society.

The subjective element of the Eighth Amendment test may also be met by claims of sexual abuse. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind. It is therefore apparent, even without considering exactly what *mens rea* is necessary to show a wanton state of mind for a claim of sexual abuse, that a prison official who sexually abuses a prisoner can be found to have a sufficiently culpable state of mind to violate the prisoner's constitutional rights.

Accordingly, allegations of sexual abuse may meet both the subjective and the objective elements of the constitutional test, thereby stating an Eighth Amendment claim under Section 1983.

*Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) (citations and quotation marks omitted).

In Boddie, the plaintiff, a male inmate, made the following allegations of sexual abuse by Officer B. Schneider, a female corrections officer:

First, Boddie maintains that on March 3, 1993, Officer B. Schneider, a female corrections officer, "made a statement" that Boddie believed to be "a pass" at him, but that he "could not be sure."

Second, Boddie claims that on the next day, Schneider squeezed his hand, touched his penis, and said, "[Y]ou know your [sic] sexy black devil, I like you."

Third, Boddie alleges that on March 19, 1993, in Officer D. DeWald's presence, Schnieder stopped Boddie, accused him of wearing an orange sweatshirt, and told him to take off the sweatshirt. According to Boddie, he resisted, stating that he was a cardiac patient, that the hallway was very cold, and that he would give the sweatshirt to her when they returned to his cellblock. When Boddie began to walk past the officers, Schnieder stopped him, "bumping into [his] chest with both her breast so hard [he] could feel the points of her nipples against [his] chest." Boddie states that Schnieder did this to Boddie twice, pinning him to a door. When he tried to pass her again, Schnieder again bumped into him, this time "with her whole body vagina against penis pinning [him] to the door ."

**\*4** *Id.* at 859–60 (footnote omitted, alterations in original). The *Boddie* court affirmed the district court's Rule 12(b)(6) dismissal of the Eighth Amendment claim of sexual abuse, stating:

> [W]e agree with the district court that Boddie ... failed to state an Eighth Amendment claim. He asserts a small number of incidents in which he allegedly was verbally harassed, touched, and pressed against without his consent. No single incident that he described was severe enough to be "objectively, sufficiently serious." Nor were the incidents cumulatively egregious in the harm they inflicted. The isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.

*Id.* at 861.[2]

[2]    The Court rejects plaintiffs' contention that *Boddie v. Schneider,* 105 F.3d 857 (2d Cir.1997), no longer represents the Eighth Amendment sexual abuse standard in this Circuit. The Second Circuit has not revised the standard since issuing the *Boddie*

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 241 of 830
Crawford v. Cuomo, Not Reported in F.Supp.3d (2014)
2014 WL 897046

decision in 1997. Indeed, it has occasionally cited *Boddie* in connection with Eighth Amendment sexual assault claims. *See, e.g., Cash v. County of Erie,* 654 F.3d 324, 337, n. 6 (2d Cir.2011) (citing *Boddie* for the observation that "sexual abuse of a prisoner by a corrections officer short of sexual assault may, in some circumstances, violate the prisoner's right to be free from cruel and unusual punishment"), *cert. denied Erie County, N.Y. v. Cash,* 132 S.Ct. 1741 (2012); *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002) ( "Because [plaintiff's] allegations do not even rise to the level of those made by the plaintiff in *Boddie,* they do not state a claim for sexual harassment in violation of the Eighth Amendment to the United States Constitution."), *abrogated on other grounds by Porter v. Nussle,* 534 U.S. 516 (2002); *Boddie v. Davis,* 242 F.3d 364, *1 (2d Cir.2000) (Table) (affirming dismissal of sexual harassment claim on ground that allegations were insufficiently serious); *United States v. Walsh,* 194 F.3d 37, 49 and n. 8 (2d Cir.1999) (stating that "sexual abuse of a prisoner by a corrections officer may constitute cruel and unusual punishment"; noting that "the isolated incidents of unwanted touching in *Boddie* [were] insufficiently serious to state a cause of action."). A multitude of district court decisions, some of which are cited herein, have applied *Boddie* in evaluating inmate sexual abuse claims. The holding in *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 236–38 (S.D.N.Y.2005), relied upon by plaintiff, is contrary to Second Circuit precedent, *see Boddie,* 105 F.3d at 861, as well as the vast majority of district court decisions. *See Hilson v. Maltese,* 2012 WL 6965105, *8, n. 12 (N.D.N.Y. Dec. 14, 2012), *report and rec. adopted* 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013); *Harry v. Suarez,* 2012 WL 2589080 (S.D.N.Y. Jul. 3, 2012).

Applying *Boddie* to the claims herein, the Court finds that plaintiffs' Eighth Amendment sexual abuse claims fail to "state a claim to relief that is plausible on its face." *Twombly,* 550 U .S. at 570.[3] The Court first addresses the March 16, 2011 incident involving James Crawford. Summarized, Crawford's allegations are as follows. Prindle stopped him as he was leaving the mess hall, told him to place his hands on the wall, and began to search him. In the course of the search, Prindle ran his hands down Crawford's chest area, grabbed Crawford's penis and held it, then grabbed Crawford tightly around his neck and warned him to remain against the wall.

Prindle then pinned Crawford to the wall, pushed his knee in Crawford's back, again grabbed Crawford's crotch area; "squeezed and roamed with his hands around Mr. Crawford's penis and down his thigh," and then "pulled Mr. Crawford's pants tightly up past Mr. Crawford's waist." Prindle instructed Crawford to stay on the wall and "continued to squeeze and fondle the area around Mr. Crawford's penis." Prindle "then proceeded to run his hands down Mr. Crawford's legs, around the area of Mr. Crawford's ankles, and on the inside of the back of Crawford's boots." After once more instructing Crawford to face the wall, Prindle ordered him to continue on to his destination, and Crawford left the area.

3    The Court notes that *Boddie* was decided under the pre-*Twombly* standard, which allowed dismissal of a complaint only where it appeared "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957). The *Twombly* case, decided in 2007, held that pleadings must contain "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570. Therefore, the instant complaint is subject to a higher pleading standard than that applied in *Boddie.*

Crawford alleges conduct that is no more objectively severe than the conduct found insufficient in *Boddie* and numerous district court cases. He alleges only a single incident, which was not excessive in duration. *See, e.g., Harry v. Suarez,* 2012 WL 2053533, *3 (S.D.N.Y. Jun. 4, 2012) (granting summary judgment dismissing claim that corrections officer "groped [plaintiff's] genitals, buttocks, and inner thighs for up to fifty three seconds in the course of a frisk."); *Irvis v. Seally,* 2010 WL 5759149, *1, *4 (N.D.N.Y. Sept. 2, 2010), *report and rec. adopted* 2011 WL 454792 (N.D.N.Y. Feb. 4, 2011) (dismissing claim alleging three instances of sexual touching during strip searches); *Montero v. Crusie,* 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (granting summary judgment where plaintiff alleged that "on several occasions" corrections officer squeezed his genitals while pat-frisking him). Crawford was fully clothed during the incident, and he does not allege that Prindle touched him beneath his clothing. *Compare, e.g., Castro–Sanchez v. N.Y.S. Dep't of Corr. Servs.,* 2012 WL 4474154, *1 (S.D.N.Y. Sept. 28, 2012) (denying as futile leave to amend complaint to add Eighth Amendment claim alleging that corrections officer pulled down plaintiff's pants and groped his buttocks); *Morrison v. Cortright,* 397 F.Supp.2d 424, 425 (W.D.N.Y.2005) (dismissing Eighth Amendment claim which included allegations that corrections

2014 WL 897046

officer rubbed his penis against inmate's buttocks during strip frisk); *Williams v. Keane,* 1997 WL 527677, *1, *11 (S.D.N.Y. Aug. 25, 1997) (dismissing claim based on allegation that corrections officer put his hand down inmate's pants and fondled inmate's genitals during pat frisk). Crawford does not allege Pridle touched him with any part of his body except his hands (and, briefly, his knee). *Compare, e.g., Boddie,* 105 F.3d at 859–61 (affirming dismissal of claim alleging female corrections officer twice bumped into plaintiff's chest with her breasts, pinning him to a door, then bumped into him "with her whole body vagina against penis pinning [him] to the door."); *Morrison,* 397 F.Supp.2d at 424–25 (dismissing claim alleging corrections officer rubbed his penis against inmate's buttocks during strip frisk). Further, Crawford does not allege physical injury, penetration, or pain. *Compare, e.g., Jones v. Rock,* 2013 WL 4804500, *19 (N.D.N.Y. Sept. 26, 2013) (dismissing sexual abuse claim alleging corrections officer "pulled plaintiffs pants up as high as they would go causing him to winch [*sic* ] in pain"; "shoved his fingers between plaintiffs buttock[s] with such force that one of his fingers ... ultimately invad[ed] plaintiff's anus"; and "groped plaintiff genitals and squeezed them until plaintiff cried out in pain"; court noted that plaintiff did not allege physical injury); *McEachin v. Bek,* 2012 WL 1113584, *6 (W.D.N.Y. Apr. 2, 2012) (granting summary judgment dismissing claim based on one incident in which plaintiff was touched without his consent, and which did not involve actual penetration); *Sanders v. Gifford,* 2011 WL 1792589, *1–*2 (N.D.N.Y. Apr. 5, 2011), *report and rec. adopted* 2011 WL 1792917 (N.D.N.Y. May 11, 2011) (dismissing under 28 U.S.C. § 1915A and 28 U .S.C. § 1915(e)(2)(B)(ii) plaintiff's claim alleging corrections officer grabbed his scrotum and squeezed hard causing him "severe pain and suffering."). In sum, Crawford's claim is indistinguishable from the claims dismissed by numerous district courts in this Circuit on the ground that "isolated instances ... of fondling and groping" are not sufficiently severe to support an Eighth Amendment cause of action. [4] *Harry,* 2012 WL 2053533 at *3 (quoting *Garcia v. Watts,* 2009 WL 2777085, *7 (S.D.N.Y. Sept. 1, 2009)).

[4] The alleged threats and sexual comments do not elevate the incident to one of federal constitutional proportions. *See, e.g., Irvis,* 2010 WL 5759149 at *1, *4 (dismissing complaint alleging corrections officer engaged in three instances of sexual touching during strip searches and on another occasion offered plaintiff cigarettes for sexual favors and "told plaintiff that he would 'satisfy [plaintiff] better than any woman could and began

to describe his oral sex techni[que].' "); *Montero,* 153 F.Supp.2d at 373, 375 (granting summary judgment dismissing claim that corrections officer squeezed plaintiff's genitals while pat-frisking him, offered plaintiff extra privileges in exchange for sexual favors, and made a series of death threats when plaintiff refused).

 **\*5** For the same reasons, Thaddeus Corley's allegations fail to state an Eighth Amendment claim. The complaint alleges that Prindle interrupted Corley's spousal visit; escorted him out of the visiting room; stated he was "going to make sure Mr. Corley did not have an erection"; ordered Corley to "put his hands against the wall held high with his feet spread apart"; and pat frisked him, pausing "to fondle and squeeze Mr. Corley's penis." When Corley "jumped off the wall and asked Officer Prindle what he was doing," Prindle responded "by threatening Mr. Corley and telling him to get back on the wall." This single, brief incident was not severe enough to be objectively, sufficiently serious as required by *Boddie.*

Based on the above, the Court finds that, under settled Second Circuit law, the first cause of action fails to state an Eighth Amendment claim on behalf of either plaintiff. The first cause of action is dismissed.

The second cause of action asserts section 1983 supervisory liability claims against Superintendent William P. Brown for deliberate indifference to Prindle's sexual abuse of inmates in violation of their Eighth Amendment rights. To establish supervisory liability, a plaintiff must establish the supervisor's personal involvement in a constitutional violation by showing that he participated directly in the constitutional violation; was informed of the violation but failed to remedy the wrong; created or permitted a policy or custom under which unconstitutional practices occurred; was grossly negligent in supervising subordinates who committed unconstitutional acts; and/or exhibited deliberate indifference to the rights of inmates by failing to act on evidence that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Here, plaintiffs do not plead that Brown participated directly in the alleged constitutional violations. Rather, plaintiffs claim that Brown "was personally aware that Officer Prindle had repeatedly engaged in the sexual abuse of inmates" at ECF; "personally signed off on more [than] twenty grievances alleging similar or identical conduct by Officer Prindle in 2010 and 2011"; "nonetheless permitted Officer Prindle to continue to engage in pat frisks and other hands-on contact with inmates, thus affording him multiple opportunities to continue to abuse them sexually"; and "thus

either intentionally caused Officer Prindle to sexually abuse inmates as a means of controlling them, or was deliberately indifferent to a serious risk to the safety of all inmates who came into contact with Officer Prindle." Inasmuch as plaintiffs fail to plead plausible claims that Prindle's alleged conduct towards them violated their Eighth Amendment rights, they cannot plausibly plead that Brown violated their Eighth Amendment rights by failing to remedy Prindle's conduct; by creating or permitting a policy or custom pursuant to which Prindle's conduct occurred; by supervising Prindle in a grossly negligent manner; or by exhibiting deliberate indifference to their Eighth Amendment rights. Thus, there is no basis for plaintiffs to pursue section 1983 supervisory liability claims against Brown arising from Prindle's alleged conduct towards them. To the extent that plaintiffs intend to assert supervisory liability claims on behalf of other inmates, they lack standing to do so. *See generally Allen v. Wright,* 468 U.S. 737, 751 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."); *Warth v. Seldin,* 422 U.S. 490, 499 (1975) ("[A] plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). The second cause of action is dismissed.

**\*6** The third cause of action alleges deliberate indifference on the part of the John Doe defendants for failing to intervene in Prindle's violation of plaintiffs' rights during the two alleged incidents. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988) ("A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers."). Having failed to plead facts supporting plausible claims that Prindle violated their Eighth Amendment rights during the two incidents, plaintiffs fail to plead viable Eighth Amendment claims against the John Doe defendants. *See, e.g., Tavares v. City of N.Y.,* 2011 WL 5877550, \*7 (S.D.N.Y. Oct. 17, 2011) ("There can be no failure to intervene ... where there was no constitutional violation."), *report and rec. adopted* 2011 WL 5877548 (S.D.N.Y. Nov 23, 2011). The third cause of action is dismissed.

The fourth cause of action seeks section 1983 injunctive relief, alleging that "the ongoing presence of defendant Prindle as an officer at [ECF] presents an immediate, ongoing risk to Mr. Corley['s] health, safety and well-being" and that "Mr. Corley is at imminent risk of again having his Constitutional rights violated." [5] The "Wherefore" clause of the complaint asks the Court to enjoin defendants "from

permitting Officer Prindle from having any contact with inmates." Because the complaint does not plausibly plead that Prindle violated Corley's constitutional rights, there is no basis for an injunction on behalf of Corley. Corley lacks standing to request an injunction on behalf of other inmates. The fourth cause of action is dismissed.

[5]   As noted, the complaint states that Crawford has recently been released on parole and that Corley continues in custody at ECF.

Plaintiffs do not seek leave to file an amended complaint. The complaint, prepared by counsel, sets forth detailed allegations regarding both incidents, the essential facts of which are within plaintiffs' own knowledge. There is no indication that plaintiffs are in possession of additional facts regarding the two incidents. Rather than seeking leave to amend, plaintiffs consistently argue that the facts detailed in the complaint are sufficient to state valid Eighth Amendment claims. The problem with plaintiffs' federal causes of action "is substantive; better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000). Thus, the first four causes of action are dismissed without leave to replead.

The remaining causes of action—the fifth cause of action for common law assault, the sixth and seventh for violations of New York's Penal Law, and the eighth against the John Doe defendants for aiding and abetting—assert only state law claims. [6] Having dismissed all federal law claims, and in view of the very early stage of the case and the number of state law claims, the Court finds that judicial economy, convenience, fairness, and comity all point toward relinquishing jurisdiction. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988); *Kolari v. New York– Presbyterian Hosp.,* 455 F.3d 118, 119 (2d Cir.2006). Therefore, the Court does not address causes of action five through eight. They are dismissed without prejudice.

[6]   Violations of state law that do not rise to the level of federal constitutional violations cannot form the basis of a federal claim under 42 U.S.C. § 1983. *See Cook v. Sheldon,* 41 F.3d 73, 77 (2d Cir.1994).

### CONCLUSION

**\*7** It is therefore

ORDERED that defendants' motion (Dkt. No. 9) to dismiss the complaint is granted and the complaint is dismissed in its entirety.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 897046

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Cole v. Suffolk County Correctional Facility, Not Reported in Fed. Supp. (2020)

2020 WL 2113205

KeyCite Yellow Flag - Negative Treatment

Distinguished by Russell v. Scott, D.Vt., April 10, 2024

2020 WL 2113205
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Anthony M. COLE, Plaintiff,
v.
SUFFOLK COUNTY CORRECTIONAL
FACILITY et al., Defendants.

20-cv-1883 (BMC) (AYS)
|
Signed 05/02/2020
|
Filed 05/04/2020

**Attorneys and Law Firms**

Anthony M. Cole, Riverhead, NY, pro se.

<u>**MEMORANDUM DECISION AND ORDER**</u>

COGAN, District Judge.

**\*1** Plaintiff *pro se*, a prisoner in the Suffolk County Correctional Facility, brings this § 1983 lawsuit against two correctional facilities, the Suffolk County Sheriff's Office, three sheriff's deputies, and three corrections officers. Although plaintiff's complaint identifies several acts of misconduct by certain prison and law enforcement personnel, none of the alleged acts rises to the level of a constitutional violation.

**BACKGROUND**

Plaintiff is currently incarcerated in the Suffolk County Correctional Facility in Riverhead, New York, although it isn't clear whether he is a pre-trial detainee or a convicted prisoner. He alleges two separate instances of genital contact by two different sheriff's deputies; one instance of allegedly inappropriate contact during a frisk search by a corrections officer; one instance of verbal mistreatment by a corrections officer; and various instances of being denied access to court proceedings and certain prison amenities.

The first incident occurred when plaintiff was pulled out of his cell for a pat frisk. Plaintiff alleges that he was instructed to exit his cell and place his hands on the bars for the search. During the frisk, "Correction Officer John Doe #1 pulled [plaintiff's] uniform pants back [along with] his underwear and looked at [his] rear end and then pulled them up into [his] rear end." The next day, plaintiff filed a complaint with Internal Affairs and met with investigators the day after that.

The second incident occurred a few weeks later. Upon returning from the prison medical unit, plaintiff "inquired with Correction Officer John Doe #2 if [he] would be allowed to receive the remaining time out for recreation." Plaintiff also asked if, as an alternative, he could use his remaining recreation time to make a phone call. Apparently without receiving an answer, plaintiff began walking outside when the corrections officer started to yell at him, saying things like "[d]on't you turn your back to me when I'm talking to you" and "[y]ou're going to end up like the other s__t that came back from medical [who] [h]ad the nerve to give me mouth." Later that day, the same corrections officer again berated plaintiff about "running [his] mouth," although plaintiff maintains he never said anything else to the officer. Presumably because of this interaction, plaintiff was denied one hour of exercise time, one hour of phone usage, and the ability to take a shower that day.

The third incident occurred in February 2020 when, at the "booking section" of the Yaphank Correctional Facility, a sheriff's deputy (who plaintiff refers to as Sheriff Deputy John Doe #1) began to pat frisk plaintiff. During the frisk, the deputy groped plaintiff's genitals. Later, while the inmates were boarding the bus back to Suffolk County Correctional Facility, that same deputy took a photograph of plaintiff with his phone camera. Plaintiff filed a grievance regarding the deputy's conduct, but no administrative action was taken.

The fourth incident occurred about a month later, again in the "booking section of Yaphank Correctional Facility during the Riverhead Correctional Facility return run." This time, however, it was "Sheriff Deputy John Doe #2" who groped plaintiff "several times." After the first time, plaintiff told the deputy to "watch his hands." In response, the deputy "became more aggressive while pat frisking [plaintiff]" and continued to grope plaintiff's penis and scrotum. Upon plaintiff complaining to the deputy that this conduct violated his rights, "Sheriff Deputy #3" approached plaintiff from behind and whispered in his ear that plaintiff should be quiet, "or else."

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 246 of 830

Cole v. Suffolk County Correctional Facility, Not Reported in Fed. Supp. (2020)

2020 WL 2113205

**\*2** Plaintiff also alleges that, on various occasions in 2019 and 2020, he was denied certain privileges, including "the right of access to the courts," the "right to make electronic testimony before Bronx Family Court," and "the right to make an appearance" at several other court proceedings despite court documents ordering that he attend via telephone.

Based on the foregoing, plaintiff alleges that he suffered psychological and emotional harm from defendants' physical and sexual abuse, excessive force, and official misconduct. For these various claimed injuries, plaintiff seeks $7,000,000 in damages.

## DISCUSSION

*Pro se* complaints are "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted). However, they must still plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), and to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Although the Court assumes all factual allegations contained in the complaint to be true, this principle is "inapplicable to legal conclusions." Id.

Under 28 U.S.C. § 1915(e)(2)(B), the Court must dismiss an *in forma pauperis* action if it determines that the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief from a defendant who is immune from such relief." An action "is frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998) (internal quotation marks and citation omitted).

A claim alleging deprivation of rights under 42 U.S.C. § 1983 requires that a plaintiff demonstrate that the challenged conduct was "committed by a person acting under color of state law," and that the conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010). Furthermore, a plaintiff must show that each of the named defendants was personally involved in

the wrongdoing or misconduct complained of. See Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

Most of this complaint evidences nothing more than that plaintiff wasn't treated kindly by the prison staff overseeing him, which does not state a claim under § 1983. See Banks v. Cty of Westchester, 168 F. Supp. 3d 682, 691 (S.D.N.Y. 2016) ("[C]ourts have consistently held that 'the mere allegation of verbal abuse, however repugnant it may be, does not rise to the level of a constitutional violation and is not cognizable under § 1983.") (quoting Webster v. Fischer, 694 F. Supp. 2d 163, 187 (N.D.N.Y. 2000), aff'd, 398 F. App'x 683 (2d Cir. 2010) and citing cases). Moreover, even certain recognized protections from state intrusion and mistreatment in the normal course are voided while under incarceration. See Hudson v. Palmer, 468 U.S. 517, 542 (1983) ("[I]mprisonment carries with it the circumscription or loss of many significant rights."); Bell v. Wolfish, 441 U.S. 520, 546 (1979) ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees.").

**\*3** Thus, to the extent plaintiff is pursuing causes of action for verbal abuse and the limited curtailment of his phone, recreation, and shower privileges, his allegations do not state a claim under the Constitution or laws of the United States. In addition, although plaintiff complains of not receiving access to the courts on certain dates, the instant complaint demonstrates that his rights in this regard have not been cut off completely, even if they have been delayed. See Banks, 168 F. Supp. 3d at 693-94 ("Plaintiff's ability to ultimately pursue his legal claims in this Court necessarily precludes a constitutional claim based on denial of access to the courts.").[1]

1    Plaintiff also alleges that he was "denied the right to make an appearance" in Bronx Family Court, where he was scheduled to "make electronic testimony" before Magistrate Judge Paul Ryneski. However, the Court isn't aware of a federal provision safeguarding a right to testify in a civil case. To the extent plaintiff suffered any negative repercussions from not testifying or appearing – which might conceivably trigger some due process concerns – he has not stated so in his complaint.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 247 of 830
Cole v. Suffolk County Correctional Facility, Not Reported in Fed. Supp. (2020)
2020 WL 2113205

Turning to the allegations concerning physical contact, plaintiff's description of the deputies' genital groping is inadequate to state a claim under § 1983. Instances of sexual contact by prison officials violate the constitution if they disturb "contemporary standards of decency" and are "objectively, sufficiently serious enough." See Boddie v. Schneider, 105 F.3d 857, 861 (2d Cir. 1997) (*colatus* [2]); see also Thompson, 284 F.3d at 416-18; Liner, 196 F.3d at 135. "[A]n inmate pursuing a sexual abuse claim under the Eighth Amendment must allege both subjective and objective elements, namely that the 'officer's intentional contact with an inmate's genitalia or other intimate area ... serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate.' " Lewis v. Huebner, No. 17-cv-8101, 2020 WL 1244254, at *9 (S.D.N.Y. Mar. 16, 2020) (quoting Crawford v. Cuomo, 796 F.3d 252, 257 (2d Cir. 2015)).

[2]    I.e., edited citation.

In applying this standard, courts have held that "brief contact with an arrestee's ... genital area during a pat-down, without more, is insufficient" to state a constitutional claim. Scalpi v. Amorim, No. 14-cv-2126, 2018 WL 1606002, at *18 (S.D.N.Y. Mar. 29, 2018). Even allegations that a corrections officer "rub[bed] plaintiff's inner thighs, buttocks, and genitals in increments of four to five ... seconds ... lasting between forty-three and fifty-three seconds" during a frisk have been held insufficient to sustain an Eighth Amendment claim. See Harry v. Suarez, No. 10-cv-6756, 2012 WL 2053533, at *3 (S.D.N.Y. June 4, 2012). And allegations that a corrections officer repeatedly fondled a prisoner's testicles during a frisk have likewise failed to state an Eighth Amendment claim. See Williams v. Keane, No. 95-cv-379, 1997 WL 527677, at *9-11 (S.D.N.Y. Aug. 25, 1997).

Although a convicted prisoner's sexual abuse claims are analyzed under the Eighth Amendment, a "pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment." See Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). In general, a pretrial detainee's "due process rights ... are at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere v. Massachusetts, 463 U.S. 239, 244 (1983). Yet despite differences between the Eighth and Fourteenth Amendments in certain contexts, courts in this Circuit apply "the established Eighth Amendment framework for claims of sexual abuse by prison officials" to pretrial detainees. See

Harry v. Suarez, No. 10-cv-6756, 2012 WL 2053533, at *2 n.3 (S.D.N.Y. June 4, 2012) (citing cases). [3]

[3]
However, some cases indicate that the Fourteenth Amendment standard may be satisfied by a lesser showing than is required under the Eighth Amendment. See Lewis, 2020 WL 1244254, at *9 (colatus) ("[I]t is presently unclear whether both prongs required for Eighth Amendment sexual abuse claims are also required for claims of sexual abuse under the Fourteenth Amendment.").

*4  In this case, the complaint fails to state a claim under either the Eighth or Fourteenth Amendment. Plaintiff alleges two instances of "groping," which is itself a vague term. And those instances do not appear to have been particularly lengthy or violent, as the frisks were carried out in the public "booking section" of a correctional facility in the presence of a busload of other people. The better-described incident of the two, in which plaintiff alleges that the deputy, while performing a frisk, "grop[ed] my penis and scrotum and then br[ought] his forearm into my scrotum," is too similar to the type of incidental contact accompanying a run-of-the-mill pat down to reasonably infer any inappropriate touching or malicious intention. The other incident, about which plaintiff only alleges that the deputy "also groped my genitals during the pat frisk," describes even less contact, although the fact that the deputy later took a photograph of plaintiff on the bus is certainly a detail that could point to his "intent to ... humiliate the inmate.' " Lewis, 2020 WL 1244254, at *9. In sum, neither of these incidents, as set forth in the complaint, "involve a harm of federal constitutional proportions as defined by the Supreme Court." See Boddie, 105 F.3d at 861-62 (citing Farmer v. Brennan, 511 U.S. 825, 833-34 (1994); Rhodes v. Chapman, 452 U.S. 337, 348-49 (1981)).

Nor does the allegation that "Correction Officer John Doe #1 pulled [plaintiff's] uniform pants back [along with] his underwear and looked at [his] rear end and then pulled them up into [his] rear end" state a claim under § 1983. Slight contact of this sort is to be expected during a frisk. Plaintiff does not aver that the officer was particularly rough or that he acted with aggression towards plaintiff or that he caused any injury. At most, the Court can infer from plaintiff's description is that he suffered a mild wedgie as a result of the officer pulling plaintiff's pants back up.

2020 WL 2113205

## CONCLUSION

The complaint is dismissed. Plaintiff's [2] request to proceed *in forma pauperis* is granted. In light of plaintiff's *pro se* status, the Court will permit him to file an amended complaint within 20 days from the date of this Order if he believes that he left out any material information in his first complaint. Plaintiff must also state whether he is a pre-trial detainee or a convicted prisoner. The amended complaint must be labeled "Amended Complaint" and include the index number of this case (20-cv-1883). This amended complaint will completely replace plaintiff's original complaint.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 2113205

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2193376

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by  Russell v. Scott,   D.Vt.,   April 10, 2024

2022 WL 2193376
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Angelo CARZOGLIO, Plaintiff,
v.
Thomas ABRAMS, Defendant.

18-CV-04198 (PMH)
|
Signed 06/17/2022

**Attorneys and Law Firms**

Angelo A. Carzoglio, Attica, NY, Pro Se.

Sean Timothy Carey, Westchester County Attorney's Office, White Plains, NY, for Defendant.

**MEMORANDUM OPINION AND ORDER**

PHILIP M. HALPERN, United States District Judge:

 **\*1**  Angelo Carzoglio ("Plaintiff"), presently incarcerated at the Attica Correctional Facility and proceeding *pro se* and *in forma pauperis*, brings this action under 42 U.S.C. § 1983 against Thomas Abrams ("Defendant"), a former captain in the Westchester County Department of Corrections ("WCDOC"). (Doc. 57, "Am. Compl."). Plaintiff alleges that Defendant: (i) subjected him to a strip search in violation of the Fourth Amendment; (ii) searched his cell in violation of the Eighth Amendment; (iii) sexually abused him in violation of the Eighth Amendment; and (iv) denied him access to courts in violation of the First Amendment. (*See generally id.*).

Plaintiff commenced this action on May 10, 2018. (Doc. 2). On February 25, 2020, Judge Roman, before whom this matter proceeded before it was reassigned to this Court on April 3, 2020, issued an Opinion and Order dismissing all of Plaintiff's claims except for a Fourth Amendment claim asserted against Defendant, and granting Plaintiff leave to file an amended complaint. (Doc. 56 at 17-18). Plaintiff, on March 16, 2020, filed an Amended Complaint against Defendant and WCDOC, alleging four claims for relief. (Doc. 57). On April 6, 2020, Defendant filed an Answer to the Amended Complaint. (Doc. 59). On April 27, 2020, WCDOC moved to dismiss the Amended Complaint for failure to state a claim for relief. (Doc. 61). On February 3, 2021, the Court dismissed the four claims for relief in the Amended Complaint as asserted against WCDOC. (Doc. 71).

Discovery was completed on the four claims for relief alleged in the Amended Complaint against Defendant on August 1, 2021. (Doc. 81). Defendant then filed his motion for summary judgment on December 16, 2021, in accordance with a briefing schedule set by the Court. (Doc. 98; Doc. 99; Doc. 100, "Def. 56.1"; Doc. 101; Doc. 102, "Def. Br."). Plaintiff, on January 6, 2022, filed a letter—which the Court construes as his opposition to the instant motion—alongside a purported Rule 56.1 Statement. (Doc. 103, "Opp. Br."; Doc. 106, "Pltf. 56.1"). Plaintiff's 56.1 Statement, is dated December 16, 2021, one week past the deadline set by this Court to file same. (Pltf. 56.1; *see also* Docs. 93, 95). Defendant seeks, on this basis, to preclude Plaintiff's Rule 56.1 Statement as untimely. (Doc. 107, "Reply" at 6-7). The Court, in exercising its discretion, considers the content of Plaintiff's late statement in connection with the instant motion. [1]  The Court, however, only considers those responses that are supported by admissible record evidence to controvert the factual statements set forth in Defendant's Local Civil Rule 56.1 Statement. Statements made by Defendant that are supported by admissible evidence and not refuted by Plaintiff will be deemed admitted. See *Mirza v. Garnet Health*, No. 20-CV-00556, 2022 WL 826410, at \*2 n.6 (S.D.N.Y. Mar. 17, 2022) ("[S]tatements in the 56.1 Counterstatement supported by admissible evidence and not refuted with citation to admissible evidence provided to the Court are deemed admitted."). [2]

---

1    *See Vasquez v. Yadali*, No. 16-CV-00895, 2022 WL 1597693, at \*2 n.6 (S.D.N.Y. May 19, 2022) (considering the substance of the plaintiff's arguments in various filings as responses to the defendants' Rule 56.1 statement even when the plaintiff did not submit a statement of his own); *Casanova v. Maldonado*, No. 17-CV-01466, 2021 WL 3621686, at \*2 n.4 (S.D.N.Y. Aug. 16, 2021) (same, noting that "[w]hile *pro se* litigants are ... not excused from meeting the requirements of Local Rule 56.1 ... where a *pro se* plaintiff fails to submit a proper Rule 56, 1 Statement in opposition to a summary judgment motion, the Court retains

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 250 of 830

Carzoglio v. Abrams, Not Reported in Fed. Supp. (2022)

2022 WL 2193376

some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (quoting *Wiggins v. Griffin*, No. 18-CV-07559, 2021 WL 706720, at *1 n.1 (S.D.N.Y. Feb. 22, 2021) (alterations in original))).

2      *See also Wilson v. Annucci*, No. 18-CV-00391, 2020 WL 1979210, at *3 (N.D.N.Y. Apr. 23, 2020) (noting that *pro se* plaintiff's opposing a motion for summary judgment were "required to submit admissible evidence"), *adopted by* 2020 WL 5229375 (N.D.N.Y. Sept. 2, 2020); Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

 **\*2** Defendant's motion for summary judgment was fully submitted upon the filing of his reply brief on January 31, 2022. For the reasons set forth below, Defendant's motion is GRANTED.

## BACKGROUND

The Court recites the facts herein only to the extent necessary to adjudicate the extant motion and draws them from: (1) the Amended Complaint; (2) Defendant's Rule 56.1 Statement; (3) Plaintiff's 56.1 Statement; and the Declaration of Sean T. Carey along with the exhibits annexed thereto (Doc. 98, "Carey Decl."), which include *inter alia*: (i) Defendant's Affidavit, sworn to on September 22, 2021 (Doc. 98-4, "Def. Aff."); (ii) a transcript of Plaintiff's deposition, conducted on May 21, 2021 (Doc. 98-5, "Pltf. Dep."); and relevant video footage (Doc. 98-10).[3]

3      Copies of the video recordings were provided to Chambers on a CD, The Court cites the placeholder docket entry number (i.e., Doc. 98-10) when referencing portions of the videos herein.

Plaintiff's claims all arise from a series of searches conducted on May 19, 2017 and June 8, 2017. (Def. 56.1 at 2). Plaintiff, at all relevant times, was a convicted prisoner at Westchester County Jail ("WCJ"). (*Id.*). Defendant was a captain in WCDOC at WCJ until he retired on June 12, 2017. (*Id.*).

Defendant's last day working at WCJ was on June 6, 2017. (*Id.* at 12).

### I. The May 19, 2017 Searches

Five searches were conducted of Plaintiff on May 19, 2017. (*Id.* at 3). The "first search" occurred in the WCJ law library at approximately 7:55 PM. (*Id.*). Defendant ordered this search, whereby CO. Curry ("Curry") conducted a pat and frisk of Plaintiff and five other inmates. (*Id.* at 3-4; Doc. 98-10 at 19:59:45-20:00:51). Sergeant Alfred Lombardo ("Lombardo") saw Plaintiff shortly thereafter, on camera in the library, remove an unidentified object from an accordion folder and take it into an area of the library not visible to the camera. Plaintiff remained out of view for nearly four seconds until another inmate came to the same corner a few seconds later. (*Id.* at 4; Doc. 98-10 at 20:03:57-20:04:21). Plaintiff explains in his deposition that the corner in the blindspot is where he stores legal documents in a filing cabinet that is only accessible to him and one other inmate, whom he could not name. (Pltf. Dep. 24:15-26:24). Based on this activity, Lombardo ordered Curry and CO. Rodriguez ("Rodriguez") to return to the law library and conduct the "second search" and advised Defendant of his order, (Def. 56.1 at 5). During the second search, Plaintiff alleges that Curry inappropriately touched his buttocks. (Pltf. Dep. at 16:25-17:1).

After reviewing video footage of the first two searches, Defendant ordered Curry and Rodriguez to return to the law library for the third and fourth searches. (Def. 56.1 at 6). Defendant purports to have ordered the third and fourth searches in part due to knowledge of Plaintiff's discipline report from February 2016 for concealing a weapon.[4] (*Id.* at 5; *see also* Doc. 98-6).

4      Plaintiff admits to having incurred this citation for concealing a piece of wood in his underwear. (Pltf. Dep. at 67:19-20).

The "third search" occurred when Curry and Rodriguez conducted a search of the law library, (Def. 56.1 at 6). The "fourth search" was a strip search conducted by Curry and Rodriguez in the male booking area of WCJ, where Sergeant Derrick McWilliams ("McWilliams") was working as the booking supervisor. (*Id.* at 7). Plaintiff alleges that McWilliams made "sexual comments" to Plaintiff while he was naked, and that Curry and Rodriguez were amused by the comments. (Pltf. 56.1 at 3). Defendant ordered the final search of May 19, 2017 at approximately 9:30 PM, after Plaintiff returned to his cell. (Def. 56.1 at 8). Defendant is unable to

Carzoglio v. Abrams, Not Reported in Fed. Supp. (2022)

2022 WL 2193376

recall if he ordered this search because of Plaintiff's conduct or if it was a random and/or routine search of Plaintiff's housing block. (*Id.*). Plaintiff maintains that, during the "fifth search," Curry and Rodriguez searched his cell and that Curry conducted another pat and frisk of Plaintiff, once again groping his buttocks and laughing while doing so. (Pltf. Dep. at 20:3-4).

II. The June 8, 2017 Searches

**\*3** Plaintiff alleges that, on June 8, 2017, two additional searches were conducted by WCJ staff—a search of the materials with him at the law library and a strip search in the male booking area. (Pltf. 56.1 at 5-6). Although Defendant was not working at WCJ on that day, Plaintiff argues that fact "doesn't mean [Defendant] didn't order [the searches]." (*Id.* at 6). Plaintiff alleges that the officers who searched him on June 8th told him that Defendant ordered the searches. (*Id.*).

This litigation followed.

**STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at \*1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial ...." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir.

2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts ...." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at \*2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir, 2004)).

Should there be no genuine issue of material fact, the movant must establish also its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when ... law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (explaining that summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant ... is proper").

**\*4** The Court is, of course, mindful that "[p]*ro se* litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." *Mortimer v. City of New York*, No. 15-CV-07186, 2018 WL 1605982, at \*9 (S.D.N.Y. Mar. 29, 2018) (internal quotation marks omitted). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff." *Adams v. George*, No. 18-CV-02630, 2020 WL 5504472, at

Carzoglio v. Abrams, Not Reported in Fed. Supp. (2022)

2022 WL 2193376

*5 (S.D.N.Y. Sept. 8, 2020). This status does not, however, excuse a *pro se* litigant from making the showing required to defeat summary judgment; he or she must offer more than "bald assertions, completely unsupported by evidence" to overcome the motion. *Wisdom v. Loiodice*, No. 17-CV-04837, 2020 WL 4431590, at *4 (S.D.N.Y. May 31, 2020); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (explaining that the mere fact that a litigant is *pro se* "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment" (internal quotation marks omitted)); *Ross v. Koenigsmann*, No. 14-CV-01321, 2017 WL 9511096, at *1 (N.D.N.Y. Aug. 16, 2017), *adopted sub nom. Ross v. Mannava*, 2017 WL 4338883 (N.D.N.Y. Sept. 29, 2017).

However, the degree of special solicitude due a *pro se* litigant depends upon that particular party's litigation experience, as "the degree of solicitude may be lessened where the particular *pro se* litigant is experienced in litigation and familiar with the procedural setting presented." *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010). The Court takes note of Plaintiff's litigation experience, as he described it in his deposition on May 22, 2021. Plaintiff states therein that he is "[n]ot only interest[ed] [in the law], but ... actually studying and hopefully in the near future ... taking [the] Bar exam." (*id.* at 23:12-15), Plaintiff also states in the same deposition that he is litigating four currently pending cases *pro se*—this matter, two civil cases, and a criminal case (*id.* at 14:5-8)—that he has "read a lot of case law" (*id.* at 62:5), and that he gives legal advice to other inmates in their ongoing cases (*id.* at 22). Despite this purported wealth of legal experience, the Court will, nevertheless, grant Plaintiff *pro se* special solicitude in reviewing his opposition papers.

## ANALYSIS

Plaintiff's claims against Defendant are made pursuant to 42 U.S.C. § 1983. That statute provides, in pertinent part, that "[e]very person who, under color of any statute ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." 42 U.S.C. § 1983. "[T]his language does not create substantive rights; rather, it creates a mechanism by which individuals can vindicate the violation of rights secured elsewhere." *Santucci v. Levine*, No. 17-CV-10204, 2021 WL 76337, at *3 (S.D.N.Y. Jan. 8, 2021). Plaintiff makes four claims for relief under § 1983: (i) a strip search

claim under the Fourth Amendment; (ii) a cell search claim under the Eighth Amendment; (iii) a sexual abuse claim under the Eighth Amendment; and (iv) an access to courts claim under the First Amendment. (*See generally* Am. Compl.). The Court addresses these claims *seriatim*.

### I. Claim No. 1: The Strip Search Claim (Fourth Amendment)

Plaintiff's first claim for relief is grounded in the Fourth Amendment and is based on the fourth search of May 19, 2017 and the strip search of June 8, 2017.

### A. The May 19 Strip Search

Although Plaintiff complains of five searches conducted on May 19, only the fourth search that day is relevant to the strip search claim. Defendant admits that he ordered the fourth search. (Def. 56.1 at 6). During that search, Curry and Rodriguez brought Plaintiff into the male booking area and conducted a strip search with the booking supervisor, McWilliams, present. (*Id.* at 7). Plaintiff contends that McWilliams, looking on, made "verbal, sexual comments" to him while he was naked. (Pltf. 56.1 at 3).

 *5 The Fourth Amendment prohibits only unreasonable searches, *Carroll v. United States*, 267. U.S. 132, 147 (1925). "There is a long-established principle that the routine, random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment." *Vaughn v. Strickland*, Nos. 12-CV-02696, 12-CV-03335, 12-CV-02995, 12-CV-03333, 2013 WL 3481413, at *4 (S.D.N.Y. July 11, 2013) (internal quotation omitted). "Nevertheless, 'the Fourth Amendment still requires all searches conducted within a prison, including strip searches, to be reasonable.' " *Id.* (quoting *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006), *aff'd*, 461 F. App'x 18 (2d Cir. 2012)).

The test of reasonableness under the Fourth Amendment requires a balancing of the need for the search against the invasion of personal rights that it entails. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In that regard, "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Torres v. City of New York*, No. 17-CV-06604, 2019 WL 4784756, at *5 (S.D.N.Y. Sept. 30, 2019). Notwithstanding, "inmates retain a limited right to bodily privacy under the Fourth Amendment." *Harris*

Carzoglio v. Abrams, Not Reported in Fed. Supp. (2022)

2022 WL 2193376

*Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 253 of 830*

*v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (noting that "maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy").

"[I]f the inmate's Fourth Amendment claim challenges an isolated search [such as the strip search on May 19], courts typically apply the standard set forth in *Bell v. Wolfish*." *Harris*, 818 F.3d at 58 (internal citation omitted). The *Bell* four-factor test of reasonableness requires courts to consider: (1) the scope of the intrusion; (2) the manner in which the search was conducted; (3) the justification for commencing the search; and (4) the place in which the search was conducted. *Torres*, 2019 WL 4784756, at *5 (citing *Bell*, 441 U.S. at 559).

There is no doubt, upon application of the *Bell* factors, that the strip search on May 19 was reasonable.

As regards the first *Bell* factor (i.e, the scope of the intrusion), the Second Circuit has stated that there are two relevant issues to consider: (i) the type of search; and (ii) the sex of the person conducting it. *Harris*, 818 F.3d at 58. It is undisputed that the type of search conducted in the fourth search was a "strip search" (Def. 56.1 at 6; Pltf. 56.1 at 3), which is "an inspection of a naked individual, without any scrutiny of the subject's body cavities." *Harris*, 818 F.3d at 58. Such a search is inherently invasive because "[a] strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy." *Id.* (internal quotation omitted). However, as to the person conducting the search, the officers were the same sex as the Plaintiff, (Def. 56.1 at 6). Thus, unlike in *Harris*, the first *Bell* factor as to the scope of the intrusion weighs in favor reasonableness. *Harris*, 818 F.3d at 59 (finding cross-gender strip searches to aggravate the scope of the intrusion); *see also Sankara v. Plaskett*, No. 15-CV-08470, 2017 WL 4444250, at *3 (finding reasonable a strip search performed by a member of the same sex).

The remaining *Bell* factors similarly weigh in favor of reasonableness. The propriety of the manner of the strip search, which did not involve any inappropriate touching, is uncontroverted. (Def. 56.1 at 6-7; Pltf. Dep. at 31:13-20). "A strip search conducted in a professional manner is more reasonable than one that is not." *Harris*, 818 F.3d at *59-60. The record here is barren of any evidence that the search was conducted in anything but a professional manner, as there was no violence or coercion involved. [5] *See Sankara*, 2017

WL 4444250 at *3 (finding the manner of search reasonable where "there [were] no allegations of force or other abusive behavior").

[5]    Even if McWilliams made inappropriate comments, as Plaintiff maintains, that would not alter the conclusion as to the second *Bell* factor. *See Vann*, 2018 WL 6199860, at *5 ("[A]n officer's inappropriate comments, without additional allegations such as physical or sexual abuse, do not make unreasonable an otherwise reasonable search.") (citing *Malik v. City of New York*, 2012 WL 3345317, at *13 (S.D.N.Y. Aug. 15, 2012)).

**\*6** As to the third *Bell* factor (i.e., the justification), Defendant justified the search based on: (i) witnessing Plaintiff acting suspicious off camera; and (ii) knowledge of Plaintiff's previous discipline in WCJ for hiding and possessing a weapon. (Def. Br. at 11). Plaintiff does not dispute the facts underlying either of these purported justifications. (*See* Pltf. Dep. at 67:19-20; 25:9-15). Defendant has met his burden of proving justification under these circumstances, even though, as Plaintiff argues, no contraband was ultimately found. *See Crawford v. Cuomo*, 796 F.3d 252, 257-59 (2d Cir. 2015) ("[s]earches that do not uncover contraband may be no less penologically justified than those that do"); *see also Torres*, 2019 WL 4784756, at *5 (finding a "legitimate penological reason" for conducting a body cavity search based on *observations* of plaintiff's suspicious conduct, which indicated that he was hiding contraband); *Thomas v. Jacobs*, No. 19-CV-06554, 2022 WL 504787 at *9 (same).

Finally, as to the fourth *Bell* factor (i.e., the location), it is undisputed that the search occurred in the male booking area at WCJ. (Def. 56.1 at 6). The male booking area is an off-camera area designed to provide privacy for inmates while being strip searched. (Def. Br. at 11). These circumstances weigh in favor of reasonableness under the fourth *Bell* factor. *See Thomas*, 2022 WL 504787 at *9 ("The search here was conducted in a private strip-frisk room ... this does not strike the Court as excessive or unnecessary, and weighs in favor of reasonableness.").

The Court concludes, based upon the undisputed facts, that the May 19 strip search was reasonable in light of all four *Bell* factors.

Carzoglio v. Abrams, Not Reported in Fed. Supp. (2022)

2022 WL 2193376

### B. The June 8 Strip Search

Plaintiff claims that Defendant is liable under § 1983 in connection with the strip search conducted on June 8, 2017. However, as a fundamental prerequisite "[t]o establish[ing] a § 1983 claim, a plaintiff must show the defendants' personal involvement in the alleged constitutional violation." *Boley v. Burets*, 687 F. App'x 40, 41 (2d Cir. 2017) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). That Defendant was not involved in the events of June 8 renders any claim based on the events of that day "fatally defective on its face." *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir. 1987) (internal quotation marks omitted). Simply being a supervisor is not enough to impute personal involvement onto a defendant; liability exists only where the "defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal quotation omitted).

It is undisputed that Defendant was not working at WCJ on June 8, 2017. (Pltf. 56.1 at 6). Plaintiff, however, contends that Defendant was personally involved in the events of June 8 because Defendant ordered the searches before leaving work on June 6. (*Id.*). Defendant denies this outright and Plaintiff provides no evidence to the contrary besides his own speculation. (*See* Def. Aff. at 1; Pltf. 56.1 at 6). Simply having been a supervisor of the guards who conducted the June 8 searches is not sufficient to impute liability to Defendant. *Tangreti*, 983 F.3d at 618. Given Defendant's express denial of knowledge or responsibility, and in the absence of proof to the contrary, Plaintiff's conclusory allegations are insufficient to raise an issue of fact and to avoid summary judgment. *See Brown v. Artus*, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009) (citing *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) and *Russo v. City of Bridgeport*, 479 F.3d 196, 210-11 (2d Cir. 2007)). The Court concludes that the June 8 strip search is not actionable against Defendant in light of his lack of personal involvement.

The Court therefore grants Defendant's motion for summary judgment as to the strip search claim, with regard to both the May 19 and June 8 searches.

### II. Claim No. 2: The Cell Search Claim (Eighth Amendment)

**\*7** Plaintiff's second claim is that the fifth search on May 18, 2017, a cell search, violated his constitutional rights. At all relevant times, Plaintiff was a convicted prisoner at WCJ. (Def. Br. at 6, n.2; Am. Compl. at 2). Therefore, the Court must assess Plaintiff's cell search claim under the strictures of the Eighth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Prisoners, unlike pretrial detainees, retain no Fourth Amendment reasonable expectation of privacy against searches of their cells, even those made to harass. *Willis v. Artuz*, 301 F.3d 65, 68-69 (2d Cir. 2002). "The only constitutional limit on the search of a prison cell is imposed by the Eighth Amendment's bar against cruel and unusual punishment." *Jones v. Harris*, 665 F. Supp. 2d 384, 394-95 (S.D.N.Y. Oct. 13, 2009).

An Eighth Amendment claim based on a cell search requires a showing that Defendant " 'ordered the search ... with the specific intent to cause plaintiff harm and that the search ... in fact caused him harm.' " *Id.* (quoting *Lashley v. Wakefield*, 367 F. Supp. 2d 461, 470 (W.D.N.Y. 2005)). Moreover, the violation must be; (i) objectively serious, and (ii) committed by a defendant with subjective culpability. *See id.* There is no dispute that Defendant ordered a single search of Plaintiff's cell, (*See generally* Def 56.1 at 8-9). A single cell search is not objectively serious enough to violate the Eighth Amendment under Second Circuit case law. *Stewart v. Richardson*, No. 15-CV-09034, 2019 WL 719638, at \*5-6 (S.D.N.Y. Feb. 20, 2019) (collecting cases and finding three cell searches in the span of five weeks was not objectively serious, noting only that courts have found daily searches over the span of more than a month to be objectively serious); *see also Corley v. City of New York*, No. 14-CV-03202, 2017 WL 4357662, at \*15 (S.D.N.Y. Sept. 28, 2017) (dismissing a Fourth Amendment claim made by a pretrial detainee for 30 cell searches as not an excessive amount). Plaintiff points to no case—and the Court has not found any—in which a single cell search was deemed objectively serious. Therefore, regardless of Defendant's state of mind, the cell search claim fails as a matter of law. *See generally Jones*, 665 F. Supp. 2d at 395. [6]

[6]    Assuming, *arguendo*, that the objective prong was met, Plaintiff does not dispute the facts underlying Defendant's purported rationale for the search, which was to look for weapons based on Plaintiff's history—which, as discussed *supra*, is a legitimate penological interest. *See Nilsson v. Coughlin*, No. 86-CV-07135, 1987 WL 12823, at \*4 (S.D.N.Y. June 18, 1987) ("[A] prisoner maintains the right under the Eighth Amendment to be free from searches which are *unrelated to prison needs*, but rather calculated to harass." (emphasis added)).

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 255 of 830

Carzoglio v. Abrams, Not Reported in Fed. Supp. (2022)

2022 WL 2193376

Defendant, therefore, would be entitled to summary judgment on this claim under the subjective prong as well.

The Court therefore grants Defendant's motion for summary judgment as to the cell search claim.

III. Claim No. 3: The Sexual Abuse Claim (Eighth Amendment)

Plaintiff's sexual abuse claim is based on three of the searches conducted on May 18, 2017, [7] and the strip search conducted on June 8, 2017. In light of the Court's findings herein, the actionable events remaining in this claim are the second and fifth searches on May 18, 2017. [8]

[7]    Those three searches are: (a) the second search, a pat and frisk conducted by Curry; (b) the fourth search, a strip search conducted by Curry, Rodriguez, and McWilliams; and (c) the fifth search, a pat and frisk conducted by Curry while Rodriguez conducted the cell search.

[8]    As set forth *supra*, Defendant was not personally involved in any conduct occurring on June 8, 2017, and the fourth search on May 18, 2017 was a reasonable, constitutionally appropriate strip search.

**\*8** Plaintiff's sexual abuse claim, as with his cell search claim, is assessed under the strictures of the Eighth Amendment. "Under the Eighth Amendment, conditions of confinement 'must not involve the wanton and unnecessary infliction of pain.' " *Vann*, 2018 WL 6199860, at \*6 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). "[S]exual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." *Boddie v. Schnieder*, 105 F.3d 857, 860-61 (2d Cir. 1997). Moreover, the violation must be (i) objectively serious, and (ii) committed by a defendant with subjective culpability. *See e.g.*, *Castro-Sanchez v. N.Y.S. Dep't of Corr. Servs.*, No. 10-CV-08314, 2012 WL 4474154, at \*2-3 (S.D.N.Y. Sept. 28, 2012).

There is no evidence that the conduct complained of here was objectively serious. Plaintiff testified that Curry's "groping" of Plaintiff's buttocks during each pat and frisk lasted for no more than 3 seconds. (Pltf. Dep. at 30:3-5; 35:5-10). Courts have consistently found such brief contact fails to establish an Eighth Amendment violation as a matter of law. *See, e.g.*,

*Boddie*, 105 F.3d at 861 (upholding dismissal of sexual abuse claim based on an officer grabbing an inmate's penis and making lewd comments toward him); *Cole v. Suffolk Cnty. Corr. Facility*, No. 20-CV-01883, 2020 WL 2113205, at \*3-4 (E.D.N.Y. May 4, 2020) (finding two instances of an officer groping an inmate's penis to be "too similar to the type of incidental contact accompanying a run-of-the-mill pat down to reasonably infer any inappropriate touching or malicious intention."); *Scalpi v. Amorim*, No. 14-CV-02126, 2018 WL 1606002 (S.D.N.Y. Mar. 29, 2018) (collecting cases and finding that courts in the Second Circuit consistently find no violation for brief contact with an inmate's breasts or genitals during a pat down); *Castro-Sanchez*, 2012 WL 4474154, at \*2-3 (officer's groping of inmate's buttocks not sufficiently serious); *cf. Crawford*, 196 F.3d 252 (fondling plaintiff's penis in front of plaintiff's wife with accompanying demeaning comments was sufficiently serious). Even assuming, as Plaintiff alleges, that Curry groped his buttocks for no more than three seconds on two different occasions, this does not meet the level of objective seriousness set forth in relevant Second Circuit case law.

Moreover, even if the conduct were objectively serious, there is no evidence that Defendant was subjectively culpable. When analyzing the subjective prong of a sexual abuse claim, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Crawford*, 796 F.3d at 257-58. Plaintiff's sole evidence as to the subjective prong is that Curry (i.e., not Defendant) laughed at him while conducting the second pat and frisk. As a matter of law, this does not raise an issue of material fact as to subjective culpability, even if the claim were proceeding against *Curry*. *See e.g.*, *Castro-Sanchez*, 2012 WL 4474154, at \*3 (officer calling inmate a "sexy black devil" during a pat and frisk insufficient for the Eighth Amendment). Moreover, there is simply no evidence as to *Defendant's* state of mind. Defendant denies outright having ordered the searches to be conducted in a sexually abusive way (Def. Aff. at 6) and Plaintiff admits lacking personal knowledge as to Defendant's state of mind. (Pltf. Dep. 44:17-45:25). Plaintiff did not speak to Defendant about the events, there is no evidence that Defendant watched the searches to gratify himself, and no witness has stated that Defendant ordered the searches *to be conducted inappropriately* other than the speculation of one unnamed individual, who Plaintiff alleges said that he "wouldn't be surprised" if that were the case. (Pltf. Dep. 71:13-15). This unsubstantiated hearsay is insufficient

2022 WL 2193376

evidence of Defendant's subjective state of mind to survive summary judgment. Thus, Plaintiff's sexual abuse claim fails as a matter of law under both the objective and subjective prongs of Eighth Amendment analysis.

**\*9** For the foregoing reasons, the Court grants Defendant's motion for summary judgment as to the sexual abuse claim.

### IV. Claim No. 4: The Access to Courts Claim (First Amendment)

Plaintiff's fourth claim is that Defendant deprived him of access to courts when, during the first and third searches on May 19, Curry and Rodriguez "tampered" with Plaintiff's legal materials and "distracted" him from legal work on another case. (Opp. Br. at 19). Access to courts claims are grounded in the First Amendment. *See Coke v. Koeningsman*, No. 19-CV-10038, 2021 WL 311543 8, at * 10 (S.D.N. Y. July 22, 2021). "To establish a denial of access to courts claim, plaintiff must demonstrate not only that defendants deliberately or maliciously 'took or w[ere] responsible for actions that hindered plaintiff's efforts to pursue a legal claim,' but 'that the defendant[s'] actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.' " *Stewart*, 2019 WL 719638, at \*8 (quoting *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)); *see also Gunn v. Doe*, No. 20-CV-00730, 2020 WL 1140746, at \*2 (S.D.N.Y. Mar. 6, 2020). The record is devoid of any evidence of actual injury. Ruffling through papers and distracting an inmate on a single occasion is insufficient to establish actual injury for an access to courts claim. *See Stewart*, 2019 WL 719638, at \*8 (granting summary judgment dismissing an inmate's access to courts claim where officers confiscated and destroyed plaintiff's legal papers, and plaintiff alleged that he lost lawsuits because of the missing paperwork); *Conley*, 2017 WL 4357661, at \*8 (dismissing an access to courts claim where prison officials destroyed and disorganized an inmate's legal papers because plaintiff alleged no actual injury even though he had to spend hours reorganizing), Plaintiff was not prejudiced in any of his legal actions because of Defendant's conduct and thus, Plaintiff's access to courts claim fails as a matter of law.

The Court therefore grants Defendant's motion for summary judgment as to the access to courts claim.

### CONCLUSION

For the foregoing reasons, the motion for summary judgment is GRANTED and the Amended Complaint against Defendant is dismissed with prejudice in its entirety. The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Doc. 98, enter judgment in favor of Defendant, mail a copy of this Memorandum Opinion and Order to Plaintiff, and close this case.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2193376

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 257 of 830

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)

2022 WL 866745

KeyCite Yellow Flag - Negative Treatment

Distinguished by Russell v. Scott, D.Vt., April 10, 2024

2022 WL 866745
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eric LYNCH, Plaintiff,

v.

COUNTY OF HERKIMER, et al., Defendants.

9:20-CV-63 (BKS/ATB)
|
Signed 02/16/2022

**Attorneys and Law Firms**

ERIC LYNCH, Plaintiff, pro se.

GREGG T. JOHNSON, ESQ., for Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and
Recommendation, pursuant to 28 U.S.C. § 636(b) and Local
Rules N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff
raises various constitutional claims related to events allegedly
having occurred during his confinement as a pretrial detainee
at Herkimer County Jail ("HCJ"). (Complaint ("Compl."))
(Dkt. No 2). Plaintiff filed his original complaint in New York
State Supreme Court, Herkimer County. Defendants removed
the action to the Northern District of New York on January 16,
2020. (Dkt. No. 1). The defendants answered the complaint
through counsel, and discovery ensued. (Dkt. Nos. 6, 51).

Presently before the court is the defendants' motion for
summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No.
55). Plaintiff has responded in opposition to the motion (Dkt.
No. 69), and defendants filed a reply (Dkt. No 72). Plaintiff
filed a sur-reply, which was subsequently accepted by the
court for filing. (Dkt. Nos. 79, 80).

**I. Summary Judgment**

Summary judgment is appropriate where there exists no
genuine issue of material fact and, based on the undisputed
facts, the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56; Salahuddin v. Goord, 467 F.3d 263,
272-73 (2d Cir. 2006). "Only disputes over ["material"] facts
that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment."
Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). It must
be apparent that no rational finder of fact could find in favor
of the non-moving party for a court to grant a motion for
summary judgment. Gallo v. Prudential Residential Servs., 22
F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of
disputed material facts by informing the court of portions
of pleadings, depositions, and affidavits which support the
motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
If the moving party satisfies its burden, the nonmoving party
must move forward with specific facts showing that there is
a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at
273. In that context, the nonmoving party must do more than
"simply show that there is some metaphysical doubt as to
the material facts." Matsushita Electric Industrial Co., Ltd. v.
Zenith Radio Corp., 475 U.S. 574, 586 (1986). In determining
whether there is a genuine issue of material fact, a court must
resolve all ambiguities, and draw all inferences, against the
movant. See United States v. Diebold, Inc., 369 U.S. 654, 655
(1962); Salahuddin, 467 F.3d at 272.

**II. Facts**

Plaintiff was remanded to the custody of the HCJ on March 9,
2017, where he remained incarcerated as a pretrial detainee at
all times relevant to the underlying complaint. (Compl. ¶¶12–
13). The following is a summary of the facts as stated in the
complaint. To the extent that additional facts were developed
through discovery, and included in the summary judgment
motion, I will discuss them during my analysis of the pending
claims.

**A. Medical Care**

**1. Mental Health Treatment**

**\*2** While in custody at HCJ, plaintiff "filed several
sick call request[s] to see mental health due to plaintiff's
history of PTSD, regarding anxieties, reoccurring nightmares,
and depression." (Id. ¶16(a)). "These requests went
unanswered." (Id.). Plaintiff filed a grievance on April 27,
2017, presumably with respect to his unanswered sick call
requests. (Id. ¶16(b)). The grievance was "returned and
signed" on April 28, 2017, by non-party HCJ Lieutenant

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)
2022 WL 866745

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 258 of 830

Coddington, advising plaintiff that medical issues were not "grievable." (*Id.* ¶16(c)).

## 2. Knee Injury

On August 26, 2017, plaintiff was instructed to clean the showers at HCJ. (*Id.* ¶16(d)). In the course of doing so, plaintiff "slipped and fell, injuring his right knee." (*Id.*). Non-party HCJ Nurse Urtz examined plaintiff's knee and provided him with an ice pack and a cane. (*Id.*). Plaintiff requested a knee brace, but was "told by medical that they did not have that medical device in stock." (*Id.* ¶16(e)). Plaintiff's mother was authorized to purchase a knee brace for plaintiff to use at HCJ. (*Id.*). Plaintiff was eventually taken to the emergency room, and has had ongoing knee pain since. (*Id.* ¶16(f)).

## 3. Kidney Condition

Plaintiff alleges that "medical staff knew that plaintiff had kidney problems ... [including] one functioning kidney, which was borderline renal failure." (*Id.* ¶16(g)). Plaintiff was taken for monthly blood work to check on his kidney function, and was also treated by an outside nephrologist. (*Id.*).

In February 2018, plaintiff "had blood in his urine." (*Id.* ¶16(h)). A subsequent test conducted the following day showed blood "still in [his] urine." (*Id.*). Plaintiff "pleaded" to be taken to the emergency room, but his request was denied because there was no transport officer available. (*Id.*). After waiting five days, plaintiff was "finally" taken to the emergency room. (*Id.* ¶16(i)). Plaintiff was informed that he had passed a kidney stone, and the emergency room physician "explained what a kidney stone could do to an already damaged kidney." (*Id.*). The physician also stated that the kidney stone could have been "broken up" to prevent further damage to plaintiff's kidneys, had it been found earlier. (*Id.*).

On July 13, 2018, plaintiff underwent a CT scan which showed "scarring of the right kidney." (*Id.* ¶16(j)). His nephrologist stated that this was consistent with damage from a kidney stone. (*Id.*).

## 4. Staph Infection/Bed Bug Bites

On December 13, 2017, plaintiff "noticed a red circle on his left ankle." (*Id.* ¶16(m)). Non-party HCJ Nurse Practitioners Char Macri and Deninno examined plaintiff and concluded that he had an ingrown hair. (*Id.*). Plaintiff's ankle was examined by a visiting facility physician on December 22, 2017, who alternatively diagnosed plaintiff with a staph infection, and prescribed him antibiotics. (*Id.* ¶16(n)). The physician informed plaintiff that he was "lucky [the infection] didn't spread and become drug resistant," and that "plaintiff should've been seen sooner." (*Id.*).

In January 2018, plaintiff submitted a sick call slip concerning "a severe case of bite marks on plaintiff's stomach, back, and head[.]" (*Id.* ¶16(o)). Plaintiff was seen by a nurse who "immediately determined that the bite marks were from bed bugs[.]" (*Id.* ¶16(p)). The nurse commented that HCJ was "infested with them," and that plaintiff could change his cell location. (*Id.*). He was not provided treatment for the bites or itching. (*Id.*). Plaintiff asserts that the conditions at the HCJ were "deplorable" and "filthy," as evidenced by an "infestation of bed bugs throughout" the facility. (*Id.* ¶17).

## B. Access to Legal Resources

**\*3** Plaintiff and the rest of the general population at HCJ were "not allowed to contact their lawyers during law library visits based upon a policy of the HCJ legal coordinator," non-party John Korce. (*Id.* ¶16(k)). Korce also denied access to the legal research kiosk and other legal supplies if he was "mad or upset with a particular detainee." (*Id.*).

## C. HCJ Grievance Procedure

Plaintiff alleges, generally, that the "[grievance] system at HCJ is broken." (*Id.* ¶16(l)). He asserts that while grievances involving "minor issues" will be answered, "anything serious" requires an inmate to keep submitting grievances "continuously." (*Id.*).

## D. Sexual Assault

On December 25, 2017 at approximately 7 p.m., defendant correctional officer ("C.O.") Andrew Sheppard "ordered [certain inmates, including plaintiff,] to grab the wall," in order to conduct a search prior to transporting the inmates to church services. (*Id.* ¶18). Plaintiff immediately asked defendant C.O. Adrienne Aiello if she would conduct the pat search instead of C.O. Sheppard, due to the fact that C.O. Sheppard, who was "new," "constantly made homosexual comments, that he passed of[f] as jokes," to plaintiff and

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 259 of 830
Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)
2022 WL 866745

other inmates. (*Id.* ¶19). C.O. Aiello replied that "this was [C.O. Sheppard's] thing," and denied plaintiff's request. (*Id.* ¶20). C.O. Sheppard proceeded to conduct a pat search of the inmates, "with [C.O.] Aiello standing nearby observing." (*Id.* ¶21). When he got to plaintiff, C.O. Sheppard "began squeezing [plaintiff's] butt buttocks while at the same time rubbing [plaintiff's] chest from behind." (*Id.* ¶22). Plaintiff "stiffen[ed]" and looked directly at C.O. Aiello, who "put her hand over her mouth and turned away from what was happening." (*Id.*). C.O. Aiello then stated to C.O. Sheppard, "are you going to at least buy him dinner afterwards[?]" (*Id.*).

After the church service, plaintiff was returned to his cell block. (*Id.* ¶23). There, plaintiff informed non-party C.O. Minosh "what had happened." (*Id.*). C.O. Minosh "immediately went downstairs and informed [non-party] Sergeant Harrod" of plaintiff's complaint. (*Id.*). Sergeant Harrod came to plaintiff's cell, and directed plaintiff to write to non-party Captain McGrail. (*Id.* ¶24). Plaintiff "immediately wrote to Captain McGrail and gave [the correspondence] to C.O. Minosh to deliver to Captain McGrail's mailbox[,] per Sergeant Harrod's instructions." (*Id.*). Plaintiff never received a reply from Captain McGrail, and "nothing was done." (*Id.* ¶25).

### DISCUSSION

### III. Defendant C.O. Jonathan Hadden

C.O. Hadden is identified as a defendant in one of the introductory paragraphs of plaintiff's complaint. (Compl. ¶3). C.O. Hadden is not, however, listed as a defendant in the plaintiff's state summons (*Id.* at CM/ECF p. 1), nor in the Request for Judicial Intervention (*Id.* at CM/ECF p. 15). Moreover, C.O. Hadden is not referenced in the body of plaintiff's complaint, relative to any of the factual allegations. (*See id.*, generally). Accordingly, defendants argue that the complaint should be dismissed as against C.O. Hadden for lack of his personal involvement in any of the alleged constitutional violations. (Defendants' Memorandum of Law ("Def.'s MOL") at 28) (Dkt. No. 55-22). In his response to the summary judgment motion, plaintiff has requested that C.O. Hadden be dismissed from this action. (Plaintiff's Opposition to SJM ("Pl.'s Opposition") at CM/ECF p. 3) (Dkt. No. 69). In light of the plaintiff's request for a voluntary dismissal, and in the absence of any factual allegations alleging C.O. Hadden's personal involvement in the underlying causes of action, this court recommends that the complaint be dismissed as against C.O. Hadden.

### IV. Exhaustion of Administrative Remedies

#### A. Legal Standards

**\*4** The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint,* 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones,* 549 U.S. at 218-19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake,* 578 U.S. 632, 136

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 260 of 830

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)

2022 WL 866745

S. Ct. 1850, 1857 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, 578 U.S. at ——, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at ——, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

> (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

**\*5** *Ross*, 578 U.S. at ——, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id.* The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

### B. Application

The defendants argue that plaintiff failed to exhaust his administrative remedies with respect to claims regarding the allegedly deficient medical care he received at HCJ. (Def.'s MOL at 33). Through their papers, the defendants have established "that a grievance process exist[ed] and applie[d] to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dept.*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted). (Def.'s SJM Exs. E "HCJ Grievance Policy;" F "Inmate

Handbook"). Defendants have also submitted as evidence a redacted copy of plaintiff's grievance log, as further proof that plaintiff failed to file any grievances with respect to medical care during his confinement at HCJ. (Def.'s SJM Ex. D "Grievance Log"). In light of the aforementioned, the burden of production accordingly shifts to plaintiff, compelling him to present evidence that one of the exceptions to the administrative exhaustion requirement applies, excusing his failure to exhaust and permitting his claim to survive summary judgment. *Id.*

Plaintiff testified that he received a rule book upon his transfer into HCJ, through which he became familiar with the facility's grievance process. (50-H Transcript at CM/ECF p. 20–26) (Dkt. No. 55-7). However, plaintiff maintains that he was consistently told by HCJ staff that medical issues were "not grievable." (50-H Transcript at CM/ECF p. 35; Def.'s SJM Ex. K "Notice to Admit" at CM/ECF pp. 30, 33–34; Plaintiff's EBT Transcript at CM/ECF pp. 9–10, Dkt. No. 55-8). Plaintiff also maintains that the grievance process at HCJ was only "available" to the extent an inmate had to inform an HCJ correctional officer about the subject of his or her grievance, before the correctional officer would "decided whether or not to give [the inmate] a grievance form" to fill out. (Notice to Admit at CM/ECF pp. 35–36). When plaintiff requested grievance forms for medical issues, he was "denied" a form and told the issue "was not grievable." (Plaintiff's EBT Transcript at CM/ECF pp. 9–10).

"When questions of fact and issues of credibility exist regarding the failure to exhaust administrative remedies, a court should neither engage in fact finding nor make determinations as to credibility in addressing a defendant's motion for summary judgment for failure to exhaust." *Curtis v. Bola*, No. 9:15-CV-00718 (GLS/TWD), 2016 WL 7735755, at \*9 (N.D.N.Y. Nov. 1, 2016), *report and recommendation adopted*, 2017 WL 120945 (N.D.N.Y. Jan. 12, 2017) (listing cases). In this case, there is, arguably, an existing question of fact as to whether the conduct of HCJ staff, as alleged by plaintiff, so precluded him from filing grievances about his medical issues as to render them "unavailable" pursuant to *Ross*. However, because the court is recommending dismissal of plaintiff's claims surrounding his medical care based on the merits of those claims, as further discussed below, there is no need for an evidentiary hearing on the issue of exhaustion.

### V. Municipal Liability - County of Herkimer

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 261 of 830

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)

2022 WL 866745

**A. Legal Standards**

**\*6** A municipality may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. A municipality may not be held liable solely because it employs a tortfeasor. *LaVertu v. Town of Huntington*, No. 13-CV-4378, 2014 WL 2475566, at \*3 (E.D.N.Y. Apr. 4, 2014) (citing inter alia *Los Angeles County, Cal. v. Humphries*, ––– U.S. ––––, 131 S. Ct. 447, 452 (2010)), *report recommendation adopted in relevant part*, 2014 WL 2506217 (E.D.N.Y. June 2, 2014). Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell*, 436 U.S. at 694.

"The existence of a municipal policy that gives rise to *Monell* liability can be established in four ways: (1) a formal policy endorsed by the municipality; (2) actions directed by the government's 'authorized decisionmakers' or 'those who establish governmental policy;' (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees[.]" *Deferio v. City of Syracuse*, 770 F. App'x 587, 590 (2d Cir. 2019)(cleaned up). "Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an 'affirmative link,' between the policy and the deprivation of his constitutional rights." *Id.* (citing *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)); *see also Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (holding that plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged").

A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985)) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, the municipality's "failure to train its employees in a relevant respect must amount to ' 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' " *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)). "Only then 'can such a shortcoming be properly

thought of as a city 'policy or custom' that is actionable under § 1983.' " *Id.* (quoting *Canton*, 489 U.S. at 389).

**B. Application**

Plaintiff alleges injury as the result of a multitude of constitutional violations having occurred at HCJ. The majority of plaintiff's claims attempt to assert liability not on any individual actors operating within the HCJ, but instead on the defendant County of Herkimer (the "County"). [1] The defendants have devoted the majority of their motion papers, and the evidence attached thereto, to arguing the merits of plaintiff's § 1983 claims, asserting that plaintiff has failed to raise a triable issue of fact with respect to medical indifference, access to courts, conditions of confinement, and sexual abuse. (Def.'s MOL at 5–26, 27–31). However, the defendants also argue that liability cannot attach to the County defendant for any of the asserted constitutional violations under *Monell*. (*Id.* at 26–27). For the following reasons, this court agrees that plaintiff's complaint should be dismissed as against the County.

1        Plaintiff's sexual abuse and failure to intervene claims being the exception.

**\*7** With respect to plaintiff's medical care claims, plaintiff alleges that the County "created or allowed an unwritten practice to continue within its jail by allowing the detainees in their care to be denied proper medical treatment for serious [ ] medical needs[.]" (*Id.* ¶28). "To prove the third *Monell* kind of liability—custom or usage—the plaintiff must establish a longstanding practice or custom which constitutes standard operating procedure." *Gleeson v. Cty. of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at \*15 (E.D.N.Y. Sept. 30, 2019) (citing *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989)). "The policy must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.' " *Id.* (quoting *Byvalets v. NYC Housing Authority*, No. 16-CV-6785, 2017 WL 7793638, at \*16 (E.D.N.Y. July 28, 2017)); *see also Board of County Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997) (The relevant custom must be "so widespread as to have the force of law.").

In this case, plaintiff concedes that HCJ provided him with medical care to some extent, namely for his mental health conditions, kidney issues, knee injury, and bed bug bites/staph infection. At the outset, the court seriously questions whether most of plaintiff's claims of constitutionally deficient medical care would have survived, had they been brought against the HCJ medical staff personally involved in his care. *See Askins*

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 262 of 830

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)

2022 WL 866745

*v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("Unless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable. *Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy."); *LeClair v. Raymond*, No. 1:19-CV-0028(BKS/DJS), 2020 WL 5027278, at *13 (N.D.N.Y. Aug. 25, 2020) (quoting *Aquino v. City of New York*, No. 16-CV-1577, 2017 WL 2223921, at *1 (S.D.N.Y. May 19, 2017)) ("It is well-established that a plaintiff must prove the denial of a constitutional right by a municipal officer in order to hold a municipality liable under *Monell*."). [2]

[2]    *But see Van Hoven v. City of New York*, No. 16-CV-2080, 2018 WL 5914858, at *8 (S.D.N.Y. Aug. 21, 2018), *report and recommendation adopted*, 2018 WL 4417842 (S.D.N.Y. Sept. 17, 2018) ("*Monell* carries with it no prerequisite that individual liability be established before the municipality can be held responsible for a Section 1983 violation; indeed, a plaintiff may proceed on a *Monell* claim without even naming any individual actors as defendants."); *Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) (holding that district court erred, as a matter of law, in instructing jury that the liability of the municipal defendants was contingent upon the liability of the individual defendants, and finding that County Human Rights Commission as a whole could have violated the plaintiff's constitutional rights, even if individual Commission members did not).

However, even assuming that plaintiff could establish some unconstitutional conduct, a section 1983 claim against a municipality for the existence of a policy, custom or practice cannot be sustained "by inference solely from evidence of the occurrence of the incident in question." *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986); *see also Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy). Here, plaintiff appears to infer a municipal custom of providing deficient medical care solely on the basis of his isolated personal experiences, which would vitiate his claim for municipal liability even if his constitutional rights had been violated. Indeed, plaintiff

has not produced evidence of, much less referenced, any other inmate's experience of deficient medical care at HCJ.

**\*8** Moreover, plaintiff's conclusory allegations of a custom or policy sustained by the County with respect to medical care, without more, do not suffice to establish the County's liability. Specifically, plaintiff claims that the general act he alleges the County has engaged in – allowing pretrial detainees to be denied adequate medical care – is the actionable custom or policy. However, plaintiff has not proffered evidence of an "affirmative link" between this alleged custom and constitutional violations he was subject to. *See Mayes v. Village of Hoosick Falls*, 162 F. Supp. 3d 67, 96 n. 12 (N.D.N.Y. 2016) ("Plaintiffs do not specify or produce evidence of any failure to train or inappropriate policy leading to any particular unconstitutional conduct and thus cannot make out a direct causal link between the alleged municipal failing and any constitutional deprivation."); *see also Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) (affirming dismissal of complaint where the *Monell* allegations "contained only conclusory and speculative assertions" that the alleged conduct occurred "pursuant to the practice, custom, policy and particular direction of" the policymaker) (quotation marks omitted); *Bradley v. City of New York*, No. 08-CV-1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The Complaint's conclusory, boilerplate language ... is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused" the plaintiff's injuries). Plaintiff has failed to advance any specific policies or allegations other than those generally asserted in his complaint relative to the County's overall provision of medical care at HCJ, despite the opportunity for further discovery. Accordingly, plaintiff's claim against the County with respect to this issue should be dismissed.

Plaintiff further asserts that the County "knew or should have known through reports/complaints that the grievance system [at HCJ] was broken," and that grievances were "systematically not being answered[.]" (*Id.* ¶29). However, it is "well established that a prison inmate has no constitutional right of access to an internal grievance process." *Johnson v. Cty. of Saratoga*, No. 9:18-CV-0096 (DNH/DEP), 2018 WL 10910777, at *9 (N.D.N.Y. Apr. 16, 2018); *see also Rhodes v. Hoy*, No. 05-CV-0836, 2007 WL 1343649, at *6 (N.D.N.Y. May 5, 2007) (noting that inmates have "no constitutional right of access to the established inmate grievance program"). The same applies to the plaintiff here, notwithstanding his status as a pretrial detainee. *See Bell v. Beebe*, No. 9:06–

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)

2022 WL 866745

CV–544 (NAM/GJD), 2007 WL 1879767, at *4 (N.D.N.Y. June 29, 2007) (violation of state inmate grievance procedures "does not give rise to a claim under section 1983, under the due process clause or otherwise"); *Johnson v. New York City Dep't of Health,* No. 06 Civ. 13699, 2008 WL 5378124, at *3 (S.D.N.Y. Dec. 22, 2008) (pretrial detainee's allegations that inmate medical complaints were knowingly excluded from the institutional grievance process did not state a constitutional claim). Thus, given the absence of an underlying constitutional violation, plaintiff's allegations against the County with respect to the "broken" grievance system at HCJ cannot state a claim under *Monell. See, e.g., Schultz v. Inc. Vill. of Bellport,* 479 Fed. App'x 358, 360 (2d Cir. 2012) ("Because [the plaintiff] was unable to establish an underlying violation of his constitutional rights ..., his ...*Monell* claim necessarily fail[s] as well.").

Plaintiff has also raised a claim of unconstitutional conditions of confinement against the County, claiming that "no exterminator was called to eradicate" the bed bugs that caused "bite marks throughout his body." (*Id.* ¶30). Construing the facts in a light most favorable to the non-moving party, plaintiff has established an isolated, one time incident in December 2017, wherein he was assessed to have suffered "scattered bug bites" on his body. The undisputed record reflects that upon discovering plaintiff's bites, HCJ staff moved him to a different cell, disinfected his mattress, and replaced his sheets. (Compl. ¶¶16(o)-(p); Defendants' SJM Ex. I at CM/ECF p. 5, Dkt. No. 55-16). There is no evidence outside of plaintiff's conclusory allegation suggesting that HCJ had an ongoing bug infestation issue, that any other inmate at HCJ suffered from similar bug bites, or that an alleged "infestation" was brought to the attention of, or should have been known by, the County defendant.

On these facts, plaintiff cannot sustain a claim based on his allegations of the County's consistent and widespread practice of allowing bug infestations at HCJ, where he is relying "on his own experiences and then extrapolating to the entire jail population." *Rutherford v. Westchester Cty.,* No. 18-CV-4872, 2020 WL 433841, at *12 (S.D.N.Y. Jan. 28, 2020). This, combined with the absence of any "factual indicia from which this court could infer the existence of a policy or custom," proves fatal to plaintiff's claim against the County with respect to the conditions of his confinement. *Mercedes v. Westchester County,* No. 18-CV-4087, 2019 WL 1429566, at *5 (S.D.N.Y. Mar. 29, 2019) (dismissing *Monell* claim alleging that the plaintiff was served unhygienic and inedible food where the plaintiff did not allege "the existence of any policy,

any actions taken or decisions made by ... policymaking officials" ... or any "factual indicia from which this Court could infer the existence of a policy or custom"); *see also Figueroa v. Cty. of Rockland,* No. 16-CV-6519, 2018 WL 3315735, at *9 (S.D.N.Y. July 5, 2018) (dismissing pretrial detainee's *Monell* claim alleging unsanitary conditions of confinement where complaint contained allegations of a "single incident," without "a single allegation tying any of the alleged unlawful conduct to an overarching policy or custom.").

**\*9** Although the plaintiff does not list any specific causes of action against the County for his purportedly restricted access to legal materials and communication, the court assumes for purposes of this motion that those claims are also intended to be asserted against the County, considering the absence of any other named defendant who appears to be even remotely connected to those allegations. Nevertheless, plaintiff has failed to establish a *Monell* claim under any of the available theories. There is no allegation, or evidence, to suggest that the County acted pursuant to a formal municipal policy, or an informal custom or practice, with respect to the alleged difficulty plaintiff experienced accessing legal resources at HCJ. Nor has plaintiff advanced any evidence that similar deprivations occurred as to other inmates. Plaintiff merely alleges that the demand for the only available legal research kiosk was so great among the inmates that he often did not get a turn to use it on his visits to the law library, and that the other legal resources available to him were "old." (Plaintiff EBT Transcript at CM/ECF pp. 12–14). Plaintiff also testified to an incident wherein the HCJ law library coordinator refused to allow plaintiff to pay for printouts relevant to plaintiff's legal research. (50-H Transcript at CM/ECF pp. 51–52). However, plaintiff concedes that he had been permitted to pay for and retain printouts from the law library "multiple times in the past" – thus indicating that the challenged conduct at issue was not a policy promulgated by the County, but merely the isolated actions of an individual correctional officer. (*Id.*).

Furthermore, plaintiff has not provided any evidence of the training provided to HCJ staff employed in the law library, or advanced any theory as to how a training deficiency by the County prevented him from sufficiently accessing necessary legal resources. *See Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 130 (2d Cir. 2004) ("It is impossible to prevail on a claim that the Town's training program was inadequate without any evidence as to whether the Town trained its officers between the two demonstrations, how the training was conducted, how better or different training

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)

2022 WL 866745

could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted under the circumstances' to remove passively resisting protesters."). For these reasons, plaintiff's claim against the County further fails.

Purportedly referring to the alleged incident of sexual abuse by C.O. Sheppard, and C.O. Aiello's failure to intervene, plaintiff attempts to attribute fault to the County by alleging that, "through its policies, customs [written and/or unwritten], practices, usage, [the County] failed to properly train its staff when coming into contact with its detainees." (Compl. ¶27). At the outset, plaintiff's claim based on an alleged failure to train once again fails because plaintiff does not "identify a specific deficiency in the [county's] training program and establish that that deficiency is closely related to [plaintiff's] ultimate injury, such that it actually caused [his] constitutional deprivation." *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006). Moreover, for the reasons discussed below this court is recommending that plaintiff's claims against C.O. Sheppard and C.O. Aiello be dismissed for failure to raise a question of material fact sufficient to survive summary judgment. Accordingly, plaintiff cannot sustain a claim against the County based on the conduct of C.O. Sheppard and C.O. Aiello, in the absence of any constitutional deprivation therein.

## VI. Sexual Assault/Failure to Intervene

### A. Legal Standards

#### 1. Sexual Assault

In *Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015), the Second Circuit explained that an inmate pursuing a sexual abuse claim under the Eighth Amendment must allege both subjective and objective elements, namely that the "officer's intentional contact with an inmate's genitalia or other intimate area ... serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate[.]" *796 F.3d at 257*. The "principal inquiry" a court must make "is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is taken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257–58.

A pretrial detainee's claim of sexual abuse against a correctional officer is governed by the due process clause of the Fourteenth Amendment, and not by the Eighth Amendment, as "pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (internal quotation marks, citations, and alterations omitted). However, courts in this Circuit have noted that it is not yet clear whether a pretrial detainee's sexual abuse claim under the Fourteenth Amendment— as opposed to an excessive force claim—is subject to an objective or subjective *mens rea* requirement. *See, e.g., Lewis v. Huebner*, No. 17 Civ. 8101, 2020 WL 1244254, at *9 (S.D.N.Y. Mar. 16, 2020) ("[I]t is presently unclear whether both prongs required for Eighth Amendment sexual abuse claims are also required for claims of sexual abuse under the Fourteenth Amendment." (citation and internal quotation marks omitted)); *Gilliam v. Black*, No. 18 Civ. 1740, 2019 WL 3716545, at *10 (D. Conn. Aug. 7, 2019) ("[T]he Supreme Court has ruled in *Kingsley* that only an objective standard is appropriate when analyzing claims of excessive force brought by pre-trial detainees, it is unclear to what extent this ruling is applicable to a pretrial detainee's claims of sexual abuse under the Fourteenth Amendment."). In general, protections under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Darnell*, 849 F.3d at 29 (citation and quotation marks omitted).

#### 2. Failure to Intervene

**\*10** When a pretrial detainee plaintiff brings § 1983 claims alleging failure to protect or intervene, the plaintiff must satisfy a two-prong test by showing: "(1) he is incarcerated under conditions posing a substantial risk of serious harm ... and (2) the defendant-official acted intentionally ... or recklessly failed to act with reasonable care to mitigate the risk ... even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Barnes v. Harling*, 368 F. Supp. 3d 573, 596 (W.D.N.Y. 2019) (internal citations and quotations omitted) (citing inter alia *Darnell v. Pineiro*, 849 F.3d 17, 30, 35 (2d Cir. 2017)); *see, e.g., Taylor v. City of New York*, No. 16 Civ. 7857, 2018 WL 1737626, at *11 (S.D.N.Y. Mar. 27, 2018) ("Although *Darnell* involved a Fourteenth Amendment challenge to a prisoner's conditions of confinement, its holding applies with equal measure to failure to protect claims."); *Molina v. County of Westchester*, No. 16-CV-3421, 2017 WL 1609021, at *2–3 (S.D.N.Y. Apr. 28, 2017) (applying the deliberate indifference standard articulated in *Darnell* to a failure to protect claim).

Case 9:19-cv-00109-FCC-MJK    Document 410    Filed 02/21/25    Page 265 of 830

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)

2022 WL 866745

**B. Application**

In his complaint, plaintiff alleges that he was sexually abused during a pat search at HCJ when C.O. Sheppard "intentionally squeezed plaintiff's right buttocks while rubbing plaintiff's chest simultaneously, making low sounds, as if he were 'getting off.' " (Compl. ¶34). Plaintiff also asserts that C.O. Aiello is culpable for observing C.O. Sheppard's conduct, and failing to intervene and stop the sexual abuse. (*Id.* ¶37).

The facts as asserted by plaintiff were further developed throughout the course of discovery. At his 50-H hearing, plaintiff testified that C.O. Sheppard made him feel "uncomfortable" during his confinement at HCJ. (50-H Transcript at CM/ECF p. 41) (Dkt. No. 55-7). Plaintiff elaborated that C.O. Sheppard made "homosexual" jokes directed at the inmates. (*Id.*). With respect to the subject pat search, plaintiff testified that on December 25, 2017, C.O. Sheppard approached the inmates waiting to be searched before attending church services, and instructed them to put their hands on the wall and spread their legs. (*Id.* at CM/ECF p. 44). Plaintiff and the other inmates complied. (*Id.* at CM/ECF pp. 44–45). Plaintiff testified that the purpose of the search was to ensure that the inmates did not have contraband in their possession. (*Id.* at CM/ECF p. 45). Plaintiff was the third inmate to be patted down by C.O. Sheppard. (*Id.* at CM/ECF p. 46). Plaintiff testified that during the pat search, C.O. Sheppard squeezed and grabbed plaintiff's right buttocks for between five and ten seconds. (*Id.*). C.O. Sheppard also "wrapped his arm around [plaintiff] and rubbed [his] chest from behind," with one hand, for approximately ten to fifteen seconds. (Defendants' Reply Declaration Ex. N at CM/ECF pp. 4–5, 6) (Dkt. No. 72-1). Plaintiff testified that C.O. Sheppard did not say anything to him during the pat search. (50-H Transcript at CM/ECF p. 47). Plaintiff did not say anything to C.O. Sheppard, as he was "stunned, shocked, [and] nervous." (*Id.*). C.O. Sheppard proceeded to search the rest of the inmates. (*Id.*). At this time, C.O. Aiello was positioned at the end of the hall. (*Id.* at CM/ECF p. 49). Plaintiff did not hear C.O. Aiello say anything during the pat search conducted by C.O. Sheppard. (*Id.*). Another inmate later told plaintiff that C.O. Sheppard had performed the same act on him during the pat search, however plaintiff did not observe this. (*Id.* at CM/ECF pp. 48–49).

Plaintiff provided further testimony at his examination before trial. There, he testified that prior to December 25, 2017, other correctional officers had come in contact with his chest during the course of routine pat searches. (Plaintiff's EBT Transcript at CM/ECF pp. 18–19). Plaintiff also testified that other correctional officers had grazed the outside of his buttocks during prior, routine pat searches. (*Id.* at CM/ECF p. 20).

**\*11** Defendants dispute that plaintiff was subject to sexual abuse during the pat search conducted by C.O. Sheppard. In support of their motion, defendants have submitted C.O. Sheppard's sworn declaration describing the underlying incident. (Declaration of Andrew Sheppard ("Sheppard Decl.")) (Dkt. No. 55-5). C.O. Sheppard began working as a correctional officer at HCJ in the fall of 2017, and was apparently working there on a part-time basis at the time of the underlying incident, while simultaneously attending the New York State Police Academy. (Sheppard Decl. ¶3). Before working independently as a correctional officer at the HCJ, however, C.O. Sheppard was required to, and did, complete an on-the-job training program. (*Id.*). On December 25, 2017, C.O. Sheppard and non-party C.O. Minosh were summoned from the booking office at HCJ to transport a group of three inmates, one of which was plaintiff, to the recreation room on the second floor. (*Id.* ¶8). It was a routine security practice at HCJ to pat search an inmate when he was transported to or from a group activity, in order to control and prevent the transfer of contraband. (*Id.*). C.O. Sheppard performed a pat search of the three inmates under the direct observation of C.O. Minosh, a more experienced officer, as well as in the view of C.O. Aiello, who was "at a post down the hallway near the entrance of the recreation room." (*Id.*). He conducted the pat search in the same manner he had conducted all pat searches of inmates since his initial training, which included the following sequence:

> having the inmate face the wall; have the inmate place their hands on the wall and spread their legs; start pat down process at the shirt collar and work [his] way down patting the inmate with both hands paying particular attention to the collar, waistband and front pocket looking for potential contraband; and finish the pat down at the inmate's feet and pant legs before instructing them to put their shoes back on.

(*Id.*). C.O. Sheppard further avers that "conducting pat searches is always a serious and unpleasant procedure, so

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 266 of 830

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)

2022 WL 866745

it is not [his] practice to joke around or even speak with the inmates during such searches unless [he is] giving them further instructions." (*Id.*). C.O. Sheppard's only purpose for conducting pat searches of the inmates at HCJ was to comply with security procedures, and he disputes plaintiff's allegations otherwise as "false and ridiculous." (*Id.*). C.O. Sheppard became aware of plaintiff's "false" allegation of sexual abuse within a few days after the fact. (*Id.*). C.O. Sheppard had "very little contact" with plaintiff after December 25, 2017, and he asserts that HCJ administrators "attempted to assign [him] to posts at locations away from plaintiff in order to protect [C.O. Sheppard] from additional false allegations." (*Id.* ¶9).

Defendants have also submitted the sworn declaration of Adrienne Aiello in support of their summary judgment motion. (Declaration of Adrienne Aiello ("Aiello Decl.")) (Dkt. No. 55-4). In December 2017, C.O. Aiello was employed as a correctional officer assigned at the HCJ. (*Id.* ¶1). C.O. Aiello specifically recalls the events of December 25, 2017 because they were subject to an "internal investigation conducted by the Sheriff's Office." (*Id.* ¶7). At the time in issue, C.O. Aiello was assigned to a post in the second floor hallway, from which she could see the hallway and also see into the recreation room. (*Id.*). It was C.O. Aiello's responsibility to observe the inmates in the recreation room, operate the secure door between the rooms and the hallways, and observe activities in the hallway. (*Id.*). It was a routine security practice to subject any inmate transported to or from a group activity to a pat search, in order to control and prevent the transfer of contraband. (*Id.*). In accordance with that security practice, C.O. Aiello observed C.O. Minosh and C.O. Sheppard place three inmates against the wall, one of which was plaintiff. (*Id.*). She then observed C.O. Sheppard conduct a pat search of the three inmates under the supervision of C.O. Minosh, the more senior correctional officer. (*Id.*). C.O. Aiello did not hear anything that was said to, or by, any of the inmates searched by C.O. Sheppard. (*Id.*). She did not observe anything unusual about the manner or duration of the pat searches completed by C.O. Sheppard. (*Id.*). C.O. Aiello "did not say anything" to the inmates while they were being searched. (*Id.*). She observed the pat search performed by C.O. Sheppard of plaintiff to be "similar to the hundreds of routine pat searches she had observed by male C.O.s in the HCJ." (*Id.*).

**\*12** Last, defendants have submitted the declaration of Sheriff Scott Scherer in support of their motion for summary judgment. (Declaration of Sheriff Scott Scherer ("Scherer

Decl.")) (Dkt. No. 55-2). In December 2017, Sheriff Scherer worked as the Undersheriff in the Herkimer County Sheriff's Office. (*Id.* ¶2). There came a time when Sheriff Scherer was made aware of the allegations made by plaintiff against C.O. Sheppard with respect to the subject pat search. (*Id.* ¶12). He discussed the allegations with the then acting Sheriff and Captain, jointly reaching a decision to formally investigate the allegation, considering the nature of the claim and the fact that C.O. Sheppard was new to the HCJ. (*Id.*). After assigning a professional investigator from the criminal division of the Sheriff's Office to conduct an impartial investigation, plaintiff's allegations were deemed to be unfounded. (*Id.*). C.O. Sheppard has "continued to work effectively as a HCJ C.O. since that date." (*Id.*).

Based on the record presently before this court, plaintiff has failed to raise a material question of fact in order to sustain his sexual abuse claim against C.O. Sheppard. At the outset, plaintiff has failed to satisfy the objective prong of his claim, whether assessed under the Eighth or Fourteenth Amendment. *See Horace v. Gibbs*, 802 F. App'x 11, 14 (2d Cir. 2020) ("For both the Eighth and Fourteenth Amendments, the objective prong poses the same standard."); *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 235 (2d Cir. 2007) (citing the "objectively, sufficiently serious" standard and writing that "[w]e apply the same standard of law to excessive force claims brought by pretrial detainees, which arise under the Fourteenth Amendment rather than the Eighth."). In order to survive summary judgment, plaintiff must establish a material question of fact as to whether C.O. Sheppard acted in a manner objectively "sufficiently severe or serious" to "constitute conduct that was sufficiently harmful enough to offend contemporary standards of decency." *Gilliam*, 2019 WL 3716545, at \*10. At most, plaintiff has established that during the course of a routine pat search, which was undisputedly warranted, C.O. Sheppard rubbed plaintiff's chest and squeezed his right buttock for between five to ten seconds. Despite plaintiff's initial allegations, his subsequent sworn testimony reflects that C.O. Sheppard did not say anything to plaintiff during the encounter. Plaintiff also concedes that some contact with his chest and buttock is the sort to be expected during a pat search, and which he had experienced to some extent during searches performed by other correctional officers. Even construing the facts in a light most favorable to plaintiff,[3] the events as described by him are "too similar to the type of incidental contact accompanying a run-of-the-mill pat down to reasonably infer any inappropriate touching or malicious intention." *Cole v. Suffolk Cty. Corr. Facility*, No. 20-CV-1883, 2020 WL

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 267 of 830
Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)
2022 WL 866745

2113205, at *4 (E.D.N.Y. May 4, 2020) (dismissing pretrial detainee's sexual assault claim alleging that deputy, while performing a frisk, "grop[ed] my penis and scrotum and then br[ought] his forearm into my scrotum").

[3]     C.O. Sheppard denies that he ever came into contact with plaintiff's buttock during the subject pat search. (Plaintiff's Opp. at CM/ECF p. 22).

Moreover, courts in this district have dismissed sexual abuse claims that alleged either equivalent or more serious conduct than that attributed to C.O. Sheppard in this case, even post-*Crawford*. [4] *See Hernandez v. Oswinski*, No. 18 CV 7365, 2019 WL 4274377, at *2 (S.D.N.Y. Sept. 10, 2019) (correctional officers alleged to have "tapped" plaintiff on the buttock during one search, and "touched his private parts" during another); *Perez v. Ponte*, 236 F. Supp. 3d 590, 618 (E.D.N.Y. Feb. 14, 2017) (plaintiff alleged that correctional officer put his hand between the plaintiff's buttocks during a strip search and then removed his fingers and told the plaintiff that he "smelled sweet"); *Dozier v. Franco*, No. 17-CV-3348, 2018 WL 3094935, at *3 (S.D.N.Y. June 22, 2018) (while being pat frisked before walking to recreation, correctional officer "squeezed, grabbed, and fondled" plaintiff's "genital area twice"); *Bey v. Griffin*, No. 16 CV 3807, 2017 WL 5991791, at *3 (S.D.N.Y. Dec. 1, 2017) (during pat frisk, correctional officer's hands were "in [plaintiff's] pants," and that he felt him "up in down" and touched his "private parts").

[4]     Prior to 2015, the standard set forth in *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) governed Eighth Amendment claims arising from sexual abuse in prison. "Although *Boddie* held that inmate sexual abuse could, in principle, violate the Eighth Amendment, it concluded that a 'small number of incidents in which the plaintiff allegedly was verbally harassed, touched, and pressed against without his consent' were insufficient to state a claim." *Crawford v. Cuomo*, 721 Fed. App'x 57, 59 (2d Cir. 2018) (quoting *Boddie*, 105 F.3d at 861). Thus, "the court [in *Boddie*] held that the plaintiff's Eighth Amendment rights were not violated where the plaintiff claimed a corrections officer 'made a pass' at him, squeezed [his] hand, touched his penis, called him a 'sexy black devil,' and pressed her breasts to his chest and her vagina to his penis." *Williams v. Cmty. Sols., Inc.*, 932 F. Supp. 2d 323, 330 (D. Conn. 2013) (quoting *Boddie*, 105 F.3d at 859). However, in 2015 the Second Circuit

decided *Crawford*, wherein the court indicated that "while the standard articulated in *Boddie* remains the same, its applicability must change as the basic mores of society change." *Crawford v. Cuomo*, 796 F.3d 252, 260 (2d Cir. 2015) (punctuation omitted). "Accordingly, conduct that might not have been seen to rise to the severity of an Eighth Amendment violation 18 years ago may now violate community standards of decency, and for that reason" the Second Circuit surmised that the officers' conduct in *Boddie* would flunk its own test today. *Id.*

**\*13** There is, furthermore, no evidence that plaintiff suffered injuries from the pat search, other than his conclusory allegation that he was "humiliated" and "shamed" by C.O. Sheppard, and suffers "mental anxiety" as a result. (Compl. ¶36). *See Washington v. Fitzpatrick*, No. 20 CV 911, 2021 WL 966085, at *4 (S.D.N.Y. Mar. 15, 2021) (plaintiff failed to satisfy objective prong of sexual abuse claim where no physical injuries were sustained and plaintiff offered "no factual allegations to suggest that [the] pat frisk was not 'incidental to legitimate official duties' "). Accordingly, plaintiff has not adduced sufficient evidence that C.O. Sheppard's conduct was sufficiently harmful enough to offend contemporary standards of decency in order to satisfy the objective prong of his sexual abuse claim. *See Crawford v. Cuomo*, 796 F.3d at 256 (To state a claim for sexual abuse, an inmate plaintiff "must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions.").

With respect to the mens rea prong of plaintiff's sexual abuse claim, plaintiff has not advanced more than conclusory evidence of overtly sexual comments or conduct from which this court could adduce that C.O. Sheppard acted with an intent to gratify his own sexual desire, or to humiliate plaintiff. In an effort to overcome summary judgment, plaintiff has produced the voluntary statement of C.O. Sheppard, which was apparently prepared by the Herkimer County Sheriff's Office in conjunction with its internal investigation of plaintiff's allegations of sexual abuse. (Pl.'s Opposition Ex. A at CM/ECF p. 22) (Dkt. No. 69-1). C.O. Sheppard's description of the pat search in his voluntary statement generally aligns with that contained in the declaration he has since submitted in support of the defendants' motion. However, in his voluntary statement to the Sheriff's Office, C.O. Sheppard additionally asserts:

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 268 of 830

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)

2022 WL 866745

As far as comments made regarding sexual acts, I have made comments, both to inmates and C.O.s, in joking manners in the past. This is something that does occur as people are standing around joking. I may have made comments to [plaintiff] in the past, but don't recall specific comments made to him.

(*Id.*).

Although not in direct conflict with his sworn declaration prepared for purposes of the pending motion, C.O. Sheppard's admission casts some doubt on his purported aversion to "joking around" with inmates during pat searches.[5] (Sheppard Decl. ¶8). Notwithstanding, C.O. Sheppard's remote history of making sexually charged jokes to the plaintiff and other inmates on prior, separate occasions, however reprehensible considering his position of authority, does not suffice to create a material question of fact as to his intentions during the subject pat search of plaintiff. In his complaint, plaintiff alleges that C.O. Sheppard was making "low sounds" during the pat search, from which plaintiff extrapolated that C.O. Sheppard was obtaining some sexual gratification from the incident. However, in his subsequent, sworn testimony, plaintiff conceded that C.O. Sheppard did not speak to him at all during the search. *See Medina v. Angrignon*, No. 15-CV-427-A, 2021 WL 1817046, at *7 (W.D.N.Y. May 6, 2021) (quoting *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 279 (S.D.N.Y. 2002)) ("Faced with [a] confounding contradiction [between plaintiff's allegations in her complaint and her sworn testimony], the Court has no basis for accepting as true the vague statements in [the] [c]omplaint as opposed to [plaintiff's] sworn testimony...."). There is no other evidence before this court of any overtly sexual actions or comments contemporaneously made by C.O. Sheppard.

[5]    As does the statement of C.O. Sheppard's coworker, who apparently made comments to plaintiff, such as "do you want [C.O.] Sheppard to cuddle with you," as a "joke," within days after the subject pat search. (Pl.'s Opposition at CM/ECF p. 23).

**\*14** Moreover, the parties do not dispute that C.O. Sheppard had a legitimate, penological basis for conducting the pat search of plaintiff before he was transported to another area within the HCJ. Thus, the court finds that plaintiff has adduced only conclusory allegations that, based on prior inappropriate comments made by C.O. Sheppard, and the discomfort plaintiff felt around him, C.O. Sheppard obtained some sexual gratification from the December 25, 2017 pat search. *See Grant v. Norfleett*, No. 17-CV-328, 2017 WL 1902150, at *3 (D. Conn. May 9, 2017) ("[T]he Complaint includes only a conclusory allegation that the defendants conducted the search for their own sexual gratification, and an assertion that on occasions after the plaintiff was strip searched, the defendants 'watched him like a piece of meat.' "); *Lewis v. Huebner*, 2020 WL 1244254, at *9 (pretrial detainee did not meet subjective prong of sexual abuse claim where she did not allege any overtly sexual comments or conduct; "rather, she simply asserts knowledge of [the defendant's] intent and state of mind in conclusory fashion"); *compare Wiley v. Kirkpatrick*, 801 F.3d 51, 56-57, 61, 69-70 (2d Cir. 2015) (vacating district court's order dismissing harassment claim based on allegation that correction officer "lick[ed] his lips" and "bl[ew] kisses" toward plaintiff inmate while plaintiff was showering). Accordingly, the court recommends that plaintiff's claim of sexual abuse against C.O. Sheppard be dismissed.

Based on my recommendation that defendants' motion for summary judgment be granted with respect to plaintiff's sexual abuse claim against C.O. Sheppard, "it follows that the claim against [C.O. Aiello] for failure to intervene is moot." *Maxwell v. Miller*, No. 9:16-CV-0275(LEK/DEP), 2018 WL 3095834, at *7 (N.D.N.Y. May 21, 2018), *report and recommendation adopted*, 2018 WL 3069210 (N.D.N.Y. June 21, 2018) (citing *Holland v. City of N.Y.*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016)) (discussing that, if an officer's conduct does not violate a constitutional right, the analysis ends, because failure to intervene claims are contingent upon the underlying claims); *see also Sankara v. Plaskett*, No. 15-CV-8470, 2017 WL 4444250, at *5 (S.D.N.Y. Oct. 4, 2017) ("Failure to intervene claims are contingent upon the disposition of the primary claims underlying the failure to intervene claim."). Accordingly, because the court finds that plaintiff has not established a constitutional violation against C.O. Sheppard, the claim against C.O. Aiello necessarily fails.[6]

[6]    Plaintiff contends that video footage from the "2 North Camera" inside of the HCJ, recorded

Lynch v. County of Herkimer, Not Reported in Fed. Supp. (2022)

2022 WL 866745

on December 25, 2017 between 6:35 p.m. and 6:40 p.m., shows that C.O. Aiello was "standing alongside" C.O. Sheppard and observed C.O. Sheppard sexually abuse plaintiff. The court has had an opportunity to view this video footage, as was submitted by the defendants in their reply papers. (Defendants' Reply Declaration Ex. O) (Dkt. No. 72). The relevant video footage, however, does not depict C.O. Aiello, nor does it capture C.O. Sheppard's pat search of plaintiff in any respect.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 55) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2022 WL 866745

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 270 of 830

Vann v. Sudranski, Not Reported in Fed. Supp. (2020)

2020 WL 3001072

KeyCite Yellow Flag - Negative Treatment

Distinguished by    Russell v. Scott,    D.Vt.,    April 10, 2024

2020 WL 3001072
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kouriockein VANN, Plaintiff,
v.
Correction Officer Y. SUDRANSKI
and Lieutenant S. Hann, Defendants.

16 CV 7367 (VB)
|
Signed 06/04/2020

**Attorneys and Law Firms**

Kouriokein Vann, Fallsburg, NY, pro se.

Jennifer Rose Gashi, State of New York Office of the Attorney General, White Plains, NY, Neil Shevlin, New York State Office of the Attorney General, New York, NY, for Defendants.

**OPINION AND ORDER**

Briccetti, J.:

 **\*1** Plaintiff Kouriockein Vann, proceeding pro se and in forma pauperis, brings this action under 42 U.S.C. § 1983, alleging Correction Officer ("C.O.") Y. Sudranski and Lieutenant ("Lt.") S. Hann, employees of the New York State Department of Corrections and Community Supervision, violated plaintiff's Eighth Amendment rights while he was incarcerated at Green Haven Correctional Facility ("Green Haven"). [1]

[1]    Plaintiff also brought claims against several other Green Haven employees. By Opinion and Order dated December 20, 2017, the Court dismissed those claims and terminated those defendants from this action. (Doc. #64).

Before the Court is defendants' motion for summary judgment. (Doc. #145).

For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

Defendants have submitted memoranda of law, a statement of material facts pursuant to Local Civil Rule 56.1, declarations, and supporting exhibits. Plaintiff has submitted memoranda of law with an incorporated statement of material facts, and a collection of documents in support of his position. Together, the parties' submissions reflect the following factual background.

On July 12, 2015, in a Green Haven recreational yard, a fight broke out between two inmates, during which one of the two inmates sustained a laceration to his left arm. On-duty medical personnel determined the injury was caused by an unrecovered weapon. Thereafter, for safety and security reasons, the yard was ordered closed and several Green Haven officers performed pat frisks on all inmates who were in the yard, including plaintiff, in an attempt to recover any weapons.

C.O. Sudranski was tasked with frisking plaintiff and several other inmates who were in the yard. According to plaintiff, upon patting plaintiff's clothed inner and outer legs, C.O. Sudranski "struck plaintiff forcefully with a 'reverse karate chop' to his testicle and groin area, and then, reached around and groped plaintiff's penis." (Doc. #158 ("Pl. Mem.") at 1). Plaintiff says C.O. Sudranski told plaintiff to walk to his housing block following the pat frisk.

C.O. Sudranski denies using excessive force against plaintiff, assaulting plaintiff, or touching plaintiff in an inappropriate manner. According to C.O. Sudranski, the frisk was performed without incident, after which plaintiff walked to his housing block.

Lt. Hann supervised the frisks on July 12, 2015, which were performed by several correction officers. Plaintiff claims that while walking toward his housing block, he attempted to speak with Lt. Hann about C.O. Sudranski's alleged misconduct. According to plaintiff, C.O. Sudranski then shouted: "[Y]ou can't stop and talk to her. You must proceed back to your block." (Pl. Mem. at 2). Plaintiff acknowledges

Lt. Hann did not directly participate in the frisk of plaintiff, and that because Lt. Hann was supervising several officers conducting frisks, plaintiff does not know whether Lt. Hann witnessed C.O. Sudranski's allegedly improper frisk.

**\*2**  Plaintiff claims that after he returned to his housing unit, he told non-party C.O. Blackmon about the incident with C.O. Sudranski, and that C.O. Blackmon then told Lt. Hann. According to plaintiff, Lt. Hann instructed C.O. Blackmon to provide plaintiff a sick call slip so that plaintiff could be seen by medical personnel. Plaintiff was evaluated by a nurse the following day, July 13, 2015.

According to plaintiff, upon speaking with C.O. Blackmon on July 12, 2015, and learning of plaintiff's complaints, Lt. Hann should have interviewed plaintiff immediately, created a report of the incident, and sent plaintiff for a medical evaluation.

On July 20, 2015, plaintiff submitted a grievance respecting C.O. Sudranski's alleged misconduct. Plaintiff wrote: "C.O. Sudranski deliberately hit me in the testicle area. Then, [h]e fondled my groin area in the front with his left hand. Causing great discomfort and pain. I tried to speak with the Lieutenant on [s]ite. But was immediately told to keep going, there's no stopping." (Doc. #148 ("Gashi Decl.") Ex. C at 1).

## DISCUSSION

I. Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[2]

[2]  Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 322–23. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**\*3**  In deciding a motion for summary judgment, the Court need consider only evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998). The burden to proffer evidence admissible pursuant to the Federal Rules of Evidence applies "equally to pro se litigants." Varughese v. Mt. Sinai Med. Ctr., 2015 WL 1499618, at \*4 (S.D.N.Y. Mar. 27, 2015) (citing Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)).[3] Accordingly, bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 272 of 830

Vann v. Sudranski, Not Reported in Fed. Supp. (2020)

2020 WL 3001072

3    Plaintiff will be provided copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

## II. Excessive Force Claim

Defendants argue plaintiff fails as a matter of law to establish an Eighth Amendment excessive force claim with respect to C.O. Sudranski's pat frisk of plaintiff.

The Court agrees inasmuch as plaintiff alleges an excessive force claim against Lt. Hann, but disagrees as to plaintiff's excessive force claim against C.O. Sudranski.

### A. Legal Standard

There are two components to a claim of cruel and unusual punishment in violation of the Eighth Amendment: one objective and one subjective. Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009). The objective inquiry focuses on the harm done in light of "contemporary standards of decency." Wright v. Goord, 554 F.3d at 268 (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). An inmate must show "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. (quoting Hudson v. McMillian, 503 U.S. at 8). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.... This is true whether or not significant injury is evident.' " Id. at 268–69 (quoting Hudson v. McMillian, 503 U.S. at 9).

> Although not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights, a showing of extreme injury is not required to bring an excessive force claim if the alleged conduct involved unnecessary and wanton infliction of pain.

Toliver v. N.Y.C. Dep't of Corr., 202 F. Supp. 3d 328, 334–35 (S.D.N.Y. 2016).

To establish the subjective inquiry, an inmate must show the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." Wright v. Goord, 554 F.3d at 268. "The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (citing Hudson v. McMillian, 503 U.S. at 7).

To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response."

**\*4** Id. (quoting Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993)).

### B. C.O. Sudranski

There are genuine issues of material fact as to whether C.O. Sudranski used excessive force while performing a pat frisk on plaintiff on July 12, 2015. With respect to the first prong of the Eighth Amendment analysis, plaintiff has presented evidence that the alleged wrongdoing was objectively harmful. Indeed, plaintiff testified at his deposition that during the frisk, C.O. Sudranski "forcibly reverse[ ] karate chopped and hit me in my groin, my testicles and then he leaned on my back with his right arm and he reached with his left hand around and fondled my groin area and shook it." (See Doc. # 148-2 ("Pl. Dep.") at 40). Plaintiff further testified he told C.O. Blackmon about the alleged incident immediately after it occurred (id. at 44), and on July 20, 2015, plaintiff filed a grievance respecting C.O. Sudranski's alleged misconduct. (See Doc. #148-3). Moreover, attached to plaintiff's opposition are records of plaintiff's complaints to medical personnel of testicular pain following the incident, one of which, dated July 13, 2015—the day after the frisk—notes tenderness in plaintiff's testicles and minor trauma. (Pl. Mem. at ECF 62).[4] Whether plaintiff's story is true is for a jury to determine.

4    Citations to "ECF __" refer to page numbers automatically assigned by the Court's Electronic Case Filing system.

Defendants nevertheless argue the record evidence demonstrates C.O. Sudranski's use of force was de minimis

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 273 of 830
Vann v. Sudranski, Not Reported in Fed. Supp. (2020)
2020 WL 3001072

and applied for the legitimate, penological purpose of performing a routine pat frisk to ensure safety and maintain order at Green Haven. Even still, the material factual dispute respecting what occurred on July 12, 2015, precludes summary judgment in C.O. Sudranski's favor. Defendants would have the Court overlook plaintiff's testimony and instead rely only on defendants' factual recitation of the incident—that the force used was de minimis and appropriate under the circumstances. But "as a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010). Again, plaintiff's credibility is a jury question.

With respect to the subjective prong of the inquiry, a triable issue of fact exists regarding whether the alleged force was used in a good-faith effort to conduct a routine frisk, or maliciously and sadistically to cause harm. The record is devoid of evidence suggesting C.O. Sudranski needed to use any amount of force to maintain plaintiff's compliance during the frisk, or evidence suggesting plaintiff failed to follow C.O. Sudranski's orders during same. In other words, there appears to have been no need for C.O. Sudranski to employ a forceful strike or motion during the frisk, if in fact that is what he did. Moreover, defendants do not convincingly suggest that such force, if used, would have been justified under the circumstances.

**\*5** Instead, defendants contend no reasonable jury could find that C.O. Sudranski's alleged use of force was malicious or sadistic because he and plaintiff had no prior relationship, and because C.O. Sudranski was unaware plaintiff took issue with the frisk when it occurred. This argument fails. First, it presupposes that an excessive force claim cannot lie absent retaliatory intent, and second, it inappropriately deflects focus of the inquiry to plaintiff's reaction to the allegedly unconstitutional conduct.

In short, genuine issues of material fact preclude summary judgment on the excessive force claim against C.O. Sudranski.

### C. Lt. Hann

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." Wright v. Smith, 21 F.3d 496, 501 (2d. Cir. 1994).

Supervisor liability under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)). [5] Moreover, Section 1983 liability cannot be predicated on a theory of respondeat superior. See City of Canton v. Harris, 489 U.S. 378, 385 (1989). Indeed, "[t]he bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." Colon v. Coughlin, 58 F.3d at 874.

[5]
After Ashcroft v. Iqbal, district courts within the Second Circuit have been divided as to whether claims alleging personal involvement under the second, fourth, and fifth of these factors remain viable. See Marom v. City of New York, 2016 WL 916424, at \*15 (S.D.N.Y. Mar. 7, 2016) (collecting cases). The Second Circuit has yet to resolve this dispute. Id.

Here, plaintiff concedes Lt. Hann did not directly participate in the frisk conducted by C.O. Sudranski. In fact, according to plaintiff, he (plaintiff) attempted to discuss the incident with Lt. Hann after the incident had occurred. Accordingly, because Lt. Hann had no personal involvement in the alleged constitutional violation, she is entitled to summary judgment on the excessive force claim.

### III. Sexual Abuse Claim

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 274 of 830

Vann v. Sudranski, Not Reported in Fed. Supp. (2020)

2020 WL 3001072

Defendants next argue plaintiff, as a matter of law, cannot establish an Eighth Amendment sexual abuse claim against C.O. Sudranski.

The Court agrees.

"Instances of sexual contact by prison officials violate the constitution if they disturb 'contemporary standards of decency' and are 'objectively, sufficiently serious enough." Cole v. Suffolk Cty. Corr. Facility, 2020 WL 2113205, at *3 (E.D.N.Y. May 4, 2020) (quoting Boddie v. Schneider, 105 F.3d 857, 861 (2d Cir. 1997)). "In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." Crawford v. Cuomo, 796 F.3d 252, 258 (2d Cir. 2015) (citing Whitley v. Albers, 475 U.S. 312, 320–21 (1986)). Courts in the Second Circuit have consistently held that "brief contact with an arrestee's ... genital area during a pat-down, without more, is insufficient" to state a constitutional claim. Scalpi v. Amorim, 2018 WL 1606002, at *18 (S.D.N.Y. Mar. 29, 2018) (collecting cases).

**\*6** Here, the undisputed record evidence demonstrates C.O. Sudranski made, at most, brief contact with plaintiff's genital area during a routine and necessary pat frisk. "Slight contact of this sort is to be expected during a frisk," Cole v. Suffolk Cty. Corr. Facility, 2020 WL 2113205, at *4, and is inherent in an officer's pat-down of an inmate's person to search for contraband. The undisputed evidence demonstrates the contact was not lengthy, and plaintiff's legs, pelvic, and groin areas were clothed during the frisk. Moreover, the frisk was conducted in the presence of several other officers, inmates, and at least one supervisor, and was incidental to legitimate penological duties. Simply, there is no evidence to suggest C.O. Sudranski frisked plaintiff in a sexually inappropriate manner, even though, as noted above, there is a material issue of fact respecting the amount of force C.O. Sudranski used during the frisk.

Thus, defendants are entitled to summary judgment on the sexual abuse claim.

IV. Failure to Intervene Claim

Defendants further argue plaintiff, as a matter of law, cannot establish an Eighth Amendment failure to intervene claim against Lt. Hann.

The Court agrees.

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). "Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be." Jean-Laurent v. Wilkerson, 461 F. App'x 18, 21 (2d Cir. 2012) (summary order) (citing Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001)). "However, 'in order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.' " Id. (citing Anderson v. Branen, 17 F.3d at 557).

Here, the record evidence, including plaintiff's testimony, demonstrates the complained-of force involved, at most, "one strike" to plaintiff's groin area. (See Pl. Dep. at 85; see also Pl. Mem. at 1 ("Sudranski struck plaintiff forcefully with a 'reverse karate chop' to his testicle and groin area.")). The evidence does not support any claim that Lt. Hann witnessed the allegedly unlawful conduct, encouraged or acquiesced in such conduct, or had a realistic opportunity to prevent the alleged use of excessive force from occurring.

For these reasons, Lt. Hann is entitled to summary judgment on this claim. [6]

[6]     Because plaintiff's failure to intervene claim against Lt. Hann fails as a matter of law, the Court need not address whether plaintiff exhausted this claim.

V. Qualified Immunity

Finally, C.O. Sudranski argues that, to the extent the record supports an Eighth Amendment excessive force claim, such claim should be dismissed on the basis of qualified immunity. [7]

[7]     Because plaintiff's claims against Lt. Hann fail as a matter of law, the Court need not address whether Lt. Hann is entitled to qualified immunity.

The Court disagrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

**Vann v. Sudranski, Not Reported in Fed. Supp. (2020)**

2020 WL 3001072

The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). "Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail." Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003); see also Atkins v. County of Orange, 372 F. Supp. 2d 377, 403–04 (S.D.N.Y. 2005) (precluding summary judgment on defense of qualified immunity as to plaintiff's excessive force claim), aff'd sub nom. Bellotto v. County of Orange, 248 F. App'x 232 (2d Cir. 2007) (amended summary order).

*7 Here, there is a genuine factual dispute concerning whether C.O. Sudranski used excessive force against plaintiff during the July 12, 2015, frisk. Plaintiff's Eighth Amendment right to be free from the use of excessive force was clearly established at the time of the allegedly unlawful conduct, and it would not have been objectively reasonable for C.O. Sudranski to have believed he could lawfully violate that right

by forcefully striking plaintiff in the groin during a routine pat frisk.

Accordingly, factual issues preclude summary judgment in favor of C.O. Sudranski on basis of qualified immunity.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's Eighth Amendment excessive force claim against C.O. Sudranski shall proceed. All other claims are dismissed.

Plaintiff and defense counsel are directed to appear for a telephone status conference on July 8, 2020, at 11:00 a.m., at which time the Court will discuss the scheduling of a trial. Defense counsel shall make all necessary arrangements for plaintiff to appear by telephone. Plaintiff and defense counsel shall attend the conference by calling the following number and entering the access code when requested:

**Dial-In Number:**          **(888) 363-4749 (toll free) or (215) 446-3662**

**Access Code:**          **1703567**

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate the motion (Doc. #145) and terminate Lt. Hann as a defendant in this action.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2020 WL 3001072

---

**End of Document**          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 276 of 830

Washington v. Piper, Not Reported in Fed. Supp. (2019)

2019 WL 6343516

2019 WL 6343516
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kenneth Eric WASHINGTON, Plaintiff,

v.

C.O. L. PIPER; Sheriff Carl E. DuBois, Defendants.

18 CV 7783 (NSR)
|
Signed 11/26/2019

**Attorneys and Law Firms**

Kenneth Eric Washington, Goshen, NY, pro se.

Karen D. Edelman-Reyes, New York County District
Attorney's Office, New York, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United State District Judge

**\*1** *Pro se* inmate Plaintiff Kenneth Eric Washington
("Plaintiff") commenced the instant action on August 23,
2018 asserting 42 U.S.C. § 1983 ("Section 1983") claims
against Defendants. (ECF No. 2). In his Complaint, Plaintiff
alleges Defendants violated his Eighth Amendment rights
against cruel and unusual punishment. Plaintiff asserts direct
claims against Defendant Correction Officer L. Piper ("C.O.
Piper") and supervisory liability claims against Defendant
Sheriff DuBois ("DuBois"). As against DuBois, Plaintiff
asserts he displayed gross indifference as a supervisor of the
correctional facility during the time of the alleged violation.
Presently before the Court is Defendants' motion to dismiss
the Complaint pursuant to Rule 12(b) 6 of the Federal Rules
of Civil Procedure. ("Rule 12(b) 6"). (ECF No. 19.) For the
following reasons, Defendants' motion is Granted.

**BACKGROUND**

For the purposes of this motion, all facts in Plaintiff's
Complaint are taken as true and are construed in the light most
favorable to *pro se* Plaintiff.

*Pro se* Plaintiff Kenneth Eric Washington ("Plaintiff") was
housed at the Orange County Correctional Facility ("Jail")

on March 5, 2018, and during the days that followed, as a
pre-trial detainee. On March 5, 2018, at approximately 5:45
a.m. while in the "E-2 Dormitory" of the facility, Plaintiff was
subjected to the poking of his groin by C.O. Piper. Plaintiff
subsequently filed a grievance which was denied as meritless.
Plaintiff seeks to recover $750,000 in damages for mental
anguish, and he requests that officers receive better training
in preventing sexual assault and managing cases of alleged
sexual assault.

**STANDARD OF REVIEW**

**Rule 12(b)** 6

Rule 12(b) 6 provides in relevant part that a party may motion
to dismiss a complaint for "failure to state a claim upon
which relief can be granted." Fed. R. Civ. P. 12. "To survive a
motion to dismiss, a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is
plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678
(2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,
570 (2007)). In evaluating the sufficiency of a complaint,
"[a] court 'can choose to begin by identifying pleadings that,
because they are no more than conclusions, are not entitled
to the assumption of truth.' " *Hayden v. Paterson*, 594 F.3d
150, 161 (2d Cir. 2010) (*quoting Iqbal*, 556 U.S. at 679). "At
the second step, a court should determine whether the 'well-
pleaded factual allegations,' assumed to be true, 'plausibly
give rise to entitlement to relief.' " *Hayden*, 594 F.3d at 161
(*citing Iqbal*, 556 U.S. at 679); *accord Harris v. Mills*, 572
F.3d 66, 72 (2d Cir. 2009).

"A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard
is not akin to a probability requirement, but it asks for more
than a sheer possibility that a defendant has acted unlawfully."
*Id.* (internal quotations omitted). "Where a complaint pleads
facts that are merely consistent with a defendant's liability, it
stops shorts of the line between possibility and plausibility of
entitlement to relief." *Id.* (internal quotations omitted).

**\*2** Although documents filed *pro se* are to be liberally
construed, *see Hill v. Curcione*, 657 F.3d 116, 122 (2d
Cir. 2011), even *pro se* pleadings "must contain factual
allegations sufficient to raise a 'right to relief above the
speculative level.' " *Dawkins v. Gonyea*, 646 F. Supp.2d 594,
603 (S.D.N.Y. 2009), *quoting Twombly*, 550 U.S. at 555. A

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 277 of 830

Washington v. Piper, Not Reported in Fed. Supp. (2019)

2019 WL 6343516

complaint that "tenders 'naked assertions' devoid of 'further factual enhancement' " is insufficient. *Iqbal*, 550 U.S. at 678 *quoting Twombly*, 550 U.S. at 557. Thus, while the Court is " 'obligated to draw the most favorable inferences' " that the complaint supports, it " 'cannot invent factual allegations that [the plaintiff] has not pled.' " *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 361 (S.D.N.Y. 2013) (*quoting Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). In other words, "the duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it for him." *Joyner v. Greiner*, 195 F. Supp. 2d 500, 503 (S.D.N.Y. 2002).

## Section 1983

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). To state a claim under § 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, No. 09-CV-5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). Therefore, a § 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *See Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution.") (citation omitted).

## DISCUSSION

### Personal Involvement

Plaintiff fails to assert personal involvement on the part of Defendant DuBois in this matter. In order to hold a defendant responsible for a constitutional deprivation, Plaintiff must demonstrate, *inter alia*, the defendant's personal involvement. *Grullon v. City of New Haven*, 720 F.3d 133, 138-39 (2d Cir. 2013). "[P]ersonal involvement of Defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C. § 1983.]" *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "The general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the Defendant is required." *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060 (2d Cir. 1989); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 692-95 (1978). Supervisory officials may be personally involved within the meaning of Section 1983 only if he or she participated in unlawful conduct. *See Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986). "A Plaintiff must thus allege a tangible connection between the acts of a Defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[A] Plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). In the context of a prisoner's lawsuit, a Plaintiff must show "more than the linkage in the prison chain of command" to state a claim against a supervisory defendant. *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).

**\*3** Here, Plaintiff fails to allege facts of any personal involvement by Defendant DuBois. There is merely the allegation of supervisory approval of the alleged Section 1983 violation. Within this circuit, courts have held that the mere allegation of supervisory approval, without more, is insufficient to show any personal involvement. See *Gomez v. Sepiol*, 11-cv-1017 (SR), 2014 WL 1575872 at *6 (W.D.N.Y., Apr. 11, 2014), (Court noting that merely rubber stamping the results of a disciplinary hearing is insufficient to establish personal involvement in a § 1983 claim); *Rodriguez v. The City of New York*, 644 F. Supp. 2d 168, 199 (E.D.N.Y., 2008) (Complaint against several individual defendants dismissed where Court held that the approval of an employment decision to terminate plaintiff in reliance on other individuals did not constitute personal involvement for § 1983 purposes); *Allah v. Poole*, 506 F.Supp.2d 174, 190 (W.D.N.Y., 2007) (dismissing complaint against defendant where sole allegation was that he, as a supervisor, approved the recommendation of another employee to transfer plaintiff to a restrictive housing unit within a correctional facility, holding that mere approval did not establish sufficient personal involvement).

2019 WL 6343516

For the aforementioned reasons, the claim against Defendant DuBois is dismissed for lack of personal involvement.

## 8th Amendment

The Eighth Amendment of the United States Constitution prohibits cruel and unusual punishment against a prisoner. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Sexual abuse of a prisoner by a corrections officer may be the basis for an 8th Amendment claim under § 1983. *Boddie v. Schneider*, 105 F.3d 857, 859 (2d Cir. 1997). To establish a violation of the Eighth Amendment, the following two elements must be met: (1) The alleged abuse must be "objectively, sufficiently serious"; and (2) the prison official must have a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Even though Plaintiff does no specifically discern in his Complaint, he was a pre-trial detainee. (ECF No. 20). Therefore, Plaintiff's allegations must sufficiently state a claim against Defendant Piper under the Fourteenth Amendment standard applicable to pretrial detainees. See *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) citing *Kingsley v. Hendrickson*, U.S., 135 S.Ct. 2466, 2476 (2015).

Under the objective standard,[1] the sexual abuse must be "objectively, sufficiently serious" considering "contemporary standards of decency, but "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997) quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); see also *Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015). In *Boddie*, *infra*, though the Court held that certain allegations of sexual abuse may violate contemporary standards of decency and constitute a violation of the Eighth Amendment, it noted that the alleged abuse must be "severe or repetitive" to establish that the conduct complained of was objectively, sufficiently serious. See *Boddie v. Schneider*, 105 F.3d at 861. The *Boddie* Court rejected allegations of a small number of incidents in which the defendant made inappropriate comments, touched Plaintiff's genitals and pressed against Plaintiff without his consent, and the Court found this was not in violation of the Eighth Amendment. *Id.*

[1]   An assessment of the objective standard remains pursuant to the same standards as the Eight Amendment proscribed prior to *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

Courts following *Boddie*, have noted that where the allegation is "a single incident of sexual abuse" it must be "sufficiently severe or serious," in order to objectively violate the Eighth Amendment in that the act alleged must demonstrate "intentional contact with an inmate's genitalia ... which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate." *Crawford*, 796 F.3d at 257-58 (finding objective prong satisfied where officer was alleged to have "fondl[ed] and squeeze[ed] [the inmate's] penis," "roamed" the inmate's thigh, to "make sure [he] did not have an erection"); *see also Shannon v. Venetozzi*, 670 Fed.Appx. 29, 31 (2d Cir. 2016) (allegations that officer hit and fondled the inmate's genitals and rubbed his buttocks while stating that "[t]his is my visiting room and I run it the way I want," on four occasions sufficient for Eighth Amendment violation); *Shepherd v. Fischer*, 08-cv-9297 (RA), 2018 WL 3122053 at *2 (S.D.N.Y. June 26, 2018) (inmate allegations that officer "rammed" a metal wand "between [his] ... butt cheeks," and stating to inmate that he "should ... 'f' [Plaintiff] with it," sufficient for Eighth Amendment violation); *cf. Shtilman v. Makram*, 14-cv-6589 (NSR), 2018 WL 3745670 at *5, (S.D.N.Y. Aug. 6, 2018) (officer alleged to have "nearly stuck their fingers ... between [Plaintiff's] buttcheeks [sic]," not sufficient to establish an Eighth Amendment claim).

**\*4** In the present matter, Plaintiff alleges that he was subjected to a single incident of a poke to "the groin (penis)." (ECF No. 2). Accepting Plaintiff's version of the facts as true, these allegations fail to rise to the level of a constitutional violation to support a Section 1983 claim. *See Boddie*, *infra*, *Crawford*, *infra*. Plaintiff also failed to allege sufficient facts concerning the severity of the poke. The allegations fail to identify any physical injury. The Complaint is simply devoid of any facts which would contextualize the poke to such a degree that it would support a finding that it was an effort to "arouse or gratify the officer or humiliate the inmate." *Crawford v. Cuomo*, 796 F.3d at 257-58.

As noted by the court in *Boddie*, though the isolated episodes of alleged touching may be unsavory, "they do not involve a harm of federal constitutional proportions as defined by the Supreme Court." See *Montero v. Crusie*, 153 F.Supp.2d 368, 373, 375 (S.D.N.Y. 2001) (allegation that correctional officer squeezed inmate's genitalia while pat-frisking him not sufficient to sustain an Eighth Amendment claim, especially where no allegation of injury); *Harry v. Suarez*, 2012 WL 2053533, at *3 (S.D.N.Y., June 4, 2012) (allegations that corrections officer groped plaintiff's genitals, buttocks, and

Washington v. Piper, Not Reported in Fed. Supp. (2019)

2019 WL 6343516

inner thighs for up to 53 seconds during frisk insufficient to sustain Eighth Amendment claim); *Williams v. Keane*, 1997 WL 527677, *9-11 (S.D.N.Y., Aug. 25, 1997) (dismissing the Eighth Amendment claim as insufficient where defendant put his hand down plaintiff's pants and fondled plaintiff's testicles).

Plaintiff's allegation of minimal contact by Defendant Piper is an example of a single incident which is not "sufficiently severe or serious," and does not objectively violate the Constitution. *See Crawford v. Cuomo*, 796 F.3d 252, 257-58 (2d Cir. 2015) (finding objective prong satisfied where officer was alleged to have "fondl[ed] and squeeze[d] [the inmate's] penis," "roamed" the inmate's thigh, to "make sure [he] did not have an erection").

While the subjective prong, requires an assessment of "whether the contact is incidental to legitimate official duties, such as justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate," the analysis must take place in the context of Plaintiff's status as a pretrial detainee. *Crawford v. Cuomo*, 796 at 257-58; *see also Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (Plaintiff's claims as pretrial detainee are "governed by the Due Process Clause of the Fourteenth Amendment, rather than ... the Eighth Amendment"). As a pretrial detainee, Plaintiff need only establish that his detention conditions were " 'sufficiently serious to constitute objective deprivations of the right to due process' and that the officer acted intentionally or with at least deliberate indifference to the challenged conditions." *Noonan v. New York City Police Department Officer Carlos Becker*, 14-cv-4084 (LTS) (JLC), 2017 WL 3638201 at *4 (S.D.N.Y. Aug. 23, 2017), quoting *Darnell v. Pineiro*, 849 F.3d at 29, 35.

Under the subjective prong, the Plaintiff must allege that Defendant Piper's poke to the groin was " 'sufficiently serious to constitute objective deprivations of the right to due process' and that the officer acted intentionally or with at least deliberate indifference to the challenged conditions." *Id.* quoting *Darnell v. Pineiro*, 849 F.3d at 29, 35. While "where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances be sufficient evidence of a culpable state of mind," *Boddie, supra*, 861, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Crawford v.*

*Cuomo, supra*, at 257-58; *Shtilman v. Makram*, 14-cv-6589 (NSR), 2018 WL 3745670 at *5, (S.D.N.Y. Aug. 6, 2018) (officer alleged to have "nearly stuck their fingers ... between [Plaintiff's] buttocks [sic]," not sufficient to establish an Eighth Amendment claim).

**\*5** Plaintiff's bare allegations of a poke to the groin while he was in inside of his housing unit fail to assert sufficient facts. The Plaintiff does not assert any injury to Plaintiff, allegations of statement or comment by Defendant Piper, provide further description of the surrounding circumstances, nor indicate whether he was awake or asleep just prior to the incident. Plaintiff fails to allege sufficient objective facts of an act which is sufficiently severe and serious. Plaintiff also fails to allege facts of Defendant Piper's culpable state of mind as required under the Fourteenth Amendment. *See Shepherd v. Fisher*, 08-cv-9297 (RA), 2017 WL 666213, at *18 (S.D.N.Y. Feb. 16, 2017) ("squeezing and fondling of Plaintiff's genitalia, combined with the accompanying threats of sexual violence or retaliation, would allow a reasonable factfinder to find that the corrections officer ... intended to sexually gratify themselves, to humiliate [ ], or both."); *see also Shannon v. Venettozzi*, 670 Fed.Appx. at 31 ("[sexually-explicit] statements, in conjunction with ... description of the forcefulness of ... the pat-downs were sufficient to plausibly allege that [the officer] conducted the pat-downs" to gratify himself or humiliate the inmate).

For the aforementioned reasons, Plaintiff's complaint fails to state a claim of an 8th Amendment violation.

## COMPENSATORY DAMAGES

Plaintiff seeks seven hundred fifty thousand dollars ($750,000.00) in damages for the alleged violations of his constitutional rights. However, Plaintiff failed to specifically denominate what type of injury he sustained. Section 1997e(e) of the PLRA states that – "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." Plaintiff does not allege any physical injury resulting from the claimed deprivation of his constitutional rights – rather, he only alleges emotional harm. (ECF No. 2). For claims seeking damages for mental or emotional damages, a defendant must "make a prior showing of physical injury." *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999). In this matter, Plaintiff failed to assert sufficient facts to support a finding of a requisite harm of physical injury.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 280 of 830

Washington v. Piper, Not Reported in Fed. Supp. (2019)

2019 WL 6343516

Separately, to the extent that plaintiff's claim for damages includes punitive damages, such measure of damages is not warranted. Plaintiff has not alleged any facts indicating that defendants' conduct was "motivated by evil motive or intent" or that defendants exhibited "reckless or callous indifference" to his federally protected rights which is a pre-requisite to the imposition of punitive damages. *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (*quoting Smith v. Wade*, 461 U.S. 30, 56 (1983)).

**QUALIFIED IMMUNITY**

Qualified immunity protects government officials from liability as long as their actions are discretionary in nature and do not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity is available 'when the undisputed facts establish that it was objectively reasonable for the defendants to believe that their actions did not violate clearly established rights.' " *Dawkins v. Gonyea*, 646 F.Supp.2d 594, 613 (S.D.N.Y. 2009), *quoting Before v. Premore*, 86 F.3d 48, 50 (2d Cir. 1996). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Johnson v. Goord*, 487 F. Supp.2d 377, 398 (S.D.N.Y. 2007), aff'd 305 Fed. Appx. 815 (2d Cir. 2009) (internal quotations and citations omitted). The Supreme Court has urged courts to decide the issue of qualified immunity at the earliest possible opportunity, *See Saucier v. Katz*, 533 U.S. 194, 200 (2001), overruled on other grounds, *Pearson v. Callahan*, 555 U.S. 223 (2009). "[T]he question to be answered is whether the defendant officer, confronted with the facts as alleged by the plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right." *5 Borough Pawn, LLC v. City of New York*, 640 F.Supp.2d 268, 285 (S.D.N.Y. 2009); *accord Dawkins*, *supra*, at 613.

**\*6** The facts as alleged are insufficient to establish a constitutional or statutory violation on the part of Defendant Piper. It was objectively reasonable for a correctional officer to believe that his actions were lawful, if true, under the circumstances. No facts were alleged as to the conduct by Defendant DuBois. Therefore, Defendants is entitled to qualified immunity, and the operative Complaint is dismissed against Defendants Piper under Rule 12(b)6.

**CONCLUSION**

For the aforementioned reasons, Defendants' motion to dismiss the Complaint is granted in its entirety. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 19, to close the case, to mail a copy of this Opinion and Order to Plaintiff's last known address and to show proof on the docket.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 6343516

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Dozier v. Franco, Not Reported in Fed. Supp. (2018)

2018 WL 3094935

KeyCite Yellow Flag - Negative Treatment

Distinguished by *Russell v. Scott,* D.Vt., April 10, 2024

2018 WL 3094935
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gary Lee DOZIER, Jr., Plaintiff,

v.

C.O. FRANCO, Defendants.

17-cv-3348 (NSR)
|
Signed 06/22/2018

**Attorneys and Law Firms**

Gary Lee Dozier, Jr., Fishkill, NY, pro se.

Amanda Shoffel, NYS Office of the Attorney General, New York, NY, for Defendants.

OPINION AND ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Gary Lee Dozier, Jr. ("Plaintiff"), proceeding *pro se,* commenced this action on May 4, 2017, pursuant to 42 U.S.C. § 1983 for alleged Eighth Amendment violations, (*see* Complaint ("Compl."), (ECF No. 1) ), against Defendant CO. Franco ("Franco" or "Defendant"). Presently before the Court is Defendant's motion to dismiss Plaintiff's Complaint for failure to state a cause of action and for sovereign immunity pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), respectively ("Defendant's Motion"). (*See* Defendant's Brief in Support of his Motion to Dismiss ("Def. Br.") (ECF No. 14).) Plaintiff has failed to oppose Defendant's Motion. The Court deems the motion fully submitted and renders the following decision on the merits. For the following reasons, Defendant's Motion is GRANTED.

**FACTUAL BACKGROUND**

The incident that is central to this case occurred while Plaintiff was an inmate at Sing Sing Correctional Facility ("Sing Sing"). [1] (*See* Compl. at 2.) [2] On January 22, 2017, at approximately 9:30 a.m., before walking to "keeplock

recreation", Plaintiff was subjected to a frisk by a corrections officer. (*Id.* at 3.) All inmates must be frisked before they enter "keeplock recreation." (*Id.*) Franco performed the frisk of Plaintiff, and "squeezed, grabbed, and fondled [Plaintiff's] genital area twice." (*Id.*) While he was doing so, he attempted to loosen Plaintiff's "belt and go threw [sic] [his] boxers to do it again." (*Id.*) Plaintiff contends that as a result of this incident, he was given pain medication, but suffers "constant pain in [his] genital area" and "a permanent phobia of being pat frisked." (*Id.*) Plaintiff alleges no other facts.

[1]     Plaintiff now resides at Sing Sing Correctional Facility. (*See* Compl. at 1.)

[2]     As Plaintiff is proceeding *pro se* and his Complaint is the standard, fillable 42 U.S.C. § 1983 complaint, all citations thereto will be to pages, not paragraphs.

**LEGAL STANDARD**

**I. 12(b)(6)**

Dismissal is proper on a 12(b)(6) motion to dismiss unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) ). The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 555.

Courts must construe *pro se* pleadings in a particularly liberal fashion, *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009), and interpret them "to raise the strongest arguments that they suggest," *Harris v. City of N.Y.,* 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation omitted). Nevertheless, a *pro se* plaintiff's pleading must contain factual allegations that sufficiently "raise a right to relief above the speculative level," *Jackson v. N.Y.S. Dep't of Labor,* 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010), and the Court's duty to construe the complaint liberally is not "the equivalent of a duty to re-write it," *Geldzahler v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

**II. 12(b)(1)**

**\*2** Without subject matter jurisdiction, the Court is devoid of the "power to adjudicate the merits of the case." *Carter v. HealthPort Tech., LLC,* 822 F.3d 47, 55 (2d Cir. 2016); *see also Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167, 170

2018 WL 3094935

(2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010); *Alliance for Env't'l Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006). If an official or entity is entitled to sovereign immunity, a court has no subject matter jurisdiction to hear the case. *See Cooper v. N.Y. State Dep't of Mental Health*, No. 01-CV-943 (AGS), 2001 WL 456348, at *1 (S.D.N.Y. May 1, 2001); *see also Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 37-38 (2d Cir. 1977).

## DISCUSSION

### I. Sovereign Immunity

Defendant moves to dismiss all claims alleged against him in his official capacity as barred by sovereign immunity. (*See* Def. Br. at 4-5.) Plaintiff's Complaint does not specify whether he is suing Defendant in his individual capacity only, or his individual and official capacity. (*See generally* Compl.) To the extent Plaintiff's claims are asserted against Defendant in his official capacity, they are barred by the doctrine of sovereign immunity.

It is axiomatic that a state is immune from suit in federal court, absent abrogation by Congress. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-56 (1996); *Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir. 1990). This immunity extends to agents and employees of DOCCS, as they are considered "arms of the state." *Dube*, 900 F.2d at 594-95; *see also Matteo v. Perez*, No. 16-CV-1837(NSR), 2017 WL 4217142, at *7 (S.D.N.Y. Sept. 19, 2017). Section 1983 has not carved out an exception to the doctrine of sovereign immunity, thus claims against state agents in their official capacity pursuant to Section 1983 are ripe for dismissal. *Matteo*, 2017 WL 4217142, at *7 (citing *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012) and *Koehl v. Dalsheim*, 85 F.3d 86, 88-89 (2d Cir. 1996) for proposition that Section 1983 claims based on official capacity "barred by sovereign immunity"). Defendant's Motion is granted in this regard.

Any state law claims asserted against Defendant in his official capacity are likewise barred and hereby dismissed. *See Parris*, 947 F. Supp. 2d at 365; *Baker v. Coughlin*, 77 F.3d 12, 15-16 (2d Cir. 1996) (state law claims arising "from acts or omissions within the scope of their employment at DOCCS" dismissible for lack of subject matter jurisdiction); *see also* N.Y. Corr. Law § 24 (requiring that lawsuits related to DOCCS employees' conduct within the scope of their employment, be brought in New York Court of Claims against the State).

## II. Eighth Amendment Claim

The crux of Defendant's Motion is that Plaintiff's Complaint must be dismissed for failure to allege facts indicating that the alleged sexual misconduct that occurred during pat frisk rises to the level of an Eighth Amendment claim. (*See* Def. Br. at 1-4.) This Court agrees.

To make out any Eighth Amendment claim, a Plaintiff must "satisfy a two-prong test with both objective and subjective components." *Banks v. William*, No. 11-CV-8667(GBD) (JLC), 2012 WL 4761502, at *3 (S.D.N.Y. Sept. 27, 2012), *report and recommendation adopted by* 2013 WL 764768 (Feb. 28, 2013). There is no doubt that "sexual abuse by a corrections officer can give rise to an Eighth Amendment claim." *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015) (citing *Boddie v. Schnieder*, 105 F.3d 857, 859 (2d Cir. 1997) ). Such conduct amounts to an Eighth Amendment violation where the alleged conduct "serves no penological purpose *and* is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate." *Id.* (emphasis added.) Even a "single incident of sexual abuse, if sufficiently severe or serious, may violate" the inmate's rights. *Id.* Moreover, "even less severe but repetitive conduct may still be cumulatively egregious enough to violate the constitution." *Shannon v. Venettozzi*, 670 Fed.Appx. 29, 31 (2d Cir. 2016) (summary order). The critical inquiry "is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it was taken to arouse or gratify the officer or humiliate the inmate." *Crawford*, 796 F.3d at 257 (citing *Whitley v. Albers*, 475 U.S. 312 (1986) ). Plaintiff's facts, as alleged, simply do not give rise to an Eighth Amendment violation.

**\*3** Preliminarily, Plaintiff's facts regarding the description of the event are scant, leaving this Court little room to ascertain the true nature of the conduct. Additionally, this was a single incident that took place during a routine pat frisk to which all inmates were subjected on their way to the "keeplock recreation" area, (*see* Compl. at 3), unlike in *Crawford*, where Plaintiff Corley's incident occurred during his visit with his wife, *Crawford*, 796 F.3d at 298. Most compellingly, Plaintiff fails to allege facts that would demonstrate that the conduct was undertaken to humiliate him or to sexually gratify Defendant. *Compare Bey v. Griffin*, No. 16-CV-3807(VB), 2017 WL 5991791, at *3 (S.D.N.Y. Dec. 1, 2017) (dismissing claim in absence of facts "to suggest the pat frisk was conducted with the intention of humiliating [plaintiff], for the sexual gratification of the C.O.s, or for a

2018 WL 3094935

malicious purpose"); *Banks*, 2012 4761502, at *4 (dismissing claim where officer "fondled [plaintiff] on a single occasion during a pat-down frisk") *with Crawford*, 796 F.3d at 298 (conduct sufficiently serious where officer made comment that he wanted to "make sure [plaintiff] did not have an erection" when he fondled and squeezed his penis); *Shannon*, 670 Fed.Appx. at 31 (noting that conduct occurred on four occasions, the pat frisks were described as "aggressive and very provocative", and plaintiff was told that if he did not "want to be searched and sexually assaulted" he should "stop coming to prison"). Plaintiff's claim must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion is GRANTED in its entirety and Plaintiffs Complaint is dismissed. The claims raised against Defendant in his official capacity are dismissed *with* prejudice. The claims for an Eighth Amendment violation against Defendant in his individual capacity, however, are dismissed without prejudice, and Plaintiff is granted leave to re-plead and file an Amended Complaint that alleges more facts to that would shed light on Defendant's intent (such as comments he made at the time) or the circumstances surrounding the frisk, in line with this opinion. To the extent Plaintiff intends to file an Amended Complaint, he must do so on or before July 23, 2018. The Clerk of the Court is respectfully requested to terminate the motion at ECF No. 13. Upon review of the DOCCS records, the Court has discovered that Plaintiff is no longer housed at Downstate Correctional Facility. The Clerk of the Court is therefore directed to mail a copy of this Opinion and Order to Plaintiff at Gary Lee Dozier, Jr., 11-A-1948, Sing Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562 and update the docket to reflect this address. Plaintiff is advised that it is his obligation to inform this Court of any and all address changes he has.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2018 WL 3094935

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)

2020 WL 409744

2020 WL 409744
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rodney JOSEPH, Plaintiff,

v.

Anthony ANNUCCI, et al., Defendants.

18-cv-7197 (NSR)
|
Signed 01/23/2020

**Attorneys and Law Firms**

Rodney Joseph, Napanoch, NY, pro se.

Rebecca Lynn Johannesen, NYS Office of the Attorney General, New York, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

**\*1** *Pro se* Plaintiff, Rodney Joseph ("Plaintiff"), formerly incarcerated at Sullivan Correctional facility, brings this action under 42 U.S.C. § 1983, asserting claims of deliberate indifference to his medical needs, forcible touching, assault, retaliation, denial of due process, and impeding religious practice. (*See* Complaint ("Compl."), ECF No. 2.) Plaintiff sues 44 medical staff members, kitchen staff members, correctional officers, and correctional officials employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), including Anthony Annucci, William Keyser, Edward Burnett, Gail Williams, Angelo Justiniano, Corey Proscia, Joseph Maxwell, Lane Kortright, Swany Reid, Frank Decker, Samuel Encarnacion, Stainislaus Ogbonna, Jefrysson Aldana, Scott Christie, Colleen Bennett, Tanya Pomeroy, Wladyslaw Sidorowicz, Janice Wolf, S.T. Herman, Epifanio Tolentio, Kevin Miller, Wayne Jordan, William Beach, Renee Askew, Michael Wood, Van Fuller, Gina Maliga, Heather Wyatt, William Elberth, Kellyanne Giminiani, Christopher Conway, Blain Reddish, Mark Puerschner, David Jurgens, Edward Bonnell, Shaun Braisington, Joseph Franke, Matthew DeFrank, Chester Stungis, Robert Depaolo, and Adam Jarosz (the "Represented Defendants").[1] (*Id.*)

[1]    Defendants Ginger Eggler, "Ginsin," and Alan Hanson have not been served. (*See* ECF Nos. 10, 11, and 15; Defendants' Memorandum of Law in Support of Their Motion to Dismiss, ECF No. 80 ("Defs.' Mot.") at 8, n.1.)

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), the Represented Defendants have moved to dismiss the Complaint. (*See* ECF No. 79.) Plaintiff has not responded to the motion; thus, per a memorandum endorsement dated August 5, 2019, the Court deemed the motion fully submitted. (*See* ECF No. 81.) For the following reasons, the Represented Defendants' unopposed motion to dismiss is GRANTED in part and DENIED in part.

BACKGROUND

**I. Factual Allegations**
The following facts are derived from the Complaint or matters of which the Court may take judicial notice and are taken as true and construed in the light most favorable to *pro se* Plaintiff for the purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).

**a. Plaintiff's Medical Condition and Treatment**
Plaintiff asserts that in or about 2008, after suffering a heart attack, he was placed on diabetic medications by a Sullivan Correctional Facility ("Sullivan") doctor. (Compl. at 18.) Sometime in 2016, however, he was taken off the diabetic medications by the medical staff at Sullivan. (*Id.*) Shortly after being taken off the diabetic medications, Plaintiff began to suffer pain in his arms, difficulty breathing, and an increased heart rate. (*Id.*) He complained to the Medical Department on a sick call visit, but only received 30 days off from work. (*Id.*) Plaintiff asserts that the pain got worse and he kept going to sick call but nothing was done to alleviate his pain. (*Id.*) In or about June 2017, after going to emergency sick call with "unbearable pain," Plaintiff suffered another heart attack and was rushed to a hospital where he underwent quadruple-bypass heart surgery. (*Id.*) Plaintiff asserts the following: the medical staff taking him off the diabetic medications led to his heart attack; he is presently in severe pain but is not receiving all of the recommended medications prescribed by a specialist; and he is possibly suffering the symptoms of another imminent heart attack or stroke. (*Id.* at 18–19.)

### b. January 11, 2018 Incident

**\*2**  Plaintiff also asserts forcible touching and assault claims against Defendant Correctional Officer Wyatt ("Wyatt") stemming from an incident that occurred on or about January 11, 2018. (*Id.* at 19.) Plaintiff alleges that, on January 10, 2018, he filed a grievance against Wyatt. (*Id.*) He alleges that after he filed the grievance, when he delivered feed-up bags for other inmates, Wyatt ordered him on the wall for a pat frisk although he had previously been pat frisked when he left the kitchen. (*Id.*) Plaintiff claims that while he was on the wall, Wyatt "started squeezing and poking in the areas where [he] had [his] quadruple-by-pass surgery, chest, arms, legs, and private parts." (*Id.* at 20.) Plaintiff alleges that Wyatt's actions caused him chest pains and led to a one-week hospital stay at Albany Medical Center because most of his arteries were blocked. (*Id.*)

### c. Officers' Retaliation

Plaintiff asserts that Wyatt acted in retaliation for Plaintiff's filing of the grievance against her. (*Id.*) Plaintiff also claims that he was subjected to retaliation by other correction officers for the filing of grievances. (*Id.*) He claims the following retaliatory actions: he was issued a fabricated misbehavior report and his job assignment was taken away on or about June 20, 2018, despite an "excellent work evaluation"; DOCCS staff would not allow him to notify his family when he was admitted to an outside hospital, or allow him to call his family; his cell was unreasonably searched five out of seven days; he was denied access to medication; and his religious callout was cancelled without a security reason. (*Id.* at 21–22.)

### d. Incident with Correctional Officer Elberth

Finally, Plaintiff alleges that while conducting a pat frisk, Correctional Officer Elberth ("Elberth") told him to reach back with his left hand and take off his right boot. (*Id.* at 22.) When Plaintiff told Elberth that he was unable to stretch out like that because of his medical issues, Elberth grabbed his left leg and pulled it back in a manner that caused Plaintiff's chest and face to hit the wall, causing him pain. (*Id.*) Plaintiff claims that Elberth then did the same thing to his right leg, despite Plaintiff informing Elberth that he was in pain. (*Id.*) After the incident, Plaintiff went to emergency medical and had to be rushed to the hospital for a "minor heart attack." (*Id.*) Plaintiff claims that the attack was caused by Elberth's actions, and now every time he sees Elberth, the officer threatens him. (*Id.*) Plaintiff asserts that Elberth also sends unspecified threatening messages to him through other correction officers. (*Id.*)

## LEGAL STANDARD

### I. Rule 12(b)(6)

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). Factual allegations must "nudge [a plaintiff's] claim from conceivable to plausible." *Twombly,* 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts which allow the court to draw a reasonable inference the defendant is liable. *Iqbal,* 556 U.S. at 678. To assess the sufficiency of a complaint, the court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir. 2013). While legal conclusions may provide the "framework of a complaint," "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678–79. When a motion to dismiss a complaint is unopposed, a court should nevertheless "assume the truth of a pleading's factual allegations and test only its legal sufficiency." *McCall v. Pataki,* 232 F.3d 321, 322 (2d Cir. 2000).

**\*3**  *Pro se* complaints are to be liberally construed. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). They must be held to less stringent standards than complaints written by lawyers, and only dismissed when the plaintiff can prove "no set of facts in support of his claim which would entitle him to relief." *Estelle,* 429 U.S at 106 (quoting *Conley v. Gibson*, 335 U.S. 41, 45–46 (1957)). This "is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir. 2008). *Pro se* complaints must be interpreted as raising the strongest claims they suggest, but "must still state a plausible claim for relief." *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir. 2013).

### II. Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. U.S.,* 201 F.3d 110, 113 (2d Cir. 2000). A plaintiff asserting subject matter jurisdiction in a federal court bears

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)

2020 WL 409744

the burden of proving that jurisdiction by the preponderance of the evidence. *Id.* The court must take all facts in the complaint as true and draw all inferences in favor of the party asserting jurisdiction. *Fountain v. Karim,* 838 F.3d 129, 134 (2d Cir. 2000). As with Rule 12(b)(6), when dealing with Rule 12(b)(1), the Court construes the allegations in a *pro se* plaintiff's complaint in the light most favorable to the *pro se* plaintiff. *Makarova,* 201 F.3d at 113.

### III. 42 U.S.C. § 1983 Claims

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under § 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " *Giordano v. City of New York,* 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999)).

### DISCUSSION

#### I. Defendants Who Are Only Named in the Caption

As an initial matter, Defendants Annucci, Keyser, Burnett, Williams, Justiniano, Proscia, Maxwell, Kortright, Reid, Decker, Encarnacion, Ogbonna, Aldana, Christie, Eggler, Bennett, Pomeroy, Sidorowicz, Wolf, Herman, Jordan, Tolentio, Miller, Beach, Askew, Wood, Maliga, Giminiani, Conway, Reddish, Puerschner, Ginsin, Jurgens, Bonnell, Braisington, Franke, Defrank, Depaolo, Stungis, and Jarosz are only named in the caption and the complaint contains no allegations that they violated the law or otherwise caused injury to the Plaintiff.

Plaintiff fails to assert personal involvement on the part of these 40 defendants in this matter. In order to hold a defendant responsible for a constitutional deprivation, Plaintiff must demonstrate, *inter alia,* the defendant's personal involvement.

*Grullon v. City of New Haven,* 720 F.3d 133, 138–39 (2d Cir. 2013). "[P]ersonal involvement of Defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C. § 1983.]" *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). "The general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the Defendant is required." *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060 (2d Cir. 1989); *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 692–95 (1978). Supervisory officials may be personally involved within the meaning of § 1983 only if he or she participated in unlawful conduct. *See Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir. 1986). "A Plaintiff must thus allege a tangible connection between the acts of a Defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). "[A] Plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). In the context of a prisoner's lawsuit, a Plaintiff must show "more than the linkage in the prison chain of command" to state a claim against a supervisory defendant. *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985).

**\*4** Here, Plaintiff fails to allege facts of any personal involvement by the 40 aforementioned defendants. They are named in the caption only. The body of the Complaint does not contain any factual allegations naming them, or indicating that they violated the law or injured the Plaintiff in some manner. For this reason, the claims against Defendants Annucci, Keyser, Burnett, Williams, Justiniano, Proscia, Maxwell, Kortright, Reid, Decker, Encarnacion, Ogbonna, Aldana, Christie, Eggler, Bennett, Pomeroy, Sidorowicz, Wolf, Herman, Jordan, Tolentio, Miller, Beach, Askew, Wood, Maliga, Giminiani, Conway, Reddish, Puerschner, Ginsin, Jurgens, Bonnell, Braisington, Franke, Defrank, Depaolo, Stungis, and Jarosz are dismissed without prejudice for lack of personal involvement.

#### II. Eighth Amendment Medical Indifference

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Consequently, the government is obligated to provide adequate medical care to incarcerated people, and the failure to do so is a violation of the Eighth Amendment and gives rise to a deliberate indifference claim under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 103–05 (1976). In order to make a claim of medical indifference, a prisoner must show that there is: (1) an objectively serious medical need and (2) subjective

deliberate indifference, which measures whether the prison official acted with a sufficiently culpable state of mind. *Harrison v. Barkley*, 219 F.3d 132, 136–38 (2d Cir. 2000). The defendant must have actual notice of the prisoner's serious medical need. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1986). The subjective standard for deliberate indifference is essentially criminal recklessness: the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Therefore, "the defendant's belief that his conduct poses no serious harm ... need not be sound as long as it is sincere." *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006). Further, the charged official must be aware that there is a substantial risk of harm. *Id.*

Defendant does not allege that any Defendant was involved in his medical care or treatment—his Complaint mentions that "DOCCS Staff" took him off the diabetic medications, and that he made complaints to the "Medical Department" at sick call. (*See* Compl. at 18.) While chest pain resulting from clogged arteries and heart attacks surely constitute serious medical conditions,[2] Plaintiff has failed to allege any Defendant's involvement in, let alone any Defendant's deliberate indifference to, Plaintiff's medical care. Therefore, Plaintiff's Eighth Amendment claim is dismissed without prejudice.

[2]    "[S]evere chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard." *Melvin v. Cty. of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, at *5 (S.D.N.Y. Mar. 29, 2016) (quoting *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005)); *Mandala v. Coughlin*, 920 F. Supp. 342, 353 (E.D.N.Y. 1996) (noting that "ignoring a prisoner's complaints of chest pains where the prisoner later died of a heart attack" has been found to constitute a sufficiently serious injury).

It is possible that Plaintiff intended to bring claims against certain named defendants from the caption, whom he has identified as serving in medical roles at Sullivan: Ginger Eggler (Nurse Administrator 1); Colleen Bennett (Nurse Administrator 2); Wladyslaw Sidorowicz (Facility Doctor); and Janice Wolf a/k/a Janice Wolf-Friedman (Facility Doctor). To the extent that Plaintiff can provide more factual allegations relating to these four defendants with respect

to Plaintiff's alleged medical indifference claim, Plaintiff is granted leave to replead that claim.

## III. Retaliation Under the First Amendment

**\*5** Plaintiff's claims against several prison officials regarding alleged retaliatory action sound in the First Amendment. To properly assert a First Amendment retaliation claim, a plaintiff has the burden of demonstrating: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation ... Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds, Swierkewicz v. Sorema*, 534 U.S. 506 (2002) (citations omitted).

"Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.* In addition, the "casual connection" element requires plaintiffs to prove that an adverse action relates to protected First Amendment activity —that is, the plaintiff must present evidence from which a jury could conclude that the plaintiffs protected First Amendment activity was "a substantial or motivating factor" in the prison official's adverse action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). "To survive a motion to dismiss, such claims must be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.' " *Friedl v. City of New York*, 210 F.3d 79, 85-86 (2d Cir. 2000) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

The Second Circuit has repeatedly held that a court must assess a claim of retaliation with "skepticism and particular care" because such claims are "easily fabricated" by inmates. *Dawes*, 239 F.3d at 491. Such claims create a "substantial risk of unwarranted judicial intrusion into matters of general prison administration" because:

virtually any adverse action taken against a prisoner by a prison official —even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.... Given that such adversity is an ever-present concomitant of prison life, the opportunities to characterize its manifestations as actionable retaliation are far greater than that for society at large.

*Id.* (internal citations and quotations omitted).

#### a. January 11, 2018 Incident and Cell Searches

Plaintiff alleges that Defendant Wyatt retaliated against him because he filed a grievance against Wyatt on January 10, 2018, when Plaintiff discussed the grievance with Defendant Sergeant Fuller. (Compl. at 19.) Plaintiff alleges that this retaliation took the form of a pat frisk on January 11, 2018, in which Wyatt "squeez[ed]" and "pok[ed]" his chest, arms, legs, and "private parts." (*Id.* at 20.) Plaintiff further alleges that Area Sergeant Defendant Hanson told him that "if [he] did not sign off on this grievance, [he] was going to have a whole lot of problems." (*Id.* at 20.) Additionally, Plaintiff alleges that his cell was searched in an "unreasonable manner" five out of seven days. (*Id.* at 21.)

On these issues, Plaintiff has failed to state a claim for relief because "cell searches and pat frisks, even if conducted for retaliatory reasons, cannot constitute an adverse action as required to support a First Amendment retaliation claim." *Amaker v. Fischer*, No. 10-CV-0977A SR, 2014 WL 8663246, at *8 (W.D.N.Y. Aug. 27, 2014), *report and recommendation adopted*, No. 10-CV-0977, 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015). This is "because inmates have no reasonable expectation of privacy in their prison cells" and therefore "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 239 (S.D.N.Y. 2005); *see also Henry v. Annetts*, No. 08 Civ. 286, 2010 WL 3220332, at *2 (S.D.N.Y. July 22, 2010) ("Cell searches and pat frisks are an ordinary part of prison life and ... do not deter the average inmate from continuing to exercise ...

First Amendment rights"). Furthermore, the Complaint does not link the cell searches to any particular defendant. (*See* Compl. at 21.) Accordingly, even if retaliatory in nature, Plaintiff's claims against Defendants Wyatt, Hanson, and any other defendants regarding these incidents must be dismissed with prejudice. [3]

3      To the extent that Plaintiff's allegation suggest that Defendant Wyatt used excessive force, these allegations also fail to state a claim upon which relief can be granted. The actions alleged by Plaintiff do not rise to the level of a constitutional violation. *See Kalwasinski v. Artuz*, No. 02 CV 2582 (LBS), 2003 WL 22973420, at *7 (S.D.N.Y. Dec. 18, 2003) (rejecting Eighth Amendment claim where defendant's action in pressing plaintiff's face into a wall while conducting a pat frisk was "consistent with a good faith attempt to maintain prison discipline and order" and lacked "malicious" intent).

To the extent that Plaintiff alleges that Defendant Wyatt committed offenses under the New York State Penal Law, this claim must be dismissed because the law does not provide a private right of action to enforce rights allegedly created by this provision. *See Casey Sys., Inc. v. Firecom, Inc.*, No. 94 CIV. 9327 (KTD), 1995 WL 704964, at *3 (S.D.N.Y. Nov. 29, 1995) ("As a general rule, when a statute is contained solely within the Penal Law Section, the legislature intended it as a police regulation to be enforced only by a court of criminal jurisdiction.").

#### b. Loss of Job Assignment

**\*6** Plaintiff further alleges that his job assignment was taken away from him due to a "fabricated misbehavior report" as retaliation for Plaintiff's filing of harassment grievances. (Compl. at 21.) Plaintiff notes that despite his "excellent work evaluation," the proffered basis for his termination was that Plaintiff "do[es] not get along with other inmates and staff." (*Id.*) This claim similarly fails on the pleadings.

Defendants are correct that inmates do not have any constitutional, statutory, or regulatory right to any prison job. *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) ("New York law does not give a prisoner 'any statutory, regulatory or precedential right to his prison job.' "). Furthermore, the thin allegations contained in the complaint are "wholly conclusory with no plausible nexus between the grievance

2020 WL 409744

and the misbehavior report." *White v. Bergenstock*, No. 08 Civ. 717, 2009 WL 4544390, at *7 (N.D.N.Y. Nov. 25, 2009). Plaintiff's Complaint does not contain any allegations as to the nature of the misbehavior report that led to the loss of his job, who wrote the misbehavior report, nor does it connect the writer of that misbehavior report to the grievances in any way. *See Bouknight v. Shaw*, No. 08 CIV 5187(PKC), 2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009) (finding plaintiff's allegation that officer "wrote [him] up for revenge" was conclusory and insufficient to state a plausible retaliation claim).

Consequently, these claims are dismissed without prejudice. To the extent that Plaintiff can provide more factual allegations relating to the author of the misbehavior report and a connection between Plaintiff's grievance, the misbehavior report, and loss of Plaintiff's job, Plaintiff is granted leave to replead his claim.

## IV. First Amendment Freedom of Speech

Plaintiff additionally asserts that "DOCCS staff" did not allow him to notify his family about his treatment at an outside hospital, and that he was not allowed to call them. (Compl. at 21.) This amounts to a First Amendment freedom of speech claim, which is a cognizable claim under § 1983. *See Morgan v. LaVallee*, 526 F.2d 221, 225 (2d Cir. 1975) ("A prison inmate's rights to communicate with family and friends are essentially First Amendment rights subject to § 1983 protection."). First Amendment rights "may not be infringed without good cause," and "there must be a showing of a substantial governmental interest serving the legitimate and reasonable needs and exigencies of the institutional environment ... to warrant such limitations upon an individual inmate's rights to communicate." *Id.* (internal citations omitted). But, as courts considering prison telephone restrictions have agreed, "an inmate has no right to unlimited telephone use." *Pitsley v. Ricks*, No. 96-CV-0372NAMDRH, 2000 WL 362023, at *4 (N.D.N.Y. Mar. 31, 2000) (citing support from First, Sixth, Seventh, Eighth, Fifth, and Ninth Courts of Appeals). The same holds true with regard to mailing non-legal letters. *See Corby v. Conboy*, 457 F.2d 251, 254 (2d Cir. 1972) ("[A] prisoner's right to mail letters to his family or friends is not absolute.").

In any case, allegations of infringement of rights must have some specificity. Again, Plaintiff has failed to allege that any Defendant in this action was involved in this denial. For the reasons outlined above, because a defendant's personal involvement is a necessary element of a 1983 claim, *see*

*McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), this claim must be dismissed without prejudice.

## V. First Amendment Free Exercise

**\*7** Plaintiff's next claim pertains to the exercise of his religious beliefs, which he claims were infringed by an "intentional" cancellation of his religious "call-out." (Compl. at 22.) Plaintiff alleges that "there is no security reason for this." (*Id.*)

"The Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience.' " *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). The Second Circuit has acknowledged, however, that "although prisoners do not abandon their constitutional rights at the prison door, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (internal quotation marks and citations omitted).

To establish a free exercise claim, courts in this Circuit have generally required inmate plaintiffs to plead that the disputed conduct substantially burdened a sincerely held religious belief. *See Turner v. Sidorowicz*, No. 12-CV-7048 (NSR), 2016 WL 3938344, at *5 (S.D.N.Y. July 18, 2016); *Holland v. Goord*, 758 F.3d 215, 220–23 (2d Cir. 2014). Defendants "then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct[.]" *Salahuddin*, 467 F.3d at 275.

In the present action, Plaintiff has again failed to allege that any Defendant was involved in the cancellation of his religious call out. Plaintiff does not specify how often or why his callout was canceled. Without more, Plaintiff cannot plausibly allege that his sincerely held religious beliefs were "substantially burdened." *See Williams v. Weaver*, No. 9:03CV0912(LEK/GHL), 2006 WL 2794417, at *5 (N.D.N.Y. Sept. 26, 2006) (denial of access to two weekly religious services does not constitute substantial burden); *c.f. George v. Cty. of Westchester*, NY, No. 13 CV 4511 VB, 2014 WL 1508612, at *4 (S.D.N.Y. Apr. 10, 2014) (finding substantial burden plausibly alleged where plaintiff

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 290 of 830

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)

2020 WL 409744

was denied congregate religious services "repeatedly" over two periods totaling approximately ten months). Accordingly, this claim is also dismissed without prejudice.

## VI. Eighth Amendment Excessive Force

Next, Plaintiff's description of the incident with Correctional Officer Elberth may be read to present an Eighth Amendment excessive force claim. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. For a prisoner to prevail on a claim asserting that he was subjected to cruel and unusual punishment, he must prove both "an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or failed to act, with a 'sufficiently culpable state of mind.' " Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

**\*8** The objective prong, requiring the alleged conduct to be " 'sufficiently serious' to reach constitutional dimensions," Hogan v. Fischer, 738 F.3d 509, 515 (2d Cir. 2013), is a context-specific standard that focuses on the harm done given "contemporary standards of decency." Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009) (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). The Supreme Court has explained that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Hudson, 503 U.S. at 9. Therefore, "the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] per se ... whether or not significant injury is evident." Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999). Nevertheless, "a de minimis use of force will rarely suffice to state a constitutional claim." Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Lebron v. Mrzyglod, No. 14-CV-10290(KMK), 2019 WL 3239850, at \*14 (S.D.N.Y. July 18, 2019).

### a. Excessive Force Analysis

Here, during the course of a pat frisk, Plaintiff alleges that Elberth instructed him to reach back with his left hand and take off his right boot. (Compl. at 22.) Plaintiff did not comply, and instead told Elberth that "he could not reach back like that because he had a Qua[dru]ple By Pass and was unable to stretch back like that." (Id.) In response, Elberth grabbed Plaintiff's left leg and pulled it back in a manner that caused Plaintiff's chest and face to hit the wall.

(Id.) Plaintiff further specifies that Elberth retorted, "How does that feel?", to which Plaintiff responded that he was in pain. (Id.) Elberth then repeated the action using Plaintiff's right leg. (Id.) Subsequently, Plaintiff suffered a "minor heart attack." (Id.)

Defendants argue that the amount of force described by Plaintiff was commensurate with the need to conduct a pat frisk and does not rise to the level of a constitutional violation. The Court recognizes that "a pat frisk, involving some physical contact, is a standard procedure inside a prison." Beckles v. Bennett, No. 05 CIV. 2000 (JSR), 2008 WL 821827, at \*20 (S.D.N.Y. Mar. 26, 2008). As such, allegations of aggressive pat frisks have generally not been found to be "sufficiently serious" to present viable excessive force claims. See Tavares v. City of New York, No. 08 CIV. 3782 PAE JCF, 2011 WL 5877550, at \*6 (S.D.N.Y. Oct. 17, 2011), report and recommendation adopted, No. 08 CIV. 3782 PAE, 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011) (finding "actions taken consistent with a forceful pat frisk—the most serious contact alleged by the plaintiff—are not sufficiently 'repugnant to the conscience of mankind,' to give rise to an Eighth Amendment claim."); Kalwasinski v. Artuz, No. 02 CV 2582 (LBS), 2003 WL 22973420, at \*6 (S.D.N.Y. Dec. 18, 2003) (pressing inmate's face into the wall while conducting pat frisk was "commensurate with the need to conduct a pat frisk"); Rivera v. Goord, 119 F. Supp. 2d 327, 342 (S.D.N.Y. 2000) (finding level of force applied in "aggressive pat frisks" does not rise to a constitutional violation); see also Anderson v. Sullivan, 702 F. Supp. 424, 427 (S.D.N.Y. 1988) (no excessive force found where, while handcuffing plaintiff, officer pulled plaintiff's hands behind his back and pushed him against a bar).

While the level of force alleged here by Plaintiff may not, on its own, rise to the level of a constitutional violation, Plaintiff has alleged extenuating circumstances that distinguish his case from those involving run-of-the-mill pat frisks. Plaintiff alleges that he informed Elberth of his medical condition and heart surgery, which prevented him from moving his body as Elberth had instructed. Plaintiff further alleges that he did suffer physical pain as a result of Elberth's actions—and informed Elberth of this—but that Elberth disregarded Plaintiff's condition and continued to forcefully move Plaintiff's legs. Plaintiff has thus averred sufficient facts to plausibly claim that force was applied "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." Hudson, 503 U.S. at 6; see also Santiago v. Westchester Cty., No. 13–CV–1886, 2014 WL 2048201, at \*5 (S.D.N.Y. May

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 291 of 830

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)
2020 WL 409744

19, 2014) (finding allegations that a prison official "threw [the] [p]laintiff to the ground, twisted his arm, [and] picked him up off the ground while squeezing his throat ... lead to a plausible inference that the force inflicted was malicious and wanton").

**\*9** This conclusion is reached by construing the allegations in the Complaint in a light most favorable to Plaintiff, and bearing in mind Plaintiff's status as a *pro se* litigant. Evidence uncovered during discovery may ultimately prove that the force employed by Defendant Elberth was done in a good faith effort to maintain or restore discipline, but such a determination is best resolved on a motion for summary judgment or at trial. *See Olutosin v. Lee*, No. 14-CV-685 (NSR), 2016 WL 2899275, at \*9 (S.D.N.Y. May 16, 2016); *Landy v. Irizarry*, 884 F. Supp. 788, 797 (S.D.N.Y. 1995) ("[T]he fact intensive inquiry of whether a particular use of force was reasonable is best left for a jury to decide.") (collecting cases). As such, Defendants' motion to dismiss is denied as to Plaintiff's excessive force claims against Defendant Elberth.

### b. Qualified Immunity Defense

Defendants argue that Defendant Elberth should be entitled to the defense of qualified immunity. The doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.' " *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). As such, "qualified immunity shields both state and federal officials from suit unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (internal quotation marks omitted). To determine whether a right was clearly established, the Court looks to: (1) whether the right was defined with "reasonable specificity"; (2) whether the Supreme Court and the applicable circuit court support the existence of the right; and (3) whether under existing law a reasonable defendant would have understood that the conduct was unlawful. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013). "In this Circuit, a defendant may [raise qualified immunity in a pre-answer motion to dismiss], but the defense is held to a higher standard than if it were asserted in a motion for summary judgment." *Sledge v. Bernstein*, No. 11 CV. 7450(PKC)(HBP), 2012 WL 4761582, at \*4 (S.D.N.Y. Aug. 2, 2012); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (a defense of qualified immunity in a motion to

dismiss can only be sustained if plaintiff cannot state any facts that would prevent the application of qualified immunity).

It is well-settled that freedom from the use of excessive force is a clearly established constitutional right. *See, e.g., Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 401 (S.D.N.Y. 2005), *aff'd on other grounds sub nom. Bellotto v. Cty. of Orange*, 248 F. App'x 232 (2d Cir. 2007). As discussed above, the Complaint sufficiently alleges a violation of Plaintiff's clearly established constitutional right to be free from excessive force under the Eighth Amendment. Further, "nothing at this stage of the proceedings suggests that [the defendant] reasonably believed his actions to be lawful at the time of the challenged act." *Santiago*, 2014 WL 2048201, at \*5. Consequently, the Court does not find the application of qualified immunity to be warranted at this juncture.

### VII. Defendant Fuller

The only other Defendant named in the Complaint, Defendant Fuller, is also not alleged to have been personally involved in any constitutional violation. Plaintiff's only allegation against Defendant Fuller is that Plaintiff and Defendant Fuller engaged in a discussion about Plaintiff's intent to file a grievance against Defendant Wyatt. (Compl. at 19.) These allegations fail to show Defendant Fuller's personal involvement in any constitutional violation, and for the same reasons as previously stated, he is therefore dismissed from this action without prejudice.

### CONCLUSION

**\*10** For the foregoing reasons, Defendants' unopposed motion to dismiss is GRANTED in part and DENIED in part. The motion is denied as to Plaintiff's excessive force claims against Defendant Elberth. The motion is granted as follows:

The following of Plaintiff's claims are dismissed *with prejudice*:

- Plaintiff's First Amendment retaliation claims against Defendants Wyatt, Hanson, and any other defendants regarding the January 11, 2018 incident and cell searches.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 292 of 830

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)

2020 WL 409744

The following of Plaintiff's claims are dismissed *without prejudice*:

- Plaintiff's Eighth Amendment medical indifference claims against Eggler, Bennett, Sidorowicz, and Wolf;

- Plaintiff's First Amendment retaliation claim regarding the loss of his job assignment;

- Plaintiff's First Amendment freedom of speech claim;

- Plaintiff's First Amendment free exercise claim; and

- All remaining claims against Defendants Annucci, Keyser, Burnett, Williams, Justiniano, Proscia, Maxwell, Kortright, Reid, Decker, Encarnacion, Ogbonna, Aldana, Christie, Eggler, Bennett, Pomeroy, Sidorowicz, Wolf, Herman, Jordan, Tolentio, Miller, Beach, Askew, Wood, Maliga, Giminiani, Conway, Reddish, Puerschner, Ginsin, Jurgens, Bonnell, Braisington, Franke, Defrank, Depaolo, Stungis, Jarosz, and Fuller.

Accordingly, the Clerk of the Court is respectfully directed to terminate the Represented Defendants' Motion to Dismiss at ECF No. 79.

Plaintiff shall have thirty-five days from the date of this Opinion, on or before February 27, 2020, to amend the Complaint as to those claims that are dismissed without prejudice. Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wishes to remain—aside from those claims dismissed with prejudice per this Order—must be included in the amended complaint. An Amended Civil Rights Complaint form is attached to this Opinion. If Plaintiff elects to file an amended complaint, Defendants shall have thirty days from the date of Plaintiff's filing to respond.

If Plaintiff does not file an amended complaint within thirty-five days, and he cannot show good cause to excuse such a failure, those claims dismissed without prejudice by this order will be deemed dismissed with prejudice, and the Complaint (ECF No. 2) will serve as the operative complaint in this action to which remaining Defendants should respond. The remaining Defendant Elberth is directed to file an answer to the Complaint on or before March 19, 2020. The parties are directed to confer, complete, and submit to the Court the attached case management plan on or before April 9, 2020.

The Clerk of the Court is respectfully directed to terminate Defendants Annucci, Keyser, Burnett, Williams, Justiniano, Proscia, Maxwell, Kortright, Reid, Decker, Encarnacion, Ogbonna, Aldana, Christie, Eggler, Bennett, Pomeroy, Sidorowicz, Wolf, Herman, Jordan, Tolentio, Miller, Beach, Askew, Wood, Maliga, Giminiani, Conway, Reddish, Puerschner, Ginsin, Jurgens, Bonnell, Braisington, Franke, Defrank, Depaolo, Stungis, Jarosz, Fuller, Wyatt, and Hanson. The Clerk of the Court is directed to mail a copy of this Opinion to Plaintiff at his last address listed on ECF and file proof of service on the docket.

**\*11** SO ORDERED.

Attachment

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 293 of 830
Joseph v. Annucci, Not Reported in Fed. Supp. (2020)
2020 WL 409744

## I.    LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "Bivens" action (against federal defendants).

☐  Violation of my federal constitutional rights

☐  Other:

## II.    PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

First Name            Middle Initial         Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

County, City                        State                    Zip Code

## III.    PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐  Pretrial detainee
☐  Civilly committed detainee
☐  Immigration detainee
☐  Convicted and sentenced prisoner
☐  Other:

Page 2

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

First Name            Last Name              Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                        State                    Zip Code

Defendant 2:

First Name            Last Name              Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                        State                    Zip Code

Defendant 3:

First Name            Last Name              Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                        State                    Zip Code

Defendant 4:

First Name            Last Name              Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                        State                    Zip Code

Page 3

## V.    STATEMENT OF CLAIM

Place(s) of occurrence:

Date(s) of occurrence:

FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

Page 4

INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

## VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

Page 5

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 294 of 830

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)

2020 WL 409744

## VII.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Dated _____          Plaintiff's Signature _____

First Name _____   Middle Initial _____   Last Name _____

Prison Address _____

County, City _____          State _____          Zip Code _____

Date on which I am delivering this complaint to prison authorities for mailing: _____

Page 6

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                              Rev. Jan. 2012
-----------------------------------------------------------------x

                                                    CIVIL CASE DISCOVERY PLAN
                        Plaintiff(s),               AND SCHEDULING ORDER

- against -

                        Defendant(s).          _____ CV _____ (NSR)

-----------------------------------------------------------------x

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1.   All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c).  The parties are free to withhold consent without adverse substantive consequences.  (If all parties consent, the remaining paragraphs of this form need not be completed.)

2.   This case [is] [is not] to be tried to a jury.

3.   Joinder of additional parties must be accomplished by _____.

4.   Amended pleadings may be filed until _____.

5.   Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter.  The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6.   First request for production of documents, if any, shall be served no later than _____.

7.   Non-expert depositions shall be completed by _____.

     a.   Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

     b.   Depositions shall proceed concurrently.

     c.   Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8.   Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9.   Requests to Admit, if any, shall be served no later than _____.

10.  Expert reports shall be served no later than _____.

11.  Rebuttal expert reports shall be served no later than _____.

12.  Expert depositions shall be completed by _____.

13.  Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14.  **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15.  Any motions shall be filed in accordance with the Court's Individual Practices.

16.  This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17.  The Magistrate Judge assigned to this case is the Hon. _____.

18.  If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19.  The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)

SO ORDERED.

Dated: White Plains, New York
       _____

                                    _____
                                    Nelson S. Román, U.S. District Judge

**All Citations**

Not Reported in Fed. Supp., 2020 WL 409744

---

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 295 of 830

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

2016 WL 3004670
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Jeremie SMITH, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

Case # 13-CV-6127-FPG

|

Signed 05/23/2016

**Attorneys and Law Firms**

Jeremie Smith, Fort Lauderdale, FL, pro se.

Hillel David Deutsch, NYS Attorney General's Office, Department of Law, Rochester, NY, for Defendants.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

**\*1** Before the Court is a motion to dismiss filed by various defendants in this case. ECF No. 36.

### **BACKGROUND**

This case is made up of two separate actions. The Court previously consolidated the action bearing case number 6:13-cv-6208 into the present action, which bears case number 6:13-cv-6127. ECF No. 35. Thus, for purposes of the pending motion to dismiss (ECF No. 36), two complaints are at issue.[1]

[1]     The Court will cite documents filed in the 6:13-cv-6208 action prior to consolidation in the following form: "6208, ECF No. ___." Documents filed in the 6:13-cv-6127 action, both before and after consolidation, will be cited in the Court's usual form: "ECF No. ___."

As the Court said in its consolidation order, the two complaints filed by Plaintiff Jeremie Smith ("Smith") are "extraordinarily long and prolix"—they add up to about 230 pages along with about 160 pages of exhibits. *Id.* at 1. Additionally, Smith has filed roughly 250 pages of letters,

affidavits, and exhibits that either repeat allegations in the complaints or duplicate exhibits attached to the complaints. ECF Nos. 4; 5; 7; 11; 15; 18; 25; 26; 27; 28; 29; 31.[2] Based on the complaint's captions, Smith is suing about 60 different defendants.[3]

[2]     Smith has also filed multiple letters and declarations concerning both an alleged retaliatory transfer from Five Points to Great Meadow Correctional Facility ("Great Meadow"), and then various problems he had while at Great Meadow. ECF Nos. 6; 9; 17; 33. The issues in these letters and declarations are not properly before the Court, and it will correspond with Smith about these issues in a separate letter.

[3]     Smith is proceeding *in forma pauperis*, and thus his complaints were subject to screening under 28 U.S.C. § 1915. In a previous screening order, the Court dismissed a few of these defendants. 6208, ECF No. 7.
        The Court also notes that, based on the bodies of the complaints, Smith may actually be making claims against even more individuals than just those listed in the complaints' captions.

A global factual narrative of the complaints is not feasible as Smith's claims are based on a litany of separate factual scenarios. By way of brief background, at the time Smith filed his complaints, he was a prisoner at Five Points Correctional Facility ("Five Points") in Romulus, New York. Smith has since been released from prison. He brought this action *pro se* for money damages as well as declaratory and injunctive relief under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act. The defendants all appear to be officials who work for the New York State Department of Corrections and Community Supervision ("DOCCS"); almost all of them work specifically at Five Points. Smith has sued all of them in their official and individual capacities.

Generally speaking, Smith's allegations revolve around confinement conditions at Five Points and various uses of force by Five Points officials. For example, Smith consistently references his "psychogenic dysphagia"—which is essentially a persistent fear of choking when eating—and asserts that officials at Five Points did not feed him an appropriately "soft" diet for 14 to 18 months. ECF No. 1 at, *e.g.*, ¶¶ 50-57, 60-67, 73, 136. Accordingly, Smith alleges that

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 296 of 830
Smith v. Fischer, Not Reported in Fed. Supp. (2016)
2016 WL 3004670

he could not eat the food he was served and thus suffered from malnutrition. [4] *Id.* at, *e.g.*, ¶¶ 60-67. Smith also alleges that, for instance, his in-cell toilet was broken for five days (*id.* at ¶¶ 101—05) and that he was denied access to a razor for shaving for "over a month" (*id.* at ¶ 112). As for the excessive force claims, Smith alleges in one instance that an official struck his leg with an extraction shield after Smith, by his own words, "urinated out of his feed up slot in his cell door... [and] [t]hen stuck his leg out through the food slot in his cell door and refused to pull his leg back into his cell." 6208, ECF No. 1 at ¶ 53. In another separate instance, Smith alleges that after he "began to verbally curse and threaten [an officer]," the officer applied a metal waist chain excessively tight, causing Smith pain and suffering. ECF No. 1 at ¶ 109.

[4]    The voluminous exhibits Smith has filed are illuminating as to the types of soft foods Smith believed he could eat without choking. For example, he requested at various times hot chocolate, peanut butter, ice cream, jelly, apple sauce, pudding, and sugar. ECF Nos. 1 at p. 127; 12 at 42; 38-1 at 18. By contrast, he did not want meals like the one he was served on June 16, 2012, which consisted of a "salad, a burnt piece of meat loaf and mashed potatoes with skins mixed in them." ECF No. 29 at 16.

Due to Smith's alleged inability to eat the food he was served, he was placed on "hunger strike" status at Five Points. ECF No. 1 at ¶ 72. He remained on hunger-strike status for an extended period of time because, as a nurse recounted in a medical record that Smith filed along with his response to the motion to dismiss, "[Smith] believes that his hunger strike status is part of the 'proof that he needs to win a lawsuit against the State of New York that he is being mistreated in prison." ECF No. 38-1 at 55.

**\*2** These allegations will be discussed in detail below.

### DISCUSSION

In the pending motion, 24 of the defendants move to dismiss the claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 36 at 2-16. Additionally, the defendants have asked the Court to dismiss both complaints without prejudice for failure to comply with Rule 8 of the Federal Rules of Civil Procedure. *Id.* at 1.

Before addressing these arguments, the Court raises two preliminary issues *sua sponte.* These issues relate to, first, Smith's claims for injunctive and declaratory relief, and second, to his claims for money damages under the ADA and Rehabilitation Act.

### I. Claims for Injunctive and Declaratory Relief

Smith makes several claims for declaratory and injunctive relief. Specifically, he requests a declaratory judgment stating that the defendants' medical care and uses-of-force violated the Eighth and Fourteenth Amendments. ECF No. 1 at ¶ 152(A); 6208, ECF No. 1 at p. 120. He also requests injunctive relief in the form of a visit to an outside hospital, a dietary consultation, an audiological consultation, an orthopedic consultation, and a psychiatric assessment. ECF No. 1 at ¶ 152(B); 6208, ECF No. 1 at p. 120-21.

The docket reflects that Smith has been released from prison since the time he requested this declaratory and injunctive relief. It is settled in the Second Circuit that an inmate's release from prison moots his claims for declaratory and injunctive relief against the prison's officials. *See Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir. 2006); *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir. 1976); *see also Pugh v. Goord,* 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) ("Where a prisoner has been *released* from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot.") (emphasis in original). Accordingly, Smith's claims for declaratory and injunctive relief, all of which are based on the conditions at Five Points, are now dismissed as moot.

### II. Claims for Money Damages Under the ADA and Rehabilitation Act

The Court next addresses Smith's claims for money damages under the ADA and Rehabilitation Act, both of which are specifically cited in one of Smith's complaints. ECF No. 1 at p. 2. Generally speaking, Title II of the ADA and Section 504 of the Rehabilitation Act protect disabled individuals from being excluded from public services. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794. Both provisions apply to inmates in state prisons. [5] *See Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 213 (1998) (ADA); *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1035-36 (S.D.N.Y. 1995) (Rehabilitation Act).

2016 WL 3004670

5    As a slight qualification that does not affect this analysis, the Rehabilitation Act applies to inmates in state prisons as long as the prison is accepting federal funding. *See Clarkson v. Coughlin*, 898 F.Supp. 1019, 1035-36 (S.D.N.Y. 1995).

Neither the ADA nor the Rehabilitation Act, however, provide for liability against defendants in their individual capacities. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Accordingly, to the extent Smith is suing any defendants in their individual capacities under the ADA or Rehabilitation Act, those claims are dismissed. *See* 28 U.S.C. § 1915(e)(2) (B)(ii) (mandating dismissal of *in forma pauperis* actions "at any time" if the court determines that the action fails to state a claim).

**\*3** As for Smith's official-capacity claims under the ADA and Rehabilitation Act, the Court observes that "the State is the real party in interest for ... claims against... individual defendants in their official capacities." *Fox v. State Univ. of N.Y.*, 497 F.Supp.2d 446, 451 (E.D.N.Y. 2007). Stated differently, a judgment against a public official in his official capacity imposes liability on the entity he represents, provided that the entity received notice and an opportunity to respond. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).

Here, the entity represented by the defendants in this case is DOCCS, and DOCCS has, of course, received notice and an opportunity to respond to Smith's complaints. Because DOCCS is the real party in interest for the official-capacity claims, the Court hereby dismisses the ADA and Rehabilitation Act claims against the individual defendants in their official capacities. *See Hallett v. New York State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 199-200 (S.D.N.Y. 2000) ("Because plaintiff is able to assert his ADA and Rehabilitation Act claims against DOCS directly ... there is no justification for allowing plaintiff to also assert ADA and Rehabilitation Act claims against the individual defendants in their official capacities."); *see also B.D.S. v. Southold Union Free Sch. Dist.*, No. CV-08-1319 SJF WDW, 2009 WL 1875942, at \*21 (E.D.N.Y. June 24, 2009). DOCCS is now substituted as the sole defendant for the ADA and Rehabilitation Act claims.

### III. Dismissal Under Rule 8

The Court now turns to the arguments in the defendants' motion to dismiss. The defendants first argue that both of Smith's complaints should be dismissed without prejudice

because they fail to comply with Rule 8 of the Federal Rules of Civil Procedure.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint present a "short and plain statement of the claim showing that the pleader is entitled to relief." Shortness and plainness are prescribed because the purpose of a complaint is simply to provide the adverse party with fair notice of the plaintiff's claim. *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1998). "Unnecessary prolixity in [the complaint] places an unjustified burden on the district judge and the party who must respond to it because they are forced to ferret out the relevant material from a mass of verbiage." 5 C. Wright & A. Miller, *Fed. Prac. & Proc. Civ.* § 1281 (3d ed. 1998).

There is no doubt that Smith has included a vast amount of unnecessary detail in his two complaints. As will become clear momentarily, Smith writes at length about what appear to be, frankly, the relatively minor inconveniences associated with prison life. The Second Circuit has been clear, however, that there is a difference between a complaint that simply includes a large amount of unnecessary detail and a complaint that is wholly "unintelligible" and "defie[s] comprehension." *Shomo v. State of New York*, 374 Fed.Appx. 180, 183 (2d Cir. 2010) (citations and internal quotations omitted). Dismissal under Rule 8 is generally warranted only in the second category of cases where, in short, the complaint is so rambling that it is incomprehensible. *See id.* at 182-83. The case that the defendants rely on in seeking dismissal under Rule 8, *Ceparano v. Suffolk Cty.*, No. 10-CV-2030-SJF-ATK, 2010 WL 5437212, at \*2 (E.D.N.Y. Dec. 15, 2010), is also clear on this point: "[D]ismissal of a complaint in its entirety should be reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any is well disguised." *Id.* at \*3 (citations and internal quotations omitted).

**\*4** By contrast, where a complaint "enunciate[s] recognizable unconstitutional behavior" despite its unnecessary length and detail, a district court should not dismiss the complaint, even without prejudice. *See Shomo*, 374 Fed.Appx. at 182. Here, Smith's two complaints clearly fall into the first category of complaints; while they are certainly not models of clarity or brevity, they are also not "unintelligible" nor "a labrynthian prolixity of unrelated and vituperative charges that def[y] comprehension." *Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir. 1972). Smith has described, in clear handwriting and in a relatively

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 298 of 830

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

understandable manner, multiple uses of force by Five Points officials and, more generally, "the day-to-day events ... [that] concern the activities of his daily living." *Shomo*, 374 Fed.Appx. at 183. It is clear to the Court that his claims "center[ ] around his disability and the alleged deliberate indifference to his serious medical needs," and that is enough at this stage in the litigation. *Id.* It is acknowledged, of course, that Smith's lengthy complaints place a heavy burden on both the New York Attorney General's Office, which represents all of the defendants in this action, and this Court. The law is, however, unambiguous on this point—dismissal under Rule 8 is not warranted for these types of complaints.

### IV. Claims for Money Damages Under Section 1983

The Court now addresses Smith's claims for money damages under 42 U.S.C. § 1983. This statute imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In other words, to recover under this provision, a plaintiff must show a violation of a federal constitutional or statutory right.

In the pending motion, as stated above, 24 of the defendants now move to dismiss the Section 1983 claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this standard, the factual allegations must permit the court "to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

Because Smith is proceeding *pro se*, the Court must "construe [the] complaint liberally and interpret it to raise the strongest arguments that it suggests." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotations omitted). "Even in a *pro se* case, however, ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citations and internal quotations omitted). So while the Court will draw the most favorable inferences that the complaint supports, it will not "invent factual allegations that [the plaintiff] has not pled." *Id.*

The Court makes one final preliminary point before turning to the individual defendants. As stated previously, Smith has sued all of the defendants in their official and individual capacities. ECF No. 1 at p. 2; ECF No. 1 at p. 2; 6208. To the extent Smith seeks damages from the DOCCS officials in their official capacities under Section 1983, those claims are barred by the Eleventh Amendment. *See Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under § 1983] for money damages against state officials in their official capacities."). Accordingly, all official capacity claims for money damages brought under § 1983 are hereby dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(iii) (mandating dismissal of *in forma pauperis* actions "at any time" if the court determines that the defendants are immune from monetary relief).

Below, the Court addresses the arguments of each defendant, and occasionally groups together those defendants who make similar arguments for dismissal.

#### *A. Defendants Abbott, Lt. Gardener, and Patches*

**\*5** Defendants Abbott, Lt. Gardener, [6] and Patches are all corrections officials at Five Points. The only claims against them are straightforward. Smith alleges that on December 1, 2011, he was on "in cell 'water deprivation,' " (ECF No. 1 at ¶ 101) (internal quotations in original) which—as is apparent from other parts of the complaints—is where officials turn off an inmate's in-cell sink and toilet water after the inmate is accused of intentionally flooding his cell (*id.* at ¶¶ 58-59). Smith alleges that on December 1, 2011 he asked Officer Filighera, another Five Points corrections official who is a defendant in this case, to turn his in-cell water back on. ECF No. 1 at ¶ 101. Filighera turned on Smith's sink water but "walked off... without turning on the [his] toilet water." *Id.* Later that day, Smith informed Officer Patches that his toilet water was still off, and Patches apparently came back to Smith's cell shortly therafter with Filighera. *Id.* at ¶ 102. Both officers made "several attempts to turn on the plaintiff[']s toilet water to no avail." *Id.* at ¶ 102. Patches told Smith that the valve on Smith's toilet was broken, and that he would place a work order for Smith's toilet to be fixed. *Id.* at ¶ 103.

[6]     There appears to be both a "Gardener" who is a nurse and a "Gardener" who is a corrections officer. This analysis refers to the Gardener who is a corrections officer.

The next day, December 2, 2011, Smith informed Officers Abbott and Lt. Gardener that his toilet was still broken.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 299 of 830

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

*Id.* at ¶ 103. "After several attempts were made to fix the plaintiff[']s toilet," Lt. Gardener and another official in this case [7] informed Smith once again that his toilet valve was broken and that they would place another work order for Smith's toilet to be fixed. *Id.* at ¶ 104. On December 5, 2011, a plumber fixed Smith's toilet. *Id.* at ¶ 105.

[7]    The claims against this official, Officer Terry, are discussed in Part IV.Q, *infra.*

In sum, Smith alleges that for five days from December 1, 2011 to December 5, 2011, he was left inside his cell "with accumulated waste and a broken toilet." *Id.* at ¶ 105.

Plaintiff is effectively attempting to state a conditions-of-confinement claim against the three officials at issue under the Eighth Amendment, which prohibits "cruel and unusual punishments. U.S. Const, amend. VIII. To state a valid conditions-of-confinement claim, an inmate must allege that: "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations and internal quotations omitted) (ellipses in original).

Smith's conditions-of-confinement claim against Abbott, Lt. Gardener, and Patches fails to pass the motion-to-dismiss threshold. In short, regardless of whether a broken toilet with "accumulated waste" is an objectively serious condition under the Eighth Amendment, Smith has failed to show how he could satisfy the subjective prong of the test. In other words, Smith has failed to allege that Abbott, Lt. Gardener, or Patches were deliberately indifferent to his health and safety. By Smith's own words, Abbott, Lt. Gardener, and Patches were actually quite diligent in trying to fix Smith's toilet: On the same day Smith told Officer Patches about the broken toilet, Patches made "several attempts to turn on the plaintiff[']s toilet water" before then placing a work order for the toilet to be fixed. On the next day, when Smith told Defendants Abbott and Lt. Gardener about his broken toilet, Abbott and Gardener also made "several attempts ... to fix the plaintiff's toilet" before placing yet another work order for it to be fixed. The toilet was then fixed five days after Smith's original complaint.

On these allegations, Smith has not at all indicated that Abbott, Lt. Gardener, or Patches were deliberately indifferent to this admittedly unfortunate condition. For this reason, the motions to dismiss by Abbott, Lt. Gardener, and Patches are GRANTED.

### B. Defendant Atwood

**\*6** Defendant Atwood is another corrections official at Five Points. Smith attempts to state an excessive force claim against Atwood by alleging as follows: On March 20, 2012, Smith "became mentally unstable and urinated out of his feed up slot in his cell door. The plaintiff then stuck his leg out through the food slot in his cell door and refused to pull his leg back into his cell." 6208, ECF No. 1 at ¶ 53. Atwood then allegedly "authorized" another official in this case to "sneak up along side of the plaintiff[']s cell to 'strike' the plaintiff in the leg with the N.Y.S. DOCCS extraction shield without any warning to the plaintiff." *Id.* (quotations in original).

Smith's claim for excessive force also arises under the Eighth Amendment. To state an excessive force claim, an inmate must allege that: (1) "the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions," and (2) "the defendant acted with a subjectively sufficiently culpable state of mind," which is "characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, ___ F.3d ____, No. 14-2957, 2016 WL 963904, at * 10-12 (2d Cir. Mar. 15, 2016) (citations and internal quotations omitted).

In his motion to dismiss, Defendant Atwood skips the excessive force analysis altogether by attempting to neatly parse Smith's allegations. In short, Atwood argues that Smith never alleged in the complaint that another official actually struck Smith in the leg with an extraction shield; rather, Smith merely alleged that Atwood "authorized" another officer to strike Smith in the leg with a shield. ECF No. 36-1 at 3-4. Atwood thus asserts that because a mere verbal threat in a prison setting cannot rise to the level of a constitutional violation, the § 1983 claim against him must be dismissed. *Id.*

While it is generally true that verbal harassment does not rise to the level of a constitutional violation, the Court finds that the claim against Atwood can be dismissed more directly. Even if an officer followed Atwood's order and struck Smith in the leg, Smith has failed to make sufficient allegations to state an excessive force claim. First, as for the objective prong, Smith has failed to allege that he suffered any sort of injury or harm from the incident. *Pesola v. City of New*

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 300 of 830
Smith v. Fischer, Not Reported in Fed. Supp. (2016)
2016 WL 3004670

York, No. 15-CV-1917 (PKC)(SN), 2016 WL 1267797, at *7 (S.D.N.Y. Mar. 30, 2016) ("Courts in this Circuit regularly hold that a plaintiff must have sustained some injury to maintain a claim of excessive force. That injury, however, need not be severe.") (internal citations omitted) (collecting cases). Thus, Smith fails to satisfy the first prong of the excessive-force test.

As for the subjective prong, Smith admits that the entire situation resulted from him urinating out of the feed-up slot in his cell door, sticking his leg out of the slot, and then refusing to pull his leg back into his cell. 6208, ECF No. 1 at ¶ 53. Given that the subjective prong is characterized by "wantonness *in light of the particular circumstances*," *Harris,* 2016 WL 963904 at * 10 (emphasis added) (citations and internal quotations omitted), these particular circumstances show that the force used used was not malicious or wanton; rather, it was an understandable effort to exert control over an out-of-control inmate. *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993) (observing that a "good-faith effort to maintain or restore discipline" does not support an excessive force claim). Given that, once again, Smith has not alleged that he suffered any injury, it also appears to have been a proportional effort exert such control. This sort of force is antithetical to an excessive force claim.

**\*7** For these reasons, the motion to dismiss by Defendant Atwood is GRANTED.

### *C. Defendants Bellnier, Koenigsmann, and Van Buren*

Defendants Bellnier, Koenigsmann, and Van Buren are all DOCCS supervisory officials. Bellnier is the Deputy Commissioner for Correctional Facilities, Dr. Koenigsmann is the Deputy Commissioner/Chief Medical Officer, and Van Buren is the Assistant Commissioner.

As for Dr. Koenigsmann, Smith alleges that he "sent numerous complaints of medical neglect and abuse" to Koenigsmann. ECF No. 1 at ¶ 134. Smith alleges that Koenigsmann simply assigned the investigations of these complaints to subordinates without investigating the complaints himself. *Id.*

The Court deals with these allegations briefly. As will be revisited throughout this Decision, for a plaintiff to receive a damages award under § 1983, he must show that the defendant in question was personally involved in the alleged constitutional deprivation. *See Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir. 2001). There are a variety of ways that a

defendant can be personally involved in a deprivation, *see Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995), but as a general rule, an official does not become personally involved by merely forwarding a prisoner's complaint to a subordinate. See *Rivera v. Fischer,* 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("[I]f an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter."). Here, Koenigsmann's only alleged involvement in the alleged "medical neglect and abuse" was his receipt and forwarding of Smith's letters. This is not enough to support a § 1983 claim, and thus, Smith's claim regarding the matters raised in the letters he sent to Dr. Koenigsmann is dismissed.

Additionally, to the extent Smith is seeking to hold Koenigsmann liable for simply failing to investigate his complaints, the law is settled that "that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *See McCloud v. Prack,* 55 F. Supp. 3d 478, 481 (W.D.N.Y. 2014) (citations and internal quotations omitted). Accordingly, any claim based on a failure to investigate is dismissed.

Smith makes similar allegations against Bellnier, Koenigsmann, and Van Buren as a group. By way of brief background, Smith asserts throughout the 6:12-cv-6127 complaint that he is afflicted with "psychogenic dysphagia," which essentially is a persistent fear of choking when eating. ECF No. 1 at, *e.g.,* ¶¶ 47-57. Smith further asserts throughout this complaint that Five Points officials did not feed him an appropriately "soft" diet over a period of 14 to 18 months, and thus he suffered from malnutrition. *Id.* at, *e.g.,* ¶¶ 60-67, 136.

With this background in mind, Smith asserts that an attorney at Prisoners' Legal Services of New York wrote to Bellnier, Koenigsmann, and Van Buren in November 2011 regarding Smith's inadequate diet. *Id.* at ¶ 135. Smith alleges that despite this letter, Bellnier, Koenigsmann, and Van Buren "did not intervene ... to prevent the abuse and neglect of the plaintiff." ECF No. 1 at ¶ 136. In short, Smith alleges that they ignored the letter and did not provide him with a suitable diet. *Id.*

**\*8** Smith has once again failed to adequately allege that Bellnier, Koenigsmann, or Van Buren were personally involved in the diet-related deprivation. In short, as a general rule, an "allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 301 of 830

official so as to create liability under § 1983." *Richardson v. Coughlin*, 101 F. Supp. 2d 127, 132 (W.D.N.Y. 2000) (citations and internal quotations omitted). Notably, the fact that this letter was written *on behalf of the prisoner* as opposed to *by the prisoner himself* is not legally significant. Whether an official becomes personally involved in a deprivation after receiving a letter turns on the degree to which the official "personally look[ed] into the matters raised in the letter." *Rivera*, 655 F. Supp. 2d at 238. Here, there are no allegations that Bellnier, Koenigsmann, or Van Buren "personally look[ed] into" the matters raised in the letter or responded in any way. Without these types of allegations, Smith has not stated a claim against Bellnier, Koenigsmann or Van Buren.

Accordingly, Bellnier, Koenigsmann, and Van Buren's motions to dismiss are GRANTED.

#### D. Defendant Bianconi

Defendant Bianconi is a mental health therapist at Five Points. In a single paragraph of one of the complaints, Smith makes the following brief allegations against Bianconi: "Bianconi [was] well aware of the plaintiff's psychiatric [d]iagnosis of 'psychogenic dysphagia.' " ECF No. 1 at ¶ 137 (internal quotations in original). Despite Bianconi's alleged awareness of Smith's condition, Bianconi "allowed [him] to be placed on an in cell 'hunger strike' from 12-25-2011-4-3-2012 without being properly monitored by [t]he [Five Points] medical and mental health staff." *Id.* (internal quotations in original). Here, the Court notes that Smith's allegation that he was "placed on ... hunger strike" refers to the fact that Five Points officials placed him on hunger-strike status as a precautionary measure because he was unwilling or unable to eat the food he was served. *Id.* at, *e.g.*, ¶ 72 (internal quotations omitted); *see also supra* note 4.

Smith is effectively attempting to state a claim for deliberate medical indifference against Bianconi. Once again, however, Smith has failed to sufficiently alleged that Bianconi was personally involved in the diet-related deprivation, so Bianconi cannot be liable for damages under § 1983. *See Gaston*, 249 F.3d at 164. In short, the only allegation against Bianconi—she was "well aware" of Smith's problem yet did not nothing to resolve it—is exactly the type of bare, conclusory allegation that cannot be credited on a motion to dismiss. *Iqbal*, 556 U.S. at 680 (disregarding as conclusory allegations that officials "knew of" yet "condoned" harsh conditions of confinement); *see also Bellamy v. Mount Vernon Hosp.*, No. 07 CIV. 1801 (SAS), 2009 WL 1835939, at *6

(S.D.N.Y. June 26, 2009), *aff'd sub nom. Bellamy v. Mount Vernon Hosp.*, 387 Fed.Appx. 55 (2d Cir. 2010) ("[The plaintiff's] conclusory allegations that [the prison official] must have known about [the plaintiff's] plight is not enough to impute section 1983 liability").

For these reasons, Bianconi's motion to dismiss is GRANTED.

#### E. Defendant Bradley

Defendant Bradley is a corrections official at Five Points. Smith alleges that on March 28, 2012, Bradley came to Smith's cell to pass out his dinner. 6208, ECF No. 1 at ¶ 68. Bradley allegedly ordered Smith to go to the back of his cell, face the wall, get down his knees, and place his hands on his head.[8] *Id.* Smith, by his own admission, refused Bradley's order, and thus Bradley declined to give Smith his dinner that night. *Id.* Smith also alleges that Bradley told a nurse not to give Smith his nutritional supplement and psychiatric medications. *Id.*

[8]    Based on exhibits Smith attached to a motion for a preliminary injunction he previously filed in this case, Smith was required to get in this position before receiving meals "[d]ue to numerous instances of unhygienic acts ... as well as obstructing the closing of feed-up hatches with property or hands or feet." ECF No. 12 at 62.

**\*9** Smith also adds that his cell on March 28, 2012 was "completely bare," that is, it was missing sheets and toiletries.[9] *Id.* (internal quotations omitted). Accordingly, Smith asked Bradley to provide him with certain items including bed sheets, a blanket, toilet paper, soap, and toothpaste. *Id.* Bradley allegedly "denied the plaintiff these [items], and advised the plaintiff to speak with RMHU Security Captain P. Piccolo in order to receive [them]." *Id.*

[9]    It appears that Smith's cell was "completely bare" on March 28, 2012 due to concerns over his mental health. Smith had spent the previous five days, from March 23, 2012 to March 28, 2012, in the Residential Crisis Treatment Program at Five Points. 6208, ECF No. 1 at ¶¶ 66-67.

The Court first addresses Bradley's alleged failure to give Smith his dinner and nutritional supplement (which Smith drinks as a sort of meal replacement). In short, even assuming this allegation is true, it is clear in this Circuit that the

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

failure to receive one or two meals in prison is a *de minimis* deprivation that does not support constitutional claim. *See, e.g., Parker v. Peek-Co*, No. 06-CV-1268, 2009 WL 211371, at *4 (N.D.N.Y. Jan. 27, 2009) ("While plaintiff alleges that he was deprived of two meals on that date as a result of the defendant's actions, such a deprivation, while not to be condoned, is *de minimis* and does not rise to a level of constitutional significance."); *Cagle v. Perry*, No. 9:04CV1151 (TJM/GHL), 2007 WL 3124806, at *14 (N.D.N.Y. Oct. 24, 2007), *report and recommendation adopted*, No. 9:04CV1151(TJM/GHL), 2007 WL 3124806, at *14 (N.D.N.Y. Oct. 24, 2007) ("[T]wo meal deprivations ... [are] not sufficiently numerous, prolonged or severe to rise to the level of an Eighth Amendment violation.") (emphasis omitted). Thus, the claim against Bradley regarding his failure to give Smith his dinner and nutritional supplement on March 28, 2012 is dismissed.

Similarly, Bradley's alleged refusal to provide Smith with bed sheets, a blanket, and toiletries also falls squarely within the realm of a *de minimis* deprivation. Notably, Smith has not even alleged that he was without these items for the night of March 28, 2012; he has merely alleged that Bradley told him to talk to another official about the items. However, even assuming Smith was without bed sheets, a blanket, and certain toiletries on the night of March 28, 2012, such a brief and intermittent deprivation of these sorts of items is *de minimis*. *See, e.g., Phelan v. Zenzen*, No. 10-CV-6704 CJS, 2012 WL 5420423, at *5 (W.D.N.Y. Nov. 6, 2012) (holding that the denial of a pillow and razor for several nights did not violate constitutional rights); *Loadholt v. Lape*, No. 9:09-CV-0658, 2011 WL 1135934, at *4 (N.D.N.Y. Mar. 3, 2011), *report and recommendation adopted*, No. 9:09-CV-0658 LEK RFT, 2011 WL 1114253 (N.D.N.Y. Mar. 25, 2011) ("[C]ourts in this Circuit have found the deprivations of better pain medicine, a cane, a mattress, a pillow, or better shoes, as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment."). Simply put, "the Constitution does not require comfortable prison conditions." *Walker*, 717 F.3d at 125 (2d Cir. 2013) (citations and internal quotations omitted).

Finally, the Court addresses Bradley's alleged directive to a nurse to not provide Smith with his psychiatric medications on March 28, 2012.

Smith has effectively attempted to state a deliberate indifference claim against Bradley for a temporary interruption in medical treatment. The deliberate indifference standard under the Eighth Amendment has two components: "First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (internal citations and quotations omitted). Notably, the Second Circuit has provided guidance on the first prong when the basis for the claim is a temporary disruption in medical treatment. *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). In short, instead of focusing on the inmate's "*underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' " the Court must focus on the "challenged *delay* or *interruption* in treatment." *Id.* (emphasis in original) (quoting *Chance*, 143 F.3d at 702). Consequently, to satisfy the objective prong, a plaintiff who temporarily did not receive his medication cannot just allege that he has an objectively serious medical condition like depression. Rather, the Court will look to, most importantly, the "actual medical consequences that flow from the alleged denial of care" in determining whether the prong is satisfied. *Smith*, 316 F.3d at 187.

**\*10** Here, Smith has failed to identify a single medical consequence that resulted from his alleged failure to receive his psychiatric medications on March 28, 2012. He has simply alleged, without any other detail, that he failed to receive his medications on a single night. Furthermore, even apart from his failure to identify a medical consequence flowing from this interruption, the complaint is devoid of any other "relevant facts and circumstances" regarding the deprivation that might allow him to survive a motion to dismiss. *Id.* (observing broadly that courts should examine the "specific factual context of each case" to determine whether the interruption in treatment is sufficiently serious). Notably, Smith also does not identify what drugs he was actually denied, and, more generally, he does not even say what psychiatric problems he was suffering from on March 28, 2012. Without providing this sort of information, Smith has failed to adequately allege that the interruption in treatment was sufficiently serious. Accordingly, Bradley's motion to dismiss is GRANTED.

### *F. Defendant Burri*

Defendant Burri is a corrections official at Five Points. All of the events involving Burri occurred on December 30, 2011.

First, Smith alleges that while he was lying on a medical examination table with his shirt unbuttoned, Burri made the following remarks: "Smith! You should get your nipples

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 303 of 830

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

pierced, I had mine done;" and "If I was locked in a cell all day long all I would do is beat off and smoke weed." ECF No. 1 at ¶¶ 96-97. Additionally, while Burri and Parish—another officer who is a defendant in this case—were escorting Smith back to his cell, Parish said, "Smith! Whenever I jerk off all my fluids comes out of my dick and I get dehydrated." *Id.* at ¶ 99. Burri and the other officers allegedly laughed at this comment. *Id.* Finally, Smith alleges that during the same walk back to his cell, Burri intentionally stepped on the back of Smith's shoe, causing the shoe to fall off. *Id.* at ¶ 100. Smith apparently tried to turn around to pick up the shoe, but another officer tightly gripped Smith's waist chain and ordered Smith to face forward. *Id.*

First, as for Burri's comments to Smith and his laughing at another officer's comments, it is well-settled that verbal harassment by a corrections official is not a constitutional violation. *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Jones v. Harris*, 665 F. Supp. 2d 384, 396 (S.D.N.Y. 2009). Accordingly, the claims related to Burri's comments to Smith and his laughing at another officer's comments are dismissed.

Second, Burri stepping on the back of Smith's shoe does not rise to the level of a constitutional claim. *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) ("[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). This is especially true as Smith has not alleged that he suffered "discernible injury" from the incident. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).

Finally, the Court notes that to the extent Smith is trying to hold Burri liable for participating in an incident where another officer tightened Smith's waist chain, that allegation is also not actionable. It is a general rule in this Circuit that in a prison setting, an assertion that an official tightened handcuffs or waist chains is insufficient to support an excessive force claim "unless it causes some injury beyond temporary discomfort." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F.Supp.2d 459, 468 (S.D.N.Y. 2008); *Rosenberg v. Coon*, No. 12 CV 3803 VB, 2013 WL 1223516, at *3 (S.D.N.Y. Mar. 27, 2013) (treating as legally equivalent the tightening of handcuffs and the tightening of waist chains). Here, Smith has not even alleged that he suffered temporary discomfort from the waist-chain tightening incident. Accordingly, the claim against Burri related to waist-chain tightening on December 30, 2011 is also dismissed.

For the reasons above, Burri's motion to dismiss is GRANTED.

### G. Defendant Colvin

Defendant Colvin is the Deputy Superintendent for Security at Five Points. Colvin is a supervisory official, and Smith makes a variety of allegations against Colvin in his supervisory capacity.

**\*11** First, Smith alleges that he filed a grievance on December 21, 2011 regarding a nurse failing to wear gloves while pouring his nutritional supplement into a Styrofoam cup. ECF No. 1 at ¶¶ 78-79. Colvin apparently responded to the grievance as follows: "The investigation reveals that the pouring of Jevity [nutritional supplement] into a styrofoam cup does not require the use of a sterile procedure. The grievant has the right to refuse the Jevity. Grievance [d]enied." *Id.* at ¶ 79.

Second, Smith alleges that he filed a grievance on January 6, 2012 regarding a "destructive cell search." *Id.* at ¶ 113. Smith further alleges, without any elaboration, that Colvin denied the grievance. *Id.*

Third, Smith alleges that he wrote a letter to Defendant Sheahan, another supervisory official, on January 30, 2013 regarding his request for a kosher diet. *Id.* at ¶ 141. Sheahan apparently forwarded the letter to Colvin, who then forwarded the letter to another official. *Id.* That offical then responded to Smith unfavorably. *Id.*

As for the first allegation, Smith has adequately alleged that Colvin was personally involved in the underlying incident. In short, Smith alleges that Colvin responded to Smith directly about his grievance regarding a nurse not wearing gloves while handling a nutritional supplement. In his response, Colvin allegedly indicated that he had conducted an "investigation" into the nurse not wearing gloves. That is enough to establish Colvin's personal involvement in the incident at this stage. *See Walker v. Pataro*, No. 99CIV.4607(GBD)(AJP), 2002 WL 664040, at * 13 (S.D.N.Y. Apr. 23, 2002) ("[W]here a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found ....").

Smith has not, however, alleged any Eighth Amendment claim underlying the grievance in question. Construed liberally, Smith is attempting to a state a claim for inadequate

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 304 of 830

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

medical care. Such a claim must satisfy (1) an objective component, where "the alleged deprivation of adequate medical care must be sufficiently serious," and (2) a subjective component, where the "official must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 279 (citations and internal quotations omitted).

To satisfy the objective prong on a motion to dismiss, an inmate typically must allege that he suffered some actual harm due to the inadequate medical care. *See Goolsby v. Cicconi-Crozier*, No. 13-CV-822-A, 2014 WL 1279066, at *4 (W.D.N.Y. Mar. 27, 2014) ("[P]laintiff's allegations fail to satisfy the objective component of a deliberate indifference claim because he does not allege that any actual harm resulted ...."). *Salahuddin*, 467 F.3d at 280. At the very least, the inmate can satisfy the objective prong by alleging that future harm was likely or "very likely" to result from the inadequate care. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993). Here, Smith has not anywhere alleged that he suffered actual harm from a nurse not wearing gloves while handling his nutritional supplement; he also has not alleged that he was likely to suffer any future harm from the nurse not wearing gloves. Smith has merely alleged that the nurse's "completely bare" hands were "germ infested" as a result of the nurse "rub[bing] his face and eyes" and touching other prisoners' medications. ECF No. 1 at ¶ 79. This is not nearly enough to show that the care Smith received was objectively inadequate. Accordingly, there is no underlying constitutional deprivation related to the grievance filed on December 21, 2011, and thus, that claim against Colvin is dismissed.

**\*12** As for Smith's other allegations against Colvin, Smith has not adequately alleged Colvin's personal involvement in any underlying deprivation. Smith alleges in one instance that Colvin denied his grievance relating to a destructive cell search. Smith has not, however, provided any further detail about Colvin's denial of the grievance. Without any allegation that Colvin looked into the matters raised in the grievance or responded to the grievance in detail, Smith has not established that Colvin was personally involved in the cell search. *See McClenton v. Menifee*, No. 05 CIV.2844(JGK), 2006 WL 2474872, at *10 (S.D.N.Y. Aug. 22, 2006) ("[A] supervisor's mere denial of a grievance is insufficient to establish personal involvement. ..."); *see also Brooks v. Chappius*, 450 F. Supp. 2d 220, 226 (W.D.N.Y. 2006) ("[W]hile there is some authority from within this circuit that a supervisory official's denial of a grievance can suffice to show personal involvement, in general personal involvement

will not be found unless the supervisor's response is detailed and specific ....") (internal citations and quotations omitted).

Similarly, Colvin's forwarding of Smith's letter about a kosher diet to another official does not show that Colvin was personally involved in the underlying incident. *See supra* Part IV.C; *Rivera*, 655 F. Supp. 2d at 238 ("[I]f an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter."). In short, the claims regarding Colvin's involvement in both the destructive cell search and Smith's kosher diet are also dismissed.

For the reasons stated above, Colvin's motion to dismiss is GRANTED.

### *H. Defendants Crance and O'Connor*

Defendants Crance and O'Connor are corrections officials at Five Points. Smith alleges that on May 23, 2012, Crance and O'Connor came to Smith's cell to take him to a disciplinary hearing and to see a nurse. 6208, ECF No. 1 at ¶ 75. The officials first shackled Smith's ankles (*id.*), which Smith contends they were not authorized to do (*id.* at ¶ 78). They then asked Smith to put his arms through the slot of his cell door to be handcuffed. *Id.* at ¶ 75. After Smith put his hands through the food slot, Smith, by his own admission, "refused to be placed into handcuffs and ... refused to pull his arms back into his cell to allow N.Y.S. DOCCS staff to shut his food slot hatch." *Id.* O'Connor subsequently grabbed Smith's arm and both O'Connor and Crance "used force on the plaintiff and began to pull the plaintiff['] right arm through the feed up slot in the plaintiff['] cell door." *Id.* at ¶ 76. Crance and O'Connor then brought Smith to the nurse, who "documented the plaintiff['] injuries on a medical entry form" yet cleared Smith without ever filing an official injury report. *Id.* at ¶¶ 76-77.

Smith further alleges that O'Connor fabricated a misbehavior report regarding the incident. *Id.* at ¶ 79. O'Connor's allegedly false report stated that O'Connor and Crance grabbed Smith's arm because Smith made an "aggressive movement" towards the officers with his arm. *Id,* The misbehavior charge resulting from this report was apparently later dismissed by a hearing officer. *Id.*

The Court first addresses the excessive force claim against both O'Connor and Crance. A claim for excessive force requires a showing that (1) "the conduct was objectively

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 305 of 830

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

harmful enough or sufficiently serious to reach constitutional dimensions," and (2) "the defendant acted with a subjectively sufficiently culpable state of mind." *Harris*, 2016 WL 963904 at \* 10-12. (citations and internal quotations omitted). The clear implication from this standard is that "not ... every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). In short, *de mimimis* uses of force do not support excessive force claims. *Id.* at 9-10.

**\*13** The force used here, which amounts to a pull of an arm, was *de minimis. See, e.g., Brown v. Busch*, 954 F. Supp. 588, 597 (W.D.N.Y. 1997) (holding that officers who "pushed, shoved and struck [inmate] while forcing him back into his cell" used *de minimis* force); *DeArmas v. Jaycox*, No. 92 CIV. 6139 (LMM), 1993 WL 37501, at \* 1, 4 (S.D.N.Y. Feb. 8, 1993), *aff'd*, 14 F.3d 591 (2d Cir. 1993) (holding that force used was *de minimis* where officers punched inmate in the arm and kicked him in the leg, causing the inmate to fall down); *Anderson v. Sullivan*, 702 F. Supp. 424, 427 (S.D.N.Y. 1988) (holding that officers did not use excessive force when they pulled inmate's arms behind his back and pushed his face into cell bars). Notably, Smith has not alleged that he suffered any specific injury from the arm grab; he makes only a vague reference to "injuries" in alleging that the nurse "only documented the plaintiff[']s injuries on a medical entry form" instead of an "inmate injury report." 6208, ECF No. 1 at ¶ 76 (internal quotations omitted). This sort of bare, conclusory allegation need not be credited on a motion to dismiss. *See Iqbal*, 556 U.S. at 680.

Moreover, Smith admits that the arm-grabbing incident was triggered by his refusal to allow O'Connor and Crance to handcuff him. In other words, the arm grab was quite clearly not the result of malice, but rather the result of a "good faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6 (citations and internal quotations omitted). Accordingly, the force used was by no means excessive, and the claim that arises out of it against Crance and O'Connor is dismissed.

As for Smith's allegation that O'Connor and Crance did not have the proper authorization to place him in foot shackles, this allegation does not support any sort of constitutional claim. The Court observes that as a general matter, prison officials are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (1992) (citations and internal quotations omitted). The decision by

officials to place an inmate in foot shackles for a walk down the hall certainly does not implicate constitutional rights.

Finally, the Court briefly addresses Smith's allegation that O'Connor filed a false report in connection with the arm-grabbing incident. In short, the law is clear that "the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process." *Sital v. Burgio*, 592 F. Supp. 2d 355, 357 (W.D.N.Y. 2009) (citations and internal quotations omitted); *see also Moore v. Casselberry*, 584 F. Supp. 2d 580, 582 (W.D.N.Y. 2008) ("There is no basis for a constitutional claim alleging the mere filing of a false report."). An inmate may, however, maintain a claim against an official for filing a false report if (1) he "was disciplined without adequate due process, as a result of the report," or (2) "the report was issued in retaliation for exercising a constitutionally protected right." *Sital v. Burgio*, 592 F. Supp. 2d 355, 357 (W.D.N.Y. 2009). Here, Smith has failed to make any allegation that satisfies either prong. As for the first prong, Smith acknowledges that the charge resulting from the allegedly false report was later dismissed and, thus, he was not disciplined for the incident. As for the second prong, Smith has not at all alleged that O'Connor issued the false report with a retaliatory motive.

For the reasons above, Crance's motion to dismiss is GRANTED. Additionally, although O'Connor did not file a motion to dismiss, the Court *sua sponte* dismisses the claims against him with prejudice.

### *I. Defendants Fischer and Lempke*

Defendant Fischer was the Commissioner of DOCCS during Smith's incarceration at Five Points. Defendant Lempke was the Five Points Superintendent when Smith arrived at Five Points.

**\*14** Smith's allegations against these two defendants are straightforward. Smith alleges that he sent numerous written complaints to Fischer and Lempke. ECF No. 1 at ¶ 54, 133. These letters generally concerned "physical abuse, medical neglect and staff mistreatment" (*id.* at ¶ 133) as well Smith's allegedly inadequate diet (*id.* at ¶ 54). Smith alleges that Fischer and Lempke simply forwarded the letters to other officials without investigating the complaints themselves. *Id.* at ¶ 54, 133.

These allegations are not enough to show that either Fischer or Lempke were personally involved in the underlying deprivations. An official does not become personally

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 306 of 830

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

involved in the matters raised in a prisoner's written complaint by simply forwarding the complaint to a subordinate. *See Rivera*, 655 F. Supp. 2d at 238; *supra* Part IV.C; Part IV.G. Accordingly, Smith has not stated a § 1983 claim for damages related to the matters in these letters against either Fischer or Lempke.

Additionally, to the extent Smith is seeking to hold Fisher and Lempke liable for simply failing to investigate his complaints, the law is settled that "that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *McCloud*, 55 F. Supp. 3d at 481. (citations and internal quotations omitted). Accordingly, any claim based on a failure to investigate is dismissed.

For these reasons, Fischer and Lempke's motions to dismiss are GRANTED.

### *J. Defendant Levac*

Defendant Levac is a Five Points official who acted as the hearing officer in one of Smith's disciplinary proceedings. Levac apparently found Smith guilty of cursing at a nurse on May 22, 2012, and thus he sentenced Smith on June 5, 2012 to an "additional 30 days of keeplock cell confinement, [10] [and] 30 days loss of commissary, package and phone privileges." ECF No. 1 at ¶¶ 84, 89. The Court notes here that it is unclear what Smith means by his assertion that he was sentenced to an "*additional* 30 days" of keeplock confinement. *Id.* at ¶ 89 (emphasis added). Construed in its strongest (that is, harshest) possible terms, Smith means that he was placed in keeplock immediately following the incident on May 22, 2012, and then Levac sentenced him to an *additional* 30 days in keeplock on June 5, 2012.

[10] "Keeplock" or "Keep Lock" generally refers to confinement where an inmate is locked in his cell for 23 hours per day.

Smith appears to allege that during the disciplinary hearing, Levac violated his rights by crediting false testimony. *Id.* at ¶¶ 85-88. For context, the supposedly false testimony relates to a peripheral issue—at the hearing, Smith and two nurses disputed whether the nurse in question, before arriving at Smith's cell, touched a neighboring inmate's infection without wearing gloves. *Id.* at ¶¶ 81-88.

Construed liberally, Smith is arguing that Levac did not grant him due process at the disciplinary hearing. In evaluating an inmate's due process claim when the punishment is segregated

confinement within prison, a court must consider "(1) whether the plaintiff had a protected liberty interest in not being [so] confined and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations, internal quotations, and internal alterations omitted).

As for the first prong, a court determines whether a plaintiff has a protected liberty interest by looking at "how long the confinement lasted, along with the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population." *Nieves v. Prack*, ___ F. Supp. 3d ____, No. 6:15-CV-06101 EAW, 2016 WL 1165820, at *3 (W.D.N.Y. Mar. 24, 2016) (citations and internal quotations omitted). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) (internal citation omitted).

**\*15** There is no bright-line duration of time in segregated confinement that qualifies as a loss of a protected liberty interest. *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). However, the Second Circuit has held that confinement for fewer than 101 days, under normal keeplock or special housing unit ("SHU") [11] conditions, does not qualify as an "atypical and significant hardship" that implicates due process. *Sealey*, 197 F.3d at 589 (citations and internal quotations omitted); *see also Tafari v. McCarthy*, 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (observing that SHU confinement of 90 days or less implicates a liberty interest only if the conditions are more severe than normal SHU conditions). Moreover, there is broad agreement in this Circuit that "that keeplock or SHU confinement of 30 days or less in New York prisons" does not implicate due process. *Williams v. Keane*, No. 95 CIV. 0379 AJP JGK, 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997) (Peck, M.J.) (collecting cases).

[11] SHU confinement is another form of segregated confinement where an inmate is typically locked in his cell for 23 hours per day.

Here, Smith appears to allege that as a result of the flawed disciplinary proceeding, he was sentenced to keeplock for 30 days, and he lost his "commissary, package and phone privileges" for the same amount of time. ECF No. 1 at ¶ 89. These allegations are not enough to support a due process claim because, in short, 30 days in keeplock generally

2016 WL 3004670

does not qualify as the loss of a protected liberty interest. Furthermore, Smith has not made any sort of allegation that his 30 days in keeplock were characterized by "especially harsh conditions." *Sealey*, 197 F.3d at 586. He has merely alleged that the confinement was coupled with the loss of some other minor privileges that are typically associated with general population confinement. Accordingly, Smith's due process claim must fail.

The Court makes one additional note to this analysis. Even if Smith, in alleging that he was sentenced to an *"additional* 30 days" of keeplock confinement (*id.* at ¶ 89 (emphasis added)), means that he was already in keeplock for the incident at the time of the hearing, the conclusion here would be the same. To restate the relevant timeline, Smith allegedly cursed at the nurse on May 22, 2012 and the ensuing disciplinary hearing took place on June 5, 2012. ECF No. 1 at ¶¶ 84, 89. Accordingly, interpreting Smith's "additional 30 days" allegation in the strongest (or harshest) possible light, Smith was placed in keeplock for the nurse-cursing incident on the very day he cursed at the nurse, May 22, 2012. He then remained in keeplock until his June 5, 2012 hearing, where he was sentenced to an "additional 30 days" in keeplock. This would mean he stayed in keeplock for 44 days as a result of cursing at a nurse. Even assuming this were true, a 44-day confinement still would not qualify as the loss of a protected liberty interest. Once again, courts generally treat 100 days of segregated confinement as the lower bound for triggering a protected liberty interest. *See Sealey*, 197 F.3d at 589; *Palmer v. Richards*, 364 F.3d 60, 64-65 (2d Cir. 2004) (observing that when inmates are confined to SHU or keeplock for an "intermediate duration," *i.e.*, "between 101 and 305 days," courts must take a close look at a "detailed record of the conditions of the confinement" to determine whether a liberty interest is implicated) (citations and internal quotations omitted). Accordingly, in light of the fact that Smith has not alleged that his stay in keeplock confinement was unusually harsh, a 44-day keeplock confinement still does not implicate due process rights.

For the reasons above, Smith has not stated a due process claim against Levac, and thus Levac's motion to dismiss is GRANTED.

### K. Defendant Mosko

**\*16** Defendant Mosko is a corrections official at Five Points. Defendants' counsel has understandably missed Smith's allegations against Mosko in the morass of the complaints, arguing that Mosko should be dismissed because "[a]s best

Defendants can determine,... [Mosko] is not alleged to have committed any wrongdoing." ECF No. 36-1. The Court directs defendants' counsel to paragraphs 99-100 of the complaint filed in the 6:12-cv-6208 action. Here, Smith alleges that he was beaten by Mosko and another officer. 6208, ECF No. 1 at ¶ 99-100.

Mosko's motion to dismiss is DENIED.

### L. Defendant Parish

Defendant Parish is a corrections official at Five Points. Smith makes a variety of allegations against him.

First, Smith alleges that on October 8, 2011, Parish instituted an "in cell water deprivation" by shutting off Smith's in-cell sink and toilet water. ECF No. 1 at ¶ 58. Parish apparently shut off Smith's cell water because Smith was accused of flooding his cell earlier that day. *Id.* at ¶ 59. Smith further asserts that Parish did not provide him with either a "formal misbehavior report" or a hearing before shutting off his water. *Id.* As a result of both the in-cell water deprivation and his ongoing dietary issues, Smith alleges that he "physically deteriorate[d] from severe malnutrition and dehydration." *Id.* at ¶ 60. Furthermore, while Smith appears to allege in the complaint that his water was only shut off for one day (*id.* ¶ 59) ("The imposition of this 10-8-2011 in cell water deprivation ... violated the plaintiff[']s 8th Amendment... rights ...."), Smith notes in his reply papers that while he does not exactly know how long his in-cell water was turned off, it was for "a lot longer than just [a] twenty four hour period." ECF No. 38 at 4.

Second, Smith alleges that on December 30, 2011, while Parish and other officers were escorting Smith back to his cell, Parish said, "Smith! Whenever I jerk off all my fluids come out of my dick and I get dehydrated." [12] *Id.* at ¶ 99. Parish and the other officers then laughed at this comment.

[12]    This incident was previously detailed with respect to Defendant Burri, *see supra* Part IV.F.

Finally, Smith alleges that on January 18, 2012, two officers came to his cell to take him to the infirmary. 6208, ECF No. 1 at ¶ 44. One of the officers allegedly squeezed Smith's waist chain in an excessively tight manner, and then pushed Smith into a cell door. *Id.* at ¶ 48. Parish responded to the scene, and Smith told Parish that his waist chain was too tight. *Id.* at ¶ 50. Parish checked the waist chain and "disregarded" Smith's complaint. *Id.*

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 308 of 830

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

As for the allegations related to Parish shutting off Smith's water, Smith appears to be making both a conditions-of-confinement claim and a due process claim. Each claim is addressed in turn.

With regard to the conditions-of-confinement claim, as the Court has already indicated, Smith must allege that (1) the deprivation was objectively serious in that Smith was "denied the minimal civilized measure of life's necessities," and (2) Parish acted with deliberate indifference to Smith's health and safety. *Walker*, 717 F.3d at 125 (citations and internal quotations omitted).

Here, Smith has failed to allege that the in-cell water deprivation was an objectively serious deprivation. In a Northern District of New York case that also addressed an inmate's temporary loss of in-cell water privileges, the court stated that "[n]owhere has it been held that prisoners are entitled to complete and unfettered access to water or showers." *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (holding that a six day suspension of in-cell water privileges, instituted after the prisoner had flooded his cell, did not constitute an objectively serious deprivation); *see also Johnson v. Comm'r of Corr. Servs.*, 699 F. Supp. 1071, 1072-74 (S.D.N.Y. 1988) (holding that an in-cell sink that was inoperable for nine days did not establish a conditions-of-confinement claim under the Eighth Amendment). The Court stands by this statement. Notably, Smith has not at all alleged that he was without access to water for any period of time; he has merely alleged that his *in-cell water* was turned off after he was accused of flooding his cell. This sort of deprivation does not constitute a denial of the "minimal civilized measure of life's necessities." *Walker*, 717 F.3d at 125 (citations and internal quotations omitted). Accordingly, the conditions-of-confinement claim against Parish related to the in-cell water deprivation is dismissed.

 **\*17** Furthermore, Smith has failed to state any sort of due process violation with regard to the in-cell water deprivation. Once again, as a threshold matter, a valid due process claim requires the loss of a "protected liberty interest." *Tellier*, 280 F.3d at 79-80 (citations and internal quotations omitted). A "protected liberty interest" is, in turn, implicated if the alleged deprivation was "atypical and significant." *Id.* Here, the Court determines that Smith did not have a protected liberty interest in continuous, uninterrupted access to running water in his cell. *See Beckford*, 151 F. Supp. 2d at 219 ("In light of the minimal amount of time that Plaintiff's

dietary, water, and plastic shield restrictions were put in place, the Court holds, as a matter of law, that his confinement was not sufficiently atypical to implicate a protected liberty interest."). Considering that there is a broad agreement in this Circuit that 30 days in segregated confinement—which typically means the inmate is locked in a cell for 23 hours a day—does not qualify as the loss of a protected liberty interest (*see supra* Part IV.J), the brief loss of in-cell water privileges certainly does not qualify as the loss of a protected liberty interest. Consequently, Smith was not entitled to due process before Parish shut off his in-cell water, and thus his due process claim fails.

As for Smith's allegation that Parish made a lewd comment toward him, the Court has already observed that verbal harassment by a corrections official is not a constitutional violation. *See Purcell*, 790 F.2d at 265; *supra* Part IV.F.

Similarly, as for the tightening of Smith's waist chain, the Court has also previously explained that the tightening of handcuffs and waist chains does not support an excessive force claim unless the tightening causes injury beyond temporary discomfort. *See Rosenberg*, 2013 WL 1223516 at \*3, *supra* Part IV.F. Smith has not alleged that he suffered any injury from the waist-chain tightening on January 18, 2012.

For the foregoing reasons, Parish's motion to dismiss is GRANTED. Notably, Parish did not specifically move to dismiss the claim regarding his involvement in the tightening of Smith's waist chain on January 18, 2012. The Court *sua sponte* dismisses that claim with prejudice.

### M. Defendant Piccolo

Defendant Piccolo is a corrections official at Five Points.

The allegations against Piccolo revolve around Smith's dietary issues. Smith first alleges that a supervisory official, L. Jones, approved his request for a kosher diet on January 30, 2013. ECF No. 1 at ¶ 141. He next alleges that even though this request was approved on January 30, corrections officers did not immediately serve him with the diet. ECF No. 1 at ¶ 141. Accordingly, Smith wrote a letter of complaint, presumably on January 30, to an official who soon forwarded the letter to Piccolo. *Id.* Piccolo wrote back to Smith in a February 6, 2013 memorandum, saying that Smith's kosher-diet request "was still pending approval from the Deputy Superintendent of Programs." *Id.* Smith then began receiving the kosher diet on February 8, 2013. ECF No. 1 at ¶ 146.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 309 of 830

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

Construed liberally, Smith is attempting to state a First Amendment claim against Piccolo for the delay in serving him a kosher diet. There is a colorable basis for such a claim. The Second Circuit has long recognized that the right of the people to freely exercise religion under the First Amendment includes "the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson*, 527 F.2d 492, 495-96 (2d Cir. 1975). Therefore, an inmate is "entitled to a reasonable accommodation of his ... religious dietary practices." *Davidson v. Murray*, No. 92-CV-0283C, 2005 WL 1123756, at *3 (W.D.N.Y. May 10, 2005).

Traditionally, an inmate establishes a violation of his free exercise rights by showing "[1] that he has a sincerely held religious belief, [2] that it was substantially burdened, and [3] that defendants' conduct was not reasonably related to some legitimate penological interest." *Barnes v. Furman*, 629 Fed.Appx. 52, 55 (2d Cir. 2015).

Notably, the Second Circuit has recently observed that it is actually an open question whether an inmate must still show that the challenged practice "substantially burdened" his religious beliefs. *See Barnes*, 629 Fed.Appx. at 55 n.3. ("We have not decided whether the substantial burden test remains viable in our Circuit. ..."). However, the Second Circuit has also noted that even "[r]ejecting the substantial burden test" would not mean that "every possible restriction on religious practices is a violation" of free exercise rights. *McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004). In other words, regardless of whether the prong still applies, *de minimis* violations of free exercise rights are not actionable under § 1983. *See id.*

**\*18**  In this vein, district courts in this Circuit have found that where a delay in serving an inmate a religious diet is brief and caused by "typical and acceptable institutional delay," the inmate's religious rights are not violated. *Davidson*, 2005 WL 1123756 at *4 (citations and quotations omitted) (finding that a 10-day delay in receiving a religious diet after the inmate transferred prisons did not violate free exercise rights); *Tapp v. Stanley*, No. 04-CV-6400 CJS, 2008 WL 4934592, at * 1,7 (W.D.N.Y. Nov. 17, 2008) (finding that a 77-day delay in inmate receiving a special diet that was caused by administrative processing did not violate religious rights); *see also Dove v. Broome Cnty. Corr. Facility*, No. 9:10-CV-0002 DNH/DEP, 2011 WL 1118452, at *2, 8-9 (N.D.N.Y. Feb. 17, 2011), *report and recommendation adopted*, No. 9:10-CV-02, 2011 WL 867072 (N.D.N.Y. Mar. 10, 2011) (finding that a 30-day discontinuance of a kosher diet after inmate violated

policy by eating non-kosher food did not violate free exercise rights). This is understandable as prison officials, while accommodating the beliefs of inmates, are also "charged with complex duties arising from administration of the penal system." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citations and internal quotations omitted).

Here, Smith has effectively attempted to hold Piccolo liable for causing, at most, a nine-day delay in the distribution of his kosher diet. To restate the relevant allegations, Smith alleges that he wrote to Piccolo on January 30, 2013 about not receiving his kosher diet. Piccolo wrote back on February 6, 2013, apparently believing that Smith's request was still pending approval. In any event, Smith then received his kosher diet on February 8, 2013, nine days after he wrote the letter that reached Piccolo. Notably, before January 30, 2013, there is no indication that Piccolo had any knowledge of Smith's request for a kosher diet, so that delay cannot be attributed to Piccolo. In short, this brief nine-day delay caused by Piccolo, without any kind of allegation that it was more than a reasonable processing-related delay, is the sort of *de minimis* deprivation that does not implicate the First Amendment.

For these reasons, Piccolo's motion to dismiss is GRANTED.

### *N. Defendant Seidel*

Defendant Seidel is a corrections official at Five Points. Smith first alleges that on April 2, 2012, Seidel and another officer placed Smith on a "shaving razor deprivation order." ECF No. 1 at ¶ 112. Thus, Smith could not shave for over a month. *Id.*

Second, Smith alleges that on October 5, 2011, Seidel wrote Smith a misbehavior report after Smith, by his own admission, urinated on his cell floor. *Id.* at ¶ 139. Smith then alleges that Seidel did not provide him with any cell-cleaning supplies in order to clean up the urine for two days, so Smith and his neighboring inmates were "fed [their] breakfast, [l]unch and dinner meals with the lingering odor of urine in the air, from the uncleaned urine in front of the plaintiff[']s cell and on the plaintiff[']s cell floor." *Id.*

As for the claim regarding Seidel's failure to provide Smith a razor for shaving, this is the sort of *de minimis* deprivation that does not concern the Constitution. *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) ("[A] failure to provide razors for shaving [does not] rise to the level of constitutional concern").

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

Smith has also attempted to state a conditions-of-confinement claim arising out of Smith urinating on his cell floor. As for such a claim related to the exposure to waste, the Court observes a distinction in this Circuit between an inmate's "continuous and chronic exposure to waste" versus "intermittent or brief exposure." *Ortiz v. Dep't of Corr. of City of New York*, No. 08 CIV. 2195 RJSHBP, 2011 WL 2638137, at *8 (S.D.N.Y. Apr. 29, 2011), *report and recommendation adopted sub nom. Ortiz v. Hernandez*, No. 08 CIV. 2195 RJSHBP, 2011 WL 2638140 (S.D.N.Y. July 5, 2011). Chronic exposure to waste qualifies as an objectively serious condition that implicates the Eighth Amendment. *See Gaston*, 249 F.3d at 165 (vacating summary judgment where plaintiff asserted that for "several consecutive days ... his cell was filled with human feces, urine and sewage water"); *LaReau v. MacDougall*, 473 F.2d 974, 977-79 (2d Cir. 1972) (finding that inmate who spent five days in small cell that contained only a grate-covered hole in the floor for a toilet was deprived of Eighth Amendment rights). On the other hand, brief or intermittent exposure to waste does not does not qualify as an objectively serious condition. *See Ortiz*, 2011 WL 2638137 at *8 (dismissing claim where inmate was exposed to "sewage overflow" on the three separate occasions but for "probably less than 24 hours" total time); *Evans v. Fogg*, 466 F.Supp. 949, 950 (S.D.N.Y. 1979) ("To be kept in a refuse-strewn cell for 24 hours and in a flooded cell (a condition resulting from [plaintiff's own acts) for two days is a rough experience, but, since neither condition persisted for more than a limited period of time, it cannot be said that the condition amounted to cruel and unusual punishment.").

**\*19** After comparing the postures of these cases to the facts at hand, it is apparent that Smith's exposure to his own urine for two days is the type of brief or intermittent exposure to waste that fails to satisfy the objective element of a conditions-of-confinement claim. Bolstering this conclusion is the fact that Smith has failed to allege that he suffered any harm or health problems from the condition.

For these reasons, Seidel's motion to dismiss is GRANTED.

### O. Defendants Scranton and Trombly

Defendants Scranton and Trombly are corrections officials at Five Points. Smith alleges that on March 20, 2012, a nurse at Five Points diagnosed him with dehydration, placed him on " 'hunger strike' observation," and ordered that he be sent to the infirmary. ECF No. 1 at ¶ 73 (internal quotations in original). Smith then went to the infirmary where another nurse allegedly failed to "provide [him]

with any fluids or nourishment." *Id.* Officers Scranton and Trombly subsequently "had the plaintiff discharged from the medical infirmary and sent back to his [mental health unit] cell without any proper medical clearance." *Id.*

Construed liberally, Smith is making a claim against Scranton and Trombly for deliberate indifference for discharging him from the infirmary. In general, to state a claim for medical indifference, Smith must allege that (1) objectively, the deprivation of medical care was sufficiently serious, and (2), subjectively, the officials in question acted with deliberate indifference to his health. *Salahuddin*, 467 F.3d at 279-80.

Here, Scranton and Trombly are both non-medical personnel. As the Supreme Court has noted, deliberate indifference by non-medical personnel is manifested by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

On the allegations in the complaint, Smith has not sufficiently pled that Scranton or Trombly denied or delayed access to medical care or otherwise interfered with a prescribed course of treatment. They certainly did not deny or delay access to care—Smith was sent promptly to the infirmary for his dehydration where a nurse on duty apparently decided he was not in need of immediate care. Only at this point did Scranton and Trombly discharge him from the infirmary. They also did not interfere with any course of treatment—once again, there was no immediate course of treatment. The Court also notes that to the extent that Smith's placement on "hunger strike observation" is a form of care or course of treatment, Scranton and Trombly also did not at all interfere with that treatment—upon Smith's discharge from the infirmary, he returned to the mental health unit of the prison (*id.* at ¶ 74) where he remained on hunger-strike status until the next month, April 2012 (*id.* at ¶ 72). In short, Smith has not shown that Scranton or Trombly were deliberately indifferent to either his dehydration on March 20, 2012 or his hunger-strike status.

Thus, Scranton and Trombly's motions to dismiss are GRANTED.

### P. Defendant Sheahan

Defendant Sheahan is the Superintendent at Five Points. Smith makes various allegations against Sheahan in his supervisory capacity.

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

First, Smith alleges that he filed a grievance regarding an incident of "physical abuse and torture" that he suffered at Five Points on November 2, 2012. *Id.* at ¶ 130. Sheahan apparently "took no action to investigate" this grievance *Id.* Similarly, Smith alleges that he filed "numerous" grievances regarding his inadequate diet. ECF No. 1 at ¶ 64. He notes, without elaboration, that Sheahan and the grievance committee denied all of these grievances. *Id.*

**\*20** The Court addresses these allegations in short order. Smith has not sufficiently alleged that Sheahan was personally involved in any of the alleged deprivations raised in these grievances. First, it is well-settled that the "receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement." *Jones v. Fischer*, No. 9:11-CV-774 GLS/ CFH, 2013 WL 4039377, at \*10 (N.D.N.Y. Aug. 7, 2013). Similarly, a supervisor's denial of a grievance—without any further allegation that the supervisor provided a detailed or specific response to the prisoner—is generally not enough to establish personal involvement. *See Brooks*, 450 F. Supp. 2d at 226; *supra* Part IV.G. Without personal involvement, there can be no damages award under § 1983. *See Gaston*, 249 F.3d at 164. Accordingly, to the extent Smith is trying to hold Sheahan personally responsible under § 1983 for matters raised in these grievances, those claims are dismissed.

The Court also notes that to the extent Smith is attempting to state a due process claim based on Sheahan "t[aking] no action to investigate" his grievance, that claim is also dismissed. In short, "[i]t is well established ... that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim." *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008). In other words, Sheahan had no responsibility under the Constitution to investigate Smith's grievances.

The rest of Smith's allegations against Sheahan are also straightforward. Smith alleges that on June 5, 2012, he was found guilty at a disciplinary hearing for cursing at a nurse. ECF No. 1 at ¶¶ 81-89, *see supra* Part IV. J. Smith appealed the decision to Sheahan, who forwarded it to another official, who then affirmed the decision. ECF No. 1 at ¶ 90. Similarly, Smith alleges that he wrote a letter to Sheahan in 2013 regarding his kosher-diet request. *Id.* at ¶

141. Sheahan forwarded the letter to another official, who responded unfavorably to Smith. *Id.*, *see supra* Part IV.M.

As the Court previously explained, the fact that Sheahan forwarded a disciplinary decision or correspondence to another official does also not establish that he was personally involved in the underlying matters. *See Rivera*, 655 F. Supp. 2d at 238; *supra* Part IV.C, Part IV.G; Part IV.I. Accordingly, he cannot be liable for damages for these matters under § 1983. *See Gaston*, 249 F.3d at 164. Thus, these claims against Sheahan are also dismissed.

For the reasons stated above, Sheahan's motion to dismiss is GRANTED.

### *Q. Defendant Terry*

Defendant Terry is a corrections official at Five Points. Smith's first allegation against Terry is that he, along with three other officers, failed to fix Smith's toilet in December 2011. ECF No. 1 at ¶¶ 102-05. The Court already discussed this incident in Part IV.A and dismissed the conditions-of-confinement claims against the three other officers involved. For the same reasons, it now dismisses the conditions-of-confinement claim against Terry. *See supra* Part IV.A. In short, all of the officers appear to have been quite diligent, as opposed to indifferent, in dealing with the broken toilet.

Smith references Terry in one other incident. By way of brief background, Smith alleges that on November 2, 2012, he fell unconscious behind his cell toilet. ECF No. 1 at ¶ 123. Multiple officers allegedly dragged Smith out from behind the toilet and "shoved" his face into the floor. *Id.* at ¶ 124. A nurse then "shoved one smelling salt packet up each one of the plaintiff's nostrils." *Id.* at ¶ 126. Smith alleges that he suffered a bloody nose and "visible facial injuries" from the incident. *Id.* at ¶¶ 127-28. Immediately following the incident, he was taken to the infirmary where the nurse cleaned his bloody nose and conducted a brief checkup. ECF No. 1 at ¶ 127; 38-2 at 49.

**\*21** As for Terry's involvement, Smith alleges that after he was discharged from the infirmary later that day, he informed Terry about the "physical abuse" he had just endured. *Id.* at ¶ 128. Terry, however, "refused to take the plaintiff[']s complaint of physical abuse seriously and refused to have photographs taken of the plaintiff[']s face." *Id.*

As an initial observation, it is unclear what exactly Smith means by his assertion that Terry "refused to take [his] complaint of physical abuse seriously." *Id.* If Smith means

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 312 of 830

Smith v. Fischer, Not Reported in Fed. Supp. (2016)

2016 WL 3004670

that Terry ignored his injuries and thus Smith was denied adequate medical care following the incident, that is contradicted by both the complaint and by the exhibits Smith attached to his response to the motion to dismiss. In short, Smith received prompt medical care after the incident. ECF No. 1 at ¶ 127 ("[M]y bleeding nose was then cleaned by medical nurse Kim Cheasman and [my] vital signs were checked."); 38-2 at 49 (medical record showing that a nurse checked Smith's blood pressure, pulse, and oxygen saturation following the incident). Nowhere else in the complaint does Smith complain about the supposed injuries he suffered during the incident, so he has not alleged or otherwise implied that he was ever in need of any further medical care. Thus, there is no claim for deliberate medical indifference arising from this incident against Terry.

If Smith means that Terry failed to appropriately respond to a complaint of excessive force, Smith has not sufficiently alleged that Terry was personally involved in the underlying use-of-force. Once again, a defendant must be personally involved in the alleged constitutional deprivation to be liable for damages under § 1983. *See* Gaston, 249 F.3d at 164. Personal involvement of a supervisory defendant may be shown in a variety of ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

The Court observes at the outset that Terry did not directly participate in this incident—Smith asserts that Terry showed up in his cell after the incident was over. ECF No. 1 at ¶ 128.

Likewise, the rest of the *Colon* possibilities for personal involvement are not supported by the allegations. In short, Smith's interaction with Terry appears to be isolated; with the exception of this incident and the problem with Smith's toilet, Terry is not referenced a single other time in either complaint. Thus, there is no indication that Terry was informed of a wrong prior to the incident in question and failed to remedy it or, similarly, was deliberately indifferent by failing to act on certain information. For the same reason, Smith has failed to allege that this problem was caused by Terry's grossly negligent supervision of subordinates or that Terry created or tolerated a policy which allowed this incident to happen. Once again, Smith has merely alleged that he complained to Terry once about a use-of-force after it happened, and that Terry "refused to take the ... complaint... seriously." ECF No. 1 at ¶ 128. That is not enough to show that Terry was personally involved in the incident.

**\*22** Finally, the Court briefly addresses Smith's allegation that Terry "refused to have photographs taken of the plaintiff[']s face" following the alleged assault. *Id.* at ¶ 128. Smith is essentially asserting here that Terry failed to conduct a proper investigation of the alleged assault after it occurred. As the Court has previously stated, the law is settled that "that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *See* McCloud, 55 F. Supp. 3d at 481 (citations and internal quotations omitted). Accordingly, any claim against Terry arising from a failure to investigate is dismissed.

For the above reasons, Terry's motion to dismiss is GRANTED.

### *R. Defendant Wuest*

Defendant Wuest is a corrections official at Five Points. Smith alleges that on November 20, 2011, Wuest came to Smith's cell after Smith made an emergency sick call request. ECF No. 1 at ¶ 108. Wuest placed handcuffs on Smith and then ordered Smith to turn around in his cell. *Id.* at ¶ 109. In Smith's own words, Smith "became seriously upset and began to verbally curse and threaten C.O.D. Wuest." *Id.* Wuest then allegedly applied Smith's waist chain in an excessively tight manner "and began to twist the plaintiff[']s metal waist chain with his hand, therefore causing the metal waist chain to[ ] dig into the plaintiff[']s waist causing the plaintiff pain and suffering." *Id.*

Smith has effectively attempted to state another claim of excessive force for the tightening of a waist chain. In general, an allegation that an official tightened handcuffs or waist chains is insufficient to state an excessive force claim unless it causes injury beyond temporary discomfort. *See Rosenberg, 2013 WL 1223516 at \*3, supra* Part IV.F, Part IV.L. Smith has not alleged that he suffered any injury beyond temporary discomfort from this incident. Therefore, the claim fails, and Wuest's motion to dismiss is GRANTED.

## CONCLUSION

For the reasons stated above, the Court dismisses the following claims *sua sponte*: (1) all claims for injunctive and declaratory relief, (2) the ADA and Rehabilitation Act claims for money damages against the defendants in their individual capacities, (3) the ADA and Rehabilitation Act claims for money damages against the defendants in their official capacities, and (4) the § 1983 claims for money damages against the defendants in their official capacities. Notably, the Court substitutes DOCCS as the defendant for the official-capacity claims for money damages under the ADA and Rehabilitation Act.

Additionally, the motions to dismiss by the following defendants are GRANTED, and thus, they are dismissed from the case: Abbott, Atwood, Bellnier, Bianconi, Bradley, Burri, Colvin, Crance, Fischer, Lt. Gardener, Koenigsmann, Lempke, Levac, Parish, Patches, Piccolo, Scranton, Seidel, Sheahan, Terry, Trombly, Van Buren, and Wuest. Additionally, the Court *sua sponte* dismisses O'Connor from the case. The motion to dismiss by Mosko is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3004670

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 942367

🚩 KeyCite Blue Flag – Appeal Notification
Appeal Filed by  Jackson v. The City of Syracuse,  2nd Cir.,  April 29, 2024

2024 WL 942367
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Torrance JACKSON, Plaintiff,
v.
Police Officer Anthony FIORINI, Defendant.

5:20-CV-1215 (GTS/ML)
|
Signed March 5, 2024

**Attorneys and Law Firms**

FRED B. LICHTMACHER, ESQ., THE LAW OFFICE OF FRED LICHTMACHER P.C., Counsel for Plaintiff, 116 West 23rd Street, Suite 500, New York, NY 10011.

TODD M. LONG, ESQ., Senior Assistant Corp. Counsel, CITY OF SYRACUSE LAW DEPARTMENT, Counsel for Defendants, 233 East Washington Street, 300 City Hall, Syracuse, NY 13202.

## DECISION and ORDER

GLENN T. SUDDABY, United States District Judge

 **\*1** Currently before the Court, in this civil rights action filed by Torrance Jackson ("Plaintiff") against Police Officer Anthony Fiorini ("Defendant") pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983, is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 73.) For the reasons set forth below, Defendant's motion for summary judgment is granted and Plaintiff's Complaint is dismissed.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint
Generally, in his Complaint, Plaintiff asserts two claims against Defendant. (Dkt. No. 1.) First, Plaintiff claims that Defendant used excessive and unnecessary force against him in violation of the Fourth and Fourteenth Amendments of the United States Constitution by physically abusing him,

punching him, pepper spraying him, involuntarily restraining him in the hospital, and subjecting him to a colonoscopy procedure without his consent ("First Claim"). (*Id.* at ¶¶ 38-45.)

Second, Plaintiff claims that Defendant violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution by failing to intervene in the above-discussed use of excessive force ("Second Claim"). (*Id.* at ¶¶ 46-50.)

### B. Procedural History
On December 18, 2020, the five original Defendants in this action [1] filed a motion for judgment on the pleadings. (Dkt. No. 13.) On August 20, 2021, the Court granted that motion in part and denied it in part, dismissing the claims against the City of Syracuse [2] and Officers Abraham, Kittle, and Proccopio, as well as the claim against Defendant Fiorini for failure to intervene in the alleged use of excessive force while at the hospital, while leaving undisturbed the First Claim against Defendant Fiorini arising from the excessive force used both during the traffic stop and at the hospital, and the Second Claim against Defendant Fiorini arising from a failure to intervene as it relates to the traffic stop. (Dkt. No. 19.)

[1]     The four other original Defendants in this action were Syracuse City Police Officer Mamoun Abraham, Syracuse City Police Officer William Kittle, Syracuse Police Lieutenant David Proccopio, and the City of Syracuse. (Dkt. No. 1, at ¶¶ 4, 6.)

[2]     In addition to the claims described above, Plaintiff's Complaint asserted a claim that Defendant City of Syracuse should be held liable for the violations of his rights through the above actions on the basis that it was aware of the Syracuse Police Department's propensity to commit unconstitutional acts but acted with deliberate indifference to that knowledge ("Third Claim"). (Dkt. No. 1, at ¶¶ 51-65.)

On January 24, 2022, Plaintiff filed a motion to amend or correct the Complaint, but on February 23, 2022, United States Magistrate Judge Miroslav Lovric denied that motion without prejudice. (Dkt. No. 35.) Plaintiff never renewed that motion. (*See generally* Docket Sheet.)

**C. Undisputed Material Facts on Defendant's Motion for Summary Judgment**

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b). This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6, 525 F.Supp.3d 305 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.' " *LaFever*, 2021 WL 921688, at *7, 525 F.Supp.3d 305 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 56.1(b).

**\*2** Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendant, and either expressly admitted or denied without a supporting record citation by Plaintiff.

**Initial Traffic Stop**

1. On October 16, 2017, at approximately 12:34 PM, Defendant, Officer Abraham, and Investigator Christopher Reidy from the New York State Attorney General's Office initiated a traffic stop at the 1900 block of South State Street on a 2012 Nissan Rogue bearing New York State license plate number HBA3283.

2. On that day, Defendant was a patrol officer for the Syracuse Police Department ("SPD") who was working alongside the Gang Violence Task Force with Officer Abraham and Investigator Reidy to conduct "a Street Operations detail in high crime and gang areas due to a recent spike in shots fired" calls.

3. The driver of the Nissan Rogue activated his turn signal "just prior to making a right turn" in violation of New York State Vehicle and Traffic Law Section 1163(b). [3]

[3]   Plaintiff disputes that he violated any vehicle and traffic laws; however, the portion of Plaintiff's deposition testimony cited in support of the denial does not in fact contain a denial of the asserted fact; rather, it indicates that, although Plaintiff believes the purpose of the relevant individuals pulling his vehicle over was to harass him, he admitted that they pulled him over for not having his "blinkers on at the stop sign." (Dkt. No. 73, Attach. 4, at 58-59.) Other evidence shows that Plaintiff was charged with a violation of the above provision for failure to signal during the 100 feet before a turn in violation of N.Y. Veh. & Traf. Law § 1163(b). (Dkt. No. 73, Attach. 2, at 5.) Because Plaintiff has not cited evidence to show that he did not commit the relevant infraction, the asserted fact is deemed to be admitted.

4. Defendant recognized the front seat passenger, Dontray Sullivan, from prior incidents, but he had never before encountered Plaintiff, who was the driver of the Nissan Rogue at that time.

5. Plaintiff had picked up Mr. Sullivan (who is his cousin) on Hall Avenue in the City of Syracuse, after which they drove to the Blue Star gas station to "grab an eighth of weed," the purchase of which, at the time of this incident, was a violation of the New York State Penal Code.

6. Plaintiff did not have his driver's license on him during the traffic stop; his license was suspended at that time.

7. Plaintiff admits that his window was rolled down and that he was making reaching movements for his ID during the traffic stop when he was approached by Officer Abraham.

8. In Defendant's training and experience, his observation that Plaintiff lifted his body while sitting in the car was "consistent with individuals attempting to conceal illegal narcotics or other evidence within their rectum from officers on the scene."

9. Defendant discovered that Plaintiff did not possess a valid driver's license, and Plaintiff later pled guilty to the offense of driving without a valid license.

10. Defendant and Officer Abraham "had [Plaintiff] exit the vehicle due [to] his furtive movements and to the fact that [they] were planning on towing the vehicle as there was no licensed driver on scene."

**\*3** 11. Defendant smelled marijuana emanating from Plaintiff as Plaintiff exited the vehicle.

12. The odor of marijuana caused Defendant to believe that Plaintiff possessed marijuana.

13. Defendant "observed a clear knotted plastic baggie sticking out of [Plaintiff's] front waistband, and Plaintiff admitted at his deposition that this was where he had stored his eighth of marijuana. [4]

[4]     Although Plaintiff does not expressly deny this fact, he implicitly denies it by citing his deposition testimony in which he testified that he was searched by Officer Abraham while Defendant searched Mr. Sullivan. (Dkt. No. 75, Attach. 1, at ¶ 14; Dkt. No. 74, Attach. 4, at 71.) However, the fact that Officer Abraham may have searched him does not preclude the possibility that Defendant visually observed the bag, which Defendant stated was sticking out of Plaintiff's waistband. This fact is therefore deemed to be admitted.

14. Defendant collected the baggie "which contained a green/brown plant-like substance."

15. Based on Defendant's training and experience, he knew the "substance to be consistent with marijuana."

16. A Duquenois-Levine Reagent test kit tested positive for the presence of marijuana.

17. The plastic sandwich bag retrieved from Plaintiff contained marijuana.

18. Plaintiff also had "Goodsense sandwich bags" in the "pocket of his driver's door," which are commonly used for packaging drugs for sale.

19. Officer Abraham also located "crumbs of a beige chunky substance" on the front seat of the vehicle where Plaintiff had been sitting at the time of the traffic stop. [5]

[5]     Although Plaintiff does not expressly deny this fact, he implicitly denies it by stating that he never had crack cocaine in his car. (Dkt. No. 75, Attach. 1, at ¶ 20.) However, the asserted fact does not state that the substance found was crack cocaine, and Plaintiff does not directly dispute that some sort of beige chunky substance was found in his vehicle. The asserted fact is therefore deemed to be admitted.

20. The beige chunky substance tested positive for the presence of cocaine when Officer Abraham used a "NIK Cocaine Wipe" on it. [6]

[6]     Although Plaintiff does not expressly deny this fact, he implicitly denies it by stating that no test for cocaine was done in the field, citing his own deposition testimony. (Dkt. No. 75, Attach. 1, at ¶ 21.) However, his testimony does not support an assertion that no test of any kind was conducted at the scene. Rather, when asked whether anything was found in the vehicle, Plaintiff answered, "No. But he said he had a positive reaction to something," and elaborated, "He couldn't test it. Whatever it was, he couldn't test it because it was going after the test supposedly." (Dkt. No. 73, Attach. 4, at 75.) Although Plaintiff's testimony is somewhat ambiguous, it clearly indicates that some sort of test was indeed performed because Plaintiff acknowledged that (1) Defendant Abraham stated that there had been a "positive reaction" to something in the car and (2) the substance "was going *after the test* ....". Further, the evidence includes a photograph of the test wipe showing a blue "positive" spot on the wipe, but no beige chunky substance. (Dkt. No. 73, Attach. 27, at 3.) This appears to explain Plaintiff's statement that the substance "was going after the test," meaning it was dissolving after it had been wiped with the test kit, leaving no additional residue to be tested in another manner. Under the circumstances, although the testimony is ambiguous, no reasonable person could conclude based on Plaintiff's testimony (which is largely lacking in personal knowledge of what occurred outside of his field of vision) that no

test of any kind had been conducted. This fact is therefore deemed to be admitted.

**\*4** 21. After the NIK test showed the presence of cocaine, Defendant placed Plaintiff into handcuffs. [7]

[7]    This fact is deemed to be admitted for the same reasons discussed above in Note 6 of this Decision and Order.

22. Plaintiff was arrested at the scene of the traffic stop on the following charges: (a) Unlicensed Operation (N.Y. Veh. & Traf. L. § 509.1); (b) Aggravated Unlicensed Operation in the Third Degree (N.Y. Veh. & Traf. L. § 511[1][a]); (c) Unlawful Possession of Marijuana in the Second Degree (N.Y. Pen. L. § 221.05); and (d) Criminal Possession of a Controlled Substance in the Seventh Degree (N.Y. Pen. L § 220.03).

23. Plaintiff also received a traffic ticket for making an insufficient turn signal (N.Y. Veh. & Traf. L. 1163[b]).

24. Plaintiff was handcuffed and transported to the Onondaga County Justice Center ("Justice Center").

25. Plaintiff was not struck nor was any force used upon him at the scene of his arrest.

26. No force was used against Plaintiff while he was being transported to the Justice Center.

27. Plaintiff was never pepper sprayed at the scene of his arrest nor while being transported by SPD to the Justice Center.

28. Defendant, Officer Charles Lester, and Officer Kittell rode inside the transport vehicle with Plaintiff to have him be booked at the Justice Center.

29. Defendant believed it was necessary to ride with Plaintiff "due to [Plaintiff's] movements being consistent with someone attempting to secret evidence from officers within their rectum." [8]

[8]    Although Plaintiff does not expressly deny this fact, he implicitly denies it by stating that Defendant did not ride in the transport vehicle. (Dkt. No. 75, Attach. 1, at ¶ 30.) This denial is ineffective for two reasons. First, Plaintiff's testimony does not contradict anything

about Defendant's stated belief. Second, Plaintiff's testimony that Defendant did not ride in the transport vehicle (which is prefaced by his acknowledgment that "I really didn't get a good view") is unequivocally contradicted by the video evidence from the sally port at the Justice Center, which shows Defendant stepping out of the transport van with Plaintiff upon arrival at the Justice Center. (*See* Exh. V1, at 0:00:26.) To the extent that Plaintiff has testified contrary to what the video evidence clearly establishes, Plaintiff's testimony cannot create a *genuine* dispute of material fact. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

### Events at the Justice Center

30. Upon arrival at the Justice Center, Plaintiff was escorted from the transport vehicle to "the north cell," which is a fenced holding cell area in the sally port garage of the Justice Center, and "instructed to stand up keeping his hands out of his pants."

31. After Defendant closed the gate on the holding cell, Plaintiff put his hands toward the back of his pants. [9]

[9]    Plaintiff effectively denies the portion of the asserted fact that indicates he reached his hands *into* the rear of his pants (and exclaimed that "it" was *inside* the rear of his pants), because, in his deposition testimony, he stated that, although he did reach towards the back of his pants while in the holding cell, it was only to pull his pants up. (Dkt. No. 73, Attach. 4, at 81:19-22.)

**\*5** 32. Officer Kittell, Officer Lester, Officer Abraham, and Defendant, believing Plaintiff might have "shoved evidence into his rectum," entered the holding cell.

33. Plaintiff, as described in Defendant's report, reached for the back of his pants while thrusting his hips forward, as was visible from the perspective of Defendant and Officer Kittell moments after Plaintiff entered the holding cell.

34. The officers on the scene "assisted in escorting [Plaintiff] to the ground" after having entered the holding cell and attempting to force Plaintiff's hands away from his pants. [10]

10    Plaintiff denies that there was any need for the officers to force his hands *out of* his pants, citing to deposition testimony that he put his hands near the back of his pants only to pull them up. (Dkt. No. 75, Attach. 1, at ¶ 38.) Because there is a genuine dispute as to whether Plaintiff's hands were *inside* his pants and because the video evidence is not sufficiently clear to establish that fact either way, the Court has amended the asserted fact to more accurately reflect what is undisputed and what can be seen on the video evidence.

35. Plaintiff was brought to the ground, with Defendant on the left side of Plaintiff's body. 11

11    Plaintiff denies Defendant's assertion that the force used to place him on the ground was "limited." (Dkt. No. 75, Attach. 1, at ¶ 39.) The Court agrees that whether the force is "limited" is both a matter of interpretation and a legal conclusion. That portion of the fact has therefore been omitted.

36. While Plaintiff was being brought and held to the ground, Defendant never struck Plaintiff and never touched Plaintiff's right hand, nor did his actions play any role in the pre-existing fracture of Plaintiff's right hand.

37. Defendant at all relevant times maintained control of Plaintiff's left arm and hand while in the holding cell.

38. Defendant never punched, kicked, or otherwise struck Plaintiff while Plaintiff was in the holding cell, but only attempted to keep Plaintiff's left hand from the back of his pants and to keep him on the ground until he was moved to the booking intake area. 12

12    Plaintiff does not deny this fact other than to state that there was no need to keep his hands from his pants while he was on the ground, and cite his own deposition testimony. (Dkt. No. 75, Attach. 1, at ¶ 42.) The Court finds this denial to be ineffective for each of two reasons. First, the fact asserts nothing about a "need" to keep Plaintiff's hands from his pants but only an "attempt[ ]" by Defendant to keep Plaintiff's hands from his pants. Second, in any event, the testimony to which Plaintiff cites does not support his assertion, because in that testimony he admitted that, while in the cage, he put his hands

to the back of his pants when he needed to pull them up, and there is nothing in the testimony to indicate he did not need to pull his pants up after being brought to the ground. This fact is therefore deemed to be admitted.

39. Plaintiff claims his right hand and/or wrist were injured by the officers' actions in the sally port holding cell, but evidence shows that the fracture in that hand/wrist occurred "about 1 month prior to his original visit" to Upstate University Hospital on October 18, 2017, or approximately three-and-a-half or four weeks before his arrest on October 16, 2017. 13

13    Plaintiff does not deny this fact other than to state that he "felt a fracture" around the area of his hand and wrist after being brought to the ground by the officers, including Defendant, and cites his own deposition testimony. (Dkt. No. 75, Attach. 4, at ¶ 43; Dkt. No. 73, Attach. 4, at 81-82.) The Court finds this denial to be ineffective for each of two reasons. First, the assertion that Plaintiff "felt a fracture" does not actually controvert any portion of the above-stated fact. Second, in any event, any assertion that Plaintiff's wrist broke during this incident (and not before it) is contradicted by the clear evidence in the record, particularly the submitted medical records. Because no reasonable factfinder could credit Plaintiff's assertion in light of the other evidence, his testimony does not create a genuine dispute of material fact on this point. *Scott*, 550 U.S. at 380, 127 S.Ct. 1769.

**\*6** 40. Members of the Onondaga County Sheriff's Department ("Sheriff's Department") observed Plaintiff "was screaming and yelling while attempting to pull away from" SPD officers.

41. Following the incident in the sally port holding cell, custody of Plaintiff was transferred to members of the Sheriff's Department.

42. Sheriff's Deputy Timothy Stanton then performed a pat search of Plaintiff.

43. At no point while Plaintiff was in booking intake with the Sheriff's Department at the Justice Center did Defendant use any force on Plaintiff or make any physical contact with Plaintiff.

44. Defendant never verbally directed any of the employees at the Justice Center to conduct a strip search of Plaintiff.

45. It is the policy of the Sheriff's Department's Custody Division (which operates the Justice Center) to conduct a strip search of every newly admitted inmate at the Justice Center (regardless of the reason for the inmate's arrest) as part of the booking intake process in order to check for any secreted contraband (e.g., narcotics or weapons).

46. Pursuant to this policy, as part of the process of booking Plaintiff at the Justice Center, Sheriff's Deputy William Pufky escorted Plaintiff to the booking shower room ("strip search room") at approximately 1:10 P.M. to have the required strip search performed on Plaintiff.

47. Neither Defendant nor any other SPD officer was in the group of Sheriff's Deputies who escorted Plaintiff to the booking shower room prior to his strip search. [14]

[14]    Plaintiff denies this asserted fact, relying on his own deposition testimony. (Dkt No. 75, Attach. 1, at ¶ 52.) The Court finds this denial to be ineffective for each of two reasons. First, elsewhere in his testimony, Plaintiff indicates a lack of personal knowledge of the above-stated fact: more specifically, the portion of deposition testimony relied on by Plaintiff was (1) prefaced by an acknowledgment that, while he was being taken to the strip out room, he "was incoherent," (2) followed by two acknowledgments that, while he was in that room, he was "incoheren[t]," and (3) followed by an acknowledgment that he could not remember if three officers were in the strip out room with him. (Dkt. No. 73, Attach. 4, at 91-93.) *See* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602; *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (setting forth narrow exception to rule prohibiting the rendering of credibility determinations on motion for summary judgment). Second, in any event, the video evidence from the surveillance cameras directly and unequivocally contradicts Plaintiff's testimony. (*See* Exh. V6, at 0:00:30-0:00:53 [showing that all of the officers escorting him down the hall to the strip search room are wearing vests emblazoned with either "Sheriff" or "S.E.R.T.," with the exception of two officers, neither of whom are Defendant].) Because the video clearly shows Defendant was not with

the group that escorted Plaintiff to the strip search room, Plaintiff has not created a genuine dispute of material fact as to the asserted fact. *Scott*, 550 U.S. at 380, 127 S.Ct. 1769.

48. Sheriff's Deputy Sergeant Murphy decided to leave Plaintiff handcuffed while he was being transported to the strip search room.

**\*7** 49. Before arriving at the strip search room, Deputy Pufky asked Plaintiff if he had drugs or anything else on him that would be discovered during the search, and Plaintiff responded "no."

50. Plaintiff's handcuffs were removed upon entering the strip search room.

51. Deputy Pufky then ordered Plaintiff to remove his clothing and Plaintiff complied.

52. Deputy Pufky "ordered [Plaintiff] to raise his arms, open his mouth, lift his scrotum and [Plaintiff] complied."

53. Deputy Pufky then "ordered [Plaintiff] to turn around and bend at the waist while spreading his buttocks apart. [Plaintiff] immediately placed his left arm behind his body and inserted his left hand/fingers deeply into his buttocks area." [15]

[15]    Plaintiff does not expressly deny this fact but states that he "was given orders to strip his clothes and very shortly after was beaten." (Dkt. No. 75, Attach. 1, at ¶ 58.) However, this not responsive to the asserted fact, and in any event the deposition testimony he cites does not support his denial. Specifically, although he testified that it was only a short period of time between when he was asked to strip and when he was beaten and pepper sprayed, he does not say that nothing occurred between those two events. (Dkt. No. 73, Attach. 4, at 92, 94-96.) This fact is therefore deemed to be admitted.

54. Sheriff's Deputy Joseph Lee, Deputy Stanton, and Deputy John Allen also observed Plaintiff reach his hand into his buttocks. [16]

[16]    Plaintiff disputes the asserted fact, citing his own deposition testimony in support of his statement

2024 WL 942367

that he never reached his hands into his rectum. (Dkt. No. 75, Attach. 1, at ¶ 59.) However, this denial is ineffective for similar reasons as were discussed above in Note 15 of this Decision and Order. The evidence cited does not state one way or the other whether Plaintiff reached his hand into his rectum at the relevant time. This asserted fact is therefore deemed to be admitted.

55. According to Deputy Allen, "[t]his action, to place his hand inside his rectum, is commonly associated with the attempt to hide contraband from authorities." [17]

> [17] Plaintiff does not expressly deny this fact other than to state that he never reached his hand into his rectum, citing his own deposition testimony. Plaintiff's partial denial is insufficient for the reasons discussed above in Note 16 of this Decision and Order.

56. Plaintiff "was ordered to show his hands several times and refused all orders." [18]

> [18] Plaintiff denies this fact, but the cited evidence does not support his assertion that he was never ordered to move his hands. (Dkt. No. 75, Attach. 1, at ¶ 61.) When asked if he was given a command to move to his hands away from his backside, he answered, "I never heard that. I don't recall." (Dkt. No. 73, Attach. 4, at 96.) The fact that Plaintiff does not recall the order being spoken or did not hear it does not contradict the testimony that it was given. *See Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses ... do not create genuine issues of material fact."). This fact is deemed to be admitted.

**\*8** 57. Deputy Pufky then "grabbed [Plaintiff's] left arm in an attempt to pull his arm and hand forward, while giving numerous orders to [Plaintiff] to give [Deputy Pufky] his hand." [19]

> [19] Plaintiff's denial of this asserted fact is insufficient for the reasons discussed above in Notes 16 and 18 of this Decision and Order.

58. "[Plaintiff] refused all of [Deputy Pufky's] orders and continued to force his hand/fingers deeply into his buttocks area while attempting to pull away from" Deputy Pufky." [20]

> [20] Plaintiff's denial of this asserted fact is insufficient for the reasons discussed above in Notes 16 and 18 of this Decision and Order.

59. Deputy Pufky then dispersed two one-second bursts of his Vexor pepper spray to Plaintiff's facial area.

60. Plaintiff continued to thrash his body and became combative.

61. Plaintiff was then "taken to the floor" by Sheriff's Department officers and he continued to struggle and would not place his hand behind his back.

62. Deputy Pufky was holding Plaintiff's legs because Plaintiff was attempting to kick the officers.

63. During this struggle, Plaintiff continued to try to push his hand into his buttocks.

64. Plaintiff "grabbed and squeezed" Deputy Stanton's left hand; when Deputy Stanton ordered him to let go, he refused, and therefore Deputy Stanton struck him several times in the shoulder area with a closed fist until he released Deputy Stanton's hand.

65. Deputy Lee gained control of Plaintiff's left wrist by pulling it and placing it behind Plaintiff's back.

66. Defendant could hear a commotion with Plaintiff yelling.

67. While waiting for notification as to whether Plaintiff possessed illegal contraband, Defendant, Officer Abraham, and Officer Kittell observed several Sheriff's Deputies running toward the strip search room.

68. Defendant never entered the room where the strip search of Plaintiff was conducted at any relevant time. [21]

> [21] Plaintiff disputes this asserted fact, citing his own deposition testimony that he saw Defendant in the strip search room. (Dkt. No. 75, Attach. 1, at ¶ 77.) The Court finds this denial to be ineffective for each of two reasons. First, elsewhere in his testimony, Plaintiff indicates a lack of

personal knowledge of the above-stated fact: more specifically, the portion of deposition testimony relied on by Plaintiff was (1) prefaced by an acknowledgment that, while he was being taken to the strip out room. he "was incoherent," (2) followed by two acknowledgments that, while he was in that room, he was "incoheren[t]," and (3) followed by an acknowledgment that he could not remember if three officers were in the strip out room with him. (Dkt. No. 73, Attach. 4, at 91-93.) *See* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602; *Jeffreys*, 426 F.3d at 554-55. Second, in any event, the video surveillance evidence from inside the Justice Center clearly establishes that Defendant did not enter the strip search room at any time while Plaintiff was in it; he walked to the hallway outside the door of that room while the search was occurring, but he did not open the door or enter the room. (Exh. V6, at 0:00:33-0:04:33.) *See Scott*, 550 U.S. at 380, 127 S.Ct. 1769. The asserted fact is therefore deemed to be admitted.

**\*9** 69. Defendant did not pepper spray Plaintiff, nor was he in the strip search room when Deputy Pufky dispersed the pepper spray.

70. Plaintiff passed Defendant in the hallway as he left the strip search room and was escorted by Sheriff's Deputies back to the booking intake room.

71. In the booking intake room, Plaintiff was escorted to the eyewash station, where cold water was applied to his eyes and face for decontamination.

72. After Plaintiff was decontaminated, he was transferred back to SPD custody and transported to the hospital.

73. At no time while Plaintiff was at the Justice Center was he punched, kicked, or otherwise struck by Defendant.

74. Plaintiff was then transported by ambulance to St. Joseph's Hospital.

### Application for and Signing of Search Warrant

75. While other SPD officers monitored Plaintiff at St. Joseph's Hospital, Defendant proceeded to the Special Investigation Division to complete a strip search warrant.

76. Upon completing the search warrant and application, Defendant proceeded to the residence of Syracuse City Court Judge Rory A. McMahon (as an acting Onondaga County Court Judge) to have the warrant application and search warrant reviewed and signed.

77. The warrant application was based on, among other things, Defendant's observations as set forth in his own sworn statement, Officer Abraham's observations, positive field tests for marijuana and cocaine, and Deputy Pufky's affidavit.

78. The search warrant was signed by Judge McMahon on October 16, 2017.

79. The search warrant "directed" the following:

The person of Torrence L. Jackson, black male, [date of birth omitted] 6'03", 240 lbs., black hair, brown eyes, to include a search of all body cavities to include the rectum/anus, as well as any areas of his clothing which are capable of concealing the narcotic controlled substance commonly known as cocaine and the illegal substance commonly known as marihuana as well as any and all illegal controlled substances, paraphernalia, weapons, moneys, compounds, mixtures, cutting agents, used in the preparation of, possession of, use of, sale of, and/or concealment of the narcotic controlled substance commonly known as cocaine and the illegal substance commonly known as marihuana and/or illegal controlled substance and any and all item(s) (evidence) showing or tending to show preparation of, possession of, use of, sale of, and/or concealment of the narcotic controlled substance commonly known as cocaine and the illegal substance commonly known as marihuana, as well as any other illegal controlled substance(s), this being in violation of sections 220.00 and 221.00 of the New York State Penal Law.

The court further allows for medical staff of St. Joseph's Hospital to utilize any/all medicines and/or medical/surgical procedures to assist in said removal to include, but not limited to, anesthesia, IV, x-ray/sonogram and/or physical manipulation, and any and all other medical procedures determined by said medical staff to be necessary and prudent to assist in the retrieval/removal of said illicit/illegal substances (evidence) located within the anal cavity of Torrence L. Jackson. Said medical procedures to assist in the removal/recovery of said items to be conducted by medical staff with or without the consent of Jackson.

**\*10** 80. Defendant then traveled to St. Joseph's Hospital with the signed search warrant.

**Plaintiff at St. Joseph's Hospital and His Sigmoidoscopy**

81. Defendant was not at St. Joseph's Hospital when Plaintiff arrived there at approximately 1:52 P.M.

82. One of the reasons listed in the certified medical records for Plaintiff's visit was a "drug problem."

83. Plaintiff was placed in the "A" section of the St. Joseph's Emergency Department, which is where agitated or psychiatric patients are typically placed.

84. Dr. William Paolo was the attending physician assigned to the "A" section when Plaintiff arrived at St. Joseph's Hospital and he was supervising a resident doctor, Dr. Kavitha Muruganantham; Nurse Mark Manansala was the primary nurse assigned to Plaintiff.

85. Dr. Paolo noted that Plaintiff was "agitated, combative, and stat[ed] 'I refuse everything.' "[22]

[22]  Plaintiff does not expressly deny this fact, other than to assert that he was not offered any treatment and was only calling for help, citing his own deposition testimony. (Dkt. No. 75, Attach. 1, at ¶ 121.) However, Plaintiff testified at his deposition that, although he recalls a doctor talking to him at some point and telling him about an x-ray, he was asleep much of the time in the hospital and does not remember much of what happened there. (Dkt. No. 73, Attach. 4, at 104-05.) *See* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602; *Genger*, 663 F. App'x at 49 n.4; *Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d at 75. This fact is therefore deemed to be admitted.

86. Police also noted that, "[u]pon arrival to the ER [Plaintiff] was very aggressive and uncooperative towards police and hospital staff."

87. Dr. Paolo was concerned that Plaintiff was a threat to himself and others because he was combative and fighting.

88. At 1:59 P.M., Nurse Manansala administered five milligrams of Haldol, fifty milligrams of Benadryl, and two milligrams of Ativan to Plaintiff.

89. Neither Defendant Fiorini nor any other SPD officer administered sedatives to Plaintiff.

90. Nurse Manansala required assistance to hold Plaintiff down while administering the sedative medication, although he does not remember who participated in restraining Plaintiff.

91. However, Dr. Paolo did not remember any police officers restraining Plaintiff.

92. Plaintiff never saw Defendant while he was at St. Joseph's Hospital.

93. Neither Dr. Paolo nor Nurse Manansala was able to identify any of the SPD officers they encountered when Plaintiff was brought to the hospital.

94. At 2:20 P.M., Nurse Manansala administered five milligrams of midazolam, an additional sedative medication.

95. Nurse Manansala opined that crack cocaine located in an individual's rectum could be absorbed into the bloodstream.

96. At 2:32 P.M., Nurse Manansala removed the spit mask from Plaintiff's head and washed the pepper spray from his eyes.

97. Nurse Manansala did not recall Plaintiff complaining about any distress from the pepper spray prior to his face being cleaned.

98. Plaintiff did not make any subsequent complaints regarding the pepper spray after his face was cleaned.

**\*11** 99. Dr. Paolo noted that Plaintiff's eyes exhibited no discharge and that he was in no respiratory distress.

100. Plaintiff did not complain to Nurse Manansala about pain anywhere else on his body.

101. Plaintiff also did not exhibit any behavior while at St. Joseph's Hospital that would indicate he sustained pain or injury to his right wrist.

102. At 6:35 P.M., Dr. Paolo and Dr. Muruganantham ordered an x-ray of Plaintiff's abdomen.

103. Although the x-ray did not show a "radiopaque foreign body inside of Plaintiff," Dr. Paolo stated that it would be possible that drugs would not appear on an x-ray; hospital gastroenterologist Dr. Hui Hing Tin also opined that an x-ray would only show density, not tell if there were drugs present inside of Plaintiff's body.

104. At 7:25 P.M., Dr. Paolo turned Plaintiff's care over to Dr. Kishani Heller.

105. After Judge McMahon signed the search warrant, Defendant returned to St. Joseph's Hospital.

106. At some point, Dr. Heller spoke with a police officer who informed her that they had a court order to obtain a foreign body from Plaintiff's rectum; she was unable to recall the officer's name or their appearance.

107. Based on the information relayed to her, Dr. Heller was concerned that there might be cocaine in Plaintiff's gastrointestinal tract.

108. Dr. Heller requested that Plaintiff drink a laxative beverage, which he refused.

109. Dr. Heller then requested that the charge nurse page the hospital attorney.

110. At 9:14 P.M., Dr. Heller noted that she "[s]poke with hospital attorney Mr. Lowell Seifter, who had reviewed the court order and spoken with the judge who issued the court order and says the patient does not have the right to refuse."

111. At 10:01 P.M., Dr. Heller informed Plaintiff of the plan to transfer him to the operating room for a sigmoidoscopy and Plaintiff became violent. [23]

[23]    Plaintiff does not expressly deny any part of this fact, and instead adds facts that fail to respond to this fact. (Dkt. No. 75, Attach. 1, at ¶ 156.) See *Nanos v. City of Stamford*, 609 F. Supp. 2d 260, 263 (D. Conn. 2009) ("Nanos does not actually deny the City's factual allegations, but simply adds commentary or analysis not related to the existence or non-existence of the facts alleged by the City. Such commentary or analysis

is not appropriate when responding to a Local Rule Statement ...."). This asserted fact is therefore deemed to be admitted.

112. Dr. Heller then called for hospital police because she and her hospital staff were not capable of holding patients down to restrain them. [24]

[24]    Plaintiff does not deny this fact, other than to assert that "[n]ursing staff are capable of restraining patients, and in fact do restrain plaintiff," citing to a portion of the deposition testimony from Dr. Heller. (Dkt. No. 75, Attach. 1, at ¶ 157.) Having reviewed Dr. Heller's cited testimony in its entirety, the Court notes that Dr. Heller appears to use the word "restrain" in two different contexts in her testimony: in one context using "restrain" to mean the physical restraint of a patient by individuals to allow medical personnel to administer sedatives or other treatments (which restraints medical personnel do *not* apply), and in another context using "restrain" to mean the application of devices that would hold a patient to the bed for longer periods of time (which restraints medical personnel *do* apply). (*Compare* Dkt. No. 73, Attach. 18, at 34 [testifying that she called hospital police when Plaintiff became violent because "we are not capable of restraining patients, I'm not capable of it, or my nursing staff"] *with* Dkt. No. 73, Attach. 18, at 38-39 [testifying that it was one of the nurses who placed Plaintiff into the "violent adult restraints" ordered by Dr. Heller].) Because Dr. Heller's testimony is not self-contradictory but successfully supports the asserted fact, that fact is deemed to have been admitted.

**\*12** 113. At 10:04 P.M., Dr. Heller also ordered that Plaintiff be placed in "violent adult restraints" because he became "combative and verbally threatening towards staff and SPD."

114. Nurse Shannon Phillips placed Plaintiff into restraints and monitored him in the restraints.

115. At 10:06 P.M., an electrocardiogram of Plaintiff's heart revealed signs of tachycardia and an elevated heart rate of 128; potential causes of an elevated heart rate include agitation and ingesting drugs.

116. Dr. Tin consulted with Dr. Heller, who informed him that "the warrant would want us to retrieve this object from the rectum with any means."

117. At 10:30 P.M., Dr. Tin noted that he had spoken with hospital attorney, Mr. Seifter, who had stated the warrant was valid and legally advised Dr. Tin that he was "obligated to help the police under any means to retrieve the object."

118. The decision to perform the sigmoidoscopy was made between Dr. Tin and Dr. Heller upon the legal advice of Mr. Seifter.

119. Dr. Tin decided to perform a sigmoidoscopy because he did not know how far inside of Plaintiff the object could be or what the object was at the time of the consultation.

120. Crack cocaine, whether in a burst package or placed unpackaged into the rectum, could be absorbed by the body; if placed inside the rectum without packaging, it could be absorbed within ten hours.

121. Members of SPD did not direct Dr. Tin to perform the sigmoidoscopy.

122. Dr. Tin performed the sigmoidoscopy at approximately 11:42 P.M., which is approximately eleven hours after Plaintiff's traffic stop at 12:34 P.M.

123. The sigmoidoscopy procedure lasted approximately five-to-eight minutes.

124. The sigmoidoscopy did not reveal a foreign body in the area examined.

125. Dr. Tin did not recall seeing blood after the sigmoidoscopy.

126. At 12:28 A.M. on October 17, 2017, Dr. Heller ordered a rapid drug screen of Plaintiff, which showed positive results for benzodiazepine, marijuana, and cocaine.

127. Plaintiff was discharged from St. Joseph's Hospital on October 17, 2017, at 12:52 A.M.

128. Plaintiff testified that he saw eight or nine officers at the hospital but that he did not see Defendant.

129. Plaintiff was transported back to the Justice Center and arraigned and released on October 17, 2017.

### D. Parties' Arguments on Defendant's Motion for Summary Judgment

#### 1. Defendant's Memorandum of Law

Generally, in his motion for summary judgment, Defendant makes three arguments. (Dkt. No. 73, Attach. 31.) First, Defendant argues that Plaintiff's remaining First Claim for excessive force against him (as to both the events during the traffic stop/at the Justice Center and when he was at the hospital) must be dismissed as a matter of law, because the undisputed evidence shows that Defendant did not engage in any unreasonable force, and indeed did not participate in any of the alleged force that Plaintiff claims caused his injuries. (*Id.* at 9-24.) Specifically, Defendant argues as follows: (a) Plaintiff has admitted that no force was used at the scene of the traffic stop, or during transportation to the Justice Center; (b) the force Defendant used on Plaintiff while Plaintiff was in the sally port holding cell when he arrived at the Justice Center was reasonable because all he did was hold Plaintiff's torso and left arm in an effort to keep him from reaching toward the back of his pants and to subdue him to the ground when Plaintiff did not cooperate, and Plaintiff does not allege any injury to his left hand or arm; (c) Defendant was not present when Plaintiff was pepper sprayed and was not in the strip search room at all while Plaintiff was in there with Sheriff's Deputies for his search, and therefore there is no evidence to suggest he either pepper sprayed or hit Plaintiff during that altercation; (d) Defendant did not restrain or sedate Plaintiff while he was at the hospital, and indeed Plaintiff acknowledges that he did not see Defendant at the hospital at any relevant time, and it is undisputed that Defendant did not arrive at the hospital until after he had secured a warrant to search Plaintiff; and (e) Defendant did not use any force related to the sigmoidoscopy because that procedure was not only presumptively reasonable due to the duly executed search warrant, but also it was performed by medical personnel under the direction of hospital legal counsel, not by Defendant or at his specific direction. (*Id.*)

**\*13** Second, Defendant argues that, as to the remaining Second Claim regarding failure to intervene in the events that happened during the traffic stop/at the Justice Center, there is no admissible record evidence to show that excessive force was applied while Plaintiff was in the sally port holding cell,

and the video evidence undisputedly shows that Defendant was not present at any time in the strip search room when Plaintiff alleges he was pepper sprayed and beaten; and he therefore had no reasonable opportunity to intervene to the extent any of those actions could be considered excessive force. (*Id.* at 9-17.)

Third, Defendant argues that, even if Plaintiff can establish either of his claims, Defendant is protected from liability as a matter of law by the doctrine of qualified immunity, because there is no case law clearly establishing that a body cavity search based on a validly executed search warrant constitutes excessive force, and based on the current record Defendant was objectively reasonable in believing his actions in subduing Plaintiff, seeking a search warrant based on the facts known to him and his own observations, and bringing the search warrant to the hospital were constitutional. (*Id.* at 24-29.)

## 2. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant's motion for summary judgment, Plaintiff makes four arguments. (Dkt. No. 75.) First, Plaintiff argues that factual disputes preclude the entry of summary judgment on his First Claim of excessive force because, there is a genuine dispute of material fact regarding whether the initial traffic stop and following events provided sufficient suspicion that Plaintiff had drugs in his rectum, which in turn raises genuine questions regarding whether the search warrant was valid. (*Id.* at 3-5.) Plaintiff argues that a reasonable jury could determine that Defendant's testimony and narrative supporting the warrant is false or not credible, and therefore find that the force used against him at the hospital was unreasonable and excessive. (*Id.*)

Second, Plaintiff argues that the video evidence should not be used as conclusive proof of any fact regarding whether Defendant was present when force was used or whether such force was reasonable, because factual disputes remain that are not resolved by the video evidence and that require submission to a jury. (*Id.* at 5.)

Third, Plaintiff argues that the fact that his injuries may have been arguably minor in nature does not preclude an excessive force claim and that, in any event, part of his injury is that he was subjected to an unnecessary, invasive, and humiliating medical procedure in addition to sedation. (*Id.* at 6.)

Fourth, Plaintiff argues that Defendant is not entitled to qualified immunity because (a) a constitutional right to be free from unreasonable searches and seizures and unreasonable force is clearly established, and (b) there are genuine disputes of material fact that must be resolved before it can be determined whether his actions can be considered to be objectively reasonable. (*Id.* at 6-7.)

## 3. Defendant's Reply Memorandum of Law

Generally, in his reply to Plaintiff's opposition, Defendant makes three arguments. (Dkt. No. 76.) First, Defendant argues that Plaintiff's claims for excessive force and failure to intervene during the initial traffic stop and at the Justice Center fail for the following reasons: (a) it is undisputed that no force was used during the traffic stop itself; (b) his co-occurring claim for failure to intervene during the traffic stop (about which Plaintiff has made no argument in his response) should also be dismissed given that there was no allegation of any force used; (c) Defendant's actions in the sally port holding cell at the Justice Center do not constitute excessive or unreasonable force, and the evidence substantiates a finding that Plaintiff's right wrist was not fractured during that encounter and that Defendant never touched that hand or arm or hit him; and (d) Defendant was not present in the strip search room where Plaintiff was pepper sprayed, and the video evidence substantiates a finding that he was indeed never in that room while Plaintiff was in there. (*Id.* at 4-10.)

**\*14** Second, Defendant argues that Plaintiff's claim for excessive force related to the events at the hospital also fails for the following reasons: (a) there is no evidence to substantiate that Defendant physically restrained or medically sedated Plaintiff at the hospital; (b) Plaintiff has not provided any evidence beyond his own testimony and suppositions to support his argument that the narrative on which Defendant based the search warrant application was false, or that the search warrant it resulted in was invalid, and indeed the search warrant was based in part on marijuana, a substance Plaintiff admits had already been found during the traffic stop, and also in part on an affidavit from Deputy Pufky regarding Plaintiff's conduct in the strip search room; and (c) the sigmoidoscopy was performed not by Defendant, or at the direction of Defendant, but by medical personnel pursuant to the search warrant after consultation with counsel. (*Id.* at 10-13.)

2024 WL 942367

Third, Defendant argues that he is entitled to qualified immunity, because he had a valid reason for arresting Plaintiff during the initial traffic stop, and the subsequent search warrant was based on probable cause under the undisputed facts presented. (*Id.* at 13.)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [25] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e). [26]

[25]   As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[26]   Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. LR. 7.1(a)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

**\*15** For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement. [27]

[27]   Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [28] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak*

*v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

28    *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III. ANALYSIS

### A. Whether Defendant Is Entitled to Summary Judgment on Plaintiff's First Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memoranda of law. *See, supra* Parts I.D.1 and 3. To those reasons, the Court adds the following analysis.

"The Fourth Amendment protects a free citizen from excessive force in the course of an arrest or investigatory stop." *McDonald v. City of Troy*, 542 F. Supp. 3d 161, 168-69 (N.D.N.Y. 2021) (Hurd, J.) (citing *Cugini v. City of N. Y.*, 941 F.3d 604, 612 [2d Cir. 2019]). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "To succeed on a [Section] 1983 excessive force claim, a plaintiff must show that the defendant's use of force was 'objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.' " *Malarczyk v. Lovgren*, 19-CV-0042, 2022 WL 374271, at *9 (N.D.N.Y. Feb. 8, 2022) (Hurd, J.) (quoting *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 491 [N.D.N.Y. 2017] [Hurd, J.]). The objective reasonableness inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Hulett*, 253 F. Supp. 3d. at 491.

 *16   Factors the court should consider when making this assessment include "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). However, the court should be "careful to evaluate the record 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[;]' ... 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.' " *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396-97, 109 S.Ct. 1865).

There are three distinct portions of the encounter on October 16, 2017, that are relevant to Plaintiff's First Claim: actions taken during the initial traffic stop, actions taken at the Justice Center, and actions taken at St. Joseph's Hospital. With regard to the nature of the actions taken, in his Complaint, Plaintiff alleges excessive force based on (1) "[a]mong other violent acts, [he] was punched and pepper sprayed," and (2) he was "involuntarily restrained by the defendants in the hospital to facilitate the illegal colonoscopy." (Dkt. No. 1, at ¶¶ 41-42.)

### 1. Traffic Stop

As to the events that occurred during the traffic stop itself, it is undisputed that Defendant did not use any force against Plaintiff. Plaintiff alleges that, "[i]n the process of putting [him] under arrest, the defendants unnecessarily used excessive force punching and pepper spraying [him]." (Dkt. No. 1, at ¶ 15.) However, according to Plaintiff's own deposition testimony, the alleged punching and pepper spraying did not occur until after he had arrived at the Justice Center. Specifically, at his deposition, Plaintiff testified as follows related to the traffic stop: (1) Defendant and Officer Abraham approached his car; (2) Officer Abraham asked him for his license and registration and then "pulled" or escorted him to the back of the car and handcuffed him; (3) Officer Abraham searched his car while "officers" searched his person; (4) while Plaintiff was being searched, Defendant searched the passenger of the car; and (5) he was put into

2024 WL 942367

the police transport van and stated no force was used on him while he was in the van. (Dkt. No. 73, Attach. 4, at 66-80.) Plaintiff affirmatively stated that officers did not strike him or pepper spray him at the scene of the traffic stop. (*Id.* at 72, 79.) Because even Plaintiff's own account does not indicate any force was used against him before he arrived at the Justice Center, much less that excessive force that was applied by Defendant specifically, the evidence does not support any claim of excessive force related to the events of the traffic stop.

### 2. Justice Center

Turning to the events that occurred at the Justice Center, there are two distinct types of such events: (1) events that occurred in the sally port holding cell when Plaintiff first arrived at the Justice Center, and (2) events that occurred later when Plaintiff was taken into the strip search room to be searched for booking.

### a. Sally Port Holding Cell

The first of these events involved an altercation in the sally port holding cell not long after Plaintiff arrived at the Justice Center. Although there are disputed facts related to Plaintiff's actions that Defendant argues prompted the need to physically restrain him after he was placed in the holding cell (specifically whether he reached or tried to reach into his pants or into his buttocks), Plaintiff admits in his deposition testimony that, while he was in the holding cell, he put his hands toward the back of his pants in order to pull them up because, "[w]hatever type of clothing I was wearing was way below my behind." (Dkt. No. 73, Attach. 4, at 83.) There therefore is no genuine dispute of fact that he reached towards the back of his pants at the relevant time. He further acknowledges that it was after attempting to pull his pants up that the officers "rushed in and slammed [him] down to the ground." (*Id.*)

**\*17** The videos from the sally port cameras show Plaintiff in the holding cell, and, although the videos are not particularly clear, it can be seen that Plaintiff's hands (which are handcuffed behind his back) do appear to be pulling on his pants in some manner; it is not apparent whether they are outside or inside of his pants. (Exh. V1, at 0:00:53-0:01:05; Exh. V2, at 0:01:00.) While Plaintiff is doing that, Defendant and another officer enter the holding

cell. (Exh. V1, at 0:01:03; Exh. V2, at 0:01:02-0:01:05.) The other officer appears to grab Plaintiff's hands from behind, while Defendant appears to take hold first of Plaintiff's right shoulder before quickly switching his grip to Plaintiff's left shoulder and chest; he holds Plaintiff like that while the other officer appears to be patting Plaintiff down; he also reaches around to the back of Plaintiff's left side while holding Plaintiff across the chest. (Exh. V1, at 0:01:07-0:01:15; Exh. V2, at 0:01:10-0:01:20.) Defendant eventually moves his hands to Plaintiff's left elbow as Plaintiff continues to visibly struggle against the officers' grip. (Exh. V1, at 0:01:15-0:01:22; Exh. V2, at 0:01:20-0:01:25.) Multiple other officers enter the holding cell and Plaintiff is gradually pushed toward one of the benches by the group of officers; while Plaintiff is on the bench, Defendant is seen to be holding him with one hand still near the left side of his body, although the other officers have taken a more active role at this point. (Exh. V1, at 0:01:22-0:01:40; Exh. V2, at 0:01:25-0:01:40.) Defendant can be seen helping to bring Plaintiff down to the ground, where Plaintiff is held by the officers. (Exh. V1, at 0:01:40-0:02:30; Exh. V2, at 0:01:40-0:02:05.) At no point in this video did Defendant (or any of the other officers) punch or kick Plaintiff, although one officer (not Defendant) can be seen elbowing one of Plaintiff's limbs that another officer is either holding or (if it is indeed Plaintiff's arm) being held by. (Exh. V1, at 0:01:42-0:01:44.) Although stating that he was struck during the altercation, Plaintiff himself was unable to recall who struck him, testifying that he was too preoccupied with "trying not to let [his] head hit the bench," and that, although he "felt something" other than "pure falling," he was disoriented and could not answer specifically where he was struck other than to assert that his wrist was broken. (Dkt. No. 73, Attach. 4, at 83-84.)

Setting aside the issue of whether Plaintiff's right wrist was fractured during this altercation or whether he suffered any other injuries as a result of the officers' conduct in the holding cell,[29] the video evidence from the two cameras clearly substantiates that, most relevantly, Defendant did not engage in any conduct that can be considered to be unreasonable excessive force. His actions consisted of holding Plaintiff in place around the abdomen and left arm, attempting to pull Plaintiff's hands away from the back of his pants, and assisting the other officers in subduing Plaintiff first to the bench and then to the floor through means of gradual, controlled force without striking or hitting him. This force was applied based on the belief that Plaintiff was reaching into the back of his pants, where Defendant has stated he believed Plaintiff might be hiding contraband based on previous observations of his

behavior at the traffic stop and during transportation to the Justice Center. (Dkt. No. 73, Attach. 2, at 6; Dkt. No. 73, Attach. 3, at 42; Dkt. No. 73, Attach. 14, at 5-6.)

<sup>29</sup> Whether Plaintiff suffered the fracture during the altercation or weeks before his arrest does not answer the question of whether the force used was excessive, because "[t]he fact of injury alone does not render the [force] used by the officers excessive." *Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 405 (S.D.N.Y. 2009) (finding that excessive force was not used where the plaintiff was injured in a fall after officers pushed him, because the fall itself was caused not by the push, but the fact the plaintiff slipped on water on the floor after being pushed). As will be discussed below, even if Plaintiff's wrist was fractured in the course of the officers restraining him to the ground in the holding cell, the force they used to do so was not excessive or unreasonable under the circumstances.

Although Plaintiff offers his own testimony that he did not have contraband in his pants and did not attempt to reach into his pants at that time (but was merely attempting to pull his pants up because they were sagging), his account does not suffice to create a genuine dispute of material fact regarding whether the force used in response to his actions was excessive. As was already discussed, the standard for assessing whether force is excessive is not necessarily what the truth, learned after the fact, might be; it is whether the use of force was objectively reasonable from the perspective of a reasonable officer on the scene with the knowledge he or she possessed at the time. *Hulett*, 253 F. Supp. 3d. at 491; *Tracy*, 623 F.3d at 96; *Graham*, 490 U.S. at 396-97, 109 S.Ct. 1865. Defendant and the other officers had already found marijuana in Plaintiff's waistband and a small piece of a substance that tested positive for cocaine where Plaintiff was seated in the car; Plaintiff's testimony that he did not possess cocaine in the car cannot contradict the clear evidence of the NIK Cocaine Wipe, at least to the extent that the positive test result provided officers with reason to believe Plaintiff possessed cocaine at the time of his arrest. (Dkt. No. 73, Attach. 25, at ¶¶ 13-18.) They also found plastic sandwich bags that, in Officer Abraham's experience, are known to be commonly used for packaging drugs for sale. (Dkt. No. 73, Attach. 25, at ¶¶ 10-11.) Further, although Plaintiff does not make any mention of shifting in his seat between the time the traffic stop occurred and when he was ordered to get out of the car, he also does not affirmatively state he did not

make any such movements. (Dkt. No. 73, Attach. 4, at 67-68.) Defendant stated that he was in the police vehicle running Plaintiff's license when he observed Plaintiff "lift the right side of his body up off the seat causing his head to come completely out the front driver's side window," an action that Defendant interpreted as consistent with an attempt to conceal narcotics; Plaintiff did admit that his window was open at the time during the traffic stop consistent with Defendant's account. (Dkt. No. 73, Attach. 2, at 6; Dkt. No. 73, Attach. 4, at 67-68; Dkt. No. 73, Attach. 14, at 5.) Further, Plaintiff did not deny, and has not presented any evidence to contradict, Defendant's assertion that, when he was placed in the holding cell, he was "instructed to stand up keeping his hands out of his pants." (Dkt. No. 73, Attach. 2, at 6.)

**\*18** Therefore, even omitting from consideration disputed facts regarding whether Plaintiff attempted to reach his hands into his pants during the ride in the transport van or whether he made a statement to the effect that "I got it in there" to officers while he was in the holding cell, there is sufficient undisputed evidence to give rise to a reasonable belief that Plaintiff might have been hiding contraband in his pants or buttocks, and evidence to suggest Defendant and other officers present believed Plaintiff was violating the order to keep his hands out of his pants. This knowledge gave rise to a reasonable need to ensure that Plaintiff did not attempt to hide that contraband further, a task which ultimately required a use of force given that the undisputed video clearly shows that Plaintiff was resisting the officers' attempts to control his arms. The force applied by Defendant specifically, which, again, consisted primarily of holding Plaintiff's abdomen and left arm to keep him in place and his hands away from his pants and helping to bring him to the ground with the assistance of other officers when Plaintiff continued to resist, as substantiated by the video evidence, was objectively reasonable under the circumstances known to Defendant at the time the altercation occurred. Because the undisputed facts are sufficient to show that the force used by Defendant was reasonable based upon his own observations and knowledge at the time, no reasonable factfinder could conclude that he violated Plaintiff's constitutional rights through his actions in the holding cell.

Further, to the extent that Plaintiff offers testimony regarding an improper motive for the eventual search of his rectum (namely that Defendant and Officer Abraham wished to harass him), the assessment of excessive force must be whether the force used was reasonable " 'without regard to their underlying intent or motivation.' " *Malarczyk*, 2022

WL 374271, at *9 (quoting *Hulett*, 253 F. Supp. 3d at 491). Because there is sufficient evidence from which Defendant and the other officers could have reasonably believed Plaintiff might be hiding contraband in his pants or buttocks at the time he was in the holding cell, the force used by Defendant to subdue Plaintiff and prevent him from reaching into his pants is objectively reasonable regardless of any potential improper motive as asserted by Plaintiff, and no reasonable factfinder could conclude otherwise based on the evidence presented.

For all of the above reasons, although Defendant undisputedly used force against Plaintiff in the holding cell at the Justice Center, no reasonable factfinder could conclude that such force was excessive under the circumstances presented.

**b. Strip Search Room**

Plaintiff also alleges that Defendant is responsible for the excessive force used on him while he was in the strip search room at the Justice Center, during which time he alleges he was physically attacked and pepper sprayed. The incident report completed by Deputy Pufky indicates that he was in the strip search room with Plaintiff, along with Timothy Stanton and Kevin Murphy. (Dkt. No. 73, Attach. 12, at 6-7.) Witness statements were also submitted regarding the events in the strip search room by Kevin Robbins, Joseph Lee, and Jon Allen. (Dkt. No. 73, Attach. 12, at 9-19.) None of these statements mentions any SPD officers (much less specifically Defendant) being in the strip search room at the relevant time. Further, Defendant testified that he was not present when Plaintiff was being pepper sprayed. (Dkt. No. 73, Attach. 3, at 37.)

The surveillance camera video from the hallway outside of the strip search room shows eleven individuals escorting Plaintiff to that room, all but two of whom are wearing a vest with "Sheriff" or "S.E.R.T." on the back. (Exh. V6, at 0:00:33-0:00:40.) It is clear that none of the individuals is Defendant. Approximately two minutes later, another individual can be seen rushing to the strip search room, wearing a "S.E.R.T." vest. (Exh. V6, at 0:02:17.) Following that individual, two persons in "Police" vests, one of whom is Defendant, and another unmarked person walk in the hallway towards the strip search room and stand outside the closed door in the hallway; none of them enters the room or opens the door. (Exh. V6, at 0:02:20-0:03:00.) Someone inside the strip search room opens the door and the Sheriff's officers begin to exit while Defendant and the other two men continue to stand across from the door out of sight of the camera. (Exh. V6, at 0:03:02-0:03:28.) After a few of the Sheriff's officers have exited, someone in the hallway (it is not clear who at this point, because the camera has a view only of their legs) leans against the door to the strip search room to partially open it and look inside, stepping halfway in before exiting again to the hallway. (Exh. V6, at 0:03:25-0:03:38.) When that individual walks closer to the camera, it is clear he is not Defendant, who emerges into frame next to him as they walk away from the strip search room. (Exh. V6, at 0:03:38-0:03:52.) When the door to the strip search room opens and Plaintiff is escorted out, Defendant is clearly seen further away from the door near the camera. (Exh. V6, at 0:04:33.) This video evidence therefore shows unequivocally that Defendant never entered the strip search room at any time while Plaintiff was inside.

**\*19** Despite this clear, undisputable evidence, Plaintiff argues that the video is in fact not conclusive, citing to unspecified "factual disputes unresolved by the video evidence" and the point of law that a jury should be the one to resolve what the evidence means and which competing account to believe. (Dkt. No. 75, at 5.) However, the Supreme Court has recognized that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Indeed, in that case, the Supreme Court specifically found that the Court of Appeals erred in adopting the plaintiff's account of the facts because "it [was] so utterly discredited by" the video evidence of his dangerous driving that "it should have viewed the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 380-81, 127 S.Ct. 1769; *see also Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (noting that, while it is generally not the duty of a district court to weigh the credibility of the parties on a summary judgment motion, a court may disregard a version of events that is based solely on the party's own contradictory or incomplete testimony so long as there is no other evidence in the record upon which a reasonable factfinder could find in the party's favor). Because Plaintiff's unsupported assertions that he saw Defendant in the strip search room (in the context of also admitting that he was "incoherent" throughout this encounter and that he has difficulty remembering what happened because of the trauma) are blatantly contradicted by the video evidence, no reasonable factfinder could interpret the evidence in Plaintiff's favor, and, as a result, he has presented no genuine dispute

of material fact regarding whether Defendant was in the strip search room, let alone that Defendant participated in the alleged use of force in that room. (Dkt. No. 73, Attach. 4, at 91-95.)

Because the video evidence clearly shows that Defendant never entered the strip search room, Plaintiff's claim that Defendant used any force against him during this incident, much less excessive force, is not supported.

### 3. St. Joseph's Hospital

Lastly, Plaintiff alleges that he was subjected to excessive force while he was at St. Joseph's Hospital through being physically and medically restrained and through being forced to undergo a sigmoidoscopy against his will. However, Plaintiff has not adduced admissible record evidence to raise a genuine dispute of material fact that Defendant was the person who applied any such force against him.

In his Complaint, Plaintiff alleges both that Defendant went to the police station to draft a search warrant while Plaintiff was at the hospital, and that "Defendant Fiorini returned to the hospital with the warrant around 6:36 p.m." (Dkt. No. 1, at ¶¶ 22-23.) There is no evidence to suggest that Defendant was at the hospital any time prior to when he arrived with the warrant. Defendant has testified that he went from the Justice Center to the station to write the warrant application and then proceeded to the home of Judge Rory McMahan to have the warrant signed. (Dkt. No. 73, Attach. 2, at 7; Dkt. No. 73, Attach. 3, at 38-39.) Plaintiff testified that he saw "officers" in the room when they were sedating him upon his arrival at the hospital, but acknowledged that he was having difficulty seeing due to the spit mask and the after-effects of being pepper sprayed, and that his memory of being in the hospital is fuzzy due to being sedated; he affirmed that he did not specifically see Defendant, but only that he saw "about eight, nine officers." (Dkt. No. 73, Attach. 4, at 100-04.) Because there is no admissible record evidence from which a reasonable factfinder could conclude Defendant was at the hospital before approximately 6:30 P.M., Plaintiff has provided no basis for liability against him as to any alleged use of force that occurred before that time, including the application of physical or medical restraints.

As to events occurring after Defendant arrived at the hospital with the search warrant, Plaintiff testified that he had no idea who administered the sedative medications to him, or whether he had been physically held down when sedated or who restrained him. (Dkt. No. 73, Attach. 4, at 110.) He further did not know if Defendant was in the group of officers that were in his room when he regained awareness after the sigmoidoscopy was performed. (Id. at 112-13.)

Regarding the alleged sedation and restraint, the undisputed evidence shows that sedative medications were administered by Nurse Manansala at approximately 1:59 P.M. and 2:20 P.M., which was before Defendant arrived at the hospital. (Dkt. No. 73, Attach. 11, at 25, 26-30; Dkt. No. 73, Attach. 16, at 28, 34-35.) The only documented instance of Plaintiff being physically restrained by persons after Defendant arrived at the hospital occurred at approximately 10:04 P.M. (Dkt. No. 73, Attach. 11, at 23; Dkt. No. 73, Attach. 18, at 33-36.) Progress notes from Plaintiff's hospital stay indicate that Dr. Heller was presented with the signed search warrant by "police" at approximately 7:25 P.M., after which she spoke with another doctor to consult with the hospital attorney; Dr. Heller reported that the attorney, Mr. Seifter, told her that Plaintiff did not have the right to refuse intervention within the scope of the warrant. (Dkt. No. 73, Attach. 11, at 23.) Dr. Heller attempted to have Plaintiff drink a cathartic, [30] which was refused, as well as to conduct a body cavity search and perform a CT of Plaintiff's abdomen, but Plaintiff refused to cooperate with those procedures; she then consulted with gastroenterology and anesthesiology and Plaintiff was sent for a sigmoidoscopy, at which point he became "violent" and "hospital police" had to be called. (Dkt. No. 73, Attach. 11, at 23; Dkt. No. 73, Attach. 18, at 30-33.) "Violent adult restraints" were ordered by Dr. Heller and placed by Nurse Phillips. (Id. at 33-34.) Because Plaintiff himself has no memory of whether Defendant specifically restrained him, and there is no admissible record evidence from which it can be inferred based on anything more than speculation or chance that Defendant did so, Plaintiff has not raised a genuine dispute of fact regarding whether Defendant used force against him in this respect at the hospital, let alone whether any such force was excessive.

[30]     As Dr. Heller explained, a cathartic is "a liquid that is given so you can have a bowel movement." (Dkt. No. 73, Attach. 18, at 26.)

**\*20**  Regarding the sigmoidoscopy procedure, Defendant testified at his deposition that he did not approach the doctors at the hospital to ask them to proceed with the sigmoidoscopy, and he did not know who did so; he also stated that he "never asked for a [sigmoidoscopy] to be

conducted on [Plaintiff].... I have never asked anyone to have a [sigmoidoscopy] conducted on him." (Dkt. No. 73, Attach. 3, at 50-51.) Dr. Tin, the gastroenterologist who performed the procedure, stated in the medical records related to the consultation that "I spoke to Mr. Seiser [sic] (hospital lawyer) who states it's a valid warrant and we are obligated to help the police under any means to retrieve the object." (Dkt. No. 73, Attach. 11, at 47.) Because there is no admissible record evidence to suggest that Defendant did anything more than obtain the search warrant (i.e., there is no evidence that he directed hospital personnel to perform a sigmoidoscopy or in any way directed the course of conduct taken by hospital personnel), Plaintiff also has not raised a genuine dispute of material fact regarding whether Defendant used force against him related to that procedure, much less that any such force was excessive. [31]

[31]    This is particularly true given that the warrant itself does not direct or order the medical staff at St. Joseph's to specifically perform a sigmoidoscopy or any similar procedure; rather it states that they are "allowed" to use "any/all" medication or medical or surgical procedures to assist in the removal of any marijuana or cocaine, including but not limited to "anesthesia, IV, x-ray/sonogram and/or physical manipulation, and any and all other medical procedures determined by said medical staff to be necessary and prudent to assist in the retrieval/removal" of those substances. (Dkt. No. 73, Attach. 14, at 1.) As discussed above, the evidence shows that, although the relevant physicians were instructed by hospital counsel that they were required to comply with the warrant, it was those sources and not Defendant who determined that a sigmoidoscopy was the best method of retrieval under the circumstances. (Dkt. No. 73, Attach. 18, at 27-33.) Plaintiff has not offered any admissible record evidence to show that the decisions regarding which medical procedures to perform or medications to administer were made by anyone other than the medical sources at St. Joseph's Hospital.

Plaintiff attempts to circumvent the lack of evidence by arguing that the force used, particularly at the hospital, was excessive because the warrant was based on a false narrative and false statements by Defendant. (Dkt. No. 75, at 4-5.) However, even if Plaintiff's argument were accepted (which it is not, given that Plaintiff has not provided any evidence to

undermine the probable cause underlying the warrant, which was supported not only by Defendant's own statements, but also those of Deputy Pufky, and which permitted a search for evidence of not only cocaine but also marijuana, a substance Plaintiff had already been found to have possessed at the time of his arrest), Plaintiff's argument does not address the fact that there is no admissible record evidence to support a rational finding that Defendant ever personally and directly used force against Plaintiff. *See Livingston v. Hoffnagle*, 19-CV-0353, 2021 WL 3888283, at *5 (N.D.N.Y. Aug. 3, 2021) (Hummel, M.J.), report-recommendation adopted by 2021 WL 3885247 (N.D.N.Y. Sharpe, J.) (noting that, to meet the requirement of direct participation underlying an excessive force claim, the use of force by the individual officer "is always an affirmative act and never passive indifference"). While the invalidity of the warrant might impact whether the force used by the hospital personnel or other persons present was excessive, it does not impute such force to Defendant, particularly given that it is undisputed that (1) Defendant did not direct hospital personnel to perform any specific actions regarding sedation or the sigmoidoscopy, (2) Defendant did not personally perform any of the medical interventions, (3) the warrant itself did not require performance of any specific measure related to the search, and (4) the choices regarding what actions were to be taken were made by hospital personnel and the hospital lawyer in light of Plaintiff's agitation and refusal to submit to other, less-intrusive methods of search. Thus, although the search warrant allowed for the hospital staff to take the actions they did, there is no admissible record evidence to suggest that Defendant asserted any control over the actions they chose to take. As a result, the fact that Defendant secured the search warrant does not constitute a use of force against Plaintiff, and he cannot be held directly liable for the actions of others. [32]

[32]    Further, as was already discussed, Plaintiff's claim against Defendant for failure to intervene at the hospital was dismissed with prejudice on a prior motion. (Dkt. No. 19, at 23.) He therefore cannot be held liable in this action for any asserted failure to stop hospital personnel or others from using force against Plaintiff.

**\*21** For all of the above reasons, the Court finds that Plaintiff has not raised a genuine dispute of material fact regarding any use of excessive force against him by Defendant, and grants Defendant's motion for summary judgment on this claim.

### B. Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Second Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memoranda of law. *See, supra* Parts I.D.1 and 3. To those reasons, the Court adds the following analysis.

Having found that the force used by Defendant was not excessive, or that he did not directly participate in the actions Plaintiff alleges to be excessive force, the Court turns to Plaintiff's alternative argument that Defendant is nonetheless liable for failing to intervene to prevent the use of unconstitutional excessive force by others. "A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016). "For [a plaintiff] to succeed on their failure to intervene claim, there must 'have been a realistic opportunity to intervene to prevent the harm from occurring.' " *Smith v. Sawyer*, 435 F. Supp. 3d 417, 438 (N.D.N.Y. 2020) (Sannes, J.) (quoting *Felix v. City of New York*, 408 F. Supp. 3d 304, 312 [S.D.N.Y. 2019]).

#### 1. Traffic Stop

Because, as discussed above in Part III.A.1. of this Decision and Order, it is undisputed that there was no force used during the traffic stop portion of the interaction on October 16, 2017, there also can be no valid claim for a failure to intervene in the use of excessive force regarding those events. *See Livingston*, 2021 WL 3888283, at *6 ("It is well settled that an underlying constitutional violation is a precondition of a failure-to-intervene claim, ... and thus [w]here the record does not disclose an underlying excessive force violation, ... summary judgment on a duty to intercede claim is appropriate.") (internal quotation marks and citations omitted); *accord Harig v. City of Buffalo*, 22-30-cv, 2023 WL 3579367, at *5 (2d Cir. 2023).

#### 2. Justice Center

As to Plaintiff's claim regarding a failure to intervene in the events at the Justice Center, the Court acknowledges that some force was used in both the altercation in the sally port holding cell and the strip search room. However, the fact that force was used does not mean that such force was excessive, nor does it inherently mean that Defendant specifically had any reasonable opportunity to intervene in it. Each of these events will be discussed in turn.

#### a. Sally Port Holding Cell

For many of the reasons discussed above in Part III.A.2.a of this Decision and Order, the force used by the officers to subdue Plaintiff in the holding cell cannot reasonably be found to be excessive under the circumstances. There was suspicion that Plaintiff might be hiding contraband in his pants, and he was given an order to not reach into his pants when he was put into the holding cell. Plaintiff admits he reached for the back of his pants, and that such movement triggered the officers to come into the holding cell, first only Defendant and one other officer, and then multiple other officers joined when Plaintiff continued to resist his efforts to get his hands away from his pants, all of which is documented in the video evidence. The video shows that none of the involved officers punched or kicked Plaintiff at any time, other than a single instance of an officer hitting one of Plaintiff's limbs with his elbow. Because there was no obvious excessive force occurring, and because Defendant would not have been reasonably able to preemptively stop a single blow from an officer's elbow (an action which was not repeated), no reasonable factfinder could conclude that Defendant had any duty to intervene to stop the conduct of the other officers in the holding cell. *See Durr v. Slater*, 558 F. Supp. 3d 1, at 20-21 (N.D.N.Y. 2021) (D'Agostino, J.) (finding a single kick did not constitute a use of excessive force of significant duration to have allowed the defendant to intervene) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 [2d Cir. 1988]).

#### b. Strip Search Room

**\*22** Similarly, for many of the reasons discussed above in Part III.A.2.b of this Decision and Order, putting aside (for the sake of brevity) any assessment of whether the force used by Deputy Pufky and the other Sheriff's officers in the strip search room was excessive, there is no admissible record evidence to reasonably suggest that Defendant had a reasonable opportunity to intervene in the use of that force. The video evidence clearly shows that he did not enter the strip search room at any time while Plaintiff was inside. Further, the video establishes that, although Defendant was standing in the hallway directly opposite that door for a

portion of the time Plaintiff was in that room, the door was closed at all times until some of the Sheriff's officers began to exit the room, after Deputy Pufky had already discharged his pepper spray. (Exh. V1, at 0:03:00-0:03:20.) It does appear from the video that Defendant would have been able to hear Plaintiff yelling from inside the strip search room, because Plaintiff's yelling is audible even on the video from the booking circle where Defendant and others were initially waiting after Plaintiff was escorted to the strip search room; he admitted that he did indeed hear Plaintiff's yelling at that time. (Exh. V5, at 0:02:15-0:02:45; Dkt. No. 73, Attach. 2, at 7.) However, there is no evidence to indicate that Defendant was able to see what was happening in the strip search room at the relevant time, or that he had any knowledge of what was occurring, much less any reasonable chance to intervene. *See Rahman v. Acevedo*, 08-CV-4368, 2011 WL 6028212, at *9 (S.D.N.Y. Dec. 5, 2011) (granting summary judgment to defendant on failure-to-intervene claim where defendant "heard a commotion" from the levels below the prison mess hall but could not see what was happening or discern it from the noise, noting that "there is no evidence that she would have been able to determine from what she could hear that the officers were employing excessive force rather than appropriately restraining a disruptive inmate"). Under these circumstances, no reasonable factfinder could conclude that Defendant had any reasonable opportunity to know that what was occurring in the strip search room was unconstitutional as opposed to a normal search against which Plaintiff was resisting, much less to intervene to stop the conduct of the Sheriff's officers in that room.

For the above reasons, summary judgement is granted to Defendant on Plaintiff's remaining Second Claim.

### C. Whether Defendant Is Entitled to the Defense of Qualified Immunity

In the alternative, the Court finds that, based on the current record, Defendant would be shielded from liability as a matter of law by the doctrine of qualified immunity, because it was objectively reasonable for him to believe his conduct at the various times did not violate any clearly established constitutional right. As was discussed above, Defendant's undisputed actions involve (1) restraining Plaintiff and helping bring him to the ground in the holding cell at the Justice Center, (2) waiting outside of the strip search room while the Sheriff's Deputies attempted to search Plaintiff, and (3) preparing and obtaining a search warrant and bringing it to the hospital. Based on the evidence and analysis already discussed above related to Plaintiff's substantive

claims, Defendant possessed a reasonable belief regarding the constitutionality of his actions at all stages of the alleged encounter: he had a reasonable belief that Plaintiff was hiding drugs in his pants or buttocks and restrained Plaintiff in a fairly conservative manner to prevent him from being able to hide those further despite Plaintiff's continuing to struggle against officers; he was not involved in any force used on Plaintiff inside the Justice Center strip search room, and did not have the opportunity to see whether the force being used was excessive, because he was never in the room; and he prepared the search warrant based on evidence collected and both his own statements and the affidavit of Deputy Pufky, had it signed by a qualified judge, and presented it to the hospital without directing hospital staff regarding what procedures to use to comply with the warrant.

Plaintiff argues Defendant is not entitled to qualified immunity because the rights against unconstitutional searches and use of excessive force are clearly established, and because "[i]t should not be considered 'objectively reasonable' for an officer to harass a citizen under the false pretext of a traffic stop, or for an officer to present a false narrative to a magistrate in order to obtain a warrant to unnecessarily search the citizen's body cavities." (Dkt. No. 75, at 6-7.) However, Plaintiff's conception of the rights involved here are far too broad despite the well-established dictate that the right under scrutiny when determining whether qualified immunity applies should not "be defined at a high level of generality," but should focus "on the 'specific factual situation the officers confronted.'" *Martin v. Town of Ulster*, 21-CV-0597, 2023 WL 6977389, at *3 (N.D.N.Y. Oct. 23, 2023) (Sharpe, J.) (quoting *McKinney v. City of Middletown*, 49 F.4th 730, 738 [2d Cir. 2022]). Plaintiff has not offered any argument as to whether there was a clearly established constitutional right to be free from the actions taken in the specific circumstances that occurred here. Nor does the Court see any precedent which makes it "sufficiently clear that every reasonable official would have understood that what he is doing violates that right" or which has "placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S.Ct. 4, 211 L.Ed.2d 164 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 [2015]; *White v. Pauly*, 580 U.S. 73, 78, 137 S.Ct. 548, 196 L.Ed.2d 463 [2017]).

**\*23** Further, Plaintiff's characterization of the nature of Defendant's conduct is based purely on speculation because, even with the disputed issues of fact that remain, there is no evidence beyond Plaintiff's unsubstantiated claims that

2024 WL 942367

Defendant wanted to harass him or falsified the statements in the search warrant application to support a finding that either the traffic stop or the search warrant were not valid. The evidence instead shows that Plaintiff was charged with the relevant traffic infraction for which Defendant states he was stopped, he was arrested for driving without a license and possessing marijuana (both of which he has admitted to doing), and the warrant was based not only on Defendant's statements, but also in part on the statements of Deputy Pufky that Plaintiff continued to engage in behaviors that raised suspicion he was hiding drugs in his rectum while deputies attempted to search him at the Justice Center, as well as the fact that officers had already found him in possession of marijuana and at least a small amount of cocaine during the traffic stop. Thus, regardless of the issues of fact that remain, there has been no admissible record evidence presented to raise a genuine dispute regarding either the validity of Plaintiff's arrest or the search warrant. Plaintiff's speculative

assertions do not suffice to show that Defendant's conduct was objectively unreasonable.

For the above reasons, the Court finds that, in the alternative to a substantive resolution of Plaintiff's claims on the merits, Defendant is entitled to summary judgment based on the affirmative defense of qualified immunity.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 73) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**All Citations**

Slip Copy, 2024 WL 942367

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 336 of 830

Berman v. Williams, Not Reported in Fed. Supp. (2019)

2019 WL 4450810

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by    Frost v. New York City Police Department,    2nd Cir.
(N.Y.),   November 12, 2020

2019 WL 4450810
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Simon BERMAN, Plaintiff,

v.

Captain WILLIAMS, et al., Defendants.

17cv2757 (JGK)
|
Signed 09/17/2019

**Attorneys and Law Firms**

Simon Berman, Elmira, NY, pro se.

Kiran Hans Rosenkilde, New York City Law Department,
New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

John G. Koeltl, District Judge:

 **\*1**  The plaintiff, Simon Berman, brought this pro se action
against Correction Captains Williams and Agard, and Officers
Octavio Perez, Brian Weise, Christopher Wong, Bobbitt,
Wallace, Jones, and one John Doe defendant (collectively,
the "defendants") asserting claims pursuant to 42 U.S.C. §
1983 for alleged violations of his federal civil rights. The
plaintiff alleges claims for excessive force and denial of
medical care. In a prior opinion, this Court dismissed all of
the plaintiff's claims against Captain Agard. See Berman v. Perez,
No. 17cv2757, 2018 WL 565269 (S.D.N.Y. Jan. 24, 2018).
The remaining defendants now move for summary judgment
pursuant to Federal Rule of Civil Procedure 56 dismissing the
plaintiff's claims. The defendants' motion is unopposed.

## I.

The standard for granting summary judgment is well
established. "The Court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett,
477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential
Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he
trial court's task at the summary judgment motion stage of
the litigation is carefully limited to discerning whether there
are any genuine issues of material fact to be tried, not to
deciding them. Its duty, in short, is confined at this point to
issue-finding; it does not extend to issue-resolution." Gallo,
22 F.3d at 1224. The moving party bears the initial burden
of "informing the district court of the basis for its motion"
and identifying the matter that "it believes demonstrate[s] the
absence of a genuine issue of material fact." Celotex, 477 U.S.
at 323. The substantive law governing the case will identify
those facts that are material and "[o]nly disputes over facts
that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a
court must resolve all ambiguities and draw all reasonable
inferences against the moving party. See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
Summary judgment is improper if there is any evidence
in the record from any source from which a reasonable
inference could be drawn in favor of the nonmoving party. See
Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir.
1994). If the moving party meets its burden, the nonmoving
party must produce evidence in the record and "may not rely
simply on conclusory statements or on contentions that the
affidavits supporting the motion are not credible." Ying Jing
Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

Where, as here, a pro se litigant is involved, although the
same standards for dismissal applies, a court should give the
pro se litigant special latitude in responding to a summary
judgment motion. See McPherson v. Coombe, 174 F.3d 276,
279 (2d Cir. 1999) (courts "read the pleadings of a pro se
plaintiff liberally and interpret them 'to raise the strongest
arguments that they suggest' " (quoting Burgos v. Hopkins, 14
F.3d 787, 790 (2d Cir. 1994))). In particular, the pro se party
must be given express notice of the consequences of failing
to respond appropriately to a motion for summary judgment.
See McPherson, 174 F.3d at 281; Vital v. Interfaith Med. Ctr.,
168 F.3d 615, 620-21 (2d Cir. 1999).

 **\*2**  The defendants provided express notice of the
consequences of a failure to respond to the plaintiff at
Elmira Correctional Center, where the plaintiff is currently
incarcerated. The Court has extended the plaintiff's deadline

Berman v. Williams, Not Reported in Fed. Supp. (2019)

2019 WL 4450810

to respond to the defendants' motion several times and informed the plaintiff that a failure to respond could result in the dismissal of his case. As of June 17, 2019, the most recent deadline to respond, the plaintiff has not filed any response, and the defendants' motion for summary judgment is therefore unopposed.

However, "[e]ven when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 242 (2d Cir. 2004). The district court may not grant an unopposed motion for summary judgment "without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001). "[I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion." Vt. Teddy Bear, 373 F.3d at 244; see also McClenton v. Menifee, No. 05cv2844, 2009 WL 195764, at *2 (S.D.N.Y. Jan. 12, 2009).

## II.

The following facts are undisputed unless otherwise indicated.

### A.

On February 17, 2013, the plaintiff was admitted to the custody of the Department of Correction ("DOC") on bond of $1,500,000 or bail of $750,000. Defs.' 56.1 Stmt. ¶¶ 12-14. On March 5, 2015, the plaintiff pleaded guilty to several crimes, "including attempting to bribe a public servant with more than $10,000, and undertaking a variety of acts to further a narcotics distribution conspiracy." Id. ¶ 15. The plaintiff alleges that the defendants used excessive force on him on three separate dates in 2014.

The plaintiff claims he was first subjected to excessive force on April 16, 2014 but admits he "can't really remember" the events of the day in question. Id. ¶¶ 21, 25-28. The plaintiff believes the incident occurred while he was incarcerated in the Manhattan Detention Center ("MDC") and being transferred

to. solitary housing. Id. ¶¶ 25-26. Although he is unsure who started the altercation, the plaintiff claims that Officer Perez and possibly another corrections officer punched the plaintiff all over his body, kicked him, choked him, and slammed his head against the wall and the floor. Id. ¶¶ 23, 31-35. The plaintiff claims he received serious injuries as a result of the alleged beating. Id. ¶ 38.

In contrast, the DOC "24 Hour Report," which documents all significant incidents occurring at the MDC -- including uses of excessive force -- made no mention of any use of force involving either the plaintiff or Officer Perez between 6:00 AM on April 16 and 6:00 AM on April 17, 2014. Id. ¶¶ 22-24. However, Captain Garel, who is not named as a defendant, documented a concern for the plaintiff's mental state on the day in question. Id. ¶¶ 40-41. Captain Garel wrote a referral form, which stated that the plaintiff had failed to take his psychiatric medication and expressed a loss of. the will to live. Id. Captain Garel and another non-defendant officer escorted the plaintiff to see Cynthia Hill, a mental health professional. Id. ¶¶ 45-47. Ms. Hill's report from the session indicates that the plaintiff used the time to "vent his concerns" about being harassed by a housing area officer. Id. ¶ 48. During the session, the plaintiff neither mentioned nor showed signs of any physical injuries from the alleged use of force, even though the plaintiff admits the session occurred after the alleged use of force. See id. ¶¶ 38, 49, 51, 57.

### B.

#### 1.

**\*3** The plaintiff claims that a second series of incidents occurred the following day, on April 17, 2014. The plaintiff was escorted to the "Intake Search Area" of the MDC to be strip searched on the way to solitary housing. Id. ¶¶ 59-60, 63. This is where the first alleged April 17 incident - the "Intake Search Area incident" - took place. Officers Wong, Weise, Jones, Bobbitt, Wallace, and Captain Williams were present at the Intake Search Area. Id. ¶ 68. The plaintiff refused to comply with orders that he remove his clothes and protested, "I'm not a stripper." Id. ¶¶ 72-75. After the plaintiff continued to refuse to remove his clothes, Captain Williams ordered that the plaintiff be handcuffed. Id. ¶ 78. When the plaintiff continued to resist, the defendant officers applied "upper body control holds" and fell to the floor trying to restrain the plaintiff. Id. ¶¶ 80-81. The plaintiff continued to resist even after his final article of clothing was removed

Berman v. Williams, Not Reported in Fed. Supp. (2019)

2019 WL 4450810

and searched. Id. ¶ 83. Captain Williams warned the plaintiff that continued resistance would result in the use of mace, but the plaintiff continued to resist, and Captain Williams briefly sprayed the plaintiff's eyes. Id. ¶¶ 84-85. The plaintiff then struck Officer Wong in the face, causing Officer Wong's head to slam against a wall. Id. ¶¶ 86-87. Officer Jones and Captain Williams both came to Officer Wong's aid by striking the plaintiff in the upper torso. Id. ¶¶ 88-89. Finally, Officer Weise was able to secure the plaintiff in handcuffs. Id. ¶ 90.

The Intake Search Area incident was partially documented by video security cameras. Id. ¶¶ 91-98. At first, the plaintiff complied with the officers' directions to remove his clothes and began removing his clothes for about forty seconds. Rosenkilde Decl. Ex. P, Video from Camera 191.32-MDC-INTK-SEARCH3, at 00:30-01:10. Then, the footage shows the six officers converging on the plaintiff, out of frame, seemingly because the plaintiff stopped complying with the officers' direction. Id. at 01:15. In the following minutes, the six officers appear to be struggling with the plaintiff out of frame. Id. at 01:15-10:30. During that time, the plaintiff remains out of frame, and during that time the six officers intermittently move in and out of frame, appearing to struggle with the plaintiff throughout. Id. The footage ultimately shows the plaintiff emerging back in to frame in handcuffs wearing only his boxers. Id. at 10:35. The footage then shows the plaintiff sitting in a chair just outside the intake search area for about one minute before leaping up, while still handcuffed, and running away. Id. at 11:45. Several officers and medical officials then tend to Officer Wong out of frame before eventually removing him about thirty minutes later on a gurney while Officer Wong has on a neck brace and sling. Id. at 36:30. Officer Wong's medical records show that on April 17, 2014, he was brought to Bellevue Hospital Center, bounded and collared, and with perceived loss of consciousness, head trauma, right wrist pain, and left back pain. Defs.' 56.1 Stmt. ¶ 138.

The plaintiff denies having attacked any of the officers, including Officer Wong, who the plaintiff claims was faking his injuries. Id. ¶¶ 103-07. The plaintiff also alleges that he was punched over twenty times after the search was completed and that he received injuries to his entire body from the Intake Search Area incident. Id. ¶¶ 101-02, 108.

**2.**

Immediately following the incident, the plaintiff ran to the front of the Intake area, which is called the "Intake Non-search Area." Id. ¶ 110. This is where the second alleged use of force on April 17, 2014 took place.

The plaintiff threatened to spit on a non-defendant captain. Id. ¶ 111. In response to this threat, several non-defendant officers, none of whom were involved in the previous uses of force, pushed the plaintiff up against the wall. Id. ¶¶ 112-15, 117. These new officers immediately escorted the plaintiff to the clinic to receive medical treatment for his injuries. Id. ¶¶ 118-19. The plaintiff alleges that, on the way to the clinic, the non-defendant officers threw him to the floor, stepped on his foot, and held him in a painful position with his face pressed against the floor. Id.

At the clinic, Dr. Landis L. Barnes diagnosed the plaintiff with "avulsions and abrasions, a cervical sprain/strain, thoracic sprain/strain and lumbar sprain." Id. ¶ 125. The plaintiff's x-rays showed no sign of fractures. Id. ¶ 127. Photographs were also taken on April 17, 2014 of the plaintiff's injuries. Rosenkilde Decl. Ex. O.

**3.**

**\*4** The plaintiff alleges yet another use of force by the probe team officers while he was at the clinic. The plaintiff alleges that during this third April 17, 2014 use of force, either Officer Perez or "Francois," who is not a named defendant, attempted to sodomize him; but the plaintiff was unable to describe the probe team officer who allegedly attempted to sodomized him. Id. ¶¶ 130, 132. According to a report generated by a subsequent investigation, none of the named defendants were present at the clinic when the alleged use of force took place. Id. ¶¶ 129, 133.

As a result of his conduct, the plaintiff was indicted for, and later pleaded guilty to, assaulting defendant Officers Jones, Wong, Wallace, and Weise. Id. ¶¶ 137, 139-40. In doing so, the plaintiff admitted to physically injuring the defendants, including Officer Wong, who lost consciousness and was transported to a hospital. Id. ¶¶ 139, 141. An investigation of the April 17, 2014 incidents conducted by the DOC Intelligence Division exonerated the prison staff, including the defendant officers, from any wrongdoing. Id. ¶¶ 142-44. The investigation included a review of video surveillance, plaintiff's medical records, and staff reports. Id. ¶ 143.

## C.

The final instance of alleged excessive force occurred on June 9, 2014. While incarcerated at Rikers' Island, the plaintiff alleges that he was subjected to excessive force by terminated defendant Captain Agard and one or two unknown officers. Id. ¶¶ 147-49; Rosenkilde Decl. Ex. H at 153. Neither of these two unknown officers were named as defendants in this case.[1] An "Injury to Inmate Report" generated after the incident indicated that the plaintiff was in a "stable condition," "ha[d] no complaint," and had "no visible injuries." Defs.' 56.1 Stmt. ¶ 156 (quotation marks omitted).

[1]   The plaintiff described the unknown officers in such a way that rules out either of the unknown officers being Officer Perez. The plaintiff described Officer Perez as Spanish, weighing over 200 pounds, "chubby," and having "almost like a bald head" and sporting facial hear consisting of a "little scruff or maybe like a low." Defs.' 56.1 Stmt. ¶ 152. In contrast, he described the unknown officers as both weighing around 180 pounds, each with a medium build. Id. ¶¶ 150-51. Moreover, the plaintiff does not allege in his amended complaint that Officer Perez was involved in the June 9, 2014 incident. Other than Officer Perez, the plaintiff acknowledges that none of the other remaining defendants were involved in the June 9, 2014 incident. Id. ¶ 154.

## III.

The remaining defendants move for summary judgment on the claims of excessive force and denial of medical care. The plaintiff has failed to respond to the defendants' motion. For the reasons stated below, the defendants' motion is **granted.**

## A.

The defendants argue that the plaintiff's excessive force claims relating to the June 9, 2014 incident and the two April 17, 2014 incidents other than the Intake Search Area incident should be dismissed for lack of personal involvement.

To state a claim for a violation of § 1983, a plaintiff must plead the personal involvement of each defendant. That is, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); see also Floyd v. Bailey, No. 10cv7794, 2013 WL 929376, at *7 (S.D.N.Y. Mar. 12, 2013). "There is no respondeat superior liability in § 1983 cases." Green v. Bauvi, 46 F.3d 189, 194 (2d Cir. 1995) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)).

**\*5** In this case, the plaintiff does not allege that any of the named defendants participated in his alleged beating on June 9, 2014. The plaintiff explicitly denied that Captain Williams and Officers Weise, Wong, Bobbitt, Wallace, and Jones were involved. Rosenkilde Decl. Ex. H at 164. Moreover, the plaintiff does not allege in his complaint that Officer Perez was involved. The only named party whom the plaintiff alleges was involved in the June 9, 2014 incident is Captain Agard. But this Court has already dismissed the plaintiff's claims against Captain Agard. See Berman, 2018 WL 565269 at *4.

Similarly, the plaintiff does not allege that any of the named defendants committed any of the alleged acts of excessive force that occurred on April 17, 2014 after the Intake Search Area incident.[2] Therefore, the defendants' motion for summary judgment is **granted** with respect to the plaintiff's excessive force claims regarding the June 9, 2014 incident and the two April 17, 2014 incidents other than the Intake Search Area incident.

[2]   The plaintiff speculates that Officer Perez might have been one of the officers who allegedly attempted to sodomize him in the clinic. However, the officers were all wearing helmets, and thus the plaintiff was unable to describe any of the officers at his deposition. See Defs.' 56.1 Stmt. ¶ 130. The plaintiff's speculation about Officer Perez is insufficient to create a dispute of material fact when countered by the reported list of officers who were involved in the alleged incident, none of whom are defendants. See Ying Jing Gan, 996 F.2d at 532.

## B.

The defendants move for summary judgment with respect to the plaintiff's excessive force claim from April 16, 2014. The plaintiff claims that Officer Perez and other unnamed officers beat him before he was taken to a psychiatrist.

2019 WL 4450810

However, on April 16, Captain Garel referred the plaintiff to the psychiatrist for mental health concerns, and there was no referral for any sort of physical injuries. Moreover, the psychiatrist's report does not mention any physical injuries, which the plaintiff claims were substantial and widespread. Instead, despite being given the opportunity to "vent his concerns," Defs.' 56.1 Stmt. ¶ 48, the plaintiff complained only about depression and a lack of will to live. The plaintiff's "inconsistent and self-serving testimony" should not be credited at summary judgment when "directly contradicted by the medical evidence." Allah v. Wilson, No. 13cv4269, 2017 WL 4350611, at *3 (S.D.N.Y. July 31, 2017), appeal dismissed, No. 17-2727, 2018 WL 4489086 (2d Cir. Jan. 2, 2018), cert. denied, 139 S. Ct. 569 (2018).

Moreover, no other evidence in the record supports the plaintiff's version of events on April 16, 2014. The DOC 24 Hour Report from that day, which catalogues all uses of force by officers and inmates, does not mention the plaintiff or Officer Perez. Nor did the plaintiff report the alleged excessive use of force to anyone. Given the strength of the record, the plaintiff's mere conclusory allegations are insufficient to create a dispute of material fact, especially given that he admits that he cannot remember exactly what happened that day. See Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir. 2005); Williams v. Shaaban, No. 16cv8439, 2019 WL 1438048, at *2 (S.D.N.Y. Mar. 29, 2019) ("[A] pro se party's bald assertion, completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." (quotation marks omitted)). Therefore, the defendants' motion for summary judgment dismissing the plaintiff's excessive force claim relating to the April 16, 2014 incident is **granted.**

### C.

**\*6** The defendants move for summary judgment dismissing the plaintiff's excessive force claims relating to the April 17, 2014 Intake Search Area incident. They argue that any use of force was objectively reasonable in response to the threats the plaintiff posed and thus there was no constitutional violation, and that in any event they are entitled to qualified immunity.

### 1.

Because the plaintiff was a state pretrial detainee at the time of his incident, his claims of excessive force are analyzed under the Due Process Clause of the Fourteenth Amendment. Darnell v. Pineiro, 849 F.3d 17, 21 n.3 (2d Cir. 2017). To be liable for a deprivation of the plaintiff's Fourteenth Amendment due process rights, the defendants must have acted purposefully or knowingly, "or possibly" recklessly. Kingsley v. Hendrickson, 135 S. Ct. 2466, 2472 (2015). However, "negligently inflicted harm is categorically beneath the threshold of constitutional due process." Id. (quotation marks and emphasis omitted).

In determining whether the force used was "excessive," courts apply a standard of objective reasonableness. Id. at 2472-73. An action is objectively reasonable when it is "rationally related to a legitimate governmental objective." Edrei v. Macguire, 892 F.3d 525, 536 (2d Cir. 2018) (citing Kingsley, 135 S. Ct. at 2473). An action is objectively unreasonable when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." Id. (quoting City of Sacramento v. Lewis, 523 U.S. 833, 847 (1998)). "[P]urposeful, knowing or (perhaps) reckless action that uses an objectively unreasonable degree of force is conscience shocking." Id. (emphasis removed); see also Vargas v. N.Y.C. Dep't of Corrs., No. 17cv2544, 2018 WL 3392873, at *2 (S.D.N.Y. July 12, 2018).

The defendants' use of force during the Intake Search Area incident was objectively reasonable because it was proportionate to the plaintiff's resistance. The plaintiff refused to comply with orders to remove his clothing in the Intake Search Area, [3] which was a legitimate command. See Israel v. City of New York, No. 11cv7726, 2012 WL 4762082, at *3-4 (S.D.N.Y. Oct. 5, 2012) (discussing the constitutional latitude the DOC receives in strip searching inmates).

[3]    See Carmona v. City of New York, No. 13cv3273, 2016 WL 4401179, at *3 (S.D.N.Y. Mar. 1, 2016) (noting that "[o]bvious security concerns arise" when an unsecured inmate refuses to obey orders); see Ramos v. Hicks, No. 87cv2272, 1988 WL 80176, at *2 (S.D.N.Y. July 25, 1988) (Sand, J.) (finding a justified use of force when plaintiff became upset and refused to comply with a defendant officer's direct orders).

The plaintiff presented an additional security risk when he physically resisted the officers. In such situations, officers have a legitimate governmental objective to quell security risks. See Kingsley, 135 S. Ct. at 2473 (stating that courts must "account for the legitimate interests that stem from

Berman v. Williams, Not Reported in Fed. Supp. (2019)

2019 WL 4450810

[the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security" (quotation marks omitted, alterations in original)). In this case, the force the defendant officers employed upon the plaintiff -- punching and using one burst of mace -- was reasonable given the security concerns that the plaintiff's conduct raised. See Jones v. Diaz, No. 09cv2625, 2011 WL 1202024, at *4 (S.D.N.Y. Mar. 23, 2011) (single spray of a chemical agent was not unreasonable force); DeArmas v. Jaycox, No. 92cv6139, 1993 WL 37501, at *4 (S.D.N.Y. Feb. 8, 1993) (punching an inmate in the arm and kicking the inmate in the leg was not unreasonable force), aff'd, 14 F.3d 591 (2d Cir. 1993). Indeed, following the Intake Search Area incident, the plaintiff pleaded guilty to assaulting several of the defendant officers, substantiating the threat he posed to the officers.

*7 The security video further undermines the plaintiff's claim that the defendants used excessive force. "When the parties disagree as to the existence of a genuine dispute of a material fact, the Court may consult incontrovertible video evidence to determine whether summary judgment is nevertheless appropriate." Wiles v. City of Mew York, No. 13cv2898, 2016 WL 6238609, at *3 (S.D.N.Y. Oct. 25, 2016), aff'd, 724 F. App'x 52 (2d Cir. 2018); see also Scott v. Harris, 550 U.S. 372, 378-81 (2007). Although parts of the incident are obscured from view, the video footage shows the plaintiff continually resisting the officers. It also illustrates that as a result of the struggle to subdue the plaintiff, Officer Wong suffered substantial injuries to his arm and his neck and head area to the point that he was immobile, and eventually had to be taken away on a gurney with his neck in a brace and his arm in a sling.

Finally, subsequent documentation of the plaintiff's injuries suggests that the defendants' use of force in the Intake Search Area was objectively reasonable. Medical records - including x-rays - and photographs of the plaintiff from the same day as the Intake Search Area incident show that the plaintiff received relatively minor injuries, which were limited to sprains or strains, avulsions, and abrasions. Defs.' 56.1 ¶¶ 124-27; Rosenkilde Decl. Ex. O; see Rodriguez v. City of New York, 802 F. Supp. 2d 477, 481 (S.D.N.Y. 2011) (finding that the plaintiff's excessive force claim was belied by photographs and an undisputed medical record).

Because the defendant officers' use of force does not "shock[ ] the conscious" and was objectively reasonable, the plaintiff did not suffer a constitutional violation. See Edrei, 892 F.3d at 536.

**2.**

In any event, the defendant officers are entitled to qualified immunity. Qualified immunity protects government officials performing discretionary functions, such as arrests, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014); Iqbal, 556 U.S. at 672; Malley v. Briggs, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."). "Requiring the alleged violation of law to be clearly established balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Wood v. Moss, 572 U.S. 744, 758 (2014) (citation and quotation marks omitted). As the Supreme Court has explained, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001) (citation omitted), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009); see also McKay v. City of New York, 32 F. Supp. 3d 499, 506 (S.D.N.Y. 2014).

As explained above, the defendant officers' use of force was objectively reasonable in light of clearly established law. Therefore, they are entitled to qualified immunity from the plaintiff's claims. See Munafo v. Metro. Transp. Auth., 285 F.3d 201, 210 (2d Cir. 2002).

The defendants' motion for summary judgment dismissing the plaintiff's excessive force claim relating to the April 17, 2014 Intake Search Area incident is **granted.**

**D.**

**Berman v. Williams, Not Reported in Fed. Supp. (2019)**

2019 WL 4450810

Finally, the plaintiff claims that the defendants denied him medical care following the alleged uses of force on all three relevant days. However, reports show that medical professionals treated the plaintiff on both April 16 and 17, 2014, and that he was evaluated on June 9, 2014 but had no injuries.

**\*8** On April 16, 2014, Captain Garel documented the plaintiff's psychological problems and escorted him to the psychiatrist for treatment. There is no mention of injuries in the psychiatrist's report despite plaintiff's allegation that he had severe injuries, and despite the plaintiff's opportunity to relay any concerns to the psychiatrist. Moreover, the plaintiff concedes that he was immediately taken to the clinic on April 17, 2014, after the Intake Search Area incident, where Dr. Barnes diagnosed and treated him and ordered x-rays. See Estevez v. City of New York, No. 16cv073, 2017 WL 1167379, at \*5 (S.D.N.Y. Mar. 28, 2017) (holding that a plaintiff's claims of inadequate medical care should be dismissed after finding that doctors "promptly treated" the plaintiff by ordering x-rays and by prescribing medication). Finally, on June 9, 2014, the Injury to Inmate Report stated that the plaintiff did not complain of any injuries and none were visible. See Andrew v. Bellevue Hosp., No. 13cv8531, 2016 WL 7009018, at \*3 (S.D.N.Y. Nov. 30, 2016) (noting that, to succeed on a failure to provide medical care claim, the plaintiff must show that an official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." (alterations in Andrew, quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994))).

These medical reports counter the plaintiff's conclusory allegations that the defendants failed to provide him with medical care such that no reasonable jury could find in the plaintiff's favor. Therefore, the defendants' motion for summary judgment dismissing the plaintiff's failure to provide medical care claims is **granted.**

## CONCLUSION

The Court has considered all the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the defendants' motion for summary judgment is **granted.**

The Clerk is directed to enter judgment dismissing the case. The Clerk is also directed to close all pending motions and to close this case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4450810

---

**End of Document**　　　　© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Towns v. Stannard, Not Reported in Fed. Supp. (2017)

2017 WL 11476416

2017 WL 11476416
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramel M. TOWNS, Plaintiff,

v.

New York State Trooper Theresa STANNARD, in
her individual capacity, Investigator William Shea,
in his individual capacity, Senior Investigator Karl
Meybaum, in his individual capacity, Trooper Matthew
Carniglia, in his individual capacity, Trooper Timothy
Mallory, in his individual capacity, And Investigator
Warren Law, in his individual capacity, Defendants.

1:16-CV-01545 (BKS/DJS)
|
Signed December 20, 2017

**Attorneys and Law Firms**

Lewis B. Oliver, Jr., Oliver Law Office, 156 Madison Avenue,
Albany, NY 12202, For Plaintiff.

Eric T. Schneiderman, Attorney General of the State of New
York, Helena O. Pederson, Assistant Attorney General, The
Capitol, Albany, NY 12224, For Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Court Judge:

**I. INTRODUCTION**

 *1  Plaintiff Ramel M. Towns ("Plaintiff") brought this
action under 42 U.S.C. § 1983 alleging that Defendant
New York State Troopers and Investigators violated his
constitutionally protected rights when they stopped, searched,
and arrested him on September 8, 2014 in Warren County,
New York. (Dkt. No. 1, at 5–16). Specifically, Plaintiff
claims that Defendants' conduct constituted: (1) illegal
detention, excessive use of force, unlawful search and seizure,
malicious prosecution, and conspiracy in violation of the
Fourth Amendment; (2) racial discrimination in violation of
the Fourteenth Amendment and 42 U.S.C. § 1981; and (3)
false arrest, assault and battery, and malicious prosecution in
violation of New York State common law. (Id. at 16–41).

Defendants move to dismiss Plaintiff's state-law claims for
false arrest, assault and battery, and malicious prosecution on

the ground that they are time barred. (Id. at 8–11). Defendants
further move to dismiss Plaintiff's claims against them in their
official capacities as barred by the Eleventh Amendment,
and Plaintiff's Fourth Amendment claims for excessive force,
malicious prosecution, conspiracy, and racial discrimination
for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Dkt.
No. 8-1, at 11–22). Additionally, Defendants move to dismiss
Plaintiff's excessive force, malicious prosecution, conspiracy,
and racial discrimination claims on the basis that Defendants
are entitled to qualified immunity. (Id. at 22–24).

Plaintiff states that his claims against Defendants in their
official capacities were brought "as an editing error" and
clarifies that his complaint is against Defendants in "their
individual capacities only." [1] (Dkt. No. 13, at 2). Plaintiff
does not dispute that his state-law claims are time barred (id.
at 3) and also withdraws his claim for malicious prosecution
because "by the time the criminal complaint was filed,"
Defendants "did have probable cause to commence a criminal
prosecution against plaintiff," (id. at 4). Accordingly, with
regard to Plaintiff's official capacity claims, state-law claims,
and malicious prosecution claim, Defendants' motion to
dismiss is granted. Plaintiff's remaining claims for excessive
force, conspiracy, and racial discrimination are considered in
turn below. [2]

[1]     Accordingly, the Court has amended the caption to
        reflect dismissal of all claims against Defendants in
        their official capacities.

[2]     Defendants did not move to dismiss Plaintiff's
        illegal detention (Claim 1) or unlawful search and
        seizure claims (Claim 5).

**II. BACKGROUND** [3]

[3]     The facts are taken from the Complaint and
        assumed to be true for the purposes of this decision.
        Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d
        Cir. 2011).

On September 8, 2014, Plaintiff was traveling northbound on
interstate I-87 as a passenger in a 2001 Pontiac Grand Am
driven by James Hairston. (Dkt. No. 1, at 5). Plaintiff and
Mr. Hairston, both African-American males, were traveling
from Bronx, New York, to Burlington, Vermont, to visit one
of Plaintiff's family members. (Id. at 5, 7). At approximately
mile marker 62, Defendant New York State Trooper Theresa
Stannard initiated a traffic stop on the vehicle "for allegedly
speeding." (Id. at 5). Trooper Stannard performed a "DMV

Towns v. Stannard, Not Reported in Fed. Supp. (2017)

2017 WL 11476416

check" of the driver, Mr. Hairston, and his vehicle, which indicated that his license had been suspended, that he had no insurance on file, and that the vehicle's registration had been suspended for multiple unpaid parking violations. (*Id.*). Trooper Stannard requested backup, and Senior Investigator Meybaum, Investigator Shea, and Investigator Law arrived shortly thereafter in response. (*Id.* at 5–6). Mr. Hairston was then placed under arrest for operating a vehicle with a suspended license and suspended registration. (*Id.* at 6). Mr. Hairston was not cited for speeding. (*Id.*).

**\*2** The responding Troopers and Investigators ordered Plaintiff to exit out of the passenger-side door to be searched and questioned, having allegedly noticed "a small amount of marijuana particles" in the cup holder of the vehicle. (*Id.*). In fact, "[t]here were no marijuana particles in the cup holder." (*Id.*). The Troopers questioned Plaintiff about the reason for traveling to Vermont and asked whom he intended to visit there. (*Id.* at 7). Plaintiff provided the Troopers with the name of a family member, but showed them a different name in his cell phone—a discrepancy he explained to be the result of the family member using a childhood nickname, rather than the name Plaintiff initially told the police. (*Id.*). Plaintiff was then handcuffed with his hands "twisted" so that his "left palm was touching the back of his right wrist," causing "extreme pain to his wrist and shoulder." (*Id.*). The Troopers and Investigators then conducted a "vehicle impound and inventory search" of the vehicle that lasted approximately fifty minutes. (*Id.*). During this time the Defendants "repeatedly frisked and/ or patted down and searched" Plaintiff. (*Id.* at 8). Finding nothing, the Troopers and Investigators then asked Plaintiff whether he had any drugs hidden in his rectum, and told him that a canine unit was being dispatched to determine whether Plaintiff was lying. (*Id.*). Plaintiff denied having any drugs—when he objected to another pat-down search, an Investigator "stated words to the effect that 'it's not like it's because you're black.' " (*Id.* at 9). Defendants also told Plaintiff that he "should call his boy and tell him that the package isn't coming and that [Plaintiff] had gotten popped," and commented on the tightness of his pants. (*Id.* at 10–11). During this time, Plaintiff repeatedly asked for water and to be "re-handcuffed or handcuff[ed] ... with his hands in front of him," but "Defendants refused to accommodate [P]laintiff's requests." (*Id.* at 7).

At approximately 2:00 pm, approximately four hours after Plaintiff was initially handcuffed by the Troopers and Investigators, Trooper Carniglia arrived at the scene with his drug-sniffing canine. (*Id.* at 10). When the canine allegedly positively alerted to the presence of drugs on the front passenger seat of the vehicle, the Troopers informed Plaintiff that he was under suspicion for the possession of drugs. (*Id.* at 12). Trooper Carniglia performed a cavity search on Plaintiff that lasted approximately five minutes on the side of interstate I-87 in view of passing traffic. (*Id.* at 12). The search uncovered a "package" of a substance that a field drug identification test indicated was crack cocaine. (*Id.* at 13). An Investigator then read Plaintiff his *Miranda* rights and Plaintiff was transported to Lake George Town Court for arraignment. (*Id.* at 14). Plaintiff was charged with possession of a controlled substance in the seventh degree, a misdemeanor, and released ninety-two days later on January 7, 2015. (*Id.*).

On October 22, 2015, a suppression hearing was held before the Town Justice of the Lake George Town Court. (*Id.* at 15). Following the hearing, Plaintiff's attorney determined that mile marker 62, where the Troopers had stopped the vehicle in which Plaintiff was a passenger, was within the jurisdictional boundary of the town of Bolton, not Lake George. (*Id.*). On November 2, 2015, the Town Justice of the Lake George Town Court dismissed charges against Plaintiff for "lack of geographic jurisdiction and an inability to transfer the matter to another court." (*Id.*). The Warren County District Attorney, despite being "free to file an accusatory instrument in the Town of Bolton," did not pursue further charges against Plaintiff in connection with the September 8, 2014 incident. (*Id.* at 15).

### III. STANDARD OF REVIEW

To survive a motion to dismiss brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.' " *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Mayor & City Council of Balt.*, 709 F.3d at 135 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768

2017 WL 11476416

F.3d 247, 253 (2d Cir. 2014).[4] Finally, "[a] court must deny a motion to dismiss 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Aikman v. Cty. of Westchester*, 491 F. Supp. 2d 374, 378 (S.D.N.Y. 2007) (quoting *Stewart v. Jackson & Nash*, 976 F.2d 86, 87 (2d Cir. 1992)).

[4]  The Court notes that Plaintiff has attached extensive documentary evidence to his response in opposition to Defendants' motion to dismiss without providing any legal rationale to support the Court's consideration of this evidence. (Dkt. No. 13 at 4–6). When considering a motion to dismiss, however, a court "must limit itself 'to a consideration of the facts that appear on the face of the complaint,' " or convert the motion to one for summary judgment. *Vollinger v. Merrill Lynch & Co.*, 198 F. Supp. 2d 433, 437 (S.D.N.Y. 2002) (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)). The Court declines to convert Defendants motion to one for summary judgment, and accordingly, disregards the exhibits attached to Plaintiff's opposition papers. (Dkt. No. 13-1).

## IV. DISCUSSION

### A. Excessive Force (Claim 3)

**\*3**  Defendants move to dismiss Plaintiff's excessive force claim on the basis that the Complaint "contains no allegation that [Plaintiff] suffered any type of injury as a result of the handcuffing, beyond temporary pain and discomfort." (Dkt. No. 8-1, at 12). Plaintiff responds that this is not a "simple handcuffing case," and that "[f]ocusing only on whether the handcuffs injured a citizen fails to take into consideration the objective reasonableness of the use of force under all the circumstances as required by the Fourth Amendment." (Dkt. No. 13-2, at 13).

Any claim that police officers "have used excessive force— deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (emphasis omitted). In determining whether a particular use of force is "reasonable," a court must evaluate "the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an

immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000). This "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

"Courts apply a separate standard to claims for excessive force in the use of handcuffs," *Sachs v. Cantwell*, No. 10 Civ. 1663, 2012 U.S. Dist. LEXIS 125335 at \*44, 2012 WL 3822220, at \*14 (S.D.N.Y. Sept. 4, 2012), and courts within the Second Circuit have held that "overly tight handcuffing can constitute excessive force," *Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008). In determining "the reasonableness of handcuffing," a Court is to consider whether a plaintiff has sufficiently alleged that: "(1) the handcuffs were unreasonably tight; (2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; (3) the degree of injury to the wrists." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214–15 (E.D.N.Y. 2005) (citations omitted). "The injury requirement is particularly important." *Usavage v. Port Auth. Of N.Y. & N.J.*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. Mar. 26, 2013) (internal quotation marks omitted). "These injuries need not be 'severe or permanent,' but must be more than merely '*de minimis.*' " *Id.* (quoting *Vogeler v. Colbath*, No. 04-CV-6071 (LMS), 2005 U.S. Dist. LEXIS 44658 at \*30, 2005 WL 2482549, at \*9 (S.D.N.Y. Oct. 6, 2005)). Furthermore, "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch*, 567 F. Supp. 2d at 468; *see also Gonzalez*, 2000 U.S. Dist. LEXIS 5230 at \*12, 2000 WL 516682, at \*4 (E.D.N.Y. Mar. 7, 2000) ("[I]f the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force.").

Plaintiff requests that the Court view his excessive force claims "in the context of the pretextual traffic stop and intrusive strip search and body cavity search." (Dkt. No. 13-2, at 11). Although Plaintiff correctly argues that any alleged use of excessive force during an arrest or investigative stop must be considered within the totality of the circumstances of the incident, he fails to plead any facts indicating that the force used by Defendant Troopers and Investigators was objectively unreasonable or more than *de minimis*—the only allegation of "force" in the Complaint is that Plaintiff

2017 WL 11476416

was improperly handcuffed for approximately four hours. Although there are factors that indicate that this is "more than a simple handcuffing case,"[5] (*id.*), Plaintiff does not allege that the handcuffs were too tight—only that he was handcuffed with his hands twisted. Furthermore, Plaintiff does not allege that he suffered any continuing injury beyond the discomfort he experienced during the investigative stop and subsequent searches. *See Lynch*, 567 F. Supp. 2d at 467 ("[T]he fact that the tight handcuffing did not cause [plaintiff] any continuing injury is fatal to the excessive force claim."). Although Plaintiff does allege that he experienced "extreme pain to his wrist and shoulder," (Dkt. No. 1 at 7), this qualifies as the kind of "temporary discomfort that courts have consistently found cannot constitute a claim for excessive force." *Bender v. City of New York*, No. 09 CV 3286 (BSJ), 2011 U.S. Dist. LEXIS 103947 at *18, 2011 WL 4344203, at *6 (S.D.N.Y. Sep. 14, 2011) (internal quotation marks omitted) (granting motion to dismiss where plaintiff alleged that she was handcuffed "extremely tightly for nearly fourteen hours leaving indentations in plaintiff's forearms for over six hours").

[5]   These factors include, *inter alia*, that (1) Defendants frisked Plaintiff at least five times during the traffic stop; (2) Plaintiff requested water and repeatedly asked to be re-handcuffed in a more comfortable position; (3) Plaintiff was repeatedly moved in and out of a police vehicle between searches; and (4) the searches culminated in a cavity search in view of the public on the side of I-87. (Dkt. No. 13-2, at 11–13).

**\*4** Even taking into account the length of time Plaintiff was handcuffed, courts have consistently dismissed excessive-force handcuffing claims as reasonable in cases where the handcuffing lasted a similar amount of time or longer. *See, e.g., Mueller v. Mena*, 544 U.S. 93, 100, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) (two to three hours); *Johnson v. City of New York*, 940 F. Supp. 631, 637 (S.D.N.Y. 1996) (four to five hours); *Omor v. City of New York*, 2015 U.S. Dist. LEXIS 24135, 2015 WL 857587, at *8 (S.D.N.Y. Feb. 27, 2015) (four to five hours); *Bender*, 2011 U.S. Dist. LEXIS 103947, at *18, 2011 WL 4344203, at *6 (fourteen hours). As the Supreme Court has noted, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Michigan v. Summers*, 452 U.S. 692, 702–03, 101 S.Ct. 2587, 69 L.Ed.2d 340 (2005). Plaintiff has therefore failed to plead that

the handcuffing was unreasonable, and accordingly, Plaintiff's excessive force claim must be dismissed.

### B. Conspiracy to Violate Civil Rights (Claim 8)

In their motion to dismiss, Defendants argue that because "Defendants are employees of the New York State Police, a single public entity and ... were acting within the scope of their employment," Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 8-1, at 19). In response, Plaintiff asserts that the intracorporate conspiracy doctrine is inapplicable because the "New York State police are not a corporation like a private company or an incorporated village or county." (Dkt. No. 13-2, at 9).

To survive a motion to dismiss on a § 1983 conspiracy claim, a plaintiff must allege: "(1) an agreement between two or more state actors ... (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). Even where the requisite elements are sufficiently alleged, however, "[e]mployees of a single corporate entity are legally incapable of conspiring together under the intracorporate conspiracy doctrine. This doctrine applies to public entities and their employees." *Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 442 (N.D.N.Y. 2009) (holding that plaintiff's conspiracy claim against Syracuse Police Department barred by the intracorporate conspiracy doctrine), *overruled on other grounds*, *Widomski v. State Univ. of N.Y.*, 748 F.3d 471 (2d Cir. 2014). Courts within the Second Circuit have "squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases." *Rahman v. Fischer*, No. 9:10-CV-1496 (LEK/TWD), 2012 U.S. Dist. LEXIS 140455 at *40, 2012 WL 4492010, at *13 (N.D.N.Y. Sep. 28, 2012).

Despite Plaintiff's contention to the contrary, courts within this Circuit have repeatedly held that the intracorporate conspiracy doctrine is applicable to police departments or other law enforcement agencies as "public entities." *See, e.g., Zachary v. City of Newburgh*, No. 13 CV 5737 (VB), 2015 U.S. Dist. LEXIS 129578 at *7, 2015 WL 5474245, at *3 (S.D.N.Y. July 27, 2015) (explaining that "plaintiff is incorrect that the intracorporate conspiracy doctrine does not apply" to police departments); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 389 (S.D.N.Y. 2013) (applying intracorporate conspiracy doctrine because "participants in the conspiracy are officers with the White Plains Police Department"); *Ferlito v. City of Oswego*, 2006 U.S. Dist. LEXIS 54561 at *37, 2006 WL 2238939, at *12 (N.D.N.Y.

Towns v. Stannard, Not Reported in Fed. Supp. (2017)

2017 WL 11476416

Aug. 4, 2006) ("The intracorporate conspiracy doctrine applies to individual defendants who are members of the same police department."). Thus, the intracorporate conspiracy doctrine is plainly applicable to Defendants as it is undisputed that they were all employees of the New York State Police at the time of the incident.

**\*5** The only recognized exception to the intracorporate conspiracy doctrine applies where the alleged participants in the conspiracy "pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord*, 411 F. Supp. 2d 153, 165 (N.D.N.Y. 2006), *vacated and remanded on other grounds*, *Orafan v. Rashid*, 249 F. App'x 217 (2d Cir. 2007). This exception, however, is inapplicable here—Plaintiff acknowledges that "it is within the scope of employment of state troopers to apprehend speeding motorists and person who possess controlled substances." (Dkt. No. 13-2, at 9). Although Plaintiff attempts to argue that "the intracorporate conspiracy doctrine should not be applied to excuse law enforcement officers who knowingly violate [a] citizen's Fourth Amendment rights," (*id.*), the Court is unable to find any authority in support of this proposition. Accordingly, Plaintiff's conspiracy claim is dismissed as barred by the intracorporate conspiracy doctrine.

### C. Racial Discrimination Claim (Claim 9)

Plaintiff alleges that Defendants' conduct constituted a "violation of [P]laintiff's clearly established right not to be subjected to racial profiling and racial discrimination under 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment." (Dkt. No. 1, at 39–40).[6] Defendants contend that Plaintiff's claim must be dismissed because, "not only does it fail to allege that Defendants treated him differently than similarly situated persons, he also fails to allege facts suggesting that Defendants were motivated by any impermissible consideration." (Dkt. No. 14, at 9).

[6]     Courts in the Second Circuit "resolve Section 1981 claims under Section 1983 standards." *Anderson v. City of New York*, No. 06-CV-5726 (RRM) (RER), 2012 U.S. Dist. LEXIS 182520, 2012 WL 6720694, at \*3 (E.D.N.Y. Dec. 27, 2012); *see also Whaley v. City Univ. of New York*, 555 F. Supp. 2d 381, 400 (S.D.N.Y. 2008) ("To the extent [plaintiff] seeks to vindicate any independent rights under 42 U.S.C. § 1981, he must do so via claims under § 1983."). Because § 1981 "provides no broader a remedy against a state actor than a suit

brought under § 1983," when a plaintiff brings claims under both statutes "and the defendants are state actors, the claims merge and the § 1981 claim is treated exactly like the § 1983 claim." *Caidor v. M&T Bank*, No. 5:05-CV-297, 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547, at \*10 (N.D.N.Y. Mar. 27, 2006) (internal quotation marks omitted). Accordingly, "a separate § 1981 analysis is not required, and the Court will consider Plaintiff's § 1981 claims only pursuant to § 1983." *Anderson*, 2012 U.S. Dist. LEXIS 182520, 2012 WL 6720694, at \*3.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situation should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting U.S. Const. amend. XIV, § 1). To adequately plead an "equal protection violation, claimants must prove purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). Although the Second Circuit has held "[m]erely conscious exercise of some selectivity in enforcement is not in itself a constitutional violation," *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974), "a plaintiff who ... alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race based manner ... is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001).

**\*6** The allegations contained within the Complaint are sufficient to plausibly infer that the Defendants intentionally discriminated against him. Although the allegations of racial profiling are conclusory, the Complaint alleges that Defendant Trooper Stannard pulled over the vehicle on the morning in question because Plaintiff and Mr. Hairston were "African-American males" riding in "a vehicle in rural upstate New York"; that the vehicle was not speeding, as Stannard had alleged; that Mr. Hairston was not subsequently cited for a speeding violation; that there was not any illegal motor vehicle infraction; and that the stop was pretextual. (Dkt. No. 1, at 6, 9–11, 40). With respect to the remaining Defendants charged with racial discrimination, the allegations regarding the searches, which are incorporated into this count, include allegations that when Plaintiff complained about being searched again, after he had been repeatedly frisked

Towns v. Stannard, Not Reported in Fed. Supp. (2017)

2017 WL 11476416

and searched, the investigator responded "it's not like it's because you're black," (*id.* at 9); when Plaintiff's cell phone began ringing, an investigator told Plaintiff that he should contact his "boy" and tell him he had "gotten popped," (*id.* at 10); the Plaintiff was detained for four hours on the side of the interstate (*id.* at 27–28); the Defendants falsely relied on "marijuana particles" in the cup holder of the vehicle as a basis for the detention and repeated searches (*id.* at 6, 28); and the Defendants conducted an illegal "strip search of the plaintiff's private bodily areas and body cavities" on the side of the interstate "in broad daylight and in plain sight of passing motorists" without an adequate legal justification for the search (*id.* at 28). Drawing all inferences in favor of Plaintiff, Plaintiff has sufficiently alleged that "a facially neutral law"—the New York Vehicle and Traffic Code— and facially neutral policies governing searches were "applied in an intentionally discriminatory race-based manner." *Pyke,* 258 F.3d at 110; *see Aikman v. Cty. of Westchester,* 491 F. Supp. 2d 374, 377, 383 (S.D.N.Y. 2007).

### D. Qualified Immunity [7]

[7]    As Plaintiff's excessive force, malicious prosecution, and conspiracy claims are dismissed *supra,* Section VI(a)-(b), the Court considers Defendant's qualified immunity argument as to racial discrimination only.

"A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman,* 574 U.S. 13, 135 S. Ct. 348, 350, 190 L.Ed.2d 311 (2014) (per curiam). "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.' " *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Further, when a defendant raises a qualified immunity defense at the motion to dismiss stage, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004). "Therefore, although possible, '*usually,* the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted.' " *Hershey v. Goldstein,* 938 F. Supp. 2d 491, 521 (S.D.N.Y. 2013) (quoting *McKenna,* 386 F.3d at 436) (internal punctuation omitted). It is premature to resolve a qualified immunity defense on the basis of allegations in a complaint when those allegations "do not sufficiently

'support the defense on the face of the complaint.' " *Id.* (quoting *McKenna,* 386 F.3d at 435) (internal punctuation omitted).

Here, the facts of the Complaint do not support Defendants' qualified immunity defense. As noted above, Plaintiff has sufficiently stated a claim for racial discrimination. As the case progresses, development of relevant facts will determine whether the unlawfulness of the traffic stop and subsequent searches should have been apparent to a reasonable law enforcement officer. Accordingly, Defendants' motion to dismiss based on qualified immunity is denied.

### V. LEAVE TO AMEND
Plaintiff requests leave to amend his claims "in the event the Court finds that any one of these claims is not sufficiently plead." (Dkt. No. 13-2, at 20). Plaintiff's request for leave to amend his claim for excessive force is granted. Any amendment to Plaintiff's claim for conspiracy to violate civil rights, however, would be futile because the claim would remain barred by the intracorporate conspiracy doctrine. *See Terry v. Inc. Vill. of Patchogue,* 826 F.3d 631, 633 (2d Cir. 2016) ("[L]eave to amend need not be granted when amendment would be futile."). Plaintiff's request for leave to amend his claim for conspiracy to violate civil rights is therefore denied.

### VI. CONCLUSION
For these reasons, it is

**ORDERED** that Plaintiff's claims against Defendants in their official capacities are **DISMISSED**; and it is further

 **\*7  ORDERED** that Defendants' motion to dismiss (Dkt. 8-1) is **DENIED** as to Plaintiff's racial discrimination claim; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. 8-1) is otherwise **GRANTED** in its entirety; and it is further

**ORDERED** that Plaintiff is granted leave to file an Amended Complaint as set forth above within **THIRTY DAYS** of the date of this Order; and it is further

**ORDERED** that in the event Plaintiff fails to file an Amended Complaint, the case will proceed only with respect to the claims in the Complaint that have not been dismissed, that is

2017 WL 11476416

Plaintiff's First, Fifth and Ninth claims against the Defendants in their individual capacities.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 11476416

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Graham v. City of New York,   E.D.N.Y.,   March 6, 2013

KeyCite Overruling Risk - Negative Treatment
Overruling Risk   Pearson v. Callahan,   U.S.,   January 21, 2009

2005 WL 2482549
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Christian VOGELER and Derek J. Kiechle Plaintiffs,
v.
Police Officer Michael COLBATH, Defendant.

No. 04 Civ. 6071(LMS).
|
Oct. 6, 2005.

*DECISION AND ORDER*

SMITH, Magistrate J.

**\*1** This matter is before me by consent of the parties pursuant to 28 U.S.C. § 636(c). Plaintiffs filed this cause of action pursuant to 42 U.S.C. § 1983 against Rockland County, Town of Ramapo Police Officer Michael Colbath, Village of Spring Valley Police Officer Kevin Freeman, and Unknown Police Officers 1 through 5. In a stipulation agreed upon by the Plaintiffs and Defendant Colbath, the claims against Rockland County and Police Officer Kevin Freeman were dismissed with prejudice.[1] Plaintiffs claim that Defendant arrested them without probable cause, impermissibly searched their persons and conducted a strip search, maliciously prosecuted them, and exerted excessive force during the course of their arrest. Defendant filed a motion for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure seeking to have all claims against him dismissed. Plaintiffs then filed a cross-motion for summary judgment pursuant to Rule 56(a). For the foregoing reasons, I grant the Defendant's motion for summary judgment in its entirety and dismiss all claims against him. Accordingly, Plaintiffs' cross-motion for summary judgment on all claims is denied.

[1]   *See* Docket Entry # 40, Stipulation and Order of Discontinuance as to Defendants Rockland County and Police Office Kevin Freeman.

*BACKGROUND*

The parties do not dispute the following facts that are material to a decision in this case.

On the evening of May 1, 2003, Plaintiffs Christian Vogeler ("Vogeler") and Derek Kiechle ("Kiechle") were inside Room 308 at the Wellesley Inn ("Room 308,") located in Ramapo, New York, when the Rockland County Task Force ("Task Force") executed a no-knock search warrant on Room 308. Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("Pls' Statement") at ¶¶ 1, 13; Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Def's Statement") at ¶ 12. Defendant Michael Colbath ("Colbath,") as a member of the Town of Ramapo Police Department, worked with the Task Force and was present when the no-knock search warrant was executed. Def's Statement at ¶ 1,7; Plaintiffs' Response to Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Pls' Resp.") at ¶¶ 1,7. The Task Force had been conducting an investigation into allegations of narcotics activity within Room 308. Def's Statement at ¶ 8; Pls' Resp. at ¶ 8. As a part of its investigation, the Task Force had utilized the assistance of a confidential informant, and on two occasions had directed him to purchase narcotics from "Nino," the suspected dealer, who was then located in Room 308. Def's Statement at ¶ 9; Pls' Resp. at ¶ 9.

On May 1, 2003, the Task Force obtained a search warrant from a Village of Airmont Justice Court Judge for Room 308. Def's Statement at ¶ 10; Pls' Resp. at ¶ 10. The Task Force, including the Defendant, executed the search warrant. Def's Statement at ¶ 12; Pls' Resp. at ¶ 12. Subsequent to execution of the warrant, Plaintiffs Vogeler and Kiechle, along with "Nino," the suspected dealer, were arrested. Def's Statement at ¶ 19; Pls' Resp. at ¶ 19. Plaintiffs were handcuffed, placed face-down on the floor, frisked and searched. Pls' Statement at ¶ 16; Defendant's Response to Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("Def's Resp.") at ¶ 16. While no illegal substances were recovered from the Plaintiffs' persons, Pls' Statement at ¶ 23; Def's Resp. at ¶ 23, the Task Force seized and removed from the room nine clear bags containing a white powder, subsequently identified as cocaine, nine clear bags containing a green leafy substance, later identified as marijuana, an additional sandwich bag

Vogeler v. Colbath, Not Reported in F.Supp.2d (2005)

2005 WL 2482549

containing marijuana, an electronic scale, numerous empty clear zip lock bags, and a sizable amount of U.S. currency. Def's Statement at ¶ 17; Pls' Resp. at ¶ 17.

**\*2** Plaintiffs were charged with Criminal Possession of a Controlled Substance in the Third Degree, N.Y. PENAL LAW § 220.16(1) (Consol.2005), and Unlawful Possession of Marijuana, N.Y. PENAL LAW § 221.05 (Consol.2005). Pls' Statement at ¶ 25; Def's Resp. at ¶ 25. After additional investigation, the District Attorney dismissed the charges. Pls' Statement at ¶ 27; Def's Resp. at ¶ 27. Plaintiffs then initiated this cause of action against the Defendants for false arrest and false imprisonment, illegal search and seizure, malicious prosecution and use of excessive force during the course of arrest.

*DISCUSSION*

A. *Introduction*

Plaintiffs assert that Defendant Colbath violated their Fourth Amendment rights to be free from false arrest and false imprisonment, to be free from unreasonable searches and seizures, to be free from malicious prosecution, and to be free from excessive force by the police when making an arrest. Plaintiffs' Complaint ("Pls' Compl.") at ¶ 15. The Defendant moves for summary judgment on the first three claims as he had probable cause to arrest the Plaintiffs and therefore cannot be liable. Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def's Mem.") at 1. The Defendant also seeks summary judgment on the Plaintiffs' claim of excessive force as there is no evidence in the record indicating that it was the Defendant who lifted the Plaintiffs from the ground. Def's Mem. at 6. Defendant seeks summary judgment on this claim on the separate ground that any force exerted during the arrest was reasonable, and thus he is entitled to summary judgment as a matter of law. *Id.* Lastly, Defendant exerts a broad of claim of qualified immunity insulating him from civil liability for his actions, if any, which may have violated the Plaintiffs' constitutional rights.[2] *Id.* at 11.

[2]    Although the Defendant invokes the protection of qualified immunity, I need not determine whether he is entitled to its protection because I conclude at no point did he violate the Plaintiffs' constitutional rights. Under the Supreme Court's holding in *Saucier v. Katz,* 533 U.S. 194, 201 (2001), a

court must conduct a two-step analysis when determining whether a police officer is entitled to qualified immunity. A court must first determine whether the defendant violated the plaintiff's constitutional rights. *Id.* If the court determines that the defendant's actions did not constitute a violation, the qualified immunity analysis ends. *Id.*

Because a review of the record in this case indicates that there are no genuine issues of material fact, I hereby grant the Defendant's motion for summary judgment on all claims and deny the Plaintiffs' cross-motion for summary judgment.

B. *Summary Judgment*

Under the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 320-23 (1986). "Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion." LOCAL CIV. R. 56.1(a). A fact is "material" when it may affect the outcome of a case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* A trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. *Id.* at 250. The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a finder of fact. *Id.*

**\*3** Where a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56. Under Local Rule 56.1(b), "the papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate,

Vogeler v. Colbath, Not Reported in F.Supp.2d (2005)

2005 WL 2482549

short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." LOCAL CIV. R. 56.1(b). Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.' " *Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (quoting *Celotex,* 477 U.S. at 323) (alteration in original). "The nonmoving party must have 'had the opportunity to discover information that is essential to his [or her] opposition' to the motion for summary judgment." *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (quoting *Anderson,* 477 U.S. at 250 n. 5). Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in its favor." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.,* 277 F.3d 232, 236 (2d Cir.2002); *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 97 (2d Cir.2001); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 764 (2d Cir.1998); *see also Anderson,* 477 U.S. at 261 n. 2. Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992) (quoting *H.L. Hayden Co. of New York, Inc. v. Siemans Med. Sys. Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989)).

In the present case, a review of the record shows that there is no genuine issue of any material facts and that therefore, the Defendant, the moving party, is entitled to a judgment as a matter of law, FED. R. CIV. P. 56(c), and Plaintiffs' cross-motion for summary judgment must be denied.

### C. *Plaintiffs' Causes of Action*

#### 1. *False Arrest and False Imprisonment*

To successfully establish a cause of action for false arrest and false imprisonment, each Plaintiff must show that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged ." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (citations omitted); *Boose v. Rochester,* 421 N.Y.S.2d 740, 745 (N.Y.App. Div 1979). Probable cause is a complete defense to the claims of false arrest and false imprisonment. *Bernard v. U.S.,* 25 F.3d 98, 102 (2d Cir.1994). The burden is on the Defendant to show the existence of probable cause as an affirmative defense. *Broughton v. State of New York, et. al.,* 37 N.Y.2d 451, 458 (1975).

**\*4** Defendant is entitled to summary judgment on the claims of false arrest and false imprisonment because he had probable cause to arrest the Plaintiffs. Under the Fourth Amendment, a police officer must have probable cause to arrest an individual without an arrest warrant. *Beck v. Ohio,* 379 U.S. 89, 91 (1964). A constitutionally valid arrest turns upon whether the police had the requisite "facts and circumstances within their knowledge ... to warrant a prudent man in believing that the [individual] [has] committed or was committing an offense." *Id.* It is undisputed that on May 1, 2003, the Defendant entered Room 308 pursuant to a search warrant issued by a Village of Airmont Justice Court Judge. Def's Statement at ¶ 12; Pls' Resp. at ¶ 12. It is also undisputed that the Plaintiffs were present in the room when the search warrant was executed. Def's Statement at ¶ 16; Pls' Resp. at ¶ 16. Once in the room, the Defendant seized several transparent zip lock bags that were identified via field testing as containing cocaine and marijuana, an electronic scale, and a large quantity of U.S. currency. [3] Def's Statement at ¶ 17. Moreover, the Task Force's confidential informant reported that a drug transaction had occurred in Room 308 in the Plaintiffs' presence just prior to the officers' execution of the search warrant. Defendant's Affirmation in Reply and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment ("Def's Opp'n Statement"), Ex. C.

[3]    The Plaintiffs correctly point out that there is an inconsistency in the Defendant's testimony regarding the location of the currency seized from Room 308. *Compare* Pls' Statement Ex. 9 at 7 (grand jury testimony of Defendant that U.S. currency recovered from clothing found within Room 308), *with* Pls' Statement Ex. 15 at ¶ 4 (Defendant's affadavit stating that money recovered from tabletop in corner of Room 308). This discrepancy, however, is of no value to the Plaintiffs because the issue surrounding the currency's location within Room 308 is not a material fact. In order for a fact to be material, and thus meaningful for this court to examine on a motion for summary judgment, the fact must alter or possibly alter the outcome of the case. *Anderson,* 477 U.S. at 248. Immaterial facts have no bearing on this court in deciding a motion for summary judgment. *Celotex Corp,* 477 U.S. at 323.

Moreover, Plaintiff Voegeler's grand jury testimony and Plaintiff Kiechle's depositions are not without inconsistency either. Plaintiff

Vogeler claims that Plaintiff Kiechle was driving on the evening of May 1, 2003. *See* Pls' Statement Ex. 8 at 5, lines 12-14; *see also* Pls' Statement Ex. 12 at 10-11, lines 25-1. Plaintiff Kiehcle, however, claims Plaintiff Vogeler was driving on the night of May 1, 2003. *See* Pls' Statement Ex. 11 at 13 lines 16-24. While this inconsistency does not go to a material fact either, it is worth noting that neither Plaintiffs' nor Defendant's statements are wholly consistent.

The presence of illegal narcotics within Room 308, as well as the information relayed by the confidential informant, gave the Defendant sufficient probable cause to arrest the room's occupants based upon the suspicion that they committed or were committing a criminal offense. *See Beck*, 379 U.S. at 91; *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir.2001). Defendant's motion for summary judgment on the Plaintiffs' claim of false arrest and false imprisonment must be granted therefore, because the Defendant had probable cause to arrest them. *Broughton*, 37 N.Y.2d at 458.

Defendant cites to N.Y. PENAL LAW § 220.25(2) (Consol.2005) as additional support for his argument that he had sufficient probable cause to arrest the Plaintiffs subsequent to the search warrant's execution. N.Y. PENAL LAW § 220.25(2) provides, in part,

> [t]he presence of a narcotic drug, narcotic preparation, marihuana or phencyclidine in open view in a room, other than a public place, under circumstances evincing an intent to unlawfully mix, compound, package or otherwise prepare for sale such controlled substance is presumptive evidence of knowing possession thereof by each and every person in close proximity to such controlled substance at the time such controlled substance was found....

New York's statutory constructive possession presumption, however, is subsidiary to the primary establishment of probable cause to arrest the Plaintiffs stemming from the Defendant's seizure of illegal narcotics from the hotel room

in which they were located. Thus, the contentions Plaintiffs raise regarding their awareness of narcotics in plain view and their personal proximity to the narcotics are of no issue. [4] The Plaintiffs' presence in Room 308 during an illegal narcotics distribution, as well as their presence in the room when illegal narcotics were seized, provided the requisite probable cause to substantiate their arrest.

[4]  Plaintiffs assert that they were unaware of the presence of illegal narcotics within Room 308. Pls' Statement at ¶ 10. Their subjective awareness and proximity to the narcotics, however, is of no importance in this instance because the Defendant had probable cause to arrest the Plaintiffs upon the seizure of illegal narcotics from the room. *See, e.g. Maryland v. Pringle*, 540 U.S. 366, 374 (2003) (holding officer had probable cause to believe individual possessed cocaine and therefore could arrest individual, absent a warrant, based upon presence of narcotics and money within car).

**\*5** Because the Defendant had sufficient probable cause to arrest the Plaintiffs, I must grant the Defendant's motion for summary judgment on the Plaintiffs' false arrest and false imprisonment causes of action.

### 2. *Illegal Search and Seizure*

#### a. *Search of Plaintiffs' Persons*

Plaintiffs additionally assert that the Defendant violated their Fourth Amendment rights to be free from illegal searches and seizures when the Defendant searched their persons. Because the Defendant entered Room 308 and searched the Plaintiffs' persons pursuant to a valid search warrant, and permissibly searched their persons under the search-incident-to-arrest doctrine, the Defendant's motion for summary judgment must be granted.

In accordance with the requirements established by the United States Supreme Court, a search warrant is valid if it is issued by a neutral and disinterested magistrate upon a showing by affidavit of probable cause. *Dalia v. U.S.*, 441 U.S. 238, 255 (1979). The search warrant must also describe with sufficient particularity the location to be searched, the items to be seized, and the persons who may be searched. *Id.*

In addition to these fundamental requirements, New York courts recognize the constitutionality of an "all persons" search warrant, such as the one used here, when probable

Vogeler v. Colbath, Not Reported in F.Supp.2d (2005)

2005 WL 2482549

cause exists to believe that any and all individuals found within a given location are involved in criminal activity. *Campbell v. Fernandez,* 54 F.Supp.2d 195, 197 (S.D.N.Y.1999); *People v. Nieves,* 36 N.Y.2d 396, 404 (1975). Most commonly, "all persons" search warrants are issued when the police suspect illegal narcotics trafficking or distribution from a particular location, but are unable to name the specific individuals to be searched. *See, e.g. People v. Miner,* 510 N.Y.S.2d 300, 302 (N.Y.App. Div 1987) ("all persons" search warrant valid where probable cause existed to believe area and persons involved in drug trafficking); *People v. Soler,* 460 N.Y.S.2d 537, 541 (N.Y.App.Div.1983) (search of bystander in room during execution of "all persons" search warrant valid because of suspected drug trafficking).

The Defendant entered Room 308 pursuant to a validly executed search warrant authorizing the search of "all persons" found within Room 308. Defendant's Affidavit in Support of Motion for Summary Judgment ("Def's Aff."), Ex. B. A neutral and disinterested judge issued a sufficiently particular search warrant identifying the location to be searched and the items to be seized. Def's Aff., Ex. B. The judge issued the search warrant upon receiving the Defendant's affidavit establishing probable cause. The Defendant developed probable cause to believe criminal activity was taking place within Room 308 based upon the information provided by a confidential informant working with the Task Force. A police officer may rely upon the reports of an informant to establish probable cause when the "totality of the circumstances" indicates that the informant's information is reliable and truthful. *Illinois v. Gates,* 462 U.S. 213, 238 (1983). The Defendant had reason to rely on the confidential informant's information based upon two prior successful drug transactions the informant conducted with "Nino," within Room 308, at the request of the Task Force. Def's Aff., Ex. B at ¶¶ 5 & 6. Based upon these transactions, the Defendant could conclude with sufficient probability that criminal activity was afoot in Room 308. *People v. Miner,* 510 N.Y.S.2d 300, 302 (N.Y.App. Div 1987) (two controlled purchases of illegal narcotics is sufficient evidence to establish probable cause of "activity inconsistent with innocent behavior.").

**\*6** Because the Defendant entered Room 308 and searched the Plaintiffs' person pursuant to a valid search warrant, the Defendant is entitled to summary judgment on the Plaintiffs' claims of illegal search and seizure.

In addition to the authority to search the Plaintiffs per the search warrant, the Defendant was also authorized to search the Plaintiffs' persons under the "search incident to arrest" doctrine articulated by the Supreme Court in *Chimel v. California,* 395 U.S. 752 (1969). In *Chimel,* the Supreme Court recognized that it is reasonable for a police officer to conduct a search of the arrestee's person, and the area around the arestee's person, known as his or her wing span, even in the absence of a warrant. 395 U.S. at 763.

Naturally, *Chimel'* s search-incident to arrest doctrine only applies when there is a valid basis for an arrest. As noted, *supra,* upon entering Room 308 to execute the valid search warrant, the Defendant found several transparent zip lock bags, later identified as containing cocaine and marijuana, as well as an electronic scale and a large quantity of U.S. currency. The presence of such narcotics and drug paraphernalia within Room 308 provided the Defendant ample justification to arrest the Plaintiffs on the suspicion that they were involved in the commission of a crime. Because the Defendant had probable cause to arrest the Plaintiffs, the Defendant was authorized to search their persons upon arrest under *Chimel.*

Plaintiffs cite to *Ybarra v. Illinois,* 444 U.S. 85 (1979), in support of the proposition that the search of their persons was unconstitutional. Reliance on *Ybarra,* however, is mistaken. *Ybarra* dealt with the execution of a no-knock search warrant at a tavern. 444 U.S. at 88. The search warrant only authorized the police to search the tavern and one named suspect, the bartender. *Id.* Upon entering the tavern, however, the police frisked all persons located within the tavern, including petitioner Ybarra. *Id* . As a result of the frisk of Ybarra's person, the police seized a package of cigarettes containing heroin. *Id.* at 89.

In suppressing the evidence of narcotics possession, the Supreme Court held that each person who entered the tavern continued to hold his or her individualized Fourth Amendment right to be free from unreasonable searches and seizures. *Id.* at 91. The Court noted that "a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.* The Court held that the reasonable suspicion required to frisk each occupant of the tavern could not be extrapolated from the probable cause supporting the issuance of the search warrant. *Id.*

The present situation, however, is markedly different from the one posed in *Ybarra.* Unlike *Ybarra,* where the search warrant

only authorized the search of the premises and one individual, here, the Defendant entered Room 308 with a search warrant authorizing him to search "[a]ll persons found within [Room 308 of the Wellesley Inn]." Def's Aff., Ex. B. Additionally, upon entry, the Defendant seized several clear bags containing illegal narcotics from a table located towards the back of the room. Pls' Statement Ex. 6 at 6-7, lines 18-4. Differing from *Ybarra,* here, illegal contraband was *first* found within the room *and then* the Defendant searched the Plaintiffs. In *Ybarra,* just the opposite was true: the initial search of the petitioner led the police to discover illegal contraband. *Cf. Md. v. Pringle,* 540 U.S. 366, 373 (2003) (noting the Fourth Amendment protection recognized in *Ybarra* does not equally apply to individuals in private locations who are in close proximity to illegal narcotics).

**\*7** Unlike *Ybarra,* in which the petitioner was frisked only because of his presence in the bar, the Plaintiffs here were arrested and searched due to the presence of illegal narcotics within the room. Additionally, the properly issued search warrant authorized the searches of the Plaintiffs' persons. Accordingly, the Defendant is entitled to summary judgment on Plaintiffs' claim of illegal search and seizure.

### b. *Strip Search*

Plaintiffs additionally assert their constitutional right to be free from illegal searches and seizures was violated when they were subjected to full body strip searches subsequent to their arrest. Plaintiffs are correct in arguing that pre-trial detainee strip searches are governed by the Fourth Amendment's reasonableness standard. *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986). Plaintiffs are unable, however, to establish that the Defendant was the individual who conducted the strip searches. In order for Plaintiffs to succeed on their § 1983 claim for illegal search and seizure, Plaintiffs must establish, with sufficient definiteness, the precise actor or actors who deprived them of their constitutional rights. *See Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1994) (personal involvement of defendant prerequisite to award of damages under 1983); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) (absence of evidence of defendant's personal involvement in alleged deprivation of rights fatal to § 1983 claim against defendant). Because the Plaintiffs have not provided sufficient evidence from which a finder of fact could conclude that the Defendant conducted or oversaw the strip searches, their claim cannot survive the Defendant's motion for summary judgment.

The evidence put forth by Plaintiffs fails to identify the Defendant as the police officer who conducted the strip search. The deposition of Plaintiff Vogeler ends with the Plaintiff explicitly denying that he had "any interaction with Police Officer Colbath" on the evening of May 1, 2003. Pls' Statement Ex. 12 at 48, lines 20-22. Plaintiff Kiechle's deposition only affirms the fact that he was strip searched; at no time does the Plaintiff identify who conducted the strip search. Pls' Statement Ex. 11 at 43, lines 18-22.

Plaintiffs assert that the Defendant's name on their arrest reports establishes that the Defendant was the officer who "oversaw" their respective strip searches. Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross Motion for Summary Judgment ("Pls' Memo") at 12. Such a nominal assertion on the part of the Plaintiffs, without more, does not create a genuine issue of material fact. *See Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (a "non-moving party may not rely on conclusory allegations or unsubstantiated speculation" when attempting to establish a genuine issue of material fact). The Defendant, however, testified that his presence in Room 308 was only to serve as the evidence officer, the individual responsible for gathering any illegal contraband seized during the execution of a search warrant. Pls' Statement Ex. 6 at 6, lines 1-9. While Defendant's name is on the arrest report for both Plaintiffs, Pls's Statement Ex. 2 and Ex 4, absent more specific evidence upon which a jury could find that the Defendant administered or oversaw the challenged strip searches, this court must grant the Defendant's motion for summary judgment on the claim of unconstitutional strip searches.

### 3. *Malicious Prosecution*

**\*8** Plaintiffs also assert a claim of malicious prosecution. The elements of malicious prosecution in New York are: "(1) the defendant commenced or continued a criminal proceeding against plaintiff, (2) the proceeding terminated in plaintiff's favor, (3) there was no probable cause for the criminal proceeding, and (4) the defendant initiated the criminal proceeding out of malice." *Bernard v. U.S., et al.,* 25 F.3d 98, 104 (2d Cir.1994) (citation omitted). Some type of judicial proceeding must occur prior to the complained of deprivation of rights because the "essence of malicious prosecution is the perversion of proper legal procedures." *Singer,* 63 F.3d at 117 (quoting *Broughton v. State of New York,* 37 N.Y.2d 451, 457 (1975)). Generally, the required judicial proceeding is in the form of a warrant, an arraignment, or an indictment by a Grand Jury. *Singer,* 63 F.3d at 117. A claim

Vogeler v. Colbath, Not Reported in F.Supp.2d (2005)

2005 WL 2482549

for malicious prosecution cannot survive summary judgment absent evidence of bad faith or malice on the part of the police. *Bernard,* 25 F.3d at 104..

In the present case, the Defendant served as the affiant for the search warrant leading to the arrest and search of the Plaintiffs' persons. Pls' Statement at Ex. 7. Plaintiffs were subsequently charged with Criminal Possession of a Controlled Substance in the Third Degree, N.Y. PENAL LAW § 220.16(1) (Consol.2005), and Unlawful Possession of Marijuana, N.Y. PENAL LAW § 221.05 (Consol.2005). Akin to the absolute probable cause defense Defendant can raise to the false arrest and false imprisonment claim, and the illegal search and seizure claim, Defendant is also entitled to summary judgment on the malicious prosecution charge because he acted pursuant to probable cause. *Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir.2003). As explained, *supra,* Defendant had probable cause to believe that criminal activity was conducted within Room 308 of the Wellesley Inn based upon the information provided by the confidential informant. *See supra,* Sections (C)(1) and (C)(2). Using this information, the Defendant validly obtained a search warrant. Upon entry into Room 308, the Defendant seized several bags of illegal narcotics, including cocaine and marijuana, arrested the Plaintiffs, and conducted a valid search of their persons. As such, the Plaintiffs cannot establish that the Defendant acted without the requisite probable cause necessary to establish a successful claim of malicious prosecution.

Moreover, Plaintiffs have asserted no evidence of actual malice on the part of the Defendant. Evidence of actual malice is required to establish an actionable claim for malicious prosecution. Such evidence can be inferred from a lack of probable cause, *Sulkowska v. City of New York,* 129 F.Supp.2d. 274, 295 (S.D.N.Y.2001), by proof of the defendant's recklessly or grossly negligent conduct, *Boose v. Rochester,* 421 N.Y.S.2d 740, 749 (N.Y.App.Div.1979), or by some evidence that the Defendant had an improper motive for initiating the proceedings, *Hernandez v. City of Rochester,* 260 F. Supp 2d 599, 615 (W.D.N.Y.2003).

**\*9** In this case, actual malice cannot be inferred from the lack of probable cause because the Defendant had the requisite probable cause to believe Room 308 was being used for criminal purposes, to arrest the Plaintiffs, and to search their persons. Plaintiffs' only offer of evidence of Defendant's actual malice is a taunt, attributed to the Defendant by Plaintiff Kiechle, upon the Plaintiffs' arrest. Pls' Statement Ex. 11 at 28, lines 7-12 (unidentified member of the Task

Force told Plaintiffs they "were in trouble," upon arrest. This statement, alone, neither establishes actual malice, nor evinces bad faith on the part of the Defendant required for a successful malicious prosecution cause of action. [5] *Hernandez,* 260 F.Supp.2d. at 615 (absence of evidence of improper motive fatal to malicious prosecution claim on summary judgment).

[5]    Further supporting Defendant's motion for summary judgment is the fact that this statement is not even firmly attributed to the Defendant. *See* Pls' Statement Ex 11 at 28, lines 7-12.

Because the Plaintiffs have failed to establish evidence of the required actual malice for a successful malicious prosecution claim, and because the Defendant had probable cause to obtain a search warrant and arrest the Plaintiffs, Defendant's motion for summary judgment on the Plaintiffs' malicious prosecution claim is granted.

### 4. *Excessive Force*

Unlike Plaintiffs' three other causes of action, Plaintiffs' claim for excessive force does not turn on whether the Defendant acted upon the requisite degree of probable cause, but whether the Defendant's conduct was "objectively reasonable" in light of the facts and circumstances as presented to the Defendant at the time of the Plaintiffs' arrest. *Graham v. Connor,* 490 U.S. 386, 397 (1989) (quoting *Scott v. U.S.,* 436 U.S. 128, 137-139 (1978)). In order to succeed on a claim of excessive force, the Plaintiffs must put forth evidence that the Defendant's conduct was "objectively sufficiently serious or harmful...." *U.S. v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999). Generally, the force used by the Defendant must be more than de minimis in order for the Plaintiffs' claim to be actionable. *Graham,* 490 U.S. at 397; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). Finally, Plaintiffs must also allege, and support with evidence, the personal involvement of the Defendant in the actions underlying their claim. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (personal involvement of Defendant is predicate for award for damages under § 1983).

Plaintiffs base their excessive force claim upon two separate instances during the course of their arrest. First, Plaintiffs claim they were both subjected to tight handcuffing when arrested. Pls' Memo. at 13. Second, Plaintiffs claim they were lifted and dragged off the ground by their arms while their hands were cuffed behind their backs. *Id.* Like their other claims, because the record does not establish a genuine issue

of material fact, I grant Defendant's motion for summary judgment.

### a. *Tight Handcuffing*

When analyzing a claim of excessive force based upon the use of handcuffs, in addition to evidence of the fact that the handcuffs were too tight and that the Plaintiffs' requests for them to be loosened went unanswered, the court may consider the degree of injury suffered by the Plaintiffs. *Esmont v. City of New York,* 371 F. Supp 2d 202, 215 (E.D.N.Y.2005). While tight handcuffing, alone, can give rise to a cause of action under § 1983, *Simpson v. Saroff,* 741 F.Supp. 1073, 1078 (S.D.N.Y.1990), the plaintiffs must suffer some form of injury from the tight handcuffs in order for such a claim to be actionable. *Id.* (excessive force claim proper when tight handcuffing lead to bloody wrist and scarring). Though the Plaintiffs' injuries need not be severe or permanent, some injury must be asserted. *Esmont,* 371 F. Supp 2d at 215.

**\*10** Both Plaintiffs claim they were tightly handcuffed when arrested, Pls' Statement Ex. 11 at 41, lines 12-13; Pls' Statement Ex. 12 at 46 lines 9-11, and that their requests for their cuffs to be loosened went unheaded. Pls' Statement Ex. 11 at 47, lines 2-7; Pls' Statement Ex. 12 at 46, lines 9-20. Despite these complaints, Plaintiff Kiechle testified that he was neither injured nor hurt during the course of arrest. Pls' Statement Ex. 11 at 41, lines 66-67. Plaintiff Vogeler also testified that he was not hurt during the course of his arrest. Pls' Statement Ex. 12 at 46, lines 21-23 and Ex. 12 at 47, lines 6-10. Neither Plaintiffs' testimony establishes they suffered any harm, let alone any measurable harm. Unlike prior excessive force cases where plaintiffs have survived summary judgment by putting forth evidence of bleeding and scarring, *Simpson,* 741 F. Supp at 1078, or prolonged bruising, *Robinson v. Via,* 821 F.2d 913 (2d Cir.1993), the Plaintiffs' mere claims of minor discomfort do not establish a triable issue that can withstand Defendant's motion for summary judgment. *Esmont,* 371 F.Supp.2d. at 215 (quoting *Carter v. Morris,* 164 F.3d 215, 219, n. 3 (4th Cir.1999)).

### b. *Handling of the Plaintiffs' Persons*

Plaintiffs also claim that they were lifted off the ground by their arms while lying handcuffed face down on the ground. Pls' Statement Ex 11 at 68, lines 16-24; Pls' Statement Ex. 12 at 47, lines 8-10. This claim, however, suffers from many of the same defects that the Plaintiffs' other causes of action suffer. Plaintiffs have neither provided sufficient evidence to establish that the Defendant was personally involved in the

excessive force, *Hernandez,* 341 F.3d at 144, nor have they proven that they suffered any injury from the complained-of activity. *Esmont,* 371 F.Supp.2d. at 215. As such, the Plaintiffs fail to establish a triable issue of fact that can survive Defendant's motion for summary judgment.

While both Plaintiffs complain of being lifted from the ground while handcuffed, Pls' Statement at ¶ 3, neither Plaintiff has identified the offending officer. Both Plaintiffs' depositions are replete with generic references to "the officers," and allusions to multiple police officers being present during the course of their arrest. *See, e.g.* Pls' Statement Ex. 11 at 28; Pls' Statement Ex. 12 at 22, 47. Plaintiff Kiechle is unable to identify the police officer or officers that physically handled him that evening. Pls' Statement Ex. 11 at 66. Likewise, Plaintiff Vogeler cannot recall any police officer exhibiting any "vicious propensities" or using excessive force during the course of the arrest. Pls' Statement Ex. 12 at 33-34, lines 25-7. Most explicit, Plaintiff Vogeler claims he had no personal interaction with the Defendant on the night of his arrest, May 1, 2003. Pls' Statement Ex. 12 at 48, lines 20-22. [6]

[6]
> In fact, this is the only time the Defendant is mentioned by name during the course of either Plaintiffs' deposition. Though having no legal significance, it is interesting to note that the only reason the Defendant's name appears anywhere in the course of either Plaintiffs' deposition provided to the court is because it was brought up by Mr. Specht, an attorney for the Town of Ramapo.

Assuming, *arguendo,* that Plaintiffs could establish that the Defendant was the individual who physically lifted them from the ground, the Defendant's actions would be assessed against the Fourth Amendment's reasonableness standard. *Saucier v. Katz,* 533 U.S. 194, 204 (2001); *Graham v. Connor,* 490 U.S. 386, 397 (1989). Under this standard, the police have the latitude to "use some degree of physical coercion or threat thereof" to effectuate an arrest. *Graham,* 490 U.S. at 396. Factors that a court may consider when evaluating an excessive force claim include the severity of the crime, whether the suspect posed a threat to the officers, and whether the suspect was resisting or attempting to evade arrest. *Id.*

**\*11** In their motion for summary judgment, Plaintiffs employ the tautological argument, "no use of force was permitted because none was required." Pls' Mem. at 13. The standard articulated by the Supreme Court, however, is not whether force was required, but rather whether the use of

2005 WL 2482549

force was reasonable under the circumstances as presented to the officers at the time of arrest. *Graham,* 490 U.S. at 396. As has been quoted numerous times when assessing excessive force causes of action, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal citations omitted).

Plaintiffs' claim that the Defendant exerted "gratuitous and unnecessary" force during the course of their arrest cannot withstand Defendant's motion for summary judgment. While Plaintiffs may have been lifted in an unconventional manner, they have failed to show that such action was any more than de minimis force exerted during the course of an arrest following the raid of a suspected drug trafficking locale. *See, e.g. Roundtree v. N.Y.,* 778 F. Supp 614, 622-23 (E.D.N.Y.1991) (defendant's motion for summary judgment on claim of excessive force proper when plaintiff suffered no physical injuries and required no medical attention); *but see, Maxwell v. City of New York,* 380 F.3d 106, 109 (2d Cir.2004) (allowing an excessive force claim to survive defendant's

motion for summary judgment when plaintiff suffered from post-concussive syndrome).

Because the Plaintiffs have failed to produce the requisite proof required to establish a "genuine issue of material fact" regarding their claims of excessive force against the Defendant, the Defendant's motion for summary judgment on the claim for excessive force must be granted.

*CONCLUSION*

For the foregoing reasons, I grant the Defendant's motion for summary judgment in its entirety. Accordingly, I deny the Plaintiffs' cross-motion for summary judgment.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2482549

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by Stefanopoulos v. City of New York, E.D.N.Y., February 28, 2005

2000 WL 516682
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Juan GONZALEZ Plaintiff,

v.

THE CITY OF NEW YORK, New York City Police
Department, and P.O. Joseph Ryder, Defendants.

No. 98-CV-3084.
|
March 7, 2000.

*MEMORANDUM AND ORDER*

GLASSER, J.

**\*1** This is a civil rights action brought by plaintiff Juan Gonzalez ("Gonzalez") pursuant to 42 U.S.C. § 1983 against defendant Police Officer Joseph Ryder ("Ryder"). Gonzalez has also brought pendent state law claims for false arrest, false imprisonment, assault, and battery against Officer Ryder and the City of New York (the "City"). The Police Department of the City of New York was dismissed from this action on August 18, 1999 and plaintiff has withdrawn his *Monell* claims against the City. Defendants now move for summary judgment. For the reasons stated below, that motion is granted in part and denied in part.

*BACKGROUND*

In the afternoon on May 4, 1997, plaintiff was driving on Coney Island Avenue in Brooklyn, New York. Plaintiff was pulled over by Police Officers Ryder and Stevens because his car had a heavy tinted plastic covering over his rear taillights, which is a violation of the New York Vehicle and Traffic Law. According to plaintiff, he was not informed of the reason he was stopped, nor was he issued a summons or a ticket. Officer Stevens asked plaintiff for his driver's licence, car registration, and insurance card and he produced a temporary license that had expired in 1991. Officer Ryder checked the status of plaintiff's driver's license and discovered that it

was suspended. Gonzalez was then arrested for operating a vehicle with a suspended license. Plaintiff claims that he was "dragged to the front of the police vehicle, slammed against the hood of the vehicle and forcibly handcuffed by P.O. Ryder ... then thrown in the back of the police vehicle." Pl. Mem. at 2. At no time did plaintiff resist the arrest.

Initially, plaintiff was rear-handcuffed. Shortly thereafter, plaintiff complained that the handcuffs hurt his wrists. According to Officers Ryder and Stevens, plaintiff's handcuffs were adjusted so that his hands were in front of him to relieve his discomfort. Ryder Dep at 38; Stevens Dep at 47-48. Plaintiff denies this took place. He maintains that until he was processed, which was a couple of hours after his arrest, he remained rear-handcuffed. Gonzalez 50-H Tr. at 54. Plaintiff asserts that during that time, he continued to complain about his wrists, but the officers refused to loosen the handcuffs. Gonzalez EBT Tr. at 62.

Plaintiff also alleges that when police could not start his car, he "was dragged out of the police vehicle and placed in his car [and after he started it] he was then taken out of his vehicle and thrown back into the police vehicle." Pl. Mem at 3.

The officers brought Gonzalez to the 61 st precinct, where the arrest was processed. His handcuffs were eventually removed. He claims that at that time he noticed scrapes and bruises on his wrists. Plaintiff mentioned these bruises in his 50-H testimony, but did not refer to them in his deposition. Gonzalez 50-H Tr. at 56.

P.O. Ryder re-handcuffed Gonzalez and took him to Central Booking. Gonzalez contends that again the handcuffs were too tight, he complained, and was ignored. Gonzalez EBT Tr. at 97-99. According to Gonzalez, it took about fifty minutes to get to Central Booking. *Id.* at 99. There, according to defendants, a brief medical screening was conducted. The report of that screening indicates that plaintiff did not report that he was sick and did not complain of any injuries. Central Booking Medical Screening Report, Cohen Dec. Ex. G. Gonzalez testified that he does not recall receiving a medical screening at Central Booking. Gonzalez EBT Tr. at 110, 229-30. After spending a night in a cell, Gonzalez made his first appearance before the State Court and received an adjournment contemplating dismissal concerning his arrest. Cohen Dec. Ex. F.

**\*2** One week after being released from custody, Gonzalez went to Coney Island Hospital because of pain in his right

wrist, hand, index finger, thumb, and arm. Hospital Record dated May 12, 1999, Pl.Ex. J. Since that time, Gonzalez has had several medical examinations and received physical therapy on a number of occasions. Gonzalez EBT Tr. at 175-76. He claims that his hand is injured as a result of the incident and that his hand still cannot grip or hold anything in his right hand for more than two minutes. *Id.* at 191.

Dr. Irving Friedman, a neurologist, examined Gonzalez four times between January 29, 1999 and October 15, 1999. In his affidavit, Dr. Friedman states that based on his examination and testing of the plaintiff, and on medical records that were created after plaintiff's arrest, he believes:

> [a]s a result of the blunt trauma and the excessively tight handcuff, Mr. Gonzalez sustained serious injuries including post-traumatic right radial nerve palsy ... tear of the tendon of the right index finger ... chronic pain syndrome, post-traumatic right wrist arthropathy ... [and] post-traumatic stress disorder ... It is also my opinion that the prognosis for the right hand injury is poor and as of the date of my last examination on October 15, 1999, Mr. Gonzalez had limited use of his right hand. Mr. Gonzalez remains with a significant and painful disability at the [sic] as a result of the injuries sustained on May 4, 1997.

Pl.Ex. G.

Richard Trachtman Ph.D., the Clinical Supervisor at the Jewish Board of Family and Children's Services, Inc., wrote to plaintiff's counsel in October 1999 that Mr. Gonzalez is being treated weekly with psychotherapy and medication:

> He reports suffering almost daily flashbacks to a period when he was arrested and, allegedly, treated harshly by police. He spends most of his days isolated in a room with a dog where he feels safe. He reports crying often. He finds it exceedingly difficult to go

out of doors unescorted and becomes panicky any time he sees a uniformed policeman.

Pl.Ex. H.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment under Rule 56 is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the burden of proof on such motion. *See United States v. All Funds,* 832 F.Supp. 542, 550-51 (E.D.N.Y.1993).

If the summary judgment movant satisfies its initial burden of production, the burden of proof shifts to the nonmovant who must demonstrate that a genuine issue of fact exists for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a jury could return a verdict in its favor. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324. Once the nonmovant has adduced evidence of a genuine issue of material fact, its "allegations [will be] taken as true, and [it] will receive the benefit of the doubt when [its] assertions conflict with those of the movant." *Samuels v. Mockry, et al.,* 77 F.3d 34, 26 (2d Cir.1996).

### II. *False Arrest and False Imprisonment*

**\*3** Probable cause is a complete defense to an action for false arrest or false imprisonment, under both federal and state law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) *cert denied,* 517 U.S. 1189 (1996); *Caracciola v. City of New York,* No. 95 Civ. 3896 CSH, 1999 WL 144481 *6 (S.D.N.Y. March 17, 1999); *Quigley v. City of Auburn,* 701 N.Y.S.2d 580. 581

(4 th Dep't 1999). "Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer* 63 F.3d at 118; *see also Weyant* 101 F.3d at 852.

In the present case, plaintiff was stopped because his car's taillights were covered by a heavy tinted plastic covering. In New York, a car must have taillights, each of which are "red to amber" and each one must be visible from at least five hundred feet. N.Y. Veh. & Traf. Law ("VTL") § 375 (McKinney 1999). [1] Plaintiff was then arrested because it was discovered that he was driving with a suspended license, which is a misdemeanor. VTL § 511 (McKinney 1999) . [2]

[1]    N.Y. VTL § 375(40)(b) reads:
       Every motor vehicle, except a motorcycle, operated or driven upon the public highways of the state, if manufactured on or after January first, nineteen hundred fifty-two, shall be equipped with at least two stop lamps, one on each side, each of which shall display a red to amber light visible at least five hundred feet from the rear of the vehicle when the brake of such vehicle is applied.

[2]    N.Y. Veh. & Taf. Law § 511
       1. Aggravated unlicensed operation of a motor vehicle in the third degree.
       (a) A person is guilty of the offense of aggravated unlicensed operation of a motor vehicle in the third degree when such person operates a motor vehicle upon a public highway while knowing or having reason to know that such person's license or privilege of operating such motor vehicle in this state or privilege of obtaining a license to operate such motor vehicle issued by the commissioner is suspended, revoked or otherwise withdrawn by the commissioner.
       (b) Aggravated unlicensed operation of a motor vehicle in the third degree is a misdemeanor. When a person is convicted of this offense, the sentence of the court must be: (i) a fine of not less than two hundred dollars nor more than five hundred dollars; or (ii) a term of imprisonment of not more than thirty days; or (iii) both such fine and imprisonment.

Section 140.10(1)(a) of N.Y.Crim. Proc. provides that a police officer may make an arrest without a warrant "when he has reasonable cause to believe that such a person has committed such offense in his presence." Gonzalez was driving while suspended in the presence of Officer Ryder. Therefore, there was probable cause for plaintiff's arrest and his claims for false arrest and false imprisonment under both federal and state law are dismissed.

III. *Plaintiff's § 1983 Excessive Force Claim*

Section 1983 of Title 42 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States. *See Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) *cert. denied,* 512 U .S. 1240 (1994). Plaintiff alleges in his Complaint that defendants used excessive force against him in violation of the Fourth Amendment *See Graham v. Connor,* 490 U.S. 386, 395 n. 10 (1989).

Police are privileged to use reasonable force to effectuate an arrest and to protect themselves from injury and dangers posed by an escapee. N.Y. Penal Law § 35.30 (McKinney 1998); [3] *Graham,* 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop carries with it the right to use some degree of physical coercion or threat thereof to effectuate it.") The reasonableness of the use of force must be judged from the perspective of "a reasonable officer at the scene." *Id.* "Not every push and shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment." *Id.* (*citing Johnson v. Glick,* 481 F.2d 1028. 1033 (2d Cir.) *cert. denied,* 414 U.S. 1033 (1973)).

[3]    N.Y. Penal Law § 35.30 reads in part:
       Justification; use of physical force in making an arrest or in preventing an escape
       1. A police officer or a peace officer, in the course of effecting or attempting to effect an arrest, or of preventing or attempting to prevent the escape from custody, of a person whom he reasonably believes to have committed an offense, may use physical force when and to the extent he reasonably believes such to be necessary to effect the arrest, or to prevent the escape from custody, or to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force ...

**\*4** If a plaintiff sustains an injury during an arrest, this is a relevant factor for the court in considering whether the force used was reasonable. However, reasonable force does not become unconstitutional merely because it caused the plaintiff serious injury. *Hudson v. McMillian,* 503 U.S. 1, 7 (1992).

Courts have found that handcuffing can give rise to a § 1983 excessive force claim where plaintiff suffers an injury as a result. *See Simpson v. Saroff,* 741 F.Supp. 1073, 1078 (S.D.N.Y.1990) (plaintiff had swollen and bleeding wrists from the tight handcuffs, as well as a faintly detectable scar on her left wrist from the incident). However, if the application of handcuffs was merely uncomfortable or caused pain, that is generally insufficient to constitute excessive force. *See Brumfield v. Jones,* 849 F.2d 152, 156 (5 th Cir.1988); *Van Houten v. Baughman,* 663 F.Supp 887, 891 (C.D.Ill.1987).

"The Fourth Amendment inquiry is an exclusively objective one, and requires consideration of the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Hemphill v. Schott,* 141 F.3d 412, 417 (2d Cir.1998) (citing *Graham,* 490 U .S. at 396, 109 S.Ct. at 1872). In the present case, plaintiff was not charged with a serious crime, did not pose a threat to the safety of the officers, and was not resisting arrest. Officer Ryder testified that Gonzalez was a "gentleman," Ryder Dep. at 68, and Officer Steven stated that he did not resist arrest. Stevens Dep. at 71.

Plaintiff's version of the events on the day he was arrested, along with the medical evidence he has put forward, raises a genuine issue of fact for trial. If he is believed, plaintiff, who was undisputedly not resisting arrest, was dragged to the front of the police car, slammed against the hood of the vehicle and forcibly handcuffed by Officer Ryder. He was placed in very tight handcuffs for more than two hours, first, up until the time he was taken to the 61 st precinct, and then when he was taken to Central Booking. During that time, he repeatedly complained that his wrists hurt and asked that the handcuffs be loosened, but was ignored. As a result, he sustained serious injury to his right hand.

Defendants respond that plaintiff initially did complain about his handcuffs, but they were quickly adjusted and no further complaints were made. They assert that plaintiff was handcuffed for less time than he alleges. They also question the existence and seriousness of plaintiff's injuries.

Plaintiff did not seek immediate medical assistance. One week after his arrest he went to the Coney Island Hospital complaining about his right wrist and hand. Plaintiff's medical expert testified that plaintiff suffered serious injuries resulting from his arrest on May 4, 1997. It is true that Dr. Friedman did not examine plaintiff until more than a year after his arrest. Moreover, Dr. Friedman conceded that the MRI of plaintiff's wrist showed that it was normal, and admitted that he relied exclusively on information from plaintiff and medical records subsequent to May 4, 1997. Friedman Dep. at 38, 55-56, 61, 63-65. Although these facts raise issues as to the credibility of plaintiff's expert, that is a matter that for the jury to decide.

**\*5** Viewing these facts in a light most favorable to Gonzalez, a factual dispute does exist as to whether Officer Ryder used excessive force and unreasonably caused injury to the plaintiff.

Under the "reasonableness standard" of the Fourth Amendment, Officer Ryder is not entitled to qualified immunity. Assuming Gonzalez's version of events is true, no reasonable officer could believe that the abusive application of handcuffs was constitutional, given the fact that he did not resist arrest. *See Palmer v. Sanderson,* 9 F.3d 1433, 1436 (9 th Cir.1993) (defendants not entitled to qualified immunity where officer refused to loosen plaintiff's handcuffs, resulting in bruises that lasted for several weeks); *Quesinberry v. Rouppasong,* 331 S.C. 589, 587 (S.C.S.C.1998) (qualified immunity denied where plaintiff repeatedly claimed handcuffs were too tight and was later diagnosed with carpal tunnel syndrome.) Therefore summary judgment as to plaintiff's § 1983 claim against Officer Ryder is denied.

*CONCLUSION*

For the reasons stated above, defendants' motion for summary judgment is granted with respect to the claims of false imprisonment and false arrest under both federal and state law. Summary judgment is denied as to plaintiff's § 1983 claim against Ryder for excessive force and his state law claims for assault and battery.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 516682

**Gonzalez v. City of New York, Not Reported in F.Supp.2d (2000)**

2000 WL 516682

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

2019 WL 7500501

2019 WL 7500501
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Richard H. LIVINGSTON, Plaintiff,

v.

William HOFFNAGLE, et al., Defendants.

No. 9:19-CV-0353 (GLS/CFH)
|
Signed 11/08/2019

**Attorneys and Law Firms**

Richard H. Livingston, 326 N. Beech Street, Syracuse, New York 13207, Plaintiff pro se.

OF COUNSEL: CHRISTOPHER J. HUMMEL, ESQ.[1], Assistant Attorney General, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants.

[1]    The undersigned bears no relation to counsel for defendants.

**REPORT-RECOMMENDATION AND ORDER**[2]

[2]    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Richard H. Livingston ("Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Correctional Sergeant ("Sgt.") William Hoffnagle, Correction Officer ("C.O.") Dustin Hollenbeck, and C.O. Chris King—who, at all relevant times were employed at Upstate Correctional Facility ("Upstate")—violated his constitutional rights under the First and Eight Amendments. See Dkt. No. 1 ("Compl.").[3]

[3]    Following initial review of plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), Senior

District Judge Gary L. Sharpe dismissed certain claims with and without prejudice. See Dkt. No. 4. The Court dismissed plaintiff's Fourteenth Amendment Due Process and Equal Protection Claims. See Dkt. Nos. 1, 4. Further, Judge Sharpe's Decision and Order dismissed plaintiff's claims insofar as plaintiff sought monetary damages against defendants in their official capacity pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915(A) as barred by the Eleventh Amendment. See Dkt. No. 4 at 8.

Presently pending before the Court is defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 12. Plaintiff did not file a response.[4] For the reasons that follow, it is recommended that defendants' motion be granted in part and denied in part.

[4]    In lieu of filing a response, plaintiff submitted a letter stating that he relied "solely" on a previous report and recommendation in a separate case arising out of largely the same facts and circumstances as alleged herein in which Magistrate Judge Peebles recommended granting defendants' motion to dismiss plaintiff's prior complaint on the basis that plaintiff failed to exhaust administrative remedies, but "note[d] that 'the outcome could very well have been different if plaintiff had, in fact, permitted the thirty-day period to elapse prior to commencing [that] suit.'" Dkt. No. 14 (quoting Livingston v Hoffnagle et al., 9:17-CV-1158 (MAD/DEP), Dkt. No. 28 at 18 n.11).

**I. Background**

**A. Plaintiff's Recitation of the Facts**

The facts are related herein in the light most favorable to plaintiff as the non-moving party. See section II.A. infra. At all times relevant to this complaint, plaintiff was incarcerated at Great Meadow Correctional Facility ("Great Meadow"). See generally Compl. On August 1, 2017, plaintiff was transferred from Clinton Correctional Facility ("Clinton") to Upstate,[5] where he was to be housed in solitary confinement for six months as a result of his involvement in an altercation with another inmate at Clinton. See Compl. at 5 ¶ 8; Dkt. No. 1-1 at 2. Upon his arrival to Upstate, plaintiff requested that

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

Sgt. Hoffnagle, the area supervisor, place him in protective custody because "he was in fear for his life and safety" as a result of the prior altercation, which he characterized as a "gang attack." Compl. at 5 ¶ 8. According to plaintiff, the inmate with whom he had engaged in an altercation at Clinton was a gang member and had initiated the fight with plaintiff. See id. However, plaintiff "had gotten the best of" him, which plaintiff believed became widely known throughout DOCCS. Id. Therefore, plaintiff asserts, he was worried that a gang member at Upstate would retaliate against him. See id. Plaintiff alleges that, in response to his request for protective custody, Sgt. Hoffnagle directed his two subordinates, C.O. Hollenbeck and C.O. King, "to dissuade" plaintiff from requesting protective custody. Id. at 12 ¶ 45.

5    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. Samuels v. Selsky, No. 01-CV-8235 (AGS), 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

*2  Plaintiff states that defendants "tortured" him by locking him in a holding cell, "chained and handcuffed tightly," with no food, water, or bathroom access between 1:00 P.M. and 6:30 P.M. Id. at 9 ¶ 39, 5 ¶ 12. He asked defendants "over 10 times" to loosen his chains and handcuffs, for water, and to use the bathroom "for relief," but defendants ignored his requests. Id. at 6 ¶ 13, 10 ¶ 40. Between 5:30 P.M. and 6:30 P.M., plaintiff "threaten[ed] to file grievances and lawsuits" against defendants based on "constitutional violations." Id. at 6 ¶ 15. In response, C.O. King told plaintiff that "the Sgt. wants to write plaintiff a ticket" and that "he was instructed to write a misbehavior report" based on plaintiff's "refus[al] of a direct order to lock into a cell," which plaintiff denies, stating that "this was not the case." Id. at 6 ¶¶ 17, 18. Sometime between 6:00 p.m. and 6:30 p.m., plaintiff was placed in a cell with a "violent gang banger," purportedly in contravention of DOCCS Directive No. 4003B, and given a tray of food that was "freezer cold." Id. at 6 ¶ 20. Plaintiff states that he was housed with this inmate as "punishment" for requesting protective custody. Id. at 6 ¶ 20, 7 ¶ 22. Plaintiff alleges that being housed with this "gang member" caused him "psychological pain" and loss of "sleep for days in fear of his life." Id. at 11 ¶ 43.

On August 3 and August 7, 2017, plaintiff filed two nearly identical grievances concerning the events that occurred on August 1, 2017. See id. at 7; Dkt. No. 1-1 at 4, 5.

On September 25, 2017, plaintiff's grievance was denied. See Dkt. No. 1-1 at 10-11. Plaintiff appealed the denial to Central Office Review Committee (CORC). See id. at 12. On December 12, 2018, CORC denied plaintiff's appeal as without merit. See id. at 16.

## II. Discussion [6]

6    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standard for Motions Pursuant to Fed. R. Civ. P. 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009)) (internal quotation marks omitted). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is " 'plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible....") (internal quotation marks and citation omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Livingston v. Hornagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law....

 **\*3**  Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, ... a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

### B. Eighth Amendment

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. Hudson v. McMillian, 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Sims v. Artuz, 230 F.3d 14, 20 (2d Cir 2000) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).

### 1. Excessive Force

Plaintiff alleges that defendants used excessive force in violation of his Eighth Amendment rights by applying his chains and handcuffs too tightly. Compl. at 10 ¶¶ 12, 41. Plaintiff states that the tightness of the chains and handcuffs caused "soreness." Id. at 10 ¶ 41. He further contends that he "asked over 10 times" for his handcuffs and chains to be loosened and "continued to complain about the tightness and soreness for [six] hours," but defendants refused to loosen the chains and handcuffs. See id. at 6 ¶ 14. He alleges that the chains and handcuffs were applied tightly in order to make him "break[ ] down and forget about wanting protective custody." Compl. at 9 ¶ 37. Defendants argue that plaintiff has failed to state a claim for excessive force because plaintiff's alleged injury is *de minimis* for constitutional purposes. See Dkt. No. 12-1 at 5.

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. See Davidson v. Flynn, 32 F.3d 27, 30 (2d Cir. 1994). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 8 (internal quotation marks and citation omitted); Blyden, 186 F.3d at 262. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims, 230 F.3d at 22 (internal quotation marks, alteration, and citation omitted). However, "the malicious use of force to cause harm[ ] constitute[s] [an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (internal quotation marks and citations omitted). "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." Id. at 7.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions

2019 WL 7500501

characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citations omitted). Thus, the key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause[ ] harm." Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted); see also Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (Observing that the Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—"not whether a certain quantum of injury was sustained.") (internal quotation marks and citation omitted). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:

> **\*4**  the extent of the injury and the mental state of the defendant[;] ... need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

"While handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force." Burroughs v Petrone, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (internal quotation marks and citation omitted). For example, in Davidson, the plaintiff alleged that correction officers "placed ... handcuffs and leg irons and waist chain on [him] so tight as to cut into [his] flesh[,] reduce circulation[,] and cause swelling," which left a scar on his right ankle and numbness in the area, and caused his "wrists [to be] numb for several months afterwards." Davidson, 32 F.3d at 29. Further, the plaintiff alleged that the defendants purposefully placed the handcuffs and chains too tightly in retaliation for filing lawsuits, and that they refused his requests to loosen the restraints. See id. at 29, 30. The Second Circuit concluded that the plaintiff's complaint in Davidson

> plainly allege[d] both the objective and subjective components of a

cause of action for an Eighth Amendment violation: the handcuffs were allegedly placed on the plaintiff too tightly, leading to serious and permanent physical injury (the objective component), and such excessive force was applied to the plaintiff wantonly and maliciously in retaliation for being a litigious inmate (the subjective component).

Id. at 30 (internal quotation marks and brackets omitted).

By contrast, courts routinely dismiss claims of excessive force based on tight handcuffing where an inmate asserts only a *de minimis* injury without plausible allegations of wantonness or maliciousness. [7] For instance, in Burroughs v. Mitchell, the Court dismissed a *pro se* inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist." Burroughs v. Mitchell, 325 F. Supp.3d 249, 265 (N.D.N.Y. 2018) (internal quotation marks omitted). Similarly, in Burroughs v. Petrone, the Court dismissed the *pro se* inmate's excessive force claim based on tight handcuffing where the complaint alleged, without more, that the handcuffs caused "pain, swelling, and bruising." Burroughs v. Petrone, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (internal quotation marks and brackets omitted).

[7]     As defendants observe, some relevant caselaw appears to suggest that, in order to state an Eighth Amendment excessive force claim based on tight restraints, a plaintiff must allege a permanent injury. See Dkt. No. 12-1 (citing, among other cases, Burroughs v. Petrone, 138. F. Supp. 3d 182, 213 (N.D.N.Y. 2015) ("In the absence of any facts alleging any permanent injury as a result of handcuffing, plaintiff's excessive force claims against Weeks, S. King, Melendez, and McKeown fail to state a cause of action under § 1983.")). However, many of those cases assess excessive force claims under the Fourth Amendment. See Bourdon v. Roney, No. 9:99-CV-0769 (LEK/ GLS), 2012 WL 21058177, at * 9-10 (N.D.N.Y. Mar. 6, 2003) (assessing an arestee's Fourth Amendment excessive force claim arising out of events that occurred during the course of the plaintiff's arrest); Jackson v. City of New York,

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 368 of 830

Livingston v. Hornfagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013) (same); Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468–69 (S.D.N.Y. 2008) (same); Layou v. Crews, No. 9:11-CV-0114 (LEK/RFT), 2013 WL 5494062, at *7 (N.D.N.Y. Sept. 30, 2013) (same). It is well settled that Fourth Amendment excessive force claims are assessed under the objective reasonableness standard, which does not apply to post-conviction inmates and, unlike the Eighth Amendment standard that includes both objective and subjective elements, is an "exclusively objective analysis" under which the defendant's "intent is irrelevant." Franks v. New Rochelle Police Dep't, No. 13-CV-636 (ER), 2015 WL 4922906, at *10 (S.D.N.Y. Aug. 18, 2015). Further, the complaint in the Eighth Amendment excessive force case relied on by defendants, which cites to cases assessing Fourth Amendment excessive force claims, lacked allegations of wantonness, which allowed the court to bypass the subjective analysis and dismiss the Eighth Amendment excessive force claim on the objective prong alone. See Petron, 138 F. Supp. 3d at 213 (dismissing the plaintiff's Eighth Amendment excessive force claim where the complaint was devoid of allegations of malicious force and alleged only a de minimis injury). As discussed in section II.B.1., "[t]he appropriate test" for assessing an excessive force claim brought "under the Eighth Amendment involves both subjective and objective elements." Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). Accordingly, this Report-Recommendation & Order will apply the test articulated in Blyden.

*5 Further, where a pro se inmate's complaint alleged that overly tight handcuffing caused "pain in his wrists and pain, numbness[,] and swelling in his foot and ankle," the court concluded that the alleged injuries were "more than likely to prove de minimis." Warren v. Purcell, No. 03-CV-8736 (GEL), 2004 WL 1970642, at *8 (S.D.N.Y. Sept. 3, 2004). However, the court in Warren declined to determine whether such injuries were sufficiently serious for purposes of the Eighth Amendment because it concluded that the complaint failed to satisfy the subjective element, reasoning that the complaint did not "attribute[ ] any improper or retaliatory motive to the defendant officers, either in attaching the cuffs in ... the first instance, or in failing to loosen them once he complained." Id.

Moreover, in Wilson v. Woodbourne Corr. Facility, the pro se inmate alleged only that the defendants used excessive force by applying "handcuffs ... too tightly when escorting [him]." Wilson v. Woodbourne Corr. Facility, No. 9:11-CV-1088 (DNH/ATB), 2012 WL 1377615, at *4 (N.D.N.Y. Mar. 21, 2012), report and recommendation adopted sub nom. Wilson v. Depolo, No. 9:11-CV-1088, 2012 WL 1366590 (N.D.N.Y. Apr. 19, 2012). Noting the absence of any facts in the complaint alleging that the defendant correction officers were aware that the restrains were causing pain or that the plaintiff requested the restraints to be loosened, the Court concluded that the "[p]laintiff's allegation, without more, ... [wa]s clearly de minimis, and ... certainly not repugnant to the conscience of mankind." Id. (internal quotation marks omitted).

Here, the undersigned finds that plaintiff has sufficiently pleaded a per se claim for excessive force because he has alleged facts which plausibly suggest that the force asserted was done maliciously for the purpose of causing harm. See Hudson, 503 U.S. at 9-10. Although, as defendants correctly contend, plaintiff's alleged injury resulting from the "tight" handcuffs and chain—"soreness"—is de minimis, Compl. at 10 ¶¶ 12, 41; see Warren, 2004 WL 1970642, at *8 (holding that temporary pain, numbness and swelling as a result of tight handcuffing was "more than likely to prove de minimis"); Ruggiero v Fisher, No. 15-CV-00962 (RJA/JJM), 2018 WL 7892966, at *7 (W.D.N.Y. Sept. 27, 2018), report and recommendation adopted sub nom. Ruggiero v. Fisher, No. 15-CV-962-A, 2019 WL 1438810 (W.D.N.Y. Apr. 1, 2019 (temporary discomfort resulting from tight restraints held to be de minimis), "[t]he absence of serious injury [while] relevant to the Eighth Amendment inquiry, ... does not end it." Hudson, 503 U.S. at 7.

Plaintiff alleges that he asked defendants to "loosen the chains and [handcuffs] over ... 10 times," "complain[ed] about the tightness and soreness for [six] hours," that defendants ignored his "constant pleas and cries to loosen the chains and [hand]cuffs" and tightly chained and handcuffed him in order to make him "break[ ] down and forget about wanting protective custody." Compl. at 6 ¶ 13, 9 ¶ 37. Based on these allegations, the undersigned finds that the complaint sufficiently pleads facts plausibly suggesting that the use of force was malicious and done for the purpose to cause harm. See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) ("[T]he malicious use of force to cause harm constitutes an 'Eighth Amendment violation per se ... whether or not significant injury is evident.' ") (quoting Blyden, 186 F.3d at

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 369 of 830

263) (alteration omitted)). Thus, although plaintiff does not allege that he suffered any significant or permanent injury as a result of the tight handcuffs and chains, "any or even ... no injuries resulting from the events plaintiff described could amount to a *per se* constitutional violation." Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at *9 (N.D.N.Y. June 16, 2017) (citing Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005)); Cf. Warren, 2004 WL 1970642, at *8 (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness, and swelling, and no improper or wanton motive was alleged for the officers' actions).

**\*6** Accordingly, it is recommended that defendants' motion to dismiss on this ground be denied.

### 2. Failure to Protect

Plaintiff next alleges that defendants failed to protect him in violation of his Eighth Amendment rights by placing him in a holding cell with a "violent gang member" despite his numerous requests to be placed in protective custody. Compl. at 11 ¶ 42. He further alleges that as a result of being housed with this other inmate, he was unable "to sleep for days in fear of his life" and experienced "psychological pain." Id. at 11 ¶ 43. Defendants argue that plaintiff's claim fails to state a cause of action for failure to protect because plaintiff "does not allege that the inmate he was housed with assaulted him[] or caused any other injury whatsoever." Dkt. No. 12-1 at 6.

"The Eighth Amendment requires prison officials to take 'reasonable measures to guarantee the safety of inmates' in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 832-33 (1994)). "[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983." Morales v. New York State Dep't of Corr., 842 F.2d 27, 30 (2d Cir. 1988). To state a claim for failure to protect under the Eighth Amendment, a plaintiff must demonstrate that (1) he or she was "incarcerated under conditions posing a substantial risk of serious harm" (objective prong); and (2) prison officials acted with deliberate indifference to that risk and the inmate's safety (subjective prong). Farmer, 511 U.S. at 834.

As to the objective prong, the deprivation must be "sufficiently serious," Hathaway v. Coughlin, 37 F.3d 63,

66 (2d Cir. 1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation marks omitted)), and "contemplate[ ] 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " Id. (quoting Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting)). "A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." Gilmore v. Rivera, No. 13-CV-6955 (RWS), 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014); see Rivers v. Spinnella, No. 9:09-CV-309 (FJS/RFT), 2010 WL 6428486, at *5 (N.D.N.Y. Nov. 4, 2010) (granting the defendants' motion for summary judgment where "there [were] no specific facts, nor even allegations, that indicate the [the d]efendant was aware that [the p]laintiff faced a substantial risk of serious harm until the altercation had already started.").

As to the subjective prong, the plaintiff must demonstrate that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. See Farmer, 511 U.S. at 837. The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. The plaintiff must "show that the defendants actually inferred from that disclosure that a substantial risk of serious harm existed." Murray v. Goord, 668 F. Supp. 2d 344, 359 (N.D.N.Y. 2009). Negligence by a prison official is insufficient to amount to a constitutional violation. See Hathaway, 37 F.3d at 66.

**\*7** As to the objective prong, plaintiff does not allege facts plausibly suggesting that he faced a substantial risk of serious harm from his cellmate. As urged by defendants, plaintiff does not claim that the inmate with whom he was housed on August 1, 2017, threatened or assaulted him in any way. Rather, plaintiff alleges only that he could not sleep for some uncertain amount of time and that he experienced unspecified "psychological pain" as a result of being housed with this inmate. Compl. at 11 ¶ 43. Such conclusory and speculative fears certainly do not " 'contemplate[ ] 'a condition of urgency, ... that may produce death, degeneration, or extreme pain.' " Hathaway, 37 F.3d at 66 (quoting Nance, 912 F.2d at 607). Further, given the absence of allegations of actual physical injury, plaintiff has failed to satisfy the objective element of the test. See Dzwonczyk v. Syracuse City Police Dep't, 710 F. Supp. 2d 248, 267 (N.D.N.Y. 2008) ("where, as here, the plaintiff does not allege that he was assaulted or

Livingston v. Hornfagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

threatened by other inmates, or where plaintiff only alleges that he was in fear of an assault, a claim for failure to protect must be dismissed"); Johnson v. Lynn-Caron, No. 9:11-CV-386 (GLS/CFH), 2013 WL 5465594, *5 (N.D.N.Y. Sept. 30, 2013) (dismissing the plaintiff's failure to protect claim where the plaintiff did not demonstrate actual physical harm); Jamison v. Hayden, No. 9:03-CV9-13 (FJS/DRH), 2008 WL 907316, at *3 (N.D.N.Y. Mar. 31, 2008) (dismissing an inmate's failure to protect claim where the only injury alleged was "severe stress" in the absence of allegations of actual physical injury); Dolberry v. Levine, 567 F. Supp. 2d 413, 418 (W.D.N.Y. 2008) (dismissing a failure to protect claim where plaintiff failed to proffer evidence showing he was subjected to any physical harm); see also Garcia v. Rodriguez, No. 05-CV-5915 (JSR), 2007 WL 2456631, at *2 (S.D.N.Y. Aug. 24, 2007) (holding that even an isolated threat from one inmate to another that an inmate would "get hurt," without any other present or past violent indications between the two inmates, does not demonstrate a substantial risk of serious harm).

As to the subjective prong, plaintiff fails to contend that defendants actually knew of and disregarded an excessive risk to his safety. Although plaintiff alleges that he explained to defendants "his reason for requesting [protective custody]"—that he had a general fear of retaliation for the altercation at Clinton—the complaint is devoid of any factual allegations that he informed defendants that the particular inmate with whom he was housed at Upstate had a connection to the inmate involved in the altercation at Clinton, knew of that incident, posed any specific risk to his safety as a result thereof, or engaged in any threatening or assaultive behavior toward plaintiff. Compl. at 11 ¶ 42. Therefore, the complaint fails to allege sufficient factual allegations that defendants could have "actually inferred from that disclosure that a substantial risk of serious harm existed" as a result of plaintiff's placement with his cellmate. Murray, 668 F. Supp. 2d at 359. Indeed, it is well settled that a defendant's knowledge of a plaintiff's generalized fear of harm is an insufficient basis upon which to establish a failure to protect claim. See Burns v. Martuscello, No. 9:13-CV-0486 (LEK/CFH), 2015 WL 541293, at *13 (N.D.N.Y. Feb. 10, 2015) (internal quotation marks omitted) ("Eighth Amendment failure to protect claims are not to be based on a defendant's knowledge of a general risk of harm to an inmate.") (internal quotation marks omitted); see also Hogan v. Fischer, No. 09-CV-6225, 2012 WL 4845609, at *6 (W.D.N.Y. Oct. 10, 2012) (holding the failure to protect the plaintiff against a general threat of harm is insufficient to raise a failure to protect

claim under the Eighth Amendment), vacated in part on other grounds, 738 F.3d 509 (2d Cir. 2013). Thus, the complaint does not sufficiently state a claim for failure to protect against defendants. [8]

[8]    In addition, to the extent that plaintiff also contends that defendants violated DOCCS Directive 4003B by housing him with the alleged gang member, it is well settled that "[f]ailure to follow a DOCCS Directive does not give rise to a § 1983 claim." Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 n.8 (N.D.N.Y. July 14, 2015); see Cabassa v. Gummerson, No. 9:01-CV-1039 (DNH/GHL), 2008 WL 4416411, at *6 n.24 (N.D.N.Y. Sept. 24, 2008) (violation of a DOCCS Directive does not give the plaintiff a claim under 42 U.S.C. § 1983); see also Ahlers v. Nowicki, No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983.").

*8    Accordingly, it is recommended that plaintiff's failure to protect claim be dismissed.

### 3. Conditions of Confinement

Reading plaintiff's allegations to raise the strongest arguments they suggest, the complaint alleges that defendants subjected him to unconstitutional conditions of confinement in violation of his Eighth Amendment rights by placing him in a holding cell for a maximum period of five and one-half hours, during which time he was handcuffed, denied access to a bathroom, deprived of food and water, and housed with a "violent gang member." Compl. at 10 ¶ 40, 11 ¶ 43. Defendants argue that the alleged conditions of plaintiff's confinement do not rise to the level of an Eighth Amendment violation. See Dkt. No. 12-1 at 4-6.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is well settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer, 511 U.S. at 832 (internal quotation marks and citations omitted); see Blyden, 186 F.3d at 263 ("society does not expect or intend prison conditions

Livingston v. Hornagle, Not Reported in Fed. Supp. (2019)
Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 371 of 830
2019 WL 7500501

to be comfortable, [and] only extreme deprivations" of basic human needs "are sufficient to sustain a [conditions of confinement] claim.") (internal quotation marks omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Objectively, the deprivation must be "sufficiently serious [such] that [the inmate] was denied the minimal civilized measure of life's necessities." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted). The objective prong can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the inmate's] health." Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). There is no "static test" to determine whether or not an alleged deprivation is sufficiently serious to satisfy the objective prong. Id. (internal quotation marks omitted). Rather, courts must determine whether the conditions violate "contemporary standards of decency." Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)) (additional citation omitted). To satisfy the subjective test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind ... such as deliberate indifference to [the inmate's] health or safety." Id. (internal quotation marks and citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002).

Unconstitutional conditions of confinement have generally been found when the duration of the deprivation is sufficiently long, or when the deprivation is an ongoing condition of an inmate's confinement, rather than the result of a single, isolated incident. See Hutto v. Finney, 437 U.S. 678, 686-87 (1978) ("A filthy, overcrowded cell and a diet of grue might be tolerable for a few days and intolerably cruel for weeks or months.") (internal quotation marks omitted); Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996) ("[T]he length of time a prisoner is subjected to harsh conditions is a critical factor in [an Eighth Amendment] analysis. Conditions such as a filthy cell that may be tolerable for a few days are intolerably cruel for weeks or months." (citations omitted)); Walker v. Schriro, No. 11-CV-9299 (JPO), 2013 WL 1234930, at *13 (S.D.N.Y. 2013) (allegations that the plaintiff was temporarily deprived of food, shower, linens, running water or bathroom were insufficient to state a claim "[g]iven that none of the[ ] deprivations rose to an acute and conscience-shocking level, either alone or in combination, the relative brevity of the [p]laintiff's mistreatment precludes a finding that [the p]laintiff can satisfy the requirement of an objectively serious deprivation").

### i. Handcuffing/Denial of Bathroom Access

**\*9** "Individuals in custody do not have a constitutional right to use the bathroom ... whenever they please." Treat v. Cent. New York Psychiatric Ctr., No. 9:12-CV-602, 2013 WL 6169746, at *2 (N.D.N.Y. Nov. 20, 2013). It is well settled held that "[t]he temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation." Whitted v. Lazerson, No. 96-CV-2746 (AGS), 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998); see Odom v. Keane, No. 95-CV-9941 (SS), 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (concluding that, the absence of a working toilet in prison cell for approximately ten hours, without any allegation that the prisoner risked contamination by contact with human waste, did not rise to the level of cruel and unusual punishment. In the absence of allegations of serious physical harm or serious risk of contamination, courts have routinely rejected unconstitutional conditions of confinement claims where plaintiffs have alleged that they experienced pain or discomfort and were forced to relieve themselves in their clothing as a result of waiting to use a bathroom. See Whitted, 1998 WL 259929, at *2 (finding that the inmate failed to establish an objective injury where he was forced to wait one and a half hours to use the bathroom, during which time he "was forced to hold his bowel movement at painful levels, and at times partially urinated and defecated in his clothing."); Gill v Riddick, No. 9:03-CV-1456, 2005 WL 755745, at *16 (N.D.N.Y. Mar. 31, 2005) (concluding no Eighth Amendment violation in the absence of allegations of serious injury to the inmate's health as a result of being forced to hold his urine for approximately 70 minutes); Bourdon v. Roney, No. 9:99-CV-0769 (LEK/GLS), 2003 WL 21058177, at *30-31 (N.D.N.Y. Mar. 6, 2003) (observing that "[t]he standard for analyzing a pre[-]trial detainee's [conditions of confinement] claim is the same as the Eighth Amendment standard," and holding that the pre-trial detainee's allegations of being deprived of bathroom privileges for a maximum of three hours while locked in a hot police car without water "failed to adequately allege that he was denied minimal necessities of civilized life for a substantial period of time" in violation of his constitutional rights); see also Qawi v. Howard, No. Civ-A-98-220 (GMS), 2000 WL 1010281, at *3-4 (D. Del. July 7, 2000) (holding that the denial of the use of a bathroom for six hours during which the inmate was forced to urinate in drinking cup and bowl and defecate into

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 372 of 830

**Livingston v. Hornagle, Not Reported in Fed. Supp. (2019)**

2019 WL 7500501

a paper bag did not constitute sufficiently serious deprivation because the duration of the condition was brief and the inmate suffered no significant health risk).

On the other hand, courts have, under certain circumstances, found that the denial of bathroom access may give rise to an Eighth Amendment violation. For example, in Hart v. City of New York, the Court refused to dismiss an inmate's Eighth Amendment claim where he alleged that the defendant correction officers ignored his repeated requests to use the bathroom for 12 hours, which forced plaintiff to "repeatedly soil himself and remain[ ] imprisoned in urine-soaked clothing," despite having been informed that the plaintiff suffered from multiple sclerosis which caused the need for frequent urination. Hart v. City of New York, No. 11-CV-4678 (RA), 2013 WL 6139648, at *7 (S.D.N.Y. Nov. 18, 2013). Further, in DeBlasio v. Rock, the Court denied the defendants' motion for summary judgment as to an inmate's Eighth Amendment claim of unconstitutional conditions of confinement where he alleged that the defendant correction officers handcuffed him behind his back and refused to "remove [his] handcuffs so that he could use the bathroom" for five hours, ultimately forcing the inmate to urinate and defecate on himself. DeBlasio v. Rock, No. 9:09-CV-1077 (TJM/GHL), 2011 WL 4478515, at *16 (N.D.N.Y. Sept. 26, 2011).

Here, plaintiff has not alleged any "serious physical harm or a serious risk of contamination" as a result the denial of bathroom access on August 1, 2017. Whitted, 1998 WL 259929, at *2. Rather, plaintiff contends only in conclusory terms that he requested "to use the restroom for relief." Compl. at 6 ¶ 13. The complaint does not allege that plaintiff experienced any pain or significant discomfort, that he was forced to urinate or defecate in his clothing, or that he has suffered any persisting physical injury as a result of his experience. Cf. Whitted, 1998 WL 259929, at *2. Further, unlike in Hart, plaintiff does not allege that he made defendants aware of any medical condition which would necessitate an exceptional need for bathroom access, or that this deprivation extended beyond the single, isolated incident on August 1, 2017. Cf. Hart, 2013 WL 6139648, at *7; accord Hutto, 437 U.S. at 686–87.

Moreover, although Rock involved a handcuffed inmate who was deprived bathroom access for a comparable period of time to plaintiff, that case appears distinguishable. The plaintiff in Rock specifically alleged that the defendants had applied handcuffs behind his back, which prevented him from

using the bathroom in his cell for approximately five hours until he was forced to urinate and defecate on himself. See id. Here, by contrast, plaintiff asserts only that his handcuffs and chains were applied "tight" and that he requested that the handcuffs and chain be loosened but does not state any facts from which the Court can infer that his handcuffs hindered him from relieving himself. Cf. Rock, 2011 WL 4478515, at *16. Thus, the present case appears more analogous to cases in which an inmate has alleged an Eighth Amendment violation based on temporary discomfort due to a fairly brief and isolated denial of bathroom access without any serious physical harm or serious risk of contamination. See Whitted, 1998 WL 259929, at *2.

 *10  Similarly, concerning the application of "tight" handcuffs and chain, the complaint fails to allege facts demonstrating that the use of these restraints while plaintiff was confined in his cell was sufficiently serious such that it posed "an unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30 (quoting Walker, 717 F.3d at 125). As discussed in detail in part II.B.1 supra, plaintiff alleged only that he suffered temporary "soreness" as a result of the application of the chains and handcuffs and does not allege that he sought or required medical attention, or that he is currently suffering any injury as a result thereof. Compl. at 10 ¶ 41. Such minor discomfort cannot be said to pose an "unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30; see also Hudson, 503 U.S. at 9 ("routine discomfort is part of the penalty that criminal offenders pay for their offenses against society" (internal quotation marks and citation omitted)). Thus, plaintiff's Eighth Amendment claim for unconstitutional conditions of confinement insofar as premised upon the application of tight handcuffs and temporary denial of bathroom access fails to satisfy the objective prong of the Eighth Amendment test. Accordingly, it is unnecessary to reach the subjective prong because "without a constitutional violation, [d]efendants clearly could not have acted with 'deliberate indifference.' " Gill, 2005 WL 755745, at *16 (quoting Odom, 1997 WL 576088, at *5).

### ii. Denial of Food and Water

Plaintiff asserts that defendants subjected him to unconstitutional conditions of confinement in violation of his Eighth Amendment rights by depriving him of food and water between 1:00 P.M. and sometime between 6:00 P.M. and 6:30 P.M. on August 1, 2017, when he arrived at

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 373 of 830

Livingston v. Hornagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

Upstate. See Compl. at 6 ¶ 20, 11 ¶ 43. He concedes that, "[b]etween 6[:00] p.m. [and] 6:30 p.m., [he] was offered a hot tray of food, which was freezer cold." Id. at 6 ¶ 20. Defendants contend that plaintiff fails to state a claim because the temporary deprivation of food and water "has been routinely found insufficient to state a[n] [Eighth Amendment] conditions[ ]of[ ]confinement claim." Dkt. No. 12-1 at 5.

The deprivation of food, as any other deprivation, must be tested by the same Eighth Amendment analysis. In order to rise to the level of an Eighth Amendment claim, the deprivation must be sufficiently serious, and the defendant must have been deliberately indifferent to the inmate's health or safety. See Farmer, 511 U.S. at 834. As the Second Circuit has noted, courts have not explicitly held that the denial of food is a *per se* violation of a prisoner's Eighth Amendment rights. See Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (citing Moss v. Ward, 450 F. Supp. 591, 596 (W.D.N.Y. 1978)). However, "under certain circumstances[,] a substantial deprivation of food may well be recognized as being of constitutional dimension." Id. For example, depriving a prisoner of all food for four consecutive days was held to have violated the Eighth Amendment. Moss, 450 F. Supp. at 596-97.

On the other hand, "isolated" deprivations of food do not typically rise to the level of an Eighth Amendment violation. Reeder v. Hogan, No. 9:09-CV-520, 2012 WL 4107822, at *18 (N.D.N.Y. July 11, 2012), report and recommendation adopted 2012 WL 4106740 (N.D.N.Y. Sept. 19, 2012). For example, allegations of intermittent deprivations for periods of approximately eight- and one-half hours, twenty-three hours, and during periods of confinement, were held insufficient to state an Eighth Amendment conditions of confinement claim. See Little v. Mun. Corp., 51 F. Supp. 3d 473, 490 (S.D.N.Y. 2014); see also Konovalchuk v. Cerminaro, No. 9:11-CV-01344 (MAD/CFH), 2014 WL 272428, at *21 (N.D.N.Y. Jan. 24, 2014) (holding that an inmate's claim that he missed two consecutive meals while being transported to-and-from the courthouse was "not substantial and d[id] not amount to cruel and unusual punishment."); Zimmerman v. Seyfert, No. 9:03-CV-1389 (TJM), 2007 WL 2080517, at *27 (N.D.N.Y. July 19, 2007) (holding that requiring the plaintiff to go eleven hours without eating did not rise to the level of a constitutional claim). Moreover, courts in this Circuit have held that being denied a single meal does not give rise to a constitutional deprivation. See, e.g., Hankerson v. Nassau Cnty. Corr. Facility, No. 12-CV-5282 (SJF/WDW), 2012 WL 6055019, at *3 (E.D.N.Y.

Dec. 4, 2012) ("[The plaintiff's] allegation that he was denied a single meal while incarcerated ... does not give rise to a constitutional deprivation."); Scarbrough v. Evans, No. 11-CV-131 (NAM/DRH), 2012 WL 4364511, at *5 (N.D.N.Y. May 17, 2012) ("[T]he denial of a single meal is insufficient to state a claim for relief.") (citations omitted).

**\*11** Here, it is undisputed that plaintiff did not receive food from 1:00 P.M. until between 6:00 P.M. and 6:30 P.M. on August 1, 2017—a deprivation which lasted, at most, five and one-half hours. See Compl. at 11 ¶ 43. Thus, plaintiff's claim in this regard fails to satisfy the objective prong of the test, as he does not allege a deprivation of "the measure of food necessary to maintain health, but rather ha[s] described the sort of isolated withholding[ ] that do[es] not typically rise to [the] level of constitutional significance." Reeder, 2012 WL 4107822, at *18; see Zimmerman, 2007 WL 2080517, at *27. [9] Further, as defendants argue, the lack of a meal over the course of five and one-half hours is "not an atypical experience for most people over the course of an ordinary day, let alone those ... subjected to the more restrictive ... conditions of a prison setting." Dkt. No. 12-1 at 7. Indeed, this alleged deprivation is less significant than deprivations of food found to be insufficient to state a claim for cruel and unusual punishment. See Konovalchuk, 2014 WL 272428, at *21; Zimmerman, 2007 WL 2080517, at *27. Thus, even affording the complaint the most liberal construction possible, plaintiff does not even assert the denial of a single meal—a legally insufficient basis to support a constitutional claim. See Hankerson, 2012 WL 6055019, at *3; Scarbrough v. Evans, 2012 WL 4364511, at *5.

9      Insofar as the complaint may be construed as alleging an Eighth Amendment violation based on the provision of "freezer cold" food, plaintiff fails to state a claim. Compl. at 6 ¶ 20. It is well established that "[t]he provision of cold food, is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Martin v. Oey, No. 9:16-CV-00717 (TJM/TWD), 2017 WL 6614680, at *6 (N.D.N.Y. Nov. 28, 2017) (internal quotation marks and citation omitted). Here, the complaint is devoid of allegations that the food was prepared or served under conditions presenting an immediate danger to plaintiff's health or wellbeing; therefore, the alleged provision of

2019 WL 7500501

cold food, without more, fails to state a claim upon which relief may be granted. See id.; see also Brooks v. NYC DOC Comm'r, No. 14-CV-6283 (RRM/CLP), 2016 WL 4530456, at *4-5 (E.D.N.Y. Aug. 29, 2016) (sua sponte dismissing cause of action based on the failure to provide hot meals where there was no allegation that the inmate did not receive nutritionally adequate meals).

Plaintiff likewise fails to allege facts sufficient to state a claim for cruel and unusual punishment based on the temporary denial of drinking water. Liberally construing plaintiff's claim, his deprivation of drinking water coincided with his deprivation of food. See Compl. at 5 ¶ 12. Therefore, as plaintiff admits that he was provided a meal sometime between 6:00 P.M. and 6:30 P.M., this claim, too, amounts only to a short, isolated deprivation and, therefore, does not arise to the level of an Eighth Amendment violation. See Mortimer Excell v. Fischer, No. 9:08-CV-945, 2009 WL 3111711, at *5-6 (N.D.N.Y. Sept. 24, 2009) (holding that, to the extent the plaintiff alleged that he was denied water during the same 24-hour period he was denied a meal, he failed to state a constitutional claim); McGee v. Pallito, No. 10-CV-11, 2011 WL 6291954, at *13 (D. Vt. Aug. 3, 2011) ("temporary deprivations of drinking water are not unconstitutional"), report and recommendation adopted, 2011 WL 6294202 (D. Vt. 2011); see also Beckford v. Portuondo, 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."). Thus, plaintiff's Eighth Amendment claim premised on the denial of food and water fails to satisfy the objective element of the Eighth Amendment test. Therefore, as plaintiff has failed to adequately plead a constitutional violation, it is unnecessary to reach the subjective prong. See Gill, 2005 WL 755745, at *16 (quoting Odom, 1997 WL 576088, at *5).

### iii. Plaintiff's Cellmate

**\*12**  Liberally construed, the complaint also alleges that plaintiff was subjected to unconstitutional conditions of confinement because he was housed with a "violent gang member." Compl. at 11 ¶ 43, 7 ¶ 22. Plaintiff contends that, as a result of being housed with this inmate, he was unable to "sleep for days" and experienced "psychological pain." Id. at 11 ¶43. Defendants posit that plaintiff fails to a claim in this regard because he "does not allege that he suffered any injury or harm as a result." Dkt. No. 12-1 at 8.

Despite plaintiff's conclusory assertion, he has failed to proffer sufficient factual allegations to establish an Eighth Amendment claim based on his placement with his cellmate at Upstate. Iqbal, 556 U.S. at 678. Even viewing the facts in the light most favorable to plaintiff, he does not allege how being placed in the cell with this inmate "pose[d] an unreasonable risk of serious damage to [his] health." Darnell, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). As discussed in section II.B.2. supra, the complaint does not state any factual allegations which could plausibly suggest that defendants' act of housing him with the purported gang member placed him at risk of harm. Indeed, plaintiff does not allege that his cellmate threatened or harmed him in any way, and plaintiff has not alleged any communication between him and defendants indicating that he informed defendants that his cellmate presented any specific risk to him, or that defendants were aware of, but disregarded, any such risk. See section II.B.2. supra.

Further, plaintiff's vague assertion that he lost sleep for an unspecified number of days as a result of being housed with this inmate fails to assert facts plausibly alleging an objectively serious injury. See generally Phelan v. Durniak, No. 9:10-CV-666 (FJS/RFT), 2014 WL 4759937, at *10 (N.D.N.Y. Sept. 24, 2014) (holding that the plaintiff's allegations that he was unable to sleep and suffered migraines because of the noise of the other inmates' televisions and radios late at night failed to satisfy the objective element of an Eighth Amendment claim); Cf. Mena v. City of New York, No. 13-CV-2430 (RJS), 2014 WL 4652570, at *4 (S.D.N.Y. Sept. 18, 2014) (concluding that the plaintiff plausibly alleged facts to support an inference that he was objectively prevented from sleeping at all for approximately two and one half days from being forced to lie on a cold, wet floor in a cell large enough for only one inmate as opposed to the three inmates who were housed there). Moreover, plaintiff's assertion that he suffered psychological pain is wholly conclusory and, as discussed in section II.B.2, the complaint contains no allegations that plaintiff ever sought therapy or other medical treatment following the alleged placement with his cellmate. See Iqbal, 556 U.S. at 664. Plaintiff has, therefore, failed to state an Eighth Amendment claim against defendants based on the alleged placement in the cell with a purported gang member.

In sum, the complaint fails to allege "conditions [that] either alone or in combination, pose[d] an unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30 (quoting Walker, 717 F.3d at 125). Accordingly, it is

2019 WL 7500501

recommended plaintiff's Eighth Amendment conditions of confinement claim be dismissed.

### C. First Amendment Retaliation

Plaintiff alleges that defendants retaliated against him by placing him in a cell with a "violent gang member" for threatening to file grievances and a federal civil rights lawsuit based on their denial of plaintiff's requests for protective custody, to loosen his chains and handcuffs, food and water, and bathroom access, in violation of his First Amendment rights. Compl. at 9-10 ¶ 39. The complaint may also be construed as asserting a First Amendment retaliation claim based on C.O. King's alleged threat to file a false misbehavior report against plaintiff. See id. at 6 ¶¶ 17. Defendants contend that plaintiff fails to sufficiently plead a First Amendment retaliation claim because "[p]laintiff's verbal requests for protective custody ... do not constitute protected speech," and even if they did, "the alleged application of tight handcuffs and chains" and the temporary denial of food, water, and bathroom access does not constitute adverse action. Dkt. No. 12-1 at 10, 11.

 **\*13**  In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must allege the following: that "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). Because of the potential for abuse and the "ease with which claims of retaliation may be fabricated," courts must examine prisoner retaliation claims with "skepticism and particular care." Johnson v. Eggersdorf, 8 F. App'x 140, 144 (2d Cir. 2001) (summary order) (quoting Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)).

It is well settled that the filing of administrative grievances and lawsuits constitutes protected speech. See Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) ("the filing of prison grievances is a constitutionally protected activity"); Williams v. Ingraham, No. 04-CV-257 (GLS/DRH), 2005 WL 3746222, at *2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue—complaints to judicial officials, filing a lawsuit, and grievances—are clearly constitutionally protected rights") (citing Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)). Further, courts in this Circuit have routinely found that a prisoner's threat of filing a grievance

or lawsuit constitutes protected activity. See Flemming v. King, No. 14-CV-316 (DNH/CFH), 2016 WL 5219995, at *4 (N.D.N.Y. June 20, 2016) (concluding that inmate's threat to file lawsuit sufficient to establish protected activity), report and recommendation adopted, No. 9:14-CV-0316 (DNH/DEP), 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016); Gibson v. Fischer, No. 9:10-CV-0968 (LEK/TWD), 2014 WL 7178346, at *15 (N.D.N.Y. Dec. 15, 2014) (denying summary judgment as to retaliation claim where the plaintiff threatened to file a grievance); Sprau v. Coughlin, 997 F. Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint sufficient to establish protected activity). Here, plaintiff's threat to file grievances and a lawsuit constitutes protected activity; therefore, the complaint satisfies the first prong of the First Amendment retaliation test. See Flemming, 2016 WL 5219995, at *4; Gibson, 2014 WL 7178346, at *15; Sprau v. Coughlin, 997 F. Supp. at 393.

To adequately plead an "adverse action," a plaintiff must allege that he was subject to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill, 389 F.3d at 381 (internal quotation marks and citations omitted). Courts in this Circuit have found that a prison official defendant's "refusal of protective custody" can be an "adverse action" for the purposes of a First Amendment retaliation claim because it could cause a prisoner to "fear[ ] for his safety." Cruz v. Grosso, No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *7 (N.D.N.Y. May 23, 2014); see also Cruz v. Lee, No. 14-CV-4870 (NSR/JCM), 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) ("[p]laintiff alleges that [the d]efendants' denial of protective custody ... constitutes an adverse action because [the p]laintiff feared for his safety without custodial protection. It cannot be said, as a matter of law, that this fear would not deter a similarly situated individual from filing further lawsuits or grievances. Therefore, [the p]laintiff has sufficiently alleged an adverse action.").

Here, plaintiff alleges that he requested protective custody out of fear that a gang member would retaliate against him for his altercation at Clinton and that defendants denied his request. See Compl. at 5 ¶ 8. Thus, accepting plaintiff's allegations as true, defendants' denial of protective custody could be considered adverse action. See Lee, 2016 WL 1060330, at *6; Grosso, 2014 WL 2176256, at *6.

 **\*14**  As for the third element,

"[p]roof of causal connection can be established indirectly by showing that the protected activity was followed closely

Livingston v. Hornagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

by discriminatory treatment ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant."

DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 116 (2d Cir. 1987) (internal citations omitted). With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted). For example, in Lee, the court concluded that an inmate sufficiently established a causal connection where he alleged facts demonstrating a "close temporal proximity" between the protected activity of filing a lawsuit and the adverse action of defendants denying his requests for protective custody "taken together with [the d]efendants' knowledge of the protected activity and statements tending to demonstrate a retaliatory motive." Lee, 2016 WL 1060330, at *7. Similarly, in Grosso, the inmate alleged that he informed the defendant of his pending lawsuit the same day that the defendant refused him protective custody status and that the defendant stated the reason for denying protective custody was because the inmate was "go[ing] against [prison] [a]dministration." Grosso, 2014 WL 2176256, at *7. Observing the temporal proximity of

the protected activity and adverse action, and noting that the defendant's statement "plausibly suggest[ed] a reason for the refusal of protective custody [that] related to retaliation," the Court concluded that the inmate established the causation prong for a First Amendment retaliation claim. Id.

Here, although close in temporal proximity, as the complaint makes clear, the adverse action of denying plaintiff's request for protective custody occurred prior to plaintiff threatening to file grievances and lawsuits, and well before plaintiff actually filed his two grievances or the present lawsuit. See Compl. at 6 ¶¶ 15, 20. Therefore, as the alleged adverse action preceded plaintiff's threat to file grievances and a lawsuit, plaintiff cannot show that defendants' denial of protective custody was motivated by this conduct. See, e.g., Gustafson v. Vill. of Fairport, 106 F. Supp. 3d 340, 353 (W.D.N.Y. 2015) (holding that the plaintiff failed to establish a causal link to support his First Amendment retaliation claim where the alleged adverse action of defendant police officers beating him preceded his constitutionally-protected expression of requesting an attorney).

**\*15** Additionally, insofar plaintiff's claim can be read to allege that defendants retaliated against him in violation of his First Amendment rights based on his repeated requests for protective custody, the complaint fails to state a claim because such requests do not appear to be constitutionally-protected speech. Rather, plaintiff's request for protective custody, in effect, constitutes a request for transfer to housing of his preference, which is not constitutionally protected speech. See Barrow v. Buren, No. 9:12-CV-01268 (MAD/CFH), 2015 WL 417084, at *13 (N.D.N.Y. Jan. 30, 2015) (concluding that an inmate's transfer requests were not constitutionally-protected speech); see generally McMahon v. Fischer, 446 F. App'x 354, 357 (2d Cir. 2011) (summary order) ("A prisoner has no right to housing in a particular facility"). Plaintiff's position would yield absurd results, as every denial of an oral request for protective custody status would give rise to a First Amendment retaliation claim. Therefore, the undersigned finds that the complaint fails to satisfy the first element for a First Amendment retaliation claim in this regard.

Moreover, to the extent that the complaint may be read as alleging that defendants retaliated against plaintiff for stating his intention to file grievances and lawsuits based on C.O. King's purported threat to file a false misbehavior report, even assuming arguendo that plaintiff's stated intention could be considered constitutionally-protected speech, plaintiff fails to state a First Amendment retaliation claim. See Compl. at 6 ¶

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 377 of 830

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

16, 17. As articulated in the complaint, C.O. King informed plaintiff that he had been instructed to file a misbehavior report and that "the Sgt. want[ed] to write [him] a ticket" based on plaintiff's refusal to follow a direct order to lock into a cell shortly after stating that he would file grievances and lawsuits. See Compl. at 6 ¶¶ 17, 19. Plaintiff denies that he refused to follow a direct order from defendants. See id. at 6 ¶¶ 18. Therefore, liberally construing the complaint, plaintiff appears to allege that C.O. King threatened to file a false misbehavior report.

As an initial matter, plaintiff does not allege that C.O. King actually wrote a misbehavior report, and no misbehavior report is contained in plaintiff's submissions; rather, plaintiff merely asserts that C.O. King threatened write a misbehavior report. In any event, it is well settled that a correction officer's filing of a false misbehavior report to prevent an inmate from seeking redress does not rise to the level of a constitutional violation in the absence of evidence that the filing of the false report actually hindered or prevented the inmate from exercising his constitutional right to seek redress through either the prison grievance procedure or by filing a lawsuit. See Nelson v. Michalko, 35 F. Supp. 2d 289, 294 (W.D.N.Y. 1999); Husbands v. McClellan, 957 F. Supp. 403, 407 (W.D.N.Y. 1997). Here, plaintiff does not allege that C.O. King's purported threat to file a false misbehavior report in any way hindered or prevented him from exercising his First Amendment right to file grievances and lawsuits. Indeed, it is undisputed that plaintiff, in fact, did file two grievances and this lawsuit subsequent to C.O. King's purported threat. Accordingly, based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim be dismissed in its entirety and that defendants' motion be granted on this ground.

### D. Conspiracy

Plaintiff alleges that defendants "entered into an agreement that if [he] continue[d] to request protective custody status, and make their job extensive by filing extra paperwork[,] they ... [would] ... keep [him] locked in a holding cell, chained and tightly cuffed, without food, water or use of the bathroom, until [he] br[oke] down and forg[ot] about wanting protective custody." Compl. at 9 ¶ 37. Defendants argue that plaintiff's conspiracy claim must be dismissed because the underlying claims upon which it is based fail to state a claim for relief. See Dkt. No. 12-1 at 10.

**\*16** In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009). "An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient." McRae v. Fischer, No. 9:17-CV-0146 (BKS/CFH), 2018 WL 3432743, at *6 (N.D.N.Y. June 6, 2018), report and recommendation adopted, No. 9:17-CV-0146 (BKS/CFH), 2018 WL 3432700 (N.D.N.Y. July 16, 2018). Although exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action." Anilao v. Spota, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. See Ciambriello, 292 F.3d at 325.

Here, even construing the facts in the light most favorable to plaintiff, plaintiff has failed to allege anything more than conclusory allegations of a conspiracy. There are no allegations outlining with specificity when, why, or how an alleged conspiracy occurred or the existence of an explicit or implicit agreement between any or all of the defendants. Even though exacting specifics are unnecessary at the pleading stage, the complaint is devoid of factual allegations establishing that defendants had any meeting of the minds in which they contemplated "break[ing] plaintiff down" until he "forgot about wanting protective custody status." Compl. at 9 ¶ 37; see Anilao, 774 F. Supp. 2d at 512-13. Rather, plaintiff merely alleges, in conclusory fashion, that defendants "entered into an agreement" to do so. Compl. at 9 ¶ 37. Likewise, plaintiff conclusorily alleges that defendants wanted to curtail him from requesting protective custody status in order to avoid "filing extra paperwork," but fails to offer any indication as to when, where, or how defendants agreed to execute the purported conspiracy. Compl. at 9 ¶ 37. Beyond stating that C.O. King informed plaintiff that Sgt. Hoffnagle wanted to write him a misbehavior report for failing to follow a direct order to lock into a cell, which plaintiff does not allege was ever filed, the complaint fails to plead a "meeting of the minds between any of the[ ] [d]efendants to act in concert to inflict a constitutional injury on [p]laintiff." Cusamano, 604 F. Supp. 2d at 432.

In any event, although not addressed by the parties, plaintiff's claim also fails as it is likely barred by intracorporate

2019 WL 7500501

conspiracy doctrine. The intracorporate conspiracy doctrine provides that officers, employees, and agents of a single corporate entity are legally incapable of conspiring together. See Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008). Although the Second Circuit has recognized that the doctrine applies in the Section 1985 context, see id., it has not passed directly on the doctrine's applicability in the Section 1983 context. However, district courts within the Circuit have applied the doctrine to such claims. See Vega v. Artus, 610 F. Supp. 2d 185, 205-06 (N.D.N.Y. 2009) (dismissing conspiracy claim pursuant to intracorporate conspiracy doctrine where all of the defendants were DOCCS employees acting within the scope of their employment); see also Williams v. Korines, No. 9:16-CV-1157 (FJS/TWD), 2018 WL 4521204, at *5 n.1 (N.D.N.Y. Sept. 21, 2018) (concluding that the intracorporate conspiracy doctrine applied to an inmate's Section 1983 conspiracy claim); Richard v. Dignean, 126 F. Supp. 3d 334, 338-39 (W.D.N.Y. 2015) (finding intracorporate conspiracy doctrine applicable to claim by inmate against prison officials for discrimination against him based on race and religion); Toliver v. Fischer, No. 9:12-CV-00077 (MAD/ATB), 2015 WL 403133, at *22 (N.D.N.Y. Jan. 29, 2015) (dismissing conspiracy claim by inmate against DOCCS personnel under the intracorporate conspiracy doctrine).

 *17  An exception to the intracorporate conspiracy doctrine applies when the individuals are "pursuing personal interests wholly separate and apart from the entity." Ali v. Connick, 136 F. Supp. 3d 270, 282-83 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). However, a plaintiff must show more "than simply alleging that the defendants were motivated by personal bias against the plaintiff." Medina v. Hunt, No. 9:05-CV-1460 (DNH), 2008 WL 4426748, at *8 (N.D.N.Y. Sept. 25, 2008); see also Vega, 610 F. Supp. 2d at 205 (holding that "in order to allege facts plausibly suggesting that individuals were pursuing personal interests wholly separate and apart from the entity" to overcome the intracorporate conspiracy doctrine "more is required of a plaintiff than simply alleging that the defendants were motivated by personal bias against plaintiff.").

Here, all defendants were DOCCS employees during the period set forth in the Complaint and all were acting within the scope of their employment. Therefore, the intracorporate conspiracy doctrine applies. See Vega, 610 F. Supp. 2d at 205-06. Additionally, plaintiff has not alleged facts to plausibly suggest that the exception to the intracorporate conspiracy doctrine applies. Plaintiff's conclusory allegation

that defendants conspired to violate his constitutional rights in retaliation for his repeated requests for protective custody, which would have "ma[de] their job extensive by" creating "extra paperwork" for them to file, Compl. at 9 ¶ 37, does not appear to establish that defendants acted out of personal interests wholly separate and apart from Upstate. See, e.g., Richard v. Leclaire, No. 9:15-CV-00006 (BKS/TWD), 2017 WL 9511181, at *13, (N.D.N.Y. July 10, 2017) (concluding that the pro se inmate failed to allege facts to establish the personal interest exception to the intracorporation conspiracy doctrine where he alleged that the defendants conspired to file a false misbehavior report and rig a disciplinary hearing so that he would be found guilty in retaliation for being found not guilty in a prior prison disciplinary proceeding). Indeed, the Complaint specifically alleges that, "[a]t all relevant times[,] defendants acted under color of law," Compl. at 5 ¶ 6, which contradicts any claim that defendants acted out of personal interest wholly distinct from those of Upstate. See Dowd v. DeMarco, 314 F. Supp. 3d 576, 588 (S.D.N.Y. 2018) (holding that the personal interest exception to the intracorporation conspiracy doctrine did not apply where the inmate's complaint alleged that the defendant correction officers' purported acts "were conducted within the scope of their official duties or employment." (internal quotation marks omitted)). Rather, plaintiff appears to allege that defendants acted out of personal bias against him, which is insufficient to defeat the application of the intracorporate conspiracy doctrine. See generally Medina, 2008 WL 4426748, at *8.

Accordingly, it is recommended that plaintiff's conspiracy claim be dismissed.

### E. Supervisory Liability

Plaintiff alleges that, after he informed Sgt. Hoffnagle that he desired to be placed on protective custody status, Sgt. Hoffnagle "sent his subordinates[,]" C.O. King and C.O. Hollenbeck, to "dissuade [him from] checking into [protective custody] by threatening to issue a misbehavior report," after which the alleged First and Eighth Amendment violations occurred. Compl. at 12 ¶ 45. Defendants argue that plaintiff's supervisory claims against Sgt. Hoffnagle must be dismissed because the underlying First and Eighth Amendment claims upon which they are based fail to state claims upon which relief can be granted. See Dkt. No. 12-1 at 8-9.

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 379 of 830

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

**\*18** Supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). In this Circuit, the " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (additional citations omitted)). However, supervisory personnel may be considered personally involved in their subordinate's conduct if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright, 21 F.3d at 501 (additional citation omitted)). [10] Absent a subordinate's underlying constitutional violation, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability.").

[10]   Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (recognizing that several District Courts in the Second Circuit have debated Iqbal's impact on the five Colon factors), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y.

2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

Construing the complaint liberally, plaintiff appears to allege supervisory liability under Colon factor one. See Colon, 58 F.3d at 873. As discussed in section II.B.1 supra, plaintiff has plausibly asserted a claim for excessive force. Therefore, it is recommended that defendants' motion to dismiss plaintiff's supervisory liability claim against Sgt. Haffnagle, insofar as it is based upon his excessive force claim, be denied. However, as discussed in sections II.B.2.-D supra, plaintiff has failed to adequately allege the remainder of his constitutional claims and, therefore, cannot state a claim for § 1983 supervisory liability based upon those allegations. See Elek, 815 F. Supp. 2d at 808.

Accordingly, it is recommended that defendants' motion be granted as to plaintiff's supervisory liability claim against Sgt. Hoffnagle insofar as it is based upon plaintiff's Eighth Amendment failure to protect and conditions of confinement claims and First Amendment retaliation claim. It is further recommended that defendants' motion to dismiss plaintiff's supervisory claim be denied insofar as it is based upon plaintiff's Eighth Amendment excessive force claim.

### III. Conclusion

**\*19 WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion to Dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) be **GRANTED IN PART** and the following of plaintiff's claims be **DISMISSED WITH PREJUDICE**:

(1) Eighth Amendment failure to protect claim;

(2) Eighth Amendment conditions of confinement claim;

(3) Conspiracy claim; and

(4) First Amendment retaliation claim;

(5) Supervisory claim against Sgt. Hoffnagle insofar as that claim is based upon plaintiff's Eighth Amendment failure to protect, conditions of confinement, and

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 380 of 830
**Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)**
2019 WL 7500501

conspiracy claims, and First Amendment retaliation claim, and it is further

**RECOMMENDED**, that defendants' motion to dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) be **DENIED** as to plaintiff's:

(1) Eighth Amendment excessive force claim;

(2) Supervisory claim against Sgt. Hoffnagle insofar as that claim is based upon plaintiff's Eighth Amendment excessive force claim; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT**

**TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72. [11]

[11]     If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7500501

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4627106
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Desmond QUICK, Plaintiff,
v.
John QUINN, Lieutenant, Auburn Correctional Facility;
Chris Novack, Correctional Officer, Auburn Correctional
Facility; Sean Reilly, Correctional Officer, Auburn
Correctional Facility; and Joseph Baney, Correctional
Officer, Auburn Correctional Facility, Defendants.

No. 9:12–CV–1529 (DNH/DEP).
|
Signed Sept. 11, 2014.

**Attorneys and Law Firms**

Desmond Quick, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Rachel M. Kish, Esq., Ass't Attorney General, of
Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

 **\*1** Pro se plaintiff Desmond Quick brought this civil
rights action pursuant to 42 U.S.C. § 1983. On August
11, 2014, the Honorable David E. Peebles, United States
Magistrate Judge, advised by Report–Recommendation that
defendants' motion for partial summary judgment dismissing
plaintiff's claims against defendant Reilly be granted based
upon lack of personal involvement. No objections to the
Report–Recommendation were filed.

Based upon a careful review of the entire file and the
recommendations of the Magistrate Judge, the Report–
Recommendation is accepted in whole. See 28 U.S.C. §
636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for partial summary judgment is
GRANTED;

2. Plaintiff's claims against defendant Sean Reilly are
DISMISSED;

3. This matter is referred back to Magistrate David E. Peebles
for further proceedings consistent with this Decision and
Order; and

4. The Clerk is directed to serve a copy of this Decision and
Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Desmond Quick, a New York State prison
inmate, has commenced this action pursuant to 42 U.S.C.
§ 1983, alleging that four corrections officers employed at
the facility in which he was confined at the relevant times
deprived him of his civil rights. Plaintiff contends that some
of the named defendants physically assaulted him, while
others either orchestrated the assault or failed to intervene and
protect him.

Now that discovery in the action is closed, defendants have
moved for partial summary judgment dismissing plaintiff's
claims against one of the corrections officers named in
plaintiff's complaint, arguing that he was not personally
involved in the alleged constitutional deprivations. For the
reasons set forth below, I recommend that defendants' motion
be granted.

I. *BACKGROUND* [1]

[1]    In light of the procedural posture of the case, the
       following recitation is derived from the record now
       before the court, with all inferences drawn and
       ambiguities resolved in plaintiff's favor. *Terry v.
       Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate currently being held in the
custody of the New York State Department of Corrections and
Community Supervision ("DOCCS"). *See generally Dkt. No.
1.* While he is currently incarcerated elsewhere, at the times
relevant to his claims in this action Quick was confined in

the Mental Health Unit ("MHU") at the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *Dkt. No. 1 at 5; Dkt. No. 43 at 1;see also Dkt. No. 41–1 at 10.*

On April 16, 2012, while confined in an MHU cell at Auburn, plaintiff spread feces over himself and his cell. *Dkt. No. 1 at 5; Dkt. No. 41–1 at 10.* As a result of plaintiff's actions, a call was placed by defendant John Quinn, a corrections lieutenant and named-defendant, for assistance in connection with the matter. *Dkt. No. 1 at 5.* According to plaintiff, in response, Corrections Officers Chris Novack, Sean Reilly, [2] and Joseph Baney, all of whom are also named as defendants in Quick's complaint, appeared in full extraction gear, prepared to remove him from his cell. *Dkt. No. 1 at 5; Dkt. No. 41–1 at 10–11.* Plaintiff alleges that defendants Novack and Reilly restrained him, using handcuffs and a waist chain, and then "dragged" him to the shower. *Dkt. No. 1 at 8; Dkt. No. 41–1 at 10.* Upon arrival at the shower, defendants Novack and Reilly stripped plaintiff but left him handcuffed behind his back. *Dkt. No. 1 at 8.* Plaintiff alleges that defendant Novack struck him in the face until he began to bleed and stepped on his right foot, knee, and thigh "numerous times." *Id.* at 9; *Dkt. No. 41–1 at 11.* Defendant Reilly also allegedly bent plaintiff's right arm and hand. [3] *Dkt. No. 1 at 9.* According to plaintiff, although defendant Baney witnessed the incident, he stood by without intervening to protect plaintiff. *Id.; Dkt. No. 41–1 at 11.* Plaintiff alleges he suffered bumps and bruises to the face, forehead, and right thigh, as well as a cut over his right eye. *Dkt. No. 1 at 10.*

[2]    Although plaintiff's complaint and the court's records list this defendant as "C.O. Shawn Riely," it appears from his declaration that his name is correctly spelled as "Sean Reilly." *Dkt. No. 41–2.* The clerk is respectfully directed to adjust the court's records to reflect the correct spelling of that defendant's name.

[3]    At his deposition, plaintiff testified that, in addition to bending his right arm and hand, defendant Reilly bit him. *Dkt. No. 41–1 at 11.*

**\*2** Following the assault, Corrections Officer Frantcezk, who is not named as a defendant, arrived at the shower and began videotaping plaintiff. *Dkt. No. 1 at 9; Dkt. No. 41–1 at 11.* Plaintiff was then escorted to an MHU interview room, where he was treated for his injuries by a prison nurse. [4] *Dkt. No. 1 at 9–10; Dkt. No. 41–1 at 11.*

[4]    As a result of the incident, plaintiff was charged with violating prison rules, including committing an unhygienic act and causing loss/damage to DOCCS property. *Dkt. No. 41–1 at 17.* Following a disciplinary hearing, plaintiff was found guilty of the charges and sentenced to two months and twenty-three days of confinement in a facility special housing unit. *Id.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on October 9, 2012, with the filing of a complaint accompanied by an application to proceed in the action *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Named as defendants in plaintiff's complaint are Corrections Lieutenant John Quinn and Corrections Officers Chris Novack, Sean Reilly, and Joseph Baney. *Dkt. No. 1 at 1–2.* The court granted plaintiff's IFP application on November 21, 2012. *Dkt. No. 7.*

On October 3, 2013, following the joinder of issue and completion of pretrial discovery, defendants filed a motion, seeking the entry of partial summary judgment as against defendant Reilly. *Dkt. No. 41.* Defendants' motion is based exclusively upon their assertion that there is insufficient record evidence from which a reasonable factfinder could conclude that defendant Reilly was personally involved in the incident on April 16, 2012, as alleged by plaintiff, since he was not working at Auburn on that date. *Dkt. No. 41–3 at 5–6.* Plaintiff has since responded in opposition to defendants' motion. *Dkt. No. 43.* The pending motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for

2014 WL 4627106

purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250. When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Tolan,* 134 S.Ct. at 1866; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Personal Involvement*

**\*3** In their motion, defendants contend that, because defendant Reilly was not working at Auburn on April 16, 2012, there is insufficient record evidence from which a reasonable factfinder could conclude that he was personally involved in the alleged assault of plaintiff at Auburn on that date. *Dkt. No. 41–3 at 5–6* .

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal,* 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts

of a defendant and the injuries suffered ." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.,* No. 91–CV8135, 1994 WL 23069, at \*3 (S.D.N.Y. Jan. 24, 1994). [5]

5        Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

In support of their motion, defendants have submitted a sworn declaration of defendant Reilly, in which he denies having had contact with plaintiff on April 16, 2012, and states that he was not working at Auburn on that date because it was his regular day off. *Dkt. No. 41–2 at 1–2.* This assertion is supported by a copy of defendant Reilly's timecard which, though difficult to read, appears to substantiate his statement that he did not work on April 16, 2012. *Id.* at 4.

Defendant Reilly's contention that he did not work on the day in question is contradicted by the allegations in plaintiff's complaint, *Dkt. No. 1,* which was signed under penalty of perjury and thus carries the force and effect of an affidavit. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes."). In his opposition to defendants' pending motion, however, plaintiff does not squarely dispute defendant Reilly's assertion that he was not working at Auburn on April 16, 2012. *See generally Dkt. No. 43–1.* Instead he contends that (1) the timecard submitted by defendant Reilly is not authentic and may have been altered, and (2) defendants failed to produce the MHU sign-in logbook for April 16, 2012, which, according to plaintiff, "cannot be altered" and would show "who entered the facility that day." *Id.* at 6.

With respect to plaintiff's second contention, he maintains that he requested the logbook in his May 21, 2013 discovery demand, but that the documents produced by defendants did not include the logbook. *Dkt. No. 43–2 at 1–2.* On February 15, 2013, I issued a standard Rule 16 scheduling order in this case requiring the parties to provide certain mandatory disclosures. That order required, *inter alia,* that defendants provide the following documents within their possession, custody, or control concerning plaintiff's excessive force claims:

**\*4** Photographs, unusual incident reports, use-of-force reports, disciplinary charges, records (including transcripts) of disciplinary hearings, determinations of disciplinary charges and appeals therefrom, videotapes, audiotapes, and medical records concerning treatment for any injuries allegedly received by the plaintiff as a result of the incident(s) alleged in the complaint.

*Id.* at 6 (footnotes omitted). In a letter dated May 22, 2013, the court was advised by defendants' counsel that defendants had fully complied with that order. *Dkt. No. 25.*

On June 25, 2013, the court entertained oral argument concerning two applications by the plaintiff, one requesting an order compelling defendants to produce additional documents, and the second requesting an extension of the deadline for filing a further motion to compel discovery, related to the discovery demands served on May 21, 2013. Dkt. Nos. 28, 29. After noting that plaintiff's requests were untimely under this court's local rules, which require that any discovery demands be served more than thirty days prior to the close of discovery, I nonetheless ordered defendants to respond to the late discovery demands, and specifically directed that defendants produce to plaintiff certain documents, including "sign-in" sheets and logbooks, that would identify DOCCS personnel present in the MHU at Auburn at any time during the 7:00 a.m. to 3:00 p.m. shift on April 16, 2012. *Dkt. No. 30.* Defendants were directed t produce those documents on or before July 16, 2014. *Id.* Significantly, plaintiff did not request the court's assistance enforcing that order until he submitted his opposition to the pending motion for summary. *Dkt. No. 43–2.* In light of plaintiff's delay in seeking court intervention, and because it appears that defendants have made a good faith effort to comply with the court's orders compelling production, I do not view this issue as an impediment to deciding the present summary judgment motion.

Turning now to plaintiff's contention that the timecard submitted by defendant Reilly is not authenticated and may have been altered, I find it unsupported by any record evidence and therefore not a basis upon which I may conclude a genuine dispute of material fact exists for trial. *Dkt. No. 43–1 at 5–6; see Ying Jing Gan v. City of N.Y.,* 996 F.2d 522, 532 (2d Cir.1993) (holding that the nonmoving party may not defeat a motion for summary judgment based "simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"). In light of plaintiff's verified complaint, however, which contains an allegation that defendant Reilly was present and participated in the assault of plaintiff on April 16, 2012, I ordinarily would conclude that such conflicting accounts would present a triable issue of fact, turning on witness credibility, that would preclude the entry of summary judgment. *See Rule v. Brine,* Inc. 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). The Second Circuit, however, has recognized a very limited exception to this general rule in *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005). In that case, the court held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations, aside from his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could credit the his testimony. *Jeffreys,* 426 F.3d at 54–55. To qualify for the *Jeffreys* exception, a defendant must satisfy each of the following three requirements: (1) "the plaintiff must rely 'almost exclusively on his own testimony,' " (2) the plaintiff's "testimony must be 'contradictory or incomplete,' " and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Benitez v. Ham,* No. 04–CV–1159, 2009 WL 3486379, at \*20–21 (N.D.N.Y. Oct. 21, 2009) (Mordue, J., *adopting report and recommendation by* Lowe, M.J.) (quoting *Jeffreys,* 426 F.3d at 554).

**\*5** In this instance I find that the requirements for invoking the *Jeffreys* exception are satisfied. The only evidence suggesting defendant Reilly's involvement in the relevant events is plaintiff's uncorroborated allegation in his verified complaint. *See generally Dkt. No. 1.* While, in support of his opposition to the pending motion, plaintiff has submitted an affidavit from a fellow inmate concerning the incident, that inmate does not identify defendant Reilly as one of the corrections officers participating in the extraction of plaintiff from his cell. *Dkt. No. 43–2 at 16.* In addition, in response to the pending motion, plaintiff does not explicitly deny defendants' contention that defendant Reilly was not at work on April 16, 2012, but instead focuses on defendants' alleged failure to comply with discovery orders. *See generallyDkt.*

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 385 of 830
Quick v. Quinn, Not Reported in F.Supp.3d (2014)
2014 WL 4627106

No. 43–1. Finally, and perhaps most tellingly, in response to the portion of defendants' statement of undisputed material facts, submitted pursuant to rule 7.1(a)(3) of the local rules of practice for this court, stating "[d]efendant Reilly was off and not working in Auburn Correctional Facility on April 16, 2012", plaintiff responded that he "[l]ack [s] sufficient knowledge to truthfully admit or deny." *Dkt. No. 43 at 3.* Under these circumstances, where the only record evidence that exists to support the allegation that defendant Reilly participated in the assault on April 16, 2012, is plaintiff's self-serving and unsupported statement contained in his complaint, I find that no reasonable factfinder could conclude that defendant Reilly participated in the incident giving rise to plaintiff's claims. *See Anderson,* 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *Jeffreys,* 426 F.3d at 554 ("To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)); *Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 188 (2d Cir.1992) (noting that summary judgment cannot be defeated "on the basis of conjecture or surmise"); *McMahon v. Fura,* No. 10–CV–1063, 2011 WL 6739519, at *10 (N.D.N.Y. Dec. 23, 2013) (Lowe, M.J. (on consent)) (applying the *Jeffreys* exception where the only evidence supporting the plaintiff's version of events was his testimony that "he 'must have' been tased by 'an officer,' " and the defendants offered testimony from the only officer involved who had a taser that he did not use it).

Accordingly, I recommend that plaintiff's claims against defendant Reilly be dismissed based upon lack of personal involvement.

IV. *SUMMARY AND RECOMMENDEATION*

Defendants have submitted convincing evidence that defendant Sean Reilly was not involved in the alleged use of excessive force against plaintiff on April 16, 2012, and indeed was not even working at Auburn on that date. To counter that proof, plaintiff relies on his allegation in his verified complaint that Reilly was involved. In view of this and plaintiff's inability to admit or deny the portion of defendants' rule 7.1(a)(3) statement regarding the matter, I conclude that no reasonable factfinder could find that defendant Reilly was present and involved. Accordingly, it is hereby respectfully

**\*6** RECOMMENDED that defendants' motion for partial summary judgment (*Dkt. No. 41* ) be GRANTED, and that plaintiff's claims against defendant Sean Reilly be DISMISSED with prejudice; and it is further

ORDERED that the clerk is hereby respectfully directed to modify the court's records to reflect the correct spelling of defendant Sean Reilly's name.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed Aug. 11, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4627106

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by   McRae v. City of Hudson,   N.D.N.Y.,   January 21, 2015

2009 WL 3486379

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Henry BENITEZ, Plaintiff,

v.

HAM, et al., Defendant.

No. 9:04–CV–1159.

|

Oct. 21, 2009.

**Attorneys and Law Firms**

Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse, NY, for Defendants.

### *ORDER*

NORMAN A. MORDUE, Chief Judge.

 *1 The above matter comes to me following a Report–Recommendation by Magistrate Judge George H. Lowe, duly filed on the 30th day of September 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its entirety.

2. Defendants' motion for summary judgment (Dkt. No. 92) is GRANTED IN PART AND DENIED IN PART. The following claims are dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff, (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive summary judgment and sua sponte review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff, (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez

2009 WL 3486379

alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL SUMMARY

 **\*2**  Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint [1] . Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12–13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

[1]    Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits–the affidavit of Defendant Dr. Evelyn Weissman—contradicts Plaintiff's version of events.

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4–10.)

As to Plaintiff's other claims, Dr. Weissman declares:

Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

 **\*3**  (Weissman Aff. ¶¶ 11–13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff [2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff. Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

[2]     Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee

alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35–36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean–Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05–CV–5493, 2008 U.S. Dist. LEXIS 31863, at *1, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. Plaintiff asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on." [3] (Dkt. No. 1 ¶ 19.)

[3]     In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt.

No. 92–10 at 35–36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

**\*4** On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van." [4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21–22.)

[4]    In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92–10 at 35–36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor. [5] (Dkt. No. 1 ¶ 23.)

[5]    The medical records produced by Defendants in support of their motion for summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

[6]    The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92–10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his

asthma was acting up. Nurse "Goon" 's note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**\*5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

[7]    The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

[8]    It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch. Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17–18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed him the interview was over and left the area." (Defs.' Ex. 15 at 2–3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

**\*6** On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and

an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28–34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1–2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2–3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

*7 On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [10] In determining whether a genuine issue of material [11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [12]

9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in

this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

10    *Ross v. McGinnis,* No. 00–CV–0275, 2004 U.S. Dist. LEXIS 9367, at * 20–21, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

11    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

12    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted.[13] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

13    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. §

1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);[14] or (2) a challenge to the legal cognizability 14 of the claim.[15]

14    *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

15    *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.")

2009 WL 3486379

(citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at *4–5, 2004 WL 2613993, at *1–2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b] [6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 333 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* No. 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12(b)(6) motion—one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [16] The main purpose of this rule is to "facilitate a proper decision on the merits." [17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [18]

[16] *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (citation omitted).

[17] *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

[18] *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) ( McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98–CV–0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556–57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not *shown*— that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

[19] *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

[20] *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [24] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [25]

[21] "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96–CV–7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at * 1, n. 2, 1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d

192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.3d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.4d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

[22] *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

[23] *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

[24] *Yang v. New York City Trans. Auth.,* No. 01–CV–3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

[25] *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g., See Rhodes v. Hoy,* No. 05–CV–0836, 2007 U.S. Dist. LEXIS

48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* No. 07–CV–0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.,* No. 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* No. 00–CV–1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[28] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[29]

[26]     *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

[27]     *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

[28]     *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,* 408 F.3d 124,

Benitez v. Ham, Not Reported in F.Supp.2d (2009)
Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 396 of 830
2009 WL 3486379

128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

29   *Stinson v. Sheriff's Dep't of Sullivan County.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

### III. ANALYSIS

#### A. Weissman/Richards Health Care

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92–10 at 13–14.)

#### 1. *Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element

of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corr. Med. Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

2009 WL 3486379

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505, at *2 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious

treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance,* 143 F.3d at 704.

### 2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe Atarax. (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the Atarax medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92–10 at 13–14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need. [30] Applying the analytical framework described above, I must first address whether Plaintiff was actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe Atarax constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe Atarax, noting that he had already tried treating Plaintiff with Hydroxyzine, Vistril, Allegra, and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A–9.)

[30]   Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92–10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28–30.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe Atarax caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of Atarax harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe Atarax.

2009 WL 3486379

Having found that there is not a triable issue of fact on the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe Atarax was not deliberate indifference because the decision of "what medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92–10 at 13–14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. [31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7–8, Ex. A–9 and A–10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A–9.) His requests were denied. (Weissman Aff. ¶¶ 7–8, Ex. A–9 and A–10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? [32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

[31]    Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

[32]    *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended

when their request for approval of knee surgery was denied).

3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92–10 at 13–14.) Defendants are correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A–13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A–14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated by the orthopedist." (Dkt. No. 109 at 24–25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards. [33]

33    Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

## B. Ham/Grievances

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9–10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28–29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92–10 at 21–23, 38.)

### 1. *Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92–10 at 21–23.) I find that there is a triable issue of fact that Plaintiff's failure to receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [34] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some

other wrong." [35] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program. [36]

34    42 U.S.C. § 1997e.

35    *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

36    7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. [37] First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven (7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process. [38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

37    7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No. 00–CV–3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

38    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d

546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01–CV–0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03–CV–0671, Report–Recommendation, at 15–16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92–4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[39] *Id.*

39  The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92–4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards's denial of Atarax. (Dkt. No. 92–4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92–4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92–3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92–4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb.27, 2002). Even if CORC had acted on Plaintiff's appeal, I assume that they would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had

not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies. [40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

[40]  See *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Good,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

[41]  *Hemphill,* 380 F.3d at 686 (citation omitted).

[42]  *Id.* (citations omitted).

[43]  *Id.* (citations and internal quotations omitted).

2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92–10 at 22–23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

**\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant

to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at *24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[44]

44    Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92–11.)

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled too tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

### 3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28–29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50–51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92–10 at 38.) Defendants are correct.

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29,

2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–370 (W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

### C. Frisk Room Incident/Aftermath/Grievances

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright, Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[45] (Dkt. No. 1 ¶¶ 16–22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30–31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32–34.)

45    The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92–10 at 40–42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

1. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92–10 at 25–26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92–4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163–64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

2. *Conspiracy*

**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim.[46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine.[47] (Dkt. No. 92–10 at 31–32.)

[46] Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

[47] Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92–10 at 31–32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I have not addressed Defendants' argument regarding class-based animus.

a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92–10 at 31–32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21–22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 404 of 830
Benitez v. Ham, Not Reported in F.Supp.2d (2009)
2009 WL 3486379

b. *Intracorporate Conspiracy Doctrine*

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92–10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97–cv–1337, 1999 U.S. Dist. LEXIS 3164, at \*5, 1999 WL 151702, at \*2 (W.D.N.Y. Mar.17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases.[48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims." I will assume that the doctrine applies in § 1983 cases.

[48]    *See Green v. Greene,* No. 9:07–CV–0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09–cv–98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at \*3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08–CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08–CV–61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* –––– F.Supp.2d ––––, No. 05–CV–5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06–CV–2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03–CV–202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL

925724 (N.D.N.Y. March 26, 2007); *Malone v. City of New York,* No. CV–05–2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05–CV–297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06–2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05–CV–1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at \*6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

3. *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92–10 at 33–35.) Specifically, Defendants argue that:

> [P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records

for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

**\*20** (*Id.* at 34–35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46–47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten

everywhere." (Bannister Aff. ¶ 10).) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551–52. Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92–5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force. [49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

[49] Read broadly, the complaint also asserts an excessive force claim against Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

### 4. False Misbehavior Reports

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against them "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17–18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92–10 at 25–29.)

#### a. Forfeiture

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his

opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92–10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman,* 808 F.2d at 953–54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim—a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights—in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere provision of procedural due process could eliminate all

2009 WL 3486379

liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590–91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the procedural due process claim at issue in *Freeman.*" *Id.* at 679–80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer.* In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer,* 533 F.Supp.2d at 323. The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer,* 533 F.Supp.2d at 330. Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.* The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer,* 533 F.Supp.2d at 330.

**\*24** Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which

*Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing. [50]

[50]    I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91–CV–717, 1994 U.S. Dist. LEXIS 11114 (N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92–10 at 39.)

   b. *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92–10 at 28, 30.)

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the

prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats. (Dkt. No. 92–5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

**\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats. [51] (Dkt. No. 92–5, Ex. 11.) The most serious of these charges was the threat charge.

[51]    Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion. (Dkt. No. 92–5, Exs.11–12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y.

Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

5. *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19–20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92–10 at 36–37.)

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants'

motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[52]

[52]     Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30–34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92–10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

**D. Disciplinary Hearing/Sentence**

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36–37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21–day loaf diet (Dkt. No. 1 ¶ 36–37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving

as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." [53] (Dkt. No. 1 ¶ 35.)

[53]   The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated 'Get what I want or I'll fuck you up.'" Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92–5, Ex. 15 at 2–3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84, 115

S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair. [54]

[54]   Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92–10 at 38–39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92–10 at 39, citing *inter alia, Jackson,* 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived

2009 WL 3486379

of a liberty interest, it is not necessary to reach this issue.

### 2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92–10 at 39–40.) As discussed above, Defendants are correct. *McEachin,* 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

### 3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37–38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92–10 at 14–20.)

#### a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92–10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy,

Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

#### b. *Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92–10 at 15–20.) Defendants are correct.

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygienic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92–8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygienic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years worth of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved of the loaf diet. To establish deliberate

indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702–703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that Plaintiff is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a contraindication for the restricted diet." (Weissman Aff. ¶¶ 14–15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

#### 4. *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

#### E. Five Points Health Care

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23–26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a

serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92–10 at 6, 20.)

#### 1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92–10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

[55]    This 120–day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM–285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7–8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kulhman by substituting the name 'Coleman' ... for 'Kuhlman.' " (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

#### 2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body itch. Plaintiff also alleges that

2009 WL 3486379

he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23–26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92–10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. *Salahuddin,* 467 F.3d at 279–80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." *Id.; Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92–10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose,* No. CIV. S–08–1531, 2008 WL 5386637, at * 3 (E.D.Cal.Dec.24, 2008) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment—not deliberate indifference." (Dkt. No. 92–10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment.

The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be ***GRANTED IN PART AND DENIED IN PART;*** and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to

2009 WL 3486379

intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of *Miller v. Bailey,* No. 05–CV–5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); *Odom v. Poirier,* No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); *Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); *Bond v. Board of Educ. of City of New York,* 97–cv–1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); *Medina v. Hunt,* No. 9:05–CV–1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*32**  Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3486379

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Staton v. Farrell, Not Reported in Fed. Supp. (2023)**

2023 WL 10354380

2023 WL 10354380
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Billyray STATON, Plaintiff,
v.
Patrick FARRELL, et al., Defendants.

1:20-CV-01120 LJV (MJR)
|
Signed September 29, 2023

**Attorneys and Law Firms**

Billyray Staton, Romulus, NY, Pro Se.

Jennifer Metzger Kimura, Kim S. Murphy, New York State Attorney General's Office, Buffalo, NY, for Defendants Patrick Farrell, Justin Cudzillo.

REPORT AND RECOMMENDATION

MICHAEL J. ROEMER, United States Magistrate Judge

**INTRODUCTION**

**\*1** This case has been referred to the undersigned pursuant to Section 636(b)(1) of Title 28 of the United States Code, for all pretrial matters and for hearing and reporting on dispositive motions for consideration by the District Court. (Dkt. No. 28) Before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 27) For the following reasons, it is recommended that the motion be granted in part and denied in part.

**PROCEDURAL BACKGROUND**

Plaintiff Billyray Staton, an inmate in the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), filed a *pro se* complaint alleging that his Eighth Amendment rights were violated when he was assaulted on March 18, 2018 at Wende Correctional Facility by two other inmates. (Dkt. No. 8) Plaintiff sued Correctional Officer Justin Cudzilo and Correctional Sergeant Patrick Farrell (collectively referred to as "defendants"), alleging that they did not sufficiently protect

him from and during the incident. (*Id.*) Defendants Cudzilo and Farrell filed an answer to the complaint on July 13, 2021. (Dkt. No. 14) The Court issued a Case Management Order and the parties engaged in discovery. (Dkt. No. 16)

On October 3, 2022, defendants filed the instant motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 27) They included a "Notice to *Pro Se* Litigants Regarding Rule 56 Motion For Summary Judgment," as required pursuant to Rule 56(b) of the Local Rules of Civil Procedure for the Western District of New York. (*Id.*) This notice advised plaintiff that failure to respond to defendants' motion for summary judgment could result in his complaint being dismissed without a trial. (*Id.*)

On October 8, 2022, this Court issued a scheduling order requiring plaintiff to file a response to defendants' motion for summary judgment by November 14, 2022. Plaintiff failed to respond. On January 27, 2023, plaintiff filed a motion for the appointment of counsel. (Dkt. No. 29) On June 13, 2023, this Court denied plaintiff's motion to appoint counsel without prejudice, and instructed plaintiff to respond to defendants' motion for summary judgment on or before July 11, 2023. [1] (Dkt. No. 31) Plaintiff again failed to respond to the motion for summary judgment.

[1]     The Order directing plaintiff to respond to the summary judgment motion by July 11, 2023 was sent to Five Points Correctional Facility, the address for plaintiff on file with the Court at that time. On June 20, 2023, the Court received a letter from defense counsel indicating, *inter alia*, that plaintiff had been transferred to Attica Correctional Facility. (Dkt. No. 32) The Court then forwarded a copy of the Order to plaintiff at his new address. (Dkt. No. 33)

On July 25, 2023, this Court issued an order stating that plaintiff had been given two opportunities to respond to defendants' motion for summary judgment and had failed to respond. (Dkt. No. 34) The Court stated it would give plaintiff one final opportunity to respond to defendants' motion, on or before August 14, 2023. (*Id.*) The Court further instructed that "should plaintiff fail to respond, this Court will make a recommendation to the District Court as to the outcome of defendants' motion for summary judgment without a response from plaintiff, which may result in a recommendation that plaintiff's case be dismissed." (*Id.*) As of the date of this Report and Recommendation, plaintiff has not

2023 WL 10354380

filed a response to defendants' motion for summary judgment. In fact, plaintiff has not actively participated in this case in many months, despite repeated outreach by the Court.

## SUMMARY JUDGMENT STANDARD

**\*2**  Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56. The court must "view the evidence in the light most favorable to the party against whom the motion was made and ... draw all reasonable inferences in favor of that party." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). Thus, the court "should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party." *DeJesus v. Malloy*, 531 F. Supp. 3d 650, 657 (W.D.N.Y. 2021), *reconsideration denied*, 582 F. Supp. 3d 82 (W.D.N.Y. 2022).

It is the burden of the party moving for summary judgment to demonstrate the absence of any material facts genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988). Importantly, a court must not "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). Ultimately, "[s]ummary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit ... for the court in considering such a motion 'must disregard all evidence favorable to the moving party that the jury is not required to believe.' " *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015); *quoting Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).

Rule 56 "does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014). The district court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001). If it has not, summary judgment is inappropriate, for "no defense to an insufficient showing is required." *Id.*; *accord Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970). Moreover, "in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district

court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Rather, "the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Jackson*, 766 F.3d at 194. In doing so, "the court may rely on other evidence in the record even if uncited." *Id.*; *citing* Fed. R. Civ. P. 56(c)(3).

## FACTS [2]

[2]     The facts described herein are taken from plaintiff's amended complaint and the documents attached thereto as well as defendants' motion for summary judgment, including defendants' statement of undisputed facts and the accompanying affidavits and exhibits.

At all times relevant to this lawsuit, plaintiff Billyray Staton was an inmate in the care and custody of DOCCS and was incarcerated at Wende Correctional Facility ("Wende"). (Dkt. No. 27-2, ¶ 8; Dkt. No. 8) At all times relevant to this lawsuit, defendant Patrick Farrell was a correctional sergeant employed by DOCCS and working at Wende. (Dkt. No. 27-2, ¶ 9; Dkt. No. 8) At all times relevant to this lawsuit, defendant Justin Cudzilo was a correctional officer employed by DOCCS and working at Wende. (Dkt. No. 27-2, ¶ 10; Dkt. Nos. 8)

**\*3**  On March 18, 2018, at approximately 5:00 p.m., Staton was assaulted in the Wende messhall by two other inmates. (Dkt. No. 27-2, ¶¶ 11-14; Dkt. No. 8, pgs. 5, 7) The two inmates were later identified as "Dunton" and "Valdez." (Dkt. No. 27-2, ¶¶ 13-14) Sergeant Farrell and Officer Cudzilo were present and working in the messhall when the assault occurred. (Dkt. No. 27-2, ¶ 12)

The assault began when Inmate Dunton removed a weapon from his mouth, unsheathed it, and attacked Staton from behind. (Dkt. No 27-2, ¶ 14; Dkt. No. 8, pgs. 5, 7) Staton was seated at the time of the attack and Dunton used the weapon to repeatedly cut and/or slash the right side of Staton's face. (Dkt. No. 8, pg. 5; Dkt. No. 27-4, pg. 5; Dkt. No. 27-5, ¶ 7) Inmate Valdez then joined in the attack on Staton, and a fight ensued between the three inmates. (*Id.*; Dkt. No. 27-3, pg. 4) Officers stationed in the messhall at the time of the incident broke up

Staton v. Farrell, Not Reported in Fed. Supp. (2023)

2023 WL 10354380

the fight. (Dkt. No. 27-2, ¶ 17; Dkt. No. 27-3, pg. 5; Dkt. No. 27-4, ¶ 9; Dkt. No. 27-5, ¶ 8) Staton received lacerations on his face consistent with a "blade type weapon." (Dkt. No. 27-4, pg. 5) After the incident, Staton was asked if he wanted to be placed in voluntary protective custody and he declined. (Dkt. No. 27-4, pgs. 6-7)

During his deposition, Staton testified that, at the time of the March 18, 2018 assault, he lived in the same gallery as Inmate Dunton. (Dkt. No. 27-3, pg. 3) Staton knew Dunton by face but "not necessarily by name" and had little to no interaction with him prior to the assault. (*Id.*) Staton further testified that he did not have any altercations or difficulties with Dunton prior to the incident nor did he have any current that Dunton was going to assault him before the attack occurred. (*Id.* at 12) Staton testified that he did not know Inmate Valdez at all prior to the assault. (*Id.* at 3)

Staton filed a grievance over the assault on March 28, 2018. (Dkt. No. 8, pg. 5) Staton stated that, on March 18, 2018, he was "physically assaulted in the messhall (A-side) which resulted in "3 cuts going across [his] face[.]" (*Id.*) Staton's grievance further stated that "[t]here were officers in the immediate area [who] failed to prevent the assault." (*Id.*) Staton's grievance was denied on April 11, 2018 and Staton filed an appeal on April 17, 2018. (*Id.* at pg. 6) In his amended complaint, Staton generally alleges that Cudzilo and Farrell failed to protect him when they watched two inmates assault him without intervening. (Dkt. No. 8) Staton alleges that Officer Cudzilo observed an inmate remove a weapon from his mouth, unsheathe it, and assault him, while another inmate joined the attack. (*Id.* at pg. 7) Staton further alleges that Sergeant Farrell and Officer Cudzilo "observed both inmates as they attack[ed] me deliberately disregarding their duty to protect inmates." (*Id.*)

Both Officer Cudzilo and Sergeant Farrell submitted affidavits in support of defendants' motion for summary judgment. (Dkt. Nos. 27-4, Dkt. No. 27-5) Cudzilo states that on March 18, 2018, at the time of the assault, he was stationed in A block as a recreational officer. (Dkt. 27-5, ¶ 6) His duties included escorting inmates to and from the messhall as well as observing the inmates during mealtime to ensure that they remained seated and sitting forward. (*Id.*) Farrell states that at the time of the assault, he was stationed near the middle of the messhall, close to the serving line. (Dkt. No. 27-4, ¶ 7) His duties included supervising the inmates and staff. (*Id.*) Prior to the March 18, 2018 incident, neither Cudzilo nor Farrell

could recall having any contact or interactions with Staton. (Dkt. No. 27-4, ¶ 13; Dkt. No. 27-5, ¶ 9)

**\*4** Contrary to the claims made by Staton, Cudzilo and Farrell both aver that they did not witness Dunton remove a weapon from his mouth to attack Staton. (Dkt. No. 27-4, ¶ 11; Dkt. No. 27-5, ¶ 10) Both Cudzilo and Farrell aver that when they did see a fight break out between the three inmates, they responded immediately. (Dkt. No. 27-4, ¶ 9; Dkt. No. 27-5, ¶ 8) Cudzilo issued several verbal direct orders to the inmates to cease fighting, which they eventually did. (Dkt. No. 27-5, ¶ 8) Cudzilo had his baton out but did not use it or otherwise administer force. (*Id.*) Cudzilo and Farrell both aver that it "appears from [their] recollections and from viewing the surveillance video that the fight was broken up in approximately less than (30) seconds." (Dkt. No. 27-4, ¶ 10; Dkt. No. 27-5, ¶¶ 6, 8)

A surveillance video depicting the March 18, 2018 assault was admitted as an exhibit during Staton's deposition. (Dkt. No. 27-3, pgs. 5-8) Staton was shown the video during his deposition. (*Id.*) Both Officer Cudzilo and Sergeant Farrell indicate that they viewed the surveillance video prior to the submissions of their affidavits and both refer to the contents of the video in their affidavits. (Dkt. No. 27-4, ¶ 6; Dkt. No. 27-5, ¶ 5) Plaintiff and defendants all agree that the video represents a true and accurate description of the incident on March 18, 2018. (Dkt. No. 27-4, ¶ 6; Dkt. No. 27-5, ¶ 5; Dkt. No. 27-3, pg. 6) Despite all this, defendants have not submitted the surveillance video as part of the record evidence in support of their motion. Thus, the Court has had no occasion to view the surveillance video which apparently depicts the incident which is the main subject of this lawsuit.

During his deposition, Staton testified that he never heard officers give verbal commands to him, Dunton, and Valdez to stop fighting. (Dkt. No. 27-3, pg. 4) Staton testified that the assault ended "eventually [when] a few officers physically intervened." (*Id.* at pgs. 4-5) Contrary to Cudzilo and Farrell, who indicated that the fight was broken up "within 30 seconds," Staton testified that approximately a minute and half to two minutes elapsed between the time he was attacked by Dunton and when officers intervened to stop the assault. [3] (*Id.*) Staton testified that Cudzilo "observed an inmate unwrap, unsheathe a weapon, and assault me, and observed another inmate join into the assault before he reacted." (*Id.* at 10) Staton further stated that Farrell should not have been positioned on the side of the messhall when

"there's somebody with a weapon in their mouth and pulling it out in front of officers." (*Id.* at pg. 9)

3    Defense counsel questioned Staton regarding the contents of the surveillance video during his deposition. (Dkt. No. 27-3, pgs. 6-8) In discussing the video, defense counsel states that "we can't see the fight" but notes that the video does portray "the officers that are responding to the incident." (*Id.* at pg. 7) Staton goes on to identify both Cudzilo and Farrell as present in the video. (*Id.*) In the portions of the deposition transcript submitted by defendants in support of their motion, there is no discussion of any time stamps that would give an indication as to how much time elapsed between when the assault began and when officers broke it up.

Also during his deposition, Staton testified that he spoke with Lieutenant Fisher about concerns he had for his safety following an incident on March 5.[4] (Dkt. No. 27-3, pgs. 13-14) Staton testified that his conversation with Fisher was brief and that he "didn't tell [Fisher] what the incident was because [he] didn't know." (*Id.* at 13) Lieutenant Fisher asked Staton if, due to his safety concerns, he wanted to be placed in protective custody, and Staton declined. (*Id.*)

4    Staton did not provide the year of the March 5 incident and defense counsel did not ask Staton what year he was referring to. The Court presumes that plaintiff was referring to an incident on March 5, 2018, approximately 13 days before the March 18, 2018 assault. Also, the portions of the deposition transcript submitted by defendants do not include a description or explanation as what occurred on March 5, 2018 that caused plaintiff to fear for his safety.

## DISCUSSION

### *Failure to Protect*

**\*5** "The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996); *citing Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "Prison officials [thus] have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 ("Being violently

assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.") (internal quotation marks omitted). However, "not ... every injury suffered by one prisoner at the hands of another" warrants imposition of constitutional liability pursuant to 42 U.S.C. § 1983. *Id.* Liability for such an injury is imposed only when the prison officials' actions or omissions demonstrate "deliberate indifference" to the safety of the inmates in their custody, "mere negligence will not suffice." *Hayes*, 84 F.3d at 620.

Where a claim is based on an alleged failure to protect a prisoner against an attack by a fellow inmate, the test for deliberate indifference requires a plaintiff to demonstrate that: (1) he is "incarcerated under conditions posing a substantial risk of serious harm"; and (2) the "defendant prison officials possessed sufficient culpable intent." *Id.* at 620; *accord Farmer*, 114 S. Ct. at 1977. A prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm, and he disregards that risk by failing to take reasonable measures to abate the harm. *Id.*; *see Farmer*, 511 U.S. at 837 (explaining that this state of mind is "more blameworthy than negligence" and is "equivalent to criminal recklessness").

To the extent that Staton is asserting a § 1983 claim based on defendants' alleged failure to protect him from the March 18, 2018 assault, his claim fails as a matter of law. As explained below, even assuming that the March 18, 2018 assault placed Staton at substantial risk of serious harm, no reasonable jury could find, based on the record before the Court, that either Farrell or Cudzilo were aware that Staton faced serious risk of harm and disregarded that risk.

There is no evidence in the record that Staton was involved in a prior altercation with Dunton or Valdez. Likewise, there is no evidence in the record that Dunton or Valdez previously threatened Staton. In fact, Staton testified that he had little to no interaction with Dunton prior to the assault. Staton also testified that he had no reason to believe, prior to the assault, that Dunton intended to attack him or to otherwise cause him harm. Similarly, Staton testified he did not know Valdez at all prior to the March 18, 2018 incident. Moreover, there is no evidence in the record that Staton told any officers at Wende, including Farrell or Cudzilo, that he might be attacked by Valdez or Dunton or that he was otherwise fearful of them. Thus, the undisputed evidence shows that there was no reason for defendants to be on notice that there was any risk of an altercation between Staton, Valdez, and Dunton.

2023 WL 10354380

Absent clear notice of a risk of harm by way of (1) prior altercations between plaintiff and his attacker; (2) prior threats made against plaintiff by his attacker or; (3) some other reason for prison officials to be on notice of a risk of an altercation between plaintiff and his attacker, courts routinely deny deliberate indifference claims, like this one, that are based upon surprise attacks. *Fernandez v. New York Dep't Corr. Servs.*, 08 CV 4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010). *See also Harris v. Poole*, 03 CV 861, 2006 U.S. Dist. LEXIS 83287 (W.D.N.Y. Nov. 15, 2006) (Plaintiff did not allege previous history of confrontation with his attacker and therefore did not demonstrate a factual question as to whether defendants knew of and disregarded an excessive risk to plaintiff's health or safety.); *King v. Dep't of Corr.*, 95 Civ. 3057, 1998 U.S. Dist. LEXIS 1825 (S.D.N.Y. Feb. 18, 1998) (failure to protect inmate from isolated attack did not sustain § 1983 claim; *Rosario v. Nolan*, 16-CV-0228, 2021 U.S. Dist. LEXIS 56039 (W.D.N.Y. Mar. 22, 2021) (where plaintiff testified that, prior to the attack, he had no problems with his attacker and did not feel the need to complain to anyone about him ... no reasonable officer could have drawn an inference that plaintiff may have been in danger).

**\*6** Staton's deposition testimony seems to indicate that he spoke with Lieutenant Fisher about concerns he had for his safety following an incident on March 5, 2018. But Staton admits that he did not provide Fisher with any details about the March 5 incident. Moreover, the record is devoid of evidence that Staton identified Dunton and Valdez as the sources of his concern. In fact, the undisputed facts indicate that Staton's conversation with Fisher would not have involved either of these inmates. Staton testified that he had little to no interaction with Dunton and Valdez before the March 18, 2018 assault and, even more significantly, that he had no prior indication that they planned to harm him. "An official demonstrates deliberate indifference when he has actual or constructive notice of a specific risk and fails to take steps to protect the inmate from injury." *Arroyo v. Coughlin*, 92-CV-0426, 1993 U.S. Dist. LEXIS 5091 (W.D.N.Y. April 8, 1993); *Meriweather v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989). Thus, Staton's "general, conclusory statement that [he] fear[ed] for his safety, without more, [was] insufficient information from which an inference [could] be drawn that [his] safety [was] actually at risk." *Wilson v. Campbell*, 9:06-CV-175, 2008 U.S. Dist. LEXIS 124326 (N.D.N.Y. Feb. 11, 2008).

Also, Staton testified that in response to his concerns about the incident on March 5, 2018, Lieutenant Fisher offered to place Staton in protective custody, which Staton declined. Thus, it cannot be concluded, based on the undisputed facts in the record, that Fisher, or any other Wende officers for that matter, were deliberately indifferent to Staton's safety concerns. *See e.g., Wood v. Skinner*, 98-CV-0146, 2000 U.S. Dist. LEXIS 12387 (W.D.N.Y. Aug. 23, 2000) ("Moreover, the fact that plaintiff had previously refused to enter 'protective custody' undermines any inference that defendants have been -- and continue to be -- indifferent to plaintiff's health and safety.... If anything, such refusal is indicative of plaintiff's own indifference to his own health and safety."); *Simmons v. Artuz*, 94 Civ. 6777, 1996 U.S. Dist. LEXIS 6061 (S.D.N.Y. May 7, 1996) ("It is undisputed that plaintiff was interviewed by a Sergeant after the first attack and that the plaintiff refused protective custody status. Thus, plaintiff has failed to show that defendants had the requisite knowledge and culpable state of mind prior to these two attacks to establish a violation under Section 1983.").

Finally, the record reflects that the conversation regarding Staton's concerns for his safety following an incident on March 5, 2018 occurred between Staton and Lieutenant Fisher. There is no evidence in the record that Farrell or Cudzilo were either present for this conversation or that they were later made aware of the discussion. Thus, after considering all of the record evidence in a light most favorable to Staton, no reasonable jury could conclude that Farrell or Cudzilo were "aware of facts from which the inference could be drawn that a substantial risk of serious harm [to Staton] existed [and] that [they drew] that inference." *Farmer*, 511 U.S. at 825. *See e.g., Parris v. New York Dep't Corr. Servs.*, 947 F. Supp. 2d 354 (S.D.N.Y. May 23, 2013) ("Because the plaintiff has alleged no facts suggesting that any of the defendants knew of a particular risk to the plaintiff's safety, the plaintiff has failed to state a claim that any of the defendants was deliberately indifferent in failing to protect him from the surprise attack."); *Wilson*, 2008 U.S. Dist. LEXIS 124326 (recommending that defendants' motion for summary judgment be granted as to plaintiff's failure to protect claim where "[t]here [was] no evidence on the record that either named [d]efendant was warned that plaintiff's safety would be in danger should he be released from SHU."). [5]

5      A plaintiff may also state a claim for deliberate indifference based on a failure to protect him against a general risk of harm to all inmates at

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 420 of 830
Staton v. Farrell, Not Reported in Fed. Supp. (2023)
2023 WL 10354380

the facility. To do so, a plaintiff must allege that the defendants knew of a history of prior inmate-on-inmate attacks similar to the one he suffered and that the measures defendants should have taken in response to such prior attacks would have prevented the attack on plaintiff. *See Coronado v. Goord*, 99 Civ. 1674, 2000 U.S. Dist. LEXIS 13876, (S.D.N.Y. Sept. 25, 2000). Here, the record is devoid of any evidence to suggest (1) a history of serious inmate-on-inmate assaults in the messhall or at Wende in general; (2) that defendants knew of any such history; or (3) that such prior assaults were similar enough to the attack suffered by Staton that remedial actions would have prevented that attack. Therefore, no reasonable jury could conclude that defendants were deliberately indifferent in failing to protect Staton against a general risk of harm. *Parris*, 947 F. Supp.2d at 363-64.

**\*7** For these reasons, it is recommended that defendants' motion for summary judgment be granted with respect to plaintiff's failure to protect claim.

### *Failure to Intervene*

"An Eighth Amendment claim that officers failed to protect an inmate from an attack by a fellow inmate is 'quite different' from the claim that an officer stood by and permitted the attack to continue." *Smith v. Huggler*, 9:20-CV-1435, 2022 U.S. Dist. LEXIS 214750 (N.D.N.Y. Nov. 29, 2022); *accord Davidson v. Cannon*, 474 U.S. 344, 348 (1986). Indeed, an officer's failure to intervene when an inmate is attacked can constitute a violation of the inmate's rights under the Eighth Amendment. *Davidson*, 474 U.S. at 348.

To establish liability on the part of a defendant under a failure to intervene theory, a plaintiff must establish that (1) the officer observed or had reason to know that plaintiff was involved in a physical altercation with another inmate; (2) the officer had reasonable opportunity to intervene; (3) the officer failed to intervene; and (4) the officer's failure to intervene was the proximate cause of injuries sustained by the plaintiff. *Rosen*, 667 F. Supp. 2d at 355; *accord Williams v. Russo*, 01-CV-6401, 2009 U.S. Dist. LEXIS 5086 (W.D.N.Y. Jan. 26, 2009). Stated another way, a correction officer can be held liable for failure to intervene in an attack on an inmate if the officer "displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *Rosen*, 667 F. Supp. at 360.

Here, it is undisputed that, on March 18, 2018, in the Wende messhall, Dunton removed a weapon from his mouth, unsheathed it, and attacked Staton by cutting and slashing at his face. It is undisputed that Valdez joined in the attack on Staton and that a fight ensued between the three inmates. It is undisputed that Cudzilo and Farrell were present when the assault occurred. The parties also agree that the fight between the three inmates was stopped, at some point, by officers. It is further undisputed that Staton received lacerations to the right side of his face as a result of the assault.

The remainder of the material facts surrounding the March 18, 2018 assault are in dispute. Both Cudzilo and Farrell claim that they did not see Dunton remove a weapon and attack Staton, and that they only became aware of the incident after a fight had ensued between all three inmates. Cudzilo and Farrell further claim that as soon as they observed the fight, they ran over to assist in breaking it up. Conversely, Staton claims that both Farrell and Cudzilo saw Dunton remove the weapon from his mouth and attack him, and that they also witnessed Valdez join in the assault. Staton maintains that despite seeing this occur, defendants failed to intervene and stop the attack. Cudzilo maintains that the inmates stopped fighting after he issued several verbal orders to them. On the other hand, Staton testified that he never heard Cudzilo issue verbal orders to stop fighting and that the fight ended when "officers eventually physically intervened." Cudzilo and Farrell submit that "the inmate-on-inmate assault was broken up within thirty seconds." However, Staton testified that it took officers between a minute and a half and two minutes to intervene and break up the altercation between him, Dunton, and Valdez.

**\*8** In light of these competing narratives by plaintiff and defendants, a genuine issue of material fact exists as to whether Farrell and Cudzilo had a reasonable opportunity to intervene and prevent the harm suffered by Staton, yet failed to do so. *See Rosen*, 667 F. Supp. 2d at 360 (summary judgment denied as to prisoner's failure to intervene claim where there were questions of fact as to whether officer was in a position to view the fight between inmates, how long the officer may have been watching the fight, and whether the officer had a reasonable opportunity to intervene, giving due consideration to his own safety); *Blake v. Saxton*, 12 Civ. 7245, 2016 U.S. Dist. LEXIS 38798 (S.D.N.Y. Mar. 24, 2016) (summary judgment denied as to prisoner's claim that officer failed to intervene when he was attacked by another inmate because "the reasonableness of Defendant's

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 421 of 830
Staton v. Farrell, Not Reported in Fed. Supp. (2023)
2023 WL 10354380

response turns squarely on when Defendant actually learned of the altercation, a fact clearly in dispute."). Considering plaintiff's testimony that (1) defendants did not act after seeing Dunton remove a knife from his mouth and slash plaintiff while another inmate joined in the attack, and (2) that it took officers almost two minutes to respond to the assault, a reasonable jury could conclude, should they believe plaintiff, that defendants had adequate time to assess the threat to Staton and a reasonable opportunity to intervene, but did not do so.

Defendants claim that a surveillance video confirms that the altercation was broken up with thirty seconds, but they have not submitted the video as evidence in support of their motion. Thus, the Court is left only with plaintiff's version of events on the one hand and defendants' competing version on the other. It is well-settled that a district court may not make credibility determinations on a motion for summary judgment. *See Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (internal quotations omitted).

Further, even assuming that the assault was broken up with thirty seconds of when it commenced, this fact alone does not require summary judgment in favor of defendants. *See Smith*, 2022 U.S. Dist. LEXIS 214750 (denying summary judgment as to inmate's claim that defendant officers failed to intervene in an attack by another inmate where defendants maintained that the incident lasted fifteen seconds and they immediately approached the inmates and directed them to stop fighting, and plaintiff claimed that the attacked lasted one minute and he saw defendants standing twenty feet away and "watching the entire incident."); *Mason v. Moore*, 9:17-CV-1086, 2020 WL 555943, at *5 (N.D.N.Y. Jan. 13, 2020) (rejecting the defendants' argument that there was no opportunity to intercede where the incident lasted only fifteen to twenty seconds when the plaintiff, while in the defendants' "full view," was "punched and kicked multiple times[ ]"); *Figueroa v. Mazza*, 825 F.3d 89 (2d Cir. 2016) ("even assuming that the assault lasted less than twenty seconds," the court could not hold "that the assault occurred so quickly that the officers ... lacked time to intercede as a matter of law.").

The Court rejects defendants' argument that summary judgment is appropriate here because defendants were confronted with three inmates fighting with a weapon and "thus it was reasonable to immediately call for assistance

and [verbally] direct the inmates to break it up." (Dkt. No. 27-1, pg. 22) Defendants seem to claim that any delay in responding, or their decision not to physically intervene in the altercation, was due to the presence of the weapon and the need to wait for assistance from other officers. However, the evidence in the record does not support this version of events. Both Cudzilo and Farrell state, in their affidavits, that they did not see Dunton remove a weapon from his mouth. Further, neither Cudzilo nor Farrell indicate, in their affidavits, that they called for back-up because they believed the situation too dangerous to intervene without assistance. To the contrary, both defendants claim that as soon as they became aware of the altercation, they acted promptly to stop it. Plaintiff claims the opposite. [6]

[6]    Inmate Misbehavior Reports filed after the March 18, 2018 assault indicate that additional staff or officers arrived at some point during the incident. (Dkt. No. 27-4, pg. 5; Dkt. No. 27-5, pg. 5) However, these reports do not state that either Cudzilo or Farrell called these officers for assistance. (*Id.*) Moreover, neither Cudzilo nor Farrell's affidavits indicate that they called for back-up before responding to the incident or that they delayed responding because they needed assistance and/or feared for their own safety. (Dkt. No. 27-4; Dkt. No. 27-5) Instead, both defendants aver that they responded immediately as soon as they became aware of the altercation. (Dkt. No. 27-4, ¶ 9; Dkt. No. 27-5, ¶ 8)

**\*9** It may be that defendants' actions on March 18, 2018 were objectively reasonable, in light of all the circumstances presented, including concerns for their own safety and the safety of other prisoners. However, too many questions of fact exist as to what actually occurred on March 18, 2018 to make such a determination at this stage. Indeed, upon viewing all of the record evidence in a light most favorable to plaintiff and after drawing all reasonable inferences in plaintiff's favor, questions of fact exist as to whether defendants had adequate time to assess the threat against Staton and a fair opportunity to protect him without risk to themselves, but still failed to intervene in the assault. *See Harris v. Westchester Cty. Dep't of Corr.*, 17-CV-839, 2019 U.S. Dist. LEXIS 178392 (S.D.N.Y. Sept. 23, 2019) ("Whether Defendants had a reasonable opportunity to intervene, and whether calling a Code 1 and verbally telling the inmates to stop fighting was a reasonable response, are material questions of fact for a jury, not this Court."); *Pearson v. Correction Officer Principe*, 97 Civ.

Staton v. Farrell, Not Reported in Fed. Supp. (2023)

2023 WL 10354380

3746, 1999 U.S. Dist. LEXIS 1294 (S.D.N.Y. Feb. 9, 1999) ("Perhaps, [the officer] can offer a plausible explanation for the failure to intervene in a timely fashion, assuming that the plaintiff's version of events is accurate. But, the plausibility of any explanation is an issue of fact for the jury.").

Accordingly, it is recommended that defendants' motion for summary judgment be denied with respect to plaintiff's failure to intervene claim.

### *Qualified Immunity*

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages under federal claims insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Ayers v. Ryan*, 152 F.3d 77, 82 (2d Cir. 1998). A government official is entitled to qualified immunity when "(1) [p]laintiff fails to allege a violation of a federal right; (2) the right alleged was not clearly established at the time of the alleged violation; or (3) the [d]efendant's actions were objectively reasonable in light of the legal rules that were clearly established at the time it was taken." *Burns v. Citarella*, 443 F. Supp. 2d 464, 469 (S.D.N.Y. 2006); *citing Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211-12 (2d Cir. 2003). "Correction officers have a clearly established duty to protect prisoners from violence at the hands of other prisoners." *Dennis v. Westchester Cty. Jail Corr. Dep't*, 485 Fed. App'x 478, 481 (2d Cir. 2012); *accord Farmer*, 511 U.S. at 833.

Defendants contend that they are entitled to qualified immunity because their actions on March 18, 2018 were objectively reasonable based upon all of the circumstances presented to them. Dismissal on the basis of a qualified immunity defense is not appropriate, however, where there are facts in dispute that are material to a determination of reasonableness. *See Thomas v. Roach*, 165 F.3d 137, 143-45 (2d Cir. 1999); *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995).

As discussed above, there are too many unresolved factual disputes for the Court to determine that Cudzilo and Farrell's actions in response to the March 18, 2018 assault of Staton were objectively reasonable. *See Smith*, 2022 U.S. Dist. LEXIS 214750, *21 ("Because a reasonable jury could conceivably accept Plaintiff's claim that Defendant's conduct was objectively unreasonable, Defendants are not entitled to qualified immunity for alleged Eighth Amendment

violations."); *Villante v. Vandyke*, 904 Civ. 759, 2008 U.S. Dist. LEXIS 3408 (N.D.N.Y. Jan. 15, 2008) ("Since [p]laintiff has raised an issue of fact about whether [d]efendants stood by and allowed other inmates to attack him ... [d]efendants are not entitled to qualified immunity").

Therefore, the Court declines to grant defendants qualified immunity at this stage.

### CONCLUSION

For the foregoing reasons, it is recommended that defendants' motion for summary judgment be granted in part and denied in part. (Dkt. No. 27) Specifically, it is recommended that plaintiff's failure to protect claim be dismissed but that plaintiff's failure to intervene claim be permitted to proceed.

**\*10** Pursuant to 28 U.S.C. § 636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Vilardo.

*Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURTS ORDER. See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."* **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 10354380

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1051986
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Billyray STATON, Plaintiff,
v.
Stewart ECKERT, et al., Defendants.

20-CV-1120-LJV-MJR
|
Signed March 11, 2024

**Attorneys and Law Firms**

Billyray Staton, Romulus, NY, Pro Se.

Jennifer Metzger Kimura, Kim S. Murphy, New York State Attorney General's Office, Buffalo, NY, for Defendants Patrick Farrell, Justin Cudzillo.

DECISION & ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT JUDGE

**\*1** On August 21, 2020, the *pro se* plaintiff, Billyray Staton, commenced this action under 42 U.S.C. § 1983. Docket Item 1. On October 3, 2022, defendants Justin Cudzilo and Patrick Farrell moved for summary judgment, Docket Item 27, and three days later, the case was referred to United States Magistrate Judge Michael J. Roemer for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B), Docket Item 28. After Staton did not respond and his time to do so expired, [1] *see* Docket Item 34, Judge Roemer issued a Report and Recommendation ("R&R") finding that the defendants' motion should be granted in part and denied in part, Docket Item 35.

[1]     Judge Roemer gave Staton several opportunities to respond and explicitly warned him that if he did not respond by August 14, 2023, Judge Roemer would "make a recommendation to the District Court ... without a response from [the] plaintiff, which may result in a recommendation that [the] plaintiff's case be dismissed." *See* Docket Item 35 at 2-3; *see also* Docket Items 31 and 34.

The defendants then moved to supplement the record with a video of the underlying assault. Docket Item 36. Staton was given an opportunity to respond to that motion, but he never did. *See* Docket Items 39 and 40. After this Court granted the unopposed motion to supplement, Docket Item 40, the defendants objected to the R&R on the ground that Judge Roemer should have recommended granting their motion for summary judgment in full, Docket Item 41. Staton did not respond even after this Court gave him a second opportunity to do so and directed him to show cause why the Court should not rule on the objections without his response. *See* Docket Items 42 and 43. His time to respond now has passed. [2] See Docket Item 43.

[2]     In fact, Staton apparently has been absent from this litigation for about a year. *See* Docket Item 30 (notice of change of address filed by Staton on March 10, 2024).

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). But neither 28 U.S.C. § 636 nor Federal Rule of Civil Procedure 72 requires a district court to review the recommendation of a magistrate judge to which no objections are raised. *See Thomas v. Arn*, 474 U.S. 140, 149-50 (1985).

This Court has carefully and thoroughly reviewed the R&R, the record in this case, the objections, and the materials submitted to Judge Roemer. Based on that review, the Court accepts and adopts Judge Roemer's recommendation to grant in part the defendants' motion for summary judgment. And based on the video that Judge Roemer did not have the opportunity to review, the Court grants the remainder of the defendants' motion as well.

**LEGAL PRINCIPLES**

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). Even if a motion for summary judgment is unopposed, the district court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no

2024 WL 1051986

material issue of fact remains for trial." *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001); *see Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014).

## DISCUSSION

**\*2** The Court assumes the reader's familiarity with the facts alleged in the amended complaint, *see* Docket Item 8, and Judge Roemer's recitation of the facts and his analysis in the R&R, *see* Docket Item 35.

## I. FAILURE TO PROTECT

Judge Roemer concluded that Staton's failure to protect claim "fails as a matter of law" because "no reasonable jury could find ... that either Farrell or Cudzilo were aware [before the assault] that Staton faced serious risk of harm and disregarded that risk," as is required to succeed on such a claim. Docket Item 35 at 9-14. He therefore recommended that Staton's failure to protect claim be dismissed. *Id.* The parties did not object to that recommendation. *See* Docket Items 36, 41, and 43.

Although not required to review that recommendation in the absence of any objection, *see Thomas*, 474 U.S. at 149-50, this Court nevertheless has reviewed Judge Roemer's R&R as well as the parties' submissions to him. Based on that review and the absence of any objections, the Court accepts and adopts Judge Roemer's recommendation to grant the defendants' motion for summary judgment as to Staton's failure to protect claim.

## II. FAILURE TO INTERVENE

A plaintiff asserting a claim against a corrections officer for failing to intervene in an assault by another inmate must show "(1) that [the defendant] observed or had reason to know that the [p]laintiff was involved in a physical altercation with another inmate; (2) that [the defendant] had a reasonable opportunity to intervene to prevent the attack from continuing ...; (3) that in failing to intervene[, the defendant was] deliberately indifferent to a substantial risk of harm to [the p]laintiff; and (4) that [the defendant's] deliberate indifference to a substantial risk of harm ... caused [the p]laintiff some harm." *Rosen v. City of New York*, 667 F. Supp. 2d 355, 360 (S.D.N.Y. 2009) (quoting *Williams v. Russo*, 2009 WL 185758, at \*4 (W.D.N.Y. Jan. 26, 2009)).

Judge Roemer recommended that the defendants' motion for summary judgment be denied as to Staton's failure to intervene claim because some of "the material facts surrounding the March 18, 2018[,] assault are in dispute." Docket Item 35 at 14-19. He based that recommendation on the different stories told by Staton and the defendants about what occurred. As Judge Roemer correctly noted, the defendants say "that they did not see Dunton"—one of the inmates who assaulted Staton—"remove a weapon and attack Staton"; "that they only became aware of the incident after a fight had ensued"; and that "as soon as they observed the fight, they ran over to assist in breaking it up." *Id.* at 15. And as Judge Roemer also correctly noted, Staton "claims that both Farrell and Cudzilo saw Dunton remove the weapon from his mouth and attack" Staton; that they "witnessed Valdez," another inmate, "join in the assault"; and that "despite seeing this occur, [the] defendants failed to intervene and stop the attack." [3] *Id.* Moreover, Judge Roemer noted that the defendants say that the "assault was broken up within thirty seconds," while Staton "testified that it took officers between a minute and a half and two minutes to intervene and break up the altercation." *Id.* at 15-16.

[3]   Judge Roemer also noted that "Cudzilo maintains that the inmates stopped fighting after he issued several verbal orders to them," while Staton "testified that he never heard Cudzilo issue verbal orders to stop fighting and that the fight ended when officers eventually physically intervened." Docket Item 35 at 15 (internal quotation marks omitted).

**\*3** Judge Roemer found that "[i]n light of these competing narratives ..., a genuine issue of material fact exists as to whether Farrell and Cudzilo had a reasonable opportunity to intervene and prevent the harm suffered by Staton, yet failed to do so." *Id.* at 16. But he also noted that while the defendants "claim that a surveillance video confirms that the altercation was broken up with[in] thirty seconds," they "[did] not submit[ ] the video as evidence." *Id.* All that was correct both as a matter of law and based on the record before Judge Roemer.

After moving for leave to supplement the record, Docket Item 36, however, the defendants submitted the video referenced in their motion for summary judgment, Docket Item 37. Staton had viewed that video, *see* Docket Item 36-2 at 4-5, and he was given an opportunity to object to its submission, *see*

2024 WL 1051986

Docket Item 39, which he failed to do, *see* Docket Item 40. And that video confirms the defendants' version of events.

The video, which is time-stamped March 18, 2018, and begins at 5:03:24 p.m., shows a large group of inmates eating. At approximately the 5:04:05 mark, one inmate—Dunton —stands up, and at the 5:04:07 mark, he attacks Staton. By the 5:04:09 mark, the two inmates are fighting on the ground. Less than ten seconds later—by the 5:04:15 mark— multiple officers walk over to break up the altercation. And by the 5:04:30 mark—about 25 seconds after Dunton left his seat and 23 seconds after the attack began—the fighting has stopped and the inmates have been separated.

Although most of the altercation itself is not visible in the video, there is no doubt that officers broke up the fight in less than thirty seconds, as the defendants say.

In light of the video—which Judge Roemer did not have the benefit of viewing—no reasonable juror could find that the defendants failed to intervene and exhibited deliberate indifference. [4] On the contrary, the defendants and other officers responded immediately and successfully. The defendants therefore are entitled to summary judgment on Staton's failure to intervene claim.

[4]    While this Court could have referred the defendants' motion for summary judgment back to Judge Roemer for consideration of the video, as a matter of efficiency, the Court considers the video as part of its *de novo* review of Staton's failure to intervene claim. *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir. 1998) (finding that for purposes of *de novo* review of magistrate judge's report and recommendation, "the district court had discretion to consider evidence that had not been submitted

to the [m]agistrate [j]udge"); *see also* 28 U.S.C. § 636(b)(1)(C) (after a magistrate judge "file[s] his proposed findings and recommendations," the district judge may "receive further evidence or recommit the matter to the magistrate judge"); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may ... receive further evidence ....").

## CONCLUSION

For the reasons stated above and in the R&R, the defendants' motion for summary judgment, Docket Item 27, is GRANTED. The Clerk of the Court shall close the file.

The Court hereby certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore denies leave to appeal as a poor person. *Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

Staton must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within 30 days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with the United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**\*4**  SO ORDERED.

## All Citations

Slip Copy, 2024 WL 1051986

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 654414
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jose BERMUDEZ, Plaintiff,
v.
C.O. WAUGH, Defendant.

Civil Action No. 9:11–CV–0947 (MAD/DEP).
|
Jan. 29, 2013.

**Attorneys and Law Firms**

Jose Bermudez, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Douglas J. Goglia, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** This action was commenced by *pro se* plaintiff Jose Bermudez, a New York State prison inmate, by the filing of a petition that has been construed by the court as asserting a civil rights claim pursuant to 42 U.S.C. § 1983. Liberally interpreted, that petition alleges that defendant Waugh, a corrections officer employed at the prison facility in which plaintiff was confined at the relevant times, assaulted Bermudez after he refused to comply with an order that he was allegedly exempt from obeying. [1]

[1]      District Judge Mae A. D'Agostino construed plaintiff's petition as also asserting a claim against another corrections officer, defendant Meineke, whose only alleged role in the events giving rise to this action was to serve Bermudez with a misbehavior report that resulted from the incident. Dkt. No. 7 at 7. Plaintiff's claim against defendant Meineke, however, was dismissed, *sua sponte*, on November 1, 2011, based on Judge D'Agostino's initial review of plaintiff's claims pursuant to 28 U.S.C. §§ 1915(e) and 1915A(b). *Id.* at 7–8.

Currently pending before the court is defendant Waugh's motion for summary judgment seeking dismissal of the excessive force claim asserted against him. In support of that motion, defendant argues that the amount of force applied, even by plaintiff's account, was constitutionally insignificant and does not support an Eighth Amendment cruel and unusual punishment claim. Plaintiff has not opposed defendant's motion. For the reasons set forth below, I recommend that the defendant's motion be granted.

I. *BACKGROUND*

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Def.'s Local Rule 7.1 Statement (Dkt. No. 24, Attach.2) at ¶ 1. [2] At all the times relevant, plaintiff was confined at the Eastern Correctional Facility ("Eastern"), located in Napanoch, New York. *Id.*

[2]      Because plaintiff has not opposed defendant's summary judgment motion, the facts set forth in defendant's statement of material facts, submitted pursuant to Northern District of New York Local Rule 7.1(a)(3), are deemed admitted by plaintiff for purposes of the pending motion. *See* N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."); *see also* Ketchuck v. Boyer, 2011 WL 5080404, at *2 (N.D.N.Y. Oct. 25, 2011) (McAvoy, J.) ("The responding Statement of Material Facts is not a mere formality, and the courts apply this ruly strictly." (listing cases)).

On the morning of May 4, 2011, Bermudez was informed that he was being relocated from his cell in Eastern's west wing to another housing unit within the facility. Def.'s Local Rule 7.1 Statement (Dkt. No. 24, Attach.2) at ¶ 3. In response, plaintiff prepared for the move by packing his personal property and proceeding to the ground floor of Eastern. *Id.* at ¶¶ 4–5.

When defendant Waugh, a corrections officer at Eastern, arrived at the ground floor, a dispute arose concerning the extent of plaintiff's personal property. Def.'s Local Rule 7.1 Statement (Dkt. No. 24, Attach.2) at ¶ 6. Specifically, defendant Waugh accused plaintiff of having excessive property, and ordered plaintiff several times to take his property bags to the basement for inspection and inventorying. *Id.* at ¶¶ 7–13. Plaintiff refused each of those orders, claiming that, because he was medically exempt

from lifting anything in excess of twenty pounds, he could not comply with defendant Waugh's directives. *Id.* at ¶ 14. Instead, plaintiff sat down in a chair, explicitly stated that he was refusing to comply with the orders, and demanded that the sergeant on duty be contacted. *Id.* at ¶ 15.

After another corrections officer approached the area and indicated that he needed to use the cart on which plaintiff's personal property was situated, defendant Waugh again ordered plaintiff to remove a bag of property from the cart. Def.'s Local Rule 7.1 Statement (Dkt. No. 24, Attach.2) at ¶¶ 20–21. After plaintiff complied, defendant directed him to carry the rest of his bags. *Id.* at ¶ 23. Plaintiff again refused to comply with this order, and defendant Waugh "charged [him] like a football player ... leaned down a little bit, ran towards [him,] ... pushed his weight against [his] body" and either hit or punched plaintiff in the chest. Plf.'s Dep. Tr. (Dkt. No. 24, Attach.4) at 19; *see also* Def.'s Local Rule 7.1 Statement (Dkt. No. 24, Attach.2) at ¶ 26. Immediately following the encounter, which lasted only "seconds," plaintiff was transported to the facility's special housing unit ("SHU"). *Id.* at ¶¶ 27, 31. Approximately one hour later, Bermudez was taken to the prison infirmary, where his injuries were examined by facility medical staff and photographed. Def.'s Local Rule 7.1 Statement (Dkt. No. 24, Attach.2) at ¶ 32. Medical records from that examination reflect that plaintiff's injuries for the alleged assault included only a "dime-size" abrasion in an "I" pattern on his chest, some redness and edema, and a bruise on the right side of his chest. Def.'s Local Rule 7.1 Statement (Dkt. No. 24, Attach.2) at ¶ 33. Those observations are consistent with Bermudez's deposition testimony, in which he agreed that the entirety of his injuries as a result of defendant Waugh's alleged assault included a "red mark" or "red bruise" on his chest. Plf.'s Dep. Tr. (Dkt. No. 24, Attach.4) at 33–36.

**\*2** Following the incident, plaintiff's property was inspected revealing an altered hot pot, considered contraband under prison rules. *Id.* at ¶¶ 29, 30. Plaintiff was subsequently issued a misbehavior report for possessing contraband, creating a disturbance, refusing to obey a direct order, and engaging in verbal harassment. *Id.* at ¶ 30; *see also* Disciplinary Incident Summary (Dkt. No. 24, Attach.7) at 2–3. On May 16, 2011, a Tier III hearing was held on the charges, and plaintiff was found guilty on all counts. [3] *Id.*

[3]     The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653,

655 n. 1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n. 1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action in the Southern District of New York through the filing of a "Petition Pursuant to Civil Service Law," dated May 9, 2011. Dkt. No. 1. In that petition, plaintiff requests that the court initiate proceedings against defendants Waugh and Meineke pursuant to, *inter alia,* N.Y. Civil Service Law § 75. *See generally id.* Following a review of that petition, the matter was transferred to this district by order of Chief District Judge Loretta A. Presca issued on August 5, 2011, based on the fact that the events giving rise to plaintiff's claims arose in this district. Dkt. No. 5.

Upon transfer of the matter to this district, Judge D'Agostino conducted an initial review of plaintiff's petition and accompanying *in forma pauperis* ("IFP") application, concluding that plaintiff qualifies for IFP status, and that his petition, liberally construed, sets forth an excessive force claim against defendant Waugh, in violation of the Eighth Amendment pursuant to 42 U.S.C. § 1983. Dkt. No. 7 at 6–7. The court also concluded that the petition did not assert any cognizable claims against defendant Meineke, and ordered all claims against her be dismissed with leave to replead. [4] *Id.* at 7–8.

[4]     Despite being given this opportunity, plaintiff has not submitted an amended complaint or petition.

Now that discovery in the action is closed, defendant Waugh has moved for the entry of summary judgment dismissing plaintiff's excessive force claim against him. Dkt. No. 24. In his motion the defendant argues that the record evidence, including plaintiff's own deposition testimony, demonstrates that the amount of force used against plaintiff was *de minimis,* and does not support an Eighth Amendment violation. *Id.* Despite receiving notice of defendant's filing of the motion, and the need to properly oppose it, from both defendant's counsel and the court, *see* Dkt. Nos. 24, 25, plaintiff has failed to respond. *See generally* Docket Sheet. Defendant's motion

is now ripe for determination, and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*3** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also* *Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Merits of Plaintiff's Excessive Force Claim*

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (internal quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (internal quotation marks omitted), *accord, Blyden,* 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy,* 130 S.Ct. 1175, 1179 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins,* 130 S.Ct. at 1179; *Hudson,* 503 U.S. at 9.

**\*4** Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted); *see also*

Bermudez v. Waugh, Not Reported in F.Supp.2d (2013)

2013 WL 654414

*Griffin,* 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (internal quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8); *see also Blyden,* 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter,* 501 U.S. 294, 303 (1991), *accord Hudson,* 503 U.S. at 8; *see also Wright,* 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins,* 130 S.Ct. at 1178. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano,* 998 F.2d at 105.

Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")).

In this case, the record evidence, even considered in the light most favorable to plaintiff, demonstrates no dispute of material fact as to whether the force used by defendant Waugh

can satisfy either the objective or subjective components of an excessive force analysis. As it relates to the objective component, by his own account, plaintiff's injury only amounted to a small "red mark" or "red bruise" on his chest. Plf.'s Dep. Tr. (Dkt. No. 24, Attach.4) at 35; *see also* Plf.'s Dep. Tr. (Dkt. No. 24, Attach.4) at 7–8 (describing the use of force as "a simple assault" and testifying that he does not claim "that [he] was hurt severely"). Such a limited use of force cannot satisfy the objective requirement "in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8).

**\*5** Neither can plaintiff's claim satisfy the subjective component of an excessive force analysis. Again, by plaintiff's own account, defendant Waugh used force only as a result of plaintiff's explicit refusal to obey multiple orders. *See, e.g.,* Plf.'s Dep. Tr. (Dkt. No. 24, Attach.4) at 17 ("[Defendant Waugh] said, 'Now I am giving you a direct order ....' I said, 'I refuse a direct order. Call the sergeant.' "). In addition, the degree of force that was applied was minimal. Specifically, the force by defendant Waugh was applied over only a matter of seconds and included only a single push or shove, with plaintiff admitting that defendant Waugh, when allegedly "charging" plaintiff, was not running at top speed. *Id.* at 18–19, 34. Considering all of this testimony together, I find that no rational factfinder could conclude that defendant Waugh used force against plaintiff in a malicious or sadistic manner, or that the force used was not in a "good faith effort to ... restore discipline." *Hudson,* 503 U.S. at 6.

This finding is consistent with that of other courts applying *Hudson* and its progeny. *See, e.g., Boddie v. Schneider,* 105 F.3d 857, 862 (finding allegations that the plaintiff was "bumped, grabbed, elbowed, and pushed" by defendants insufficient to support to an excessive force claim); *Gillard v. Hamel,* No. 09–CV–0431, 2012 WL 967064, at *4– 6 (N.D.N.Y. Feb. 24, 2012) (Peebles, M.J.), *report and recommendation adopted in its entirety by* 2012 WL 960967 (N.D.N.Y. Mar. 21, 2012) (McAvoy, J.) (finding allegations that a defendant took the plaintiff's hands, twisted his wrists, placed his knee on his neck, and rubbed his face on the ground while trying to subdue him in the course of an altercation with a fellow inmate insufficient to establish an Eighth Amendment cruel and unusual punishment claim); *Brown v. Busch,* 954 F.Supp. 588, 595–96 W.D.N.Y.1997) (finding the allegation that two officers pushed the plaintiff into his cell causing a small abrasion on his neck found to be constitutionally insignificant). [5]

2013 WL 654414

5     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

Finally, although not dispositive, it is worth noting that plaintiff testified at his deposition that it was not his objective to have his petition to be construed as a section 1983 civil rights action challenging the physical force used against him by defendant Waugh. Plf.'s Dep. Tr. (Dkt. No. 24, Attach.4) at 8. Instead, plaintiff intended only to challenge "the fact that [he] was ... forced to obey an order that[,] medically[, he] was exempt from" obeying. *Id.* at 8; *see also id.* at 38 ("[A]s I understand it today, this has turned now to a lawsuit that my whole claim was something else.").

For all of these reasons, I recommend that plaintiff's excessive force claim be dismissed.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's petition in this matter has been construed by the court as asserting an excessive force claim against defendant Waugh, based upon his application of force following Bermudez's refusal to obey his orders. It now appears that in commencing this action, plaintiff did not intend to sue defendant Waugh for damages claiming that his Eighth Amendment rights were violated. In any event, because no rational factfinder could find that the use of force, which resulted in only a minor injury requiring no medical treatment, was anything but *de mininis,* and there is no record evidence to support a finding that defendant Waugh applied force maliciously and sadistically, I conclude that no reasonable factfinder could find that, by his actions, defendant Waugh violated plaintiff's Eighth Amendment right to be protected from cruel and unusual punishment. Accordingly, it is hereby respectfully,

**\*6** RECOMMENDED defendant's motion for summary judgment (Dkt. No. 24) be GRANTED, and that plaintiff's complaint in this action be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 654414

---

**End of Document**       © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 654401
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jose BERMUDEZ, Plaintiff,
v.
C.O. WAUGH, Defendant.

No. 9:11–CV–0947 (MAD/DEP).
|
Feb. 21, 2013.

**Attorneys and Law Firms**

Jose Bermudez, Comstock, NY, pro se.

Office of the New York, State Attorney General, Douglas J.
Goglia, AAG, of Counsel, Albany, NY, for Defendant.

**MEMORANDUM–DECISION AND ORDER**

Hon. MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

*1 This action, commenced by Plaintiff in the United
States District Court for the Southern District of New
York, was transferred to the Northern District by Order
of Southern District Chief Judge Loretta A. Preska. See
Dkt. No. 5. Plaintiff, who is an inmate currently in the
custody of the New York State Department of Corrections and
Community Supervision ("DOCCS"), alleges that Defendant,
a corrections officer employed at the prison facility in which
Plaintiff was confined at relevant times, assaulted him in
violation of the Eighth Amendment after he refused to comply
with an order that he was allegedly exempt from obeying. See
Dkt. No. 1.

On July 7, 2012, Defendant filed a motion for summary
judgment. See Dkt. No. 24. Despite receiving notice of
Defendant's motion and the need to properly oppose it from
both Defendant's counsel and the Court, Plaintiff failed to
respond to the motion. See Dkt. Nos. 24, 25. On January
29, 2013, Magistrate Judge Peebles issued a Report and
Recommendation in which he recommended that the Court
grant Defendant's motion. See Dkt. No. 26. On February 13,

2013, the Court received Plaintiff's objections to Magistrate
Judge Peebles' Report and Recommendation. See Dkt. No. 27.

Currently before the Court is Magistrate Judge Peebles'
Report and Recommendation.

**II. BACKGROUND**

On the morning of May 4, 2011, Plaintiff was informed that
he was being relocated from his cell in Eastern Correctional
Facility's ("Eastern C.F.") west wing to another housing unit
within the facility. See Dkt. No. 24–2 at ¶ 3. In response,
Plaintiff prepared for the move by packing his personal
property and proceeding to the ground floor. See id. at ¶¶ 4–5.

When Defendant arrived at the ground floor, a dispute
arose concerning the extent of Plaintiff's personal property.
See id. at ¶ 6. Specifically, Defendant accused Plaintiff of
having excessive property and ordered him several times to
take his property bags to the basement for inspection and
inventorying. See id. at ¶¶ 7–13. Plaintiff refused each of
those orders, claiming that, because he was medically exempt
from lifting anything in excess of twenty pounds, he could
not comply. See id. at ¶ 14. Instead, Plaintiff sat down in a
chair, explicitly stated that he was refusing to comply with the
orders, and demanded that the sergeant on duty be contacted.
See id. at ¶ 15.

After another corrections officer approached the area and
indicated that he needed to use the cart on which Plaintiff's
personal property was situated, Defendant again ordered
Plaintiff to remove a bag from the property cart. See id. at ¶¶
20–21. After Plaintiff complied, Defendant directed him to
carry the rest of his bags. See id. at ¶ 23. When Plaintiff again
refused to comply with this order, Defendant "charged [him]
like a football player ... leaned down a little bit, ran towards
[him,] ... pushed his weight against [his] body" and either hit
or punched Plaintiff in the chest. See Dkt. No. 24–4 at 19;
Dkt. No. 24–2 at ¶ 26.

*2 Immediately following the encounter, which lasted only
"seconds," Plaintiff was transported to the facilities Special
Housing Unit ("SHU"). See Dkt. No. 24–2 at ¶¶ 27, 31.
Approximately one hour later, Plaintiff was taken to the
prison infirmary, where his injuries were examined and
photographed by the medical staff. See id. at ¶ 32. Medical
records from the examination reflect that Plaintiff's injuries
from the alleged assault included only a "dime-size" abrasion

2013 WL 654401

in an "I" pattern on his chest, some redness and edema, and a bruise on the right side of his chest. *See id.* at ¶ 33. The observations in the medical records are consistent with Plaintiff's deposition testimony, in which he agreed that the entirety of his injuries included a "red mark" or "red bruise" on his chest. *See* Dkt. No. 24–4 at 33–36.

Following the incident, Plaintiff's property was inspected revealing an altered hot pot, which is considered contraband under prison rules. *See* Dkt. No. 24–2 at ¶¶ 29–30. Plaintiff was subsequently issued a misbehavior report for possessing contraband, creating a disturbance, refusing to obey a direct order, and engaging in verbal harassment. *See id.* at ¶ 30; Dkt. No. 24–7 at 2–3. On May 16, 2011, a Tier III hearing was held and Plaintiff was found guilty of all charges. *See id.*

Plaintiff commenced this action in the Southern District of New York through the filing of a "Petition Pursuant to Civil Service Law," dated May 9, 2011. *See* Dkt. No. 1. Upon transfer to this district, the Court conducted an initial review of the petition and concluded that the petition, liberally construed, sets forth an Eighth Amendment excessive force claim against Defendant. *See* Dkt. No. 7 at 6–7. [1]

[1]    The Court also concluded that the petition failed to assert a cognizable claim against Defendant Meineke and ordered all claims against her to be dismissed with leave to replead. *See* Dkt. No. 7 at 7–8. Despite being given this opportunity, Plaintiff did not submit an amended complaint.

On July 2, 2012, Defendant moved for summary judgment. *See* Dkt. No. 24. In his motion, Defendant argues that the record evidence, including Plaintiff's own deposition testimony, demonstrates that the amount of force used against Plaintiff was *de minimis* and, therefore, does not support an Eighth Amendment violation. *See* Dkt. No. 24–1 at 9–13. Despite receiving notice of Defendant's motion and the need to properly oppose it from both Defendant's counsel and the Court, Plaintiff failed to respond. *See* Dkt. Nos. 24, 25.

On January 29, 2013, Magistrate Judge Peebles issued a Report and Recommendation in which he recommended that the Court grant Defendant's motion in its entirety. *See* Dkt. No. 26. Specifically, Magistrate Judge Peebles found that, "[a]s it relates to the objective component, by his own account, plaintiff's injury only amounted to a small 'red mark' or 'red bruise' on his chest." *See id.* at 14 (citing Dkt. No. 24–4 at 35). Therefore, Magistrate Judge Peebles recommended

that the Court find that such "a limited use of force cannot satisfy the objective requirement" of Plaintiff's excessive force claim. *See id.* (citation omitted). Moreover, Magistrate Judge Peebles found that Plaintiff cannot satisfy the objective prong either because, "[b]y plaintiff's own account, defendant Waugh used force only as a result of plaintiff's explicit refusal to obey multiple orders." *See id* . (citing Dkt. No. 24–4 at 17). Further, Magistrate Judge Peebles noted that "the force by defendant Waugh was applied over only a matter of seconds and included only a single push or shove, with plaintiff admitting that defendant Waugh, when allegedly 'charging' plaintiff, was not running at top speed." *See id.* at 14–15 (quoting Dkt. No. 24–4 at 18–19, 34).

## III. DISCUSSION

### A. Standard of review

**\*3** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

2013 WL 654401

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at *2 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment. *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

## B. Relief under 42 U.S.C. § 1983

**\*4** Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin,* 758 F.Supp. 876, 881

(S.D.N.Y.1991) (citing *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)) (other citation omitted).

## C. Excessive force

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The Eighth Amendment's prohibition against cruel and unusual punishment prohibits the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000).

To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *See Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute [s][an] Eighth Amendment violation *per se* " regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9); *see also Wilkins v. Gaddy,* 559 U.S. 34, 130 S.Ct. 1175, 1178, 175 L.Ed.2d 995 (2010) ("The 'core judicial inquiry' ... was not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm' " (quotation omitted)). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*5** The subjective element requires a plaintiff to demonstrate a "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 F.3d at 21 (citation

2013 WL 654401

omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

Having carefully reviewed the entire record in this matter, the Court finds that Magistrate Judge Peebles correctly determined that the Court should grant Defendant's motion for summary judgment. Plaintiff does not dispute Defendant's account regarding the amount of force used during the incident in question and the resulting injury. During his deposition, Plaintiff recounted the incident as follows:

> He charged me like a football player. Body was leaned down a little bit, ran towards me. He ran for—I can't say he was running full force, he wasn't that far from me. I don't know how many feet there was. But it was like a three-step staircase, but you have to come down from. He ran towards me, and with his weight he pushed his weight on my body, and I believe with his fist that he punched me in my chest area with his body weight at the same time.

*See* Dkt. No. 24–4 at 18–19. This conduct resulted in injuries that were described by Plaintiff as only a "little red mark" or "red bruise," which was only "a couple centimeters across." *See id.* at 34–35. This *de minimis* use of force, which caused only slight bruising, is clearly insufficient to satisfy the objective prong of an excessive force claim. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (holding that inmate's claims that he was "bumped, grabbed, elbowed, and pushed" by prison officials insufficient); *James v. Phillips,* No. 05 Civ. 1539, 2008 WL 1700125, *4–*5 (S.D.N.Y. Apr. 9, 2008) (finding *de minimis* use of force when prison guard shoved inmate into door which resulted in swelling of the

inmate's chin); *Virella v. Pozzi,* No. 05 Civ. 10460, 2006 WL 2707394, *3 (S.D.N.Y. Sept.20, 2006) (finding only a *de minimis* force used where officer swung keys at the plaintiff, making contact with his head and causing a bump); *Espinal v. Goord,* No. 00 Civ. 2242, 2001 WL 476070, *4, *13 (S.D.N.Y. May 7, 2001) (finding that the use of force was *de minimis* where guard struck the plaintiff in face two or three times, causing his face to turn red, but resulting in no other injuries); *Yearwood v. LoPiccolo,* No. 95 Civ. 2544, 1998 WL 474073, *1, *7 (S.D.N.Y. Aug. 10, 1998) (finding a *de minimis* use of force where guard choked the plaintiff, hit his head with a pair of keys, and punched him in the lip); *Show v. Patterson,* 955 F.Supp. 182, 192–93 (S.D.N.Y.1997) (finding only a *de minimis* force used where officer pushed the inmate against wall); *Gonzalez v. Coughlin,* No. 92 Civ. 7263, 1996 WL 496994, *4–*5 (S.D.N.Y. Aug.21, 1996) (finding no excessive use of force where the plaintiff alleged corrections officers tripped him to the ground and hit him in the knee); *DeArmas v. Jaycox,* No. 92 Civ. 6139, 1993 WL 37501, *4 (S.D.N.Y. Feb.8, 1993) (finding a *de minimis* use of force where the inmate suffered a bruise and injured right knee after being punched and kicked once).

**\*6** Moreover, Magistrate Judge Peebles correctly found that Plaintiff has failed to put forth sufficient evidence to create a question of fact as to the subjective element of his claim. By his own account, Defendant only used force as a result of Plaintiff's explicit refusal to obey multiple orders. *See* Dkt. No. 24–4 at 17. Further, Plaintiff admits that the force used lasted only "seconds ." *See id.* at 18–19, 34. Considering this testimony, no rational trier of fact could find that Defendant used force against Plaintiff in a malicious or sadistic manner, or that the force that was used was for a purpose other than a "good faith effort to ... restore discipline." *Hudson,* 503 U.S. at 6.

In his objections to Magistrate Judge Peebles Report and Recommendation, Plaintiff asks this Court to forgive his failure to submit a response to Defendant's motion. *See* Dkt. No. 27 at ¶ 2. Plaintiff claims that he "had no idea that this matter was in discovery stage" or that discovery had now closed. *See id.* at ¶ 3. Moreover, Plaintiff now asserts that he was only taken to the SHU after he "complained of the assault and how it was trying to be covered-up." *See id.* at ¶ 6. Plaintiff claims that the Tier III hearing, at which he was found guilty of various charges, was procedurally defective and that no evidence was presented to support the finding of guilt on several of the charges. *See id.* at ¶¶ 9–13. Moreover, Plaintiff claims that his placement in the SHU constituted

2013 WL 654401

cruel and unusual punishment because it was "done under a false pretense." *See id.* at ¶ 14.

First, to the extent that Plaintiff is now attempting to allege a First Amendment retaliation claim, a Fourteenth Amendment due process claim, and an Eighth Amendment claim regarding his SHU confinement, his claims must be rejected. It is well settled that a litigant may not raise new claims not contained in the complaint in opposition to a motion for summary judgment or in objections filed in response to a Magistrate Judge's report and recommendation. *See Avillan v. Donahoe,* 483 Fed. Appx. 637, 639 (2d Cir.2012) (holding that the district court did not err in disregarding allegations the plaintiff raised for the first time in response to the defendant's motion for summary judgment); *Shah v. Helen Hayes Hosp.,* 252 Fed. Appx. 364, 366 (2d Cir.2007) (holding that "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint") (citation omitted); *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 219–20 (N.D.N.Y.2008) (holding that a *pro se* plaintiff's civil rights complaint should not be effectively amended by his new allegations presented in his response to the defendants' motion for summary judgment). Although the Court is aware of the special solicitude afforded to *pro se* litigants, construing Plaintiff's objections to the Report and Recommendation as amending his complaint would be inappropriate. In its November 1, 2011 Memorandum–Decision and Order, the Court granted Plaintiff an opportunity to amend his complaint, but he declined to do so. *See* Dkt. No. 7. Moreover, that decision made clear to Plaintiff that the Court construed his complaint as alleging only the two causes of action identified. *See id.* If Plaintiff was attempting to allege claims in his complaint in addition to those identified by the Court, he should have moved to amend at that point or in the eight months that followed prior to Defendant filing its motion for summary judgment.

**\*7** Moreover, at Plaintiff's deposition, he indicated to Defendant's counsel that he originally intended for this action to raise the above mentioned claims in addition to his excessive force claim. *See* Dkt. No. 24–4 at 37–38. Plaintiff

indicated to counsel during that deposition that he was going to "write the judge" regarding this issue and to explain that he intended for his complaint to contain these additional allegations. *See id.* Plaintiff, however, did not bring this issue to the Court's attention until he filed his objections to the Report and Recommendation. Finally, the Court notes that Plaintiff has not filed a motion to amend his complaint and the discovery that has taken place in this matter was directed solely at the issue of whether Defendant used excessive force in violation of the Eighth Amendment. *See State Farm Ins. Co. v. Kop–Coat, Inc.,* 183 Fed. Appx. 36, 38–39 (2d Cir.2006) (citation omitted).

## IV. CONCLUSION

After carefully considering Magistrate Judge Peebles' Report and Recommendation, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' January 29, 2013 Report and Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve the parties with a copy of this Memorandum–Decision and Order in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 654401

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 967064

2012 WL 967064
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gary GILLARD, Plaintiff,
v.
Scott HAMEL and Peter McNally, Defendants.

Civ. Action No. 9:09–CV–0431 (TJM/DEP).
|
Feb. 24, 2012.

**Attorneys and Law Firms**

Gary Gillard, Pine City, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General, State of
New York, Michael G. McCartin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Gary Gillard, a New York State prison
inmate, has commenced this action pursuant to 42 U.S.C.
§ 1983, alleging that he was deprived of his civil rights by
the defendants during the period of his confinement. As a
result of prior court decisions, the sole remaining claims in the
action are asserted against two corrections officers employed
at the prison facility in which plaintiff was housed at the
relevant times, and stem from an incident in which defendants
allegedly encouraged a fellow inmate to attack Gillard, failed
to protect him from the inmate's assault, and then applied
excessive force in subduing him. Plaintiff's complaint seeks
both monetary damages and injunctive relief, including a
directive that he be transferred to another prison facility. [1]

[1]    A federal court has no authority to decide an issue
       when the relief sought can no longer be given,
       or is no longer needed. *Martin–Trigona v. Shiff,*
       702 F.2d 380, 386 (2d Cir.1983). It is well settled
       in this circuit that transfer from a prison facility
       moots an action for injunctive relief involving the
       transferring facility. *Prins v. Coughlin,* 76 F.3d
       504, 506 (2nd Cir.1996) (citing *Young v. Coughlin,*
       866 F.2d 567, 568 n. (2d Cir.), *cert. denied, 492*

       *U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989),*
       and *Beyah v. Coughlin,* 789 F.2d 986, 988 (2d
       Cir.1986)); *Candelaria v. Greifinger,* No. 96–CV–
       0017, 1998 WL 312375, at *2 (N.D.N.Y. June 8,
       1998) (Pooler, J. and Scanlon, M.J.). In this case,
       plaintiff's request for a transfer has been rendered
       moot by virtue of the fact that he is now confined
       in a correctional facility other than the one at which
       the relevant events occurred.

Currently pending before the court is an application by the
remaining two defendants seeking the entry of summary
judgment dismissing plaintiff's remaining claims, both on
merits and on the basis of qualified immunity. For the reasons
set forth below, I recommend that defendants' motion be
granted.

I. *BACKGROUND* [2]

[2]    In light of the procedural posture of this case, the
       following recitation is derived from the record now
       before the court, with all inferences drawn and
       ambiguities resolved in favor of the plaintiff. *Terry
       v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate entrusted to the care and custody
of the New York State Department of Corrections and
Community Services ("DOCCS"). *See generally* Complaint
(Dkt. No. 1); *see also* Defendants' Local Rule 7.1(a)(3)
Statement (Dkt. No. 56–6) ¶ 1. [3] At the time the relevant
events in this action occurred plaintiff was designated to
the Great Meadow Correctional Facility ("Great Meadow"),
located in Comstock, New York. Complaint (Dkt. No. 1)
Preliminary Statement.

[3]    As will be seen, by his failure to properly
       oppose defendants' motion, plaintiff is deemed to
       have admitted the allegations of fact set forth in
       Defendants' Local Rule 7.1(a)(3) Statement. *See*
       pp. 7–9, *post.*

While as originally constituted plaintiff's complaint in this
action broadly alleged the existence of an ongoing conspiracy
and that he was continuously harassed by prison officials at
Great Meadow, his claims have been winnowed significantly,
and now center upon an incident occurring at that facility
on March 13, 2009. On that date, according to the plaintiff,
Corrections Officer Hamel directed another inmate to attack
him and then stood by during the incident, refusing to stop
the ensuing fight, and later utilizing excessive force against

2012 WL 967064

the plaintiff until the encounter had ended. Complaint (Dkt. No. 1) ¶ 30; Defendants' Local Rule 7.1.(a)(3) Statement (Dkt. No. 56–6) ¶ 3. Plaintiff alleges that defendant Hamel placed his knee into Gillard's kidney and lower back area, and placed his forearm on Gillard's neck while in the process of placing restraints on his wrists, and additionally placed his knee on plaintiff's neck area "with all of his weight." Complaint (Dkt. No. 1) ¶ 30. Plaintiff alleges that defendant Hamel's actions caused aggravation of his pre-existing cervical and lumbar back spine injuries. *Id.* at ¶¶ 30, 32.

As a result of the incident plaintiff was issued a misbehavior report accusing him of violent conduct and fighting. *See* McCartin Decl. (Dkt. No. 56–2) Exh. B. The issuance of that misbehavior report was based upon an investigation which, according to prison officials, revealed that Gillard was the aggressor and initiated the fight with his fellow inmate. *See id.* That misbehavior report led to the convening of a Tier II hearing, in which plaintiff refused to participate, and a subsequent finding of guilt with a corresponding sentence which included a thirty-day period of disciplinary keeplock confinement and a corresponding loss of package, commissary, and telephone privileges. *See* McCartin Decl. (Dkt. No. 56–2) Exh. B.

## II. *PROCEDURAL HISTORY*

**\*2**  Plaintiff commenced this action on April 13, 2009. Dkt. No. 1. In his complaint Gillard named several defendants, including David Rock, the Superintendent at Great Meadow; Corrections Counselor Howard Osborne; Corrections Sergeants Michael Hoy and Matthew Sabo; Corrections Officers Michael Rovelli, Scott Hamel, Alfred Aubin, Peter McNally, Smith, and Ronald Lamb; Bruce Porter, a Maintenance Assistant at the facility; and two John Doe defendants. *See id.* Although those claims were not stated as discrete causes of action, plaintiff's complaint asserted that the defendants have 1) violated his right to due process; 2) denied him the right to correspond with those outside of the facility; 3) denied him access to the courts; 4) unlawfully tampered with his incoming and outgoing mail; 5) subjected him to cruel and unusual punishment through the use of excessive force and the denial of power, television, and radio without due process; 6) issued him false misbehavior reports; and, 7) breached their duty to protect him from harm. *See generally* Plaintiff's Complaint (Dkt.No.1).

Following service of process all of the named defendants, with the exception of Scott Hamel and Peter McNalley, filed a pre-answer motion seeking dismissal of plaintiff's complaint

for failure to state a claim upon which relief may be granted. Dkt. No. 27. That motion resulted in my issuance on August 30, 2010 of a report recommending that defendants' motion be granted and that all claims in the action except those against defendants Hamel and McNally be dismissed, with leave to replead. Dkt. No. 52. That report and recommendation was adopted by Senior District Judge Thomas J. McAvoy on December 13, 2010. Dkt. No. 54. Despite being granted leave to replead, plaintiff has not filed an amended complaint in the action.

On June 7, 2011, following the completion of discovery which included the taking of plaintiff's deposition, the remaining two defendants moved for the entry of summary judgment dismissing plaintiff's remaining claims.[4] Dkt. No. 56. In their motion defendants argue that any force alleged to have been applied against the plaintiff did not rise to a level of constitutional significance and that his excessive force claim is therefore subject to dismissal, additionally asserting their entitlement to qualified immunity from suit. *See generally id.* Plaintiff has since responded in opposition to defendants' motion. Dkt. No. 61.

[4]    Plaintiff's deposition began on a sour note, with plaintiff refusing to answer questions posed by defendants' counsel concerning his criminal history and quarreling over the refusal. *See* McCartin Decl. (Dkt. No. 56–2) Exhs. A at pp. 9–14/95.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure to Submit a Local Rule 7.1(a)(3) Statement*

Among the materials submitted by the defendants in support of their motion is a statement of material facts which, they contend, are not in dispute, as required by Northern District of New York Local Rule 7.1(a)(3). In his opposition papers, plaintiff has failed to address that statement. Before turning to the merits of defendants' motion the court must first address the significance, if any, of this failure.

**\*3**  By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement

2012 WL 967064

of Material Facts that the opposing party does not specifically controvert." N .D.N.Y.L.R. 7.1(a)(3). Courts in this district have consistently enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000)* (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). [5]

[5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

In this instance, the plaintiff was pointedly warned of the consequences of failing to properly respond to defendants' motion. In their notice of motion, defendants specifically advised Gillard of the requirements of Local Rule 7.1(a)(3), noting that "[i]n the absence of such a statement [responding to Defendants' Local Rule 7.1(a)(3) Statement], all material facts set forth in defendants' statement of material facts will be deemed to be admitted by the Court." *See* Notice of Motion (Dkt. No. 56) at p. 2. In addition, the court's form notice to *pro se* plaintiffs of the consequences of failing to respond properly to a summary judgment motion, which was attached to plaintiff's notice of motion, advises in relevant part that

> [i]f you do not submit a short and concise statement of material facts as to which you claim there are genuine issues in dispute, all material facts set forth in the statement filed and served by the defendant(s) shall be deemed admitted.

*See* Notification of Consequences (Dkt. No. 56–1). In light of these admonitions and plaintiff's failure to provide a Local Rule 7.1(a)(3) Statement, I recommend that the court deem him to have admitted each of the statements of fact set forth in Defendants' Local Rule 7.1(a)(3) Statement. [6]

[6]    As to those facts not contained in the Defendants' Local Rule 7 .1(a)(3) Statement, I assume for

purposes of this motion that plaintiff's version of those facts is true, since plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting an obligation of court to consider whether *pro se* plaintiff understood the nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.

*Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Merits of Plaintiff's Claims*

#### 1. *Defendant Hamel*

Plaintiff's claims against defendant Hamel appear to have two components. The first alleges that he directed a fellow inmate to attack the plaintiff and then stood idly by, failing to protect him during the course of the ensuing fight. Plaintiff further asserts that after the fight Corrections Officer Hamel applied excessive force, twisting his wrists, placing his knee onto his neck, and rubbing his face on the ground during the course of placing his hands in restraints.

#### a. *Excessive Force*

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which outlaws punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; it is against this backdrop that the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

**\*5** A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). When an inmate alleges the use of excessive force by a corrections employee the lynchpin inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and

sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. —— U.S. ——, ——, 130 S.Ct. 1175, 1179, 175 L.Ed.2d 995 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is case specific and relies upon "contemporary

2012 WL 967064

standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000).

**\*6** That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate. *Wrigh t,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

During his deposition plaintiff testified that while he and a fellow inmate were on the ground fighting, defendant Hamel and other officers attempted to end the altercation. Defendants' Local Rule 7 .1(a)(3) Statement (Dkt. No. 56–6) ¶ 5; McCartin Decl. (Dkt. No. 56–2) Exh. 1 at p. 29. During that endeavor defendant Hamel took plaintiff's hands, twisted his wrists, and placed his knee on his neck. McCartin Decl. (Dkt. No. 56–2) Exh. 1 at p. 29. At no time did Corrections

Officer Hamel punch, kick or throw Gillard into the wall. *Id.* at p. 32. While plaintiff claims that his neck was injured as a result of the actions, he also admitted having had a previous serious neck injury. *Id.* at p. 71.

The application of the Eighth Amendment's cruel and unusual punishment provision to claims of excessive force is extremely fact specific. *Dukes v. Troy Housing Auth.,* No. 1:08–CV–479, 2011 WL 1261317, at \*7 (N.D.N.Y. Mar.31, 2011)) (Scullin, S.J.). The question ultimately revolves around the need for force to maintain and restore discipline and the extent of force utilized. In this case, it is clear that corrections officers, including defendant Hamel, were faced with situation of two inmates fighting and the need to restore discipline and to apply the amount of necessary force to accomplish that end. While plaintiff alleges their use of force, there is no indication that he received any serious injury as a result of their actions, nor does it appear from his complaint that the force utilized was excessive given the situation presented. Simply stated, the force which plaintiff claims was applied was *de minimis,* in light of the circumstances, and insufficient to implicate the protections of the Eighth Amendment against cruel and unusual punishment. *See Smith v. City of New York,* No. 04 Civ. 3286, 2010 WL 3397683, at \* 11 (S.D.N.Y.2010) (granting summary judgment as to excessive force claim finding "it does not appear from plaintiff's own testimony that the handcuffs were unreasonably tight, and plaintiff's injuries were clearly *de minimis."); see also Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (claim that inmate was bumped, grabbed, elbowed, and pushed by two officers "not sufficiently serious or harmful" to meet objective element); *Brown v. Busch,* 954 F.Supp. 588, 595–96 (W.D.N.Y.1997) (two officers pushed inmate into cell, causing small superficial abrasion on inmate's back; amount of force used was "clearly *de minimis ");* Maguire v. Coughlin,* 901 F.Supp. 101, 104 (N.D.N.Y.1995) (summary judgment granted dismissing inmate's claim that he was "physically manhandled" during prison transfer; court found no evidence "that the defendants used more than *de minimus* [sic] force against plaintiff, or that their use of de *minimus* [sic] force was repugnant to the conscience of mankind.").

### b. *Failure to Protect*

**\*7** Undeniably, prison officials have a responsibility to provide a safe environment for prisoners, and an inmate can establish an Eighth Amendment violation by showing that he or she "incarcerated under conditions posing a substantial risk of serious harm and that prison official's

Gillard v. Hamel, Not Reported in F.Supp.2d (2012)

2012 WL 967064

acted with "deliberate indifference" to the inmate's safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). A corrections worker who, though not participating, if present when an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). When examining a failure to protect claim under the Eighth Amendment, a court must determine whether the inmate has demonstrated that 1) he or she was incarcerated under conditions posing a substantial risk of serious harm, and that 2) prison officials exhibited deliberate indifference to the inmate's plight. *Farmer,* 511 U.S. at 834, 837, 114 S.Ct. at 1977, 1979; *Matthews,* 36 F.Supp.2d at 124–25; *Coronado v. Lefevre,* 886 F.Supp. 220, 224 (N.D.N.Y.1995) (Scullin, J.). As can be seen, this analysis entails both an objective and subjective inquiry.

In objective terms, a plaintiff must prove that an alleged deprivation is "sufficiently serious" such that it denied him or her the "minimal civilized measure of life's necessities." *Dawes v. Walker,* 239 F.3d 489, 493–94 (2nd Cir.2001) (internal quotations and citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Specifically, as noted above, in situations where an inmate's safety is at issue, that person must demonstrate that he or she was incarcerated under conditions posing a substantial risk of serious harm. *Farmer,* 511 U.S. at 834, 837, 114 S.Ct. at 1977, 1979; *Dawes,* 239 F.3d at 493; *Matthews,* 36 F.Supp.2d at 124–25.

To demonstrate that defendants were deliberately indifferent to his or her plight, a plaintiff must show that prison officials actually knew of, but disregarded, an excessive risk to his or her health and safety—"the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Matthews,* 36 F.Supp.2d at 124–25.

In this instance, plaintiff's deposition testimony is clear and unequivocal. Prior to the fight, he did not feel that he needed protective custody from any other inmate. *See* McCartin Decl. (Dkt. No. 56–2) Exh. 1 at p. 37. By his own admission, during the fight the other inmate never even made contact with plaintiff, but instead failed at two attempts to punch Gillard. *Id.* With the other inmate's third effort to swing at him, Gillard grabbed his attacker, tripped him, and brought him down to the floor. *Id.* As plaintiff readily acknowledged at his deposition, he suffered no harm as a result of the fight

with his fellow inmate. *See* McCartin Decl. (Dkt. No. 56–2) Exh. 1 at p. 37.

**\*8** Objectively, plaintiff's testimony itself effectively precludes a finding that he was exposed to conditions posing a substantial risk to his safety. Plaintiff's speculation that defendant Hamel directed the other inmate to attack Gillard is unsupported by the record, and contradicted by denials of both Hamel and the inmate involved. *See* Plaintiff's Motion Response (Dkt. No. 61) pp. 26/40 and 29/40. Even when crediting plaintiff's version of the events that transpired, it is clear that before the fight there was no reason to believe that his well-being was in jeopardy, and during the fight plaintiff maintained the upper hand. Additionally, both plaintiff's testimony and the conceded lack of an injury is contradictory to the notion that, subjectively, when witnessing the altercation defendant Hamel became aware of but disregarded a serious threat of harm to plaintiff. In sum, the record is devoid of any evidence upon which a reasonable factfinder could conclude that defendant Hamel was aware of and disregarded an excessive risk to plaintiff's safety. Accordingly, I recommend dismissal of this aspect of plaintiff's claim against defendant Hamel as well. [7]

[7]    Claims involving the alleged failure of prison officials to protect an inmate from harm are also subject to review under the Fourteenth Amendment's substantive due process provision. Though the requisite mental state for establishing a Fourteenth Amendment failure to protect claim is somewhat unclear, it is at least apparent that to be legally cognizable under that provision, the actions alleged on the part of a defendant must transcend mere negligence. *Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986) (lack of due care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent); *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986) (same); *Morales v. New York State Dep't of Corrs.,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not provide cause of action for negligent failure of prison officials to protect an inmate from injury); *Abdul–Matiyn v. New York State Dept. of Corr. Servs.,* 871 F.Supp. 1542, 1546–47 (N.D.N.Y.1994) (Chin, J.) (citing Morales). For the same reasons that plaintiff's failure to protect claim under the Eighth Amendment fails, any such claim brought under the

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 443 of 830
Gillard v. Hamel, Not Reported in F.Supp.2d (2012)
2012 WL 967064

Fourteenth Amendment cannot survive defendants' motion for summary judgment.

*2. Defendant McNally*

Defendant McNally does not appear to have been involved in the March 13, 2009 incident. *See* Complaint (Dkt. No. 1) ¶ 30. Plaintiff's complaint alleges that two days later he was informed by another individual that Officer McNally told the inmate that Gillard had raped a seven year old girl, apparently intending that the inmate harm Gillard. *Id.* ¶ 33. This claim, which is both purely speculative and attenuated in nature, is insufficient to support a constitutional claim against defendant McNally. *See McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("speculation alone is insufficient to defeat a motion for summary judgment"); *see also Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 90 (2d Cir.2005) (holding that, in age discrimination case, allegations of defendant's knowledge of protected ground must be supported by evidence to avoid summary judgment); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 432–33, 469 (N.D.N.Y.2009) (plaintiff's contention that defendant Sobek was on the other end of a telephone conversation was a mere "guess" insufficient to defeat a grant of summary judgment with respect to a claim that defendants conspired to violate plaintiff's civil rights). Moreover, during his deposition plaintiff conceded that Corrections Officer McNally never physically harmed him and stated that while Officer McNally "[s]anctioned another inmate to attack [him]", he admitted that the alleged attack is not part of this lawsuit. McCartin Decl. (Dkt. No. 56–2) Exh. 1 at pp. 53–55. I therefore recommend dismissal of plaintiff's claims against defendant McNally.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's remaining claims in this action against defendant McNally appear to be nebulous, at best, and by plaintiff's own admission are not central to this action. Based upon the record now before the court I conclude that no reasonable factfinder could find a basis to hold defendant McNally accountable for violating plaintiff's civil rights.

**\*9** Turning to plaintiff's claims against defendant Hamel, as a matter of law the record fails to support a claim of failure to protect the plaintiff from a known harm as well as his claim of the use of excessive force. Simply stated, it appears that the force involved and any resulting injuries sustained by the plaintiff were *de minimis* and constitutionally insignificant, particularly given that at the relevant times Corrections Officer Hamel and his fellow officers were acting to restore discipline following an altercation between two inmates. [8] Accordingly, it is hereby respectfully

[8]    In light of my recommendation on the merits I find it unnecessary to address defendants' alternative argument of entitlement to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Harhay v. Town of Ellington Bd. Of Ed.,* 323 F.2d 206, 211 (2d Cir.2003); *Warren v. Town of Ellington* Bd. Of Ed., 323 F.3d 206, 211 (2d Cir.2003); *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)).

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 56) be GRANTED, and plaintiff's remaining claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 967064

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 960967
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gary GILLARD, Plaintiff,

v.

Scott HAMEL and Peter McNally, Defendants.

No. 9:09–CV–0431 (TJM/DEP).
|
March 21, 2012.

**Attorneys and Law Firms**

Gary Gillard, Pine City, NY, pro se.

Michael G. McCartin, Office of Attorney General, Albany, NY, for Defendant.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report–Recommendation and Order dated February 24, 2012 have been filed, and the time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report–Recommendation and Order is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report–Recommendation and Order for the reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary judgment (Dkt.# 56) is **GRANTED,** and all claims in this action are **DISMISSED.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 960967

End of Document          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 125774
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Thomas DALLIO, Plaintiff,
v.
Scott SANTAMORE; William Comstock; Frank
Buksa; Amos LeClaire; Alicia McGuoirk; Lawrence
Hopkinson; Craig Ramsdell; Andrew Bouchey;
Paul Gilmore; Donald Quinn; Roy Girdich; C.O.
Gettman; Lt. O'Connell; R.N. Kimberly Perrea; R.N.
Lillian Riley; and R.N. Debra Smith, Defendants.

No. 9:06–CV–1154 (GTS/DRH).
|
Jan. 7, 2010.

West KeySummary

1    **Civil Rights** 🔑 Criminal law enforcement;
     prisons

     **Summary Judgment** 🔑 Prisons and jails

     A genuine issue of material fact as to
     whether corrections officers used excessive force
     in restraining a prisoner precluded summary
     judgment in favor of the officers in the prisoner's
     Eighth Amendment excessive force action.
     The prisoner struck an officer, was quickly
     restrained, and was then allegedly assaulted by
     multiple officers, which was unreasonable and
     unnecessary to sustain institutional order and
     safety since the prisoner was compliant and
     defenseless. U.S.C.A. Const.Amend. 8.

     15 Cases that cite this headnote

**Attorneys and Law Firms**

Thomas Dallio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Dean J. Higgins, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

**DECISION and ORDER**

Hon. GLENN T. SUDDABY, District Judge.

 **\*1**  Currently before the Court in this *pro se* prisoner civil
rights action filed by Thomas Dallio ("Plaintiff") against
sixteen employees of the New York State Department of
Correctional Services ("Defendants") are (1) Defendants'
motion for summary judgment (Dkt. No. 78), (2) United
States Magistrate Judge David R. Homer's Report–
Recommendation recommending that Defendants' motion be
granted in part and denied in part (Dkt. No. 87), and (3)
Plaintiff's Objections to the Report–Recommendation (Dkt.
No. 88). For the following reasons, Plaintiff's Objections
are rejected; the Report–Recommendation is accepted and
adopted in its entirety; Defendants' motion is granted in part
and denied in part; and Plaintiff's Complaint is dismissed in
part.

**I. RELEVANT BACKGROUND**

  **A. Plaintiff's Complaint**
Plaintiff filed his Complaint in this action on September 27,
2006. (Dkt. No. 1.)

Construed with the utmost of liberality, Plaintiff's Complaint
alleges that, between approximately November 10, 2003, and
November 20, 2003, while he was incarcerated at Upstate
Correctional Facility in Malone, New York, the above-
captioned Defendants violated his rights in the following
manner: (1) by subjecting him to excessive force in violation
of the Eighth Amendment; (2) by failing to intervene to
prevent others from subjecting him to excessive force, in
violation of the Eighth Amendment; (3) by being deliberately
indifferent to his serious medical needs, in violation of
the Eighth Amendment; (4) by conspiring to violate his
aforementioned constitutional rights; and (5) by committing
various torts against him (including assault, battery and
negligence) under New York State law. (*See generally* Dkt.
No. 1 [Plf.'s Compl.].)

More specifically, Plaintiff alleges as follows: (1) Defendants
Santamore, Comstock, LaClaire, Buksa, Ramsdell, and
Hopkins assaulted him after he was fully restrained in his cell;
(2) Defendants Gilmore and McGuoirk failed to intervene
during this incident; (3) Defendants Riley and Perrea failed
to properly treat him for his subsequent injuries; and (4)

Defendants conspired against him by falsifying investigative reports and medical records. (*Id.*)

For a more detailed recitation of Plaintiff's factual allegations, the Court refers the reader to the Complaint in its entirety, and Magistrate Judge Homer's Report–Recommendation. (Dkt.Nos.1, 87.)

### B. Defendants' Motion for Summary Judgment and Plaintiff's Response

On October 1, 2008, Defendants filed a motion for summary judgment. (Dkt. No. 78.) In their motion, Defendants argue that Plaintiff's Complaint should be dismissed for the following reasons: (1) Plaintiff has failed to establish an excessive-force claim and/or a failure-to-intervene claim under the Eighth Amendment because insufficient record evidence exists from which a rational fact finder could conclude either that Plaintiff was subjected to force that was sufficiently serious or that Defendants used that force with a sufficiently culpable mental state; (2) Plaintiff has failed to establish a medical-indifference claim under the Eighth Amendment because insufficient record evidence exists from which a rational fact finder could conclude either that Plaintiff experienced a medical need that was sufficiently serious or that Defendants were deliberately indifferent to such a medical need; (3) Defendants are protected from liability as a matter of law by the doctrine of qualified immunity; (4) Plaintiff has failed to establish a conspiracy claim because insufficient record evidence exists from which a rational fact finder could conclude that Defendants reached an agreement to deprive Plaintiff of his constitutional rights; and (5) Plaintiff's pendant state law claims (of assault, battery and negligence) should be dismissed under the Eleventh Amendment and New York Corrections Law § 24 because (a) Plaintiff sued Defendants for damages arising out of acts that they allegedly performed or failed to perform within the scope of their employment, and (b) New York Civil Law Practice Law and Rules § 215(3) bars Plaintiff's intentional tort claims on the ground of untimeliness. (Dkt. No. 78, Attachment 20, at 7–18.)

**\*2** On October 31, 2008, Plaintiff filed his response in opposition to Defendants' motion. (Dkt. No. 85.) In his response, Plaintiff argues as follows: (1) he has adduced sufficient record evidence to establish an excessive-force claim and a failure-to-intervene claim under the Eighth Amendment; (2) he has adduced sufficient record evidence to establish a medical-indifference claim under the Eighth Amendment; (3) Defendants are not protected from liability

as a matter of law by the doctrine of qualified immunity, based on the current record; and (4) Plaintiff has adduced sufficient record evidence to establish a conspiracy claim. (Dkt. No. 85, Attachment 2, at 1–14.) In addition, Plaintiff concedes that his state law claims are barred by New York Corrections Law § 24. (*Id.* at 13.)

### C. Magistrate Judge Homer's Report–Recommendation

On October 26, 2009, Magistrate Judge Homer issued a Report–Recommendation recommending as follows: (1) that all of Plaintiff's claims against Defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley be dismissed with prejudice pursuant to Fed.R.Civ.P. 56;[1] (2) that Plaintiff's excessive-force claims and failure-to-intervene claims against Defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson and Gilmore *not* be dismissed pursuant to Fed.R.Civ.P. 56 due to the existence of genuine issues of material fact regarding those claims; and (3) that Plaintiff's claims against Defendant Smith be dismissed without prejudice for failure to serve, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b). (Dkt. No. 87.)

[1]    The Court notes that included in these claims are all of Plaintiff's medical-indifference claims under the Eighth Amendment, and Plaintiff's conspiracy claims. (Dkt. No. 87, at 14–20.) The Court notes also that Magistrate Judge Homer recommends the dismissal of all of Plaintiff's claims against Defendants Bouchey and Gettman based on Plaintiff's failure to demonstrate their personal involvement in the constitutional violations alleged. (*Id.* at 20–21.)

### D. Plaintiff's Objections

On November 4, 2009, Plaintiff timely filed his Objections to the Report–Recommendation. (Dkt. No. 88.) In his Objections, Plaintiff asserts, *inter alia,* the following arguments: (1) he did not hit his head against the wall, but rather his injuries were caused by Defendants, a fact that Defendants are collectively trying to "cover up";[2] (2) because Magistrate Judge Homer failed to refer to a number of his exhibits in the Report–Recommendation, he failed to resolve all ambiguities and draw all reasonable inferences in his favor; (3) Plaintiff did not receive adequate due process during his grievance investigation in that he was denied an opportunity to "present witnesses and other evidence in support of his Grievance Complaint"; and (4) Defendants

Perrea, Riley, Girdich, and O'Connell should not be dismissed from the action because the record evidence demonstrates that these Defendants "act[ed] in concert with each other to participate in the violation of Plaintiff's Eighth Amendment rights." (Dkt. No. 88, at 1–5.)

2    More specifically, Plaintiff argues that Defendant McGuoirk and the Department of Correctional Services ("DOCS") Inspector General's investigator tried to "cover up" the fact that he did not hit his head. To the extent that Plaintiff is attempting to assert, for the first time, a claim against the DOCS Inspector General's investigator, such a claim is dismissed because, among other things, the DOCS Inspector General is not a named party Defendant. *Excell v. Burge,* 05–CV–1231, 2008 WL 4426647, at *3 n. 4 (N.D.N.Y. Sept.25, 2008) (Kahn, J. adopting DiBianco, M.J.) (noting that a person "not listed in the caption and ... never served with process ... is not ... a defendant [in the action]").

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report–Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). [3] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999). [4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

3    On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

4    *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

### B. Standard Governing a Motion for Summary Judgment

**\*3** Magistrate Judge Homer correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 87, at 8–9.) As a result, this standard is incorporated by reference in this Decision and Order.

## III. ANALYSIS

After carefully reviewing all of the papers herein, including Magistrate Judge Homer's thorough Report–Recommendation, the Court can find no error (clear or otherwise) in the Report–Recommendation. Magistrate Judge Homer employed the proper standards to Plaintiff's claims, accurately recited the facts surrounding these claims, and reasonably applied the law to those facts. The Court would only add the following three observations.

First, with regard to Plaintiff's argument that he did not receive adequate due process during his grievance investigation, the Court declines to consider the due process claim implicitly asserted in the argument because Plaintiff is asserting that due process claim for the first time in his Objections to the Report–Recommendation. *Williams v. Cooney,* 01–CV–4623, 2004 WL 434600, at *2 n. 1 (S.D.N.Y. Mar.8, 2004) (noting that a district court "has discretion to review arguments which are raised for the first time in objections to the Report"). In any event, even if the Court were to consider this late-blossoming due process claim, the Court would reject that claim on three alternative grounds: (1) Plaintiff has failed to introduce any admissible record evidence that he exhausted his administrative remedies with regard to this claim; (2) Plaintiff has failed to introduce any admissible record evidence that he was in fact not provided with an opportunity to present evidence in support of his grievance; and (3) "the manner in which grievance investigations are conducted do[es] not create a protected liberty interest." *Odom v. Poirier,* 99–CV–4933, 2004 WL 2884409, at *10 (S.D.N.Y. Dec.10, 2004) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 [S.D.N.Y.2003] ), *accord Thomas v. Picio,* 04–CV–3174, 2008 WL 820740, at *5 n. 5 (S.D.N.Y. Mar.26, 2008). For all of these reasons, the Court rejects Plaintiff's newly asserted due process claim.

Second, with regard to Plaintiff's argument that Magistrate Judge Homer's omission of references to Plaintiff's numerous exhibits in the Report–Recommendation is evidence that Magistrate Judge Homer failed to resolve all ambiguities and draw all reasonable inferences in his favor, this argument fails to specifically address any of Magistrate Judge Homer's factual or legal conclusions. Instead, the argument generally attacks the findings and conclusions of the Report–Recommendation. As a result, the portion of the Report–Recommendation challenged by the argument is subject to only clear-error review. In any event, this portion of Magistrate Judge Homer's Report–Recommendation, as well as the other portions of his Report–Recommendation, would survive even a *de novo* review. Contrary to Plaintiff's argument, Magistrate Judge Homer relied on Plaintiff's version of the facts (and thus on Plaintiff's exhibits) in concluding that a question of material fact exists regarding Plaintiff's excessive-force claims and failure-to-intervene claims. For these reasons, the Court rejects Plaintiff's argument that Magistrate Judge Homer failed to resolve all ambiguities and draw all reasonable inferences in his favor.

**\*4** Finally, with regard to Plaintiff's argument that he did not hit his head against the wall, but rather his injuries were caused by Defendants, and Defendants are collectively trying to "cover up" this fact, Plaintiff has failed to point to (or introduce in his Objections) any admissible record evidence as to when, where, or how Defendants came together and planned to (1) assault him, and (2) subsequently cover up the assault. As a result, the Court rejects Plaintiff's argument that his conspiracy claim should survive summary judgment.

For all of these reasons, Magistrate Judge Homer's Report–Recommendation is accepted and adopted in its entirety.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Homer's Report–Recommendation (Dkt. No. 87) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 78) is **GRANTED** in part and **DENIED** in part, in the following regards:

(1) all of Plaintiff's claims against Defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley (including all of Plaintiff's medical-indifference claims under the Eighth Amendment, and Plaintiff's conspiracy claims) are **DISMISSED** **with prejudice** pursuant to Fed.R.Civ.P. 56;

(2) Plaintiff's claims against Defendant Smith are **DISMISSED without prejudice** for failure to serve, pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b);

(3) remaining in this action, following the issuance of this Decision and Order, are Plaintiff's excessive-force claims and failure-to-intervene claims against Defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson and Gilmore. (Plaintiff's claims against these Defendants are *not* dismissed due to the existence of genuine issues of material fact regarding those claims.)

## REPORT–RECOMMENDATION AND ORDER [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2010 WL 125774

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Thomas Dallio ("Dallio"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this civil rights action pursuant to 42 U.S.C. §§ 1981, 1983, and 1985 alleging that defendants, sixteen DOCS employees, violated his constitutional rights under the Eighth Amendment. Compl. (Docket No. 1).

Presently pending is the motion of fifteen of the defendants [2] for summary judgment pursuant to Fed.R.Civ.P. 56. Docket Nos. 78, 79, 83, 84. Dallio opposes the motion. Docket No. 85. For the following reasons, it is recommended that the motion be granted in part and denied in part.

[2]    Defendant R.N. Debra Smith has never been served with process or otherwise appeared in the action. *See* Docket Nos. 11 (summons returned unexecuted as to Smith after service was attempted by the United States Marshals Service), 36 & 38 (answers filed for 11 defendants except Smith), 78–1 (defendants' motion herein filed on behalf of all defendants except Smith). Under Fed.R.Civ.P. 4(m), a complaint must be served upon a defendant within 120 days. *See also* N.D.N.Y.L.R. 4.1(b) (same). The complaint herein was filed on September 27, 2006 and the summonses were issued on November 20, 2006. Docket No. 1; Docket entry dated Nov. 20, 2006. Thus, more than 120 days have elapsed without completion of service of process on Smith. Accordingly, it is recommended that the complaint be dismissed without prejudice as to Smith in accordance with Rule 4(m) and Local Rule 4.1(b).

### I. Background

The facts are related herein in the light most favorable to Dallio as the non-moving party. *See* subsection II(A) *infra*.

### A. The Incident

On November 10, 2003, defendants Scott Santamore and William Comstock, corrections officers at Upstate Correctional Facility, arrived at Dallio's cell to escort him to a holding area while his cell was searched. Compl. ¶ 19; Comstock Decl. (Docket No. 78–11) ¶ 1; Santamore Decl.

(Docket No. 78–10) ¶ 2. After the search, Santamore and Comstock escorted Dallio back to his cell and instructed him to stand against the wall so that his waist chain could be removed. Comstock Decl. ¶¶ 1–3; Santamore Decl. V 3. The waist chain was removed, Dallio was ordered to turn and proceed into his cell, and when Dallio turned, he punched Comstock in the face. Comstock Decl. ¶¶ 3–5; Santamore Decl. ¶¶ 5–7; Dallio Decl. (Docket No. 85–2) ¶ 6; Dallio Dep. Tr. (Docket No. 78–14) at 26. A struggle ensued as Comstock, Santamore, and Dallio all fell into Dallio's cell. Comstock Decl. ¶ 6–8; Santamore Decl. ¶¶ 8–12.

*5  An alarm was sounded and a response team composed of defendants Alicia McGuoirk, Amos LaClaire, [3] Frank Buksa, Craig Ramsdell, Lawrence Hopkins, and Paul Gilmore quickly arrived at Dallio's cell. Docket No. 78, Ex. D at 28, 32–35; LaClaire Decl. (Docket No. 78–4) ¶ 1; Buksa Decl. (Docket No. 78–5) ¶ 1; Ramsdell Decl. (Docket No. 78–6) ¶ 2; Hopkinson Decl. (Docket No. 78–7) ¶ 2; Gilmore Decl. (Docket No. 78–9) ¶¶ 3–5. Dallio immediately fell to the ground, was restrained, and ceased physical resistance but was then kicked and punched over twenty times in his face, abdomen, back, and legs. Dallio Decl. ¶¶ 2, 6–7, 15; Dallio Dep. at 31–37. Gilmore and McGuoirk stood by while Santamore, Comstock, LaClaire, Buksa, Ramsdell, and Hopkinson assaulted Dallio. Dallio Decl. ¶¶ 16, 18. [4] During the incident, Dallio's arms (Gilmore Decl. ¶ 13; Hopkinson Decl. ¶¶ 3–4; LaClaire Decl. ¶ 2; Docket No. 78, Ex. D at 33, 35) and legs (Gilmore Decl. ¶ 12; Ramsdell Decl. ¶ 4; Buksa Decl. ¶ 1; Docket No. 78, Ex. D at 32, 34) were restrained, immobilized with a bed sheet (Gilmore Decl. ¶¶ 12, 14, 15; Buksa Decl. ¶¶ 1–2), and Dallio was placed under his bunk without further incident. Gilmore Decl. ¶ 16; Buksa Decl. ¶ 3; Docket No. 78, Ex. D at 32. [5] Dallio was then left alone in his cells. [6]

[3]    The complaint spells the name as "LeClaire." Compl. The correct spelling is LaClaire." *See* LaClaire Decl. (Docket No. 78–4). The correct spelling will be used herein.

[4]    Defendants dispute Dallio's account.

[5]    A video tape was made by a surveillance camera fixed on the hallways outside Dallio's cell which shows the events which occurred outside the cell but not those inside. It also contains sound recordings of the raised voices while the parties

were inside the cell. *See* Video (Docket No. 78–20). The video shows Dallio strike Comstock, Comstock, Santamore, and Dallio then tumbling into Dallio's cell, and officers responding to the cell. Dallio can be heard on the tape yell that he was not resisting and that excessive force was occurring. *Id.; see also* Dallio Dep. Tr. at 28 (testifying that he agreed that the video was an accurate depiction of what occurred in the hallway).

[6] McGuoirk was then sent back to Dallio's cell to check on him and heard strange noises coming from his cell. McGuoirk Decl. ¶ 4. McGuoirk observed Dallio hitting his head and rubbing his face against the wall multiple times. *Id.* ¶¶ 4–6. McGuoirk reported this behavior to Gilmore and the medical department. *Id.* ¶ 7. McGuoirk then returned to Dallio's cell and observed him engaging in the same activity. *Id.* ¶¶ 8–9. Dallio now denies this conduct, but during an interview with the DOCS Inspector General's investigator, Dallio admitted to hitting his head against the wall of his cell in frustration after the incident. Docket No. 83, Ex. E at 169.

Later that day, Dallio was issued a misbehavior report which charged him with violating a direct order, assault on a staff member, and violent conduct. Docket No. 78, Ex. D at 22. A disciplinary hearing was conducted on the charges and at its conclusion, Dallio was found guilty of all three charges. Docket No. 78, Ex. D at 17; *see also* Docket No. 78, Ex. D at 68–150 (disciplinary hearing transcript). After administrative appeals, Dallio received a total sentence of twenty-four months in the special housing unit (SHU) [7] and twenty-four months loss of packages, commissary, and telephone privileges. Docket No.78, Ex. D at 13–16.

[7] SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On November 24, 2003, Dallio filed a grievance against the defendants for the alleged assault. Docket No. 78, Ex. F at 4.

After an investigation, defendant Donald Quinn determined that "[b]ased on the documentation submitted and Inmate Dallio's lack of witnesses or evidence his allegations cannot be substantiated." Docket No. 78, Ex. F at 7; *see also* Docket No. 78, Ex F at 7–60 (attachments of all documents and interviews considered during the investigation). The grievance was denied based on the internal investigation. Docket No. 78, Ex. F at 3. Dallio appealed, but the denial was affirmed, based upon both the findings of the internal investigation and the outcome of Dallio's disciplinary hearing. Docket No. 78, Ex. F at 2–3.

On November 24, 2003, Dallio filed a complaint with the Office of the DOCS Inspector General (IG) concerning the incident. Docket No. 83, Ex. E at 15–19. After another lengthy investigation, the IG concluded that the "[m]edical documentation and photo's [we]re consistent with The Use of Force reported by [the defendants]" and that Dallio's allegations were unsubstantiated. Docket No. 83, Ex. E at 1–2; *see also* Docket No. 83, Ex. E at 20–180 (compilation of all the correspondence, interviews, documentation, photographs, and records utilized by the IG in evaluating Dallio's complaints).

**B. Medical Treatment**

\*6 After the incident, Dallio was taken to the medical department where defendant Kimberly Perrea, a registered nurse, and Perrea completed a physical examination. Docket No. 78, Ex. D at 36; Docket No. 78, Ex. F at 19; Docket No. 85, Ex. I. Examination revealed (1) bruising and superficial abrasions to the forehead, (2) bruising on both cheeks, (3) bruising and swelling of the bridge of Dallio's nose, (4) one superficial abrasion on the left elbow, (4) superficial abrasions to the left shoulder and bruising to the left clavicle, (5) swelling and abrasions on the right flank, (6) a bruised right knee, (7) a bruised right hip with superficial abrasions, (8) redness throughout the middle and lower portions of Dallio's spine and back, sternum, and front of the neck, and (9) superficial abrasions and redness on Dallio's right wrist. Docket No. 78, Ex. D at 36; Docket No. 78, Ex. F at 36; Docket No. 85 Ex. I. The medical report indicated that Dallio should abrase the areas which received abrasions with soap and water when he returned to his cell. Docket No. 78, Ex. D at 49; Docket No. 78, Ex. F at 20. During his deposition, Dallio testified that he suffered from internal bleeding in his eye, injuries to his spinal area, difficulty walking, bruising throughout his face and legs, and lacerations. Dallio Dep.

2010 WL 125774

at 45–48. Defendants Lt. O'Connell and Roy Girdich both subsequently made rounds after the incident and observed Dallio's condition and failed to take any actions. Compl. ¶¶ 35, 44–45.

On November 11, 2003, Dallio was examined by a non-party member of the medical staff who noted Dallio's subjective complaints of bruising on his head, legs, back and stomach, chest pains, and difficulty breathing. Docket No. 83, Ex. E at 144. There was no physician or nurse practitioner on duty due to the holiday and when Dallio was informed of this, he became upset. *Id.* Dallio appeared in no obvious distress and could breathe easily as he had no difficulty yelling at the nurse. *Id.* Later that day, Dallio sought emergency treatment to see a physician but was warned that his current medical condition was not an emergency and that further abuse of the system would result in a misbehavior report. *Id.*

On November 12 and 13, 2003, Dallio complained of a spinal injury from the incident. Docket No. 83, Ex. E at 143; *see also* Riley Decl. (Docket No. 78–8) ¶ 5 (noting Dallio's complaints of discomfort, desire to see a chiropractor, the absence of objective signs of distress, and that he was given Tylenol to relieve pain). Both days, Dallio was observed standing in no distress, waving his extremities without any difficulty with his range of motion, responding easily to questions and yelling at staff to express his displeasure, and was treated with pain relievers. Docket No. 83, Ex. E at 143; *see also* Riley Decl. ¶ 9 ("At times from November 10, 2003 to November 15, 2003 [Dallio] frequently yelled at me...."). Additionally, Dallio complained of an injury to his right eye which was not noted to have occurred at the time of the incident. Docket No. 83, Ex. E at 143; *see also* Riley Decl. ¶ 6 (noting that "medical records for November 14, 2003 reveal that other medical personnel observed no injury to either of his eyes."). When the eye was examined, it was found to be reddened but without symptoms. Docket No. 83, Ex. E at 143. Dallio asked to be referred to a chiropractor for his complaints of spinal pain. Docket No. 83, Ex. E at 143.

**\*7** The following two days, November 14 and 15, 2003, Dallio continued to complain about his eye injury. Docket No. 83, Ex. E at 141–42. Dallio was seen by optometry on July 3, 2003 and by ophthalmology on October 9, 2003, his eye was reddened, but no further treatment was indicated. Docket No. 83, Ex. E at 141–42. Dallio was again noted to be moving all extremities without difficulty, standing in no apparent distress, ambulating without difficulty, speaking clearly, and continually yelling at medical staff. Docket No.

83, Ex. E at 141–42. [8] Again on November 17, 2003, Dallio was noted to have no difficulty with ambulation, movement, or speech. *Id.*

[8]    Dallio's examination was eventually terminated due to his behavior. Docket No. 83, Ex. E at 141–42. It was similarly terminated on November 17 due to his behavior and aggression toward staff. Docket No. 83, Ex. E at 141.

On November 18, 2003, Dallio requested treatment for injuries suffered during the incident. Docket No. 83, Ex. E at 140. Dallio was offered Tylenol and Motrin, and refused both. *Id.* He again demanded to see an eye doctor. *Id.* On November 20, Dallio lodged his last set complaints of back pain. *Id.* He again refused pain medication and was noted to be waving his arms around wildly and yelling at staff. *Id.* After twenty minutes, the examination was terminated due to Dallio's behavior. *Id.*

This action followed.

## II. Discussion [9]

[9]    Initially Dallio alleged pendant state law claims for assault, battery, and negligence. However, he has since conceded that his state law claims are barred. Plaintiff's Memorandum of Law (Docket No. 85–3) at 13. Accordingly, defendants' motion as to those claims should be granted.

In his complaint, Dallio alleges that defendants have violated his Eighth Amendment rights by subjecting him to excessive force, failing to intervene, and being deliberately indifferent to his serious medical needs. Additionally, Dallio alleges that defendants conspired to falsify reports and medical records and to remain silent about his injuries after the incident to make him appear culpable for the incident. The moving defendants seek summary judgment on all claims.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing

the court of portions of pleadings, depositions, and affidavits which support the motion. *Fed.R.Civ.P. 56; Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

**\*8** When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the

Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se"* regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

**\*9** In this case, the moving defendants have proffered substantial evidence to refute Dallio's claim of excessive force. The defendants themselves have offered affidavits that the force used was only that necessary to restrain Dallio from assaulting officers further. Dallio was found guilty of assault and that finding was affirmed on administrative appeal. The video tape confirms Dallio's assault on Comstock. An independent investigation by the IG found no basis for Dallio's contentions. The physical injuries allegedly suffered by Dallio were consistent with the self-inflicted injuries

observed by McGuoirk. Opposed to this evidence are only Dallio's own testimony and his voice on the video tape asserting that the officers were assaulting him in his cell after he had been restrained.

The question presented by this motion, then, is whether any question of fact exists as to whether any defendant used excessive force against Dallio or failed to intervene to prevent the use of such force. The evidence must be construed in the light most favorable to Dallio as the non-moving party. So construed, Dallio's testimony and statements heard on the vido tape stand in stark contrast to the substantial evidence proffered by defendants. This competing evidence rests on each side on the credibility of Dallio on the one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party leaves no choice but to credit Dallio's version of events for purposes of this motion. *See In re Dana Corp.*, 574 F.3d 128, 152 (2d Cir.2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

As described above, Dallio's evidence would concede that he in fact struck Comstock but that he was quickly restrained in his cell and, so restrained and defenseless, was struck repeatedly by Comstock, Santamore, LaClaire, Buksa, Ramsdell, and Hopkinson while Gilmore and McGuirk stood by and took no steps to intervene. Despite the relatively minor injuries Dallio suffered, the defendants' actions in assaulting an inmate who was restrained and compliant could constitute a *per se* constitutional violation. Thus, viewing the facts in the light most favorable to Dallio, he has proffered sufficient evidence to raise an issue of fact as to the objective prong of the Eighth Amendment analysis to require resolution by a jury.

Furthermore, if Dallio's evidence is credited, defendants' actions could be found wanton and malicious. The need for force dramatically subsided once Dallio was restrained and compliant on the ground. Viewing the facts in the light most favorable to Dallio, defendants continued to assault him. This conduct could be found unreasonable and unnecessary to sustain institutional order and safety once Dallio was compliant. Thus, such actions, as alleged by Dallio, are more than sufficient as well to raise a question of material fact as to the subjective prong of the Eighth Amendment analysis.

**\*10** Accordingly, defendants' motion for summary judgment should be denied as to defendants Comstock, Santamore, LaClaire, Buksa, Ramsdell, and Hopkinson on Dallio's claim of excessive force.

### 2. Failure to Intervene

Daillo further claims that Gilmore and McGuoirk failed to intervene when they saw the other defendants assaulting him. Prison officials are obliged to protect prisoners from known harms. *Farmer,* 511 U.S. at 829. "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citations omitted). In order to establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.*

Viewing the facts in the light most favorable to Dallio, he has raised a material issue of fact as to the failure to intervene of Gilmore and McGuoirk. While the two defendants may not have had advanced warning that the other defendants' attack against Dallio when they responded to the alarm and arrived at Dallio's cell, it became clear when Dallio was restrained and became compliant that Gilmore and McGuoirk could and should intercede to prevent additional harm when they observed six officers punching and kicking a defenseless inmate. Additionally, as discussed *infra,* a reasonable person in the officer's position would be well aware that such a use of force was contrary to an individual's constitutional rights. Thus, crediting Dallio's evidence, by standing idly by, Gilmore and McGuoirk failed to take no reasonable steps to intervene and terminate the violation of Dallio's constitutional rights. This conclusion is further supported as to Gilmore in light of his position as a supervisor,

Therefore, defendants' motions for summary judgment on Dallio's claim against Gilmore and McGuoirk for failing to intervene should be denied.

### 3. Medical Treatment [10]

10    Liberally construing Dallio's complaint, he alleges deliberate indifference to his cardiac conditions as well. Defendants traditionally filed Dallio's medical record. Docket No. 78, Ex. G. There are no indications of deliberately indifferent to Dallio's treatment. In the four months following the incident, Dallio was examined solely for cardiac issues on twenty different occasions, underwent four diagnostic tests, signed four refusals of treatment, and had one referral to a specialist. Additionally, from June 2005 until June 2007, Dallio's medical records reflect at least sixty related examinations for cardiac care, six diagnostic examinations revealing unremarkable results, four specialist consultations, five trips for emergency medicine, and nine treatment refusals. These 600 pages of records confirm that defendants were actively involved in Dallio's care on a near-daily basis and were neither deliberately indifferent nor delayed any treatments. Any claims based on Dallio's alleged cardiac condition should, therefore, be denied.

The Eighth Amendment prohibition also extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson,* 503 U.S. at 9). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (*citing Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care

should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**11   Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

Defendants correctly contend that, even viewing the facts in the light most favorable to Dallio, the bleeding in his right eye, bruises, and superficial abrasions were insufficient to constitute a serious medical condition either separately or in combination. In a recent decision in this district in another case, Dallio's Eighth Amendment claims for similar injuries sustained in another incident were deemed insufficient on a motion for summary judgment. *See Dallio v. Herbert,* No. 06–CV–118 (GTS/GHL), 2009 WL 2258964, at *5 (N.D.N.Y. July 28, 2009) (granting judgment to defendants for lack of serious injuries where Dallio suffered black eyes, bruising in his abdomen and kidney area, kick marks to his abdomen, open lacerations and bruising on his knees, lacerations on his arms and wrists, a headache, and numbness in his hands and fingers) (citing cases).

Even assuming that Dallio has raised a question of fact on this prong, he has still failed to prove deliberate indifference to that condition. Dallio received medical attention immediately after the incident, complaining of relatively minor injuries that only required cleansing with soap and water. Docket No. 78, Ex. D at 49; Docket No. 78, Ex. F at 20. Dallio disagreed with this course of treatment, but such disagreements are insufficient to sustain a constitutional violation. *Sonds,* 151 F.Supp.2d at 312.

Moreover, in the following ten days, Dallio was seen by the medical staff on eight of those days. Docket No. 84, Ex. E at 140–44. Thus, despite Dallio's conclusory allegations of a failure to provide medical treatment, the

record demonstrates that medical staff treated Dallio on a near-daily basis. Such involvement with an inmate's care is not indifferent. Additionally, examination of Dallio generally revealed that he was standing and waiting at his cell door, he ambulated without any difficulty, he appeared in no physical distress, and he had no problem speaking clearly, yelling, or waving his arms at medical staff to signify his displeasure. [11] *Id.* Such uncontradicted determinations by multiple individuals, both parties and non-parties to this action, belie Dallio's subjective and uncorroborated complaints of disabling pain and indifferent treatment. Additionally, Dallio was consistently offered pain medication to increase his level of comfort. On at least two occasions, Dallio refused this medication. Docket No. 83, Ex. E at 140. Dallio's voluntary actions in refusing the pain medication cannot be attributed to any alleged delay or interference by any defendant.

[11]    Any allegations that Dallio's progressive and frequent fits of rage were exaggerated or contrived are belied by the medical record which indicates at least twenty-seven instances from June 2005 until June 2007 where Dallio showed extreme anger and yelled at staff. Additionally, from prior to the incident until January 2004, there were seventeen similar instances where Dallio became argumentative and uncooperative with medical staff generally resulting in the termination of the examination.

*12 Furthermore, Dallio's contentions that he had injured his eye are not supported by any objective medical evidence. While it is undisputed that Dallio suffered from a reddened eye, the cause and timing of the irritation is immaterial to this claim, for medical staff noted and evaluated the condition and determined that it was not an emergency. Docket No. 83, Ex. E at 143. These findings were supported by the multiple record entries, by multiple medical staff, which agreed that there was no injury to the eye. Riley Decl. ¶ 6. No medical evidence has been proffered by Dallio to the contrary. Even if there was an injury and the multiple opposing medical conclusions were wrong, the misdiagnosis would, at worst, constitute negligence. *See Estelle,* 429 U.S. at 107. This is still insufficient to sustain a claim for deliberate indifference. *Id.* at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Moreover, to the extent that Dallio contends that he should have been seen by a chiropractor or eye doctor, [12] such

contentions are also insufficient to support a constitutional claim. Docket No. 83, Ex. E at 143. An inmate has no right to a physician of his or her choosing. *See Dean v. Coughlin,* 804 F.3d 207, 215 (2d Cir.1986). Moreover, any decisions relating to the appropriateness or timing of a specialist consultation are within the purview of the medical staff and any disagreement the inmate has with the decision qualifies as a disagreement over treatment, which is not an actionable Eighth Amendment claim. *Sonds v. St. Barnabas Hosp.,* 151 F.Supp.2d 303, 312 (S.D.M.Y.2001).

[12]    Medical records indicate that Dallio had seen eye specialists on July 3 and October 9, 2003. Docket No. 83, Ex. E at 141–42. Additionally, records subsequent to the incident indicate an ophthalmology consult within a month of the incident as well as multiple examinations by medical staff over eye problems and broken glasses, glasses orders, and follow-up appointments and consultations. Therefore, there is no dispute in the record on this motion that Dallio's eyes were being treated in an appropriate manner and defendants' actions neither delayed treatment nor showed deliberate indifference to Dallio's treatment.

Accordingly, defendants' motion as to this claim should be granted as to Perrea and Riley.

### C. Conspiracy

Dallio alleges that all defendants conspired to violate his constitutional rights.

### 1. § 1983

In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement may be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143,177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d

Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

**\*13** In this case, even construing the facts in the light most favorable to Dallio, he has failed to advance anything more than conclusory allegations of a conspiracy. Dallio fails to show specifically when, where, or how defendants came together and planned to assault him. Moreover, Dallio fails to show when or how multiple departments agreed, either expressly or implicitly, to collaborate with one another and independently perpetrate the alleged web of deceit by filing false incident reports, medical records, and investigations. Without anything more than a conclusory allegation that all defendants conspired with one another, Dallio's claims fall short of raising a material question as to whether defendants' actions constituted a conspiracy. [13]

[13]   Dallio relies on *Juan v. Rafferty,* 577 F.Supp. 774 (D.N.J.1984), to support the proposition that his assertions that all defendants filed false reports is sufficient to withstand the current motion. Dallio's reliance is misplaced. In *Juan,* (1) defendants filed a motion to dismiss as opposed to the present motion for summary judgement and (2) the litigation was in its infancy as discovery had not yet been completed. *Id.* at 778. Therefore, the pleadings were sufficient at that early stage to present a basis for a claim. *Id.* The present case is at a far different point. Discovery is now complete and actual evidence rather than allegations of agreements among multiple parties must be advanced. Like *Juan,* Dallio has survived the pleadings stage of the litigation. However, unlike *Juan,* allegations alone at this stage are insufficient as evidence must now be presented for the claim to withstand the current motion. As no evidence was provided, the claim fails to raise a material question of fact.

**2. § 1985**

"Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). To demonstrate that a conspiracy existed, "the plaintiff must prove a mutual understanding or meeting of the minds to violate [his or] her civil rights." *Salgado v. City of N.Y.,* No. 00–CV–3667 (RWS), 2001 WL 290051, at \*8 (S.D.N.Y. Mar.26, 2001) (citations omitted). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Dallio does not assert any facts giving rise to a conspiracy. First, Dallio vaguely assert conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. *See X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.1999). Second, as discussed *supra,* there has been proffered no evidence relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Dallio of his civil rights. Lastly, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus.

Accordingly, defendants' motion for summary judgment as to Dallio's claims of conspiracy should be granted.

### D. Bouchey and Gettman

Defendant Andrew Bouchey was named in the complaint as a member of the response 20 team. Compl. (Docket No.

1) ¶ 22. However, the undisputed evidence shows that he was not personally involved in the incident. As such, no personal involvement has been shown and Bouchey is entitled to judgment on all claims against him. *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)* ( "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotations and citations omitted).

**\*14** Similarly, defendant C.O. Gettman was identified in the complaint as the individual responsible for taking the photographs subsequent to the incident. Compl. ¶¶ 36–37. All submissions indicate without contradiction that the individual responsible for these photographs was named Clarke. *See generally* Docket No. 78, Ex. D at 7. As such, no evidence of any personal involvement has been shown with regard to Gettman either. Accordingly, he as well should be granted judgment. *Wright, 21 F.3d at 501.*

### E. Qualified Immunity

Defendants claim that even if Dallio's constitutional claims are substantiated, they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Aiken v. Nixon, 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002)* (McAvoy, J.), *aff'd, 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003).* However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany, No. 03–CV–1157, 2006 WL 839525 \*16 (N.D.N.Y. Mar. 27, 2006)* (quoting *Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir.1990)* (internal citations omitted)).

A court must first determine whether, if a plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).* Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken, 236 F.Supp.2d at 230.*

Here, the second prong of the inquiry need not be reached concerning Dallio's claims other than his Eighth Amendment excessive force and failure to intervene claims because, as discussed *supra,* accepting all of Dallio's evidence as true, he has not shown that any of the defendants in those claims violated his constitutional rights.

As to Dallio's excessive force and failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. *See, e.g., Hudson, 503 U.S. at 9–10.* Thus, accepting all of Dallio's allegations about the incident as true, qualified immunity cannot be granted to defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, or Gilmore since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation.

**\*15** Accordingly, defendants' motion for summary judgment on this ground should be (1) granted in the alternative as to Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley, and (2) denied as to Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, and Gilmore.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No.78) be:

A. **GRANTED** as to defendants Bouchey, Quinn, Girdich, Gettman, O'Connell, Perrea, and Riley as to all claims against them, and these defendants should be terminated from this action; and

B. **DENIED** as to defendants Santamore, Comstock, McGuoirk, LaClaire, Buksa, Ramsdell, Hopkinson, and Gilmore as to Dallio's Eighth Amendment claims of excessive force and failure to intervene; and

2. The complaint be **DISMISSED** without prejudice as to defendant Smith pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

**Dallio v. Santamore, Not Reported in F.Supp.2d (2010)**

2010 WL 125774

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of* *HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 125774

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1063875
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
R. LAMORA, R. Scott, R. MacWilliams, K. Crossett, E.
Facteau, C.O. Demers, R. Woods, R. Gill, Defendants.

Civ. Action No. 9:08–CV–431 (GLS/DEP).
|
Feb. 24, 2010.

West KeySummary

1  **Civil Rights** 🔑 Criminal law enforcement;
prisons

**Summary Judgment** 🔑 Prisons and jails

Genuine issue of material fact existed as to
whether corrections officer repeatedly hit the
inmate after the inmate was subdued and
thus summary judgment was precluded on the
inmate's excessive force claim. The inmate
alleged in his complaint, testified under oath
at his deposition, and stated in a sworn
affidavit that the corrections officer punched him
unnecessarily in the head several times during
the inmate's cell extraction. Although the cell
extraction was supposed to be videotaped, the
video was never recorded. Despite the fact that
the inmate's injuries were slight and were at least
indirectly brought about by his own action of
refusing handcuffs, there were credibility issues
to be determined. U.S.C.A. Const.Amend. 8.

35 Cases that cite this headnote

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General,
State of New York, C. Harris Dague, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Terry Cicio, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983, alleging
deprivation of his civil rights. In his complaint Cicio, who
refused multiple orders from prison officials to exit his cell
in order to effectuate a transfer to another location, complains
that in the course of the ensuing cell extraction, during
which he was removed through the use of force, one of
the corrections officers who participated exerted excessive
force causing him to suffer injuries, while the others involved
failed to intervene, all in violation of the Eighth Amendment's
protection against cruel and unusual punishment. As relief
for the violation, plaintiff seeks the recovery of compensatory
and punitive damages from defendants.

Currently pending before the court is defendants' motion for
summary judgment seeking dismissal of plaintiff's complaint.
In their motion defendants challenge the legal sufficiency of
plaintiff's excessive force and failure to intervene claims and
additionally assert their entitlement to Eleventh Amendment
immunity from suit in their official capacities and good
faith qualified immunity from suit as individuals. Because
a reasonable factfinder could conclude from the record now
before the court that more force than necessary to subdue
and remove Cicio from his cell was applied maliciously
and sadistically by prison officials, I am constrained to
recommend that defendants' motion be denied, except as to
plaintiff's claims against defendant Woods and those against
defendants in their official capacities, which are subject to
dismissal.

I. *BACKGROUND* [1]

[1]  In light of the procedural posture of this case, the
following recitation is from the record now before
the court, with all inferences drawn and ambiguities
resolved in favor of the plaintiff. *Terry v. Ashcroft,*
336 128, 137 (2d Cir.2003). It should be noted that
while most of the pertinent facts are undisputed,
defendants sharply contest plaintiff's allegation
that he was unnecessarily punched by defendant
MacWilliams during the forcible removal from his
cell.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1); *see also* Dague Decl. (Dkt. No. 35–16) ¶ 3 and Exh. A (Dkt. No. 35–17). At the times relevant to his claims, plaintiff was designated to the Upstate Correctional Facility ("Upstate"), located in Malone, New York. [2] *Id.*

[2]     Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

The events giving rise to the claims in this action were set in motion on December 27, 2007, when plaintiff refused to return a razor given to him by prison officials to permit him to shave. Dague Decl. (Dkt. No. 35–16) Exh. B (Dkt. No. 35–18) (Transcript of Deposition of Terry Cicio, conducted on March 12, 2009, hereinafter cited as "Cicio Dep. Tr.") at pp. 29–30; Gill Aff. (Dkt. No. 35–4) ¶ 5 and Exh. A (Dkt. No. 35–5). According to Cicio, he purposefully withheld the razor in order to prompt a transfer out of the gallery on which his cell was located to another area. Cicio Dep. Tr. at pp. 27–28.

Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or "PIMS", intended to provide incentive and encourage behavioral adjustment for SHU inmates. *See* Dague Decl. (Dkt. No. 35–16) ¶ 8. Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges. *Id.; see also* Cicio Dep. Tr. at p. 27. At the time of plaintiff's refusal of surrender his razor, he was assigned to a PMS level three cell. Cicio Dep. Tr. at p. 27.

**\*2** On December 27, 2007, following the razor incident, plaintiff was informed that he would be relocated to a PIMS level one cell. Cicio Dep. Tr. at p. 31; Gill Aff. (Dkt. No. 35–4) ¶ 7 and Exh. B (Dkt. No. 35–6). To effectuate the move, prison officials instructed the plaintiff to place his back to the cell door and his hands through the feed up slot in order to permit the application of hand restraints. Gill Aff. (Dkt. No. 35–4) ¶ 8. Plaintiff refused that order as well as several subsequent directives to voluntarily exit his cell. *Id.* at ¶ 9 and Exh. A. Attempts were made to convince plaintiff to reconsider his refusal; those efforts included interventions by clergy and

guidance staff at the facility. *Id.* When those measures proved unsuccessful, orders were given to prepare a cell extraction team. Gill Aff. (Dkt. No. 35–4) ¶ 10.

At 2:30 p.m. on that day Corrections Lieutenant Andrew Lamora issued a final order directing plaintiff to exit his cell, warning that if he persisted in his refusal force would be applied to carry out his removal. Gill Aff. (Dkt. No. 35–4) ¶¶ 11–12; Lamora Aff. (Dkt. No. 35–8) ¶¶ 8–10; *see also* Complaint (Dkt. No. 1) Statement of Facts ¶ 4. Despite that last directive, plaintiff refused to obey defendant Lamora's command. Lamora Aff. (Dkt. No. 35–8) ¶ 9.

Following established facility protocol, prison officials took the first step toward conducting a forcible extraction by administering two one-second bursts of a chemical aerosol into plaintiff's cell, followed by another request for voluntary compliance. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–13 and Exhs. A (Dkt. No. 34–5) and B (Dkt. No. 34–6); Lamora Aff. (Dkt. No. 35–8) ¶ 11. The process was repeated at two minute intervals on four more occasions; each time, corrections officers offered plaintiff the opportunity to comply with their orders before administering another dose. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–14.

When the use of chemicals failed to convince Cicio to exit his cell, the cell extraction team that had been assembled, including Corrections Officers Richard Scott, Richard MacWiliams, Kurt Crossett and Christopher Demers, entered the cell. Gill Aff. (Dkt. No. 35–4) ¶ 17 and Exhs. A (Dkt. No. 35–5) and B (Dkt. No. 35–6); Lamora Aff. (Dkt. No. 35–8) ¶ 15. To accomplish the forced extraction each of those individuals was assigned a specific task. Lamora Aff. (Dkt. No. 35–8) ¶ 16. Corrections Officer Scott was designated to be the first to enter the cell and, through use of a shield, was tasked with attempting to bring Cicio to the ground and assist with the application of handcuffs. *Id.* Corrections Officer MacWilliams' assigned role was to control plaintiff's arms and to assist in the take down and application of handcuffs. *Id.* Corrections Officer Demers was assigned to control Cicio's right leg and assist in the take down and application of ankle restraints, and Corrections Officer Crossett was similarly designated as the person responsible for control of plaintiff's left leg, assisting in the take down, and application of ankle restraints. *Id.* The cell extraction, which proceeded in accordance with this protocol, was successfully completed in approximately two minutes or less. Gill Aff. (Dkt. No. 35–4) ¶ 20; Lamora Aff. (Dkt. No. 35–8) ¶ 18; Scott Aff. (Dkt. No. 35–7) ¶ 13; Demers Aff. (Dkt. No. 35–12) ¶

2010 WL 1063875

13; Crossett Aff. (Dkt. No. 35–10) ¶ 13; Facteau Aff. (Dkt. No. 35–11) ¶ 12.

**\*3** Also in accordance with the established protocol, Corrections Officer Eric Facteau was assigned to record the cell extraction using a hand-held camera. Facteau Aff. (Dkt. No. 35–11) ¶¶ 5–6. Unfortunately, however, while Corrections Officer Facteau attempted to videotape the process he later discovered the tape was defective, and none of the cell extraction was recorded. *Id.* at ¶¶ 9, 14.

Following the cell extraction, plaintiff was taken to a decontamination area where his clothes were removed and traces of the chemical aerosol were eliminated. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5). Plaintiff was thereafter brought to a holding cell to be medically examined and photographed. *Id.*

During the course of the cell extraction both plaintiff and two of the participating corrections officers suffered injuries. Plaintiff described his injuries as including a scratch to the right side of his face less than an inch long, a contusion above his left eye, a bruise on his left shoulder "the size of a quarter or a little bigger[, n]othing major", and a bruise to the back of his shoulder. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; Cicio Dep. Tr. at pp. 48–52. A medical report prepared following the examination notes the following with regard to plaintiff's injuries:

> Inmate has small abraised/red area to rt. upper/lateral aspect of chest. Has small contused area to left lateral aspect of forehead, has small eccymotic area to rt. lateral aspect of shoulder. No life threatening injuries. No blood present. Alert and oriented. No signs of distress. No treatment necessary.

Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6). Following the incident plaintiff stated to medical staff that he was "fine" and did not wish to receive treatment. *Id.; see also* Cicio Dep. Tr. at pp. 75–76. During the cell extraction Corrections Officer MacWilliams suffered injury to his right wrist, and Corrections Officer Scott injured his right hip; no other staff members involved reported any injuries. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5).

For the most part, the foregoing facts are not disputed by the plaintiff. He does, however, contend that during the course of the extraction he was "repeatedly punched" by Corrections Officer MacWiliams, who asked "you want to play?" Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 46–47; Cicio Aff. (Dkt. No. 36) ¶¶ 10, 12. Plaintiff further alleges that while the other members of the cell extraction team, including Sergeant R. Gill and Lieutenant R. Lamora, "had ample time to curb the abuse" he suffered, they stood by without intervening. *Id.* at ¶ 11.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 7, 2008. Dkt. No. 1. Named as defendants in Cicio's complaint are Robert Woods, the superintendent at Upstate; Corrections Lieutenant Randy Lamora; Corrections Sergeant Robert Gill; and Corrections Officers Richard Scott, Richard MacWilliams, Kirk Crossett, Eric Facteau, and Christopher Demers. Plaintiff's complaint asserts a single cause of action, alleging violation of his Eighth Amendment right against cruel and unusual punishment.

**\*4** Following joinder of issue and completion of pretrial discovery, defendants moved on August 6, 2009 for summary judgment dismissing plaintiff's complaint. Dkt. No. 35. In their motion, defendants argue that plaintiff's excessive force and failure to intervene claims are lacking in merit, that his claims against the defendants in their official capacities are barred by the Eleventh Amendment, and that in any event they are entitled to qualified immunity from suit against them for damages as individuals. *Id.* Plaintiff has since responded in opposition defendants' motion,[3] Dkt. No. 36, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York 72.3(c). *See* Fed.R.Civ.P. 72(b).

[3]      Plaintiff opposes defendants' motion and, alternatively, requests that he be granted a continuance so that he may pursue additional discovery. In particular, plaintiff seeks discovery regarding the facility's alleged refusal to allow plaintiff to view the DOCS directives regarding use of force, video procedures, chemical agents, and cell extractions. As an initial matter, I note that the deadline for completion of discovery expired on March 13, 2009, Dkt. No. 28, several months

2010 WL 1063875

before defendants filed their pending motion, and plaintiff has shown no reason why he did not timely pursue the discovery now requested. In any event, as will be seen, none of the information now sought by plaintiff would impact my recommendation regarding the defendants' motion, especially considering that nearly all of the material facts are undisputed by the plaintiff.

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d

Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998).[4] The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

4     With their motion defendants properly filed a statement of materials facts alleged not to be in dispute, as required under Northern District of New York Local Rule 7.1(3). Dkt. No. 35–2. Under that rule when filing papers in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it in matching numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). In light of plaintiff's failure to provide such a statement, the court could deem the assertions set forth in defendants' Local Rule 7.1(a) (3) Statement, including to the effect that defendant MacWilliams did not punch him as alleged, *see* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 35–2) ¶¶ 34–35, to have been admitted by him. *Id.; see, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and contested the claim that defendant MacWilliams did not strike him, though without minimizing the importance of Local Rule 7.1(a) (3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement.

B. *Excessive Force*

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)

2010 WL 1063875

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. ––– U.S. ––– – , ––– S.Ct. ––––, ––– L.Ed.2d ––– – , 2010 WL 596513, at *3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

*6    [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting Hudson, 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated .... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000).

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)
2010 WL 1063875

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

**\*7** In this case, although the injuries sustained by Cicio as a result of the incident in question were admittedly slight and at least indirectly brought about by his own actions, because the governing law requires that the evidence be viewed in the light most favorable to the non-moving party, I am compelled to conclude that issues of fact preclude the entry of judgment as a matter of law in favor of the defendants. Plaintiff has alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that defendant MacWilliams punched him unnecessarily in the head several times during the cell extraction. Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 52–55; Cicio Aff. (Dkt. No. 36) ¶ 10. According to Cicio, when the defendants entered the cell and hit him with a shield he immediately dropped to the floor. Cicio Dep. Tr. at p. 64. At that point, plaintiff asserts, he could no longer resist because the corrections officers involved had his arms pinned, and could have easily handcuffed him. *Id.* Instead, plaintiff claims, "[MacWilliams] just kept hitting me. He hit me several times.... When I say maliciously and sadistically when he tells me that, when he's asking me if I want to play, he's hitting me. That means he's doing it for his own purpose...." *Id.* at pp. 52, 53–54. One could argue further that from the lack of a videotape recording of the relevant events, despite orders to Corrections Officer Facteau to follow the established protocol and record the cell extraction, a reasonable factfinder could infer that excessive force was applied during the incident and that a videotape of the events would have disclosed the punches thrown by defendant MacWilliams.

Without question, the evidentiary support for plaintiff's claim is far from overwhelming. Plaintiff's assertions are sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio. MacWilliams Aff. (Dkt. No. 35–9) ¶ 13. Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him. Additional evidence tending to contradict plaintiff's allegations includes the fact that it took two minutes or less for the corrections officers to perform the cell extraction and the reports of medical examinations conducted of the plaintiff shortly after the incident as well as the photographs of plaintiff's face, both revealing that he sustained only a slight bruise, *see* Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6), an injury that would also be fully consistent with what would be expected to result when corrections officers must take a resisting inmate to the floor for the purpose of administering arm and leg restraints. [5] Moreover, during his deposition, plaintiff acknowledged that the photographs accurately depict the full extent of the injuries suffered during the cell extraction. Cicio Dep. Tr. at 80–81.

[5]     Not insignificantly, during his deposition plaintiff acknowledged his realization that his refusal to obey a direct order to leave his cell would result in the use of force to accomplish that end. *See* Cicio Dep. Tr. at p. 37. This evidence could provide some support for a finding that defendants' acted reasonably.

**\*8** Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact. *Griffin,* 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him."). I view of the foregoing, I am obligated to recommend that defendants' motion be denied as to plaintiff's excessive use of force claim.

### C. *Failure To Intervene*

In addition to asserting that defendant MacWilliams beat him excessively, plaintiff alleges that the various other defendants

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)

2010 WL 1063875

observed the incident but stood by without intervening on his behalf .[6] Defendants contend that plaintiff's failure to intervene claim similarly lacks merit.

[6]   Superintendent Wood has submitted an affidavit indicating that he was not present during the course of the incident, and plaintiff has offered no evidence to the contrary. *See* Woods Decl. (Dkt. No. 35–13) ¶ 7. Under these circumstances, defendant Woods is entitled to dismissal of plaintiff's claims against him on the independent basis of his lack of personal involvement in the constitutional violation alleged. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor).

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02–CV–6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).[7] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

[7]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*9** Although defendants deny that MacWilliams struck plaintiff, I have already determined that material questions of fact exist with respect to this issue. As to the co-defendants, plaintiff testified that "they had plenty of time during the whole incident to actually stop [MacWilliams] from assaulting [him]." Cicio Dep. Tr. at p. 52. Once again, though the evidence in plaintiff's favor is weak, I find that questions of fact preclude summary judgment with respect to plaintiff's failure to intervene claim and therefore recommend that this portion defendants' motion also be denied.

### D. *Eleventh Amendment*

To the extent that damages are sought against them in their official capacities, defendants' motion also seeks dismissal of those claims on the basis of the protection afforded under of the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and to state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

It is unclear from plaintiff's complaint whether he has sued defendants in their individual or official capacities, or both. Insofar as plaintiff's damage claims against the defendants are brought against them in their official government-employee capacity they are the equivalent of claims against the State of New York, and they are subject to dismissal under the Eleventh Amendment state-employee exception. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–

99 (N.D.N.Y.1984) (McCurn, J.). I, therefore, recommend dismissal of plaintiff's damage claims against the defendants in their official capacities.

E. *Qualified Immunity*

In their motion defendants also rely on the doctrine of qualified immunity, arguing that because their actions were reasonable under the circumstances they are immune from suit and plaintiff's complaint should be dismissed.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

**\*10** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[8] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[9] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient

disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." [10] *Pearson,* 555 U.S. at——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

8    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

9    In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

10   Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional

violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*11** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Undeniably, the right of a prison inmate to be free from excessive use of force has long been established. *Russo v. City of Bridgeport,* 479 F.3d 196, 212 (2d Cir.), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007). Since I have already determined that, if credited, plaintiff's testimony could support a jury finding that defendants acted intentionally to harm him, it follows that a rational trier of fact could also conclude that defendants' conduct was not objectively reasonable under the circumstances. *See id.; see also Dallio v. Santamore,* No. 9:06–CV–1154, 2010 WL 125774, at \*14 (N.D.N.Y. Jan.7, 2010) (Suddaby, J. and Homer, M.J.) ("As to [plaintiff's] excessive force and failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. Thus, accepting all of [plaintiff's] allegations about the incident as true, qualified immunity cannot be granted ... since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation."). As a result, I have determined that material questions of fact exist on the issue of whether defendants are entitled to qualified immunity from suit and therefore recommend that this portion of defendants' motion also be denied.

IV. *SUMMARY AND RECOMMENDATION*

Given the circumstances leading up to the forcible extraction of Cicio from his cell, it is doubtful that he will be viewed by a jury as a particularly sympathetic plaintiff. Plaintiff placed his own safety as well as that of others in jeopardy by refusing a lawful order to exit his cell, admittedly knowing that his actions would result in the use of force to remove him. Plaintiff's refusal to obey prison officials' commands, however, though plainly indefensible, did not provide corrections officers with a license to exact retribution by needlessly punching him after he was subdued and no longer resisting, as he has alleged. Whether Officer MacWilliams did, in fact, needlessly punch the plaintiff raises a question of credibility given the conflicting accounts now before the court. I am therefore compelled to conclude that the existence material questions of fact preclude the court from granting defendants' motion for summary judgment with respect to plaintiff's excessive use of force and failure to intervene claims and on the issue of qualified immunity. Because defendants are immune from suit in their official capacities, however, and plaintiff has adduced no evidence that defendant Woods was personally involved in the offending conduct, defendants' motion dismissing plaintiff's damage claims against them in their official capacities and all claims against defendant Woods should be granted. Accordingly, it is hereby respectfully

**\*12** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods be DISMISSED but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such

2010 WL 1063875

objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063875

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2632600
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raszell REEDER, Plaintiff,
v.
M. HOGAN, et al, Defendants.

No. 9:09–CV–520 (NAM/ATB).
|
June 11, 2013.

**Attorneys and Law Firms**

Raszell Reeder, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Adrienne J. Kerwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

Justin C. Levin, Assistant Attorney General.

### *ORDER*

NORMAN A. MORDUE, District Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Andrew T. Baxter,
duly filed on the 17th day of May 2013. Following fourteen
(14) days from the service thereof, the Clerk has sent me
the file, including any and all objections filed by the parties
herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. Defendant William Allan's summary judgment motion
(Dkt. No. 162) is granted, and the complaint is dismissed in
its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon
all parties and the Magistrate Judge assigned to this case

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

ANDREW T. BAXTER, United States Magistrate Judge.

**I. Background**

Plaintiff commenced this action pro se, seeking damages
for injuries resulting from various incidents occurring
between 2007 and 2008. (Dkt. No. 1). Liberally construed,
plaintiff's original complaint set forth several First and Eighth
Amendment claims, including excessive force, denial of
medical care, failure to receive proper Ramadan meals, and
challenges to his conditions of confinement. *Id.*

On November 16, 2009, defendants filed a motion to dismiss
the complaint pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No.
69). While defendants' motion to dismiss was pending,
plaintiff filed an amended complaint ("First Amended
Complaint") on January 4, 2010. (Dkt. No. 84). Although
the motion to dismiss was filed prior to the First Amended
Complaint, the only amendment to the original complaint
was the addition of two named defendants in place of
two of the John/Jane Doe defendants. The new defendants
requested that they be allowed to join the pending motion to
dismiss. (Dkt.Nos.72, 87). The court granted these requests.
(Dkt.Nos.77, 88).

On September 29, 2010, then-Chief District Judge Mordue
granted defendants' motion in part and denied it in part.
(Dkt. No. 122). On October 8, 2010, this action was referred
to Magistrate Judge Victor E. Bianchini for settlement
proceedings, pursuant to the Pro Se Prisoner Settlement
Program, and the case was stayed in all other respects until
the proceedings were completed. (Dkt. No. 124).

On November 1, 2010, plaintiff filed a motion to amend,
together with a Second Amended Complaint. (Dkt. No. 129).
In light of the stay, the Court did not address the motion.
On January 31, 2011, the stay was lifted. (Dkt. No. 133).
Before this Court could address plaintiff's November 1, 2010
motion, plaintiff filed another motion to amend on May 4,
2011, together with a Third Amended Complaint. (Dkt. No.
141). In an order dated June 22, 2011, this court denied
plaintiff's motion to amend filed on May 4, 2011, but granted,
in part, the November 1, 2010 motion. (Dkt. No. 145).
The operative pleadings were then plaintiff's First Amended

2013 WL 2632600

Complaint, filed January 4, 2010, without the claims that were dismissed as a result of Judge Mordue's September 29, 2010 Order, read together with plaintiff's Second Amended Complaint. Defendants filed a motion for summary judgment on December 27, 2011. (Dkt. No. 150). Plaintiff filed a response on January 9, 2012. (Dkt. No. 154).

**\*2** On September 19, 2012, Judge Mordue granted defendants' motion for summary judgment (Dkt. No. 150), and all claims against all defendants were dismissed except for plaintiff's claim based on excessive force against defendant Allan, which was denied without prejudice to defendant Allan filing another summary judgment motion (Dkt. No. 161). On October 19, 2012, defendant Allan filed his motion for summary judgment. (Dkt. No. 162). Plaintiff opposed the motion. (Dkt. No. 165).

## II. *Facts and Contentions*

Plaintiff alleges that on August 25, 2008, defendants Uhler, Allen, Marcil, and other correction officers wanted plaintiff to come out of his cell, but he "disagreed with coming out," because "they did not come with [a] camera." (First Am. Compl. ¶ 24, 41). A "distraction unit" was called, bringing a camera, so plaintiff "agreed to come out," but defendants Uhler, Allen, Marcil and others still used mace "repeatedly." *Id.* Plaintiff was placed in full restraints and escorted to the SHU. (First Am. Compl. ¶ 24–25; Pl.'s Dep. 109–12 (Dkt. No. 162–3)).

For the reasons below, the court recommends granting defendant's motion and dismissing plaintiff's complaint in its entirety.

## III. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. *Fed.R.Civ.P. 56*; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Fed.R.Civ.P. 56(c)(1) (A).* If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

## IV. Excessive Force

**\*3** Plaintiff alleges that various correction officers and a "distraction" unit used excessive force against him on August 25, 2008.

### A. Legal Standards

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s]

2013 WL 2632600

[an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

**B. Application**

Plaintiff claims that on August 25, 2008, Sergeant Rendle told plaintiff to get dressed so he could return to his cell in the Special Housing Unit ("SHU"). (Pl.'s Dep. 101) (Dkt. No. 162–3). Plaintiff said that he and Sergeant Rendle exchanged "disrespectful statements," and he told Sergeant Rendle, "The door is locked, but when I catch you, you know I'm going to hurt you ." (Pl.'s Dep. 101–02). Because plaintiff refused to comply with direct orders, it was apparent that plaintiff was not going to voluntarily leave his cell, and an extraction team was called.

**\*4** Sergeant Rendle's report states that when he returned to plaintiff's cell with the extraction team, plaintiff was standing in his cell with something in his right hand. (Dkt. No. 162–9 at 18). Sergeant Rendle ordered plaintiff several times to drop what he was holding in his hand, after which plaintiff threw it against the door of the cell and retrieved what appeared to Sergeant Rendle to be feces from the toilet. *Id.* Sergeant Rendle's report indicates that plaintiff continued to refuse to comply with direct orders. *Id.* In an effort to subdue plaintiff

so he could be removed from his cell, the extraction team used chemical agents. *Id.* Even after the chemical agents were used, plaintiff refused to comply, so the extraction team entered and restrained plaintiff. *Id.*

Plaintiff disputes the reason why the extraction team came to his cell on August 25, 2008, and claims that he complied with instructions and stood with his back to the door so he could be handcuffed. (Pl.'s Dep. 103–04). Plaintiff claims that Sergeant Rendle started spraying mace at plaintiff without provocation or warning. (Pl.'s Dep. 104–05). Plaintiff claims that when the members of the extraction unit told him to get on the floor, he complied. (Pl.'s Dep. 105–07). Plaintiff testified that after he was handcuffed, no more mace was sprayed. (Pl.'s Dep. 117). The chemical agent affected plaintiff's eyes and his breathing, and within one minute he was taken to the decontamination shower, and within seven minutes, the effects from the chemical agent were gone. (Pl.'s Dep. 113, 115). Plaintiff claims that defendant Allan is responsible for the use of excessive force against him on August 25, 2008. The other officers on the extraction team are not defendants in this action. [1]

[1]    The Use of Force Report dated August 25, 2008, indicates that R. Rendle, M. Chagnon, N. Moore, E. Owen, and T. Saunders assisted on the extraction team, none of whom were named as defendants in this action. (Dkt. No. 162–9 at 11, 14).

Defendant Allan was one of the lieutenants in charge of the Correction Emergency Response Team (CERT) at Clinton in August 2008. (Dkt. No. 162–9 at 1–2). The record contains a declaration by defendant Allan, who affirmed that he was called to plaintiff's cell on August 25, 2008, and he attempted to convince plaintiff to comply with orders to exit his cell so he could be escorted back to the SHU. (Dkt. No. 162– 9 at 2). Defendant Allan affirmed that plaintiff continued to ignore orders to exit his cell, and defendant Allan then ordered Sergeant Rendle to use force to extract plaintiff from his cell. Sergeant Rendle sprayed two one-second bursts of chemical agents a total of five times at plaintiff. (*Id.*). Defendant Allan affirmed that even after the chemical agents were sprayed, plaintiff still would not exit his cell. (*Id.*). The extraction team then entered plaintiff's cell and using body holds, placed plaintiff in restraints and escorted him to the decontamination shower. (*Id.*). Plaintiff was escorted to the SHU, where he was examined by defendant Nurse Farnan, who found no injuries. (Dkt. No. 162–9 at 15).

Defendant Allan submitted a video of the cell extraction that occurred on August 25, 2008.[2] (Dkt. No. 159). The video is approximately 30 minutes long and documents the cell extraction team at plaintiff's cell through when he arrives at his new cell. (*Id.*). The video depicts that when the extraction team arrives at the cell, plaintiff is given one last direct order to exit the cell, and he is told to come to the front of the cell so he can be handcuffed through the food slot. (*Id.* at 2:32:30). Plaintiff approaches the door to the cell, and one of the extraction team asks what is in plaintiff's hand. (*Id.* at 2:32:47). Plaintiff is repeatedly told to drop what he has in his hand. (*Id.* at 2:32:48, 50, 52, 55). At that point, plaintiff backs away from the door and goes to the floor. (*Id.* at 2:32:54). He is again told repeatedly to drop what he has in his hand (*Id.* at 2:32:58; 2:33:00, 04, 06, 09, 22, 24, 30, 54, 55, 56; 2:34:11, 22, 39, 42, 50), and get away from the toilet (*Id.* at 2:34:37; 2:35:08, 11, 29, 32). A member of the team is heard to remark, "He almost got you that time," apparently in reference to plaintiff throwing material at the cell door. (*Id.* at 2:35:05). After plaintiff is subdued by the extraction team, the camera pans over the door, showing where what appears to be feces have been thrown at the door. (*Id.* at 2:36:49–53). The camera also shows a toilet that has been used, but not flushed. (*Id.* at 2:36:55–57).

[2]    The court may rely on the video of the relevant events in concluding that no reasonable fact finder could credit the plaintiff's inconsistent claims about the incident. *See, e.g., Kalfus v. New York and Presbyterian Hosp.,* 476 F. App'x 877, 880–81 (2d Cir.2012) (the video demonstrated that plaintiff resisted arrest by refusing to stand up or be handcuffed, and that the patrolmen used only reasonable force to overcome his resistance; no reasonable fact finder could conclude that defendants applied excessive force); *Green v. Morse,* 00–CV–6533, 2009 WL 1401642, 2009 U.S. Dist. LEXIS 42368, at *27 (W.D.N.Y. May 18, 2009) (this court may rely on the video evidence clearly showing that some use of force was necessary to grant summary judgment and dismiss plaintiff's excessive force claim) (citations omitted).

**\*5** The video corroborates that when plaintiff approached the door, he was not complying with orders, but instead had what was apparently feces in his hand. When he was asked to drop what he was holding, plaintiff moved away from the door. Defendant Allan authorized the use of chemical agents

to subdue plaintiff, allowing the extraction team to enter his cell and restrain him. Plaintiff was repeatedly warned and refused to comply with the guards' orders. He then escalated his defiance by throwing feces at the door of his cell.

No reasonable finder of fact would credit plaintiff's claims that he was compliant with orders to exit his cell peacefully. Defendant Allan did not authorize the use of force to subdue plaintiff without provocation. The defendants used necessary force to restore discipline and subdue plaintiff, who was aggressively refusing to comply with orders. In addition, defendants' actions indicate that their use of chemical agents was in response to the perceived threat that plaintiff aggressively refuse to comply. Defendants have shown that there is no issue of fact as to either of the elements of an Eighth Amendment violation. Accordingly, the claim against defendant Allan should be dismissed. *See, e.g., Alston v. Butkiewicus,* No. 3:09–CV207, 2012 WL 6093887, 2012 U.S. Dist. LEXIS 173770, at *40–42 (D.Conn. Dec. 7, 2012) (use of chemical agent did not constitute excessive force when inmate refused to comply with direct orders); *Carolina v. Pafumi,* No. 3:12–cv–163, 2013 WL 1673108, 2013 U.S. Dist. LEXIS 55209, at *8–12 (D.Conn. April 17, 2013) (use of chemical agent to subdue noncompliant inmate did not constitute excessive force); *Green v. Morse,* 2009 U.S. Dist. LEXIS 42368, at *38, 42, 2009 WL 1401642 (use of chemical agent on noncompliant inmate did not constitute excessive force).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's summary judgment motion (Dkt. No. 162), be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2632600

**Reeder v. Hogan, Not Reported in F.Supp.2d (2013)**

2013 WL 2632600

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 474 of 830

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)

2002 WL 31413804

2002 WL 31413804
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rodney BOOMER, Plaintiff,

v.

Gary M. LANIGAN, Commissioner of N.Y.C. D.O.C.S.;
Warden Grant, OBCC/CPSU; Deputy Warden Angelo
Rivituso, OBCC/CPSU; Deputy Moran, OBCC/
CPSU; Captain Randy Wheeler "140", OBCC/
CPSU; C.O. Andre White "9256", OBCC/CPSU;
C.O. Ervin Weatherl "14416", OBCC/CPSU; C.O.
Ronnie Santana "14985", OBCC/CPSU; C.O. Elliot
Martin "122227", OBCC/CPSU; Peter Conquet
"15369", OBCC/CPSU; Dr. Patel, M.D., OBCC/
CPSU; and St. Barnabas Hospital, Defendants.

No. 00 Civ. 5540(DLC)
|
Oct. 25, 2002.

**Synopsis**

Pre-trial detainee brought pro se action against city prison officials, physician, and hospital, alleging excessive force and deprivation of medical treatment in violation of the Fourteenth Amendment in connection with a cell extraction. On defendants' motions for summary judgment, the District Court, Cote, J., held that: (1) correction officer did not use excessive force, in violation of due process clause of the Fourteenth Amendment, when he sprayed chemical agent at detainee, after detainee refused to follow repeated orders to remove his arm from food slot in his cell; (2) cell extraction team did not use excessive force, in violation of the due process clause of the Fourteenth Amendment, when extracting detainee from his cell; (3) fact questions as to whether officials ignored requests by detainee, who was known to be an epileptic, for medical care, and thus whether they were deliberately indifferent to detainee's medical needs, precluded summary judgment on detainee's due process claim under the Fourteenth Amendment; (4) fact question as to whether physicians were deliberately indifferent to detainee's medical needs, precluded summary judgment on detainee's due process claim under the Fourteenth Amendment; (5) fact questions as to whether officials prevented detainee from pursuing grievance, precluded summary judgment on issue of whether detainee exhausted his administrative remedies under Prison Litigation Reform Act (PLRA); (6) defense of qualified immunity was not available to any defendants,

who were allegedly deliberately indifferent to detainee's medical needs in violation of the Fourteenth Amendment; and (7) New York statutory requirement that notice of claims against city employee had to be filed with city comptroller, as condition precedent to maintaining tort claims against employees, applied only to claims against employees for which employees had right to indemnification from city.

Motions granted in part, and denied in part.

West Headnotes (9)

**[1]    Constitutional Law** ⬤— Safety and security
**Prisons** ⬤— Use of force

Correction officer did not use excessive force, in violation of due process clause of the Fourteenth Amendment, when he sprayed chemical agent at pre-trial detainee, after detainee refused to follow repeated orders to remove his arm from food slot in his cell; officer's actions were not characterized by wantonness, in that officer used minimal, one-second burst of agent, after receiving authorization from physician to do so.
U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[2]    Constitutional Law** ⬤— Safety and security
**Prisons** ⬤— Use of force

Cell extraction team did not use excessive force, in violation of the due process clause of the Fourteenth Amendment, when extracting pre-trial detainee from his cell; video tape of incident showed that team did not act with wantonness and that their use of force did not constitute objectively sufficient serious deprivation of detainee's constitutional rights.
U.S.C.A. Const.Amend. 14.

8 Cases that cite this headnote

**[3]    Civil Rights** ⬤— Criminal law enforcement; prisons
**Summary Judgment** ⬤— Prisons and jails

Fact questions as to whether city prison officials ignored requests by pre-trial detainee, who was known to be an epileptic, for medical care, and thus as to whether they were deliberately indifferent to detainee's medical needs, precluded summary judgment on detainee's due process claim under the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

9 Cases that cite this headnote

**[4]** **Civil Rights** ⚷ Criminal law enforcement; prisons

**Summary Judgment** ⚷ Prisons and jails

Fact question as to whether city hospital physician's authorization of use of chemical agent on pre-trial detainee, who was an epileptic, constituted deliberate indifference to detainee's medical needs, precluded summary judgment on detainee's due process claim under the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

8 Cases that cite this headnote

**[5]** **Civil Rights** ⚷ Criminal law enforcement; prisons

**Summary Judgment** ⚷ Prisons and jails

Fact question as to whether physicians were deliberately indifferent to pre-trial detainee's medical needs, in failing to treat extreme pain that detainee was experiencing following his epileptic seizure, precluded summary judgment on detainee's due process claim under the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

**[6]** **Civil Rights** ⚷ Criminal law enforcement; prisons

**Summary Judgment** ⚷ Prisons and jails

Fact questions as to whether pre-trial detainee was unable to appeal prison official's refusal to accept his grievance, asserting that officials and physicians were deliberately indifferent to his medical needs, because of restrictions imposed on him, and as to whether prison

staff failed to handle grievance properly, precluded summary judgment on issue of whether detainee sufficiently exhausted his administrative remedies under Prison Litigation Reform Act (PLRA) before bringing due process claim under the Fourteenth Amendment against officials and physicians. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1997e(a).

1 Case that cites this headnote

**[7]** **Civil Rights** ⚷ Prisons, jails, and their officers; parole and probation officers

Defense of qualified immunity was not available to any prison official or physicians, who were allegedly deliberately indifferent to pre-trial detainee's medical needs in violation of the due process clause of the Fourteenth Amendment; it was clearly established at time of alleged conduct that deliberate indifference to inmate's medical needs violated inmate's constitutional rights. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

13 Cases that cite this headnote

**[8]** **Health** ⚷ Particular procedures

Under New York law, pre-trial detainee, who was epileptic, was required to present expert medical opinion evidence to support his medical malpractice claim against hospital and physicians, arising out of their treatment of him in connection with cell extraction.

1 Case that cites this headnote

**[9]** **Municipal Corporations** ⚷ Applicability in particular cases

New York statutory requirement that notice of claims against city employee had to be filed with city comptroller as condition precedent to maintaining tort claims against employees, applied only to claims against employees for which employees had right to indemnification from city. McKinney's General Municipal Law § 50-k.

1 Case that cites this headnote

2002 WL 31413804

**Attorneys and Law Firms**

Rodney Boomer, Elmira, NY, pro se.

Concepcion A. Montoya, Corporation Counsel of the City of New York, New York, NY, for defendants Lanigan, Grant, Rivituso, Moran, Wheeler, White, Weather, Santana, Martin, and Conquet.

Andrew Zwirling, Garbarini & Scher, New York, NY, for defendants Patel and St. Barnabas Hospital.

*OPINION AND ORDER*

COTE, J.

**\*1** Plaintiff Rodney Boomer ("Boomer"), who is proceeding *pro se,* brought this action on July 26, 2000, pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging excessive force and deprivation of medical treatment in violation of the Fourteenth Amendment in connection with a cell extraction which occurred on the night of September 14, 1999, at the Central Punitive Segregation Unit ("CPSU") of the Otis Bantum Correctional Center at Riker's Island, where Boomer was a pre-trial detainee. Boomer also alleges assault, battery, and negligence under state law. On August 29, 2001, Dr. Patel ("Patel") and St. Barnabas Hospital ("St.Barnabas") (collectively, the "Hospital Defendants") moved to dismiss. By Opinion and Order dated December 17, 2001, this Court denied that motion. *Boomer v. Lanigan,* No. 00 Civ. 5540(DLC), 2001 U.S. Dist. LEXIS 20838 (S.D.N.Y.2001). Following discovery, Gary Lanigan ("Lanigan"), L. Grant ("Grant"), Randy Wheeler ("Wheeler") and Andre White ("White"), Ervin Weatherl ("Weatherl"), Ronnie Santana ("Santana"), Elliot Martin ("Martin"), and Peter Conquet ("Conquet") (collectively, the "DOCS Defendants") moved for summary judgment. The Hospital Defendants also moved for summary judgment. For the reasons stated below, defendants' motions for summary judgment are granted in part and denied in part.

BACKGROUND

The following facts are undisputed or as described by Boomer unless noted otherwise. [1] Boomer has a history of epilepsy resulting from a head injury sometime in 1996 or 1997, and

walks with a cane because of an injury sustained during a fight with an inmate. Boomer also has a long history of back pain for which he has received physical therapy.

[1]   Boomer has submitted numerous papers in connection with summary judgment motions filed in the instant action as well as another action before this Court, *Boomer v. Lanigman, et al.,* 00 Civ. 4709(DLC). In connection with the instant action, Boomer has submitted two hand-written versions of his opposition under the title "Response in opposition to Defendants' Summary Judgment [motion]." The versions appear to be verbatim copies, although the pagination is different. Boomer has also submitted a sur-reply under the title "Continuation Attachment Opposition response of plaintiff['']s (3) three part response to both counsels['] Summary Judgments" and a further "Declaration of Rodney Boomer."

On September 14, 1999, Boomer was a pre-trial detainee housed in an isolation cell in the CPSU. At approximately noon on September 14, Boomer began feeling "dizzy headed," which he described in his deposition testimony as "the same feeling when I'm about to go into a seizure." In his verified second amended complaint, Boomer states that, at approximately 2:00 p.m. and again at approximately 7:00 p.m., he told corrections officers, whom he is unable to identify, of his condition. The DOCS Defendants state that they have no record that Boomer informed anyone of his condition. According to Boomer, the corrections officer to whom he spoke at approximately 7:00 p.m. left the food slot of his cell door open and told him "to get some air" until medical personnel arrived. [2] In his second amended complaint, Boomer states that no medical staff visited his cell. Boomer thereafter refused to remove his arm from the food slot of his cell door and was generally being loud and disruptive.

[2]   The DOCS Defendants state that at approximately 8:00 p.m., Boomer was visited by Dr. Okechukwu Igwe ("Igwe") of St. Barnabas. Igwe's notes, which are largely illegible, record that Boomer refused treatment at that time.

At approximately 9:45 p.m., a cell extraction team consisting of Captain Wheeler and Corrections Officers White, Weatherl, Santana, Martin, and Conquet (the "Extraction Team") assembled outside Boomer's cell. Boomer states that he attempted to explain to Wheeler that he was epileptic

2002 WL 31413804

and feeling sick, but that Wheeler "swiftly cut [him] off by spraying chemical agent into [his] eyes, face and hair." A video tape made of the incident, which begins at 9:45 p.m., shows that Wheeler gave several orders to Boomer to remove his left arm from the food slot, but Boomer refused to do so. Wheeler then stated to the video camera that he received authorization from Assistant Deputy Warden Moran to remove plaintiff from his cell, and that he had received authorization from Igwe to use a chemical agent, but not an electronic immobilization shield. [3]

[3]       The use of an electronic immobilization shield was contraindicated because of Boomer's history of epilepsy.

**\*2** According to the video tape evidence, at approximately 9:49 p.m., the Team opened the door of Boomer's cell slightly and Wheeler sprayed a one-second burst of a chemical agent. The Team then closed the door and waited for the chemical agent to take effect. Wheeler occasionally attempted to guide Boomer's arm back through the food slot. At approximately 9:53, Boomer began to slap his hand against the outside of the cell door below the food slot. At approximately 9:55 p.m., his left arm began to shake spasmodically.

In his second amended complaint, Boomer states that Wheeler ordered the Team to open and close the cell door several times while he was having convulsions and his arm was still hanging out of the food slot. According to the video tape evidence, however, the door to Boomer's cell remained closed until approximately 9:56 p.m., when the Team entered Boomer's cell, handcuffed Boomer, who was apparently unconscious, and carried him to an elevator, took him to another floor of the CPSU, and placed him on a stretcher. At approximately 10:04 p.m., the Team removed Boomer from the stretcher and carried him to a shower cell. At 10:05, the video tape of the incident temporarily stops.

Igwe states that at approximately 10:25 p.m., he examined Boomer at the shower area because Boomer refused to go to the examination room. Boomer states in his second amended complaint that although he was experiencing "severe head and neck pain and could have suffered a serious life threatening head concus[s]ion or brain damage[ ] during his extreme violent seizure attack," Igwe did not conduct an examination of him. Igwe's notes indicate that Boomer refused a "full evaluation." There is no video tape evidence of Igwe's examination.

At approximately 11:04 p.m., the video tape resumed and continued to record until 11:33 p.m. Wheeler stated to the video camera that Boomer had been examined by medical personnel and was being escorted to the "housing area." Boomer appears on the tape standing in the shower cell and does not appear to be in any pain. He waited patiently and watched through the shower cell door as the Team attempted to determine which key opened the door. Upon opening the door, the video tape shows the Team escorting Boomer to an elevator and then to another floor. Boomer walked without any apparent pain and appeared to be calm.

The video tape shows that when the Team then attempted to insert Boomer into another holding cell, Boomer became physically aggressive, threatening and spitting at a corrections officer not pictured. The tape shows that a scuffle ensued between Boomer and the Team, which consisted essentially of the Team leaning into Boomer to hold him against the wall until he settled down. While they were holding him against the wall, various Team members sought to talk Boomer into voluntarily entering the holding cell. The video tape further shows that after a few minutes, at approximately 11:12 p.m., the Team pushed him into the holding cell, and that Boomer never lost his footing when they did so. The video tape shows that inside the cell, the Team attempted to uncuff Boomer, but he resisted. The Team responded by again leaning against Boomer, who was now seated on a bench in the cell, to hold him in place until he again settled down. The video tape shows that at approximately 11:15 p.m., the Team ceased leaning against Boomer. They stood around him with only their hands resting on his shoulders and talked with him as he said that he would not stay in the holding cell and wanted to be returned to his original cell.

**\*3** The tape shows that at 11:22 p.m., Wheeler attempted to explain to Boomer why he would remain in the holding cell. Boomer responded with aggressive language. The Team continued to stand around Boomer until 11:30 p.m., when they escorted him to the medical clinic. Boomer walked without any apparent pain or injury. At 11:33 p.m., Boomer was inserted without incident into a holding cell in the medical clinic. The tape then temporarily stops.

At 12:18 p.m., the video tape resumes. At 12:20 a.m. on September 15, Boomer was escorted out of the holding cell in the medical clinic to an examining table. The tape shows that at 12:21 a.m., Boomer was secured to the examining table. The tape then temporarily stops.

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)

2002 WL 31413804

At 12:25 a.m., Boomer was examined by Patel. This examination is not recorded on tape. In his second amended complaint, Boomer states that he was "only verbally interviewed but once again obtain[ed] no medical treatment or exam" with regard to his epileptic condition.

The video tape resumes at 12:27 a.m. It shows the Team waiting for the examination to conclude. At 12:28 a.m., the tape temporarily stops. It resumes at 12:29 a.m. and shows the Team escorting Boomer to his original cell without incident. At 12:32 a.m., the tape recording concludes.

Boomer states in his second amended complaint that on September 20, 1999, he filed an "institutional grievance complaint" with respect to the cell extraction of September 14, 1999. Boomer states, however, that the grievance was returned to him and that he was "informed that [the CPSU] Grievance program do[es] not handle matters of staff assault, misuse of force and lack or denial in medical issues." Boomer does not specify who gave him this information. In this connection, Boomer has submitted an affidavit by inmate Ronald Henderson ("Henderson") in which Henderson states that DOCS' staff frequently mishandles inmate grievances.

In his "Second Opposition," Boomer states that he is unable to submit a copy of the grievance because his legal documents were taken from him while he was an inmate at Sing Sing Correctional Facility. In connection with the St. Barnabas Defendants' Motion to Dismiss, however, Boomer did submit a copy of the grievance that he states he filed. *See Boomer,* 2001 U.S. Dist. LEXIS 20838, at *7. In that grievance, which Boomer erroneously dated September 14, *1998,* Boomer writes that he informed a corrections officer that he was epileptic and feeling ill. Thereafter,

> [t]he officer left my food slot open[ ] telling me to get some air while he contact[s the] medical unit. Medical staff never showed up, and approximately (30) minutes later a[n] unknown captain and several officers showed up in full riot gear. As I started to explain[ ] to [the] captain that I am feeling ill and that I am a[n] epileptic person, [t]his captain swiftly cut me off by spraying chemical agent in my eyes, nose and face. I immediately went into a violent seizure attack while one of my arms remained extended out of [the] food slot. I was flopping around violently during my seizure attack and one could eas[i]ly see that I was undergoing an epileptic attack. However, this captain continued to order the cell door open while one of my arms remained extended out of [the] slot. They continued their assault while I remained unconscious and undergoing my seizure attack. I was taken to CPSU clinic and verbally interviewed by [a] doctor. I received no examination despite th[e] fact that I told him my back, head, [and] neck was hurting severely.

**\*4** The DOCS Defendants' records do not reflect any filing of a grievance by Boomer in connection with the September 14, 1999 extraction. Their records show that Boomer filed three grievances from September 1999 to August 2000, and that none of these addressed the September 14 extraction.

Boomer admits in his "Second Opposition" that he took no action to appeal the CPSU staff's refusal to accept his grievance. Boomer states, however, that he "was powerless in this matter because he was CPSU-confined (23) twenty-three hours a day with absolutely no available hands on access to IGP [Inmate Grievance Procedure] Department, committee, warden or IGP staff person."

In his second amended complaint, Boomer further states that on September 21, an "investigator from the New York City Commission Department of Investigation for DOCS" named Willoughby ("Willoughby") visited Boomer's cell to obtain a written statement regarding the cell extraction. Boomer states that Willoughby also interviewed an inmate who witnessed the extraction.

Boomer states that he contacted Jonathan Chasan ("Chasan") of the New York City Prisoners' Rights Project and that Chasan obtained the video tape recordings of the September 14 cell extraction. Boomer states that he did not thereafter receive any more information from either Willoughby or Chasan.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 479 of 830

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)

2002 WL 31413804

## Standard

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 465–66 (2d Cir.), cert. denied, 534 U.S.993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Fed.R.Civ.P. 56(e); *see also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue. Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). [4]

[4]    Both the Court and the defendants provided Boomer with a formal notice of the Rule 56 requirements for opposing defendants' summary judgment motions.

## DISCUSSION

**\*5** Boomer argues that the defendants used excessive force against him and were deliberately indifferent to his medical needs. Boomer further argues that defendants committed assault and battery on him and were negligent in their medical care of him. The defendants deny these claims and respond that Boomer failed to exhaust his administrative

remedies, that they are immune from liability under the doctrine of qualified immunity, and, with respect to the state law claims, that Boomer failed to file a notice of claim with the Comptroller of the City of New York. Each of these issues is considered in turn.

### I. Federal Claims

#### A. Excessive Force

**[1]**    "[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Walsh,* 194 F.3d 37, 47 (2d Cir.1999). In the Second Circuit, the same standard applies to excessive force claims under the Fourteenth Amendment as applies under the Eighth Amendment. *Id.* at 48. To establish a constitutional violation under either amendment, an inmate must meet both a subjective and an objective requirement. *Id.* at 48–49. "[T]he subjective requirement is satisfied if the defendant has a sufficiently culpable state of mind, shown by actions characterized by wantonness." *Id.* at 50 (citations omitted). The core of the inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). As to the objective requirement, it is well established in this Circuit that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citation omitted). The plaintiff must show that the violation is "objectively sufficiently serious or harmful enough," *Walsh,* 194 F.3d at 50, and not *de minimis, id.*

Boomer argues that the DOCS Defendants used excessive force when they (1) used a chemical agent on him, (2) opened and closed his cell door repeatedly while he was experiencing a seizure, (3) entered his cell, and (4) pushed him into the holding cell. With respect to the use of the chemical agent, Boomer asserted in his second amended complaint that Wheeler used the spray as he was attempting to explain his medical problems to him. Boomer has failed to address, however, the video tape evidence that covers the approximately four minutes before the spray was used. It shows, and Boomer has not disputed, that the Wheeler used a chemical agent only after repeated orders to Boomer that he remove his arm from the food slot. In his opposition, Boomer argues that Wheeler simply ordered him to close his food slot without asking him why he refused to do so, and

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 480 of 830

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)
2002 WL 31413804

that this somehow constitutes excessive force. Boomer has failed to explain, however, why he should not have obeyed a repeated order of a corrections officer or why Wheeler, the commanding officer of a cell extraction team who had received authorization to extract Boomer from his cell, was obligated to listen to Boomer's complaint.

**\*6** The DOCS Defendants have also shown, and Boomer has not disputed, that Wheeler used a minimal, one-second burst of the agent, after receiving authorization to do so from Igwe. Given these undisputed facts, Boomer has not presented evidence to raise an issue of fact that, as a subjective matter, the DOCS Defendants' actions were "characterized by wantonness."

**[2]** With respect to the other incidents which Boomer alleged in his pleadings constituted excessive force, Boomer has failed to address the video tape evidence that the Team did not open and close his cell door repeatedly, that the Team entered his cell when he was unconscious and applied no force whatsoever to him at that time, and that when the Team pushed him into the holding cell, it did so with minimal force and only after holding him in place for several minutes in an effort to settle him down. In his submissions in opposition to the motions for summary judgment, Boomer has essentially abandoned his excessive force allegations with respect to these incidents. He has presented no evidence in response to the DOCS Defendants' video tape or motion papers. Given this undisputed evidence, Boomer cannot establish that the Team acted with "wantonness" or that their use of force constituted an objectively sufficiently serious deprivation of his constitutional rights. For these reasons, Boomer's claims of excessive force must be dismissed.

### B. Deliberate Indifference to Medical Needs

**[3]** While a convicted prisoner's right to medical care stems from the Eighth Amendment's ban on cruel and unusual punishments, *see Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the analogous right of a pretrial detainee arises under the Due Process Clause of the Fourteenth Amendment. *Henderson v. Sheahan,* 196 F.3d 839, 845 n. 2 (7th Cir.1999); *Lopez v. LeMaster,* 172 F.3d 756, 764 (10th Cir.1999); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996); *Ali v. Szabo,* 81 F.Supp.2d 447, 463 (S.D.N.Y.1999). "[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's

rights are at least as great as those of a convicted prisoner." *Weyant,* 101 F.3d at 856.

"[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Id.* To prove a violation, a plaintiff must show deliberate indifference under an objective and a subjective test. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). To satisfy the objective prong, the alleged deprivation must be of a "sufficiently serious" condition, one that "may produce death, degeneration, or extreme pain." *Morales v. Mackalm, et al.,* 278 F.3d 126, 132 (2d Cir.2002) (citation omitted). The subjective prong requires the plaintiff to demonstrate that the official acted with a sufficiently culpable state of mind, which must be "the equivalent of criminal recklessness," namely, when the official "knows of and disregards an excessive risk to inmate health or safety." *Hathaway,* 99 F.3d at 553 (citation omitted). Mere negligence or medical malpractice does not constitute deliberate indifference, *id.,* nor do mere differences of opinion between the prisoner and the defendants concerning the proper course of treatment. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Rather, officials must "intentionally deny[ ] or delay[ ] access to medical care or intentionally interfere with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05.

**\*7** Boomer argues that defendants were deliberately indifferent to his medical needs when they (1) failed to provide him with medical attention after he initially reported feeling dizzy, (2) used a chemical agent upon him despite his epileptic condition, (3) failed thoroughly to examine him in the shower cell, and (4) failed thoroughly to examine him at 12:25 a.m.

With respect to the first issue, Boomer has raised a material question of fact as to whether he informed corrections personnel that he was feeling dizzy at 2:00 p.m. and 7:00 p.m. on September 14, and as to whether any medical personnel visited his cell before the Team approached his cell at approximately 9:45 p.m. Ignoring requests for medical care made by a prisoner known to be an epileptic may constitute deliberate indifference to serious medical needs, particularly when it is undisputed that the inmate suffered a seizure after making those requests.

**[4]** As to the use of the chemical agent, it is undisputed that Igwe was aware of Boomer's history of epilepsy when

he authorized the use of a chemical agent during the cell extraction. In light of the undisputed facts that Boomer experienced a seizure upon being sprayed with the agent and that he required medical attention after that seizure, Boomer has raised a question of fact as to whether the authorization to use a chemical agent on an inmate with a history of epilepsy constituted deliberate indifference to that inmate's medical needs.

 [5]   With respect to the final two issues, the thoroughness of the examinations, Boomer does not dispute that Igwe examined him at approximately 10:25 p.m. and that Patel examined him at approximately 12:25 a.m. Boomer's argument is that the examinations, neither of which was recorded on video tape, were not thorough enough given his epileptic condition and given the "excruciating" pain he states he was experiencing. The medical records do not reflect that Boomer was given any pain medication after his seizure. Boomer has raised a question of fact as to whether Igwe and Patel were deliberately indifferent to his medical needs in failing to treat the extreme pain he states he was experiencing. Boomer has not identified other treatment that his condition required and that he was denied during these two examinations.

*C. Exhaustion*

The Prison Litigation Reform Act ("PLRA") provides that

> no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (1994) (emphasis supplied). In *Nussle v. Porter,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Supreme Court held that "the PLRA's exhaustion requirement applies to all suits about prison life, whether they involve general circumstances or particular episodes," *id.* at 532. Because Boomer's remaining deliberate indifference to medical needs claims fall within Section 1997(e)(a)'s exhaustion requirement, Boomer must have exhausted his administrative remedies for those claims prior to filing his complaint.

*8   [6]   Each of the deliberate indifference claims that has survived defendants' motions for summary judgment was sufficiently identified in the copy of the grievance Boomer asserts that he submitted to the prison. Boomer states that the grievance was returned to him and that he was told, in effect, that the CPSU grievance process did not handle the claims he was grieving. Boomer failed to appeal this refusal to accept his grievance, but contends that he was unable to do so because of the restrictions associated with his confinement in CPSU. Boomer has also presented evidence, in the form of Henderson's affidavit, that the CPSU staff often failed properly to handle grievances. Boomer presents this evidence in support of the argument that but for the CPSU staff's failure to handle his grievance properly, he would have exhausted his administrative remedies. This evidence creates issues of fact regarding Boomer's exhaustion of his administrative remedies.

*D. Qualified Immunity*

 [7]   Defendants argue that they are immune from liability under the doctrine of qualified immunity. "Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were clearly established at the time." *Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002) (citation omitted). The first step in a qualified immunity analysis is to "determine whether the plaintiff[ ] ha[s] alleged a violation of a constitutional right." *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002); *see also Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002). The second step is to "determine whether the right was clearly established at the time of the alleged violation." *African Trade,* 294 F.3d at 359. Thus "a qualified immunity defense is established when ... the defendant's action did not violate clearly established law." *Poe,* 282 F.3d at 133 (citation omitted). Because it was clearly established at the time of the alleged conduct that deliberate indifference to an inmate's medical needs violates an inmate's constitutional rights, the defense of qualified immunity is not available to any defendant who was deliberately indifferent.

*II. State Law Claims*

*A. Assault and Battery*

Under New York law, an assault is "an intentional placing of another person in fear of imminent harmful or offensive contact," and a battery is "an intentional wrongful physical

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 482 of 830

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)
2002 WL 31413804

contact with another person without consent." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105, 108 (2d Cir.1993); *see also Johnson v. Suffolk County Police Department,* 245 A.D.2d 340, 665 N.Y.S.2d 440, 440 (N.Y.App.Div.1997). Neither tort requires a physical injury. *See Hassan v. Marriott Corp.,* 243 A.D.2d 406, 663 N.Y.S.2d 558, 559 (N.Y.App.Div.1997) ("Physical injury need not be present for an assault"); *Zgraggen v. Wilsey,* 200 A.D.2d 818, 606 N.Y.S.2d 444, 445 (N.Y.App.Div.1994) ("An action for battery may be sustained without a showing that the actor intended to cause injury as a result of the intended contact."). The DOCS Defendants have not responded to Boomer's assault and battery claim other than to argue that it is barred by his failure to file a notice of claim with the Comptroller of the City of New York, which is addressed below.

### B. Negligence

**\*9** **[8]** Boomer's claim that the Hospital Defendants were "negligent" in their treatment of him is governed by New York's medical malpractice law. "To establish a claim of medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Milano v. Freed,* 64 F.3d 91, 95 (2d Cir.1995) (citation omitted). "New York law further provides that, except as to matters within the ordinary experience and knowledge of laymen, expert medical opinion evidence is required to make out both of these elements." *Id.* (citing state court cases). *See also Barnes v. Anderson,* 202 F.3d 150, 259–60 (2d Cir.1999); *Einaugler v. Supreme Court,* 109 F.3d 836, 841 (2d Cir.1997). The requirement for expert medical testimony applies to *pro se* inmate plaintiffs. *See, e.g., Perez v. State of New York,* 293 A.D.2d 918, 742 N.Y.S.2d 140, 142 (3d Dep't 2002).

Boomer has failed to present any expert medical testimony in support of this claim. Since Boomer's analogous Fourteenth Amendment claims have survived summary judgment, he will be given a further opportunity to obtain expert medical testimony to support his state law claims of medical malpractice.

### C. Notice of Claim

**[9]** Defendants argue that Boomer's state law claims should be dismissed because he failed to file a notice of claim with the Comptroller of the City of New York. In federal court, state law notice of claim requirements apply to pendent state law claims such as Boomer's. *Hardy v. N.Y. City Health &*

*Hosps. Corp.,* 164 F.3d 789, 793 (2d Cir.1999). It is well established that a plaintiff suing a New York City employee must serve a notice of claim on the City if, at the time the alleged injury occurred, the employee was acting within the scope of his duty such that the City may be required to indemnify the employee. *See, e.g., Silverman v. City of N.Y.,* 98 Civ. 6277(ILG), 2001 WL 218943, at \*8 (E.D.N.Y. Feb. 2, 2001); *Ortega v. City of N.Y.,* 95 Civ. 7206(LMM), 2000 WL 358459, at \*2 (S.D.N.Y. Apr. 7, 2000); *Sussman v. N.Y. City Health & Hosp. Corp.,* 94 Civ. 8461(DBS), 1997 WL 334964, at \*17 (S.D.N.Y. June 16, 1997); *D'Angelo v. City of N.Y.,* 929 F.Supp. 129, 135 (S.D.N.Y.1996); *Alifieris v. Am. Airlines, Inc.,* 63 N.Y.2d 370, 377, 482 N.Y.S.2d 453, 472 N.E.2d 303 (1984) (interpreting Section 50–j); *cf. Shakur v. McGrath,* 517 F.2d 983, 985 (2d Cir.1975) (notice of claim required in suit against employee doctors and the City "as their indemnitor"). Under New York General Municipal Law Sections 50–e and 50–i, a plaintiff may not maintain a tort claim against a municipality unless that claim has been preceded by a notice of claim served upon the municipality within ninety days of the time the cause of action arose. *See N.Y. Gen. Mun. Law §§ 50–e, -i (McKinney 1999).* A plaintiff required to file a notice of claim fails to state a cause of action if he does not plead the following in the complaint: "that (1) the plaintiff has served the notice of claim; (2) at least thirty days have elapsed since the notice was filed (and before the complaint was filed); and (3) in that time the defendant has neglected to or refused to adjust or to satisfy the claim." *Hardy,* 164 F.3d at 793.

**\*10** While the notice of claim requirement is applicable to certain claims against municipal employees, it does not, however, apply to all such claims. Section 50–e(1) does not itself create an obligation to file a notice of claim, but sets a ninety-day time limit for filing the notice "[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action ... against a public corporation ... or any ... employee thereof." N.Y. Gen. Mun. Law § 50–e(1)(a).

It appears that Section 50–k is the source of the duty to file a notice of claim when suing City employees. Section 50–k, entitled "Civil actions against employees of the city of New York," provides for the defense and indemnification of City employees for certain tort claims. Indemnification is limited to acts that

> occurred while the employee was
> *acting within the scope of his public*

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 483 of 830

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)

2002 WL 31413804

*employment* and in the discharge of his duties and w[ere] not in violation of any rule or regulation of his agency at the time the alleged damages were sustained; the duty to indemnify ... *shall not arise* where the injury or damage resulted *from intentional wrongdoing or recklessness* on the part of the employee.

*Id.* § 50–k(3) (McKinney 1999) (emphasis supplied). Section 50–k(6) then provides that "no action or proceeding instituted hereunder ... shall be prosecuted or maintained against the city or any agency or an employee unless notice of claim shall have been made and served upon the city in compliance with section fifty-e of this chapter." *Id.* § 50–k(6). Although Section 50–k(6) does not specify what constitutes an action "instituted hereunder," that provision is best understood to apply only to claims against a City employee for which the employee has a right to indemnification. *Int'l Shared Servs., Inc. v. County of Nassau,* 222 A.D.2d 407, 634 N.Y.S.2d 722, 724 (2d Dep't 1995); *Bardi v. Warren County Sheriff's Dep't,* 194 A.D.2d 21, 603 N.Y.S.2d 90, 92 (3d Dep't 1993); *see also Reed v. Powers,* 97 Civ. 7152(DLC), 2002 U.S. Dist. Lexis 5125, at *19 (S.D.N.Y. Mar. 28, 2002); *Hemrie v. City of N.Y.,* 96 Civ. 213(DLC), 2000 WL 1234594, at *2–3 (S.D.N.Y. Aug. 31, 2000).

Defendants have not cited or discussed Section 50–k(6) or shown that they may be entitled to indemnification by the City. Accordingly, summary judgment on Boomer's state law claims based on his failure to plead the filing of a notice of claim is not available without a further showing.

CONCLUSION

For the reasons stated, defendants' motions for summary judgment are granted in part and denied in part. They are granted with respect to Boomer's excessive force claim. They are denied with respect to Boomer's deliberate indifference to medical needs claims and negligence claims arising from the alleged failure timely to provide Boomer with medical attention after he reported feeling dizzy, the authorization of the use of a chemical agent, and the failure to treat his pain at the 10:25 p.m. and 12:25 a.m. examinations. They are also denied with respect to the assault and battery claims.[5] A Scheduling Order governing the further litigation of these issues will also be issued.

[5]   A separate Opinion will be issued relating to St. Barnabas's claim that it cannot be held liable under Section 1983 because it lacks policymaking authority with respect to inmate health services.

**11**  SO ORDERED:

**All Citations**

Not Reported in Fed. Supp., 2002 WL 31413804

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Alston v. Butkiewicus, Not Reported in F.Supp.2d (2012)

2012 WL 6093887

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by  Celestin v. Angeletta,   S.D.N.Y.,   March 19, 2021

2012 WL 6093887
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Ira ALSTON, Plaintiff,
v.
BUTKIEWICUS, et al., Defendants.

No. 3:09–cv–207(CSH).
|
Dec. 7, 2012.

**Attorneys and Law Firms**

Ira Alston, Somers, CT, pro se.

*RULING ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT [Doc. # 98]*

CHARLES S. HAIGHT, JR., Senior District Judge.

 **\*1** In this civil rights action, the plaintiff, Ira Alston, an
inmate in a Connecticut correctional facility, alleges that
on several occasions in July 2007, February 2008, October
2008 and January 2009, the defendants used excessive
force against him by spraying him with a chemical agent
and/or confining him in restraints for an extended period.
The defendants, Captain Butkiewicus, Lieutenant Jackson,
Lieutenant Casey, Captain Salius, Lieutenant Rae, Lieutenant
Saylor, Lieutenant Riordan, Lieutenant Siwicki, Lieutenant
Harnett, Warden McGill, Deputy Warden Rose, Deputy
Warden Rodriguez, former Deputy Commissioner Murphy
and former Commissioner Lantz, have filed a motion
for summary judgment. For the reasons that follow, the
defendants' motion is granted.

I. *Standard of Review*
In a motion for summary judgment, the burden is on the
moving party to establish that there are no genuine issues
of material fact in dispute and that it is therefore entitled
to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a);
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106
S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party may
satisfy this burden "by showing—that is pointing out to

the district court—that there is an absence of evidence to
support the nonmoving party's case." *PepsiCo, Inc. v. Coca–
Cola Co.,* 315 F.3d 101, 105 (2d Cir.2002) (per curiam)
(internal quotation marks and citations omitted). Once the
moving party meets this burden, the nonmoving party must
"set forth specific facts showing that there is a
genuine issue for trial," *Anderson,* 477 U.S. at 255, and present such
evidence as would allow a jury to find in his favor in order
to defeat the motion for summary judgment. *Graham v. Long
Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000). Merely verifying
the allegations of the complaint in an affidavit, however,
is insufficient to oppose a motion for summary judgment.
*Zigmund v. Foster,* 106 F.Supp.2d 352, 356 (D.Conn.2000)
(citing cases).

When reviewing the record, the court resolves all ambiguities
and draws all permissible factual inferences in favor of the
party against whom summary judgment is sought. *Patterson
v. County of Oneida, NY,* 375 F.3d 206, 218 (2d Cir.2004).
If there is any evidence in the record on a material issue
from which a reasonable inference could be drawn in favor
of the nonmoving party, summary judgment is inappropriate.
*Security Ins. Co. of Hartford v. Old Dominion Freight Line
Inc.,* 391 F.3d 77, 83 (2d Cir.2004). However, " '[t]he
mere existence of a scintilla of evidence in support of
the [plaintiff's] position will be insufficient; there must be
evidence on which the jury could reasonably find for the
[plaintiff].' " *Dawson v. County of Westchester,* 373 F.3d 265,
272 (2d Cir.2004) (quoting *Anderson,* 477 U.S. at 252)).

When reviewing evidence submitted in support of a motion
for summary judgment, the court can rely on video
recordings. "When opposing parties tell two different stories,
one of which is blatantly contradicted by the [video] record,
so that no reasonable jury could believe it, a court should not
adopt that version of the facts for purposes of ruling on a
motion for summary judgment." *Scott v. Harris,* 550 U.S. 372,
380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (holding that
court should have viewed facts in light depicted by videotape
rather that as presented by non-moving party).

II. *Facts* [1]

[1]       The facts are taken from the defendants' Local
Rule 56(a) 1 Statement of Material Facts. Local
Rule 56(a) 2 requires the party opposing summary
judgment to submit a Local Rule 56(a) 2 Statement
which contains separately numbered paragraphs
corresponding to the Local Rule 56(a) 1 Statement

2012 WL 6093887

and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. In addition, the opposing party must submit a list of disputed factual issues. *See* D. Conn. L. Civ. R. 56(a)2 & 56(a)3.

The plaintiff has been afforded numerous extensions of time to respond to the defendants' motion for summary judgment. On June 28, 2012, the plaintiff was advised that his final deadline for responding to the motion was July 16, 2012 and that the deadline would not be further extended. Notwithstanding that advice, the plaintiff did not respond to the motion for summary judgment until July 26, 2012. His response included a purported Local Rule 56(a) 2 Statement. However, even if that statement were not untimely, it does not generally contain the required citations to evidence, or meet the substance of the facts alleged. Accordingly, the defendants' facts are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 56(a) 2.").

**\*2** The plaintiff currently is serving a thirty-six year sentence. He was confined at Northern Correctional Institution at all times relevant to this action. The plaintiff asserts claims concerning several separate incidents.

*July 22, 2007 Incident*

After the distribution of his noon meal, the plaintiff blocked the food trap in his cell door with his foot and a blanket so correctional staff could not close and secure the trap. The plaintiff refused orders to remove the obstruction and said that he was blocking the trap because his morning meal bag had a hole ripped in it and was altered. The plaintiff refused the morning bag meal and demanded another one. No substitute meal bag was provided.

After the plaintiff refused to permit the trap to be closed, defendant Captain Butkiewicus went to the plaintiff's cell and ordered him to remove the obstructions. The plaintiff refused. Defendant Butkiewicus told the plaintiff that, if the plaintiff removed the obstructions, he would look into the issue of the morning meal. The plaintiff again refused. Defendant Butkiewicus explained to the plaintiff that correctional staff

were not required to provide substitute meal bags until he found one acceptable, that his refusal of the morning meal bag could be considered a voluntary meal refusal, and that he could file a grievance regarding the incident if he believed that correctional staff had not acted appropriately. Despite these arguments and explanation that blocking the trap was not an appropriate response, the plaintiff refused to remove the obstruction. After approximately thirty minutes, a nurse and social worker were called to try to gain the plaintiff's compliance. The plaintiff rejected their efforts. Defendant Butkiewicus told the plaintiff that if he failed to comply, he would receive a disciplinary report for interfering with safety and security and that a chemical agent would be deployed to force compliance.

After the plaintiff ignored defendant Butkiewicus' final order to remove the obstruction, a one-second burst of chemical agent was deployed into the cell. The blanket blocking the trap rendered the chemical agent ineffective. After about a minute, correctional staff were able to pull the blanket from the trap. Defendant Butkiewicus deployed a second burst of chemical agent into the plaintiff's cell. This time, the chemical agent had the desired effect. The plaintiff complied with orders to back up to the trap so restraints could be applied to his wrists. The plaintiff immediately was escorted to a shower unit for decontamination. His head and face were placed under the water for several minutes. The plaintiff did not complain that the water was too hot and did not attempt to move his head out of the shower stream.

The plaintiff was taken to a new cell, strip-searched, given clean clothing and bedding and placed on in-cell restraints. The plaintiff's hands were cuffed in front of his body, his legs were shackled and a tether chain was applied connecting his hands and feet. The tether chain was adjusted so the plaintiff's wrists could reach shoulder level when he was seated. The plaintiff was checked by medical staff. He accepted further irrigation of his eyes to relieve residual effects of the chemical agent. When asked about any injuries, the plaintiff stated that he was scratched by a female officer. The scratch was treated. The nurse checked the in-cell restraints and found them properly applied and spaced. The plaintiff could walk upright in the restraints and made no complaints.

**\*3** The plaintiff was placed on modified meal status and a fifteen minute watch. As he had been advised, he also was issued a disciplinary report for interfering with safety and security. That evening, a nurse went to the plaintiff's cell to check his restraints. The plaintiff was on the bunk, under

2012 WL 6093887

the covers. He refused to come to the cell window to enable the nurse to check his restraints. The following morning, defendant Lieutenant Saylor went to the plaintiff's cell to check his restraints. The plaintiff refused to allow defendant Saylor to check his restraints and used profanity and insulting language toward defendant Saylor. That evening, a nurse checked the plaintiff's restraints. She found ample spacing and intact skin. The plaintiff denied any injuries and made no complaints.

In the morning of July 24, defendant Lieutenant Rae went to the plaintiff's cell to determine whether he should be removed from in-cell restraint status. The plaintiff remained under the covers and refused to comply with defendant Rae's order that he sit up on the bunk and show him the restraints. Defendant Rae told the plaintiff that in-cell restraint status would be continued if he did not comply with the order. The plaintiff refused and in-cell restraint status was continued. At about the same time, a nurse went to the plaintiff's cell to check his restraints. The plaintiff refused to get off the bed and come to the window. The plaintiff said that his body was too sore to get up. He did not complain of a headache or indicate that he experienced difficulty speaking. That evening, the plaintiff again refused to get up and come to the trap in the cell door for his restraints to be evaluated.

On the morning of July 25, defendant Saylor went to the plaintiff's cell to evaluate in-cell restraint status. He spoke with staff and with the plaintiff. At the time, the plaintiff's clothing did not appear soiled and the plaintiff did not report that he was unable to eat his meals because of the restraints, or that he had a headache or had difficulty speaking. The fifteen minute check sheet showed that the plaintiff had not engaged in disruptive behavior. At this time, the plaintiff was complying with defendant Saylor's directions. As a result, defendant Saylor ordered that he plaintiff be removed from in-cell restraint status. At that time, the plaintiff was evaluated by a nurse. The only issue was slight redness on his wrist and ankles. The plaintiff did not complain about soiled clothing, headaches or difficulty speaking. The plaintiff was provided a shower. Because there were no available cells, he was returned to the same call after the shower.

*February 14, 2008 Incident*
At about 6:45 p.m., on February 14, 2008, the plaintiff, along with several other inmates, covered his cell window. All of the inmates refused orders to remove the coverings. Defendant Lieutenant Casey opened the trap in the plaintiff's cell door to look in and ensure that the plaintiff was safe. When the trap

opened, the plaintiff stuck his arm through the opening and prevented the trap from being closed. The plaintiff refused numerous orders from defendant Casey to remove his arm.

**\*4** The plaintiff told defendant Casey that he had not gotten his 6:00 p.m. phone call and would only remove his arm if he got the call. Defendant Casey told the plaintiff that he did not get the call because there was a Code Orange in the unit. Staff were occupied dealing with an inmate who had harmed himself and had gotten behind in other duties. Defendant Casey told the plaintiff that he would arrange for the plaintiff to get his call later that evening if the plaintiff removed his hand from the trap. In response, the plaintiff demanded the phone call before 7:00 p.m.

The plaintiff refused additional orders to remove his arm from the trap and to present his hands to be cuffed. A social worker was called but could not get the plaintiff to comply. Defendant Casey repeatedly told the plaintiff he did not want the incident to escalate and asked the plaintiff to remove his arm. The plaintiff refused to comply. Defendant Casey then issued multiple orders that the plaintiff turn around so he could be placed on in-cell restraints. The plaintiff said that he was not going on in-cell restraints and demanded his phone call.

Defendant Casey finally told the plaintiff that if he did not comply, hands-on force might be used. The plaintiff was not persuaded. Defendant Casey also warned the plaintiff that failure to comply would result in the issuance of a disciplinary report and loss of phone privileges. Despite repeated offers of compromise, the plaintiff demanded a phone call to cease his disruptive behavior. Defendant Casey stated that, if the plaintiff refused to permit staff to secure him, a chemical agent would be deployed. After ten minutes of warnings, defendant Casey deployed a one-second burst of a chemical agent. The chemical agent did not have the desired effect. The plaintiff refused to remove his arm and blocked the trap with his shoulder and chest. When the cell door was opened to allow a second deployment of the chemical agent, the plaintiff came to the door and challenged correctional staff.

Additional correctional staff arrived with a safety shield. The plaintiff backed into his cell, but continued to refuse to comply with orders. Two additional bursts of the chemical agent were deployed through the door and then the door was closed. The plaintiff continued to refuse to back up to the trap so restraints could be applied. The cell door was reopened, a third burst of chemical agent was deployed and the door

closed. After several minutes, the chemical agent had the desired effect and the plaintiff complied with the order to approach the trap to be restrained.

After restraints were applied, the plaintiff was escorted to the shower unit for decontamination. While being escorted, the plaintiff began to resist staff. Another one-second burst of chemical agent was deployed to regain compliance. The chemical agent missed the plaintiff and struck the wall. While restrained, the plaintiff was placed alone in a shower and told to place his head and face under the water. The plaintiff decontaminated himself under the water for three minutes. During this time, correctional staff tended other duties in the unit. After the session, defendant Casey asked the plaintiff if he would like the shower activated for another three minutes. Although the plaintiff did not respond, defendant Casey provided the plaintiff another three-minute shower session. The plaintiff voluntarily stood under the water and did not complain about the water temperature.

 *5  After the shower, the plaintiff was taken to the medical triage room and examined by a nurse. When the plaintiff complained about burning eyes and skin, his eyes were flushed. The nurse told the plaintiff that the burning sensation on his skin would dissipate over time.

The plaintiff was strip-searched, provided clean clothing, including a jumpsuit tied around his waist to enable him to tend to bodily functions while restrained. The length of the tether chain between his hands and feet was adjusted to permit his wrists to reach his waist while standing erect. The nurse checked the restraints and found ample spacing. The plaintiff complained of left wrist pain, but the nurse observed no inflammation. The plaintiff did not complaint that the restraints were too tight or the tether too short. A fifteen minute watch was imposed.

*February 15, 2008 Incident*
On February 15, 2008, defendant Lieutenant Rae told the plaintiff that he was going to be moved to another cell because they needed the plaintiff's current cell to house an inmate on four-point stationary restraints. The plaintiff stated that he wanted to be taken off in-cell restraints and returned to his original cell. Defendant Rae explained that the plaintiff's in-cell restraint status would be reviewed by the second shift supervisor. The plaintiff became disruptive and refused to comply with the order to move. Medical and mental health staff attempted to intervene and gain the plaintiff's compliance, but were unsuccessful.

The plaintiff complied with the order to remain on his bed when correctional staff entered the cell. When ordered to walk to the new cell, however, the plaintiff refused and told correctional staff to drag him. When staff lifted him to a sitting position and to his feet, the plaintiff passively resisted by remaining limp. The plaintiff was returned to the bed and mental health staff attempted to coax him to comply and avoid use for hands-on force. The plaintiff refused. Four correctional officers lifted the plaintiff at his shoulders and legs and carried him to the new cell. The plaintiff was in full restraints. He did not complain of pain or discomfort while he was being carried.

En route, the plaintiff was placed on the dayroom floor in a sitting position. The plaintiff became disruptive. He repeatedly urged other inmates to refuse staff directions and ignored orders to stop this behavior. The plaintiff then laid down on the floor on his back with his hands comfortably at his waist and legs fully stretched. After five minutes, the plaintiff again was ordered to stand and walk to the new cell. The plaintiff refused and was carried to the cell. The plaintiff then was placed in four-point soft restraints for four hours as a result of his disruptive behavior of inciting other inmates. Once secured, the restraints were checked by medical staff and found to be properly applied. The plaintiff did not complain of pain or discomfort. The plaintiff was checked by medical staff every fifteen minutes. He was released from four-point soft restraints after less than twelve hours.

 *6  The plaintiff was placed in full metal restraints and taken to another cell. The cell was clean and sanitary. The walls were clean and there were no feces, urine or blood in the cell. The plaintiff complained that the tether chain was too short. Medical staff checked the clearances and found them appropriate. The plaintiff was checked every fifteen minutes.

The following day, defendant Lieutenant Siwicki assessed the plaintiff's restraint status. Based on staff accounts and the restraint checklist, defendant Siwicki decided to remove the plaintiff from in-cell restraint status. When he told the plaintiff that he would be removed from in-cell restraint status and moved to a population cell, the plaintiff refused to move. Defendant Siwicki decided to allow the plaintiff to remain on in-cell restraint status. He recorded the refusal using a hand-held video camera. On February 17, 2008, the plaintiff cooperated with his removal from incell restraint status but remained in the same cell.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 488 of 830
Alston v. Butkiewicus, Not Reported in F.Supp.2d (2012)
2012 WL 6093887

*February 18, 2008 Incident*

During lunch hour on Monday, February 18, 2008, the plaintiff stuffed his mattress in the food trap in the cell door, preventing it from being closed. The plaintiff complained that he was denied cleaning supplies to clean urine, feces and blood that was smeared on his cell walls. The plaintiff was aware that cleaning supplies were only distributed on Saturday. Although the plaintiff alleged that he did not put the urine, feces and blood on the cell walls, the video of the cell when the plaintiff was first admitted shows that the walls were clean.

Defendant Saylor repeatedly ordered the plaintiff to remove the mattress from the trap. The plaintiff refused. Defendant Saylor called medical and mental health staff to try to persuade the plaintiff to comply with the order and to ensure that there was no medical reason he was unable to comply. Although the plaintiff was found able to remove the mattress, he refused to do so. Defendant Saylor warned the plaintiff that if he failed to comply with the order, an extraction team would be called. When the plaintiff still refused to comply, the cell door was partially opened, a onesecond burst of chemical agent deployed and the door closed. The plaintiff immediately moved to the rear of the cell and tried to cover himself with a wet towel. In response, a second one-second burst of chemical agent was deployed into the cell.

The chemical agent took effect and the plaintiff complied with orders to kneel and put his arms behind his back for handcuffing. When the cell door was opened to remove the plaintiff from the cell, the walls were clean. The plaintiff was escorted to the shower unit for decontamination. He did not complain about the time spent under the shower or the water temperature.

The plaintiff was taken to a new cell, provided clean clothing and placed on in-cell restraints. The restraints were applied while the plaintiff was standing upright. A nurse checked the restraints and determined that the tether was of proper length and there was proper clearance under the restraints. Medical staff was called to provide further decontamination when the plaintiff complained of burning in his eyes. The plaintiff, however, refused treatment, became argumentative and would not sit still. Defendant Saylor ordered the plaintiff to calm down and allow the nurse to flush his eyes. The plaintiff refused. The plaintiff was on fifteen minute watch until he was released from in-cell restraint status approximately twenty-four hours later.

*October 10, 2008 Incident*

**\*7** The plaintiff attempted to assault two correctional officers by throwing a milk carton out of the food trap in his cell door. Defendant Rae ordered the plaintiff to put his hands through the food trap to be handcuffed. The plaintiff eventually complied with this order. The plaintiff was strip-searched and issued new clothing before in-cell restraints were applied. The plaintiff complained that the tether chain was too short because correctional staff had looped the chain over the top of the handcuff chain before securing it to the handcuff ring. The correctional procedures, however, require that the tether chain be adjusted to keep the inmate's hands at waist level when standing erect. Looping the chain over the handcuff chain is the accepted mean of adjusting the tether chain to the proper length.

After the restraints were applied, they were examined by medical and custody staff. Both determined that the restraints were properly applied. The plaintiff was placed on fifteen-minute checks until the afternoon of October 12, 2008, when defendant Rae decided to remove the plaintiff from in-cell restraint status. When the restraints were removed, the plaintiff's clothing was clean and he made no complaints that he was unable to use the toilet or eat any of his meals.

*January 9, 2009 Incident*

When defendant Lieutenant Harnett tried to distribute legal mail, the plaintiff stuck his arm through the food trap preventing the trap from closing. The plaintiff refused all orders to remove his arm. Defendant Harnett summoned additional correctional staff to the area to assist in placing the plaintiff on in-cell restraint status. By the time the additional staff members, along with a videocamera operator arrived, the plaintiff had removed his arm from the trap. Defendant Harnett ordered the plaintiff to turn around and place his arms through the food trap so handcuffs could be applied. The plaintiff refused, arguing that there was no need for in-cell restraint status as he had removed his arm from the trap.

When the plaintiff continued to refuse to comply with orders, defendant Harnett called medical and mental health staff. The social worker got the plaintiff to comply with the order. The plaintiff was placed in handcuffs and shackles and escorted to another cell. The plaintiff repeatedly objected to being strip-searched and placed on in-cell restraint status and relaxed his legs to passively disrupt the staff's ability to apply in-cell restraints. When the staff attempted to strip-search the plaintiff while he was lying on the floor, the plaintiff began

2012 WL 6093887

kicking his legs. Correctional staff then physically restrained the plaintiff's legs. When the plaintiff refused to stand so the tether chain could be applied, defendant Harnett decided to place the plaintiff in four-point soft restraints.

The plaintiff continued to passively resist. Correctional staff lifted and carried him in a prone, face down position into the next cell and placed him, face-down on the bed. He was rolled onto his back and soft four-point restraints were applied. Defendant Harnett checked the clearances and found them proper. The plaintiff continued to be disruptive and resist removal of the handcuffs. Fifteen minute watches began at 10:15 a.m.

**\*8** After fifteen minutes, medical staff entered the cell to take the plaintiff's vital signs. The plaintiff refused to comply. The plaintiff did not respond to inquiries during the next few checks. At 11:37 a.m., defendant Rae offered the plaintiff food and downgraded his status to in-cell restraints.

When defendant Rae began removing the four-point restraints, the plaintiff stated that defendant Harnett purportedly found a pen with a razor attached in the plaintiff's cell in June 2008, and that the plaintiff had found a similar pen found in his cell two days earlier. The plaintiff stated that he tried to tell defendant Harnett about the second pen, an item not allowed in administrative segregation and asked that the pen be removed from his cell. Defendant Harnett accused the plaintiff of having a weapon and stated that the plaintiff would be put on in-cell restraint status. These purported statements were not the reasons for placing the plaintiff on restraint status.

After the plaintiff was secured on in-cell restraint status, defendant Rae and a nurse checked the clearances and found them proper. The plaintiff made no complaints about the restraints being tight or the tether chain being short. The plaintiff was left in the cell with a modified meal. The following morning, defendant Harnett found the plaintiff's behavior compliant and removed the plaintiff from in-cell restraint status. At this time, the plaintiff's cell and clothing were clean and the plaintiff made no complaints.

### III. *Discussion*
In this action, the plaintiff asserts federal law claims for use of excessive force, deliberate indifference to serious medical needs, unconstitutional conditions of confinement, violation of Department of Correction procedures and verbal abuse as well as state law claims of assault and battery. The defendants

argue that the plaintiff cannot establish any genuine issue of material fact regarding any claim; the evidence shows that they acted patiently and professionally and only in response to the plaintiff's disruptive behavior.

### A. *Eleventh Amendment*
The defendants first argue that the Eleventh Amendment bars all suits for damages against them in their official capacities. The defendants are correct. However, the plaintiff alleges that he seeks damages from the defendants in their individual capacities and only injunctive relief against the defendants in their official capacities. *See* Doc. # 1–2 at 8, ¶ 24.

As there is no official capacity claim for money damages, the defendants' motion for summary judgment is denied on this ground.

### B. *Conditions of Confinement*
It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *See Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *see also Rhodes v. Chapman,* 452 U.S. 337, 351, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). To state an Eighth Amendment claim, an inmate must allege facts demonstrating the failure of prison officials to provide for inmates' "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

**\*9** An inmate may prevail on an Eighth Amendment claim "only where he proves both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.,* with 'deliberate indifference to inmate health or safety.' " *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The objective element is satisfied where the inmate shows that the deprivation he alleges is sufficiently serious, *i.e.,* that his confinement under the alleged conditions violates contemporary standards of decency. The subjective element requires the inmate to show that correctional officials were aware of and disregarded a substantial risk of serious harm. *See id.* at 185–86. The defendants "must both be aware of facts from which the inference could be drawn that a

2012 WL 6093887

substantial risk of serious harm exists, and ... must also draw that inference." *Farmer,* 511 U.S. at 837.

Prisoners have no right to be housed in comfortable surroundings. Restrictions do not violate the Eighth Amendment unless they are "totally without penological justification," "grossly disproportionate," or "involve the unnecessary and wanton infliction of pain." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1980) (internal citations omitted). Harsh or restrictive conditions are part of the penalty criminal offenders pay for their crimes. *Id.* at 347; *see, e.g., Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir.1996) (allegation that pretrial detainee was subjected to raw sewage for four days because of inoperative toilet did not rise to level of constitutional violation); *Allebach v. Sherrer,* No. Civ. 04–287, 2005 WL 1793726, at *3–*4 (D.N.J. Jul.27, 2005) (holding that denial of running water, religious items, visitation, recreation, use of the telephone, mattress and clothing for thirty-six days did not violate the Eighth Amendment).

### 1. *Urine, Feces and Blood in Cell, Toilet Issues and Hygiene Products*

The plaintiff alleges that he was unable to use the toilet while confined on in-cell restraint status and that the cells in which he was confined had urine, feces and blood smeared on the walls, sink and bunk. He also contends that he was denied hygiene products for four days.

The video recordings submitted by the defendants belie this claim. The recordings show that each time the plaintiff was placed on in-cell restraints after use of a chemical agent, he was provided clean clothing and dressed in a way that enabled him to use the toilet while on in-cell restraints. The plaintiff's clothing was clean when he was removed from in-cell restraint status. The video evidence also shows that each cell was clean both when the plaintiff entered and when he left. At no time, when placed in the cells, did the plaintiff complain on the recordings about the cleanliness of the cells or ask for cleaning supplies. As explained above, the court can rely on video evidence to establish the facts. In light of the video evidence, the court concludes that there is no factual basis for the plaintiff's claims that his cells were covered with feces, urine and blood, and that he was unable to use the toilet.

**\*10** The plaintiff also contends that he was denied hygiene products for four days in January 2009. Even if true, the denial of hygiene products for four days does not constitute the denial of the minimal civilized measure of life's necessities.

*See Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir.1988) (denial of toilet paper for five days and soap, toothpaste and toothbrush for ten days not of constitutional dimension); *Martin v. Lane,* 766 F.Supp. 641, 648 (N.D.Ill.1991) (denial of sanitary and hygiene living conditions for between three and eighteen days does not violate Eighth Amendment). The defendants' motion for summary judgment is granted on these claims.

### 2. *Food Portions and Lack of Eating Utensils*

The plaintiff claims that he did not receive his full morning meal on one day and that, when confined on in-cell restraint status, he was unable to eat his modified meals because he was not provided eating utensils. Neither claim is of constitutional dimension.

The plaintiff alleged that items were missing from his morning meal. Even if he had not been provided any meal, the denial of a meal on one occasion does not constitute an Eighth Amendment claim. *See Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (holding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal).

The Eighth Amendment requires "that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (quoting *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir.1980)). That the plaintiff was not provided utensils to eat oatmeal from a styrofoam cup, although unfortunate, is not of constitutional magnitude. *See Thomas v. Owens,* 345 Fed. Appx. 892 (5th Cir.2009) (prisoner's claim that he was denied, *inter alia,* eating utensils for days held not to state an Eighth Amendment claim); *Stanley v. Page,* 44 Fed. Appx. 13, 15 (7th Cir. Aug.20, 2002) (prisoner's claim regarding denial of utensils and a need to eat with his hands described only a "temporary inconvenience" and was not cognizable under the Eighth Amendment); *Martin,* 766 F.Supp. at 648 (holding that a prisoner's allegations concerning the lack of eating utensils were "not cognizable").

The defendants' motion for summary judgment is granted on these claims.

### 3. *Showering in Restraints*

2012 WL 6093887

The plaintiff claims that the defendants violated his Eighth Amendment rights by requiring him to shower while wearing shackles.

Requiring a particular inmate to shower while wearing shackles for security reasons does not constitute an Eighth Amendment claim. *See Branham v. Meachum,* 77 F.3d 626, 631 (2d Cir.1996); *see also Sanders v. Hopkins,* 131 F.3d 152, 1997 WL 755276, at *2 (10th Cir.1997) (holding that requiring an inmate in disciplinary segregation to shower in handcuffs and ankle shackles does not violate the Eighth Amendment); *LeMaire v. Maass,* 12 F.3d 1444, 1457 (9th Cir.1993) (requiring an inmate who had assaulted prison guards and fellow inmates to shower while wearing handcuffs and ankle shackles does not state a claim under the Eighth Amendment). The defendants have presented evidence that the plaintiff is a dangerous inmate. He is classified as a Security Risk Group Safety Threat Member and has received over 150 disciplinary charges, over 100 of which are for interfering with institutional safety and security, threats, fighting and assaults on correctional staff or other inmates. *See* Doc. # 98–3, Ex. 40. The court concludes that requiring the plaintiff to shower wearing shackles does not violate the Eighth Amendment. The defendants' motion for summary judgment is granted on this claim.

### 4. *Verbal Abuse*

**\*11** The plaintiff alleges that several correctional staff subjected him to verbal abuse and harassment. Although unprofessional and inappropriate, such conduct does not constitute a constitutional violation. *See Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010) ("Verbal harassment itself does not rise to the level of a constitutional violation. Verbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations." (citation omitted)); *see also Morgan v. Ward,* 699 F.Supp. 1025, 1055 (N.D.N.Y.1988) (noting that exchange of verbal insults between inmates and guards is a constant daily ritual in prison). Accordingly, the defendants' motion for summary judgment is granted on this claim.

### 5. *Four-point and In-cell Restraints*

Finally, the plaintiff argues that his placement on four-point restraints and in-cell restraints subjected him to unconstitutional conditions of confinement. He contends that every time he was placed on in-cell restraints, he was short-chained, preventing him from being able to stand without bending over at the waist, and that the restraints were too tight.

The plaintiff's claim that he was short-chained lacks a factual basis. He alleges that whenever in-cell restraints were applied, the tether chain was impermissibly wrapped around the handcuffs. Although this happened, that fact does not mean that the plaintiff was "short-chained." The video evidence clearly shows that after the in-cell restraints were applied, the plaintiff was able to stand comfortably and was not required to bend over at the waist. In fact, one video shows the plaintiff stretched out comfortably on the floor with his hands at his waist. Nor does the plaintiff complain about the restraints being too tight when they were applied. The court can rely on this video evidence to contradict the plaintiff's allegations. Accordingly, these claims are without merit.

The plaintiff also challenges the length of time he was restrained. The plaintiff was placed on in-cell restraint status for seventy-two hours in July 2007, fifteen hours in February 2008, fifty-three hours in October 2008, and eight hours in January 2009. After forty-five hours of the seventy-two hour period, however, the plaintiff was offered the chance to be removed from in-cell restraint status and returned to population. The plaintiff refused to move and, therefore, remained on in-cell restraint status until the following day. The plaintiff was confined in four-point soft restraints for four hours in February 2008 and one hour in January 2009.

The maintenance of prison order and security are legitimate governmental objectives. Accordingly, use of restraints that are reasonably related to maintaining prison security, without more, does not violate the Eighth Amendment. *See Dolphin v. Manson,* 626 F.Supp. 229, 234 (D.Conn.1986) (citing *Bell v. Wolfish,* 442 U.S. 520, 540 (1979)). When reviewing the use of restraints under the Eighth Amendment, the court must consider the individual circumstances surrounding the use of restraints, including the length of time restraints were imposed and the objective sought to be served. *See Ferola v. Moran,* 633 F.Supp. 814, 820–21 (D.R.I.1985).

**\*12** As noted above, the plaintiff has a history of serious disciplinary infractions. Each use of incell restraints was precipitated by acutely disruptive actions by the plaintiff. In July 2007, February 2008 and January 2009, the plaintiff had stuffed objects or put body parts through the food trap, preventing correctional staff from closing the trap. The plaintiff disregarded repeated orders and efforts by correctional staff to persuade him to remove the obstructions. In October 2008, the plaintiff attempted to assault correctional staff through the food trap. The use of four-point restraints

2012 WL 6093887

was precipitated, in February 2008, by the plaintiff while on in-cell restraint status inciting other inmates to disobey orders and, in January 2009, by the plaintiff's resistance to the application of incell restraints.

The defendants have provided evidence that the decisions to utilize in-cell or four-point restraints were intended to control the plaintiff's disruptive behavior, not to impose unnecessary punishment or the wanton infliction of pain. The video evidence documents the correctional staff's compliance with the departmental procedures regarding imposition of the restraints and the required periodic medical checks during the time the restraints were in use. Other courts have found that similar uses of restraints did not violate the Eighth Amendment. *See, e.g., LeMaire,* 12 F.3d at 1460 (holding that use of in-cell or four-point restrains in accordance with prison directives, even for extended periods of time, does not constitute an Eighth Amendment violation); *Bruscino v. Carlson,* 854 F.2d 162, 166 (7th Cir.1988) (holding that handcuffs, shackles and four-point restraints are reasonable measures to maintain order when dealing with violent inmates), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989); *see also Parks v. Williams,* 157 Fed. Appx. 5, 6 (9th Cir.2005) (noting that prison security measure taken for the protection of prison officials and the inmate population is constitutional if applied in good faith and not used maliciously).

The court concludes that the video evidence demonstrates that the defendants followed departmental procedures and did not act maliciously. The defendants' motion for summary judgment is granted on this claim.

### C. *Due Process*

In addition to challenging his confinement on in-cell restraint status and in four-point soft restraints as unconstitutional conditions of confinement, the plaintiff also argues that the confinements violated his Fourteenth Amendment right to substantive due process.

To establish a substantive due process violation, the plaintiff must identify conduct that may be considered "so brutal and offensive to human dignity as to shock the conscience." *Silvera v. Department of Corrections,* No. 3:09–cv–1398(VLB), 2012 WL 877219, at * 15 (D.Conn. Mar. 14, 2012) (internal quotation marks and citations omitted). In the prison context, the Supreme Court has found only two examples of conduct that violated an inmate's constitutionally protected liberty interest: transfer to a mental hospital, and the

involuntary administration of psychotropic medication. *See Sandin v. Conner,* 515 U.S. 472, 479 n. 4, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). There is no liberty interest in avoiding confinement under more adverse conditions. *See Wilkinson v. Austin,* 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). Confinement on in-cell restraint status or in four-point restraints does not rise to the level of a substantive due process violation. *See, e.g., Grinter v. Knight,* 532 F.3d 567, 574 (6th Cir.2008) (prisoner has no liberty interest in avoiding confinement in four-point restraints for four hours without a nurse present).

**\*13** The plaintiff also alleges in the complaint that the defendants violated his right to due process by failing to move him to a particular cell. Prisoners, however, have no right to be housed in any particular cell or area within the prison. *See Russell v. Scully,* 15 F.3d 219, 221 (2d Cir.1993) (holding that inmate has no due process right to be housed in any particular area of the prison). Thus, a refusal to transfer the plaintiff to the cell of his choosing does not state a cognizable constitutional claim.

Finally, the plaintiff contends that the defendants violated his right to due process by failing to comply with correctional administrative directives regarding his placement on in-cell and four-point restraint status. Failure to comply with state-created procedures does not create a protected liberty interest. Fourteenth Amendment due process protections, therefore, are not implicated by the defendants' alleged failure to comply with administrative directives. *See Rhodes v. Hoy,* No. 9:05–CV–836, 2007 WL 1343649, at *2 (N.D.N.Y. May 5, 2007) (holding that due process is not implicated by failure to comply with institutional administrative procedures); *see also Levine v. Torvik,* 986 F.2d 1506, 1515 (6th Cir.1993) ("A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable."), *overruled in part on other grounds by Thompson v. Keohane,* 516 U.S. 99, 111, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

The defendants' motion for summary judgment is granted on the plaintiff's due process claims.

### D. *Use of Chemical Agents*

The plaintiff contends that the defendants used excessive force against him when they deployed chemical agents to gain his compliance with orders. When considering the use of force by correctional officers, the court must determine

2012 WL 6093887

"whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal quotation marks and citation omitted).

The court considers objective and subjective components to an excessive force claim. *See id.* at 8. The objective component relates to the level of physical force used against the inmate and whether that force is repugnant to the conscience of mankind. *See id.* at 9–10. The subjective component focuses on whether the correctional officers had a "wanton" state of mind when they were applying the allegedly excessive force. *See id.* at 8.

An excessive force claim cannot be decided merely by considering the extent of an inmate's injuries. *See Perkins v. Brown,* 285 F.Supp.2d 279, 283 (E.D.N.Y.2003) (acknowledging that claim of excessive force may be established even if the victim does not suffer serious or significant injury) (citations omitted). Instead, the court uses the extent of the inmate's injuries as one factor in determining whether the use of force could have been thought necessary by correctional staff or demonstrated an unjustified infliction of harm. *See Hudson,* 503 U.S. at 7. Other factors to be considered are the need for use of force, the threat perceived by correctional staff and the relationship between the perceived threat and the amount of force used. *See id.* For example, an inmate who does not suffer serious or significant injury may establish a claim for use of excessive force if he can show that the force used was more than *de minimis* or was repugnant to the conscience of mankind and that the defendant acted with a sufficiently culpable state of mind. *United States v. Walsh,* 194 F.3d 37, 48–50 (2d Cir.1999).

 **\*14** This approach is consistent with the view that "[e]xcessive force does not, in and of itself, establish malice or wantonness for Eighth Amendment purposes." *Romano v. Howarth,* 998 F.2d 101, 106 (2d Cir.1993); *see, e.g., Johnson v. Blaukat,* 453 F.3d 1108, 1113 (8th Cir.2006) (affirming denial of summary judgment on excessive force claims where questions existed regarding, *inter alia,* whether actions of correctional staff "were necessary to maintain order or were excessive reactions by frustrated officers; and whether the amount of force used was commensurate with the situation ... whether verbal orders or the application of less force would have been sufficient, whether or not a warning issued before application of the pepper spray"). "Infliction of pain that is 'totally without penological justification' is per se malicious."

*Hope v. Pelzer,* 536 U.S. 730, 737, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

The application of force in this case is the deployment of a chemical agent. The defendants argue that the use of the chemical agent was warranted because the plaintiff refused repeated orders and requests to remove obstructions from the food trap. The repeated orders from correctional staff and the requests from medical and mental health staff are documented on the video evidence. Following specific warnings, the chemical agent was used instead of hands-on force. Once the plaintiff complied with orders, use of the chemical agent ceased. The plaintiff was immediately restrained and escorted to the shower area for decontamination.

The Supreme Court encourages courts to "give a wide range of deference to prison officials acting to preserve discipline and security." *Whitley v. Albers,* 475 U.S. 312, 321–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Courts considering the use of chemical agents have held that deployment of a chemical agent is an accepted means of controlling an unruly or disruptive inmate. *See, e.g., Scroggins v. Davis,* 346 Fed. Appx. 504, 505 (11th Cir.2009) (use of chemical agent to subdue high-risk inmate was not excessive), *cert. denied, —— U.S. ——,* 130 S.Ct. 1711, 176 L.Ed.2d 197 (2010); *Soto v. Dickey,* 744 F.2d 1260, 1271 (7th Cir.1984) ("the chemical agent was used for failure of the inmate to obey a direct order and the use of mace was a reasonable response to the institution's legitimate security concern"), *cert. denied, 470 U.S. 1085, 105 S.Ct. 1846, 85 L.Ed.2d 144 (1985). When reviewing the use of a chemical agent against a recalcitrant inmate, the court can find a constitutional violation only where the use of the chemical agent is malicious and sadistic. That the use may have been objectively unreasonable is insufficient to establish an Eighth Amendment claim. *See Howard v. Nunley,* No. CV–06–00191–NVW, 2010 WL 3785536, at \*4 (E.D.Cal. Sept.24, 2010) (considering use of chemical agent against inmate who deliberately violated direct orders).

The largest number of deployments of chemical agent occurred on February 14, 2008. The plaintiff alleges that defendant Casey deployed a chemical agent eleven times, with each deployment lasting between three and five seconds. The video evidence shows this allegation an exaggeration. The chemical agent was deployed between five and seven times, each time for one second. The number was so large because the plaintiff refused to comply with orders.

2012 WL 6093887

For example, when the cell door was opened after initial deployment, the plaintiff came out of the door in a threatening manner and taunted correctional staff. After additional deployments, the plaintiff still refused to present his hands so restraints could be applied and told defendant Casey the he would have to utilize the chemical agent more times before the plaintiff would cooperate. *See* Defs .' Local Rule 56(a) Statement, Ex. 14.

**\*15** The video evidence clearly shows that, on all occasions, the use of a chemical agent was precipitated by the plaintiff's actions. The chemical agent was deployed only after many direct orders and attempts to persuade the plaintiff to comply. As soon as the plaintiff complied with the orders, he was restrained and escorted to the shower to be decontaminated. The court concludes that the video evidence clearly shows that no defendant acted maliciously or wantonly regarding the use of a chemical agent. Accordingly, the defendants' motion for summary judgment is granted on this claim.

### E. *Deliberate Indifference to Medical Needs*

The plaintiff alleges that the defendants were deliberately indifferent to his serious medical needs arising from the use of chemical agents and the imposition of in-cell restraints and four-point soft restraints.

Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To state such a claim, the plaintiff must allege facts demonstrating sufficiently harmful acts or omissions and intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. *Id.* at 104–06.

Because mere negligence will not support a section 1983 claim, not all lapses in prison medical care constitute a constitutional violation. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003). In addition, inmates are not entitled to the medical treatment of their choice. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). The conduct complained of must "shock the conscience" or constitute a "barbarous act." *McCloud v.*

*Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988). In addition, the fact that a prison official did not alleviate a significant risk that he should have but did not perceive does not constitute deliberate indifference. *See Farmer v. Brennan,* 511 U.S. 825, 838, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

There are both subjective and objective components to the deliberate indifference standard. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Objectively, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The condition must produce death, degeneration or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006).

**\*16** After each incident during which a chemical agent was deployed, the plaintiff was taken to the shower area for decontamination. Following decontamination, medical staff flushed the plaintiff's eyes if he complained of irritation. The residual effects of a chemical agent, however, do not constitute a serious medical need. *See Blond v. City of Schenectady,* No. 10–CV–0598, 2010 WL 4316810, at *5 (N.D.N.Y. Oct.25, 2010) (denial of ability to rinse eyes for thirty to sixty minutes after being sprayed with chemical agent was not serious medical need); *Strasser v. O'Flynn,* No, 04–CV–6021CJS, 2006 WL 839411, at *8 (W.D.N.Y. Mar.27, 2006) (exposure to temporary discomfort of pepper spray is not a serious medical need) (citing cases).

The plaintiff also alleges that he suffered pain from the restraints. The video evidence demonstrates that, while confined in four-point soft restraints, the plaintiff was checked every fifteen minutes by medical staff. On occasion, he refused to allow medical staff to take his temperature while on four-point restraints. Frequently, the plaintiff refused to uncover his restraints or approach the cell door for in-cell restraints to be checked. The plaintiff did not complain of any pain during these checks. He also alleges that he experienced redness or slight bruising from restraints. Such complaints do not rise to the level of a serious medical need. Other minor medical complaints, such as a scratch on his arm, were addressed by the medical staff. The fact that the plaintiff may have preferred a different treatment does not support an Eighth Amendment claim.

2012 WL 6093887

The court concludes that the plaintiff has not presented any evidence that he suffered a serious medical need as a result of the incidents underlying the complaint. Accordingly, the defendants' motion for summary judgment is granted as to any claims for deliberate indifference to a serious medical need.

### F. *State Law Claims*

The plaintiff includes in his complaint various state law claims. Where no federal claims remain in a lawsuit, the district court may decline to exercise supplemental jurisdiction and leave the state law claims to be considered by the state courts. *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over state law claims where all federal claims have been dismissed); *Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir.2001) (collecting cases). As the court has granted summary judgment in favor of the defendant on the federal claim, it declines to exercise supplemental jurisdiction over the remaining state law claims.

### IV. *Conclusion*

The defendants' motion for summary judgment [**Doc. # 98**] is **GRANTED.** The Clerk is directed to enter judgment in favor of the defendants and close this case.

**SO ORDERED**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6093887

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 496 of 830
Taylor v. Nieves, Not Reported in Fed. Supp. (2020)
2020 WL 7028907

2020 WL 7028907
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Roy TAYLOR, Plaintiff,
v.
OBCC C.O. NIEVES, et al., Defendants.

17-cv-7360 (AJN)
|
Signed 11/30/2020

**Attorneys and Law Firms**

Roy Taylor, East Elmhurst, NY, pro se.

Hannah Victoria Faddis, New York City Law Department, New York, NY, Nakul Y. Shah, Hill Wallack LLP, Princeton, NJ, for Defendants.

MEMORANDUM OPINION & ORDER

ALISON J. NATHAN, District Judge:

**\*1** In this pro se prisoner case under 42 U.S.C. § 1983, Roy Taylor, then a detainee at the Otis Bantum Correctional Center, claims that several correctional officers violated his constitutional rights by pepper spraying him when he refused instructions to return to his cell. The City of New York and the individual correctional officers move for summary judgment. The Court concludes that the correctional officers are entitled to qualified immunity and that Taylor has not produced evidence supporting a claim for municipal liability against the City. It thus grants the motion.

**I. Background**

Taylor has not filed a statement of undisputed facts as required by Local Rule 56.1 despite being served with a notice to pro se litigants explaining the requirements of that rule. *See* Dkt. Nos. 78–79. However, mindful of its obligation to construe pro se filings liberally, *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006), the Court construes his brief in opposition as a response to the Defendants' Rule 56.1 Statement wherever it disputes the facts contained therein. This factual recitation includes solely the facts on which all parties apparently agree.

On April 10, 2017, Taylor was a detainee at the Otis Bantum Correctional Center ("OBCC") on Riker's Island, New York.

Defendants' Rule 56.1 Statement ¶ 4. The facility was in at least partial lockdown, under which the movement of at least some inmates was restricted. *Id.* ¶ 5; Plf. Br., Dkt. No. 88, ¶ 12.

Captain Katena Isaac, one of the defendant correctional officers, stopped in front of Taylor's cell on the balcony of the housing unit to supervise meal service to inmates in that area. Def. 56.1 ¶ 8. After Taylor's cell door was opened, he exited his cell and rushed past Isaac. *Id.* ¶ 9. At the time, Taylor was wearing a soft cast because he had broken his wrist about six months earlier. *Id.* ¶¶ 25, 39. Isaac asked where Taylor was going and told him that he was not allowed to leave his cell. *Id.* ¶ 10. Taylor said he was going to the shower and continued along the balcony past Isaac, ignoring her instructions. Plf. Br. ¶ 6; Def. 56.1 ¶ 12. Isaac followed Taylor along the balcony and sprayed him from behind with a short burst of pepper spray. Def 56.1 ¶ 12.

Taylor did not react to Isaac's use of pepper spray. *Id.* ¶ 13. He continued briskly along the balcony and then broke into a run. *Id.* Around this time, correctional officer Luis Nieves came up the stairs on the far side of the balcony to assist Isaac. *Id.* ¶ 15. Taylor rounded the corner of the balcony, and as he approached Nieves, turned back toward Isaac and started waving his hands and yelling. *Id.* ¶¶ 16–17. After gesturing wildly and yelling at Isaac for about thirty seconds, he turned and again started advancing toward Nieves. *Id.* ¶ 18–19. Nieves told Taylor to stop and warned him that he would use pepper spray. *Id.* ¶ 20. Taylor continued rushing toward him, and Nieves sprayed him in the face with a second short burst of pepper spray. *Id.* ¶ 21; Plf. Br. ¶ 6. Taylor stopped and staggered back. *Id.* ¶ 22. Captain Jermaine Slack, the last of the correctional officer defendants, arrived moments later and called a probe team. *Id.* ¶ 23. Slack handcuffed Taylor—first using mechanical cuffs on one arm only, and then switching to plastic flex cuffs with Taylor's hands positioned in front of his body—and the probe team escorted Taylor to the OBCC clinic. *Id.* ¶¶ 24–34. Staff at the clinic diagnosed Taylor with exposure to a chemical agent and a wrist contusion. *Id.* ¶ 37. He was returned to his cell with instructions to periodically rinse his face with cold water. *Id.* ¶ 38. When staff examined him at the clinic again two days later, he had recovered his full range of motion in his arm. *Id.* ¶ 41.

**\*2** Taylor filed suit against the City and correctional officers. The City and correctional officers move for summary judgment, contending that the use of force was objectively reasonable; that the officers are entitled to

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 497 of 830

Taylor v. Nieves, Not Reported in Fed. Supp. (2020)

2020 WL 7028907

qualified immunity; and that municipal liability does not lie against the City. *See* Dkt. Nos. 74, 76.

In support of their motion for summary judgment, the City and correctional officers presented evidence including video of the pepper spray incident from six different angles. *See* Declaration of Hannah V. Faddis, Dkt. No. 75, Exs. E–J. The video evidence is clear and comprehensive. It fully corroborates the account in the Rule 56.1 statement. It shows Taylor leaving his cell abruptly and briskly walking past Isaac without heeding her instructions. It shows him running along the curved portion of the balcony and then turning back, yelling, and waving his arms at Isaac. It then shows Nieves raise her pepper spray in warning as Taylor approaches, and discharge it only several seconds later as Taylor presses forward, undeterred.

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56.* "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.' " *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (internal citations omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In applying this standard, [courts] 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.' " *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (quoting *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. Discussion

### A. The Defendant Correctional Officers Are Entitled to Qualified Immunity

A pretrial detainee's claim of excessive force or unconstitutional conditions of confinement is governed by the Due Process Clause of the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015); *Darnell v. Pineiro*,

849 F.3d 17, 29 (2d Cir. 2017). To succeed on an excessive force claim, a pretrial detainee must prove that the use of force was "*objectively* unreasonable." *Kingsley*, 576 U.S. at 391–92. "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397. "Running a prison is an inordinately difficult undertaking." *Id.* at 399 (alteration omitted) (quoting *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)). Courts must thus afford prison officials some latitude to make "good-faith effort[s] to maintain or restore discipline." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

**\*3** Qualified immunity protects officers who do not violate constitutional or statutory rights of which a reasonable person would have known. *White v. Pauly*, 137 S. Ct. 548, 551 (2017). "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Supreme Court precedent "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). A district court may consider whether qualified immunity is available without deciding whether the conduct complained of amounts to a constitutional violation. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court concludes that the correctional officers are entitled to qualified immunity. Second Circuit precedent clearly disallows the gratuitous use of pepper spray against restrained individuals. *See Tracy v. Freshwater*, 623 F.3d 90, 98–99 (2d Cir. 2010). However, there is no clearly established law forbidding its use against individuals who refuse to comply with officer instructions after a warning. In *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017), the Second Circuit held that an officer who used pepper spray to subdue a suspect was entitled to qualified immunity. There, the suspect repeatedly refused to comply with the officer's instructions and to put her hands behind her back to be handcuffed. *Id.* The court held that it was not clearly unreasonable in those circumstances to push her to the ground and pepper spray her

repeatedly, because the officer warned her before each use of pepper spray and she continued to refuse to comply. *Id.*

The correctional officers' treatment of Taylor was considerably more measured and restrained than the conduct in *Brown*. Isaac sprayed Taylor just once and, then, after he continued to yell and move away from his cell, Nieves sprayed him just once more. Def. 56.1 ¶¶ 12–21. Their use of pepper spray was unaccompanied by other acts of physical force. The video evidence shows that other steps they took to cajole Taylor to return to his cell were ineffective, and the force they used was the minimum necessary to achieve compliance with their instructions. It further shows that, as in *Brown*, Nieves clearly warned Taylor before using pepper spray and only did so when Taylor continued to advance. The deference due to prison officials in maintaining discipline is also greater than that due to police officers on the street. *See Kingsley*, 576 U.S. at 399. If the use of pepper spray in *Brown* was not clearly unreasonable, the correctional officers' conduct does not approach that high threshold.

Taylor also complains that the correctional officers unreasonably handcuffed him despite his prior wrist injury and exacerbated irritation from the pepper spray by washing his face with hot water, rather than cold. However, he does not dispute that Slack initially only applied mechanical handcuffs to one of his arms, and then promptly switched to plastic flex handcuffs, in an apparent effort to avoid any injury. *See Def 56.1 ¶¶ 25–30.* Any injuries appear to be de minimis and do not support a claim of clearly unlawful conduct. *See, e.g., Walton v. Lee*, No. 15-cv-3080 (PGG), 2019 WL 1437912, at *4 (S.D.N.Y. Mar. 29, 2019) (de minimis injury from use of handcuffs fails to amount to excessive force). Nor is there any clearly established law that decontamination of a prisoner after use of pepper spray with hot water, rather than cold, is constitutionally unreasonable, even where that fails to comport with a prison's internal policies.

**\*4** Finally, Taylor raises two additional claims against the correctional officers. In his brief in opposition to summary judgment, he argues that the prison discriminated against him by allowing "gang members" to use the showers during the lockdown but not allowing him to do so. In his complaint, he also alleges that the officers failed to produce him to court and to allow him visits with counsel. Taylor supplies no evidence —or even more specific factual allegations—in support of either claim, and so the Court concludes that the officers are entitled to summary judgment on these claims, too. *See Celotex*, 477 U.S. at 322.

**B. Taylor Has Failed to Produce Evidence Supporting Municipal Liability**

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may not be held liable for constitutional violations by its employees on the basis of respondeat superior. *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). Instead, a plaintiff must establish that a municipal policy or custom caused the constitutional violation. *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). When a plaintiff's *Monell* claim rests on a failure to train, the plaintiff must establish "deliberate indifference" to constitutional deprivations in the face of "known or obvious consequences." *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997)).

Taylor has failed to demonstrate—or even plead—that the correctional officers' conduct in this case was the result of a municipal policy or custom. To the contrary, he argues at length that the officers' conduct was unreasonable because it was *contrary* to prison policy. *See, e.g.,* Plf. Br. ¶ 12 (contending that the correctional officers' orders for Taylor to return to his cell were contrary to prison policy); *id.* ¶ 14 (contending that the correctional officers' use of pepper spray was contrary to prison policy and that the officers failed to follow to prison decontamination procedures). Nor does Taylor allege or offer any evidence to show that the officers' conduct was the result of any systematic defect in training. Because Taylor bears the burden to establish municipal liability, his failure to introduce any evidence to do so is fatal to his claim against the City on summary judgment. *See Celotex*, 477 U.S. at 322.

**C. The Defendant NYPD Officers Are Not Properly Joined in this Case**

After this Court directed service in this case, it instructed Taylor to amend his complaint to clarify the true names of the defendants. *See* Dkt. No. 33. When Taylor did so, he also added to the caption of his complaint two New York Police Department officers and to the body of his complaint a new claim for wrongful arrest. *See* FAC ¶ 5. His factual allegations do not mention the two NYPD officers at all. The Magistrate Judge assigned to this case ordered Taylor to amend his complaint to add any additional parties by June 12, 2019, and the Court then extended that deadline an additional month. *See* Dkt. No. 43. Taylor did not do so, and the NYPD officers identified in the caption of Taylor's amended complaint have

2020 WL 7028907

not been served. The Court therefore concludes that they were not properly joined as defendants in this action.

Nor would joinder of the NYPD officers be permissible under Federal Rule of Civil Procedure 20. Taylor's allegations in support of this claim are sparse. But the claim appears to relate to an entirely separate incident, occurring nearly a year earlier, in which Taylor was arrested following an altercation with a man who Taylor alleges was squatting in his brother's apartment. FAC ¶ 5. This claim does not "aris[e] out of the same ... occurrence" as his claims related to the pepper spray incident, nor does it present any "question of law or fact" in common with his claims against the other defendants. Fed. R. Civ. P. 20(a)(2). Joinder would thus be improper.

 **\*5**  The Court therefore concludes that Taylor has not and could not properly join the NYPD defendants in this action and so dismisses the claims against them without prejudice.

### Conclusion

The motion for summary judgment filed by the City and the correctional officers (Dkt. No. 74) is GRANTED, and judgment will be entered in their favor. Taylor's wrongful arrest claim against the NYPD officers is dismissed without prejudice. All other pending motions are DENIED as moot. The Clerk of Court is respectfully directed to enter judgment and close the case.

The Court finds pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and, therefore, in forma pauperis status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

The Clerk of Court is respectfully directed to mail a copy of this Order to Taylor and to note the mailing on the public docket.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2020 WL 7028907

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 500 of 830

Quinones v. Rollison, Not Reported in Fed. Supp. (2020)

2020 WL 6420181

2020 WL 6420181
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jose M. QUINONES, Plaintiff,

v.

Captain Adam ROLLISON, Shield No. 192,
Correction Officer Eric Wilson, Shield No. 11616,
Correction Officer Kenny Rochez, Shield No. 5196,
Correction Officer Sammy Fernandez, Shield No.
5335, and Captain Carlos Blackwood, Defendants.

18-cv-1170 (AJN)
|
Signed 11/01/2020

**Attorneys and Law Firms**

Ezra Spilke, Law Offices of Ezra Spilke, PLLC, Brooklyn,
NY, for Plaintiff.

Joseph Peter Zangrilli, New York City Law Department, New
York, NY, for Defendants.

OPINION & ORDER

ALISON J. NATHAN, District Judge:

**\*1** In 2016, Plaintiff Jose Quinones was detained at
the George R. Vierno Center on Rikers Island. On his
first day at that facility, another inmate violently attacked
him, and a corrections officer subsequently used pepper
spray to break up the altercation. Plaintiff now claims that
Defendants, a number of Department of Corrections staff, used
excessive force against him in breaking up the fight and
were deliberately indifferent to his safety. Defendants have
moved for summary judgment on both claims. For the reasons
that follow, Defendants' motion is GRANTED.

**I. BACKGROUND**

**A. The Facts**

The following facts are undisputed: In November 2016,
the New York Police Department arrested Plaintiff Jose
Quinones. Dkt. No. 104 ¶ 3; *see also* Dkt. No. 93 Ex.
D. For about two weeks, Plaintiff was incarcerated at the

Manhattan Detention Center, and he and two other inmates
were subsequently transferred to the George R. Vierno Center
(GRVC) on Rikers Island. Dkt. No. 104 ¶ 5. When he arrived
at GRVC, Plaintiff asked a corrections offer which unit he
was being placed in and which gang was in control of the
unit. *Id.* ¶¶ 6–7. Plaintiff was informed that he was being
placed in Unit 8A, and "that the Macballas controlled the
unit." *Id.* ¶ 8. The parties agree that Plaintiff did not belong
to the Macballas gang, but was instead affiliated with another
gang. *Id.* ¶ 9. Plaintiff testified that he was a member of
the Bloodhound Brims, which is affiliated with the Bloods.
*See* Quinones Dep., Dkt. No. 93 Ex. C., at 40:9–13, 45:21–
46:1. The two other inmates that came with Plaintiff from
MDC were affiliated with other gangs. Quinones Dep. 29:6–
11 (noting that these individuals were members of the Ape
and Gorilla gangs; *see also* Dkt. No. 104 ¶ 12. [1] Plaintiff
and the other inmates "notified the officer that their gangs had
problems with the Macballas and that plaintiff expected he
would be attacked." Dkt. No. 104 ¶ 13. Nonetheless, Plaintiff
and the other two individuals were all placed in Unit 8A. *Id.* ¶
15. Plaintiff did not inform other Department of Corrections
staff members that he was concerned for his safety. *Id.*

[1]     Plaintiff admits this fact "to the limited extent
        that Plaintiff believed the two other inmates to be
        members of the Gorilla gang." Dkt. No. 104 ¶
        12. However, this proposition is conclusory, not
        supported by any citations to the record, and indeed
        contradicted by the record. The same is true for
        other facts contained in Plaintiff's Response to
        Defendants' 56.1 Statement and Plaintiff's Rule
        56.1 statement. Plaintiff has therefore failed to raise
        a genuine dispute as to certain facts. *See Scott v.
        Harris,* 550 U.S. 372, 380 (2007); Local Civil Rule
        56.1(c)–(d).

The next morning, Plaintiff was let out of his cell and spoke
with a man named Mike, who he knew from his time living
in Harlem. *Id.* ¶ 19. Mike informed Plaintiff that Unit 8A
housed members of the Macballas and Patria gangs, and that
there were "two other Blood gang members also inside the
housing unit." *Id.* ¶¶ 20–21. Plaintiff then spoke with these
"other Blood gang members" and learned that "the Bloods
shared one of the Macballas' phones and were allowed to use
it at certain times of the day." *Id.* ¶ 22. Later that day, after
confirming with other Blood members that he could use the
phone, Plaintiff made a phone call. *Id.* ¶ 24. On that call, he
informed the individual with whom he was speaking that "he
rejected an offer" from Department of Corrections officers "to

2020 WL 6420181

go into protective custody ... because he was trying to look cool." *Id.* ¶ 25.

**\*2** While on the phone, at about 9 AM, Plaintiff was "slashed by another inmate." *Id.* ¶ 26. Specifically, "an inmate sliced Mr. Quinones in the cheek and neck, leaving a five-inch gash." Dkt. No. 105 ¶ 14. The parties disagree about the exact details of what happened next, but here's the (undisputed) gist: Officer Sammy Fernandez, a defendant in this action, was working in Unit 8A at the time. Dkt. No. 104 ¶ 28. Officer Fernandez described his job as "basically walk[ing] around and monitor[ing] the housing area." Fernandez Dep., Dkt. No. 93-8, at 25:2–47. Unit 8A contains two levels of cells, and Officer Fernandez was on the higher level at the time. *Id.* 25:11–13, 29:17–30:3 ("I was on the top tier of the housing area ... I was letting inmates out of their cells."). After Plaintiff was attacked, Officer Fernandez ran to the stairwell, came downstairs, and "pushed his Personal Body Alarm immediately after he saw blood on the plaintiff." Dkt. No. 104 ¶ 30.

Plaintiff admits that after he "was cut he turned in an aggressive manner towards his assailant." *Id.* ¶ 31. The assailant and the Plaintiff continued to fight—though the parties dispute who "threw the first punch." *See id.* ¶ 32. Officer Fernandez "ordered the plaintiff and other inmate to stop," and Plaintiff admits that Officer Fernandez said "stop" while looking at him. Dkt. No. 104 ¶ 34. Officer Fernandez further informed both inmates "that he would utilize his chemical agent if they continued to fight." *Id.* ¶ 35. Plaintiff subsequently threw a garbage can in the direction of the inmate who had cut him and others who had gathered on the scene. *Id.* ¶ 36. Officer Fernandez then used a "two-second burst of chemical agent," and both Plaintiff and his assailant were sprayed. *Id.* ¶ 37; *see also* Fernandez Dep. 55:1-16. After Officer Fernandez sprayed the chemical agent, "the fight stopped and the inmates dispersed throughout the housing area." *Id.* ¶ 39. A "probe team" then arrived and escorted both inmates out of the housing unit. *Id.* ¶ 40; *see also id.* ¶ 43 ("Approximately five minutes after the incident the plaintiff was escorted out of the unit."). Defendants have also provided undisputed video footage of this entire incident. Def. Ex. G.

Plaintiff was soon seen in the GRVC clinic by a doctor, and was then "referred to Urgi-Care where his laceration wound was treated with Dermabond/Sterile strips." *Id.* ¶¶ 41–42. A subsequent Department of Corrections investigation determined "that the plaintiff had been slashed by an inmate

who belonged to the Trinitarian gang," not the Macballas. *Id.* ¶ 46.[2]

[2]     Plaintiff contends that Defendants' Exhibit K, a New York City Department of Corrections incident report, is inadmissible because it constitutes hearsay. However, this incident report satisfies all requirements for the business-record exception to hearsay, and the Court can thus consider it on summary judgment. *See* Federal Rule of Evidence 803(6); *United States v. Kaiser*, 609 F.3d 556, 574–75 (2d Cir. 2010).

### B. Procedural History

In February 2018, Plaintiff filed this action under 42 U.S.C. § 1983. More than a year later, he filed a fourth amended complaint, which is the operative pleading in this matter. Dkt. No. 88. He named as defendants several Department of Corrections staff, such as Officer Fernandez and the officers who conducted his intake into GRVC. *Id.* ¶¶ 5–8.[3] Plaintiff alleged that Defendant Fernandez had violated his constitutional rights by using excessive force. And Plaintiff alleged that the other Department of Corrections Staff, whom the parties refer to as the "Intake Defendants," violated the Fourteenth Amendment's Due Process Clause by placing him into Unit 8A even though he expressed that he was not a Macballas member, thereby acting with deliberate indifference to his safety. *See id.*

[3]     Plaintiff also named as Defendant Correction Officer Jane or John Doe, Dkt. No. 88 ¶ 5, but he subsequently consented to "dismissal of the John or Jane Doe defendants," Dkt. No. 99 ¶ 2.

**\*3** After lengthy discovery, Defendants have moved for summary judgment on all counts. That motion is now before the Court.

### II. LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The relevant inquiry on summary judgment

Quinones v. Rollison, Not Reported in Fed. Supp. (2020)

2020 WL 6420181

is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). Moreover, if the evidence for the nonmoving party is a mere scintilla or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50. A fact is "material" only if it will affect the outcome of the suit under applicable law, and such facts "properly preclude the entry of summary judgment." *Id.* at 248. Disputes over irrelevant facts will not preclude summary judgment. *Id.* The goal is to "isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

While the moving party bears the initial burden of showing that no genuine issue of material fact exists, *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005), in cases where the non-moving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case," *Celotex*, 477 U.S. at 325. "It is ordinarily sufficient for the movant to point to a lack of evidence ... on an essential element of the non-movant's claim.... [T]he nonmoving party must [then] come forward with admissible evidence sufficient to raise a genuine issue of fact for trial...." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party ... must come forward with evidence that would be sufficient to support a jury verdict in his favor.").

## III. DEFENDANTS' MOTION IS GRANTED

### A. Plaintiff's Excessive-Force Claim against Officer Fernandez Fails

The Court begins with Plaintiff's claim that Fernandez's use of pepper spray constituted constitutionally excessive force, in violation of the Fourteenth Amendment. Section 1983 imposes liability on individuals who, while acting under color of state law, deprive a plaintiff of a federal right. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "A pretrial detainee who is subjected to excessive force may bring a claim under § 1983." *Cunningham v. Rodriguez*, No. 01-cv-1123 (DC), 2002 WL 31654960, at *4 (S.D.N.Y. Nov. 22, 2002). Because the Eighth Amendment's protection from cruel and unusual punishment does not apply " 'until after conviction and sentence,' the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)). "The Second Circuit applies the same standard to excessive force claims brought under the Fourteenth Amendment as under the Eighth Amendment." *Virella v. Pozzi*, No. 05-cv-10460 (RWS), 2006 WL 2707394, at *3 (S.D.N.Y. Sept. 20, 2006).

**\*4** To establish a violation of the "right of pretrial detainees to be free from excessive force amounting to punishment," a pretrial detainee must show that the force used against him was "objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). This inquiry is "context specific, turning upon 'contemporary standards of decency.' " *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (quoting *Hudson v. McMillan*, 503 U.S. 1, 8 (1992)). "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

The Second Circuit has long made clear that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). In other words, "plaintiff must show that the harm incurred was more than de minimis." *Berry v. City of New York Dep't of Corr.*, No. 12-cv-7819 (RWS), 2014 WL 2158518, at *5 (S.D.N.Y. May 22, 2014), *aff'd sub nom. Berry v. New York City Dep't of Correction*, 622 F. App'x 10 (2d Cir. 2015). The use of pepper spray "constitutes a significant degree of force" and can in certain cases form the basis of a constitutional violation. *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) ("Unquestionably, infliction of pepper spray on an arrestee has a variety of incapacitating

and painful effects...."); *see Berry*, 2014 WL 2158518, at *5. However, if the force was "applied in a good-faith effort to maintain or restore discipline, it is unlikely to be repugnant to the conscience of mankind, and will not amount to excessive force under Second Circuit law." *Adilovic v. Cnty. of Westchester*, No. 08-cv-10971 (PGG), 2011 WL 2893101, at *6 n. 12 (S.D.N.Y. July 14, 2011) (internal citation omitted) (quoting *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000)); *accord Berry*, 2014 WL 2158518, at *5.

The Court concludes that, on the undisputed facts, no reasonable jury could conclude that Officer Fernandez's use of force was objectively unreasonable. *See Kingsley*, 576 U.S. at 397. To begin, the amount of force used was small. It is undisputed that Officer Fernandez used only a two-second burst of pepper spray against Mr. Quinones. Dkt. No. 104 ¶ 37. He used a similar, seconds-long spray to subdue the assailant, and the parties agree that the "plaintiff and his assailant were both sprayed *one time* [each] by Officer Fernandez." *Id.* ¶ 38 (emphasis added); *see also* Def. Ex. G (surveillance video demonstrating that pepper spray was used only for seconds). This case is thus a far cry from *United States v. Praisner*, in which the pretrial detainee alleged that he had been "sprayed six times on four separate occasions over approximately 40 minutes, and was not decontaminated during that period." No. 09-cr-264 (MRK), 2010 WL 2574103 (D. Conn. Apr. 27, 2010).

Moreover, even reading the record most favorably to Plaintiff, Officer Fernandez's use of force was proportional to the need for force. Plaintiff does not dispute, and the surveillance video of the incident clearly demonstrates, that Officer Fernandez employed the two-second burst of pepper spray against two inmates who were in the midst of a violent fight involving a dangerous weapon, had been warned to stop their conduct, had nonetheless continued fighting, and had been specifically warned that failure to do so would result in the use of pepper spray. Dkt. No. ¶¶ 34–35.; Def. Ex. G. Plaintiff's conduct posed a risk to other inmates, himself, Officer Fernandez, and other prison staff. The parties agree that this limited force was sufficient to achieve the desired end: "After the chemical agent was utilized the fight stopped and the inmates dispersed throughout the housing area." Dkt. No. 104 ¶ 39; *see also* Ex. G. And Officer Fernandez's repeated warnings speak to his efforts "to temper or to limit the amount of force ... and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397; *accord Beauvoir v. Falco*, 345 F. Supp. 3d 350, 369 (holding that this factor favored summary judgment because "Defendants tried multiple times to convince Plaintiff

to follow their orders ... before resorting to use of force"). Indeed, despite Fernandez's warnings, Dkt. No. 104 ¶¶ 34–35, Plaintiff continued his involvement in the fight and threw a garbage can at his assailant and other inmates. *Id.* ¶ 36. Though Plaintiff contends that the garbage can was thrown in self-defense, and thus the Court should disregard this fact, Plaintiff's subjective state of mind is irrelevant—the Court must determine if Fernandez's actions, in response to these circumstances, was objectively reasonable. *See Kingsley*, 576 U.S. at 396–97.

**\*5** Plaintiff contends that he has established a genuine dispute on his excessive-force claim because the pepper spray entered his fresh wound. However, as the Supreme Court has repeatedly admonished, a "court must make [the objective-reasonableness] determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. It is undisputed that Officer Fernandez had just come onto the first floor of Unit 8A and was the only officer on the scene, and had seconds to assess the situation before acting. *See* Ex. G; Dkt. No. 104 ¶¶ 28–29. Given the violent fight occurring before him between two inmates, using the two-second burst of pepper spray was not objectively unreasonable. This is true even though Plaintiff had suffered a serious, though-not-life threatening, injury, and the pepper spray irritated his wound until he shortly thereafter received medical treatment. Dkt. No. 104 ¶ 41. Indeed, Officer Fernandez had seconds to observe that injury, and he still used only proportionate force to "ensure compliance of an uncooperative ... inmate," *Adilovic*, 2011 WL 2893101, at *6. Crucially, unlike in *Tracy*, there is no evidence that Officer Fernandez "applied pepper spray after [the plaintiff] had already been handcuffed and was offering no physical resistance of police commands." 623 F.3d at 98–99. To the contrary, Officer Fernandez quickly desisted from using pepper spray after his initial burst ended the confrontation. *See* Dkt. No. 104 ¶ 37 (Plaintiff concedes that Fernandez used a "two-second burst"); *id.* ¶ 39; Ex. G. And within one hour of the incident, Plaintiff was seen and treated by medical staff. *Id.* ¶ 41.

In sum, Officer Fernandez is entitled to summary judgment because Plaintiff has not established a material issue of fact as to the objective element of his excessive-force claim. *Accord Beauvoir*, 345 F. Supp. 3d at 369 (granting defendants summary judgment in a § 1983 case because the "use of the pepper spray ... was permissible in the context of needing to maintain a baseline of order in the prison system,"

2020 WL 6420181

*even though* plaintiff "was not behaving belligerently or threateningly," in part because "Plaintiff repeatedly resisted multiple officers' orders"); *Berry*, 2014 WL 2158518, at **5–6 (finding evidence that defendant officer used pepper spray to break up a violent fight between inmates insufficient to raise a genuine dispute about excessive force, and thus granting defendants summary judgment); *see also Perry v. Stephens*, 659 F. Supp. 2d 577, 582–83 (S.D.N.Y. 2009).

### B. Officer Fernandez is Also Entitled to Qualified Immunity

Plaintiff's excessive-force claim also fails because Officer Fernandez is entitled to qualified immunity. In other words, even if a reasonable jury could find that Fernandez violated the Fourteenth Amendment by using excessive force, he would still be entitled to summary judgment because he did not violate a *clearly established* constitutional right.

An officer may take advantage of qualified immunity, and thereby avoid liability for civil damages and the burdens of a lawsuit, if he demonstrates that his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks omitted). " 'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation omitted). "[E]xisting law must have placed the constitutionality of the officer's conduct beyond debate." *Id.* (quotation omitted). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation omitted). Moreover, the Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 590 (quotation omitted). In other words, "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 149 S. Ct. 500, 501 (2019) (finding that defining the clearly established as "the right to be free of excessive force" was too general). It is a "constitutional right[ ] of which a reasonable person would have known" and "reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (per curiam) (internal citations and quotations

omitted). Summary judgment should be granted on the basis of qualified immunity only if "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

**\*6** Plaintiff contends that "no reasonable officer in the Second Circuit could have believed that he was entitled to use pepper spray on the fresh, open facial cut of the victim of an ongoing attack by another inmate." Dkt. No. 100 at 7. This conclusory statement, however, is not enough to defeat summary judgment on this ground, as Plaintiff points to no Supreme Court or Second Circuit authority to this effect. Moreover, Plaintiff omits from this statement myriad, undisputed facts in the record. As noted, even reading the record most favorably to Mr. Quinones, Officer Fernandez was the sole DOC staff member that responded to an inmate-on-inmate altercation involving a dangerous weapon, observed Plaintiff and his assailant engaging in a fight, told Plaintiff to "stop" (which Plaintiff concedes he heard), told Plaintiff that failure to do so would result in the use of chemical agent against him, and observed Plaintiff move in an aggressive manner and throw a garbage can. Dkt. No. 104 ¶¶ 30–38. Only then did Fernandez spray a two-second burst of pepper spray to stop the conduct. Plaintiff has pointed to no authority—let alone binding authority—and the Court has found none suggesting that this proportionate use of non-deadly force to regain control of a violent situation in a prison constitutes unconstitutionally excessive force. *See Wesby*, 138 S. Ct. at 589.

To the contrary, the Second Circuit has stated that "the use of entirely gratuitous force is unreasonable and therefore excessive ... no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Tracy*, 623 F.3d at 99 n.5. Yet here, the undisputed facts establish that Officer Fernandez's use of force was *not* gratuitous, Plaintiff was *not* restrained, and Plaintiff *continued* his violent conduct after twice being warned to desist. Similarly, in *Rodriguez v. City of New York*, the plaintiff's complaint survived a Rule 12 motion because plaintiff alleged that the corrections officers sprayed pepper spray in an indiscriminate manner against him after assaulting another inmate. Case. No. 14-cv-8647 (PGG) (S.D.N.Y.), Dkt. No. 38, at 2–3, 9, 13. Yet

2020 WL 6420181

here, it is undisputed that Fernandez used pepper spray in a targeted and limited manner. *See* Def. Ex. G. On summary judgment, Plaintiff must offer more than allegations that Defendants' conduct constituted excessive force—yet even reading the record favorably to him, no reasonable jury could conclude that Fernandez's use of pepper spray was or gratuitous. Because Officer Fernandez did not violate a clearly established right, he is entitled to qualified immunity on Plaintiff's excessive-force claim. *Accord Berry*, 2014 WL 2158518, at \*\*6–7 (granting qualified immunity on similar facts in this posture), *aff'd*, 622 F. App'x at 11 (holding that defendants were "entitled to qualified immunity"); *Beauvoir*, 345 F. Supp. 3d at 375–76 (same).

### C. Defendants Are Entitled to Summary Judgment on Plaintiff's Deliberate-Indifference Claim

The Court next considers Mr. Quinones's claim that the Intake Defendants—Defendants Rochez, Wilson, Rollison, and Blackwood—were deliberately indifferent to the risk of harm that other inmates posed to him. Specifically, Plaintiff claims that the Intake Defendants "were notified of a credible threat to Mr. Quinones' safety," as it is undisputed that upon intake to GVRC that Plaintiff and the two other inmates informed the Intake Defendants that they could not be placed in Unit 8A, because the Macballas controlled that unit and that "their gangs had problems with the Macballas and that plaintiff expected he would be attacked." Dkt. No. 104 ¶¶ 10–13. Because the Intake Defendants nonetheless placed him in Unit 8A, Plaintiff claims that "they recklessly failed to act with reasonable care to mitigate that threat." Dkt. No. 100 at 9–10.

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Therefore, "[a]llowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances." *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009). However, not every injury that a prisoner suffers at the hands of another results in constitutional liability for the officials responsible for that prisoner's safety. *See Farmer*, 511 U.S. at 834. Instead, an official must act with " 'deliberate indifference' to a substantial risk of serious harm to an inmate." *Id.* at 828. When such claims are made by a pretrial detainee such as Mr. Quinones, they "are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment,"

which as discussed above applies only to convicted prisoners. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

**\*7** To state a claim for deliberate indifference, plaintiff's allegations must satisfy a two-prong test, referred to as the "objective prong" and the "subjective prong" (better understood as the mens rea or mental element prong). *See id.* at 30–32; *Taylor v. City of New York*, No. 16-cv-7857 (NRB), 2018 WL 1737626, at \*\*11–12 (S.D.N.Y. Mar. 27, 2018). Under the first prong, the inmate must show that the alleged violation was "sufficiently serious to constitute objective deprivations of the right to due process." *Darnell*, 849 F.3d at 29. The second prong requires the defendant's deliberate indifference to the objective deprivation. *See id.* at 32. Specifically, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. As the Second Circuit explained, "[i]n other words, the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively." *Id.* Although *Darnell* involved a Fourteenth Amendment challenge to a prisoner's conditions of confinement, its holding also applies to failure-to-protect claims. *See id.* at 33 n.9 ("[D]eliberate indifference means the same thing for each type of claim under the Fourteenth Amendment."); *Taylor*, 2018 WL 1737626, at \*12.

Here, the undisputed facts show that Plaintiff has failed to establish a genuine dispute as to either prong. At best, the record evidence shows that Plaintiff informed a still-unidentified intake officer that he could not be housed with Macballas gang members, in part because of "his knowledge that Macballas did not let anyone else live with them while inside correctional facilities." Dkt. No. 104 ¶ 14. However, Plaintiff did not inform "any of the officers in Unit 8A about his safety concerns." *Id.* ¶ 18. And another inmate in the unit, Mike, whom Plaintiff knew from his time living in Harlem, informed Plaintiff that "two other Blood gang members" also lived in the housing unit. *Id.* ¶ 21. Indeed, Plaintiff admits that he "spoke with other Blood gang members" and was informed that the Macballas permitted Blood members use one of the telephones in the unit at certain times of the day. *Id.* ¶ 22. It is therefore undisputed that there were multiple Blood gang members—as well as the other inmates who were not affiliated with the Macballas, such as the two individuals with whom Plaintiff's intake was processed—also housed in

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 506 of 830

Quinones v. Rollison, Not Reported in Fed. Supp. (2020)

2020 WL 6420181

Unit 8A, and that these individuals were not attacked by Macballas. *Id.* ¶ 21.

Moreover, Plaintiff did not inform the Intake Defendants (nor does he now contend) that there was a more specific threat against him, such as one made by a specific Macballa member. *Cf. Rennalls v. Alfredo*, 2015 WL 5730332, at *4 (S.D.N.Y. Sept. 30, 2015) ("A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by [a] plaintiff to be separated from the attacker."); *Velez v. City of New York*, No. 17-cv-9841 (GHW), 2019 WL 3495642, at *4 (S.D.N.Y. Aug. 1, 2019) ("Those cases which have found officers potentially liable for failing to prevent an attack involved clear and specific threats against an inmate.") (collecting cases). Given these undisputed facts, Plaintiff has failed to establish a genuine dispute that "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 135; *accord Velez*, 2019 WL 3495642, at *4 (S.D.N.Y. Aug. 1, 2019) ("a number of courts in this district have found that an inmate informing an officer about a nebulous or untethered fear does not put an officer on notice that the inmate is at risk of attack") (collecting cases); *see, e.g., Desulma v. City of New York*, No. 98-cv-2078 (RMB), 2001 WL 798002, at *7 (S.D.N.Y. July 6, 2001) (although prison official knew that the plaintiff feared certain inmates and had requested protective measures, "given the lack of prior history of violence between [plaintiff] and [his attackers,]" there was no reason for him "to infer the existence of a threat of harm").

**\*8**  For the same reason, no reasonable jury could conclude that the Intake Defendants "act[ed] intentionally to impose the alleged condition, or recklessly fail[ed] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. There are certainly no facts in the record, and Plaintiff does not point to any, suggesting that the Intake Defendants intentionally exposed Plaintiff to harm. And given the number of non-Macballas housed in Unit 8A and the generality of Plaintiff's comment made to a single corrections officer, Plaintiff has

not established a genuine dispute that the Intake Defendants acted recklessly. *See* Dkt. No. 104 ¶¶ 16–18. Moreover, a Department of Corrections report created after the incident identifies the assailant as a Trinitarian gang member, not a Macballas member. *See* Def. Ex. K. It is undisputed that Plaintiff never raised concerns about any gang other than the Macballas, and thus even with Plaintiff's statement, the Intake Defendants were not reckless in placing him in Unit 8A, which was controlled by the Macballas. *See* Dkt. No. 104 ¶ 46. In sum, Defendants are also entitled summary judgment on Plaintiff's deliberate-indifference claim. [4] *Accord Anselmo v. Kirkpatrick*, No. 19-cv-0350 (TJM), 2019 WL 2137469, at *4 (N.D.N.Y. May 16, 2019) ("[A]n inmate's communications about 'generalized safety concerns' or 'vague concerns of future assault by unknown individuals' are insufficient to provide knowledge that the inmate is subject to a substantial risk of serious harm." (quoting *Ross v. City of New York*, No. 12-CV-8545, 2014 WL 3844783, at *8 (S.D.N.Y. 2014) and collecting cases).

[4]    For the same reasons, Plaintiff has not shown that the Intake Defendants violated a clearly established constitutional right. They have pointed to no cases, let alone binding authority, holding "with specificity" that such conduct constitutes a violation of the Fourteenth Amendment. *See City of Escondido, Cal. v. Emmons*, 149 S. Ct. 500, 501 (2019). The Intake Defendants, like Officer Fernandez, are therefore also entitled to qualified immunity.

### IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment, Dkt. No. 91, is GRANTED. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2020 WL 6420181

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Urena v. City of New York,   S.D.N.Y.,   September 10, 2024

2014 WL 3887880
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gabriel José VAZQUEZ, Plaintiff,
v.
Captain SPEAR 347, C/O F. Degado
74621, C/O La. Williams, Defendants.

No. 12CV6883(VB).
|
Signed Aug. 5, 2014.

### MEMORANDUM DECISION

BRICCETTI, District Judge.

**\*1**  Plaintiff Gabriel José Vazquez, proceeding *pro se,* brings this Section 1983 action against Captain Spears (sued as "Spear"), and Correction Officers Delgado (sued as "Degado") and Williams, all of whom are employees of the New York City Department of Correction, asserting claims for excessive force, deliberate indifference to medical needs, and deprivation of property.

Now pending is defendants' motion (i) for summary judgment on plaintiff's excessive force claim, and (ii) for judgment on the pleadings on the remaining claims. (Doc. # 34).

For the following reasons, the motion is GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### BACKGROUND

At the time of the relevant events, [1] plaintiff was a pre-trial detainee at Rikers Island. Inmates may be found to require "Red ID" or enhanced restraint status after incidents of violence directed at staff or other inmates. Red ID inmates are required to wear security mitts, handcuffs, and leg irons

during "movement to and from all service areas or places of escort." (Doc. # 3).

[1]    In support of their motion, defendants submitted a Local Rule 56.1 Statement, several documents, and a copy of a video of the August 1, 2012, incident. Despite being given multiple opportunities to do so, plaintiff did not submit any papers in opposition.

On June 21, 2012, plaintiff was diagnosed with asthma. A physician recommended that if classified as a Red ID inmate, plaintiff should be handcuffed in front with one hand free. (Doc. # 36, Ex. B).

On August 1, 2012, plaintiff was brought to the Bronx Supreme Court for a court appearance. As shown in a video of plaintiffs encounter with defendants, Williams approached plaintiff in the inmate waiting room and attempted to place him in rear handcuffs. Plaintiff and Williams spoke briefly before Williams and Delgado moved plaintiff toward the wall with his hands behind his back. Plaintiff resisted, and began crouching on the ground. Williams pulled plaintiff up off the ground, and after continued resistance from plaintiff, Spears utilized a burst of chemical spray. Plaintiff was subdued. (Doc. # 36, Ex. C).

The next day, August 2, plaintiff was notified he was being placed in Red ID status based on an April 2012 incident in which he used a weapon to assault a correction officer. Plaintiff was then examined to determine "whether the enhanced restraints were likely to cause a significant adverse consequence for the inmate or aggravate an inmate's existing condition." The physician performing the assessment determined plaintiff was not cleared for rear handcuffs or mittens, and must always have one hand free. At a hearing on August 7 to review the August 2 Red ID placement, plaintiff's Red ID and enhanced restraint status was upheld and continued. (Doc. # 3).

Plaintiff claims that during the August 1 incident, defendants destroyed records of his medical status, his legal documents, and his "English/Spanish comfort book." Plaintiff further claims he suffered an asthma attack, his breathing was labored, and he had burns on his eye and mouth as a result of the chemical spray used in the incident. (Doc. # 3).

Plaintiff thereafter commenced the instant action.

2014 WL 3887880

---

**DISCUSSION**

I. *Legal Standards*

A. *Summary Judgment*

**\*2** The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. *See id.* The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.,* 625 F.3d 54, 60 (2d Cir.2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. *Zalaski v. City of Bridgeport Police Dep't,* 613 F.3d 336, 340 (2d Cir.2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir.2011) (internal citations omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. *Dawson v. Cnty. of Westchester,* 373 F.3d 265, 272 (2d Cir.2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. *Dallas Aerospace, Inc. v.*

*CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,* 391 F.3d 77, 83 (2d Cir.2004). However, as pertinent here, when "the parties tell conflicting versions of an incident and one version is supported by a videotape, the court must credit that version of events." *Carolina v. Pafumi,* 2013 WL 1673108, at \*3 (D.Conn. Apr. 17, 2013).[2]

[2]       Plaintiff will be provided with copies of all unpublished opinions cited in this decision *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d. Cir.2009).

B. *Judgment on the Pleadings*

At any time after the pleadings close and before trial commences, a party may move for judgment on the pleadings under Rule 12(c). *See Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC,* 724 F.Supp.2d 407, 414 (S.D.N.Y.2010). "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 520 (2d Cir.2006).

**\*3** In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal. See* 556 U.S. 662, 679 (2009). First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. *Id.* at 678; *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir.2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." *Ashcroft v. Iqbal,* 556 U.S. at 678; *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

---

Vazquez v. Spear, Not Reported in F.Supp.3d (2014)
2014 WL 3887880

Because plaintiff is proceeding *pro se,* the Court must construe his submissions liberally and interpret them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (per curiam) (internal quotation marks omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a *pro se* plaintiff alleges civil rights violations. *See Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008). "Even in a *pro se* case, however ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (internal quotation marks omitted). Nor may the Court "invent factual allegations" plaintiff has not pleaded. *Id.*

II. *Excessive Force*

A pre-trial detainee seeking to establish an excessive force claim under the Fourteenth Amendment must show that the conduct was objectively sufficiently serious or harmful. *United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999). "A claim of excessive force may be established even if the victim does not suffer serious or significant injury, if plaintiff can demonstrate that the amount of force used is more than *de minimis,* or, otherwise involves force 'repugnant to the conscience of mankind.' " *Cunningham v. Rodriguez,* 2002 WL 31654960, at *4 (S.D.N.Y. Nov. 22, 2002) (quoting *United States v. Walsh,* 194 F.3d at 47). However, the injuries caused by the defendant's conduct are useful indicia of the amount of force applied against plaintiff. *See id.* at *5; *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010). The objective requirement of the excessive force analysis ultimately seeks to determine the nature of the force exerted, not just the extent of injuries suffered.

**\*4** An excessive force claim in the prison context also has a subjective component. Plaintiff must show that defendant had a "sufficiently culpable state of mind ... shown by actions characterized by 'wantonness.' " *United States v. Walsh,* 194 F .3d at 50 (citations omitted). To determine whether conduct is wanton, "a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Showers v. Eastmond,* 2001 WL 527484, at *3 (S.D.N.Y. May 16, 2001) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d. Cir.1973), overruled on other grounds. *Graham v. Connor,* 490 U.S. 386 (1989)).

Ultimately, the "core judicial inquiry" is whether the force was nontrivial and "was applied ... maliciously and sadistically to cause harm." *Wilkins v. Gaddy,* 559 U.S. at 37 (internal quotation marks omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d at 1033.

Here, the force used in handcuffing plaintiff does not satisfy the objective prong of the excessive force analysis. Defendants indisputably did not use force "repugnant to the conscience of mankind," but rather used *de minimis* force in the form physical restraint. *Sulkowska v. City of New York,* 129 F.Supp.2d 274, 292 (S.D.N.Y.2001) ("Plaintiff's restraint by handcuffs was merely an incident of her detention, and does not amount to the type of punishment that violates the Fourteenth Amendment."). This conclusion is supported by the fact that plaintiff does not identify any injuries arising from his handcuffing. *See Wilkins v. Gaddy,* 559 U.S. at 38 (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992) ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim."). Because the force exerted was not sufficiently serious, plaintiff's claim that excessive force was used in handcuffing him fails as a matter of law.

In addition, defendants have not been shown to have acted in bad faith in placing plaintiff in rear handcuffs. Attached to plaintiff's complaint is a referral form dated June 21, 2012, that recommends plaintiff be handcuffed in front with one mitten only, citing plaintiff's asthmatic condition. However, handwritten under this recommendation is a notation that this course of action is to be followed "if [plaintiff is] Red ID." (Doc. # 36, Ex. B). Because plaintiff had not been placed into Red ID status at the time of the August 1 incident, defendants did not contradict the medical recommendation letter in placing plaintiff in rear handcuffs, and thus did not act in bad faith.

**\*5** To the extent the excessive force claim is based on the use of a chemical spray, that claim likewise fails as a matter of law. "While correction officers may not use chemical agents in greater quantities than necessary or for the sole purpose of punishment or infliction of pain, 'the use of non-dangerous quantities of [a chemical agent] in order to prevent a perceived future danger does not' generally overstep constitutional parameters." *Geas v. DuBois,* 868 F.Supp. 19, 24 (D.Mass.1994) (quoting *Soto v. Dickey,* 744

2014 WL 3887880

F.2d 1260, 1270 (7th Cir.1984)); *accord Berry v. City of New York,* 2014 WL 2158518, at *5 (S.D.N.Y. May 22, 2014) (if pepper spray is used "in a good-faith effort to maintain or restore discipline, it is unlikely to be repugnant to the conscience of mankind, and will not amount to excessive force under Second Circuit law"). Thus, the use of single burst of a chemical agent, which is not a dangerous quantity, is not "an unacceptable means of controlling an unruly or disruptive inmate." *Carolina v. Pafumi,* 2013 WL 1673108, at *2.

The video of the August 1 incident shows that defendants used a single, two-second burst of a chemical agent after plaintiff refused to comply with orders to be handcuffed. (Doc. # 36, Ex. C). Plaintiff stopped resisting after the chemical agent had its desired effect. This video demonstrates that plaintiff was a "recalcitrant inmate," and thus defendants' use of chemical agents to force compliance with direct orders was not "malicious and sadistic," but rather a good faith effort to restore order. *Carolina v. Pafumi,* 2013 WL 1673108, at *3.

Accordingly, defendants' motion for summary judgment on the excessive force claim is granted.

III. *Deliberate Indifference*

Liberally construed, the complaint alleges defendants were deliberately indifferent to his medical needs, in violation of his due process rights under the Fourteenth Amendment.[3]

[3]    Although a pre-trial detainee's right to be free from cruel and unusual punishment is rooted in the Fourteenth Amendment's protection of due process, Eighth Amendment analysis governs the merits of such a claim. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d.Cir.1996) (citing *Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983)).

To state a claim for deliberate indifference to medical needs, an inmate must allege that (I) objectively, the medical condition is "sufficiently serious," and (2) subjectively, the defendant had a state of mind of "deliberate indifference" to the inmate's health. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d. Cir.2000).

To satisfy the first prong, plaintiff must allege the medical condition in question was so serious it imposed a "substantial risk of serious harm." *Mitchell v. City of New York.* 2010 WL 3734098, at *2 (S.D.N.Y. Sept. 23, 2010). To create a substantial risk of serious harm, a condition must be one "of urgency, one that may produce death, degeneration, or

extreme pain." *Patterson v. Lilley,* 2003 WL 21507345, at *3 (S.D.N.Y. June 30, 2003) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

The second prong requires that plaintiff plausibly plead facts supporting an inference that a defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm," and is thus an inquiry into the defendant's state of mind. *Farmer v. Brennan,* 511 U.S. at 842. Plaintiff must allege the defendant official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [drew] the inference." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d. Cir.1996) (quoting *Farmer v. Brennan,* 511 U.S. at 837). Plaintiff's complaint must also allege facts sufficient to support the inference that the defendant who had knowledge of the condition and the risk " 'disregard[ed] that risk by failing to take reasonable measures.' " *Jennings v. Horn.* 2007 WL 2265574, at *4 (S.D.N.Y. Aug. 7, 2007) (quoting *Farmer v. Brennan,* 511 U.S. at 847). Thus, the state of mind required under this test is the equivalent of criminal recklessness. *See Hathaway v. Coughlin,* 99 F.3d at 553.

**\*6** Plaintiffs claim of deliberate indifference fails to meet the objective prong of the analysis, as his asthmatic condition alone does not impose a substantial risk of serious harm. *See Patterson v. Lilley,* 2003 WL 21507345, at *4 ("Being an asthmatic (a person susceptible to asthma attacks) is not a condition, in Eighth Amendment parlance, that is severe or 'sufficiently serious.' "). Plaintiff's condition might have imposed a substantial risk of serious harm if at the time of the cuffing plaintiff was already suffering from an asthma attack. *See Ennis v. Davies,* 1990 WL 121527, at *3 (S.D.N.Y. Aug. 15, 1990) (denying motion for summary judgment where plaintiff alleged he was already suffering from an asthma attack when officers refused to give him his medication). But plaintiff has not alleged facts sufficient to support the inference that at the time of his restraint he was suffering from an asthma attack. Because just being asthmatic is not a sufficiently serious condition to support a deliberate indifference claim, plaintiff's claim fails on the first prong of the analysis.

Plaintiff's claim also fails on the second prong of the analysis, as defendants' conduct, at most, evinces negligence. Plaintiff's medical assessment notes he was not cleared for rear cuffing if declared a Red ID inmate, and his referral form states he should have one hand free, presumably to reach for his inhaler in the event of an asthma attack. (Doc. # 3). Plaintiff was

not a Red ID inmate at the time of the incident, and thus defendants were under no obligation to follow the medical assessment. Although, by rear cuffing plaintiff when he was not demonstrating signs of an imminent attack, defendants effectively restricted his access to his inhaler, courts have regularly held the denial of access to asthma medication when a detainee is in custody and not suffering from an asthma attack amounts to negligence, not deliberate indifference. *See Patterson v. Lilley,* 2003 WL 121527, at *4; *Sulkowska v. City of New York,* 129 F.Supp.2d at 274.

Accordingly, defendants' motion for judgment on the pleadings on the deliberate indifference claim is granted.

IV. *Deprivation of Property*
Liberally construed, plaintiff's complaint asserts a claim for the deprivation of property, in contravention of his Fourteenth Amendment right to Due Process. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984).

Plaintiff has not alleged the deprivation of his medical records, legal documents, and English/Spanish comfort book was the result of an established state procedure. Rather, plaintiff alleges this was a "random and unauthorized" act. *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990). "[B]ecause New York provides an adequate post-deprivation remedy in the form of state law causes of action for ... replevin or conversion," plaintiff's claim for the deprivation of his property is dismissed. *Dove v. City of New York,* 2000 WL 342682, at *3 (S.D.N.Y. Mar. 30, 2000).

**\*7** Accordingly, defendants' motion for judgment on the pleadings on the deprivation of property claim is granted. [4]

[4] Although a district court ordinarily should not dismiss *pro se* claims for failure to state a claim "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Cuoco v. Moritsugu,* 222 F.3d at 112 (quoting *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999)), here, liberally construed, the complaint contains no allegations suggesting plaintiff has valid claims for deliberate indifference to medical needs or deprivation of property that he has merely "inadequately or inartfully pleaded" and therefore should "be given a chance to reframe." *Id.* On the contrary, repleading would be futile, because the problems with these claims are substantive, and supplementary and/or improved pleading will not cure their deficiencies. Accordingly, the Court declines to grant plaintiff leave to replead.

## CONCLUSION

Defendants' motion for summary judgment and for judgment on the pleadings is GRANTED.

The Clerk is directed to terminate the pending motion (Doc. # 34) and close this case.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED:

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3887880

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5989600

2021 WL 5989600
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Equarn WHITE, Plaintiff,
v.
Randel SMITH, et al., Defendants.

9:17-CV-1094 (LEK/ATB)
|
Signed 10/15/2021

**Attorneys and Law Firms**

EQUARN WHITE, Plaintiff, pro se.

ERIK B. PINSONNAULT, Asst. Attorney General for
Defendants.

**REPORT-RECOMMENDATION**

Andrew T. Baxter, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and
Recommendation by the Honorable Lawrence E. Kahn,
Senior United States District Judge. Plaintiff brought this
civil rights action asserting various constitutional claims
arising from his confinement at Upstate Correctional Facility
("Upstate"). (Complaint ("Compl.")) (Dkt. No. 1).

**I. Procedural History**

After the court's initial review of the original complaint,
the court allowed three claims to go forward: (1) an
Eighth Amendment conditions of confinement claim against
defendant Randal Smith, [1] (Dkt. No. 4 at 28-29, 42); (2)
an Eighth Amendment deliberate medical indifference claim
against defendant Waterson (*Id.* at 23, 42); and (3) a First
Amendment retaliation claim against defendants LeClerc,
Nelson, and Bernier. (Dkt. No. 4 at 34, 36-37, 42).

[1]    Plaintiff misspelled this defendant's first name in
the original complaint. Where relevant, the court
will refer to defendant Smith with the proper
spelling of his first name.

On March 26, 2018, defendants Smith, Waterson, and Nelson
("SORC Nelson") [2] moved to dismiss the complaint pursuant

to Fed. R. Civ. P. ("FRCP") 12(b)(6), as to any claims asserted
against them. (Dkt. No. 19). Plaintiff opposed the motion and
sought leave to file a 253-page amended complaint pursuant
to FRCP 15(a)(2). (Dkt. Nos. 24, 28). On December 12, 2018,
I recommended that the claims against defendants Waterson
(medical care) and SORC Nelson (retaliation) be dismissed
and that plaintiff's motion to amend be denied. (Dkt. No.
34). On March 8, 2019, the Honorable Lawrence E. Kahn
modified the recommendation in part, dismissed the medical
care claim against defendant Waterson, but denied the motion
to dismiss plaintiff's retaliation claim against SORC Nelson.
(Dkt. No. 36 at 43). Judge Kahn also allowed the plaintiff to
file a proposed amended complaint with specific limitations.
(Dkt. No. 36 at 18, 43-44).

[2]    During the period in question, defendants
Nelson and Bernier worked at Upstate as
Supervising Offender Rehabilitation Coordinators
("SORC"), and defendant Leclerc was an Offender
Rehabilitation Coordinator ("ORC").

On June 5, 2019, plaintiff filed his motion to amend the
complaint, together with a proposed amended complaint.
(Dkt. No. 44). After a review of the proposed amended
complaint, the court allowed the following claims to go
forward:

(1) Eighth Amendment conditions-of-confinement claim
related to Cell 18 against R. Smith.

(2) First Amendment retaliation claims against Bernier,
Nelson, and LeClerc.

(3) Eighth Amendment excessive force claim against M.
Gokey related to the September 2, 2014.

(4) Eighth Amendment deliberate medical indifference
claims against Maynard, Marinelli, Winston, Barkman, P.
Baker, and H. Baker.

(5) Eighth Amendment deliberate medical indifference
claim related to his mental health medication in 2014
against Byno.

**\*2** (6) Eighth Amendment deliberate medical indifference
claim against H. Baker related to medical treatment after
the September 2014 incident.

(7) Eighth Amendment conditions of confinement claims,
related to Cells 13 and 15, against Maynard, Winston,

White v. Smith, Not Reported in Fed. Supp. (2021)
2021 WL 5989600

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 513 of 830

Gallagher, Fournier, Eddy, L. Gokey, Marinelli, and R. Smith.

(8) Retaliation claims against L. Gokey and R. Smith related to sleep deprivation and Cell 15.

(Dkt. No. 55 at 23-24). [3] Plaintiff filed a signed copy of his proposed amended complaint, which has become the operative pleading herein, with the remaining claims noted above. [4] (Dkt. No. 56).

[3]    My Decision and Order contains only seven numbered claims because the first "claim" contained two separate issues. (Dkt. No. 55 at 23-24). In this Report and Recommendation, I have separated what was the first claim in the Decision and Order into two separate claims. Thus, there are eight remaining claims as listed herein.

[4]    Unfortunately, contrary to the court's order, plaintiff's amended complaint contains many claims which relate to other districts, other time periods, and other facilities. The court sifted through hundreds of paragraphs to determine the remaining relevant facts and claims. Plaintiff's Exhibits A-X are mostly unrelated to the remaining claims and consist of a variety of affidavits, documents, and photographs. (Dkt. No. 56) (Ex. A-X). Exhibit B was stricken from the record by court order. (Dkt. No. 55 at 24).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 75). On May 5, 2021, the court received a letter from the plaintiff advising that he had been moved and did not have copies of his legal documents. (Dkt. No. 79). The court sent plaintiff the documents associated with the summary judgment motion other than his lengthy deposition, but instructed him that he could request portions of the deposition. (Dkt. No. 80). Plaintiff was specifically warned in the main document of the defendants' motion and in Docket # 80 that "[his] failure to file any response to the motion may result in the motion being granted since the court will not have the benefit of the plaintiff's response to consider in making its decision." (*See* Dkt. Nos. 75, 80). Plaintiff has failed to respond to the motion, despite being given a sua sponte extension to do so by the court. [5] (Dkt. No. 82).

[5]    Plaintiff appears to have failed to file an updated change of address. The last change of address he filed was on June 7, 2021 and prompted the court to sua sponte extend plaintiff's time to respond to defendants' motion. (Dkt. Nos. 81, 82). Unfortunately, on June 14, 2021, the orders were returned to the court "undeliverable." (Dkt. No. 83). The court checked the New York City Department of Corrections website, which had a different address listed than the address in Dkt. No. 81. (Dkt. No. 83). The court mailed copies of Dkt. Nos. 81 and 82 to the address listed by the NYC Dep't of Corrections. Although the mail was not returned "undeliverable," plaintiff has failed to respond to the defendants' motion by the court-extended deadline.

The facts in the plaintiff's amended complaint are disjointed, and the amended complaint describes incidents which allegedly occurred at various times between 2013 and 2018, even though plaintiff was directed to restrict his amended complaint to the issues remaining after Judge Kahn's March 8, 2019 order (Dkt. No. 36). Thus, rather than stating a summary of facts at the outset, I will discuss the facts as relevant to each of the remaining claims in my analysis.

## II. **Summary Judgment**

**\*3**  Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 514 of 830

White v. Smith, Not Reported in Fed. Supp. (2021)

2021 WL 5989600

the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

As noted, plaintiff failed to oppose defendant's motion for summary judgment, notwithstanding the fact that he was notified of the consequences of failing to respond. (Dkt. Nos. 75, 80). "Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that movant is proceeding pro se." *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 209 (N.D.N.Y. 2008); *Evans v. Albany Cty. Corr. Facility*, No. 9:05-CV-1400 (GTS/DEP), 2009 WL 1401645, at *6 & n.35 (N.D.N.Y. May 14, 2009) (collecting cases).

### III. Conditions of Confinement

#### A. Legal Standards
The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298)). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v.*

*Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992)) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

**\*4** The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

#### B. Analysis

##### 1. Cell 18 - December 2015 - Defendant Randal Smith (Claim # 1)

In the amended complaint, plaintiff alleges that defendant Randal Smith placed plaintiff "next to 18 cell"[6] in 2015 "to deprive sleep and failed to correct rodent problem which the plaintiff was eventually bittin [sic] by one." (Amended Complaint ("AC") ¶ 413). At his deposition, plaintiff stated that defendant Smith was one of the "instrumental pieces in keeping me next to inmate Reader [sic]" when plaintiff moved "back"[7] to Upstate. (Pl.'s Dep. at 160) (Dkt. No. 75-11).

[6]    This has been interpreted as plaintiff being place in Cell 18. The number of the cell is not relevant to the issue herein. The central claim is that defendant Smith placed plaintiff in a cell next to inmate Razell Reeder, who was known to make a great deal of noise, allegedly preventing plaintiff from sleeping more than a few hours per night.

[7]    The records indicate that plaintiff was confined at Upstate Correctional Facility ("Upstate") from approximately May 3, 2014 to September 25, 2014 and, after over a year at Green Haven Correctional Facility ("Green Haven"), plaintiff was transferred

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 515 of 830
White v. Smith, Not Reported in Fed. Supp. (2021)
2021 WL 5989600

back to Upstate from approximately December 17, 2015 to March 21, 2016. (Declaration of AG Pinsonnault ("Pins Decl.") Exh. C).

It has been stated that sleep is "critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) (citing cases). Vague, conclusory, and unsupported allegations do not raise a triable issue of fact as to whether the noise level was "objectively sufficiently serious for purposes of a conditions of confinement claim." *See Phelan v. Durniak*, No. 9:10-CV-666 (FJS/RFT), 2014 WL 4759937, at *10 (N.D.N.Y. Sept. 24, 2014) (citations omitted).

In the amended complaint, plaintiff alleges that he was placed near or next to inmate Reeder twice by defendants Smith, once in May of 2014 in Cell # 15, and again after plaintiff was returned to Upstate in December of 2015, while plaintiff was in Cell # 18.[8] The plaintiff's first claim deals only with the December 2015 placement, plaintiff claims that he was near or next to Inmate Reeder for approximately one month, but there is no indication that plaintiff suffered any adverse effects as the result of the loss of sleep,[9] other than "peace of mine [sic]."[10] (AC ¶ 210 & 210(B)).

[8]    The Eighth Amendment claim is separate from the Retaliation claim involving the same conduct. Plaintiff claims that being placed next to Inmate Reeder was, in itself, an Eight Amendment violation. However, he also claims that he was placed next to inmate Reeder in retaliation for grievances that he filed. The plaintiff's various retaliation claims are discussed below.

[9]    Plaintiff claims that he was able to get two to three hours of sleep per day. (AC ¶ 250(B)).

[10]    Plaintiff's allegations regarding the 2014 placement did elaborate on "injuries" that he suffered as a result of his lack of sleep. I will discuss the 2014 placement below.

**\*5** In addition, during his deposition, plaintiff stated that Inmate Reeder could "annoy a whole company." (Pl.'s Dep. at 148). It appears that the proximity to Inmate Reeder may not have made any difference to plaintiff's ability to sleep. Plaintiff also testified, without any supporting evidence, that defendant Smith was "one of the instrumental pieces [sic]" in keeping plaintiff next to inmate Reeder. (Pl.'s Dep. at 160). He stated that "the problem is sleep." (Pl.'s Dep. at

160). Such general allegations are insufficient to state a constitutional claim. *See Little v. City of New York*, No. 16 Civ. 0780 (PAE/JCF), 2017 WL 713895, at *5 (S.D.N.Y. Feb. 3, 2017) (citing inter alia *Youmans v. Schriro*, No. 12 Civ. 3690, 2013 WL 6284422, at *5 n.3 (S.D.N.Y. Dec. 3, 2013)) (general allegations of conditions that merely interfere with sleep insufficient)). *Cf. Mena v. City of New York*, No. 13-CV-2430 (RJS), 2014 WL 4652570, at *4 (S.D.N.Y. Sept. 18, 2014) (detailed allegations of unconstitutional conditions of confinement, including overcrowded cell resulting in substantial lack of sleep).

Plaintiff alleges that when he returned to Upstate (in December of 2015) he told defendant Smith that plaintiff hoped that Smith was not "moving [him] next to inmate Reeder," and that defendant Smith said "no." (Pl.'s Dep. at 160-61, AC ¶ 209). Defendant Smith states in his declaration, that an inmate's cell placement was not solely his decision, and as discussed further below, during 2014 and 2015, Upstate was full. (Smith Decl. ¶ 7) (Dkt. No. 75-9). There were limited options for placement of any inmate. (*Id.*) Inmate Reeder was assigned to a single cell, and during his 2014 stay at Upstate, plaintiff had required a single-cell. (*See* Marinelli Decl. Ex. C) (Dkt. No. 76-1). Plaintiff may have been placed next to Inmate Reeder in 2015, in part, because both inmates required a single cell.[11] There is no indication that defendant Smith was solely responsible[12] for plaintiff's placement in Cell # 18, nor that he was deliberately indifferent to a serious risk to plaintiff's health as a result of his placement near Inmate Reeder.

[11]    Defendant Smith also states in his declaration that Upstate was a double-bunk facility. (Smith Decl. ¶ 5). There were several criteria to consider when finding a suitable cell-mate for an inmate, including height, weight, age, and any known gang affiliations. (*Id.*) Defendant Smith states that, to the extent that he made any decisions regarding plaintiff's placement, they were made in accordance with facility policy and in an effort to decrease the risk of any violent or any other dangerous incident in the cell. (*Id.*) Since plaintiff had a history of making "homicidal" statements regarding cell-mates, plaintiff would have been placed in a single cell. However, defendant Smith did not have an independent recollection of plaintiff being in a cell next to Inmate Reeder. (Smith Decl. ¶ 8). Defendant Smith also states that he was never

*White v. Smith*, Not Reported in Fed. Supp. (2021)

2021 WL 5989600

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 516 of 830

made aware of any excessive risk to plaintiff from being housed next to Inmate Reeder, during either 2014 or 2015, and he had no intention of disturbing plaintiff's sleep, nor of "punishing" him for any reason. (*Id.*)

[12]   In order to be liable under section 1983, a defendant must be personally responsible for the unconstitutional conditions. *Tangretti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020) (plaintiff must establish that the defendant violated the Eighth Amendment by his own conduct, he must know of and disregard an excessive risk to plaintiff's health or safety).

Plaintiff claims that on December 30, 2015, he spoke to defendant Smith about "moving" and asked defendant Smith to get an exterminator because there were mice and "rats" in his cell. (AC ¶ 210(A)). Plaintiff states that the mice would climb up on his bed to retrieve the bread that plaintiff had saved under the mattress. (AC ¶ 210 (B)). Plaintiff claims that he was "eventually" bitten by a mouse because defendant Smith was somehow responsible for failing to correct the rodent problem in the housing unit. (AC ¶¶ 210(B); 413). During his deposition, plaintiff stated that he told defendant Smith to "fix the conditions." (Pl.'s Dep. at 161).

**\*6**   In his declaration, defendant Smith states that he did not ignore a rodent problem at Upstate. (Smith Decl. ¶ 12). He states that Upstate had rodent traps, access to extermination services, and means by which inmates could report rodent issues. (*Id.*) Plaintiff has failed to respond to the defendants' motion to contest any of the sworn facts in their declarations. Although plaintiff states that he was bitten by a mouse, he does not claim any adverse affect resulting from the bite, and he does not describe how the "rodent" problem rose to the level of cruel and unusual punishment. The court must also point out that, if plaintiff was saving bread under his mattress, he could have been exacerbating the rodent problem himself. Defendant Smith could not be responsible for plaintiff placing food under his mattress. Thus, plaintiff has failed to raise a genuine issue of material fact with respect to the conditions of his confinement in or near Cell # 18 in December of 2015, and any such claims may be dismissed as against defendant Smith.

**2. Cell ## 13 and 15 - May through September of 2014 - Defendants Maynard, Winston, Gallagher, Fournier, Eddy, L. Gokey, Marinelli, and R. Smith (Claim # 7)**

**a. Cell # 13**

Plaintiff claims that in May of 2014, defendants Maynard, Winston, Barkman, Marinelli, and Gallagher placed plaintiff in a dirty cell, with "body waste" all over the mattress, toilet, and shower area in the corners. (AC ¶ 410). Plaintiff also alleges that the cell was "freezing," he was not given sheets, wash rag, towel, pillow/pillowcase, and he was not provided any clothing. (*Id.*) Plaintiff claims that he was given a pillow, towel, and wash rag after two and one half months. (*Id.*) Plaintiff also alleges that defendant Fournier refused to give him cleaning supplies, allegedly because plaintiff made defendant Gallagher "mad" when plaintiff tried to kill himself. (AC ¶ 411). Although plaintiff's causes of action generalize the claim against the named defendants, the fact section of the complaint and plaintiff's deposition show that each of the defendants was only involved at specific times during the short time that plaintiff was housed in Cell #13.

In the fact section of the amended complaint, plaintiff claims that when he transferred from Downstate to Upstate, he was taken to a holding cell, where he told Officer Scott that he was "homicidal" and "suicidal." (AC ¶ 71). As a result, plaintiff was placed in a "holding cell." (AC ¶ 72). Plaintiff claims that Officer Scott spoke with defendant Byno, who suggested that plaintiff be sent to the infirmary for "OMH" [13] watch. [14] (*Id.*) Plaintiff states that he was on "OMH watch" until May 5, 2014, when he told defendant Maynard that he was still homicidal and would likely hurt any cell mate. (AC ¶ 73). Plaintiff claims that he was brought to Cell # 13, but the inmate who was in the cell would not let plaintiff in, so the inmate was taken to a different cell, while plaintiff was left alone in Cell #13. (AC ¶¶ 74-75). Plaintiff claims that when he was placed in Cell # 13, the cell was cold because the ventilation system was blowing cold air, and he was not given any sheets, blanket, wash rag, towel, or pillow. The cell was dirty, and there were urine stains in the corners of the cell, toilet rim, and shower. There were urine and semen stains on the mattress, and plaintiff alleges that defendant Maynard denied him any supplies. (AC ¶ 76). Plaintiff states that he laid in the "fetal position" all day and night, and that the cell was "constantly illuminated." (*Id.*)

White v. Smith, Not Reported in Fed. Supp. (2021)

2021 WL 5989600

[13]  Office of Mental Health.

[14]  Plaintiff states that Officer Scott, who is not a
defendant herein, suggested that plaintiff simply be
placed in a single cell. (AC ¶ 72).

Plaintiff alleges that on May 6, 2014, defendants Winston
and Gallagher delivered breakfast at 7:40 a.m., and plaintiff
told them that he needed cleaning supplies because the cell
was filthy, and he needed sheets and the other supplies listed
above. (AC ¶ 77). Plaintiff claims that defendant Winston
and Gallagher told plaintiff they would see what they could
do, and then they walked away. (*Id.*) Later on during the
day, while plaintiff was in a mental health interview with
defendants P. Baker and Barkman, plaintiff claims to have
asked about the above supplies. (AC ¶ 83). Plaintiff claims
that these defendants told him to ask the guards, but when
plaintiff stated that he had already done that, defendants P.
Baker and Barkman told him that "it is what it is." (*Id.*) After
the interview, plaintiff states that he was brought back to
Cell # 13 by defendants Winston and Gallagher. (AC ¶ 84).
Plaintiff asked them for a new T-shirt because there was blood
on the one he was wearing and he informed them again that he
needed cleaning and other supplies. (*Id.*) Plaintiff also asked
them for his "personal property," because it had been longer
than 72 hours since he was transferred to Upstate, but he was
told that it was "not going to happen." (*Id.*)

**\*7** Plaintiff alleges that, at approximately 5:00 or 6:00
p.m. on May 6, 2014, defendant Fournier "was doing cell
clean up." (AC ¶ 86). Plaintiff states that he asked defendant
Fournier for cleaning supplies, but defendant Fournier denied
the request, whispering to plaintiff that he should not
have "piss [sic] officer Gallagher off." Plaintiff claims that
defendant Fournier "saw" that plaintiff's cell was filthy and
that he had nothing in the cell but a mattress. (*Id.*) Plaintiff
states that on May 8, 2014, he received a towel, two sheets,
a blanket, and a pillowcase, but he was told that no pillows
were currently available, and there were no wash rags "up
front." (AC ¶ 86). Plaintiff repeats his statement that the cell
was "constantly illuminated." (*Id.*) Plaintiff states that he was
given his personal property on May 10, 2014. [15] (AC ¶ 87).

[15]  Claims regarding the delay in providing plaintiff
with his personal property have been dismissed.
(Dkt. No. 55 at 13-14).

During plaintiff's deposition, he testified that he was in Cell #
13 for a month, and that the dirty conditions in Cell #13 lasted
for a week, but then he stated that "I think within five days,

I was able to clean up the cell." (Pl.'s Dep. at 144-45, 157).
A "good officer" provided plaintiff with "everything" at that
time. (Pl.'s Dep. at 146).

Defendants first argue that plaintiff's Eighth Amendment
claim is barred by the statute of limitations because the events
forming the basis of this claim occurred in May of 2014,
and plaintiff filed his original complaint on October 2, 2017.
(Def.'s Br. at 22). The statute of limitations for section 1983
actions is three years after the plaintiff's cause of action
accrued. *See Owens v. Okure*, 488 U.S. 235, 240-41 (1989).
"While state law supplies the statute of limitations for claims
under § 1983, federal law determines when a federal claim
accrues. The claim accrues when the plaintiff knows or has
reason to know of the harm." *Eagleston v. Guido*, 41 F.3d
865, 871 (2d Cir. 1994) (internal quotation marks and citation
omitted).

Defendants are correct in arguing that plaintiff knew or should
have known of the harm at the time he was subjected to the
allegedly unconstitutional conditions in Cell # 13 in May of
2014, and the statute of limitations would have run three years
later in May of 2017. [16] Therefore, plaintiff's claims relative
to the conditions in Cell #13 would be time barred because his
original complaint was not filed until October 2, 2017. (Dkt.
No. 1).

[16]  Although plaintiff stayed in Cell # 13 until May
27, 2014, he testified that within five days to one
week of his placement, his cell was cleaned and
he was given his property on May 10, 2014. Thus,
any conditions of confinement claim would have
accrued on or before May 10, 2014.

However, the court must also determine whether the statute of
limitations was tolled during any part of the three year period.
The Second Circuit has held that the statute of limitations for
an inmate's section 1983 claim must be tolled while the inmate
is actively exhausting his administrative remedies. *Gonzalez
v. Hasty*, 651 F.3d 318, 323-24 (2d Cir. 2011). In this case,
plaintiff has attached as Exhibit A, two Central Office Review
Committee ("CORC") [17] decisions, one dated October 15,
2014, denying a grievance, which the CORC form indicates
was filed on May 19, 2014, and the second dated December
3, 2014, which states that the grievance was filed on May 6,
2014. (Pl.'s Ex. A) (Dkt. No. 56-2).

[17]  The CORC is the highest level of an inmate's
administrative remedy procedure in New York

White v. Smith, Not Reported in Fed. Supp. (2021)

2021 WL 5989600

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 518 of 830

State. N.Y. Comp. Codes R. & Regs., tit. 7 § 701.5(d).

Although plaintiff has not filed the grievances themselves, he claims in the amended complaint that he filed various grievances while he was in Cell #13, and they were consolidated for review. (AC ¶ 88). It appears from reading the CORC decisions in Exhibit A, that plaintiff raised his challenge to the Cell # 13 conditions of confinement in these grievances. In its October 15, 2014 decision, the CORC stated that

> **\*8** all empty cells are cleaned and inspected for issues prior to another inmate housing there. It is noted that the grievant was placed in SHU on 5/4/14 and also had the opportunity for dry and wet clean up on 5/5/14 and 5/6/14 respectively. CO F ... denies denying the grievant cleaning supplies, meals or barbershop access on 5/6/14 and states that he did not complain about unsanitary conditions that day and had all state issued items to which he was entitled.... It is noted that his property was issued to him on 5/10/14 after arriving at the facility separately, and the area supervisor does not recall any complaints about cold air flowing out of the vents.

(Pl.'s Ex. A at 1). In its December 3, 2014 decision, the CORC again stated that "CO F ..." denied refusing plaintiff access to barbershop, cell cleanup, or meals on May 6, 2014. (Pl.'s Ex. A at 2). Thus, plaintiff was actively exhausting his administrative remedies with respect to the conditions in Cell # 13 from May 6, 2014 until December 3, 2014, and the statute of limitations would have been tolled. If the statute of limitations was tolled until December 3, 2014 or even if it were only tolled until October 15, 2014, then plaintiff's claims with respect to the conditions in Cell #13 are timely. Notwithstanding plaintiff's timely filing, his conditions of confinement claim with respect to Cell #13 may be dismissed on the merits.

The temporary or limited exposure to conditions that fall below the "contemporary standards of decency" do not amount to Eighth Amendment violations. *See Ford v. Phillips,*

No. 05 Civ. 6646, 2007 WL 946703 (S.D.N.Y. Mar. 28, 2007) (finding that, as a matter of law, minor and temporary deprivations of property, showers and recreation "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment."). In this case, even though plaintiff repeated the alleged deprivations in multiple paragraphs of his amended complaint, ultimately, plaintiff conceded that he was subject to the allegedly unconstitutional conditions for only a few days. He moved into Cell # 13 on May 5, 2014, but by May 8, he testified that he had everything but a pillow, in five days he was able to clean his cell, and by May 10, he had been given his personal property. Plaintiff alleges that there were stains on his mattress and urine stains in the corners of the room. While unpleasant and perhaps unsanitary, such deprivations do not rise to the level of unconstitutional conditions. Plaintiff claims that he was "freezing," however, he was housed in Cell #13 in May. While it may have been cold until he was given a blanket three days later, [18] it is unlikely that plaintiff suffered freezing temperatures in his cell. Plaintiff has failed to allege that he was subjected to unconstitutional conditions of confinement in Cell # 13, and any such claims may be dismissed against all defendants.

[18]  For purposes of this analysis, the court assumes, without finding, that plaintiff was given bedding on May 8, as he stated during his deposition. The court is aware that Upstate Correctional Facility is in Malone, New York, and the temperatures may be colder than in other parts of the state, it is unlikely that plaintiff would have been subjected to freezing temperatures in May for an extended period of time during the day. The average low temperature in May in Malone, New York is 45.1 degrees Fahrenheit. https://www.weather-us.com/en/new-york-usa/malone-weather-may#temperature

### b. Cell # 15

Plaintiff also alleges that defendants Smith, Eddy, Gokey, and Marinelli placed plaintiff next to "a mentally ill" inmate to deprive him of sleep and to psychologically torture him. (AC ¶ 89). Plaintiff alleges that on May 27, 2014, he was told that he would be placed in a "single cell," and he would be transferred from Cell # 13 to Cell #15. (AC ¶ 89). Plaintiff states that he was told that "security" made the decision to move him and to keep him in a single cell. [19] (*Id.*)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 519 of 830

White v. Smith, Not Reported in Fed. Supp. (2021)
2021 WL 5989600

**19**    This should not be a surprise to plaintiff since on May 6, 2014, he told defendant Marinelli that he was "homicidal" and did not want a "bunky." (Marinelli Decl. Ex. C). After plaintiff was told that he would be placed in a single cell "per security," "Pt now says he will not need OMH again." (*Id.*)

**\*9** While plaintiff exhausted his administrative remedies with respect to conditions in Cell #13, thus tolling the statute of limitations with respect to those claims, it is unclear whether the same is true for plaintiff's claims about the "conditions" in Cell #15. Plaintiff states that he was transferred to Cell #15 on May 27, 2014. Neither of the grievances that are attached to the amended complaint as Exhibit A could have referred to the conditions in Cell #15 because both grievances were filed before May 27, 2014. Once the defendant demonstrates that the statute of limitations has facially run, the burden is on plaintiff to establish tolling. *Whyte v. Tompkins Cty. Sheriff*, No. 9:20-CV-284 (LEK/CFH), 2020 WL 4732101, at \*6 (N.D.N.Y. Aug. 14, 2020) (citing *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007)).

In this case, plaintiff claims that the "defendants" placed him in Cell #15, knowing that the inmate in the next cell was mentally ill and would make noise consistently, keeping the plaintiff awake. Plaintiff asserts a wide variety of adverse effects that he allegedly suffered as the result of the lack of sleep. Any cause of action would have accrued when plaintiff was placed in the cell and became aware that he was suffering as the result of the inmate's noise. In his amended complaint, plaintiff states that shortly after he was moved to Cell #15, he began to hear "banging." (AC ¶ 90). At the latest, plaintiff's cause of action would have accrued the day that he was transferred out of Cell #15 and out of Upstate Correctional Facility on September 25, 2014.

Unlike his challenge to the conditions in Cell # 13, plaintiff has not filed any grievance decisions or other documents, showing that he challenged his placement in Cell #15 or complained about the adverse effects that he was suffering as the result of a lack of sleep. Unlike the failure to exhaust per se,[20] which the defendants have the burden to establish, the burden of establishing tolling, equitable or otherwise, is on the plaintiff who asserts that the statute of limitations is tolled. *White, supra* (equitable tolling); *Weatherwax v. Barone*, No. No. 3:19-CV-1502(KAD), 2021 WL 4125452, at \*4 (D. Conn. Sept. 9, 2021) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)) (exhaustion of administrative remedies).

**20**    Defendants do not argue failure to exhaust as a defense.

Plaintiff has failed to respond in opposition to the defendants' motion for summary judgment. In the amended complaint, plaintiff vaguely refers to a grievance that he filed on September of 2014: "on 9/8/14 plaintiff filed an [sic] grievance about not being moved to level 3 and his neighbor denying him sleep."[21] (AC ¶ 114). If true, plaintiff appears to have waited approximately three months to file a grievance, notwithstanding his claim that he was being driven to suicide over the noise.[22] Plaintiff does not include a grievance number, nor does he include any documents that would substantiate his statement. Thus, there is no evidence that statute of limitations was tolled by exhaustion of administrative remedies, and the plaintiff's claim relative to his placement in Cell #15 may be dismissed as barred by the statute of limitations.

**21**    According to defendant Smith, an inmate begins on PIMS (Progressive Inmate Movement System) level 1, and if he receives no disciplinary tickets within 30 days, he may be moved "up" to an area reserved for PIMS level 2. (Smith Decl. ¶ 9; *See* DOCCS Directive # 4933, 7 N.Y.C.R.R. Ch. VI, § 303 - Standards for Special Housing Units ("SHU")). According to Directive # 4933, PIMS is a behavioral incentive program in SHU whereby an inmate who completes a period free of regressions, deprivation orders, or misbehavior reports may increase their PIMS level and accordingly their privileges - while an inmate is designated PIMS level 1 for 30 days, there is no indication that a level increase is automatic upon the passage of time - § 303.1 (a)-(c)). Plaintiff believed that he was not being moved quickly enough according to the PIMS schedule. (AC ¶ 113) (Plaintiff claims that on September 19, 2014, he asked defendant Smith why he had not been moved to "PIMS 3.") Plaintiff states that he was told that he was on PIMS 3 hold, and he needed to "ask security," which plaintiff speculated was defendants Smith, L. Gokey, and Eddy. (*Id.*) Plaintiff stated that defendant Smith told plaintiff there were no available cells, but plaintiff "knew" that one of the cells was "unoccupied." (*Id.*)

White v. Smith, Not Reported in Fed. Supp. (2021)

2021 WL 5989600

[22] During plaintiff's deposition, he stated that he filed a grievance about defendant Smith "after" he was in Cell # 15, but plaintiff was not clear on the timing. (Pl.'s Dep. at 156). "That's before – that's not – this was not what – this is – this is when I was in – yeah, I think in cell fifteen and in a different cell because I was moved – I was eventually...." (*Id.*)

**\*10** In any event, defendant Smith states in his declaration, that he was not alone responsible for an inmate's placement in either 2015 or 2014. (Smith Decl. ¶ 5). To the extent that defendant Smith was involved in any placement, particularly in 2014, there were clearly considerations regarding the requirement that plaintiff be housed in a single cell based on his own statements to corrections officials that he would likely hurt any cell-mate. Defendant Laura Gokey has filed a similar declaration, stating that she was not solely responsible for inmate placement, notwithstanding her position as a Sergeant in 2014. (L. Gokey Decl. ¶ 5) (Dkt. No. 75-3). Defendant L. Gokey reiterates that in 2014, Upstate was full, and the options for placing inmates were limited. (L. Gokey Decl. ¶ 6). "Space constraints were a substantial factor" in such placement. (*Id.*) Defendant L. Gokey has no independent recollection of plaintiff or the alleged incidents in this case, however, she states that she was never made aware of an excessive risk to plaintiff based on his cell placement at Upstate.[23] (L. Gokey Decl. ¶ 7).

[23] In the amended complaint, plaintiff alleges that, after L. Gokey interviewed him about an alleged sexual assault in September 2014, she was escorting him back to his cell, and he asked her why other inmates who came "after" him were being moved, and she told him it was because they did not file grievances. (AC ¶ 109). Plaintiff states that defendant L. Gokey told him to "let it go" when he asked to file criminal charges against the perpetrators of the assault, but plaintiff then assumes that she meant that he would get a misbehavior report if he pursued the grievance. (AC ¶ 108). The amended complaint is filled with plaintiff's interpretations of what a defendant "meant" when he or she spoke to plaintiff. Plaintiff then told defendant L. Gokey that his neighbor was depriving him of sleep, and she stated that she would "see what she could do," but did not do anything.

In the amended complaint, the only statement that plaintiff made about defendant Eddy was that he "spoke" with Eddy and requested to be moved to level 3 and told him about Reeder. (AC ¶ 95). Plaintiff claims that defendant Eddy told plaintiff he would be "moved shortly," but it never happened. (*Id.*) During plaintiff's deposition, he stated that defendant Eddy "left [him] next to Reeder, knowing he was binging [sic]." (Pl.'s Dep. at 165). Plaintiff has named defendants based on the fact that he may have mentioned his situation to them, but they did not act quickly enough or remedy the perceived problem. There is no indication that defendant Eddy [24] or defendant L. Gokey [25] were in a position to change plaintiff's cell location when he requested it or intentionally placed him near Inmate Reeder to "torture" the plaintiff. As stated above, the defendant must be personally involved in the alleged constitutional violation and must have the requisite state of mind in order to be held liable. *Tangretti, supra.* Thus, any claims relating to plaintiff's placement in Cell # 15 may be dismissed as against all defendants.

[24] Defendant Eddy has not filed a declaration in support of the defendants' motion. However, it is clear from the amended complaint and from plaintiff's deposition that any claims against defendant Eddy were speculative and based solely on plaintiff's assumption that this defendant was involved in plaintiff's placement and plaintiff's assumption that by mentioning his problem to the defendant that he was in a position to immediately rectify the situation. Thus, the complaint may be dismissed as against defendant Eddy without relying on a declaration by the defendant.

[25] At his deposition, plaintiff clarified that his claim against defendant L. Gokey for keeping him next to Reeder were more in the nature of retaliation for his alleged grievances against "her husband," which will be discussed below. (Pl.'s Dep. at 161-62).

## IV. Medical Care (Claims ## 4, 5, 6) (Defendants Maynard, Marinelli, Winston, Barkman, P. Baker, H. Baker, and Byno)

### A. Legal Standards

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). The first element is objective and measures the severity

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 521 of 830

White v. Smith, Not Reported in Fed. Supp. (2021)

2021 WL 5989600

of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### 1. Objective Element

**\*11** In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. 2019) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Salahuddin*, 467 F.3d at 279. The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 844–47 (1994)).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith*, 316 F.3d at 185–86). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### 2. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). In order to meet

the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer*, 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Abreu v. Lipka*, 778 F. App'x 28, 32 (2d Cir. 2019) (quoting *Smith*, 316 F.3d at 184). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

**\*12** Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Riddick v. Maurer*, 730 F. App'x 34, 38 (2d Cir. 2018) (quoting *Chance*, 143 F.3d at 703). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*,

White v. Smith, Not Reported in Fed. Supp. (2021)

2021 WL 5989600

474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

**B. Analysis**

Plaintiff alleges that defendants Marinelli, Winston, Barkman, P. Baker, and H. Baker failed to send plaintiff to a mental observation cell and failed to allow him to see a psychiatrist after "knowing" that plaintiff was suicidal, homicidal, and had just cut his wrist in a suicide attempt, exposing him to a "potential" risk. (AC ¶ 400). Plaintiff claims that defendants H. Baker and Marinelli, "intentionally conspired" to have plaintiff stop taking his psychiatric medication by giving him "wrong poisonous pills" so that he could be taken off Marinelli's "case." (AC ¶ 404). The pills made plaintiff throw up, "etc." (*Id.*) Plaintiff claims that defendant Byno failed to give plaintiff his medication for 17 days. (AC ¶ 405). Finally, plaintiff alleges that he was not given proper medical treatment by defendant H. Baker after plaintiff was assaulted by officers on September 2, 2014.

In the factual portion of his amended complaint, plaintiff states that when he was transferred to Upstate, on May 3, 2014, he spoke to defendant Nurse Byno and told her that he had attempted suicide at his previous facility, and that he was on mental health medication. (AC ¶ 70). Notwithstanding this information, plaintiff was escorted to Cell #13. (*Id.*) Later, plaintiff told Officer Scott [26] that he was "homicidal" and "suicidal" and that he would hurt any cell mate. (AC ¶ 71).

[26]     Officer Scott is no longer a defendant herein.

According to plaintiff, because of this statement, he was taken out of Cell #13 and taken to a holding area. Officer Scott spoke to defendant Nurse Byno, and although Officer Scott simply suggested that plaintiff be placed in a single cell, defendant Byno sent plaintiff to the infirmary on OMH watch. (AC ¶ 72). Plaintiff claims that he came out of the infirmary on May 5, but told defendant Maynard that he was still "homicidal" and would likely hurt a cell mate. (AC ¶ 73). As stated above, plaintiff states that he was ultimately placed alone in Cell #13, after the inmate who was in Cell #13 was moved to a different cell. (AC ¶¶ 74-75).

Plaintiff alleges that, on May 6th, he told defendant Marinelli that he was still homicidal and suicidal, and that he was hearing voices, but that defendant Marinelli told him he was not homicidal, and he was not hearing voices. (AC ¶ 78).

Plaintiff claims that shortly after defendant Marinelli left plaintiff's cell, defendant Winston stopped at his cell to ask plaintiff if he wanted to use a shaving razor because it was "shower day." (AC ¶ 79). Plaintiff accepted the razor, but then broke it into pieces and tried to cut his wrist. (*Id.*) Two minutes later, [27] defendant Winston came back and took plaintiff to an interview room, where defendant Barkman told plaintiff to stop cutting his wrist. (*Id.*)

[27]     Plaintiff has written the exact times in the amended complaint. The court has noted the time only to demonstrate the speed at which the defendants reacted to plaintiff's situation, even according to plaintiff's own account.

**\*13** Plaintiff claims that, another two minutes later, he was taken to the nurses' station. (AC ¶ 80). At the nurses' station, plaintiff states that he told P. Baker and H. Baker that he was suicidal. (*Id.*) Plaintiff claims that defendant Marinelli came to the nurses' station, mocked plaintiff, and told defendant P. Baker that Marinelli was not going to send plaintiff to an OMH Satellite, [28] and he did not consider plaintiff's act as an attempt to take his life. (AC ¶ 81). Eight minutes later, after plaintiff's wrist had been bandaged, plaintiff was sent to an interview room, where he allegedly told defendant Barkman that plaintiff had received "threat tickets" [29] on May 3 and May 4. [30] (AC ¶ 82). Plaintiff also told defendant Barkman that he was not getting the proper mental health treatment. (*Id.*) Plaintiff alleges that he told defendant P. Baker that he tried to hang himself three weeks earlier while he was still at Downstate Correctional Facility. (AC ¶ 83). Plaintiff told defendant P. Baker about his placement on OMH Watch from May 3 through May 5. (*Id.*) Plaintiff explained that he was currently on anti-depressants, and that he still felt homicidal and suicidal. [31] (*Id.*) After the interview, plaintiff was brought back to Cell #13. (AC ¶ 84).

[28]     An OMH "satellite" would have been an outside facility.

[29]     The court assumes that plaintiff meant that he received misbehavior reports for threatening someone.

[30]     It is unclear who plaintiff claims to have threatened since he only arrived at Upstate on May 3, 2014. Plaintiff does not elaborate on these "tickets," only

White v. Smith, Not Reported in Fed. Supp. (2021)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 523 of 830

2021 WL 5989600

to mention later that they were "dismissed" by defendant Barkman. (AC ¶ 125).

31    As stated above, plaintiff also told defendant P. Baker about the lack of supplies in Cell #13, but defendant Baker told plaintiff to ask the guards about supplies, stating that "it is what it is," when plaintiff told defendant Baker that he had already asked the guards. (AC ¶ 83).

Plaintiff alleges that after he was transferred to Cell #15, and placed next to Inmate Reeder, after months of banging and other deprivations, plaintiff began to suffer hallucinations, confusion, loss of impulse control, and migraines. (AC ¶¶ 91-95). Plaintiff became depressed and suicidal, and on September 1, 2014, he attempted to make a noose to hang himself. (AC ¶ 97). Plaintiff claims that an officer happened to come by plaintiff's cell and saved his life, after which he was sent to the infirmary for mental health observation. (*Id.*) On September 2, 2014, while he was still on observation status, plaintiff claims that defendant Byno came to his cell to ask him why he tried to kill himself, and plaintiff told her that his "mental health" [sic] being discontinued was a factor. (AC ¶ 98). Plaintiff also claims that after defendant Byno's visit on September 2, 2014, he was assaulted, sexually and otherwise, by defendant M. Gokey and other John Doe officers. (AC ¶¶ 101-103).

Plaintiff alleges that, on September 10, 2014, he was in a great deal of pain due to the sexual assault. (AC ¶¶ 105, 106). Plaintiff alleges that he was "on his door for sick call" between 6:00 and 7:00 p.m. (AC ¶ 106). Plaintiff states that he told defendant H. Baker that his anus and his testicles hurt, but before he could explain further, defendant Baker walked away. (*Id.*) However, at approximately 10:00 p.m., defendant L. Gokey "pulled plaintiff out for an interview." (AC ¶ 107). Defendant L. Gokey had defendant H. Baker took pictures of plaintiff's body, but refused to take pictures of his anus and his swollen testicles. "She" stated that "obvious injuries look normal and fail [sic] to issue pain meds or have plaintiff stitch [sic] up." (*Id.*)

Defendants again argue that plaintiff's medical care claims are time-barred because they accrued, if at all, prior to October 2, 2014, and plaintiff filed this action on October 2, 2017. Plaintiff's Exhibit A, shows that he did include some challenges to his medical care in his May 19, 2014 grievance, which was, in part, entitled "Nurse Denied Medication." (Pl.'s Ex. A). The CORC response referred to an RN B, who assessed plaintiff on multiple dates in May of 2014, and

determined that plaintiff "did not require treatment." (Pl.'s Ex. A at 1). The CORC response also referred to RN B as "he," so plaintiff could not have been referring to defendant Byno, whose first name is Michele and who is a woman. [32]

32    During his deposition, plaintiff consistently referred to Nurse Byno as "she." (*See e.g.* Pl.'s Dep. at 134) (referring to Nurse Byno as "Ms." and "she.")

**\*14** Plaintiff has failed to include his original grievance documents, and it is impossible to determine the exact claims that were made therein. The parties have confused the issue in such a way as to make it impossible for the court to determine whether the statute of limitations would have been tolled with respect to the medical care that plaintiff received in May of 2014. The court will therefore, consider the merits of plaintiff's claims.

The amended complaint states that Nurse Byno allegedly denied plaintiff his mental health medication from October 14, 2014 until October 31, 2014. (AC ¶¶ 133-35). Plaintiff filed this action on October 2, 2017, thus, if defendant Byno denied plaintiff medication between October 14, 2014 and October 31, 2014, plaintiff's claim would be timely. [33] Plaintiff states that he filed a grievance, and the CORC found that his medication prescription was "renewed" on 10/10/14, 11/7/14, and 5/20/15. Defendant Byno has filed a declaration, stating that, as a nurse, she has no authority to prescribe or to discontinue a prescription for medication. (Byno Decl. ¶¶ 6-7) (Dkt. No. 76-2). In addition, defendant Byno does not recall ever failing to give plaintiff a medication that was duly prescribed by a physician. (Byno Decl. ¶ 8). Defendant Byno states that she has no recollection of treating plaintiff at any time during his stay at Upstate. (Byno Decl. ¶ 9).

33    Plaintiff claims that when defendant Byno was making her rounds on October 14, 2014 to deliver medications, she walked by the plaintiff's cell without giving him any medications. (AC ¶ 133). Plaintiff claims that he asked defendant Byno about his medications on October 16, 2014, but she told plaintiff they were "discontinued." (AC ¶ 134). The following week, on October 23, 2014, plaintiff claims that he asked defendant Byno about his medication, and she showed plaintiff a letter from "Timothy Kemp" stating that plaintiff had been receiving his medication regularly. (AC ¶ 135). Plaintiff claims that defendant Byno was lying

White v. Smith, Not Reported in Fed. Supp. (2021)
Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 524 of 830
2021 WL 5989600

about giving plaintiff his medications and lied to someone who investigated "the grievance" because the grievance response stated that the medication was "unavailable." (AC ¶ 136). Plaintiff assumes that because this statement was included in the grievance response, defendant Byno must have told the investigator that the medication was unavailable.

However, the plaintiff's medical records reveal that on September 1, 2014, defendant Byno made an entry noting that plaintiff complained of hearing voices and expressed thoughts of self-harm. (Byno Decl. ¶ 9 & Ex. A). Defendant Byno further stated that plaintiff had a piece of sheet tied to his cell door. (*Id.*) The record further indicates that on September 1, 2014, defendant Byno completed an OMH 1:1 referral, and plaintiff was transferred to the infirmary for a 1:1 watch. (*Id.* & Ex. A). In his amended complaint, plaintiff states that defendant Byno sent plaintiff for an OMH 1:1 watch in early May based on his initial interview statements regarding suicide and homicide. [34] (AC ¶¶ 70, 72). Either way, defendant Byno was clearly attempting to treat plaintiff, to the extent that she was authorized to do so, based on his suicidal and homicidal statements. Thus, to the extent that defendant Byno did have some contact with plaintiff, there is no indication that her conduct violated plaintiff's right to proper medical care. [35] Once again, plaintiff has failed to respond to the defendant's sworn statements, nor has he contradicted the medical records presented. Thus, plaintiff's claims of deliberate indifference may be dismissed as against defendant Byno.

[34]    It is unclear whether plaintiff has mistaken the date upon which defendant Byno "sent" him to OMH watch, or whether this happened twice, once on May 3, 2014 (Marinelli Decl. ¶ 8 - there is no individual listed as the referring staff member) and then again on September 1, 2014, when the record shows that defendant Byno referred plaintiff for the OMH watch. Plaintiff claims that Nurse Byno was the initial interviewer in May when he initially told the officers of his mental health issues, and it was defendant Byno who suggested that he be placed on OMH watch. (AC ¶¶ 70, 72). The court notes, however, that plaintiff claimed that he was sent to OMH watch on September 1, 2014 because he tried to hang himself. The medical records indicate that, plaintiff talked about suicide and had a sheet hanging in his cell, not that he attempted to hang himself. (*Compare* AC ¶ 97 *with* Byno Decl. Ex. A

("Inmate c/o 'hearing voices *thoughts of self-harm*' Had piece of sheet tied to cell door....") (emphasis added)).

[35]    The court also notes, that to the extent that any of defendant Byno's conduct occurred on September 1, 2014, rather than on the October dates, without a grievance to toll the statute of limitations, any such claim would be time barred.

**\*15** Plaintiff makes various allegations against defendant Marinelli, who is employed by the Central New York Psychiatric Center ("CNYPC") and is assigned as a "Psychologist II" at Upstate. (Marinelli Decl. ¶ 1) (Dkt. No. 76-1). Defendant Marinelli carries a caseload of inmates at Upstate who have mental health issues. (*Id.*) Defendant Marinelli's duties included performing intake interviews to assess inmates' mental status. (*Id.*) As part of his intake review, defendant Marinelli asks the inmates whether they have any past history of suicide, and he also has access to the inmate's institutional file so that he is aware of the inmate's needs and requirements prior to his arrival at Upstate. (Marinelli Decl. ¶ 5).

Defendant Marinelli states that, if an individual expresses suicidal ideation, he is immediately taken to the infirmary and placed on "observation watch" until the staff determines that the individual is no longer a threat to himself. (Marinelli Decl. ¶ 6). Generally, the watch lasts a day or two. (*Id.*) When the infirmary staff makes the determination that the individual is no longer a danger to himself, then he is taken to his assigned cell. (Marinelli Decl. ¶ 7). If he is still exhibiting suicidal tendencies, the inmate may be continued on watch at the infirmary, or if appropriate, transferred to an OMH satellite unit at a different facility. (*Id.*) In any event, an inmate is not released from the infirmary if he is still exhibiting suicidal tendencies. (*Id.*)

Although defendant Marinelli does not remember the specifics of any interaction he may have had with the plaintiff, the medical records indicate that plaintiff was transferred to the infirmary upon his arrival at Upstate on May 3, 2014 because he stated that he was suicidal. (Marinelli Decl. ¶ 8). He was released on May 5, 2014 and was transferred to his assigned cell. (*Id.*) Defendant Marinelli has attached a copy of plaintiff's progress notes while he was on observation from May 3 until May 5. (Marinelli Decl. Ex. A). Defendant Marinelli states that he would not have played any part in the decision to release the plaintiff to his cell because only the staff at the infirmary are authorized to make that

White v. Smith, Not Reported in Fed. Supp. (2021)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 525 of 830

2021 WL 5989600

determination. (Marinelli Decl. ¶ 9). None of the progress notes are signed by defendant Marinelli, and all of the notes indicate that plaintiff was in no distress, was resting "well," and denied any complaints. (Marinelli Decl. Ex. A).

Plaintiff was released from the infirmary on May 5, 2014. In the amended complaint, plaintiff states that he told defendant Sergeant Maynard that he was "homicidal" and would hurt someone else, not that he was suicidal. (AC ¶ 73). Plaintiff never alleges that he was placed for any period of time with another inmate, and it is clear from the discussion below that it was ultimately decided to place plaintiff in a single cell. Thus, defendant Maynard is not responsible for any alleged denial of mental health care.

On the morning of May 6, 2014, plaintiff self-inflicted a razor cut to his inner left wrist.[36] (Marinelli Decl. Ex. B). Plaintiff was treated for the cut in the infirmary at 8:40 a.m. (Id.) The medical records state that the cut was one half inch long and one millimeter deep. (Marinelli Ex. B). The wound was cleaned, a dressing applied, and "OMH notified." (Id.) Defendant Marinelli saw plaintiff prior to his cutting his wrist and again after the incident in his cell at 9:00 a.m. (Marinelli Decl. Ex. C). Defendant Marinelli's progress note states that the wound was treated with "cleaning and band-aid." (Id.) The plaintiff told defendant Marinelli that he cut his wrist because he was "depressed and needs to be alone." (Id.) Defendant Marinelli stated that he had seen plaintiff prior to the wrist cutting incident, and at that time, plaintiff told Marinelli that he was homicidal, and needed to be single-celled, denied suicidal thoughts, said he was hearing voices, but then signed his treatment plan. (Id.)

[36]    Defendant Marinelli has no independent recollection of this interaction with plaintiff, but the medical records are clear in their description of the events of May 6, 2014, including the timing of various actions. (Marinelli Decl. ¶ 14 & Exs. B, C).

**\*16** When defendant Marinelli arrived at plaintiff's cell after the wrist cutting incident, his notes indicate that he observed plaintiff speaking with the officers who were delivering breakfast. (Marinelli Decl. Ex. C). Plaintiff's interaction with the officers was normal, and his interaction with Marinelli was normal, answering questions appropriately, and maintaining good eye contact, "with no signs of psychosis, depression, or anxiety." (Id.) Plaintiff told defendant Marinelli that he was "homicidal" and did not want a "bunky." Plaintiff was told by security that he would be

returned to his cell and that he would be single-celled. (Id.) As a result, "Pt now says he will not need omh again. Pt says not suicidal." (Id.) Defendant Marinelli noted that he would follow up on SHU rounds. (Id.)

Defendant Marinelli states that, based on his progress notes, which articulate his interaction with the plaintiff, and the medical records indicating that plaintiff's cut was small with minimal bleeding, it was his "professional opinion as Psychologist II," that plaintiff's cut did not "constitute grounds for further action." (Id.) The plaintiff's medical records indicate that he was seen on May 7, 2014, complaining only of a dry scalp and acne. (Marinelli Decl. Ex. B).

It appears from the records that defendant Marinelli did not make the decision to release the plaintiff from the infirmary. However, he visited plaintiff on the morning of May 6, and plaintiff denied suicidal ideation. Rather, he claimed that he was homicidal and wished to have a single cell. Defendant Marinelli did not give plaintiff a razor, nor would he have known that defendant Winston was making rounds offering inmates razors because it was "shower day."

Defendant Winston is a corrections officer and is not a medical provider. " 'Nonmedical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel.' " *Bookman v. Lindstrand*, No. 9:15-CV-1542 (MAD/DEP), 2018 WL 3121688, at \*12 (N.D.N.Y. Feb. 14, 2018), *report and recommendation adopted*, 2018 WL 1470585 (N.D.N.Y. Mar. 26, 2018) (quoting *Baumann v. Walsh*, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999)). In his declaration, defendant Winston states that he would not have given plaintiff a razor if he had known that plaintiff might use it to harm himself. (Winston Decl. ¶ 8). Instead, the proper procedure would have been to alert a sergeant. (Id.) Plaintiff does not claim that he told defendant Winston that he was suicidal prior to the razor being given to plaintiff. (AC ¶ 79). The cut that plaintiff sustained was small, and he did not suffer significant harm. Thus, neither defendant Winston, nor defendant Marinelli exhibited deliberate indifference to plaintiff's medical needs.

After the cutting incident, defendant Marinelli made the professional decision, based on the evidence, that plaintiff's cut was not a suicide attempt, there was no reason for further intervention, and that there was no significant

White v. Smith, Not Reported in Fed. Supp. (2021)

2021 WL 5989600

risk involved. The subsequent medical records support his determination. Thus, defendant Marinelli did not act with deliberate indifference to plaintiff's serious medical needs after the incident. Plaintiff's disagreement with the care he received or with defendant Marinelli's decision does not rise to the level of constitutionally inadequate care. To the extent that defendant Marinelli was negligent (a finding that this court does not make), such negligence does not rise to the level of a constitutional violation. Any medical care claims may be dismissed as to defendants Marinelli and Winston relative to any incidents occurring in early May of 2014.

Plaintiff also alleges that on May 21, 2014, he had a video conference with a psychiatrist, who changed the dosage of plaintiff's medication. (AC ¶ 120). Plaintiff claims that defendant Marinelli encouraged plaintiff to stop taking his mental health medications even though they were working. (*Id.*) However, plaintiff does not indicate that he acted on defendant Marinelli's suggestion. Plaintiff then states that on May 28, 2014, defendant H. Baker gave plaintiff a large pill that did not look familiar, and he had an adverse reaction to the pill. (AC ¶ 121). Plaintiff states that on May 29, 2014, defendant H. Baker gave him a yellow pill, and although plaintiff questioned why the pill was yellow, he took the pill, but it made plaintiff throw up and have a migraine headache. (AC ¶ 122). On June 2, 2014, plaintiff asked an unidentified nurse about the colors of the pills, and she suggested that if he had a problem, he should write to the Nurse Administrator. (AC ¶ 123). Apparently, on June 3, 2014, defendant H. Baker gave plaintiff the correct pill, but plaintiff suspects that it was because defendant H. Baker had another nurse with him. (AC ¶ 124).

**\*17** Plaintiff alleges that on June 10, 2014, defendant Marinelli stopped at the plaintiff's cell and told him that defendant Barkman dismissed the "homicidal tickets" that plaintiff received in the beginning of May. Defendant Marinelli also asked whether plaintiff was going to "sign off" on his "meds," but plaintiff said "no." (AC ¶ 125). Defendant Marinelli asked plaintiff whether he was breaking "the deal," and plaintiff said yes. (*Id.*) Plaintiff claims that he told defendant Marinelli about the different color medications,[37] but that defendant Marinelli said "maybe it's a sign," and winked when plaintiff asked if he had anything to do with "it."[38] (AC ¶ 126). Defendant Marinelli told plaintiff that if he "signed off" on his medications, he would see a doctor immediately, and he told plaintiff he had three days to think about it. (*Id.*)

[37] Plaintiff appears to suspect that he was being given the wrong medications because they were the wrong color. (AC ¶ 126).

[38] Plaintiff apparently believes that this "wink" indicated confirmation of his involvement with the medication tampering. (*See also* Pl.'s Dep. 159-60).

Plaintiff alleges that on June 11, 2014, defendant H. Baker came to plaintiff's cell, and plaintiff accused Baker of giving him the wrong medications and told defendant H. Baker that he would not take any more medications from him. (AC ¶ 127). Plaintiff states that the next day he received a letter indicating that one of his medications was now orange. (AC ¶ 128). Plaintiff claims that a nurse told him that evening that H. Baker had discontinued his medication. (AC ¶ 129). Plaintiff stated that "it usually takes 3 refusals in a row to have M.H.U. meds discontinued." (*Id.*) Plaintiff states that he filed various grievances regarding these issues, which were all consolidated, but he has not submitted any of these grievances for the court's review.

In his declaration, defendant Marinelli states that in his position as Psychologist II, he had no authority to discontinue medications. (Marinelli Decl. ¶ 17). Only a treating psychiatrist has the authority to do so. To the extent that medication is discontinued, it may be done for a variety of reasons, including plaintiff's refusal to take the medication. (*Id.*) Plaintiff accuses defendant H. Baker of discontinuing his medications based on deliberate indifference. However, it is clear from the amended complaint that plaintiff believed he was getting the wrong medications.[39] He was upset because, after telling defendant H. Baker that he was no longer going to accept medication from him, the medications were "discontinued" too soon because plaintiff should have had the chance to "refuse" his medication three times.[40] In addition, as a nurse, defendant H. Baker had no authority to discontinue medications. (H. Baker Decl. ¶ 10).

[39] This is even assuming that plaintiff's allegations are true.

[40] It is not clear that plaintiff's medications were discontinued, or that as a nurse, defendant H. Baker could discontinue the medication. But, what is clear is that plaintiff admits that he told defendant H. Baker that he would no longer accept medications from him.

White v. Smith, Not Reported in Fed. Supp. (2021)

2021 WL 5989600

Plaintiff's claims against Lieutenant Barkman, and Sergeant P. Baker are all based on vague allegations that plaintiff mentioned to them that he had mental health problems.[41] (AC ¶¶ 79-83). Neither officer had any authority over plaintiff's mental health care, and it is clear from the evidence presented that, at the same time, plaintiff's mental health needs were being monitored by medical personnel. Thus, plaintiff's claims of the denial of constitutionally adequate medical care may be dismissed as against defendants Barkman, H. Baker, and P. Baker.

[41]   Plaintiff states that when defendant Winston came back after plaintiff cut himself, he took plaintiff for an interview with defendant Barkman, who told him to stop cutting himself. Later, plaintiff states that he told Sergeant P. Baker and Nurse H. Baker that he felt suicidal. (AC ¶ 80). Plaintiff states that Sergeant Baker sent plaintiff to an interview room after he was bandaged, and plaintiff told defendant Barkman that he was not getting the appropriate mental health treatment. (AC ¶ 82). Finally, plaintiff claims that defendant Sergeant Baker came into the room, and plaintiff told him all about his prior mental health problems and the problems with his cell. (AC ¶ 83). There is no indication that either defendant had any authority to change plaintiff's care or were deliberately indifferent to a serious risk.

**\*18** Finally, plaintiff alleges that defendant H. Baker refused to properly assess plaintiff's injuries after the alleged sexual assault on September 2, 2014. (AC ¶¶ 106-107). During plaintiff's deposition, plaintiff testified that the first time that he asked for medical assistance and saw defendant H. Baker after the assault was "ten days after the incident." (Pl.'s Dep. at 124). Plaintiff claims that, at sick call on September 10, 2014,[42] defendant H. Baker walked away when plaintiff tried to explain that he was in pain after the sexual assault, and later refused to take pictures of his anus and his testicles to avoid documenting the injury. (AC ¶¶ 106-107).

[42]   Although plaintiff's deposition testimony refers to "ten days after the incident," the medical records indicate that plaintiff saw H. Baker on sick call September 10, 2014. (H. Baker Decl. Ex. A).

In his declaration, defendant H. Baker states that he has no recollection of interacting with plaintiff on September 10, 2014. (H. Baker Decl. ¶ 8). However, he states that the policy at Upstate is that no photographs of injuries are taken during sick call, and that as a nurse, defendant H. Baker was not authorized to send any inmate to an outside provider. (*Id.*) Thus, defendant H. Baker could not have taken pictures of plaintiff's injuries during sick call, even if plaintiff requested such photographs to be taken, and defendant H. Baker was not personally responsible for any failure to refer plaintiff for treatment by an outside provider.

The medical records attached to defendant H. Baker's declaration show that plaintiff was seen on September 8, 2014 by Nurse Holcombe. (H. Baker Decl. Ex. A). Nurse Holcombe is not a defendant in this action, and the note indicates that there were no complaints of medical needs voiced or noted. (*Id.*) There are two entries for September 10, 2014. The first states that there was "NSC" (no significant change), and that plaintiff "refused to answer assessment questions." (*Id.*) The second entry notes that H. Baker "viewed [plaintiff] in holding pen per security request. Inmate claims sexual assault by staff on 9/2/14." (*Id.*) The note indicates that plaintiff was "fully assessed," and that there was "no indication of trauma or injury found during [the] assessment." (*Id.*) It seems unusual that, if plaintiff were suffering as he says, he would not have mentioned it to the nurse who he saw on September 8, 2014, instead of telling him or her that he had no "medical needs." There is no indication that even if defendant H. Baker failed to take photographs of plaintiff's injuries, or failed to "treat" plaintiff on September 10, 2014, that defendant H. Baker exhibited deliberate indifference to plaintiff's serious medical needs. The amended complaint may thus be dismissed as against defendant H. Baker.

## V. Retaliation

### A. Legal Standards

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) he engaged in speech or conduct that was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord,* 758 F.3d 215, 225 (2d Cir. 2014)(citations omitted). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Faulk v. Fisher,* 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 528 of 830
White v. Smith, Not Reported in Fed. Supp. (2021)
2021 WL 5989600

and particular care." *Rivera v. Goord*, 119 F. Supp 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 (2002)).

**\*19** In order to satisfy the final prong, "the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Cruz v. Grosso*, No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at \*6 (N.D.N.Y. May 23, 2014) (citing *inter alia Colon*, 58 F.3d at 873). Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, including temporal proximity between the protected activity and the alleged retaliatory act, and statements by the defendant concerning his or her motivation. *Cruz*, 2014 WL 2176256, at \*6 (citing *Colon*, 58 F.3d at 872-73). However, temporal proximity alone is not enough to establish a causal connection. The Second Circuit has held that where "timing is the only basis for a claim of retaliation ... an inference of retaliation does not arise." *Thomas v. Waugh*, No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at \*15 (N.D.N.Y. Sept. 30, 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).

Even where plaintiff can make a showing of retaliatory motive, the defendant may be entitled to summary judgment if she can show that the alleged retaliatory action would have occurred even without the improper motivation. *Greer v. Mehiel*, 805 F. App'x 25, 29 (2d Cir.), *cert. denied*, 141 S. Ct. 136 (2020), *reh'g denied*, 141 S. Ct. 217 (2020) (citing *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003)) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). *See also Jordan v. Bd. of Elections*, 816 F. App'x 599, 602-603 (2d Cir. 2020); *Osborne v. Harris*, No. 9:20-CV-673 (TJM/ATB), 2021 WL 1131413, at \*11 (N.D.N.Y. Jan. 15, 2021) (citations omitted), *report-recommendation adopted*, 2021 WL 1124575 (N.D.N.Y. Mar. 24, 2021). The defendant bears the burden of making the showing that she would have taken exactly the same action in the absence of an improper motive. *Greer*, 805 F. App'x at 29 (citing *Scott*, 344 F.3d at 288).

**B. Analysis**

### 1. Defendants Bernier and Nelson (Freedom of Information ("FOIL") Requests (Claim #2)

Plaintiff claims that defendants Denise Bernier and Tracy Nelson retaliated against plaintiff for filing grievances by failing to provide plaintiff with requested video footage under FOIL, destroying the relevant footage after this litigation began, and overcharging plaintiff for FOIL requests. (AC ¶ 2). Defendant Bernier was the Offender Rehabilitation Coordinator ("ORC") Supervisor and FOIL Officer at Upstate before she retired in April of 2016. (Bernier Decl. ¶ 1) (Dkt. No. 75-7). Tracy Nelson took over the position from defendant Bernier at that time, but for a short time prior to defendant Bernier's retirement, she and defendant Nelson worked together. (*Id.* & Nelson Decl. ¶ 1 (Dkt. No. 75-5)).

Although plaintiff claims that defendant Bernier denied plaintiff FOIL requests in retaliation for some grievance that he filed against her, the evidence does not support plaintiff's allegations. First, plaintiff alleges that defendant Bernier failed to produce his requested materials before he ever allegedly filed a grievance against her. (AC ¶ 211-12) (plaintiff filed grievance because defendant Bernier failed to produce requested materials). In any event, on April 22, 2016, after plaintiff filed his grievance, and defendant Bernier was no longer working at Upstate, defendant Nelson met with plaintiff to discuss his complaints. (Nelson Decl. ¶ 7 & Ex. A). The records show that between January 15, 2016 and April 11, 2016, plaintiff filed **twelve** FOIL requests. (Nelson Decl. Ex. A). Of those twelve requests, only two were outstanding at the time of the review, and they were filed 10 days prior to plaintiff's meeting with defendant Nelson. The rest had been fulfilled, most of which were requests for videotaped materials. (*Id.*) Defendant Nelson states that she followed up with plaintiff on May 10, 2016 and June 6, 2016 to keep him informed about the status of his open requests. (Nelson Decl. ¶ 8). Other than plaintiff's unsupported assertion that the FOIL requests were denied due to his grievance against defendant Bernier, there is absolutely no support for his claims. Plaintiff's concern that the materials were not produced quickly enough may not form the basis for a retaliation claim. Plaintiff has not alleged any adverse effects of the timing of the FOIL production.

**\*20** To the extent that plaintiff claims that videos were "destroyed," defendant Bernier states that it is the Department of Corrections and Community Supervision ("DOCCS") policy to retain video tapes for a period of one year. (Bernier

Decl. ¶ 8). This action was commenced in October of 2017. To the extent that videos were deleted, there is no indication that this law suit was the cause of such elimination. As shown above, the plaintiff was given several videos between January and April of 2016. There is no indication that any videos were destroyed for any reason related to this plaintiff.

Plaintiff also claims that he was overcharged for FOIL materials in retaliation for his grievances. Defendant Bernier asserts that she was not involved in the determination of the charges for FOIL requests. (Bernier Decl. ¶ 9-10). The copies of requested video footage and their cost calculations were approved by a Captain within the FOIL Guidance Department. Then, defendant Bernier, in her role as a FOIL Officer, communicated the results of the FOIL request, and corresponding charge, set and approved by the Captain, to the requesting inmate via FOIL Request Receipts. (Bernier Decl. ¶ 9). Defendant Bernier declares that she had no responsibility for setting the cost or method of cost calculation. (Bernier Decl. ¶ 10).

Defendant Nelson states that, prior to August of 2017, Upstate had a policy whereby inmates who requested video footage were charged based on the amount of time that an employee worked to produce the materials. (Nelson Decl. ¶ 9). At that rate, the price of one of plaintiff's requests was close to $100.00. (*Id.*) After August of 2017, pursuant to a New York State Court order, Upstate was directed to stop charging inmates based upon an employee's hours of labor. (Nelson Decl. ¶ 10; Bernier Decl. ¶ 11). As a result, the plaintiff's charge was reduced accordingly, and defendant Nelson states that she modified the charges for all incarcerated individuals. (*Id.*)

It is clear from the evidence presented that neither defendant Bernier, nor defendant Nelson were responsible for the charges incurred by plaintiff for his FOIL requests. As stated above, a defendant must be personally responsible for the alleged constitutional violation. *Tangretti, supra*. When the court ordered a change in the method of cost calculation, defendant Nelson adjusted the costs for all inmates affected by the overcharge. Plaintiff has failed to raise a genuine issue of material fact regarding his retaliation claims against defendants Bernier and Nelson relative to his FOIL requests.

### 2. Defendants Bernier, LeClerc, and Nelson (Sex Offender Counseling and Treatment Placement ("SOCTP")) (Claim #2)

Plaintiff alleges that he was placed in the Sex Offender Counseling and Treatment Program ("SOCTP") by defendants Bernier, LeClerc, and Nelson in retaliation for his grievances. Plaintiff argues that he should not have been placed in the program because his crime of conviction was not a sex offense. The court must first point out that plaintiff's due process claims with respect to this issue have been dismissed. Only plaintiff's retaliation claims survive.

Plaintiff has mistaken the criteria for placement in the program. Defendant LeClerc is the Offender Rehabilitation Coordinator ("ORC") at Upstate. (LeClerc Decl. ¶ 1) (Dkt. No. 75-8). Defendant LeClerc states that, at the time of the incidents herein, the Central Office SOCTP staff reviewed an inmate for potential placement based on various criteria, including a guilty disciplinary disposition for a sex offence, threats to commit a sex offence, penal law offense of a sexual nature or an attempt to commit such an offense. (LeClerc Decl. ¶ 5). Thus, contrary to plaintiff's assertion, referral to the SOCTP is not dependent solely upon the inmate's crime of conviction, but it may also be based upon the inmate's behavior while incarcerated. (LeClerc Decl. ¶ 5 & Ex. A ¶ 6 (Program Eligibility)).

**\*21** Defendant LeClerc states that an inmate's programming is reviewed every quarter to determine whether he is receiving the programming suitable to his needs. (LeClerc Decl. ¶ 6). When defendant LeClerc reviewed plaintiff's file, she determined that he had received three misbehavior reports for lewd conduct, two while he was at Great Meadow, and one while he was at Green Haven. (LeClerc Decl. ¶ 6 & Ex. B (Disciplinary History)). In accordance with DOCCS policy, defendant LeClerc indicated that plaintiff might be suitable for placement in the SOCTP, and referred the file to her supervisor, defendant Bernier. (LeClerc Decl. ¶ 7). Defendant Bernier then referred plaintiff's file to the Central Office Guidance and Counseling Unit, requesting that plaintiff be reviewed for placement in the SOCTP. (LeClerc Decl. ¶ 8).

On March 28, 2016, the Central Office Staff made the determination that plaintiff's placement in SOCTP was appropriate, and defendant LeClerc so informed the plaintiff. (LeClerc Decl. ¶ 9). When plaintiff questioned the timing of the referral, defendant LeClerc told him that the referral

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 530 of 830

White v. Smith, Not Reported in Fed. Supp. (2021)
2021 WL 5989600

should have been made at his prior facility, but it may have been overlooked. (LeClerc Decl. ¶ 10). On September 14, 2017, Jeff McCoy, the Deputy Commissioner for Program Services, wrote to plaintiff informing him that his placement in SOCTP was appropriate given his disciplinary history. (LeClerc Decl. ¶ 11 & Ex. C). Deputy Commissioner McCoy's letter to plaintiff makes the department's reasoning quite clear. The disciplinary determinations for lewd conduct which influenced the determination were not made at Upstate, and most of them took place before plaintiff was ever incarcerated at Upstate. Thus, is it clear that plaintiff's placement in the SOCTP would have been made regardless of any "retaliatory" [43] motive. Thus, any claims of retaliation against defendants Bernier, LeClerc, and Nelson may be dismissed.

[43]    This court does not find that a retaliatory motive existed.

### 3. Defendants Gokey and Smith
### (Cell 15 Placement) (Claim # 8)

Plaintiff appears to allege that defendants Gokey and Smith had plaintiff placed in a cell next to Inmate Reeder in retaliation for a grievance or grievances. The amended complaint states generally that plaintiff was told that "security," meaning "sergeants in 11 building" made the decision to have plaintiff single-celled, and they were moving him to Cell #15. (AC ¶ 89). During his deposition, plaintiff further speculated on who "security" was. [44] (Pl.'s Dep. at 148). Plaintiff also speculates in the amended complaint that "staff knows and is fully aware" of Inmate Reeder's behavior, and inmates who filed grievances are placed in the next cell in order to deprive them of sleep and psychologically torture them. (AC ¶ 93).

[44]    Plaintiff testified that "security is -- Sergeant security is Sergeant Gokey. Security is Sergeant Eddie [sic]; security is Sergeant Smith." (Pl.'s Dep. at 148).

In the factual recitation of plaintiff's claims, he does not identify "staff," other than to say "sergeants in 11 building" were retaliating against him for filing "grievances," nor does he state to which grievances he was referring. In the "Causes of Action" section of the amended complaint, plaintiff states that defendant L. Gokey and R. Smith were responsible for placing plaintiff in Cell #15 next to Inmate

Reeder. (AC ¶ 414). However, during his deposition, plaintiff testified that he never had a problem with Sergeant L. Gokey before plaintiff was placed in Cell #15. (Pl.'s Dep. at 149). Plaintiff stated that he "actually thought she was a decent sergeant." (*Id.*) Plaintiff appears [45] to have also testified that he never had a problem with Sergeant Smith prior to his placement in Cell #15. (Pl.'s Dep. at 149-50). He stated that he never had a problem, but once he started filing grievances, "that's when everything began with these people." (Pl.'s Dep. at 150).

[45]    Plaintiff's testimony was very unclear at various times during his deposition. He tended to ramble when he was asked a question, and it was not always clear to what question his answers referred.

**\*22** During his deposition, plaintiff testified that although he had never filed a grievance against Sergeant L. Gokey, he filed a grievance against "her husband." (Pl.'s Dep. 152-53). Defendant Laura Gokey has filed a declaration, stating that in 2014, she was a Sergeant at Upstate. (Gokey Decl. ¶ 1) (Dkt. No. 75-3). Sergeant Gokey states that in 2014, Upstate was full, there were limited options for placing inmates, [46] and the plaintiff's placement was not solely her determination. (Gokey Decl. ¶¶ 5-6). Defendant L. Gokey also states that she is *not* married to defendant M. Gokey. (Gokey Decl. ¶ 11). Thus, plaintiff's pure speculation that Sergeant L. Gokey's "decision" to place plaintiff in Cell #15 was somehow in retaliation for a grievance against M. Gokey because he was her husband is clearly baseless. In any event, it is unclear when plaintiff would have filed a grievance against M. Gokey since plaintiff's claims against defendant M. Gokey are that he was involved in an assault on plaintiff in *September* of 2014. Plaintiff's placement in Cell # 15 was in May of 2014. Thus, plaintiff had not yet filed a grievance against defendant M. Gokey, and no defendant could have been retaliating for a grievance which had not yet been filed.

[46]    Although not stated by defendant L. Gokey in her declaration, it is also clear, as discussed above, that plaintiff told corrections personnel that he was homicidal, and the decision was made that plaintiff needed to be placed in a single cell, which could also have influenced the plaintiff's placement.

During his deposition, plaintiff was asked whether he ever filed a grievance against defendant Smith, and plaintiff responded that he had filed a grievance against defendant Smith in *2013* at Upstate. (Pl.'s Dep. at 153). Plaintiff's

White v. Smith, Not Reported in Fed. Supp. (2021)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 531 of 830

2021 WL 5989600

claims against defendant Smith relative to Cell # 15 placement occurred in May of 2014, after he was transferred from another facility early in the month. Defendant Smith also states that the decision where to place an inmate would not have been his alone. (Smith Decl. ¶ 5). Inmates were placed in cells based upon an inmate's height, weight, and known gang affiliation, and in plaintiff's case, the housing would have to be a single cell based on the statements he made to corrections personnel. (*Id.*)

Defendant Smith also states that during 2014, Upstate was full, and there were limited options for the placement of inmates. (Smith Decl. ¶ 7). Inmate Reeder was a "single-cell" inmate. (Smith Decl. ¶ 6). Plaintiff's status as a "single-cell" inmate also influenced the placement. While plaintiff's complaints about needing a single-cell may have gotten him that designation,[47] they may also have been instrumental in his placement next to Inmate Reeder.[48] There is no indication that defendant Smith was responsible for placing plaintiff in a cell in proximity to Inmate Reeder in retaliation for any grievances that plaintiff might have filed. Defendants have presented evidence showing that there is no question of material fact regarding plaintiff's retaliation claim, and plaintiff has failed to respond to their motion. Thus, plaintiff's retaliation claim against defendants L. Gokey and R. Smith may be dismissed.[49]

[47]    It appears from defendant Marinelli's notes that plaintiff made many of his comments for purposes of obtaining a single cell. (Marinelli Decl. Ex. C - plaintiff told staff that he was homicidal and did not want a "bunky," but after he was told that he would get his single cell, he told staff that he would no longer need "OMH." (*Id.*)

[48]    Defendant Smith states that Upstate is a "double bunk" facility, and only "some" inmates at Upstate are designated to a single cell. Inmate Reeder was one of those inmates. (Smith Decl. ¶¶ 5, 6).

[49]    The defendants have also argued that any retaliation claims against defendants L. Gokey and R. Smith are time-barred because the plaintiff's cause of action accrued in May of 2014, and plaintiff filed this action in October of 2017. As discussed above, this would be true if plaintiff did not actively pursue a grievance against these two defendants which would have tolled the statute of limitations for as long as the grievance was

pending, including any appeals to the CORC. Although plaintiff states generally that he filed many grievances, there is no indication that he filed a grievance against defendants L. Gokey and R. Smith, specifically referencing retaliation for his placement next to Reeder. The statute of limitations would be an additional basis for dismissal of this claim.

## VI. Excessive Force (Claim # 3)

### A. Legal Standards

**\*23**  Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain a claim of excessive force, a plaintiff must still establish the objective and subjective elements of an Eighth Amendment claim. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims*, 230 F.3d at 22 (citation omitted). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' ... or 'significant' injury, ... provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.' " *Hudson*, 503 U.S. at 7-10.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting

White v. Smith, Not Reported in Fed. Supp. (2021)
2021 WL 5989600

*Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

**B. Analysis**

Plaintiff claims that defendant M. Gokey and other unidentified correctional officers attacked him, beat him, and sexually assaulted him on September 2, 2014. Once again, defendants argue that plaintiff's claim is time-barred because the claim would have accrued on September 2, 2014, and he did not file this action until October 2, 2017. In the alternative, they argue that plaintiff has failed to properly assert the personal involvement of defendant Gokey in the alleged assault.

Plaintiff claims that he filed grievances complaining about the September 2nd assault and specifies the numbers that were assigned to those grievances. (AC ¶¶ 110-11). Defendants have not alleged, or supported any allegations, that plaintiff failed to bring grievances relating to the assault. [50] Thus, the court will proceed to the issue of personal involvement.

[50]     The court has stated above that, it is the plaintiff's burden to establish equitable or other tolling for the statute of limitations. Unlike the claims above, where plaintiff generally asserted or failed to assert that he brought a grievance, here, plaintiff has listed grievance numbers. It would have been easy for defendants to make an argument that such grievance did not exist or that the grievance did not toll the statute of limitations. Defendants did not address equitable tolling in their statute of limitations argument. In any event, because the plaintiff's claim fails on the issue of personal involvement, the court will not recommend dismissal based on the statute of limitations.

**\*24**  It was apparent from plaintiff's deposition, that plaintiff did not know defendant M. Gokey. (Pl.'s Dep. at 82). Plaintiff stated that he did not know which one was Michael Gokey, but he was "definitely in the vicinity." (*Id.*) Plaintiff also stated "a

lot of inmates say he was Michael Gokey, but I'm not ... that's what the inmates say." (Pl.'s Dep. at 92). Plaintiff stated that defendant M. Gokey was always in O.B.S., and that he was there "at the situation because the way how [sic] Ms. Gokey, his wife when I – when the – when the situation got brought up, that's how I kind of figured it." (Pl.'s Dep. at 95). "He's known for this type of stuff." (*Id.*)

Plaintiff testified that when he told another inmate what happened, the other inmate told plaintiff that Michael Gokey did the same thing to him, and that it was his "M.O." with the inmates. (Pl.'s Dep. at 96). That is why plaintiff was "almost positive" M. Gokey was there, but admitted that he did not know for sure, and that another inmate gave him the name. (*Id.*) Plaintiff stated that "it could possibly be Gokey," but "I don't know." (Pl.'s Dep. at 97-98). He stated that "I'm telling you information that -- what other inmates is telling me. Like every time this type of stuff came up, like he's known for the -- that type of stuff, whatever." (Pl.'s Dep. at 98).

Defendant Gokey has submitted a declaration stating that on September 2, 2014, he was a corrections officer at Upstate. (M. Gokey Decl. ¶ 1) (Dkt. No. 75-4). However, September 2, 2014 was defendant Gokey's regular day off, and therefore, could not have been involved in an excessive force incident on that day. (M. Gokey Decl. ¶ 5). Moreover, defendant Gokey states that when he was on duty during September of 2014, he was assigned to the 5:00 a.m. to 1:00 p.m. shift outside the facility, working with inmates who were assigned to a work crew. (M. Gokey Decl. ¶ 6). Defendant M. Gokey also confirms that he is not, nor was he ever, married to Sergeant L. Gokey. (M. Gokey Decl. ¶ 7). Finally, defendant M. Gokey specifically asserts that he did not assault, or otherwise use force on plaintiff on September 2, 2014. (M. Gokey Decl. ¶ 8).

Plaintiff has failed to respond to the defendants' motion for summary judgment. It is the plaintiff's burden to establish that the defendant was personally involved in any alleged constitutional violation. It is clear from plaintiff's own statements at his deposition that he only named defendant M. Gokey because some other inmate or inmates mentioned his name and somehow assumed because M. Gokey and defendant L. Gokey share the same name, they were married, and that he somehow was assaulting plaintiff because of that relationship. Defendants have established that there is no question of material fact regarding the personal involvement of defendant M. Gokey, and the plaintiff's excessive force claim against him may be dismissed for lack of personal involvement.

2021 WL 5989600

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 75) be **GRANTED**, and the amended complaint **DISMISSED IN ITS ENTIRETY as against all remaining defendants.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5989600

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 534 of 830

White v. Smith, Not Reported in Fed. Supp. (2021)

2021 WL 5988626

2021 WL 5988626
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Equarn WHITE, Plaintiff,
v.
Randel SMITH, et al., Defendants.

9:17-CV-1094 (LEK/ATB)
|
Signed 12/17/2021

**Attorneys and Law Firms**

Equarn White, East Elmhurst, NY, Pro Se.

Erik Boule Pinsonnault, New York State Attorney General, Albany, NY, for Defendants John Marinelli, Robert Barkman, Patrick M. Baker, Luc Maynard, Randel Smith, Michael Eddy, Laura Gokey, Richard Winston, Adam Gallagher, Brian Fournier, Heath Baker, Michele Byno, Denise Bernier, Roxanne LeClerc, Tracy Nelson, M. Gokey.

**DECISION AND ORDER**

Lawrence E. Kahn, Senior United States District Judge

**I. INTRODUCTION**

*1 Plaintiff Equarn White commenced this *pro se* action on October 2, 2017 pursuant to 42 U.S.C. § 1983 for alleged violations of his constitutional rights that occurred during his confinement at Upstate Correctional Facility. Dkt. No. 1 ("Complaint"). On June 5, 2019 Plaintiff amended his complaint. Dkt. No. 44. After initial review of this amended complaint, the Court allowed review of Plaintiff's claims to continue including claims asserting Eighth Amendment conditions-of-confinement, First Amendment retaliation, Eighth Amendment excessive force, and Eighth Amendment deliberate medical indifference asserted against various defendants. See Dkt. No. 55 at 22–24.

On April 5, 2021, Defendants filed a motion for summary judgment. Dkt. No. 75. Plaintiff requested, and the Court granted, additional time to respond to Defendants' motion on June 7, 2021. Dkt. Nos. 81, 82. However, Plaintiff never filed a response. See Docket.

Now before the Court is a Report-Recommendation regarding the motion for summary judgment filed by the Honorable Andrew T. Baxter, recommending that Defendants' motion for summary judgment be granted. Dkt. No. 84 ("Report-Recommendation"). For the reasons that follow, the Court approves and adopts the Report-Recommendation.

**II. BACKGROUND**

**A. Factual Allegations**
Petitioner's factual allegations are detailed in the Report-Recommendation, familiarity with which is assumed. See generally R. & R.

**B. The Report-Recommendation**
After a very thorough review of the facts and claims asserted by Plaintiff, as well as the uncontradicted record evidence presented by Defendants, Judge Baxter found no material facts at issue and that summary judgment is appropriate as to each of Plaintiff's claims. See id. at 53.

**III. STANDARD OF REVIEW**
Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal...."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

**IV. DISCUSSION**

2021 WL 5988626

**\*2**  Plaintiff did not file objections to the Report-Recommendation. See Docket. Consequently, the Court reviews the Report-Recommendation for clear error and finds none. Therefore, the Court adopts the Report-Recommendation in its entirety.

**V. CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 84) is **APPROVED and ADOPTED** in its entirety; and it is further

**ORDERED**, that Defendants' motion for summary judgment (Dkt. No. 75) is **GRANTED**; and it is further

**ORDERED**, the amended complaint be dismissed in its entirety as against all remaining defendants; and it is further

**ORDERED**, that the Clerk close this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5988626

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

531 F.Supp.3d 630
United States District Court, W.D. New York.

Corey MAZYCK, Plaintiff,

v.

Deputy Superintendent of Security Gregory
KELLER, Sergeant Matthew W. Scull, Sergeant
Berghorn, and Officer Hendrickson, Defendants.

6:20-CV-06055 EAW
|
Signed 03/31/2021

**Synopsis**

**Background:** Inmate brought § 1983 action against prison's deputy superintendent, correctional officer, and officer's supervisors for failure to protect and excessive force under the Eighth Amendment, First Amendment retaliation, conspiracy to obstruct justice, supervisory liability, and deprivation of due process under the Fourteenth Amendment. Defendants filed motion to dismiss for failure to state a claim.

**Holdings:** The District Court, Elizabeth A. Wolford, J., held that:

[1] inmate stated a claim against correctional officer for excessive use of force;

[2] inmate stated a claim against deputy superintendent for failure to protect;

[3] inmate plausibly alleged that he was retaliated against for reporting assault by correctional officer;

[4] inmate stated a claim for conspiracy to obstruct justice;

[5] inmate stated a claim for deprivation of due process;

[6] inmate stated claims against supervisors and deputy superintendent for failure to protect, retaliation, and deprivation of due process pursuant to theory of supervisory liability; but

[7] inmate failed to state claim against supervisors and deputy superintendent for excessive use of force pursuant to theory of supervisory liability.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (44)

**[1]    Federal Civil Procedure    Insufficiency in general**

In order to withstand a motion to dismiss for failure to state a claim, a party must set forth enough facts to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

**[2]    Federal Civil Procedure    Insufficiency in general**

A claim has facial plausibility, and will withstand a motion to dismiss for failure to state a claim, when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 12(b)(6).

**[3]    Federal Civil Procedure    Insufficiency in general**

Although a complaint attacked by a motion to dismiss for failure to state a claim does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not do. Fed. R. Civ. P. 12(b)(6).

**[4]    Federal Civil Procedure    Insufficiency in general**

In order to state a plausible claim, a complaint's factual allegations must be enough to raise a right to relief above the speculative level. Fed. R. Civ. P. 12(b)(6).

**[5]**    **Sentencing and Punishment**  ⚷  **Conditions of Confinement**

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. U.S. Const. Amend. 8.

**[6]**    **Sentencing and Punishment**  ⚷  **Use of force**

In order to state an Eighth Amendment claim against prison officials for excessive use of force, a prisoner must allege two elements: first, the prisoner must allege that the defendant acted with a subjectively sufficiently culpable state of mind, and second, he must allege that the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions. U.S. Const. Amend. 8.

**[7]**    **Sentencing and Punishment**  ⚷  **Use of force**

In order to state an Eighth Amendment claim against prison officials for excessive use of force, a prisoner must show that the defendant acted with a sufficiently culpable state of mind, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct. U.S. Const. Amend. 8.

**[8]**    **Sentencing and Punishment**  ⚷  **Use of force**

For purposes of a prisoner's excessive force claim against prison officials under the Eighth Amendment, the test for wantonness is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. U.S. Const. Amend. 8.

**[9]**    **Sentencing and Punishment**  ⚷  **Use of force**

In a prisoner's action against a prison official for excessive force under the Eighth Amendment, the determination of whether the official's conduct toward the prisoner was objectively harmful enough or sufficiently serious to reach constitutional dimensions is context specific, turning upon contemporary standards of decency. U.S. Const. Amend. 8.

**[10]**    **Sentencing and Punishment**  ⚷  **Use of force**

The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force against prisoners by prison officials, provided that the use of force is not of a sort repugnant to the conscience of mankind. U.S. Const. Amend. 8.

**[11]**    **Sentencing and Punishment**  ⚷  **Use of force**

Certain actions by prison officials against prisoners, including the malicious use of force to cause harm, constitute Eighth Amendment violations per se; this result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. U.S. Const. Amend. 8.

**[12]**    **Prisons**  ⚷  **Use of force**

    **Sentencing and Punishment**  ⚷  **Use of force**

Inmate alleged a malicious and sadistic use of force by correctional officer, and thus inmate stated a § 1983 claim for excessive use of force under the Eighth Amendment; inmate alleged that officer suddenly and for no apparent penological reason projected him into a wall while he was wearing handcuffs, and that, when inmate asked why he was thrown into the wall, officer responded that inmate was stupid and had gotten blood on him. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

**[13]**    **Sentencing and Punishment**  ⚷  **Conditions of Confinement**

The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates. U.S. Const. Amend. 8.

2021 WL 1201224

**[14]    Sentencing and Punishment** 🔑 **Protection from violence**

Not every assault against an inmate translates into constitutional liability under the Eighth Amendment for prison officials responsible for the victim's safety. U.S. Const. Amend. 8.

**[15]    Sentencing and Punishment** 🔑 **Hazardous and unhealthful conditions**

In order for an inmate to state a claim against a prison official under the Eighth Amendment on the basis that the official has failed to prevent harm, the inmate must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the official acted with deliberate indifference. U.S. Const. Amend. 8.

1 Case that cites this headnote

**[16]    Sentencing and Punishment** 🔑 **Deliberate indifference in general**

Deliberate indifference under the Eighth Amendment means that a prison official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S. Const. Amend. 8.

2 Cases that cite this headnote

**[17]    Prisons** 🔑 **Protection from violence, assault, or abuse**

**Sentencing and Punishment** 🔑 **Protection from violence**

Inmate stated a § 1983 claim against prison's deputy superintendent for failure to protect under the Eighth Amendment; inmate alleged that he wrote a letter to officer notifying him of heightened substantial risk of harm to his health and safety due to a hit being ordered on him by another inmate who had been a co-defendant and possessed a gang affiliation, that deputy superintendent never replied to such letter and failed to take any precautions to prevent harm to inmate, that inmate was attacked by other inmates three days later, and that he learned at a disciplinary hearing that deputy superintendent had received the letter but chose not to place inmate into protective custody. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

**[18]    Prisons** 🔑 **Protection from violence, assault, or abuse**

**Sentencing and Punishment** 🔑 **Protection from violence**

It was irrelevant for purposes of inmate's § 1983 claim against prison's deputy superintendent for failure to protect under the Eighth Amendment whether injuries sustained by inmate in attack by other inmates rose to the level of a constitutional violation; such claim relied upon the existence of a substantial risk of serious harm rather than the extent of physical injuries sustained. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[19]    Sentencing and Punishment** 🔑 **Protection from violence**

Conditions of confinement can be deemed to objectively pose an unreasonable risk of serious harm to an inmate's current or future health, as element of a failure to protect claim against a prison official under the Eighth Amendment, even where no serious physical injury results. U.S. Const. Amend. 8.

3 Cases that cite this headnote

**[20]    Sentencing and Punishment** 🔑 **Protection from violence**

In assessing whether the risk of an inmate's violence against other inmates is sufficiently serious to trigger constitutional protection under the Eighth Amendment, as required for an inmate to establish a failure to protect claim against prison officials, the focus of inquiry must be the existence of a substantial risk of serious harm

rather than the extent of the physical injuries sustained in an attack. U.S. Const. Amend. 8.

5 Cases that cite this headnote

---

[21]  **Prisons**  ⚷ Protection from violence, assault, or abuse

**Sentencing and Punishment**  ⚷ Protection from violence

Injuries sustained by inmate in an attack by other inmates were sufficiently serious to support a § 1983 claim against prison's deputy superintendent for failure to protect under the Eighth Amendment, where inmate's injuries included a broken tooth and several severe lacerations which required emergency treatment at an outside hospital and several staples and sutures. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

---

[22]  **Civil Rights**  ⚷ Criminal law enforcement; prisons

Inmate adequately alleged that prison's deputy superintendent was personally involved in failure by prison officials to protect inmate from attack other inmates, supporting § 1983 claim against deputy superintendent for failure to protect under the Eighth Amendment; inmate alleged that he wrote a letter informing deputy superintendent that other inmate, who had been a co-defendant, had placed a hit on him and possessed a gang affiliation, and that it was confirmed at a disciplinary hearing that deputy superintendent received inmate's letter but failed to take any protective action. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

---

[23]  **Civil Rights**  ⚷ Persons Liable in General

A defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority; the defendant's personal involvement in alleged constitutional deprivations is a prerequisite to an award of damages. 42 U.S.C.A. § 1983.

---

[24]  **Constitutional Law**  ⚷ Retaliation

In order to state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action. U.S. Const. Amend. 1.

2 Cases that cite this headnote

---

[25]  **Constitutional Law**  ⚷ Prisoners

**Prisons**  ⚷ Particular violations, punishments, deprivations, and conditions

Inmate plausibly alleged that he was retaliated against for reporting an assault by correctional officer, supporting § 1983 claim against correctional officer and supervisors for First Amendment retaliation; inmate alleged that he verbally reported the assault to officer's supervisor, that supervisor then deterred inmate from speaking further about the assault by informing multiple other inmates that inmate was a snitch, that inmate was denied medical treatment for damage to his tooth resulting from the assault, that he was denied protective custody housing and instead placed in a cell block where supervisor had previously announced that inmate was a snitch, and that the threats and cover up were meant to chill his speech about said assault. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

---

[26]  **Civil Rights**  ⚷ Prisons and jails; probation and parole

**Constitutional Law**  ⚷ Prisoners

**Prisons**  ⚷ Particular violations, punishments, deprivations, and conditions

Inmate plausibly alleged that he engaged in protected activity under the First Amendment when he reported an assault by correctional officer, supporting § 1983 claim against officer and supervisors for First Amendment retaliation,

even though it was not clear from the complaint when inmate made such reports or the nature of those reports; inmate alleged that he verbally reported the assault to officer's supervisor and prison's medical clinic, and this reporting did not constitute mere confrontation or disagreement with a lawful order given by a corrections officer. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[27]    Constitutional Law ⟜ Prisons
Constitutional Law ⟜ Prisoners

Not every statement an inmate makes in prison is afforded First Amendment protection, but certain verbal complaints by prisoners about the conduct of prison officials may be considered protected action for purposes of a First Amendment retaliation claim. U.S. Const. Amend. 1.

3 Cases that cite this headnote

[28]    Constitutional Law ⟜ Prisoners
Prisons ⟜ Particular violations, punishments, deprivations, and conditions

Inmate plausibly alleged that he sustained an injury and experienced adverse action by prison officials after reporting an assault by correctional officer, supporting § 1983 claim against officer and supervisors for First Amendment retaliation; inmate alleged that, in retaliation for reporting the assault, he was denied medical care for tooth damage sustained during the assault, that he was denied placement in protective custody even though he faced risk of serious harm from a fellow inmate who had been a co-defendant, and that officer and supervisors put inmate at an increased risk of harm by informing other inmates that he was a snitch. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

[29]    Constitutional Law ⟜ Retaliation in general

In the context of a First Amendment retaliation claim, an adverse action is defined as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; the test is

objective, and the plaintiff is not required to show that he was actually deterred. U.S. Const. Amend. 1.

1 Case that cites this headnote

[30]    Constitutional Law ⟜ Freedom of Speech, Expression, and Press

A plaintiff has standing to bring a First Amendment retaliation claim if he can show either that his speech has been adversely affected by the alleged government retaliation or that he has suffered some other concrete harm. U.S. Const. Amend. 1.

[31]    Constitutional Law ⟜ Prisoners
Prisons ⟜ Particular violations, punishments, deprivations, and conditions

Inmate plainly alleged a causal connection between his protected activity of reporting an assault by correctional officer and resulting adverse actions, supporting § 1983 claim against officer and supervisors for First Amendment retaliation; inmate alleged that, immediately after he made his report, officer and supervisors disclosed to other inmates that he was a snitch, that he was denied medical care for damage to his tooth resulting from assault, and that he was denied protective custody despite the threat posed by fellow inmate who had been a co-defendant. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

[32]    Conspiracy ⟜ Obstructing justice or judicial proceedings

A conspiracy to obstruct justice need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct. 42 U.S.C. § 1985(2).

[33]    Conspiracy ⟜ Civil rights conspiracies

Conclusory, vague, and general allegations of a conspiratorial agreement are insufficient to

allege conspiracy to obstruct justice. 42 U.S.C. § 1985(2).

**[34]**  **Conspiracy**  ⟶  Civil rights conspiracies

Inmate plausibly alleged an agreement between correctional officer and supervisors to obstruct justice regarding allegedly excessive use of force by officer in violation of the Eighth Amendment; inmate alleged that while he was receiving treatment in prison medical clinic, he overheard supervisor instruct other supervisor to have an officer retrieve inmate's tooth from scene of the alleged assault and place it inside orientation room to create impression that tooth had actually been chipped during a separate assault of inmate which had occurred there, and that supervisor instructed other supervisor to not allow anyone into orientation room until pictures had been taken to show that this was where inmate's tooth was found. U.S. Const. Amend. 8; 42 U.S.C.A. § 1985(2).

**[35]**  **Conspiracy**  ⟶  Civil rights conspiracies

Inmate's allegations against correctional officer and supervisors regarding conspiracy to obstruct justice as to excessive use of force by officer in violation of the Eighth Amendment were sufficient to invoke personal stake exception to the intracorporate conspiracy doctrine; inmate alleged that supervisors fabricated evidence to cover up officer's assault of inmate and alleged that this conduct was not related in any way to a corporate policy or management decision. U.S. Const. Amend. 8; 42 U.S.C.A. § 1985(2).

8 Cases that cite this headnote

**[36]**  **Conspiracy**  ⟶  Intracorporate conspiracy doctrine in general

Pursuant to the intracorporate conspiracy doctrine, employees or agents of a single corporate entity, acting within the scope of their employment, are legally incapable of conspiring together.

4 Cases that cite this headnote

**[37]**  **Conspiracy**  ⟶  Personal stake or interest

Under the personal stake exception, the intracorporate conspiracy doctrine does not apply to bar conspiracy claims against individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity.

7 Cases that cite this headnote

**[38]**  **Constitutional Law**  ⟶  Access to courts

**Prisons**  ⟶  Access to Courts and Public Officials

Inmate stated a claim that his due process rights under the Fourteenth Amendment were violated when correctional officer and supervisors fabricated evidence to cover up officer's alleged assault of inmate by trying to make it appear that injuries from said assault actually resulted from a separate assault by other inmates, and to retaliate against inmate for telling the truth about the other assault; inmate's claim was based on allegation that the cover up had tainted material evidence and made it almost impossible for him to litigate his underlying claim of conspiracy to obstruct justice, based on violations of the Eighth and First Amendments. U.S. Const. Amends. 1, 14; 42 U.S.C.A. §§ 1983, 1985(2).

1 Case that cites this headnote

**[39]**  **Civil Rights**  ⟶  Failure to act or protect or to enforce law

**Constitutional Law**  ⟶  Constitutional Rights in General

There is no right under the United States Constitution to an investigation by government officials; however, courts do recognize an inadequate investigation as sufficient to state a § 1983 claim when there was another recognized constitutional right involved. 42 U.S.C.A. § 1983.

**[40]**  **Constitutional Law**  ⟶  Retaliation in general

A § 1983 claim for First Amendment retaliation may proceed when the plaintiff alleges that an

investigation was falsified for the purpose of retaliating against him for the exercise of his legal rights. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

[41]  **Civil Rights** 🔑 Criminal law enforcement; prisons

Inmate stated a claim against prison's deputy superintendent pursuant to theory of supervisory liability for failure to protect under the Eighth Amendment, based on failure to properly supervise officer who allegedly assaulted inmate, failure to implement a proper inmate classification system, and failure to remedy wrongs committed by officer; inmate alleged that deputy superintendent was personally involved in said conduct. U.S. Const. Amend. 8.

[42]  **Civil Rights** 🔑 Criminal law enforcement; prisons

**Conspiracy** 🔑 Prisons, jails, and convicts

Inmate stated a claim against correctional officer's supervisors pursuant to theory of supervisory liability for failure to protect under the Eighth Amendment, First Amendment retaliation, deprivation of due process under the Fourteenth Amendment, and conspiracy to obstruct justice, based on failure to properly supervise officer who allegedly assaulted inmate, failure to implement a proper inmate classification system, and failure to remedy the wrongs committed by officer; inmate alleged that supervisors personally participated in said conduct. U.S. Const. Amend. 8; 42 U.S.C.A. § 1985(2).

[43]  **Labor and Employment** 🔑 Negligent training and supervision

Simply because a defendant serves in supervisory capacity does not automatically make every claim a plaintiff has against that defendant one for supervisory liability.

1 Case that cites this headnote

[44]  **Civil Rights** 🔑 Prisons and jails; probation and parole

Inmate failed to state a claim pursuant to theory of supervisory liability against correctional officer's supervisors and prison's deputy superintendent for use of excessive force under the Eighth Amendment, based on officer's alleged assault of inmate and creation of a policy or custom under which inmates were abused by corrections officers, even though inmate alleged that prison had a longstanding culture of brutality; inmate's second amended complaint lacked specific allegations describing prior instances of abuse by officer, or specific allegations that supervisors or deputy superintendent were aware of or encouraged those actions. U.S. Const. Amend. 8.

1 Case that cites this headnote

**Attorneys and Law Firms**

*635 Poupa Jenny Marashi, Marashi Legal, Bronx, NY, for Plaintiff.

Matthew D. Brown, New York State Office of the Attorney General, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

*636 **INTRODUCTION**

**1** Plaintiff Corey Mazyck ("Plaintiff") commenced this action on January 24, 2020, against defendants Deputy Superintendent of Security Gregory Keller, Sergeant Matthew W. Scull, Sergeant Berghorn, and Officer Hendrickson (hereinafter "Defendants") in their individual capacities, alleging claims for failure to protect, excessive force, First Amendment retaliation, conspiracy, supervisory liability, and violation of due process of law, pursuant to 42 U.S.C. § 1983. (Dkt. 1; Dkt. 9).

Presently before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)

(6). (Dkt. 10). For the following reasons, Defendants' motion is granted as to the fifth cause of action for "supervisory liability," but it is otherwise denied.

## BACKGROUND

The following facts are taken from Plaintiff's second amended complaint (Dkt. 9) and are assumed true for purposes of this motion. During the events in question, Plaintiff was an inmate at Elmira Correctional Facility ("Elmira"). (*Id.* at ¶ 4). Plaintiff arrived at Elmira on August 10, 2018. (*Id.* at ¶ 11). Plaintiff has "a very serious case of the chronic auto-immune disease Myasthenia gravis, and as a result of such is very weak and does not have strong muscles," which "makes [him] very vulnerable to any acts of violence as he does not have the physical capacity to fight back or to defend himself." (*Id.* at ¶ 12).

On August 11, 2018, an arrival interview was conducted by Sergeant Issac, [1] during which Plaintiff was asked if he "had enemies." (*Id.* at ¶ 13). Plaintiff informed Sergeant Issac that he suffered two prior attacks at other facilities, and also made Sergeant Issac aware of an "ongoing feud/beef/dispute he had with his criminal codefendant J. Padilla, as a result of a written statement where Plaintiff had, in the mind of [his] co-defendant, cooperated with law enforcement, during their criminal case." (*Id.*). Sergeant Issac verified that J. Padilla was present at Elmira, and that he was undergoing a pending disciplinary Tier 3 hearing and was housed in the Special Housing Unit. (*Id.* at ¶ 14). Despite Plaintiff's pleas that he be placed in protective custody and his concerns about the past two attacks he suffered and J. Padilla, Sergeant Issac told Plaintiff that protective custody was not necessary, even though the prison had a general policy of segregating co-defendants in a "known conflict situation." (*Id.* at ¶ 15). Sergeant Issac instructed Plaintiff to sign a "Protective Custody Waiver" despite Plaintiff's objections. (*Id.* at ¶ 16). Following his arrival interview, Plaintiff was released **\*637** from his 72-hour quarantine keep-lock status. (*Id.* at ¶ 17).

[1]  Defendants argue that Sergeant Issac should be dismissed from the case because the second amended complaint makes no allegations against him. (Dkt. 10-2 at 13). Sergeant Issac was named as a defendant in the complaint and first amended complaint, but not in the second amended complaint. In his response, Plaintiff explains that

Sergeant Issac was voluntarily withdrawn as a defendant in the second amended complaint, but also that he reserves the right to add him if discovery reveals his further involvement. (Dkt. 17 at 13 n.2). Because Plaintiff has voluntarily withdrawn Sergeant Issac from the case and he is not named in the second amended complaint, which is the operative pleading in the case, the Clerk of Court is directed to terminate Sergeant Issac as a party on the docket. Thus, the motion to dismiss Sergeant Issac is denied as moot.

**\*2** Between August 12, 2018 and August 19, 2018, Plaintiff had "several documented encounters" with other inmates which further solidified his belief that he was at substantial risk of serious harm. (*Id.* at ¶ 18). During these encounters, Plaintiff was approached and notified of J. Padilla's affiliation with the Bloods; informed that the two prior attacks he suffered at other facilities were orchestrated by J. Padilla; and was warned and notified of a pending attack ordered by J. Padilla in the event Plaintiff was transferred to Elmira. (*Id.* at ¶¶ 19-21). As a result of these encounters, on August 20, 2018, Plaintiff wrote a letter to defendant Keller, notifying him of the heightened substantial risk of harm to his health and safety, as well as of J. Padilla's gang affiliation and how it "would turn the feud between himself and [his] co-defendant into something much larger[.]" (*Id.* at ¶ 22). Plaintiff mailed the letter to defendant Keller via Elmira's internal mail system. (*Id.*). Although defendant Keller was "the final authority, and decision maker regarding all mat[t]ers at Elmira regarding the policy of and the placement decisions for security of prisoners," Plaintiff never received any direct correspondence from him following his letter, nor did defendant Keller take any precautions to prevent the heightened risk of harm. (*Id.* at ¶¶ 23-24).

After several days of not receiving a response from defendant Keller, on August 22, 2018, Plaintiff wrote a letter to his assigned counselor, E. Klosterman, requesting protective custody housing based on his co-defendant status and the additional information he had received, and mailed it to him via the internal mail system. (*Id.* at ¶ 25). During this time, defendant Keller still failed to act to prevent an impending attack on Plaintiff, despite being aware of the incidents reported to him by Plaintiff. (*Id.* at ¶ 26).

On August 23, 2018, at approximately 9:25 AM, Plaintiff was attacked in the unsupervised orientation room on the second floor of Shop 5. (*Id.* at ¶ 27). Specifically, "[t]wo inmates, Roman and Rubin, assaulted Plaintiff with sharp

foreign objects, causing Plaintiff to sustain multiple serious lacerations to the face and head." (*Id.*). The officers assigned to Shop 5 failed to timely respond to stop the attack, and only responded when an uninvolved inmate notified them of the incident, but many minutes had already passed, and Plaintiff had already sustained injuries. (*Id.* at ¶ 28). When the officers responded, Plaintiff was attempting to protect himself, while the other inmates were assaulting him in the face and head with sharp objects. (*Id.* at ¶ 29). Plaintiff complied with the officers' orders to stop fighting and backed away from the other inmates. (*Id.* at ¶ 30). Defendant Hendrickson told Plaintiff to "face the fucking wall" and put his hands behind his back. (*Id.*). Plaintiff complied with this order, and while defendant Hendrickson was placing restraints on him, he whispered in Plaintiff's ear, "I don't want your fucking blood on me, and it is in your best interest to make sure that doesn't happen." (*Id.* at ¶ 31).

Defendant Hendrickson told Plaintiff he was taking him to the clinic due to his injuries. (*Id.* at ¶ 33). Plaintiff and defendant Hendrickson exited the orientation room and Plaintiff was guided to turn right. (*Id.*). Suddenly, and while Plaintiff was still in restraints, defendant Hendrickson "maliciously, and with no lawful objective, projected Plaintiff with great force, into a wall on the left side of the hallway of the second floor, seriously injuring Plaintiff," which "considerably added to his bodily bruises and lacerations," and also caused severe injury to Plaintiff's mouth, **\*638** including a chipped front top right tooth and an injured lip, and a tear in his shin. (*Id.* at ¶ 34). Plaintiff asked defendant Hendrickson why he had thrown him against the wall, to which defendant Hendrickson responded that Plaintiff was stupid and got blood on him. (*Id.* at ¶ 36).

When Plaintiff and defendant Hendrickson reached the bottom of the emergency fire steps, Plaintiff noticed that defendant Scull was also present and escorting him to the clinic. (*Id.* at ¶ 37). Plaintiff notified defendant Scull, who supervised defendant Hendrickson, that defendant Hendrickson had projected him into a wall and of his injuries. (*Id.*). Defendant Scull stated "in sum and substance that nobody will ever know Defendant Hendrickson did it, then called Plaintiff 'a dumb stupid black n****r that everyone will know is a snitch' because he would personally make sure of it." (*Id.* at ¶ 38). In an effort to ensure that Plaintiff did not inform anyone of defendant Hendrickson's actions, defendant Scull "took conscious shocking action against Plaintiff" and, while they were walking the path between the gym, G Block and the clinic, "loudly berated Plaintiff to multiple inmates

attending protective custody recreation in the gym yard, calling Plaintiff a snitch while pointing at Plaintiff's multiple bleeding lacerations." (*Id.* at ¶¶ 39-41). Defendant Scull also asked if anyone knew Plaintiff, and without waiting for a response from the inmates, stated "[w]ell, now you know he's a snitch; let everybody know." (*Id.* at ¶ 42). Before entering the clinic, defendant Scull told Plaintiff that he would "never make it home now because he will be killed in jail for being a snitch." (*Id.* at ¶ 43). Plaintiff alleges that the berating by defendant Scull "was in direct retaliation for [Plaintiff]'s putting into the verbal statement of the report of the incident that Defendant Hendrickson had caused Plaintiff serious injury." (*Id.* at ¶ 44).

**\*\*3** Plaintiff was examined by medical personnel at the clinic, during which Plaintiff informed them what had occurred and who had injured him, including the injuries inflicted by defendant Hendrickson. (*Id.* at ¶ 45). Plaintiff suffered the following injuries:

> multiple lacerations and bruises, some of which were caused by Defendant Officers, in addition to the chipped tooth, swollen lip and shin abrasion. Plaintiff was notified by medical personnel that he had a 7" laceration extending from the right side forehead to the right ear, a ... 5" laceration on his scalp, and a 1 ¼" laceration on his left cheek, and finally a 1" laceration in and on the right ear.

(*Id.* at ¶ 46).

Plaintiff was asked by defendant Scull if he wanted protective custody, and Plaintiff again requested protective custody housing, but he was not provided such housing. (*Id.* at ¶ 47). Following the medical examination, defendant Berghorn, who was also a sergeant and supervisor, took photographs of Plaintiff's injuries. (*Id.* at ¶ 48). Plaintiff was administered an HIV/AIDS screening test due to blood getting on defendant Hendrickson. (*Id.* at ¶ 49). Plaintiff was then notified that he was being sent to an outside hospital due to the severity of his injuries. (*Id.* at ¶ 50).

Plaintiff then observed and overheard defendants Scull and Berghorn in the doorway of the emergency room of the clinic

discussing the misconduct by defendant Hendrickson. (*Id.* at ¶ 51). Defendant Berghorn instructed defendant Scull to solicit an officer to retrieve Plaintiff's tooth from the second floor hallway of Shop 5 and place it inside the Orientation room, to create the impression that his tooth had been chipped during the assault by the prisoners, rather than by defendant Hendrickson in the hallway. (*Id.*). Defendant Berghorn also instructed defendant Scull **\*639** that no person was to enter the orientation room until pictures had been taken placing the tooth there. (*Id.* at ¶ 52). Plaintiff alleges that these actions and fabrication of evidence were taken to "cover up the action of their subordinate Defendant Hendrickson, knowing that their photos and their placement of the tooth would create the false illusion that ... only inmates had injured Plaintiff, and that Defendant Hendrickson had not." (*Id.* at ¶ 53).

Plaintiff received treatment at Arnot Ogden Medical Center for his lacerations, but not his chipped tooth. (*Id.* at ¶ 54). He received 11 staples and 24 sutures, as well as other treatment. (*Id.* at ¶ 55). When he returned to Elmira, Plaintiff was escorted back to the clinic and met by defendant Scull, who asked Plaintiff to sign paperwork following his request for protective custody. (*Id.* at ¶ 56). However, defendant Scull intentionally placed Plaintiff in G block—which is a general population housing area and where defendant Scull had earlier berated Plaintiff—to continue to retaliate against him for stating on incident reports, medical reports, and other documents that defendant Hendrickson had injured him. (*Id.* at ¶ 57). Plaintiff remained in G Block, at a heightened risk of harm, for six days following the incident and his request for protective custody housing. (*Id.* at ¶ 59).

On August 29, 2018, during a disciplinary hearing, Plaintiff expressed his concerns regarding his current housing area. (*Id.* at ¶ 60). Mrs. Lyndaker, the civilian hearing officer, assured Plaintiff that she would make sure he was placed in more appropriate housing. (*Id.*). During the disciplinary hearing, either on or off the record, Plaintiff was informed that defendant Keller had received Plaintiff's letter, which had detailed and warned of the immediate risk of harm to Plaintiff, but he chose not to place Plaintiff in protective custody. (*Id.* at ¶ 61). Following the hearing, Plaintiff was transferred to H block, the protective custody housing area. (*Id.* at ¶ 63).

## PROCEDURAL HISTORY

**\*\*4** Plaintiff filed his complaint on January 24, 2020. (Dkt. 1). On February 14, 2020, Defendants filed a motion to dismiss. (Dkt. 6). Thereafter, on March 6, 2020, Plaintiff filed an amended complaint (Dkt. 8), and the Court denied Defendants' motion to dismiss as moot (Dkt. 11). Plaintiff filed a second amended complaint on March 19, 2020, removing the previously-named "Issac" defendant. (Dkt. 9). Plaintiff's second amended complaint alleges six causes of action: (1) an excessive force claim against defendant Hendrickson, in violation of the Eighth Amendment; (2) a failure to protect claim against defendant Keller, in violation of the Eighth Amendment; (3) a retaliation claim against defendants Berghorn, Scull, and Hendrickson, in violation of the First Amendment; (4) a claim for conspiracy to obstruct justice against defendants Scull, Berghorn, and Hendrickson, pursuant to 42 U.S.C. § 1985(2); (5) a claim for supervisory liability against defendants Scull, Berghorn, and Keller; and (6) a claim for violation of due process of law against defendants Scull, Berghorn, and Hendrickson, in violation of the Fourteenth Amendment. (*Id.* at 16-23). On April 7, 2020, Defendants filed a motion to dismiss the second amended complaint. (Dkt. 10). Plaintiff filed a response in opposition to the motion on May 15, 2020. (Dkt. 16; Dkt. 17).

## DISCUSSION

### I. Legal Standard

**[1]** **[2]** "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated **\*640** reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a party must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

**[3]** **[4]** "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds

of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

## II. Plaintiff's Eighth Amendment Claims

Plaintiff's first and second claims are for violations of his Eighth Amendment rights—an excessive use of force claim against defendant Hendrickson, and a failure to protect claim against defendant Keller. (Dkt. 9 at 15-18). Defendants contend that Plaintiff's Eighth Amendment claims must be dismissed because (1) Plaintiff has failed to allege that he suffered a serious injury, as he suffered only a "chipped tooth and facial lacerations" (Dkt. 10-2 at 8), and (2) the claims against defendant Keller must be dismissed because Plaintiff has failed to allege that he was personally involved in the constitutional violations, as his receipt of Plaintiff's letter, by itself, does not amount to personal involvement (*id.* at 10-11).

### A. Excessive Use of Force Claim Against Defendant Hendrickson

[5] [6] [7] [8] "The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. To state an Eighth Amendment claim, a prisoner must allege two elements, one subjective and one objective. First, the prisoner must allege that the defendant acted with a subjectively sufficiently culpable state of mind. Second, he must allege that the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (internal quotations and citations omitted). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quotations and citations omitted). For an excessive force claim, "the test for wantonness 'is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

**5 [9] [10] [11] "The objective component of the Eighth Amendment test is also context specific, turning upon 'contemporary standards *641 of decency.' " *Id.* at 64 (citation omitted). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quotations and citation omitted). However, "certain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations *per se*. This result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Harris*, 818 F.3d at 64 (citation omitted).

[12] Plaintiff's allegations against defendant Hendrickson easily satisfy both the subjective and objective elements of an excessive use of force claim, and Defendants' argument that Plaintiff has failed to allege that he sustained a "serious injury" is misplaced. Plaintiff alleges that defendant Hendrickson, suddenly and for no apparent penological reason, projected Plaintiff—who was wearing handcuffs—into a wall. When Plaintiff asked defendant Hendrickson why he threw him into the wall, defendant Hendrickson replied that Plaintiff was stupid and got blood on him. In other words, Plaintiff has alleged the malicious and sadistic use of force by defendant Hendrickson, which amounts to a *per se* violation of the Eighth Amendment. Accordingly, Defendants' motion to dismiss Plaintiff's excessive use of force claim against defendant Hendrickson is denied.

### B. Failure to Protect Claim Against Defendant Keller

[13] [14] [15] [16] The Constitution imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotations and citation omitted). However, not every assault "translates into constitutional liability for prison officials responsible for the victim's safety." *House v. City of N.Y.*, No. 18 Civ. 6693 (PAE)(KNF), 2020 WL 6891830, at *11 (S.D.N.Y. Nov. 24, 2020) (citation omitted). "To state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with 'deliberate indifference.' " *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020). "Deliberate indifference under the Eighth Amendment standard means

the official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (alterations and quotations omitted).

[17] Plaintiff has plausibly alleged a failure-to-protect claim against defendant Keller. Specifically, Plaintiff alleges:

> On August 20th, 2018, as a result of the information he had received in the above enumerated encounters with previously unknown inmates, Plaintiff wrote a letter to Defendant Keller notifying him of the heightened substantial risk of harm to his health and safety resulting from the hit on him ordered by his co-defendant Padilla, and also notified Defendant Keller of the co-defendant's gang affiliation and how it would turn the feud between himself and [his] co-defendant into something much larger, and involve not only Padilla, but also unknown to Plaintiff associates, or affiliates of Padilla's. Plaintiff the[n] mailed the letter to Defendant Keller via Elmira Correctional Facility's internal mail system.

**\*\*6  \*642** (Dkt. 9 at ¶ 22). Plaintiff never received a response to his letter and defendant Keller did not take any precautions to prevent harm to Plaintiff (*id.* at ¶¶ 22-25), and Plaintiff ultimately was attacked three days after he wrote the letter to defendant Keller (*id.* at ¶ 27). Plaintiff further alleges that he learned at a disciplinary hearing on August 29, 2018, that defendant Keller had received his letter, but chose not to place Plaintiff in protective custody, which was unreasonable due to the information in the letter, detailing the serious risk of harm to Plaintiff. (*Id.* at ¶ 61). In other words, Plaintiff has alleged that he communicated specific information relating to a risk of serious harm—including information relating to an impending attack—and that defendant Keller had knowledge of this information but chose to disregard the risk of harm to Plaintiff by failing to place him in protective custody. *Stewart v. Fisher*, No. 11 Civ. 2184(HB), 2011 WL 6153084, at \*6 (S.D.N.Y. Dec. 12, 2011) (finding that plaintiff adequately

alleged failure to protect claim, where defendants "knew of a substantial risk prior to the February 28, 2011 attack and failed to take reasonable measures to abate the harm"); *see also Douglas v. Annuci*, No. 14-CV-6018 CJS, 2017 WL 5159194, at \*6 (W.D.N.Y. Nov. 7, 2017)) (finding that plaintiff plausibly pleaded a substantial risk of serious harm where the complaint alleged that there was "an active 'contract' on his life by the Bloods gang, and that he has already been slashed by Bloods gang members on five occasions").

[18] [19] [20] [21] To the extent Defendants also contend that the injuries Plaintiff sustained due to defendant Keller's failure to prevent an attack are not "sufficiently serious" to rise to the level of a constitutional violation, the Court rejects this argument. Most of the cases cited by Defendants for this proposition do not involve failure to protect claims, as alleged by Plaintiff. (*See* Dkt. 10-2 at 9-10). Rather, these cases involve deliberate indifference to serious medical needs claims, which require that a plaintiff allege a "serious medical need." *See Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019). In the context of a failure to protect claim, "the objective prong can be satisfied even where no serious physical injury results," and "[a]t bottom, [i]n assessing whether the risk of an inmate's violence against other inmates is 'sufficiently serious,' to trigger constitutional protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.' " *Randle v. Alexander*, 960 F. Supp. 2d 457, 473-74 (S.D.N.Y. 2013) (quotations and citation omitted). Here, Plaintiff has plainly alleged that he informed defendant Keller of a substantial risk of serious harm that existed due to the threat from J. Padilla and his associates, but that defendant Keller failed to take any action to protect him.[2]

---

[2]
> Even if the focus of the failure to protect inquiry was the injuries resulting from an attack, Plaintiff's alleged injuries—which included a broken tooth and several severe lacerations which required emergency treatment at an outside hospital and several staples and sutures—are sufficiency serious. *See Dabney v. Sawyer*, No. 9:11-CV-0273(LEK/RFT), 2013 WL 5494074, at \*10 (N.D.N.Y. Sept. 30, 2013) ("a broken tooth may be considered sufficiently serious for purposes of stating a medical deliberate indifference claim"); *Goldston v. Albany Cnty. Sheriff Dept.*, No. 9:02-CV-1004, 2006 WL 2595194, at \*7 (N.D.N.Y. Sept. 11, 2006) (finding that plaintiff's injuries,

including "a two-centimeter deep laceration on his forehead that required six stitches to close" was sufficiently serious for constitutional purposes).

**[22]** **[23]** Defendants also argue that Plaintiff has failed to allege defendant Keller's personal involvement. "A defendant in **\*643** a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority. Rather, the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (internal alterations, quotations, and citations omitted). Although in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), the Second Circuit identified five categories of evidence that may establish the liability of a supervisory official, more recently, in *Tangreti v. Bachmann*, the Second Circuit held that, post-*Iqbal*, "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 983 F.3d 609, 618 (2d Cir. 2020). The Second Circuit explained that "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary," and "[t]he violation must be established against the supervisory official directly." *Id.* (second alteration in original) (quotations and citations omitted).

**\*\*7** At this stage of the case, Plaintiff has alleged defendant Keller's personal involvement in the failure to protect claim. Plaintiff alleges that he wrote to defendant Keller directly to inform him of the specific risk of harm he faced due to J. Padilla and that defendant Keller was aware of the risk of harm to Plaintiff, but he failed to take any action to protect Plaintiff from that harm. Plaintiff further alleges that at a disciplinary hearing he received confirmation that defendant Keller had received Plaintiff's letter and was therefore aware of the risk of harm. In other words, contrary to Defendants' implication in their motion to dismiss (Dkt. 10-2 at 10–11), Plaintiff's claims against defendant Keller are not based solely on his position as deputy superintendent of security at Elmira, but rather on his personal involvement in the alleged constitutional deprivations.

The Second Circuit's recent decision in *Morgan v. Dzurenda*, 956 F.3d 84 (2d Cir. 2020), although involving a failure to protect claim at the summary judgment stage, is instructive on this point. In *Morgan*, the district court granted summary judgment to two prison officials on the plaintiff's failure to

protect claim, based on the doctrine of supervisory liability. *Id.* at 89. The Second Circuit reversed, explaining:

> [W]hile Chapdelaine and Godding both held supervisory roles at Osborn, Morgan seeks to hold them liable only for acts that they themselves committed. The crux of Morgan's allegations against Chapdelaine and Godding is that they violated the Eighth Amendment by ignoring his pleas for help. Morgan nowhere suggests that Chapdelaine, Godding, or any other defendant improperly allowed a subordinate prison official to commit a constitutional violation. The doctrine of supervisory liability is therefore not implicated.

> We hold that the district court erred in dismissing Morgan's claims against Chapdelaine and Godding on the ground that neither was "on notice that ... Morgan faced an unreasonable risk to his safety." The Inmate Request Forms Chapdelaine and Godding acknowledged receiving were detailed and explicit regarding the threat Morgan believed Rodriguez posed.... In response, Godding made dismissive remarks to Morgan, which Morgan relayed to Chapdelaine in his Inmate Request Form. Chapdelaine ignored these requests for help. These actions reflect Chapdelaine and Godding's subjective awareness of, and deliberate indifference to, Morgan's **\*644** specific, repeated, and urgent expressions of fear for his safety.

*Id.* at 89-90 (internal citations omitted). Because Plaintiff has alleged defendant Keller's personal involvement, Defendants' motion to dismiss the failure to protect claim against defendant Keller is denied.

## III. Plaintiff's First Amendment Retaliation Claims Against Defendants Berghorn, Scull, and Hendrickson

**[24]** Plaintiff's third claim is for First Amendment retaliation. (Dkt. 9 at 18). "To state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

**[25]** Plaintiff has alleged facts plausibly suggesting that Plaintiff was retaliated against for reporting the assault by defendant Hendrickson. Specifically, Plaintiff alleges that he verbally reported the incident involving defendant

Hendrickson to his supervisor defendant Scull, after which defendant Scull, to deter Plaintiff from further speaking about the alleged assault by defendant Hendrickson, informed multiple inmates that Plaintiff was a snitch. (Dkt. 9 at ¶¶ 37, 39-44). Plaintiff also reported defendant Hendrickson's attack to the medical clinic and was denied treatment for his tooth. (*Id.* at ¶¶ 45, 54). Plaintiff further alleges that following the attack, he was denied protective custody housing and was instead placed in G block where defendant Scull had previously announced that Plaintiff was a snitch, and this placement was in retaliation for Plaintiff reporting the incident involving defendant Scull. (*Id.* at ¶¶ 57-58). Plaintiff remained in G block for six days at an increased risk of harm. (*Id.* at ¶ 59). Finally, Plaintiff alleges that the threats by defendant Scull, as well as the cover up instigated by defendants Scull and Berghorn, were meant to chill Plaintiff's speech about the incident involving defendant Hendrickson. (*Id.* at ¶ 107).

**8 [26] [27] Defendants argue that Plaintiff has not alleged a First Amendment retaliation claim because he has failed to identify the exercise of a protected right. (Dkt. 10-2 at 14-15). In response, Plaintiff contends that his statements to prison officials immediately after the attack and before he filed a grievance were protected speech because "[a] prisoner's statement that he ... intends to file a grievance is constitutionally protected speech." (Dkt. 17 at 27). "An inmate's informal complaints or requests as well as formal grievances constitute protected activity under the First Amendment. With regard to oral or verbal complaints, the Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate." *Smith v. Barone*, No. 3:20cv794(VLB), 2021 WL 917118, at *4 (D. Conn. Mar. 10, 2021) (internal quotations and citations omitted). "[A]lthough not every statement an inmate makes in prison is afforded First Amendment protection, certain verbal complaints by prisoners about the conduct of prison officials may be considered protected action for purposes of a First Amendment retaliation claim." *Washington v. Fitzpatrick*, No. 20 CV 911 (VB), 2021 WL 966085, at *6 (S.D.N.Y. Mar. 15, 2021) (quotations and citation omitted); *but see McIntosh v. United States*, No. 14-CV-7889(KMK), 2016 WL 1274585, at *26 (S.D.N.Y. Mar. 31, 2016) ("courts in the Second Circuit and others have distinguished between unambiguously protected activity and situations where an inmate verbally confronts a prison official"); *645 Rossi v. Goord*, No. 9:00-CV-1521(LEK/DEP), 2006 WL 2811505, at *10 n.16 (N.D.N.Y. Sept. 28, 2006) ("The questioning by an inmate of a lawful order given by a corrections officer,

however, does not constitute protected speech deserving of First Amendment protection.").

The Court finds that Plaintiff has plausibly alleged that he engaged in protected activity for purposes of his First Amendment retaliation claim. Plaintiff alleges that he initially verbally reported the assault by defendant Hendrickson to defendant Scull, and also that he reported the assault to the medical clinic. (*See, e.g.*, Dkt. 9 at ¶ 37 ("Plaintiff notified and informed Defendant Scull, a supervisor of Defendant Hendrickson, and the rank of Sergeant, of Defendant Hendrickson's projecting him to the wall, and the serious injury and excessive bleeding to his mouth, around his teeth, lip and shins tears directly caused by Defendant Hendrickson."); *id.* at ¶ 45 ("During the examination, Plaintiff informed the medical personnel what had happened and who had injured him, including the very serious injuries inflicted on him by Defendant Hendrickson.")). Plaintiff further alleges that he stated on incident and medical reports that defendant Hendrickson had injured him (*id.* at ¶ 57 ("Regardless of Plaintiff's signature for placement into Protective Custody housing, Defendant Scull intentionally housed Plaintiff into G Block in order to continue to retaliate against Plaintiff for stating on incident reports, medical reports, and other documents that Defendant Hendrickson had inflicted severe injury on Plaintiff.")), although it is not clear from the complaint when Plaintiff made those specific reports or the nature of the reports. Although Plaintiff's initial report of the actions taken by defendant Hendrickson to defendant Scull was verbal, it was not a mere confrontation or a disagreement with a lawful order given by a corrections officer. Rather, Plaintiff made a verbal report of an assault by defendant Hendrickson to his supervisor.

[28] Defendants next argue that Plaintiff has failed to allege that he sustained an injury or experienced any adverse action due to his engaging in protected speech. (Dkt. 10-2 at 14-16). Specifically, Defendants contend that Plaintiff's speech was not chilled because he filed grievances regarding his claim, and he filed the instant lawsuit. (*Id.* at 15). Defendants further contend that the six days Plaintiff spent in general population before he was placed in protective custody is not an injury, because "fear of being assaulted is not a sufficiently serious injury." (*Id.* at 15-16).

[29] [30] The Court has considered these arguments and finds them to be without merit. In the context of a First Amendment retaliation claim, "[a]n adverse action is defined as retaliatory conduct that would deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quotations and citation omitted). While "[i]t might seem that, because [an inmate] continued to file grievances even after the alleged retaliation, the defendants' actions were not sufficiently adverse ... such a view misperceives what constitutes adverse action. The test is objective, and the plaintiff is not required to show that he was actually deterred." *Id.* In other words, "[c]hilled speech is not the *sine qua non* of a First Amendment claim. A plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm. Various non-speech related harms are sufficient to give a plaintiff standing." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

**\*\*9** Here, Plaintiff alleges that he sustained injuries, beyond just the chilling of his speech, in retaliation for his reporting the assault by defendant Hendrickson. For example, **\*646** Plaintiff alleges that he was denied medical care for his tooth, that he was denied placement in protective custody despite the fact that he faced a risk of serious harm, and that Defendants informed other inmates that he was a snitch, putting him at an increased risk of harm. *See Thurmond v. Thomas-Walsh*, No. 18-CV-409(KMK), 2019 WL 1429559, at \*10 (S.D.N.Y. Mar. 29, 2019) (denial of medical evaluation or treatment could constitute adverse action for purposes of First Amendment retaliation claim); *see also Livingston v. Hoffnagle*, No. 9:19-CV-0353(GLS/CFH), 2019 WL 7500501, at \*13 (N.D.N.Y. Nov. 8, 2019) ("Courts in this Circuit have found that a prison official defendant's refusal of protective custody can be an adverse action for the purposes of a First Amendment retaliation claim because it could cause a prisoner to fear for his safety." (alterations, quotations, and citation omitted)), *adopted*, 2020 WL 95431 (N.D.N.Y. Jan. 8, 2020).

**[31]** Finally, the Court notes that Plaintiff plainly alleges a causal connection between the protected activity and the adverse actions. Defendants disclosing to other inmates that Plaintiff was a snitch, the denial of medical care for his tooth, and the denial of protective custody all occurred immediately after Plaintiff initially reported the incident involving defendant Hendrickson. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action"). Accordingly, Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim is denied.

## IV. Plaintiff's Conspiracy to Obstruct Justice Claim Against Defendants Berghorn, Scull, and Hendrickson

**[32]** **[33]** Plaintiff's fourth claim is for conspiracy to obstruct justice, in violation of 42 U.S.C. § 1985(2). (Dkt. 9 at 19). A conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the 'parties have a tacit understanding to carry out the prohibited conduct.' " *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (citation omitted). However, "[c]onclusory, vague, and general allegations of a conspiratorial agreement is insufficient to allege conspiracy under section 1985." *Berry v. Fed. Bureau of Investigations*, No. 3:20-cv-1116-VLB, 2021 WL 260255, at \*6 (D. Conn. Jan. 26, 2021); *see also Rolkiewicz v. City of N.Y.*, 442 F. Supp. 3d 627, 649 (S.D.N.Y. 2020) ("A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct. A plaintiff must, however, provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." (quoting *Sanders v. Long Island Newsday*, No. CV 09-2393(JFB)(SIL), 2015 WL 5475694, at \*14 (E.D.N.Y. July 14, 2015))).

**[34]** Defendants contend that this claim must be dismissed because (1) "Plaintiff offers only conclusory, vague, and general allegations of a conspiracy," and (2) the individuals involved in the conspiracy were all employees of the New York Department of Corrections and are therefore precluded by the intracorporate conspiracy doctrine. (Dkt. 10-2 at 17). In response, Plaintiff contends that there are exceptions to the intracorporate conspiracy doctrine, including where the defendants have engaged in criminal conduct, and where the involved individuals are pursuing personal interests wholly separate from the entity. (Dkt. 17 at 24).

Contrary to Defendants' argument, Plaintiff's allegations relating to the alleged **\*647** conspiracy are not conclusory. Plaintiff alleges that while he was in the clinic receiving treatment for his injuries, he observed and heard defendants Scull and Berghorn discussing the misconduct of defendant Hendrickson. (Dkt. 9 at ¶ 51). Specifically, defendant Berghorn instructed defendant Scull to solicit an officer to retrieve Plaintiff's tooth from the second floor hallway of Shop 5 and place it inside the orientation room, to create the impression that his tooth had been chipped during the assault by the prisoners, rather than by defendant Hendrickson in the hallway. (*Id.*). Defendant Berghorn also instructed defendant Scull that no one be permitted to enter the orientation room

until pictures had been taken placing the tooth there, knowing that the photos and placement of the tooth would create the false illusion that only the inmates had injured Plaintiff, and that defendant Hendrickson had not. (*Id.* at ¶¶ 52-53). These allegations plausibly allege an agreement by the parties to carry out prohibited conduct.

**\*\*10** **[35]** **[36]** **[37]** Nor does the intracorporate conspiracy doctrine operate to bar Plaintiff's conspiracy claim. Pursuant to the intracorporate conspiracy doctrine, "employees or agents of a single corporate entity, acting within the scope of their employment, are legally incapable of conspiring together." *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015). However, "[a]ccording to the personal stake exception, the intracorporate conspiracy doctrine does not apply to bar conspiracy claims against individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Id.* (quotations and citation omitted). "Courts have applied this exception in cases where officers were alleged to have exercised excessive force and then conspired to cover-up this alleged use of force." *Rolkiewicz*, 442 F. Supp. 3d at 648.

At this stage of the proceedings, the Court finds that Plaintiffs' allegations are sufficient to invoke the personal stake exception to the intracorporate conspiracy doctrine. Plaintiff has alleged that defendants Scull and Berghorn fabricated evidence to cover up the action of defendant Hendrickson (Dkt. 9 at ¶ 53), and that "[n]one of these acts were in any way related to corporate policy or management decision" (*id.* at ¶ 111). Taking these allegations as true, Plaintiff has plausibly alleged that Defendants "acted other than in the normal course of their corporate duties," by "using excessive force and then agreeing to cover up the alleged assault by manipulating or destroying evidence." *Brown v. Annucci*, No. 19 CV 9048(VB), 2021 WL 860189, at \*10-11 (S.D.N.Y. Mar. 8, 2021) (internal quotations and citation omitted); *see also Edwards v. Annucci*, No. 17 CV 5018(VB), 2019 WL 1284295, at \*9 (S.D.N.Y. Mar. 20, 2019) (explaining that "[e]mploying excessive force and falsifying documents are not core functions performed in the normal course of a correction officer's duties," and "accepting plaintiff's allegations as true for purposes of deciding this motion, plaintiff adequately pleads defendants acted outside the scope of their employment and in their own personal interest when they allegedly tried to cover up the beating, rendering the intracorporate conspiracy doctrine inapplicable"). Accordingly, Defendants' motion to dismiss Plaintiff's conspiracy claim is denied.

## V. Plaintiff's Due Process of Law/"Cover Up Claim" Against Defendants Scull, Berghorn, and Hendrickson

**[38]** Plaintiff's sixth claim is that his due process rights were violated when Defendants failed to properly investigate his claim against defendant Hendrickson and engaged in a "cover up" to protect defendant **\*648** Hendrickson. (Dkt. 9 at 22). In connection with this claim, Plaintiff alleges that there was ample evidence showing he had been attacked by defendant Hendrickson, but that defendants Scull and Berghorn fabricated evidence and manufactured the cover up of evidence, and therefore made it impossible for Plaintiff to litigate his underlying claim (*id.* at ¶¶ 132-34), and Plaintiff was not permitted to produce evidence of his position at the disciplinary hearings brought by the prison (*id.* at ¶ 140). Defendants argue that this claim must be dismissed because "Plaintiff does not have a constitutional right to an investigation." (Dkt. 10-2 at 16). In response, Plaintiff contends that he is not bringing a failure to investigate claim, but rather a substantive due process violation "grounded in the Fourteenth Amendment, for the cover up and tainting of key evidence which has now been hidden for use in subsequent proceedings." (Dkt. 17 at 31).

**[39]** **[40]** "Although there is ... no constitutional right to an investigation by government officials, courts do recognize an inadequate investigation as sufficient to state a civil rights claim [when] there was another recognized constitutional right involved." *Melendez v. Falls*, No. 06-CV-6198P, 2009 WL 529259, at \*1 (W.D.N.Y. Mar. 2, 2009) (alteration, quotations, and citations omitted). For example, "where, as here, the plaintiff alleges that the investigation was falsified for the purpose of retaliating against him for the exercise of his legal rights, such a claim may proceed." *Id. See also Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) ("An act in retaliation for the exercise of a constitutional right is actionable under section 1983 even if the act, when taken for different reasons, would have been proper." (alterations and citation omitted). Here, Plaintiff plausibly alleges that Defendants fabricated evidence both to protect defendant Hendrickson, but also in retaliation for Plaintiff's exercising his First Amendment rights. (*See, e.g.,* Dkt. 9 at ¶ 106 ("The cover up of the force used by Defendant Hendrickson ... w[as] all inflicted as retaliation for [Plaintiff]'s assertion of his right to tell the truth about the inmate attack incident that was being investigated, and also [Plaintiff]'s due process rights and rights in accessing the courts."); *id.* at ¶ 134 ("This cover up was performed by Defendants Scull, Berghorn, and Hendrickson in order to cover up Defendant

Mazyck v. Keller, 531 F.Supp.3d 630 (2021)

2021 WL 1201224

Hendrickson's unlawful actions, and has now made it almost impossible for Plaintiff to litigate this underlying claim, because material evidence was destroyed that showed the tooth in the hallway, and no treatment was provided for the tooth to cover up actions of Defendants.")). Accordingly, Defendants' motion to dismiss Plaintiff's due process claim on the basis that Plaintiff does not have a constitutional right to an investigation is denied.

## VI. Plaintiff's Supervisory Liability Claim Against Defendants Scull, Berghorn, and Keller

**11 [41] [42] Plaintiff's fifth cause of action is for "eighth amendment—supervisory liability" against defendants Scull, Berghorn, and Keller, based on their failure to properly supervise defendant Hendrickson, failure to implement a proper inmate classification system, and by failing to remedy the wrongs committed by defendant Hendrickson and other Department of Corrections employees. (Dkt. 9 at 20-21). Defendants contend that this claim must be dismissed because Plaintiff does not allege that they created a policy or custom under which unconstitutional practices occurred. (Dkt. 10-2 at 11-13).

In response to the motion to dismiss, Plaintiff argues that he has properly pleaded a supervisory liability claim against defendants Berghorn and Scull. *649 (Dkt. 17 at 21). Citing to the five categories delineated by the Second Circuit in Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995), he points to the following allegations in the second amended complaint which he argues support his supervisory liability claim:

> [t]he SAC plausibly alleges that Berghorn and Scull directly participated in the excessive force violation through *all five* means iterated above. They (1) covered up evidence (SAC ¶¶ 51-53). They (2) did not remedy the wrong after being informed of it by Mr. Mazyck (SAC ¶¶ 37-53), and (3) in covering up the violation, allowed it to continue (SAC ¶¶ 37-53). Berghorn and Scull (4) were grossly negligent regarding Hendrickson, who committed the violation (SAC ¶¶ 37-53), and (5) did not act (in a lawful manner) on information indicating the unlawful

use of force had taken place (SAC ¶¶ 37-59)[.]

(Dkt. 17 at 22 (citations omitted)). Plaintiff further clarifies that he only alleges "supervisory liability claims, not any *Monell* claims." (*Id.* at 21 n.9).

The Court first notes that the theories of supervisory liability delineated in Colon are no longer controlling following the Second Circuit's decision in Tangreti v. Bachmann, where the Second Circuit held that "there is no special rule for supervisory liability," and that "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 983 F.3d at 618 (quotations and citations omitted). Accordingly, Colon is no longer controlling on this issue.

[43] The parties' arguments addressing Plaintiff's claim for "supervisory liability" appear to be based on their misapprehension of such a claim. Simply because a defendant serves in supervisory capacity does not automatically make every claim a plaintiff has against that defendant one for "supervisory liability." See Morgan, 956 F.3d at 90 (doctrine of supervisory liability implicated where plaintiff contends that supervisory defendant improperly allowed subordinate prison official to commit a constitutional violation). As explained above, Plaintiff has plausibly alleged the personal involvement of defendants Keller, Berghorn, and Scull— all of whom hold supervisory positions—in several of the specific constitutional deprivations alleged by Plaintiff. Specifically, Plaintiff alleges that defendant Keller was personally involved in the failure to protect claim, and defendants Berghorn and Scull personally participated in the alleged retaliation, due process, and conspiracy claims.

[44] However, to the extent Plaintiff attempts to hold defendants Keller, Berghorn, and Scull liable for actions taken by defendant Hendrickson only, or for creating a policy or custom under which inmates were abused by corrections officers at Elmira, the Court agrees with Defendants that he has failed to state such a claim. While the second amended complaint contains allegations that there is "a longstanding culture of brutality at Elmira" (Dkt. 9 at ¶ 78), that defendants "Keller, Scull, and Berghorn failed to instruct, train, supervise, control, and discipline personnel in documenting uses of force and preserving evidence, contributing to the culture of lawlessness at Elmira

and allowing abusive officers to continue their pattern of excessive force against inmates in their custody" (*id.* at ¶ 80), as well as that they were aware that "Defendants had been involved in multiple incidents of abuse of inmates prior to their abuse of Plaintiff but did nothing to prevent that abuse" (*id.* at ¶ 72), those allegations are conclusory and vague, and lack the required specificity to hold supervisory defendants responsible for the actions of their subordinates. For example, the second **\*650** amended complaint lacks specific allegations describing prior instances of abuse by defendant Hendrickson, or that defendants Keller, Scull, and Berghorn were aware of or encouraged those actions. Because Plaintiff has failed to allege facts plausibly suggesting that defendants Keller, Scull, and Berghorn may be held liable for the actions of their subordinates, Plaintiff's claim for "supervisory liability" is dismissed.

## CONCLUSION

**\*\*12** For the foregoing reasons, Defendants' motion to dismiss the second amended complaint (Dkt. 10) is granted in part and denied in part. Defendants' motion is denied in all respects, except as to Plaintiff's fifth cause of action for "supervisory liability," which is dismissed. In addition, the Clerk of Court is directed to terminate Sergeant Issac from the docket.

SO ORDERED.

**All Citations**

531 F.Supp.3d 630, 2021 WL 1201224

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 554 of 830
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

KeyCite Yellow Flag - Negative Treatment
Distinguished by Smith v. Collins,   S.D.N.Y.,   October 1, 2015

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of New
York, Kelly L. Munkwitz, Esq., Asst. Attorney General, of
Counsel, Department of Law, Albany, NY, for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jeff Smith, brought this civil rights action
pursuant to 42 U.S.C. § 1983. By Report-Recommendation
dated March 17, 2006, the Honorable George H.
Lowe, United States Magistrate Judge, recommended that
defendants' motion for summary judgment be granted, and
that plaintiff's motion for partial summary judgment be
denied. (Docket No. 51). The plaintiff has filed objections to
the Report-Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff
has objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly, it
is ORDERED that
1. Defendants' motion for summary judgment is GRANTED;

Plaintiff's motion for partial summary judgment is DENIED.
and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd, United
States District Judge, pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c) of the Rules of Practice for this Court.
In this *pro se* civil rights action brought under 42 U.S.C. §
1983, Jeff Smith ("Plaintiff") alleges that five employees of
Upstate Correctional Facility-Deputy Superintendent Robert
K. Woods, Captain Joseph R. Belarge, Sergeant G.J.
O'Donnel, Food Service Administrator Richard Antonelli,
and Correction Officer Wayne Holt ("Defendants")-violated
his rights under the First, Fourth, Eighth, and Fourteenth
Amendments by (1) retaliating against him for having
previously filed a complaint, (2) subjecting him to an
unreasonable search and seizure, (3) subjecting him to a
damaged bunk bed while he was housed in the Upstate
Correctional Facility Special Housing Unit, and (4) taking
away his "good time" credits without affording him due
process. (Dkt. No. 5 [Plf.'s Am. Compl.].) [1]

[1]     Given my duty to liberally construe a *pro
se* plaintiff's civil rights complaint, I construe
Plaintiff's Amended Complaint as including a claim
that various Defendants violated Plaintiff's rights
under the Fourth Amendment to be free from
unreasonable searches and seizures. *See Phillips
v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We
leave it for the district court to determine what
other claims, if any, [the plaintiff] has raised. In
so doing, the court's imagination should be limited
only by [the plaintiff's] factual allegations, not
by the legal claims set out in his pleadings.")
[citations omitted]. *(See also* Dkt. No. 5, ¶ 44 [Plf.'s
Am. Compl., alleging that Defendants Woods and
Holt "violat[ed] plaintiff's 4th ... Amendment[ ]

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21

2006 WL 1133247

*(1972) (per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court may construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]    *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and*

that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material facts, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

6   See *Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; *Fed.R.Civ.P. 56(c)* ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7   *Fed.R.Civ.P. 56(e)* ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8   See *Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649,

664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. 9 Of course, an affidavit may be conclusory because its assertions are too general. 10 However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." 11 Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

9   See *Fed.R.Civ.P. 56(e)* (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d.Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10  *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging

2006 WL 1133247

remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by

admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

 **\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a] [2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

12    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13    *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff **"stuck with them** as well as the other

two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here*"]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to *hold a copy of the complaint*" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]    (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]    (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

[16]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]    (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]    (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]    (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37

2006 WL 1133247

[Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]     (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

[21]     (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. [22]

[22]     (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. [23] In pertinent part, the letter stated,

[23]     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already told both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. [24]

[24]     (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. [25]

[25]     (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. [26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." [27] In addition, the last page of the letter states:

26    (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

27    (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original*.
It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession.28

28    (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters.29 In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

29    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods.30 The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request."31

30    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

31    (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods.32 The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention."33

32    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

33    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic."34

34    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

2006 WL 1133247

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. [35] The note stated, in pertinent part:

[35] (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a <DEAD> man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself. [36]

[36] (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

*7 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37] (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38] (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39] (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

[40] (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41] (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42] (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43] (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement];

2006 WL 1133247

Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1
Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli
Aff., attaching misbehavior report which suggests
that Defendants Belarge and O'Donnell had in their
possession Inmate Alcivar's legal documents as
well as various correspondence between Plaintiff
and Inmate Alcivar's two daughters, before those
Defendants interviewed Plaintiff at 11:00 a.m.
on August 31, 2002]; Dkt. No. 5, "Facts of the
Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating
that Defendant Belarge had in his possession a
letter that Plaintiff had written to Raisa Alcivar by
the time he interviewed Plaintiff at 10:57 a.m. on
August 31, 2002].)

44    (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1
Statement, asserting this fact]; Dkt. No. 42, Part
1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any
admissible evidence in support of his denial of this
fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt.
No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part
16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex.
B [Antonelli Aff., attaching documents discovered
in Plaintiff's cell, and "Chain of Custody" Record
indicating that Defendant O'Donnell was the one
who found the documents]; Dkt. No. 38, Part 4
at 90 [exhibit to Plaintiff's motion for summary
judgment, attaching Contraband Receipt issued by
Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A
at 31-33 [Munkowitz Decl., attaching transcript of
Plaintiff's deposition, in which he admits numerous
times that, after Defendant Holt failed to take
"control" of Inmate Alcivar's legal documents,
Plaintiff, along with two other inmates, retained
possession of those documents, out of a fear
that those documents would be stolen by another
inmate, and out of a sense of duty to Inmate
Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12,
14 [Antonelli Aff., attaching 7/16/02 letter from
Plaintiff, in which he states, "I am going to hold a
copy of the complaint" in Inmate Alcivar's federal
civil rights action]; Dkt. No. 37, Part 7 [Ex. C to
Woods Aff., attaching Plaintiff's 8/5/02 letter, in
which he states, "in the future if anything should
come of a matter of said documents being in my
possession ... you and the administration cannot
take any action against the inmate's family nor
myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden
Aff., testifying that at some point in the summer
of 2002 Plaintiff told Holden that he was helping

an inmate who had been taken to the hospital due
to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge
Reply Aff., swearing that evidence in question did
not come from any interception of Plaintiff's mail,
but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002,
Defendants Belarge and O'Donnell interviewed Plaintiff
about his statements in his August 5, 2002, note to Defendant
Woods. [45]  At approximately 2:50 p.m. on August 31,
2002, Defendant O'Donnell stored Inmate Alcivar's legal
documents (as well as various correspondence between
Plaintiff and Inmate Alcivar's two daughters) in an evidence
locker at Greene C.F. [46]

45    (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1
Statement, asserting that interview took place];
Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response,
admitting that interview took place despite his
blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5
[Belarge Aff.]; Dkt. No. 5, "Facts of the Incident,"
¶¶ 13-15 [Plf.'s Am. Compl., stating that interview
took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37,
Part 17, Ex. A [Antonelli Aff., attaching 8/31/02
misbehavior report, stating that the interview took
place at 11:00 a.m. on 8/31/02].)

46    (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff.,
attaching documents discovered in Plaintiff's cell,
and "Chain of Custody" Record indicating that
Defendant O'Donnell stored the documents in an
evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No.
37, Part 17, Ex. A at 2 [Antonelli Aff., attaching
8/31/02 misbehavior report, stating that Defendant
O'Donnell stored the documents in an evidence
locker on 8/31/02].)

Plaintiff's Misbehavior Report,
Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent
interview conducted, Defendants Belarge and O'Donnell
issued Plaintiff a misbehavior report on August 31, 2002. [47]
The misbehavior report charged Plaintiff with three offenses:
(1) providing legal assistance to Inmate Alcivar without
prior authorization in violation of Inmate Rule 180.17; (2)
exchanging legal materials with Inmate Alcivar without
authorization in violation of Inmate Rule 113.15; and (3)

2006 WL 1133247

soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

47     (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

48     (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate family member without the consent or approval of the Superintendent or his designee. [51]

49     (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

50     (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14][v].

51     (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or

services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits. [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

52     (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

53     (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

54     (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

55     (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1
       Statement, asserting this fact]; Dkt. No. 42, Part 1,
       ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No.
       42, Part 23 at 46-48 [Munkowitz Decl., attaching
       transcript of Plaintiff's deposition, in which he
       discusses the appeal]; Dkt. No. 38, Part 3 at 46,
       68 [exhibits to Plaintiff's motion for summary
       judgment, attaching his appeal and Mr. Selsky's
       affirmance].)

56     (Dkt. No. 42, Part 23 at 46-48 [Munkowitz
       Decl., attaching transcript of Plaintiff's deposition,
       in which he discusses his one-page appeal and
       acknowledges that it did not complain about any
       lack or denial of witnesses]; Dkt. No. 38, Part 3 at
       46, 68 [exhibits to Plaintiff's motion for summary
       judgment, attaching his appeal and Mr. Selsky's
       affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a
discretionary review of Plaintiff's SHU sentence. [57] Based
upon this review, Plaintiff's SHU time was reduced from 90
days to 75 days. [58] However, Plaintiff's good time loss was
unaffected by the discretionary review. [59]

57     (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1
       Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶
       3 1 [Plf.'s Response, admitting part of this fact, not
       specifically controverting the rest of this fact, and,
       in any event not citing any admissible evidence in
       support of any denial of this fact]; Dkt. No. 37, Part
       8, ¶ 8 [Belarge Aff.].)

58     (Id.)

59     (Id.)

Meetings Between Defendants
Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August
31, 2002, Defendant Woods met with Defendant Belarge
to discuss Plaintiff. [60] Defendant Belarge then met with
Defendant O'Donnell to discuss Plaintiff. [61]

60     (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1
       Statement, asserting this fact]; Dkt. No. 42, Part 1,

¶ 37 [Plf.'s Response, not specifically controverting
this fact, and, in any event not citing any admissible
evidence in support of any denial of this fact]; Dkt.
No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37,
Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23
at 35-37 [Munkowitz Decl., attaching transcript of
Plaintiff's deposition, asserting that such a meeting
took place between Defendants Woods and Belarge
at some point].)

61     (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1
       Statement, asserting this fact]; Dkt. No. 42, Part
       1, ¶ 3 8 [Plf.'s Response, admitting this fact];
       Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No.
       42, Part 22 at 35-37 [Munkowitz Decl., attaching
       transcript of Plaintiff's deposition, asserting that
       such a meeting took place between Defendants
       Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance
of Plaintiff's misbehavior report on August 31, 2002) were
held according to standard procedure at Greene C.F. [62]
Specifically, the purpose of the meetings was to discuss how
to investigate whether Plaintiff had violated prison rules. [63]

62     (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1
       Statement, asserting this fact]; Dkt. No. 42, Part 1,
       ¶ 39 [Plf.'s Response, not specifically controverting
       that the pre-misbehavior report meeting between
       Defendants Woods and Belarge, and the pre-
       misbehavior report meeting between Defendants
       Belarge and O'Donnell, were held according to
       standard procedure at Greene C.F., and, in any
       event not citing any admissible evidence in support
       of any denial of this fact]; Dkt. No. 37, Part
       3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9
       [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden
       Aff., disclaiming any knowledge about an alleged
       unlawful meeting between Defendants Woods,
       Belarge, and O'Donnell concerning Plaintiff].)

63     (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1
       Statement, asserting this fact]; Dkt. No. 42, Part
       1, ¶¶ 37-39 [Plf.'s Response, not specifically
       controverting this fact, and, in any event not
       citing any admissible evidence in support of
       any denial of this fact]; Dkt. No. 37, Part 3, ¶
       13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9
       [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden
       Aff., disclaiming any knowledge about an alleged

unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002.[64]

[64]    (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU.[65]

[65]    (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned.[66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood.[67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU.[68]

[66]    (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial

of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]    (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]    (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

*9  In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. See Gill v. Pidlypchak, 389 F.3d

2006 WL 1133247

379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d.Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have

been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers.[69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]    *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing.[70] Plaintiff's letter did not mention Defendant Antonelli.[71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing.[72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing.[73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such

2006 WL 1133247

complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

70    (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

71    (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

72    (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter"

with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    *(See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

**B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim**

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

75    (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth

2006 WL 1133247

Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am".] ) *See Clissuras v. CUNY*, 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. [76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. [77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." [78]

[76]    *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

[77]    (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am"

even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am".] )

[78]    (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

[79]    *See also Tinsley v. Greene*, 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann*, 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd*, 122 F.3d 1055 (2d Cir.1995).

[80]    *See Freeman v. Goord*, 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin*, 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

[81]    (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and

seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

[82]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

[83]    I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

[84]    See, e.g., DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not

established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

*12 With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference' exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis" [85] in September of 2002 as a result of

sleeping on a defective bed.[86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

[85]    "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at *35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

[86]    (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

[87]    *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at *4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at *13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at *4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

[88]    (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard

conditions there, which included his allegedly defective bunk].)

[89]    (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective.[90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question.[91]

[90]    (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]    *(See, supra,* Statement of Fact No. 29.)

**\*13** More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed,[92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002.[93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002.[94]

[92]    (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]    *(Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different

SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02**] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**] *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

94

(Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time) [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. 95 For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

95

*See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

**2. Deliberate Indifference**

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3, 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. 96 More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. 97 Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

96

(Dkt. No. 5, ¶ 38 [Am. Compl.].)

97

*(See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. 98 Any assertion by Plaintiff that Defendants

2006 WL 1133247

Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]     (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]     *(Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October

24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]     (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]     *(See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under §

2006 WL 1133247

1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations

omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]    (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]    (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding

that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [105]

[104]   *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]   (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

   2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

   3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]   (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]   (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]   (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their threshold burden with regard to this issue.[109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated.[110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated.[111]

[109] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ...

upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110] *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111] *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group

of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have

personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

### G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant

official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112]   *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113]   *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819; *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the

sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20**  As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment

Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the*

*moving party to submit an accurate and complete Statement
of Material Facts shall result in a denial of the motion.*")
[emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for
partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary
judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial
summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the
parties have ten days within which to file written objections
to the foregoing report. Such objections shall be filed with
the Clerk of the Court. **FAILURE TO OBJECT TO THIS
REPORT WITHIN TEN DAYS WILL PRECLUDE
APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85,
89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human
Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b);
Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4486086

2012 WL 4486086
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benji D. REED, Plaintiff,
v.
John DOE No. 1; John Doe No
2; and M. Soto, Defendants.

Civil Action No. 9:11–CV–0250 (TJM/DEP).
|
July 26, 2012.

**Attorneys and Law Firms**

Benji D. Reed, Elmira, NY, pro se. [1]

[1] The court's records list the plaintiff as being confined in the Southport Correctional Facility "Southport", based upon a change of address notice filed by Reed on February 22, 2012. *See* Dkt. No. 20. According to publically available information, however, Reed is now being held in the Elmira Correctional Facility. *See* http//nysdoccslookup.doccs.ny.gov. GCA00P00/ WINQ130 (screenshot attached. Plaintiff is reminded of his obligation under the court's rules to notify the court and defendants' counsel of any further address changes in order to facilitate communications with him. *See* N.Y.N.D.L.R. 10.1(c)(2).

Hon. Eric T. Schneiderman, Attorney General of the State of New York, James Seaman, Esq., Assistant Attorney General, Albany, NY, for Defendant Soto.

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Benji D. Reed, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 against various prison officials, alleging deprivation of his civil rights. While the scope of his complaint has been winnowed, and it now raises only claims of cruel and unusual punishment and unlawful retaliation against one named and

two unidentified "Doe" defendants, as originally filed that pleading asserted an array of claims stemming from incidents occurring at two separate correctional facilities.

In response to plaintiff's complaint the sole remaining named defendant has moved for dismissal of all claims against him for failure to state a plausible cause of action upon which relief may be granted. The plaintiff, in turn, has applied for leave to amend his complaint, and for appointment of counsel to represent him *pro bono*. For the reasons set forth below, I recommend that defendant's motion to dismiss be granted, and will deny plaintiff's application for leave to amend, on the basis of futility in light of my recommendation regarding the legal sufficiency of his existing claims, as well as his request for assignment of counsel.

I. *BACKGROUND* [2]

[2] The following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). In light of the severance and transfer of plaintiff's claims arising out of his confinement at the Southport Correctional Facility to the Western District of New York, I have included only the facts relevant to his remaining claims, all of which involve events at the Eastern Correctional Facility ("Eastern").

Plaintiff is a prison inmate entrusted to the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to the claims remaining in the action, he was designated to Eastern, located in Napanoch, New York. *Id.* at ¶ 3.

The events giving rise to plaintiff's claims were set in motion on September 14, 2010, when Reed developed an illness he attributed to food consumed in the mess hall at Eastern. Complaint (Dkt. No. 1) ¶¶ 32–37. Plaintiff maintains that the food causing his intestinal issues was known by defendant John Doe No. 1 to have been contaminated, and should have been inspected by defendant John Doe No. 2 prior to being served to the inmates. Complaint (Dkt. No. 1) ¶¶ 41–42.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiff was initially treated on the following day at the facility's medical clinic, along with several other affected inmates, and given "dymotabs" to address the condition. Complaint (Dkt. No. 1) ¶ 38. The medication was subsequently discontinued on that same day, however, and plaintiff was confined to his cell and placed on a water diet for one day. *Id.* at ¶¶ 39–40.

While at Eastern, plaintiff was designated to undergo alcohol and substance abuse treatment in a program ("ASAT") overseen by defendant M. Soto, a counselor at the facility. *See* Complaint (Dkt. No. 1) ¶¶ 6, 31. Based apparently upon his absence from ASAT treatment while confined to his cell due to illness, plaintiff received a misbehavior report authored by defendant M. Soto accusing him of lying regarding his location on September 15, 2010, after being asked why he did not appear for ASAT treatment, and for failing to follow facility rules regarding attendance in the program. Complaint (Dkt. No. 1) ¶¶ 46–47. At a subsequent disciplinary hearing conducted to address the accusations set forth in the misbehavior report, however, the charges were dismissed. *Id.* at ¶ 49.

**\*2** Following plaintiff's return to the ASAT program he was called into defendant Soto's office and, after a conversation during which Reed refused to discuss the conviction that led to his incarceration, he was forced by Soto to sign a refusal to participate in ASAT training. *Id.* at ¶¶ 50–56. Plaintiff was then removed from the ASAT program and escorted to his cell, where he remained in keeplock pending a hearing stemming from the issuance of a new misbehavior report alleging his refusal to participate in the ASAT program. [3] *Id.* at ¶¶ 57–61. At a subsequent hearing, conducted on October 12, 2010, Reed was exonerated of all charges and was permitted to return to the ASAT program. *Id. at* ¶¶ 64–65. As a result of issuance of the two misbehavior reports, while at Eastern plaintiff was keeplock-confined for a total of fourteen days. [4] *See* Plaintiff's Memorandum (Dkt. No. 18) p. 6 of 18.

[3]  Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving the inmate of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160124, at \*2 n. 2 (N.D.N.Y. Mar. 31, 1997)

(Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)) (Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.). Inmate conditions while keeplocked are substantially the same as in the general population, the primary exception being that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

[4]  Plaintiff's opposition memorandum also intimates that he lost good time credits as a result of the relevant events. *See* Plaintiff's Memorandum (Dkt. No. 18) at p. 6 of 18. There is no factual support for this statement, however, in either plaintiff's complaint or the attached exhibits.

Plaintiff was subsequently transferred out of Eastern and into the Southport Correctional Facility, located in Pine City, New York, in December 2010. Complaint (Dkt. No. 1) ¶ 71.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on March 8, 2011. Complaint (Dkt. No. 1). Plaintiff's complaint named the two Doe defendants, M. Soto, and seven corrections employees assigned to Southport as defendants, and asserted claims under the Eighth Amendment to the United States Constitution, the Americans With Disabilities Act, 42 U.S.C. § 12,101 *et seq.,* and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, additionally setting forth a pendent claim of negligence. By order issued on August 2, 2011, based upon an initial review of plaintiff's complaint and accompanying *in forma pauperis* application, Senior District Judge McAvoy ordered all claims arising from events occurring at Southport severed, and directed that those claims be transferred to the Western District of New York. Dkt. No. 4.

In lieu of answering plaintiff's complaint defendant Soto, the sole remaining named defendant in this action, moved on October 17, 2011 for dismissal of plaintiff's claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 11. In his motion defendant argues that plaintiff's complaint fails to allege a plausible claim upon which relief may be granted, and that in any event he is entitled to

qualified immunity from suit. *Id.* Plaintiff has since submitted a response in opposition to defendant's motion. Dkt. No. 18.

Following the filing of defendant's dismissal motion, plaintiff moved on December 7, 2011 for leave to file an amended complaint, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Dkt. No. 14. In his motion Reed asserts that amendment is sought to permit elimination of the claims and references to the defendants affected by the transfer to the Western District of New York, and to clarify and expand upon facts set forth in his original complaint relating to events at Eastern. *See* Motion for Leave to Amend (Dkt. No. 14) ¶¶ 1–2. Plaintiff has also requested appointment of counsel to represent him in the action, *pro bono.* Dkt. No. 15. Defendant Soto has since responded in opposition to those motions, by letter dated January 6, 2011 from his counsel, Megan A. Brown, Esq., arguing that the motion for leave to amend should be denied as futile for the same reasons as set forth in his dismissal motion, and taking no position with regard to plaintiff's request for appointment of counsel. Dkt. No. 17.

**\*3** Defendant's dismissal motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Rule 72.3(c). *See* Fed.R.Civ.P. 72(b). The remaining two motions brought by the plaintiff fall within my non-consensual jurisdiction, and therefore will be addressed in the form of an order from this court.

### III. *DISCUSSION*

#### A. *Standard of Review*

Defendant's motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ——, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim that is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims." *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations and quotations omitted)).

**\*4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

#### B. *Plaintiff's Retaliation Claim*

Plaintiff alleges that defendant Soto, motivated by Reed's use of the medical facilities at Eastern, issued two false misbehavior reports to him in September 2010. In response,

Soto argues that plaintiff's vague and conclusory allegations offered in support of this retaliation claim are insufficient to survive a motion to dismiss.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the provisions of the Eighth Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.2008). Claims by inmates that adverse actions taken by prison workers are, of course, easily incanted, and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis,* 320 F.3d at 352 (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff succeeds in carrying this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*5** Affording plaintiff the deference which he is due as a *pro se* litigant and broadly construing his complaint, it appears that plaintiff is claiming the September misbehavior reports were issued in retaliation for his having sought medical treatment due to a sudden illness.[5] As defendant correctly argues, the mere allegation that a false misbehavior report has been issued to an inmate, standing alone, does not rise to level of constitutional significance. *Boddie v. Schnieder,* 105

F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)). The further assertion that the false misbehavior report was prompted by the accused inmate having engaged in protected activity, however, can suffice to support a cognizable claim of unlawful retaliation. *Franco,* 854 F.2d at 589.

5    In his motion defendant Soto has assumed, for the sake of argument, that plaintiff's resort to seeking medical treatment within the facility constituted protected activity sufficient to trigger the First Amendment's protection against retaliation, and I will do likewise.

Having assumed plaintiff's ability to establish that he engaged in protected activity, the court's focus turns next to the question of whether he has sufficiently alleged that he experienced adverse action at the hands of the defendant. In the prison context, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes,* 239 F.3d at 493; *see also Davis,* 320 F.3d at 353. The adverse action inquiry is a contextual one. *Davis,* 320 F.3d at 353. Courts should bear in mind that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

The adverse action alleged by the plaintiff in support of his retaliation claim consists of the issuance of two false misbehavior reports. The filing of a false misbehavior report can qualify as an adverse action for purposes of a First Amendment retaliation. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). The false misbehavior reports at issue led to plaintiff's keeplock cell confinement for a period of fourteen days. At this early procedural juncture, I am unable to conclude that this allegation is insufficient to support a plausible finding of adverse action. *See Edwards v. Horn,* No.2012 WL 76012, at \* 16 (S.D.N.Y. Mar. 8, 2012) (citing *Gill,* 389 F.3d at 384) (false misbehavior report and placement in keeplock constitutes adverse action)).

The third requirement for pleading a cognizable retaliation claim involves linking the protected activity and adverse action alleged. It is in connection with this element that plaintiff's retaliation claim fails. In cases involving claims of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558

2012 WL 4486086

(N.D.N.Y.2007). When evaluating whether a misbehavior report is the product of retaliatory animus, an analysis most typically undertaken on a motion for summary judgment, courts generally look to several factors as bearing upon any potential nexus between the protected conduct and the misbehavior report, including "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

**\*6** In this instance, plaintiff's complaint is lacking in any factual allegations that would establish the requisite nexus between his visit to the prison infirmary and defendant Soto's issuance of misbehavior reports. Indeed, in his complaint Reed hypothesizes that Soto disbelieved his explanation concerning his whereabouts at the time of his absence from the ASAT program, prompting him to issue the misbehavior reports. *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 54, 65. This allegation by the plaintiff suggests a non-retaliatory motivation for defendant's issuance of the misbehavior reports at issue.

In light of the plaintiff's failure to state facts sufficient to satisfy this critical element of a retaliation claim, I recommend that the defendant's motion be granted, and that plaintiff's retaliation cause of action under the First Amendment be dismissed.

### C. *Verbal Harassment/False Misbehavior Report Claims*
Liberally construed, plaintiff's complaint could be interpreted as also asserting a claim, independent of retaliation, under the Eighth Amendment for harassment and for issuance of false misbehavior reports.

As was previously observed, the mere issuance of a false misbehavior report, standing alone, is insufficient to support a cognizable claim under the Eighth Amendment or otherwise on behalf of a prison inmate; a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)). As such, plaintiff's claim related to the filing of a false misbehavior report, independent of his First Amendment retaliation cause of action, is subject to dismissal.

Defendant also interprets plaintiff's complaint as alleging that he was generally harassed by Soto, and that Soto stated to other inmates that Reed was a monster with whom they should not associate. These allegations appear to be calculated to state a violation of his Eighth Amendment's right to be free from cruel and unusual punishment. Reed's complaint, however, fails to allege any conduct that would warrant Eighth Amendment protection. As a general matter, mere verbal harassment, including that accompanied by the use of profanity, without any corresponding physical injury does not support a cognizable claim under section 1983, however boorish and unprofessional the alleged conduct may be. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Nor do threats amount to a constitutional violation. *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). Because plaintiff's complaint lacks allegations that would plausibly support an Eighth Amendment violation claim, I recommend dismissal of that cause of action, to the extent that his complaint may properly be construed as raising such a claim.

### D. *Leave to Amend*
**\*7** Following the filing of plaintiff's dismissal motion, plaintiff sought leave to amend his complaint to flesh out certain factual allegations in support of his claims. *See* Dkt. No. 14. At this juncture the court must determine whether to permit the amendment now sought, and additionally whether the plaintiff should be granted leave to amend in any event in an effort to cure the deficiencies perceived with regard to his existing claims against defendant Soto.

#### 1. *Leave to Amend Generally*
Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure which provides, in pertinent part, that unless amendment as a matter of right is permitted-under circumstances not applicable here-a party may amend its pleading "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). Under Rule 15(a), leave to amend ordinarily should be liberally granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Elma RT v. Landesmann Int'l Mktg. Corp.,* No. 98–CIV–662, 2000 WL 297197, at \*3 (S.D.N.Y. Mar. 22, 2000) (citing *Foman* ).

2012 WL 4486086

Notwithstanding the familiar and well-accepted precept that leave to amend should be granted freely and is typically permitted, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion, then permitting amendment would be an act of futility that should not be sanctioned. *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 124 (E.D.N.Y.1996); *In re Boesky Sec. Litig.,* 882 F.Supp. 1371, 1379 (S.D.N.Y.1995). If, on the other hand, a proposed claim sets forth facts and circumstances that may entitle the pleader to relief, then futility is not a proper basis on which to deny the right to amend. *Saxholm,* 938 F.Supp. at 124 (citing *Allstate Ins. v. Administratia Asigurarilor De Stat,* 875 F.Supp. 1022, 1029 (S.D.N.Y.1995) and *Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief)).

The court has reviewed plaintiff's proposed amended complaint, and finds that it suffers from the same deficiencies as are noted above with respect to his initial complaint. Accordingly, plaintiff's motion for leave to file the proposed amended complaint accompanying his motion will be denied on basis of futility. [6] *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted); *accord Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sep.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted).

[6]  In his proposed amended complaint plaintiff seeks to add a claim for denial of equal protection, alleging that because he was issued a misbehavior report for exercising his right to seek medical care while another inmate was permitted to attend the medical clinic, his right to equal protection was denied. *See* Proposed Amended Complaint (Dkt. No. 14–1) ¶ 60.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)

(citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (internal quotation marks omitted)).

While plaintiff's complaint alleges that he was treated differently than another inmate, conspicuously absent from his proposed amended complaint is the allegation of any fact plausibly suggesting that the difference in treatment was the result of an intentional or purposeful discrimination directed at an identifiable or suspect class. For this reason, I find that the proposed amended complaint does not state a plausible equal protection claim.

### 2. Leave to Amend to Cure Perceived Deficiencies

**\*8**  Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon,* 875 F.Supp. at 1003 (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). The court must next determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

I am unable to conclude that if given the opportunity plaintiff nonetheless would be unable to set forth allegations sufficient to avoid dismissal of his claims at this early stage in the litigation. If he opts to amend, however, the plaintiff is advised that the law requires that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25 (N.D.N.Y. May 22, 1995)

2012 WL 4486086

(Pooler, D.J.) (citation omitted). Such an amended complaint will replace the existing second amended complaint, and therefore must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); *see also* Fed.R.Civ.P. 10(a). The proposed amended complaint also specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged, providing sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

E. *Appointment of Counsel*

In addition to seeking leave to amend, plaintiff has applied to the court for appointment of counsel. As a threshold matter, prior to requesting appointment of *pro bono* counsel, a party must first demonstrate that he or she has been unable to obtain counsel through the private sector or public interest firms. *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 173–74 (2d Cir.1989) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986)). Given that plaintiff has not provided the court with information regarding any efforts by him to obtain counsel, his request is subject to denial on this basis alone.

Turning to the merits of his application, I find that Reed has not demonstrated entitlement to appointment of counsel under the applicable statute. 28 U.S.C. § 1915(e)(1) affords district courts broad—though not limitless—discretion in determining whether to appoint counsel to represent indigent civil litigants. *Hodge,* 802 F.2d at 60. In *Hodge,* the Second Circuit noted that when exercising that discretion the court

**\*9** should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for crossexamination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and

any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination.

*Id.* at 61–62; *see also Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (citing Hodge). As can be seen, of the criteria enunciated by the Second Circuit to be considered when determining whether assignment of pro bono counsel is appropriate, the most important is the merits—that is, "whether the indigent's position [is] likely to be of substance." *Cooper,* 877 F.2d at 172 (citations and internal quotations omitted). Where a plaintiff does not provide a court with evidence, as opposed to mere allegations, relating to his or her claims, that party does not meet this threshold requirement. *See Herman v. Runyon,* No. 96 CIV. 6080, 1997 WL 118379, at \*1 (S.D.N.Y. Mar. 17, 1997).

Each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, J.) (citing *Hodge,* 802 F.2d at 61). Although the Constitution guarantees indigent litigants "meaningful access" to the courts, it does not entitle all such parties to receive the benefit of *pro bono* representation. *Hodge,* 802 F.2d at 60. While, as was previously indicated, the appointment of counsel to represent indigent parties in civil suits is authorized by statute, when that authority is exercised the court is required to call upon attorneys to donate their time *pro bono* to the benefit of indigent litigants and the court. Accordingly, in deference to the limited resources available to the court to serve the interests of the many indigent litigants who pursue claims before it, and recognizing the "thankless burden" associated with such assignments, *Miller v. Pleasure,* 296 F.2d 283, 285 (2d Cir.1961), *cert. denied,* 370 U.S. 964, 82 S.Ct. 1592, 8 L.Ed.2d 830 (1962), courts should not grant such applications indiscriminately, but instead must exercise good judgment and restraint in doing so. *Cooper,* 877 F.2d at172.

In this instance, plaintiff has failed to make a sufficient showing to warrant appointment of counsel to represent him at this early stage in the litigation. Plaintiff's application for appointment of counsel will therefore be denied, without prejudice to renewal. [7]

[7]    In accordance with the customary practice of this court, once a case passes through the discovery and motion phases and becomes trial ready, *pro bono* counsel is usually appointed for an indigent *pro*

2012 WL 4486086

*se* inmate litigant to assist in preparation for and during the trial, either as attorney of record or as standby counsel.

IV. *SUMMARY AND RECOMMENDATION*

The claims now remaining before this court, following severance and transfer of a portion of plaintiff's original complaint to the Western District of New York, include causes of action against two John Doe defendants arising from plaintiff's alleged investigation of contaminated food, as well as claims of retaliation, harassment, and cruel and unusual punishment against defendant M. Soto. Because the Doe defendants in this case have not yet been identified and thus have not yet appeared in the action, the court has not been called on to gauge the sufficiency of plaintiff's claims against those defendants. [8] Turning to plaintiff's claims against defendant Soto, based upon a review of the allegations set forth in plaintiff's complaint, I recommend that all claims against defendant Soto be dismissed, with leave to replead, and find it unnecessary to address his alternative argument, to the effect that he is entitled to qualified immunity from suit.

[8]    Because only "persons" may act under color of state law, a complaint seeking money damages pursuant to § 1983 must name one or more individuals as defendants. *See Walker v. State of Connecticut,* No. 3:06CV165, 2006 WL 1981783, *2 (D.Conn.2006); *Connor v. Hurley,* No. 00Civ.8354LTSAJP, 2004 WL 885828, at * 3 (S.D.N.Y.2004). It is not uncommon for a *pro se* plaintiff to include a "John Doe" or other unknown defendants, together with named defendants in a complaint. Generally, in such cases the complaint is served upon the named defendants, and the plaintiff is directed to pursue discovery to identify the John Doe(s) and to thereafter seek leave to amend the complaint to name them as defendants. In the event the plaintiff chooses to abandon his claims against defendant Soto, leaving only the two "Doe" defendants in the case, I recommend the court allow plaintiff to name the superintendent of Eastern as a defendant—even though there is no suggestion of his or her personal involvement in the alleged constitutional violations—solely for the purpose of effecting service and so that issue may be joined. In that event, once issue is joined, plaintiff may seek through discovery the identity of the John Doe defendant(s). *See Peralta v. Doe,* No. 04–CV–6559P, 2005 WL

357358, at * 2 (W.D.N.Y. Jan.24, 2005) (citing *Valentin v. Dinkins,* 121 F.3d 72, 76 (2d Cir.1997)) (district court should assist *pro se* incarcerated litigants with their inquiry into the identities of unknown defendants and "may pursue any course that it deems appropriate to a further inquiry into the identity" of the unknown defendant); *Harvey v. Corrections Officer,* 9:09–CV–0517 (N.D.N.Y.) (LEK/GHL) (order filed 6/1/09 permitting plaintiff to name superintendent as a defendant for purposes of service and discovery).

**\*10** Turning to plaintiff's pending motions, I conclude that his motion for leave to amend should be denied, based upon futility, but that he nonetheless should be afforded an opportunity to further amend his complaint in an effort to cure the deficiencies cited in this report and recommendation in connection with his allegations against defendant Soto. I further find, however, that he has failed to establish a basis for appointment of counsel to represent him, *pro bono,* at this early procedural juncture in this litigation.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that the motion of defendant M. Soto to dismiss plaintiff's claims against him in this action (Dkt. No. 11) be GRANTED, and that all claims against that defendant be DISMISSED, with leave to file an amended complaint as directed above within thirty days from the date of the filing a decision and order acting upon my recommendation of dismissal; and it is further

ORDERED, that plaintiff's motions for leave to amend (Dkt. No. 14) and for appointment of counsel (Dkt. No. 15) be DENIED in all respects, without prejudice to renewal.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roland v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

2012 WL 4486086

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4486086

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4486085
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benji D. REED, Plaintiff,
v.
John DOE NO. 1; John Doe No
2; and M. Soto, Defendants.

No. 9:11–CV–0250 (TJM/DEP).
|
Sept. 27, 2012.

**Attorneys and Law Firms**

Benji D. Reed, Elmira, NY, pro se.

James Seaman, New York State Attorney General, Albany,
NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This pro se action brought pursuant to 42 U.S.C.
§ 1983 was referred by this Court to the Hon. David
E. Peebles, United States Magistrate Judge, for a Report
and Recommendation pursuant to 28 U.S.C. § 636(b)
and Local Rule N.D.N.Y. 72.3(c). In his July 26, 2012 Report–
Recommendation and Order, Magistrate Judge Peebles
recommended that "the motion of defendant M. Soto to
dismiss plaintiff's claims against him in this action (Dkt. No.
11) be GRANTED, and that all claims against that defendant
be DISMISSED, with leave to file an amended complaint as
directed [in the ReportRecommendation and Order] within
thirty days from the date of the filing of a decision and order
acting upon my recommendation of dismissal." Rep. Rec., p.
28 [dkt. # 22].

In the Report–Recommendation and Order, Magistrate Judge
Peebles also addressed Plaintiff's motions (1) for leave to
file an amended complaint [Dkt. No. 14], and (2) to appoint
counsel [Dkt. No. 15]. Magistrate Judge Peebles denied
Plaintiff's motion for leave to amend because the proposed
amended complaint submitted with the motion did not contain
allegations setting forth plausible claims. See July 26, 2012

Report–Recommendation and Order, pp. 18–20. Magistrate
Judge Peebles denied Plaintiff's motion for appointment of
counsel [Dkt. No. 15], without prejudice to renewal, because
Plaintiff "failed to make a sufficient showing to warrant
appointment of counsel to represent him at this early stage in
the litigation." *Id.* p. 25; *see also id.* pp. 22–25.

Defendant Soto objects to the recommendation to the extent
that it recommends that Plaintiff be granted leave to file an
amended complaint, arguing that Plaintiff already had ample
opportunity to do so but failed to state a claim upon which
relief can be granted. Def. Obj. [dkt. # 24]. Plaintiff objects
by asserting that the complaint does contain sufficient factual
allegations to set forth a plausible claim of retaliation, or, in
the alternative, he should be granted leave to file an amended
complaint to assert a retaliation claim. Pl. Obj. [dkt. # 26].
He also argues that he should be appointed counsel "for the
sole purpose of ascertaining the names of the two John Doe
defendants." *Id.*

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and
recommendation are lodged, the district court makes a *"de
novo* determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." *See* 28 U.S.C. § 636(b)(1)(C); *see also United States
v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997) (The Court
must make a *de novo* determination to the extent that a party
makes specific objections to a magistrate's findings.). "[E]ven
a *pro se* party's objections to a Report and Recommendation
must be specific and clearly aimed at particular findings
in the magistrate's proposal, such that no party be allowed
a second bite at the apple by simply relitigating a prior
argument." *Machicote v. Ercole,* 2011 WL 3809920, at \* 2
(S.D.N.Y., Aug.25, 2011) (citations and interior quotation
marks omitted); *DiPilato v. 7–Eleven, Inc.,* 662 F.Supp.2d
333, 340 (S.D.N.Y.2009) (same). By the same reasoning, a
party may not advance new theories that were not presented to
the magistrate judge in an attempt to obtain this second bite at
the apple. *See Calderon v. Wheeler,* 2009 WL 2252241, at \*1,
n. 1 (N.D.N.Y. July 28, 2009); *Green v. City of New York,* 2010
WL 148128, at \* 4 (E.D.N.Y. Jan.14, 2010) ("[N]ew claims ...
presented in the form of, or along with, 'objections ...' should
be d ism issed.") (citations omitted).

**\*2** General or conclusory objections, or objections which
merely recite the same arguments presented to the magistrate
judge, are reviewed for clear error. *Farid v. Bouey,* 554
F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v.*

Reed v. Doe No. 1, Not Reported in F.Supp.2d (2012)

2012 WL 4486085

*N.Y.C.,* 2009 WL 465645 at *2 (S.D.N.Y. Feb.25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

## III. DISCUSSION

With this standard in mind, and after having reviewed Defendant's and Plaintiff's objections, the Court determines to adopt the recommendation for the reasons stated in Magistrate Judge Peebles's thorough report.

Plaintiff's attempts to reargue the positions he took before Magistrate Judge Peebles are insufficient. The Court finds no error in Magistrate Judge Peebles's analysis or determinations. Moreover, Plaintiff is granted leave to re-plead his claims, so he suffers no prejudice by dismissal. Should he elect to do so, Plaintiff should take care to re-plead his retaliation claim with more particularity as to (1) what he asserts was the retaliatory conduct, and (2) what he believes was the motivation for this conduct. *See* Rep. Rec. p. 21.[1]

[1]    As Magistrate Judge Peebles stated:

If he opts to amend, however, the plaintiff is advised that the law requires that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25, 1995 WL 316935 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). Such an amended complaint will replace the existing second amended complaint, and therefore must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128

(2d Cir.1994)); *see also* Fed.R.Civ.P. 10(a). The proposed amended complaint [must] also specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged, providing sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Inasmuch as the re-pled claims must be accordance with the parameters set forth contained in the Report–Recommendation and Order, *see* fn. 1, *supra,* the Court rejects Defendant's objection to this portion of the recommendation. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ( "It is the usual practice upon granting a motion to dismiss to allow leave to replead.") (citations omitted), *cert den.,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Hughes v. Anderson,* 2011 WL 5829658, at *1 (2d Cir. Nov.21, 2011) ("As a general matter (excepting clearly frivolous cases), it is improper for a district court to dismiss a complaint with prejudice for failure to state a claim without giving the plaintiff notice and an opportunity to be heard and to offer an amended pleading.") (summary order) (citing *Perez v. Ortiz,* 849 F.2d 793, 797 (2d Cir.1988)).

To the extent that Plaintiff's objections challenge Magistrate Judge Peebles's determinations to deny (1) leave to file the previously proposed amended complaint, and (2) appointment of counsel, the objections are in the nature of an appeal. A district court judge reviewing a magistrate judge's non-dispositive pretrial order may not modify or set aside any part of that order unless it is clearly erroneous or contrary to law. *Labarge v. Chase Manhattan Bank, N.A.,* 1997 WL 583122, at *1 (N.D.N.Y. Sept.3, 1997) (Pooler, D.J.) (citing 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a); N.D.N.Y. LOCAL RULE 72.1(b)); *Mathias v. Jacobs,* 167 F.Supp.2d 606, 621–23 (S.D.N.Y.2001). Findings are clearly erroneous when the reviewing court is firmly convinced the lower court decided an issue in error. *Lanzo v. City of New York,* 1999 WL 1007346, *2–3 (E.D.N.Y. Sept.21, 1999). This standard imposes a heavy burden on the objecting party, and only permits reversal where the district court determines that the magistrate judge "abused his broad discretion over resolution of discovery matters." *Labarge,* 1997 WL 583122, at *1; *see Mathias,* 167 F.Supp.2d at 621–23; *Lanzo,* 1999 WL 1007346, *3.

**\*3** The Court finds no error or abuse of discretion by Magistrate Judge Peebles and, therefore, affirms Magistrate

2012 WL 4486085

Judge Peebles's decisions in these regards for the reason set forth in the Report–Recommendation and Order at pages 18–20 and 22–25.

## IV. CONCLUSION

For the reasons discussed above, the Court adopts Magistrate Judge Peebles's July 26, 2012 Report–Recommendation and Order in its entirety. Therefore, Defendant M. Soto's motion to dismiss Plaintiff's claims against him in this action (Dkt. No. 11) is GRANTED, and all claims against Defendant Soto are DISMISSED. Plaintiff is granted leave to file an amended complaint. An amended complaint, if one is filed, must be in accordance with the directions contained in the Report–Recommendation and Order, and must be filed within thirty (30) days from the date of the filing of this Decision and Order.

To the extent that Plaintiff's objections can be construed as appeals from Magistrate Judge Peebles's determinations to deny Plaintiff's motions to amend the complaint [Dkt. No. 14], and to appoint counsel [Dkt. No. 15], Magistrate Judge Peebles's determinations are AFFIRMED.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4486085

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 976035

2012 WL 976035
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Allen MORRIS, Plaintiff,
v.
Calvin RABSATT, P. Barr, Sgt.
McLear, J. Rupert, Defendants.

No. 9:10–CV–0041 (MAD/GHL).
|
Jan. 31, 2012.

**Attorneys and Law Firms**

Allen Morris, Sonyea, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, William J. Mccarthy, Jr., Esq., of Counsel, Albany,
NY, for Defendants.

*REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me
for Report and Recommendation by the Honorable Mae A.
D'Agostino, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Allen
Morris alleges that Defendants falsely accused him of having
a weapon in his cell to retaliate against him for making
complaints against the Cape Vincent Correctional Facility and
the Jefferson County Public Defender's Office. (Dkt. No. 9 ¶
6.) Currently pending before the Court is Defendants' motion
for summary judgment pursuant to Federal Rules of Civil
Procedure 56.[1] (Dkt. No. 34.) For the reasons that follow, I
recommend that Defendants' motion be granted.

[1]     Also pending is Plaintiff's motion to compel
        discovery and strike documents. (Dkt. No. 32.) It
        will be addressed below.

**I. LEGAL STANDARD GOVERNING MOTIONS FOR
SUMMARY JUDGMENT**
Under Federal Rule of Civil Procedure 56, summary
judgment is warranted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).
The party moving for summary judgment bears the initial
burden of showing, through the production of admissible
evidence, that no genuine issue of material fact exists.
Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir.2006).
Only after the moving party has met this burden is the
nonmoving party required to produce evidence demonstrating
that genuine issues of material fact exist. Salahuddin, 467
F.3d at 272–73. The nonmoving party must do more than "rest
upon the mere allegations ... of the [plaintiff's] pleading" or
"simply show that there is some metaphysical doubt as to the
material facts." Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538
(1986). Rather, a dispute regarding a material fact is *genuine*
"if the evidence is such that a reasonable jury could return a
verdict for the nonmoving party." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986). In determining whether a genuine issue of material [2]
fact exists, the Court must resolve all ambiguities and draw
all reasonable inferences against the moving party. Major
League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290,
309 (2d Cir.2008).

[2]     A fact is "material" only if it would have some
        effect on the outcome of the suit. Anderson, 477
        U.S. at 248.

In filing this motion for summary judgment, Defendants filed
a Statement Pursuant to Rule 7.1(a)(3) in compliance with the
Local Rules of this District.[3] (Dkt. No. 34–1.) Plaintiff did
not file a response to this Statement, in contravention of this
Rule.[4] Where a plaintiff has failed to properly respond to a
defendant's Statement of Material Facts (a/k/a its "Rule 7.1
Statement"), the facts as set forth in that Rule 7.1 Statement
will be accepted as true[5] to the extent that (1) those facts are
supported by the evidence in the record,[6] and (2) the non-
moving party, if he is proceeding *pro se,* has been specifically
advised of the potential consequences of failing to respond to
the movant's motion for summary judgment. *See Champion,*
76 F.3d at 486; *cf .* N.D.N.Y. L.R. 56.2 (imposing on movant
duty to provide such notice to *pro se* opponent). The Court
notes that Defendants provided Plaintiff with this District's
"Notification of the Consequences of Failing to Respond to a
Summary Judgment Motion." (Dkt. No. 34 at 3.[7] )

[3]     Local Rule 7.1(a)(3) provides, in part: "Any motion
        for summary judgment shall contain a Statement

of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established."

4    *See* N.D.N.Y. L.R. 7.1(a)(3) ("The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.").

5    *See* N.D.N.Y. L.R. 7.1(a)(3) (*"The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* ) (emphasis in original).

6    *See* Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") (internal quotation marks and citations omitted).

7    The Court advises Defendants that there is an updated "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion" form on the Northern District website (www . nynd.uscourts.gov) under the "e-Library" link.

## II. FACTUAL BACKGROUND

**\*2** Plaintiff was, at the time of the events relevant to this action, an inmate at Riverview Correctional Facility. (Dkt. No. 34–3 at 17:7–9. [8] ) On November 25, 2009, Defendant Correction Officer Rupert received a "snitch note" on his desk stating that Plaintiff had a weapon in his cube. (Dkt. No. 34–7 ¶ 6.) This was reported to Defendant Sergeant McLear, who directed Defendant Barr to conduct a pat frisk of Plaintiff and a search of his cube. (Dkt. No. 34–6 ¶ 7; Dkt. No. 34–7 ¶ 12.) Defendant Barr carried out the pat frisk and search. (Dkt. No. 34–6 ¶ 9.) During Defendant Barr's search of the cube, an item of contraband was discovered; it was a rolled-up can top with black electrical tape on one end. *Id.* ¶¶ 10–11. Defendant Barr notified Defendant McLear, who escorted Plaintiff first to the infirmary and then to the Special Housing Unit ("SHU"). (Dkt. No. 34–5 ¶¶ 9–10.) Defendant Barr wrote up an Inmate Misbehavior Report. (Dkt. No. 34–6 ¶ 14.)

8    Citations to Plaintiff's deposition refer to the page numbers of the transcript.

Plaintiff alleges that Defendant Barr's actions were "clearly a set-up" because Defendant Rupert had the misbehavior report on his desk before the search was conducted. (Dkt. No. 9 ¶ 6; Dkt. No. 34–3 at 16:20–25.) Plaintiff maintains that the weapon did not belong to him. (Dkt. No. 34–3 at 9:1–6.)

Plaintiff alleges that Defendants retaliated against him because he had previously made complaints against the Superintendent of Cape Vincent Correctional Facility and the Jefferson County Public Defender's Office. (Dkt. No. 9 ¶ 6.) He claims that Defendants knew about his complaints because when he arrived at Riverview along with several other inmates, a non-party corrections officer asked him which one of them had "the drug case." (Dkt. No. 34–3 at 18:7–15 and 19:21–23.) It is not clear from the record whether or not Plaintiff confirmed that it was he who was involved.

At the time of Plaintiff's deposition on March 18, 2011, he had two lawsuits pending in the Northern District of New York. One was *Morris v. Barkley,* 09–CV–1413 (N.D.N.Y.), wherein Plaintiff alleged he was improperly charged with possession of drugs while incarcerated at Cape Vincent Correctional Facility. *Id.* at Dkt. No. 8 ¶ 6. The other case was *Morris v. Jefferson County Public Defender's Office,* 09–CV–1412 (N.D.N.Y.), wherein he alleged ineffective assistance of counsel. *Id.* at Dkt. No. 1 ¶ 6. However, both of these lawsuits were filed on December 21, 2009, which was nearly a month *after* the events alleged in this action. Plaintiff may

Morris v. Rabsatt, Not Reported in F.Supp.2d (2012)
2012 WL 976035

have filed grievances or made verbal complaints with respect to his claims against Cape Vincent Correctional Facility and against the Jefferson County Public Defender's Office, but there is no reference in the record before the Court about any complaints made prior to the search of Plaintiff's cube on November 25, 2009.

Defendants have now moved for summary judgment. (Dkt. No. 34.) Plaintiff has opposed the motion. (Dkt. No. 41.) Defendants have filed a letter in reply, essentially resting on the arguments made in their motion. (Dkt. No. 43.)

**\*3** Prior to Defendants' motion for summary judgment, Plaintiff filed a motion to compel certain items of discovery and to strike certain documents provided by Defendants as part of the discovery process. (Dkt. No. 32.) Defendants did not file a response to this motion.

### III. ANALYSIS

#### A. Exhaustion of Administrative Remedies

Defendants argue that this action must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 34–2 at 4–6.[9]) Defendants also made this argument in an earlier motion to dismiss this action. (Dkt. No. 20.) Plaintiff submits that he is excused from this requirement because this action pertains to matters that are "non-grievable." (Dkt. No. 9 ¶ 4; Dkt. No. 41 ¶¶ 6–7.)

[9]    Citations to Defendant's Memorandum of Law refer to the internal page numbers of the document.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program ("IGP"), which is the proper procedure for exhausting most, but not all, claims. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2010). First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id* . at (b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing. *Id.* at (b)(2). At the second step, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at (c). At the third step, a grievant may appeal to the Central Office Review Committee ("the CORC") within seven working days of receipt of the superintendent's written decision. *Id.* at (d). "To properly exhaust administrative remedies, an inmate must file an appeal with the CORC ." *Torres v. Carry,* 672 F.Supp.2d 338, 343 (S.D.N.Y.2009).

**\*4** DOCCS also has an expedited procedure for inmates who wish to file a grievance alleging harassment.[10] N.Y. Comp.Codes R. & Regs. tit. 7, § 701.8 (2010). Under this procedure, the inmate is required to file a grievance with the facility's IGP clerk as under the normal program. *Id.* (a). Rather than being reviewed under the normal guidelines, however, the grievance "must be forwarded to the superintendent by close of business that day." *Id.* (b). The superintendent "shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment ... If not, then it shall be returned to the IGRC for normal processing." *Id.* (c). If the superintendent determines that the grievance presents a "bona fide harassment issue," he must either initiate an in-house investigation, request an investigation by the Inspector General's office, or request an investigation by the New York State Police, Bureau of Criminal Investigation. *Id.* (d). If the inmate is dissatisfied with the superintendent's response or if the superintendent fails to respond to the grievance, the inmate may appeal to the CORC. *Id.* (g)-(h).

[10]    The regulations define "harassment" as "employee misconduct meant to annoy, intimidate or harm an

inmate." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1(e) (2010).

DOCCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. In fact, the regulations specifically state that the results of disciplinary hearings are "non-grievable." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.3(e) (1)-(2) (2010). Rather than "grieving" the result, an inmate who is dissatisfied with the result of a Tier II hearing must file an appeal with the facility superintendent within seventy-two hours of receiving the written disposition of the disciplinary hearing. N.Y. Comp.Codes R. & Regs. tit. 7, § 253.8 (2010). An inmate who is dissatisfied with the result of a Tier III hearing must file an appeal to the commissioner within thirty days of receiving the written disposition. N.Y. Comp.Codes R. & Regs. tit. 7, § 254.8 (2010). The filing of such an appeal constitutes exhaustion under the PLRA. *Davis v. Barrett*, 576 F.3d 129, 132 (2d Cir.2009).

DOCCS' regulations note that if an inmate is unsure whether an issue is grievable or nongrievable, he should "file a grievance and the question will be decided through the grievance process." N.Y. Comp.Codes. R. & Regs. tit. 7, § 701.3(e).

It is clear that Plaintiff did not properly follow either the standard three-step procedure or the expedited procedure for allegations of harassment by staff. Both of these procedures require an inmate to file a grievance with the IGP clerk, which Plaintiff admits on the face of his complaint he did not do. (Dkt. No. 9 ¶ 4.)

Plaintiff states that he was not required to file a grievance because the issues that concerned him were "non-grievable." *Id.* DOCCS' regulations specifically state that the results of disciplinary hearings are "non-grievable." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.3(e)(1)(2) (2010). However, Plaintiff did not have a disciplinary hearing. (Dkt. No. 34–3 at 7:12–14.) Therefore, there was nothing to appeal. Plaintiff testified that he was escorted to the SHU after the incident and that he remained there for seven days before "the ticket was expunged off his record" and he was "released and restored back to population status." (Dkt. No. 9 at 6; Dkt. No. 34–3 at 7:16–17.) It does not appear that Plaintiff's issue was "non-grievable," as that term is utilized by DOCCS' regulations. Therefore, this Court finds that Plaintiff failed to exhaust his administrative remedies.

**\*5** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir.2004).[11] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

11    The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Chavis v. Goord*, No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

Here, neither of the first two *Hemphill* inquiries save Plaintiff's complaint. As discussed above, administrative remedies were available to Plaintiff. Defendants have preserved the exhaustion defense by raising it in their answer. (Dkt. No. 26 ¶ 9.) Plaintiff has not indicated that Defendants inhibited his exhaustion of administrative remedies in any way. Thus, the Court must consider whether special circumstances have been plausibly alleged that justify Plaintiff's failure to comply with the administrative procedural requirements.

Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good*, 380 F.3d 670, 678 (2d Cir.2004). Plaintiff argued in his response to Defendants' motion to dismiss that he could not exhaust his administrative remedies by filing a grievance because the results of disciplinary hearings and matters under investigation by

the Inspector General are "non-grievable." (Dkt. No. 21 at 1.) As discussed above, there was no disciplinary hearing held. DOCCS regulations clearly state that if an inmate is unsure whether an issue is grievable or non-grievable, he should "file a grievance and the question will be decided through the grievance process." N .Y. Comp.Codes. R. & Regs. tit. 7, § 701.3(e). On the other hand, "a letter to the Superintendent who then commences an Inspector General investigation can constitute 'special circumstances' that satisfy the PLRA requirement that prison officials are afforded time and opportunity to address prisoner complaints internally." *Hairston v. LaMarche,* No. 05 Civ. 6642, 2006 U.S. Dist. LEXIS 55436, at * 32, 2006 WL 2309592, at *9 (S.D.N.Y. Aug. 10, 2006).[12]

[12]  A copy of this case was provided to Plaintiff with Defendants' motion papers. (Dkt. No. 34–3 at 44–55.)

**\*6** In this Court's Report–Recommendation on Defendants' motion to dismiss, later adopted by the Hon. Lawrence E. Kahn, I stated that "Plaintiff's complaint and his opposition to the motion to dismiss plausibly suggest that Defendant Rabsatt forwarded Plaintiff's letter to the Inspector General for investigation. This suggestion may, of course, be refuted through evidence at a later stage in this litigation." (Dkt. Nos. 23 at 9–10, 24.) Defendants have now come forward with evidence to refute this claim. A declaration by Defendant Rabsatt has been submitted stating that he did not forward Plaintiff's complaint to the Inspector General's office for investigation. (Dkt. No. 34–4 ¶ 12.) Moreover, Defendants also submitted a letter from DOCCS stating that "[t]he Inspector General's office has no record of any investigation concerning this allegation." (Dkt. No. 34–3 at 57.[13] ) In light of this evidence, and the fact that Plaintiff has offered nothing to dispute it, I recommend that Defendants' motion for summary judgment be granted because Plaintiff failed to exhaust his administrative remedies.

[13]  Page number refers to the number assigned by the ECF system.

**B. Retaliation**

Even if Plaintiff had not failed to exhaust his administrative remedies, Defendants should still be granted summary judgment because Plaintiff cannot sustain a claim for retaliation.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Due to the fact that Plaintiff cannot demonstrate a causal connection between his alleged

2012 WL 976035

complaints and the discovery of a weapon in his cube, I recommend that Defendants be granted summary judgment.

**\*7** The filing of a grievance against prison officials is constitutionally protected conduct. *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). "Prisoners ... have a constitutional right of access to the courts and to petition the government for the redress of grievances." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Filing a lawsuit is constitutionally protected activity. *Houston v. Zen Zen,* 388 F.Supp.2d 172, 174 (W.D.N.Y.2005). Therefore, Plaintiff's filing of a lawsuit or grievance is protected conduct, and satisfies the first prong of the *Mt. Healthy* criteria.

The Second Circuit defines " 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superceded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb.10, 2003)) (emphasis in original). It is possible, for the sake of argument, that if Plaintiff's allegations were true, the actions of the corrections officers could be considered adverse.

The final part of the analysis centers on whether Plaintiff can show a causal connection between his protected activity and the discovery of a weapon in his cube. Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

Regarding temporal proximity, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citations omitted). No bright line test has been drawn " 'to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the

exercise of a federal constitutional right and an allegedly retaliatory action.' " *Id.* (quoting *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001)). The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Id.* (citing *Gorman–Bakos,* 252 F.3d at 555 (suggesting the lapse of five months between protected activity and retaliation may show a causal connection). As discussed above, Plaintiff filed his lawsuits against the Cape Vincent Correctional Facility and the Jefferson County Public Defender's Office on December 21, 2009, which was after the search of his cubicle occurred; therefore, the lawsuits themselves cannot have caused the alleged retaliation. If he is alleging that the retaliation occurred as a result of other complaints he made, there is no evidence regarding if or when such a complaint or grievance was made, so there is no way to determine the temporal proximity of Plaintiff's complaints and the search of his cubicle.

**\*8** There is no evidence in the record regarding Plaintiff's disciplinary history. Regarding the third factor, vindication of the inmate after a hearing may constitute circumstantial evidence of a defendant's retaliatory motive. *Gayle,* 313 F.3d at 683 ("A false reason for the report's issuance would support the inference that the real reason was the improper one: retaliation."). However, as stated above, no disciplinary hearing took place.

The fourth factor involves analyzing any statements by the defendant concerning his or her motivation. In support of the instant motion, Defendants have come forward with a declaration from each Defendant stating that he was not aware of Plaintiff's complaints on the day of the search of Plaintiff's cube. (Dkt. No. 34–4 ¶ 15; Dkt. No. 34–5 ¶ 17; Dkt. No. 34–6 ¶ 23; Dkt. No. 34–7 ¶ 18.) Plaintiff has not submitted anything to refute this evidence. He claims the officers knew about his complaints because another, non-defendant sergeant asked who had the "drug case." (Dkt. No. 34–3 at 18:7–15.) However, there is no evidence in the record that Defendants themselves knew about any complaints or took any action as a result of such knowledge.

Plaintiff has not presented sufficient evidence to establish a triable issue of fact regarding whether the corrections officers retaliated against him. Therefore, I recommend that Defendants' motion for summary judgement be granted.

### C. Motion to Compel and Motion to Strike

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 598 of 830
Morris v. Rabsatt, Not Reported in F.Supp.2d (2012)
2012 WL 976035

Prior to the filing of the motion for summary judgment, Plaintiff filed a motion to compel. (Dkt. No. 32.) He is seeking a copy of the "snitch note," documents relating to a purported investigation by DOCCS' Inspector General, a copy of the minutes from his deposition of March 18, 2011, and a copy of Defendants' Notice of Compliance. *Id.* ¶ 6.

As an initial matter, Defendants have already established that the Inspector General's office did not conduct any investigation into Plaintiff's allegations. (Dkt. No. 34–3 at 57; Dkt. No. 34–4 ¶ 12.) This Court is satisfied that Plaintiff was provided with a copy of Defendants' Notice of Compliance because it was included in his motion to compel. (Dkt. No. 32 at 18. [14]) It is quite probable that Plaintiff was provided a copy of the minutes of his deposition because the copy submitted in support of Defendants' motion contains two errata sheets with Plaintiff's signature. (Dkt. No. 34–3 at 5–6. [15]) In any event, a copy was provided to Plaintiff with Defendants' motion. (Dkt. No. 34–3.) The only remaining item requested is the "snitch note." Even if produced, this note would not cure the fatal flaws in Plaintiff's claims, namely, his failure to exhaust administrative remedies and his inability to show a causal connection between any complaints and the search of his cube. Therefore, Plaintiff's motion to compel is denied.

[14]    This citation utilizes the page number assigned by the ECF system.

[15]    This citation utilizes the page numbers assigned by the ECF system.

The motion to compel also includes a motion to "strike" some of the documents submitted to Plaintiff by Defendants as part of discovery, pursuant to Federal Rule of Civil Procedure 12(f). (Dkt. No. 32 ¶ 11.) Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, the documents given to Plaintiff were provided as part of the discovery process, and are not part of a pleading. Complaints, answers, counterclaims, and crossclaims are all pleadings. Fed.R.Civ.P. 7. Rule 7 does not encompass discovery materials. Therefore, Plaintiff's motion to strike is denied.

**\*9  ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 34) be **GRANTED;** and it is further

**ORDERED** that Plaintiff's motion to compel (Dkt. No. 32) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion to strike (Dkt. No. 32) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

### All Citations

Not Reported in F.Supp.2d, 2012 WL 976035

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by Santos v. Schroeder, 2nd Cir., January 23, 2024

2023 WL 9377500
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Francisco SANTOS, Plaintiff,
v.
B. SCHROEDER, et al., Defendants.

9:19-cv-1610 (BKS/TWD)
|
Signed November 3, 2023

**Attorneys and Law Firms**

Plaintiff pro se: Francisco Santos, 13-A-0532, Wende Correctional Facility, P.O. Box 1187, Alden, NY 14004.

For Defendants: Letitia James, Attorney General of the State of New York, Nicholas W. Dorando, Assistant Attorney General, of Counsel, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

**\*1** This decision follows on the heels of the Court's Memorandum-Decision & Order dated September 27, 2023. (Dkt. No. 115). As background, Plaintiff Francisco Santos commenced this civil rights action asserting claims under 42 U.S.C. § 1983 arising out of his incarceration. (Dkt. Nos. 1, 51). On February 21, 2023, Defendants filed a motion for summary judgment under Federal Rule of Civil Procedure 56 seeking dismissal of Plaintiff's claims. (Dkt. No. 99). On August 9, 2023, Plaintiff filed a response, (Dkt. No. 109), and a reply was filed on August 16, 2023, (Dkt. No. 111). This matter was referred to United States Magistrate Judge Thérèse Wiley Dancks who, on August 22, 2023, issued a Report-Recommendation recommending that Defendants' motion for summary judgment be granted. (Dkt. No. 112). Magistrate Judge Dancks advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the Report-Recommendation and that failure to do so within fourteen days would preclude appellate review. (Id., at 20).

On August 30, 2023, Plaintiff requested an extension of the deadline to file objections, and the Court granted his request in part, extending the deadline until September 18, 2023. (Dkt. Nos. 113–14). As no objections to the Report-Recommendation were filed by that deadline, on September 27, 2023, the Court reviewed the Report-Recommendation for clear error, found none, adopted the Report-Recommendation, and dismissed Plaintiff's case. (Dkt. No. 115).

On September 28, 2023, the Court received objections from Plaintiff, which were signed on September 17, 2023. (Dkt. No. 117). Plaintiff states that he placed a copy of his objections in the mail at his facility on September 17, 2023. (Id., at 2). Under the "prison mailbox rule," the date of filing is deemed to be the date that the prisoner plaintiff delivered his complaint to a prison guard for mailing to court, which is presumed to be the date that the complaint was signed. See Houston v. Lack, 487 U.S. 266, 276 (1988); Noble v. Kelly, 246 F.3d 93, 97 (2d Cir. 2001). Therefore, the Court will consider Plaintiff's objections as timely, vacate the decision and judgment dated September 27, 2023, and review Plaintiff's objections.[1]

[1] For these reasons, the Court will grant Plaintiff's motion filed on November 1, 2023, which seeks reconsideration and to vacate the decision and judgment on the basis that his objections were timely under the prison mailbox rule. (Dkt. No. 119).

**II. DISCUSSION**

Plaintiff alleges First Amendment retaliation claims against Defendants Corrections Officer ("CO") Schroeder, CO Kassen, Sgt. Sirvent, Lt. Masner, and Inmate Grievance Program ("IGP") Supervisor Parmiter. (See Dkt. Nos. 50–51). In general, Plaintiff alleges that after he filed a grievance, Defendants caused him to receive a misbehavior report and spend 19 days in "keeplock" confinement and also failed to file a later grievance. (Id.). The Court assumes familiarity with the rest of the factual background set forth by Magistrate Judge Dancks in the Report-Recommendation. (Dkt. No. 112, at 4–6). The Court adopts Magistrate Judge Dancks's summary of the applicable law, which has not drawn an objection from the parties.

**\*2** As an initial matter, Plaintiff claims that there was an "abuse of discretion in denying the Amendment and

2023 WL 9377500

Supplement of the Complaint to confirm with the evidence made available after the closing of discovery through Court's orders, prior to the filing of the instant Second Motion (Dkt. #99) for Summary Judgment by the Defendants." (Dkt. No. 117, at 6, 22). This objection appears to concern a ruling made by Magistrate Judge Dancks on January 23, 2023. (Dkt. No. 96). However, the Court's review is strictly limited to the Magistrate Judge's Report-Recommendation regarding Defendants' summary judgment motion. To the extent Plaintiff protests rulings made earlier in this case that do not concern the Report-Recommendation, such objections are improper at this stage and will be disregarded.

Turning to the Report-Recommendation, Magistrate Judge Dancks recommended denying summary judgment on exhaustion grounds, finding that there was an issue of fact as whether administrative remedies were available to Plaintiff. (Dkt. No. 112, at 9). On this topic, Plaintiff appears to object to an "[o]versight of the disputed material facts regarding to the thwarted administration remedies" by Defendant IGP Supervisor Parmiter. (Dkt. No. 117, at 7). But Plaintiff does not explain this objection. Therefore, the Court has reviewed Magistrate Judge Dancks's exhaustion finding for clear error, and finding none, adopts it.

As to the merits, Magistrate Judge Dancks recommended granting summary judgment on Plaintiff's First Amendment retaliation claim against CO Schroeder because "Defendants have established CO Schroeder would have issued the misbehavior report regardless of any retaliatory animus he may have had against Plaintiff." (Dkt. No. 112, at 15). Magistrate Judge Dancks also recommended granting summary judgment on Plaintiff's First Amendment retaliation claims against CO Kassen, Sgt. Sirvent, Lt. Masner, and IGP Supervisor Parmiter because Plaintiff failed to show that they "had a motive to retaliate against him for his grievance against CO Schroeder," and failed to raise an issue of fact as to causation, i.e. that his protected conduct was a "substantial or motivating factor in his discipline[.]" (*Id.*, at 19).

### A. CO Schroeder

Plaintiff claims that Magistrate Judge Dancks erred in finding that Defendants established that CO Schroeder "issued the misbehavior report because Plaintiff disobeyed a direct order and not necessarily based on any retaliatory motive[.]" (Dkt. No. 117, at 12). Relatedly, Plaintiff claims that Magistrate Judge Dancks abused her discretion and improperly resolved "clearly disputed material facts," including whether or not Plaintiff refused a direct order. (*Id.*, at 21–22). As relevant

here, CO Schroeder states that on August 18, 2019, he "noticed Plaintiff exiting the Inmate bathroom with used paper towels in his hands." (Dkt. No. 99-3, at 3). According to CO Schroeder, he ordered Plaintiff to "return to the bathroom and throw away the paper towels, as directed by the sign in the bathroom." (*Id.*). CO Schroeder states that "Plaintiff ignored my orders, walked by me, and threw the used paper towels away in the upper Visit Room trash can." (*Id.*).

Plaintiff's version of this incident differs in important respects. Plaintiff testified that he came out of the bathroom with a paper towel in his hand, and CO Schroeder "started telling me that I got to throw it out." (Dkt. No. 99-2, at 35). According to Plaintiff, "[t]hinking nothing of it I threw [the paper towel] in the garbage that's nearest to him." (*Id.*). Plaintiff testified that "[a]t that point [CO Schroeder] didn't say specifically which garbage so I just threw it out on the garbage that was right in front of him." (*Id.*). Plaintiff testified that CO Schroeder then told him, "I got to grab it from the garbage can, pick it up and go back to the bathroom and throw it in the garbage can inside the bathroom." (*Id.*, at 36). Plaintiff further testified that he did not follow this order because it was "inhumane," "degrad[ing]," and "not within the authorized policy." (*Id.*).

**\*3** Based on the forgoing, the Court finds that there is an issue of fact as to whether Plaintiff refused a direct order. On one hand, CO Schroeder states that he ordered Plaintiff to return to the bathroom and throw away the paper towels, which Plaintiff refused to do. In contrast, Plaintiff testified that CO Schroeder initially only ordered Plaintiff to throw away the paper towels and Plaintiff obeyed this order by throwing them in the visit room garbage can. Plaintiff testified that CO Schroeder then issued a *second* order to remove the paper towels from the visit room garbage can and put them in the bathroom garbage can. It is this second order which Plaintiff admits refusing to obey. But CO Schroeder's affidavit does not even mention giving such an order. Thus, the parties' conflicting testimony raises issues of fact as to what exactly CO Schroeder said to Plaintiff in ordering him to throw away the paper towels and what Plaintiff did in response.

These issues of fact preclude summary judgment on Plaintiff's First Amendment retaliation claim.[2] There is no dispute that Plaintiff engaged in protected activity by filing a grievance against CO Schroeder on July 26, 2019, and that CO Schroeder took an adverse action when he issued a misbehavior report against Plaintiff on August 18, 2019 for allegedly disobeying a direct order, which caused Plaintiff to

spend 19 days in keeplock confinement. Viewing the facts in the light most favorable to Plaintiff, he did not disobey a direct order, and therefore, the Court cannot conclude that CO Schroeder would have issued the misbehavior report regardless of any retaliatory animus he may have had against Plaintiff. Rather, Plaintiff has raised an issue of fact as to whether retaliatory animus was the but-for cause of CO Schroeder's action. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (stating that but-for causation applies to First Amendment retaliation claims). Therefore, the Court declines to adopt the portion of the Report-Recommendation regarding CO Schroeder.

2  Having found an issue of fact regarding whether Plaintiff disobeyed a direct order, the Court declines to address Plaintiff's related arguments that there are issues of fact as to the signage in the bathroom and spoliation of evidence. (*See* Dkt. No. 117, at 6–8).

**B. CO Kassen, Sgt. Sirvent, Lt. Masner, and IGP Supervisor Parmiter**

As relevant here, Plaintiff alleges that CO Kassen, Sgt. Sirvent, and Lt. Masner "conspired with CO Schroeder to issue the false misbehavior report in retaliation for Plaintiff's July 26, 2019, grievance against CO Schroeder." (Dkt. No. 51-1, at 13–14, 20–22). Plaintiff also alleges that he submitted a grievance on September 1, 2019 against CO Schroeder, CO Kassen, Sgt. Sirvent, and Lt. Masner regarding the misbehavior report, but IGP Supervisor Parmiter refused to file it. (*Id.*, at 28–29). Addressing these claims, Magistrate Judge Dancks found that "Plaintiff has not demonstrated CO Kassen, Sgt. Sirvent, Lt. Masner, and Parmiter had a motive to retaliate against him for his grievance against CO Schroeder." (Dkt. No. 112, at 19). Magistrate Judge Dancks further found that Plaintiff's "conclusory and speculative allegations are insufficient to support 'an inference of a causal connection between' the protected conduct and the alleged false misbehavior report and refusal to file a grievance." (*Id.*).

Plaintiff objects that Magistrate Judge Dancks incorrectly found that he failed to prove an inference of a causal connection between his protected activity and these Defendants' actions. (Dkt. No. 117, at 12). Specifically, Plaintiff cites comments allegedly made by CO Kassen and IGP Supervisor Parmiter as evidence of causation and retaliatory intent. (*Id.*, at 19). But Magistrate Judge Dancks evaluated these comments and found otherwise. (Dkt. No. 112, at 17–19). To the extent Plaintiff wishes to relitigate the

issue, that is not proper basis for an objection. Therefore, the Court will only review for clear error. *See Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) (recognizing that clear error review applies to arguments that simply "rehash" those made to the Magistrate Judge). Having reviewed this portion of the Report-Recommendation for clear error, the Court finds none.

**\*4** In any event, even if Plaintiff had made a proper objection, the Court would reach the same ultimate conclusion as Magistrate Judge Dancks. There is no dispute that the August 18, 2019 misbehavior report was issued by CO Schroeder. (Dkt. No. 51-1, at 44–45). Plaintiff has not adduced any evidence that CO Kassen, Sgt. Sirvent, or Lt. Masner participated in issuing the misbehavior report, and his vague allegations of conspiracy are insufficient to show their personal involvement in any retaliation, much less intent and causation. *See Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) (dismissing prisoner's claim that officers conspired to retaliate against him as "unsupported, speculative, and conclusory") (internal quotation marks omitted). Therefore, CO Kassen, Sgt. Sirvent, and Lt. Masner are entitled to summary judgment on Plaintiff's First Amendment retaliation claims against them.

Plaintiff's claim against IGP Supervisor Parmiter fares no better. According to Plaintiff, IGP Supervisor Parmiter retaliated against him by refusing to file his September 1, 2019 grievance against CO Schroeder, CO Kassen, Sgt. Sirvent, and Lt. Masner. (Dkt. No. 51-1, at 28–29). Plaintiff alleges that IGP Supervisor Parmiter said that she would not file or process his grievance because she "did not feel like doing so." (*Id.*, at 28). But this comment does not reflect any retaliatory motive. Further, the record contains evidence of a legitimate, non-retaliatory motive: IGP Supervisor Parmiter sent a memo to Plaintiff on September 17, 2019 stating that his grievance was untimely. (*Id.*, at 64). IGP Supervisor Parmiter also sent a memo to Plaintiff on September 24, 2019 stating that he could provide mitigating circumstances for the untimely grievance, (*id.*, at 66), an invitation that is not consistent with retaliation.

Plaintiff cites, as evidence of IGP Supervisor's Parmiter's retaliatory intent, a comment she allegedly made on September 27, 2019, that "if [Plaintiff] value[s] [his] life, [he] shall not make any further attempts to file [the September 1, 2019 Grievance], because next time it will be more than a 'Kee[p]lock' confinement." (Dkt. No. 117, at 19) (quoting Dkt. No. 109, at 67). But any inference of retaliatory intent

2023 WL 9377500

that could be drawn from this comment is undermined by Plaintiff's testimony that he believed IGP Supervisor Parmiter was "assisting [to] cover up the retaliation that was already taking place." (Dkt. No. 99-2, at 51). In other words, even accepting Plaintiff's version of events, IGP Supervisor Parmiter was driven by a desire to cover up for her colleagues' alleged conspiracy to issue the false misbehavior report. And as described above, these conspiracy allegations are entirely speculative.

In sum, on this record, considering all of the evidence in the light most favorable to Plaintiff, the Court finds that no reasonable jury could find that Plaintiff's grievance against CO Schroeder was the but-for cause of an adverse action by IGP Supervisor Parmiter. Accordingly, IGP Supervisor Parmiter is entitled to summary judgment on Plaintiff's First Amendment retaliation claim against her. [3]

[3]    The Court reaches this conclusion without relying on IGP Supervisor Parmiter's Declaration, which as Plaintiff points out, was submitted to the Court unsigned. (Dkt. No. 99-4, at 1–5).

## III. CONCLUSION
For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for reconsideration/to vacate (Dkt. No. 119) is **GRANTED**; and it is further

**ORDERED** that the Court's Memorandum-Decision & Order (Dkt. No. 115) and Judgment (Dkt. No. 116) shall be **VACATED**; and it is further

**ORDERED** that the Report-Recommendation, (Dkt. No. 112), is **ADOPTED in part and REJECTED in part as stated above**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 99) is **GRANTED in part and DENIED in part**; and it is further

**\*5  ORDERED** that Plaintiff's First Amendment retaliation claims against Defendants CO Kassen, Sgt. Sirvent, Lt. Masner, and IGP Supervisor Parmiter are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's First Amendment retaliation claim against Defendant CO Schroeder shall proceed; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 9377500

---

**End of Document**                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 603 of 830

Flemming v. King, Not Reported in Fed. Supp. (2016)

2016 WL 5219995

2016 WL 5219995
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Woodrow FLEMMING, Plaintiff,

v.

Matthew J. KING; David Bilow, Defendants.

No. 14-CV-316 (DNH/CFH)
|
Signed 06/20/2016

**Attorneys and Law Firms**

WOODROW FLEMMING, P.O. Box 146 New York, New York 10039, Plaintiff Pro Se.

HON. ERIC T. SCHNEIDERMAN Attorney General for the State of New York The Capitol, OF COUNSEL: ORIANA CARRAVETTA, ESQ. Assistant Attorney General, Albany, New York 12224-0341 Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]     This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

**\*1**   Plaintiff pro se Woodrow Flemming ("Flemming"), formerly an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants King and Bilow: (1) used excessive force on him in violation of the Eighth Amendment; and (2) assaulted him in retaliation for his filing grievances against correction staff, in violation of the First Amendment. [2] See Dkt. No. 1 ("Compl.") at 5. Although no longer incarcerated, Flemming was incarcerated at Upstate Correctional Facility ("Upstate C.F.") at all relevant times.

[2]     Following initial review of the complaint filed in this action, District Judge David N. Hurd dismissed Flemming's Eighth Amendment medical indifference claims against defendants Adams, Smith, and Rock. Dkt. No. 5 at 10. Defendants

Adams, Smith, and Rock were also dismissed from this action. Id.

Presently pending before the Court is defendants' motion to dismiss Flemming's claims pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) for failure to state a claim upon which relief may be granted. Dkt. No. 32. Flemming filed a response in opposition to defendants' motion. Dkt. No. 34. For the following reasons, it is recommended that defendants' motion be granted in part, and denied in part.

**I. Background**

The facts are reviewed in the light most favorable to Flemming as the non-moving party. See subsection III(A) infra. Because a portion of Flemming's claims were dismissed upon initial review of the complaint, Flemming's allegations are summarized below only to the extent that they are relevant to the pending motion.

**A. Flemming's Recitation of the Facts**

Flemming alleges that, on March 24, 2011, defendant King assaulted him, and defendant Bilow pushed him to the ground. Compl. at 5. Both incidents occurred outside the draft room at Upstate C.F. Id. Flemming also alleges that, on this same date, he was threatened by "officers" [3] and told not to file any more grievances. Id.

[3]     Although not identified in his complaint, Flemming identifies the officers who threatened him as defendants King and Bilow in his opposition papers. See Dkt. No. 34 at 3, ¶ 13.

**II. Discussion** [4]

[4]     All unpublished opinions cited to by the Court in this Report-Recommendation and Order are, unless otherwise noted, attached to this Report-Recommendation and Order.

**A. Legal Standard**

Flemming v. King, Not Reported in Fed. Supp. (2016)

2016 WL 5219995

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 326, 335 (2d Cir. 2009)) (internal quotation marks omitted). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

**\*2** Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is " 'plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (internal citations omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

**B. Special Solicitude**

Ordinarily, where a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too num erous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' (internal citations omitted)). However, "there are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude' or status that is normally afforded pro se litigants." Standley v. Dennison, No. 9:05-CV-1033 (GLS/GHL), 2007 WL 2406909, at \*7 (N.D.N.Y. Aug. 21, 2007) (quoting Smith v. Burge, No. 03-CV-0955, 2006 WL 2805242, at \*3 & n.3 (N.D.N.Y. Sept. 28, 2005) (Kahn, J., adopting report-recommendation of Lowe, M.J.) (citations omitted)).

This Court has already diminished the special solicitude afforded to Flemming. In a Memorandum-Decision and Order entered July 16, 2015, this Court reviewed Flemming's extensive litigation history within the Second Circuit. See Dkt. 22 at 7-8. At that time, Flemming had filed nearly sixty civil rights in the Second Circuit. Id. at 7. Based on Flemming's lengthy history of filing complaints in the Second Circuit, this Court diminished the special solicitude that would normally be afforded to him as a pro se litigant at the pleading stage of this action.[5] Id. at 9. Thus, the Court will decide defendants' motion to dismiss bearing in mind Flemming's diminished status as a pro se litigant.

[5]     The Court also notes that, in a separate action brought by Flemming on January 12, 2015, District Judge Hurd determined that Flemming is not entitled to the special solicitude normally afforded to a pro se litigant, based on Flemming's history as an "experienced and vexatious pro se plaintiff."

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 605 of 830

Flemming v. King, Not Reported in Fed. Supp. (2016)

2016 WL 5219995

Flemming v. Rock, No. 9:15-CV-30, 2016 WL 632248, at *2 (N.D.N.Y. Feb. 16, 2016).

### C. Excessive Force

**\*3** A prisoner plaintiff seeking to demonstrate a claim of excessive force must satisfy both objective and subjective components. The subjective component determines whether the defendants acted "with a sufficiently culpable state of mind." Hudson v. McMillian, 503 U.S. 1, 21 (1992) (citation omitted). This component requires a showing that the defendants "had the necessary level of culpability, showing by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999) (quoting Wilson v. Seiter, 501 U.S. 294, 299 (1991)); see, e.g., Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000); Davidson v. Flynn, 32 F.3d 27, 30 n.2 (2d Cir. 1994). T he objective component is demonstrated where the alleged conduct is " 'sufficiently serious' by objective standards." Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)) (additional citation omitted). "The objective component of the Eighth Amendment test is also context specific, turning upon 'contemporary standards of decency.' " Blyden, 186 F.3d at 263 (quoting Hudson, 503 U.S. at 8) (additional citation omitted).

Here, Flemming claims that he was "assaulted" by defendant King and "push [sic] down by [ ] Bilow to the ground." Compl. at 5. Defendants allege that Flemming's complaint fails to meet the pleading standard articulated in Iqbal. Dkt. No. 32-1 at 8. Defendants further argue that, even assuming that the allegations are true, the use of force alleged by Flemming is de minimis. Id. at 8-9.

As to the objective element of Flemming's excessive force claims, he has failed to allege he suffered an injury. "The Second Circuit has noted its agreement with other circuits that 'some degree of injury is ordinarily required to state a claim [of excessive force.]' " Benjamin v. Flores, No.11-CV-4216 (ARR), 2012 WL 5289513, at *3 (E.D.N.Y. Oct. 23, 2012) (quoting United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999)). Although the objective element may be satisfied even if the prisoner does not show a "serious" injury, Flemming's failure to allege any injury at all falls short of satisfying pleading requirements. See Hudson, 503 U.S. at 7 ("The absence of serious injury is ... relevant to the Eighth Amendment inquiry, but does not end it."). Thus, Flemming has failed to plausibly allege the objective element of his

Eighth Amendment claim. See Benjamin, 2012 WL 5289513, at *3 (finding that the plaintiff failed to meet the objective element of his excessive force claim where he failed to allege any injury).

As to the subjective element of his excessive force claim, Flemming's allegations against defendants King and Bilow fail to provide the context of the alleged incident. Although the Second Circuit has previously allowed a prisoner's Eighth Amendment excessive force claim to proceed despite the "claim [was] weak and [the] evidence extremely thin," Griffin, 193 F.3d at 91, Flemming has lost the full benefit of the special solicitude normally afforded to pro se litigants in this Court, due to his lengthy and sometimes abusive litigation history. See Dkt. No. 22. Given that Flemming has failed to plead against King and Bilow both the context by which the alleged force was used or any injuries sustained, he has failed to state a claim upon which relief may be granted. See Iqbal, 556 U.S. at 678 ("A pleading that offers labels and conclusions ... a formulaic recitation of the elements of a cause of action ... [or] naked assertions devoid of further factual enhancement" does not suffice.) (internal quotation marks and citations omitted). Flemming has failed to meet the subjective element of the analysis because he does not allege facts to show that either defendant acted "maliciously" or "wantonly" as required to adequately state a claim of excessive force. See Boddie v. Schneider, 105 F.3d 857, 862 (2d Cir. 1997) (dismissing excessive force claim where the plaintiff failed to allege any facts to show that the defendants had "used force maliciously and sadistically to cause harm") (internal quotation marks and citation omitted). Indeed, a complaint does not suffice "where the well-pleaded facts do not permit the court to infer more than a mere possibility of misconduct[.]" [6] Id. at 679. Thus, Flemming has failed to plausibly allege the subjective element of his excessive force claim.

[6]    The Court further notes that District Judge Hurd dismissed Flemming's excessive force claims in Flemming v. Rock, 2016 WL 632248, at *3, and noted that the dismissed claims were nearly identical to excessive force claims asserted by Flemming in a prior action—Flemming v. Santamore, No. 9:15-CV-29 (DNH/CFH). Judge Hurd further noted that those claims were nearly identical to the excessive force claims asserted in two other complaints filed by Flemming in the Northern District of New York. Flemming v. Rock, 2016 WL 632248, at *2 n.4. Upon review of the

Flemming v. King, Not Reported in Fed. Supp. (2016)

2016 WL 5219995

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 606 of 830

complaint in Flemming v. Rock, the Court notes that Flemming's excessive force claims—which were dismissed for failure to state a claim upon which relief may be granted—are very similar to the excessive claims asserted in this case, albeit against different defendants. See Flemming v. Rock, No. 9:15-CV-30, Dkt. No. 1.

**\*4** Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. First Amendment Retaliation

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98, 110 (2d Cir. 2009). " To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. 506 (2002)). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." See Barclay v. New York, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). In order to prove an adverse action, a plaintiff must show that the defendant's " 'retaliatory conduct ... would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights .... Otherwise, the retaliatory act is simply de minimis, and therefore outside the ambit of constitutional protection.' " Roseboro v. Gillespie,

791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting Dawes, 239 F.3d at 292-93).

Here, Flemming alleges in his second cause of action that he was threatened by defendants King and Bilow. Compl. at 5. He also states that he told King and Bilow that he would file a lawsuit against them. Id. He then states, in a separate cause of action, that King and Bilow assaulted him. Id.

To satisfy the first element of a retaliation claim, Flemming must show that he engaged in a protected activity. Flemming states that he threatened to file a lawsuit against defendants King and Bilow. Compl. at 5. Courts in this Circuit have routinely found that a prisoner's threat of filing a grievance or lawsuit constitutes protected activity. See Gibson v. Fischer, No. 9:10-cv-0968 (LEK/TWD), 2014 WL 7178346, at \*15 (N.D.N.Y. Dec. 15, 2014) (denying summary judgment as to retaliation claim where the plaintiff threatened to file a grievance); Sprau v. Coughlin, 997 F. Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint sufficient to establish protected activity); but see Henry v. Dinelle, No. 9:10-CV-0456 (GTS/DEP), 2011 WL 5975027, at \*7 (N.D.N.Y. Nov. 29, 2011) (finding that a prisoner's statement implying that he would be consulting an attorney about whether to file a grievance was not protected activity).

**\*5** As to the second prong, although Flemming states that he was assaulted by defendant King, and pushed down by defendant Bilow, the Court has stated above in section III.C, supra, that Flemming has failed to state an excessive force claim against defendants Kind and Bilow. However, for the purposes of First Amendment retaliation analysis, the Court notes that a physical assault constitutes adverse action. See Baskerville v. Blot, 224 F. Supp. 2d 723, 731-32 (S.D.N.Y. 2002) (finding that a retaliatory assault constitutes adverse action). Indeed, the alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis. The alleged adverse action need only be " '*capable* of deterring a person of ordinary firmness' from exercising the constitutional right in question." Nelson v. McGrain, No. 6:12-CV-6292(MAT), 2015 WL 7571911, at \*2 (W.D.N.Y. Nov. 24, 2015) (quoting Hill v. Lappin, 630 F.3d 468, 472 (6th Cir. 2010)) (emphasis in original) (citation omitted). Thus, at this stage of the pleadings, Flemming has satisfied the second prong. See id. (concluding that retaliatory acts were more than de minimis acts of harassment).[7]

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 607 of 830

Flemming v. King, Not Reported in Fed. Supp. (2016)

2016 WL 5219995

7

Defendants assert in their Memorandum of Law in support of their motion that the adverse action prong of Flemming's retaliation claim consists only of a claim that officers threatened him to cease his filing grievances. Dkt. No. 32-1 at 6-7. They base this argument on Flemming's use of the form civil rights complaint, stating that because he alleges threats in the section labeled "second cause of action" and a physical assault in the section labeled "third cause of action," he has failed to satisfy the second prong of First Amendment retaliation analysis. Id. at 7. The Court rejects this argument. Upon initial review, District Judge Hurd interpreted Flemming's complaint as stating that Flemming was assaulted for threatening to initiate a lawsuit. Dkt. No. 3 at 5-6. The undersigned will do the same.

Lastly, as to the third prong, plaintiff states that on March 24, 2011, he was threatened by King and Bilow to not file any more grievances. Compl. at 5. He then states that he threatened to file a lawsuit against defendants King and Bilow. Id. That same day, he was allegedly assaulted by King, and pushed down by Bilow. Id. Claims of retaliation "must be 'supported by specific and detailed factual allegations,' 'not stated in wholly conclusory terms.' " Friedl v. City of New York, 210 F.3d 79, 86 (2d Cir. 2000) (quoting Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)). The only circumstantial evidence supporting the finding of a causal connection is Flemming's assertions that the alleged assaults committed by both defendants happened on the same day that he threatened to file a lawsuit against those same defendants. See Compl. at 5. However, this temporal proximity, coupled with the common identity between the officers who Flemming verbalized his threat to, and the officers who allegedly assaulted him, are sufficient to establish the third prong of Flemming's First Amendment retaliation claim. See Vogelfang v. Capra, 889 F. Supp. 2d 489, 518 (S.D.N.Y. 2012) (denying motion to dismiss retaliation claim where the plaintiff alleged temporal proximity, coupled with a common identity between the subject of the plaintiff's grievance and the officer who issued a false misbehavior report).

Although Flemming's pleadings lack specificity, the Court finds that at this stage in the proceedings, he has alleged

sufficient facts to state a plausible claim. While this Court diminished the special solicitude afforded to Flemming at the pleading stage of the proceedings, it did not completely abolish the leniency with which his pleadings are to be construed. See Sealed Plaintiff, 537 F.3d at 191. Thus, the Court finds that Flemming has stated a plausible First Amendment retaliation claim to overcome defendants' motion.

Accordingly, it is recommended that defendants' motion on this ground be denied.

### III. Conclusion

**\*6** For the reasons stated above, it is hereby:

RECOMMENDED that defendants Matthew J. King and David Bilow's motion for dismissal under Rule 12(b)(6) (Dkt. No. 32) of plaintiff Woodrow Flemming's complaint (Dkt. No. 1) be

1. **GRANTED** as to the Eighth Amendment excessive force claims against defendants King and Bilow.

2. **DENIED** as to the First Amendment retaliation claims against defendants King and Bilow; and it is further

**ORDERED** that the Clerk serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties m ay lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

DATED: June 20, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5219995

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Flemming v. King, Not Reported in Fed. Supp. (2016)
2016 WL 5173282

2016 WL 5173282
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Woodrow FLEMMING, Plaintiff,

v.

Matthew J. KING; David Bilow, Defendants.

9:14-CV-0316 (DNH/DEP)
|
Signed 09/21/2016

**Attorneys and Law Firms**

WOODROW FLEMMING, P.O. Box 146, New York, NY 10039, Plaintiff pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, The Capital, OF COUNSEL: ORIANNA CARRAVETTA, ESQ., Assistant Attorney General, Albany, NY 12224-0341.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

 **\*1** *Pro se* plaintiff Woodrow Flemming brought this civil rights action pursuant to 42 U.S.C. § 1983. On June 20, 2016, the Honorable Christian F. Hummel, United States Magistrate Judge, advised by Report-Recommendation that

defendants' motion for summary judgment be granted in part and denied in part. See ECF No. 37. Defendants have filed timely objections and plaintiff has filed a response. See ECF Nos. 39, 40.

Based upon a de novo review of the Report-Recommendation, the Report-Recommendation is accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Defendants Matthew J. King and David Bilow's motion for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 32) of plaintiff Woodrow Flemming's complaint (ECF No. 1) is:

  (a) **GRANTED** as to the Eighth Amendment excessive force claims against defendants King and Bilow; and

  (b) **DENIED** as to the First Amendment retaliation claims against defendants King and Bilow; and

2. The Clerk serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5173282

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

2018 WL 3195095
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bruce FLYNN, Plaintiff,

v.

Joe WARD and Lief Wellenstein, Defendants.

No. 15-CV-1028 (TJM/CFH)
|
Signed 06/06/2018
|
Filed 06/07/2018

**Attorneys and Law Firms**

Bruce Flynn, 10-A-1558, Elmira Correctional Facility, P.O. Box 500, Elmira, NY 14902, pro se.

Attorney General for the State of New York, OF COUNSEL: BRIAN W. MATULA, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Bruce Flynn ("Flynn" or "Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendants Acting Superintendent Joe Ward ("Defendant" or "Ward") and C.O. Lief Wellenstein ("Defendant" or "Wellenstein") for violations of his rights under the First Amendment. Dkt. No. 20 ("Am. Compl."). Additional defendants were named, but the claims against them have since been dismissed. Dkt. No. 22. Presently before the undersigned is Defendants' motion for summary judgment and dismissal of the Amended Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 64. Flynn did not oppose the motion. For the following reasons, it is recommended that Defendants' motion be granted in part and denied in part.

**I. Failure to Respond**

Flynn failed to submit any opposition papers to Defendants' motion for summary judgment. Flynn was notified of the consequences of failing to respond to a summary judgment motion by Defendants and the Court. Dkt. Nos. 64-1 and 65. However, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response, Defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56(c). While "[a] verified complaint is to be treated as an affidavit ... and [may] be considered in determining whether material issues of fact exist[,]" see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted), Flynn's Amended Complaint is not verified. [2] Thus, the Amended Complaint does not have the "force and effect of an affidavit." See Tafari v. Brown, No. 9:10-CV-1065 (GTS/DRH), 2012 WL 1098447, at *7, n. 8 (N.D.N.Y. Mar. 30, 2012) (collecting cases). Despite this fact, the Court may consider the exhibits attached to the Amended Complaint. See Dawkins v. Williams, 511 F. Supp. 2d 248, 255 (N.D.N.Y. 2007) (considering the exhibits annexed to the pro se plaintiff's amended complaint when deciding the defendant's motion for summary judgment even though that pleading was not verified). Defendants do not dispute the authenticity of the exhibits and, in fact, utilized the exhibits during Flynn's deposition and cite to the exhibits in support of the motion. Dkt. No. 64-2 ¶¶ 46-48; Dkt. No. 64-4; Dkt. No. 64-7 at 1-2. [3] Additionally, a copy of Flynn's deposition transcript is annexed as an exhibit to Defendants' motion. Dkt. No. 64-4. Consequently, the facts set forth in Defendants' Rule 7.1 Statement of Material Facts [4] are accepted as true, but only as to those facts that are not disputed by Flynn's sworn testimony or the exhibits annexed to the Amended Complaint. See N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

[2]   The Amended Complaint is not notarized and does not contain any statement from Flynn certifying the veracity of the document under the penalty of perjury.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 610 of 830

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

3       Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

4       Local Rule 7.1(a)(3) states:
        Summary Judgment Motions
        Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.
        The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.
        Local Rule 7.1(a)(3).

## II. Background

### A. Facts

**\*2**  The facts are related herein in the light most favorable to Flynn as the nonmoving party. See subsection III(A) infra. The facts recited are for the relevant time period as referenced in the Amended Complaint.

At the time of the incidents described in the Amended Complaint, Flynn was confined in the Long Term Protective Custody Unit ("LTPC") at Mid-State Correctional Facility ("Mid-State C.F."). See generally Am. Compl. Wellenstein was a law library officer at Mid-State C.F. Dkt. No. 64-4 at 35-36. Ward was the Superintendent at Mid-State C.F. Id. at 10. From December 2014 through June 2015, Flynn filed numerous requests for legal materials/legal assistance. Dkt. No. 20-2.

From October 2011 until March 5, 2015, inmates in the LTPC had physical access to the law library from 4:30 p.m. until 5:45 p.m. Dkt. No. 20-1 at 2; Dkt. No. 64-4 at 35-36. On March 5, 2015, Captain Goppert issued a memorandum advising the LTPC Population that their law library services would be "modified." Dkt. No. 20-1 at 1. In accordance with Facility Operations Manual 21.04 [5] and Directive #4833, [6] LTPC inmate requests for legal assistance from the law library must be made in writing and forwarded to the law library officer through the facility mail. Dkt. No. 20-1 at 3. Inmates were permitted two requests each day. Dkt. No. 64-4 at 36; Dkt. No. 64-2 ¶ 34.

5       Mid-State C.F. Facility Operations Manual No. 21.04 provided, in relevant part:
        3. Inmates in SHU areas may request, in writing, legal assistance from the Law Library.
        a. All requests for assistance must be sent to the Law Library Officer vi a facility mail and each request should document what kind of service is needed.
        c. SHU inmates will only be allowed to have two (2) legal research resources in their possession at a time. Pick-up and delivery of legal materials will be made on a daily basis, Monday through Sunday.
        Dkt. No. 20-1 at 17.

6       DOCCS Directive #4833 provided, in pertinent part:
        Cell Study Services: Inmates prohibited by their confinement status from visiting the Law Library shall be allowed to study Law Library materials in their cells and obtain legal services normally available to general population inmates. Such inmates may request, in writing, a maximum of two items per day and these will be delivered, if available, within 24 hours of receipt of the request. Inmates may retain said legal materials for a period of not less than 16 hours nor more than 24 hours.
        Dkt. No. 20-1 at 5.

#### 1. Grievances

On January 6, 2015; February 14, 2015; and February 17, 2015, Flynn filed grievances claiming that Wellenstein refused to make copies of his legal work or perform "word"

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 611 of 830

2018 WL 3195095

and "key number searches" on the computer. Dkt. No. 64-5 at 4-7. The grievances were consolidated (MS-28194-15) and on March 11, 2015, the Superintendent responded that Flynn was being properly assisted.[7] Id. at 8. Flynn appealed the decision to the Central Office Review Committee ("CORC"), and, on January 20, 2016, CORC upheld the Superintendent's determination. Id. at 3.

[7]    The signature of the Superintendent is illegible.

On March 10, 2015, Flynn filed a grievance claiming that Wellenstein refused to accept his March 8, 2015 request and overcharged him for copies. Dkt. No. 20-3 at 12.

**\*3** On April 5, 2015, Flynn filed a grievance alleging that Wellenstein (1) denied him access to the courts; (2) fraud; (3) destruction of property; (4) refused to provide legal materials or assistance; and (5) refused to respond to weekend requests (MS-21943-15). Dkt. No. 64-5 at 10-16. On May 6, 2015, the Superintendent responded that Flynn's concerns were being properly addressed.[8] Id. at 17. Flynn appealed the decision to CORC and on October 21, 2015, CORC upheld the Superintendent's determination. Id. at 9.

[8]    See Footnote 8, supra.

On April 17, 2015, Flynn filed a grievance claiming that Wellenstein unlawfully ordered him to remain out of his cell while he made rounds. Dkt. No. 20-3 at 33.

On April 28, 2015, Flynn filed a grievance claiming that Wellenstein was deliberately harassing him and destroying his documents. Dkt. No. 20-3 at 34.

On April 30, 2015, Flynn filed a grievance charging Wellenstein with repeated verbal harassment. Dkt. No. 20-3 at 42. Flynn claimed that Wellenstein came to his cell, accused Flynn of smoking, entered the cell, and pushed Flynn aside. Id. Flynn alleged that Wellenstein made "a couple of smart remarks" and was "angry" over the numerous grievances Flynn filed. Id.

On May 6, 2015; May 8, 2015; and May 11, 2015, Flynn filed grievances accusing Wellenstein of destroying copies, harassment, and threatening behavior. Dkt. No. 64-5 at 19-21. The grievances were consolidated (MS-21970-15), and, on July 14, 2015, after an investigation, the Superintendent issued a decision denying the grievances.[9] Id. at 22-23. Flynn

appealed the decision to CORC and on September 21, 2015, the Superintendent's decision was affirmed. Id. at 18.

[9]    See Footnote 7, supra.

On May 14, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide books. Dkt. No. 20-3 at 46.

On July 21, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide envelopes and deliberately amended his documents. Dkt. No. 20-6 at 2.

On August 1, 2015, August 7, 2015, and August 10, 2015, Flynn filed grievances against Wellenstein claiming that he refused to make copies of documents "in retaliation for the 2 most recent grievances against him." Dkt. No. 64-5 at 26-28. The grievances were consolidated (MS-22079-15) and on August 27, 2015, after an investigation, the Superintendent denied the grievances.[10] Id. at 29. Flynn appealed the decision to CORC and on October 21, 2015, CORC affirmed the Superintendent's decision. Id. at 24.

[10]    See Footnote 7, supra.

On August 20, 2015, Flynn filed a grievance (MS-22105-15) claiming that Wellenstein threatened him and told him, "if I did not stop with my grievances that he, C.O.'s Jordan and Miller were going to set me up again like they have done numerous times in the past." Dkt. No. 20-6 at 10.

On October 23, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide copies and purposefully delayed his access to the courts (MS-22183-15). Dkt. No. 64-5 at 31. On November 10, 2015, after an investigation, the Superintendent determined that Flynn was being provided with Law Library services pursuant to Directive #4483.[11] Id. at 33. Flynn appealed to CORC, and on February 17, 2016, CORC upheld the determination. Id. at 30.

[11]    See Footnote 7, supra.

On November 6, 2015, Flynn filed a grievance (MS-22200-15) claiming that Wellenstein's behavior prohibited him from conducting meaningful research. Dkt. No. 64-5 at 37. On December 15, 2015, after an investigation, the Superintendent denied the grievance.[12] Id. at 38. Flynn appealed the decision to CORC, and on March 23, 2016, CORC affirmed the determination. Id. at 36.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 612 of 830

2018 WL 3195095

12   See Footnote 7, supra.

**\*4** On January 14, 2016, Flynn filed a grievance claiming that the photocopier was not functioning properly because Wellenstein manipulated the memory function. Dkt. No. 20-6 at 61.


## 2. Misbehavior Reports

On April 30, 2015, Wellenstein issued a misbehavior report charging Flynn with smoking. 13 Dkt. No. 20-6 at 70. After a Tier II disciplinary hearing, Flynn was sentenced to eighteen days in keeplock confinement. Id. Flynn served his sentence from April 30, 2015 until May 18, 2015. Id.

13   The misbehavior report is not part of the record.

On August 1, 2015, Officer Koscielniak issued Flynn a misbehavior report charging him with violating facility rules related to smoking. Dkt. No. 20-6 at 6. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges. Id. at 70. On August 1, 2015, Wellenstein issued a second misbehavior report charging Flynn with disobeying a direct order. Dkt. No. 20-6 at 5. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges for thirty days, but the sentence was suspended until November 16, 2015. Id. at 70.

On August 17, 2015, Officer Alsante issued Flynn a misbehavior report charging him with placing a three-way call in violation of facility rules. Dkt. No. 20-6 at 8. Alsante noted that, on August 17, 2015, "[a]t approx. 9:05 p.m., at the request of C.O. J. Jordan, I began monitoring 10-2 SHU phone[.]" Id. As a result of the report, Flynn was placed in keeplock for eighteen days from August 17, 2015 until September 4, 2015. Id. at 8, 70. Flynn appealed the decision to Ward claiming that Jordan asked Alsante to monitor his telephone call "as part of a campaign of harassment that CO Wellenstein has launched against those inmates in 10-2 who are trying to access the law library and [c]ourts." Id. at 9. Flynn further noted:

> CO W has written 4 misbehavior reports against me & encourages other CO's to do the same, as well as monitor our alleged activities, and in this incident no 3-way call was made & this is retaliation for my litigation.

Dkt. No. 20-6 at 9.

On August 24, 2015, Wellenstein issued a misbehavior report charging Flynn with threats and harassment. Dkt. No. 20-6 at 12. Wellenstein reported that Flynn told him, "[o]ne day when I get out, I am going to see you selling flowers on the corner and then I will take care of you the way I want to." Id. After a Tier II disciplinary hearing, Flynn was sentenced to thirty days in keeplock confinement. Id. at 70. The sentence was suspended until December 8, 2015. Id.

On November 12, 2015, Officer U. Upshaw issued Flynn a misbehavior report charging him with smoking, arson, false statements, and possessing flammable material. Dkt. No. 20-6 at 24. After a disciplinary hearing, the charges were dismissed. Id. at 25.

On November 18, 2015, Wellenstein issued a misbehavior report charging Flynn with harassment. Dkt. No. 20-6 at 16. The misbehavior report was dismissed by the hearing officer. Am. Compl. ¶ 125.

On December 11, 2015, Wellenstein issued a misbehavior report charging Flynn disobeying a direct order and harassment. Dkt. No. 20-6 at 26. The ticket was dismissed by the hearing officer. Am. Compl. at ¶ 130.


## 3. Legal Work

**\*5** In 2013, Flynn filed a Habeas Corpus petition in this Court. See Flynn v. J. Colvin, No. 9:13-CV-1247 (JKS) (N.D.N.Y. 2013). On October 19, 2015, Flynn filed an action in the Court of Claims against Wellenstein charging him with deliberately destroying legal documents. Dkt. No. 20-6 at 27-28. In 2014 and 2015, Flynn was researching and gathering exhibits in support of a writ of error coram nobis to vacate his conviction. Dkt. No. 64-4 at 17. In 2014 and 2015, Flynn was also working on a petition for the Department of Veterans' Affairs to increase his disability benefits, Article 78 petitions, a foreclosure action, and commenced litigation in the Court of Claims. Dkt. No. 64-4 at 18, 21, 25, 29. On August 24, 2015, Flynn commenced the within action. Dkt. No. 1.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)
Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 613 of 830
2018 WL 3195095

During his deposition, Flynn testified that did not know the procedural posture of any of his actions or petitions, could not recall whether deadlines were in place in any litigation, and could not remember the details of each petition and action. Dkt. No. 64-4 at 17-31. Flynn testified that his legal work was lost and therefore, without being able to refer to his legal records, he could not state whether he suffered any negative consequences in any legal matter. Id. at 31-32, 44, 107.

In June 2016, Flynn was transferred out of Mid-State C.F. Dkt. No. 25.

### B. Procedural History

On August 24, 2015, Flynn filed the Complaint in this action. Dkt. No. 1. In a Decision and Order filed December 4, 2015 ("December Order"), the Court reviewed the Complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A, and determined that the Complaint failed to state a claim upon which relief could be granted and, therefore, was subject to dismissal. Dkt. No. 11. In light of his pro se status, Flynn was afforded an opportunity to submit an amended complaint. Dkt. No. 11 at 18. On February 25, 2016, Flynn filed an Amended Complaint. Dkt. No. 20. Upon review of the Amended Complaint, the Court directed Wellenstein and Ward to respond to the First Amendment claims related to access to the courts and retaliation. Dkt. No. 22 at 14, 26, 29.

### III. Discussion [14]

[14]    All unpublished opinions cited to by the undersigned in this Report-Recommendation are, unless otherwise noted, attached to this Report-Recommendation.

In the Amended Complaint, Flynn alleges that his First Amendment right to access the courts was violated and further, that Wellenstein retaliated against him for filing grievances. See generally Am. Compl. Defendants move for summary judgment arguing that (1) Flynn failed to allege any "actual injury" to sustain a First Amendment claim; (2) Flynn cannot establish a retaliation claim against Wellenstein; (3) Flynn's supervisory claims against Ward must be dismissed; and (4) Flynn failed to exhaust his administrative remedies with respect to retaliatory conduct. See generally Dkt. No. 64.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. See FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. See FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. See Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

*6    The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. See Gallo v. Prudential Residential Servs., Ltd. P'ship., 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," ... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

2018 WL 3195095

## B. First Amendment

### 1. Access to Courts

Flynn claims that Wellenstein deliberately "mixed up" and destroyed legal exhibits, refused to accept legal requests, and failed to provide legal materials, assistance, and copies. See generally, Am. Compl. As a result, Flynn claims that he was prevented from filing a writ of coram nobis, a petition for habeas relief, a petition with the Department of Veterans' Affairs, an Article 78 petition, and an appeal with the New York State Retirement System and missed deadlines in pending litigation. See id. Defendants argue, even assuming that Flynn had demonstrated a material issue of fact as to whether Defendants acted deliberately and maliciously in failing to provide him with legal assistance and materials, the record does not support Flynn's conclusory claim that he suffered an actual injury caused by the Defendants. Dkt. No. 64-6 at 4.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. See Bounds v. Smith, 430 U.S. 817, 824 (1977); Lewis v. Casey, 518 U.S. 343, 350 (1996) ("The right that Bounds acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them[.]" Lewis, 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. See Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). Second, the plaintiff must demonstrate that he suffered an actual injury, "i.e., [the defendant] took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (internal citations, quotation marks, and alterations omitted) (quoting Lewis, 518 U.S. at 329); Davis, 320 F.3d at 351 (internal quotation marks omitted). "[A] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Benjamin v. Kerik, 102 F. Supp. 2d 157, 164 (S.D.N.Y. 2000) (citation omitted), aff'd sub nom. Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001).

*7 Here, while Flynn made several claims in his Amended Complaint related to pending legal matters, Flynn testified at his deposition that he could not recall what litigation he was working on in 2015, the procedural posture of any pending litigation, or whether he was subject to any Court imposed deadlines. Dkt. No. 64-4 at 12-31. Flynn testified that he filed actions in the Court of Claims against Wellenstein related to the destruction of his legal work, and that the actions were dismissed, but he could not attribute that dismissal to Wellenstein's actions or inactions. Id. at 25-26, 29, 30. Flynn explained that he could not provide any specific information related to Court deadlines or legal matters because he was compelled to send his legal work home and it was lost. Dkt. No. 64-4 at 18-19, 25, 31, 45. Flynn testified:

> ... Most of my legal work was shipped —sent home. They forced me to send most of my legal work home, so—and I haven't been able to get my legal work sent to me. Then they lost a box of legal work, so.

Dkt. No. 64-4 at 18.

The record however, lacks any facts related to who directed Flynn to send his legal work home, when or what portion of his work was misplaced or lost, and who was responsible for his missing legal work.

Even if the undersigned accepts Flynn's explanation, the docket reports for cases pending in this Court, as well as Flynn's litigation history, belie his First Amendment claims. In October 2013, Flynn filed a Petition for Habeas Corpus relief. See Flynn v. Colvin, No. 9:13-CV-1247 (JKS), Dkt. No. 1 (N.D.N.Y. Oct. 7, 2013). From February 2014 until June 2016, Flynn filed several submissions in that case including various motions, an application for counsel, a reply to his petition, and objections to Court Orders. Id.; Dkt. Nos. 20, 22, 24, 26, 27, 29, 31, 33, 34, 35, 36, 38. In December 2016, the Petition was denied and Judgment was entered. Id.; Dkt. Nos. 47, 48. Nothing in the record suggests that the Petition was denied for failure to comply with deadlines, prosecute, or purse the action.

In August 2015, Flynn commenced the within action by filing an eighteen page complaint with over two hundred pages of exhibits, together with a motion to proceed IFP, an inmate authorization form, a motion to appoint counsel, and a motion for preliminary injunctive relief. Dkt. Nos. 1, 2, 3, 4, 5. From August 2015 until June 2016, Flynn filed letters, motions, and

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 615 of 830
Flynn v. Ward, Not Reported in Fed. Supp. (2018)
2018 WL 3195095

a fifty-four page Amended Complaint. Dkt. No. 6, 8, 10, 12, 16, 18, 20, 23. Flynn has clearly been able to proceed in his litigation of this case, despite his claims otherwise.

In December 2017 and March 2018, the Appellate Division issued Orders dismissing two such petitions. See Flynn v. Annucci, 156 A.D.3d 1105 (3d Dep't 2017); Flynn v. Annucci, 159 A.D.3d 1181, 1182 (3d Dep't 2018). In the 2018 Order, the Court affirmed the disciplinary determination after considering the documentary evidence, hearing testimony, and misbehavior report. Flynn, 159 A.D.3d at 1182. The record lacks facts establishing that these cases were dismissed due to Flynn's inability to prosecute or purse the matters or Defendants' behavior. See Davis, 320 F.3d at 352 (holding that a plaintiff must show that there is "a causal connection between the protected speech and the adverse action.") (citation omitted).

To summarize, Flynn has failed to show that Defendants' actions hindered his efforts to pursue a legal claim. Flynn was able to file several submissions in this Court, demonstrating that Defendants' alleged conduct did not prevent him from litigating actions. Flynn has failed to provide evidence of any type of actual injury which occurred as a result of Defendants' actions. Flynn has failed to identify which legal claims were frustrated, if they were meritorious, and how his access to legal materials, supplies, or the law library would have supported the viability of such claims. In the absence of any evidence that Flynn suffered any actual injury precluding him from pursuing any judicial action, it is recommended that Defendants' motion for summary judgment on this ground should be granted.

### 2. Retaliation

**\*8** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. See Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F.Supp.2d 317, 347 (N.D.N.Y. 2010). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. See Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008). Therefore, conclusory allegations alone

are insufficient. See id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.") ). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his engaging in the protected conduct. See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson, 549 F. Supp. 2d at 215.

The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good disciplinary record, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted). Temporal proximity between the protected activity and the adverse action "must be very close." Meyer v. Shulkin, ——— F. App'x ———, 2018 WL 480478, at \*2 (2d Cir. Jan. 19, 2018) (citation omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 616 of 830

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

*Burton v. Lynch*, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Flynn claims that Wellenstein assaulted him, threatened him, denied him access to the court, and filed misbehavior reports in retaliation for Flynn's grievances against Wellenstein. See generally Am. Compl. It is well-settled that the filing of a grievance constitutes protected speech under the First Amendment. See *Graham*, 89 F.3d at 80; *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that *section 1983* is intended to remedy.") (alteration and internal quotation marks omitted); see also *Roseboro*, 791 F. Supp. 2d at 367 (finding that the filing of a grievance is a protected activity); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same). Thus, for each allegation, Flynn has satisfied the first prong of First Amendment retaliation analysis. Thus, the Court turns to whether Flynn has established that he suffered an adverse action and a causal connection between the protected conduct and the adverse action.

### a. Assault

**\*9** Flynn alleges that Wellenstein assaulted him on April 30, 2015 in retaliation for filing grievances. See Am. Compl. ¶ 54. With respect to the second prong of the analysis, Defendants claim that the alleged action, i.e., pushing, was de minimis and thus, not an adverse action. The undersigned agrees. Although an alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis, Flynn's allegations that Wellenstein "push[ed] him around," see Am. Compl. ¶ 54, are de minimis. See *Rivera v. Goord*, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) ("[E]ven though [the plaintiff] has alleged that the actions of [the defendants] were motivated by [the plaintiff's] filing of grievances, the alleged acts of retaliation, even if assumed to be true, are de minimis; [the plaintiff] states only that [the defendants] 'shoved' him while taking him to the 'box' (i.e., Green Haven's Special Housing Unit, or "SHU"). Such actions, even if proven at trial, would not

chill a person of ordinary firmness from continuing to engage in First Amendment activity."); *Sloane v. Mazzuca*, No. 04 CV 8266(KMK), 2006 WL 3096031, at *13-14 (S.D.N.Y. Oct. 31, 2006) (concluding that the defendant's conduct of throwing a food tray at plaintiff did not amount to adverse action); cf. *Williams v. Hesse*, No. 9:16-CV-01343 (GTS/ TWD), 2018 WL 1363759, at *7-8 (N.D.N.Y. Feb. 2, 2018) (concluding that the defendants' threats coupled with spitting chewing tobacco in the plaintiff's face that resulted in "severe burning, pain, and a temporary loss of vision in his right eye for nearly six hours, and a severe headache for days" constituted adverse action) Moreover, there is no indication that plaintiff sought medical treatment or experienced severe pain or suffering as a consequence of the alleged assault. See *Williams*, 2018 WL 1363759, at *7-8. Therefore, because the undersigned finds that Wellenstein's alleged assault does not amount to adverse action, it is recommended that Defendants' motion on this ground be granted.

### b. Access to Courts

Flynn alleges that Wellenstein denied him access to the law library and to the courts in retaliation for filing grievances. Dkt. No. 20 ¶¶ 57, 59, 118, 119, 120, 122. Although a defendant's underlying action may not amount to a violation of a constitutionally protected right, this does not preclude such action from consideration as an adverse action. See *Shariff v. Poole*, 689 F. Supp. 2d 470, 478-79 (W.D.N.Y. 2010). " 'An act in retaliation for the exercise of a constitutional right is actionable under *§ 1983* even if the act when taken for different reasons would have been proper.' " Id. (quoting *Franco*, 854 F.2d at 588); see *Nei v. Dooley*, 372 F.3d 1003, 1007 (8th Cir. 2004) (rejecting the defendants' argument that "[a]s for the inmates' claim that they were retaliated against for filing their lawsuit by being denied access to the prison law library, the officials contend the district court should have construed the claim as one of denied access to the courts, requiring proof of actual injury, rather than one of retaliation) (citation omitted)." Thus, even though the undersigned has recommended dismissal of plaintiff's access to the courts claim, Wellenstein's underlying conduct may still be assessed as adverse action.

It is well-settled that the denying an inmate access to the law library or destroying legal material constitutes adverse action. See *Guillory v. Haywood*, No. 9:13-CV-01564 (MAD), 2015 WL 268933, at *17 (N.D.N.Y. Jan. 21, 2015) ("Furthermore, refusing to allow Plaintiff to go to the law library knowing

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 617 of 830

2018 WL 3195095

that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.") (internal quotation marks and citation omitted); see also Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *10 (N.D.N.Y. Jan. 24, 2013), report and recommendation adopted, 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013) ("Destruction of Plaintiff's legal material and documents for his Second Circuit appeal constitutes an adverse action for purposes of the retaliation analysis."). Thus, Flynn has established the second prong of the retaliation analysis.

With respect to the third prong, Flynn must establish a causal connection "sufficient to support the inference 'that the speech played a substantial part' in the [ ] adverse [ ] action." Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991) ). As to temporal proximity, the record indicates that on March 10, 2015; April 5, 2015; April 30, 2015; May 6, 2015; May 8, 2015; May 11, 2015; May 14, 2015; July 21, 2015; August 7, 2015; October 23, 2015; and November 6, 2015, Flynn filed grievances against Wellenstein. See Dkt. N. 64-7. Although there is no "bright line" establishing the time frame appropriate for establishing temporal proximity, the short gap between the protected conduct and adverse action appears sufficiently close to support an indication of a causal connection. See Espinal, 558 F.3d at 129 (holding that passage of six months between protected conduct and adverse action sufficiently supported an inference of a causal connection); see, e.g., Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002) (concluding that the short time frame between grievance and retaliatory action, along with allegation of the defendant's involvement, sufficed to support an inference of a retaliatory motive), abrogated on other grounds, Porter v. Nussle, 534 U.S. 516 (2002).

**\*10** However, "temporal proximity alone cannot create a genuine issue of material as to whether the motivation behind [the defendant's] actions was retaliation." Parks v. Blanchette, 144 F.Supp.3d 282, 336-37 (D. Conn. 2015). Additional circumstantial evidence supports the conclusion that Wellenstein's conduct may have been motivated by Flynn's complaints. On May 8, 2015, Flynn contends that Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. On May 11, 2015, Wellenstein stated "don't [you] dare request anything

or I will write you up. I will set you up for grieving me all the time." Id. ¶ 58. Assessing these statements in the light most favorable to Flynn as the non-moving party, the statements are sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged denial of legal materials and/or the law library. Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Moreover, Wellenstein has not provided an affidavit or other evidence to refute Flynn's testimony. Therefore, there is a genuine triable issue of fact for a jury to consider. See Ramos v. O'Connell, 28 F. Supp. 2d 796, 803 (W.D.N.Y. 1998) (denying summary judgment where the defendants failed to submit affidavits or documents to contradict the plaintiff's account). Therefore, affording plaintiff special solicitude, it is recommended that Defendants' motion on this ground be denied.

### c. Threats

Verbal harassment and threats are generally not considered conduct "that would deter a similarly situation individual of ordinary firmness of exercising constitutional rights." Cabassa v. Smith, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009) (citing Gill, 389 F.3d at 380) (additional citation omitted). Verbal threats however, may constitute adverse action for purpose of a First Amendment retaliation if the threats are sufficiently specific. Barrington v. New York, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011); see also Ford v. Palmer, 539 F. App'x 5, 6 (2d Cir. 2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances).

Here, Flynn testified that Wellenstein threatened him and told him not to go to the law library. Dkt. No. 64-4 at 93-94. Upon further questioning, Flynn testified:

Q. Okay. When did he make threats about not going to the law library?

A. I don't recall.

Q. What about threats in writing you up, when did he say that?

A. I don't recall.

2018 WL 3195095

Q. Do you recall the sum and substance of any of the conversations about not going to the law library or about writing you up?

A. I don't recall right now.

Dkt. No. 64-4 at 94.

Flynn did not document or report the threats. Dkt. No. 64-4 at 96. Based upon the record, the Court concludes that Wellenstein's alleged threats are not sufficiently specific to constitute adverse action. See Bartley v. Collins, No. 95 Civ. 10161, 2006 WL 1289256, at *2-4 (S.D.N.Y. May 10, 2006) (finding no adverse action where a corrections officer tells a plaintiff that he is going to "get [him]" for filing a lawsuit); Alicea v. Howell, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (finding no adverse action where a prison official told an inmate that he would "have to pay the consequences" for filing a grievance against her).

Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims on this ground be granted. [15]

[15]    In light of my recommendation that Flynn's retaliation claim based upon threats be dismissed in its entirety based on the merits, I find it unnecessary to address the alternative failure to exhaust arguments related to this claim.

### d. Misbehavior Reports

Flynn alleges that Wellenstein filed misbehavior reports, and directed other officers to file misbehavior reports, in retaliation for grievances. Am. Compl. ¶¶ 55, 70, 71, 73, 79. A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action). Courts in this Circuit have held that a temporary loss of privileges does not constitute adverse action. See Smith v. City of New York, No. 14 CIV. 5927, 2017 WL 2172318, at *6 (S.D.N.Y. May 16, 2017); see also Monko v. Cusack, No. 9:11-CV-1218 (GTS/TWD), 2013 WL 5441724, at *11 (N.D.N.Y. Sept. 27, 2013) ("... the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are de minimis and do not constitute adverse action for purposes

of a retaliation claim.") (citation omitted); Bartley, 2006 WL 1289256 at *7 (holding that a misbehavior report which resulted in the temporary loss of commissary privileges does not constitute adverse action because the penalty was de minimis).

**\*11** As a result of the misbehavior reports issued by Koscielniak and Wellenstein on August 1, 2015, Flynn suffered a temporary loss of privileges. Dkt. No. 20-6 at 70. Flynn was not sentenced to any disciplinary confinement or penalized as a result of the November 12, 2015, November 18, 2015 and December 11, 2015 misbehavior reports. Dkt. No. 20-6 at 25; Am. Compl. ¶¶ 125, 130. Therefore, because Flynn has failed to show that he suffered an adverse action as a result of the aforementioned tickets, the undersigned need not determine whether there is a causal connection between Flynn's protected conduct and these misbehavior reports. Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon the August 1, 2015; November 12, 2015; November 18, 2015; and December 11, 2015 reports be granted. [16]

[16]    See Footnote 17, supra.

The Court reaches a different conclusion however, with respect to the remaining misbehavior reports. As a result of the April 30, 2015 and August 18, 2015 tickets, Flynn was sentenced to eighteen days in keeplock. Dkt. No 20-6 at 70. As a result of the August 24, 2015 misbehavior report, Flynn received a thirty day keeplock sentence. [17] Id. Accordingly, Flynn has established the second prong of the retaliation analysis with respect to these misbehavior reports. Having found that Flynn satisfied the first and second prong of the retaliation analysis with respect to these tickets, the Court turns to whether the record establishes a causal connection between the protected conduct and the adverse action.

[17]    Defendants argue that a suspended sentence does not constitute an adverse action. Dkt. No. 64-6 at 18. Defendants claim, without evidentiary support, that Flynn did not serve keeplock or lose any privileges as a result of this misbehavior report. Id. The record before the Court establishes that the thirty day sentence was suspended until December 8, 2105. Dkt. No. 20-6 at 70. There is however, a genuine issue of fact regarding whether Flynn served the keeplock sentence. Construing the facts in a light most favorable to the pro se, non-moving

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 619 of 830

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

party, the Court finds that Defendants have failed to meet their burden of proof with regard to this issue.

### i. April 30, 2015

On April 30, 2015, Wellenstein issued Flynn a misbehavior report for smoking. Am. Compl. ¶ 55; Dkt. No. 64-6 at 14. Flynn contends that this misbehavior is in retaliation for his April 16, 2015 and April 28, 2015 grievances. Am. Compl. ¶ 55. First, the undersigned notes that the April 16, 2015 grieves conduct by the "law library relief officer" and makes no mention of Wellenstein. See Dkt. No. 20-3 at 31. Absent evidence by plaintiff that Wellenstein either was the library relief officer or knew of the contents of said grievance, the April 16, 2015 grievance cannot be the basis for his retaliation claim. See Tafari, 714 F. Supp. 2d at 374 (concluding that the plaintiff failed to establish a causal connection where the defendant was not named in the original grievance). Second, as to the April 28, 2015 grievance, although the temporal proximity of two days sufficiently supports an inference of causal connection, temporal proximity "without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citing inter alia Ayers v. Stewart, 101 F.3d 687, 1996 WL 346049 (Table), at *1 (2d Cir. 1996) ("[T]he plaintiff's] reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment.") ). As to statements regarding Wellenstein's motivations, the record indicates that on May 8, 2015, Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. Assessing this statement in the light most favorable to Flynn as the non-moving party, the undersigned finds it sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged filing of misbehavior reports. Baskerville, 224 F. Supp. 2d at 732.

**\*12** Wellenstein argues that even assuming the evidence creates a material question of fact as to whether he had retaliatory intent, he would have issued the misbehavior report even in the absence of the protected conduct. "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage."

Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998). "Defendants [may meet] their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct if 'it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct' for which he had been cited in a misbehavior report." Id. (citing Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994) ).

In September 2013 and March 2015, Flynn was charged with smoking at Mid-State C.F. Dkt. No. 20-6 at 70. Flynn was found guilty of those charges. Id. During his deposition, Flynn admitted that he smoked in his cell in the past and conceded that he "had several disciplinary issues with smoking[.]" Dkt. No. 64-4 at 95-96. However, Flynn maintains that on April 30, 2015, he was not smoking in his cell. Id. As discussed supra, Wellenstein has not provided any sworn testimony in support of the motion, and, thus, has not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct. Accordingly, there is an genuine dispute as to whether Flynn committed the charged conduct. See Gayle, 313 F.3d at 684 (denying summary judgment where it is disputed whether the plaintiff committed the prohibited conduct). Therefore, the undersigned recommends that Defendants' motion for summary judgment, on this basis, be denied.[18]

[18]    See Footnote 15, supra.

### ii. August 17, 2015

The August 17, 2015 misbehavior report was written by Officer Alsante. Dkt. No. 20-6 at 8. To establish a retaliation claim, a plaintiff must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." Graham, 89 F.3d at 81. "[I]t is difficult to establish one defendant's retaliation for complaints against another defendant." Hare v. Hayden, No. 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) ).

Here, Flynn did not file any grievances or complaints against Alsante. The record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations. Without more, the evidence does not present a genuine issue of material fact for a jury to resolve. See Ciaprazi v. Goord, No. 9:02-CV-915 (GLS/DEP), 2005

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

WL 3531464, at *9 (N.D.N.Y. Dec. 22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff); see also Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 (N.D.N.Y. July 14, 2015); Guillory v. Ellis, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014). Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon this misbehavior report be granted. [19]

[19]    See Footnote 17, supra.

### iii. August 24, 2015

On August 24, 2015, Wellenstein issued plaintiff a misbehavior report alleging that Flynn threatened and verbally harassed him. Dkt. No. 20-6 at 12. Plaintiff contends that this misbehavior report was in retaliation for his August 20, 2015 and August 22, 2015 grievances. Am. Compl. ¶ 79. However, as Defendants note, during his deposition, plaintiff admitted that he "made a smart remark about [Wellenstein] selling flowers for a living," but that Wellenstein "took that to a whole different level." Dkt. No. 64-4 at 91, 93, 95. Thus, as plaintiff admitted to making the statement that is the basis for the August 24, 2015 misbehavior report, the evidence suggests that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." Gayle, 313 F.3d at 682. Therefore, Defendants have established a non-retaliatory reason for the filing of the August 24, 2015 misbehavior report. See Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that plaintiff's admission of the underlying conduct established a "proper, non-retaliatory reason[ ] for filing the misbehavior report."). Accordingly, it is recommended that Defendants' motion on this ground be granted.

### C. Supervisory Liability

**\*13** Defendants argue that Flynn's claims against Ward must be dismissed because Ward was not personally involved in any constitutional violations. Dkt. No. 64-6 at 20-23. Flynn does not allege, nor does the record support the conclusion that Ward directly participated in any alleged constitutional violations. Construing the Amended Complaint liberally,

Flynn contends that Ward was personally involved in the alleged constitutional violations by denying his grievances.

Supervisory officials may not be held liable merely because they held a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986) ).

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. Smart v. Goord, 441 F.Supp.2d 631, 643 (S.D.N.Y. 2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Also, it is within the purview of a superior officer to delegate responsibility to others. See Vega v. Artus, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007) ).

"[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Perilla v. Fischer, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing inter alia Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) ) (citation omitted) ). "[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Molano v. Bezio, No. 10-CV-6481, 2012 WL

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 621 of 830

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing Collins v. Ferguson, 804 F.Supp.2d 134, 140 (W.D.N.Y. 2011), Black v. Coughlin, 76 F.3d 72, 74–75 (2d. Cir. 1996) ).

The record before the Court contains Superintendent responses related to six grievances. Dkt. No. 64-5 at 8, 17, 22-23, 29, 33, 38. As noted supra, the signature of the Superintendent who executed the response, in each instance, is illegible. See Part II(A)(1). In response to the May 6, 2015 grievance (MS-21970-15), the Superintendent concluded that, "[i]n this investigation, the grievant alleges that he is not being provided assistance with law library requests, his copies are purposely damaged and he is being retaliated against for filing complaints." Dkt. No. 64-5 at 22. Defendants argue that Ward was not involved in that grievance and attribute only two grievances to Ward: MS-22079-15 and MS 22200-15. Dkt. No. 64-6 at 22-23. While Defendants concede that additional grievances were appealed to the Superintendent, Defendants claim that the remaining grievance responses were not issued by Ward and thus, Ward was not involved in the decision-making process or investigation regarding these grievances. These arguments are asserted by counsel in the Memorandum of Law, but notably absent from the record is any affidavit or declaration from Ward. Without such evidence, a factual dispute exists as to whether Ward proactively participated in the decision-making process related to Flynn's grievances. As such, there is triable issue of material fact for a jury to resolve with respect to Ward's personal involvement in Wellenstein's alleged retaliatory conduct. See Celotex Corp., 477 U.S. at 323. Accordingly, Defendants' motion against Ward on this ground should be denied.

**\*14** A different conclusion is reached however, with respect to Flynn's First Amendment claims based upon access to the courts. Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability"). As discussed supra, Flynn failed to raise an issue of material fact with respect to his First Amendment claim based upon access to courts. Accordingly, the undersigned recommends that Defendants' motion for summary judgment and dismissal of Flynn's First Amendment claims against Ward based upon access to the courts be granted.

### D. Exhaustion

As an alternative ground for dismissal of the retaliation claims, Defendants contend that the motion for summary judgment must be granted because Flynn failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 64-2 at 23-26. The PLRA requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). "The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004) (citing Porter, 534 U.S. at 524-25). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 W L 2708434, at *4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

"The mere fact that an inmate plaintiff filed some grievance prior to filing suit is not enough. The grievance must also have related to the subject matter of the federal lawsuit." Allah v. Poole, 506 F. Supp. 2d 174, 180 (W.D.N.Y. 2007) (citation omitted). The scope of a plaintiff's federal claim may not exceed that of the grievance. Donahue v. Bennett, No. 02-CV-6430, 2004 WL 1875019, at *8 (W.D.N.Y. Aug. 17, 2004).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this district followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

if the plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill, is no longer consistent with the statutory requirements of the PLRA. See Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

*15 Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5 (2015). First, the inmate must file a complaint with an internal grievance program ("IGP") clerk within twenty-one days of the alleged action. Id. § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven

days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

Flynn testified that he was familiar with the grievance process and filed "numerous" grievances in 2015. Dkt. No. 64-4 at 41-44. As discussed supra, the record contains copies of six (6) grievances that Flynn appealed to CORC and thus, Defendants concede, exhausted.[20] The record contains a certification attesting to the veracity of the grievance records. Dkt. No. 64-5 at 2.

[20]    Flynn filed additional grievances, but the record does not contain proof that these grievances were exhausted. To wit, Flynn testified that "at least two or three" of his grievances "made it to Albany." Dkt. No. 64-4 at 46. Flynn could not recall which grievances were appealed and testified that while nothing prevented him from exhausting of all his grievances, he did not appeal certain grievances because they were "repetitive." Id.

With respect to the exhausted grievances, Defendants argue that Flynn's retaliation claims were not properly exhausted because these grievances did not contain allegations that Wellenstein retaliated against Flynn when he assaulted him and issued misbehavior reports. Dkt. No. 64-6 at 25-26. Defendants have not provided an affidavit from any DOCCS' employee with personal knowledge to support Defendants' contention that there is no connection between Flynn's grievances and the matters raised in the federal court complaint. Once again, Defendants rely upon the unsupported statements by counsel without evidentiary support. Upon review of the record, the undersigned finds that has exhausted his remaining retaliation claims. In the May 6, 2015 grievance, Flynn claimed that Wellenstein provided distorted copies of court forms and asserted, "[t]his is the 3[rd] time he has deliberately ruined copies to the point they are unusable. This is deliberate harassment and the denial of legal copies." Dkt. No. 64-5 at 21. In the May 8, 2015 grievance, Flynn claimed:

> *16 On 5/8/15 at 5:05 p.m. C.O Wellenstein came to my cell and

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 623 of 830

Flynn v. Ward, Not Reported in Fed. Supp. (2018)
2018 WL 3195095

started kicking the cell door and slaming [sic] feed up door, verbally harassing me and making numerous threats. For months C.O. Wellenstein has been harassing me. As a result of his harassment I am afraid to use the law library services and request legal material.

Dkt. No. 64-5 at 19.

On July 14, 2015, the Superintendent responded and categorized these claims as "retaliation" claims in response to filing prior complaints. Dkt. No. 64-5 at 22. The Superintendent conducted an investigation and interviewed Wellenstein. Id.

In the August 7, 2015 grievance, Flynn reiterated his harassment complaints claiming that, "Wellenstein has refused to make copies in retaliation for the 2 most recent grievances against him. His refusal to make copies is harassment[.]" Dkt. No. 64-5 at 26-28. On August 27, 2015, the Superintendent issued a response finding that the grievant "has not substantiated his claim that he has been the victim of harassment by staff[.]" Id. at 29. The Superintendent noted that Wellenstein denied the allegations. Dkt. No. 64-5 at 29. In his Appeal Statement, Flynn argued that Wellenstein continues to deter him from using the law library "in retaliation for filing grievances[.]" Id. On October 21, 2015, CORC issued a decision quoting Directive #4040, Section 701.6(b) related to prohibited "reprisals" against an inmate who utilizes the grievance process. [21] Id. at 24.

[21]    Section 701.6(b) provides:
Reprisals prohibited. No reprisals of any kind shall be taken against an inmate or employee for good faith utilization of this grievance procedure. An inmate may pursue a complaint that a reprisal occurred through the grievance mechanism. A grievant shall not receive a misbehavior report based solely upon an allegedly false statement made by the inmate to the grievance committee.
N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6.

Drawing all inferences in Flynn's favor, the Court finds that the facts alleged in Flynn's grievances encompass the facts set forth in the Amended Complaint. See Curry v. Fischer, No. 02

Civ.4477, 2004 WL 766433, at *8 (S.D.N.Y. Apr. 12, 2004). Accordingly, it is recommended that Defendants' Motion for Summary Judgment, insofar as it raises the affirmative defense of nonexhaustion, be denied.

### IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment access to the courts claims against Wellenstein and Ward;

(2) Insofar as it seeks dismissal of Flynn's retaliation claims against Wellenstein and Ward related to misbehavior reports issued on August 1, 2015, August 17, 2015, August, 24, 2015, November 12, 2015, November 18, 2015, and December 11, 2015;

(3) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for the April 30, 2015 assault; and

(4) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for threats,

the motion be **GRANTED**; and it is further

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 64) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward based on access to courts and the misbehavior report issued on April 30, 2015; and

**\*17** (2) Insofar as it seeks dismissal of plaintiffs retaliation claims for access to the courts and the April 30, 2015 misbehavior report due to nonexhaustion, the motion be **DENIED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

2018 WL 3195095

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[22]

[22]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added

to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3195095

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Sloane v. Mazzuca, Not Reported in F.Supp.2d (2006)

2006 WL 3096031

KeyCite Yellow Flag - Negative Treatment

Distinguished by Allah v. Greiner, S.D.N.Y., April 30, 2007

2006 WL 3096031
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Derek SLOANE, Plaintiff,
v.
W. MAZZUCA, et al., Defendants.

No. 04 CV 8266(KMK).
|
Oct. 31, 2006.

**Attorneys and Law Firms**

Derek Sloane, Valhalla, NY, pro se.

Benjamin J. Lee, Esq., New York State Office of the Attorney General, New York, NY, for Defendants.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge.

 **\*1** Derek Sloane, *pro se* Plaintiff, brings this action against ten corrections officers and officials, pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Defendants retaliated against him for his refusal, purportedly on religious grounds, to consent to a Purified Protein Derivative Test ("PPD Test") for the detection of latent tuberculosis ("TB") while he was incarcerated at the Fishkill Correctional Facility ("Fishkill"). Plaintiff further alleges that he was the subject of racially-motivated taunting and otherwise improper retaliation by prison officers.

Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), claiming, *inter alia,* that Plaintiff failed to exhaust his administrative remedies under the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e, and that Plaintiff failed to state a claim upon which relief can be granted. Defendants have also moved to convert their Motion to Dismiss into a Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56, in the event that the Court must look to materials outside the pleadings to rule on their motion.

For the reasons set forth below, Defendants' Motion to Dismiss is DENIED in part and GRANTED in part. Defendants' Motion for Partial Summary Judgment is GRANTED.

*I. Background*

The following facts are drawn from Plaintiff's Initial Complaint, Amended Complaint, and all relevant attached materials. [1]

[1]    Early in the Amended Complaint, Plaintiff claims he "repeats and realleges each and every allegation set forth above." (Am. Compl. IV Statement of Claim 5.) Based on Plaintiff's usage of this phrase in documents he has submitted to the Court, it appears that he understands this phrase to mean that he realleges allegations made in previously submitted documents. (Pl.'s Mem. Opp. Mot. to Dismiss 1 ("Pl.'s Resp.").) As a *pro se* Plaintiff, Sloane is subject to a more liberal pleading standard, which requires that the Court consider factual allegations in Sloane's opposition papers to supplement allegations in his Initial and Amended Complaints. *See Collins v. Goord,* 438 F.Supp.2d 399, 403 n. 1 (S.D.N.Y.2006); *Fox v. Fischer,* No. 04 Civ. 6718, 2005 WL 1423580, at \*2 n. 1 (S .D.N.Y. June 14, 2005); *Verley v. Goord,* No. 02 Civ. 1182, 2004 WL 526740, at \*5 (S.D.N.Y. Jan. 23, 2004). Therefore, the Court will consider facts alleged in the Complaint, Amended Complaint, and opposition papers as long as there is no disagreement between the documents.

The events underlying Plaintiff's complaints all took place at the Fishkill Correctional Facility. [2] Plaintiff claims that he was placed on a one-year confinement hold based on his refusal to take a PPD test while he was incarcerated at Fishkill. (Compl. IV Statement of Claim 8.) Plaintiff states that he refused to take the PPD test because of his religious beliefs. (Compl. IV Statement of Claim 3-4.) Plaintiff insists that his religious beliefs are sincerely held, even though he failed to identify his religion in his Initial Complaint or Amended Complaint, and he failed to explain why his religion prohibits him from taking a PPD test. (Hr'g Tr. 9-11, Aug. 22, 2006.)

2    Sloane is currently an inmate at the Westchester County Jail.

Plaintiff alleges that on March 23, 2003, he was transferred from the Clinton Correctional Facility to the Fishkill secure housing unit ("SHU"). (Am. Compl. IV Statement of Claim 2.) He alleges that the PPD test was administered on May 8, 2003 (Compl. IV-A 9), and that after he refused the test, he was placed in a confinement cell. (Compl. IV Statement of Claim 8.) [3] Plaintiff was subsequently transferred to the Elmira Correctional Facility in early 2004.

3    The exact duration of Plaintiff's hold in the SHU is unclear. Plaintiff claimed on April 2, 2004, in a grievance filed from the Elmira Correctional Facility ("Elmira"), that he has been on "a t .b. hold for 2 years in the box," (Compl. Ex. Elmira Grievance 2, EL26-403-04), which is inconsistent with claims made in his Complaint where he states that he has been in the SHU since March 24, 2003. (Compl. IV Statement of Claim 10.)

Sloane claims that after he refused to take the PPD test, several prison officials and officers conspired to retaliate against him on the basis of his religion and race. He named ten defendants [4] to this action: Superintendent William Mazzuca, Deputy Superintendent for Security R. Ercole, Lieutenant Michael Melton, [5] Lieutenant V. Lopiccolo, Sergeant K. Conklin, and Corrections Officers ("CO") Michael Venne, Nick Valhos, T. Geulu, [6] R. Padgett, and R. Woodward. [7]

4    The Court has adopted Plaintiff's spelling of Defendants' names.

5    Lieutenant M. Melton was terminated as a party to this case on June 6, 2005. (Doc. No. 19.)

6    Although Plaintiff lists "T. Geulu, C.O." as a Defendant in both his Complaint and Amended Complaint, Fishkill officials are not aware of any employee by that name. (Defs.' Supplemental Mem. of Law in Further Supp. of the Mot. to Dismiss the Am. Compl. 1 ("Defs.' Supplemental Mem.").) After investigating the allegations in the Complaint, Defendants' counsel informed Plaintiff that they believed "T. Geulu" was CO Thomas Geno. (Benjamin J. Lee Letter to the Court, Feb. 18, 2005.) Nonetheless, Plaintiff has continued to maintain his allegations against the unknown Geulu

and has dismissed Geno as a defendant in the Amended Complaint. (Am.Compl.1.)

7    Plaintiff's Initial Complaint lists Mazzuca, Ercole, Valhos, Padgett, Venne, Conklin, Woodward, Geulu and Melton in Section III of the Complaint, which is where the Plaintiff is required to name the "Parties" to the action. (Compl.3.) The form Plaintiff used to prepare his Complaint warns Plaintiff to: "Make sure that the defendant(s) listed above are identical to those contained in the caption on page 1." *(Id.)* Plaintiff did not heed those instructions, because the caption does not include Melton's name. (Compl.) Furthermore, Plaintiff identified only Mazzuca, Melton and Lopiccolo in Section III of his Amended Complaint, but Mazzuca, along with Ercole, Valhos, Padgett, Venne, Conklin, Geulu and Woodward appear on the caption page. (Am.Compl.) Adding further confusion, in the body of Plaintiff's Amended Complaint, he lists the following Defendants: Mazzuca, Ercole, Melton, Lopiccolo, Valhos, Venne, and Geulu, while dismissing Geno as a Defendant. (Am.Compl.1.)

**\*2** Plaintiff alleges that the retaliation against him began on May 8, 2003, when CO DiGregonio-who is not a defendant in this action-issued Plaintiff a misbehavior ticket as a warning for failure to comply with the PPD test requirements. [8] (Compl. IV Statement of Claim 3.) Plaintiff alleges that the fifteen misbehavior reports [9] issued against him between May 8, 2003, and January 9, 2004, constitute a pattern of retaliation against him by prison officials and corrections officers [10] on account of his religion. [11] (Compl. IV Statement of Claim 4.) In addition to the various misbehavior reports which were filed against him, Plaintiff alleges that Defendants Mazzuca and Ercole "ran a campaign" of harassing him in retaliation for refusing to take the PPD test. (Compl. IV Statement of Claim 6.)

8    Records incorporated into the Amended Complaint indicate that CO DiGregonio issued Plaintiff a misbehavior ticket on May 8, 2003. (Am.Compl.Ex.) At 8:15 a.m., CO DiGregonio ticketed Plaintiff for making threats, harassing corrections staff, and refusing to obey a direct order. *(Id.)* Sergeant Conkling also issued Plaintiff a misbehavior ticket on the same day at 10:35 a.m.,

charging Plaintiff with making threats and refusing to obey a direct order. *(Id.)*

9    Plaintiff's misbehavior reports, grievances, and grievance appeals are all either incorporated by reference or attached as supplemental exhibits to the Amended Complaint. When citing these documents, the Court will generally refer to the corresponding exhibits in the Lee Declaration, where the documents are reprinted, as they are well organized in that submission.

10   Plaintiff's misbehavior reports, with issuing officer's name, are listed here for completeness: (1) May 8, 2003, 8:15 a.m. (CO DiGregonio): Plaintiff made threats, harassed corrections staff, and refused to obey a direct order; (2) May 8, 2003, 10:35 a.m. (Sgt.Conklin): Plaintiff failed to promptly follow a direct order, engaged in threats and verbal harassment; (3) June 26, 2003, 8:45 a.m. (CO Straley): Plaintiff engaged in violent conduct, disturbed the facility, and disobeyed a direct order; (4) July 14, 2003, 9:00 a.m. (CO Manning): Plaintiff destroyed, altered, and tampered with state property; (5) July 14, 2003, 2:50 p.m. (CO Phillips): Plaintiff destroyed, altered, and counterfeited property; (6) July 28, 2003, 9:00 a.m. (CO Manning): Plaintiff damaged state property; (7) July 29, 2003, 9:00 a.m. (CO Manning): Plaintiff damaged state property; (8) August 18, 2003, 2:13 p.m. (CO Laporte): Plaintiff engaged in conduct that disturbed the order of the facility; (9) October 14, 2003, 4:50 p.m. (CO Venne): Plaintiff engaged in harassment and threats; (10) November 9, 2003, 11:10 p.m. (CO Venne): Plaintiff obstructed visibility of his cell and kept an unclean cell; (11) November 21, 2003, 10:35 a.m. (Sgt.Conkling): Plaintiff lied, destroyed state property, and obstructed visibility of his cell; (12) December 31, 2003, 11:15 a.m. (CO Padgett): Plaintiff failed to promptly obey orders, obstructed the visibility of his cell, and kept an unclean cell; (13) January 7, 2004, 12:45 p .m. (CO Valhos): Plaintiff refused to obey a direct order, interfered with an employee, and failed to comply with mess hall policies; (14) January 9, 2004, 7:15 a.m. (CO Valhos): Plaintiff engaged in threats, violent and disturbing conduct, interfered with an employee, and wasted food; (15) January 9, 2004, 9:08 a.m. (CO Padgett): Plaintiff refused to obey a direct

order, interfered with an employee, and failed to follow staff directions. (Lee.Decl.Ex. C .)

11   In his pleadings, Plaintiff failed to identify what religion required his refusal to take the PPD test, let alone what religious basis he relied upon in refusing the test. At oral argument, Plaintiff indicated that he was a Muslim, however, when asked which sect of Islam he followed (Shia or Sunni), Plaintiff merely claimed that he was an "American Muslim." (Hr'g Tr. 10-11.) Further, Plaintiff could not cite at oral argument, any religious text, such as the Koran, which prohibited him from taking the PPD test. *(Id.* at 11.)

Plaintiff asserts that in addition to religiously-motivated retaliation, he was subjected to racially-motivated retaliation. Plaintiff claims that Defendants issued misbehavior citations in response to his filing grievances against members of the prison staff, which Plaintiff identifies as part of a "pattern of harassing ethnic minorities." (Compl. IV Statement of Claim 5-6, 9.)

In his Amended Complaint, Plaintiff qualified and expanded his retaliation claim, stating that although he could "not say actually if [the guards retaliated against him] for his religious beliefs," he had determined that there were several other reasons why Defendants retaliated against him. (Am. Compl. IV Statement of Claim 3 (extraneous punctuation omitted).) For example, Plaintiff claims that Defendants retaliated against him because he was scheduled to come before the parole board, and in order to adversely affect his parole hearing, the Defendants taunted him with "a variety of alleged misdeeds." (Am. Compl. IV Statement of Claim 4-7.) During approximately the same period of time that Sloane claims he was retaliated against, he filed twelve inmate grievances, and appealed five of these grievances to the Central Office Review Committee ("CORC"). 12 (Lee Decl. Exs. A, B.) Sloane claims that these grievances themselves prompted retaliation by prison officials who conspired to "find grounds for issuing tickets" against him. (Am. Compl. IV Statement of Claim 4.)

12   Sloane's twelve grievances were as follows: (1) April 3, 2003: inmate grievance FCF 24097-03, alleging a denial of legal copies. This grievance was appealed to the CORC, which issued a final determination on May 28, 2003; (2) April 14, 2003: inmate grievance FCF 24114-03, alleging insufficient supplies in S-block. This grievance

2006 WL 3096031

was appealed to the CORC, which issued a final determination on June 4, 2003; (3) April 24, 2003: inmate grievance FCF 24160-03, alleging misplacement of his legal documents. This grievance was appealed to the CORC, which issued a final determination on June 25, 2003; (4) May 9, 2003: inmate grievance FCF 24171-03, alleging denial of supplies and a racist remark concerning slavery made by prison staff; (5) June 10, 2003: inmate grievance FCF 24248-03, alleging denial of legal copies; (6) June 24, 2003: inmate grievance FCF 24296-03, alleging prison staff listened to his privileged tape; (7) July 22, 2003: inmate grievance FCF 24372-03, alleging a request to type legal documents was not granted; (8) September 11, 2003: inmate grievance FCF 24520-03, alleging denial of library materials; (9) September 18, 2003: inmate grievance FCF 24522-03, alleging CO Venne made an inappropriate comment to Plaintiff. This grievance was appealed to the CORC, which issued a final determination on October 22, 2003; (10) January 14, 2004: inmate grievance FCF 24865-04, alleging an unidentified officer spit in his food; (11) January 14, 2004: inmate grievance FCF 24866-04, alleging prison staff threw a food tray at him. This grievance was appealed to the CORC, which issued a final determination on March 3, 2004; (12) April 2, 2004: While at Elmira, Plaintiff filed inmate grievance EL26-403-04, alleging his TB confinement constituted religious discrimination. (Lee Decl. Exs. A, B.)

Only two of the five grievances appealed by Sloane-FCF 24866-04 and FCF 24522-03-postdated Sloane's refusal to take the PPD test and were appealed to the CORC. In neither of these two grievances did Plaintiff allege any religious-based retaliation. In grievance FCF 24866-04, Plaintiff accused Defendants Conklin, Geulu, Padgett, Valhos, and Woodward of participating in a "racially motivated incident" in which Conklin allegedly threw a breakfast tray at Plaintiff. (Lee Decl. Ex. B.) Plaintiff further accused Valhos of engaging in a "cover-up" to protect Defendant Conklin. *(Id.)* Plaintiff also alleged a "pattern of ... persistent racial taunting" fueled by a conspiracy among the named officers and Mazzuca and Ercole to keep the "incidents alive." *(Id.)* Plaintiff made no indication in this grievance that prison staff were retaliating against him because of his religion. On appeal, the CORC concluded that Plaintiff "has not substantiated his claim that he has been the victim of harassment by staff nor has sufficient evidence been produced to support such a conclusion." *(Id.)*

**\*3** In grievance FCF 24522-03, Sloane claimed that "a white officer" responded to Sloane with, "That(s a good boy [sic]," after Sloane had complied with the officer's command to take down a towel which was obstructing a clear view of Sloane's cell.[13] *(Id.)* Plaintiff made no allegation in his grievance that this incident was spurred by Plaintiff's religious beliefs. After reviewing the results of an investigation into Sloane's allegations, the CORC determined that Sloane's appeal was "without merit." *(Id.)*

[13]   Reports collected by the New York State Department of Correctional Services' ("DOCS") subsequently identified CO Venne as the alleged offending officer. (Lee Decl. Ex. B.)

## II. Discussion

### A. Legal Standard

When considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint via reference. *See Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996) (citation omitted). Where a party proceeds *pro se,* the Court is obligated to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Davis v. Kelly,* 160 F.3d 917, 922 (2d Cir.1998) ("Though a court need not act as an advocate for *pro se* litigants, in *pro se* cases there is a greater burden and a correlative greater responsibility upon the district court to insure that constitutional deprivations are redressed and that justice is done." (quotation and citation omitted)). However, even when assessing a *pro se* plaintiff's claim under the Rule 12(b)(6) standard, "a conclusory allegation ... without evidentiary support or allegations of particularized incidents, does not state a valid claim." *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990).

When a court considers materials outside the pleadings, conversion of a motion to dismiss to one for summary judgment may be appropriate. However, before converting a motion, the court ordinarily is to provide notice to the parties. *See* Fed.R.Civ.P. 12(b). In particular, the court should appraise

2006 WL 3096031

a *pro se* litigant of the consequences of failing to adequately respond to a motion for summary judgment. *See Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999). However, such notice, even to *pro se* plaintiffs, is not always required. "The essential inquiry is whether the [the parties] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or [were] taken by surprise and deprived of reasonable opportunity to meet facts outside the pleadings." *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999) (internal quotation marks omitted).

On August 22, 2006, the Court engaged Plaintiff in a colloquy, in which the Court made clear that Defendants were seeking to convert their Motion to Dismiss into one for summary judgment, particularly relating to the question of exhaustion of administrative remedies. (Hr'g Tr. 3-4.) Plaintiff acknowledged that he understood that Defendants were pursuing a Motion for Summary Judgment in the alternative when he filed his Opposition to Summary Judgment. *(Id .)* Indeed, Plaintiff's responding papers expressly discuss summary judgment standards. (Pl.'s Reply Opp'n.) Furthermore, Defendants alerted Plaintiff, pursuant to Local Civil Rule 12. 1, that they would seek to convert their Motion to Dismiss into one for summary judgment. (Local Rule 12.1 Notice to Pro Se Litigant Opposing Mot. Dismiss Treated as Mot. Summ. J.) Other district courts have converted motions to dismiss into motions for summary judgment in PLRA cases where, as here, it is clear to both parties that Court likely will convert the motion, particularly as it relates to the question of proper exhaustion of administrative remedies. *See Collins,* 438 F.Supp.2d at 411-12 (collecting cases). Thus, the Court may apply summary judgment principles to the exhaustion question. *See McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y .2003) ("[N]onexhaustion should be resolved as early as possible by the court.").

**\*4** A motion for summary judgment, pursuant to Fed.R.Civ.P. 56(b) and (c), "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden is on the movant to show that there is no genuine factual dispute. *See Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003). All reasonable inferences must be made in the non-movant's favor. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).

"If the evidence is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact finder could return a verdict for that party, then a genuine issue of material fact exists, and summary judgment is not warranted." *Magan v. Lufthansa German Airlines,* 339 F.3d 158, 161 (2d Cir.2003) (citing *Green Door Realty Corp. v. TIG Ins. Co.,* 329 F.3d 282, 286-87 (2d Cir.2003)); *see also Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000). The genuine issue of material fact "is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968).

### B. Exhaustion of Administrative Remedies

Before the Court turns to Defendants' Motion to Dismiss for failure to state a claim, the Court considers whether Plaintiff has exhausted all available administrative remedies.

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). As noted by the Supreme Court, Congress enacted the PLRA to "reduce the quantity and improve the quality of prisoner suits" by allowing prison officials to initially address prisoner complaints through internal processes. *Porter v. Nussle,* 534 U.S. 516, 524-25 (2002). The PLRA's exhaustion requirement "applies to all inmate suits about prison life," including the constitutional and retaliation complaints alleged by the Plaintiff here. *Id.* at 532.

Exhaustion is not a jurisdictional predicate, *see Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003), but an affirmative defense. *See Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). "[D]efendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy,* 255 F.Supp.2d at 248; *accord Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 677 (4th Cir.2005) (summarizing law of the majority of circuits, including the Second Circuit, which holds that exhaustion of administrative remedies under the PLRA is not a pleading requirement). Nonetheless, a complaint may be dismissed if plaintiff's failure to exhaust administrative remedies is apparent from the face of the complaint. *See Anderson,* 407 F.3d at 682; *McCoy,* 255 F.Supp.2d at 249,

2006 WL 3096031

251. However, "[b]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss." *Nicholson v. Murphy,* No. 302 Civ. 1815, 2003 WL 22909876, at *6 (D.Conn. Sept. 19, 2003); *see also McCoy,* 255 F.Supp.2d at 249-50 ("[I]f, as is usually the case, it is not clear from the face of the complaint whether the plaintiff exhausted, a [motion to dismiss] is not the proper vehicle."). "Rather, the defendants must present proof of non-exhaustion." *Nicholson,* 2003 WL 22909876, at *6.

 *5 This past Term, the Supreme Court considered the PLRA's exhaustion requirement and held that, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2385 (June 22, 2006) (footnote omitted). Thus, the Court's decision requires that there be "proper exhaustion," *id.* at 2385, before a case may succeed in federal court. Concurring in the judgment, Justice Breyer left open the possibility that the Court's adoption of the "proper exhaustion" requirement of the PLRA may still allow for exceptions to exhaustion recognized by the Second Circuit. *Id.* at 2393 (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)).

In the Second Circuit, a district court must consider three factors before the court can decide whether the prisoner has failed to exhaust available administrative remedies. Those three factors are: (1) whether administrative remedies were "available" to the prisoner; (2) whether the defendants are estopped from asserting an exhaustion defense; and (3) whether special circumstances exist that excuse the prisoner from the exhaustion requirements. *See Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir.2006); *Hemphill v. New York,* 380 F.3d 680, 686-92 (2d Cir.2004); *Giano,* 380 F.3d at 677.

The Second Circuit has not addressed how the three-part approach outlined above has been affected by *Woodford.* In fact, just before the issuance of this Opinion, the Second Circuit declined to "determine what effect *Woodford* has on [its] case law in this area." *Ruggiero v. County of Orange,* ---F.3d ----, No. 05-4774-cv, 2006 WL 2973034, at *4 (2d Cir. Oct. 18, 2006). Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this Circuit

to the exhaustion claims.[14] *See Collins,* 438 F.Supp.2d at 411 n. 13 (noting *Woodford's* potential impact on the law of the Second Circuit but deciding exhaustion claims under the Second Circuit's three-part inquiry); *Hernandez v. Coffey,* No. 99 Civ. 11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). The three-part exhaustion test is discussed in *seriatim.*

14    In any event, the Court does not believe that anything in *Woodford* would change the result in this case. *See Ruggiero,* 2006 WL 2973034, at *4 ("[Appellant] could not have prevailed even under [the Circuit's] pre-*Woodford* case law.").

### *1. Whether Administrative Remedies were "Available" to the Prisoner

Before dismissing a complaint filed under the PLRA for failure to exhaust, the Court must "establish the availability of an administrative remedy from a legally sufficient source." *Snider v. Melindez,* 199 F.3d 108, 114 (2d Cir.1999). "To be 'available' under the PLRA, a remedy must afford 'the possibility of some relief for the action complained of.' " *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (quoting *Booth v. Churner,* 532 U.S. 731, 738 (2001)). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Id.* at 668 (quoting *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003)); *see also Taylor v. New York City Dep't of Corr.,* No. 03 Civ.1929, 2004 WL 2979910, at *6 (S.D.N.Y. Dec. 22, 2004).

 *6 In some circumstances, a defendant's behavior will render an administrative remedy unavailable. *See Hemphill,* 380 F.3d at 687. "Exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance or otherwise prevent him from seeking his administrative remedies." *Abney,* 380 F.3d at 667 (citation omitted); *see also Hemphill,* 380 F.3d at 688-89 (determining that threats from guards which prevent the filing of a grievance would make the remedy unavailable) (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Additionally, an administrative remedy is unavailable in "instances where the prisoner obtains a favorable disposition of his grievance, only to find, after the time for filing an administrative appeal has expired, that the relief he had won was not forthcoming." *Giano,* 380 F.3d at 677 (citation omitted).

In this case, the administrative procedures that *Woodford* requires Plaintiff to properly exhaust are the administrative

Sloane v. Mazzuca, Not Reported in F.Supp.2d (2006)

2006 WL 3096031

procedures established by DOCS. The DOCS program includes a three-step administrative mechanism called the Inmate Grievance Program ("IGP"), which provides an avenue for prisoners to resolve complaints about the conditions of their incarceration. See N.Y. Correct. Law § 139. The IGP requires that an inmate first file a complaint with the Inmate Grievance Review Committee ("IGRC") within fourteen days of the challenged event.[15] See 7 N.Y.C .R.R. § 701.7(a)(1); see also Collins, 438 F.Supp.2d at 410. The IGRC must then respond within seven days. See 7 N.Y.C.R.R. § 701.7(a)(3). The inmate may then appeal an adverse IGRC decision to the superintendent of the facility. Id. at 701.7(b); see also Collins, 438 F.Supp.2d at 410. Finally, the inmate may appeal to the DOCS CORC. See 7 N.Y.C.R.R. § 701.7(c); see also Collins, 438 F.Supp.2d at 410. The IGP also permits "matters not decided within the time limits [to] also be appealed to the next step ." 7 N.Y.C.R.R. § 701.8. A few aspects of prison life, such as complaints concerning outside agencies, are not grievable. See 7 N.Y.C.R.R. § 701.3(f). However, an inmate may otherwise grieve "virtually any issue affecting their confinement." Flanagan v. Maly, No. 99 Civ. 12336, 2002 WL 122921, at *1 (S.D.N.Y. Jan. 29, 2002) (citations omitted).

[15]     Although an inmate has fourteen calendar days from the date of an incident to file a grievance, the IGP supervisor may toll the deadline on the basis of "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1); Hemphill, 380 F.3d at 682 n. 3. In this case, neither Plaintiff nor Defendants argue that the fourteen-day time period was waived or tolled in any of Plaintiff's grievances.

### 2. Estoppel

Under the Second Circuit's three-part inquiry, the Court must also inquire as to "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." Hemphill, 380 F.3d at 686 (citations omitted). Under this analysis, for example, the Second Circuit has held that defendants may be estopped from raising a non-exhaustion affirmative defense where prison officials prevented an inmate from exhausting his administrative remedies. See Ziemba, 366 F.3d at 162-63 (estopping defendants where they had prevented exhaustion of remedies by beating and threatening the inmate, denying him grievance forms, and transferring him to another prison).

### 3. Special Circumstances

**\*7** Next, the Court must consider any special circumstances which may have frustrated an inmate's grievance. In Giano, the Second Circuit determined that "there are certain 'special circumstances' in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." 380 F.3d at 676 (citations omitted). In Giano, the plaintiff's reasonable interpretation of DOCS regulations constituted the "special circumstances" justifying his failure to exhaust. Id.

### C. Exhaustion Analysis

Defendants do not argue, and they would be unsuccessful if they did, that it is apparent from the face of the Complaints (and Plaintiff's other pleadings) that Plaintiff has not properly exhausted his administrative remedies. Instead, in support of their claim that Plaintiff has not properly exhausted his administrative remedies, Defendants submit documents and affidavits beyond Plaintiff's pleadings. Plaintiff has responded in kind with references to documents outside the pleadings he has filed. And, as previously noted, Plaintiff has acknowledged that he was on notice that Defendants' motion regarding the exhaustion claim could (and should) be converted to a summary judgment motion. Accordingly, the Court will consider the additional items submitted by the parties and evaluate the exhaustion claim under summary judgment principles. See Taylor, 2004 WL 2979910, at *4 (converting defendants' motion to dismiss to one for summary judgment where defendants submitted additional documents and Plaintiff was on notice of possibility of conversion of motion).

Defendants argue that many of Plaintiff's grievances were not properly exhausted, and they offer the sworn declaration of Karen Bellamy ("Bellamy Decl."), the Assistant to the Director of the Inmate Grievance Program at DOCS, to carry their burden of demonstrating non-exhaustion. Bellamy is responsible for "maintaining records of appeals of grievances filed by inmates" and she "oversee[s] the computer records that DOCS maintains of all appeals made to the Central Office Review Committee...." (Id. ¶ 2) DOCS' Directive # 4040 "requires that grievance files and logs be maintained for at least the current year plus the previous four calendar years." (Id. ¶ 3) Furthermore, the CORC maintains grievance

Sloane v. Mazzuca, Not Reported in F.Supp.2d (2006)

2006 WL 3096031

appeals to CORC dating back to 1990. *(Id.)* "[R]etaliation and conspiracy [claims] may be grieved through the inmate grievance program." *(Id.* ¶ 5)

It is clear based on Defendants' submissions, which Plaintiff does not contest, that administrative remedies were available to Sloane under the IGP. There is also nothing in the record that suggests that Sloane's efforts to utilize the IGP were frustrated by prison officials. [16] Therefore, the first part of the exhaustion test has been met; administrative remedies were available to Sloane.

[16]   The Court notes that Plaintiff was transferred in early 2004 to Elmira "due to inappropriate behavior." (Lee Decl. Ex. B.) Although in *Ziemba,* the Second Circuit noted that the transfer of a prisoner contributed to a pattern of behavior which estopped the defendants from raising the non-exhaustion defense, 366 F.3d at 162-64, a number of courts have determined that transfer by itself does not prevent a Plaintiff from exhausting available administrative remedies. *See, e.g., Sims v. Blot,* No. 00 Civ. 2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Thomas v. Henry,* No. 02 Civ. 2584, 2002 WL 922388, at *2 (S.D.N.Y. May 7, 2002) (finding transfer of prisoner from a city to a state prison did not relieve him of obligation to pursue the grievance procedures); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that Plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred).

**\*8** The second part of the exhaustion test asks if Defendants are estopped from raising exhaustion as a defense. Here, they are not. Defendants first raised the PLRA exhaustion defense in their Motion to Dismiss. (Defs.' Mem. of Law in Supp. of their Mot. to Dismiss the Compl. 7-9) Other courts in this district have held that an exhaustion defense was not waived when defendants timely raised the defense in their second amended answer. *See Legal Aid Soc'y v. City of New York,* 114 F.Supp.2d 204, 222 (S.D.N.Y.2000). In this case, Defendants have exceeded that standard, and asserted the exhaustion defense in both their Motion to Dismiss the initial Complaint, and their Motion to Dismiss the Amended Complaint. (Defs' Supplemental Mem. 8-12)

In addition, Defendants have not prevented Plaintiff from pursuing the available administrative remedies, and Plaintiff has not argued otherwise. *See Hernandez,* 2006 WL 2109465, at *4 (citations omitted).

The third part of the exhaustion test has also been satisfied. There are no special circumstances which would excuse Plaintiff from availing himself of administrative remedies. Plaintiff has not asserted that he was inhibited in his pursuit of administrative remedies, nor has he suggested that his interpretation of DOCS regulations differed from that of prison officials, as in *Giano.*

All of Plaintiff's claims in this action could have been pursued through the IGP, and since none of the three factors the Court must consider excuses Plaintiff's failure to properly exhaust his remedies, the Court must now determine which of Plaintiff's claims were properly exhausted. From the materials submitted by Defendants, most of which are either attached or referred to in Plaintiff's Complaints, it is evident that Plaintiff filed a total of twelve grievances through the IGP. (Lee Decl. Exs. A, B.) These twelve grievances can be placed into three categories. The first category consists of grievances which Plaintiff filed before the alleged date of the PPD test. The second category consists of grievances which were filed but not appealed, and therefore, not properly exhausted. The third category is comprised of properly exhausted grievances.

*1. Grievances Which Pre-date the PPD Test*

Plaintiff attached a number of grievances to his Initial Complaint, three of which pre-date Plaintiff's assertion that prison officials conspired to retaliate against Plaintiff for refusing to take the May 8, 2003, PPD test. [17] In those grievances, Plaintiff claimed, respectively, that he was denied access to his legal files, that the S-block facility did not stock adequate office supplies, and that Plaintiff's legal documents were misplaced. (Lee Decl. Ex. A.) Since all of these events took place before Plaintiff refused the PPD test, they could not have been in retaliation for his refusal of the test, nor could they all be part of a conspiracy aimed at harming Plaintiff for refusing the test. [18] In addition, Plaintiff has not alleged that he sustained any injury as a result of the conduct underlying these grievances, which means that section 1983 is not available to him as a remedy for these instances of alleged misconduct. *See Moore v. Gardner,* 199 F.Supp.2d 17, 28 (W.D.N.Y.2002) (denying section 1983 claim for confiscation of legal papers because plaintiff sustained no injury).

[17]   The three grievances, filed on April 3, 2003, April 14, 2003, and April 24, 2003, were FCF 24097-03, FCF 24114-03, and FCF 24160-03, respectively. (Lee Decl. Ex. A.)

[18]   Though not dispositive, the April 3 and April 14 grievances were granted, which would seem to undermine Plaintiff's claims that he was the victim of a conspiracy. (Lee Decl. Ex. A.) Furthermore, Plaintiff has not argued at any point that the denial of access to his legal files or access to supplies has hindered his ability to exhaust his administrative remedies.

### 2. Claims Not Exhausted

 **\*9**  Defendants argue that most of Plaintiff's claims were not fully exhausted and in support, they have offered a computer printout which lists all of Plaintiff's grievances which were appealed to CORC. (Bellamy Decl. Ex. A.) Based on that computer record, Defendants contend that "the only grievances that inmate Sloane has appealed at Fishkill Correctional Facility after May 8, 2003 ... are one grievance for alleged inappropriate comments by a corrections officer (FCF 24522-03) and a grievance for a food tray allegedly being thrown at him (FCF 24866-04)." [19]  (Bellamy Decl. ¶ 6.) Plaintiff has not challenged Defendants' claim that only these two grievances were appealed to the CORC, and, therefore, the remaining grievances were not fully exhausted. *See* *Woodford,* 126 S.Ct. at 2385 (defining proper exhaustion); *Gibson v. Goord,* 280 F.3d 221, 224 (2d Cir.2002) (noting that unappealed grievances are deemed to be unexhausted grievances). The Court agrees with Defendants that only two of Plaintiff's grievances were fully exhausted.

[19]   Plaintiff failed to exhaust his remedies for the following grievances: (1) May 9, 2003: Plaintiff filed inmate grievance FCF 24171-03, alleging denial of supplies and a racist remark concerning slavery made by prison staff; (2) June 10, 2003: Plaintiff filed inmate grievance FCF 24248-03, alleging denial of legal copies; (3) June 24, 2003: Plaintiff filed inmate grievance FCF 24296-03, alleging prison staff listened to his privileged tape recording; (4) July 22, 2003: Plaintiff filed inmate grievance FCF 24372-03, alleging a request to type legal documents was not granted; (5) September 11, 2003: Plaintiff filed inmate grievance FCF 24520-03, alleging denial of library materials; (6)

January 14, 2004: Plaintiff filed inmate grievance FCF 24865-04, alleging an unidentified officer spit in his food.

The impact of Plaintiff's failure to exhaust his administrative remedies is fatal, because the gravamen of Plaintiff's complaint in this section 1983 action is found in a grievance Plaintiff filed at Elmira-EL 26403-04-which was not fully exhausted. This is the only grievance alleging that Plaintiff's TB confinement constituted religious discrimination. (Lee Decl. Ex. A.)

### 3. Properly Exhausted Claims

Defendants concede that two of Plaintiff's grievances were properly exhausted. On September 18, 2003, Plaintiff filed inmate grievance FCF 24522-03, alleging that CO Venne made an inappropriate comment to Plaintiff. This grievance was appealed to the CORC, which issued a final determination on October 22, 2003. (Bellamy Decl. Ex. A.) On January 14, 2004, Plaintiff filed inmate grievance FCF 24866-04, alleging that prison staff threw a food tray at him. *(Id.)* This grievance was appealed to the CORC, which issued a final determination on March 3, 2004. *(Id.)* Since these two grievances were the only fully exhausted grievances, the Court will limit Sloane, in accord with the PLRA, to claims raised in grievances FCF 24522-03 and FCF 24866-04. The Court cannot consider any allegation by Sloane made in his complaints or papers that does not appear in either grievance.

### D. Individual Defendants

The Court now turns to the question of which of the named Defendants were identified by Sloane in his two exhausted grievances. The allegation of a defendant's personal involvement in any alleged constitutional violation is a prerequisite to a damage award for personal injury under section 1983. *See* *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). In Plaintiff's two properly exhausted grievances, he names several individuals, but Defendants Melton and Lopiccolo are not among them. Because Plaintiff failed to name Melton or Lopiccolo in either grievance, claims against these Defendants are dismissed. *See* *Roper v. Hynes,* No. 05 Civ. 7664, 2006 WL 2773032, at \*9 (S.D.N.Y. Sept. 27, 2006) (dismissing section 1983 action for lack of personal involvement) (citing *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987)); *Luckerson v. Goord,* No. 00 Civ. 9508, 2002 WL 1628550, at \*2 (S.D.N.Y. July 22, 2002) (finding that litigating a federal suit based on allegations that

were never made at the administrative level would make a "mockery of the exhaustion requirement").

**\*10** Plaintiff also makes allegations against Superintendent Mazzuca and Deputy Superintendent for Security Ercole, both of whom are properly categorized as supervisory personnel. The personal involvement of a supervisory official in a section 1983 action can be established by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

Plaintiff's claims against the supervisory Defendants fail, as neither Defendant has been alleged to be involved in any of the conduct underlying Plaintiff's exhausted grievances. Plaintiff has also failed to allege that any of the five *Colon* factors for supervisory officials has been met. Rather, Plaintiff generally asserts that Mazzuca and Ercole "ran a campaign of keeping incidents alive" (Compl. IV Statement of Claim 6), but he does little more than offer conclusory statements that Mazzuca and Ercole, both of whom sit high atop the prison hierarchy, conspired against him. Such conclusory allegations are insufficient to sustain a claim. *See Collins,* 438 F.Supp.2d at 420 (dismissing claim against DOCS officials who had no direct role in subject of plaintiff's complaint (citing *Colon,* 58 F.3d at 874)); *see also Davis v. County of Nassau,* 355 F.Supp.2d 668, 677 (E.D.N.Y.2005) ("A complaint that essentially regurgitates the relevant 'personal involvement' standard, without offering any facts indicating that, or how, an individual defendant in a supervisory role was personally involved in a constitutional violation, cannot withstand dismissal."); *Madison v. Mazzuca,* No. 02 Civ. 10299, 2004 WL 3037730, at \* 10 (S.D.N.Y. Dec. 30, 2004) (dismissing "wholly conclusory" allegations of supervisory culpability). Therefore, any claims against Defendants Mazzuca and Ercole are dismissed. Thus, the following Defendants are the remaining parties to this lawsuit: Sergeant Conklin, COs Venne, Valhos, Geulu, Padgett, and Woodward.

### E. *Section 1983*

To state a claim under section 1983, Plaintiff must show that defendants, while acting "under color of state law," deprived Plaintiff of his constitutional or statutory rights. *Shabazz v. Vacco,* No. 97 Civ. 3761, 1998 WL 901737, at \*2 (S.D.N.Y. Dec. 28, 1998) (citing *Pitchell v. Callan,* 13 F.3d 545, 547-48 (2d Cir.1994)); *see also* 42 U.S.C. § 1983.

While *pro se* complaints are to be liberally construed and interpreted "to raise the strongest argument that they suggest," *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citation omitted), the Court must dismiss a section 1983 complaint if it fails to set forth specific factual allegations indicating a deprivation of constitutional rights. *See Alfaro Motors,* 814 F.2d at 887 ("[B]road, simple, and conclusory statements are insufficient to state a claim under § 1983."); *Shabazz,* 1998 WL 901737, at \*2 ("[T]he court will dismiss a complaint that consist[s] of nothing more than naked assertions, and set[s] forth no facts upon which a court could find a [constitutional] violation.") (citations and quotation marks omitted). The Second Circuit has "repeatedly held, [that] complaints relying on ... civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987).

#### 1. *Inappropriate Comments*

**\*11** Plaintiff alleges that he was the target of an inappropriate comment by a "white officer," who was later identified by DOCS to be CO Venne. Plaintiff alleges that after he complied with CO Venne's directive to remove a towel from his cell which was obstructing the officer's view into the cell, Venne responded by saying, "That(s) [sic] a good boy."

The alleged comment is not actionable under section 1983 for two reasons. First, verbal harassment-even potentially racist

2006 WL 3096031

harassment—"unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and is therefore not actionable under 42 U.S.C. § 1983." *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (collecting cases) (citations and punctuation omitted); *see also Purcell v. Coughlin* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed." (citing *McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983)); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Second, Plaintiff has no section 1983 claim even assuming, arguendo, that there is a racial subtext to the comment, because discriminatory statements are not actionable under section 1983. *See Wright v. Santoro,* 714 F.Supp. 665, 667 (S.D.N.Y.1989) (noting that discriminatory statements reflecting racial prejudice are not actionable under section 1983 where not connected to any physical injury), *aff'd,* 891 F.2d 278 (2d Cir.1989). Therefore, this cause of action is dismissed for failure to state a claim.

### 2. Food Tray Incident

Sloane alleges that CO Conklin threw a food tray at him in what Plaintiff says was a racially-motivated incident. Sloane further alleges that CO Valhos participated in a "cover up" to conceal the food tray incident. Sloane does not claim that he was struck by the tray.

The food tray incident is not actionable under section 1983. Plaintiff has not identified which of his constitutional or statutory rights was violated by the officers. Furthermore, physical contact that falls short of producing an injury is not actionable under section 1983. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (holding that plaintiff's allegations that he was "bumped, grabbed, elbowed, and pushed" did not present a viable section 1983 claim (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993))). Here, there was no physical contact, and thus no actionable section 1983 injury. Further, because the alleged act of throwing a food tray by itself is not actionable in the absence of any injury, neither is any alleged cover up. Therefore, this cause of action is dismissed for failure to state a claim.

### 3. Conspiracy

**\*12** Next, Sloane alleges that he is a victim of a "pattern of ... persistent racial taunting" which is fueled by a conspiracy to issue Plaintiff misbehavior citations as part of a scheme to keep "incidents alive."

To successfully assert a section 1983 claim for conspiracy, plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing harm to plaintiff. *See Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). The Court is mindful, however, that "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Id.* at 72 (citation and quotations omitted). Nonetheless, claims of conspiracy, as with all civil rights causes of action, must be plead with some specificity. *See Roper,* 2006 WL 2773032, at *9 (noting that conspiracy claims must be plead with specificity); *Brewster v. Nassau County,* 349 F.Supp.2d 540, 547 (E.D.N.Y.2004) (same).

Plaintiff has failed to allege, with any specificity, that Defendants formed an agreement to conspire against Plaintiff, or that there was a "meeting of the minds." The mere fact that Defendants are DOCS employees, and have encountered Plaintiff on various occasions, by itself, is not sufficient to state a claim for conspiracy. *See Webb v. Goord,* 340 F.3d 105, 110-11 (2d Cir.2003) (holding that plaintiffs failed to allege in a non-conclusory manner any meeting of the minds); *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy ... cannot withstand ... dismiss[al].").

In addition, to the extent Plaintiff alleges that the "persistent racial taunting" he faces is verbal harassment, those claims are not actionable under section 1983. *See supra,* Part II.E.1. Finally, Sloane's conspiracy claim also fails because he relies on unsupported, conclusory statements for his conspiracy allegation. For example, Plaintiff has not alleged with any specificity how Defendants acted in concert to injure Plaintiff. This mandates dismissal of this claim. *See Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) ("[C]onclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed."); *McCoy,* 255 F.Supp.2d at 259 (allegations of conspiracy were too broad and conclusory). Therefore, this cause of action is dismissed for failure to state a claim.

### 4. Retaliation

Although Plaintiff's complaints and papers do not clearly allege that the conduct underlying his exhausted claims form the basis of a First Amendment retaliation claim, the Court will assume that Plaintiff has alleged retaliation. To state a claim of retaliation for exercise of First Amendment rights, Plaintiff must make non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U .S. 506 (2002); *Holmes v. Grant,* No. 03 Civ. 3426, 2006 WL 851753, at *15 (S.D.N.Y. Mar. 31, 2006). Because prisoners' claims of retaliation are prone to abuse, the Court approaches Plaintiff's claims with justifiable caution and some skepticism. *See Allah v. Greiner,* No. 03 Civ. 3789, 2006 WL 357824, at *3 (S.D.N.Y. Feb. 15, 2006) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[C]laims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse ."). That is because "[v]irtually every prisoner can assert ... [a claim of retaliation] as to every decision which he or she dislikes." *Flaherty,* 713 F.2d at 13. Thus, to survive a Motion to Dismiss, a retaliation claim must be pled with specificity. *See Ramsey v. Goord,* No. 05 Civ. 47A, 2005 WL 2000144, at *7 (W.D.N.Y. Aug. 13, 2005); *Allah,* 2004 WL 1713811, at *1; *Prince v. Edwards,* No. 99 Civ. 8650, 2000 WL 633382, at *1 (S.D.N.Y. May 17, 2000).

 **\*13** Read charitably, Plaintiff has alleged that his time spent in the SHU confinement cell, numerous misbehavior reports, and two incidents with corrections officers, were the products of retaliation on account of Plaintiff's "American Muslim" religious identity. With respect to the first claim, that Plaintiff was placed in a confinement cell in retaliation for his exercise of his religion, that claim is rejected on summary judgment grounds for failure to exhaust available administrative remedies. As noted above, no properly exhausted grievance made *any* allegations of misconduct based on Plaintiff's supposedly religious objection to the PPD test, and the one grievance that relied on this claim was never appealed. Plaintiff cannot circumvent the exhaustion requirement by simply cloaking his claims under the guise of "retaliation." Indeed, any allegations of retaliation based on misbehavior reports is also rejected on summary judgment grounds, because Plaintiff failed to exhaust administrative remedies available for grieving retaliation claims. *See Lawrence v. Goord,* 304 F.3d 198, 200 (2d Cir.2002) (noting that claim

for retaliation based on misbehavior tickets issued against plaintiff had to be exhausted).

However, the Court will now consider the retaliation claim that arguably could be based on Plaintiff's two exhausted grievances. Plaintiff alleges that two discrete events-one alleging an inappropriate comment by a corrections officer and one where a food tray was allegedly thrown at him-constitute retaliation against Plaintiff. The first prong of a retaliation claim requires that the speech or conduct at issue was protected. These events, if precipitated because of animus towards Plaintiff's "American Muslim" identity, arguably satisfy the first prong for a retaliation claim, because prisoners have a constitutional right to the free exercise of their religion. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003).

The second prong of a retaliation claim requires an adverse action, which is an act that "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). Adverse actions are measured objectively, even if the plaintiff was not deterred. *Id.* (citing *Davis,* 320 F.3d at 353-54). If the adverse action is one that does not deter an individual of ordinary firmness, however, the retaliatory act "is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis,* 320 F.3d at 353.

To determine whether retaliatory acts are *de minimis,* "the court's inquiry must be 'tailored to the different circumstances in which retaliation claims arise,' bearing in mind that '[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse.' " *Davis v. Goord,* 320 F.3d at 353 (quoting *Thaddeus -X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999)). "Thus, in retaliation actions by prisoners, courts have found that a range of potentially retaliatory acts by prison officers are legally insufficient to state a retaliation claim." *Salahuddin v. Mead,* No. 95 Civ. 8581, 2002 WL 1968329, at *4 (S.D.N.Y. Aug. 26, 2002).

 **\*14** Neither of Plaintiff's exhausted claims rises to the level of constitutional significance and both are merely *de minimis* for reasons explained in this Opinion. *See supra* Part II.E. The conduct at issue falls far short of crossing the threshold for adverse actions when compared to other retaliation cases which were brought forth in the Second Circuit. *See Morales v. Mackalm,* 278 F.3d 126, 131-32 (2d Cir.2002) (finding that an officer's reference to plaintiff as

a "stoolie," intended to stigmatize plaintiff as an informant, was insufficient to support a claim for retaliation), *abrogated on other grounds by Porter,* 534 U.S. at 532; *Dawes,* 239 F.3d at 493 (concluding that an officer's references to plaintiff as a "rat" and an "informant," combined with plaintiff's conclusory allegations that the references exposed him to assault from other inmates, were insufficient to support a claim for retaliation); *Rivera v. Goord,* 119 F.Supp.2d 327, 340 (S.D.N.Y.2000) (dismissing retaliation claim against defendant who "shoved" an inmate on the ground that the harm was *de minimis).*

The third prong requires a causal connection between the protected speech and the adverse action. Courts may consider a number of factors when examining the causal connection requirement, such as: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *See Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon,* 58 F.3d at 872-73).

None of these four factors supports an inference "of a causal connection between the adverse actions and the protected conduct." *Id.* (citing *Dawes,* 239 F.3d 432). Plaintiff has failed to allege any series of events which plausibly could suggest that prison officials retaliated against Plaintiff for his refusal to take the PPD test. The first factor, temporal proximity, weighs against Plaintiff. Plaintiff refused the PPD test on May 8, 2003, and the conduct underlying his two exhausted grievances took place on September 8, 2003 and January 14, 2004, at least a full four months after Plaintiff's refusal to take the PPD test. And, more than four months separated the first and the second alleged incident. The lapse of time between the PPD test and the alleged retaliation strongly suggests that there is no causal connection between these events. *See Cobian v. New York City,* No. 99 Civ. 10533, 2000 WL 1782744, at *18 (S.D.N.Y. Dec. 6, 2000) (report and recommendation) (finding a lapse of over four months, standing alone, is insufficient to justify an inference of a causal connection in employment context), *aff'd,* 23 Fed. Appx. 82 (2d Cir.2001); *cf. Jordan v. Garvin,* No. 01 Civ. 4393, 2004 WL 302361, at *6 (S.D.N .Y. Feb. 17, 2004) (finding that lapse of two days permitted an inference of causal connection). Plaintiff has only met the temporal proximity factor in the most rudimentary sense, because his refusal of the PPD test pre-dates the alleged retaliation, but that alone is not enough to meet the third prong. *See Williams*

*v. Lappin,* No. Civ.A. 7:04CV00625, 2004 WL 3334806, at *2 (W.D.Va. Oct. 26, 2004) (" 'Temporal proximity' between the inmate's protected activity and the allegedly retaliatory, official action 'is simply too slender a reed on which to rest' a § 1983 retaliation claim." (quoting *Wagner v. Wheeler,* 13 F.3d 86, 90-91 (4th Cir.1993))).

**\*15** The remaining factors also militate strongly against Plaintiff's claim: Plaintiff has not alleged that his troubles with prison officials began on the day he refused the PPD test; the IGP has not vindicated any of his retaliation claims; and Plaintiff has not pointed to any evidence of a retaliatory motive, other than his conclusory claims. In fact, Plaintiff has made no attempt in any of his papers to connect the officers named in the two exhausted grievances to his refusal to take the PPD test or his religious beliefs. Only CO DiGregonio, who is not named by Plaintiff in either exhausted grievance, had a connection to the PPD test, because DiGregonio issued Plaintiff with a misbehavior ticket for his refusal to take the PPD test. Plaintiff failed to exhaust that grievance, however. Plaintiff's allegations are conclusory, and "[e]ven at the motion to dismiss stage ... plaintiff must offer more than mere conclusory allegations that a causal connection existed between the protected conduct and the adverse action." *Holmes,* 2006 WL 851753, at *15 (citing *Dawes,* 239 F.3d at 491-92); *see also Flaherty,* 713 F.2d at 13 ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone"); *Smith v. Masterson,* No. 05 Civ. 2897, 2006 WL 2883009, at * 14 (S.D.N.Y. Sept. 29, 2006) ("Because Plaintiff has failed to make specific and detailed factual allegations tending to show any causal connection between his success at having disciplinary charges dismissed and the alleged conduct of the DOCS Defendants, his retaliation claim must be dismissed."). Because Plaintiff "has no factual basis for the claim other than an adverse administrative decision ... the costs of discovery should not be imposed on defendants." *Flaherty,* 713 F.2d at 13. Therefore, Plaintiff's retaliation claim, to the extent he alleges one, and even if exhausted, is dismissed for failure to state a claim.

*F. Qualified Immunity*

Defendants argue that they are protected from suit under the qualified immunity doctrine. The doctrine applies in cases such as this one, where an inmate has brought a civil rights action against prison officials. *See Freeman v. Goord,* No. 02 Civ. 9033, 2005 WL 3333465, at * 11 (S.D.N.Y. Dec. 7, 2005) (citing *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004)). The qualified immunity doctrine shields government officials

2006 WL 3096031

performing discretionary functions from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *see also Wilson v. Layne,* 526 U.S. 603, 609 (1999). A right is clearly established if (1) the underlying law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit recognizes that right, and (3) a reasonable defendant would understand that his conduct was unlawful. *See Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003).

**\*16** The "first step" in a qualified immunity analysis is to "determine whether the alleged conduct violates any constitutionally protected right at all. Conduct that does not violate any constitutional right certainly does not violate a constitutional right that was 'clearly established' at the time the conduct occurred." *Mozzochi v. Borden,* 959 F.2d 1174, 1179 (2d Cir.1992) (citing *Siegert v. Gilley,* 500 U.S. 226 (1991)). Because the conduct that Sloane has properly exhausted does not rise to a constitutional violation, Defendants are entitled to qualified immunity. The Court, therefore, need not consider the remainder of the qualified immunity inquiry.

### G. Eleventh Amendment

To the extent that Plaintiff is suing Defendants in their official capacities, such claims are barred by the Eleventh Amendment. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985) (holding claim for damages against state officials in their official capacity is considered claim against the state and, therefore, is barred by the Eleventh Amendment); *Hafer v. Melo,* 502 U.S. 21, 25 (1991) (same); *Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (same).

### III. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is DENIED in part and GRANTED in part. Defendants' Motion for Partial Summary Judgment is GRANTED. The Clerk of the Court is directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3096031

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 639 of 830

Houston v. Coveny, Not Reported in Fed. Supp. (2020)

2020 WL 1151345

KeyCite Yellow Flag - Negative Treatment
On Reconsideration in Part    Houston v. Coveny,    W.D.N.Y.,    May 14,
2020

2020 WL 1151345
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Tyrone HOUSTON, Plaintiff,
v.
R. COVENY, et al., Defendants.

Case # 14-CV-6609-FPG
|
Signed 03/09/2020

**Attorneys and Law Firms**

Tyrone Houston, Beacon, NY, pro se.

Gary M. Levine, New York State Office of the Attorney
General, Rochester, NY, for Defendants.

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

**INTRODUCTION**

**\*1** On October 28, 2014, *pro se* Plaintiff Tyrone Houston
sued numerous Defendants pursuant to 42 U.S.C. § 1983 for
alleged violations of his constitutional rights. ECF No. 1.
Defendant Lester Cady is the only remaining defendant in this
case. ECF No. 119. Plaintiff alleges that Defendant subjected
him to sexual abuse, excessive force, and retaliation on three
occasions—September 22, 2015 and December 22 and 31,
2015—in violation of his First and Eighth Amendment rights.
ECF No. 85.

On October 28, 2019, Defendant moved for summary
judgment pursuant to Federal Rule of Civil Procedure 56.
ECF No. 127. Plaintiff made a cross motion for summary
judgment. ECF No. 137. In Plaintiff's reply to his motion for
summary judgment, he appears to bring motions *in limine*
and to appoint counsel. ECF No. 140 at 6, 9. For the
reasons that follow, Plaintiff's motion for summary judgment
(ECF No. 137) is DENIED and Defendant's motion for
summary judgment (ECF No. 127) is GRANTED IN PART

and DENIED IN PART. Plaintiff's motions *in limine* and to
appoint counsel (ECF No. 140) are DENIED WITHOUT
PREJUDICE TO RENEW.

**BACKGROUND** [1]

[1]    The Court draws these facts from the parties'
       Rule 56 Statements, which are undisputed unless
       otherwise noted. ECF No. 127-1; ECF No. 135.

On September 22, 2015, Plaintiff was an inmate at Five Points
Correctional Facility. On that day around 8:10 a.m., Plaintiff
was heading to the law library when Defendant directed
him to put his hands on the wall for a pat frisk. Defendant
submitted a sworn declaration wherein he averred that part
of his job that morning "was to conduct random searches of
inmates for contraband" and that he frisked Plaintiff "as part
of a random search of inmates traveling in that part of the
prison at that time of the day." ECF No. 127-3 ¶¶ 4, 6. Plaintiff
alleges that Defendant said: "Put your hands on the wall—
you want to keep writing me up? Now I'm going to fuck you."
ECF No. 135 at 1.

Two weeks earlier, on September 8, 2015, Plaintiff wrote
a letter to the Superintendent of Five Points complaining
about two other corrections officers. In that letter, Plaintiff
wrote that he wanted the Superintendent to "stop allowing
prisoner guard [C]ady to illegally encourage and influence
their judgments." ECF No. 138 at 16. Defendant affirmed that
he did not know about the September 8 letter when he frisked
Plaintiff on September 22. ECF No. 127-3 ¶ 7. Nonetheless,
Plaintiff believes that the letter was the reason for Defendant's
actions that day.

Defendant pat frisked Plaintiff over his clothes while inmates
passed them in the hallway and another corrections officer
stood next to Defendant and searched Plaintiff's papers.
Security cameras recorded the interaction, and this footage
was submitted to the Court. The video reveals that the entire
interaction lasted about three minutes and that Defendant
had his hands on Plaintiff for about one minute and fifteen
seconds. Defendant avers that he frisked Plaintiff "in a
professional and thorough manner" the same way he frisks all
other inmates. ECF No. 127-3 ¶ 9.

**\*2** Plaintiff tells a very different story about the pat frisk. He
alleges that Defendant "violently" pulled his pants upward,
which squeezed his genital and rectal areas tightly, kicked his

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 640 of 830

Houston v. Coveny, Not Reported in Fed. Supp. (2020)

2020 WL 1151345

right foot, and squeezed his penis "real hard twice, causing painful swelling and bloody urinations." ECF No. 138 at 2. Defendant admits touching Plaintiff's buttocks and genitals as part of the pat frisk but maintains that he "did not do this for any sexual gratification" and "did not squeeze any part of [P]laintiff's genitals." ECF No. 127-3 ¶¶ 14-15.

The undisputed facts about the December 22 and 31 incidents are sparse. According to Defendant, Plaintiff alleges that he frisked him on those days the same way he frisked him on September 22. Defendant also asserts that the December 22 incident was not the subject of a grievance and that neither the December 22 nor December 31 incidents were fully appealed. Therefore, Plaintiff did not properly exhaust claims related to those incidents.

Plaintiff's Second Amended Complaint reveals that, on December 22, Defendant allegedly hit Plaintiff in the left knee so hard that it bent, made threatening comments to him, stole his program card, and put him in keeplock in retaliation for Plaintiff's grievance about the September 22 incident. ECF No. 85 at 4-5. Defendant avers that he does not recall pat frisking Plaintiff on December 22 and that prison officials advised him that there is no known grievance related to this date. ECF No. 127-3 ¶ 17. Nonetheless, Defendant states that he conducts all his frisks in the same manner "for the purpose of institutional safety and not for the intent of sexual gratification." *Id.*

On December 31, Defendant allegedly "sexually and maliciously" pat frisked Plaintiff by "touching and hitting his genitalia area hard" and threatened to put contraband in Plaintiff's cell and beat his head into the wall. ECF No. 85 at 5. Plaintiff also claims that Defendant rammed his arm into Plaintiff's back and "hit [his] genitalia hard twice," which caused painful swelling to his left testicle. *Id.* Defendant avers that he did not touch Plaintiff "with any intent of sexual gratification" on that day. ECF No. 127-3 ¶ 16.

## LEGAL STANDARD

A court grants summary judgment when the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a)-(b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). It is the movant's burden to establish the nonexistence of any genuine issue of material fact. If there is record evidence from which a reasonable inference in the

non-moving party's favor may be drawn, a court will deny summary judgment. *Id.*

Once the movant has adequately shown the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to present evidence sufficient to support a jury verdict in its favor, without simply relying on conclusory statements or contentions. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing Fed. R. Civ. P. 56(e)). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). To survive a motion for summary judgment on § 1983 claims, the plaintiff must offer concrete evidence from which a reasonable juror could conclude that the defendants deprived him of the rights, privileges, or immunities guaranteed to him by law. *See Johnson v. Davis*, No. 12-CV-2449, 2015 WL 1286764, at *2 (E.D.N.Y. Mar. 20, 2015).

**\*3** Here, in light of Plaintiff's *pro se* status, the Court will construe his opposition papers liberally "to raise the strongest arguments that they *suggest.*" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2009) (quotation and citation omitted). Nevertheless, proceeding *pro se* does not relieve Plaintiff from the usual summary judgment requirements. *See Wolfson v. Bruno*, 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011).

## DISCUSSION

Plaintiff alleges that Defendant subjected him to sexual abuse, excessive force, and retaliation on three occasions —September 22, 2015 and December 22 and 31, 2015—in violation of his First and Eighth Amendment rights. ECF No. 85. The Court addresses each claim for each incident in turn.

### I. September 22, 2015 Incident

#### A. Sexual Abuse Claim

A corrections officer violates an inmate's Eighth Amendment right to be free from cruel and unusual punishment when he makes "intentional contact with an inmate's genitalia or other intimate area" and that contact "serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate." *Telesford v. Wenderlich*, No. 16-CV-6130 CJS, 2018 WL 4853667, at *9 (W.D.N.Y. Oct.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 641 of 830

Houston v. Coveny, Not Reported in Fed. Supp. (2020)

2020 WL 1151345

5, 2018) (citing *Crawford v. Cuomo*, 796 F.3d 252, 254 (2d Cir. 2015) [hereinafter "*Crawford I*"]).

A single incident may "reach constitutional significance if sufficiently severe or serious," but, "[a]t the same time, there are searches of an intensely personal nature that are not properly the subject of a lawsuit." *Id.* (quotation marks and citations omitted). A court's "principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.* (citation omitted).

Here, Plaintiff insists that the pat frisk involved the squeezing of his genitals and that Defendant said "I'm going to fuck you" while frisking him. ECF No. 135 at 1, 4. Another inmate averred to hearing the same. ECF No. 135 at 27. Defendant argues that he conducted a random pat frisk on Plaintiff in a "professional and thorough manner" without squeezing Plaintiff's genitals to search for contraband but makes no mention of whether he spoke to Plaintiff during the frisk. ECF No. 127-3 at 1-2.

The alleged manner of the pat frisk of Plaintiff's genitals coupled with Defendant's alleged comments as overheard by another inmate create a question of fact as to whether the pat frisk was "undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate." *See Hayes v. Dahkle*, No. 9:16-CV-1368 (TJM/CFH), 2018 WL 7356343, at *12 (N.D.N.Y. Dec. 11, 2018), *report and recommendation adopted*, 2019 WL 689234 (N.D.N.Y. Feb. 19, 2019) (collecting cases indicating that "offensive remarks" made during pat frisk would not violate Eighth Amendment unless the comments allude to officer's current or future sexual contact with the inmate); *Shepherd v. Fisher*, No. 08-CV-9297 (RA), 2017 WL 666213, at *19 (S.D.N.Y. Feb. 16, 2017) (denying summary judgment on plaintiff's sexual abuse claim where officer commented during pat frisk that "he was going to fuck [plaintiff] in [his] ass with [a hand] scanner." (internal quotation marks omitted)); *cf. Torres v. City of New York*, No. 17 Civ. 6604 (GBD) (DCF), 2019 WL 4784756, at *5 (S.D.N.Y. Sept. 30, 2019) (dismissing plaintiff's sexual abuse claim where officer touched his buttocks during contraband search but officer had not "said anything of a sexual nature during the course of the search"); *Allen v. Graham*, No. 9:16-CV-0047 (GTS/ATB), 2017 WL 5957742, at *6 n.6, 7 (N.D.N.Y. Dec. 1, 2017) (collecting cases holding that pat frisks involving only touching of plaintiffs' genitals accompanied by "inappropriate" comments do not violate

the Eighth Amendment, particularly when plaintiffs did not allege any associated pain due to the pat frisk).

**\*4** Because there is an issue of fact, Defendant's and Plaintiff's motions for summary judgment are DENIED with respect to Plaintiff's sexual abuse claim.

**B. Excessive Force Claim**

To determine whether prison officials used excessive force in violation of the Eighth Amendment, a court considers "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). To succeed on such a claim, a plaintiff must prove objective and subjective elements. *Id.* at 7-8.

The objective element is "contextual and responsive to contemporary standards of decency," *id.* at 8-9 (quotation and citation omitted), and requires that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). Thus, the Eighth Amendment "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks and citation omitted). "Consequently, not every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 9 (citation omitted).

The subjective component "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (quotation marks and citations omitted). Whether the defendant's conduct was "wanton" turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Blyden*, 186 F.3d at 262-63.

Plaintiff claims that he suffered bloody urine, a swollen testicle, and bladder wall thickening as a result of Defendant's pat frisk. ECF No. 135 at 8-9, 15. An inmate injury report from the day of the incident indicates that Plaintiff's anus and scrotum were examined and showed "excoriations/redness/ swelling." ECF No. 138 at 22. Yet, a progress note from a medical visit the day after the alleged incident states that there are "no visible injuries" to Plaintiff's scrotum or anus. ECF No. 135 at 29. Plaintiff points to the results of a urinalysis that shows Plaintiff's urine is positive for the presence of blood

and a progress note indicating Plaintiff has a swollen left testicle as further proof of his injuries. ECF No. 135 at 31; ECF No. 141. The urinalysis was conducted on a sample of Plaintiff's urine taken 17 days after the incident. ECF No. 135 at 30-31. The progress note showing Plaintiff has a swollen testicle is dated more than four years after the incident. ECF No. 141.

The nature of these alleged injuries, if caused by Defendant's part frisk, creates a question of fact as to whether they are more than *de minimis*. *See Brown v. Jones*, 471 F. App'x 420, 420-21 (5th Cir. 2012) (vacating grant of summary judgment to officer on excessive force claim where plaintiff alleged that "during a pat down search [the officer] struck him in the groin and squeezed his testicles.... result[ing] in both immediate and continuing pain, as well as an injury that resulted in blood in his urine"); *Scalpi v. Amorim*, No. 14-CV-2126 (KMK), 2018 WL 1606002, at *19-20 (S.D.N.Y. Mar. 29, 2018) (indicating allegations "that [the defendant] struck [plaintiff] so hard in the testicles that his testicles were swollen and he was urinating blood," and "[t]o this day, [the] [p]laintiff maintains he suffers from pain in his testicular area and has blood in his urine" would allow excessive force claim to survive summary judgment (citation omitted)).

**\*5** There is also a question of fact as to whether Defendant acted wantonly. The Second Circuit has considered the following factors when assessing whether a defendant acted maliciously or wantonly in applying force:

> [T]he extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (quotation and citation omitted).

Plaintiff alleges that he was frisked in this manner for naming Defendant in a grievance letter prior to the frisk, complaining of Defendant's encouragement and influence on other guards' judgment. ECF No. 138 at 16. Defendant denies knowledge of

the letter when he randomly selected Plaintiff for a pat frisk. ECF No. 127 at 1-2. Otherwise, there is little information in the record pertaining to Defendant's mental state precipitating the pat frisk.

There is no question that "conducting pat frisks on prisoners is a necessary procedure to ensure safety and security of prisons, and correction officers are authorized to conduct random pat frisks on free movement inmates going to or coming from services and programs." *Tavares v. City of New York*, No. 08 Civ. 3782(PAE)(JCF), 2011 WL 5877550, at *6 (S.D.N.Y. Oct. 17, 2011) (quotation and citation to record omitted). However, given the nature of Plaintiff's injuries, the temporal proximity of the grievance letter to the incident, and the seeming lack of threat or need for force as indicated by the video evidence, there is a question of fact as to whether Defendant acted wantonly in how he conducted the pat frisk. *See Santiago v. C.O. Campisi Shield No. 4592*, 91 F. Supp. 2d 665, 673 (S.D.N.Y. 2000) ("[P]laintiff has satisfied his burden on [the subjective excessive force] element by merely pleading a scenario in which the use of force could not have been in good faith."); *cf. Hayes*, 2018 WL 7356343, at *13 (ruling plaintiff had not satisfied summary judgment burden on subjective element of excessive force claim when record was clear that force was justified in response to plaintiff's assault on staff member). *But see Fox v. Lee*, No. 9:15-CV-0390 (TJM/CFH), 2018 WL 1211111, at *24 (N.D.N.Y. Feb. 25, 2018) (denying plaintiff's summary judgment motion on excessive force claim where plaintiff "self-serving[ly]" alleged officer was "furious" at him for filing grievance and record lacked other evidence of officer's mental state); *Caldwell v. Crossett*, No. 9:09–CV–576 (LEK/RFT), 2010 WL 2346337, at *4 (N.D.N.Y. May 24, 2010) (finding that grabbing of plaintiff's testicles during pat frisk, resulting in "exchange of words" and plaintiff being slammed against a wall, did not satisfy subjective element of excessive force claim because force was used to ensure compliance with orders).

Accordingly, with respect to Plaintiff's excessive force claim, both Plaintiff's and Defendant's motions for summary judgment are DENIED.

### C. Retaliation Claim

To prevail on a First Amendment retaliation claim, a plaintiff must show that: (1) he engaged in constitutionally protected speech or conduct; (2) the defendant took adverse action against him; and (3) there is a causal link between the protected conduct and the adverse action. *Williams v. King*,

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 643 of 830
Houston v. Coveny, Not Reported in Fed. Supp. (2020)
2020 WL 1151345

763 F. App'x 36, 38 (2d Cir. 2019) (citation omitted) (summary order). Adverse action is conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003).

**\*6** Because courts "recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, [they] examine prisoner's claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). Here, Plaintiff alleges that he was frisked and threatened for naming Defendant in a grievance letter written two weeks prior. Defendant denies knowledge of the letter when he randomly selected Plaintiff for a pat frisk. ECF No. 127 at 1-2.

There is no dispute that Plaintiff's use of the prison grievance system is a protected activity. *Hayes v. Dahkle*, No. 9:16-CV-1368 (TJM/CFH), 2017 WL 9511178, at \*7 (N.D.N.Y. Oct. 30, 2017), *report and recommendation adopted as modified*, 2018 WL 555513 (N.D.N.Y. Jan. 19, 2018) (collecting cases). However, "pat frisks, even if conducted for retaliatory reasons, cannot constitute an adverse action as required to support a First Amendment retaliation claim" because "prisoners have no legitimate expectation of privacy." *Amaker v. Fischer*, No. 10-CV-0977A (Sr), 2014 WL 8663246, at \*8 (W.D.N.Y. Aug. 27, 2014), *report and recommendation adopted*, 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015) (internal quotation and citation omitted). Thus, a pat frisk of the type Plaintiff alleges does not constitute an adverse action for purposes of a retaliation claim. *Joseph v. Annucci*, No. 18-cv-7197 (NSR), 2020 WL 409744, at \*5 (S.D.N.Y. Jan. 23, 2020) (holding a "pat frisk ... in which [officer] 'squeez[ed]' [plaintiff's] chest, arms, legs, and 'private parts' was not retaliatory); *Amaker*, 2014 WL 8663246, at \*8 (holding an officer's pat frisk consisting of "rubbing plaintiff's penis, fondling and squeezing plaintiff's buttocks and running his index finger across plaintiff's anus" was not retaliatory).

Accordingly, with respect to Plaintiff's retaliation claim, Defendant's motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED.

**II. Failure to Exhaust Administrative Remedies for the December 22, 2015 and December 31, 2015 Incidents**
Defendant argues that any allegations stemming from the December 22, 2015 incident should be dismissed because

the incident was never the subject of a grievance complaint and that the December 31, 2015 complaint was never fully appealed—thus, Plaintiff has failed to exhaust his administrative remedies for either incident. ECF No. 127-5 at 4-5. Plaintiff argues that the December 22, 2015 incident was consolidated with his December 31, 2015 grievance and thus he has exhausted his administrative remedies. ECF No. 135 at 11.

The exhaustion process is as follows:

Pursuant to the [Prison Litigation Reform Act] ["PLRA"], "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

"To satisfy that requirement, prisoners in New York must ordinarily follow a three-step DOCS grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance Resolution Committee [("IGRC")]. Next, the inmate may appeal an adverse decision to the prison superintendent. Finally, the inmate may appeal the superintendent's decision to the Central Office Review Committee ("CORC"). In general, it is only upon completion of all three levels of review that a prisoner may seek relief in federal court under § 1983." *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (citations omitted) (granting motion for summary judgment filed in lieu of answer because plaintiff did not file grievances or appeals to CORC).

**\*7** In addition to the normal grievance process, when an inmate in the custody of DOCCS makes an allegation of sexual abuse, the allegation is referred to the Inspector General's Office, which performs an investigation. *See Amador v. Andrews*, 655 F.3d 89 (2d Cir. 2011) ("[A]n IG investigation of alleged acts of sexual abuse is an integral part of the internal grievance procedure."). The Inspector General's determination following its investigation can also be appealed to CORC. *Id.* ("[A]n IG determination about abuse of an inmate can be appealed to CORC when the determination is reported to and accepted by the superintendent.").

*Omaro v. Annucci*, 68 F. Supp. 3d 359, 363 (W.D.N.Y. 2014).

2020 WL 1151345

It appears from the record that Plaintiff's December 22 grievance was never received by the IGRC, or, in the alternative, was consolidated with the December 31 grievance complaint. In any event, while complaint FPT-31235-16 appears to have been appealed to the prison superintendent, it was not appealed to CORC. ECF No. 134 at 8, 10-11. Therefore, Plaintiff has not exhausted his administrative remedies for either the December 22 or 31 incidents.

It is clear from the record that Plaintiff made two separate grievance complaints, one dated December 22, 2015 [2] and one dated December 31, 2015. ECF No. 135 at 34, 38-39. Both the December 22 and December 31 complaints are labeled with Grievance Number FPT-31235-16. ECF No. 135 at 34, 38-39. Only the December 31 complaint is labeled with Prison Rape Elimination Act ("PREA") number 2016-01 and only the December 31 complaint is stamped as being received by the IGRC on January 7, 2016. ECF No. 127-4 at 7, 13. Defendant submitted a log report of Plaintiff's grievances from 2015 and 2016 showing ostensibly only one grievance for the December 31 incident. [3] ECF No. 127-4 at 5-6. The two complaints may in fact have been consolidated, [4] making it plausible that only one grievance would be noted in the correctional facility's log report. However, there is no copy of the December 22 complaint in the record that bears a stamp from the IGRC. Thus, there is no evidence in the record that indicates the December 22 complaint was ever received by the IGRC. [5]

[2] The complaint is dated at the top as "11/22/15" but dated at the bottom and signed on December 22, 2015 and discusses the December 22, 2015 incident. Thus, the Court assumes the complaint was made on December 22, 2015.

[3] The log report is accompanied by a certification signed by Brenda Griffin, an office assistant for DOCCS, attesting to the veracity of the log report. ECF No. 127-4 at 5. Plaintiff's allegations that Defendant has made "false and misleading representations" concerning the veracity of the log report or that Defendant "altered" or "doctored" the log report and his medical records are conclusory and unsubstantiated. ECF No. 127-4 at 5; ECF No. 138 at 5-6; ECF No. 140 at 1, 5.

[4] See generally *Fox*, 2018 WL 1211111, at *5 (noting plaintiff's grievance complaints alleging similar

issues and made within ten days of each other were consolidated into one grievance).

[5] The "Violation Hearing Disposition" Plaintiff submitted indicating that a Tier I hearing was scheduled to address the allegations of misbehavior against Plaintiff from the December 22 incident appears to relate to the process for determining whether Plaintiff committed the acts of misbehavior alleged, and does not relate to the grievance process for Plaintiff's complaint against Defendant stemming from that incident. ECF No. 135 at 35, 36.

A February 3, 2016 notice from the Superintendent stated that "the allegations contained in [the FPT-31235-2016] complaint have been investigated as a PREA. #2016-01 [sic]. The investigation found that the allegations could not be substantiated. Grievance is denied." ECF No. 134 at 8. A February 5, 2016 letter from the Inmate Grievance Program Supervisor stated that Plaintiff's complaint was filed as FPT-31235-16 and that Plaintiff's "PREA allegations will be deemed exhausted upon filing for Prison Litigation Reform Act (PLRA) purposes. [Plaintiff's] additional allegations (harassment, retaliation, denial of meals, false misbehavior report, etc.) will be investigated and addressed." ECF No. 135 at 43. Thus, the December 31 complaint was appealed to the Superintendent.

**\*8** However, CORC records Defendant submitted showing Plaintiff's closed cases do not list complaint FPT-31235-16, which indicates that it was never appealed to CORC. ECF No. 134 at 10-11. Therefore, Plaintiff has not exhausted his administrative remedies for either the December 22 or 31 incidents.

Accordingly, with respect to any claims stemming from the December 22 and December 31, 2015 incidents, Defendant's motion is GRANTED, and Plaintiff's motion is DENIED.

### III. Qualified Immunity
Defendant argues that even if a question of fact exists as to any of the above alleged claims, summary judgment should be granted in his favor because he is entitled to qualified immunity. The Court disagrees.

A state official is entitled to qualified immunity unless a plaintiff pleads

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 645 of 830
Houston v. Coveny, Not Reported in Fed. Supp. (2020)
2020 WL 1151345

facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. A right is clearly established when its contours ... are sufficiently clear that, at the time of the challenged conduct, every reasonable official would have understood that what he is doing violates that right. [G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but existing precedent must have placed the statutory or constitutional question beyond debate. The dispositive question is whether the violative nature of the *particular* conduct is clearly established.

*Crawford v. Cuomo*, 721 F. App'x 57, 58-59 (2d Cir. 2018) (summary order) (internal quotations and citations omitted) [hereinafter "*Crawford II*"].

Here, there can be no dispute that Plaintiff pleaded Eighth Amendment sexual abuse and excessive force violations and that his right to be free from those abuses was clearly established at the time of the September 22, 2015 incident. *Crawford I* firmly established "an inmate's right to be free of sexual abuse in light of evolving standards of decency," building on the Second Circuit's previous statement in *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir. 1997) that "sexual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." *Id.* at 58, 59. In *Crawford I*, the Second Circuit held that a pat frisk of an inmate leaving the mess hall in which the officer "squeezed" and "fondled" the inmate's penis and made "demeaning comments" of a sexual nature was a violation of the inmate's Eighth Amendment rights, particularly because the officer's comments "suggest[ed] that [the officer] undertook the search in order to arouse himself, humiliate [the inmate], or both." *Crawford I*, 796 F.3d at 258-59.

Similarly, in the present case, Defendant allegedly squeezed Plaintiff's penis and made a demeaning comment stating that he was going to "fuck" the Plaintiff. Thus, Defendant's alleged conduct was clearly established as violative of the

Eighth Amendment. Defendant's reliance on *Shaw v. Prindle*, 661 F. App'x 16, 19 (2d Cir. 2016) (summary order) is unpersuasive. There, the Second Circuit held that a pat frisk was not violative of the Eighth Amendment where it was clearly conducted to search for contraband the officer had just seen despite the inmate's allegations that the search of his crotch and buttocks was excessive and involved the massaging of his rectum and groin. Here, in contrast, and as in *Crawford I*, the pat search was random and involved demeaning comments and very specific allegations of Plaintiff having his penis squeezed "real hard twice, causing painful swelling and bloody urinations." ECF No. 138 at 2.

**\*9** Furthermore, *Crawford II* makes clear that Defendant is not entitled to qualified immunity because the Second Circuit's August 11, 2015 decision in *Crawford I* was issued prior to the September 22, 2015 incident that gives rise to Plaintiff's alleged constitutional violations. Accordingly, Defendant is not entitled to qualified immunity.

## IV. Plaintiff's Motions *in Limine* and to Appoint Counsel

Plaintiff appears to make a motion for appointment of counsel and a motion *in limine* to allow his own testimony in lieu of a medical expert to establish that he saw blood in his urine. ECF No. 140 at 6, 9.

There is no constitutional right to appointed counsel in civil cases. Under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants. *See, e.g.*, *Sears, Roebuck & Co. v. Charles Sears Real Estate, Inc.*, 865 F.2d 22, 23 (2d Cir. 1988). The assignment of counsel in civil cases is within the trial court's discretion. *In re Martin-Trigona*, 737 F.2d 1254, 1260 (2d Cir. 1984). The Court must consider the issue of appointment carefully, because "every assignment of a volunteer lawyer deprives society of a volunteer lawyer available for a deserving cause." *Cooper v. A. Sargenti Co.*, 877 F.2d 170, 172 (2d Cir. 1989). In determining whether to assign counsel, the Court considers several factors, including whether the indigent is able to investigate the facts concerning his claim; whether the legal issues are complex; and whether there are special reasons why the appointment of counsel would be more likely to lead to a just determination. *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997); *Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986).

The appointment of counsel is not warranted in this case. The remaining claims in this case are not complex, and from reading Plaintiff's submissions, he is articulate and has

demonstrated the ability to adequately present his own claims. In addition, there are no special reasons that would favor the appointment of counsel.

Finally, the motion to allow Plaintiff's own testimony is one more properly brought prior to the pre-trial conference. Accordingly, Plaintiff's motions *in limine* and to appoint counsel are DENIED WITHOUT PREJUDICE TO RENEW.

## CONCLUSION

Defendant's Motion for Summary Judgment (ECF No. 127) is GRANTED IN PART and DENIED IN PART. Plaintiff's

Cross Motion for Summary Judgment (ECF No. 137) is DENIED. Plaintiff's motions *in limine* and to appoint counsel (ECF No 140) are DENIED WITHOUT PREJUDICE TO RENEW. Only Plaintiff's Eighth Amendment sexual abuse and excessive force claims stemming from the September 22, 2015 pat frisk survive summary judgment. The Court has set a trial date for July 13, 2020. The Court will issue a separate pre-trial order setting a date for a pre-trial conference.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1151345

---

**End of Document**          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 409744

2020 WL 409744
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rodney JOSEPH, Plaintiff,

v.

Anthony ANNUCCI, et al., Defendants.

18-cv-7197 (NSR)
|
Signed 01/23/2020

**Attorneys and Law Firms**

Rodney Joseph, Napanoch, NY, pro se.

Rebecca Lynn Johannesen, NYS Office of the Attorney General, New York, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

**\*1** *Pro se* Plaintiff, Rodney Joseph ("Plaintiff"), formerly incarcerated at Sullivan Correctional facility, brings this action under 42 U.S.C. § 1983, asserting claims of deliberate indifference to his medical needs, forcible touching, assault, retaliation, denial of due process, and impeding religious practice. (*See* Complaint ("Compl."), ECF No. 2.) Plaintiff sues 44 medical staff members, kitchen staff members, correctional officers, and correctional officials employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), including Anthony Annucci, William Keyser, Edward Burnett, Gail Williams, Angelo Justiniano, Corey Proscia, Joseph Maxwell, Lane Kortright, Swany Reid, Frank Decker, Samuel Encarnacion, Stainislaus Ogbonna, Jefrysson Aldana, Scott Christie, Colleen Bennett, Tanya Pomeroy, Wladyslaw Sidorowicz, Janice Wolf, S.T. Herman, Epifanio Tolentio, Kevin Miller, Wayne Jordan, William Beach, Renee Askew, Michael Wood, Van Fuller, Gina Maliga, Heather Wyatt, William Elberth, Kellyanne Giminiani, Christopher Conway, Blain Reddish, Mark Puerschner, David Jurgens, Edward Bonnell, Shaun Braisington, Joseph Franke, Matthew DeFrank, Chester Stungis, Robert Depaolo, and Adam Jarosz (the "Represented Defendants"). [1] (*Id.*)

[1] Defendants Ginger Eggler, "Ginsin," and Alan Hanson have not been served. (*See* ECF Nos. 10, 11, and 15; Defendants' Memorandum of Law in Support of Their Motion to Dismiss, ECF No. 80 ("Defs.' Mot.") at 8, n.1.)

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), the Represented Defendants have moved to dismiss the Complaint. (*See* ECF No. 79.) Plaintiff has not responded to the motion; thus, per a memorandum endorsement dated August 5, 2019, the Court deemed the motion fully submitted. (*See* ECF No. 81.) For the following reasons, the Represented Defendants' unopposed motion to dismiss is GRANTED in part and DENIED in part.

BACKGROUND

**I. Factual Allegations**
The following facts are derived from the Complaint or matters of which the Court may take judicial notice and are taken as true and construed in the light most favorable to *pro se* Plaintiff for the purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).

**a. Plaintiff's Medical Condition and Treatment**
Plaintiff asserts that in or about 2008, after suffering a heart attack, he was placed on diabetic medications by a Sullivan Correctional Facility ("Sullivan") doctor. (Compl. at 18.) Sometime in 2016, however, he was taken off the diabetic medications by the medical staff at Sullivan. (*Id.*) Shortly after being taken off the diabetic medications, Plaintiff began to suffer pain in his arms, difficulty breathing, and an increased heart rate. (*Id.*) He complained to the Medical Department on a sick call visit, but only received 30 days off from work. (*Id.*) Plaintiff asserts that the pain got worse and he kept going to sick call but nothing was done to alleviate his pain. (*Id.*) In or about June 2017, after going to emergency sick call with "unbearable pain," Plaintiff suffered another heart attack and was rushed to a hospital where he underwent quadruple-bypass heart surgery. (*Id.*) Plaintiff asserts the following: the medical staff taking him off the diabetic medications led to his heart attack; he is presently in severe pain but is not receiving all of the recommended medications prescribed by a specialist; and he is possibly suffering the symptoms of another imminent heart attack or stroke. (*Id.* at 18–19.)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 648 of 830
**Joseph v. Annucci, Not Reported in Fed. Supp. (2020)**
2020 WL 409744

**b. January 11, 2018 Incident**

**\*2**  Plaintiff also asserts forcible touching and assault claims against Defendant Correctional Officer Wyatt ("Wyatt") stemming from an incident that occurred on or about January 11, 2018. (*Id.* at 19.) Plaintiff alleges that, on January 10, 2018, he filed a grievance against Wyatt. (*Id.*) He alleges that after he filed the grievance, when he delivered feed-up bags for other inmates, Wyatt ordered him on the wall for a pat frisk although he had previously been pat frisked when he left the kitchen. (*Id.*) Plaintiff claims that while he was on the wall, Wyatt "started squeezing and poking in the areas where [he] had [his] quadruple-by-pass surgery, chest, arms, legs, and private parts." (*Id.* at 20.) Plaintiff alleges that Wyatt's actions caused him chest pains and led to a one-week hospital stay at Albany Medical Center because most of his arteries were blocked. (*Id.*)

**c. Officers' Retaliation**

Plaintiff asserts that Wyatt acted in retaliation for Plaintiff's filing of the grievance against her. (*Id.*) Plaintiff also claims that he was subjected to retaliation by other correction officers for the filing of grievances. (*Id.*) He claims the following retaliatory actions: he was issued a fabricated misbehavior report and his job assignment was taken away on or about June 20, 2018, despite an "excellent work evaluation"; DOCCS staff would not allow him to notify his family when he was admitted to an outside hospital, or allow him to call his family; his cell was unreasonably searched five out of seven days; he was denied access to medication; and his religious callout was cancelled without a security reason. (*Id.* at 21–22.)

**d. Incident with Correctional Officer Elberth**

Finally, Plaintiff alleges that while conducting a pat frisk, Correctional Officer Elberth ("Elberth") told him to reach back with his left hand and take off his right boot. (*Id.* at 22.) When Plaintiff told Elberth that he was unable to stretch out like that because of his medical issues, Elberth grabbed his left leg and pulled it back in a manner that caused Plaintiff's chest and face to hit the wall, causing him pain. (*Id.*) Plaintiff claims that Elberth then did the same thing to his right leg, despite Plaintiff informing Elberth that he was in pain. (*Id.*) After the incident, Plaintiff went to emergency medical and had to be rushed to the hospital for a "minor heart attack." (*Id.*) Plaintiff claims that the attack was caused by Elberth's actions, and now every time he sees Elberth, the officer threatens him. (*Id.*) Plaintiff asserts that Elberth also

sends unspecified threatening messages to him through other correction officers. (*Id.*)

**LEGAL STANDARD**

**I. Rule 12(b)(6)**

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). Factual allegations must "nudge [a plaintiff's] claim from conceivable to plausible." *Twombly,* 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts which allow the court to draw a reasonable inference the defendant is liable. *Iqbal,* 556 U.S. at 678. To assess the sufficiency of a complaint, the court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir. 2013). While legal conclusions may provide the "framework of a complaint," "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678–79. When a motion to dismiss a complaint is unopposed, a court should nevertheless "assume the truth of a pleading's factual allegations and test only its legal sufficiency." *McCall v. Pataki,* 232 F.3d 321, 322 (2d Cir. 2000).

**\*3**  *Pro se* complaints are to be liberally construed. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). They must be held to less stringent standards than complaints written by lawyers, and only dismissed when the plaintiff can prove "no set of facts in support of his claim which would entitle him to relief." *Estelle,* 429 U.S at 106 (quoting *Conley v. Gibson*, 335 U.S. 41, 45–46 (1957)). This "is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir. 2008). *Pro se* complaints must be interpreted as raising the strongest claims they suggest, but "must still state a plausible claim for relief." *Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir. 2013).

**II. Rule 12(b)(1)**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. U.S.,* 201 F.3d 110, 113 (2d Cir. 2000). A plaintiff asserting subject matter jurisdiction in a federal court bears

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 649 of 830

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)

2020 WL 409744

the burden of proving that jurisdiction by the preponderance of the evidence. *Id.* The court must take all facts in the complaint as true and draw all inferences in favor of the party asserting jurisdiction. *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2000). As with Rule 12(b)(6), when dealing with Rule 12(b)(1), the Court construes the allegations in a *pro se* plaintiff's complaint in the light most favorable to the *pro se* plaintiff. *Makarova*, 201 F.3d at 113.

### III. 42 U.S.C. § 1983 Claims

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under § 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).

### DISCUSSION

### I. Defendants Who Are Only Named in the Caption

As an initial matter, Defendants Annucci, Keyser, Burnett, Williams, Justiniano, Proscia, Maxwell, Kortright, Reid, Decker, Encarnacion, Ogbonna, Aldana, Christie, Eggler, Bennett, Pomeroy, Sidorowicz, Wolf, Herman, Jordan, Tolentio, Miller, Beach, Askew, Wood, Maliga, Giminiani, Conway, Reddish, Puerschner, Ginsin, Jurgens, Bonnell, Braisington, Franke, Defrank, Depaolo, Stungis, and Jarosz are only named in the caption and the complaint contains no allegations that they violated the law or otherwise caused injury to the Plaintiff.

Plaintiff fails to assert personal involvement on the part of these 40 defendants in this matter. In order to hold a defendant responsible for a constitutional deprivation, Plaintiff must demonstrate, *inter alia*, the defendant's personal involvement.

*Grullon v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013). "[P]ersonal involvement of Defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C. § 1983.]" *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "The general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the Defendant is required." *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060 (2d Cir. 1989); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 692–95 (1978). Supervisory officials may be personally involved within the meaning of § 1983 only if he or she participated in unlawful conduct. *See Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986). "A Plaintiff must thus allege a tangible connection between the acts of a Defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[A] Plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). In the context of a prisoner's lawsuit, a Plaintiff must show "more than the linkage in the prison chain of command" to state a claim against a supervisory defendant. *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).

**\*4** Here, Plaintiff fails to allege facts of any personal involvement by the 40 aforementioned defendants. They are named in the caption only. The body of the Complaint does not contain any factual allegations naming them, or indicating that they violated the law or injured the Plaintiff in some manner. For this reason, the claims against Defendants Annucci, Keyser, Burnett, Williams, Justiniano, Proscia, Maxwell, Kortright, Reid, Decker, Encarnacion, Ogbonna, Aldana, Christie, Eggler, Bennett, Pomeroy, Sidorowicz, Wolf, Herman, Jordan, Tolentio, Miller, Beach, Askew, Wood, Maliga, Giminiani, Conway, Reddish, Puerschner, Ginsin, Jurgens, Bonnell, Braisington, Franke, Defrank, Depaolo, Stungis, and Jarosz are dismissed without prejudice for lack of personal involvement.

### II. Eighth Amendment Medical Indifference

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Consequently, the government is obligated to provide adequate medical care to incarcerated people, and the failure to do so is a violation of the Eighth Amendment and gives rise to a deliberate indifference claim under § 1983. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). In order to make a claim of medical indifference, a prisoner must show that there is: (1) an objectively serious medical need and (2) subjective

deliberate indifference, which measures whether the prison official acted with a sufficiently culpable state of mind. *Harrison v. Barkley*, 219 F.3d 132, 136–38 (2d Cir. 2000). The defendant must have actual notice of the prisoner's serious medical need. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1986). The subjective standard for deliberate indifference is essentially criminal recklessness: the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Therefore, "the defendant's belief that his conduct poses no serious harm ... need not be sound as long as it is sincere." *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006). Further, the charged official must be aware that there is a substantial risk of harm. *Id.*

Defendant does not allege that any Defendant was involved in his medical care or treatment—his Complaint mentions that "DOCCS Staff" took him off the diabetic medications, and that he made complaints to the "Medical Department" at sick call. (*See* Compl. at 18.) While chest pain resulting from clogged arteries and heart attacks surely constitute serious medical conditions,[2] Plaintiff has failed to allege any Defendant's involvement in, let alone any Defendant's deliberate indifference to, Plaintiff's medical care. Therefore, Plaintiff's Eighth Amendment claim is dismissed without prejudice.

[2]     "[S]evere chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard." *Melvin v. Cty. of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, at *5 (S.D.N.Y. Mar. 29, 2016) (quoting *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005)); *Mandala v. Coughlin*, 920 F. Supp. 342, 353 (E.D.N.Y. 1996) (noting that "ignoring a prisoner's complaints of chest pains where the prisoner later died of a heart attack" has been found to constitute a sufficiently serious injury).

It is possible that Plaintiff intended to bring claims against certain named defendants from the caption, whom he has identified as serving in medical roles at Sullivan: Ginger Eggler (Nurse Administrator 1); Colleen Bennett (Nurse Administrator 2); Wladyslaw Sidorowicz (Facility Doctor); and Janice Wolf a/k/a Janice Wolf-Friedman (Facility Doctor). To the extent that Plaintiff can provide more factual allegations relating to these four defendants with respect

to Plaintiff's alleged medical indifference claim, Plaintiff is granted leave to replead that claim.

## III. Retaliation Under the First Amendment

**\*5** Plaintiff's claims against several prison officials regarding alleged retaliatory action sound in the First Amendment. To properly assert a First Amendment retaliation claim, a plaintiff has the burden of demonstrating: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation ... Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds, Swierkewicz v. Sorema*, 534 U.S. 506 (2002) (citations omitted).

"Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.* In addition, the "casual connection" element requires plaintiffs to prove that an adverse action relates to protected First Amendment activity —that is, the plaintiff must present evidence from which a jury could conclude that the plaintiffs protected First Amendment activity was "a substantial or motivating factor" in the prison official's adverse action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). "To survive a motion to dismiss, such claims must be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.' " *Friedl v. City of New York*, 210 F.3d 79, 85-86 (2d Cir. 2000) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

The Second Circuit has repeatedly held that a court must assess a claim of retaliation with "skepticism and particular care" because such claims are "easily fabricated" by inmates. *Dawes*, 239 F.3d at 491. Such claims create a "substantial risk of unwarranted judicial intrusion into matters of general prison administration" because:

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 651 of 830
Joseph v. Annucci, Not Reported in Fed. Supp. (2020)
2020 WL 409744

> virtually any adverse action taken against a prisoner by a prison official —even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.... Given that such adversity is an ever-present concomitant of prison life, the opportunities to characterize its manifestations as actionable retaliation are far greater than that for society at large.

*Id.* (internal citations and quotations omitted).

### a. January 11, 2018 Incident and Cell Searches

Plaintiff alleges that Defendant Wyatt retaliated against him because he filed a grievance against Wyatt on January 10, 2018, when Plaintiff discussed the grievance with Defendant Sergeant Fuller. (Compl. at 19.) Plaintiff alleges that this retaliation took the form of a pat frisk on January 11, 2018, in which Wyatt "squeez[ed]" and "pok[ed]" his chest, arms, legs, and "private parts." (*Id.* at 20.) Plaintiff further alleges that Area Sergeant Defendant Hanson told him that "if [he] did not sign off on this grievance, [he] was going to have a whole lot of problems." (*Id.* at 20.) Additionally, Plaintiff alleges that his cell was searched in an "unreasonable manner" five out of seven days. (*Id.* at 21.)

On these issues, Plaintiff has failed to state a claim for relief because "cell searches and pat frisks, even if conducted for retaliatory reasons, cannot constitute an adverse action as required to support a First Amendment retaliation claim." *Amaker v. Fischer*, No. 10-CV-0977A SR, 2014 WL 8663246, at *8 (W.D.N.Y. Aug. 27, 2014), *report and recommendation adopted*, No. 10-CV-0977, 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015). This is "because inmates have no reasonable expectation of privacy in their prison cells" and therefore "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 239 (S.D.N.Y. 2005); *see also Henry v. Annetts*, No. 08 Civ. 286, 2010 WL 3220332, at *2 (S.D.N.Y. July 22, 2010) ("Cell searches and pat frisks are an ordinary part of prison life and ... do not deter the average inmate from continuing to exercise ...

First Amendment rights"). Furthermore, the Complaint does not link the cell searches to any particular defendant. (*See* Compl. at 21.) Accordingly, even if retaliatory in nature, Plaintiff's claims against Defendants Wyatt, Hanson, and any other defendants regarding these incidents must be dismissed with prejudice. [3]

3    To the extent that Plaintiff's allegation suggest that Defendant Wyatt used excessive force, these allegations also fail to state a claim upon which relief can be granted. The actions alleged by Plaintiff do not rise to the level of a constitutional violation. *See Kalwasinski v. Artuz*, No. 02 CV 2582 (LBS), 2003 WL 22973420, at *7 (S.D.N.Y. Dec. 18, 2003) (rejecting Eighth Amendment claim where defendant's action in pressing plaintiff's face into a wall while conducting a pat frisk was "consistent with a good faith attempt to maintain prison discipline and order" and lacked "malicious" intent).

    To the extent that Plaintiff alleges that Defendant Wyatt committed offenses under the New York State Penal Law, this claim must be dismissed because the law does not provide a private right of action to enforce rights allegedly created by this provision. *See Casey Sys., Inc. v. Firecom, Inc.*, No. 94 CIV. 9327 (KTD), 1995 WL 704964, at *3 (S.D.N.Y. Nov. 29, 1995) ("As a general rule, when a statute is contained solely within the Penal Law Section, the legislature intended it as a police regulation to be enforced only by a court of criminal jurisdiction.").

### b. Loss of Job Assignment

**\*6** Plaintiff further alleges that his job assignment was taken away from him due to a "fabricated misbehavior report" as retaliation for Plaintiff's filing of harassment grievances. (Compl. at 21.) Plaintiff notes that despite his "excellent work evaluation," the proffered basis for his termination was that Plaintiff "do[es] not get along with other inmates and staff." (*Id.*) This claim similarly fails on the pleadings.

Defendants are correct that inmates do not have any constitutional, statutory, or regulatory right to any prison job. *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) ("New York law does not give a prisoner 'any statutory, regulatory or precedential right to his prison job.' "). Furthermore, the thin allegations contained in the complaint are "wholly conclusory with no plausible nexus between the grievance

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 652 of 830

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)

2020 WL 409744

and the misbehavior report." *White v. Bergenstock*, No. 08 Civ. 717, 2009 WL 4544390, at *7 (N.D.N.Y. Nov. 25, 2009). Plaintiff's Complaint does not contain any allegations as to the nature of the misbehavior report that led to the loss of his job, who wrote the misbehavior report, nor does it connect the writer of that misbehavior report to the grievances in any way. *See Bouknight v. Shaw*, No. 08 CIV 5187(PKC), 2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009) (finding plaintiff's allegation that officer "wrote [him] up for revenge" was conclusory and insufficient to state a plausible retaliation claim).

Consequently, these claims are dismissed without prejudice. To the extent that Plaintiff can provide more factual allegations relating to the author of the misbehavior report and a connection between Plaintiff's grievance, the misbehavior report, and loss of Plaintiff's job, Plaintiff is granted leave to replead his claim.

## IV. First Amendment Freedom of Speech

Plaintiff additionally asserts that "DOCCS staff" did not allow him to notify his family about his treatment at an outside hospital, and that he was not allowed to call them. (Compl. at 21.) This amounts to a First Amendment freedom of speech claim, which is a cognizable claim under § 1983. *See Morgan v. LaVallee*, 526 F.2d 221, 225 (2d Cir. 1975) ("A prison inmate's rights to communicate with family and friends are essentially First Amendment rights subject to § 1983 protection."). First Amendment rights "may not be infringed without good cause," and "there must be a showing of a substantial governmental interest serving the legitimate and reasonable needs and exigencies of the institutional environment ... to warrant such limitations upon an individual inmate's rights to communicate." *Id.* (internal citations omitted). But, as courts considering prison telephone restrictions have agreed, "an inmate has no right to unlimited telephone use." *Pitsley v. Ricks*, No. 96-CV-0372NAMDRH, 2000 WL 362023, at *4 (N.D.N.Y. Mar. 31, 2000) (citing support from First, Sixth, Seventh, Eighth, Fifth, and Ninth Courts of Appeals). The same holds true with regard to mailing non-legal letters. *See Corby v. Conboy*, 457 F.2d 251, 254 (2d Cir. 1972) ("[A] prisoner's right to mail letters to his family or friends is not absolute.").

In any case, allegations of infringement of rights must have some specificity. Again, Plaintiff has failed to allege that any Defendant in this action was involved in this denial. For the reasons outlined above, because a defendant's personal involvement is a necessary element of a 1983 claim, *see*

*McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), this claim must be dismissed without prejudice.

## V. First Amendment Free Exercise

**\*7** Plaintiff's next claim pertains to the exercise of his religious beliefs, which he claims were infringed by an "intentional" cancellation of his religious "call-out." (Compl. at 22.) Plaintiff alleges that "there is no security reason for this." (*Id.*)

"The Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience.' " *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). The Second Circuit has acknowledged, however, that "although prisoners do not abandon their constitutional rights at the prison door, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (internal quotation marks and citations omitted).

To establish a free exercise claim, courts in this Circuit have generally required inmate plaintiffs to plead that the disputed conduct substantially burdened a sincerely held religious belief. *See Turner v. Sidorowicz*, No. 12-CV-7048 (NSR), 2016 WL 3938344, at *5 (S.D.N.Y. July 18, 2016); *Holland v. Goord*, 758 F.3d 215, 220–23 (2d Cir. 2014). Defendants "then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct[.]" *Salahuddin*, 467 F.3d at 275.

In the present action, Plaintiff has again failed to allege that any Defendant was involved in the cancellation of his religious call out. Plaintiff does not specify how often or why his callout was canceled. Without more, Plaintiff cannot plausibly allege that his sincerely held religious beliefs were "substantially burdened." *See Williams v. Weaver*, No. 9:03CV0912(LEK/GHL), 2006 WL 2794417, at *5 (N.D.N.Y. Sept. 26, 2006) (denial of access to two weekly religious services does not constitute substantial burden); *c.f. George v. Cty. of Westchester*, NY, No. 13 CV 4511 VB, 2014 WL 1508612, at *4 (S.D.N.Y. Apr. 10, 2014) (finding substantial burden plausibly alleged where plaintiff

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)

2020 WL 409744

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 653 of 830

was denied congregate religious services "repeatedly" over two periods totaling approximately ten months). Accordingly, this claim is also dismissed without prejudice.

**VI. Eighth Amendment Excessive Force**

Next, Plaintiff's description of the incident with Correctional Officer Elberth may be read to present an Eighth Amendment excessive force claim. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. For a prisoner to prevail on a claim asserting that he was subjected to cruel and unusual punishment, he must prove both "an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or failed to act, with a 'sufficiently culpable state of mind.' " Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

**\*8** The objective prong, requiring the alleged conduct to be " 'sufficiently serious' to reach constitutional dimensions," Hogan v. Fischer, 738 F.3d 509, 515 (2d Cir. 2013), is a context-specific standard that focuses on the harm done given "contemporary standards of decency." Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009) (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). The Supreme Court has explained that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Hudson, 503 U.S. at 9. Therefore, "the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] per se ... whether or not significant injury is evident." Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999). Nevertheless, "a de minimis use of force will rarely suffice to state a constitutional claim." Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Lebron v. Mrzyglod, No. 14-CV-10290(KMK), 2019 WL 3239850, at *14 (S.D.N.Y. July 18, 2019).

**a. Excessive Force Analysis**

Here, during the course of a pat frisk, Plaintiff alleges that Elberth instructed him to reach back with his left hand and take off his right boot. (Compl. at 22.) Plaintiff did not comply, and instead told Elberth that "he could not reach back like that because he had a Qua[dru]ple By Pass and was unable to stretch back like that." (Id.) In response, Elberth grabbed Plaintiff's left leg and pulled it back in a manner that caused Plaintiff's chest and face to hit the wall.

(Id.) Plaintiff further specifies that Elberth retorted, "How does that feel?", to which Plaintiff responded that he was in pain. (Id.) Elberth then repeated the action using Plaintiff's right leg. (Id.) Subsequently, Plaintiff suffered a "minor heart attack." (Id.)

Defendants argue that the amount of force described by Plaintiff was commensurate with the need to conduct a pat frisk and does not rise to the level of a constitutional violation. The Court recognizes that "a pat frisk, involving some physical contact, is a standard procedure inside a prison." Beckles v. Bennett, No. 05 CIV. 2000 (JSR), 2008 WL 821827, at *20 (S.D.N.Y. Mar. 26, 2008). As such, allegations of aggressive pat frisks have generally not been found to be "sufficiently serious" to present viable excessive force claims. See Tavares v. City of New York, No. 08 CIV. 3782 PAE JCF, 2011 WL 5877550, at *6 (S.D.N.Y. Oct. 17, 2011), report and recommendation adopted, No. 08 CIV. 3782 PAE, 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011) (finding "actions taken consistent with a forceful pat frisk—the most serious contact alleged by the plaintiff—are not sufficiently 'repugnant to the conscience of mankind,' to give rise to an Eighth Amendment claim."); Kalwasinski v. Artuz, No. 02 CV 2582 (LBS), 2003 WL 22973420, at *6 (S.D.N.Y. Dec. 18, 2003) (pressing inmate's face into the wall while conducting pat frisk was "commensurate with the need to conduct a pat frisk"); Rivera v. Goord, 119 F. Supp. 2d 327, 342 (S.D.N.Y. 2000) (finding level of force applied in "aggressive pat frisks" does not rise to a constitutional violation); see also Anderson v. Sullivan, 702 F. Supp. 424, 427 (S.D.N.Y. 1988) (no excessive force found where, while handcuffing plaintiff, officer pulled plaintiff's hands behind his back and pushed him against a bar).

While the level of force alleged here by Plaintiff may not, on its own, rise to the level of a constitutional violation, Plaintiff has alleged extenuating circumstances that distinguish his case from those involving run-of-the-mill pat frisks. Plaintiff alleges that he informed Elberth of his medical condition and heart surgery, which prevented him from moving his body as Elberth had instructed. Plaintiff further alleges that he did suffer physical pain as a result of Elberth's actions—and informed Elberth of this—but that Elberth disregarded Plaintiff's condition and continued to forcefully move Plaintiff's legs. Plaintiff has thus averred sufficient facts to plausibly claim that force was applied "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." Hudson, 503 U.S. at 6; see also Santiago v. Westchester Cty., No. 13–CV–1886, 2014 WL 2048201, at *5 (S.D.N.Y. May

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)

2020 WL 409744

19, 2014) (finding allegations that a prison official "threw [the] [p]laintiff to the ground, twisted his arm, [and] picked him up off the ground while squeezing his throat ... lead to a plausible inference that the force inflicted was malicious and wanton").

**\*9** This conclusion is reached by construing the allegations in the Complaint in a light most favorable to Plaintiff, and bearing in mind Plaintiff's status as a *pro se* litigant. Evidence uncovered during discovery may ultimately prove that the force employed by Defendant Elberth was done in a good faith effort to maintain or restore discipline, but such a determination is best resolved on a motion for summary judgment or at trial. *See Olutosin v. Lee*, No. 14-CV-685 (NSR), 2016 WL 2899275, at \*9 (S.D.N.Y. May 16, 2016); *Landy v. Irizarry*, 884 F. Supp. 788, 797 (S.D.N.Y. 1995) ("[T]he fact intensive inquiry of whether a particular use of force was reasonable is best left for a jury to decide.") (collecting cases). As such, Defendants' motion to dismiss is denied as to Plaintiff's excessive force claims against Defendant Elberth.

### b. Qualified Immunity Defense

Defendants argue that Defendant Elberth should be entitled to the defense of qualified immunity. The doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.' " *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). As such, "qualified immunity shields both state and federal officials from suit unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (internal quotation marks omitted). To determine whether a right was clearly established, the Court looks to: (1) whether the right was defined with "reasonable specificity"; (2) whether the Supreme Court and the applicable circuit court support the existence of the right; and (3) whether under existing law a reasonable defendant would have understood that the conduct was unlawful. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013). "In this Circuit, a defendant may [raise qualified immunity in a pre-answer motion to dismiss], but the defense is held to a higher standard than if it were asserted in a motion for summary judgment." *Sledge v. Bernstein*, No. 11 CV 7450(PKC)(HBP), 2012 WL 4761582, at \*4 (S.D.N.Y. Aug. 2, 2012); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (a defense of qualified immunity in a motion to

dismiss can only be sustained if plaintiff cannot state any facts that would prevent the application of qualified immunity).

It is well-settled that freedom from the use of excessive force is a clearly established constitutional right. *See, e.g., Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 401 (S.D.N.Y. 2005), *aff'd on other grounds sub nom. Bellotto v. Cty. of Orange*, 248 F. App'x 232 (2d Cir. 2007). As discussed above, the Complaint sufficiently alleges a violation of Plaintiff's clearly established constitutional right to be free from excessive force under the Eighth Amendment. Further, "nothing at this stage of the proceedings suggests that [the defendant] reasonably believed his actions to be lawful at the time of the challenged act." *Santiago*, 2014 WL 2048201, at \*5. Consequently, the Court does not find the application of qualified immunity to be warranted at this juncture.

### VII. Defendant Fuller

The only other Defendant named in the Complaint, Defendant Fuller, is also not alleged to have been personally involved in any constitutional violation. Plaintiff's only allegation against Defendant Fuller is that Plaintiff and Defendant Fuller engaged in a discussion about Plaintiff's intent to file a grievance against Defendant Wyatt. (Compl. at 19.) These allegations fail to show Defendant Fuller's personal involvement in any constitutional violation, and for the same reasons as previously stated, he is therefore dismissed from this action without prejudice.

### CONCLUSION

**\*10** For the foregoing reasons, Defendants' unopposed motion to dismiss is GRANTED in part and DENIED in part. The motion is denied as to Plaintiff's excessive force claims against Defendant Elberth. The motion is granted as follows:

The following of Plaintiff's claims are dismissed *with prejudice*:

- Plaintiff's First Amendment retaliation claims against Defendants Wyatt, Hanson, and any other defendants regarding the January 11, 2018 incident and cell searches.

Joseph v. Annucci, Not Reported in Fed. Supp. (2020)

2020 WL 409744

The following of Plaintiff's claims are dismissed *without prejudice*:

- Plaintiff's Eighth Amendment medical indifference claims against Eggler, Bennett, Sidorowicz, and Wolf;

- Plaintiff's First Amendment retaliation claim regarding the loss of his job assignment;

- Plaintiff's First Amendment freedom of speech claim;

- Plaintiff's First Amendment free exercise claim; and

- All remaining claims against Defendants Annucci, Keyser, Burnett, Williams, Justiniano, Proscia, Maxwell, Kortright, Reid, Decker, Encarnacion, Ogbonna, Aldana, Christie, Eggler, Bennett, Pomeroy, Sidorowicz, Wolf, Herman, Jordan, Tolentio, Miller, Beach, Askew, Wood, Maliga, Giminiani, Conway, Reddish, Puerschner, Ginsin, Jurgens, Bonnell, Braisington, Franke, Defrank, Depaolo, Stungis, Jarosz, and Fuller.

Accordingly, the Clerk of the Court is respectfully directed to terminate the Represented Defendants' Motion to Dismiss at ECF No. 79.

Plaintiff shall have thirty-five days from the date of this Opinion, on or before February 27, 2020, to amend the Complaint as to those claims that are dismissed without prejudice. Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wishes to remain—aside from those claims dismissed with prejudice per this Order—must be included in the amended complaint. An Amended Civil Rights Complaint form is attached to this Opinion. If Plaintiff elects to file an amended complaint, Defendants shall have thirty days from the date of Plaintiff's filing to respond.

If Plaintiff does not file an amended complaint within thirty-five days, and he cannot show good cause to excuse such a failure, those claims dismissed without prejudice by this order will be deemed dismissed with prejudice, and the Complaint (ECF No. 2) will serve as the operative complaint in this action to which remaining Defendants should respond. The remaining Defendant Elberth is directed to file an answer to the Complaint on or before March 19, 2020. The parties are directed to confer, complete, and submit to the Court the attached case management plan on or before April 9, 2020.

The Clerk of the Court is respectfully directed to terminate Defendants Annucci, Keyser, Burnett, Williams, Justiniano, Proscia, Maxwell, Kortright, Reid, Decker, Encarnacion, Ogbonna, Aldana, Christie, Eggler, Bennett, Pomeroy, Sidorowicz, Wolf, Herman, Jordan, Tolentio, Miller, Beach, Askew, Wood, Maliga, Giminiani, Conway, Reddish, Puerschner, Ginsin, Jurgens, Bonnell, Braisington, Franke, Defrank, Depaolo, Stungis, Jarosz, Fuller, Wyatt, and Hanson. The Clerk of the Court is directed to mail a copy of this Opinion to Plaintiff at his last address listed on ECF and file proof of service on the docket.

**\*11** SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____                    _____CV
Write the full name of each plaintiff.              (include case number if one has been
                                                    assigned)

              -against-                             AMENDED
                                                    COMPLAINT
                                                    (Prisoner)

_____                    Do you want a jury trial?
_____                    ☐ Yes    ☐ No

Write the full name of each defendant. If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

---

NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 5/20/16

**Joseph v. Annucci, Not Reported in Fed. Supp. (2020)**

2020 WL 409744

## I.    LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "Bivens" action (against federal defendants).

☐  Violation of my federal constitutional rights

☐  Other:

## II.    PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

First Name            Middle Initial            Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

County, City                    State                    Zip Code

## III.    PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐  Pretrial detainee

☐  Civilly committed detainee

☐  Immigration detainee

☐  Convicted and sentenced prisoner

☐  Other:

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

First Name            Last Name            Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

Defendant 2:

First Name            Last Name            Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

Defendant 3:

First Name            Last Name            Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

Defendant 4:

First Name            Last Name            Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

## V.    STATEMENT OF CLAIM

Place(s) of occurrence:

Date(s) of occurrence:

FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

## VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    10

## VII. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Dated _____    Plaintiff's Signature _____

First Name _____  Middle Initial _____  Last Name _____

Prison Address _____

County, City _____    State _____    Zip Code _____

Date on which I am delivering this complaint to prison authorities for mailing: _____

Page 6

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                              Rev. Jan. 2012
-----------------------------------------------------------x

                                                    CIVIL CASE DISCOVERY PLAN
                          Plaintiff(s),             AND SCHEDULING ORDER

        - against -

                          Defendant(s).             _____ CV _____ (NSR)

-----------------------------------------------------------x

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1. All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2. This case [is] [is not] to be tried to a jury.

3. Joinder of additional parties must be accomplished by _____.

4. Amended pleadings may be filed until _____.

5. Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter. The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6. First request for production of documents, if any, shall be served no later than _____.

7. Non-expert depositions shall be completed by _____.

    a. Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

    b. Depositions shall proceed concurrently.

    c. Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8. Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9. Requests to Admit, if any, shall be served no later than _____.

10. Expert reports shall be served no later than _____.

11. Rebuttal expert reports shall be served no later than _____.

12. Expert depositions shall be completed by _____.

13. Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14. **ALL DISCOVERY SHALL BE COMPLETED BY _____.**

15. Any motions shall be filed in accordance with the Court's Individual Practices.

16. This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17. The Magistrate Judge assigned to this case is the Hon. _____.

18. If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19. The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)

SO ORDERED.

Dated: White Plains, New York
       _____

                                        _____
                                        Nelson S. Román, U.S. District Judge

## All Citations

Not Reported in Fed. Supp., 2020 WL 409744

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 658 of 830

Hundley v. Frunzi, Not Reported in Fed. Rptr. (2024)

2024 WL 3886996

2024 WL 3886996
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Crushaun HUNDLEY, Plaintiff-Appellee,

v.

A. FRUNZI, Correction Officer, C. May, Correction
Officer, T. Mallare, Sergeant, Defendants-Appellants,
R. Snyder, Correction Officer, B. O'Rourke, Correction
Officer, Carroll, Captain, Lesley Pottinger, Nurse,
John Doe, Correction Officers #1–20, Defendants.

23-581-pr; 23-6932 (Con)
|
August 21, 2024

Appeal from a judgment of the United States District Court
for the Western District of New York (Charles J. Siragusa,
*Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment, entered on March 10, 2023, is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLEE: Edward Sivin, Sivin, Miller
& Roche LLP, New York, New York.

FOR DEFENDANTS-APPELLANTS: Beezly J. Kiernan,
Assistant Solicitor General of Counsel (Barbara D.
Underwood, Solicitor General, Andrea Oser, Deputy Solicitor
General, on the brief), for Letitia James, Attorney General of
the State of New York, Albany, New York.

PRESENT: JOSEPH F. BIANCO, MYRNA PÉREZ,
ALISON J. NATHAN, Circuit Judges.

**SUMMARY ORDER**

**\*1** Defendants-Appellants Sergeant Thomas Mallare
and Correction Officers Archie Frunzi and Corey May
(collectively, "Defendants") appeal from the district court's
judgment, entered after a jury trial, awarding compensatory
and punitive damages to Plaintiff-Appellee Crushaun
Hundley on his First Amendment retaliation claim brought
under 42 U.S.C. § 1983. We assume the parties' familiarity
with the underlying facts, procedural history, and issues on

appeal, to which we refer only as necessary to explain our
decision to affirm.

This case arises out of an incident during Hundley's
incarceration at the Elmira Correctional Facility (the
"Facility"). In mid-December 2017, Hundley filed a series of
grievances, complaining that he was repeatedly mishandled
and assaulted by correction officers during random and
unnecessary pat-frisks in the Facility. On December 20, 2017,
Sergeant Mallare visited Hundley's cell to interview him
about the grievances he had filed, which also contained
language threatening officers if the alleged mistreatment
continued. Officers Frunzi and May were present to conduct a
"pat-frisk" of Hundley prior to that interview. During the cell
visit, an altercation erupted between Hundley and Officers
May and Frunzi, resulting in Hundley sustaining a broken
rib. According to Hundley, after the pat-frisk the two officers
started punching him without any justification and banged his
head on a metal desk while Sergeant Mallare told him "this
is what happens when you send letters up front threatening
officers." Joint App'x at 144. Hundley further testified that,
once he was handcuffed on the ground, one of the officers
pulled down his pants and shoved an object in his rectum.
According to Officers May and Frunzi, during the pat-frisk
outside the cell, Hundley "came off the wall," and they needed
to use force while he struggled with them, which included
the officers using a bearhug to bring Hundley to the floor and
handcuff him. Joint App'x at 269, 295. Both officers denied
punching Hundley, banging his head, or sticking an object in
his rectum.

Hundley filed the instant complaint asserting claims pursuant
to Section 1983, alleging that he was subject to excessive
force in violation of the Eighth Amendment and to retaliation
for filing grievances in violation of the First Amendment.
After discovery, the case proceeded to trial, during which
Hundley and all three defendants testified. Before the case
was submitted to the jury, the parties disputed the framing
of the questions on the verdict sheet, and Hundley's counsel
agreed that Hundley's theory of retaliation relates to the
incident on December 20, and not its aftermath.[1]

[1] Hundley's complaint also alleged, as a basis of
his retaliation claim, that Defendants filed a false
misbehavior report against him after the incident.
However, Hundley's counsel abandoned this theory
of the claim at trial in order to simplify the
verdict sheet with respect to a damages award.
Some testimony about the misbehavior reports and

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 659 of 830

Hundley v. Frunzi, Not Reported in Fed. Rptr. (2024)

2024 WL 3886996

false statements contained therein was elicited from Defendants at trial as relevant to their credibility as witnesses.

**\*2** The jury delivered a split verdict, finding against Hundley on his excessive force claim but in favor of Hundley on his retaliation claim, and awarding him compensatory and punitive damages. Defendants subsequently moved to vacate and set aside the jury verdict pursuant to Federal Rule of Civil Procedure 49 and, with respect to the retaliation claim, for judgment as a matter of law under Rule 50(b), to alter or amend the judgment under Rule 59(e), or in the alternative for a new trial under Rule 59(a). The district court denied the motion and entered judgment in favor of Hundley.

On appeal, Defendants challenge only the district court's denial of their motion for a new trial on the retaliation claim. They argue that they are entitled to a new trial because the jury's split verdicts on the excessive force and retaliation claims are "ineluctably inconsistent." Appellants' Br. at 2 (internal citation omitted). Specifically, Defendants assert that a jury finding that they did not use excessive force during the incident is equivalent to a finding that they acted in good faith in their use of force, and, therefore, that their actions during the incident could not have been retaliatory in nature.

We review the denial of a motion for a new trial under Rule 59(a) for abuse of discretion. *SEC v. DiBella*, 587 F.3d 553, 563 (2d Cir. 2009). "We have held that a motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (alteration adopted) (internal quotation marks and citation omitted).

Under our precedent, "ineluctably inconsistent" *special* verdict answers require retrial. *Id.* (internal quotation marks, citation, and emphasis omitted); *see also* Fed. R. Civ. P. 49(a) (special verdicts). However, the same is not true for inconsistent *general* verdicts on separate claims. *See Cash v. Cnty. of Erie*, 654 F.3d 324, 343 (2d Cir. 2011) ("[A]ny inconsistency between general verdicts on [plaintiff's] federal and state claims would not necessarily require retrial."); *accord Globus v. L. Rsch. Serv., Inc.*, 418 F.2d 1276, 1290 n.17 (2d Cir. 1969) ("It has been said again and again ... that consistent jury verdicts are not, in themselves, necessary attributes of a valid judgment."). In other words, with respect to a general verdict, the focus is not on any purported inconsistency between the jury's verdicts as to the separate

claims, but rather on whether there was sufficient evidence to support a finding of liability on the claim as to which the plaintiff prevailed. *See Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 52–53 (2d Cir. 2014).

Here, it is clear from the verdict sheet and the jury instructions that the jury's verdicts on the excessive force and retaliation claims, which contained no special interrogatories, were general verdicts. *Lavoie v. Pac. Press & Shear Co., a Div. of Canron Corp.*, 975 F.2d 48, 54 (2d Cir. 1992); *see also Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002) (Sotomayor, J.) ("[W]here a jury is instructed to apply legal principles and assign liability, the answers to the questions submitted to the jury are not special verdicts, despite the use of those words in the title appended to the form, and Rule 49(a) therefore does not apply." (internal quotation marks and citation omitted)). Accordingly, because the claims in this case involved a general verdict and there is no basis to challenge the sufficiency of the evidence to support liability on the retaliation claim (and Defendants made no such challenge below), the district court acted well within its discretion in denying a retrial solely due to an alleged inconsistency between the verdicts. *See Matusick*, 757 F.3d at 52–53; *accord Saeed v. Kreutz*, 606 F. App'x 595, 598–99 (2d Cir. 2015) (summary order).

**\*3** In any event, the verdicts were not irreconcilably inconsistent. We emphasize that, "when faced with an apparent inconsistency, we must adopt a view of the case, if there is one, that resolves any seeming inconsistency, making every attempt to reconcile the jury's findings, by exegesis if necessary." *Ali v. Kipp*, 891 F.3d 59, 65 (2d Cir. 2018) (internal quotation marks and citations omitted); *accord Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 598 (2d Cir. 2001).

Defendants argue that the verdicts on the two claims are irreconcilable because the same conduct of the Defendants provided the basis for both claims. In particular, because there was no dispute that Hundley satisfied the objective element of an excessive force claim under the Eighth Amendment, Defendants argue that, "[i]n rejecting plaintiff's Eighth Amendment claim, the jury therefore necessarily found that defendants' use of force failed to satisfy the subjective element of that claim requiring a sadistic and malicious use of force—*i.e.*, bad faith—and found instead that defendants used force in a good-faith attempt to restrain plaintiff." Appellants' Br. at 18; *see also Baskerville v. Mulvaney*, 411 F.3d 45, 47–48 (2d Cir. 2005) (describing elements of

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 660 of 830

Hundley v. Frunzi, Not Reported in Fed. Rptr. (2024)

2024 WL 3886996

Eighth Amendment excessive force claim). Thus, relying on *Baskerville*, Defendants contend that "a jury finding that force was applied in good faith precludes a finding of retaliation, based on that same use of force, on a First Amendment claim." Appellants' Br. at 18.

On this record, we find Defendants' argument unpersuasive. As conceded by Defendants at oral argument, a court must consider the jury instructions along with the verdict sheet in examining whether a seemingly inconsistent verdict can be reconciled based upon the evidence heard by the jury. *See, e.g.*, *Baskerville*, 411 F.3d at 49–50 (analyzing jury instructions in connection with claim of inconsistent verdicts). In this case, an examination of the jury instructions on each claim (which Defendants did not challenge below and do not challenge on appeal) reveals at least two independent ways in which the jury's general verdicts can be reconciled.

First, the jury instructions did not limit the alleged "adverse action" underlying Hundley's retaliation claim to the alleged assault by Defendants that resulted in his broken rib, but rather included *any* conduct by Defendants during the December 20 incident with Hundley that met the applicable legal standard. Indeed, the district court broadly instructed the jury that "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights constitutes an adverse action for a claim of retaliation." Joint App'x at 527; *see* *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (describing legal elements of a retaliation claim). Therefore, even if the jury concluded that Defendants' use of force in subduing Hundley did not violate the Eighth Amendment, they could have found that other aspects of the incident met the applicable standard. For example, the jury could have found under that instruction that the pat-frisk of Hundley, immediately prior to the use of force, was performed solely to retaliate against Hundley for filing grievances about inappropriate and unwarranted pat-frisks in the Facility, and would deter a similarly situated individual from exercising his First Amendment rights, thereby providing a basis for liability on the retaliation claim.

**\*4** Although Defendants suggest that there was insufficient evidence to support a jury verdict under that particular theory, we disagree. The jury heard four accounts of what transpired during the incident, one from each party to this appeal. Hundley testified that the pat-frisk occurred inside his cell in contravention of prison procedures, and that it would have been impossible for the officers to have initiated the frisk, as Defendants claimed, immediately outside his cell, because

"there's no room outside the gallery." Joint App'x at 156. In summation, Hundley's counsel argued that the pat-frisk "was a pretext for an assault," that Defendants lied about the pat-frisk taking place outside the cell, and that the entire purpose of visiting Hundley's cell—including the pat-frisk— was retaliation. *Id.* at 376; *see also id.* at 378 (arguing to the jury that "pat-frisks inside an inmate's cell are clearly, clearly disallowed" and, thus, "if [Defendants] were to admit that they did a pat-frisk inside the cell, they would be admitting from the outset that they were up to no good" and "[s]o they had to say it was outside the cell"); *id.* at 385 ("[T]his wasn't a spontaneous event. This wasn't something that kind of started off small and escalated into an excessive force incident. This was planned. Those three guys arrived on H block with a plan to beat up Mr. Hundley and whatever else they were planning to do to him.").

When faced with conflicting versions of events, "[a]s in most trials, and especially in one where participants are giving their accounts of events occurring rapidly and in a highly charged atmosphere, the jurors were not required to accept the entirety of either side's account, but were free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they credited." *Haywood v. Koehler*, 78 F.3d 101, 105 (2d Cir. 1996). This trial record allowed the jury to balance all of the evidence from the incident and rationally conclude, after making the necessary credibility determinations, that the pat-frisk was done solely for the purpose of harassing and retaliating against Hundley because he filed grievances about pat-frisks and that such conduct would deter a similarly situated person of reasonable firmness from filing such grievances in the future. Those factual findings support liability on the retaliation claim even if the subsequent use of force was justified once Hundley "came off the wall" during the pat-frisk. [2] Joint App'x at 279. Because the jury's general verdict under the instructions provided by the district court rationally allowed for this separate theory of liability on the retaliation claim, the district court did not abuse its discretion in denying Defendants' motion for a new trial based on purportedly inconsistent verdicts.

[2]       Defendants suggest that the jury could not rationally find that the pat-frisk was retaliatory because, when asked to describe the pat-frisk during the trial, Hundley testified it was a "[n]ormal pat-frisk" and, as noted *supra*, that he "had no complaints of the pat-frisk." Joint App'x at 137. However, in context, a jury could have reasonably

Hundley v. Frunzi, Not Reported in Fed. Rptr. (2024)

2024 WL 3886996

construed that testimony to mean that there was nothing unusual about the *manner* of the pat-frisk (as opposed to the earlier pat-frisks about which he had complained), rather than a concession that the pat-frisk itself as part of a purported interview about his grievances was not itself retaliatory. Indeed, as noted *supra*, Hundley testified that the pat-frisk was conducted inside his cell in violation of the Facility's protocol, contrary to Defendants' testimony that it was performed outside the cell.

Second, as the district court explained, the instructions also allowed the jury to rationally find that the force was not used maliciously and sadistically, and thus did not violate Hundley's Eighth Amendment rights, but was still retaliatory. More specifically, the jury was instructed that, to prevail on the excessive force claim, Hundley must prove "that the defendant[ ] you are considering used force against [him] maliciously and sadistically, for the very purpose of causing [him] harm." Joint App'x at 523–24. The district court further instructed the jury:

> To act "maliciously" means to intentionally do a wrongful act without just cause or excuse, with an intent to inflict injury or under circumstances that show an evil intent. To act "sadistically" means to do a wrongful act with extreme or excessive cruelty.

**\*5** Joint App'x at 524. Although the jury was never instructed about the "good-faith" use of force, Defendants argue that "[a] finding that force was not applied maliciously and sadistically ... necessarily implies a good-faith use of force and precludes a finding of retaliatory animus." Appellants' Br. at 19.

We disagree based on the instructions provided to this jury. Under these instructions, the jury could have found that defendants did use some degree of unnecessary force against Hundley during the cell visit to retaliate against him for filing a grievance, but did not intend to "inflict injury" and did not commit "a wrongful act with extreme or excessive cruelty," and that Hundley's rib was broken when the retaliatory plan unintentionally got out of control and Hundley fell to the ground. If the jury made those factual findings, it could have rationally concluded under the instructions that Defendants were liable for retaliation, but not excessive force.

Although Defendants note that we have explained that "the use of force 'maliciously and sadistically' merely describes a bad-faith use of force," Appellants' Br. at 19 (citing *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999)), the jury was not instructed about "good faith" or "bad faith" in this case. Because Defendants did not ask the district court to include any such language in the instructions on the excessive force claim, the district court did not abuse its discretion in determining that Defendants were not entitled to a new trial based on seemingly inconsistent verdicts that potentially arose from confusion created by the agreed-upon instruction. *Globus*, 418 F.2d at 1289–90 (rejecting challenge to a jury's verdict as inconsistent where, *inter alia*, "[defendant's] strategy in trying the case may have contributed to any confusion the jury may have experienced").

Finally, although Defendants heavily rely upon our decision in *Baskerville* to support their position, that reliance is misplaced. To be sure, in *Baskerville*, we held that the district court did not err in determining that, once the jury found in favor of the defendant on the plaintiff's excessive force claim, the retaliation claim did not need to be submitted to the jury because it failed as a matter of law. 411 F.3d at 50. However, unlike here, the jury charge in *Baskerville* on the defendants' subjective intent on the excessive force claim "explicitly allowed the jury to consider 'whether the force was applied in order to retaliate against the plaintiff for his religious expression ....' " *Id.* at 49. We thus concluded that the district court's post-verdict dismissal of the retaliation claim was appropriate because the instruction provided the jury with the opportunity to consider the defendants' retaliatory motivation in connection with the excessive force claim. And, although it did not put that First Amendment claim squarely before the jury, "it did put all alleged conduct or harm in [the] case that could possibly form the basis of [that] claim[ ] before the jury." *Id.* at 50. Moreover, the *Baskerville* instruction on excessive force explained to the jury that the subjective element of the excessive force claim "turn[ed] upon *whether the force was applied in a good-faith effort to maintain or restore discipline*, or maliciously or sadistically to cause harm." *Id.* at 48 (emphasis added). After describing the factors that could support a finding of maliciousness (including a retaliatory motive), the instruction stated: "If, on the other hand, reflection upon these factors leads you to find that the defendants acted in a good-faith effort to maintain and restore discipline, no constitutional violation has occurred because the subjective component of the claim has not been satisfied." *Id.* Therefore, we concluded that, "[i]f the jury found, as it

Hundley v. Frunzi, Not Reported in Fed. Rptr. (2024)

2024 WL 3886996

did, that the officers' use of force did not violate the Eighth Amendment, they necessarily found that it was justified and applied in good faith, and given this, there was no evidence that could have logically and consistently supported a finding for [plaintiff] on ... [his] religious retaliation claim." *Id.* at 50.

**\*6** The components of the jury instruction that were critical to our holding in *Baskerville* are completely absent in this case —namely, here, the jury was never instructed to consider the alleged retaliatory motive in connection with the "malicious and sadistic" element of the excessive force claim, nor was the subjective intent element with regard to the excessive force claim framed as a binary choice between force applied "in a good-faith effort to maintain or restore discipline" and that applied "maliciously or sadistically to cause harm." *Id.* at 48. Thus, our analysis in *Baskerville* is inapposite and did not require the district court in this case to conclude that the verdicts on the excessive force and retaliation claims, based on the jury instructions, were irreconcilable and required a new trial. [3]

[3]     For the same reasons, we conclude that our recent holding in *Barnes v. Rock*, No. 22-2902, 2024 WL 2973709 (2d Cir. June 13, 2024) (summary order), does not dictate a different result in this case. In *Barnes*, relying upon *Baskerville*, we held that the district court did not err in granting judgment as a matter of law on a prisoner's retaliation claim because "[t]he jury verdict that [defendants] did not subject [plaintiff] to excessive force precludes a finding that the same, objectively serious conduct was exercised in retaliation for grievances filed against them." *Id.* at \*1. However, there is no indication in *Barnes* that the evidence at trial allowed the jury to find that any other conduct by

the defendants beyond the alleged excessive force itself (such as the pat-frisk here) could provide a separate adverse action for the retaliation claim. Indeed, the district court had granted the motion for judgment as a matter of law because Barnes had not introduced "admissible evidence of retaliatory intent" at trial with respect to one incident, and with respect to another incident, "because the grievance that the Plaintiff wrote and relied upon in support of the retaliation claim, was not received until after th[e] date" of the alleged force. D. Ct. Dkt. 9:13-cv-164-DJS, ECF No. 790 at 14. Moreover, as in *Baskerville*, the jury was instructed in *Barnes* that, to find in plaintiff's favor in connection with the subjective element of the excessive force claim, plaintiff must prove that "the Defendant acted maliciously and sadistically for the purpose of causing harm, and not in a good faith effort to maintain or restore discipline." *Id.*, ECF No. 738 at 18. As noted above, this "good faith" language was completely absent from the instructions in this case.

In sum, we conclude that the district court did not abuse its discretion in denying Defendants' motion for a new trial based on purportedly inconsistent verdicts.

\* \* \*

We have considered Defendants' remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2024 WL 3886996

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 663 of 830

George v. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

2021 WL 4392485
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Llewellyn Sinclair GEORGE, Plaintiff,
v.
COUNTY OF WESTCHESTER, et al., Defendants.

No. 20-CV-1723 (KMK)
|
Signed 09/24/2021

**Attorneys and Law Firms**

Llewellyn Sinclair George, White Plains, NY, Pro se Plaintiff.

Jordan Silver, Esq., Westchester County Attorney, White Plains, NY, for Defendants.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Plaintiff Llewellyn Sinclair George ("Plaintiff"), proceeding pro se, brings this Action pursuant to 42 U.S.C. § 1983 against the County of Westchester (the "County"), Assistant Warden La Fonda Spaulding ("Spaulding"), Assistant Warden Eric Middleton ("Middleton"), Sergeant Daniel Lopez ("Lopez"), Sergeant Matthew Kitt ("Kitt"), Captain Andre Mabra ("Mabra"), Captain Christopher Roberts ("Roberts"), and Captain Natasha Vanlierop ("Vanlierop"; collectively, "Defendants"), alleging that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. (Compl. 2–6 (Dkt. No. 2); Ord. of Serv. 1 (Dkt. No. 9); Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") 1 (Dkt. No. 30).) [1] Before the Court is Defendants' Motion To Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion"). (See Defs.' Not. of Mot. (Dkt. No. 28).) For the reasons that follow, Defendants' Motion is granted in part and denied in part.

[1]     Because Plaintiff's Complaint includes several handwritten pages interspersed within a standard complaint form, the Court will refer to the ECF page stamp at the top of each page. Note that Plaintiff's Complaint refers to Defendant Spaulding as "A. Spaulding" and omits first names for all but

one Defendant. (See Compl. 3–4.) Defendants have provided additional identifying information in their Memorandum of Law. (See Defs.' Mem. 1.)

I. Background

A. Factual Background

The alleged facts, which are accepted as true for purposes of resolving this Motion, are as follows. On April 4, 2019, while incarcerated at the Westchester County Jail, Plaintiff approached the desk of Vanlierop, who was conducting a tour of the "2 southwest housing unit" in her capacity as a "sector supervisor." (Compl. 6.) [2] Plaintiff tried to hand Vanlierop a grievance (the "First Grievance"), but Vanlierop "glanced" at the grievance, "turned away," and stated, "you know I don't do grievances." (Id.) Later that day, Lopez was touring the upper tier of the same housing unit when Plaintiff attempted to hand him the same grievance. (Id. at 6.) Lopez read the grievance, handed it back to Plaintiff, and said, "I'm not getting into the middle of this mess." (Id. at 7.)

[2]     Although Vanlierop was not initially named as a Defendant, (see Compl. 3–4), the Court directed the Clerk of Court to add her as a Defendant on April 21, 2020, (Ord. of Serv. 1).

Five days later, on the morning of April 9, 2019, Plaintiff's cell was being searched by two male officers when Vanlierop entered the cell and "confiscated" a separate grievance Plaintiff had prepared (the "Second Grievance") regarding Vanlierop's refusal to accept the First Grievance. (See id. at 7, 10.) Shortly thereafter, Vanlierop issued a fabricated misbehavior report against Plaintiff in retaliation for the Second Grievance. (See id.) [3]

[3]     Although at one point the Complaint does not draw a clear distinction between the First Grievance and the Second Grievance, (see Compl. 7), it also suggests that the grievance confiscated by Vanlierop addressed Vanlierop's refusal to process Plaintiff's *initial* grievance, (see id. at 7, 10), which necessarily indicates that Plaintiff had written a *second* grievance after Vanlierop refused to process the first. Specifically, Plaintiff suggests that the misbehavior report issued by Vanlierop was made in retaliation for the grievance she had seized, (see id. at 7), and Plaintiff alleges that the misbehavior report was issued in retaliation for a

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 664 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

grievance regarding "Defendant Vanlierop's refusal to accept and process [P]laintiff's grievance," (*id.* at 10). Construing the Complaint liberally, the Court therefore assumes there were two distinct grievances: (1) the First Grievance (the subject of which is unclear), and (2) the Second Grievance, which addressed Vanlierop's refusal to accept the First Grievance. It is the Second Grievance which Vanlierop allegedly confiscated, and for which she allegedly issued a false misbehavior report in retaliation. (*See id.* at 7, 10.)

**\*2** Around 11:30 A.M. on the following day (April 10), Mabra and Kitt stopped by Plaintiff's cell door with the housing unit officer. (*Id.* at 7.) Mabra ordered the housing unit officer to open Plaintiff's door, which she did. (*Id.*) While Kitt and the housing unit officer stood outside Plaintiff's cell and "act[ed] as lookouts," Mabra entered Plaintiff's cell and "inquire[d] about" Plaintiff's grievance against Vanlierop. (*Id.* at 7, 9.) Before Plaintiff could respond, Mabra, using a "stiff open palm," "shoved" Plaintiff against his cell wall and "demanded that [P]laintiff retract the contents of [his] grievance." (*Id.* at 9.) Plaintiff told Mabra "to go to hell." (*Id.*) Mabra, while exiting Plaintiff's cell, said, "I'm going to make your accommodations here a little more lengthy, your ass won't be making it home." (*Id.*) [4]

[4]    Quotations from Plaintiff's submissions occasionally reflect minor corrections to spelling and grammar.

After Vanlierop had issued the fabricated misbehavior report against Plaintiff, Defendant Roberts conducted a disciplinary hearing. (*Id.* at 10.) At the hearing, Roberts denied Plaintiff's "repeated[ ] request[s]" to call witnesses and present audio and video evidence." (*Id.*) Before the hearing had begun, Roberts stated that he had received several comments from the "warden's office" indicating "that they were pissed off about [Plaintiff's] treatment of Defendant Vanlierop." (*Id.*) Plaintiff alleges that, contrary to Roberts' written disposition, he did not plead guilty to any of the charges. (*Id.* at 11.) He further alleges that Roberts' handling of the hearing was "improperly influenced by the warden's office." (*Id.*) At the conclusion of the hearing, Roberts imposed a penalty of "several days of cell confinement and loss of good time." (*Id.* at 10.) Plaintiff subsequently appealed the hearing disposition to Spaulding and Middleton. (*Id.* at 11.) He alleges that the outcome of these appeals was "[was] improper and unjust." (*Id.*)

Plaintiff alleges that as a result of Defendants' actions, specifically their "constant threats and taunting," he suffered "mental anguish and psychological issues," as well as a "loss of sleep." (*Id.* at 8.) Plaintiff "was repeatedly seen" by the Office of Mental Health at the Westchester County Jail and was prescribed medication—Plaintiff does not identify which one(s)—"to cope with the trauma caused by the [D]efendants." (*Id.*) He seeks a "permanent court order" requiring administrators at the Westchester County Department of Correction "to record all future disciplinary hearings by audio/video." (*Id.*) He also seeks $100,000 in compensatory damages and $60,000 in punitive damages. (*Id.*)

B. Procedural History

Plaintiff filed his Complaint on February 26, 2020. (Dkt. Nos. 1–2.) On April 8, 2020, the Court granted Plaintiff leave to proceed in forma pauperis. (Dkt. No. 6.) On April 21, 2020, the Court dismissed Plaintiff's claims against the Westchester County Department of Correction and directed the Clerk of Court to add Vanlierop and the County as Defendants. (Dkt. No. 9.) [5] On August 10, 2020, Defendants filed a pre-motion letter outlining the grounds for their proposed motion to dismiss. (Dkt. No. 21.) Having received no response from Plaintiff, the Court adopted a briefing schedule for the Motion on August 25, 2020. (Dkt. No. 22.) Defendants filed the instant Motion and supporting papers on October 9, 2020. (*See* Not. of Mot.; Decl. of Jordan L. Silver, Esq., in Supp. of Mot. (Dkt. No. 29); Defs.' Mem.) Plaintiff failed to oppose the Motion, (*see* Dkt. No. 32), and on November 24, 2020, the Court deemed the Motion fully submitted, (Dkt. No. 33).

[5]    The Court dismissed claims against the Westchester County Department of Correction because municipal agencies or departments do not have the capacity to be sued under New York law. *See Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) ("In New York, agencies of a municipality are not suable entities."); *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) ("Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." (collecting cases)); *see also* N.Y. GEN. MUN. LAW § 2 ("The term 'municipal corporation,' as used in this chapter, includes only

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 665 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

a county, town, city and village."). The Court nevertheless concluded that in light of Plaintiff's pro se status and his "clear intention to assert claims against the County of Westchester," it would construe the Complaint as asserting claims against the County. (Dkt. No. 9.) Likewise, given Plaintiff's intention to assert claims against Vanlierop, the Court directed that Vanlierop be added as a Defendant. (*Id.*)

## II. Discussion

### A. Standard of Review

**\*3** The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and citation omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (alteration in original) (citation omitted) (quoting FED. R. CIV. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). However, when the complaint is from a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at \*4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at \*4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant['s] request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at \*2 (E.D.N.Y. Sept. 19, 2013), "documents either in [the] plaintiff['s] possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted), and "his opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at \*1 n.2 (S.D.N.Y. Nov. 17, 1997).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (citation and italics omitted)).

### B. Analysis

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 666 of 830
George v. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

Although Plaintiff does not identify the precise nature of his claims under the First, Eighth, and Fourteenth Amendments, the Court interprets the Complaint to raise eight distinct claims. Specifically, the Complaint claims (i) that Vanlierop and Lopez improperly refused to accept Plaintiff's First Grievance (the "Grievance Claim"), (*see* Compl. 6–7); (ii) that Vanlierop retaliated against Plaintiff in response to the Second Grievance by confiscating this grievance and filing a false misbehavior report (the "Vanlierop Retaliation Claim"), (*see id.* at 7, 10); (iii) that Mabra also retaliated against Plaintiff in response to the Second Grievance by entering Plaintiff's cell, shoving him against a wall, and demanding that he retract the contents of the Second Grievance (the "Mabra Retaliation Claim" and, together with the Vanlierop Retaliation Claim, the "Retaliation Claims"), (*see id.* at 7, 9); (iv) that Mabra used excessive force when demanding that Plaintiff retract the contents of the Second Grievance (the "Excessive Force Claim"), (*see id.* at 9); (v) that Kitt failed to intervene when Mabra was assaulting Plaintiff (the "Failure to Intervene Claim"), (*see id.* at 7, 9); (vi) that Roberts, by denying Plaintiff the opportunity to call witnesses and present audio and video evidence at his disciplinary hearing, violated Plaintiff's procedural due process rights (the "Roberts Procedural Due Process Claim"), (*see id.* at 10–11); (vii) that Spaulding and Middleton, by affirming Roberts' decision, also violated Plaintiff's procedural due process rights (the "Spaulding/Middleton Procedural Due Process Claim" and, together with the "Roberts Procedural Due Process Claim," the "Procedural Due Process Claims"), (*see id.* at 11); and (viii) that the County should be liable for the foregoing violations (the "*Monell* Claim"). The Court will address these claims in order.

### 1. The Grievance Claim

**\*4** As discussed, Plaintiff alleges that Vanlierop and Lopez refused to accept the First Grievance. (*Id.* at 6–7.) To the extent Plaintiff asserts a discrete claim based on these allegations, the Court must dismiss the claim.

"It is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances." *Crichlow v. Fischer*, No. 15-CV-6252, 2017 WL 920753, at \*7 (W.D.N.Y. Mar. 7, 2017); *see also Corley v. City of New York*, No. 14-CV-3202, 2017 WL 4357662, at \*7 (S.D.N.Y. Sept. 28, 2017) ("[The] [p]laintiff did not have a liberty interest to access the [prison's] grievance program that would provide a basis for a constitutional due process claim

here."); *Nji v. Heath*, No. 13-CV-200, 2013 WL 6250298, at \*6 (S.D.N.Y. Dec. 2, 2013) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently[,] allegations that prison officials violated those procedures do[ ] not give rise to a cognizable § 1983 claim." (citation omitted)); *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at \*10 (E.D.N.Y. June 9, 2011) ("It is well-established that prison grievance procedures do not create a due-process-protected liberty interest."), *aff'd*, 548 F. App'x 29 (2d Cir. 2013); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment."). "Rather, in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is ... directly petitioning the government for redress of his claims." *Harris v. Westchester Cnty. Dep't of Corr.*, No. 06-CV-2011, 2008 WL 953616, at \*5 (S.D.N.Y. Apr. 3, 2008) (collecting cases). Consequently, "courts regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures." *Martinez v. Schriro*, No. 14-CV-3965, 2017 WL 87049, at \*3 (S.D.N.Y. Jan. 9, 2017) (alteration omitted). Accordingly, any due process claim against Vanlierop and Lopez based on their purported interference with the grievance process is dismissed.

### 2. The Retaliation Claims

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Perkins v. Perez*, No. 17-CV-1341, 2019 WL 1244495, at \*13 (S.D.N.Y. Mar. 18, 2019) (citation omitted). To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [inmate], and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation and alteration omitted). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (quotation marks omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 667 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

may be required to tolerate more than average citizens." *Id.* (quotation marks and alterations omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed that district courts must "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (quotation marks omitted)). Accordingly, First Amendment retaliation claims must be "supported by specific and detailed factual allegations" and may not be stated "in wholly conclusory terms." *Dolan*, 794 F.3d at 295 (citation omitted).

**\*5** As noted, Plaintiff alleges that Vanlierop and Mabra both retaliated against him in response to the Second Grievance —Vanlierop by confiscating the grievance and filing a false misbehavior report, (*see* Compl. 7, 10), and Mabra by entering Plaintiff's cell, shoving him against a wall, and demanding a retraction, (*id.* at 7, 9). The Court will evaluate each claim separately under the three-part test set out in *Holland*.

### a. The Vanlierop Retaliation Claim

With respect to the first prong of the *Holland* test, the Complaint plausibly alleges that Vanlierop's actions against Plaintiff came in response to a form of protected conduct —namely, Plaintiff's preparation of the Second Grievance. "It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at \*4 (S.D.N.Y. July 16, 2013) (citing *Graham*, 89 F.3d at 80); *see also Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at \*10 (S.D.N.Y. Sept. 28, 2018) (same); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n.21 (S.D.N.Y. 2011) (same; collecting cases). Thus, Plaintiff's allegations with respect to Vanlierop are sufficient to satisfy the first prong of the *Holland* test.

With respect to *Holland*'s second prong, Plaintiff alleges two distinct forms of possibly adverse action by Vanlierop —(1) her confiscation of the Second Grievance and (2) her

filing of a false misbehavior report. (*See* Compl. 7, 10.) Although inmates have no constitutional right to be free from a cell search, including retaliatory searches, *see, e.g.*, *Joseph v. Annucci*, No. 18-CV-7197, 2020 WL 409744, at \*5 (S.D.N.Y. Jan. 23, 2020) (stating that inmates have "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches" (citation omitted)), they may nevertheless "assert a retaliation claim for retaliatory conduct in connection with a cell search," *Hill v. Laird*, No. 06-CV-126, 2014 WL 1315226, at \*8 (E.D.N.Y. Mar. 31, 2014), including a prison official's seizure of legal documents or administrative grievances, *Smith v. City of New York*, No. 03-CV-7576, 2005 WL 1026551, at \*3 (S.D.N.Y. May 3, 2005) (holding on summary judgment that the defendants' "destruction of [the plaintiff's] legal papers" constituted "an adverse action substantial enough to satisfy the second prong of the retaliation test"). At this early stage of the case, Plaintiff's allegation that Vanlierop seized the Second Grievance is sufficient to state an adverse action. *See Yunus v. Jones*, No. 16-CV-1282, 2017 WL 9511176, at \*9 (N.D.N.Y. Aug. 23, 2017) (concluding that "the allegation that [the] defendant ... confiscated [the] plaintiff's personal property"— including prison grievances—"in retaliation for the exercise of his First Amendment grievance rights [was] sufficient to withstand a motion to dismiss"), *report and recommendation adopted*, 2017 WL 5956762 (N.D.N.Y. Dec. 1, 2017); *Guillory v. Haywood*, No. 13-CV-1564, 2015 WL 268933, at \*21 (N.D.N.Y. Jan. 21, 2015) (order adopting report & recommendation) (holding that the plaintiff adequately stated a claim for retaliation where he alleged that his legal documents were confiscated shortly after complaints over his treatment at the prison facility); *Gomez v. Graham*, No. 14-CV-201, 2014 WL 5475348, at \*5 (N.D.N.Y. Oct. 29, 2014) (concluding that "[a]t th[e] early juncture of" a motion to dismiss, allegations that the plaintiff's legal papers were confiscated were sufficient to state a retaliation claim).

**\*6** Similarly, although "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *see also Thomas v. Calero*, 824 F. Supp. 2d 488, 499 (S.D.N.Y. 2011) (noting that "[t]he Second Circuit has long held ... that a prison inmate has no constitutional right to be free from being falsely accused in a misbehavior report"), there is an exception where the inmate can "show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right," *Willey v. Kirkpatrick*, 801 F.3d 51, 63

Case 9:19-cv-00109-ECC-MJK     Document 410     Filed 02/21/25     Page 668 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

(2d Cir. 2015) (quotation marks omitted); *see also Cook v. Quattrocchi*, No. 19-CV-11659, 2020 WL 564082, at *2 (S.D.N.Y. Feb. 5, 2020) (same). Here, Vanlierop allegedly issued the false misbehavior report in retaliation for Plaintiff's participation in constitutionally protected conduct—namely, his preparation of the Second Grievance—and thus, the Complaint sufficiently alleges an adverse action based on Vanlierop's issuance of the misbehavior report. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (concluding that the plaintiff sufficiently alleged an adverse action based on the defendants' filing of false misbehavior reports in response to the plaintiff's prior grievance submissions); *Arriaga v. Gage*, No. 16-CV-1628, 2019 WL 2053990, at *6 (S.D.N.Y. May 9, 2019) (concluding on a motion to dismiss that allegedly false misbehavior reports issued in retaliation for the plaintiff's grievances "qualif[ied] as adverse actions"); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) (concluding that the defendants' alleged retaliation—"[f]iling a false misbehavior report about [the plaintiff]" in response to the plaintiff's submission of a grievance—"would deter a similarly situated person of ordinary firmness from exercising his First Amendment rights," and therefore "qualifie[d] as an adverse action").

Finally, in considering whether "there was a causal connection between the protected conduct and the adverse action" under *Holland*'s third prong, *see* 758 F.3d at 225, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff," *Thomas v. DeCastro*, No. 14-CV-6409, 2019 WL 1428365, at *9 (S.D.N.Y. Mar. 29, 2019) (citation omitted). Here, Plaintiff alleges that Vanlierop seized the Second Grievance and issued the false misbehavior report on or around April 9, (*see* Compl. 7, 10)—only five days after the incident that was the subject of the Second Grievance, (*see id.* at 6, 10). [6] The Second Circuit has "held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation." *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 413 (D. Conn. 2016) (quoting *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013)), *aff'd*, 720 F. App'x 79 (2d Cir. 2018); *see also Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (summary order) (same); *Mateo*, 2013 WL 3863865, at *6 (finding a "plausible inference" that the defendants issued a misbehavior report in retaliation for the plaintiff's past grievances based in part on the fact that the report was

issued just one day after the plaintiff had a confrontation with the defendants). "Although temporal proximity between constitutionally protected activity and potentially retaliatory activity generally will not, on its own, allow a plaintiff to withstand a motion to dismiss," *Salahuddin v. Mead*, No. 95-CV-8581, 2002 WL 1968329, at *6 n.6 (S.D.N.Y. Aug. 26, 2002), courts may "exercise [their] judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases," *Quezada v. Roy*, No. 14-CV-4056, 2017 WL 6887793, at *10 (S.D.N.Y. Dec. 14, 2017) (quotation marks omitted). Though Plaintiff appears to rely solely on the temporal proximity between his protected conduct and Vanlierop's alleged retaliation, some courts in this District have found that, at the pleadings stage of a case, such close temporal proximity is sufficient to establish a causal connection, particularly where, as here, the defendant appears to retaliate in response to grievance of which he (or she) was the subject. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 518 (S.D.N.Y. 2012) (concluding, for purposes of a motion to dismiss, that where the defendant filed a false misbehavior report against the plaintiff three days after the plaintiff had filed a grievance against that defendant, "[t]he temporal proximity of th[o]se two events, as well as the common identity between the subject of [the plaintiff's] grievance and the author of the [misbehavior report], plausibly suggest[ed]" a causal connection); *Mateo*, 682 F. Supp. 2d at 435 (concluding that, on a motion to dismiss, the plaintiff's allegation that the defendant filed a false misbehavior report one day after the plaintiff filed a sexual harassment grievance against the defendant was sufficient to plead the causation element of his retaliation claim). [7] Consistent with these cases, the Court concludes that Plaintiff has adequately alleged the causation element of his retaliation claim.

[6]     Plaintiff does not specify precisely when he drafted the Second Grievance, but it necessarily was sometime between April 4 and April 9. *See generally* n.3 *supra*.

[7]     Note, however, that Plaintiff may not rely on temporal proximity alone to survive a summary judgment motion. *See, e.g., Bryant v. Goord*, No. 99-CV-9442, 2002 WL 553556, at *2 (S.D.N.Y. Apr. 12, 2002) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.").

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 669 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

**\*7** Accordingly, the Vanlierop Retaliation Claim survives the instant Motion.

### b. The Mabra Retaliation Claim

Mabra allegedly retaliated against Plaintiff in response to the Second Grievance by entering his cell, shoving him against a wall, demanding that Plaintiff retract the contents of the Second Grievance, and then threatening Plaintiff that he would "make [Plaintiff's] accommodations ... a little more lengthy," such that Plaintiff "[wouldn't] be making it home." (Compl. 7, 9.) "As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant," *Kotler v. Boley*, No. 17-CV-239, 2018 WL 4682026, at \*4 n.2 (S.D.N.Y. Sept. 28, 2018) (collecting cases)—in this case, Mabra's retaliation for complaints against Vanlierop. But courts have recognized an exception where, for example, the defendant made clear that he or she was retaliating on behalf of a colleague. *See, e.g.*, *Headley v. Fisher*, No. 06-CV-6331, 2008 WL 1990771, at \*18 (S.D.N.Y. May 7, 2008) (finding that the plaintiff adequately alleged a retaliation claim where the defendant hit him and stated, "this is for CO. Simpson," the defendant against whom the plaintiff had filed a grievance). That is the case here, where Mabra allegedly made clear that he was acting in response to the grievance concerning Vanlierop. (*See* Compl. 9 (alleging that Mabra entered Plaintiff's cell and "inquire[d] about the grievance that [P]laintiff had written against Defendant Vanlierop" before shoving Plaintiff and demanding that he "retract the contents of the grievance" against Vanlierop).) For reasons discussed with respect to Vanlierop in Part II.B.2.a, *supra*, the Court concludes that Plaintiff has adequately alleged *Holland*'s first and third elements with respect to Mabra. That is, the Complaint plausibly suggests that Mabra's allegedly retaliatory actions were in response to Plaintiff's exercise of constitutionally protected conduct (his preparation of the Second Grievance), and Mabra's actions occurred on April 10, just one day after Vanlierop seized the Second Grievance, (*see* Compl. 7), which itself had only been drafted within the past several days, *see* notes 3 & 6 *supra*, thereby establishing the necessary causal connection.

The only question remaining is whether Mabra's conduct constitutes adverse action so as to satisfy *Holland*'s second prong. Here, there are three discrete actions to consider: (1) Mabra's threat to Plaintiff ("[Y]our ass won't be making it home"); (2) Mabra's demand that Plaintiff "retract the contents of" the Second Grievance; and (3) Mabra's act of shoving Plaintiff against the wall. (*See* Compl. 9.)

With respect to the first action, "verbal threats may qualify as adverse actions" in the prison retaliation context *only* where they are "sufficiently specific and direct." *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at \*17 (S.D.N.Y. Dec. 21, 2018) (quotation marks omitted) (collecting cases); *see also Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at \*11 (S.D.N.Y. Sept. 28, 2018) (same); *Mateo*, 682 F. Supp. 2d at 434 (explaining that "[t]he less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights"). "Thus, vague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim." *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007). Here, Mabra's alleged threat is more benign than many threats which courts in the Second Circuit have found insufficient to constitute an adverse action. *See Terry*, 2018 WL 4682784, at \*11 (dismissing a First Amendment retaliation claim because the alleged threat was insufficiently specific and direct even where corrections officers stated that "they were gonna kill" the plaintiff (record citation and alteration omitted)); *see also Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at \*18 (S.D.N.Y. Mar. 30, 2016) (dismissing First Amendment retaliation claims because a corrections officer's statements to a plaintiff that his "grievances were unlikely to succeed" and that the officer "would handle things 'his way' " were insufficiently specific or direct); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that " 'me and my boys ... going to get you' while brandishing a copy of a grievance"); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at \*16 (S.D.N.Y. June 21, 2010) ("Neither [the defendant's] comment ... that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his ... comment that '[y]ou're not the only one who can write. I'm willing to bet you'll break or get broke up,' was a 'direct' or 'specific' threat." (alteration and record citations omitted)), *aff'd sub nom.*, *Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012); *cf. White*, 2018 WL 6726555, at \*14 ("This allegation constitutes a specific, clear threat made in response to [the] [p]laintiff's prospective grievance against [the] [d]efendant .... [The defendant] threatened physical harm to [the] [p]laintiff, and did so with particularity, by pointing to the inmates who would harm [the] [p]laintiff and explaining why they would

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 670 of 830

**George v. County of Westchester, Not Reported in Fed. Supp. (2021)**

2021 WL 4392485

harm him at her direction."). In sum, Plaintiff has failed to allege an adverse action based on Mabra's alleged threat.

**\*8** With respect to Mabra's second action, case law suggests that where a defendant demands that an inmate withdraw a prison grievance, such a demand does not give rise to a retaliation claim unless the demand is accompanied by a sufficiently specific and direct threat. Here, because Mabra's threat was not sufficiently specific or direct, his alleged demand that Plaintiff "retract the contents" of the Second Grievance does not constitute an adverse action. *See Rodriguez v. Patchen*, No. 13-CV-1086, 2018 WL 2122877, at \*9 (W.D.N.Y. Mar. 1, 2018) (concluding on summary judgment that the defendant's alleged "threat[ ] to use physical violence against [the] [p]laintiff unless [he] withdrew his inmate grievance" did not establish a retaliation claim because "physical violence" constituted a vague threat), *report and recommendation adopted*, 2018 WL 2119768 (W.D.N.Y. May 8, 2018); *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) (concluding on summary judgment that "verbal threats such as 'we [are] going to get you, you better drop the [law]suit,' do not rise to the level of adverse action" (footnote omitted)); *cf. St. Pierre v. Semple*, No. 14-CV-1866, 2015 WL 6872442, at \*4 (D. Conn. Nov. 9, 2015) (finding that the plaintiff adequately stated a retaliation claim against a nurse who threatened to continue to stop providing him with his prescribed pain medication unless he withdrew a grievance against her). Thus, Plaintiff cannot state a retaliation claim against Mabra based on Mabra's demand that he retract the Second Grievance.

With respect to Mabra's third action, physical assault may, depending on its severity, constitute an adverse action for purposes of a First Amendment retaliation claim. *See Flemming v. King*, No. 14-CV-316, 2016 WL 5219995, at \*5 (N.D.N.Y. June 20, 2016), *report and recommendation adopted*, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016); *see also Baskerville v. Blot*, 224 F. Supp. 2d 723, 731–32 (S.D.N.Y. 2002) (holding that a "retaliatory assault" sufficiently described an adverse action for purposes of a retaliation claim). Notably, "the alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis." *Flemming*, 2016 WL 5219995, at \*5. Even in light of this lower standard, however, Mabra's alleged action is still insufficient to constitute an adverse action. The cases in which courts have recognized assault as a form of adverse action have involved markedly more violent conduct than that alleged here. *See, e.g.*,

*Salgado v. NYS Dep't of Corr. & Cmty. Supervision*, No. 13-CV-1108, 2016 WL 6311296, at \*3, \*8 (W.D.N.Y. Sept. 15, 2016) (concluding that slamming the plaintiff's finger in a cell window and beating him constituted adverse action for purposes of retaliation claim); *Baskerville*, 224 F. Supp. 2d at 726, 732 (holding that a "retaliatory assault" in which the plaintiff was placed in a chokehold, shoved into the bars of his cell, and choked until he "was on the verge of collapsing" "sufficiently describe[d] adverse conduct that would deter a reasonable inmate from exercising his constitutional rights"). By contrast, courts have found that shoving an inmate or comparable conduct is insufficient to constitute an adverse action. *See Flynn v. Ward*, No. 15-CV-1028, 2018 WL 3195095, at \*9 (N.D.N.Y. June 7, 2018) (observing that "[a]lthough an alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis, [the plaintiff's] allegations that [a defendant] 'push[ed] him around' " was "de minimis" and therefore insufficient to constitute adverse action (record citation omitted) (last alteration in original)), *report and recommendation adopted*, 2018 WL 3193201 (N.D.N.Y. June 28, 2018); *Rivera v. Goord*, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) (concluding that particular defendants' "alleged acts of retaliation"—" 'shov[ing]' [the plaintiff] while taking him to the [Special Housing Unit ("SHU")]"—"even if assumed to be true, [were] de minimis ... [and] would not chill a person of ordinary firmness from continuing to engage in First Amendment activity" (italics omitted)); *see also, e.g., Myers v. Saxton*, No. 20-CV-465, 2021 WL 149062, at \*7 (N.D.N.Y. Jan. 15, 2021) ("[I]n this circuit, courts have routinely concluded that the type of physical assault suffered by [the] plaintiff in this case (i.e., having a food tray thrown at him) is de minimis for purposes of a retaliation claim and is not sufficient to satisfy the adverse action element."); *Woodward v. Afify*, No. 14-CV-856, 2018 WL 9875253, at \*11 (W.D.N.Y. Sept. 28, 2018) ("[V]iewing the allegations here in the light most favorable to [the] plaintiff, the [c]ourt concludes that a single punch is an insufficient adverse action to meet even the lower standard required in a First Amendment retaliation claim."), *report and recommendation adopted*, 2019 WL 5394217 (W.D.N.Y. Oct. 22, 2019). Accordingly, Plaintiff has failed to allege an adverse action taken by Mabra.

**\*9** Because Plaintiff has failed to allege adequately the "adverse action" prong of his retaliation claim against Mabra, the Court dismisses the Mabra Retaliation Claim.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 671 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)
2021 WL 4392485

### 3. The Excessive Force Claim

To the extent Plaintiff alleges a distinct excessive force claim against Mabra based on his act of shoving Plaintiff into his cell wall, (*see* Compl. 9), this claim fails for reasons already discussed: Just as the act of shoving an inmate fails to satisfy the relaxed standard necessary to allege an "adverse action," it necessarily fails to satisfy the more demanding standard necessary to establish an Eighth Amendment excessive force claim.

The Eighth Amendment's guarantee of freedom from "cruel and unusual punishment" encompasses "restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[An] [a]nalysis of cruel and unusual punishment claims requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for the conduct." *Manley v. Grossman*, No. 13-CV-1974, 2017 WL 4326541, at *8 (S.D.N.Y. Sept. 27, 2017). The objective element focuses on the harm done "in light of contemporary standards of decency," *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quotation marks omitted), and asks whether "the deprivation alleged is 'sufficiently serious,' or 'harmful enough,' to reach constitutional dimensions," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citation omitted). The subjective element requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (citation omitted).

Here, even assuming Plaintiff could satisfy the subjective element of his excessive force claim, the Court finds no basis to conclude that the alleged use of force was "objectively 'harmful enough' or 'sufficiently serious' " to violate the Eighth Amendment. *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citation omitted). Courts in the Second Circuit have found that comparable uses of force—where a corrections officer forcefully shoves or pushes an inmate— are insufficient to satisfy the objective prong of an excessive force claim. *See, e.g.*, *Tavares v. City of New York*, No. 08-CV-3782, 2011 WL 5877550, at *5–6 (S.D.N.Y. Oct. 17, 2011) (holding that a pat frisk where the plaintiff was

"forcefully 'compressed' against the wall" was not a violation of the Eighth Amendment and noting that "[c]ourts in this Circuit have routinely found such types of minimal injuries and pain insufficiently serious or harmful to satisfy the objective element of the Eighth Amendment analysis" (citing cases)), *report and recommendation adopted*, 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011); *James v. Phillips*, No. 05-CV-1539, 2008 WL 1700125, at *5 (S.D.N.Y. Apr. 9, 2008) (concluding that a guard's "shov[ing] of an inmate" constituted a de minimis use of force that could not give rise to a viable excessive force claim); *Show v. Patterson*, 955 F. Supp. 182, 192–93 (S.D.N.Y. 1997) (concluding that the alleged force—"pushing [the plaintiff] against the wall"— was "de minimis and thus not protected by the Eighth Amendment"); *Bryan v. Admin. of F.C.I. Otisville*, 897 F. Supp. 134, 137 (S.D.N.Y. 1995) ("The Second Circuit has deemed brief confrontations between prisoners and guards such as the pushing incident alleged here insignificant for Eighth Amendment purposes."). Accordingly, the Court dismisses the Excessive Force Claim.

### 4. The Failure to Intervene Claim

**\*10** Construed liberally, the Complaint raises a claim for failure to intervene against Kitt. (Compl. 7, 9.)

Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y. C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). Moreover, "[l]aw enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence." *McRae v. Gentile*, No. 14-CV-783, 2015 WL 7292875, at *2 (N.D.N.Y. Oct. 20, 2015), *report and recommendation adopted*, 2015 WL 7300540 (N.D.N.Y. Nov. 18, 2015); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (collecting cases)), *reh'g denied*, 27 F.3d 29 (2d Cir. 1994). Specifically, "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used," provided there was "a realistic opportunity to intervene to prevent the harm from occurring." *Rahman v. Acevedo*, No. 08-CV-4368, 2011

**George v. County of Westchester, Not Reported in Fed. Supp. (2021)**

2021 WL 4392485

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 672 of 830

WL 6028212, at *8 (S.D.N.Y. Dec. 5, 2011) (alteration and quotation marks omitted).

"However, 'there can be no failure to intervene claim without a primary constitutional violation.' " *Sanabria v. Tezlof*, No. 11-CV-6578, 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016) (quoting *Forney v. Forney*, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015)); *see also Posner v. City of New York*, No. 11-CV-4859, 2014 WL 185880, at *8 (S.D.N.Y. Jan. 16, 2014) (explaining that "[b]ecause [the] [d]efendants [were] entitled to summary judgment on [the] [p]laintiff's primary claims that they violated her constitutional rights, it follow[ed] that they [were] entitled to summary judgment on her failure-to-intervene ... claim[ ] as well"); *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012) (observing that a "failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim"). Because Plaintiff failed to state an excessive force claim against Mabra, it necessarily follows that the Failure to Intervene Claim against Kitt—which is premised on Kitt allegedly turning a blind eye while Mabra entered Plaintiff's cell—must also fail. *See, e.g.*, *Forney*, 96 F. Supp. 3d at 13 (explaining that because "all of [the] [p]laintiff's primary [§] 1983 claims ha[d] been dismissed, [the] [d]efendants' motion to dismiss [the] [p]laintiff's failure to intervene claim" also had to be granted). Accordingly, the Court dismisses the Failure to Intervene Claim.

### 5. The Procedural Due Process Claims

Plaintiff alleges that after Vanlierop issued a false misbehavior report in retaliation for the Second Grievance, "a disciplinary hearing was conducted by Defendant Roberts, during which [P]laintiff's repeat[ed] request[s] ... to present audio and video evidence, as well as to call witnesses[,]" were "denied." (Compl. 10.) Plaintiff also alleges that Roberts' "handling of the disciplinary hearing was improperly influenced by the warden's office," which had apparently notified Roberts that it was displeased with Plaintiff's "treatment of Defendant Vanlierop." (*Id.* at 10–11.) At the end of the hearing, the punishment imposed by Roberts was "several days of cell confinement and loss of good time." (*Id.* at 10.)

**\*11** "To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654

(2d Cir. 2004) (citation and alteration omitted), *cert. denied sub nom.*, *McBride v. Ortiz*, 543 U.S. 1187 (2005). The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment).

With respect to the first requirement, "[p]rison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). When evaluating whether an inmate has suffered "atypical and significant hardship," courts must compare the conditions imposed upon that inmate with the conditions "endured by prisoners in [the] general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999). When evaluating the severity of an inmate's hardship, courts should consider both the duration and the conditions of confinement. *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 606 (S.D.N.Y. 2009).

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). "Prison disciplinary proceedings," however, "are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Smith v. Fischer*, 803 F.3d 124, 127 (2d Cir. 2015) (quoting *Wolff*, 418 U.S. at 556). Ultimately, a guilty finding in an inmate disciplinary hearing only needs to be supported by "some evidence from which the conclusion ... could be deduced." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985) (quotation marks omitted). The Second Circuit has explained that "[j]udicial review of this 'some evidence' standard is narrowly focused." *Sira v. Morton*, 380 F.3d 57, 76 (2d Cir. 2004). Such review "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* (quoting *Hill*, 472 U.S. at 455–56). Finally, "the

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 673 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with ... utter certainty ..., how he would assess evidence he has not yet seen.' " *Rahman*, 2011 WL 6028212, at *7 (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)) (italics omitted).


### a. The Roberts Procedural Due Process Claim

As noted, Plaintiff alleges that he was sentenced to "several days of cell confinement," along with "loss of good time." (Compl. 10.) Based on the latter allegation—but not the former—Plaintiff has adequately alleged a "liberty interest sufficient to trigger due process protections during his administrative hearing. *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). However, his vague allegation that Roberts "denied" his "repeat[ed] request[s]" to "present audio and video evidence, as well as to call witnesses," (Compl. 10), is insufficient to allege a procedural violation by Roberts.

**\*12** The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s 'atypical and significant hardship' test." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003). It is not, however, the only relevant factor. "The conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of 'atypical and severe hardship.' " *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quotation marks omitted). Accordingly, courts must consider both the conditions of disciplinary confinement and their duration, as "especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).

Although the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," it has nevertheless established certain "guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed." *Palmer*, 364 F.3d at 64. For example, the Second Circuit has explained that where a plaintiff is confined in SHU for an "intermediate duration" of between 101 and 305 days, "development of a detailed record" regarding the conditions of confinement as compared to "ordinary prison conditions" is required. *Id.* at 64–65 (quotation marks omitted). Moreover, "although shorter confinements under

normal SHU conditions may not implicate a prisoner's liberty interest, [the Second Circuit has] explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Id.* at 65 (citation omitted). "In the absence of a detailed factual record," the Second Circuit has "affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than ... 30 days ... spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Id.* at 66 (collecting cases); *see also, e.g.*, *Colon v. Annucci*, 344 F. Supp. 3d 612, 633–34 (S.D.N.Y. 2018) (holding that the plaintiff's "30-day keeplock confinement alone [was] insufficient to create a liberty interest triggering due process protections" (collecting cases)); *Walker v. Quiros*, No. 11-CV-82, 2014 WL 7404550, at *8 (D. Conn. Sept. 30, 2014) ("In the absence of a more detailed factual record, a term of segregated confinement shorter than [30] days generally does not create a constitutional liberty interest."); *Houston v. Cotter*, 7 F. Supp. 3d 283, 298 (E.D.N.Y. 2014) ("Absent a detailed factual record, courts typically affirm dismissals of due process claims where the period of time spent in SHU was short—e.g., [30] days—and there was no indication of unusual conditions." (italics omitted)).

Here, Plaintiff alleges merely that he was sentenced to "several days of cell confinement," along with "loss of good time." (Compl. 10.)[8] Plaintiff offers no allegations regarding the severity or atypicality of the conditions he experienced in disciplinary confinement. Without such allegations, "several days" in disciplinary confinement is insufficient to trigger a liberty interest in his disciplinary hearing. *See Washington v. Fitzpatrick*, No. 20-CV-911, 2021 WL 966085, at *9 (S.D.N.Y. Mar. 15, 2021) (holding that the plaintiff's allegation that he was sentenced to 30 days in keeplock confinement, during which he was denied various privileges such as phone calls, television, and commissary access, did "not plausibly plead a liberty interest"); *Ruggiero v. Way*, No. 19-CV-3631, 2020 WL 5126112, at *9 (S.D.N.Y. Aug. 31, 2020) (holding that where the plaintiff alleged he was confined to SHU for 30 days, without "any allegation that he endured unusual SHU conditions during his confinement," the plaintiff "ha[d] not pleaded deprivation of a cognizable interest in liberty"); *Brown v. Murphy*, No. 16-CV-710, 2019 WL 2325777, at *2–3 (S.D.N.Y. May 30, 2019) (holding that the plaintiff's 30-day period in keeplock confinement did

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 674 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

not constitute an atypical and significant hardship where the complaint was "devoid of any allegations of the conditions of his keeplock confinement"); *Colon*, 344 F. Supp. 3d at 633–34 (dismissing due process claim where the plaintiff alleged that he was sentenced to 30 days in keeplock confinement and failed to "allege any facts suggesting that he was exposed to any conditions of confinement more harsh than typical keeplock"). Accordingly, Plaintiff has failed to allege a liberty interest based on his time in disciplinary confinement.

[8]     Plaintiff has attached to his Complaint a document labeled "Disciplinary Hearing Officers Report." (*See* Compl. 18.) Under a section labeled "Confinement Sanctions Imposed," the document indicates that Plaintiff was sentenced to keeplock confinement, (*see id.*), which is "a type of residential segregation," *Brown v. Markham*, No. 16-CV-710, 2018 WL 1918625, at *1 (S.D.N.Y. Apr. 20, 2018). Although the number of days to which he was sentenced appears to be 22, because the writing is almost illegibly faint, the Court cannot determine with certainty how long Plaintiff was confined in keeplock.

**\*13** Plaintiff also alleges, however, that he suffered a "loss of good time," (Compl. 10), and the Disciplinary Hearing Officers Report attached to his Complaint indicates that he did lose a certain number of days of his good-time behavior allowance, (*see id.* at 18). It is well-established that "the loss of good time credit can implicate a liberty interest." *Jenkins v. Cordero*, No. 17-CV-1592, 2018 WL 456311, at *4 (S.D.N.Y. Jan. 17, 2018) (citing *Wolff*, 418 U.S. at 556–57); *see also, e.g.*, *Gulley v. Roach*, No. 02-CV-908, 2004 WL 2331922, at *5 (W.D.N.Y. Oct. 15, 2004) ("Loss of good time credits implicates a prisoner's liberty interest."). Thus, Plaintiff's allegation that he lost good time credits, which is corroborated by the document attached to his Complaint, is sufficient to establish a liberty interest in his disciplinary proceedings. *See, e.g.*, *Rivers v. Paige*, No. 12-CV-6593, 2014 WL 897094, at *3 (W.D.N.Y. Mar. 6, 2014) (holding that the plaintiff adequately alleged a liberty interest in his disciplinary hearing based on allegation that he had "lost 30 days of good time credit").

But while Plaintiff has adequately alleged a liberty interest in his disciplinary hearing, his allegations regarding procedural deficiencies are too vague and conclusory to establish a procedural due process claim. As noted, Plaintiff alleges merely that Roberts "denied" his "repeat[ed] request[s]" to "present audio and video evidence, as well as to call

witnesses." (Compl. 10.) Courts have held that such vague, conclusory allegations are insufficient to establish the second prong of a procedural due process claim. *See McFadden v. Annucci*, No. 18-CV-6684, 2021 WL 463829, at *9 (S.D.N.Y. Feb. 9, 2021) ("Simply alleging that he was denied the right to call witnesses, present documents or to 'confront accusations' is wholly conclusory and does not state a claim upon which relief can be granted."); *Banks v. Royce*, No. 18-CV-4738, 2020 WL 5038590, at *4 (S.D.N.Y. Aug. 26, 2020) (concluding that the plaintiff's allegation—that the defendants "denied [him] [his] procedural due process when they prevented [him] from presenting evidence in the form of witnesses and documents"—was "the type of 'unadorned, the-defendant-unlawfully-harmed-me' allegation" that is insufficient to state a claim (citations omitted)); *see also Rush v. Canfield*, 649 F. App'x 70, 71 (2d Cir. 2016) (summary order) (holding that the plaintiff's "assertion that he was 'denied the right to call witnesses' " was "a bare legal conclusion incapable of surviving a motion to dismiss" (citation omitted)). Likewise, Plaintiff's allegation that Roberts was improperly swayed by the warden's office, (*see* Compl. 10–11), is merely a "[c]onclusory allegation[ ] of bias," which "[is] not enough to show that a plaintiff received constitutionally insufficient process," *Banks*, 2020 WL 5038590, at *4 (collecting cases); *see also Fabricio v. Griffin*, No. 16-CV-8731, 2019 WL 1059999, at *9 (S.D.N.Y. Mar. 6, 2019) (holding that the plaintiff's "conclusory allegation[ ]" that the hearing officer was biased failed to state a procedural due process claim).

Accordingly, the Court dismisses the Roberts Procedural Due Process Claim.

### b. The Spaulding/Middleton Procedural Due Process Claim

As discussed, Plaintiff also alleges that the outcome of his "appeals to Defendants Spaulding and Middleton's office [was] improper and unjust." (Compl. 11.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional deprivation." *Falls v. Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *31 (S.D.N.Y. Mar. 26, 2021) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)) (alteration omitted). There has been a long-running split in the Second Circuit as to "whether an allegation that a defendant affirmed a disciplinary proceeding is sufficient to establish" that defendant's personal involvement in the

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 675 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

underlying constitutional violation. *Samuels v. Fischer*, 168 F. Supp. 3d 625, 643 (S.D.N.Y. 2016) (surveying authority on both sides) (alterations and quotation marks omitted). Relying on the Second Circuit's 2020 decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)—which eliminated special standards for supervisory liability and required that alleged constitutional violations be "established against the supervisory official directly," *id.* at 618—at least two courts in this District have found that a defendant's "fail[ure] to correct another officer's violation" at a prison disciplinary hearing "does not suffice" to establish that defendant's personal involvement in the alleged constitutional violation, *Washington*, 2021 WL 966085, at *10 (alteration and citation omitted); *see also Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) (dismissing due process claim based on the hearing officer's "deni[al] [of the] [p]laintiff's administrative appeal" because, under *Tangreti*, such an allegation "cannot support the inference" that the officer was personally involved in the alleged constitutional violation). Thus, even if Roberts had committed a constitutional violation at Plaintiff's disciplinary hearing, it seems doubtful that Plaintiff could state a claim against Spaulding and Middleton based on their affirmance of Roberts' determination. But the Court need not resolve the claim against Spaulding and Middleton on this basis. Here, given "the absence of any underlying constitutional violation" at Plaintiff's disciplinary hearing to begin with, "Plaintiff cannot maintain a cause of action against Defendant[s] [Spaulding and Middleton] based on" their affirmance of Roberts' determination. *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, at *13 (N.D.N.Y. Sept. 11, 2014); *see also Barnes v. Annucci*, No. 15-CV-777, 2019 WL 1387460, at *15 (N.D.N.Y. Mar. 12, 2019) (explaining that "because no constitutional violation occurred" at the plaintiff's disciplinary hearing, "and there was no wrong to remedy," the plaintiff could not state a due process claim against a defendant based on his affirmance of the disciplinary determination), *report and recommendation adopted*, 201 WL 1385297 (N.D.N.Y. Mar. 27, 2019).

**\*14** For these reasons, the Court also dismisses the Spaulding/Middleton Procedural Due Process Claim.

### 6. The *Monell* Claim

To the extent Plaintiff intends to assert a claim against the County pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), his claim fails. "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690–91). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). In other words, a municipality may not be held liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S 469, 478 (1986) (italics omitted). Rather, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008). A plaintiff may satisfy the fifth element by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). Moreover, a plaintiff also must establish an "affirmative" causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985).

Here, the Complaint is utterly devoid of any allegations that would establish the fifth element of a *Monell* claim. (*See*

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 676 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

*generally* Compl.) Plaintiff does not allege, for example, that the County officially endorsed a formal policy of retaliating against inmates who file grievances, or of depriving them of procedural due process at disciplinary hearings. *Brandon, 705 F. Supp. 2d at 276.* Nor does he describe actions by "government officials responsible for establishing the policies that caused the particular deprivation in question," or a "practice so consistent and widespread" that it "constitutes a custom or usage of which a supervising policy-maker must have been aware." *Id.* at 276–77. Likewise, the Complaint says nothing with respect to the County's alleged failure "to provide adequate training or supervision to subordinates." *Id.* at 277. Because Plaintiff offers no allegations to establish the fifth element of a municipal liability claim, any such claim must be dismissed. *See Jackson v. Westchester County, No. 18-CV-7207, 2019 WL 3338020, at *4 (S.D.N.Y. July 25, 2019)* (dismissing *Monell* claim where the plaintiff failed to "allege the existence of any policy, any actions taken or decisions made by any ... policymaking officials, any systemic failures to train or supervise, or any practices so widespread that they practically have the force of law" and failed to "provide any factual details regarding ... other [purported] lawsuits and grievances" on similar issues (collecting cases)); *see also McKenzie v. City of Mount Vernon, No. 18-CV-603, 2018 WL 6831157, at *7 (S.D.N.Y. Dec. 28, 2018)* (dismissing *Monell* claim where the plaintiff did "not allege any facts suggesting a policy or custom that led to [the] alleged" constitutional deprivation); *5 Borough Pawn, LLC v. City of New York, 640 F. Supp. 2d 268, 300 (S.D.N.Y. 2009)* (dismissing *Monell* claim where the "plaintiffs fail[ed] to allege any facts showing that there is a [municipal] policy—unspoken or otherwise—that violates the Federal Constitution").

### III. Conclusion

**\*15**  For the reasons stated above, the Court dismisses the Grievance Claim, the Mabra Retaliation Claim, the Excessive Force Claim, the Failure to Intervene Claim, the Procedural Due Process Claims, and the *Monell* Claim. The Vanlierop Retaliation Claim survives.

Because this is the first adjudication of Plaintiff's claims on the merits, the dismissed claims are dismissed without prejudice. Plaintiff may file an amended complaint within 30 days of the date of this Opinion & Order. The amended complaint should contain appropriate changes to remedy the deficiencies identified in this Opinion & Order. Plaintiff is advised that the amended complaint will replace, not supplement, the instant Complaint, and therefore must contain all of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the instant Motion, (Dkt. No. 28), and mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4392485

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 677 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

2019 WL 8015209
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Seth LOGAN, Plaintiff,

v.

Superintendent GRAHAM, Auburn Correctional
Facility; C.O. Pflueger, Auburn Correctional
Facility; Officer Scott Jones, Auburn Correctional
Facility, formerly known as C.O. Smith; and C.O.
M. Gould, Auburn Correctional Facility, Defendants.

9:18-CV-0291 (DNH/ML)
|
Signed 11/26/2019

**Attorneys and Law Firms**

SETH LOGAN, Plaintiff, Pro Se, 117 Avery Avenue, Buffalo, New York 14210.

LETITIA A. JAMES, OF COUNSEL: AIMEE COWAN, ESQ., Assistant Attorney General, Attorney General for the State of New York, Counsel for Defendants, 300 South State Street, Suite 300, Syracuse, New York 13202.

**REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

 **\*1** This matter has been referred to me for a Report and Recommendation by the Honorable David N. Hurd, United States District Judge. Currently before the Court, in this civil rights action filed by Seth Logan ("Plaintiff") against Superintendent Graham, Auburn Correctional Facility, C.O. Pflueger, [1] Auburn Correctional Facility, Officer Scott Jones, Auburn Correctional Facility, formerly known as C.O. Smith, and C.O. M. Gould, Auburn Correctional Facility (collectively "Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 28). For the reasons set forth below, I recommend that Defendants' motion be granted in part and denied in part.

[1]    The Court notes that Defendants sometimes refer to Defendant Pflueger as Defendant "Plfueger" or "Pfleuger." (*See* Dkt. No. 28, Attach. 1; Dkt. No. 28, Attach. 3; Dkt. No. 28, Attach. 10.) However,

for the sake of consistency, the Court will refer to him as Defendant Pflueger, as reflected on the docket. (*See generally* docket sheet.)

**TABLE OF CONTENTS**

I. RELEVANT BACKGROUND...——
A. Plaintiff's Claims...——

B. Procedural History...——

C. Statement of Undisputed Material Facts...——

D. Parties' Briefing on Defendants' Motion for Summary Judgment...——

II. RELEVANT LEGAL STANDARDS...——
A. Standard Governing a Motion for Summary Judgment...——

B. Standard Governing Exhaustion of Administrative Remedies...——

III. ANALYSIS...——
A. Plaintiff's Failure to Oppose the Merits of Defendants' Summary Judgment Motion...——

B. Exhaustion of Grievances AUB-67199-15 and AUB-67567-15...——

C. Whether Plaintiff's First Amendment Retaliation Claims Should Nevertheless be Dismissed...——

D. Doctrine of Qualified Immunity...——

**I. RELEVANT BACKGROUND**

 **A. Plaintiff's Claims**
Generally, liberally construed, Plaintiff's Complaint asserts claims of retaliation against Defendants in violation of the First Amendment. (Dkt. No. 1; Dkt. No. 6.) The Court's Decision and Order dated May 4, 2018, thoroughly outlines Plaintiff's allegations and claims. (Dkt. No. 6.)

 **B. Procedural History**

2019 WL 8015209

On March 8, 2018, Plaintiff commenced this action by filing a verified Complaint against Defendants, Lieutenant Vasill, and Lieutenant Abate (Dkt. No. 1) together with a motion for leave to proceed *in forma pauperis* (Dkt. No. 2). On May 4, 2018, the Court granted Plaintiff's motion to proceed *in forma pauperis*. (Dkt. No. 6.) In addition, the Court ordered that Plaintiff's retaliation claims against Defendants survive *sua sponte* review, but the Court dismissed Plaintiff's remaining claims including those against Lieutenant Vasill and Lieutenant Abate. (*Id.*)

On January 25, 2019, Defendants filed a letter motion requesting dismissal for failure to prosecute. (Dkt. No. 27.) On March 6, 2019, Defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 and a motion to dismiss for lack of prosecution. (Dkt. No. 28.) These motions were referred to United Stated Magistrate Judge David E. Peebles for a Report and Recommendation. On March 27, 2019, Magistrate Judge Peebles issued a Report and Recommendation, which recommended that (1) the Complaint be dismissed based on Plaintiff's failure to prosecute and to comply with the Court's orders and local rules of practice, and (2) that Defendants' motion for summary judgment be denied as moot. (Dkt. No. 30.) On April 15, 2019, Plaintiff filed a change of address with the Court. (Dkt. No. 32.) As a result, on April 15, 2019, United States District Judge David N. Hurd *sua sponte* granted an extension of time to file objections to United Stated Magistrate Judge David E. Peebles's Report-Recommendation of March 27, 2019. (Dkt. No. 33.) Plaintiff did not file any objections to the Report-Recommendation dated March 27, 2019. (*See generally* Docket Sheet.)

**\*2** On July 3, 2019, the Court denied Defendants' motion to dismiss and referred to me for consideration of Defendants' motion for summary judgment. (Dkt. No. 35.) On July 3, 2019, Plaintiff was provided another opportunity to oppose Defendants' motion with a response due by August 20, 2019, and a reply due by August 26, 2019. (*See* text notice dated 7/3/19.) On September 9, 2019, the Court issued a text order granting Plaintiff yet another opportunity to oppose Defendants' motion with a deadline of September 30, 2019. (Dkt. No. 37.)

On October 1, 2019, Plaintiff filed a response in opposition to Defendants' motion. (Dkt. No. 39.)

**C. Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Rule 7.1 Statement and not denied by Plaintiff in a Rule 7.1 Response. (*Compare* Dkt. No. 28, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 39 [Pl.'s Response].)

1. Plaintiff was convicted in 2009 of Attempted Assault in the First and Second Degree.

2. All claims in this matter arose out of Plaintiff's confinement at Auburn Correctional Facility ("Auburn"), as a result of his felony convictions in 2009.

3. Plaintiff was released from prison to the Division of Parole on January 7, 2019. [2]

[2]   The Court notes that the citation provided by Defendants for this fact does not support the fact asserted. *See* New York State Dep't of Corr. And Comty. Servs., http:// nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/ WINQ130 (last visited November 25, 2019). However, the Court deems the fact admitted because Plaintiff failed to deny it. *Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist.*, 327 F. Supp. 3d 477, 485 n.2 & n.13 (N.D.N.Y. 2018) (Suddaby, C.J.) ("where a non-movant neither admits nor disputes a fact, the response is deemed an admission"); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding the plaintiff's responses to the defendant's statement of material facts not in dispute where the plaintiff's response paragraphs did not specifically dispute the defendant's statements or consisted of "conclusory allegations, speculation, or conjecture."); *In re Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) (stating that, "a response contending to neither admit or deny an allegation does not create a genuine issue of fact"); *accord, Piacente v. Int'l Union of Bricklayers & Allied Craftworkers*, 11-CV-1458, 2015 WL 5730095, at *2 n.3 (S.D.N.Y. Sept. 30, 2015).

4. In his Complaint, Plaintiff claims that on May 9, 2015, Defendant Pflueger stopped Plaintiff in the Auburn recreation yard, accused Plaintiff of being a white supremacist and stated that he would be searching Plaintiff's cell for gang material.

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

5. Plaintiff alleges that the next day, on May 10, 2015, Defendant Pflueger threatened him while Plaintiff was exiting his cell, stating that Plaintiff "ain't gonna be around here for long. They're gonna get you. We're not sure how yet or for what, but it's gonna happen."

6. According to Plaintiff, Defendant Pflueger did not make any specific threats about anything that he specifically was going to do to Plaintiff.

7. Plaintiff filed a grievance on May 10, 2015, complaining about the alleged incident of May 9, 2015.

8. Defendant Pflueger responded to the grievance by memo and stated that he stopped Plaintiff in the yard on May 9, 2015 after observing tattoos that could be interpreted as gang affiliation tattoos.

9. Defendant Pflueger stated that he passed the information on to the Early Warning Box—which is an avenue to convey information to Auburn Correctional Facility's intelligence unit—and denied threatening or harassing Plaintiff in any way.

*3 10. Plaintiff alleges that over a month later, on June 17, 2015, Defendant Pflueger fired Plaintiff from his job as a feed up porter.

11. Plaintiff was employed as a feed up porter at Auburn for approximately one month until he was terminated on June 17, 2015.

12. A feed up porter's duties include retrieving food trays from the mess hall and feeding inmates who are confined to their cell for disciplinary reasons.

13. On the morning of June 17, 2015, Defendant Pflueger witnessed Plaintiff pass an unidentified item into the cell of another inmate.

14. Defendant Pflueger ordered Plaintiff to return to his cell.

15. Plaintiff yelled profanities as he went back to his cell.

16. While in his cell, Plaintiff yelled "that faggot motherfucker fired me."

17. Plaintiff shouted these profanities loud enough to communicate with another inmate on a different floor.

18. Plaintiff alleges that Defendant Pflueger fired him as a feed up porter in retaliation for the grievance that Plaintiff filed dated May 10, 2015.

19. Plaintiff's only basis for this belief is that there was "no other reason" for Defendant Pflueger to fire him.

20. Based on Plaintiff's behavior on the morning of June 17, 2015, Defendant Pflueger authored a misbehavior report dated June 17, 2015, that charged Plaintiff with several DOCCS Directive violations including disobeying a direct order, creating a disturbance, harassment, and making threats.

21. Defendant Correction Officer Scott Jones endorsed the misbehavior report as a witness to a portion of these events.

22. At the time Defendant Jones endorsed the misbehavior report dated June 17, 2015, he had no knowledge that Plaintiff had filed a grievance against Defendant Pflueger on May 10, 2015.

23. Plaintiff testified that he had never interacted with Defendant Jones before this incident on June 17, 2015.

24. Plaintiff testified that he had no basis to believe that at the time Defendant Jones endorsed the misbehavior report, Defendant Jones knew that Plaintiff had filed any grievances against Defendant Pflueger.

25. Plaintiff filed a grievance regarding the incident on June 17, 2015, but that grievance was denied.

26. Defendant Pflueger was never counseled or disciplined as a result of the incident on June 17, 2015.

27. As a result of the misbehavior report dated June 17, 2015, Plaintiff was found guilty of all charges at a disciplinary hearing and sentenced to 30 days of keep-lock confinement.

28. Plaintiff filed another grievance dated July 21, 2015, which alleged that on July 8, 2015, he received a false report authored by Defendant Correction Officer Mark Gould in which, Defendant Gould recommended Plaintiff be placed in administrative segregation.

29. Defendant Gould recommended that Plaintiff be placed in administrative segregation based on information he received from confidential informants, that Plaintiff planned to assault

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 680 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

Defendant Pflueger when he was released from keep-lock confinement.

30. Plaintiff was given a hearing with respect to whether he should be in administrative segregation.

31. Plaintiff agreed with the recommendation to be placed in administrative segregation.

32. Plaintiff did not know Defendant Gould prior to his recommendation that Plaintiff be placed in administrative segregation.

**\*4** 33. Plaintiff testified that he believed Defendant Gould made the recommendation to place Plaintiff in administrative segregation on behalf of Defendant Pflueger in retaliation for Plaintiff's grievances, because "there [was] no other reason [for Defendant Gould] to do it."

34. Plaintiff admitted he has no direct evidence that Defendant Gould recommended administrative segregation based on the grievances filed by Plaintiff against Defendant Pflueger.

35. Plaintiff has no evidence that Defendant Gould even knew about any grievances filed by Plaintiff against Defendant Pflueger.

36. Plaintiff is not aware of any conversations that Defendant Gould had with Defendant Pflueger in which they discussed that Defendant Gould should file an administrative segregation recommendation based on false information.

37. Plaintiff also alleged that after he was removed from his cell in the Special Housing Unit on July 9, 2015, items went missing after another inmate witnessed Defendant Pflueger enter Plaintiff's cell.

38. Defendant Pflueger did not pack Plaintiff's cell and he did not remove any of Plaintiff's property.

39. The only basis for Plaintiff's contention that Defendant Pflueger destroyed his property is that Michael Betters, another inmate, reported seeing Defendant Pflueger enter Plaintiff's cell.

40. According to Plaintiff, Michael Betters could not actually see Defendant Pflueger in Plaintiff's cell.

41. Further, Plaintiff does not know who transported his property to his new cell in the Special Housing Unit.

42. Plaintiff filed another grievance alleging that on August 4, 2015, and August 6, 2015, Defendant Pflueger threatened Plaintiff while he was training another officer.

43. Defendant Pflueger responded to the grievance and affirmed that on August 4, 2015, and August 6, 2015, he showed various new officers the Special Housing Unit area, but they did not stop at Plaintiff's cell and he certainly never made any threatening or harassing statements to Plaintiff.

44. Plaintiff testified that at no point during his incarceration did Defendant Pflueger use any force against him.

45. Plaintiff is not alleging any physical injuries with respect to any of his claims.

46. The only basis on which Plaintiff brings retaliation claims against Defendant Graham is because he denied Plaintiff's grievances and allowed Defendant Pflueger's behavior to continue.

47. Other than the grievances he filed, Plaintiff never sent Defendant Graham any other correspondence about these incidents and he never spoke with Defendant Graham in person about them.

Exhaustion of Administrative Remedies

48. Plaintiff was familiar with the grievance process at Auburn Correctional Facility during the relevant time period.

49. Plaintiff was aware of how to properly file a grievance and where to appeal if he disagreed with the decision.

50. More specifically, Plaintiff was aware that a grievance must be submitted to the Inmate Grievance Review Committee ("IGRC") and a decision by the IGRC could be appealed to the Superintendent.

51. Further, Plaintiff was aware that a decision by the Superintendent could be appealed to the Central Office Review Committee ("CORC").

52. Plaintiff testified that if an inmate does not receive a response to his appeal to CORC, he must write to CORC and inquire as to the status of his appeal.

**\*5** 53. Plaintiff filed Grievance AUB-67199-15, in which he complained that he was "labeled a gang member" by Defendant Pflueger.

54. After an investigation, the Superintendent denied Plaintiff's grievance and Defendant Pflueger was never counseled or disciplined.

55. Plaintiff also filed Grievance AUB-67567-15, in which he complained that on July 8, 2015, he received a false report authored by Defendant Gould in which Defendant Gould recommended Plaintiff be placed in administrative segregation.

56. Grievance AUB 67567-15 also alleged that after Plaintiff was removed from his cell in the Special Housing Unit on July 9, 2015, items went missing after another inmate witnessed Defendant Pflueger packing Plaintiff's cell.

57. Defendant Graham denied Plaintiff's Grievance AUB-67567-15.

### D. Parties' Briefing on Defendants' Motion for Summary Judgment

#### 1. Defendants' Memorandum of Law

Generally, in support of their motion for summary judgment, Defendants assert three arguments. (*See generally* Dkt. No. 28, Attach. 3 [Defs.' Mem. of Law].)

First, Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to grievances AUB-67199-15 and AUB-675667-15. (*Id.*) More specifically, Defendants argue that the Prison Litigation Reform Act requires prisoners who bring a lawsuit in federal court to first exhaust their available administrative remedies; this requirement is mandatory such that, failure to comply subjects the complaint to dismissal.[3] (*Id.*) Further, Defendants argue that the New York State Department of Corrections and Community Services ("DOCCS") has the following three-tiered administrative review and appeals process for prisoner grievances: (1) review by the IGRC, (2) appellate review of the IGRC decision by the prison superintendent, and (3)

appellate review of the prison superintendent by CORC. (*Id.*) Defendants argue that Plaintiff failed to appeal the prison superintendent's decision with respect to grievances AUB-67199-15 and AUB-675667-15, to CORC and thus, the claims contained in those grievances should be dismissed for Plaintiff's failure to exhaust his administrative remedies. (*Id.*)

3    Defendants acknowledge that there are "certain caveats" to the PLRA's exhaustion requirement, however Defendants argue that those caveats are inapplicable here.

Second, Defendants argue that Plaintiff's first amendment retaliation claims should be dismissed because (a) with respect to Defendant Pflueger, (i) he lacks authority to "fire" an inmate from his job, (ii) the record lacks any evidence of a causal connection between Plaintiff's grievance of May 10, 2015, and the misbehavior report of June 17, 2015, except temporal proximity, which is insufficient to survive a motion for summary judgment, (iii) the misbehavior report of June 17, 2015, was truthful and Plaintiff admitted that he was appropriately charged with creating a disturbance and harassment, (iv) Defendants presented non-retaliatory reasons for Defendant Pflueger "firing" Plaintiff from his porter duties and authoring the misbehavior report of June 17, 2015, (v) the alleged verbal harassment and threats are not considered adverse actions for purposes of retaliation, (vi) even if the alleged verbal harassment and threats did constitute an adverse action, Plaintiff failed to demonstrate any evidence of a causal connection, (vii) there is no evidence of a causal connection between Defendant Gould's recommendation that Plaintiff be placed in administrative segregation and Plaintiff's grievances filed against Defendant Pflueger, (viii) there is no evidence that Defendant Pflueger removed or destroyed Plaintiff's property, and (ix) there is no evidence of a causal nexus between the grievances he filed and Defendant Pflueger allegedly destroying his property; (b) with respect to Defendant Jones, (i) there is no evidence that he had any knowledge that Plaintiff filed a grievance against Defendant Pflueger, and (ii) the record is devoid of any evidence establishing why he would file a false misbehavior report against Plaintiff on behalf of Defendant Pflueger; (c) with respect to Defendant Gould, (i) Plaintiff agreed with the recommendation that he remain in administrative segregation, (ii) there is no evidence in the record to support a causal connection between Plaintiff's grievance against Defendant Pflueger on May 10, 2015, and Defendant Gould's administrative segregation recommendation on July 21, 2015, and (iii) there is no evidence that Defendant Gould was aware of Plaintiff's grievance against Defendant Pflueger; and (d)

2019 WL 8015209

with respect to Defendant Graham, (i) in the event that the claims against Defendants Pflueger, Jones, and Gould are dismissed, the claims against Defendant Graham must also be dismissed because there is no supervisor liability where there is no established underlying constitutional violation, and (ii) even if the claims against Defendants Pflueger, Jones, and Gould are not dismissed, the claims against Defendant Graham still should be dismissed because he was not personally involved in the alleged constitutional violations. (*Id.*)

**\*6** Third, Defendants argue that, in the alternative, they are entitled to dismissal pursuant to the doctrine of qualified immunity. (*Id.*)

### 2. Defendants' First Supplemental Letter Brief

Generally in their first supplemental letter brief, Defendants re-assert the arguments set forth in their memorandum of law and assert that (1) Plaintiff has repeatedly failed to oppose Defendants' motion despite being provided with notice of the consequences of failing to respond to the motion two times, and (2) as a result of Plaintiff's failure to respond, the Court should deem (a) Defendants' factual assertions as true, and (b) Plaintiff to have consented to the legal arguments contained in Defendants' memorandum of law. (Dkt. No. 36.)

### 3. Defendants' Second Supplemental Letter Brief

Generally in their second supplemental letter brief, Defendants re-assert the arguments set forth in their memorandum of law and assert that (1) Plaintiff sent Defendants a "Response to Dispositive Motions," which incorrectly indicated that Defendants' motion is based solely on Plaintiff's timeliness and otherwise failed to address Defendants' arguments as to the merits of his claims, (2) Plaintiff has now failed to oppose Defendants' motion three times after receiving notice that his response was required, and (3) despite Plaintiff's request in his response for additional time to respond, the Court should not grant this request because their motion has been pending for nearly one year and Plaintiff "has been given great latitude with respect to the Court's deadlines in this matter." (Dkt. No. 38.)

### 4. Plaintiff's "Response to Dispositive Motions"

Generally, in opposition to Defendants' motion for summary judgment, Plaintiff acknowledged his failure to meet deadlines and asked that the Court consider "many mitigating factors that have contributed to this short coming" including his release from prison, the requirements of his parole, and his criminal history. (Dkt. No. 39.) In addition, Plaintiff asserts that "all these Motions to Dismiss this complaint have been based on timeliness." (*Id.*) Plaintiff did not file a response to Defendants' Statement of Material Facts, an affidavit setting forth any factual assertions, an opposition memorandum of law, or any document that responded to Defendants' legal arguments. (*See generally* Dkt. No. 39.) In addition, Plaintiff did not request any additional time to provide a more thorough response to Defendants' motion. (*Id.*)

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [4] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[4]    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

**\*7** In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317,

2019 WL 8015209

323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute—even if that non-movant is proceeding *pro se.* [5] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [6] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [7]

[5]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[6]     *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[7]     *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [8] – even when the non-movant was proceeding *pro se.* [9]

[8]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[9]     *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan,* 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [10] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[10]     *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

**B. Standard Governing Exhaustion of Administrative Remedies**

**\*8**  The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford*, 548 U.S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

In accordance with the PLRA, DOCCS has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[11] First, an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[12] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's IGRC has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to

the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. Third, a grievant may appeal to CORC within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

11    *See also Murray v. Palmer*, 03-CV-1010, 2010 WL 1235591, at \*1 & n.1 (N.D.N.Y. Mar. 31, 2010) (citation omitted) (Suddaby, J.).

12    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

In addition, "[t]he regulations [ ] provide that if the plaintiff does not get a 'receipt' from the CORC within 45 days of the date he filed his appeal, he should contact the IGP to make sure that his appeal was 'received.' " *Bell v. Napoli*, 17-CV-0850, 2018 WL 6506072, at \*5 (N.D.N.Y. Dec. 11, 2018) (Baxter, M.J.) (citing 7 N.Y.C.R.R. § 701.5(d)(3)(i)).

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[13] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can–and must–be appealed to the next level, including CORC, to complete the grievance process.[14]

13    *See Murray*, 2010 WL 1235591, at \*2 & n.3 (citing *Groves v. Knight*, 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009), an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight*, No. 09-3641, Mandate (2d Cir. Filed Jan. 15, 2010)).

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 685 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

14    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray*, 2010 WL 1235591, at *2 & n.4 (collecting cases).

**\*9** Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford*, 548 U.S. at 93; *Porter*, 534 U.S. at 524; *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure to exhaust does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004), *accord, Ruggiero*, 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted]. [15]

15    The Court notes that the Supreme Court recently eliminated this third inquiry, and courts are no longer permitted to excuse a prisoner's failure to exhaust his administrative remedies because of "special circumstances." *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016).

## III. ANALYSIS

### A. Plaintiff's Failure to Oppose the Merits of Defendants' Summary Judgment Motion

Before turning to the merits of Defendants' motion, a threshold issue to be addressed is the legal significance of Plaintiff's failure to oppose the merits of Defendants' motion.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose Defendants' motion, Plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, Plaintiff has not responded to the merits of Defendants' motion. The motion was properly filed by Defendants, and Defendants through their motion have met their burden of demonstrating entitlement to some of the relief requested. With respect to the question of whether Defendants have met their burden, I note that the "burden of persuasion is lightened such that, in order to succeed, [their] motion need only be 'facially meritorious.' " *See Rodriguez v. Goord*, 04-CV-0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., adopting Report-Recommendation on clear error review) (finding that determination of whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).

Because Defendants have accurately cited both proper legal authority and evidence in the record supporting the grounds on which their motion is based with respect to Defendants Jones and Gould as set forth below, and Plaintiff has failed to respond in opposition to the merits of the motion for summary judgment, I find that Defendants' motion is

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 686 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

facially meritorious. *Jackson*, 766 F.3d at 194. Accordingly, I recommend that the Court grant Defendants' motion with respect to Defendants Jones and Gould on this basis.

**\*10** It should also be noted that there are additional consequences flowing from Plaintiff's failure to file an opposition to Defendants' Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.*, 99-CV-0611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, 96-CV-0169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J., adopting Report-Recommendation on clear error review.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, 09-CV-0308, 2011 WL 1103045, at \*1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because Plaintiff was warned of the consequences of failing to properly respond to Defendants' Local Rule 7.1 Statements (Dkt. No. 28 at 2; text notice dated July 3, 2019), and he has failed to do so, I recommend that the Court deem the facts contained in Defendants' Local Rule 7.1(a)(3) Statements as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche*, 2011 WL 1103045, at \*1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in Defendants' Local Rule 7.1(a)(3) Statements, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry*, 336 F.3d at 137.

### B. Exhaustion of Grievances AUB-67199-15 and AUB-67567-15

There is no dispute in this case that Plaintiff filed grievances AUB-67199-15 dated May 10, 2015, and AUB-67567-15

dated July 21, 2015, and that he appealed the denial of these grievances to the facility superintendent. The parties only dispute whether Plaintiff completed the third step in the grievance process by appealing to CORC.

Defendants submitted proof in admissible form by way of an affidavit from Rachael Seguin, the custodian of the records maintained by CORC. (Dkt. No. 28, Attach. 16.) In her affidavit, Ms. Seguin stated that she searched record appeals received by CORC filed by Plaintiff, and her search revealed "no appeal for Grievance AUB-67199-15" and "no appeal for Grievance AUB-67567-15." (*Id.* at ¶¶11-12.)

However, with respect to grievance AUB-67199-15, Plaintiff alleged in his verified Complaint [16] that "[o]n [July 3, 2015, he] received [the denial from the Superintendent] and requested that it be appealed to the Central Office Review Committee." (Dkt. No. 1 at 5.) Similarly, Plaintiff testified that after receiving the denial of his grievance from the Superintendent, he appealed to CORC. (Dkt. No. 28, Attach. 5 at 46.) Moreover, Plaintiff alleged in his verified Complaint that on August 15, 2015, he "composed a letter to the C.O.R.C. Inmate Grievance Program Supervisor Karen Bellamy inquiring as to whether or not request for appeal was received." (Dkt. No. 1 at 5.) Likewise, Plaintiff testified that he wrote a letter to CORC asking about the status of his appeal. (Dkt. No. 28, Attach. 5 at 46.) Furthermore, Plaintiff alleged in his verified Complaint that on September 2, 2015, he "composed a letter to Auburn C.F. I.G.P. Supervisor Cheryl Parmiter inquiring as to whether or not [his] appeal was submitted as requested." (Dkt. No. 1 at 5.) Similarly, Plaintiff testified that "I believe that one I never received a response from Central Office. So I wrote Albany's – Auburn's I.G.R.C. and asked them what happened and they said they never received an appeal." (Dkt. No. 28, Attach. 5 at 46.)

16      "Although 'a plaintiff's pro se status does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment,' *Almonte v. Florio*, 02-CV-6722, 2004 WL 60306, at \*3 n.10 (S.D.N.Y. Jan. 13, 2004) (citation and italics omitted), where a plaintiff 'verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true and to the best of his knowledge,' the 'verified complaint is to be treated as an affidavit for summary judgment purposes,' *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 687 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

1995).” *King v. Puershner*, 17-CV-1373, 2019 WL 4519692, at *1 n.1 (S.D.N.Y. Sept. 19, 2019).

**\*11** In addition, with respect to grievance AUB-67567-15, Plaintiff alleged in his verified Complaint that “[o]n [August 15, 2015, he] received [the denial from the superintendent] and requested that it be appealed to the C.O.R.C.” (Dkt. No. 1 at 6.) Moreover, Plaintiff's verified Complaint alleged that on September 29, 2015, he “composed another letter to C.O.R.C.'s I.G.P. Supervisor Karen Bellamy informing her of all grievances he was awaiting decisions on ... as he hadn't yet received receipt of appeal for this grievance.” (Dkt. No. 1 at 6.)

Generally, conclusory allegations that an inmate appealed the superintendent's grievance denial to CORC are insufficient to withstand a motion for summary judgment. *See Gibbs v. Gadway*, 19-CV-0281, 2019 WL 5191506, at *3 (N.D.N.Y. Oct. 15, 2019) (Stewart, M.J.) (recommending dismissal based on the plaintiff's failure to exhaust his administrative remedies where the plaintiff made “a purely conclusory allegation that he appealed the grievance denial to CORC.”).

However, the case law implies that where a plaintiff sets forth the date that he or she appealed the grievance to CORC, that may be enough to survive a motion for summary judgment. *C.f. Gibbs v. Gadway*, 19-CV-0281, 2019 WL 5191506, at *3 (N.D.N.Y. Oct. 15, 2019) (Stewart, M.J.) (recommending dismissal of the plaintiff's claims for failure to exhaust his administrative remedies where the plaintiff “has not provided a copy of the grievance appeal or even asserted what date he filed the appeal.”); *Gough v. Morris*, 16-CV-1107, 2018 WL 7199494, at *3 (N.D.N.Y. Dec. 14, 2018) (Stewart, M.J.) (recommending dismissal based on the plaintiff's failure to exhaust his administrative remedies where he testified that he appealed the superintendent's response to CORC but there was no evidence in the record that (a) the grievance or the superintendent's response were appealed to CORC and, (b) despite not receiving a response from CORC, the plaintiff testified that he did not write to CORC to follow-up); *Campbell v. Prue*, 16-CV-0004, 2018 WL 4635708, at *5 (N.D.N.Y. July 3, 2018) (Hummel, M.J.) (“Although [the plaintiff] alleges that he filed [a] grievance ..., plaintiff does not state when he filed such grievance.... Further, plaintiff has not provided a copy of the alleged grievance or the Marcy IGRC's denial of that grievance.”); *Toliver v. Stefinik*, 12-CV-0077, 2016 WL 3349316, at *6 (N.D.N.Y. June 15, 2016) (D'Agostino, J.) (“vague and conclusory allegations ... [regarding] grievances ... do not, in light of the documentation Defendants have provided about Plaintiff's grievance history,

create a factual dispute material to the issue of whether Plaintiff exhausted his administrative remedies.”); *Smith v. Kelly*, 985 F. Supp. 2d 275, 289 (N.D.N.Y. 2013) (Suddaby, J.) (granting the defendants' motion for summary judgment on the issue of exhaustion where the plaintiff failed to “identify the name of the ‘IGRC's supervisor’ who purportedly told him that a new prisoner does not file a grievance at Auburn C.F. if it pertains to the prisoner's previous facility, nor does he specify the date, means or location of this purported communication.”).

Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that Defendants bear the ultimate burden of proving that Plaintiff did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact regarding whether Plaintiff appealed grievances AUB-67199-15 and AUB-67567-15. [17] As a result, I recommend that Defendants' motion be denied on this basis.

[17]  The Court notes that this conclusion is based on the special solicitude afforded to Plaintiff as a *pro se* litigant. Further, the Court notes that the evidence in the record to support the exhaustion of Plaintiff's administrative remedies is sparse. *See c.f. Richardson v. Eberth*, 14-CV-6138, 2016 WL 1271078, at *2-3 (W.D.N.Y. Mar. 29, 2016) (dismissing based on failure to exhaust administrative remedies where the plaintiff attached a copy of his original grievance which did not “bear any indicia that it was received or provided to any individual at the jail for transmission to the CORC” and his affidavit submitted in opposition failed to provide any specific details to support his allegation that he appealed his grievance to CORC (e.g. it did not state what specific person he gave it to in the prison, on what date he gave the appeal to anyone at the prison, or any other pertinent or specific information to support his allegations)); *Toliver v. Stefinik*, 12-CV-0077, 2016 WL 3349316, at *6 (June 15, 2016) (D'Agostino, J.) (dismissing for failure to exhaust administrative remedies where the plaintiff submitted a copy of a formal grievance dated March 9, 2011, that was not reflected in the defendants' records but where the plaintiff alleged that he “circulated” the grievance to the defendants

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 688 of 830
Logan v. Graham, Not Reported in Fed. Supp. (2019)
2019 WL 8015209

and it was unclear whether the grievance was ever submitted to IGRC).

### C. Whether Plaintiff's First Amendment Retaliation Claims Should Nevertheless be Dismissed

**\*12** A cognizable claim of retaliation pursuant to 42 U.S.C. § 1983 lies when prison officials take an adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a *prima facie* claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action–in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at \*4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff even in the absence of the protected conduct. *Mount Healthy*, 429 U.S. at 287. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty v. Coughlin*, 713 F.3d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

### 1. Defendant Pflueger

Plaintiff alleges that Defendant Pflueger retaliated against him during four separate incidents: (1) firing Plaintiff as a feed up porter and filing a false misbehavior report on June 17, 2015, (2) verbal harassment on (a) an unspecified dated in June or July 2015, (b) August 4, 2015, and (c) August 6, 2015, (3) causing Defendant Gould to file a false administrative segregation recommendation, and (4) the destruction of Plaintiff's personal property.

### a. Incident on June 17, 2015 [18]

[18]     Defendants argue that Defendant Pflueger, as a correction officer, would not have had authority to fire Plaintiff as a feed up porter. (Dkt. No. 28, Attach. 3 at 17-18; Dkt. No. 28, Attach. 10 at ¶11.) However, there is evidence in the record that disputes this assertion and creates an issue of fact for trial. (Dkt. No. 28, Attach. 5 at 49.)

**\*13** Defendants argue that Plaintiff's retaliation claim with respect to the incidents on June 17, 2015, fails based on the third element, that there is no evidence in the record to support the contention that Plaintiff was retaliated against for his protected speech. [19]

[19]     It is undisputed that Plaintiff engaged in constitutionally protected speech by the filing of grievances. (Dkt. No. 1 at 5-7; Dkt. No. 28, Attach. 11; Dkt. No. 28, Attach. 12; Dkt. No. 28, Attach. 14; Dkt. No. 28, Attach. 15; Dkt. No. 28, Attach. 18; Dkt. No. 28, Attach. 19.) *See also Flood v. Cappelli*, 18-CV-3897, 2019 WL 3778736, at \*7 (S.D.N.Y. Aug. 2, 2019) (collecting cases) (holding that the filing of a grievance is

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 689 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

protected speech). In addition, the alleged actions taken by Defendants constitute adverse actions because they would deter a prisoner of "ordinary firmness" from exercising his rights. *See Johnson v. Schiff,* 17-CV-8000, 2019 WL 4688542, at *24 (S.D.N.Y. Sept. 26, 2019) (collecting cases) (holding that the filing of a false misbehavior report against a prisoner is an adverse action); *Hayes v. Dahkle,* 16-CV-1368, 2017 WL 9511178, at *11 (N.D.N.Y. Oct. 30, 2017) (Hummel, M.J.) (holding that the "filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action."); *Casey v. Pallito,* 12-CV-0284, 2016 WL 96157, at *7 (D. Vt. Jan. 7, 2016) (holding that terminating a prisoner's employment is an "adverse action."); *Chavis v. Struebel,* 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004) (noting that "assigning the inmate [to] less desirable work assignments satisfies the adverse action requirement" for purposes of a prisoner's First Amendment retaliation claim).

In considering whether there is a "causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action." *Roseboro v. Gillespie,* 719 F. Supp. 2d 353, 366 (S.D.N.Y. 2011); *see also Tuitt v. Chase,* 11-CV-0776, 2013 WL 877439, at *7 (N.D.N.Y. Jan. 30, 2013) (Dancks, M.J.), *report and recommendation adopted,* 2013 WL 877617 (N.D.N.Y. Mar. 8, 2013) (factors relevant to a consideration of causal connection "include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation"). The Second Circuit has "held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation," but has also "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify,* 681 F. App'x 43, 46 (2d Cir. 2017); *see also Thomas v. Waugh,* 13-CV-0321, 2015 WL 5750945, at *4 (N.D.N.Y. Sept. 30, 2015) (D'Agostino, J. adopting Report-Recommendation on *de novo* review) (citing *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)) ("temporal proximity alone is insufficient to establish an inference of retaliation.").

**\*14** Here, in addition to temporal proximity connecting Plaintiff's grievance of May 10, 2015, to the incident on June 17, 2015,[20] Defendant Pflueger's alleged statements provide circumstantial evidence of causation. Plaintiff's verified Complaint alleged that on August 4, 2015, Defendant Pflueger said to another correction officer, "[t]his is also where we keep idiots like this guy who think they can snitch on officers and nothing's going to happen to them," and "[h]ow'd that work out for you stupid? You want to help me explain to him how our grievance procedure works?" (Dkt. No. 1 at 24-25.) Moreover, the verified Complaint alleged that on August 6, 2015, Defendant Pflueger said, "[o]h, and just so you know, I didn't forget about your latest grievance either. You better say a prayer to your White Supremacist God that I'm not here on the day they bring you down to the draft room, because I'll be watching the change sheet. You're not gonna make it outta here in 1 piece." (Dkt. No. 1 at 25.) These statements provide circumstantial evidence that Defendant Pflueger's actions on June 17, 2015, firing Plaintiff from his job as a feed up porter and filing a misbehavior report against him that ultimately resulted in his placement in keep-lock confinement for thirty days, were in retaliation for Plaintiff's grievance of May 10, 2015. *See Cole v. N.Y.S. Dep't of Corr. and Cmty. Supervision,* 14-CV-0539, 2016 WL 5394752, at *26 (N.D.N.Y. Aug. 25, 2016) (Peebles, M.J.) (finding an issue of fact as to retaliation where the defendant allegedly said (a) "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults, and (b) that the assault was "payback" for the plaintiff's grievances; *Roland v. McMonagle,* 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation where there was evidence that the defendants were aware of the plaintiff's complaints and mocked him for filing grievances).[21]

20    "In assessing temporal proximity, the Second Circuit has established that no more than six months between the protected activity and the adverse action establishes the temporal proximity sufficient to support an inference of causal connection." *Hayes v. Dahkle,* 16-CV-1368, 2017 WL 9511178, at *9 (N.D.N.Y. Oct. 30, 2017) (Hummel, M.J.) (citing *King v. McIntyre,* 11-CV-1457, 2015 WL 1781256, at *5 (N.D.N.Y. Apr. 8, 2016)). Here Plaintiff was fired as a feed up porter and Defendant Pflueger filed an allegedly false misbehavior report on June 17, 2015, which is "well within the Second Circuit's six-month time

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

frame for establishing a causal connection between [P]laintiff's filing of a grievance" on May 10, 2015. *Hayes*, 2017 WL 9511178, at *10.

21    While Defendant Pflueger denies making the statements on August 4, 2015, and August 6, 2015, (Dkt. No. 28, Attach. 10 at ¶¶ 25-25), "[t]he court, when faced with conflicting sworn statements, must leave such credibility determinations to a reasonable fact finder to determine." *Mack v. Wood*, 17-CV-1146, 2019 WL 5197230, at *7 (N.D.N.Y. July 26, 2019) (Baxter, M.J.).

As a result, the burden shifts to Defendants to show by a preponderance of the evidence that they would have taken action against the plaintiff even in the absence of the protected conduct. *Mount Healthy*, 429 U.S. at 287.

With respect to the "firing" of Plaintiff as a feed up porter, Defendants submitted a non-retaliatory reason—that Defendant Pflueger observed Plaintiff pass an unidentified object into the cell of another inmate. (Dkt. No. 28, Attach. 10 at ¶13.) However, Plaintiff testified that he did not pass any unidentified items into another inmate's cell. (Dkt. No. 28, Attach. 5 at 51-52.) As a result, I find that a material issue of fact remains for trial.

However, with respect to the allegedly false misbehavior report, Plaintiff admitted some of the allegations contained in the misbehavior report. More specifically, Plaintiff admitted that he yelled profanities as he walked back to his cell and that while in his cell, he made derogatory statements about Defendant Pflueger loud enough to be heard by an inmate on a different floor. (Dkt. No. 28, Attach. 5 at 54-55.) This admission "suggests that 'plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.' " *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at *12 (N.D.N.Y. June 7, 2018) (Hummel, M.J.) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). As a result, Defendants have established a non-retaliatory reason for the filing of the misbehavior report of June 17, 2015. *Flynn*, 2018 WL 3195095, at *12 (citing *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that plaintiff's admission of the underlying conduct established a "proper, non-retaliatory reason[ ] for filing the misbehavior report.")); *see also Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (where plaintiff admitted to committing the most serious, if not all, of the prohibited conduct charged in the misbehavior report, "defendants met their burden of

demonstrating proper, non-retaliatory reasons for filing the misbehavior report.").

  **\*15**   As a result, I recommend that Defendants' motion for summary judgment be granted with respect to the allegedly false misbehavior report of June 17, 2015, and be denied with respect to the "firing" of Plaintiff as a feed up porter.

### b. Verbal Harassment

Plaintiff alleges that sometime in June or July 2015, he was verbally harassed when Defendant Pflueger told another officer that he was going to "kick [P]laintiff's f****** a**." (Dkt. No. 1 at 19.) In addition, Plaintiff alleges that on August 4, 2015, Defendant Pflueger said to another correction officer, "[t]his is also where we keep idiots like this guy who think they can snitch on officers and nothing's going to happen to them," and "[h]ow'd that work out for you stupid? You want to help me explain to him how our grievance procedure works?" (Dkt. No. 1 at 24-25.)[22] Moreover, Plaintiff alleges that on August 6, 2015, Defendant Pflueger said, "[o]h, and just so you know, I didn't forget about your latest grievance either. Youse better say a prayer to your White Supremacist God that I'm not here on the day they bring you down to the draft room, because I'll be watching the change sheet. You're not gonna make it outta here in 1 piece." (Dkt. No. 1 at 25.)

22    While this statement suggests retaliatory animus about Plaintiff's placement in administrative segregation, for the reasons set forth in Part III.C.1.c. *infra*, there is no evidence before the Court that Defendant Pflueger had any role in Plaintiff's administrative segregation placement (other than being the alleged target of Plaintiff's planned of attack). In addition, Plaintiff accepted the recommendation that he be placed in administrative segregation. (Dkt. No. 1 at 21-22.)

In this Circuit, allegations of verbal harassment or threats are generally an insufficient basis for an inmate's § 1983 claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed"); *Hayes v. Dahlke*, 16-CV-1368, 2017 WL 9511178, at *7 (N.D.N.Y. Oct. 30, 2017) (Hummel, M.J.) ("[v]erbal harassment absent injury, is generally insufficient to rise to the level of a constitutional violation"); *Tafari v. Paul*, 06-CV-0603, 2009 WL 3260075, at *1 (W.D.N.Y.

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 691 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

Oct. 8, 2009) (allegations of verbal harassment or abuse, "without a showing of an actual injury, are insufficient to support a § 1983 claim") (citing *Lewis v. Casey,* 518 U.S. 343, 349-50 (1996)); *Alexander v. Deming,* 03-CV-0147, 2009 WL 1044561, at *5 (W.D.N.Y. Apr. 16, 2009) ("Courts within the Second Circuit have held that threats of disciplinary action and verbal harassment without injury are insufficient to state a constitutional violation") (citing cases); *Ramirez v. Holmes,* 921 F. Supp. 204, 210 (S.D.N.Y. 1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). "Such statements are only sufficiently adverse for the purpose of a First Amendment retaliation claim if they 'would deter a similarly situated individual of ordinary firmness of exercising constitutional rights.' Verbal threats may constitute [an] adverse action if the threat is sufficiently specific. 'The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights.' " *Hayes,* 2017 WL 9511178, at *7 (citations omitted). "The line between *de minimis* verbal harassment and retaliatory adverse action ... [hinges] on the specificity and seriousness of the words used." *Quezada v. Roy,* 14-CV-4056, 2015 WL 5970355, at *21 (S.D.N.Y. Oct. 13, 2015).

**\*16** "Mindful that inmates 'may be required to tolerate more than average citizens[ ] before a retaliatory action taken against them is considered adverse' " *Davis,* 320 F.3d at 353, I conclude that Defendant Pflueger's alleged statements constitute vague threats that lack the specificity and seriousness "to deter an inmate from exercising his First Amendment rights" as no real threat exists. *Id.*; *see Hayes,* 2017 WL 9511178, at *8 (holding that where a correction officer allegedly verbally harassed the plaintiff on two occasions "warning him to not get comfortable in his housing unit because 'you mess with one of us (C.O.'s) you got to deal with all of us' and informing plaintiff that '[another correction officer] said hi!' .... constitute vague threats that lack the specificity and seriousness 'to deter an inmate from exercising his First Amendment rights' as no real threat exists.").

Furthermore, with respect to Defendant Pflueger's alleged threats of physical injury, Plaintiff "does not ... allege that these threats were followed by any physical injury[,] and as a result, they are not actionable." *LaRocco v. N.Y.C. Dep't of Corr.,* 99-CV-9759, 2001 WL 1029044, at *5 (S.D.N.Y. Aug. 31, 2001). "Absent an appreciable injury following in close time to the threat of force [Defendant Pflueger's alleged] statement[ ], albeit inappropriate, lack the specificity

and seriousness 'to deter an inmate from exercising his First Amendment rights.' " *Hayes,* 2017 WL 9511178, at *8 (quoting *Quezada v. Roy,* 14-CV-4056, 2015 WL 5970355, at *21 (S.D.N.Y. Oct. 13, 2015)).

As a result, to the extent the Complaint is construed as alleging that these incidents of verbal harassment were adverse actions—as opposed to evidence of a causal connection with respect to other adverse actions—I recommend dismissal of these claims.

### c. Causing Defendant Gould to File a False Administrative Segregation Recommendation

Plaintiff has failed to adduce evidence in the record that Defendant Pflueger directed or caused Defendant Gould to file a false misbehavior report against Plaintiff. In fact, Defendant Gould affirmed that he "had no knowledge at the time [his] recommendation was made that Plaintiff had filed any grievances against Defendant [Pflueger]." (Dkt. No. 28, Attach. 6 at ¶ 11.) In addition, Plaintiff testified that (1) he did not know Defendant Gould before Defendant Gould made the recommendation that Plaintiff be placed in administrative segregation (Dkt. No. 28, Attach. 5 at 63), (2) he has no recollection of ever seeing Defendant Gould before the recommendation (*id.*), and (3) he is not aware of any conversations that Defendant Gould had with Defendant Pflueger, in which, they discussed that Defendant Gould should file an administrative segregation recommendation based on false information (*id.* at 65).

The contention that Defendant Pflueger retaliated against Plaintiff by causing Defendant Gould to file a false administrative segregation recommendation is merely a conclusory allegation, which is insufficient to establish genuine issue of material fact for trial. In addition, this contention is sheer surmise on Plaintiff's part and unsupported by the record. (Dkt. No. 28, Attach. 5 at 64 (Plaintiff testified that the basis for his belief that Defendant Gould filed the recommendation on Defendant Pflueger's behalf is "[b]ecause there is no other reason to do it.")); *Cole,* 2016 WL 5394752, at *27.

As a result, I recommend dismissal of Plaintiff's retaliation claim against Defendant Pflueger with respect to this allegation.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 692 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

#### d. Destruction of Plaintiff's Personal Property

Plaintiff failed to adduce any evidence that Defendant Pflueger destroyed (or confiscated or threw away) Plaintiff's personal property. The only evidence that Plaintiff presents in support of his contention, is that another inmate (housed three cells away) witnessed Defendant Pflueger in Plaintiff's cell. (Dkt. No. 1 at 23.) However, Plaintiff admitted that the other inmate "was inside his cell, so he couldn't see [Defendant Pflueger] inside [Plaintiff's] cell." (Dkt. No. 28, Attach. 5 at 71.) Moreover, it is undisputed that other individuals were involved in the removal of Plaintiff's property from his cell and the transportation of that property to the special housing unit. (*Id.*; Dkt. No. 1 at 23.) Plaintiff is speculating that because the other inmate saw Defendant Pflueger in Plaintiff's cell, that Defendant Pflueger is responsible for Plaintiff's alleged missing personal property. However, this speculation is insufficient to create a material issue of fact for trial because no reasonable juror could conclude that Defendant Pflueger took an adverse action against Plaintiff by destroying his property.

**\*17** As a result, I recommend dismissal of Plaintiff's retaliation claim against Defendant Pflueger with respect to this allegation.

#### 2. Defendant Jones

Plaintiff failed to show a genuine issue of material fact that his protected conduct was a substantial or motivating factor in Defendant Jones's endorsement of Defendant Pflueger's misbehavior report dated June 17, 2015. *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996). "[I]t is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009)).

Here, Plaintiff did not file any grievances or complaints against Defendant Jones. The record lacks any evidence establishing why Defendant Jones would endorse a false misbehavior report against Plaintiff, on Defendant Pflueger's behalf, beyond Plaintiff's conclusory allegations. *See Hill v. Chalanor*, 128 F. App'x 187, 189 (2d Cir. 2005) (holding that the plaintiff's claim of a causal connection between defendant "Oliver's threats and the alleged actions of the other defendants in connection with Hill's medical care is

wholly unsupported.") *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at \*12 (N.D.N.Y. June 7, 2018) (Hummel, M.J.) (recommending dismissal of retaliation claims where "[t]he record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations."). Without more, the evidence does not present a genuine issue of material fact for a jury to resolve. *Flynn*, 2018 WL 3195095; *see Wright*, 554 F.3d at 274 (dismissing retaliation claim against a correction officer when the only alleged basis for retaliation was a complaint about an incident involving another correction officer); *Alicea v. Maly*, 12-CV-0203, 2015 WL 4326114, at \*14-15 (N.D.N.Y. July 14, 2015) (D'Agostino, J.) (dismissing retaliation claim which alleged that Correction Officer Trinidad retaliated against the plaintiff for protected actions he took with respect to Correction Officer Freeman, where the plaintiff alleged a close personal friendship between Trinidad and Freeman and the record was "devoid of any specifics, but replete with conclusions"); *Guillory v. Ellis*, 11-CV-0600, 2014 WL 4365274, at \*18 (N.D.N.Y. Aug. 28, 2014) (D'Agostino, J.) ("[I]t is difficult to establish one defendant's retaliation for complaints against another defendant."); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff failed to provide any basis to believe that a correction counselor would retaliate for a grievance that she was not personally named in); *Ciaprai v. Goord*, 02-CV-0915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against correction officers other than the officer who disciplined the plaintiff).

As a result, I recommend that Plaintiff's retaliation claim against Defendant Jones be dismissed.

#### 3. Defendant Gould

For the reasons set forth above in Parts III.C.1.c. and III.C.2. of this Report-Recommendation, I find that the record lacks evidence establishing a causal connection between Defendant Gould's recommendation that Plaintiff be placed in administrative segregation and Plaintiff's grievances against Defendant Pflueger, beyond Plaintiff's conclusory allegations. As a result, I recommend that Plaintiff's retaliation claim against Defendant Gould be dismissed.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 693 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

### 4. Defendant Graham

**\*18** The Second Circuit has previously indicated that supervisory defendants may be considered personally involved only if they "(1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring." *Rasheen v. Adner*, 356 F. Supp. 3d 222, 233 (N.D.N.Y. Jan. 28, 2019) (Hurd, D.J.) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). [23]

[23]    "In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

The Supreme Court's decision in *Iqbal* has raised the question of whether all of the *Colon* factors continue to be viable. *Keyes v. Annucci*, 19-CV-0372, 2019 WL 4602240, at \*17 (N.D.N.Y. Sept. 23, 2019) (Suddaby, C.J.) (citing *Montanez v. City of Syracuse*, 16-CV-0550, 2019 WL 315058, at \*17 (N.D.N.Y. Jan. 23, 2019) (Sannes, J.)). Neither the Second Circuit nor the Supreme Court have made any findings on this issue. *Keyes*, 2019 WL 4602240, at \*17. "Courts within the Second Circuit have taken various approaches post-*Iqbal*, from finding that only the first and third factors remain viable, to continuing to apply all factors in the absence of Second Circuit guidance, to considering the specific constitutional provision underlying the claim and applying all the *Colon* factors to claims that rely on a standard of unreasonable conduct or deliberate indifference but declining to apply all of them where the claim requires instead a showing of discriminatory intent." *Id.* (*see Montanez*, 2019 WL 315058, at \*17-18 (collecting cases) (adopting the specific constitutional provision approach and applying all the *Colon* factors to the plaintiff's Fourteenth Amendment claims because they did not require a showing of discriminatory intent); *Carpenter v. Apple*, 15-CV-1269, 2017 WL 3887908, at \*9-10 (N.D.N.Y. Sept. 5, 2017) (Suddaby, C.J.) (noting that the majority of district courts have continued to apply all of the *Colon* factors "where the constitutional violation at issue does not require a showing of discriminatory intent"

and adopting that majority approach); *Marom v. City of New York*, 15-CV-2017, 2016 WL 916424, at \*15 (S.D.N.Y. 2016) (reasoning that *Iqbal* supported the specific constitutional provision approach, and finding that all the *Colon* factors might be viable for false arrest and excessive force claims that were based on a reasonableness standard, but that the second, fourth, and fifth factors would not apply to a First Amendment retaliation claim because such claim contains an intent requirement)).

The Court agrees with the specific constitutional provision approach discussed above because it is the most consistent with the guidance provided in *Iqbal*. *See Iqbal*, 556 U.S. at 676 (noting that, "[t]he factors [related to whether a government official's individual actions violated the Constitution] necessary to establish a *Bivens* violation will vary with the constitutional provision at issue," discussing that the First and Fifth Amendments require that the official acted with a discriminatory purpose, and rejecting the argument that supervisors should be held liable on such claims merely because they knew of a subordinate's discriminatory purpose. The Court will therefore consider only the first and third *Colon* factors because Plaintiff's claims are pursuant to the First Amendment.

**\*19** "[A] retaliation claim under the First amendment requires a showing of discriminatory intent, [and as a result,] supervisory liability will be imposed only if Plaintiff[ ]" establishes "that the officials either (a) directly participated in the alleged constitutional violation, or (b) created, or allowed to continue, a policy or custom under which the violation occurred." *Keyes*, 2019 WL 4602240, at \*19.

"[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Molano v. Bezio*, 10-CV-6481, 2012 WL 1252630, at \*5 (W.D.N.Y. Apr. 13, 2012) (citing *Collins v. Ferguson*, 804 F. Supp. 2d 134, 140 (W.D.N.Y. 2011); *Black v. Coughlin*, 76 F.3d 72, 74-75 (2d Cir. 1996)).

The record before the Court contains superintendent responses related to four grievances. (Dkt. No. 28, Attach. 11 at 1; Dkt. No. 28, Attach. 12 at 2; Dkt. No. 28, Attach. 14 at 1; Dkt. No. 28, Attach. 15 at 6; Dkt. No. 28, Attach. 18 at 1; Dkt. No. 28, Attach. 19 at 1.) However, the signature of the superintendent who executed the response, in each instance, is illegible. While Defendants argue that

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 694 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)
2019 WL 8015209

Defendant Graham merely rubber stamped the results of the investigation, "notably absent from the record is any affidavit or declaration from [Defendant Graham]" and absent "such evidence, a factual dispute exists as to whether [Defendant Graham] proactively participated in the decision-making process related to [Plaintiff's] grievances." *Flynn*, 2018 WL 3195095, at *13.

As such, I find that there is a triable issue of material fact for a jury to resolve with respect to Defendant Graham's personal involvement in Defendant Pflueger's alleged retaliatory conduct. *Flynn*, 2018 WL 3195095, at *13 (citing *Celotex v. Catrett*, 477 U.S. 317, 323 (1986)). Therefore, I recommend that Defendants' motion with respect to Defendant Graham be denied.

### D. Doctrine of Qualified Immunity

Finally, Defendants argue that, in any event, they are shielded from liability based on the doctrine of qualified immunity.

Qualified immunity shields federal and state officials from suit " ' unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct.' " *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "A right is 'clearly established' if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Beckles v. City of New York*, 492 F. App'x 181, 182 (2d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Here, while Defendants summarize general caselaw, their argument in support of the qualified immunity defense is one paragraph long, entirely conclusory, and unsupported by any facts. Accordingly, it is recommended that Defendants' motion on this ground, be denied. *Thomas v. Delany*, 17-CV-1023, 2019 WL 4247807, at *19 (N.D.N.Y. Aug. 13, 2019) (Hummel, M.J.) (citing *Roberts v. Hobbs*, 10-CV-0174, 2010 WL 5888777, at *6 (E.D. Ark. Nov. 8, 2010) (summarily denying dispositive motion containing unsupported and

conclusory qualified immunity arguments that fail to address the particular facts or cite any relevant cases)).

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 28) be **DENIED** with respect to Plaintiff's retaliation claims against (1) Defendant Pflueger for firing Plaintiff as a feed up porter, and (2) Defendant Graham as superintendent and **GRANTED** with respect to Plaintiff's retaliation claims against (1) Defendants Jones, (2) Defendant Gould, and (3) Defendant Pflueger for allegedly (a) filing a false misbehavior report against Plaintiff on June 17, 2015, (b) verbally harassing Plaintiff, (c) causing Defendant Gould to file an improper recommendation of administrative segregation, and (d) destroying Plaintiff's property.

**\*20**  Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

It is hereby respectfully **ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [24]

[24]      The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

### All Citations

Not Reported in Fed. Supp., 2019 WL 8015209

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Logan v. Graham, Not Reported in Fed. Supp. (2020)

2020 WL 871197

2020 WL 871197
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Seth LOGAN, Plaintiff,

v.

Superintendent GRAHAM, Auburn Correctional
Facility; C.O. Pflueger, Auburn Correctional
Facility; Officer Scott Jones, Auburn Correctional
Facility, formerly known as C.O. Smith; and C.O.
M. Gould, Auburn Correctional Facility, Defendants.

9:18-CV-291 (DNH/ML)
|
Signed 02/21/2020

**Attorneys and Law Firms**

SETH LOGAN, Plaintiff pro se, 177 Avery Avenue, Buffalo,
NY 14216.

HON. LETITIA JAMES, Attorney General for the State of
New York, OF COUNSEL: AIMEE COWAN, ESQ., Ass't
Attorney General, Attorney for Defendants, 300 South State
Street, Suite 300, Syracuse, NY 13202.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Seth Logan brought this civil rights action
pursuant to 42 U.S.C. § 1983. On November 26, 2019, the
Honorable Miroslav Lovric, United States Magistrate Judge,
advised by Report-Recommendation that defendants' motion
for summary judgment be granted in part and denied in part.
Specifically, Magistrate Judge Lovric recommended that
defendants' motion for summary judgment be denied with
respect to plaintiff's retaliation claims against (1) defendant
Pflueger for firing plaintiff as a feed up porter, and (2)
defendant Graham as Superintendent, and granted with
respect to plaintiff's retaliation claims against (1) defendant
Jones, (2) defendant Gould, and (3) defendant Pflueger
for allegedly (a) filing a false misbehavior report against
plaintiff on June 17, 2015, (b) verbally harassing plaintiff, (c)
causing defendant Gould to file an improper recommendation
of administrative segregation, and (d) destroying plaintiff's
property. Defendants timely filed objections to the Report-
Recommendation with respect to the retaliation claim against

defendant Pflueger and the supervisory claims against
defendant Graham.

Based upon a de novo review of the portions of the Report-
Recommendation to which defendants objected, the Report-
Recommendation is accepted and adopted in all respects. See
28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED
in part and DENIED in part;

2. The motion is GRANTED with respect to plaintiff's
retaliation claims against (1) defendant Jones, (2) defendant
Gould, and (3) defendant Pflueger for allegedly (a) filing
a false misbehavior report against plaintiff on June 17,
2015, (b) verbally harassing plaintiff, (c) causing defendant
Gould to file an improper recommendation of administrative
segregation, and (d) destroying plaintiff's property and those
claims are DISMISSED;

3. Defendants Jones and Gould are DISMISSED from this
action;

4. The motion is DENIED with respect to plaintiff's retaliation
claims against (1) defendant Pflueger for firing plaintiff as a
feed up porter, and (2) defendant Graham as Superintendent
(relative to defendant Pflueger's alleged retaliatory conduct
of firing plaintiff as a feed up porter) and those claims shall
proceed to trial;

5. Trial is tentatively scheduled for September 14, 2020 at
9:30 a.m. in Utica, New York. Pre-trial submissions are due
on or before August 31, 2020;

6. The parties are reminded that they have the option of
referring this case to Magistrate Judge Lovric pursuant to 28
U.S.C. § 636(c) and based on his familiarity with the case,
but are free to withhold consent without adverse substantive
consequences. The parties are directed to advise the Court on
or before April 8, 2020 whether or not a consent to a jury trial
before him will be executed; and

7. If plaintiff wishes to renew his motion for the appointment
of pro bono trial counsel, he must do so within thirty (30) days
of the date of this Decision and Order. If plaintiff makes such

a motion, the Clerk is directed to mail him a long form IFP application.

**\*2**  IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 871197

---

**End of Document**                               © 2025 Thomson Reuters. No claim to original U.S. Government Works.

George v. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

2021 WL 4392485
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Llewellyn Sinclair GEORGE, Plaintiff,
v.
COUNTY OF WESTCHESTER, et al., Defendants.

No. 20-CV-1723 (KMK)
|
Signed 09/24/2021

**Attorneys and Law Firms**

Llewellyn Sinclair George, White Plains, NY, Pro se Plaintiff.

Jordan Silver, Esq., Westchester County Attorney, White Plains, NY, for Defendants.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Plaintiff Llewellyn Sinclair George ("Plaintiff"), proceeding pro se, brings this Action pursuant to 42 U.S.C. § 1983 against the County of Westchester (the "County"), Assistant Warden La Fonda Spaulding ("Spaulding"), Assistant Warden Eric Middleton ("Middleton"), Sergeant Daniel Lopez ("Lopez"), Sergeant Matthew Kitt ("Kitt"), Captain Andre Mabra ("Mabra"), Captain Christopher Roberts ("Roberts"), and Captain Natasha Vanlierop ("Vanlierop"; collectively, "Defendants"), alleging that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. (Compl. 2–6 (Dkt. No. 2); Ord. of Serv. 1 (Dkt. No. 9); Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") 1 (Dkt. No. 30).) [1] Before the Court is Defendants' Motion To Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion"). (See Defs.' Not. of Mot. (Dkt. No. 28).) For the reasons that follow, Defendants' Motion is granted in part and denied in part.

[1]    Because Plaintiff's Complaint includes several handwritten pages interspersed within a standard complaint form, the Court will refer to the ECF page stamp at the top of each page. Note that Plaintiff's Complaint refers to Defendant Spaulding as "A. Spaulding" and omits first names for all but

one Defendant. (See Compl. 3–4.) Defendants have provided additional identifying information in their Memorandum of Law. (See Defs.' Mem. 1.)

I. Background

A. Factual Background

The alleged facts, which are accepted as true for purposes of resolving this Motion, are as follows. On April 4, 2019, while incarcerated at the Westchester County Jail, Plaintiff approached the desk of Vanlierop, who was conducting a tour of the "2 southwest housing unit" in her capacity as a "sector supervisor." (Compl. 6.) [2] Plaintiff tried to hand Vanlierop a grievance (the "First Grievance"), but Vanlierop "glanced" at the grievance, "turned away," and stated, "you know I don't do grievances." (Id.) Later that day, Lopez was touring the upper tier of the same housing unit when Plaintiff attempted to hand him the same grievance. (Id. at 6.) Lopez read the grievance, handed it back to Plaintiff, and said, "I'm not getting into the middle of this mess." (Id. at 7.)

[2]    Although Vanlierop was not initially named as a Defendant, (see Compl. 3–4), the Court directed the Clerk of Court to add her as a Defendant on April 21, 2020, (Ord. of Serv. 1).

Five days later, on the morning of April 9, 2019, Plaintiff's cell was being searched by two male officers when Vanlierop entered the cell and "confiscated" a separate grievance Plaintiff had prepared (the "Second Grievance") regarding Vanlierop's refusal to accept the First Grievance. (See id. at 7, 10.) Shortly thereafter, Vanlierop issued a fabricated misbehavior report against Plaintiff in retaliation for the Second Grievance. (See id.) [3]

[3]    Although at one point the Complaint does not draw a clear distinction between the First Grievance and the Second Grievance, (see Compl. 7), it also suggests that the grievance confiscated by Vanlierop addressed Vanlierop's refusal to process Plaintiff's *initial* grievance, (see id. at 7, 10), which necessarily indicates that Plaintiff had written a *second* grievance after Vanlierop refused to process the first. Specifically, Plaintiff suggests that the misbehavior report issued by Vanlierop was made in retaliation for the grievance she had seized, (see id. at 7), and Plaintiff alleges that the misbehavior report was issued in retaliation for a

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 698 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

grievance regarding "Defendant Vanlierop's refusal to accept and process [P]laintiff's grievance," (*id.* at 10). Construing the Complaint liberally, the Court therefore assumes there were two distinct grievances: (1) the First Grievance (the subject of which is unclear), and (2) the Second Grievance, which addressed Vanlierop's refusal to accept the First Grievance. It is the Second Grievance which Vanlierop allegedly confiscated, and for which she allegedly issued a false misbehavior report in retaliation. (*See id.* at 7, 10.)

**\*2** Around 11:30 A.M. on the following day (April 10), Mabra and Kitt stopped by Plaintiff's cell door with the housing unit officer. (*Id.* at 7.) Mabra ordered the housing unit officer to open Plaintiff's door, which she did. (*Id.*) While Kitt and the housing unit officer stood outside Plaintiff's cell and "act[ed] as lookouts," Mabra entered Plaintiff's cell and "inquire[d] about" Plaintiff's grievance against Vanlierop. (*Id.* at 7, 9.) Before Plaintiff could respond, Mabra, using a "stiff open palm," "shoved" Plaintiff against his cell wall and "demanded that [P]laintiff retract the contents of [his] grievance." (*Id.* at 9.) Plaintiff told Mabra "to go to hell." (*Id.*) Mabra, while exiting Plaintiff's cell, said, "I'm going to make your accommodations here a little more lengthy, your ass won't be making it home." (*Id.*) [4]

[4]    Quotations from Plaintiff's submissions occasionally reflect minor corrections to spelling and grammar.

After Vanlierop had issued the fabricated misbehavior report against Plaintiff, Defendant Roberts conducted a disciplinary hearing. (*Id.* at 10.) At the hearing, Roberts denied Plaintiff's "repeated[ ] request[s]" to call witnesses and present audio and video evidence." (*Id.*) Before the hearing had begun, Roberts stated that he had received several comments from the "warden's office" indicating "that they were pissed off about [Plaintiff's] treatment of Defendant Vanlierop." (*Id.*) Plaintiff alleges that, contrary to Roberts' written disposition, he did not plead guilty to any of the charges. (*Id.* at 11.) He further alleges that Roberts' handling of the hearing was "improperly influenced by the warden's office." (*Id.*) At the conclusion of the hearing, Roberts imposed a penalty of "several days of cell confinement and loss of good time." (*Id.* at 10.) Plaintiff subsequently appealed the hearing disposition to Spaulding and Middleton. (*Id.* at 11.) He alleges that the outcome of these appeals was "[was] improper and unjust." (*Id.*)

Plaintiff alleges that as a result of Defendants' actions, specifically their "constant threats and taunting," he suffered "mental anguish and psychological issues," as well as a "loss of sleep." (*Id.* at 8.) Plaintiff "was repeatedly seen" by the Office of Mental Health at the Westchester County Jail and was prescribed medication—Plaintiff does not identify which one(s)—"to cope with the trauma caused by the [D]efendants." (*Id.*) He seeks a "permanent court order" requiring administrators at the Westchester County Department of Correction "to record all future disciplinary hearings by audio/video." (*Id.*) He also seeks $100,000 in compensatory damages and $60,000 in punitive damages. (*Id.*)

B. Procedural History

Plaintiff filed his Complaint on February 26, 2020. (Dkt. Nos. 1–2.) On April 8, 2020, the Court granted Plaintiff leave to proceed in forma pauperis. (Dkt. No. 6.) On April 21, 2020, the Court dismissed Plaintiff's claims against the Westchester County Department of Correction and directed the Clerk of Court to add Vanlierop and the County as Defendants. (Dkt. No. 9.) [5] On August 10, 2020, Defendants filed a pre-motion letter outlining the grounds for their proposed motion to dismiss. (Dkt. No. 21.) Having received no response from Plaintiff, the Court adopted a briefing schedule for the Motion on August 25, 2020. (Dkt. No. 22.) Defendants filed the instant Motion and supporting papers on October 9, 2020. (*See* Not. of Mot.; Decl. of Jordan L. Silver, Esq., in Supp. of Mot. (Dkt. No. 29); Defs.' Mem.) Plaintiff failed to oppose the Motion, (*see* Dkt. No. 32), and on November 24, 2020, the Court deemed the Motion fully submitted, (Dkt. No. 33).

[5]    The Court dismissed claims against the Westchester County Department of Correction because municipal agencies or departments do not have the capacity to be sued under New York law. *See Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) ("In New York, agencies of a municipality are not suable entities."); *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) ("Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." (collecting cases)); *see also* N.Y. GEN. MUN. LAW § 2 ("The term 'municipal corporation,' as used in this chapter, includes only

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 699 of 830

George v. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

a county, town, city and village."). The Court nevertheless concluded that in light of Plaintiff's pro se status and his "clear intention to assert claims against the County of Westchester," it would construe the Complaint as asserting claims against the County. (Dkt. No. 9.) Likewise, given Plaintiff's intention to assert claims against Vanlierop, the Court directed that Vanlierop be added as a Defendant. (*Id.*)

## II. Discussion

### A. Standard of Review

**\*3** The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and citation omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not 'show[n]'—'that the pleader is entitled to relief.' " (alteration in original) (citation omitted) (quoting FED. R. CIV. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). However, when the complaint is from a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant['s] request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), "documents either in [the] plaintiff['s] possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted), and "his opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997).

Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (citation and italics omitted)).

### B. Analysis

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 700 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

Although Plaintiff does not identify the precise nature of his claims under the First, Eighth, and Fourteenth Amendments, the Court interprets the Complaint to raise eight distinct claims. Specifically, the Complaint claims (i) that Vanlierop and Lopez improperly refused to accept Plaintiff's First Grievance (the "Grievance Claim"), (*see* Compl. 6–7); (ii) that Vanlierop retaliated against Plaintiff in response to the Second Grievance by confiscating this grievance and filing a false misbehavior report (the "Vanlierop Retaliation Claim"), (*see id.* at 7, 10); (iii) that Mabra also retaliated against Plaintiff in response to the Second Grievance by entering Plaintiff's cell, shoving him against a wall, and demanding that he retract the contents of the Second Grievance (the "Mabra Retaliation Claim" and, together with the Vanlierop Retaliation Claim, the "Retaliation Claims"), (*see id.* at 7, 9); (iv) that Mabra used excessive force when demanding that Plaintiff retract the contents of the Second Grievance (the "Excessive Force Claim"), (*see id.* at 9); (v) that Kitt failed to intervene when Mabra was assaulting Plaintiff (the "Failure to Intervene Claim"), (*see id.* at 7, 9); (vi) that Roberts, by denying Plaintiff the opportunity to call witnesses and present audio and video evidence at his disciplinary hearing, violated Plaintiff's procedural due process rights (the "Roberts Procedural Due Process Claim"), (*see id.* at 10–11); (vii) that Spaulding and Middleton, by affirming Roberts' decision, also violated Plaintiff's procedural due process rights (the "Spaulding/Middleton Procedural Due Process Claim" and, together with the "Roberts Procedural Due Process Claim," the "Procedural Due Process Claims"), (*see id.* at 11); and (viii) that the County should be liable for the foregoing violations (the "*Monell* Claim"). The Court will address these claims in order.

### 1. The Grievance Claim

**\*4** As discussed, Plaintiff alleges that Vanlierop and Lopez refused to accept the First Grievance. (*Id.* at 6–7.) To the extent Plaintiff asserts a discrete claim based on these allegations, the Court must dismiss the claim.

"It is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances." *Crichlow v. Fischer*, No. 15-CV-6252, 2017 WL 920753, at \*7 (W.D.N.Y. Mar. 7, 2017); *see also Corley v. City of New York*, No. 14-CV-3202, 2017 WL 4357662, at \*7 (S.D.N.Y. Sept. 28, 2017) ("[The] [p]laintiff did not have a liberty interest to access the [prison's] grievance program that would provide a basis for a constitutional due process claim

here."); *Nji v. Heath*, No. 13-CV-200, 2013 WL 6250298, at \*6 (S.D.N.Y. Dec. 2, 2013) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently[,] allegations that prison officials violated those procedures do[ ] not give rise to a cognizable § 1983 claim." (citation omitted)); *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at \*10 (E.D.N.Y. June 9, 2011) ("It is well-established that prison grievance procedures do not create a due-process-protected liberty interest."), *aff'd*, 548 F. App'x 29 (2d Cir. 2013); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment."). "Rather, in the event that prison officials ignore a grievance that raises constitutional claims, the proper avenue to seek relief is ... directly petitioning the government for redress of his claims." *Harris v. Westchester Cnty. Dep't of Corr.*, No. 06-CV-2011, 2008 WL 953616, at \*5 (S.D.N.Y. Apr. 3, 2008) (collecting cases). Consequently, "courts regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures." *Martinez v. Schriro*, No. 14-CV-3965, 2017 WL 87049, at \*3 (S.D.N.Y. Jan. 9, 2017) (alteration omitted). Accordingly, any due process claim against Vanlierop and Lopez based on their purported interference with the grievance process is dismissed.

### 2. The Retaliation Claims

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Perkins v. Perez*, No. 17-CV-1341, 2019 WL 1244495, at \*13 (S.D.N.Y. Mar. 18, 2019) (citation omitted). To state a First Amendment claim of retaliation, an inmate must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [inmate], and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation and alteration omitted). An adverse action is any "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (quotation marks omitted). In determining whether a prison official's conduct constitutes adverse action, "the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 701 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

may be required to tolerate more than average citizens." *Id.* (quotation marks and alterations omitted). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has instructed that district courts must "approach prisoner retaliation claims with skepticism and particular care." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." (quotation marks omitted)). Accordingly, First Amendment retaliation claims must be "supported by specific and detailed factual allegations" and may not be stated "in wholly conclusory terms." *Dolan*, 794 F.3d at 295 (citation omitted).

**\*5** As noted, Plaintiff alleges that Vanlierop and Mabra both retaliated against him in response to the Second Grievance —Vanlierop by confiscating the grievance and filing a false misbehavior report, (*see* Compl. 7, 10), and Mabra by entering Plaintiff's cell, shoving him against a wall, and demanding a retraction, (*id.* at 7, 9). The Court will evaluate each claim separately under the three-part test set out in *Holland*.

### a. The Vanlierop Retaliation Claim

With respect to the first prong of the *Holland* test, the Complaint plausibly alleges that Vanlierop's actions against Plaintiff came in response to a form of protected conduct —namely, Plaintiff's preparation of the Second Grievance. "It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at \*4 (S.D.N.Y. July 16, 2013) (citing *Graham*, 89 F.3d at 80); *see also Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at \*10 (S.D.N.Y. Sept. 28, 2018) (same); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n.21 (S.D.N.Y. 2011) (same; collecting cases). Thus, Plaintiff's allegations with respect to Vanlierop are sufficient to satisfy the first prong of the *Holland* test.

With respect to *Holland*'s second prong, Plaintiff alleges two distinct forms of possibly adverse action by Vanlierop —(1) her confiscation of the Second Grievance and (2) her filing of a false misbehavior report. (*See* Compl. 7, 10.) Although inmates have no constitutional right to be free from a cell search, including retaliatory searches, *see, e.g.*, *Joseph v. Annucci*, No. 18-CV-7197, 2020 WL 409744, at \*5 (S.D.N.Y. Jan. 23, 2020) (stating that inmates have "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches" (citation omitted)), they may nevertheless "assert a retaliation claim for retaliatory conduct in connection with a cell search," *Hill v. Laird*, No. 06-CV-126, 2014 WL 1315226, at \*8 (E.D.N.Y. Mar. 31, 2014), including a prison official's seizure of legal documents or administrative grievances, *Smith v. City of New York*, No. 03-CV-7576, 2005 WL 1026551, at \*3 (S.D.N.Y. May 3, 2005) (holding on summary judgment that the defendants' "destruction of [the plaintiff's] legal papers" constituted "an adverse action substantial enough to satisfy the second prong of the retaliation test"). At this early stage of the case, Plaintiff's allegation that Vanlierop seized the Second Grievance is sufficient to state an adverse action. *See Yunus v. Jones*, No. 16-CV-1282, 2017 WL 9511176, at \*9 (N.D.N.Y. Aug. 23, 2017) (concluding that "the allegation that [the] defendant ... confiscated [the] plaintiff's personal property"— including prison grievances—"in retaliation for the exercise of his First Amendment grievance rights [was] sufficient to withstand a motion to dismiss"), *report and recommendation adopted*, 2017 WL 5956762 (N.D.N.Y. Dec. 1, 2017); *Guillory v. Haywood*, No. 13-CV-1564, 2015 WL 268933, at \*21 (N.D.N.Y. Jan. 21, 2015) (order adopting report & recommendation) (holding that the plaintiff adequately stated a claim for retaliation where he alleged that his legal documents were confiscated shortly after complaints over his treatment at the prison facility); *Gomez v. Graham*, No. 14-CV-201, 2014 WL 5475348, at \*5 (N.D.N.Y. Oct. 29, 2014) (concluding that "[a]t th[e] early juncture of" a motion to dismiss, allegations that the plaintiff's legal papers were confiscated were sufficient to state a retaliation claim).

**\*6** Similarly, although "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *see also Thomas v. Calero*, 824 F. Supp. 2d 488, 499 (S.D.N.Y. 2011) (noting that "[t]he Second Circuit has long held ... that a prison inmate has no constitutional right to be free from being falsely accused in a misbehavior report"), there is an exception where the inmate can "show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right," *Willey v. Kirkpatrick*, 801 F.3d 51, 63

George v. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 702 of 830

(2d Cir. 2015) (quotation marks omitted); *see also Cook v. Quattrocchi*, No. 19-CV-11659, 2020 WL 564082, at *2 (S.D.N.Y. Feb. 5, 2020) (same). Here, Vanlierop allegedly issued the false misbehavior report in retaliation for Plaintiff's participation in constitutionally protected conduct—namely, his preparation of the Second Grievance—and thus, the Complaint sufficiently alleges an adverse action based on Vanlierop's issuance of the misbehavior report. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (concluding that the plaintiff sufficiently alleged an adverse action based on the defendants' filing of false misbehavior reports in response to the plaintiff's prior grievance submissions); *Arriaga v. Gage*, No. 16-CV-1628, 2019 WL 2053990, at *6 (S.D.N.Y. May 9, 2019) (concluding on a motion to dismiss that allegedly false misbehavior reports issued in retaliation for the plaintiff's grievances "qualif[ied] as adverse actions"); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) (concluding that the defendants' alleged retaliation—"[f]iling a false misbehavior report about [the plaintiff]" in response to the plaintiff's submission of a grievance—"would deter a similarly situated person of ordinary firmness from exercising his First Amendment rights," and therefore "qualife[d] as an adverse action").

Finally, in considering whether "there was a causal connection between the protected conduct and the adverse action" under *Holland*'s third prong, *see* 758 F.3d at 225, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff," *Thomas v. DeCastro*, No. 14-CV-6409, 2019 WL 1428365, at *9 (S.D.N.Y. Mar. 29, 2019) (citation omitted). Here, Plaintiff alleges that Vanlierop seized the Second Grievance and issued the false misbehavior report on or around April 9, (*see* Compl. 7, 10)—only five days after the incident that was the subject of the Second Grievance, (*see id.* at 6, 10).[6] The Second Circuit has "held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation." *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 413 (D. Conn. 2016) (quoting *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013)), *aff'd*, 720 F. App'x 79 (2d Cir. 2018); *see also Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (summary order) (same); *Mateo*, 2013 WL 3863865, at *6 (finding a "plausible inference" that the defendants issued a misbehavior report in retaliation for the plaintiff's past grievances based in part on the fact that the report was

issued just one day after the plaintiff had a confrontation with the defendants). "Although temporal proximity between constitutionally protected activity and potentially retaliatory activity generally will not, on its own, allow a plaintiff to withstand a motion to dismiss," *Salahuddin v. Mead*, No. 95-CV-8581, 2002 WL 1968329, at *6 n.6 (S.D.N.Y. Aug. 26, 2002), courts may "exercise [their] judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases," *Quezada v. Roy*, No. 14-CV-4056, 2017 WL 6887793, at *10 (S.D.N.Y. Dec. 14, 2017) (quotation marks omitted). Though Plaintiff appears to rely solely on the temporal proximity between his protected conduct and Vanlierop's alleged retaliation, some courts in this District have found that, at the pleadings stage of a case, such close temporal proximity is sufficient to establish a causal connection, particularly where, as here, the defendant appears to retaliate in response to grievance of which he (or she) was the subject. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 518 (S.D.N.Y. 2012) (concluding, for purposes of a motion to dismiss, that where the defendant filed a false misbehavior report against the plaintiff three days after the plaintiff had filed a grievance against that defendant, "[t]he temporal proximity of th[o]se two events, as well as the common identity between the subject of [the plaintiff's] grievance and the author of the [misbehavior report], plausibly suggest[ed]" a causal connection); *Mateo*, 682 F. Supp. 2d at 435 (concluding that, on a motion to dismiss, the plaintiff's allegation that the defendant filed a false misbehavior report one day after the plaintiff filed a sexual harassment grievance against the defendant was sufficient to plead the causation element of his retaliation claim).[7] Consistent with these cases, the Court concludes that Plaintiff has adequately alleged the causation element of his retaliation claim.

6 Plaintiff does not specify precisely when he drafted the Second Grievance, but it necessarily was sometime between April 4 and April 9. *See generally* n.3 *supra*.

7 Note, however, that Plaintiff may not rely on temporal proximity alone to survive a summary judgment motion. *See, e.g., Bryant v. Goord*, No. 99-CV-9442, 2002 WL 553556, at *2 (S.D.N.Y. Apr. 12, 2002) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.").

George v. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

**\*7** Accordingly, the Vanlierop Retaliation Claim survives the instant Motion.


### b. The Mabra Retaliation Claim

Mabra allegedly retaliated against Plaintiff in response to the Second Grievance by entering his cell, shoving him against a wall, demanding that Plaintiff retract the contents of the Second Grievance, and then threatening Plaintiff that he would "make [Plaintiff's] accommodations ... a little more lengthy," such that Plaintiff "[wouldn't] be making it home." (Compl. 7, 9.) "As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant," *Kotler v. Boley*, No. 17-CV-239, 2018 WL 4682026, at \*4 n.2 (S.D.N.Y. Sept. 28, 2018) (collecting cases)—in this case, Mabra's retaliation for complaints against Vanlierop. But courts have recognized an exception where, for example, the defendant made clear that he or she was retaliating on behalf of a colleague. *See, e.g.*, *Headley v. Fisher*, No. 06-CV-6331, 2008 WL 1990771, at \*18 (S.D.N.Y. May 7, 2008) (finding that the plaintiff adequately alleged a retaliation claim where the defendant hit him and stated, "this is for CO. Simpson," the defendant against whom the plaintiff had filed a grievance). That is the case here, where Mabra allegedly made clear that he was acting in response to the grievance concerning Vanlierop. (*See* Compl. 9 (alleging that Mabra entered Plaintiff's cell and "inquire[d] about the grievance that [P]laintiff had written against Defendant Vanlierop" before shoving Plaintiff and demanding that he "retract the contents of the grievance" against Vanlierop).) For reasons discussed with respect to Vanlierop in Part II.B.2.a, *supra*, the Court concludes that Plaintiff has adequately alleged *Holland*'s first and third elements with respect to Mabra. That is, the Complaint plausibly suggests that Mabra's allegedly retaliatory actions were in response to Plaintiff's exercise of constitutionally protected conduct (his preparation of the Second Grievance), and Mabra's actions occurred on April 10, just one day after Vanlierop seized the Second Grievance, (*see* Compl. 7), which itself had only been drafted within the past several days, *see* notes 3 & 6 *supra*, thereby establishing the necessary causal connection.

The only question remaining is whether Mabra's conduct constitutes adverse action so as to satisfy *Holland*'s second prong. Here, there are three discrete actions to consider: (1) Mabra's threat to Plaintiff ("[Y]our ass won't be making it home"); (2) Mabra's demand that Plaintiff "retract the contents of" the Second Grievance; and (3) Mabra's act of shoving Plaintiff against the wall. (*See* Compl. 9.)

With respect to the first action, "verbal threats may qualify as adverse actions" in the prison retaliation context *only* where they are "sufficiently specific and direct." *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at \*17 (S.D.N.Y. Dec. 21, 2018) (quotation marks omitted) (collecting cases); *see also Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at \*11 (S.D.N.Y. Sept. 28, 2018) (same); *Mateo*, 682 F. Supp. 2d at 434 (explaining that "[t]he less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights"). "Thus, vague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim." *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007). Here, Mabra's alleged threat is more benign than many threats which courts in the Second Circuit have found insufficient to constitute an adverse action. *See Terry*, 2018 WL 4682784, at \*11 (dismissing a First Amendment retaliation claim because the alleged threat was insufficiently specific and direct even where corrections officers stated that "they were gonna kill" the plaintiff (record citation and alteration omitted)); *see also Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at \*18 (S.D.N.Y. Mar. 30, 2016) (dismissing First Amendment retaliation claims because a corrections officer's statements to a plaintiff that his "grievances were unlikely to succeed" and that the officer "would handle things 'his way' " were insufficiently specific or direct); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that " 'me and my boys ... going to get you' while brandishing a copy of a grievance"); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at \*16 (S.D.N.Y. June 21, 2010) ("Neither [the defendant's] comment ... that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his ... comment that '[y]ou're not the only one who can write. I'm willing to bet you'll break or get broke up,' was a 'direct' or 'specific' threat." (alteration and record citations omitted)), *aff'd sub nom.*, *Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012); *cf. White*, 2018 WL 6726555, at \*14 ("This allegation constitutes a specific, clear threat made in response to [the] [p]laintiff's prospective grievance against [the] [d]efendant .... [The defendant] threatened physical harm to [the] [p]laintiff, and did so with particularity, by pointing to the inmates who would harm [the] [p]laintiff and explaining why they would

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 704 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

harm him at her direction."). In sum, Plaintiff has failed to allege an adverse action based on Mabra's alleged threat.

**\*8** With respect to Mabra's second action, case law suggests that where a defendant demands that an inmate withdraw a prison grievance, such a demand does not give rise to a retaliation claim unless the demand is accompanied by a sufficiently specific and direct threat. Here, because Mabra's threat was not sufficiently specific or direct, his alleged demand that Plaintiff "retract the contents" of the Second Grievance does not constitute an adverse action. *See Rodriguez v. Patchen*, No. 13-CV-1086, 2018 WL 2122877, at \*9 (W.D.N.Y. Mar. 1, 2018) (concluding on summary judgment that the defendant's alleged "threat[ ] to use physical violence against [the] [p]laintiff unless [he] withdrew his inmate grievance" did not establish a retaliation claim because "physical violence" constituted a vague threat), *report and recommendation adopted*, 2018 WL 2119768 (W.D.N.Y. May 8, 2018); *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) (concluding on summary judgment that "verbal threats such as 'we [are] going to get you, you better drop the [law]suit,' do not rise to the level of adverse action" (footnote omitted)); *cf. St. Pierre v. Semple*, No. 14-CV-1866, 2015 WL 6872442, at \*4 (D. Conn. Nov. 9, 2015) (finding that the plaintiff adequately stated a retaliation claim against a nurse who threatened to continue to stop providing him with his prescribed pain medication unless he withdrew a grievance against her). Thus, Plaintiff cannot state a retaliation claim against Mabra based on Mabra's demand that he retract the Second Grievance.

With respect to Mabra's third action, physical assault may, depending on its severity, constitute an adverse action for purposes of a First Amendment retaliation claim. *See Flemming v. King*, No. 14-CV-316, 2016 WL 5219995, at \*5 (N.D.N.Y. June 20, 2016), *report and recommendation adopted*, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016); *see also Baskerville v. Blot*, 224 F. Supp. 2d 723, 731–32 (S.D.N.Y. 2002) (holding that a "retaliatory assault" sufficiently described an adverse action for purposes of a retaliation claim). Notably, "the alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis." *Flemming*, 2016 WL 5219995, at \*5. Even in light of this lower standard, however, Mabra's alleged action is still insufficient to constitute an adverse action. The cases in which courts have recognized assault as a form of adverse action have involved markedly more violent conduct than that alleged here. *See, e.g.,*

*Salgado v. NYS Dep't of Corr. & Cmty. Supervision*, No. 13-CV-1108, 2016 WL 6311296, at \*3, \*8 (W.D.N.Y. Sept. 15, 2016) (concluding that slamming the plaintiff's finger in a cell window and beating him constituted adverse action for purposes of retaliation claim); *Baskerville*, 224 F. Supp. 2d at 726, 732 (holding that a "retaliatory assault" in which the plaintiff was placed in a chokehold, shoved into the bars of his cell, and choked until he "was on the verge of collapsing" "sufficiently describe[d] adverse conduct that would deter a reasonable inmate from exercising his constitutional rights"). By contrast, courts have found that shoving an inmate or comparable conduct is insufficient to constitute an adverse action. *See Flynn v. Ward*, No. 15-CV-1028, 2018 WL 3195095, at \*9 (N.D.N.Y. June 7, 2018) (observing that "[a]lthough an alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis, [the plaintiff's] allegations that [a defendant] 'push[ed] him around' " was "de minimis" and therefore insufficient to constitute adverse action (record citation omitted) (last alteration in original)), *report and recommendation adopted*, 2018 WL 3193201 (N.D.N.Y. June 28, 2018); *Rivera v. Goord*, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) (concluding that particular defendants' "alleged acts of retaliation"—" 'shov[ing]' [the plaintiff] while taking him to the [Special Housing Unit ("SHU")]"—"even if assumed to be true, [were] de minimis ... [and] would not chill a person of ordinary firmness from continuing to engage in First Amendment activity" (italics omitted)); *see also, e.g., Myers v. Saxton*, No. 20-CV-465, 2021 WL 149062, at \*7 (N.D.N.Y. Jan. 15, 2021) ("[I]n this circuit, courts have routinely concluded that the type of physical assault suffered by [the] plaintiff in this case (i.e., having a food tray thrown at him) is de minimis for purposes of a retaliation claim and is not sufficient to satisfy the adverse action element."); *Woodward v. Afify*, No. 14-CV-856, 2018 WL 9875253, at \*11 (W.D.N.Y. Sept. 28, 2018) ("[V]iewing the allegations here in the light most favorable to [the] plaintiff, the [c]ourt concludes that a single punch is an insufficient adverse action to meet even the lower standard required in a First Amendment retaliation claim."), *report and recommendation adopted*, 2019 WL 5394217 (W.D.N.Y. Oct. 22, 2019). Accordingly, Plaintiff has failed to allege an adverse action taken by Mabra.

**\*9** Because Plaintiff has failed to allege adequately the "adverse action" prong of his retaliation claim against Mabra, the Court dismisses the Mabra Retaliation Claim.

Case 9:19-cv-00109-ECC-MJK   Document 410   Filed 02/21/25   Page 705 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

### 3. The Excessive Force Claim

To the extent Plaintiff alleges a distinct excessive force claim against Mabra based on his act of shoving Plaintiff into his cell wall, (*see* Compl. 9), this claim fails for reasons already discussed: Just as the act of shoving an inmate fails to satisfy the relaxed standard necessary to allege an "adverse action," it necessarily fails to satisfy the more demanding standard necessary to establish an Eighth Amendment excessive force claim.

The Eighth Amendment's guarantee of freedom from "cruel and unusual punishment" encompasses "restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[An] [a]nalysis of cruel and unusual punishment claims requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for the conduct." *Manley v. Grossman*, No. 13-CV-1974, 2017 WL 4326541, at *8 (S.D.N.Y. Sept. 27, 2017). The objective element focuses on the harm done "in light of contemporary standards of decency," *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quotation marks omitted), and asks whether "the deprivation alleged is 'sufficiently serious,' or 'harmful enough,' to reach constitutional dimensions," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citation omitted). The subjective element requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (citation omitted).

Here, even assuming Plaintiff could satisfy the subjective element of his excessive force claim, the Court finds no basis to conclude that the alleged use of force was "objectively 'harmful enough' or 'sufficiently serious' " to violate the Eighth Amendment. *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citation omitted). Courts in the Second Circuit have found that comparable uses of force—where a corrections officer forcefully shoves or pushes an inmate— are insufficient to satisfy the objective prong of an excessive force claim. *See, e.g.*, *Tavares v. City of New York*, No. 08-CV-3782, 2011 WL 5877550, at *5–6 (S.D.N.Y. Oct. 17, 2011) (holding that a pat frisk where the plaintiff was

"forcefully 'compressed' against the wall" was not a violation of the Eighth Amendment and noting that "[c]ourts in this Circuit have routinely found such types of minimal injuries and pain insufficiently serious or harmful to satisfy the objective element of the Eighth Amendment analysis" (citing cases)), *report and recommendation adopted*, 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011); *James v. Phillips*, No. 05-CV-1539, 2008 WL 1700125, at *5 (S.D.N.Y. Apr. 9, 2008) (concluding that a guard's "shov[ing] of an inmate" constituted a de minimis use of force that could not give rise to a viable excessive force claim); *Show v. Patterson*, 955 F. Supp. 182, 192–93 (S.D.N.Y. 1997) (concluding that the alleged force—"pushing [the plaintiff] against the wall"— was "de minimis and thus not protected by the Eighth Amendment"); *Bryan v. Admin. of F.C.I. Otisville*, 897 F. Supp. 134, 137 (S.D.N.Y. 1995) ("The Second Circuit has deemed brief confrontations between prisoners and guards such as the pushing incident alleged here insignificant for Eighth Amendment purposes."). Accordingly, the Court dismisses the Excessive Force Claim.

### 4. The Failure to Intervene Claim

**\*10** Construed liberally, the Complaint raises a claim for failure to intervene against Kitt. (Compl. 7, 9.)

Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y. C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). Moreover, "[l]aw enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence." *McRae v. Gentile*, No. 14-CV-783, 2015 WL 7292875, at *2 (N.D.N.Y. Oct. 20, 2015), *report and recommendation adopted*, 2015 WL 7300540 (N.D.N.Y. Nov. 18, 2015); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (collecting cases)), *reh'g denied*, 27 F.3d 29 (2d Cir. 1994). Specifically, "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used," provided there was "a realistic opportunity to intervene to prevent the harm from occurring." *Rahman v. Acevedo*, No. 08-CV-4368, 2011

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

Case 9:19-cv-00109-ECC-MJK     Document 410     Filed 02/21/25     Page 706 of 830

WL 6028212, at *8 (S.D.N.Y. Dec. 5, 2011) (alteration and quotation marks omitted).

"However, 'there can be no failure to intervene claim without a primary constitutional violation.' " *Sanabria v. Tezlof*, No. 11-CV-6578, 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016) (quoting *Forney v. Forney*, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015)); *see also Posner v. City of New York*, No. 11-CV-4859, 2014 WL 185880, at *8 (S.D.N.Y. Jan. 16, 2014) (explaining that "[b]ecause [the] [d]efendants [were] entitled to summary judgment on [the] [p]laintiff's primary claims that they violated her constitutional rights, it follow[ed] that they [were] entitled to summary judgment on her failure-to-intervene ... claim[ ] as well"); *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012) (observing that a "failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim"). Because Plaintiff failed to state an excessive force claim against Mabra, it necessarily follows that the Failure to Intervene Claim against Kitt—which is premised on Kitt allegedly turning a blind eye while Mabra entered Plaintiff's cell—must also fail. *See, e.g.*, *Forney*, 96 F. Supp. 3d at 13 (explaining that because "all of [the] [p]laintiff's primary [§] 1983 claims ha[d] been dismissed, [the] [d]efendants' motion to dismiss [the] [p]laintiff's failure to intervene claim" also had to be granted). Accordingly, the Court dismisses the Failure to Intervene Claim.

### 5. The Procedural Due Process Claims

Plaintiff alleges that after Vanlierop issued a false misbehavior report in retaliation for the Second Grievance, "a disciplinary hearing was conducted by Defendant Roberts, during which [P]laintiff's repeat[ed] request[s] ... to present audio and video evidence, as well as to call witnesses[,]" were "denied." (Compl. 10.) Plaintiff also alleges that Roberts' "handling of the disciplinary hearing was improperly influenced by the warden's office," which had apparently notified Roberts that it was displeased with Plaintiff's "treatment of Defendant Vanlierop." (*Id.* at 10–11.) At the end of the hearing, the punishment imposed by Roberts was "several days of cell confinement and loss of good time." (*Id.* at 10.)

**\*11** "To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654

(2d Cir. 2004) (citation and alteration omitted), *cert. denied sub nom.*, *McBride v. Ortiz*, 543 U.S. 1187 (2005). The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment).

With respect to the first requirement, "[p]rison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). When evaluating whether an inmate has suffered "atypical and significant hardship," courts must compare the conditions imposed upon that inmate with the conditions "endured by prisoners in [the] general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999). When evaluating the severity of an inmate's hardship, courts should consider both the duration and the conditions of confinement. *Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 606 (S.D.N.Y. 2009).

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). "Prison disciplinary proceedings," however, "are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Smith v. Fischer*, 803 F.3d 124, 127 (2d Cir. 2015) (quoting *Wolff*, 418 U.S. at 556). Ultimately, a guilty finding in an inmate disciplinary hearing only needs to be supported by "some evidence from which the conclusion ... could be deduced." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985) (quotation marks omitted). The Second Circuit has explained that "[j]udicial review of this 'some evidence' standard is narrowly focused." *Sira v. Morton*, 380 F.3d 57, 76 (2d Cir. 2004). Such review "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* (quoting *Hill*, 472 U.S. at 455–56). Finally, "the

**Case 9:19-cv-00109-ECC-MJK     Document 410     Filed 02/21/25     Page 707 of 830**

George V. County of Westchester, Not Reported in Fed. Supp. (2021)

2021 WL 4392485

Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with ... utter certainty ..., how he would assess evidence he has not yet seen.' " *Rahman*, 2011 WL 6028212, at *7 (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)) (italics omitted).


### a. The Roberts Procedural Due Process Claim

As noted, Plaintiff alleges that he was sentenced to "several days of cell confinement," along with "loss of good time." (Compl. 10.) Based on the latter allegation—but not the former—Plaintiff has adequately alleged a "liberty interest sufficient to trigger due process protections during his administrative hearing." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). However, his vague allegation that Roberts "denied" his "repeat[ed] request[s]" to "present audio and video evidence, as well as to call witnesses," (Compl. 10), is insufficient to allege a procedural violation by Roberts.

**\*12** The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s 'atypical and significant hardship' test." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003). It is not, however, the only relevant factor. "The conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of 'atypical and severe hardship.' " *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quotation marks omitted). Accordingly, courts must consider both the conditions of disciplinary confinement and their duration, as "especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).

Although the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," it has nevertheless established certain "guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed." *Palmer*, 364 F.3d at 64. For example, the Second Circuit has explained that where a plaintiff is confined in SHU for an "intermediate duration" of between 101 and 305 days, "development of a detailed record" regarding the conditions of confinement as compared to "ordinary prison conditions" is required. *Id.* at 64–65 (quotation marks omitted). Moreover, "although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, [the Second Circuit has] explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Id.* at 65 (citation omitted). "In the absence of a detailed factual record," the Second Circuit has "affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than ... 30 days ... spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Id.* at 66 (collecting cases); *see also, e.g.*, *Colon v. Annucci*, 344 F. Supp. 3d 612, 633–34 (S.D.N.Y. 2018) (holding that the plaintiff's "30-day keeplock confinement alone [was] insufficient to create a liberty interest triggering due process protections" (collecting cases)); *Walker v. Quiros*, No. 11-CV-82, 2014 WL 7404550, at *8 (D. Conn. Sept. 30, 2014) ("In the absence of a more detailed factual record, a term of segregated confinement shorter than [30] days generally does not create a constitutional liberty interest."); *Houston v. Cotter*, 7 F. Supp. 3d 283, 298 (E.D.N.Y. 2014) ("Absent a detailed factual record, courts typically affirm dismissals of due process claims where the period of time spent in SHU was short—e.g., [30] days—and there was no indication of unusual conditions." (italics omitted)).

Here, Plaintiff alleges merely that he was sentenced to "several days of cell confinement," along with "loss of good time." (Compl. 10.) [8] Plaintiff offers no allegations regarding the severity or atypicality of the conditions he experienced in disciplinary confinement. Without such allegations, "several days" in disciplinary confinement is insufficient to trigger a liberty interest in his disciplinary hearing. *See Washington v. Fitzpatrick*, No. 20-CV-911, 2021 WL 966085, at *9 (S.D.N.Y. Mar. 15, 2021) (holding that the plaintiff's allegation that he was sentenced to 30 days in keeplock confinement, during which he was denied various privileges such as phone calls, television, and commissary access, did "not plausibly plead a liberty interest"); *Ruggiero v. Way*, No. 19-CV-3631, 2020 WL 5126112, at *9 (S.D.N.Y. Aug. 31, 2020) (holding that where the plaintiff alleged he was confined to SHU for 30 days, without "any allegation that he endured unusual SHU conditions during his confinement," the plaintiff "ha[d] not pleaded deprivation of a cognizable interest in liberty"); *Brown v. Murphy*, No. 16-CV-710, 2019 WL 2325777, at *2–3 (S.D.N.Y. May 30, 2019) (holding that the plaintiff's 30-day period in keeplock confinement did

Case 9:19-cv-00109-ECC-MJK Document 410 Filed 02/21/25 Page 708 of 830

**George v. County of Westchester, Not Reported in Fed. Supp. (2021)**

2021 WL 4392485

not constitute an atypical and significant hardship where the complaint was "devoid of any allegations of the conditions of his keeplock confinement"); *Colon*, 344 F. Supp. 3d at 633–34 (dismissing due process claim where the plaintiff alleged that he was sentenced to 30 days in keeplock confinement and failed to "allege any facts suggesting that he was exposed to any conditions of confinement more harsh than typical keeplock"). Accordingly, Plaintiff has failed to allege a liberty interest based on his time in disciplinary confinement.

8     Plaintiff has attached to his Complaint a document labeled "Disciplinary Hearing Officers Report." (*See* Compl. 18.) Under a section labeled "Confinement Sanctions Imposed," the document indicates that Plaintiff was sentenced to keeplock confinement, (*see id.*), which is "a type of residential segregation," *Brown v. Markham*, No. 16-CV-710, 2018 WL 1918625, at *1 (S.D.N.Y. Apr. 20, 2018). Although the number of days to which he was sentenced appears to be 22, because the writing is almost illegibly faint, the Court cannot determine with certainty how long Plaintiff was confined in keeplock.

**\*13** Plaintiff also alleges, however, that he suffered a "loss of good time," (Compl. 10), and the Disciplinary Hearing Officers Report attached to his Complaint indicates that he did lose a certain number of days of his good-time behavior allowance, (*see id.* at 18). It is well-established that "the loss of good time credit can implicate a liberty interest." *Jenkins v. Cordero*, No. 17-CV-1592, 2018 WL 456311, at *4 (S.D.N.Y. Jan. 17, 2018) (citing *Wolff*, 418 U.S. at 556–57); *see also, e.g.*, *Gulley v. Roach*, No. 02-CV-908, 2004 WL 2331922, at *5 (W.D.N.Y. Oct. 15, 2004) ("Loss of good time credits implicates a prisoner's liberty interest."). Thus, Plaintiff's allegation that he lost good time credits, which is corroborated by the document attached to his Complaint, is sufficient to establish a liberty interest in his disciplinary proceedings. *See, e.g.*, *Rivers v. Paige*, No. 12-CV-6593, 2014 WL 897094, at *3 (W.D.N.Y. Mar. 6, 2014) (holding that the plaintiff adequately alleged a liberty interest in his disciplinary hearing based on allegation that he had "lost 30 days of good time credit").

But while Plaintiff has adequately alleged a liberty interest in his disciplinary hearing, his allegations regarding procedural deficiencies are too vague and conclusory to establish a procedural due process claim. As noted, Plaintiff alleges merely that Roberts "denied" his "repeat[ed] request[s]" to "present audio and video evidence, as well as to call

witnesses." (Compl. 10.) Courts have held that such vague, conclusory allegations are insufficient to establish the second prong of a procedural due process claim. *See McFadden v. Annucci*, No. 18-CV-6684, 2021 WL 463829, at *9 (S.D.N.Y. Feb. 9, 2021) ("Simply alleging that he was denied the right to call witnesses, present documents or to 'confront accusations' is wholly conclusory and does not state a claim upon which relief can be granted."); *Banks v. Royce*, No. 18-CV-4738, 2020 WL 5038590, at *4 (S.D.N.Y. Aug. 26, 2020) (concluding that the plaintiff's allegation—that the defendants "denied [him] [his] procedural due process when they prevented [him] from presenting evidence in the form of witnesses and documents"—was "the type of 'unadorned, the-defendant-unlawfully-harmed-me' allegation" that is insufficient to state a claim (citations omitted)); *see also Rush v. Canfield*, 649 F. App'x 70, 71 (2d Cir. 2016) (summary order) (holding that the plaintiff's "assertion that he was 'denied the right to call witnesses' " was "a bare legal conclusion incapable of surviving a motion to dismiss" (citation omitted)). Likewise, Plaintiff's allegation that Roberts was improperly swayed by the warden's office, (*see* Compl. 10–11), is merely a "[c]onclusory allegation[ ] of bias," which "[is] not enough to show that a plaintiff received constitutionally insufficient process," *Banks*, 2020 WL 5038590, at *4 (collecting cases); *see also Fabricio v. Griffin*, No. 16-CV-8731, 2019 WL 1059999, at *9 (S.D.N.Y. Mar. 6, 2019) (holding that the plaintiff's "conclusory allegation[ ]" that the hearing officer was biased failed to state a procedural due process claim).

Accordingly, the Court dismisses the Roberts Procedural Due Process Claim.

b. The Spaulding/Middleton Procedural Due Process Claim

As discussed, Plaintiff also alleges that the outcome of his "appeals to Defendants Spaulding and Middleton's office [was] improper and unjust." (Compl. 11.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional deprivation." *Falls v. Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *31 (S.D.N.Y. Mar. 26, 2021) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)) (alteration omitted). There has been a long-running split in the Second Circuit as to "whether an allegation that a defendant affirmed a disciplinary proceeding is sufficient to establish" that defendant's personal involvement in the

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 709 of 830
George v. County of Westchester, Not Reported in Fed. Supp. (2021)
2021 WL 4392485

underlying constitutional violation. *Samuels v. Fischer*, 168 F. Supp. 3d 625, 643 (S.D.N.Y. 2016) (surveying authority on both sides) (alterations and quotation marks omitted). Relying on the Second Circuit's 2020 decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)—which eliminated special standards for supervisory liability and required that alleged constitutional violations be "established against the supervisory official directly," *id.* at 618—at least two courts in this District have found that a defendant's "fail[ure] to correct another officer's violation" at a prison disciplinary hearing "does not suffice" to establish that defendant's personal involvement in the alleged constitutional violation, *Washington*, 2021 WL 966085, at *10 (alteration and citation omitted); *see also Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) (dismissing due process claim based on the hearing officer's "deni[al] [of the] [p]laintiff's administrative appeal" because, under *Tangreti*, such an allegation "cannot support the inference" that the officer was personally involved in the alleged constitutional violation). Thus, even if Roberts had committed a constitutional violation at Plaintiff's disciplinary hearing, it seems doubtful that Plaintiff could state a claim against Spaulding and Middleton based on their affirmance of Roberts' determination. But the Court need not resolve the claim against Spaulding and Middleton on this basis. Here, given "the absence of any underlying constitutional violation" at Plaintiff's disciplinary hearing to begin with, "Plaintiff cannot maintain a cause of action against Defendant[s] [Spaulding and Middleton] based on" their affirmance of Roberts' determination. *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, at *13 (N.D.N.Y. Sept. 11, 2014); *see also Barnes v. Annucci*, No. 15-CV-777, 2019 WL 1387460, at *15 (N.D.N.Y. Mar. 12, 2019) (explaining that "because no constitutional violation occurred" at the plaintiff's disciplinary hearing, "and there was no wrong to remedy," the plaintiff could not state a due process claim against a defendant based on his affirmance of the disciplinary determination), *report and recommendation adopted*, 201 WL 1385297 (N.D.N.Y. Mar. 27, 2019).

**\*14** For these reasons, the Court also dismisses the Spaulding/Middleton Procedural Due Process Claim.

### 6. The *Monell* Claim

To the extent Plaintiff intends to assert a claim against the County pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), his claim fails. "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690–91). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). In other words, a municipality may not be held liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted). Rather, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008). A plaintiff may satisfy the fifth element by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). Moreover, a plaintiff also must establish an "affirmative" causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985).

Here, the Complaint is utterly devoid of any allegations that would establish the fifth element of a *Monell* claim. (*See*

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 710 of 830

George V. County of Westchester, Not Reported in Fed. Supp. (2021)
2021 WL 4392485

*generally* Compl.) Plaintiff does not allege, for example, that the County officially endorsed a formal policy of retaliating against inmates who file grievances, or of depriving them of procedural due process at disciplinary hearings. *Brandon, 705 F. Supp. 2d at 276.* Nor does he describe actions by "government officials responsible for establishing the policies that caused the particular deprivation in question," or a "practice so consistent and widespread" that it "constitutes a custom or usage of which a supervising policy-maker must have been aware." *Id.* at 276–77. Likewise, the Complaint says nothing with respect to the County's alleged failure "to provide adequate training or supervision to subordinates." *Id.* at 277. Because Plaintiff offers no allegations to establish the fifth element of a municipal liability claim, any such claim must be dismissed. *See Jackson v. Westchester County,* No. 18-CV-7207, 2019 WL 3338020, at *4 (S.D.N.Y. July 25, 2019) (dismissing *Monell* claim where the plaintiff failed to "allege the existence of any policy, any actions taken or decisions made by any ... policymaking officials, any systemic failures to train or supervise, or any practices so widespread that they practically have the force of law" and failed to "provide any factual details regarding ... other [purported] lawsuits and grievances" on similar issues (collecting cases)); *see also McKenzie v. City of Mount Vernon,* No. 18-CV-603, 2018 WL 6831157, at *7 (S.D.N.Y. Dec. 28, 2018) (dismissing *Monell* claim where the plaintiff did "not allege any facts suggesting a policy or custom that led to [the] alleged" constitutional deprivation); *5 Borough Pawn, LLC v. City of New York,* 640 F. Supp. 2d 268, 300 (S.D.N.Y. 2009) (dismissing *Monell* claim where the "plaintiffs fail[ed] to allege any facts showing that there is a [municipal] policy—unspoken or otherwise—that violates the Federal Constitution").

### III. Conclusion

**\*15**  For the reasons stated above, the Court dismisses the Grievance Claim, the Mabra Retaliation Claim, the Excessive Force Claim, the Failure to Intervene Claim, the Procedural Due Process Claims, and the *Monell* Claim. The Vanlierop Retaliation Claim survives.

Because this is the first adjudication of Plaintiff's claims on the merits, the dismissed claims are dismissed without prejudice. Plaintiff may file an amended complaint within 30 days of the date of this Opinion & Order. The amended complaint should contain appropriate changes to remedy the deficiencies identified in this Opinion & Order. Plaintiff is advised that the amended complaint will replace, not supplement, the instant Complaint, and therefore must contain all of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the instant Motion, (Dkt. No. 28), and mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4392485

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

2018 WL 3195095
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bruce FLYNN, Plaintiff,

v.

Joe WARD and Lief Wellenstein, Defendants.

No. 15-CV-1028 (TJM/CFH)
|
Signed 06/06/2018
|
Filed 06/07/2018

**Attorneys and Law Firms**

Bruce Flynn, 10-A-1558, Elmira Correctional Facility, P.O. Box 500, Elmira, NY 14902, pro se.

Attorney General for the State of New York, OF COUNSEL: BRIAN W. MATULA, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]  This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1**  Plaintiff pro se Bruce Flynn ("Flynn" or "Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendants Acting Superintendent Joe Ward ("Defendant" or "Ward") and C.O. Lief Wellenstein ("Defendant" or "Wellenstein") for violations of his rights under the First Amendment. Dkt. No. 20 ("Am. Compl."). Additional defendants were named, but the claims against them have since been dismissed. Dkt. No. 22. Presently before the undersigned is Defendants' motion for summary judgment and dismissal of the Amended Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 64. Flynn did not oppose the motion. For the following reasons, it is recommended that Defendants' motion be granted in part and denied in part.

**I. Failure to Respond**

Flynn failed to submit any opposition papers to Defendants' motion for summary judgment. Flynn was notified of the consequences of failing to respond to a summary judgment motion by Defendants and the Court. Dkt. Nos. 64-1 and 65. However, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response, Defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56(c). While "[a] verified complaint is to be treated as an affidavit ... and [may] be considered in determining whether material issues of fact exist[,]" see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted), Flynn's Amended Complaint is not verified. [2]  Thus, the Amended Complaint does not have the "force and effect of an affidavit." See Tafari v. Brown, No. 9:10-CV-1065 (GTS/DRH), 2012 WL 1098447, at *7, n. 8 (N.D.N.Y. Mar. 30, 2012) (collecting cases). Despite this fact, the Court may consider the exhibits attached to the Amended Complaint. See Dawkins v. Williams, 511 F. Supp. 2d 248, 255 (N.D.N.Y. 2007) (considering the exhibits annexed to the pro se plaintiff's amended complaint when deciding the defendant's motion for summary judgment even though that pleading was not verified). Defendants do not dispute the authenticity of the exhibits and, in fact, utilized the exhibits during Flynn's deposition and cite to the exhibits in support of the motion. Dkt. No. 64-2 ¶¶ 46-48; Dkt. No. 64-4; Dkt. No. 64-7 at 1-2. [3]  Additionally, a copy of Flynn's deposition transcript is annexed as an exhibit to Defendants' motion. Dkt. No. 64-4. Consequently, the facts set forth in Defendants' Rule 7.1 Statement of Material Facts [4]  are accepted as true, but only as to those facts that are not disputed by Flynn's sworn testimony or the exhibits annexed to the Amended Complaint. See N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

[2]  The Amended Complaint is not notarized and does not contain any statement from Flynn certifying the veracity of the document under the penalty of perjury.

**Flynn v. Ward, Not Reported in Fed. Supp. (2018)**

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 712 of 830

2018 WL 3195095

3    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

4    Local Rule 7.1(a)(3) states:

    Summary Judgment Motions

    Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.

    The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

    Local Rule 7.1(a)(3).

## II. Background

### A. Facts

**\*2**  The facts are related herein in the light most favorable to Flynn as the nonmoving party. See subsection III(A) infra. The facts recited are for the relevant time period as referenced in the Amended Complaint.

At the time of the incidents described in the Amended Complaint, Flynn was confined in the Long Term Protective Custody Unit ("LTPC") at Mid-State Correctional Facility ("Mid-State C.F."). See generally Am. Compl. Wellenstein was a law library officer at Mid-State C.F. Dkt. No. 64-4 at 35-36. Ward was the Superintendent at Mid-State C.F. Id. at 10. From December 2014 through June 2015, Flynn filed numerous requests for legal materials/legal assistance. Dkt. No. 20-2.

From October 2011 until March 5, 2015, inmates in the LTPC had physical access to the law library from 4:30 p.m. until 5:45 p.m. Dkt. No. 20-1 at 2; Dkt. No. 64-4 at 35-36. On March 5, 2015, Captain Goppert issued a memorandum advising the LTPC Population that their law library services would be "modified." Dkt. No. 20-1 at 1. In accordance with Facility Operations Manual 21.04 5 and Directive #4833, 6 LTPC inmate requests for legal assistance from the law library must be made in writing and forwarded to the law library officer through the facility mail. Dkt. No. 20-1 at 3. Inmates were permitted two requests each day. Dkt. No. 64-4 at 36; Dkt. No. 64-2 ¶ 34.

5    Mid-State C.F. Facility Operations Manual No. 21.04 provided, in relevant part:

    3. Inmates in SHU areas may request, in writing, legal assistance from the Law Library.

    a. All requests for assistance must be sent to the Law Library Officer vi a facility mail and each request should document what kind of service is needed.

    c. SHU inmates will only be allowed to have two (2) legal research resources in their possession at a time. Pick-up and delivery of legal materials will be made on a daily basis, Monday through Sunday.

    Dkt. No. 20-1 at 17.

6    DOCCS Directive #4833 provided, in pertinent part:

    Cell Study Services: Inmates prohibited by their confinement status from visiting the Law Library shall be allowed to study Law Library materials in their cells and obtain legal services normally available to general population inmates. Such inmates may request, in writing, a maximum of two items per day and these will be delivered, if available, within 24 hours of receipt of the request. Inmates may retain said legal materials for a period of not less than 16 hours nor more than 24 hours.

    Dkt. No. 20-1 at 5.

### 1. Grievances

On January 6, 2015; February 14, 2015; and February 17, 2015, Flynn filed grievances claiming that Wellenstein refused to make copies of his legal work or perform "word"

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

and "key number searches" on the computer. Dkt. No. 64-5 at 4-7. The grievances were consolidated (MS-28194-15) and on March 11, 2015, the Superintendent responded that Flynn was being properly assisted.[7] Id. at 8. Flynn appealed the decision to the Central Office Review Committee ("CORC"), and, on January 20, 2016, CORC upheld the Superintendent's determination. Id. at 3.

[7]    The signature of the Superintendent is illegible.

On March 10, 2015, Flynn filed a grievance claiming that Wellenstein refused to accept his March 8, 2015 request and overcharged him for copies. Dkt. No. 20-3 at 12.

**\*3** On April 5, 2015, Flynn filed a grievance alleging that Wellenstein (1) denied him access to the courts; (2) fraud; (3) destruction of property; (4) refused to provide legal materials or assistance; and (5) refused to respond to weekend requests (MS-21943-15). Dkt. No. 64-5 at 10-16. On May 6, 2015, the Superintendent responded that Flynn's concerns were being properly addressed.[8] Id. at 17. Flynn appealed the decision to CORC and on October 21, 2015, CORC upheld the Superintendent's determination. Id. at 9.

[8]    See Footnote 8, supra.

On April 17, 2015, Flynn filed a grievance claiming that Wellenstein unlawfully ordered him to remain out of his cell while he made rounds. Dkt. No. 20-3 at 33.

On April 28, 2015, Flynn filed a grievance claiming that Wellenstein was deliberately harassing him and destroying his documents. Dkt. No. 20-3 at 34.

On April 30, 2015, Flynn filed a grievance charging Wellenstein with repeated verbal harassment. Dkt. No. 20-3 at 42. Flynn claimed that Wellenstein came to his cell, accused Flynn of smoking, entered the cell, and pushed Flynn aside. Id. Flynn alleged that Wellenstein made "a couple of smart remarks" and was "angry" over the numerous grievances Flynn filed. Id.

On May 6, 2015; May 8, 2015; and May 11, 2015, Flynn filed grievances accusing Wellenstein of destroying copies, harassment, and threatening behavior. Dkt. No. 64-5 at 19-21. The grievances were consolidated (MS-21970-15), and, on July 14, 2015, after an investigation, the Superintendent issued a decision denying the grievances.[9] Id. at 22-23. Flynn

appealed the decision to CORC and on September 21, 2015, the Superintendent's decision was affirmed. Id. at 18.

[9]    See Footnote 7, supra.

On May 14, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide books. Dkt. No. 20-3 at 46.

On July 21, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide envelopes and deliberately amended his documents. Dkt. No. 20-6 at 2.

On August 1, 2015, August 7, 2015, and August 10, 2015, Flynn filed grievances against Wellenstein claiming that he refused to make copies of documents "in retaliation for the 2 most recent grievances against him." Dkt. No. 64-5 at 26-28. The grievances were consolidated (MS-22079-15) and on August 27, 2015, after an investigation, the Superintendent denied the grievances.[10] Id. at 29. Flynn appealed the decision to CORC and on October 21, 2015, CORC affirmed the Superintendent's decision. Id. at 24.

[10]    See Footnote 7, supra.

On August 20, 2015, Flynn filed a grievance (MS-22105-15) claiming that Wellenstein threatened him and told him, "if I did not stop with my grievances that he, C.O.'s Jordan and Miller were going to set me up again like they have done numerous times in the past." Dkt. No. 20-6 at 10.

On October 23, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide copies and purposefully delayed his access to the courts (MS-22183-15). Dkt. No. 64-5 at 31. On November 10, 2015, after an investigation, the Superintendent determined that Flynn was being provided with Law Library services pursuant to Directive #4483.[11] Id. at 33. Flynn appealed to CORC, and on February 17, 2016, CORC upheld the determination. Id. at 30.

[11]    See Footnote 7, supra.

On November 6, 2015, Flynn filed a grievance (MS-22200-15) claiming that Wellenstein's behavior prohibited him from conducting meaningful research. Dkt. No. 64-5 at 37. On December 15, 2015, after an investigation, the Superintendent denied the grievance.[12] Id. at 38. Flynn appealed the decision to CORC, and on March 23, 2016, CORC affirmed the determination. Id. at 36.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 714 of 830

2018 WL 3195095

[12]        See Footnote 7, supra.

**\*4**  On January 14, 2016, Flynn filed a grievance claiming that the photocopier was not functioning properly because Wellenstein manipulated the memory function. Dkt. No. 20-6 at 61.

### 2. Misbehavior Reports

On April 30, 2015, Wellenstein issued a misbehavior report charging Flynn with smoking. [13] Dkt. No. 20-6 at 70. After a Tier II disciplinary hearing, Flynn was sentenced to eighteen days in keeplock confinement. Id. Flynn served his sentence from April 30, 2015 until May 18, 2015. Id.

[13]        The misbehavior report is not part of the record.

On August 1, 2015, Officer Koscielniak issued Flynn a misbehavior report charging him with violating facility rules related to smoking. Dkt. No. 20-6 at 6. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges. Id. at 70. On August 1, 2015, Wellenstein issued a second misbehavior report charging Flynn with disobeying a direct order. Dkt. No. 20-6 at 5. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges for thirty days, but the sentence was suspended until November 16, 2015. Id. at 70.

On August 17, 2015, Officer Alsante issued Flynn a misbehavior report charging him with placing a three-way call in violation of facility rules. Dkt. No. 20-6 at 8. Alsante noted that, on August 17, 2015, "[a]t approx. 9:05 p.m., at the request of C.O. J. Jordan, I began monitoring 10-2 SHU phone[.]" Id. As a result of the report, Flynn was placed in keeplock for eighteen days from August 17, 2015 until September 4, 2015. Id. at 8, 70. Flynn appealed the decision to Ward claiming that Jordan asked Alsante to monitor his telephone call "as part of a campaign of harassment that CO Wellenstein has launched against those inmates in 10-2 who are trying to access the law library and [c]ourts." Id. at 9. Flynn further noted:

> CO W has written 4 misbehavior reports against me & encourages other CO's to do the same, as well as

monitor our alleged activities, and in this incident no 3-way call was made & this is retaliation for my litigation.

Dkt. No. 20-6 at 9.

On August 24, 2015, Wellenstein issued a misbehavior report charging Flynn with threats and harassment. Dkt. No. 20-6 at 12. Wellenstein reported that Flynn told him, "[o]ne day when I get out, I am going to see you selling flowers on the corner and then I will take care of you the way I want to." Id. After a Tier II disciplinary hearing, Flynn was sentenced to thirty days in keeplock confinement. Id. at 70. The sentence was suspended until December 8, 2015. Id.

On November 12, 2015, Officer U. Upshaw issued Flynn a misbehavior report charging him with smoking, arson, false statements, and possessing flammable material. Dkt. No. 20-6 at 24. After a disciplinary hearing, the charges were dismissed. Id. at 25.

On November 18, 2015, Wellenstein issued a misbehavior report charging Flynn with harassment. Dkt. No. 20-6 at 16. The misbehavior report was dismissed by the hearing officer. Am. Compl. ¶ 125.

On December 11, 2015, Wellenstein issued a misbehavior report charging Flynn disobeying a direct order and harassment. Dkt. No. 20-6 at 26. The ticket was dismissed by the hearing officer. Am. Compl. at ¶ 130.

### 3. Legal Work

**\*5**  In 2013, Flynn filed a Habeas Corpus petition in this Court. See Flynn v. J. Colvin, No. 9:13-CV-1247 (JKS) (N.D.N.Y. 2013). On October 19, 2015, Flynn filed an action in the Court of Claims against Wellenstein charging him with deliberately destroying legal documents. Dkt. No. 20-6 at 27-28. In 2014 and 2015, Flynn was researching and gathering exhibits in support of a writ of error coram nobis to vacate his conviction. Dkt. No. 64-4 at 17. In 2014 and 2015, Flynn was also working on a petition for the Department of Veterans' Affairs to increase his disability benefits, Article 78 petitions, a foreclosure action, and commenced litigation in the Court of Claims. Dkt. No. 64-4 at 18, 21, 25, 29. On August 24, 2015, Flynn commenced the within action. Dkt. No. 1.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)
2018 WL 3195095

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 715 of 830

During his deposition, Flynn testified that did not know the procedural posture of any of his actions or petitions, could not recall whether deadlines were in place in any litigation, and could not remember the details of each petition and action. Dkt. No. 64-4 at 17-31. Flynn testified that his legal work was lost and therefore, without being able to refer to his legal records, he could not state whether he suffered any negative consequences in any legal matter. Id. at 31-32, 44, 107.

In June 2016, Flynn was transferred out of Mid-State C.F. Dkt. No. 25.

### B. Procedural History

On August 24, 2015, Flynn filed the Complaint in this action. Dkt. No. 1. In a Decision and Order filed December 4, 2015 ("December Order"), the Court reviewed the Complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A, and determined that the Complaint failed to state a claim upon which relief could be granted and, therefore, was subject to dismissal. Dkt. No. 11. In light of his pro se status, Flynn was afforded an opportunity to submit an amended complaint. Dkt. No. 11 at 18. On February 25, 2016, Flynn filed an Amended Complaint. Dkt. No. 20. Upon review of the Amended Complaint, the Court directed Wellenstein and Ward to respond to the First Amendment claims related to access to the courts and retaliation. Dkt. No. 22 at 14, 26, 29.

### III. Discussion [14]

[14]      All unpublished opinions cited to by the undersigned in this Report-Recommendation are, unless otherwise noted, attached to this Report-Recommendation.

In the Amended Complaint, Flynn alleges that his First Amendment right to access the courts was violated and further, that Wellenstein retaliated against him for filing grievances. See generally Am. Compl. Defendants move for summary judgment arguing that (1) Flynn failed to allege any "actual injury" to sustain a First Amendment claim; (2) Flynn cannot establish a retaliation claim against Wellenstein; (3) Flynn's supervisory claims against Ward must be dismissed; and (4) Flynn failed to exhaust his administrative remedies with respect to retaliatory conduct. See generally Dkt. No. 64.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. See FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. See FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. See Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

*6    The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. See Gallo v. Prudential Residential Servs., Ltd. P'ship., 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," ... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

2018 WL 3195095

## B. First Amendment

### 1. Access to Courts

Flynn claims that Wellenstein deliberately "mixed up" and destroyed legal exhibits, refused to accept legal requests, and failed to provide legal materials, assistance, and copies. See generally, Am. Compl. As a result, Flynn claims that he was prevented from filing a writ of coram nobis, a petition for habeas relief, a petition with the Department of Veterans' Affairs, an Article 78 petition, and an appeal with the New York State Retirement System and missed deadlines in pending litigation. See id. Defendants argue, even assuming that Flynn had demonstrated a material issue of fact as to whether Defendants acted deliberately and maliciously in failing to provide him with legal assistance and materials, the record does not support Flynn's conclusory claim that he suffered an actual injury caused by the Defendants. Dkt. No. 64-6 at 4.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. See Bounds v. Smith, 430 U.S. 817, 824 (1977); Lewis v. Casey, 518 U.S. 343, 350 (1996) ("The right that Bounds acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them[.]" Lewis, 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. See Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). Second, the plaintiff must demonstrate that he suffered an actual injury, "i.e., [the defendant] took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (internal citations, quotation marks, and alterations omitted) (quoting Lewis, 518 U.S. at 329); Davis, 320 F.3d at 351 (internal quotation marks omitted). "[A] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Benjamin v. Kerik, 102 F. Supp. 2d 157, 164 (S.D.N.Y. 2000) (citation omitted), aff'd sub nom. Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001).

*7 Here, while Flynn made several claims in his Amended Complaint related to pending legal matters, Flynn testified at his deposition that he could not recall what litigation he was

working on in 2015, the procedural posture of any pending litigation, or whether he was subject to any Court imposed deadlines. Dkt. No. 64-4 at 12-31. Flynn testified that he filed actions in the Court of Claims against Wellenstein related to the destruction of his legal work, and that the actions were dismissed, but he could not attribute that dismissal to Wellenstein's actions or inactions. Id. at 25-26, 29, 30. Flynn explained that he could not provide any specific information related to Court deadlines or legal matters because he was compelled to send his legal work home and it was lost. Dkt. No. 64-4 at 18-19, 25, 31, 45. Flynn testified:

> ... Most of my legal work was shipped —sent home. They forced me to send most of my legal work home, so—and I haven't been able to get my legal work sent to me. Then they lost a box of legal work, so.

Dkt. No. 64-4 at 18.

The record however, lacks any facts related to who directed Flynn to send his legal work home, when or what portion of his work was misplaced or lost, and who was responsible for his missing legal work.

Even if the undersigned accepts Flynn's explanation, the docket reports for cases pending in this Court, as well as Flynn's litigation history, belie his First Amendment claims. In October 2013, Flynn filed a Petition for Habeas Corpus relief. See Flynn v. Colvin, No. 9:13-CV-1247 (JKS), Dkt. No. 1 (N.D.N.Y. Oct. 7, 2013). From February 2014 until June 2016, Flynn filed several submissions in that case including various motions, an application for counsel, a reply to his petition, and objections to Court Orders. Id.; Dkt. Nos. 20, 22, 24, 26, 27, 29, 31, 33, 34, 35, 36, 38. In December 2016, the Petition was denied and Judgment was entered. Id.; Dkt. Nos. 47, 48. Nothing in the record suggests that the Petition was denied for failure to comply with deadlines, prosecute, or purse the action.

In August 2015, Flynn commenced the within action by filing an eighteen page complaint with over two hundred pages of exhibits, together with a motion to proceed IFP, an inmate authorization form, a motion to appoint counsel, and a motion for preliminary injunctive relief. Dkt. Nos. 1, 2, 3, 4, 5. From August 2015 until June 2016, Flynn filed letters, motions, and

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 717 of 830

2018 WL 3195095

a fifty-four page Amended Complaint. Dkt. No. 6, 8, 10, 12, 16, 18, 20, 23. Flynn has clearly been able to proceed in his litigation of this case, despite his claims otherwise.

In December 2017 and March 2018, the Appellate Division issued Orders dismissing two such petitions. See Flynn v. Annucci, 156 A.D.3d 1105 (3d Dep't 2017); Flynn v. Annucci, 159 A.D.3d 1181, 1182 (3d Dep't 2018). In the 2018 Order, the Court affirmed the disciplinary determination after considering the documentary evidence, hearing testimony, and misbehavior report. Flynn, 159 A.D.3d at 1182. The record lacks facts establishing that these cases were dismissed due to Flynn's inability to prosecute or purse the matters or Defendants' behavior. See Davis, 320 F.3d at 352 (holding that a plaintiff must show that there is "a causal connection between the protected speech and the adverse action.") (citation omitted).

To summarize, Flynn has failed to show that Defendants' actions hindered his efforts to pursue a legal claim. Flynn was able to file several submissions in this Court, demonstrating that Defendants' alleged conduct did not prevent him from litigating actions. Flynn has failed to provide evidence of any type of actual injury which occurred as a result of Defendants' actions. Flynn has failed to identify which legal claims were frustrated, if they were meritorious, and how his access to legal materials, supplies, or the law library would have supported the viability of such claims. In the absence of any evidence that Flynn suffered any actual injury precluding him from pursuing any judicial action, it is recommended that Defendants' motion for summary judgment on this ground should be granted.

## 2. Retaliation

**\*8** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. See Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F.Supp.2d 317, 347 (N.D.N.Y. 2010). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. See Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008). Therefore, conclusory allegations alone

are insufficient. See id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.") ). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his engaging in the protected conduct. See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson, 549 F. Supp. 2d at 215.

The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good disciplinary record, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted). Temporal proximity between the protected activity and the adverse action "must be very close." Meyer v. Shulkin, ―― F. App'x ――, 2018 WL 480478, at *2 (2d Cir. Jan. 19, 2018) (citation omitted).

There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 718 of 830

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

between the protected conduct and
adverse action were sufficient, while in
other circumstances three months was
considered too long.

*Burton v. Lynch*, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009)
(internal quotation marks and citations omitted).

Flynn claims that Wellenstein assaulted him, threatened him,
denied him access to the court, and filed misbehavior reports
in retaliation for Flynn's grievances against Wellenstein.
See generally Am. Compl. It is well-settled that the filing
of a grievance constitutes protected speech under the First
Amendment. See *Graham*, 89 F.3d at 80; *Franco v. Kelly*,
854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional
obstruction of a prisoner's right to seek redress of grievances
is precisely the sort of oppression that *section 1983* is
intended to remedy.") (alteration and internal quotation marks
omitted); see also *Roseboro*, 791 F. Supp. 2d at 367 (finding
that the filing of a grievance is a protected activity); *Mateo
v. Fischer*, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same).
Thus, for each allegation, Flynn has satisfied the first prong of
First Amendment retaliation analysis. Thus, the Court turns
to whether Flynn has established that he suffered an adverse
action and a causal connection between the protected conduct
and the adverse action.

### a. Assault

*9 Flynn alleges that Wellenstein assaulted him on April
30, 2015 in retaliation for filing grievances. See Am. Compl.
¶ 54. With respect to the second prong of the analysis,
Defendants claim that the alleged action, i.e., pushing, was
de minimis and thus, not an adverse action. The undersigned
agrees. Although an alleged assault need not rise to the
level of an Eighth Amendment excessive force violation in
order to be considered an adverse action for purposes of
First Amendment retaliation analysis, Flynn's allegations that
Wellenstein "push[ed] him around," see Am. Compl. ¶ 54, are
de minimis. See *Rivera v. Goord*, 119 F. Supp. 2d 327, 340
(S.D.N.Y. 2000) ("[E]ven though [the plaintiff] has alleged
that the actions of [the defendants] were motivated by [the
plaintiff's] filing of grievances, the alleged acts of retaliation,
even if assumed to be true, are de minimis; [the plaintiff]
states only that [the defendants] 'shoved' him while taking
him to the 'box' (i.e., Green Haven's Special Housing Unit,
or "SHU"). Such actions, even if proven at trial, would not

chill a person of ordinary firmness from continuing to engage
in First Amendment activity."); *Sloane v. Mazzuca*, No. 04
CV 8266(KMK), 2006 WL 3096031, at *13-14 (S.D.N.Y.
Oct. 31, 2006) (concluding that the defendant's conduct of
throwing a food tray at plaintiff did not amount to adverse
action); cf. *Williams v. Hesse*, No. 9:16-CV-01343 (GTS/
TWD), 2018 WL 1363759, at *7-8 (N.D.N.Y. Feb. 2, 2018)
(concluding that the defendants' threats coupled with spitting
chewing tobacco in the plaintiff's face that resulted in "severe
burning, pain, and a temporary loss of vision in his right
eye for nearly six hours, and a severe headache for days"
constituted adverse action) Moreover, there is no indication
that plaintiff sought medical treatment or experienced severe
pain or suffering as a consequence of the alleged assault. See
*Williams*, 2018 WL 1363759, at *7-8. Therefore, because the
undersigned finds that Wellenstein's alleged assault does not
amount to adverse action, it is recommended that Defendants'
motion on this ground be granted.

### b. Access to Courts

Flynn alleges that Wellenstein denied him access to the law
library and to the courts in retaliation for filing grievances.
Dkt. No. 20 ¶¶ 57, 59, 118, 119, 120, 122. Although a
defendant's underlying action may not amount to a violation
of a constitutionally protected right, this does not preclude
such action from consideration as an adverse action. See
*Shariff v. Poole*, 689 F. Supp. 2d 470, 478-79 (W.D.N.Y.
2010). " 'An act in retaliation for the exercise of a
constitutional right is actionable under § 1983 even if the act
when taken for different reasons would have been proper.'
" Id. (quoting *Franco*, 854 F.2d at 588); see *Nei v. Dooley*,
372 F.3d 1003, 1007 (8th Cir. 2004) (rejecting the defendants'
argument that "[a]s for the inmates' claim that they were
retaliated against for filing their lawsuit by being denied
access to the prison law library, the officials contend the
district court should have construed the claim as one of denied
access to the courts, requiring proof of actual injury, rather
than one of retaliation) (citation omitted)." Thus, even though
the undersigned has recommended dismissal of plaintiff's
access to the courts claim, Wellenstein's underlying conduct
may still be assessed as adverse action.

It is well-settled that the denying an inmate access to the law
library or destroying legal material constitutes adverse action.
See *Guillory v. Haywood*, No. 9:13-CV-01564 (MAD), 2015
WL 268933, at *17 (N.D.N.Y. Jan. 21, 2015) ("Furthermore,
refusing to allow Plaintiff to go to the law library knowing

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 719 of 830

2018 WL 3195095

that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.") (internal quotation marks and citation omitted); see also Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *10 (N.D.N.Y. Jan. 24, 2013), report and recommendation adopted, 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013) ("Destruction of Plaintiff's legal material and documents for his Second Circuit appeal constitutes an adverse action for purposes of the retaliation analysis."). Thus, Flynn has established the second prong of the retaliation analysis.

With respect to the third prong, Flynn must establish a causal connection "sufficient to support the inference 'that the speech played a substantial part' in the [ ] adverse [ ] action." Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991) ). As to temporal proximity, the record indicates that on March 10, 2015; April 5, 2015; April 30, 2015; May 6, 2015; May 8, 2015; May 11, 2015; May 14, 2015; July 21, 2015; August 7, 2015; October 23, 2015; and November 6, 2015, Flynn filed grievances against Wellenstein. See Dkt. N. 64-7. Although there is no "bright line" establishing the time frame appropriate for establishing temporal proximity, the short gap between the protected conduct and adverse action appears sufficiently close to support an indication of a causal connection. See Espinal, 558 F.3d at 129 (holding that passage of six months between protected conduct and adverse action sufficiently supported an inference of a causal connection); see, e.g., Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002) (concluding that the short time frame between grievance and retaliatory action, along with allegation of the defendant's involvement, sufficed to support an inference of a retaliatory motive), abrogated on other grounds, Porter v. Nussle, 534 U.S. 516 (2002).

**\*10** However, "temporal proximity alone cannot create a genuine issue of material as to whether the motivation behind [the defendant's] actions was retaliation." Parks v. Blanchette, 144 F.Supp.3d 282, 336-37 (D. Conn. 2015). Additional circumstantial evidence supports the conclusion that Wellenstein's conduct may have been motivated by Flynn's complaints. On May 8, 2015, Flynn contends that Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. On May 11, 2015, Wellenstein stated "don't [you] dare request anything

or I will write you up. I will set you up for grieving me all the time." Id. ¶ 58. Assessing these statements in the light most favorable to Flynn as the non-moving party, the statements are sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged denial of legal materials and/or the law library. Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Moreover, Wellenstein has not provided an affidavit or other evidence to refute Flynn's testimony. Therefore, there is a genuine triable issue of fact for a jury to consider. See Ramos v. O'Connell, 28 F. Supp. 2d 796, 803 (W.D.N.Y. 1998) (denying summary judgment where the defendants failed to submit affidavits or documents to contradict the plaintiff's account). Therefore, affording plaintiff special solicitude, it is recommended that Defendants' motion on this ground be denied.

### c. Threats

Verbal harassment and threats are generally not considered conduct "that would deter a similarly situation individual of ordinary firmness of exercising constitutional rights." Cabassa v. Smith, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009) (citing Gill, 389 F.3d at 380) (additional citation omitted). Verbal threats however, may constitute adverse action for purpose of a First Amendment retaliation if the threats are sufficiently specific. Barrington v. New York, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011); see also Ford v. Palmer, 539 F. App'x 5, 6 (2d Cir. 2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances).

Here, Flynn testified that Wellenstein threatened him and told him not to go to the law library. Dkt. No. 64-4 at 93-94. Upon further questioning, Flynn testified:

> Q. Okay. When did he make threats about not going to the law library?
>
> A. I don't recall.
>
> Q. What about threats in writing you up, when did he say that?
>
> A. I don't recall.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

Q. Do you recall the sum and substance of any of the conversations about not going to the law library or about writing you up?

A. I don't recall right now.

Dkt. No. 64-4 at 94.

Flynn did not document or report the threats. Dkt. No. 64-4 at 96. Based upon the record, the Court concludes that Wellenstein's alleged threats are not sufficiently specific to constitute adverse action. See Bartley v. Collins, No. 95 Civ. 10161, 2006 WL 1289256, at *2-4 (S.D.N.Y. May 10, 2006) (finding no adverse action where a corrections officer tells a plaintiff that he is going to "get [him]" for filing a lawsuit); Alicea v. Howell, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (finding no adverse action where a prison official told an inmate that he would "have to pay the consequences" for filing a grievance against her).

Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims on this ground be granted. [15]

[15]    In light of my recommendation that Flynn's retaliation claim based upon threats be dismissed in its entirety based on the merits, I find it unnecessary to address the alternative failure to exhaust arguments related to this claim.

### d. Misbehavior Reports

Flynn alleges that Wellenstein filed misbehavior reports, and directed other officers to file misbehavior reports, in retaliation for grievances. Am. Compl. ¶¶ 55, 70, 71, 73, 79. A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action). Courts in this Circuit have held that a temporary loss of privileges does not constitute adverse action. See Smith v. City of New York, No. 14 CIV. 5927, 2017 WL 2172318, at *6 (S.D.N.Y. May 16, 2017); see also Monko v. Cusack, No. 9:11-CV-1218 (GTS/TWD), 2013 WL 5441724, at *11 (N.D.N.Y. Sept. 27, 2013) ("... the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are de minimis and do not constitute adverse action for purposes

of a retaliation claim.") (citation omitted); Bartley, 2006 WL 1289256 at *7 (holding that a misbehavior report which resulted in the temporary loss of commissary privileges does not constitute adverse action because the penalty was de minimis).

**\*11** As a result of the misbehavior reports issued by Koscielniak and Wellenstein on August 1, 2015, Flynn suffered a temporary loss of privileges. Dkt. No. 20-6 at 70. Flynn was not sentenced to any disciplinary confinement or penalized as a result of the November 12, 2015, November 18, 2015 and December 11, 2015 misbehavior reports. Dkt. No. 20-6 at 25; Am. Compl. ¶¶ 125, 130. Therefore, because Flynn has failed to show that he suffered an adverse action as a result of the aforementioned tickets, the undersigned need not determine whether there is a causal connection between Flynn's protected conduct and these misbehavior reports. Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon the August 1, 2015; November 12, 2015; November 18, 2015; and December 11, 2015 reports be granted. [16]

[16]    See Footnote 17, supra.

The Court reaches a different conclusion however, with respect to the remaining misbehavior reports. As a result of the April 30, 2015 and August 18, 2015 tickets, Flynn was sentenced to eighteen days in keeplock. Dkt. No 20-6 at 70. As a result of the August 24, 2015 misbehavior report, Flynn received a thirty day keeplock sentence. [17] Id. Accordingly, Flynn has established the second prong of the retaliation analysis with respect to these misbehavior reports. Having found that Flynn satisfied the first and second prong of the retaliation analysis with respect to these tickets, the Court turns to whether the record establishes a causal connection between the protected conduct and the adverse action.

[17]    Defendants argue that a suspended sentence does not constitute an adverse action. Dkt. No. 64-6 at 18. Defendants claim, without evidentiary support, that Flynn did not serve keeplock or lose any privileges as a result of this misbehavior report. Id. The record before the Court establishes that the thirty day sentence was suspended until December 8, 2105. Dkt. No. 20-6 at 70. There is however, a genuine issue of fact regarding whether Flynn served the keeplock sentence. Construing the facts in a light most favorable to the pro se, non-moving

2018 WL 3195095

party, the Court finds that Defendants have failed to meet their burden of proof with regard to this issue.

### i. April 30, 2015

On April 30, 2015, Wellenstein issued Flynn a misbehavior report for smoking. Am. Compl. ¶ 55; Dkt. No. 64-6 at 14. Flynn contends that this misbehavior was in retaliation for his April 16, 2015 and April 28, 2015 grievances. Am. Compl. ¶ 55. First, the undersigned notes that the April 16, 2015 grieves conduct by the "law library relief officer" and makes no mention of Wellenstein. See Dkt. No. 20-3 at 31. Absent evidence by plaintiff that Wellenstein either was the library relief officer or knew of the contents of said grievance, the April 16, 2015 grievance cannot be the basis for his retaliation claim. See Tafari, 714 F. Supp. 2d at 374 (concluding that the plaintiff failed to establish a causal connection where the defendant was not named in the original grievance). Second, as to the April 28, 2015 grievance, although the temporal proximity of two days sufficiently supports an inference of causal connection, temporal proximity "without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citing inter alia Ayers v. Stewart, 101 F.3d 687, 1996 WL 346049 (Table), at *1 (2d Cir. 1996) ("[The plaintiff's] reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment.") ). As to statements regarding Wellenstein's motivations, the record indicates that on May 8, 2015, Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. Assessing this statement in the light most favorable to Flynn as the non-moving party, the undersigned finds it sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged filing of misbehavior reports. Baskerville, 224 F. Supp. 2d at 732.

**\*12** Wellenstein argues that even assuming the evidence creates a material question of fact as to whether he had retaliatory intent, he would have issued the misbehavior report even in the absence of the protected conduct. "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage."

Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998). "Defendants [may meet] their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct if 'it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct' for which he had been cited in a misbehavior report." Id. (citing Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994) ).

In September 2013 and March 2015, Flynn was charged with smoking at Mid-State C.F. Dkt. No. 20-6 at 70. Flynn was found guilty of those charges. Id. During his deposition, Flynn admitted that he smoked in his cell in the past and conceded that he "had several disciplinary issues with smoking[.]" Dkt. No. 64-4 at 95-96. However, Flynn maintains that on April 30, 2015, he was not smoking in his cell. Id. As discussed supra, Wellenstein has not provided any sworn testimony in support of the motion, and, thus, has not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct. Accordingly, there is an genuine dispute as to whether Flynn committed the charged conduct. See Gayle, 313 F.3d at 684 (denying summary judgment where it is disputed whether the plaintiff committed the prohibited conduct). Therefore, the undersigned recommends that Defendants' motion for summary judgment, on this basis, be denied. [18]

[18]    See Footnote 15, supra.

### ii. August 17, 2015

The August 17, 2015 misbehavior report was written by Officer Alsante. Dkt. No. 20-6 at 8. To establish a retaliation claim, a plaintiff must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." Graham, 89 F.3d at 81. "[I]t is difficult to establish one defendant's retaliation for complaints against another defendant." Hare v. Hayden, No. 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) ).

Here, Flynn did not file any grievances or complaints against Alsante. The record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations. Without more, the evidence does not present a genuine issue of material fact for a jury to resolve. See Ciaprazi v. Goord, No. 9:02-CV-915 (GLS/DEP), 2005

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 722 of 830

WL 3531464, at *9 (N.D.N.Y. Dec. 22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff); see also Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 (N.D.N.Y. July 14, 2015); Guillory v. Ellis, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014). Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon this misbehavior report be granted. [19]

[19]    See Footnote 17, supra.

### iii. August 24, 2015

On August 24, 2015, Wellenstein issued plaintiff a misbehavior report alleging that Flynn threatened and verbally harassed him. Dkt. No. 20-6 at 12. Plaintiff contends that this misbehavior report was in retaliation for his August 20, 2015 and August 22, 2015 grievances. Am. Compl. ¶ 79. However, as Defendants note, during his deposition, plaintiff admitted that he "made a smart remark about [Wellenstein] selling flowers for a living," but that Wellenstein "took that to a whole different level." Dkt. No. 64-4 at 91, 93, 95. Thus, as plaintiff admitted to making the statement that is the basis for the August 24, 2015 misbehavior report, the evidence suggests that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." Gayle, 313 F.3d at 682. Therefore, Defendants have established a non-retaliatory reason for the filing of the August 24, 2015 misbehavior report. See Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that plaintiff's admission of the underlying conduct established a "proper, non-retaliatory reason[ ] for filing the misbehavior report."). Accordingly, it is recommended that Defendants' motion on this ground be granted.

### C. Supervisory Liability

**\*13** Defendants argue that Flynn's claims against Ward must be dismissed because Ward was not personally involved in any constitutional violations. Dkt. No. 64-6 at 20-23. Flynn does not allege, nor does the record support the conclusion that Ward directly participated in any alleged constitutional violations. Construing the Amended Complaint liberally,

Flynn contends that Ward was personally involved in the alleged constitutional violations by denying his grievances.

Supervisory officials may not be held liable merely because they held a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986) ).

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. Smart v. Goord, 441 F.Supp.2d 631, 643 (S.D.N.Y. 2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Also, it is within the purview of a superior officer to delegate responsibility to others. See Vega v. Artus, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007) ).

"[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Perilla v. Fischer, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing inter alia Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) ) (citation omitted) ). "[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Molano v. Bezio, No. 10-CV-6481, 2012 WL

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 723 of 830

1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing Collins v. Ferguson, 804 F.Supp.2d 134, 140 (W.D.N.Y. 2011), Black v. Coughlin, 76 F.3d 72, 74–75 (2d Cir. 1996) ).

The record before the Court contains Superintendent responses related to six grievances. Dkt. No. 64-5 at 8, 17, 22-23, 29, 33, 38. As noted supra, the signature of the Superintendent who executed the response, in each instance, is illegible. See Part II(A)(1). In response to the May 6, 2015 grievance (MS-21970-15), the Superintendent concluded that, "[i]n this investigation, the grievant alleges that he is not being provided assistance with law library requests, his copies are purposely damaged and he is being retaliated against for filing complaints." Dkt. No. 64-5 at 22. Defendants argue that Ward was not involved in that grievance and attribute only two grievances to Ward: MS-22079-15 and MS 22200-15. Dkt. No. 64-6 at 22-23. While Defendants concede that additional grievances were appealed to the Superintendent, Defendants claim that the remaining grievance responses were not issued by Ward and thus, Ward was not involved in the decision-making process or investigation regarding these grievances. These arguments are asserted by counsel in the Memorandum of Law, but notably absent from the record is any affidavit or declaration from Ward. Without such evidence, a factual dispute exists as to whether Ward proactively participated in the decision-making process related to Flynn's grievances. As such, there is triable issue of material fact for a jury to resolve with respect to Ward's personal involvement in Wellenstein's alleged retaliatory conduct. See Celotex Corp., 477 U.S. at 323. Accordingly, Defendants' motion against Ward on this ground should be denied.

**\*14** A different conclusion is reached however, with respect to Flynn's First Amendment claims based upon access to the courts. Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability"). As discussed supra, Flynn failed to raise an issue of material fact with respect to his First Amendment claim based upon access to courts. Accordingly, the undersigned recommends that Defendants' motion for summary judgment and dismissal of Flynn's First Amendment claims against Ward based upon access to the courts be granted.

## D. Exhaustion

As an alternative ground for dismissal of the retaliation claims, Defendants contend that the motion for summary judgment must be granted because Flynn failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 64-2 at 23-26. The PLRA requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). "The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004) (citing Porter, 534 U.S. at 524-25). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 W L 2708434, at *4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

"The mere fact that an inmate plaintiff filed some grievance prior to filing suit is not enough. The grievance must also have related to the subject matter of the federal lawsuit." Allah v. Poole, 506 F. Supp. 2d 174, 180 (W.D.N.Y. 2007) (citation omitted). The scope of a plaintiff's federal claim may not exceed that of the grievance. Donahue v. Bennett, No. 02-CV-6430, 2004 WL 1875019, at *8 (W.D.N.Y. Aug. 17, 2004).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this district followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

if the plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill, is no longer consistent with the statutory requirements of the PLRA. See Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

*15 Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5 (2015). First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged action. Id. § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven

days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

Flynn testified that he was familiar with the grievance process and filed "numerous" grievances in 2015. Dkt. No. 64-4 at 41-44. As discussed supra, the record contains copies of six (6) grievances that Flynn appealed to CORC and thus, Defendants concede, exhausted.[20] The record contains a certification attesting to the veracity of the grievance records. Dkt. No. 64-5 at 2.

[20]     Flynn filed additional grievances, but the record does not contain proof that these grievances were exhausted. To wit, Flynn testified that "at least two or three" of his grievances "made it to Albany." Dkt. No. 64-4 at 46. Flynn could not recall which grievances were appealed and testified that while nothing prevented him from exhausting of all his grievances, he did not appeal certain grievances because they were "repetitive." Id.

With respect to the exhausted grievances, Defendants argue that Flynn's retaliation claims were not properly exhausted because these grievances did not contain allegations that Wellenstein retaliated against Flynn when he assaulted him and issued misbehavior reports. Dkt. No. 64-4 at 25-26. Defendants have not provided an affidavit from any DOCCS' employee with personal knowledge to support Defendants' contention that there is no connection between Flynn's grievances and the matters raised in the federal court complaint. Once again, Defendants rely upon the unsupported statements by counsel without evidentiary support. Upon review of the record, the undersigned finds that has exhausted his remaining retaliation claims. In the May 6, 2015 grievance, Flynn claimed that Wellenstein provided distorted copies of court forms and asserted, "[t]his is the 3[rd] time he has deliberately ruined copies to the point they are unusable. This is deliberate harassment and the denial of legal copies." Dkt. No. 64-5 at 21. In the May 8, 2015 grievance, Flynn claimed:

*16 On 5/8/15 at 5:05 p.m. C.O Wellenstein came to my cell and

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 725 of 830

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

2018 WL 3195095

started kicking the cell door and slaming [sic] feed up door, verbally harassing me and making numerous threats. For months C.O. Wellenstein has been harassing me. As a result of his harassment I am afraid to use the law library services and request legal material.

Dkt. No. 64-5 at 19.

On July 14, 2015, the Superintendent responded and categorized these claims as "retaliation" claims in response to filing prior complaints. Dkt. No. 64-5 at 22. The Superintendent conducted an investigation and interviewed Wellenstein. Id.

In the August 7, 2015 grievance, Flynn reiterated his harassment complaints claiming that, "Wellenstein has refused to make copies in retaliation for the 2 most recent grievances against him. His refusal to make copies is harassment[.]" Dkt. No. 64-5 at 26-28. On August 27, 2015, the Superintendent issued a response finding that the grievant "has not substantiated his claim that he has been the victim of harassment by staff[.]" Id. at 29. The Superintendent noted that Wellenstein denied the allegations. Dkt. No. 64-5 at 29. In his Appeal Statement, Flynn argued that Wellenstein continues to deter him from using the law library "in retaliation for filing grievances[.]" Id. On October 21, 2015, CORC issued a decision quoting Directive #4040, Section 701.6(b) related to prohibited "reprisals" against an inmate who utilizes the grievance process. [21] Id. at 24.

[21]    Section 701.6(b) provides:
Reprisals prohibited. No reprisals of any kind shall be taken against an inmate or employee for good faith utilization of this grievance procedure. An inmate may pursue a complaint that a reprisal occurred through the grievance mechanism. A grievant shall not receive a misbehavior report based solely upon an allegedly false statement made by the inmate to the grievance committee.
N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6.

Drawing all inferences in Flynn's favor, the Court finds that the facts alleged in Flynn's grievances encompass the facts set forth in the Amended Complaint. See Curry v. Fischer, No. 02

Civ.4477, 2004 WL 766433, at *8 (S.D.N.Y. Apr. 12, 2004). Accordingly, it is recommended that Defendants' Motion for Summary Judgment, insofar as it raises the affirmative defense of nonexhaustion, be denied.

### IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment access to the courts claims against Wellenstein and Ward;

(2) Insofar as it seeks dismissal of Flynn's retaliation claims against Wellenstein and Ward related to misbehavior reports issued on August 1, 2015, August 17, 2015, August, 24, 2015, November 12, 2015, November 18, 2015, and December 11, 2015;

(3) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for the April 30, 2015 assault; and

(4) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for threats,

the motion be **GRANTED**; and it is further

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 64) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward based on access to courts and the misbehavior report issued on April 30, 2015; and

**\*17** (2) Insofar as it seeks dismissal of plaintiffs retaliation claims for access to the courts and the April 30, 2015 misbehavior report due to nonexhaustion, the motion be **DENIED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 726 of 830

**Flynn v. Ward, Not Reported in Fed. Supp. (2018)**

2018 WL 3195095

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[22]

---

[22]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added

to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3195095

---

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 727 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

2019 WL 8015209
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Seth LOGAN, Plaintiff,

v.

Superintendent GRAHAM, Auburn Correctional
Facility; C.O. Pflueger, Auburn Correctional
Facility; Officer Scott Jones, Auburn Correctional
Facility, formerly known as C.O. Smith; and C.O.
M. Gould, Auburn Correctional Facility, Defendants.

9:18-CV-0291 (DNH/ML)
|
Signed 11/26/2019

**Attorneys and Law Firms**

SETH LOGAN, Plaintiff, Pro Se, 117 Avery Avenue, Buffalo,
New York 14210.

LETITIA A. JAMES, OF COUNSEL: AIMEE COWAN,
ESQ., Assistant Attorney General, Attorney General for the
State of New York, Counsel for Defendants, 300 South State
Street, Suite 300, Syracuse, New York 13202.

**REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

 **\*1** This matter has been referred to me for a Report and
Recommendation by the Honorable David N. Hurd, United
States District Judge. Currently before the Court, in this
civil rights action filed by Seth Logan ("Plaintiff") against
Superintendent Graham, Auburn Correctional Facility, C.O.
Pflueger, [1] Auburn Correctional Facility, Officer Scott
Jones, Auburn Correctional Facility, formerly known as
C.O. Smith, and C.O. M. Gould, Auburn Correctional
Facility (collectively "Defendants"), is Defendants' motion
for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt.
No. 28). For the reasons set forth below, I recommend that
Defendants' motion be granted in part and denied in part.

[1]   The Court notes that Defendants sometimes refer
to Defendant Pflueger as Defendant "Plfueger" or
"Pfleuger." (*See* Dkt. No. 28, Attach. 1; Dkt. No.
28, Attach. 3; Dkt. No. 28, Attach. 10.) However,

for the sake of consistency, the Court will refer
to him as Defendant Pflueger, as reflected on the
docket. (*See generally* docket sheet.)

**TABLE OF CONTENTS**

**I. RELEVANT BACKGROUND**...——
**A. Plaintiff's Claims**...——

**B. Procedural History**...——

**C. Statement of Undisputed Material Facts**...——

**D. Parties' Briefing on Defendants' Motion for Summary
Judgment**...——

**II. RELEVANT LEGAL STANDARDS**...——
**A. Standard Governing a Motion for Summary
Judgment**...——

**B. Standard Governing Exhaustion of Administrative
Remedies**...——

**III. ANALYSIS**...——
**A. Plaintiff's Failure to Oppose the Merits of Defendants'
Summary Judgment Motion**...——

**B. Exhaustion of Grievances AUB-67199-15 and
AUB-67567-15**...——

**C. Whether Plaintiff's First Amendment Retaliation
Claims Should Nevertheless be Dismissed**...——

**D. Doctrine of Qualified Immunity**...——

**I. RELEVANT BACKGROUND**

   **A. Plaintiff's Claims**
Generally, liberally construed, Plaintiff's Complaint asserts
claims of retaliation against Defendants in violation of the
First Amendment. (Dkt. No. 1; Dkt. No. 6.) The Court's
Decision and Order dated May 4, 2018, thoroughly outlines
Plaintiff's allegations and claims. (Dkt. No. 6.)

   **B. Procedural History**

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 728 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

On March 8, 2018, Plaintiff commenced this action by filing a verified Complaint against Defendants, Lieutenant Vasill, and Lieutenant Abate (Dkt. No. 1) together with a motion for leave to proceed *in forma pauperis* (Dkt. No. 2). On May 4, 2018, the Court granted Plaintiff's motion to proceed *in forma pauperis*. (Dkt. No. 6.) In addition, the Court ordered that Plaintiff's retaliation claims against Defendants survive *sua sponte* review, but the Court dismissed Plaintiff's remaining claims including those against Lieutenant Vasill and Lieutenant Abate. (*Id.*)

On January 25, 2019, Defendants filed a letter motion requesting dismissal for failure to prosecute. (Dkt. No. 27.) On March 6, 2019, Defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 and a motion to dismiss for lack of prosecution. (Dkt. No. 28.) These motions were referred to United Stated Magistrate Judge David E. Peebles for a Report and Recommendation. On March 27, 2019, Magistrate Judge Peebles issued a Report and Recommendation, which recommended that (1) the Complaint be dismissed based on Plaintiff's failure to prosecute and to comply with the Court's orders and local rules of practice, and (2) that Defendants' motion for summary judgment be denied as moot. (Dkt. No. 30.) On April 15, 2019, Plaintiff filed a change of address with the Court. (Dkt. No. 32.) As a result, on April 15, 2019, United States District Judge David N. Hurd *sua sponte* granted an extension of time to file objections to United Stated Magistrate Judge David E. Peebles's Report-Recommendation of March 27, 2019. (Dkt. No. 33.) Plaintiff did not file any objections to the Report-Recommendation dated March 27, 2019. (*See generally* Docket Sheet.)

**\*2**  On July 3, 2019, the Court denied Defendants' motion to dismiss and referred to me for consideration of Defendants' motion for summary judgment. (Dkt. No. 35.) On July 3, 2019, Plaintiff was provided another opportunity to oppose Defendants' motion with a response due by August 20, 2019, and a reply due by August 26, 2019. (*See* text notice dated 7/3/19.) On September 9, 2019, the Court issued a text order granting Plaintiff yet another opportunity to oppose Defendants' motion with a deadline of September 30, 2019. (Dkt. No. 37.)

On October 1, 2019, Plaintiff filed a response in opposition to Defendants' motion. (Dkt. No. 39.)

**C. Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Rule 7.1 Statement and not denied by Plaintiff in a Rule 7.1 Response. (*Compare* Dkt. No. 28, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 39 [Pl.'s Response].)

1. Plaintiff was convicted in 2009 of Attempted Assault in the First and Second Degree.

2. All claims in this matter arose out of Plaintiff's confinement at Auburn Correctional Facility ("Auburn"), as a result of his felony convictions in 2009.

3. Plaintiff was released from prison to the Division of Parole on January 7, 2019. [2]

[2]

> The Court notes that the citation provided by Defendants for this fact does not support the fact asserted. *See* New York State Dep't of Corr. And Comty. Servs., http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (last visited November 25, 2019). However, the Court deems the fact admitted because Plaintiff failed to deny it. *Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist.*, 327 F. Supp. 3d 477, 485 n.2 & n.13 (N.D.N.Y. 2018) (Suddaby, C.J.) ("where a non-movant neither admits nor disputes a fact, the response is deemed an admission"); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding the plaintiff's responses to the defendant's statement of material facts not in dispute where the plaintiff's response paragraphs did not specifically dispute the defendant's statements or consisted of "conclusory allegations, speculation, or conjecture."); *In re Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) (stating that, "a response contending to neither admit or deny an allegation does not create a genuine issue of fact"); *accord, Piacente v. Int'l Union of Bricklayers & Allied Craftworkers*, 11-CV-1458, 2015 WL 5730095, at *2 n.3 (S.D.N.Y. Sept. 30, 2015).

4. In his Complaint, Plaintiff claims that on May 9, 2015, Defendant Pflueger stopped Plaintiff in the Auburn recreation yard, accused Plaintiff of being a white supremacist and stated that he would be searching Plaintiff's cell for gang material.

Logan v. Graham, Not Reported in Fed. Supp. (2019)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 729 of 830

2019 WL 8015209

5. Plaintiff alleges that the next day, on May 10, 2015, Defendant Pflueger threatened him while Plaintiff was exiting his cell, stating that Plaintiff "ain't gonna be around here for long. They're gonna get you. We're not sure how yet or for what, but it's gonna happen."

6. According to Plaintiff, Defendant Pflueger did not make any specific threats about anything that he specifically was going to do to Plaintiff.

7. Plaintiff filed a grievance on May 10, 2015, complaining about the alleged incident of May 9, 2015.

8. Defendant Pflueger responded to the grievance by memo and stated that he stopped Plaintiff in the yard on May 9, 2015 after observing tattoos that could be interpreted as gang affiliation tattoos.

9. Defendant Pflueger stated that he passed the information on to the Early Warning Box—which is an avenue to convey information to Auburn Correctional Facility's intelligence unit—and denied threatening or harassing Plaintiff in any way.

**\*3** 10. Plaintiff alleges that over a month later, on June 17, 2015, Defendant Pflueger fired Plaintiff from his job as a feed up porter.

11. Plaintiff was employed as a feed up porter at Auburn for approximately one month until he was terminated on June 17, 2015.

12. A feed up porter's duties include retrieving food trays from the mess hall and feeding inmates who are confined to their cell for disciplinary reasons.

13. On the morning of June 17, 2015, Defendant Pflueger witnessed Plaintiff pass an unidentified item into the cell of another inmate.

14. Defendant Pflueger ordered Plaintiff to return to his cell.

15. Plaintiff yelled profanities as he went back to his cell.

16. While in his cell, Plaintiff yelled "that faggot motherfucker fired me."

17. Plaintiff shouted these profanities loud enough to communicate with another inmate on a different floor.

18. Plaintiff alleges that Defendant Pflueger fired him as a feed up porter in retaliation for the grievance that Plaintiff filed dated May 10, 2015.

19. Plaintiff's only basis for this belief is that there was "no other reason" for Defendant Pflueger to fire him.

20. Based on Plaintiff's behavior on the morning of June 17, 2015, Defendant Pflueger authored a misbehavior report dated June 17, 2015, that charged Plaintiff with several DOCCS Directive violations including disobeying a direct order, creating a disturbance, harassment, and making threats.

21. Defendant Correction Officer Scott Jones endorsed the misbehavior report as a witness to a portion of these events.

22. At the time Defendant Jones endorsed the misbehavior report dated June 17, 2015, he had no knowledge that Plaintiff had filed a grievance against Defendant Pflueger on May 10, 2015.

23. Plaintiff testified that he had never interacted with Defendant Jones before this incident on June 17, 2015.

24. Plaintiff testified that he had no basis to believe that at the time Defendant Jones endorsed the misbehavior report, Defendant Jones knew that Plaintiff had filed any grievances against Defendant Pflueger.

25. Plaintiff filed a grievance regarding the incident on June 17, 2015, but that grievance was denied.

26. Defendant Pflueger was never counseled or disciplined as a result of the incident on June 17, 2015.

27. As a result of the misbehavior report dated June 17, 2015, Plaintiff was found guilty of all charges at a disciplinary hearing and sentenced to 30 days of keep-lock confinement.

28. Plaintiff filed another grievance dated July 21, 2015, which alleged that on July 8, 2015, he received a false report authored by Defendant Correction Officer Mark Gould in which, Defendant Gould recommended Plaintiff be placed in administrative segregation.

29. Defendant Gould recommended that Plaintiff be placed in administrative segregation based on information he received from confidential informants, that Plaintiff planned to assault

2019 WL 8015209

Defendant Pflueger when he was released from keep-lock confinement.

30. Plaintiff was given a hearing with respect to whether he should be in administrative segregation.

31. Plaintiff agreed with the recommendation to be placed in administrative segregation.

32. Plaintiff did not know Defendant Gould prior to his recommendation that Plaintiff be placed in administrative segregation.

**\*4**  33. Plaintiff testified that he believed Defendant Gould made the recommendation to place Plaintiff in administrative segregation on behalf of Defendant Pflueger in retaliation for Plaintiff's grievances, because "there [was] no other reason [for Defendant Gould] to do it."

34. Plaintiff admitted he has no direct evidence that Defendant Gould recommended administrative segregation based on the grievances filed by Plaintiff against Defendant Pflueger.

35. Plaintiff has no evidence that Defendant Gould even knew about any grievances filed by Plaintiff against Defendant Pflueger.

36. Plaintiff is not aware of any conversations that Defendant Gould had with Defendant Pflueger in which they discussed that Defendant Gould should file an administrative segregation recommendation based on false information.

37. Plaintiff also alleged that after he was removed from his cell in the Special Housing Unit on July 9, 2015, items went missing after another inmate witnessed Defendant Pflueger enter Plaintiff's cell.

38. Defendant Pflueger did not pack Plaintiff's cell and he did not remove any of Plaintiff's property.

39. The only basis for Plaintiff's contention that Defendant Pflueger destroyed his property is that Michael Betters, another inmate, reported seeing Defendant Pflueger enter Plaintiff's cell.

40. According to Plaintiff, Michael Betters could not actually see Defendant Pflueger in Plaintiff's cell.

41. Further, Plaintiff does not know who transported his property to his new cell in the Special Housing Unit.

42. Plaintiff filed another grievance alleging that on August 4, 2015, and August 6, 2015, Defendant Pflueger threatened Plaintiff while he was training another officer.

43. Defendant Pflueger responded to the grievance and affirmed that on August 4, 2015, and August 6, 2015, he showed various new officers the Special Housing Unit area, but they did not stop at Plaintiff's cell and he certainly never made any threatening or harassing statements to Plaintiff.

44. Plaintiff testified that at no point during his incarceration did Defendant Pflueger use any force against him.

45. Plaintiff is not alleging any physical injuries with respect to any of his claims.

46. The only basis on which Plaintiff brings retaliation claims against Defendant Graham is because he denied Plaintiff's grievances and allowed Defendant Pflueger's behavior to continue.

47. Other than the grievances he filed, Plaintiff never sent Defendant Graham any other correspondence about these incidents and he never spoke with Defendant Graham in person about them.

Exhaustion of Administrative Remedies

48. Plaintiff was familiar with the grievance process at Auburn Correctional Facility during the relevant time period.

49. Plaintiff was aware of how to properly file a grievance and where to appeal if he disagreed with the decision.

50. More specifically, Plaintiff was aware that a grievance must be submitted to the Inmate Grievance Review Committee ("IGRC") and a decision by the IGRC could be appealed to the Superintendent.

51. Further, Plaintiff was aware that a decision by the Superintendent could be appealed to the Central Office Review Committee ("CORC").

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 731 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

52. Plaintiff testified that if an inmate does not receive a response to his appeal to CORC, he must write to CORC and inquire as to the status of his appeal.

**\*5**  53. Plaintiff filed Grievance AUB-67199-15, in which he complained that he was "labeled a gang member" by Defendant Pflueger.

54. After an investigation, the Superintendent denied Plaintiff's grievance and Defendant Pflueger was never counseled or disciplined.

55. Plaintiff also filed Grievance AUB-67567-15, in which he complained that on July 8, 2015, he received a false report authored by Defendant Gould in which Defendant Gould recommended Plaintiff be placed in administrative segregation.

56. Grievance AUB 67567-15 also alleged that after Plaintiff was removed from his cell in the Special Housing Unit on July 9, 2015, items went missing after another inmate witnessed Defendant Pflueger packing Plaintiff's cell.

57. Defendant Graham denied Plaintiff's Grievance AUB-67567-15.

### D. Parties' Briefing on Defendants' Motion for Summary Judgment

#### 1. Defendants' Memorandum of Law

Generally, in support of their motion for summary judgment, Defendants assert three arguments. (*See generally* Dkt. No. 28, Attach. 3 [Defs.' Mem. of Law].)

First, Defendants argue that Plaintiff failed to exhaust his administrative remedies with respect to grievances AUB-67199-15 and AUB-675667-15. (*Id.*) More specifically, Defendants argue that the Prison Litigation Reform Act requires prisoners who bring a lawsuit in federal court to first exhaust their available administrative remedies; this requirement is mandatory such that, failure to comply subjects the complaint to dismissal. [3] (*Id.*) Further, Defendants argue that the New York State Department of Corrections and Community Services ("DOCCS") has the following three-tiered administrative review and appeals process for prisoner grievances: (1) review by the IGRC, (2) appellate review of the IGRC decision by the prison superintendent, and (3)

appellate review of the prison superintendent by CORC. (*Id.*) Defendants argue that Plaintiff failed to appeal the prison superintendent's decision with respect to grievances AUB-67199-15 and AUB-675667-15, to CORC and thus, the claims contained in those grievances should be dismissed for Plaintiff's failure to exhaust his administrative remedies. (*Id.*)

[3]     Defendants acknowledge that there are "certain caveats" to the PLRA's exhaustion requirement, however Defendants argue that those caveats are inapplicable here.

Second, Defendants argue that Plaintiff's first amendment retaliation claims should be dismissed because (a) with respect to Defendant Pflueger, (i) he lacks authority to "fire" an inmate from his job, (ii) the record lacks any evidence of a causal connection between Plaintiff's grievance of May 10, 2015, and the misbehavior report of June 17, 2015, except temporal proximity, which is insufficient to survive a motion for summary judgment, (iii) the misbehavior report of June 17, 2015, was truthful and Plaintiff admitted that he was appropriately charged with creating a disturbance and harassment, (iv) Defendants presented non-retaliatory reasons for Defendant Pflueger "firing" Plaintiff from his porter duties and authoring the misbehavior report of June 17, 2015, (v) the alleged verbal harassment and threats are not considered adverse actions for purposes of retaliation, (vi) even if the alleged verbal harassment and threats did constitute an adverse action, Plaintiff failed to demonstrate any evidence of a causal connection, (vii) there is no evidence of a causal connection between Defendant Gould's recommendation that Plaintiff be placed in administrative segregation and Plaintiff's grievances filed against Defendant Pflueger, (viii) there is no evidence that Defendant Pflueger removed or destroyed Plaintiff's property, and (ix) there is no evidence of a causal nexus between the grievances he filed and Defendant Pflueger allegedly destroying his property; (b) with respect to Defendant Jones, (i) there is no evidence that he had any knowledge that Plaintiff filed a grievance against Defendant Pflueger, and (ii) the record is devoid of any evidence establishing why he would file a false misbehavior report against Plaintiff on behalf of Defendant Pflueger; (c) with respect to Defendant Gould, (i) Plaintiff agreed with the recommendation that he remain in administrative segregation, (ii) there is no evidence in the record to support a causal connection between Plaintiff's grievance against Defendant Pflueger on May 10, 2015, and Defendant Gould's administrative segregation recommendation on July 21, 2015, and (iii) there is no evidence that Defendant Gould was aware of Plaintiff's grievance against Defendant Pflueger; and (d)

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 732 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)
2019 WL 8015209

with respect to Defendant Graham, (i) in the event that the claims against Defendants Pflueger, Jones, and Gould are dismissed, the claims against Defendant Graham must also be dismissed because there is no supervisor liability where there is no established underlying constitutional violation, and (ii) even if the claims against Defendants Pflueger, Jones, and Gould are not dismissed, the claims against Defendant Graham still should be dismissed because he was not personally involved in the alleged constitutional violations. (*Id.*)

**\*6** Third, Defendants argue that, in the alternative, they are entitled to dismissal pursuant to the doctrine of qualified immunity. (*Id.*)

### 2. Defendants' First Supplemental Letter Brief

Generally in their first supplemental letter brief, Defendants re-assert the arguments set forth in their memorandum of law and assert that (1) Plaintiff has repeatedly failed to oppose Defendants' motion despite being provided with notice of the consequences of failing to respond to the motion two times, and (2) as a result of Plaintiff's failure to respond, the Court should deem (a) Defendants' factual assertions as true, and (b) Plaintiff to have consented to the legal arguments contained in Defendants' memorandum of law. (Dkt. No. 36.)

### 3. Defendants' Second Supplemental Letter Brief

Generally in their second supplemental letter brief, Defendants re-assert the arguments set forth in their memorandum of law and assert that (1) Plaintiff sent Defendants a "Response to Dispositive Motions," which incorrectly indicated that Defendants' motion is based solely on Plaintiff's timeliness and otherwise failed to address Defendants' arguments as to the merits of his claims, (2) Plaintiff has now failed to oppose Defendants' motion three times after receiving notice that his response was required, and (3) despite Plaintiff's request in his response for additional time to respond, the Court should not grant this request because their motion has been pending for nearly one year and Plaintiff "has been given great latitude with respect to the Court's deadlines in this matter." (Dkt. No. 38.)

### 4. Plaintiff's "Response to Dispositive Motions"

Generally, in opposition to Defendants' motion for summary judgment, Plaintiff acknowledged his failure to meet deadlines and asked that the Court consider "many mitigating factors that have contributed to this short coming" including his release from prison, the requirements of his parole, and his criminal history. (Dkt. No. 39.) In addition, Plaintiff asserts that "all these Motions to Dismiss this complaint have been based on timeliness." (*Id.*) Plaintiff did not file a response to Defendants' Statement of Material Facts, an affidavit setting forth any factual assertions, an opposition memorandum of law, or any document that responded to Defendants' legal arguments. (*See generally* Dkt. No. 39.) In addition, Plaintiff did not request any additional time to provide a more thorough response to Defendants' motion. (*Id.*)

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing a Motion for Summary Judgment

Under *Fed. R. Civ. P. 56*, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[4] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[4]    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

**\*7** In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317,

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*. [5] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [6] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [7]

[5]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[6]    *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[7]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [8] – even when the non-movant was proceeding *pro se*. [9]

[8]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[9]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [10] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[10]    *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 734 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)
2019 WL 8015209

### B. Standard Governing Exhaustion of Administrative Remedies

**\*8**  The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Porter v. Nussle, 534 U.S. 516, 524-25 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." Woodford v. Ngo, 548 U.S. 81, 89 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." Woodford, 548 U.S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532.

In accordance with the PLRA, DOCCS has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[11] First, an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[12] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's IGRC has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. Third, a grievant may appeal to CORC within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

[11]  *See also Murray v. Palmer*, 03-CV-1010, 2010 WL 1235591, at \*1 & n.1 (N.D.N.Y. Mar. 31, 2010) (citation omitted) (Suddaby, J.).

[12]  The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

In addition, "[t]he regulations [ ] provide that if the plaintiff does not get a 'receipt' from the CORC within 45 days of the date he filed his appeal, he should contact the IGP to make sure that his appeal was 'received.' " *Bell v. Napoli*, 17-CV-0850, 2018 WL 6506072, at \*5 (N.D.N.Y. Dec. 11, 2018) (Baxter, M.J.) (citing 7 N.Y.C.R.R. § 701.5(d)(3)(i)).

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application were denied, the inmate could file a complaint complaining that the application was wrongfully denied.[13] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can–and must–be appealed to the next level, including CORC, to complete the grievance process.[14]

[13]  *See Murray*, 2010 WL 1235591, at \*2 & n.3 (citing *Groves v. Knight*, 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009), an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight*, No. 09-3641, Mandate (2d Cir. Filed Jan. 15, 2010)).

2019 WL 8015209

14    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Murray*, 2010 WL 1235591, at *2 & n.4 (collecting cases).

**\*9** Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford*, 548 U.S. at 93; *Porter*, 534 U.S. at 524; *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure to exhaust does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004), *accord, Ruggiero*, 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted]. [15]

15    The Court notes that the Supreme Court recently eliminated this third inquiry, and courts are no longer permitted to excuse a prisoner's failure to exhaust his administrative remedies because of "special circumstances." *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016).

### III. ANALYSIS

#### A. Plaintiff's Failure to Oppose the Merits of Defendants' Summary Judgment Motion

Before turning to the merits of Defendants' motion, a threshold issue to be addressed is the legal significance of Plaintiff's failure to oppose the merits of Defendants' motion.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose Defendants' motion, Plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, Plaintiff has not responded to the merits of Defendants' motion. The motion was properly filed by Defendants, and Defendants through their motion have met their burden of demonstrating entitlement to some of the relief requested. With respect to the question of whether Defendants have met their burden, I note that the "burden of persuasion is lightened such that, in order to succeed, [their] motion need only be 'facially meritorious.' " *See Rodriguez v. Goord*, 04-CV-0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., adopting Report-Recommendation on clear error review) (finding that determination of whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).

Because Defendants have accurately cited both proper legal authority and evidence in the record supporting the grounds on which their motion is based with respect to Defendants Jones and Gould as set forth below, and Plaintiff has failed to respond in opposition to the merits of the motion for summary judgment, I find that Defendants' motion is

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 736 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)
2019 WL 8015209

facially meritorious. *Jackson*, 766 F.3d at 194. Accordingly, I recommend that the Court grant Defendants' motion with respect to Defendants Jones and Gould on this basis.

**\*10** It should also be noted that there are additional consequences flowing from Plaintiff's failure to file an opposition to Defendants' Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.*, 99-CV-0611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, 96-CV-0169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J., adopting Report-Recommendation on clear error review.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, 09-CV-0308, 2011 WL 1103045, at \*1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because Plaintiff was warned of the consequences of failing to properly respond to Defendants' Local Rule 7.1 Statements (Dkt. No. 28 at 2; text notice dated July 3, 2019), and he has failed to do so, I recommend that the Court deem the facts contained in Defendants' Local Rule 7.1(a)(3) Statements as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche*, 2011 WL 1103045, at \*1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in Defendants' Local Rule 7.1(a)(3) Statements, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry*, 336 F.3d at 137.

**B. Exhaustion of Grievances AUB-67199-15 and AUB-67567-15**

There is no dispute in this case that Plaintiff filed grievances AUB-67199-15 dated May 10, 2015, and AUB-67567-15

dated July 21, 2015, and that he appealed the denial of these grievances to the facility superintendent. The parties only dispute whether Plaintiff completed the third step in the grievance process by appealing to CORC.

Defendants submitted proof in admissible form by way of an affidavit from Rachael Seguin, the custodian of the records maintained by CORC. (Dkt. No. 28, Attach. 16.) In her affidavit, Ms. Seguin stated that she searched record appeals received by CORC filed by Plaintiff, and her search revealed "no appeal for Grievance AUB-67199-15" and "no appeal for Grievance AUB-67567-15." (*Id.* at ¶¶11-12.)

However, with respect to grievance AUB-67199-15, Plaintiff alleged in his verified Complaint [16] that "[o]n [July 3, 2015, he] received [the denial from the Superintendent] and requested that it be appealed to the Central Office Review Committee." (Dkt. No. 1 at 5.) Similarly, Plaintiff testified that after receiving the denial of his grievance from the Superintendent, he appealed to CORC. (Dkt. No. 28, Attach. 5 at 46.) Moreover, Plaintiff alleged in his verified Complaint that on August 15, 2015, he "composed a letter to the C.O.R.C. Inmate Grievance Program Supervisor Karen Bellamy inquiring as to whether or not request for appeal was received." (Dkt. No. 1 at 5.) Likewise, Plaintiff testified that he wrote a letter to CORC asking about the status of his appeal. (Dkt. No. 28, Attach. 5 at 46.) Furthermore, Plaintiff alleged in his verified Complaint that on September 2, 2015, he "composed a letter to Auburn C.F. I.G.P. Supervisor Cheryl Parmiter inquiring as to whether or not [his] appeal was submitted as requested." (Dkt. No. 1 at 5.) Similarly, Plaintiff testified that "I believe that one I never received a response from Central Office. So I wrote Albany's – Auburn's I.G.R.C. and asked them what happened and they said they never received an appeal." (Dkt. No. 28, Attach. 5 at 46.)

[16]     "Although 'a plaintiff's pro se status does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment,' *Almonte v. Florio*, 02-CV-6722, 2004 WL 60306, at \*3 n.10 (S.D.N.Y. Jan. 13, 2004) (citation and italics omitted), where a plaintiff 'verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true and to the best of his knowledge,' the 'verified complaint is to be treated as an affidavit for summary judgment purposes,' *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 737 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

1995).” *King v. Puershner*, 17-CV-1373, 2019 WL 4519692, at *1 n.1 (S.D.N.Y. Sept. 19, 2019).

**\*11** In addition, with respect to grievance AUB-67567-15, Plaintiff alleged in his verified Complaint that “[o]n [August 15, 2015, he] received [the denial from the superintendent] and requested that it be appealed to the C.O.R.C.” (Dkt. No. 1 at 6.) Moreover, Plaintiff's verified Complaint alleged that on September 29, 2015, he “composed another letter to C.O.R.C.’s I.G.P. Supervisor Karen Bellamy informing her of all grievances he was awaiting decisions on ... as he hadn't yet received receipt of appeal for this grievance.” (Dkt. No. 1 at 6.)

Generally, conclusory allegations that an inmate appealed the superintendent's grievance denial to CORC are insufficient to withstand a motion for summary judgment. *See Gibbs v. Gadway*, 19-CV-0281, 2019 WL 5191506, at *3 (N.D.N.Y. Oct. 15, 2019) (Stewart, M.J.) (recommending dismissal based on the plaintiff's failure to exhaust his administrative remedies where the plaintiff made “a purely conclusory allegation that he appealed the grievance denial to CORC.”).

However, the case law implies that where a plaintiff sets forth the date that he or she appealed the grievance to CORC, that may be enough to survive a motion for summary judgment. *C.f. Gibbs v. Gadway*, 19-CV-0281, 2019 WL 5191506, at *3 (N.D.N.Y. Oct. 15, 2019) (Stewart, M.J.) (recommending dismissal of the plaintiff's claims for failure to exhaust his administrative remedies where the plaintiff “has not provided a copy of the grievance appeal or even asserted what date he filed the appeal.”); *Gough v. Morris*, 16-CV-1107, 2018 WL 7199494, at *3 (N.D.N.Y. Dec. 14, 2018) (Stewart, M.J.) (recommending dismissal based on the plaintiff's failure to exhaust his administrative remedies where he testified that he appealed the superintendent's response to CORC but there was no evidence in the record that (a) the grievance or the superintendent's response were appealed to CORC and, (b) despite not receiving a response from CORC, the plaintiff testified that he did not write to CORC to follow-up); *Campbell v. Prue*, 16-CV-0004, 2018 WL 4635708, at *5 (N.D.N.Y. July 3, 2018) (Hummel, M.J.) (“Although [the plaintiff] alleges that he filed [a] grievance ..., plaintiff does not state when he filed such grievance.... Further, plaintiff has not provided a copy of the alleged grievance or the Marcy IGRC's denial of that grievance.”); *Toliver v. Stefinik*, 12-CV-0077, 2016 WL 3349316, at *6 (N.D.N.Y. June 15, 2016) (D'Agostino, J.) (“vague and conclusory allegations ... [regarding] grievances ... do not, in light of the documentation Defendants have provided about Plaintiff's grievance history,

create a factual dispute material to the issue of whether Plaintiff exhausted his administrative remedies.”); *Smith v. Kelly*, 985 F. Supp. 2d 275, 289 (N.D.N.Y. 2013) (Suddaby, J.) (granting the defendants’ motion for summary judgment on the issue of exhaustion where the plaintiff failed to “identify the name of the ‘IGRC's supervisor’ who purportedly told him that a new prisoner does not file a grievance at Auburn C.F. if it pertains to the prisoner's previous facility, nor does he specify the date, means or location of this purported communication.”).

Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that Defendants bear the ultimate burden of proving that Plaintiff did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact regarding whether Plaintiff appealed grievances AUB-67199-15 and AUB-67567-15. [17] As a result, I recommend that Defendants’ motion be denied on this basis.

[17] The Court notes that this conclusion is based on the special solicitude afforded to Plaintiff as a *pro se* litigant. Further, the Court notes that the evidence in the record to support the exhaustion of Plaintiff's administrative remedies is sparse. *See c.f. Richardson v. Eberth*, 14-CV-6138, 2016 WL 1271078, at *2-3 (W.D.N.Y. Mar. 29, 2016) (dismissing based on failure to exhaust administrative remedies where the plaintiff attached a copy of his original grievance which did not “bear any indicia that it was received or provided to any individual at the jail for transmission to the CORC” and his affidavit submitted in opposition failed to provide any specific details to support his allegation that he appealed his grievance to CORC (e.g. it did not state what specific person he gave it to in the prison, on what date he gave the appeal to anyone at the prison, or any other pertinent or specific information to support his allegations)); *Toliver v. Stefinik*, 12-CV-0077, 2016 WL 3349316, at *6 (June 15, 2016) (D'Agostino, J.) (dismissing for failure to exhaust administrative remedies where the plaintiff submitted a copy of a formal grievance dated March 9, 2011, that was not reflected in the defendants’ records but where the plaintiff alleged that he “circulated” the grievance to the defendants

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 738 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)
2019 WL 8015209

and it was unclear whether the grievance was ever submitted to IGRC).

### C. Whether Plaintiff's First Amendment Retaliation Claims Should Nevertheless be Dismissed

**\*12** A cognizable claim of retaliation pursuant to 42 U.S.C. § 1983 lies when prison officials take an adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a *prima facie* claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action–in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at \*4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff even in the absence of the protected conduct. *Mount Healthy*, 429 U.S. at 287. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against

him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

#### 1. Defendant Pflueger

Plaintiff alleges that Defendant Pflueger retaliated against him during four separate incidents: (1) firing Plaintiff as a feed up porter and filing a false misbehavior report on June 17, 2015, (2) verbal harassment on (a) an unspecified dated in June or July 2015, (b) August 4, 2015, and (c) August 6, 2015, (3) causing Defendant Gould to file a false administrative segregation recommendation, and (4) the destruction of Plaintiff's personal property.

##### a. Incident on June 17, 2015 [18]

[18]    Defendants argue that Defendant Pflueger, as a correction officer, would not have had authority to fire Plaintiff as a feed up porter. (Dkt. No. 28, Attach. 3 at 17-18; Dkt. No. 28, Attach. 10 at ¶11.) However, there is evidence in the record that disputes this assertion and creates an issue of fact for trial. (Dkt. No. 28, Attach. 5 at 49.)

**\*13** Defendants argue that Plaintiff's retaliation claim with respect to the incidents on June 17, 2015, fails based on the third element, that there is no evidence in the record to support the contention that Plaintiff was retaliated against for his protected speech. [19]

[19]    It is undisputed that Plaintiff engaged in constitutionally protected speech by the filing of grievances. (Dkt. No. 1 at 5-7; Dkt. No. 28, Attach. 11; Dkt. No. 28, Attach. 12; Dkt. No. 28, Attach. 14; Dkt. No. 28, Attach. 15; Dkt. No. 28, Attach. 18; Dkt. No. 28, Attach. 19.) *See also Flood v. Cappelli*, 18-CV-3897, 2019 WL 3778736, at \*7 (S.D.N.Y. Aug. 2, 2019) (collecting cases) (holding that the filing of a grievance is

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 739 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

protected speech). In addition, the alleged actions taken by Defendants constitute adverse actions because they would deter a prisoner of "ordinary firmness" from exercising his rights. *See Johnson v. Schiff,* 17-CV-8000, 2019 WL 4688542, at *24 (S.D.N.Y. Sept. 26, 2019) (collecting cases) (holding that the filing of a false misbehavior report against a prisoner is an adverse action); *Hayes v. Dahkle,* 16-CV-1368, 2017 WL 9511178, at *11 (N.D.N.Y. Oct. 30, 2017) (Hummel, M.J.) (holding that the "filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action."); *Casey v. Pallito,* 12-CV-0284, 2016 WL 96157, at *7 (D. Vt. Jan. 7, 2016) (holding that terminating a prisoner's employment is an "adverse action."); *Chavis v. Struebel,* 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004) (noting that "assigning the inmate [to] less desirable work assignments satisfies the adverse action requirement" for purposes of a prisoner's First Amendment retaliation claim).

In considering whether there is a "causal connection between the protected speech and the adverse action, a court may consider a number of factors, including any statements made by the defendant concerning his motivation and the temporal proximity between the protected activity and the defendant's adverse action." *Roseboro v. Gillespie,* 719 F. Supp. 2d 353, 366 (S.D.N.Y. 2011); *see also Tuitt v. Chase,* 11-CV-0776, 2013 WL 877439, at *7 (N.D.N.Y. Jan. 30, 2013) (Dancks, M.J.), *report and recommendation adopted,* 2013 WL 877617 (N.D.N.Y. Mar. 8, 2013) (factors relevant to a consideration of causal connection "include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation"). The Second Circuit has "held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation," but has also "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify,* 681 F. App'x 43, 46 (2d Cir. 2017); *see also Thomas v. Waugh,* 13-CV-0321, 2015 WL 5750945, at *4 (N.D.N.Y. Sept. 30, 2015) (D'Agostino, J. adopting Report-Recommendation on *de novo* review) (citing *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)) ("temporal proximity alone is insufficient to establish an inference of retaliation.").

**\*14** Here, in addition to temporal proximity connecting Plaintiff's grievance of May 10, 2015, to the incident on June 17, 2015,[20] Defendant Pflueger's alleged statements provide circumstantial evidence of causation. Plaintiff's verified Complaint alleged that on August 4, 2015, Defendant Pflueger said to another correction officer, "[t]his is also where we keep idiots like this guy who think they can snitch on officers and nothing's going to happen to them," and "[h]ow'd that work out for you stupid? You want to help me explain to him how our grievance procedure works?" (Dkt. No. 1 at 24-25.) Moreover, the verified Complaint alleged that on August 6, 2015, Defendant Pflueger said, "[o]h, and just so you know, I didn't forget about your latest grievance either. You better say a prayer to your White Supremacist God that I'm not here on the day they bring you down to the draft room, because I'll be watching the change sheet. You're not gonna make it outta here in 1 piece." (Dkt. No. 1 at 25.) These statements provide circumstantial evidence that Defendant Pflueger's actions on June 17, 2015, firing Plaintiff from his job as a feed up porter and filing a misbehavior report against him that ultimately resulted in his placement in keep-lock confinement for thirty days, were in retaliation for Plaintiff's grievance of May 10, 2015. *See Cole v. N.Y.S. Dep't of Corr. and Cmty. Supervision,* 14-CV-0539, 2016 WL 5394752, at *26 (N.D.N.Y. Aug. 25, 2016) (Peebles, M.J.) (finding an issue of fact as to retaliation where the defendant allegedly said (a) "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults, and (b) that the assault was "payback" for the plaintiff's grievances; *Roland v. McMonagle,* 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation where there was evidence that the defendants were aware of the plaintiff's complaints and mocked him for filing grievances).[21]

20    "In assessing temporal proximity, the Second Circuit has established that no more than six months between the protected activity and the adverse action establishes the temporal proximity sufficient to support an inference of causal connection." *Hayes v. Dahkle,* 16-CV-1368, 2017 WL 9511178, at *9 (N.D.N.Y. Oct. 30, 2017) (Hummel, M.J.) (citing *King v. McIntyre,* 11-CV-1457, 2015 WL 1781256, at *5 (N.D.N.Y. Apr. 8, 2016)). Here Plaintiff was fired as a feed up porter and Defendant Pflueger filed an allegedly false misbehavior report on June 17, 2015, which is "well within the Second Circuit's six-month time

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 740 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

frame for establishing a causal connection between [P]laintiff's filing of a grievance" on May 10, 2015. *Hayes*, 2017 WL 9511178, at *10.

21      While Defendant Pflueger denies making the statements on August 4, 2015, and August 6, 2015, (Dkt. No. 28, Attach. 10 at ¶¶ 25-25), "[t]he court, when faced with conflicting sworn statements, must leave such credibility determinations to a reasonable fact finder to determine." *Mack v. Wood*, 17-CV-1146, 2019 WL 5197230, at *7 (N.D.N.Y. July 26, 2019) (Baxter, M.J.).

As a result, the burden shifts to Defendants to show by a preponderance of the evidence that they would have taken action against the plaintiff even in the absence of the protected conduct. *Mount Healthy*, 429 U.S. at 287.

With respect to the "firing" of Plaintiff as a feed up porter, Defendants submitted a non-retaliatory reason—that Defendant Pflueger observed Plaintiff pass an unidentified object into the cell of another inmate. (Dkt. No. 28, Attach. 10 at ¶13.) However, Plaintiff testified that he did not pass any unidentified items into another inmate's cell. (Dkt. No. 28, Attach. 5 at 51-52.) As a result, I find that a material issue of fact remains for trial.

However, with respect to the allegedly false misbehavior report, Plaintiff admitted some of the allegations contained in the misbehavior report. More specifically, Plaintiff admitted that he yelled profanities as he walked back to his cell and that while in his cell, he made derogatory statements about Defendant Pflueger loud enough to be heard by an inmate on a different floor. (Dkt. No. 28, Attach. 5 at 54-55.) This admission "suggests that 'plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.' " *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at *12 (N.D.N.Y. June 7, 2018) (Hummel, M.J.) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). As a result, Defendants have established a non-retaliatory reason for the filing of the misbehavior report of June 17, 2015. *Flynn*, 2018 WL 3195095, at *12 (citing *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that plaintiff's admission of the underlying conduct established a "proper, non-retaliatory reason[ ] for filing the misbehavior report."); *see also Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (where plaintiff admitted to committing the most serious, if not all, of the prohibited conduct charged in the misbehavior report, "defendants met their burden of

demonstrating proper, non-retaliatory reasons for filing the misbehavior report.").

**\*15**  As a result, I recommend that Defendants' motion for summary judgment be granted with respect to the allegedly false misbehavior report of June 17, 2015, and be denied with respect to the "firing" of Plaintiff as a feed up porter.

### b. Verbal Harassment

Plaintiff alleges that sometime in June or July 2015, he was verbally harassed when Defendant Pflueger told another officer that he was going to "kick [P]laintiff's f****** a**." (Dkt. No. 1 at 19.) In addition, Plaintiff alleges that on August 4, 2015, Defendant Pflueger said to another correction officer, "[t]his is also where we keep idiots like this guy who think they can snitch on officers and nothing's going to happen to them," and "[h]ow'd that work out for you stupid? You want to help me explain to him how our grievance procedure works?" (Dkt. No. 1 at 24-25.) [22] Moreover, Plaintiff alleges that on August 6, 2015, Defendant Pflueger said, "[o]h, and just so you know, I didn't forget about your latest grievance either. You better say a prayer to your White Supremacist God that I'm not here on the day they bring you down to the draft room, because I'll be watching the change sheet. You're not gonna make it outta here in 1 piece." (Dkt. No. 1 at 25.)

22      While this statement suggests retaliatory animus about Plaintiff's placement in administrative segregation, for the reasons set forth in Part III.C.1.c. *infra*, there is no evidence before the Court that Defendant Pflueger had any role in Plaintiff's administrative segregation placement (other than being the alleged target of Plaintiff's planned of attack). In addition, Plaintiff accepted the recommendation that he be placed in administrative segregation. (Dkt. No. 1 at 21-22.)

In this Circuit, allegations of verbal harassment or threats are generally an insufficient basis for an inmate's § 1983 claim. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed"); *Hayes v. Dahlke*, 16-CV-1368, 2017 WL 9511178, at *7 (N.D.N.Y. Oct. 30, 2017) (Hummel, M.J.) ("[v]erbal harassment absent injury, is generally insufficient to rise to the level of a constitutional violation"); *Tafari v. Paul*, 06-CV-0603, 2009 WL 3260075, at *1 (W.D.N.Y.

2019 WL 8015209

Oct. 8, 2009) (allegations of verbal harassment or abuse, "without a showing of an actual injury, are insufficient to support a § 1983 claim") (citing *Lewis v. Casey*, 518 U.S. 343, 349-50 (1996)); *Alexander v. Deming*, 03-CV-0147, 2009 WL 1044561, at *5 (W.D.N.Y. Apr. 16, 2009) ("Courts within the Second Circuit have held that threats of disciplinary action and verbal harassment without injury are insufficient to state a constitutional violation") (citing cases); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). "Such statements are only sufficiently adverse for the purpose of a First Amendment retaliation claim if they 'would deter a similarly situated individual of ordinary firmness of exercising constitutional rights.' Verbal threats may constitute [an] adverse action if the threat is sufficiently specific. 'The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights.' " *Hayes*, 2017 WL 9511178, at *7 (citations omitted). "The line between *de minimis* verbal harassment and retaliatory adverse action ... [hinges] on the specificity and seriousness of the words used." *Quezada v. Roy*, 14-CV-4056, 2015 WL 5970355, at *21 (S.D.N.Y. Oct. 13, 2015).

**\*16** "Mindful that inmates 'may be required to tolerate more than average citizens[ ] before a retaliatory action taken against them is considered adverse' " *Davis*, 320 F.3d at 353, I conclude that Defendant Pflueger's alleged statements constitute vague threats that lack the specificity and seriousness "to deter an inmate from exercising his First Amendment rights" as no real threat exists. *Id.*; *see Hayes*, 2017 WL 9511178, at *8 (holding that where a correction officer allegedly verbally harassed the plaintiff on two occasions "warning him to not get comfortable in his housing unit because 'you mess with one of us (C.O.'s) you got to deal with all of us' and informing plaintiff that '[another correction officer] said hi!' .... constitute vague threats that lack the specificity and seriousness 'to deter an inmate from exercising his First Amendment rights' as no real threat exists.").

Furthermore, with respect to Defendant Pflueger's alleged threats of physical injury, Plaintiff "does not ... allege that these threats were followed by any physical injury[,] and as a result, they are not actionable." *LaRocco v. N.Y.C. Dep't of Corr.*, 99-CV-9759, 2001 WL 1029044, at *5 (S.D.N.Y. Aug. 31, 2001). "Absent an appreciable injury following in close time to the threat of force [Defendant Pflueger's alleged] statement[ ], albeit inappropriate, lack the specificity

and seriousness 'to deter an inmate from exercising his First Amendment rights.' " *Hayes*, 2017 WL 9511178, at *8 (quoting *Quezada v. Roy*, 14-CV-4056, 2015 WL 5970355, at *21 (S.D.N.Y. Oct. 13, 2015)).

As a result, to the extent the Complaint is construed as alleging that these incidents of verbal harassment were adverse actions—as opposed to evidence of a causal connection with respect to other adverse actions—I recommend dismissal of these claims.

### c. Causing Defendant Gould to File a False Administrative Segregation Recommendation

Plaintiff has failed to adduce evidence in the record that Defendant Pflueger directed or caused Defendant Gould to file a false misbehavior report against Plaintiff. In fact, Defendant Gould affirmed that he "had no knowledge at the time [his] recommendation was made that Plaintiff had filed any grievances against Defendant [Pflueger]." (Dkt. No. 28, Attach. 6 at ¶ 11.) In addition, Plaintiff testified that (1) he did not know Defendant Gould before Defendant Gould made the recommendation that Plaintiff be placed in administrative segregation (Dkt. No. 28, Attach. 5 at 63), (2) he has no recollection of ever seeing Defendant Gould before the recommendation (*id.*), and (3) he is not aware of any conversations that Defendant Gould had with Defendant Pflueger, in which, they discussed that Defendant Gould should file an administrative segregation recommendation based on false information (*id.* at 65).

The contention that Defendant Pflueger retaliated against Plaintiff by causing Defendant Gould to file a false administrative segregation recommendation is merely a conclusory allegation, which is insufficient to establish genuine issue of material fact for trial. In addition, this contention is sheer surmise on Plaintiff's part and unsupported by the record. (Dkt. No. 28, Attach. 5 at 64 (Plaintiff testified that the basis for his belief that Defendant Gould filed the recommendation on Defendant Pflueger's behalf is "[b]ecause there is no other reason to do it.")); *Cole*, 2016 WL 5394752, at *27.

As a result, I recommend dismissal of Plaintiff's retaliation claim against Defendant Pflueger with respect to this allegation.

2019 WL 8015209

#### d. Destruction of Plaintiff's Personal Property

Plaintiff failed to adduce any evidence that Defendant Pflueger destroyed (or confiscated or threw away) Plaintiff's personal property. The only evidence that Plaintiff presents in support of his contention, is that another inmate (housed three cells away) witnessed Defendant Pflueger in Plaintiff's cell. (Dkt. No. 1 at 23.) However, Plaintiff admitted that the other inmate "was inside his cell, so he couldn't see [Defendant Pflueger] inside [Plaintiff's] cell." (Dkt. No. 28, Attach. 5 at 71.) Moreover, it is undisputed that other individuals were involved in the removal of Plaintiff's property from his cell and the transportation of that property to the special housing unit. (*Id.*; Dkt. No. 1 at 23.) Plaintiff is speculating that because the other inmate saw Defendant Pflueger in Plaintiff's cell, that Defendant Pflueger is responsible for Plaintiff's alleged missing personal property. However, this speculation is insufficient to create a material issue of fact for trial because no reasonable juror could conclude that Defendant Pflueger took an adverse action against Plaintiff by destroying his property.

**\*17** As a result, I recommend dismissal of Plaintiff's retaliation claim against Defendant Pflueger with respect to this allegation.

#### 2. Defendant Jones

Plaintiff failed to show a genuine issue of material fact that his protected conduct was a substantial or motivating factor in Defendant Jones's endorsement of Defendant Pflueger's misbehavior report dated June 17, 2015. *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996). "[I]t is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009)).

Here, Plaintiff did not file any grievances or complaints against Defendant Jones. The record lacks any evidence establishing why Defendant Jones would endorse a false misbehavior report against Plaintiff, on Defendant Pflueger's behalf, beyond Plaintiff's conclusory allegations. *See Hill v. Chalanor*, 128 F. App'x 187, 189 (2d Cir. 2005) (holding that the plaintiff's claim of a causal connection between defendant "Oliver's threats and the alleged actions of the other defendants in connection with Hill's medical care is

wholly unsupported.") *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at \*12 (N.D.N.Y. June 7, 2018) (Hummel, M.J.) (recommending dismissal of retaliation claims where "[t]he record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations."). Without more, the evidence does not present a genuine issue of material fact for a jury to resolve. *Flynn*, 2018 WL 3195095; *see Wright*, 554 F.3d at 274 (dismissing retaliation claim against a correction officer when the only alleged basis for retaliation was a complaint about an incident involving another correction officer); *Alicea v. Maly*, 12-CV-0203, 2015 WL 4326114, at \*14-15 (N.D.N.Y. July 14, 2015) (D'Agostino, J.) (dismissing retaliation claim which alleged that Correction Officer Trinidad retaliated against the plaintiff for protected actions he took with respect to Correction Officer Freeman, where the plaintiff alleged a close personal friendship between Trinidad and Freeman and the record was "devoid of any specifics, but replete with conclusions"); *Guillory v. Ellis*, 11-CV-0600, 2014 WL 4365274, at \*18 (N.D.N.Y. Aug. 28, 2014) (D'Agostino, J.) ("[I]t is difficult to establish one defendant's retaliation for complaints against another defendant."); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff failed to provide any basis to believe that a correction counselor would retaliate for a grievance that she was not personally named in); *Ciaprai v. Goord*, 02-CV-0915, 2005 WL 3531464, at \*9 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against correction officers other than the officer who disciplined the plaintiff).

As a result, I recommend that Plaintiff's retaliation claim against Defendant Jones be dismissed.

#### 3. Defendant Gould

For the reasons set forth above in Parts III.C.1.c. and III.C.2. of this Report-Recommendation, I find that the record lacks evidence establishing a causal connection between Defendant Gould's recommendation that Plaintiff be placed in administrative segregation and Plaintiff's grievances against Defendant Pflueger, beyond Plaintiff's conclusory allegations. As a result, I recommend that Plaintiff's retaliation claim against Defendant Gould be dismissed.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 743 of 830

Logan v. Graham, Not Reported in Fed. Supp. (2019)
2019 WL 8015209

### 4. Defendant Graham

**\*18** The Second Circuit has previously indicated that supervisory defendants may be considered personally involved only if they "(1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring." *Rasheen v. Adner*, 356 F. Supp. 3d 222, 233 (N.D.N.Y. Jan. 28, 2019) (Hurd, D.J.) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). [23]

[23]    "In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

The Supreme Court's decision in *Iqbal* has raised the question of whether all of the *Colon* factors continue to be viable. *Keyes v. Annucci*, 19-CV-0372, 2019 WL 4602240, at \*17 (N.D.N.Y. Sept. 23, 2019) (Suddaby, C.J.) (citing *Montanez v. City of Syracuse*, 16-CV-0550, 2019 WL 315058, at \*17 (N.D.N.Y. Jan. 23, 2019) (Sannes, J.)). Neither the Second Circuit nor the Supreme Court have made any findings on this issue. *Keyes*, 2019 WL 4602240, at \*17. "Courts within the Second Circuit have taken various approaches post-*Iqbal*, from finding that only the first and third factors remain viable, to continuing to apply all factors in the absence of Second Circuit guidance, to considering the specific constitutional provision underlying the claim and applying all the *Colon* factors to claims that rely on a standard of unreasonable conduct or deliberate indifference but declining to apply all of them where the claim requires instead a showing of discriminatory intent." *Id.* (*see Montanez*, 2019 WL 315058, at \*17-18 (collecting cases) (adopting the specific constitutional provision approach and applying all the *Colon* factors to the plaintiff's Fourteenth Amendment claims because they did not require a showing of discriminatory intent); *Carpenter v. Apple*, 15-CV-1269, 2017 WL 3887908, at \*9-10 (N.D.N.Y. Sept. 5, 2017) (Suddaby, C.J.) (noting that the majority of district courts have continued to apply all of the *Colon* factors "where the constitutional violation at issue does not require a showing of discriminatory intent"

and adopting that majority approach); *Marom v. City of New York*, 15-CV-2017, 2016 WL 916424, at \*15 (S.D.N.Y. 2016) (reasoning that *Iqbal* supported the specific constitutional provision approach, and finding that all the *Colon* factors might be viable for false arrest and excessive force claims that were based on a reasonableness standard, but that the second, fourth, and fifth factors would not apply to a First Amendment retaliation claim because such claim contains an intent requirement)).

The Court agrees with the specific constitutional provision approach discussed above because it is the most consistent with the guidance provided in *Iqbal*. *See Iqbal*, 556 U.S. at 676 (noting that, "[t]he factors [related to whether a government official's individual actions violated the Constitution] necessary to establish a *Bivens* violation will vary with the constitutional provision at issue," discussing that the First and Fifth Amendments require that the official acted with a discriminatory purpose, and rejecting the argument that supervisors should be held liable on such claims merely because they knew of a subordinate's discriminatory purpose. The Court will therefore consider only the first and third *Colon* factors because Plaintiff's claims are pursuant to the First Amendment.

**\*19** "[A] retaliation claim under the First amendment requires a showing of discriminatory intent, [and as a result,] supervisory liability will be imposed only if Plaintiff[ ]" establishes "that the officials either (a) directly participated in the alleged constitutional violation, or (b) created, or allowed to continue, a policy or custom under which the violation occurred." *Keyes*, 2019 WL 4602240, at \*19.

"[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Molano v. Bezio*, 10-CV-6481, 2012 WL 1252630, at \*5 (W.D.N.Y. Apr. 13, 2012) (citing *Collins v. Ferguson*, 804 F. Supp. 2d 134, 140 (W.D.N.Y. 2011); *Black v. Coughlin*, 76 F.3d 72, 74-75 (2d Cir. 1996)).

The record before the Court contains superintendent responses related to four grievances. (Dkt. No. 28, Attach. 11 at 1; Dkt. No. 28, Attach. 12 at 2; Dkt. No. 28, Attach. 14 at 1; Dkt. No. 28, Attach. 15 at 6; Dkt. No. 28, Attach. 18 at 1; Dkt. No. 28, Attach. 19 at 1.) However, the signature of the superintendent who executed the response, in each instance, is illegible. While Defendants argue that

Logan v. Graham, Not Reported in Fed. Supp. (2019)

2019 WL 8015209

Defendant Graham merely rubber stamped the results of the investigation, "notably absent from the record is any affidavit or declaration from [Defendant Graham]" and absent "such evidence, a factual dispute exists as to whether [Defendant Graham] proactively participated in the decision-making process related to [Plaintiff's] grievances." *Flynn*, 2018 WL 3195095, at *13.

As such, I find that there is a triable issue of material fact for a jury to resolve with respect to Defendant Graham's personal involvement in Defendant Pflueger's alleged retaliatory conduct. *Flynn*, 2018 WL 3195095, at *13 (citing *Celotex v. Catrett*, 477 U.S. 317, 323 (1986)). Therefore, I recommend that Defendants' motion with respect to Defendant Graham be denied.

**D. Doctrine of Qualified Immunity**

Finally, Defendants argue that, in any event, they are shielded from liability based on the doctrine of qualified immunity.

Qualified immunity shields federal and state officials from suit " ' unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct.' " *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "A right is 'clearly established' if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Beckles v. City of New York*, 492 F. App'x 181, 182 (2d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Here, while Defendants summarize general caselaw, their argument in support of the qualified immunity defense is one paragraph long, entirely conclusory, and unsupported by any facts. Accordingly, it is recommended that Defendants' motion on this ground, be denied. *Thomas v. Delany*, 17-CV-1023, 2019 WL 4247807, at *19 (N.D.N.Y. Aug. 13, 2019) (Hummel, M.J.) (citing *Roberts v. Hobbs*, 10-CV-0174, 2010 WL 5888777, at *6 (E.D. Ark. Nov. 8, 2010) (summarily denying dispositive motion containing unsupported and conclusory qualified immunity arguments that fail to address the particular facts or cite any relevant cases)).

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 28) be **DENIED** with respect to Plaintiff's retaliation claims against (1) Defendant Pflueger for firing Plaintiff as a feed up porter, and (2) Defendant Graham as superintendent and **GRANTED** with respect to Plaintiff's retaliation claims against (1) Defendants Jones, (2) Defendant Gould, and (3) Defendant Pflueger for allegedly (a) filing a false misbehavior report against Plaintiff on June 17, 2015, (b) verbally harassing Plaintiff, (c) causing Defendant Gould to file an improper recommendation of administrative segregation, and (d) destroying Plaintiff's property.

**\*20** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

It is hereby respectfully **ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [24]

[24]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 8015209

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Logan v. Graham, Not Reported in Fed. Supp. (2020)

2020 WL 871197

2020 WL 871197
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Seth LOGAN, Plaintiff,

v.

Superintendent GRAHAM, Auburn Correctional
Facility; C.O. Pflueger, Auburn Correctional
Facility; Officer Scott Jones, Auburn Correctional
Facility, formerly known as C.O. Smith; and C.O.
M. Gould, Auburn Correctional Facility, Defendants.

9:18-CV-291 (DNH/ML)
|
Signed 02/21/2020

**Attorneys and Law Firms**

SETH LOGAN, Plaintiff pro se, 177 Avery Avenue, Buffalo,
NY 14216.

HON. LETITIA JAMES, Attorney General for the State of
New York, OF COUNSEL: AIMEE COWAN, ESQ., Ass't
Attorney General, Attorney for Defendants, 300 South State
Street, Suite 300, Syracuse, NY 13202.

## DECISION and ORDER

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Seth Logan brought this civil rights action
pursuant to 42 U.S.C. § 1983. On November 26, 2019, the
Honorable Miroslav Lovric, United States Magistrate Judge,
advised by Report-Recommendation that defendants' motion
for summary judgment be granted in part and denied in part.
Specifically, Magistrate Judge Lovric recommended that
defendants' motion for summary judgment be denied with
respect to plaintiff's retaliation claims against (1) defendant
Pflueger for firing plaintiff as a feed up porter, and (2)
defendant Graham as Superintendent, and granted with
respect to plaintiff's retaliation claims against (1) defendant
Jones, (2) defendant Gould, and (3) defendant Pflueger
for allegedly (a) filing a false misbehavior report against
plaintiff on June 17, 2015, (b) verbally harassing plaintiff, (c)
causing defendant Gould to file an improper recommendation
of administrative segregation, and (d) destroying plaintiff's
property. Defendants timely filed objections to the Report-
Recommendation with respect to the retaliation claim against

defendant Pflueger and the supervisory claims against
defendant Graham.

Based upon a de novo review of the portions of the Report-
Recommendation to which defendants objected, the Report-
Recommendation is accepted and adopted in all respects. See
28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED
in part and DENIED in part;

2. The motion is GRANTED with respect to plaintiff's
retaliation claims against (1) defendant Jones, (2) defendant
Gould, and (3) defendant Pflueger for allegedly (a) filing
a false misbehavior report against plaintiff on June 17,
2015, (b) verbally harassing plaintiff, (c) causing defendant
Gould to file an improper recommendation of administrative
segregation, and (d) destroying plaintiff's property and those
claims are DISMISSED;

3. Defendants Jones and Gould are DISMISSED from this
action;

4. The motion is DENIED with respect to plaintiff's retaliation
claims against (1) defendant Pflueger for firing plaintiff as a
feed up porter, and (2) defendant Graham as Superintendent
(relative to defendant Pflueger's alleged retaliatory conduct
of firing plaintiff as a feed up porter) and those claims shall
proceed to trial;

5. Trial is tentatively scheduled for September 14, 2020 at
9:30 a.m. in Utica, New York. Pre-trial submissions are due
on or before August 31, 2020;

6. The parties are reminded that they have the option of
referring this case to Magistrate Judge Lovric pursuant to 28
U.S.C. § 636(c) and based on his familiarity with the case,
but are free to withhold consent without adverse substantive
consequences. The parties are directed to advise the Court on
or before April 8, 2020 whether or not a consent to a jury trial
before him will be executed; and

7. If plaintiff wishes to renew his motion for the appointment
of pro bono trial counsel, he must do so within thirty (30) days
of the date of this Decision and Order. If plaintiff makes such

2020 WL 871197

a motion, the Clerk is directed to mail him a long form IFP application.

**All Citations**

**\*2** IT IS SO ORDERED.

Not Reported in Fed. Supp., 2020 WL 871197

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Morrow v. Bauersfeld, Not Reported in Fed. Rptr. (2022)

2022 WL 17097590

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 747 of 830

2022 WL 17097590
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Neb MORROW, III, Plaintiff-Appellant,

v.

BAUERSFELD, Commissioner's Hearing Officer (CHO),
Auburn Correctional Facility, Defendant-Appellee,

Harold Graham, Superintendent, Sergeant
Van Fleet, Superintendent of D-Block, J.
Perkins, Corrections Officer in D-Block,
Auburn Correctional Facility, Defendants.

21-2928-cv
|
November 22, 2022

Appeal from a judgment of the United States District Court
for the Northern District of New York (Hurd, J.).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Neb Morrow, III, pro se,
Ossining, NY.

FOR DEFENDANT-APPELLEE: Kate H. Nepveu, Assistant
Solicitor General of Counsel, Victor Paladino, Senior
Assistant Solicitor General, Barbara D. Underwood, Solicitor
General, for Letitia James, Attorney General State of New
York, Albany, NY.

PRESENT: DENNIS JACOBS, RICHARD C. WESLEY,
JOSEPH F. BIANCO, Circuit Judges.

## SUMMARY ORDER

**\*1** Plaintiff-appellant Neb Morrow, III, proceeding *pro se*,
appeals the district court's grant of summary judgment in
favor of defendant-appellee Brian Bauersfeld with respect
to Morrow's retaliation claim under 42 U.S.C. § 1983.
Morrow alleged that, after he filed several grievances while
incarcerated at Sing Sing Correctional Facility, the defendant
officers searched his cell without him present, in violation
of a Department of Corrections and Community Supervision

("DOCCS") directive. One of the corrections officers who
searched the cell stated that he found a weapon under
Morrow's bed—a nine-inch piece of flat metal that had been
sharpened to a point. Morrow was administratively charged
with possession of a weapon but claimed the weapon was
planted. Morrow further asserted that Bauersfeld, an attorney
acting as the Commissioner's Hearing Officer, wrongfully
found Morrow guilty of the weapon possession charge
after conducting a disciplinary hearing notwithstanding the
officers' alleged violation of the DOCCS's directive. That
decision was later overturned on administrative appeal and
the charge expunged because of the officers' violation of the
DOCCS search procedure directive, but only after Morrow
had spent a significant period of time in restricted custody
due to the disciplinary sanction. Morrow brought this First
Amendment retaliation claim against Bauersfeld, alleging
that Bauersfeld's decision to sustain the charge against him
was part of an ongoing pattern of retaliation arising out
of his filing of constitutionally-protected grievances. [1] We
assume the parties' familiarity with the underlying facts, the
procedural history, and the issues on appeal, to which we refer
only as necessary to explain our decision to affirm.

[1]     Morrow also named the corrections officers as
        defendants, but his claims against those defendants
        were dismissed by the district court as time-barred.
        He does not challenge that decision on appeal.

We review a district court's grant of summary judgment *de
novo*, construing facts in the light most favorable to the non-
moving party and resolving all ambiguities and drawing all
reasonable inferences against the moving party. *Kee v. City
of New York*, 12 F.4th 150, 157–58 (2d Cir. 2021). Summary
judgment should only be granted if "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a).

To establish a First Amendment retaliation claim under
Section 1983, "a prisoner must show (1) that the speech or
conduct at issue was protected, (2) that the defendant took
adverse action against the plaintiff, and (3) that there was
a causal connection between the protected speech and the
adverse action." *Burns v. Martuscello*, 890 F.3d 77, 84 (2d
Cir. 2018) (internal quotation marks and citation omitted). If
a plaintiff establishes these elements, a defendant may still
avoid liability by establishing that he "would have taken the
adverse action even in the absence of the protected conduct."

2022 WL 17097590

*Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (internal quotation marks and citation omitted).

**\*2** Here, it is undisputed that Morrow's filing of grievances is protected activity and the disciplinary sanction constitutes an adverse action. *See, e.g.,* *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[Plaintiff] has sufficiently alleged ... participation in protected activity: the use of the prison grievance system."); *see also id.* (holding that the filing of false misbehavior reports resulting in disciplinary sanctions satisfied the "adverse action" element). Therefore, as Bauersfeld concedes, the sole element at issue is causation. To satisfy the causal element of a retaliation claim, a plaintiff must "introduce evidence sufficient to support the inference that the speech played a substantial part in the adverse action." *Brandon*, 938 F.3d at 40 (internal quotation marks and citation omitted). In the absence of direct evidence, circumstantial evidence may satisfy a plaintiff's burden if it is "sufficiently compelling." *Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003). We have considered as circumstantial evidence, among other things, the temporal proximity between speech and an adverse action and subsequent findings that the adverse action was unjustified. *See, e.g., id.* at 138.

In response to Bauersfeld's summary judgment motion, Morrow provided no direct evidence that Bauersfeld was motivated by retaliatory animus. Instead, Morrow contended that the timing of Bauersfeld's decision, as well as the fact that it was later overturned, supplied sufficient circumstantial evidence to preclude summary judgment on the causation issue. The district court, however, concluded "[a]fter careful review of the underlying record, there is insufficient evidence from which a jury could find the causation requirement satisfied on these facts." Supp. App'x at 245. We agree.

As an initial matter, the strength of any inference drawn from the temporal proximity between the grievances and the disciplinary action must be examined in light of the circumstances. Here, it is uncontroverted that Bauersfeld did not play any role in the search that prompted the grievances, and the occurrence and timing of Morrow's hearing were set by regulation, not Bauersfeld. Therefore, because Bauersfeld had no control over the timing of the hearing, any inference from the temporal proximity between the protected activity and the adverse action following the hearing is substantially weakened. *See* *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999) (concluding that "when scrutinized" the surrounding factual context "render[s] unremarkable any temporal connection" between the protected conduct and the alleged retaliation); *cf. Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (holding that temporal proximity was established where six months had elapsed and it was "plausible that the officers waited to exact their retaliation at an opportune time").

In any event, we have repeatedly held that temporal proximity alone is insufficient for a prisoner's retaliation claim to survive summary judgment. *See, e.g.,* *Blue v. Koren*, 72 F.3d 1075, 1085 (2d Cir. 1995) ("[A] temporal sequence may fuel ... suspicions [of retaliatory motive]" but was insufficient to allow retaliation claim to survive summary judgment); *see also* *Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017) (summary order) ("Although we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim."); *accord Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (collecting cases).

The only other evidence upon which Morrow relies to support an inference of retaliatory intent is the reversal of Bauersfeld's decision on administrative appeal. However, as with the temporal proximity evidence, any inference from this reversal is substantially undermined by the surrounding circumstances. It is undisputed that Bauersfeld is not an official against whom Morrow previously filed grievances, but instead a civilian employee who had "little to no contact" with the corrections officers allegedly involved in the misconduct in his cell. Supp. App'x at 162; *see Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (holding no rational juror could find retaliatory motive by a corrections officer where, *inter alia*, inmate's grievance letter did not name that officer and that officer was not a participant in the alleged misconduct). Additionally, the record reveals no evidence about how the hearing took place, Bauersfeld's conduct at the hearing, or any prior interactions between Bauersfeld and Morrow that could support retaliatory intent. Moreover, Bauersfeld's determination was not reversed for lack of substantial evidence, but rather because, under the DOCCS directive, Morrow "should have [had] the ability to view [the] cell search in its entirety upon being removed." Supp. App'x at 196. In other words, that reversal on appeal did not call into question Bauersfeld's credibility assessments or his finding that Morrow possessed a weapon in his cell, but rather reversed the sanction on procedural grounds.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 749 of 830
**Morrow v. Bauersfeld, Not Reported in Fed. Rptr. (2022)**
2022 WL 17097590

**\*3**  Therefore, this record is distinguishable from cases in which the circumstantial evidence (including temporal proximity and the circumstances surrounding the inmate's vindication on the charges) was sufficient to preclude summary judgment on the issue of retaliatory animus. *See, e.g.*, *Bennett*, 343 F.3d at 138 (holding evidence precluded summary judgment where, in addition to the temporal proximity of the adverse actions to the protected activity, such actions were not overturned on "procedural or technical grounds" but rather were all "found to have been devoid of factual support," including one instance where "the hearing officer [was] reprimanded for failing to develop a record supporting the conclusion he had reached"); *Jones v. Coughlin*, 45 F.3d 677, 679–80 (2d Cir. 1995) (holding that plaintiff's testimony about retaliatory threats, along with the sequence of events and expungement of disciplinary charge, was sufficient to preclude summary judgment). In contrast to those cases, given the paucity of circumstantial evidence in this record, any inference of retaliatory animus from Bauersfeld's failure to recognize the procedural defect in the search would be based on sheer speculation. *See generally Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("Although all inferences must be drawn in favor of the nonmoving party, mere speculation and conjecture is insufficient to preclude the granting of [a summary judgment] motion.").

In sum, we agree with the district court that the circumstantial evidence proffered by Morrow is an insufficient basis from which a rational jury could find that Bauersfeld's decision in the disciplinary proceeding against Morrow was motivated, in substantial part, by retaliatory animus. Therefore, the district court properly granted summary judgment in Bauersfeld's favor on the retaliation claim.

\* \* \*

We have considered all of Morrow's remaining arguments and find in them no basis for reversal. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 17097590

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1329159

2020 WL 1329159
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeffrey YOUNG, Plaintiff,
v.
S. SHIPMAN and R. Sawyer, Defendants.

9:18-cv-00782 (BKS/ML)
|
Signed 03/23/2020

**Attorneys and Law Firms**

Plaintiff, pro se: Jeffrey Young, 89-A-4618, Sing Sing Correctional Facility, 354 Hunter Street, Ossining, NY 10562.

For Defendants: Letitia James, Attorney General of the State of New York, David A. Rosenberg, Assistant Attorney General, of Counsel, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

*1 Plaintiff Jeffrey Young, a New York State inmate proceeding pro se, commenced this civil rights action under 42 U.S.C. § 1983, raising claims arising out of his incarceration at the Clinton Correctional Facility. (Dkt. Nos. 1, 10). Following review under 28 U.S.C. § 1915, the following claims survived: First Amendment retaliation claims against Defendants Stephen Shipman and Roxanne Sawyer and a First Amendment free exercise claim against Defendant Shipman. (Dkt. No 15). Defendants moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure arguing, inter alia, that Plaintiff failed to exhaust his administrative remedies and that his retaliation claims failed as a matter of law. (Dkt. No. 39). The parties filed responsive papers. (Dkt. Nos. 41, 42).

This matter was referred to United States Magistrate Judge Miroslav Lovric who, on February 12, 2020, issued a Report-Recommendation recommending that Defendants' motion for summary judgment be granted and the Amended Complaint be dismissed without prejudice with respect to Plaintiff's free exercise claim against Defendant Shipman and with prejudice with respect to the retaliation claims against both Defendants.

(Dkt. No. 44). Magistrate Judge Lovric advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days to file written objections to the report and that the failure to object to the report within fourteen days would preclude appellate review. (Dkt. No. 44, at 36). No objections to the Report-Recommendation were filed.

**II. STANDARD OF REVIEW**

As no objections to the Report-Recommendation were filed and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See* Petersen v. Astrue, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment.

**III. DISCUSSION**

**A. Exhaustion of Mandatory Administrative Remedies**

Magistrate Judge Lovric recommended granting Defendants' motion for summary judgment and dismissing the Amended Complaint without prejudice because Plaintiff commenced this action before receiving a decision on his appeal from the Central Office Review Committee ("CORC"). (Dkt. No. 44, at 21–27). Plaintiff submitted his appeal to the CORC on April 27, 2018, (Dkt. No. 39-11, ¶ 12), which the CORC received on May 10, 2018. [1] (*Id.* ¶ 13). Thus, the CORC was required to respond by June 9, 2018. *See* 7 N.Y.C.R.R. § 701.5(d)(2)(ii). Plaintiff signed the Complaint that commenced this action on June 22, 2018; the mailing envelope is postmarked June 26, 2018. (Dkt. No. 1, at 5; Dkt. No. 1-3). The Complaint was docketed with this Court on July 2, 2018. (Dkt. No. 1). Under the prison mailbox rule, Plaintiff's Complaint is deemed filed upon its delivery to prison authorities for mailing. *See* Arzuaga v. Quiros, 781 F.3d 29, 33 (2d Cir. 2015). The record does not reflect what date he delivered the Complaint to prison officials. Construing the record in the light most favorable to Plaintiff to reflect the longest period of time before he commenced suit, Plaintiff commenced this action on June 26, 2018, seventeen days after the thirty-day time period to respond had expired. [2] A declaration submitted with Defendants' summary judgment motion stated that as of July 5, 2019, over one year after the CORC's deadline had passed, Plaintiff's appeal was still pending, (Dkt. No. 39-11, ¶ 15), and Plaintiff's summary judgment filing states that, as of July 30, 2019, he still had not received a response from the CORC, (Dkt. No. 41, at 35 n.1). The record does not reflect the current status of Plaintiff's appeal.

1    Courts, including Magistrate Judge Lovric in this case, have sometimes calculated the thirty days within which the CORC must respond to prisoner appeals from the date the appeal was sent to the CORC. (*See* Dkt. No. 44, at 24 (explaining that the "decision by CORC was due" "30 days after the prisoner's filing of his appeal to CORC")). The applicable regulation, however, states that "[t]he CORC shall review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the grievant, the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was *received.*" 7 N.Y.C.R.R. § 701.5(d)(2)(ii) (emphasis added).

2    Because Magistrate Judge Lovric calculated from the date Plaintiff sent his appeal to the CORC, rather than the date the CORC received the appeal, and used the date Plaintiff signed the Complaint rather than the date of postmark, Magistrate Judge Lovric calculated that Plaintiff waited "approximately twenty-six days" beyond the CORC's thirty-day deadline before initiating this action. (Dkt. No. 44, at 23).

**\*2** Magistrate Judge Lovric determined that the CORC's delay during the short time Plaintiff waited before commencing this action is not a delay "that could render the grievance process unavailable." (Dkt. No. 44, at 25). As Magistrate Judge Lovric noted, there is a split of authority in this Circuit, under the Supreme Court's decision in *Ross v. Blake*, — U.S. ——, 136 S. Ct. 1850, 195 L.Ed.2d 117 (2016) and the Second Circuit's decision in *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016), regarding what kind of delay by the CORC in deciding a prisoner's grievance renders exhaustion unavailable. *Compare, e.g., Sherwood v. Senecal*, No. 17-cv-00899, 2019 WL 4564881, at \*2–4, 2019 U.S. Dist. LEXIS 160295, at \*4–8 (N.D.N.Y. Sept. 20, 2019); *Mayandeunas v. Bigelow*, No. 18-cv-1161, 2019 WL 3955484, at \*4, 2019 U.S. Dist. LEXIS 142452, at \*10–11 (N.D.N.Y. Aug. 22, 2019) (Suddaby, C.J.); *Lovell v. McAuliffe*, No. 18-cv-0685, 2019 WL 4143361, 2019 U.S. Dist. LEXIS 74402 (N.D.N.Y. May 1, 2019), *report and recommendation adopted*, 2019 WL 4142593, 2019 U.S. Dist. LEXIS 147890 (N.D.N.Y. Aug. 30, 2019); *Bell v. Napoli*, No. 17-cv-850, 2018 WL 6506072, 2018 U.S. Dist. LEXIS 208503 (N.D.N.Y. Dec. 11, 2018); *Yates v. Smith*, No. 17-cv-1227, 2018 WL 4635715, 2018 U.S. Dist. LEXIS 116276 (N.D.N.Y. July 11, 2018), *report and*

*recommendation adopted*, 2018 WL 3727357, 2018 U.S. Dist. LEXIS 131450 (N.D.N.Y. Aug. 6, 2018); *High v. Switz*, No. 17-cv-1067, 2018 WL 3736794, 2018 U.S. Dist. LEXIS 114403 (N.D.N.Y. July 9, 2018), *report and recommendation adopted sub nom. High v. PA Switz*, 2018 WL 3730175, 2018 U.S. Dist. LEXIS 131446 (N.D.N.Y. Aug. 6, 2018) *with Dublino v. Schenk*, No. 19-cv-381, 2020 WL 263664, 2020 U.S. Dist. LEXIS 8214 (N.D.N.Y. Jan. 17, 2020); *Staples v. Patane*, No. 17-cv-0703, 2018 WL 7361009, 2018 U.S. Dist. LEXIS 207971 (N.D.N.Y. Dec. 7, 2018), *report and recommendation adopted*, 2019 WL 757937, 2019 U.S. Dist. LEXIS 26563 (N.D.N.Y. Feb. 20, 2019); *Berkley v. Ware*, No. 16-cv-1326, 2018 WL 3736791, 2018 U.S. Dist. LEXIS 113521 (N.D.N.Y. July 6, 2018), *report and recommendation adopted*, 2018 WL 3730173, 2018 U.S. Dist. LEXIS 131445 (N.D.N.Y. Aug. 6, 2018).

This Court has previously concluded that administrative remedies were unavailable under *Ross* in a case where the Plaintiff waited sixty-nine days past the CORC's 30-day deadline to commence an action. *See Sherwood*, 2019 WL 4564881, 2019 U.S. Dist. LEXIS 160295. Here, considering the short time period within which Plaintiff filed his complaint and the intra-Circuit split on this issue, the Court does not find clear error in Magistrate Judge Lovric's determination. *See Warr v. Liberatore*, No. 13-cv-6508, 2018 WL 3237733, at \*5, 2018 U.S. Dist. LEXIS 111126, at \*13–14 (W.D.N.Y. July 3, 2018) (explaining, in the context of a motion for reconsideration, that "considering the split in authority ... defendants have not demonstrated that [district court's decision was] clearly erroneous"). Accordingly, the Court adopts Magistrate Judge Lovric's recommendation that Plaintiff failed to exhaust his administrative remedies.

Over one year and two months passed between the CORC's deadline to respond to Plaintiff's appeal and Plaintiff filing his summary judgment opposition. At that point, the CORC had still not responded. In deference to Plaintiff's pro se status, and absent any briefing regarding why dismissal with prejudice would be warranted here, the Court will dismiss this action without prejudice. *See Salim v. Patnode*, No. 18-cv-57, 2018 WL 6381059, at \*3, 2018 U.S. Dist. LEXIS 205998, at \*6 (N.D.N.Y. Dec. 6, 2018). This decision does not, therefore, preclude Plaintiff from refiling his lawsuit.

### B. Retaliation Claims

**\*3** Magistrate Judge Lovric recommended dismissing Plaintiff's retaliation claims against Defendants with prejudice for the reasons set forth in Defendants'

2020 WL 1329159

memorandum of law, as supplemented in the Report-Recommendation. (Dkt. No. 44, at 32–37). Magistrate Judge Lovric concluded that Plaintiff failed to establish a causal connection between his protected conduct and the alleged adverse actions.

To establish a First Amendment retaliation claim, the plaintiff must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). In the prison context, "adverse action" is conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). This inquiry must be "tailored to the different circumstances in which retaliation claims arise," bearing in mind that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

"Once the plaintiff carries his initial burden, 'the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff even in the absence of the protected conduct.' " *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (internal quotation marks omitted)). Because of "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated," prisoners' claims of retaliation are examined with "skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

### 1. Plaintiff's Burden

Defendants did not challenge whether Plaintiff engaged in a protected activity or whether Shipman's alleged conduct constituted an adverse action. Moreover, Magistrate Judge Lovric assumed that Plaintiff could establish an adverse action as to Defendant Sawyer. (Dkt. No. 39-2, at 11, 15;

Dkt. No. 44, at 35). At issue here is Magistrate Judge Lovric's determination that Plaintiff failed to raise a triable issue of fact as to whether there was a causal connection between his protected activity—the grievance filed against Sawyer on March 8, 2018—and the adverse actions on March 23, 2018.[3] There is no dispute, as Magistrate Judge Lovric found, that there is close temporal proximity between the protected conduct and the alleged adverse actions. (Dkt. No. 44, at 33).

[3]    In addition to the alleged adverse action of filing a false misbehavior report, Plaintiff alleges that Shipman prevented Plaintiff from attending Jumu'ah. (*See* Dkt. No. 15, at 4–5; Dkt. No. 39-2, at 15; Dkt. No 39-2, at 15; Dkt No. 41, at 39; Dkt. No. 44, at 34 n.13).

#### a. Defendant Shipman

As Magistrate Judge Lovric noted, Plaintiff alleges that on the day in question he overheard Sawyer tell Shipman that Plaintiff filed a grievance against her. (Dkt. No. 44, at 33). Magistrate Judge Lovric found that: "[e]ven if the Court were to credit Plaintiff's allegations, which are contrary to Defendants' sworn declarations, the allegations are still insufficient to support a causal connection." (*Id.*) (record citations omitted). In support of his determination, Magistrate Judge Lovric cited to the facts that: (1) courts in this Circuit have declined "to find evidence of a causal connection where a plaintiff alleged retaliation by a defendant for complaints against other officers or employees"; (2) Plaintiff does not claim that either Defendant made a statement reflecting retaliatory intent; and (3) "temporal proximity alone is insufficient." (Dkt. No. 44, at 33).

**\*4**  However, crediting the Plaintiff's allegations in their full context, as the Court must, the Court concludes that Magistrate Judge Lovric clearly erred in failing to draw all reasonable inferences in Plaintiff's favor. To be sure, Shipman and Sawyer each submitted declarations denying having conversations about Plaintiff. (*See* Dkt. No. 39-7, ¶ 18; Dkt. No. 39-9, ¶ 7). "But the disparity between [the parties'] declarations] itself creates a credibility issue that is not readily amenable to resolution on summary judgment." *Colon*, 58 F.3d at 873.[4] Crediting this alleged conversation, and construing the facts in the light most favorable to Plaintiff, Plaintiff has advanced more than just temporal proximity to support a causal connection. *Id.* (explaining that if temporal

Young v. Shipman, Not Reported in Fed. Supp. (2020)

2020 WL 1329159

proximity "represented the sum total" of the plaintiff's proof, that might be sufficient to grant summary judgment on his retaliation claim).

4    Defendants cite *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 368 (S.D.N.Y. 2011) for the proposition that "conclusory allegations of conversations where grievances were allegedly discussed are insufficient to demonstrate a causal connection for retaliation purposes." (Dkt. No. 39-2, at 13). In *Roseboro*, however, the Plaintiff merely alleged that he "once saw [guards] talking." *Roseboro*, 791 F. Supp. 2d at 368. Here, by contrast, Plaintiff has described overhearing the substance of the conversation between Defendants and also notes that they stopped talking once they realized he was in earshot. (Dkt. No. 39-5, at 50–51; Dkt. No. 41, at 35).

Plaintiff testified to the following version of the events. He heard a "crackling over the loud speaker and the walkie talkie" immediately when he returned from the mess hall, (Dkt. No. 39-5, at 27), and he saw Sawyer "point[ ] out all the three Muslims that w[ere] in the tailor shop," both of which led Plaintiff to assume "the [Jumu'ah] service had been called." (*Id.* at 30; Dkt. No. 41, at 35 & n.1).[5] Plaintiff approached Shipman who said that they did not call Jumu'ah. (Dkt. No. 39-5, at 30). Then, Sawyer, after overhearing a conversation involving Plaintiff and other prisoners in the tailor shop, "confronted Plaintiff" and "in an angry tone" asked if he was talking to her. (*Id.* at 30–31). Plaintiff responded that he was not, and Shipman went to Sawyer to inquire "what was going on." (*Id.*). Shipman followed Sawyer as she "marched back to her desk," and asked, "What the hell just happened?" (*Id.*). Sawyer responded "Oh, you mean Young? He wrote me up." According to Plaintiff, who was then near the officer desk area to get a rag, Shipman and Sawyer "became silent." (*Id.*). Plaintiff then returned to his worktable. (Dkt. No. 41, at 35). Shortly after, Plaintiff again asked to attend religious service, and Shipman became belligerent. (*Id.*; Dkt. No. 10, at 2). Plaintiff "request[ed] for the guards to contact the watch commander or area sergeant." (Dkt. No. 41, at 39–40). Plaintiff testified that Shipman and Sawyer then looked at each other. (*Id.* at 35; Dkt. No. 39-5, at 64). Shipman then ordered Plaintiff out of the tailor shop at which point Shipman told Plaintiff "you are not going to ... Jumu'ah services." (Dkt. No. 39-5, at 30–31; Dkt. No. 41, at 35). Plaintiff alleges that Shipman issued him a misbehavior report, which Sawyer endorsed, falsely claiming

that during his interaction with Shipman, Plaintiff cursed Shipman. (Dkt. No. 39-5, at 66). The misbehavior report charged Plaintiff with creating a disturbance, interference with an employee, and refusing a direct order to go back to his seat. (Dkt. No. 39-7, ¶ 12).[6]

5    Plaintiff submitted a prison logbook indicating that Jumu'ah had been called at either 12:20 p.m. or 12:22 p.m. (Dkt. No. 41, at 28, 29).

6    The misbehavior report states that Shipman told Plaintiff at approximately 12:50 that Jumu'ah services had not been called. (Dkt. No. 39-10, at 2).

**\*5** The fact that there is no evidence that Defendants made a statement of retaliatory intent is a factor to consider, but that Plaintiff cannot adduce evidence of such a statement is not fatal to his claim. *Gayle v. Gonyea*, 313 F.3d 677, 684 (2d Cir. 2002) (rejecting defendants' argument that plaintiff "failed to meet his evidentiary burden because he has failed to submit direct evidence that the [misbehavior] report was filed as a retaliatory measure"); *see also Vaher v. Town of Orangetown*, 133 F. Supp. 3d 574, 596 (S.D.N.Y. 2015) ("Direct evidence of retaliatory intent is not required" to overcome summary judgment on a First Amendment retaliation claim.).

Moreover, while as a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant, the cases cited in the Report-Recommendation are factually distinguishable from the present case. In *Woodward v. Afify*, the plaintiff's allegations lacked temporal proximity: the court explained that it "strains credulity that an officer would retaliate against an inmate for lawsuits the inmate filed *years prior* against other individuals." No. 14-cv-00856, 2018 WL 9875253, at \*13, 2018 U.S. Dist. LEXIS 169547, at \*42 (W.D.N.Y. Sept. 28, 2018) (emphasis added), *report and recommendation adopted*, 2019 WL 5394217, 2019 U.S. Dist. LEXIS 182722 (W.D.N.Y. Oct. 22, 2019). In *Wright v. Goord*, the plaintiff wrote a letter—the protected activity—addressed to certain guards, none of whom were involved in an alleged retaliatory assault against plaintiff. 554 F.3d 255, 274 (2d Cir. 2009). Here, by contrast, Sawyer endorsed the misbehavior report issued against Plaintiff. In *Hare v. Hayden*, the plaintiff failed to establish that one prison guard "had a motive to retaliate arising from [plaintiff's] complaints" against another guard. No. 09-cv-3135, 2011 WL 1453789, at \*4, 2011 U.S. Dist. LEXIS 40683, at \*12 (S.D.N.Y. Apr. 14, 2011). Here, however, Plaintiff has adduced evidence that Defendants were discussing Plaintiff's grievance against Sawyer moments before the events giving

Young v. Shipman, Not Reported in Fed. Supp. (2020)

2020 WL 1329159

rise to the misbehavior report and the denial of Jumu'ah transpired.

On this record, Plaintiff has raised a genuine issue of material fact as to whether filing a grievance against Sawyer "was a substantial or motivating factor in [Shipman's] decision to" issue Plaintiff an allegedly false misbehavior report and prevent him from attending Jumu'ah services. *See Graham, 89 F.3d at 79.*

**b. Defendant Sawyer**

With respect to Sawyer, Magistrate Judge Lovric concluded that Plaintiff only adduced evidence of temporal proximity to establish a causal connection between the grievance filed against her and the false misbehavior report filed against Plaintiff. (Dkt. No. 44, at 35–36). [7] The Court disagrees. As with Sawyer, Plaintiff has adduced circumstantial evidence beyond temporal proximity to support a causal connection.

[7]    Magistrate Judge Lovric "assumed *arguendo*" that Sawyer's endorsement of the allegedly false misbehavior report constituted adverse action after noting that endorsing a false misbehavior report could arguably deter a similarly situated individual from exercising his constitutional rights. (Dkt. No. 44, at 35–36). The Court concurs. *See Higgins v. Coombe,* No. 95-cv-8696, 1997 WL 328623, at *7, 12, 1997 U.S. Dist. LEXIS 8418, at *22, 36 (S.D.N.Y. June 16, 1997) (denying defendants' motion to dismiss, including against a defendant who "allegedly 'endorsed' the false misbehavior report" at issue).

Thus, Plaintiff has raised a genuine issue of material fact as to whether filing a grievance against Sawyer "was a substantial or motivating factor in [her] decision" to endorse Shipman's allegedly false misbehavior report. *See Graham, 89 F.3d at 79.*

**2. Defendants' Burden**

**\*6**   Having found that Plaintiff established a prima facie retaliation claim, the burden "shifts to the defendants to show that, as a matter of law, [Plaintiff] would have been punished to the same extent regardless of the alleged retaliation." *Gayle,* 313 F.3d at 684 (citing *Graham, 89 F.3d at 80*). Defendants argue that Shipman would still have charged

Plaintiff with the same misbehavior report regardless of the grievance filed against Sawyer. [8] (Dkt. No. 39-2, at 14–15). However, Plaintiff denies the allegations in the misbehavior report. (Dkt. No. 39-5, at 66; Dkt. No. 41, at 19). Accordingly, viewing the evidence in the light most favorable to Plaintiff, Defendants have not "met their burden of establishing as a matter of law that [Plaintiff] would have been punished to the same extent" he was punished "regardless of the alleged retaliation." *Gayle,* 313 F.3d at 684 (citing *Graham, 89 F.3d at 80*).

[8]    Sawyer similarly stated in her declaration that she would have endorsed the misbehavior report "regardless of any prior grievance by Plaintiff." (Dkt. No. 39-9, ¶ 14).

Thus, at this stage, viewing the evidence in the light most favorable to Plaintiff, he has raised a triable issue of fact as to whether there was a causal connection between his protected conduct and the alleged adverse actions. *See Brandon,* 938 F.3d at 41. Accordingly, the Court rejects the Magistrate Judge's recommendation that summary judgment be granted with prejudice on Plaintiff's retaliation claim. The Court has reviewed the remainder of the Report-Recommendation for clear error and found none. The remainder of the Report-Recommendation is therefore adopted.

**IV. CONCLUSION**
For these reasons, it is

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 44) is **ADOPTED** in part and **REJECTED** in part as described above; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 39) is **GRANTED in part,** and the Amended Complaint is **DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative remedies; and it is further

**ORDERED** that the Clerk is directed to close this case; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 755 of 830

**Young v. Shipman, Not Reported in Fed. Supp. (2020)**
2020 WL 1329159

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1329159

---

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 756 of 830
Gilmore v. Blair, Not Reported in Fed. Supp. (2020)

2020 WL 5792467

2020 WL 5792467
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Gabriel GILMORE, Plaintiff,

v.

BLAIR, Defendant.

9:18-CV-463 (GLS/DJS)
|
Signed 06/30/2020

**Attorneys and Law Firms**

GABRIEL GILMORE, 04-B-387, Plaintiff, Pro Se, Attica
Correctional Facility, Box 149, Attica, New York 14011.

OF COUNSEL: NICHOLAS L. ZAPP, ESQ., Assistant
Attorney General, HON. LETITIA JAMES, Attorney
General of the State of New York, Attorney for Defendants,
The Capitol, Albany, New York 12224.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** Plaintiff, presently an inmate in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"), brings this *pro se* action pursuant to
42 U.S.C. § 1983, alleging the violation of his constitutional
rights. Dkt. No. 1, Compl. Defendant has now filed a Motion
for Summary Judgment seeking dismissal of the Complaint.
Dkt. Nos. 102 & 103. Plaintiff opposes the Motion. Dkt. No.
115. For the reasons which follow, the Court recommends that
the Motion be granted.

## I. BACKGROUND

The Complaint originally named multiple Defendants. *See
generally* Compl. In a June 5, 2018 Decision and Order,
the District Court dismissed all claims other than a First
Amendment retaliation claim against Defendant Blair. Dkt.
No. 13. The gravamen of the retaliation claim is that
Defendant issued a misbehavior report to Plaintiff falsely
accusing him of abusing facility health services procedures
and then played a role in tampering with Plaintiff's food. *Id.*
at p. 18.

During the time period relevant to Plaintiff's allegations,
roughly September 2016 through January 2017, Plaintiff was
housed at Coxsackie Correctional Facility. Dkt. No. 102-3,
Blair Decl. at ¶ 3; Dkt. No. 115-3 at ¶¶ 2-3. [1] During this
time, Defendant Blair was employed as a Registered Nurse at
Coxsackie. Blair Decl. at ¶ 1. Though the parties dispute their
frequency and legitimacy, the record establishes that during
this period Plaintiff had a documented history of numerous
medical complaints. Blair Decl. at ¶¶ 13-15; Dkt. No. 103,
Pl.'s Med. Records; Dkt. No. 115-4 at ¶¶ 8 & 13. This included
requesting emergency sick call on numerous occasions that
medical staff at Coxsackie deemed unwarranted. Blair Decl.
at ¶ 15.

[1]     Plaintiff has submitted numerous documents in
        opposition to the Motion which are referred to
        throughout this opinion by reference to their docket
        number.

On November 29, 2016, Plaintiff again requested emergency
sick call and according to Nurse Blair raised issues other
than those made in the sick call request. *Id.* at ¶ 16; Pl.'s
Med. Records at p. 14. As a result, Defendant issued Plaintiff
an inmate misbehavior report. Blair Decl. at ¶ 17 & Ex. B.
Following a hearing, Plaintiff was found not guilty of the
charges lodged in the misbehavior report. Dkt. No. 102-6,
Pl.'s Dep. at p. 33.

Plaintiff also alleges that his food was tampered with on
January 23, 2017. Specifically, he claims that he was given
a food tray by a corrections officer who he cannot name and
that a medication to which he had previously had an adverse
reaction had been placed in the food. Pl.'s Dep. at pp. 35-41.
Defendant denies any role in tampering with Plaintiff's food.
Blair Decl. at ¶¶ 20-21.

Defendant has offered evidence from two DOCCS officials
that Plaintiff filed no grievance regarding the two incidents of
alleged retaliation at issue in this case. *See generally* Dkt. No.
102-4, Hale Decl.; Dkt. No. 102-5, Seguin Decl.

## II. LEGAL STANDARD FOR
SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                                          1

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 757 of 830

Gilmore v. Blair, Not Reported in Fed. Supp. (2020)

2020 WL 5792467

of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

**\*2** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Defendant seeks summary judgment on three grounds: (1) Plaintiff's alleged failure to exhaust available administrative remedies; (2) on the merits of Plaintiff's retaliation claim; and (3) on the ground of qualified immunity. The Court considers each argument in turn.

### A. Exhaustion under the Prison Litigation Reform Act

#### 1. The Grievance Process

The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at \*3 (E.D.N.Y. Dec. 28, 1999).

**\*3** In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. 7 N.Y.C.R.R. § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC")

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 758 of 830

Gilmore v. Blair, Not Reported in Fed. Supp. (2020)

2020 WL 5792467

makes the final administrative determination. *Id.* at §
701.5(d). Only upon exhaustion of all three levels of review
may a prisoner seek relief in federal court. *Bridgeforth v.
Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing,
*inter alia, Porter v. Nussle*, 534 U.S. at 524); *see also Neal v.
Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other
grounds by Porter v. Nussle*, 534 U.S. 516.

An expedited procedure exists for grievances regarding
alleged harassment; this procedure also requires that the
grievant receive a response from CORC in order to
exhaust. 7 N.Y.C.R.R. § 701.8. Pursuant to this expedited
procedure, the inmate may first report the incident to the
employee's immediate supervisor. *Id.* at § 701.8(a). The
inmate's allegations are then given a grievance number and
the superintendent (or his designee) must promptly decide
whether the grievance, if true, would represent a *bona
fide* case of harassment. *Id.* at §§ 701.8(b) & (c). If the
superintendent determines the grievance to be a case of
harassment, he must render a decision within 25 days; the
grievant may then appeal that determination to CORC. *Id.* at
§§ 701.8 (d)-(h).

### 2. Plaintiff's Failure to Fully Exhaust his Claims

Here the record before the Court establishes that no timely
grievance was filed regarding either Defendant's alleged
retaliation in November 2016 or alleged involvement in
food tampering in January 2017. The records of Coxsackie
Correctional Facility indicate that no grievance was filed
regarding either claim. Hale Decl. at ¶ 12. [2] Records from
CORC further demonstrate that no appeal to CORC was ever
taken of any grievance related to these two claims. Seguin
Decl. at ¶¶ 13-18. This evidence is sufficient to establish
that no grievance was filed regarding these claims. *Powell v.
Schriro*, 2015 WL 7017516, at *7 (S.D.N.Y. Nov. 12, 2015).

[2]    Plaintiff's opposition makes much of a claim that
      Hale's Declaration is untrue because he did not
      work at Coxsackie Correctional Facility at the time
      of the events in question. *See* Dkt. No. 115-2 at ¶¶
      2-4. The Court notes that Hale's Declaration does
      not claim that he worked at Coxsackie at this time
      and is explicitly offered based on his knowledge of
      DOCCS procedure and a review of records. Hale
      Decl. at ¶¶ 1-2.

Apart from claims that his efforts to file a grievance may
have been interfered with, a claim that will be discussed
below, Plaintiff's opposition papers do not offer evidence that
a timely grievance regarding either the November 2016 or
January 2017 incidents was filed. As noted above, DOCCS
regulations require a grievance be filed within 21 days of the
event giving rise to the grievance. *Williams v. Priatno*, 829
F.3d 118, 119 (2d Cir. 2016) (citing 7 N.Y.C.R.R. § 701.5(a)
(1)). At his deposition, Plaintiff testified that he only "started
trying to make complaints" on January 23, 2017. Pl.'s Dep.
at p. 33. He offered no specifics about the nature of those
complaints, however. *Id.* The earliest date offered by Plaintiff
as to any written action regarding the events at issue here
appears to be a May 2, 2017 letter to the New York State
Office of the Inspector General. *See* Dkt. No. 115-1 at p.
10. Plaintiff's extensive opposition papers show no earlier
attempt by him to make DOCCS officials aware of these
alleged incidents. In fact, the earliest date offered by Plaintiff
regarding written communication with DOCCS appears to be
Plaintiff's June 2017 grievance regarding medical care which
mentions neither of these incidents nor Defendant Blair. Hale
Decl. at Ex. A. There is, therefore, simply no evidence of
a timely grievance regarding these incidents as required to
exhaust remedies under the PLRA. *Reeder v. Uhler*, 2019 WL
4636351, at *3 (N.D.N.Y. Sept. 26, 2019) (citing Woodford
v. Ngo, 548 U.S. at 83).

**\*4**  Plaintiff's opposition does establish that he wrote
numerous complaints to prison officials and others outside of
DOCCS. Dkt. No. 115-1 at pp. 9, 10, 14, & 15. "Generally,
'the law is well-settled that informal means of communicating
and pursuing a grievance, even with senior prison officials,
are not sufficient under the PLRA.' " *Berman v. Durkin*,
2017 WL 1215814, at *7 (N.D.N.Y. Mar. 10, 2017), *report
and recommendation adopted*, 2017 WL 1207834 (N.D.N.Y.
Mar. 31, 2017) (quoting *Timmons v. Schriro*, 2015 WL
3901637, at *3 (S.D.N.Y. June 23, 2015)) (citing cases);
*Salmon v. Bellinger*, 2016 WL 4411338, at *4 (N.D.N.Y.
July 5, 2016), *report and recommendation adopted*, 2016 WL
4275733 (N.D.N.Y. Aug. 12, 2016) ("Letters sent outside
of the grievance process ... are insufficient to satisfy the
exhaustion requirement"); *see also Macias v. Zenk*, 495 F.3d
37, 44 (2d Cir. 2007) ("Alerting the prison officials as to
the nature of the wrong for which redress is sought, does
not constitute 'proper exhaustion.' ") (internal quotations,
citations, and alterations omitted). Those letters, therefore, did
not exhaust Plaintiff's administrative remedies.

The exhaustion requirement is designed to permit prison officials to address inmate concerns before the commencement of litigation. *Jones v. Bock*, 549 U.S. 199, 204 (2007). An inmate must exhaust the entire DOCCS three-step process to exhaust a claim under the PLRA. *Seuffert v. Donovan*, 2016 WL 859815, at *4 (N.D.N.Y. Feb. 5, 2016), *report and recommendation adopted*, 2016 WL 796090 (N.D.N.Y. Feb. 26, 2016). Here, the facts establish that Plaintiff proceeded to this Court before fully exhausting the available DOCCS procedures. He thus failed to fully exhaust.

### 3. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court stated in *Ross*, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. Plaintiff bears the burden of establishing that the grievance procedures were unavailable within the meaning of *Ross*. *Martin v. Wyckoff*, 2018 WL 7356771, at *5 (N.D.N.Y. Oct. 16, 2018), *report and recommendation adopted*, 2019 WL 689081 (N.D.N.Y. Feb. 19, 2019).

Plaintiff clearly argues that he should be excused from the exhaustion requirement. *See generally* Dkt. No. 115-1. Plaintiff has filed many grievances while an inmate in DOCCS' custody. *See* Sequin Decl. at Ex. A. "This shows that Plaintiff did not view the filing of grievances as a dead end. It also demonstrates that he clearly understood DOCCS' inmate grievance policy and could navigate it when he wished to pursue a grievance. As such, the first two exceptions identified under *Ross* are not applicable here." *Walker v. Ball*, 2018 WL 1415212, at *5 (N.D.N.Y. Feb. 16, 2018), *report and recommendation adopted*, 2018 WL 1406632 (N.D.N.Y. Mar. 20, 2018); *see also Gonzalez v. Coburn*, 2017

WL 6512859, at *6 (W.D.N.Y. Dec. 20, 2017) ("Plaintiff's decision to affirmatively participate at all three levels in the inmate grievance program demonstrates that the program was neither a dead-end nor so opaque that Plaintiff could not avail himself of it.").

**\*5** Plaintiff's opposition does raise an allegation that his attempts to file grievances were somehow thwarted by DOCCS personnel. Dkt. No. 115-1. His conclusory allegations in this regard, however, are insufficient to raise a question of fact. *Richard v. Leclaire*, 2019 WL 4233184, at *3 (N.D.N.Y. Sept. 6, 2019); *Aviles v. Tucker*, 2016 WL 4619120, at *4 (S.D.N.Y. Sept. 1, 2016). Plaintiff alleges, for example, that he attempted to send an appeal by certified mail to Karen Bellamy, then a DOCCS official at CORC, but that facility staff refused to process his mail. *Id.* at p. 9. This accusation, made in a memo addressed to Ms. Bellamy, makes no reference to having filed a grievance at the facility level, however. *Id.* The Court also notes that while Plaintiff has a copy of this memo and many other correspondence dated well after the incidents at issue here, *id.* at pp. 7-14, he has not provided the Court with a copy of any grievance, grievance decision, or grievance appeal related to those issues. *See, e.g., Gibbs v. Gadway*, 2019 WL 5191506, at *5 (N.D.N.Y. Oct. 15, 2019), *report and recommendation adopted*, 2020 WL 1227156 (N.D.N.Y. Mar. 13, 2020) (conclusory claim unsupported by copies of grievances allegedly filed subject to dismissal) (citing cases); *Blake v. Porlier*, 2019 WL 7484052, at *5 (N.D.N.Y. Oct. 4, 2019), *report and recommendation adopted*, 2020 WL 58613 (N.D.N.Y. Jan. 6, 2020) (same). Nor does Plaintiff identify the date any grievance was filed or anything else about the process that would render his claims less conclusory.

For these reasons, the Court recommends that the Motion for Summary Judgment be granted based on Plaintiff's failure to exhaust his administrative remedies. The Court will, however, also address the remaining grounds for Defendant's Motion.

### B. Merits of Plaintiff's Retaliation Claim

"To prevail on a First Amendment retaliation claim, an inmate must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action.' " *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 760 of 830
Gilmore v. Blair, Not Reported in Fed. Supp. (2020)
2020 WL 5792467

Cir. 2009)). The plaintiff must establish that "the protected conduct was a substantial or motivating factor" behind the retaliatory action. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). The Second Circuit has warned that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)). This is true because given the nature of a retaliation claim they are "easily fabricated" and as a result "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d at 491.

Plaintiff claims Defendant took two retaliatory actions against him: the issuance of a misbehavior report and having something placed in his food to make him ill. Under the applicable standards neither claim survives summary judgment.

### 1. Misbehavior Report

Defendant issued a Misbehavior Report to Plaintiff on November 26, 2016, related to Plaintiff's abuse of facility emergency sick call procedures. Blair Decl. at ¶ 17 & Ex. B. Plaintiff was found not guilty of the three charges set forth in the Misbehavior Report. *See* Compl. at pp. 18 & 67; Pl.'s Dep. at p. 33. Plaintiff claims the report was issued to retaliate against him for his frequent requests for medical attention. Dkt. No. 115-4 at ¶ 17. Defendant denies any retaliatory motivation in issuing the report. Blair Decl. at ¶ 18. As to this claim, Plaintiff cannot establish either that he engaged in protected activity or that Defendant took adverse action against him. Accordingly, summary judgment is appropriate as to this claim.

Courts have not recognized a freestanding right to request medical attention as a protected activity sufficient to support a retaliation claim. *Ross v. Koenigsmann*, 2016 WL 11480164, at *17 (N.D.N.Y. Sept. 8, 2016), *report and recommendation adopted*, 2016 WL 5408163 (N.D.N.Y. Sept. 28, 2016) (citing cases); *see also Brown v. White*, 2010 WL 985184, at *12 (N.D.N.Y. Mar. 15, 2010). Plaintiff's claim in this regard thus is insufficient to establish the first element of his retaliation claim.

**\*6** Nor can Plaintiff establish an adverse action related to the issuance of the misbehavior report. In the context of inmate retaliation claims, adverse action is viewed objectively and requires the Court to ask whether the action taken with respect to the inmate "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). Courts have long recognized that if the alleged retaliation is not something that would deter an individual from exercising their rights, the alleged conduct is *de minimis* and "outside the ambit of constitutional protection." *McFadden v. Friedman*, 2015 WL 5603433, at *9 (N.D.N.Y. Sept. 23, 2015).

The filing of a false misbehavior report that results in some form of punishment that cannot be labelled *de minimis* has been found sufficient to constitute adverse actions. *See, e.g.*, *Reed v. Doe No. 1*, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action). However, the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action. *Bartley v. Collins*, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but misbehavior report that resulted in keeplock confinement for ten days did). "Typically, courts require a showing of additional punishment above the filing of a misbehavior report to find an adverse action." *Vidal v. Valentin*, 2019 WL 3219442, at *8 (S.D.N.Y. July 17, 2019); *see also Flynn v. Ward*, 2018 WL 3195095, at *10-11 (N.D.N.Y. June 7, 2018), *report and recommendation adopted*, 2018 WL 3193201 (N.D.N.Y. June 28, 2018) (same). In this case, Plaintiff was found not guilty of the charges. Pl.'s Dep. at p. 33. There is no evidence he suffered any adverse consequence in the form of lost privileges or restricted confinement as a result of the report. He, therefore, cannot show and indeed has not alleged an adverse action from the issuance of the misbehavior report.

### 2. Food Tampering Claim

As previously discussed, Plaintiff has failed to adequately allege that he was engaged in protected activity. *See* Point III(B)(1) *supra*. [3] This retaliation claim also fails because he cannot establish a causal connection to Defendant. [4]

[3] To the extent Plaintiff's claim here alleges that the retaliation was motivated by his being found not guilty of the misbehavior report, that too fails to establish a protected activity that can serve as the basis for a retaliation claim. "Being found not guilty, however, is not protected activity, or for that matter, 'activity' at all, on plaintiff's part." *Taylor v. Fischer*, 841 F. Supp. 2d 734, 737 (W.D.N.Y. 2012); *see also Davis v. Jackson*, 2018 WL 358089 at *10-11 (S.D.N.Y. Jan. 8, 2018) (same).

[4] The Court assumes without deciding that tampering with an inmate's food would satisfy the adverse action requirement. *Compare Santos v. Keenan*, 2020 WL 2859202, at *14 (W.D.N.Y. Feb. 6, 2020), *report and recommendation adopted*, 2020 WL 1025189 (W.D.N.Y. Mar. 3, 2020) (food tampering "may be adverse action[ ]" *with James v. Mosko*, 2016 WL 8671478, at *6 (W.D.N.Y. July 22, 2016), *report and recommendation adopted*, 2017 WL 397474 (W.D.N.Y. Jan. 30, 2017) (conclusory allegation of food tampering insufficient to establish adverse action)).

**\*7** A retaliation plaintiff must establish a causal connection between a protected activity and an adverse action. *Holland v. Goord*, 758 F.3d at 22. But to survive dismissal Plaintiff "must advance non-conclusory allegations." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 106 (2d Cir. 2001). In a summary judgment motion, this requires the non-movant to proffer "some tangible proof" of a causal connection and Plaintiff "may not rely on conclusory assertions of retaliatory motive." *Washington v. Cty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004). Defendant Blair denies the allegation that he had any role in tampering with Plaintiff's food. Blair Decl. at ¶¶ 20-21. In the face of express denials on the part of Defendant of any role in the allegedly retaliatory events, the opposition to the Motion for Summary Judgment does not rise above such conclusory allegations and is insufficient to defeat the Motion.

Plaintiff states that his food was tampered with on January 23, 2017, by placing H.I.V. medication to which he had previously had an adverse reaction in his food. Pl.'s Dep.

at pp. 34 & 40-42. The record, however, fails to raise a triable issue about Defendant's role in this alleged incident. Plaintiff has no specific evidence that any medication was in fact placed in his food on the day in question. His claim is based largely on the supposition that the unnamed officer, who Plaintiff says is a "bad" officer would not have given him a food tray absent some nefarious purpose. *See id.* at pp. 35, 36, & 44. He did not see anyone place anything in his food. *Id.* at p. 44. In fact, Plaintiff's deposition testimony could not specifically identify whether it was a corrections officer, Defendant, or another nurse at the facility who allegedly placed the medication in the food. *Id.* at pp. 40-41. He alleges, without specific evidence, only that the three were "working as a team." *Id.* at p. 45.

As previously discussed, inmate retaliation claims can be "easily fabricated." *Dawes v. Walker*, 239 F.3d at 491. Courts, therefore, require more than conclusory allegations to support such a claim. Here, Plaintiff fails to offer evidence beyond speculation and theories of his own design. Plaintiff's "conclusory statements alone ... fail to adequately provide this Court any factual specifics by which we could evaluate the plausibility of his claims." *Melecio v. Fischer*, 2011 WL 6987299, at *8 (N.D.N.Y. Sept. 27, 2011), *report and recommendation adopted*, 2012 WL 92846 (N.D.N.Y. Jan. 11, 2012).

For these reasons, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

### C. Qualified Immunity

Qualified immunity provides a "shield[ ] ... from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.... To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citations omitted). Qualified immunity attaches if " 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In other words, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. at 341. Although it is not the case that "an official action is protected by qualified immunity

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 762 of 830

Gilmore v. Blair, Not Reported in Fed. Supp. (2020)

2020 WL 5792467

unless the very action in question has previously been held unlawful ... it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

**\*8** While the general right to be free from retaliation is well established, this Court has previously recognized that "there is no 'clearly established right' under the First Amendment for inmates to request medical attention." *Ross v. Koenigsmann*, 2016 WL 11480164, at \*18 (N.D.N.Y. Sept. 8, 2016), *report and recommendation adopted*, 2016 WL 5408163 (N.D.N.Y. Sept. 28, 2016). Other courts have more recently continued to recognize that no such right is clearly established. *James v. Gage*, 2019 WL 6251364, at \*7 (S.D.N.Y. Nov. 21, 2019) ("a constitutional right to request medical attention is not clearly established") (citing cases). Given the lack of a clearly established right Defendant could not have known that acting against Plaintiff, if he in fact did so, would constitute unlawful retaliation. As a result, the lack of clearly established law finding a right to request medical treatment is an additional basis for granting summary judgment.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 102) be **GRANTED** and that the Complaint be **DISMISSED**; and it is

**ORDERED**, that Plaintiff's letter requests to submit additional documents in opposition to the Motion and for a conference (Dkt. Nos. 127 & 132) are **DENIED as moot**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5792467

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5775203

2020 WL 5775203
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Gabriel GILMORE, Plaintiff,

v.

BLAIR, Defendant.

9:18-cv-463 (GLS/DJS)
|
Signed 09/28/2020

**Attorneys and Law Firms**

Gabriel Gilmore, Attica, NY, pro se.

Nicholas Luke Zapp, New York State Attorney General, Albany, NY, for Defendant.

### SUMMARY ORDER

Gary L. Sharpe, U.S. District Judge

**\*1** On June 30, 2020, Magistrate Judge Daniel J. Stewart issued a Report-Recommendation and Order (R&R), which recommends that defendant Blair's motion for summary judgment be granted, and that plaintiff *pro se* Gabriel Gilmore's complaint, (Dkt. No. 1, Compl.), be dismissed. (Dkt. No. 134.) Pending before the court are Gilmore's objections to the R&R. [1] (Dkt. No. 137.)

---

[1] After Judge Stewart issued the R&R, Gilmore filed a supplement to his response in opposition to Blair's motion for summary judgment. (Dkt. No. 135.) Gilmore was already afforded an extension of time to respond, (Dkt. No. 117), and he did, in fact, file a response in opposition, (Dkt. No. 115), which was considered by Judge Stewart, (Dkt. No. 134). As such, the opportunity to file a supplement has long since passed, and the late supplement will not be considered. As to Gilmore's letter filed on September 24, 2020, (Dkt. No. 139), which is construed as a request for a status update on his case, the court believes this Summary Order squarely addresses his request.

Only specific objections warrant de novo review. *See Almonte v. N.Y. State Div. of Parole*, No. Civ. 904CV484, 2006 WL 149049, at \*3-5 (N.D.N.Y. Jan. 18, 2006). Objections that are general, conclusory, frivolous, or a mere reiteration of an argument already made to the Magistrate Judge trigger only clear error review. *See id.* at \*4-5.

The majority of Gilmore's objections fail to address the findings made by Judge Stewart. Gilmore's remaining arguments are "general, conclusory, perfunctory, [and] a mere reiteration of ... argument[s] [already] made," which trigger review only for clear error. *See Rahman v. Fischer*, No. 9:10-cv-1496, 2014 WL 688980, at \*1 (N.D.N.Y. Feb. 20, 2014) (collecting cases); *Almonte*, 2006 WL 149049, at \*4 (explaining that resubmitting the same arguments previously made "fails to comply with the specificity requirement").

Upon review of the R&R, there is no apparent, let alone clear, error in Judge Stewart's analysis, which squarely addresses Gilmore's arguments and provides multiple, appropriate reasons for granting Blair's motion for summary judgment. (Dkt. No. 134.) Accordingly, the R&R, is adopted in its entirety, and the complaint is dismissed.

Accordingly, it is hereby

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 134) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Blair's motion for summary judgment (Dkt. No. 102) is **GRANTED**; and it is further

**ORDERED** that Gilmore's complaint (Compl.) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5775203

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by DeJesus v. City of New York, S.D.N.Y., October 28, 2014

2006 WL 851753
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Brandon HOLMES, Plaintiff,
v.
Correction Officer J. GRANT et al., Defendants.

No. 03 Civ. 3426 RJH RLE.
|
March 31, 2006.

*MEMORANDUM OPINION AND ORDER*

HOLWELL, J.

**\*1** Plaintiff Brandon Holmes, currently incarcerated in Southport Correctional Facility ("Southport"), brings a *pro se* complaint under 42 U.S.C. § 1983 (2000), seeking monetary damages and declaratory and injunctive relief against defendants James Grant et al., corrections officers, staff, and prison superintendents of the New York State Department of Correctional Services ("DOCS"), alleging violation of his constitutional rights. According to a liberal reading of plaintiff's *pro se* pleadings, plaintiff alleges denial of due process, cruel and unusual punishment, malicious prosecution, and retaliation. Defendants William Kivett, A. Baker, J. Smith, Brian Sweeney, Daniel Connolly, Matt Mullin, Kenneth Colao, James Grant, J. Decklbaum, David Miller, Superintendent Eisensmidt, Officer McCreery, and William P. Scott have filed a motion to dismiss all claims or, in the alternative, to transfer any claims not dismissed to the Northern District of New York. On October 25, 2005, Magistrate Judge Ronald L. Ellis issued a Report and Recommendation (the "Report") recommending that this Court grant defendants' motion to dismiss all of plaintiff's claims.

Under 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b), this Court is required to undertake a *de novo* review of those portions of the Report to which specific written objections have been made. The Court, in its discretion, may also undertake a *de novo* review of the entire case. *See Pine Run*

*Properties v. Pine Run Ltd.,* 1991 WL 280719, at *7 (S.D.N.Y. Dec. 26, 1991). Due to the complexity of the action and the number of claims being brought by plaintiff, the Court elects to review the entire case *de novo*. For reasons to be explained below, defendants' motion to dismiss is granted in part and denied in part. [1]

[1] The Report also recommended the dismissal of plaintiff's claims for excessive force and for conspiracy. On the face of the complaint, plaintiff is not bringing either an excessive force claim and or a § 1983 conspiracy claim. Even if plaintiff's complaint was liberally interpreted to be attempting to state a conspiracy claim, he has not made any nonconclusory allegations establishing that there was an *agreement* between multiple state actors to deprive him of his civil rights. *See Brewster v. Nassau County,* 349 F.Supp.2d 540, 547 (citing *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983)) (noting that in order to make out a conspiracy claim, plaintiff must allege (1) an agreement between two or more state actors or between a state actor and a private entity (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal, and causing some harm); *see also Walter v. Jastremski,* 430 F.3d 560, 564 n. 5 (2d Cir.2005) (citing *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002)) ("[C]onclusory or general allegations are insufficient to state a claim for conspiracy under § 1983....").

BACKGROUND

Plaintiff has set forth extensive factual allegations in his complaint, which the Court shall accept as true for the purposes of this 12(b)(6) motion. In addition, both parties have submitted a number of exhibits. The Court takes judicial notice of those exhibits that constitute public records. Fed.R.Evid. 201; *see also Chambers v. Time Warner,* 282 F.3d 147, 153 (2d Cir.2002).

1. *The July 2000 Shawangunk Hearing*
Plaintiff's lengthy story begins on June 29, 2000. While confined at the Shawangunk Correctional Facility ("Shawangunk"), plaintiff was involved in a fight with several correction officers and was administratively charged with,

*inter alia,* an assault on six of them, including defendants Ryan, Bertone, Kivett, and McCreery. (Amend.Compl.¶¶ 20, 70.) A disciplinary hearing was scheduled to commence on July 5, 2000. (*Id.* ¶ 21.)

From June 29 to the conclusion of the hearing on July 21, plaintiff was held in the Shawangunk Special Housing Unit ("SHU"). (*Id.* ¶ 46.) On June 29, defendant Connolly ordered that plaintiff be placed in "mechanical restraint," consisting of handcuffs and leg irons, whenever he left his cell, and be placed on exercise deprivation, resulting in plaintiff being confined to his cell for twenty-four hours a day. (*Id.* ¶¶ 23, 63.) In these June 29 orders, Connolly concluded that plaintiff "assault[ed] ... staff resulting in injuries to 2 sergeants and 3 officers." (*Id.* ¶ 23; Pl.'s Aff., Ex. 1.) These orders remained in effect until approximately July 11. (Amend.Compl.¶ 23.)

**\*2** The hearing began on July 5, with Connolly acting as hearing officer. (*Id.* ¶ 21.) Plaintiff objected to Connolly acting as the hearing officer, since he was the same official who had ordered plaintiff's restraints and exercise deprivation and was allegedly predisposed against plaintiff. (*Id.* ¶ 24.) Connolly declined to recuse himself. (*Id.*) Plaintiff alleges that Connolly conducted the hearing in a biased and unfair manner and introduced evidence after the close of the hearing that was used to support his determination of plaintiff's guilt. (*Id.* ¶¶ 25, 42.) Plaintiff also alleges that Connolly "distorted" his mother's testimony (*id.* ¶ 27); did not properly weigh the fact that photos of plaintiff, showing his alleged injuries, were of poor quality (*id.* ¶ 28); and refused to acknowledge a defense of justification (*id.* ¶ 29). Plaintiff further alleges that Connolly refused to allow plaintiff assistance from a prison counselor for a surprise witness that Connolly called (*id.* ¶ 36) and refused to allow plaintiff to call any witnesses, claiming that they would be redundant (*id.* ¶¶ 38, 44).

Because he was confined in the SHU, plaintiff was unable to marshal evidence for his defense. Plaintiff was assisted in his preparations for the hearing by Correction Counselor Chapperino. (*Id.* ¶ 31) According to plaintiff, however, Chapperino provided little to no assistance. Chapperino, *inter alia,* refused to retrieve documents for plaintiff, claiming that they were irrelevant (*id.*) and not only did not interview witnesses on plaintiff's behalf but actively pressured and threatened witnesses not to testify (*id.* ¶ 33).

Plaintiff was ultimately found guilty at the hearing on July 21 and sentenced to five years in the SHU, a $99 restitution fee, and loss of miscellaneous privileges. (*Id.* ¶ 41.)

2. *Shawangunk SHU Confinement from June through August 2000*

In the SHU, inmates are confined to their cells for twenty-three to twenty-four hours of the day. (*Id.* ¶ 62.) Plaintiff alleges that SHU confinement is also noisy, unhygienic, and inmates throw feces as weapons. (*Id.*) SHU places a number of substantial restrictions on inmate privileges, including, *inter alia,* visitation with family being conducted behind plexiglass instead of "full-contact" visitation, limited exercise and rehabilitation opportunities, and the denial of televisions, radios and the like. (*Id.* ¶¶ 64-69.)

Plaintiff, first confined to the Shawangunk SHU on June 29 pending the Shawangunk hearing, continued to be confined there following its verdict. (*Id.* ¶ 46.) SHU prisoners are normally given some privileges if they successfully complete thirty days of "good behavior," but plaintiff alleges that Connolly falsified his records to deny him these privileges. (*Id.* ¶ 45.) Frustrated by this, plaintiff, by his own admission, received two inmate misbehavior reports ("IMRs") for incidents on August 10 and August 15. (*Id.* ¶ 45; Defs.' Aff. Ex. A, at 5.) Plaintiff was sentenced to thirty days of SHU confinement and thirty days of "keeplock" confinement as a result of these two IMRs. [2] (Defs.' Aff. Ex. A, at 5.) Plaintiff does not deny the bad conduct underlying these two IMRs or claim that the subsequent disciplinary hearings for these IMRs denied him due process.

[2]    Plaintiff uses the term "keeplock" to refer to conditions where inmates are confined for twenty-three hours a day in a general population housing unit cell. (Amend.Compl.¶ 149.)

**\*3** On August 30, plaintiff was transferred briefly to the Downstate Correctional Facility ("Downstate") before being transferred to Southport's SHU. (*Id.* ¶ 46.) At Southport, plaintiff was under a "restraint" order, and forced to wear handcuffs and waist chains, including during exercise periods. (*Id.* ¶¶ 48-49.)

3. *The August 2000 Shawangunk IMRs*

On September 18, 2000, the sentence arising out of the June 29 Shawangunk incident was reversed and a new hearing was ordered on the grounds that the hearing officer, Connolly, had been involved in "pre-hearing assessment" of plaintiff when he issued the restraint and exercise deprivation orders. (*Id.* ¶¶ 117-18; Pl.'s Aff., Ex. 5.) Plaintiff, however continued to be

2006 WL 851753

confined in Southport SHU, to begin serving the sentences received for the two August IMRs. (Amend. Compl. ¶ 48; Defs.' Aff. Ex. A, at 5.)

Plaintiff was transferred to the Eastern Correctional Facility ("Eastern") SHU on September 25. (Amend.Compl.¶ 52.) Plaintiff continued to be confined at Eastern until he was transferred on November 1. (*Id.* ¶ 61.) Between November 1 and November 7, plaintiff was confined for some time at both Downstate and Southport. (*Id.* ¶¶ 61, 119.) Sometime during the first week of November, DOCS officials decided not to hold a second administrative hearing against plaintiff for the June 29 Shawangunk incident. (*Id* . ¶ 119)

On November 7, 2000, plaintiff was transferred to the Sing Sing Correctional Facility ("Sing Sing"). (*Id.* ¶ 120.) Plaintiff alleges that he was supposed to be released into the general population but was instead kept under keeplock status. (*Id.* ¶ 121.) Prison records show, however, that this keeplock time was the remainder of the sentence that plaintiff was serving for the August IMRs. (Defs.' Aff. Ex. A, at 5.) Plaintiff complained to a corrections officer and filed a grievance through the DOCS inmate grievance program protesting his keeplock status. (*Id.* ¶ 125.) On November 17, plaintiff was released from keeplock confinement. (*Id.* ¶ 126.) At a grievance hearing, plaintiff claims he was told that he had "pissed somebody off" and that that was the cause for his confinement. (*Id.* ¶ 127.) [3]

[3]    Plaintiff was sentenced to thirty days SHU time and thirty days keeplock time as a result of the August IMRs. As indicated here, he actually spent more than thirty days in the SHU, from September 18 through October 31. Part of this SHU time was administrative confinement because he had to testify in front of the grand jury for his criminal assault charges. (*See* Amend. Compl. ¶ 104.)

4. *The Twenty-Four Hour Lighting in Eastern SHU*
As noted, plaintiff was confined in the Eastern SHU between September 25 and October 31, 2000. (*Id.* ¶ 53.) The Eastern SHU has a policy of leaving cell lights on twenty-four hours a day. (*Id.* ¶ 54.) Plaintiff alleges that he could not sleep and suffered injury as a result of this policy, including fatigue, loss of appetite, migraine headaches, and a "violent aggravation of rashes." (*Id.* ¶ 55.) Plaintiff sought medical treatment for his conditions on October 10. (*Id.* ¶ 56.) Plaintiff complained to correction officers and filed administrative grievances through the DOCS Inmate Grievance Program

("IGP"); the prison superintendent, defendant Miller; and the DOCS Central Office Review Committee ("CORC"), but his requests to have the lights turned off were denied. (*Id.* ¶¶ 54, 61; Pl. Aff., Ex. 8.) These conditions continued for thirty-five days until plaintiff was transferred on November 1, 2000. (Amend.Compl.¶ 61.)

5. *The Defendants' Filing of Criminal Assault Charges*
 **\*4**  On July 8, 2000, the six officers involved in the June 29, 2000 incident at Shawangunk filed a felony complaint for charges of assault in the second degree against plaintiff in Ulster County. (*Id.* ¶ 70; Pl. Aff., Ex. 5(b).) On August 15, 2000, plaintiff was arraigned on six counts of assault in the second degree. (Amend.Compl.¶ 98.) In October 2000, the six officers testified before the grand jury. (*Id.* ¶¶ 99, 109.) Plaintiff alleges that defendants Kivett and McCreery perjured themselves before the grand jury. (*Id.*¶¶ 71, 99, 111.) Plaintiff does not allege that defendants Ryan and Bertone committed perjury. (*See id.* ¶ 109.) Plaintiff chose to testify before the grand jury on October 12 and October 19, 2000; he was forced to do so while wearing mechanical restraints. (*Id.* ¶ 107.) The grand jury indicted plaintiff for the Ryan and Bertone assaults but dismissed the other four charges of assault. (*Id.* ¶ 100.) Plaintiff alleges that the grand jury was not properly instructed on self-defense and that, had they been so instructed, he would not have been indicted on any counts. (*Id.* ¶ 110.)

6. *The December 2000 Sing Sing IMR for Mess Hall Violations*
On December 17, 2000, defendant Deckelbaum filed an IMR against plaintiff for loss/damage of property, failing to have an identification card, mess hall violations, and impersonation. (*Id.* ¶ 130.) Plaintiff alleges that this IMR was a false accusation. (*Id.*) Plaintiff admits that he did not have his identification card and acknowledges that he had an extra food ration but maintains that he received it from his neighbor. (*Id.* ¶¶ 127, 134.) On December 22, plaintiff was sentenced to "counsel and reprimand," with no disciplinary sentence, for this IMR. (*Id.* ¶ 132.) Sometime within the week, Deckelbaum warned plaintiff that next time he would not be so "lucky" and that he would "get [his]." (*Id.* ¶ 133.) Plaintiff alleges that he filed a grievance about Deckelbaum in December but that the grievance was never processed. (*Id.* ¶ 135.)

7. *The March 2001 Sing Sing IMR*

On March 1, 2001, plaintiff was involved in a fight with another inmate named LaFontaine and charged with an IMR (the "Sing Sing IMR"). (*Id.* ¶ 138.) Plaintiff maintains that this was a one-on-one fight but that defendant Grant exaggerated the IMR filed against him, accusing him of "double-teaming" LaFontaine with another inmate. (*Id.* ¶ 139.) Plaintiff alleges that he asked Grant why he had falsified the IMR, to which Grant replied that plaintiff "pissed some real serious people off." (*Id.* ¶ 142.) At a hearing held on March 7, plaintiff pled guilty to fighting but maintained that he did so one-on-one. (*Id.* ¶ 140.) The hearing official, defendant Colao, found plaintiff guilty of both fighting and the "double-team" assault and sentenced plaintiff to a ninety-day keeplock sentence and the loss of nine months of "good time" credit. (*Id.* ¶¶ 146-47.) Plaintiff alleges that Colao made off-the-record remarks that plaintiff liked "knocking staff around," purportedly in reference to the June 29, 2000 Shawangunk incident. (*Id.* ¶ 148.)

### 8. *The March 2001 Conversion of Plaintiff's Keeplock Sentence to SHU Confinement*

**\*5** On March 19, 2001, plaintiff was transferred from the keeplock sentence he was serving at Shawangunk to the Upstate SHU. (*Id.* ¶¶ 144, 149.) Plaintiff alleges that his sentence of keeplock confinement was changed to harsher SHU confinement out of retaliation. (*Id.* ¶¶ 149-52.) At Upstate, plaintiff was confined in his cell with another prisoner for twenty-four hours a day (*Id.* ¶ 149), presumably until he was again transferred on May 17.

Upon his arrival at Upstate, defendant Kivett allegedly came up to plaintiff, asked him how he "beat the ticket" as to the June 2000 Shawangunk incident, and threatened him. (*Id.* ¶¶ 72-73.) Plaintiff's property was held for eight days following plaintiff's transfer to Upstate and, when ultimately returned to plaintiff, was covered in pancake syrup. (*Id.* ¶ 74.) Plaintiff alleges that correction officials implied that this was in retaliation for assaulting Kivett. (*Id.*) Plaintiff states further that, on April 30, 2001, prison officials gave him his meal without the standard veal ration, again in retaliation. (*Id.* ¶¶ 76-77.) Plaintiff alleges that he filed a grievance with the IGP about the food and syrup incidents, linking the two as continued retaliation, but that it was never received by the grievance committee. (*Id.* ¶ 78.)

### 9. *The May 2001 Five Points IMR*

On either May 11 or 17, 2001,[4] plaintiff was transferred to the Five Points Correctional Facility ("Five Points"). (*Id.* ¶¶ 80,

156.) On May 18, 2001, plaintiff was charged with fighting, again with LaFontaine (the "Five Points IMR"). (*Id.* ¶ 158.) Plaintiff alleges that defendant Sweeney approached him, ostensibly to investigate the allegations, but instead warned plaintiff that he would "get all of [his] time owed here." (*Id.* ¶¶ 159-60.) At the hearing, held on May 21, plaintiff pled not guilty to all charges and intimated that he was the victim of a "set-up." (*Id.* ¶ 162.) Read liberally, plaintiff's complaint alleges that he never fought with LaFontaine the second time at all and that defendants fabricated the charge. (*Id.*) The hearing officer, defendant Rich, did not allow plaintiff to call witnesses or present evidence. (*Id.* ¶ 163.) On May 25, plaintiff was found not guilty of fighting LaFontaine but found guilty of violent conduct. (*Id.* ¶ 164.) Plaintiff was sentenced to ninety-day SHU confinement and the loss of ninety days of "good time" credit. (*Id.* ¶ 166.)

4       The date differs in two different paragraphs of the complaint.

Plaintiff alleges that he served nearly sixty days in the SHU as a result of this incident, although it is not clear from the face of the complaint when this SHU sentence began or ended and how much of that time was administrative confinement and how much of it was punitive. (*Id.*) The results of the May 25 hearing were reversed and expunged on July 13, 2001. (*Id.*)

### 10. *Denial of Access to Courts*

Upon his sentencing for the Five Points IMR, plaintiff requested to return to his general population cell in order to separate his legal material from his cellmate's property. (*Id.* ¶ 170.) Defendant Mullen told plaintiff that he could not return to his cell for any purpose whatsoever. (*Id.* ¶ 171.) As a result, plaintiff's trial transcript for his original murder conviction was lost. (*Id.* ¶ 172.) Plaintiff alleges that he exhausted his grievances as to this matter and filed a complaint with Inmate Claims. (*Id.* ¶ 173.) The trial transcript was never located. (*Id.*)

**\*6** On June 18, 2001, plaintiff began his trial for the Ryan and Bertone assaults stemming from the June 2000 Shawangunk incident. (*Id.* ¶ 80.) Defendant Kivett testified against plaintiff at his trial. (*Id.*) Plaintiff was acquitted of all charges. (*Id.*)

On July 11, 2001, plaintiff was transferred back to Upstate. (*Id.* ¶ 81.) Plaintiff alleges Kivett came up to plaintiff, said that "you beat us again" in reference to plaintiff's successful defense against the assault charges, and intimated there would be further retaliation. (*Id.* ¶ 82.) On July 14, when plaintiff

went to receive his property that had been shipped to him from his previous prison, he noticed that some of his legal material was missing. (*Id.* ¶ 83.) Plaintiff therefore refused to sign the prison property inventory forms. (*Id.*) Plaintiff alleges that the same correction officer who was involved in the missing food incident in April 2001 told him that this was "Kivett's problem now," implying that Kivett was the "puppeteer" behind these acts of retaliation. (*Id.* ¶ 85.)

On July 24, 2001, plaintiff was transferred to the Clinton Correctional Facility ("Clinton"). (*Id.* ¶ 89-90.) Upon his departure, plaintiff alleges that defendant Smith asked plaintiff if he believed that Kivett would "miss [him]." (*Id.* ¶ 89.) Plaintiff's property was not distributed to him because he did not sign the inventory forms at Upstate. (*Id.* ¶ 90.) When plaintiff finally received his property one week later, he received only four out of his eight property bags. (*Id.* ¶ 91.) Plaintiff alleges that defendants Kivett, Smith, and Comstock threw away plaintiff's legal material. (*Id.* ¶¶ 83, 86, 93.) Plaintiff identifies the specific legal material that was stolen or destroyed and alleges that the loss of this material prevented him from filing a renewal motion to stop the clock for the purposes of the Antiterrorism and Effective Death Penalty Act in a timely manner, presumably for a habeas petition. (*Id.* ¶ 94.)

Sometime between July 11 and 24, plaintiff was informed that the grievance he filed about the food and syrup incidents was never received by the grievance committee. (*Id.* ¶ 95.) On August 10, 2001, plaintiff re-filed this grievance at Upstate by mail and further grieved the loss and destruction of his property. (*Id.; see also* Pl.'s Aff., Ex. 21 at 4-7.)

On August 30, 2001, plaintiff's grievance was rejected on the grounds that he was no longer a prisoner of Upstate and had to file grievances at his current facility. (Amend. Compl. ¶ 96; *see also* Pl.'s Aff., Ex. 21 at 9.) Plaintiff re-filed this grievance with the Clinton IGP. (Amend. Compl. ¶ 96; *see also* Pl's Aff., Ex. 21 at 10-14.) The grievance committee rejected his claim for the legal papers, directing him to file with Inmate Claims. (Pl.'s Aff., Ex. 21 at 15-17.)

Aside from the specific grievances mentioned above, plaintiff further alleges that he has grieved all incidents and exhausted all of his administrative remedies in a "blanket" grievance allegation. (Amend. Compl. at D.)

DISCUSSION

**\*7** Plaintiff's numerous claims are addressed below. After resolving the issue of exhaustion, the Court will address the claims in the order laid out in the original complaint.

1. *Exhaustion of Administrative Remedies*
As plaintiff is a prison inmate, he is barred by the Prison Litigation Reform Act ("PLRA") from bringing federal claims "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2000). Inmates in New York State are subject to the Inmate Grievance Program instituted by the Department of Correctional Services ("DOCS"). *Hemphill v. New York,* 380 F.3d 680, 682 (2d Cir.2004); *see also* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1. Inmates must file any grievance with a Grievance Clerk within fourteen calendar days of the alleged incident, although "mitigating circumstances" may toll the deadline. N.Y. Comp.Codes R. & Regs. tit 7, § 701.7(a)(1). The grievance is then subject to review by an Inmate Grievance Resolution Committee ("IGRC"). *Id.* § 701.7(a)(3)-(4). If unsatisfied with the result, inmates can appeal to the facility superintendent and, subsequently, to the Central Office Review Committee ("CORC") for a final administrative determination. *Id.* § 701.7(b)-(c).

In order for such grievances to constitute an exhaustion of state claims, grievances must be specific, not generalized: "[I]nmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). Strict adherence to the DOCS three-tiered system is not required, however, provided that plaintiff has utilized remedies sufficient to put the defendants on notice. *Id.* (citing *Porter v. Nussle,* 534 U.S. 516, 524-25 (2002)) (noting that the purpose of the grievance requirement is to put defendants on notice so that they have an opportunity to address complaints and holding that "[u]ncounselled inmates navigating prison administrative procedures without assistance cannot be expected to satisfy a standard more stringent than that of notice pleading" in filing grievances); *see also Braham v. Casey,* 425 F.3d 177, 183 (2d Cir.2005) (citing same).

Exhaustion under the PLRA is not a jurisdictional question; failure to exhaust is an affirmative defense that is waiveable. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003);

*Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). As such, the burden is on the defendant of proving plaintiff's failure to exhaust his administrative remedies. *See, e.g., Hallet v. New York State Dep't of Corr. Svcs.,* 109 F.Supp.2d 190, 197 (S.D.N.Y.2000); *Warren v. Purcell,* 2004 WL 1970642, at *5 n. 8 (S.D.N.Y. Sept. 3, 2004) ("It bears emphasis that it is not the plaintiff's burden to plead the elements of exhaustion in the complaint itself, but rather, the defendant's burden to raise and prove failure to exhaust in its answer or motion to dismiss."). Mere conclusory statements by a defendant that an inmate has failed to exhaust his remedies is insufficient to meet this burden. *Hallet,* 109 F.Supp.2d at 197; *see also Gonzales v. Officer in Charge of Barber Shop,* 2000 WL 274184, at *3 (S.D.N.Y. Mar. 13, 2000) (declining to dismiss on grounds of exhaustion because premature at motion to dismiss stage to resolve dispute between parties as to whether exhaustion was necessary and/or achieved); *Nicholson v. Murphy,* 2003 WL 22900876, at *6 (D.Conn. Sept. 19, 2003) ("By characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss. Rather, the defendants must present proof of non-exhaustion."). Furthermore, if a complaint has both exhausted claims and unexhausted claims, only the unexhausted claims should be dismissed. Contrary to defendants' argument, the presence of unexhausted claims does not require the Court to dismiss the complaint in its entirety. *Ortiz v. McBride,* 380 F.3d 649, 663 (2d Cir.2004).

**\*8** The defendants have moved to dismiss four of plaintiff's claims on the grounds that he has not exhausted administrative remedies: the claim for malicious prosecution, the claims arising out of the August 2000 IMRs, and the claims arising out of the pancake syrup and veal incidents. The defendants have not, however, attached any evidence refuting plaintiff's allegation that he has exhausted all of his administrative remedies. The defendants' conclusory statements, absent more, are insufficient to meet their burden. As such, the Court declines to dismiss any of plaintiff's claims for failure to exhaust.

2. *Denial of Due Process: The July 2000 Shawangunk Hearing*
Plaintiff brings a claim against defendant Connolly for depriving him of liberty without due process of law. Plaintiff alleges that his confinement in the SHU deprived him of a protected liberty interest and that the hearing held from July 5 through July 21, 2000 was so manifestly unfair as to be a deprival of due process.

*a. Is There a Protected Liberty Interest?*
In analyzing plaintiff's claim, the Court must first examine whether he had any liberty interest in avoiding SHU confinement. Plaintiff has no right to due process unless a liberty interest has been infringed. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citing *Scott v. Albury,* 156 F.3d 283, 287 (2d Cir.1998) (per curiam)). A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only when the discipline imposes an "atypical and significant hardship" on the inmate in relation to the ordinary incidents of prison. *Id.* (citing *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Factors relevant to determining whether the plaintiff endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." *Id.* (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)). A plaintiff's administrative and punitive confinement should be aggregated for the purposes of determining the duration of disciplinary segregation. *See Sealy v. Giltner,* 197 F.3d 578, 587 (2d Cir.1999).

In general, a prisoner has no protected liberty interest in avoiding normal SHU confinement that lasted less than 101 days. *See id.* at 589-90. If SHU conditions are especially harsh, however, confinement for less than 101 days can implicate a liberty interest. *See Palmer,* 364 F.3d at 64-65 (2d Cir.2004) ("[W]e have explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical.") (citing *Ortiz v. McBride,* 323 F.3d at 195 & n .1).

**\*9** Plaintiff was confined in the SHU from June 29 to September 18, 2000 for events related to the July 2000 Shawangunk hearing. Plaintiff's confinement from September 18 onwards was for the separate August 2000 IMRs filed by separate officers. While the Second Circuit has held that SHU confinement can be aggregated, defendant Connolly cannot be held responsible for aggregated SHU time unrelated and subsequent to his actions. [5] *See Sealy,* 197 F.3d at 587 ("With regard to the durational aspect of the atypicality issue, we must focus only on the interval during which [the defendant] is responsible, since, on this appeal, it is

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 770 of 830
Holmes v. Grant, Not Reported in F.Supp.2d (2006)
2006 WL 851753

his alleged denial of procedural due process for which [plaintiff] seeks [damages].") As the sentence attributable to defendant Connolly was only eighty-one days, below the 101-day threshold, this confinement does not implicate a liberty interest, so long as the SHU confinement was "normal." [6] *See Ortiz,* 380 F.3d at 655.

[5]     While plaintiff theoretically has a liberty interest in avoiding the confinement imposed after September 18, 2000, for the separate IMRs he received in August, plaintiff has made no allegations that he was deprived of due process as to those incidents and has not named any of the officers involved with those incidents as defendants in this action.

[6]     The Second Circuit, without delineating the full scope of what constitutes "normal" SHU conditions, has stated that conditions in which prisoners "are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week" are considered normal. *Ortiz,* 380 F.3d at 655.

Plaintiff has made no cognizable allegations that his confinement from July 11 to September 18, 2000, was not "normal." [7] He does allege that his confinement from June 29 to July 11, 2000, was abnormal, however, in that he was denied exercise time and confined to his cell for twenty-four hours a day and was forced to wear handcuffs and leg irons whenever he left his cell. (Amend. Compl. ¶¶ 23, 63; Pl. Aff., Ex. 1.) The fact that he was confined in his cell for twenty-four hours a day for thirteen days and forced to wear restraints whenever he left his cell may be sufficient to establish that his confinement was "atypical and significant" and thus implicates a liberty interest. *See Ortiz,* 380 F.3d at 651, 654 (finding that plaintiff's allegation that he was, *inter alia,* confined in his SHU cell for twenty-four hours a day for the first three weeks of a ninety-day confinement, was not permitted an hour of daily exercise, and was denied regular showers stated "a hardship sufficiently 'atypical and significant' to survive a motion to dismiss"); *Palmer,* 364 F.3d at 62, 66 (plaintiff who was confined in the SHU for seventy-seven days and was deprived of personal effects, mechanically restrained whenever he was taken outside of his cell, and not allowed to have family visitations, survived a motion for summary judgment). Absent a further factual record, it cannot be said that the conditions plaintiff was subject to from June 29 to July 11 were not "atypical and significant," and therefore the Court cannot say that there was no infringement of a liberty interest as a matter of law. [8]

[7]     Plaintiff does allege that prisoners confined in the SHU who successfully complete thirty days of "good behavior" usually receive more privileges (Amend. Compl. ¶ 45) and that due to falsification of reports by defendant Connolly, plaintiff did not receive these "good behavior" privileges. Even assuming that prisoners generally do get increased SHU privileges after thirty days, these SHU privileges do not constitute a protected liberty interest for the purposes of due process. *Farid v. Ellen,* 2006 WL 59517, at *6 (S.D.N.Y. Jan. 11, 2006).

[8]     While the Second Circuit held that eighteen days of SHU confinement without exercise did not constitute a protected liberty interest in *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir.1998), that case was decided on summary judgment where "[t]he district court ... sufficiently examined the circumstances of Arce's segregation and articulated the facts on which its conclusion was predicated."

*b. Was There a Deprivation of Due Process?*

Even if plaintiff has a protected liberty interest, in order to survive defendant's 12(b)(6) motion, plaintiff must also allege that defendant imposed this sentence without providing due process. *Ortiz,* 380 F.3d at 655. Plaintiff alleges that he was denied due process because: defendant Connolly was a biased officer who had predetermined plaintiff's guilt, plaintiff was denied competent employee assistance in preparing his defense, plaintiff was not allowed to call witnesses, and plaintiff was not allowed to "comment on the evidence."

**\*10** An inmate's right to assistance is limited, and an inmate has no right to full counsel. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (per curiam). In situations when an inmate is unable to "marshal evidence and present a defense," however, such as when he is confined to an SHU, he has the right to some assistance. *Id.* (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988)). Such assistance should, at least, include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. *Eng,* 858 F.2d at 898.

Here, plaintiff was confined in the SHU pending his hearing and therefore was entitled to employee assistance. In his complaint, plaintiff alleges that his assistant refused

2006 WL 851753

to retrieve documents for him on the grounds that they were irrelevant. Furthermore, not only did his assistant not interview witnesses, plaintiff alleges that his assistant actively pressured and threatened witnesses *not* to testify. If true, this certainly falls short of the required level of employee assistance and, as such, implies that plaintiff was denied due process.

An inmate also has a right to call witnesses, and a hearing officer "may not refuse to interview an inmate's requested witness without assigning a valid reason." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990) (per curiam)). The burden is not on the plaintiff to show that the official's conduct was "arbitrary and capricious" but is on the hearing officer to prove that the denial of witnesses is "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Fox,* 893 F.2d at 478. Where, as here, plaintiff allegedly sought to present witnesses to contradict his accusers' account of events, the hearing officer is not permitted to exclude them on grounds of redundancy without an interview and some showing that their testimony would have been redundant. *Id.* As such, the denial of witnesses at plaintiff's hearing may be shown to have violated due process.

It has "long been established" that an inmate has the right to an impartial hearing officer. *Black v. Coughlin,* 76 F.3d 72, 76 (2d Cir.1996). Given the alleged conduct of defendant Connolly during the hearing, coupled with the fact that he was the same officer who had ordered the mechanical restraints and exercise deprivation before the hearing began, there is at least an inference of bias that plaintiff should be given the opportunity to prove.

### c. Is There Qualified Immunity?

Prison officials performing tasks entrusted to their discretion typically "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Palmer,* 364 F.3d at 67. Whether plaintiff's liberty interest was clearly established depends, in turn, on whether the duration and conditions of plaintiff's confinement in the SHU not only infringed a liberty interest but also were of such a degree that an officer in defendant's position should have known that plaintiff's liberty interests were at stake. *Id.* In analyzing qualified immunity, the Court should look to the sentence initially imposed, regardless of the time actually served. *Hanrahan v. Doling,* 331 F.3d 93, 98 (2d Cir.2003) (citing *Saucier v. Katz,* 533 U.S. 194, 207 (2001)).

*11 Here, Connolly originally sentenced plaintiff to a five-year sentence in the SHU. (Amend.Compl.¶ 41.) A five-year sentence clearly triggers due process protection, and Connolly should clearly have known that plaintiff's interests were at stake. *See Palmer,* 364 F.3d at 67 (citing *Hanrahan,* 331 F.3d at 99 (stating that no "credible argument" could be made that it was not "clearly established" that a ten-year solitary confinement disciplinary sentence would trigger due process protections); *Tellier v. Fields,* 280 F.3d 69, 85 (2d Cir.2000) (finding it was objectively unreasonable to confine the plaintiff in SHU for 514 days without providing due process and that officials were therefore not entitled to qualified immunity)). Furthermore, it will be defendant's burden to show the nonexistence of a clearly established right and his entitlement to qualified immunity, *Palmer,* 364 F.3d at 67 (citing *Tellier,* 280 F.3d at 84), so dismissal on this basis would be premature on a motion to dismiss.

### d. Conclusion

A court may dismiss claims under Rule 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Ruiz v. E.J. Elec. Co.,* 2005 WL 3071276, at *2 (S.D.N.Y. Nov. 15, 2005). As plaintiff has alleged conditions of his SHU confinement that may give rise to a protected liberty interest and has alleged facts that establish that his disciplinary hearing may have violated due process, plaintiff has made out a cognizable claim. As such, the defendants' motion to dismiss due process claims arising out of the July 2000 Shawangunk hearing is denied.

### 3. Cruel and Unusual Punishment: Eastern SHU's Twenty-Four Hour Lighting Policy

Plaintiff brings claims against defendants David Miller, the superintendent of Eastern, and Two Unknown Officers of Eastern Prison Special Housing Unit, for cruel and unusual punishment inflicted during the thirty-five days he was confined at Eastern by the twenty-four hour lighting policy at the Eastern SHU.

In order to prevail on an Eighth Amendment claim due to the conditions of a prisoner's confinement, a plaintiff must show "both an objective element-that the prison officials' transgression was sufficiently serious-and a subjective element-that the officials acted, or omitted to act, with a sufficiently culpable state of mind, i.e., with deliberate indifference to inmate health or safety." *Phelps v. Kapnalos,*

308 F.3d 180, 185 (2d Cir.2002) (citations and internal quotation marks omitted). As to the objective element, "states must not deprive prisoners of their basic human needs-e.g., food, clothing, shelter, medical care, and reasonable safety. Nor may prison officials expose prisoners to conditions that pose an unreasonable risk of serious damage to [their] future health." *Id.* (citations and internal quotation marks omitted) (denying motion to dismiss plaintiff's cruel and unusual punishment claim where plaintiff claimed he had been fed nutritionally deficient food for fourteen days). As to the subjective element, "[t]his deliberate indifference element is equivalent to the familiar standard of recklessness as used in criminal law. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 186 (citations and internal quotation marks omitted).

**\*12** Plaintiff here has alleged specific injury resulting directly from Eastern's twenty-four hour lighting policy and the resultant sleep deprivation, namely "fatigue during the day, loss of appetite, vomiting, migraine headaches, anxiety, elevation of blood pressure, and a violent aggravation of rashes all over [his] body." (Amend.Compl.¶ 55.) Plaintiff alleges that he complained numerous times to correction officers and through a grievance that was specifically denied by the Eastern superintendent, defendant David Miller. Plaintiff's allegations, if true, can sustain a claim both that this lighting policy posed an objectively unreasonable risk to his health and that prison officials knew that there was a substantial risk and failed to act. *See Ciaprzi v. Goord,* 2005 WL 3531464, at \*2, \*10 (N.D.N.Y. Dec. 22, 2005) (adopting magistrate judge's report denying defendant's motion to dismiss plaintiff's Eighth Amendment claim alleging cruel and unusual conditions in the Upstate SHU including, *inter alia,* exposure to light for nineteen hours per day); *Amaker v. Goord,* 1999 WL 511990, at \*7, \*8 (S.D.N.Y. July 20, 1999) (holding that a plaintiff's allegations that the lighting conditions in the SHU were poor and that defendants knew about them but failed to fix them would satisfy both the objective and subjective prongs of the cruel and unusual punishment test); *see also LeMaire v. Maass,* 745 F.Supp. 623, 636 (D.Or.1990) ("There is no legitimate penological justification for requiring plaintiff to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional."), *vacated* 12 F.3d 1444, 1459 (9th Cir.1993) after, *inter alia,* prison officials agreed to

change their lighting policy; *Keenan v. Hall,* 83 F.3d 1083, 1091-92 (9th Cir.1996) (citing *LeMaire* favorably and denying defendant's summary judgment motion with respect to plaintiff's Eighth Amendment claim where plaintiff produced evidence of sleeping problems due to twenty-four hour lighting despite defendant's contrary evidence that such lighting would not cause sleeping problems).

Defendants' motion to dismiss cruel and unusual process claims arising from the Eastern SHU's twenty-four hour lighting policy is therefore denied.

4. *Denial of Access to the Courts*

Plaintiff alleges that defendants Kivett, Smith, and Comstock intentionally destroyed his legal papers in July 2001, thereby preventing him from filing a motion to stop the clock in order to file a timely habeas petition.[9]

[9]     Plaintiff's complaint, read liberally, can also be read to bring claims against defendants Mullen and Eisensmidt for denying him access to his cell after he was sentenced to the SHU in May 2001, resulting in the loss of some of his legal papers. Mere negligence resulting in the loss of legal papers, however, does not state an actionable claim; plaintiff "must allege facts demonstrating that defendants *deliberately and maliciously* interfered with his access to the courts." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995) (emphasis added); *see also Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir.1983) (per curiam) (holding that a negligent loss of legal documents is not actionable if the state provides an adequate compensatory remedy). As such, the defendants' motion to dismiss any claims arising out of a negligent loss of plaintiff's legal papers is granted, and the Court shall consider only those claims where plaintiff alleges that the defendants *deliberately* stole his legal papers.

Petitioners have a constitutional right of access to the courts, arising from the First Amendment, the Due Process Clause, and the Privileges and Immunities Clause of Article IV. *See, e.g., Colon v.. Coughlin,* 58 F.3d 865 (2d Cir.1995); *Morello v. James,* 810 F .2d 344, 346 (2d Cir.1987). To prove a violation of that right, a plaintiff must demonstrate that state action hindered his efforts to pursue a nonfrivolous legal claim and that consequently he suffered some actual concrete injury. *Lewis v. Casey,* 518 U.S. 343, 350 (1996). The "point of

recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Christopher v. Harbury,* 536 U.S. 403, 414-15 (2002). The right to access to the courts, therefore, is "ancillary to the underlying claim, without which a plaintiff would suffer no injury from being denied access." *Id.* at 415. Furthermore, when the access claim "looks backward" (i.e., seeks recompense for a lost opportunity to seek some order of relief), "the complaint must identify a remedy that may be awarded as recompense *but not otherwise available* in some suit that may yet be brought." *Id.* (emphasis added); *see also Hoard v. Reddy,* 175 F.3d 531, 533 (7th Cir.1999) (finding there is no access claim where prisoner has some other route to challenging the validity of his conviction).

**\*13** First, although plaintiff claims he is forever barred from pursuing his habeas petition, an alternative course of action with respect to this claim is to file his habeas petition and request equitable tolling in light of defendants' alleged destruction of his legal materials. *See Valverde v. Stinson,* 224 F.3d 129, 133 (2d Cir.2000) (holding that confiscation of a prisoner's habeas corpus petition "shortly before the filing deadline may justify equitable tolling and permit the filing of a petition after the statute of limitations ordinarily would have run"). Furthermore, in this case the alleged nonfrivolous underlying cause of action is plaintiff's habeas petition, and the lost remedy of that habeas petition is his release. But plaintiff is not seeking injunctive relief here; rather he is seeking damages under § 1983. This, as defendants argue, implicates *Heck v. Humphrey'* s bar against § 1983 claims for damages on any theory that implies that a conviction is invalid, unless he can "prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486-87. Although plaintiff must only establish that his claim is nonfrivolous, or colorable, in order to make out his access to courts claim, this does not avoid the holding of *Heck,* because the remedy in an access to courts claim (where injunctive relief is not sought) are damages to compensate for the loss of the underlying action. *Nance v. Vieregge,* 147 F.3d 589, 591-92 (7th Cir.1998); *Hoard,* 175 F.3d at 533-34 (emphasis added) ("If a prisoner whose access to the courts is being blocked in violation of the Constitution *cannot* prove that, had it not been for the blockage, he would have won his case, or at least settled it for more than $0 (the point emphasized in *Lewis* ) *he cannot get damages* but he can get an injunction."). [10] In order to be awarded

damages, plaintiff will have to prove that he would have prevailed in his habeas petition. An award of damages in plaintiff's access claim, therefore, would necessarily imply the invalidity of plaintiff's underlying conviction, contrary to the rule of *Heck. Cf. Barnwell v. West,* 2006 WL 381944, at \*3 n. 3, \*4 (adopting unobjected-to portion of a magistrate judge's report and recommendation finding that plaintiff may not pursue compensatory or punitive damages under *Heck* in an access claim where the underlying claim is a habeas petition). Defendants' motion to dismiss plaintiff's access claim is therefore granted.

10    As the Seventh Circuit noted in *Hoard,* "[i]n the setting of *Heck,* there is nothing corresponding to a colorable claim; either the conviction was invalid, in which case the defendant suffered a legally cognizable harm, or it is not and he did not." *Id.* at 534.

5. *Malicious Prosecution*

Plaintiff brings claims against defendants Ryan, Bertone, Kivett, and McCreery for pressing charges and bringing a malicious prosecution against him for assault, on the basis of the June 2000 Shawangunk incident.

To bring a § 1983 claim for malicious prosecution, a plaintiff must show "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions," along with a "post-arraignment seizure" that implicates the Fourth Amendment. *Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir.2003); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 116 (2d Cir.1995) (in order to prevail on a § 1983 claim for malicious prosecution, plaintiff must show that "injuries were caused by the deprivation of liberty guaranteed by the Fourth Amendment.").

**\*14** Plaintiff has failed to establish the required post-arraignment seizure necessary for a federal § 1983 claim. As plaintiff was already incarcerated at the time of the assault proceeding, he suffered no new seizure. An inmate already incarcerated has not suffered any unconstitutional deprivation of liberty as a result of being charged with new criminal offenses and being forced to appear in court to defend himself. *Wright v. Kelly,* 1998 WL 912026, at \*3 (W.D.N.Y. Oct. 16, 1998); *see also, e.g., Rauso v. Romero,* 2005 WL 1320132, at \*2 (E.D. Pa. June 2, 2005) ("Here, moreover, plaintiff did not sustain a 'deprivation of liberty

consistent with the concept of a seizure' ... since he was already in prison at the time.") (citing *Donohue v. Gavin,* 280 F.3d 371, 380 (3d Cir.2002)); *Turner v. Schultz,* 130 F.Supp.2d 1216, 1225 (D.Colo.2001) ("Mr. Turner has cited, and I have found, no clearly established law that states that an already lawfully incarcerated prisoner is seized for Fourth Amendment purposes when he is charged with an additional crime. Because Mr. Turner was already effectively 'seized,' throughout the time period in question, it is doubtful whether the additional prosecution could result in an actionable seizure.") (citing *Taylor v. Meacham,* 82 F.3d 1556, 1561 n. 5 (10th Cir.1996)). [11]

[11]    Plaintiff argues that even if he was not seized for the purposes of the Fourth Amendment, he has a substantive due process right in remaining free of prosecutions. Substantive due process, however, does not encompass the right to be free from prosecution. *Murphy v. Lynn,* 118 F.3d 938, 944 (2d Cir.1997) (citing *Albright v. Oliver,* 510 U.S. 266, 274-75 (1994) (plurality opinion); *id.* at 281 (Kennedy, J., concurring in the judgment); *id.* at 288-89 (Souter, J., concurring in the judgment)). Plaintiff argues that the rule adopted above would basically allow prison officials to initiate all sorts of prosecutions against inmates, confident in the fact that they could not be sued under § 1983 because the prisoners were already "seized." In such an event, however, plaintiff's remedy is a *state* malicious prosecution claim, which does not have § 1983's requirement of a post-arraignment seizure. (In this case, however, the New York one-year statute of limitations period for a malicious prosecution, N.Y. C.P.L.R. 215(3), has long since passed.)

Plaintiff has not stated a cognizable claim for malicious prosecution under § 1983, and, as such, defendants' motion to dismiss this claim is granted.

6. *Retaliation*

Plaintiff brings claims against defendants for retaliation, alleging that defendants retaliated against him by: (1) falsifying his behavior report during his August 2000 Shawangunk SHU confinement to justify denying him privileges; (2) filing false IMRs against him in August 2000; (3) filing a false IMR against him in December 2000 for loss/damage of property, failing to have an identification card, mess hall violations, and impersonation; (4) filing

a false IMR against him in March 2001 by exaggerating a fight between plaintiff and another inmate, (5) filing a false IMR against him in May 2001, falsely accusing him of fighting with another inmate; (6) destroying his legal material; and (7) confining him in keeplock in Sing Sing in November 2000 beyond his sentence. Plaintiff also brings a general claim of retaliation against the defendants; reading his complaint liberally, plaintiff alleges that the retaliatory acts included (8) converting his keeplock sentence to SHU confinement in March 2001; (9) pouring pancake syrup over his belongings; and (10) giving him his evening meal without the veal ration in April 2001. Plaintiff alleges that defendants retaliated against him because plaintiff successfully appealed his July 2000 Shawangunk hearing and challenged, and was ultimately acquitted of, the related criminal assault charges brought by the defendants.

It is well established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e .g., Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). Courts, however, "must approach prisoner claims of retaliation with skepticism and particular care" because claims are easily fabricated and because these claims may cause unwarranted judicial interference with prison administration. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *see also Gill v. Pidlypchack,* 389 F .3d 39, 385 (2d Cir.2004).

**\*15**    To sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

It is not disputed plaintiff's appeal of his July 2000 disciplinary conviction and defense against criminal assault charges, is protected conduct. [12] As such, plaintiff has met the first prong of the retaliation test.

[12]    Courts have held that *procedural* due process does not mandate that prison officials must provide an appeals procedure for disciplinary hearings. *See, e.g., Hernandez v. Selsky,* 2006 WL 566476, at *3 (N.D.N.Y. Mar. 7, 2006) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-70 (1974)); *Gates v. Selsky,* 2005 WL 2136914, at *8 (W.D.N.Y.

Sept. 2, 2005). Nonetheless, given that New York State does provide such a procedure, plaintiff has a *substantive* constitutional right to avail himself of it. *See Franco,* 854 F.2d at 589 (2d Cir.1988) (noting that retaliation that does not implicate procedural due process can nonetheless be unconstitutional if it infringes upon a prisoner's substantive right "to petition government for redress of grievances.") Plaintiff's exercise of the DOCS disciplinary appeal procedure is therefore protected conduct.

Defending oneself against criminal assault charges is protected conduct as well. It goes without saying that plaintiff, like all persons, has a constitutional right to defend himself in court against criminal charges. U.S. Const. amends. V, VI, XIV.

The second prong concerns whether adverse action was taken against plaintiff. For the purposes of retaliation, an adverse action is defined as one "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 380 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The test is an objective one that applies even if the plaintiff in question was not himself subjectively deterred. *Id.* (citing *Davis,* 320 F.3d at 353-54). If the action would not deter an individual of ordinary firmness, however, the retaliatory act "is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis,* 320 F.3d at 353.

The final prong is the requirement of a causal connection between the protected conduct and the adverse action. In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N . Y.2002) (citing *Colon,* 58 F.3d at 872-73). At this stage, it is not appropriate to weigh the evidence or decide whether the claimant will ultimately prevail. *Id.* at 728. Even at the motion to dismiss stage, however, plaintiff must offer more than mere conclusory allegations that a causal connection existed between the protected conduct and the adverse action. *Dawes,* 239 F.3d at 491-92.

As a preliminary matter, the Court notes that plaintiff's allegations that defendants poured syrup on his property and once served him a meal without veal are *de minimis. See Snyder v. McGinnis,* 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004) (granting a motion to dismiss because the denial of food on two occasions is *de minimis* and not actionable). As they would not have deterred a person of ordinary firmness from exercising his constitutional rights, they do not give rise to a cognizable retaliation action. As such, defendants' motion to dismiss any retaliation claims stemming from those incidents is granted. The other alleged actions, however, namely that the defendants filed false IMRs against plaintiff, kept him in keeplock, transferred him to the SHU, and stole his legal papers, are sufficiently serious to constitute adverse actions. *See Franco,* 854 F.2d at 589 (filing false misbehavior reports can constitute retaliatory action); *Auleta v. LaFrance,* 233 F.Supp.2d 396, 402 (N.D.N.Y.2002) (placing a prisoner in keeplock for seven and a half days properly construed as an adverse action); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 467 (W.D.N.Y.2005) (finding that keeplock confinement from nine to twenty days sufficiently adverse to support a retaliation claim); *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (noting that prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights, even though a prisoner has no liberty interest in remaining at a particular correctional facility); *Smith v. City of New York,* 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) (noting that theft of legal papers substantial enough to qualify as adverse action for purposes of retaliation claim). The question, therefore, is whether plaintiff has made nonconclusory allegations that give rise to a causal connection between these actions and his protected conduct.

### a. Loss of SHU Privileges

**\*16** Plaintiff first brings a retaliation claim against defendant Connolly. Plaintiff alleges that Connolly falsified his records in August 2000 to reflect that he "fail[ed] to conform to standards of good behavior" as an excuse to deny him additional privileges out of retaliation for appealing Connolly's disposition of the July 2000 Shawagunk hearing. (Amend.Compl.¶ 45.) Given that this alleged falsification took place only days or weeks after the hearing itself, and given the fact that Connolly issued the pre-hearing confinement orders, acted as the hearing officer at the hearing itself, and oversaw plaintiff's SHU confinement after the hearing, plaintiff's allegations give rise to an inference that there is a causal connection between plaintiff's protected conduct in challenging the hearing and Connolly's alleged retaliatory conduct. As such, this claim withstands a motion to dismiss.

2006 WL 851753

*b. The August 2000 IMRs*

Plaintiff has not satisfied the causation element of his retaliation claim with regard to the August 2000 IMRs. Plaintiff has not alleged any facts in his complaint that could establish a causal connection between the Shawangunk hearing and the IMRs, or any details about the IMRs whatsoever. In fact, in his complaint, plaintiff admits that the IMRs were deserved and that he was indeed misbehaving out of frustration. As plaintiff has not pleaded any causal connection between these IMRs and his protected conduct beyond wholly broad, conclusory statements, defendants' motion to dismiss is granted.

*c. The December 2000 IMR*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to the December 2000 IMR issued by defendant Deckelbaum. Plaintiff has not proffered any nonconclusory allegations showing any causal connection between the July 2000 Shawangunk hearing and Deckelbaum's IMR for lack of ID and mess hall violations or that Deckelbaum acted out of retaliation, especially considering that plaintiff admits that he did not have ID and had received an extra ration from another inmate. As such, defendants' motion to dismiss is granted.

*d. The March 2001 IMR and Hearing*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to the March 2001 IMR written up by defendant Grant and the resultant hearing presided over by defendant Colao. Plaintiff has not proffered any nonconclusory allegations showing a causal connection with the July 2000 Shawangunk hearing and the IMR plaintiff received for fighting, especially considering that plaintiff admits that he was fighting. Even if plaintiff alleges that defendants falsified his IMR to exaggerate the seriousness of the fight, plaintiff has not advanced allegations that would establish that they filed the IMR because of the Shawangunk hearing. As such, defendants' motion to dismiss is granted.

*e. The May 2001 IMR*

Plaintiff has, however, alleged sufficient facts to give rise to an inference of a causal connection with respect to the May 2001 IMR and resultant hearing. Plaintiff alleges that defendants Sweeney, Scott, and Rich falsely accused him of fighting with LaFontaine in order to ensure his return to SHU confinement just days after he was released from his March 2001 sentence. Plaintiff alleges that the May fight with LaFontaine never occurred, and that the defendants fabricated the entire charge. (*See* Amend. Compl. ¶ 165.) This allegation, combined with Sweeney's alleged statement that plaintiff "would get all of [his] time owed here," and the fact that the findings of this hearing were ultimately reversed and expunged, states a colorable claim of retaliation. *See Baskerville,* 224 F.Supp.2d at 732-33.

*f. Destruction of Legal Material*

**\*17** Plaintiff brings a retaliation claim against defendants Kivett, Smith, and Comstock for destroying his legal material in July 2001 in retaliation for successfully defending himself during his criminal trial for assault charges in June. The theft of his legal material took place just weeks after plaintiff was acquitted, giving rise to an inference of causality. *See Smith,* 2005 WL 1026551, at *4. In addition, plaintiff alleges that Kivett came up to plaintiff and said, "you beat us again" and sarcastically stated that he would "make sure [plaintiff] received [his] property" and made comments as a direct response to plaintiff's acquittal at trial. (Amend.Compl.¶ 82.) Plaintiff here has alleged enough nonconclusory facts linking the theft of his legal papers to his constitutionally protected right to defend himself in court to withstand a motion to dismiss. *See Smith,* 2005 WL 1026551, at *4 (finding that defendant's statement "I don't like you, I'm pretty sure you know why" combined with "highly suspicious timing" of destruction of plaintiff's property was sufficient to defeat defendant's motion for summary judgment).

*g. The November 2000 Keeplock*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to the ten days of keeplock that he served from November 7 to November 17, 2000. This time was attributable to the IMRs plaintiff received in August. Plaintiff has offered no nonconclusory allegations to establish that this keeplock time was the result of retaliation. As such, defendants' motion to dismiss is granted.

*h. The March to May 2001 SHU Confinement*

Plaintiff has not alleged facts that would give rise to a retaliation claim with regard to defendants' conversion of his keeplock status to SHU time in March 2001. Plaintiff has proffered no nonconclusory allegations that could establish a causal connection linking this transfer to any protected conduct sufficient to state a claim for retaliation.

*i. Conclusion*

Plaintiff has alleged sufficient nonconclusory facts to make out a claim for retaliation against defendant Connolly for falsifying his records to deny him SHU privileges in August 2000; against defendants Sweeney, Scott, and Rich for falsely accusing him of fighting in May 2001; and against defendants Kivett, Smith, and Comstock for destroying his legal material out of retaliation. The defendants' motion to dismiss all other claims of retaliation is granted.

7. *Abuse of Process*

Plaintiff brings a claim for abuse of process, alleging that the defendants brought these various criminal and administrative charges against plaintiff for the purpose of abusing the process.

State law provides the elements of the cause of action for a claim of abuse of process in § 1983 suits. *Brewster v. Nassau County,* 349 F.Supp.2d 540, 550 (E.D.N.Y.2004). Under New York law, abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of process in a perverted manner to obtain a collateral objective. *Curiano v. Suozzi,* 469 N.E.2d 1324, 1326 (N.Y.1984). In order to bring a claim for malicious process, plaintiff must allege "the improper *use* of the process after it has issued." *Id.* (emphasis added). "A malicious motive alone, however, does not give rise to a cause of action for abuse of process." *Id.*

**\*18** Plaintiff has not alleged any facts to sustain a claim for abuse of process. While plaintiff has alleged that the defendants brought criminal assault charges against him in Ulster County and have filed numerous prison administrative charges against him, he does not allege that they did so to abuse the *process*. Even assuming plaintiffs brought these charges out of malice or had other improper motives in bringing these charges, a bad motive alone does not give rise to an abuse of process claim. As a result, defendants' motion to dismiss this cause of action is granted.

8. *Denial of Due Process: The March to May 2001 Upstate SHU Confinement*
Plaintiff alleges that he was deprived of due process stemming from his confinement in the Upstate SHU from March 19 to May 17, 2001. Plaintiff alleges that he was sentenced to ninety days under keeplock as a result of his March 1 fight

with inmate LaFontaine, but that his sentence was improperly converted from a keeplock sentence to an SHU sentence.

Defendants originally moved to dismiss this claim on the grounds that it arises out of the March 2001 Sing Sing hearing, which has not been overturned. In support of their motion, defendant argued that plaintiff lost nine months of "good time" credit at the hearing and is therefore barred by *Heck v. Humphrey, supra,* from any claims arising out of that hearing unless and until it is overturned. (Defs.' Supp. Mem. of Mot. to Dismiss 17.) Plaintiff argues in response (Pl.'s Objections to the Report 9), and defendants concede (Defs.' Mem. In Opp'n to Pl.'s Objections 7), however, that *Heck* does not apply here, as plaintiff is serving a life sentence, and the loss of good time credits therefore has no effect on the length of his sentence. *Gomez v. Kaplan,* 2000 WL 1458804, at \*12 (S.D.N.Y. Sept. 29, 2000) (citing *Jenkins,* 179 F .3d 19); *see also Farid v. Ellen,* 2006 WL 59517, at \*8 & n. 2 (S.D .N.Y. Jan. 11, 2006). As such, plaintiff's claim is not barred by *Heck.*

Plaintiff's claim, however, is not that the March 2001 Sing Sing hearing lacked due process. Plaintiff maintains instead that he is entitled to *additional* due process before the keeplock sentence he received at the Sing Sing hearing can be properly converted into an SHU sentence, since SHU conditions entail harsher deprivations than keeplock. (*See* Pl.'s Objections to the Report 12.)

To prevail in his due process claim, plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996); *see also Sealey,* 197 F.3d at 51. Plaintiff alleges that this SHU confinement lasted for fifty-nine days, during which time he was confined to his cell and an adjacent area for twenty-four hours a day. Given that twenty-four hour confinement may be "atypical and significant," *see Ortiz,* 380 F.3d at 655, plaintiff may have a protected liberty interest in avoiding this confinement, despite the fact that it lasted for less than 101 days. *See Palmer,* 364 F.3d at 64-65. The remaining issue is whether plaintiff was entitled to an additional hearing before his transfer to the Upstate SHU.

**\*19** New York prison regulations permit inmates to be confined in the SHU for "disciplinary confinement, administrative segregation, protective custody, detention, *keeplock confinement,* and 'for any other reason, with the

2006 WL 851753

approval of the deputy commissioner for facility operations." ' *See, e.g., Gonzales v. Narcaro,* 363 F.Supp.2d 486, 493 (E.D.N.Y.2005) (emphasis added) (citing *Trice v. Clark,* 1996 WL 257578, at \*3 (S.D.N.Y. May 16, 1996)). Admission to SHU pursuant to a keeplock sentence is authorized under New York Regulations. *See* N.Y. Comp.Codes. R. & Regs. tit. 7, § 301.6. Section 301.6 is the New York Regulation relating to keeplock admissions and authorizes placement of inmates in SHU "at a medium or minimum security correctional facility *or Upstate Correctional Facility"* "for confinement pursuant to a disposition of a disciplinary (Tier II) or superintendent's (Tier III) [13] hearing." *Id.* (emphasis added). Furthermore subparts (c) through (h) of section 301.6 clearly contemplate that inmates sentenced to keeplock status may be assigned to SHU, subject to the property, visiting, package, commissary, telephone, and correspondence limitations set forth in section 302.2(a)-(j). *Id.; see also Chavis v. Kienert,* 2005 WL 2452150, at \*10 (N.D.N.Y. Sept. 30, 2005) (stating that "upon admission to Upstate Correctional Facility, plaintiff was confined in SHU to serve out his Coxsackie Correctional Facility keeplock sentence and that New York Regulations specifically authorize such confinement" and further finding that because plaintiff did not raise any claim that deprivations suffered were contrary to section 302.2(a)-(j), no liberty interest was implicated).

[13]     "New York conducts three types of disciplinary hearings for its inmates. Tier I hearings address the least serious infractions and have as their maximum punishment loss of privileges such as recreation. Tier II hearings address more serious infractions and may result in 30 days of confinement in a Special Housing Unit ('SHU'). Tier III hearings concern the most serious violations and may result in unlimited SHU confinement (up to the length of the sentence) and recommended loss of 'good time' credits." *Hynes v. Squillace,* 143 F.3d 653, 655 n. 1 (2d. Cir.1998).

While it is "firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement," *Ciaprazi,* 2005 WL 3531464, at \*11, plaintiff may only sustain a cause of action to vindicate the infringement of that liberty interest where he has been deprived of due process, *Ortiz,* 380 F.3d at 655. As noted, plaintiff does not allege that the March 2001 Sing Sing hearing denied him due process. Plaintiff has been afforded a full evidentiary hearing on the misconduct underlying the time spent in Sing Sing

keeplock and Upstate SHU, cannot point to any regulation entitling him to an additional hearing prior to his transfer to Upstate, and therefore cannot show that he has been deprived of a protected liberty interest without due process. *Cf. Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir.1995) (dismissing plaintiff's due process claim and finding that prisoner not entitled to reclassification hearing when, after being found guilty of major misconduct and placed in punitive detention for thirty days, he was released into administrative segregation instead of to the general prison population, since the subsequent reclassification to administrative segregation was based upon findings of guilt at a full evidentiary hearing).

**\*20** Defendants' motion to dismiss plaintiff's due process claim with respect to the conversion of his keeplock sentence into SHU time is therefore granted.

9. *Cruel and Unusual Punishment: Upstate SHU's Twenty-Four Hour Double-Celling Policy*
Plaintiff brings an Eighth Amendment claim alleging that Upstate SHU's practice of confining two prisoners in a single SHU cell for twenty-four hours a day constitutes cruel and unusual punishment.

To establish a claim for cruel and unusual punishment, "a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps,* 308 F.3d at 185. While the Eighth Amendment bars prison officials from depriving prisoners of their "basic human needs" and prohibits exposing them to conditions that "pose an unreasonable risk of serious damage to [their] future health," it "does not mandate comfortable prisons." *Id.* Furthermore, to bring a claim for cruel and unusual punishment, plaintiff must allege that the defendants acted with "deliberate indifference," i.e. that they "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.*

Unlike his claim for the twenty-four hour lighting in Eastern SHU, plaintiff has not alleged facts that would support either the objective or the subjective prong for Upstate's double-celling policy. While he has alleged specific health problems resulting from his exposure to the lighting, plaintiff here has not alleged that double-celling poses an unreasonable risk, or any risk at all, to his health. Furthermore, while plaintiff alleged that he complained about the 24-hour lighting policy to his guards and filed grievances with the IGP, the prison superintendent, and the CORC, plaintiff has not

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 779 of 830
Holmes v. Grant, Not Reported in F.Supp.2d (2006)
2006 WL 851753

alleged that he filed any grievances or complained about the double-celling to anyone sufficient to put the defendants on notice that a substantial risk of serious harm exists. As plaintiff has not made out a cognizable claim for cruel and unusual punishment due to Upstate's double-celling policy, the defendants' motion to dismiss is granted.

10. *Venue*

Defendants have moved to dismiss plaintiff's action on the grounds of improper venue or, in the alternative, to transfer the action to the Northern District of New York. A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought. 28 U.S.C. § 1391(b).

**\*21** Once a proper venue objection has been raised, the burden is on the plaintiff to show that venue is proper, and he must show that venue is proper as to each claim against each defendant. *See, e.g., Degrafinreid v. Ricks,* 2004 WL 2793168, at \*6 (S.D.N.Y. Dec. 6, 2004). For the purposes of venue, state officers "reside" in the district where they perform their official duties. *Amaker v. Haponik,* 198 F.R.D. 386, 391 (S.D.N.Y.2000); *Baker v. Coughlin,* 1993 WL 356852, at \*2 (S.D.N.Y. Sept. 9, 1993). If a case is improperly venued, the district court may either dismiss the case or, in the interest of justice, transfer it to a district in which venue is proper. 28 U.S.C. § 1406(a).

None of plaintiff's surviving claims are properly venued in the Southern District. All of the remaining defendants are DOCS officials who work in the Northern or Western Districts. Furthermore, all of the incidents for which there are cognizable claims occurred at Shawangunk, Eastern, and Upstate, all of which are in the Northern District, and Five Points, which is in the Western District. Plaintiff has not made a showing that "a substantial part of the events or omissions giving rise" to any cognizable claim arose in the Southern District.

In addition, even if venue were proper in the Southern District, the Court may transfer claims "for the convenience of the parties, in the interest of justice." 28 U.S.C. § 1404(a). As plaintiff could have brought his claims in the Northern District, the majority of the events arose there, and the majority of defendants reside there, it would be in the interests of justice to transfer this case even if venue were proper here. *See, e.g., Shariff v. Goord,* 2005 WL 2087840, at \*7 (S.D.N.Y. Aug. 26, 2005). Furthermore, as plaintiff resides in the Western District and has already brought this action outside his home district, he has already demonstrated that laying venue elsewhere in the state is not unduly burdensome. *See Madison v. Mazzuca,* 2004 WL 3037730, at \*15 (S.D.N.Y. Dec. 30, 2004).

Plaintiff's surviving claims shall be transferred to the Northern District of New York pursuant to 28 U.S.C. § 1406(a) or, in the alternative, 28 U.S.C. § 1404(a).

CONCLUSION

Defendants' motion to dismiss [25] plaintiff's claims against (I) defendant Connolly for denial of due process arising out of his July 2000 Shawangunk hearing; (2) defendants Miller and Two Unknown Officers of Eastern Prison Special Housing Unit for cruel and unusual punishment arising out of the 24-hour lighting policy at Eastern; (3) defendant Connolly for retaliation (by falsifying plaintiff's SHU records to deny him privileges in August 2000); (4) defendants Sweeney, Scott, and Rich for retaliation for falsely filing an IMR against him in May 2001 and sentencing him to the SHU; and (5) defendants Kivett, Smith, and Comstock for retaliation for stealing his legal material in July 2001 is DENIED.

Defendants' motion to dismiss [25] all of plaintiff's remaining claims is GRANTED. Furthermore, defendants' motion to transfer venue is hereby GRANTED. The Clerk of this Court is directed forthwith to take all steps necessary to transfer the remainder of this case to the Northern District of New York.

**\*22** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 851753

---

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.      16

2013 WL 1024667
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ralph Buck PHILLIPS, Plaintiff,
v.
B. LECUYER, et al., Defendants.

No. 9:08–CV–878 (FJS/ATB).
|
Feb. 19, 2013.

**Attorneys and Law Firms**

Ralph Buck Phillips, pro se.

James B. Mcgowan, Ass't Att'y Gen., for the Defendants.

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

*\*1* Currently before this court is the motion for summary judgment filed by the eleven remaining defendants, seeking dismissal of the pro se plaintiff's civil rights claims that survived a prior motion to dismiss. This matter has been referred to me by Senior U.S. District Judge Frederick J. Scullin, Jr. for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c).

Plaintiff, an inmate of the Department of Corrections and Community Supervision ("DOCCS"), commenced this civil rights action in August 2008. Plaintiff pled guilty to aggravated murder and attempted murder following his escape from Erie County jail and his shooting of two New York State Troopers, one of whom died from his injuries. [1] People v. Phillips, 56 A.D.3d 1163, 867 N.Y.S.2d 324 (4th Dep't 2008). Following those convictions, plaintiff initially was received into DOCCS custody at the Elmira Correctional Facility ("Elmira") on December 21, 2006, for processing, and he was thereafter transported to the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. (Second Amended Complaint ("2d Am. Compl.") ¶¶ 6, 10, Dkt. No. 52).

[1]     While the circumstances surrounding an inmate's prior offenses are typically not relevant in a civil

rights action, plaintiff's criminal history provides part of the justification for his confinement in administrative segregation. Moreover, plaintiff has consistently alleged that certain defendants were substantially motivated by his prior crimes in violating plaintiff's constitutional rights. (*See, e.g.,* Second Amended Complaint ¶¶ 12, 30, Dkt. No. 52).

In his first amended complaint, plaintiff asserted 28 claims against 24 defendants, arising from events at both Elmira and Clinton. (Dkt. No. 10). In March 2009, defendants filed a motion to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 46). In response to that motion, plaintiff filed a motion to amend his complaint further, which Judge Scullin granted. (Dkt.Nos.47, 51).

Defendants moved to dismiss the second amended complaint. (Dkt. No. 76). In a Memorandum–Decision and Order filed on August 29, 2011, Judge Scullin granted defendants' motion in part and denied it in part, but afforded plaintiff the opportunity to file a third amended complaint. (Dkt. No. 95 at 36–38 & n. 12). [2] Plaintiff did not file a further amended complaint. Accordingly, his second amended complaint (Dkt. No. 52), as modified by Judge Scullin's August 29, 2011 opinion, is the operative pleading in this action. The surviving claims include (a) Eighth Amendment excessive force and failure to protect claims against defendants LeBel, Doyle, Kirkpatrick, and Marinaccio (First, Second, and Third Causes of Action); (b) procedural due process claims (Fourth Cause of Action), relating to plaintiff's initial administrative segregation hearing and a disciplinary hearing before Curtis Drown; [3]

[2]     Judge Scullin's opinion was reported as *Phillips v. Roy,* 9:08–CV–878 (FJS/ATB), 2011 WL 3847265 (N.D.N.Y. Aug. 29, 2011), which accepted in part and rejected in part a Report–Recommendation by U.S. Magistrate Judge David E. Peebles, reported as *Phillips v. Fischer,* 2010 WL 7375637 (N.D.N.Y. September 27, 2010). This case was reassigned from Magistrate Judge Peebles to me on October 22, 2010, for administrative reasons. (Dkt. No. 87).

[3]     Mr. Drown died in March 2011, and the representative of his estate has been substituted as a defendant, pursuant to Fed.R.Civ.P. 25(a). (Dkt. No. 113).

(c) a First Amendment claim alleging the denial of religious services against defendant Racette (Seventh Cause of Action); (d) an Eighth Amendment medical indifference claim against defendants LeCuyer and Lashway (Tenth Cause of Action), relating to the alleged deprivation of appropriate pain medication; (e) Eighth Amendment conditions-of-confinement and First Amendment retaliation claims against defendants Allan, Bosco and Uhler (Fifteenth, Nineteenth and Twenty–Sixth Causes of Action), relating to frequent transfers of plaintiff to noisy and unsanitary SHU cells and his placement in a "freezing and filthy" mental health observation cell for three days. *Phillips v. Roy,* 2011 WL 3847265, at 19 n. 12.[4]

4      The relevant facts will be discussed below, in the analysis of each surviving claim.

**\*2** Defendants filed their summary judgment motion, seeking dismissal of all remaining claims on August 17, 2012. (Dkt.Nos.133–135). After being granted an extension of time, plaintiff filed a response to the motion on October 25, 2012. (Dkt. No. 139).[5] The defendants filed a reply on October 30, 2012. (Dkt. No. 141).

5      On the same date, plaintiff also filed his fourth motion seeking appointment of counsel. (Dkt. No. 140).

For the reasons set forth below, this court recommends that defendants' motion for summary judgment be denied in part and granted in part. In particular, this court recommends that summary judgment be denied with respect to the following claims: (a) plaintiff's Eighth Amendment excessive force claim against defendants LeBel and Doyle and the failure-to-protect claim against defendant Marinaccio (First, Second, and Third Causes of Action) and (b) plaintiff's Eighth Amendment conditions-of-confinement claim against defendants Allan and Uhler relating to the transfers of plaintiff among various SHU cells (Nineteenth and Twenty–Sixth Causes of Action). The court recommends dismissal of the remaining claims, including all surviving claims against defendants Kirkpatrick, the estate of Curtis Drown, Racette, LeCuyer, Lashway, and Bosco.

## DISCUSSION

### I. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## II. *Excessive Force and Failure–to–Intervene Claims*

### A. Background

The Second Amended Complaint alleges that defendants LeBel and Doyle assaulted plaintiff on December 21, 2006, following a strip frisk at Elmira. (2d Am.Compl.¶¶ 6–8). Specifically, plaintiff asserts that, after he was re-clothed in state prison garb, defendant LeBel whispered something to someone just outside of the strip frisk room, and then angrily told plaintiff, "Your days of media glory are over!" (*Id.* ¶ 6). Plaintiff alleges that defendant LeBel grabbed plaintiff by the throat and violently slammed his head against a wall, causing plaintiff briefly to black out. (*Id.* ¶ 6). Defendant LeBel then pinned plaintiff to the wall while squeezing his throat with his right hand, severely restricting plaintiff's ability to breathe and causing plaintiff to see black spots. (*Id.* ¶ 6). Meanwhile, defendant Doyle allegedly struck plaintiff's left hip with the heel of his right hand, while placing his left hand on plaintiff's chest to pin him against the wall. (*Id.* ¶ 7).

Phillips v. LeCuyer, Not Reported in F.Supp.2d (2013)

2013 WL 1024667

**\*3** "Only a few seconds" after the alleged assault began, Deputy Superintendent of Security Henderson drew back the curtain in the strip frisk room, and, after assessing the situation briefly, instructed the other officers to "knock it off." (2d Am.Compl.¶ 8). Defendants LeBel and Doyle allegedly did not stop their assault on plaintiff until Dep. Sup. Henderson more forcefully directed them to "knock the shit off." (*Id.* ¶ 8). Once the curtain was opened, plaintiff saw defendants Kirkpatrick and Marinaccio and another unknown correction officer just outside the room, watching the alleged attack, but not moving to intervene. (*Id.* ¶ 8). Later that day, while being transported, under video surveillance, to Clinton by several of the defendants, plaintiff allegedly heard Correction Officer ("C.O.") Marinaccio say, to C.O. LeBel, "I tried to warn you guys ...." At that point defendant LeBel allegedly put his finger to his lips to made a "shhh" gesture, which caused defendant Marinaccio to stop talking. (*Id.* ¶ 10).

Plaintiff was examined by a nurse following the incident in the strip frisk room. Plaintiff allegedly complained that his throat was sore, his head hurt, and he had a "wicked charley horse," but had no serious injuries. (2d Am.Compl. ¶ 8). The nurse observed two superficial red marks" on each side of plaintiff's neck, but no swelling or bleeding, which was confirmed by photographs of the plaintiff taken during the examination. (Use of Force Report, Dkt. No. 133–12 at 8–11, 13). During his deposition, plaintiff testified that his throat and neck were sore for several days. He also testified that, a day after the incident, a black and blue mark appeared on his leg, which was sore for about a week. (Pl.'s Dep. at 54–56, Dkt. No. 133–16).

After this use of force, defendants LeBel and Doyle alleged that plaintiff "turned off the wall [of the strip frisk room] towards staff," in direct contravention of their orders. (Use of Force Report, Dkt. No. 133–12 at 5, 7). The correction officers claimed that they used force against plaintiff to secure him against the wall and that C.O. Doyle used the palm of his right hand to strike plaintiff's left leg to prevent him from kicking the staff. (*Id.*).

C.O. LeBel filed a misbehavior report against plaintiff alleging that plaintiff refused to obey a direct order and failed to comply with frisk/search procedures. (Dkt. No. 133–15 at 3). At the disciplinary hearing, plaintiff and C.O. LeBel presented their conflicting versions of the incident during the strip frisk on December 2 Pt. (Disc. Hrg. Tr. at 2–4, 12– 14, Dkt. No. 133–15 at 12–14, 22–24). Dep. Sup. Henderson testified that he was standing outside of the room at Elmira

where defendants LeBel and Doyle were conducting the strip frisk of plaintiff. (Disc. Hrg. Tr. at 6). Dep. Sup. Henderson heard "possibly angry voices" in the room and then a "thud," causing him to open the curtain and enter the strip frisk room. He witnessed defendants LeBel and Doyle applying force to pin plaintiff to the wall and saw C.O. Doyle use his right palm to strike plaintiff's left leg or hip. Henderson issued an order "to knock it off" and "all three parties within the booth seemed to relax," ending the use of force. (Disc. Hrg. Tr. at 6–7).

**\*4** Dep. Sup. Henderson interviewed the plaintiff and the various officers present during the incident, but neither Henderson, nor the other officers outside of the room, could confirm whether the plaintiff provoked the use of force by coming off the wall. (Disc. Hrg. Tr. at 8–9). Henderson also testified that he did not personally observe plaintiff exhibiting any non-compliant behavior that day. (Disc. Hrg. Tr. at 11). After the incident, Dep. Sup. Henderson warned plaintiff that he was a "high profile" inmate and that he should keep in mind that there might not always be a supervisor present who could quickly respond to a situation like the one that occurred that day. (Disc. Hrg. Tr. at 7–8). As discussed further below, the hearing officer found plaintiff guilty of the disciplinary charges, but the disposition was later vacated on administrative appeal because of the officer's failure to reconcile the conflicting testimony of C.O. LeBel and Dep. Sup. Henderson.

In his decision regarding defendants' motion to dismiss, Judge Scullin found that the Second Amended Complaint stated a claim of excessive force against defendants LeBel and Doyle, and a claim for failure to intervene against defendants Kirkpatrick and Marinaccio. Judge Scullin dismissed plaintiff's claim against defendant Henderson for his alleged failure to intervene more promptly to stop the alleged assault. *Phillips v. Roy,* 2011 WL 3847265, at *7.*

**B. Applicable Law**

**1. Excessive Force**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both

2013 WL 1024667

objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*5** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

**2. Failure to Intervene**

A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 342 (N.D.N.Y. May 24, 2010); *Cicio v. Graham,* No. 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at \*13 (N.D.N.Y. Mar. 15, 2010). A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id.* [6] In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1)

possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Id.; Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted).

6    *See also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be."); *Anderson v. Branen,* 17 F .3d 552, 557 (2d Cir.1994) ("all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence").

**C. Analysis**

In support of their motion for summary judgment, defendants contend that the brief use of force against plaintiff was de minimis and was not maliciously intended to harm him. (Defs.' Mem. of Law at 33–34, Dkt. No. 133–18). The defendants also contend that defendants Marinaccio and Kirkpatrick did not have a reasonable opportunity to intervene to stop the use of force any faster than Dep. Sup. Henderson did. (*Id.* at 34–35). The court concludes that there are disputed issues of material fact that preclude the dismissal of the excessive force claims against defendants LeBel and Doyle and the failure-to-intervene claim against defendant Marinaccio. However, the court will recommend the dismissal of the claim against defendant Kirkpatrick because no rational fact finder could conclude that he had a reasonable opportunity to intervene to stop the use of force before Dep. Sup. Henderson did so.

**1. Excessive Force**

Defendants LeBel and Doyle have acknowledged that they used force on December 21, 2006, purportedly to subdue plaintiff after he came off the wall, contrary to orders, and attempted to kick one of the officers. Defendants emphasize that, during his deposition, the plaintiff speculated that C.O. LeBel and C.O. Doyle were not trying to "really hurt" him, but were attempting to provoke him into active resistance so that they could subdue him with greater violent force. (Pl.'s Dep. at 49–50). Defendants also argue that the lack of medical documentation of any serious injuries to plaintiff corroborates

that the use of force against him was de minimis and was not applied with malice. (Defs.' Mem. of Law at 33–34).

**\*6** However, plaintiff has consistently described a much more vicious assault than the defendants admit, involving defendant LeBel violently slamming plaintiff's head against a wall and choking plaintiff until he briefly lost consciousness. Although the medical examination of plaintiff did not reveal any serious injuries, [7] the nurse detected two red marks on plaintiff's neck, which provide some corroboration of his claim that he was choked. Dep. Sup. Henderson stated that he intervened after he heard a "thud" from the strip frisk room, which plaintiff claims was the sound of his head hitting the concrete wall. (Pl.'s Dep. at 59).

[7] While plaintiff may have few, if any, compensable injuries, that does not support dismissal on summary judgment. *See, e.g., Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994) (while plaintiff may not have proved compensable injuries caused by the use of excessive force, he still could be entitled to a judgment under Section 1983 and an award of nominal damages at trial); *Ventura v. Sinha,* 01–CV–434S, 2008 WL 365866, at \*7 (W.D.N.Y. Feb. 11, 2008) (the extent of plaintiff's injuries provides no basis for dismissal of his claim if it is determined that the blows directed at him were not de minimis for Eighth Amendment purposes) (citing *Hudson,* 503 U.S. at 10).

The court concludes that there are disputed issues of material fact with respect to whether the force applied to plaintiff was more than de minimis and would satisfy the objective element of Eighth Amendment standards. *See, e.g., Alexander v. Deming,* 03–CV–147, 2009 WL 1044561, at \*10 (W.D.N.Y. Apr. 16, 2009) (denying summary judgment on claim of excessive force where plaintiff alleged that the defendant threatened, choked and hit plaintiff's head against the wall, causing a bump on his head); *Finch v. Servello,* 06–CV–1448 (TJM/DRH), 2008 WL 4527758, at \*5 (N.D.N.Y. Sept. 29, 2008) (allegation that defendant verbally harassed plaintiff, choked him, slammed him against the wall, and dragged him back to his cell, all while plaintiff was unable to defend himself, could reasonably be found repugnant to society's standards and suffice to raise a question of fact whether defendants acted with malice for the very purpose of causing harm); *Ventura v. Sinha,* 01–CV–434S, 2008 WL 365866, at \*6 (W.D.N.Y. Feb. 11, 2008) (a jury could reasonably credit plaintiff's claim that he was verbally abused, slammed

against a wall, kicked and hit several times, and had his neck pressed against the wall until he was choked unconscious and could also find that this use of force is inconsistent with contemporary standards of decency, was not de minimis, and was with malicious intent and not for the purpose of maintaining order).

The same authority supports this court's conclusion that there are also disputed issues of material fact as to whether the defendants used force against plaintiff maliciously, rather than in a good faith effort to maintain discipline and order. In his complaint and in his deposition, plaintiff adamantly denies coming off the wall or doing anything to necessitate the use of force to maintain control over him. Sgt. Henderson's reaction to the incident—telling the correction officers to "knock it off," as opposed to intervening to assist them in controlling the plaintiff—and his observation that plaintiff had otherwise been compliant that day, provide some factual support for plaintiff's contention that he was not resisting the officers. Plaintiff's allegation that, just prior to the assault, defendant LeBel angrily told him that his days of media glory were over, was not rebutted in the declarations of defendants LeBel (Dkt. No. 133–12) or Doyle (Dkt. No. 133–9), and Dep. Sup. Henderson testified to hearing "possibly angry voices" in the strip frisk room just before he intervened. On this record, a reasonable fact finder could conclude that defendants LeBel and Doyle applied force against plaintiff wantonly, and were not acting in good faith to maintain order. The material issues of fact should preclude a grant of summary judgment on plaintiff's excessive force claim and on the defendant's contention that they are entitled to qualified immunity. [8]

[8] Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990). To the extent there are material issues of fact as to whether defendants used force against plaintiff wantonly and maliciously, there is necessarily an issue of fact as to whether it

2013 WL 1024667

was objectively reasonable for them to believe that their use of force did not violate the Eighth Amendment. *See, e.g., Finch v. Servello,* 2008 WL 4527758, at *5 (the Eighth Amendment clearly prohibited a corrections officer from assaulting or intentionally inflicting harm on an inmate, so the material issues of fact as to whether defendants maliciously used force against plaintiff precluded a grant of summary judgment on the basis of qualified immunity); *Brown v. Catania,* 3:06cv73, 2007 WL 879081, at *9 (D.Conn. Mar. 21, 2007) (where plaintiff alleged that one of the arresting officers wrapped her legs around plaintiff's waist and choked him, causing him to lose consciousness, there were questions of fact material to the reasonableness of the force used, and the question of qualified immunity therefore cannot be resolved on summary judgment).

### 2. Failure to Intervene

**\*7** Plaintiff's claim that defendants Marinaccio and Fitzpatrick failed to intervene to stop the "assault" by defendants LeBel and Doyle survived defendants' motion to dismiss. Plaintiff acknowledged, during his deposition, that he did not know who was outside of the room while he was being frisked by C.O. LeBel and C.O. Doyle. (Pl.'s Dep. at 42–43). When Dep. Sup. Henderson pulled open the curtain and entered the room, plaintiff saw Sgt. Marinaccio and Lt. Fitzpatrick standing behind Dep. Sup. Henderson, but did not know how long they had been at the scene or whether they had any interest in participating in what had been happening in the strip frisk room. (Pl.'s Dep. at 52–53, 63–65).

Lt. Fitzpatrick has filed a declaration stating that he was about 20 feet away from the strip frisk room and did not know there was anything "out of the ordinary" occurring there until he was signaled to come to the area by Dep. Sup. Henderson. (Kirkpatrick Decl. ¶¶ 4–9, 12–16, Dkt. No. 133–10). Fitzpatrick's statement clearly indicates that he did not know of an impending assault and could not have reasonably taken any action to intervene in the incident before Dep. Sup. Henderson reacted and stopped the use of force against plaintiff. Because plaintiff has not offered any information that contradicts defendant Fitzpatrick's version of the relevant events, no reasonable fact finder could conclude that Lt. Fitzpatrick violated plaintiff's Eighth Amendment rights by failing to intervene.

Sgt. Marinaccio acknowledged that he and another officer (who is not named as a defendant) were directly outside the room where plaintiff was being frisked. (Marinaccio Decl. ¶ 8, Dkt. No. 133–11). Sgt. Marinaccio alleges that he heard an usual noise from the room and then saw C.O. Doyle reacting and striking plaintiff on the thigh. (*Id.* ¶ 9). Defendant Marinaccio further states, "Before I could respond to assess the situation, Deputy Superintendent Henderson rushed past me and intervene[d]." (*Id.* ¶ 10).

Plaintiff claims that, just prior to initiating the "assault," defendant LeBel whispered something to someone outside of the strip frisk room. (Pl.'s Dep. at 44). The Second Amended Complaint (¶ 6) alleges that, after the incident in the strip frisk room, as plaintiff was being transporting from Elmira to Clinton, Sgt. Marinaccio started to tell C.O. LeBel "I tried to warn you guys. .... " Both of these allegations, which defendant Marinaccio's declaration does not address, provide some factual support for plaintiff's claim that Sgt. Marinaccio knew plaintiff was going to be assaulted, could have stepped in before Dep. Sup. Henderson did so, but did not intervene. Notwithstanding the very brief duration of the alleged attack on plaintiff, there is a material issue of fact as to whether defendant Marinaccio had a reasonable opportunity to prevent or stop the "assault" and whether he violated plaintiff's Eighth Amendment rights by making no effort to intervene.

**\*8** Based on the foregoing, this court recommends that the failure-to-intervene claim against defendant Fitzpatrick be dismissed. While it is a very close call, the court concludes that summary judgment should be denied with respect to the failure-to-intervene claim against defendant Marinaccio.

### III. *Due Process Claims*

#### A. Background

On December 22, 2006 George Seyfert, a DOCCS Deputy Inspector General, issued a recommendation to place plaintiff in administrative segregation, contending that Phillips constituted "a threat to the safety and security of staff and any institution in which he is confined." (Dkt. No. 133–3 at 3–4). On December 28, 2006, an administrative segregation hearing was convened by Curtis Drown, at which plaintiff was allowed to respond to Dep. Insp. Gen. Seyfert's allegations. (Ad. Seg. Tr., Dkt. No. 139–6 at 3–19).[9] Following the hearing, Hearing Officer Drown, emphasizing plaintiff's history of escapes and escape attempts, determined that it was necessary to separate plaintiff from the general population "to protect the safety and security of the facility and staff." (Ad.

2013 WL 1024667

Seg. Tr. at 17; Ad. Seg. Hearing Disposition, Dkt. No. 133–3 at 14).

9    During the hearing, plaintiff acknowledged, *inter alia,* that, while in custody, he had periodic verbal conflicts and at least two fist fights with other inmates. (Ad. Seg. Tr. at 7). He admitted that he had removed both handcuffs and shackles while in custody, using a paperclip, and he offered to demonstrate how he did so to the Hearing Officer. (Ad. Seg. Tr. at 8). Plaintiff described his escape from a county jail by using a screwdriver taken from a supervisor's office to cut through the roof. (Ad. Seg. Tr. at 13). He admitted that he formulated and executed his escape plan in as little as three days, after learning that he was facing a return to state custody. (Ad. Seg. Tr. at 14). Plaintiff acknowledged that, while a fugitive, he wore a stolen New York State Trooper's uniform while he pistol-whipped and threatened a bounty hunter. (Ad. Seg. Tr. at 15). Although he denied intending to kill any police officer, plaintiff admitted firing an assault rifle at the camouflaged New York State troopers who were trying to recapture him, killing one of them. (Ad. Seg. Tr. at 16).

Plaintiff filed a timely appeal of Hearing Officer Drown's determination, contending that Dep. Insp. Gen. Seyfert initiated the Administrative Segregation proceedings to further punish plaintiff for the murder and attempted murder of New York State troopers and arguing that his limited disciplinary history while in New York State custody, as opposed to his misconduct in county or other facilities, did not justify administrative segregation. (Dkt. No. 133–3 at 27–30). His appeal made no mention of Hearing Officer Drown or his conduct at the hearing. Deputy Commissioner Donald Selsky denied plaintiff's appeal (Dkt. No. 133–3 at 32), and plaintiff thereafter remained in custody in the Special Housing Unit ("SHU") at Clinton, receiving the required review of his administrative custodial status every 60 days. *Phillips v. Roy,* 2011 WL 3847265, at *4.

On December 21, 2006, defendant LeBel filed a misbehavior report alleging that plaintiff refused to obey a direct order and failed to comply with frisk/search procedures in connection with the strip frisk of plaintiff at Elmira on that day. (Dkt. No. 133–15 at 3). On January 3, 2007, Curtis Drown conducted a disciplinary hearing, at which plaintiff, Dep. Superintendent Henderson, and Officer LeBel testified. (Disc. Hrg. Tr., Dkt. No. 133–15 at 11–25). Hearing Officer Drown found that the testimony of Officer LeBel was credible and established that plaintiff failed to obey a direct order or follow frisk procedures. (Disc. Hrg. Tr. at 15). Hearing Officer Drown imposed a punishment of 200 days of SHU confinement, beginning on December 21, 2006, but suspended 100 days of that period, which could be re-imposed if plaintiff committed further infractions over the next 120 days. (Disc. Hrg. Disposition, Dkt. No. 133–15 at 9–10; Racette Decl. ¶¶ 44–49, Dkt. No. 133–13).

**\*9** Plaintiff filed a timely appeal of the disciplinary hearing, arguing that he had fully complied with frisk procedures and the orders of the officers conducting the strip frisk on December 21st, and claiming that the officers assaulted him without provocation. (Dkt. No. 133–15 at 30–33). The only mention of the hearing officer in plaintiff's appeal was the comment that Curtis Drown "rolled his eyes and appeared not to care" when plaintiff offered his version of the events on December 21st. (Dkt. No. 113–15 at 31–32). On March 7, 2007, Dep. Com'r Donald Selsky reversed the disciplinary determination, based on the hearing officer's "failure to resolve inconsistencies in testimony of employee witnesses." (Dkt. No. 133–15 at 34–35).

Plaintiff asserted due process claims arising from the administrative segregation and disciplinary hearing against several defendants, but all of the defendants other than Curtis Drown were dismissed by Judge Scullin in response to defendants' motion to dismiss. *Phillips v. Roy,* 2011 WL 3847265, at *3–4 (dismissing claims against defendant Seyfert and the defendants who periodically reviewed whether plaintiff should remain in administrative segregation). Hearing Officer Drown was not named as a defendant until plaintiff filed his Second Amended Complaint in June of 2009. (*See* Dkt. Nos. 1, 10, 52).

In the Second Amended Complaint, plaintiff first alleged that Hearing Officer Drown made the following comment during the December 28, 2006 administrative segregation hearing, while the device recording the hearing was turned off:

> You just don't know when to shut the fuck up, do you. Do you really think I give a shit about what you say. I don't. Your gonna be tortured for the rest of your life in prison for what you've done, Phillips.

(2d Am.Compl.¶ 13). Plaintiff also alleged, for the first time in the Second Amended Complaint, that Hearing Officer Drown made the following off-the-record comments during the January 3, 2007 disciplinary hearing:

> Mr. Phillips, your [sic] in prison for shooting and killing police officers. You don't really believe you'll be treated fairly, do you?

(2d Am.Compl.¶ 12). As noted elsewhere herein, plaintiff did not assert that Hearing Officer Drown made any such off-the-record comments during the hearings in his administrative appeals from those hearings. Those alleged off-the-record comments by Hearing Officer Drown were central to Magistrate Judge Peebles and Senior District Judge Scullin's conclusion that the Second Amended Complaint stated a viable due process claim against Curtis Drown by indicating that he was a biased hearing officer. *Phillips v. Fischer,* 2010 WL 7375637, at *6; *Phillips v. Roy,* 2011 WL 3847265, at *3.

As noted, Curtis Drown died in March 2011, and his estate was substituted as a defendant in this action. Defendants' summary judgment motion argues that plaintiff's due process claim against the estate of Curtis Drown should be dismissed because (a) plaintiff did not exhaust his administrative remedies by raising the alleged bias of Hearing Officer Drown during his appeals of the administrative segregation and disciplinary hearings; (b) the determinations in the administrative segregation and disciplinary hearings did not implicate a liberty interest triggering due process protections; and (c) the defendant is entitled to qualified immunity because a reasonable official in Curtis Drown's position could not believe that the dispositions he imposed would implicate a federally protected liberty interest. (Defs.' Mem. of Law at 1). Plaintiff's opposition to the defense motion to dismiss his remaining due process claims continues to focus on Curtis Drown's alleged off-the-record comments as support for plaintiff's contention that he was deprived of his right to a fair and impartial hearing officer. (Pl.'s Mem. of Law at 15–16, Dkt. No. 139). Plaintiff also argues that his prolonged confinement in SHU did deprive him of a liberty interest. (*Id.* at 17).

**\*10** The court concludes that plaintiff failed to exhaust his administrative remedies with respect to his surviving due process claim and recommends dismissal of the claim on that basis. In the alternative, the court notes that no reasonable fact finder would conclude that plaintiff was deprived of a liberty interest in connection with his disciplinary confinement.

### B. Applicable Law

#### 1. Disciplinary Confinement

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") or under similar conditions automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this Circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest. However, "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm

dismissal of due process claims where the period of time spent in SHU was short—*e.g.,* 30 days—and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

### 2. Administrative Segregation

**\*11** In *Arce v. Walker,* 139 F.3d 329, 334–35 (2d Cir.1998), the Second Circuit made it clear that even though the prison condition at issue in *Sandin* was an inmate's challenge to his confinement in "disciplinary" segregation, the *Sandin* analysis is properly applied to determine whether non-punitive, "administrative" segregation implicates a state-created liberty interest. Once the court determines that a liberty interest exists, then the distinction between administrative and disciplinary segregation determines how much process is due.

New York regulations governing administrative segregation provide that an inmate receive a hearing within fourteen days of entering administrative segregation. 7 N.Y.C.R.R. § 301.4(a). "Administrative segregation admission results from a determination by the facility that the inmate's presence in general population would pose a threat to the safety and security of the facility." 7 N.Y.C.R.R. § 301.4(b). Once it is determined that administrative segregation is appropriate, the inmate's status must be reviewed every sixty days. 7 N.Y.C.R.R. § 301.4(d). Inmates in administrative segregation are housed in the SHU and are subject to most of the same restrictions as inmates housed for disciplinary reasons. 7 N.Y.C.R.R. § 301.4(c) (administrative segregation inmates will be subject to the same rules and regulations as those disciplinary inmates who have completed 30 days of satisfactory adjustment).

If it is determined that the inmate had a liberty interest in remaining free of administrative segregation, due process

requires only that the inmate must receive some notice of the reasons for the placement and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate into administrative segregation. *Samms v. Fischer,* No. 9:10–CV–349 (GTS/GHL), 2011 WL 3876528, at \*10 (N.D.N.Y. Mar. 25, 2011) (Report–Recommendation), *adopted,* 2011 WL 3876522 (N.D.N.Y. Aug. 31, 2011).[10] The inmate's opportunity to present his views need not be as formal as that required for disciplinary proceedings; rather, the officials may conduct an informal and non-adversarial review of the information in support of the inmate's transfer into administrative custody. *Id.* (citations omitted).

[10] The court in *Samms* relied upon *Hewitt v. Helms,* 459 U.S. 460, 476 (1983), for its statement of the applicable due process requirements. The court did note that although the *Hewitt* analysis for determining the existence of a liberty interest was overruled in *Sandin,* the *Hewitt* decision was still instructive in determining the appropriate level of procedural safeguards once a liberty interest is found. 2011 WL 3876528, at \*10 n. 4 (citing *Wilkinson v. Austin,* 545 U.S. 209, 229 (2005)).

In accordance with New York regulations, plaintiff in this case was given the benefit of a formal administrative segregation hearing. Judge Scullin reasonably assumed that due process would require that such a hearing officer was "fair and impartial." *Phillips v. Roy,* 2011 WL 3847265, at \*3.

### 3. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies, inter alia, to excessive force claims). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

**\*12** The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion

2013 WL 1024667

requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust administrative remedies, an inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

To properly exhaust administrative remedies with respect to a civil rights claim, a prisoner typically is required to follow available inmate grievance procedures. However, when an inmate is raising a due process claim relating to a disciplinary hearing, he may exhaust his administrative remedies by pursuing an administrative appeal of the disciplinary determination which raises the particular objection(s) to the hearing officer's conduct. *See, e.g., Davis v. Barrett,* 576 F.3d 129, 132 (2d Cir.2009) (plaintiff raised, in his administrative appeal, his objections to the hearing officer's conduct, and could not pursue a separate grievance under New York's regulations; plaintiff's successful appeal of his administrative hearing constitutes exhaustion under the PLRA for purposes of rendering his due process claim ripe for adjudication in federal court).

A key concern underlying the PLRA's exhaustion rule is that the administrative appeal adequately apprise prison officials of the particular conduct of the hearing officer about which the inmate is complaining. *Id.* at 133 (because the plaintiff properly contested the particular manner in which the officer conducted the hearing in his administrative appeal, he satisfied the exhaustion requirement). Accordingly, in order to exhaust a due process claim with respect to a disciplinary hearing, the plaintiff's administrative appeal must specify the alleged misconduct of the hearing officer with sufficient particularity to satisfy "the purposes of the exhaustion requirement of § 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature federal litigation." *Flanagan v. Maly,* 99 CIV 12336, 2002 WL 122921, at *2 (S.D.N.Y. Jan. 29, 2002); *Bennett v. Fischer,* 9:09–CV–1236 (FJS/DEP), 2010 WL 5525368, at *8–9 & n. 15 (N.D.N.Y. Aug. 17, 2010) ("An appeal from a disciplinary hearing that presents the precise procedural infirmities raised in the section 1983 action ...

may be sufficient to exhaust administrative remedies.") (citation omitted) (Report–Recommendation), *adopted,* 2011 WL 13826 (N.D.N.Y. Jan. 4, 2011); *Barksdale v. Frenya,* 9:10–CV–00831 (MAD/DEP), 2012 WL 4107805, at *8 & n. 13 (N.D.N.Y. Aug. 17, 2012) (Report–Recommendation), *adopted,* 2012 WL 4107801 (N.D.N.Y. Sept. 19, 2012). [11]

[11]       *See also Matter of Cowart v. Coughlin,* 193 A.D.2d 887, 597 N.Y.S.2d 821, 822 (3d Dep't 1993) (inmate's claim, *inter alia,* that the hearing officer was biased was waived at his Article 78 proceeding challenging the hearing determination because the inmate failed to raise the bias issue at the tier III hearing).

### C. Analysis

#### 1. Failure to Exhaust Administrative Remedies

*\*13* As noted, plaintiff's surviving due process claim is based on the allegation that Hearing Officer Drown was biased, as demonstrated by the alleged off-the-record comments he made at the administrative segregation and disciplinary hearings. [12] Plaintiff's appeal of the administrative segregation determination made no reference to Curtis Drown's conduct at the hearing or any comments the hearing officer made suggesting that he was not impartial and fair. Because plaintiff's appeal utterly failed to provide notice to DOCCS of the basis for his current due process claim, he has not properly exhausted his administrative remedies and the claim should be dismissed. *See, e.g., Khalild v. Reda,* 00Civ.7691, 2003 WL 42145, at *4–5 (S.D.N.Y. Jan. 23, 2003) (plaintiff failed to exhaust his current Section 1983 claim—that his due process rights were violated because the disciplinary hearing commenced two days later than allowed by regulation—because his administrative appeal did not raise or even allude to that issue, thus denying prison officials the opportunity to address and correct the issue—the touchstone of exhaustion); *accord, Donato v. Phillips,* 9:04–CV–1160 (TJM), 2007 WL 168238, at *5 (N.D.N.Y. Jan. 18, 2007). Accordingly, this court recommends that plaintiff's due process claim with respect to his administrative segregation hearing be dismissed for failure to exhaust administrative remedies.

[12]       As Judge Peebles concluded previously, in addressing defendant's motion to dismiss, plaintiff's complaint does not appear to raise any due process defects in the hearings other than

2013 WL 1024667

the alleged bias of the hearing officer. *Phillips v. Fischer,* 2010 WL 7375637, at \*5–6.

In his appeal of the disciplinary determination, plaintiff did not mention the alleged, explicitly biased, off-the-record comments by Curtis Drown that plaintiff belatedly quoted in his Second Amended Complaint. However, in his appeal papers, plaintiff stated that Drown "rolled his eyes and appeared not to care" when plaintiff offered his version of the relevant underlying events. The passing and completely subjective observation that Curtis Drown "appeared" disinterested in the plaintiff's testimony was not sufficient to give DOCCS officials notice that plaintiff was objecting that the hearing officer was not impartial, nor did it provide DOCCS a fair opportunity to address that issue administratively. [13] Accordingly, this court recommends that plaintiff's due process claim with respect to his disciplinary hearing should also be dismissed on exhaustion grounds. However, because the question of whether plaintiff exhausted his administrative remedies through his appeal of the later disciplinary determination is a closer question, this court will also address an alternative ground for dismissal of this claim —plaintiff's failure to establish that he was deprived of a protected liberty interest.

[13] Cf. *Rosales v. Bennett,* 297 F.Supp.2d 637, 641 (W.D.N.Y.2004) (the factual basis for the claim of bias of the hearing officer was presented in plaintiff's appeal of the disciplinary hearing in which he alleged that the hearing officer "did not believe ... the officer who filed the report against plaintiff ... was capable of fabricating the report" and that plaintiff "was also denied his right to a fair and impartial fact finder"). *Rosales* is distinguishable from this case because the administrative appeal in that case included a much more explicit notice that the inmate was objecting that the hearing officer was not fair and impartial.

## 2. Liberty Interest

As noted above, Curtis Drown sentenced plaintiff to 200 days in SHU on the disciplinary charges against him, with 100 days suspended. Plaintiff's disciplinary term in SHU began on December 21, 2006, and was ended on or about March 7, 2007, when the disciplinary sentence was reversed on appeal. Thus, plaintiff spent approximately 77 days in SHU confinement attributable to Curtis Drown's disciplinary determination. [14] During this same time period, and

thereafter, plaintiff was in SHU at Clinton on administrative segregation status. [15]

[14] See *Hanrahan v. Doling,* 331 F.3d 93, 98 & n. 7 (2d Cir.2003) (the duration of actual confinement as well as the success of any subsequent administrative appeals, may well be relevant in assessing whether there is sufficient evidence of a due process violation) (citing *Colon v. Howard,* 215 F.3d 227, 231 & n. 4 (2d Cir.2000) (the SHU "confinement actually served" may be the "appropriate focus" in determining whether an inmate has alleged a due process violation under Sandin)). See also *Sealey v. Giltner,* 197 F.3d 578, 587 (2d Cir.1999) (focusing on the 101 days of confinement for which the defendant bore responsibility, including the effect of reversal of the defendant's order of administrative segregation, in determining whether plaintiff had a protected liberty interest).

[15] "[W]here a prisoner's placement in restrictive confinement has both a punitive and an administrative, non-punitive basis, the placement decision will not be found to have impaired a protected liberty interest." *Rosenberg v. Meese,* 622 F.Supp. 1451, 1468–69 (S.D.N.Y.1985) (citing *Sher v. Coughlin,* 739 F.2d 77, 81–82 (2d Cir.1984)). The period of plaintiff's confinement on the disciplinary charges overlapped with a period that he would have served in SHU anyway because of his administrative segregation status. Because plaintiff has no viable due process claim relating to his administrative segregation because of his failure to exhaust his administrative remedies, he arguably also does not have a liberty interest with respect to the concurrent period during which he confined for punitive reasons. *Cf. Sher v. Coughlin,* 739 F.2d at 81–82 (applying dual motivation analysis of *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–87 (1977) in holding that, if prison officials had administrative reasons for transferring plaintiff into restrictive confinement that did not trigger due process protection, the fact that they may have been also motivated by a desire to punish the plaintiff would not impair any protected liberty interest). It should be noted that the administrative segregation imposed under New York law in this

case, unlike the administrative confinement in the Reclassification Unit in *Sher,* may implicate a liberty interest protected by due process. In this case, however, plaintiff's due process claims with respect to his administrative segregation were lost because of his failure to exhaust administrative remedies.

**\*14** DOCCS records indicate that plaintiff was confined in his first SHU cell (# 002) until April 24, 2007, during all of the 77 days that he was confined as a result of the Hearing Officer Drown's disciplinary determination. (Internal Movement History, Dkt. No. 133–8 at 2). At his deposition, plaintiff testified that he hoped to stay in 2–cell because it was the quietest SHU cell. (Pl.'s Dep. at 99). Plaintiff has also acknowledged that, during his confinement in his first cell in SHU—also the initial term of his administrative segregation—his cell was clean and freshly painted, and he had no hygiene problems with his food. (Pl.'s Dep. at 24; Pl .'s Mem. of Law at 28). However, plaintiff claimed that the two neighboring inmates were mentally ill, and the noise, banging, and screaming disturbed his sleep at all hours of the day and night. (Pl.'s Dep. at 24). Plaintiff also testified that the company beyond his cell, in which he stayed for 23 hours per day, was filthy and there was a stench "probably comparable to a zoo." (*Id.*).

The only reference in the Second Amended Complaint about SHU conditions prior to March 2007, when plaintiff's confinement on the disciplinary charges ended, is the allegation that, in February 2007, plaintiff began writing to the mental health unit at Clinton complaining that his mentally ill neighbors in SHU were "acting out" and "seriously imposing upon plaintiff's mental faculties." (2d Am.Compl.¶ 26). It was not until the summer of 2007, well after plaintiff completed his term of disciplinary confinement, that he began making frequent and more substantial grievances and complaints about the conditions of confinement that he experienced in SHU. (2d Am. Compl. ¶ 27; Pl.'s Mem. of Law, Ex. D, Dkt. No. 139–5 at 3–65 & Ex. G, Dkt. No. 139–6 at 110–141).

Restrictive confinements of less than 101 days under normal SHU conditions, as defined in *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999), would not constitute atypical and significant hardships giving rise to a liberty interest protected by due process. *Palmer v. Richards,* 364 F.3d at 65. The conditions of a SHU are "doubtless unpleasant and somewhat more severe than those of general population." *Sealey v. Giltner,* 197 F.3d at 589. The SHU conditions which *Sealey* found not to create a liberty interest over 101 days included

solitary confinement for 23 hours per day, one hour of exercise outside of the cell, limited showers per week, and the loss of various privileges. The *Sealey* court found that plaintiff suffered no deprivation of a liberty interest, despite his allegations that the SHU cells were considerably noisier than those in general population, [16] and that "a few times," other prisoners threw feces at him. *Id.* at 581, 589.

[16]    *See also Hamilton v. Fisher,* 9:10–CV–1066 (MAD/RFT), 2012 WL 987374, at \*8 (N.D.N.Y. Feb. 29, 2012) ("An inmate normally cannot state a valid claim based on 'inmate-generated' noise as an impermissibly harsh condition of confinement.") (citing, *inter alia, Griffin v. Coughlin,* 743 F.Supp. 1006, 1018 (N.D.N.Y.1990)) (Report–Recommendation), *adopted,* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012).

The conditions which plaintiff alleged he experienced over the first 77 days of SHU confinement properly attributed to Curtis Drown's disciplinary determination were not more severe than "normal" SHU conditions as defined by *Sealey,* and did not give rise to a protected liberty interest. This court concludes that defendants' motion for summary judgment on plaintiff's due process claims relating to his disciplinary hearing should also be granted on that basis. *See also Smith v. Taylor,* 149 F. App'x 12, 13 (2d Cir.2005) (the district court correctly granted summary judgment and dismissed Smith's due process claims because Smith failed to offer evidence that his SHU confinement for 45 days involved conditions more onerous than those generally present in the SHU); *Pilgrim v. Bruce,* 9:05–CV–198 (GLS/GHL), 2008 WL 2003792, at \*15 (N.D.N.Y. May 7, 2008) (plaintiff's conclusory allegations, which notably do not include claims that he was denied food, clothing, bedding, heat, running water, toiletries, or medicine during his 60 days in keeplock, fail to establish that he was subjected to more severe conditions than in normal restrictive confinement); *Holland v. Goord,* 05–CV–6295, 2006 WL 1983382, at \*7 (W.D.N.Y. July 13, 2006) (77 days in keeplock during which plaintiff was deprived of TV, phone, packages, and commissary, was unable to go to Muslim services and classes did not create a protected liberty interest (*citing, inter alia, Arce v. Walker,* 139 F.3d 329, 332 (2d Cir.1998) (deprivation of exercise and access to communal religious services did not rise to a level of "an atypical and significant hardship")). [17]

[17]    Second Circuit cases that have found a possible liberty interest in SHU confinements of less

than 101 days are distinguishable because they involved more substantial evidence that the inmate suffered conditions more severe than "normal" SHU restrictions. *Cf. Palmer v. Richards,* 364 F.3d at 66 (77–day SHU confinement could implicate due process rights where plaintiff alleged that he was deprived of his property, personal clothing, grooming equipment, hygienic products, reading and writing materials, communication with his family, personal food and vitamin supplements, and placed in mechanical restraints during escorts); *Welch v. Bartlett,* 196 F.3d 389, 393–94 (2d Cir.1999) (90–day SHU confinement could implicate due process rights where plaintiff alleged that he received inadequate toilet paper, soap and cleaning supplies, a filthy mattress, and infrequent changes of clothes); *Davis v. Barrett,* 576 F.3d at 134–35 (given plaintiff's allegations that (1) his cell had no furniture, and thus all items, including his clothes and food tray, had to be kept on the floor; (2) that his mattress was "infected" with body waste; and (3) that his cell was subject to "daily" flooding, and feces and urine thrown by other inmates, an issue of fact exists as to the actual conditions of plaintiff's 55 days of SHU confinement and summary judgment should not have been granted on his due process claim).

## IV. Denial–of–Religious–Service Claims

### A. Background

**\*15** The Second Amended Complaint (¶ 15) alleges that, on December 26, 2006, plaintiff submitted requests to defendant Racette, the Deputy Superintendent of Security, seeking permission to attend congregate Native American religious ceremonies approximately ten times per year, which request was ignored. Judge Scullin denied defendants' motion to dismiss this First Amendment claim [18] because defendants had not presented any legitimate penological justification for denying plaintiff the opportunity to attend group religious services. *Phillips v. Roy,* 2011 WL 3847625, at \*8. [19]

[18]    In his Report and Recommendation, Magistrate Judge Peebles observed that plaintiff's Second Amended Complaint did not contain a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), although the allegations in the complaint could support such a claim. *Phillips v. Fischer,* 2010 WL 7375637,

at \*10 n. 16. Claims under the RLUIPA are analyzed utilizing principles similar to those which inform the analysis of plaintiff's free exercise claim, although there are subtle distinctions between the two provisions and their application in a prison setting. *See Salahuddin v. Goord,* 467 F.3d 263, 273–74 (2d Cir.2006) (RLUIPA protects inmates by providing that a government shall not "impose a substantial burden" on the "religious exercise" of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means). As noted above, Judge Scullin, after dismissing many of plaintiff's claims under *Fed.R.Civ.P. 12(b)(6),* provided him with an opportunity to file a third amended complaint, which plaintiff chose not to do. Plaintiff's Memorandum of Law (Dkt. No. 139) in opposition to the summary judgment motion did not address defendants' arguments to dismiss the claim based on the denial of plaintiff's request to attend congregate religious services. Accordingly, the court will address plaintiff's claim, as pled in the Second Amended Complaint, as one under the First Amendment. *See, e.g., Jones v. Goord,* 435 F.Supp.2d 221, 259–64 (S.D.N.Y.2006) (declining to address possible RLUIPA claims where plaintiff did not plead one and did not seek to amend to add one).

[19]    Plaintiff also alleged that a facility Rabbi violated his First Amendment rights by denying him the opportunity to engage, in his SHU cell, in "smudging," a Native American religious ceremony. (2d Am.Compl.¶ 15). Judge Scullin dismissed this claim in response to defendants' motion to dismiss. *Phillips v. Roy,* 2011 WL 3847625, at \*8–9.

In support of the defense motion for summary judgment, defendant Racette filed a sworn declaration stating that DOCCS regulations prohibited inmates housed in the SHU from attending congregate religious services. (Racette Decl. ¶¶ 21–24, Dkt. No. 133–13). Dep. Sup. Racette also set forth, in considerable detail, the reasons why he considered plaintiff, in particular, to pose a danger to the safety and security of the facility, which defendant Racette contended provided substantial penological justification for his denial of plaintiff's request to participate in religious services in the general population setting. (*Id.* ¶¶ 25–33). While plaintiff

contests many of the grounds upon which the defendants rely in determining he was a serious security risk, his admitted prior conduct provides substantial penological justification for restricting him from general population activities such as congregate religious services. Accordingly, this court concludes that no reasonable fact finder could conclude that the defendants violated plaintiff's First Amendment rights by excluding him from such religious services.

**B. Applicable Law**

The free exercise clause of the First Amendment affords inmates at least some measure of constitutional protection of their right, in appropriate circumstances, to participate in congregate religious services. *See Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services .") (citing cases). That First Amendment right, however, is limited by valid penological concerns, including those relating to institutional security. *Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system ."); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987); *Salahuddin,* 993 F.2d at 308. As the Second Circuit has observed, the determination of whether a refusal to permit attendance at a religious service impinges upon inmates' First Amendment free exercise right is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003); *Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988).

**\*16** This Circuit has clearly stated that it is error to assume that prison officials are justified in limiting appellant's free exercise rights simply because the prisoner is in disciplinary confinement. *Young v. Coughlin,* 866 F.2d 567 (2nd Cir.1989). As the *Young* court stated: "[N]ot every prisoner in segregation lawfully can be prevented from attending church services in the chapel ... [because] [n]ot all segregated prisoners are potential troublemakers...." *Id.* at 570 (citing *LaReau v. MacDougall,* 473 F.2d 974, 979 n. 9 (2d Cir.1972)). Prison officials must make individual determinations on a case-by-case basis as to the need for exclusion. *Id.* (citing *Leon v. Harris,* 489 F.Supp. 221, 225 (S.D.N.Y.1980)).

**C. Analysis**

By virtue of his position as Deputy Superintendent for Security at Clinton, defendant Racette reviewed, every 60 days, the determination that plaintiff presented a threat to the security of the facility who should remain in administrative segregation in the SHU. (Racette Decl. ¶¶ 8–11). Defendant Racette repeatedly determined that plaintiff continued to create such a security threat, based on, *inter alia:*

> Mr. Phillips' admitted escape from a local, secure facility; his admission to the shooting of three State Police members in an effort to avoid being taken into State custody; his demonstrated admitted ability to remove restraints; his admitted possession of a CB radio while in a State prison; his admitted possession of contraband, including weapons, even while within administrative segregation; his admitted ability to remove his own handcuffs with a simple paper clip; his admitted tampering with locks and other security devices while in administrative segregation; and his many threats to staff and the general security of the facility.

(Racette Decl. ¶¶ 25–26).

Plaintiff denies that he presented a significant security risk in a secure state prison and has offered various explanations of why some of his conduct could not reasonably be perceived as creating a security threat. (Pl.'s Dep. at 88–98). [20]

[20]    For example, plaintiff claimed that a piece of metal, which prison officials classified as a weapon, was only used by him as a weight on the end of a long line which he used to pass items, such as magazines, back and forth between his cell and that of other inmates. (Pl.'s Dep. at 88–92). While plaintiff admitted that he possessed a working, homemade CB radio and local map while previously confined at Auburn prison, he claimed that he only used these items to communicate

driving directions to passing truckers. (Pl.'s Dep. at 17–18). Plaintiff's purported "innocent" uses for such contraband does not eliminate substantial security issues arising from his possession and use of such items.

However, plaintiff has admitted, *inter alia,* that (1) he had previously removed handcuffs and shackles while in custody, using a paperclip (Ad. Seg. Tr. at 8) and he tried to conceal a paperclip at least once while at Clinton (Pl.'s Dep. at 29, 93–94); (2) he had escaped from a county jail by using a stolen screwdriver to cut through the roof (Ad. Seg. Tr. at 13); (3) he formulated and executed his escape plan in as little as three days (Ad. Seg. Tr. at 14); (4) while a fugitive, he wore a stolen New York State Trooper's uniform while he pistol-whipped and threatened a bounty hunter (Ad. Seg. Tr. at 15); (5) although he never intended to kill a police officer, he fired an assault rifle at the camouflaged New York State troopers who were trying to recapture him, killing one of them (Ad. Seg. Tr. at 16); (6) he threatened to kill Lt. Allan at Clinton (Pl.'s Dep. at 110); and (7) he had periodic verbal conflicts while in custody and at least two incidents of fist fights with other inmates (Ad. Seg. Tr. at 7).

**\*17** The conduct which plaintiff admits, before and during his incarceration in state prison, provides ample legitimate penological justification for the conclusion that plaintiff created a substantial risk to the security of the facility and should not be allowed to participate in religious services with the general population of the facility. The court concludes there are no material issues of fact relating to the viability of plaintiff's free-exercise-of-religion claim and recommends that this First Amendment claim be dismissed on summary judgment. *See, e.g., Aliym v. Miles,* 679 F.Supp. 1, 2 (W.D.N.Y.1988) (granting summary judgment dismissing First Amendment claim challenging prison prohibition on attendance at congregate worship services by SHU inmates considered to be a threat to other inmates, staff, and the security of the facility); *Matiyn v. Henderson,* 841 F.2d 31, 37 (2d Cir.1988) ("we agree with the district judge's ... holding that [plaintiff] was prevented from attending communal services [while in administrative segregation] for reasons related to legitimate penological objectives, and that his [First Amendment] claim was therefore without merit"); *O'Lone v. Estate of Shabazz,* 482 U.S. at 350–51 (prison officials did not violate inmate's rights, by assigning him to outside work detail that prevented him from attending weekly congregational service, because rules relating to outside assignments were reasonably related to legitimate penological objectives).

## V. *Medical Indifference Claims*

### A. Background

The tenth cause of action in the Second Amended Complaint accuses Nurse Administrator Brian LeCuyer and Nurse Practitioner Amber Lashway of deliberate indifference to plaintiff's serious medical needs. That claim is based upon the delay in granting plaintiff's request that Neurontin be prescribed for "chronic and severe" back pain, instead of the over-the-counter pain medication he was initially provided. (2d Am.Compl.¶¶ 19–21). Judge Scullin denied defendants' motion to dismiss this claim, finding it "barely plausible," *Phillips v. Roy,* 2011 WL 3847625, at \*10, and Magistrate Judge Peebles noted "it appears likely that plaintiff's deliberate indifference claim does in fact implicate nothing more than a disagreement over the course of treatment [,]" *Phillips v. Fischer,* 2010 WL 7375637, at \*13.

In support of the defense motion for summary judgment, defendants Lashway and LeCuyer have filed sworn declarations and documented plaintiff's medical history. Plaintiff's medical records confirm that, in late January 2007, he complained of back pain and requested Neurontin, which had been prescribed for him during a previous DOCCS confinement in 2004. (Ambulatory Health Record ("AHR"), Dkt. No. 134–2 at 51). Defendant Lashway, a Nurse Practitioner ("N.P.") who then provided primary medical care at Clinton and was authorized to prescribe medication, initially treated plaintiff with over-the-counter pain medications. (Lashway Decl. ¶¶ 4–7, 50, Dkt. No. 134–2; Pl.'s Dep. at 75–76, 79). Defendant Lashway also recommended physical therapy, which plaintiff declined because he exercised regularly in the SHU, which helped him manage his back pain. (*Id.*).

**\*18** Plaintiff originally agreed to conservative treatment without the use of Neurontin, understanding that N.P. Lashway viewed that medication as a "last resort." (Pl.'s Dep. at 74, 75–76). Between January 2007 and March 2008, plaintiff was seen by the medical staff at least 16 times for a variety of medical issues. (AHR, Dkt. No. 134–2 at 42–50). The medical notes indicate that plaintiff complained of back pain twice during this time period, both during the summer of 2007, and he was then prescribed ibuprofen. (AHR, Dkt. No. 134–2 at 45–46).

Medical records indicate that on March 30, 2008, plaintiff again complained of back pain and refused any further over-the-counter pain medication because "they don't

work." (AHR, Dkt. No. 134–2 at 41). [21]  On May 1, 2008, plaintiff was again seen by the medical staff for cervical pain and stated that he had been prescribed Neurontin in the past. (AHR, Dkt. No. 134–2 at 40). The medical staff prescribed Motrin and ordered an x-ray of plaintiff's cervical spine, which was performed on May 6[t], resulting in a diagnosis of spondylolisthesis [22] and a suggested referral for more comprehensive x-rays and an MRI. (Dkt. No. 134–2 at 40, 70–71). On May 23, 2008, plaintiff again requested medication for back pain and was prescribed Motrin. (AHR, Dkt. No. 134–2 at 39). On May 27, 2008, plaintiff told the medical staff he was not getting back pain relief from Motrin and wanted Neurontin prescribed. The provider notes reflected uncertainty about the true level of plaintiff's back pain and stated that plaintiff had been observed doing pull ups and other vigorous exercise in the SHU with no evidence of limping or pain. (AHR, Dkt. No. 134–2 at 38).

[21]    Plaintiff was next seen by the Clinton medical staff on April 9, 2008, based on a complaint of dry lips. (AHR, Dkt. No. 134–2 at 41).

[22]    "Spondylolisthesis is a condition in which a bone (vertebra) in the spine slips out of the proper position onto the bone below it ." PubMed Health, http://www .ncbi.nlm.nih.gov/ pubmedhealth/PMH0002240/.

Plaintiff complained again of back pain on May 30 and June 10, 2008, and he was then scheduled for further x-rays. (AHR, Dkt. No. 134–2 at 36–37). A more thorough series of x-rays was performed on June 18, 2008, resulting in a diagnosis of "severe spondylolisthesis at L5–S 1." (Dkt. No. 134–2 at 74). [23]

[23]    The medical staff discussed an MRI with plaintiff, who advised that he had undergone an MRI during a prior period of confinement at Clinton. The June 19, 2008 medical notes indicated that the staff was going to try to find the report of the prior MRI. (AHR, Dkt. No. 134–2 at 35–36).

On or about June 1, 2008, plaintiff wrote Nurse Administrator LeCuyer complaining that he was being denied medical attention for the pain and numbness caused by compressed discs in his lower back, but he did not specify that he was being denied Neurontin in favor of over-the-counter pain medication. (Dkt. No. 134–3 at 12–13). Defendant LeCuyer was a Registered Nurse ("R.N.") who was responsible for

scheduling nursing care at Clinton; he did not have the authority to provide primary care to inmates or prescribe medication, and was not directly involved in plaintiff's care. (LeCuyer Decl. ¶ ¶ 4–6, 8, Dkt. No. 134–3). R.N. LeCuyer responded to plaintiff's letter on June 3rd, by advising him that he should address his concerns at his next scheduled appointment with his primary care provider. (LeCuyer Decl. ¶ 14). [24]

[24]    Plaintiff's June 1st letter stated that he had, since December 2006, "continually filed grievances concerning my extreme back pain ." In his opposition papers, plaintiff did include a number of his prior grievances about what he viewed as inadequate medical care for a variety of medical problems. (Dkt. No. 139–6 at 80–101). The grievances filed between December 2006 and June 2008 only mentioned delays in treatment for back pain a couple of times, and never complained that he had been denied Neurontin. (Dkt. No. 139–6 at 80, 81, 95, 100).

After plaintiff reported, during three medical appointments in July and August, that Motrin and similar over-the-counter medications were not working, the medical staff prescribed Neurontin, starting on September 4, 2008, which alleviated "98 percent of his back pain." (AHR, Dkt. No. 134–2 at 33–34, 132; Pl.'s Aff. ¶ 101, Dkt. No. 139–3).

**B. Applicable Law**

 **\*19**  In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007)

(quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

**\*20** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215

(2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

**C. Analysis**

This court will assume, without deciding, that there are material issues of fact as to whether the delay in providing different medication to plaintiff to treat his back pain had sufficiently serious medical consequences to satisfy the objective prong of the Eighth Amendment standards for medical care. The court finds, however, that based upon the conclusive evidence regarding the course of plaintiff's medical treatment, he cannot establish that either defendants Lashway or LeCuyer acted with deliberate indifference to his serious medical needs. Accordingly, this court recommends that the plaintiff's claim for constitutionally deficient medical care be dismissed.

Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d at 311. An inmate does not have the right to treatment of his choice. *Ross v. Kelly,* 784 F.Supp. at 45 (citing, *inter alia, Dean v. Coughlin,* 804 F.2d at 215). In order to establish "deliberate indifference," plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin v. Goord,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 835–37). Instead, plaintiff must show that the defendant acted with the equivalent of subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839–40).

The medical records summarized above reflect that the Clinton medical staff did not callously ignore plaintiff's complaint of back pain, but provided a consistent course of treatment. Plaintiff does not dispute that defendant Lashway, his primary care physician, was always willing to provide medication for his back pain, "except for Neurontin." (Pl.'s Dep. at 79). Although plaintiff suggests that the defendants ignored repeated requests for Neurontin for close to two years (2d Am.Compl.¶¶ 19–21), the medical records and grievances indicate that plaintiff did not begin to complain that the over-the-counter medications provided to him were not reasonably managing his back pain until March 2008. [25] Over the next

2013 WL 1024667

five months, the Clinton medical staff ordered x-rays and took other steps to clarify the nature of plaintiff's back problems and the extent of his pain, and then, in early September 2008, agreed to prescribe Neurontin. Even if the delay in changing plaintiff's medication reflected negligence or even malpractice, it does not constitute deliberate indifference. *See, e.g., Estelle v. Gamble,* 429 U.S. at 100–101, 106–107 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice).

25      *See e.g., Emerson v. New York State Dep't of Corr. Servs.,* 9:08–CV–824 (NAM/ATB), 2011 U.S. Dist. LEXIS 116377, at *28 (N.D.N.Y. Sept. 9, 2011) (plaintiff's suggestion that the prison medical staff completely failed to address his pain with medication during parts of 2006 and 2007 does not create an issue of fact in the face of the overwhelming documentary evidence to the contrary—the declarations of his treating doctors, which are, in turn, corroborated by the applicable DOCS medical records) (citing, *inter alia, Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case") (Report–Recommendation), *adopted,* 2011 U.S. Dist. LEXIS 112521 (N.D.N.Y. Sept. 30, 2011); *Brown v. White,* 9:08–CV–200 (GLS/ATB), 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record).

*21     N.P. Lashway advises that the use of the anti-seizure medication Neurontin to treat back pain has not been approved by the FDA and that the drug has a variety of serious adverse side effects, including increasing the risk of suicide and/or violence. (Lashway Decl. ¶¶ 40–46; Pl.'s Dep. at 78). While such use of the drug by a qualified medical provider is allowable, N.P. Lashway contends "it was entirely appropriate to rely upon ... less invasive and dangerous approaches before resorting to off-label usages of Neurontin to treat plaintiff's reported back pain." (Lashway Decl. ¶¶ 43, 46). Plaintiff advised N.P. Lashway that his prior use of Neurontin made him "violent" and that, following his prior release from custody, he decided to wean himself from the use of Neurontin. Plaintiff also told defendant Lashway that, while he was out of jail, he managed his back pain with regular physical exercise and over-the-counter pain medications. (Pl.'s Dep. at 67–69, 76, 78). Nurse Lashway personally observed plaintiff engaging in vigorous physical exercise outside of his SHU cell, and, for a time, concluded that the safest way to manage plaintiff's back pain was a conservative treatment plan of exercise and over-the-counter pain medication. (Lashway Decl. ¶¶ 28–33, 38–39, 46–56).

While plaintiff and N.P. Lashway clearly had a disagreement as to the most appropriate medication to treat plaintiff's back pain, such a disagreement does not constitute deliberate indifference. *See, e.g., Evans v. Manos,* 336 F.Supp.2d 255, 262, 263 (W.D.N.Y.2004) (inmate's opinion that doctor should have prescribed something stronger than Advil and a back brace does not give rise to an issue of fact as to whether his constitutional rights were violated); *Veloz v. New York,* 339 F.Supp.2d 505, 525 (S.D.N.Y.2004) (inmate's disagreement with his medical provider about whether he needed something stronger than Tylenol for his back pain did not constitute deliberate indifference to a serious medical need); *Morrison v. Mamis,* 08 Civ. 4302, 2008 WL 5451639, at *10 (S.D.N.Y. Dec. 18, 2008) (doctor refusing to switch prescription pain killers for an inmate complaining of back pain and migraines does not give rise to an deliberate indifference claim) (Report and Recommendation), *adopted,* 2009 WL 2168845 (S.D.N.Y. July 20, 2009). Nurse Lashway's expressed concerns about the serious side effects of Neurontin, and the fact that defendant admitted the medication had made him violent in the past, properly influenced her professional treatment decisions and strongly rebuts plaintiff's conclusory allegations of deliberate indifference. [26] Defendant Lashway could also reasonably consider the objective evidence that plaintiff was exaggerating his pain—*e.g.,* his observed ability to engage in vigorous exercise without apparent physical limitation or pain—in delaying the prescription of a medication with more serious side effects for an "off-label" use. "The mere fact that [DOCCS] physicians in other facilities may have previously provided plaintiff with some of the treatments and accommodations he demanded at [Clinton] does not render the medical decisions of [N.P. Lashway] 'deliberate indifference.' " *Gillespie v. New York State Dept. of Correctional Services,* 9:08–CV–1339 (TJM/ ATB), 2010 WL 1006634, at *6, (N.D.N.Y. Feb. 22, 2010) (citing cases) (Report–Recommendation), *adopted,* 2010 WL 1006643 (N.D.N.Y. Mar 19, 2010).

26      *Cf. Wright v. Genovese,* 694 F.Supp.2d 137, 160–
61 (N.D.N .Y. Mar. 9, 2010) (concern about
prescribing narcotic pain medication, on which
inmates with possible substance abuse issues
could become dependent, may inform a medical
judgment about what drug to prescribe) (collecting
cases), *aff'd,* 415 F. App'x 313 (2d Cir. Mar. 23,
2011).

**\*22** With respect to defendant LeCuyer, he was not
authorized to provide primary care to inmates or to prescribe
medication. After receiving plaintiff's complaint (which did
not even specify his objections to the medications provided),
R.N. LeCuyer reviewed plaintiff's medical records and saw
no indication that plaintiff was not receiving appropriate
treatment. (LeCuyer Decl. ¶ 25). In the absence of any
evidence that defendant LeCuyer knew that N.P. Lashway
had maliciously denied plaintiff appropriate medication, his
reliance on the medical judgment of plaintiff's primary care
provider could not constitute deliberate indifference. *See, e.g.,
Gillespie v. New York State Dept. of Correctional Services,*
2010 WL 1006634, at \*6 & n. 11 (Nurse–Administrator
who deferred to or confirmed the treatment decisions of the
primary doctor was not deliberately indifferent) (citing *Smith
v. Woods,* 9:05–CV–1439 (LEK/DEP), 2008 WL 788573 at
\*9 (N.D.N.Y. Mar. 20, 2008) (unless other members of the
medical staff knew, or reasonably should have known, that
the primary doctor was engaged in deliberate indifference to
plaintiff's serious medical need, they could not be liable under
the Eighth Amendment for failing to intercede in plaintiff's
care)). 27

27      Defendant LeCuyer would also be entitled to
qualified immunity under these circumstances. *See
Cuoco v. Moritsugu,* 222 F.3d 99, 110–11 (2d
Cir.2000) (prison Health Services Administrator
was entitled summary judgment on qualified
immunity grounds because there was no evidence
that, as a non-doctor, he had the authority to
intervene in an admittedly medical decision made
by qualified professionals).

## VI. *Retaliation/Conditions–of–Confinement Claims*

### A. Background

The fifteenth cause of action in the Second Amended
Complaint accuses defendants William Allan and Maureen
Bosco of conspiring to retaliate against plaintiff for filing

prior grievances against them, by causing plaintiff to be held
for observation in the Office of Mental Health ("OMH")
Unit at Clinton, where he was allegedly subjected to cruel
and unusual conditions of confinement for three days. (*See
also* 2d Am. Compl. ¶¶ 26–29). The nineteenth cause of
action alleges that defendant Allan further retaliated against
plaintiff by causing him to be moved to a different SHU
company which was unsanitary and excessively noisy, in
violation of plaintiff's Eighth Amendment rights. (*See also*
2d Am. Compl. ¶ 32). Plaintiff's twenty-sixth cause of
action charges defendant Allan and Donald Uhler with
punishing plaintiff with frequent "retaliatory" transfers to
various SHU cells at Clinton which subjected plaintiff to
severe mental and emotional distress, again contrary to the
Eighth Amendment. (*See also* 2d Am. Compl. ¶¶ 32, 39–
40). Magistrate Judge Peebles and Senior District Judge
Scullin construed these overlapping causes of action as
stating plausible First Amendment retaliation claims and/or
Eighth Amendment claims of unconstitutional conditional of
confinement. *Phillips v. Fischer,* 2010 WL 7375637, at \*14–
15, 16–18; *Phillips v. Roy,* 2011 WL 3847265, at \*12, 14–15.

On November 30, 2007, pursuant to an administrative mail
watch targeting plaintiff, Lt. Allan intercepted an outgoing
letter in which plaintiff suggested that he was considering
hanging himself. (Allan Decl. ¶¶ 80–83, Dkt. No. 133–1). In
support of their motions for summary judgment, defendants
Bosco and Allan argue that the suicidal reference in this
letter provided a clear, non-retaliatory reason for their referral
of plaintiff to OHM observation. They further contend that
neither defendant had any influence or control over the
conditions of plaintiff's brief OMH confinement. (Defs.'
Mem. of Law at 27–29, 31–32). This court agrees with the
defendants' position and recommends granting their motion
for summary judgment with respect to the fifteenth cause of
action.

**\*23** With respect to the nineteenth and twenty-sixth causes
of action, defendants Allan and Uhler argue that the clear
security threat that plaintiff posed to the facility established
a non-retaliatory reason for his various cell transfers, and
contend that transfers among similar cells in the same SHU
unit could not constitute "adverse action" that would support
a retaliation claim. (Defs.' Mem. of Law at 29–31). The
court recommends dismissal of the retaliation claim based
on the conclusion that, even if the defendants harbored
some retaliatory intentions, the plaintiff would still have
been periodically transferred between different SHU cells for
legitimate penological reasons. Defendants Allan and Uhler

Phillips v. LeCuyer, Not Reported in F.Supp.2d (2013)

2013 WL 1024667

further argue that plaintiff cannot demonstrate that they were aware of or responsible for the conditions of confinement in the various SHU cells to which plaintiff was assigned during his confinement at Clinton. (Defs.' Mem. of Law at 31–32). This court concludes that there are disputed issues of material fact with respect to defendant Allan and Uhler's personal involvement in the conditions of plaintiff's SHU confinement, and concludes that the Eighth Amendment claims against them should not be dismissed.

### B. Applicable Law

#### 1. Retaliation

In order to establish a viable claim of retaliation under the First Amendment, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion in matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)).

#### 2. Conditions of Confinement

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to

an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

**\*24** "The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. at 298). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.199) (citing *Hudson v. McMillan,* 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway,* 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

#### 3. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability for any constitutional claim. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d at 152–53 (stating that defendant could be liable under section 1983 if he failed to remedy a constitutional violation after learning of it, or was grossly negligent in managing subordinates who caused violation); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

### C. Application

#### 1. Confinement for OMH Observation

**\*25** Plaintiff alleges that in August 2007, he filed a complaint with defendant Bosco, the OHM Unit Chief at Clinton, accusing her of "purposeful neglect" of mentally ill inmates housed in SHU, including a specific neighbor of plaintiff who created frequent disturbances and unsanitary conditions, by smearing feces over his body and cell. (2d Am.Compl.¶ 27). Defendant Bosco allegedly ignored the letter, but, when later making rounds in SHU, told plaintiff to "mind your own business." (*Id.*).

On Friday, November 30, 2007, plaintiff was escorted to OMH for an interview with defendant Bosco about his "suicide note." Plaintiff stated that "he may be a bit 'homicidal' occasionally (jokingly) but never suicidal" and demanded to see the note. When defendant Bosco declined to show plaintiff the note, plaintiff told her "since she wanted to play games, she would be in his lawsuit." (2d Am.Compl.¶ 28). Stating that she felt "threatened," Ms. Bosco terminated the interview and advised plaintiff that she would hold plaintiff for observation over the weekend. (*Id.;* Pl.'s 12/26/2007 Grievance at 3, Dkt. No. 139–4 at 130).

Plaintiff, allowed to wear only a patient smock, was then placed, by other staff members, in a mental health cell for observation for a period of three days, subjecting him to a cell that was "bitter" cold and filthy, infested with cockroaches, with walls smeared with feces, a sink filled with feces, urine in puddles on the floor, an inoperable toilet "full of shit," and no toilet paper, soap, or other hygiene products. (2d Am.Compl.¶

29). Plaintiff complained about his condition to unknown prison/OMH staff over the weekend, but was not released back to the SHU until the following Monday, after being told by someone on the OHM staff that it was a "grave error" to place him on a suicide watch. (*Id.*).

Lt. Allan, who was supervising an ongoing "mail watch" of plaintiff's correspondence, has stated that he referred plaintiff to OMH for an evaluation after reviewing an outgoing letter from plaintiff which stated, in pertinent part:

> I am sooo [sic] overwhelmed with grieving—may be [sic] I'll hang up—but I'll have to jerk-off while I'm doin' it—may be [sic] I'll die with a stiff cock. Then they can photograph that and give the pictures to their wives and daughters to prove mine is bigger!

(Allan Decl. ¶ 82, Dkt. No. 133–1; Pl.'s 11/29/07 Ltr. at 3, Dkt. No. 133–3 at 37). Lt. Allan noted that "hanging up" is prison slang for attempted suicide by hanging and is a basis for a mental health referral, specifically listed on the appropriate DOCCS form. (Allan Decl. ¶ 83; 11/30/07 Mental Health Referral, Dkt. No. 133–3 at 33). Plaintiff has since admitted writing the letter, knowing that he was subject to a mail watch, and acknowledges that his letter was the basis for Lt. Allan's OMH referral. (Pl.'s Dep. at 83–84). Although plaintiff alleged that Lt. Allan retaliated against him in various ways for "filing grievances against the administration" and for what plaintiff was "writing in [his] letters[,]" plaintiff does not specifically identify grievances or written complaints directed to or focused on defendant Allan prior to November 2007. (2d Am. Compl. ¶¶ 32, 35; Pl.'s Aff. ¶¶ 103–105, Dkt. No. 139–3 at 19–20). [28]

[28]  Plaintiff did file grievances and complaints explicitly relating to Lt. Allan well after plaintiff's referral to OMH in November 2007. (*See, e.g.,* Pl.'s 11/14/08 Grievance, Dkt. No. 133–3 at 63–69).

**\*26** Lt. Allan contends that, after making the referral, he had no responsibility over whether the mental health professionals at OMH would keep plaintiff for observation or treatment, or over the conditions under which plaintiff might be housed in the OMH. (Allan Decl. ¶¶ 87–90). During his deposition, plaintiff testified that he did not know whether Lt. Allan had

2013 WL 1024667

any responsibility for the condition of the OMH observation cells. (Pl.'s Dep. at 85).

Defendant Bosco is a licensed social worker with a master's degree in that field. (Bosco Decl. ¶ 3, Dkt. No. 134–1). On November 30, 2007, she read Lt. Allan's OMH referral and plaintiff's letter with the reference to "hanging up" and decided to interview plaintiff to assess his mental health, and in particular, his suicide risk. (Bosco Decl. ¶ 29–30). Plaintiff denied being suicidal, but stated he "may be 'homicidal' occasionally" and threatened to sue defendant Bosco. As documented by her contemporaneous medical records, defendant Bosco determined that, because of plaintiff's failure to cooperate with the interview, she could not complete a proper assessment of plaintiff. (Bosco Decl. ¶¶ 31–36, 38; Dkt. No. 134–1 at 21–25). Accordingly, she terminated plaintiff's interview and directed that he be admitted to the OMH observation unit "in a safe holding environment in order to assess his level of suicidality." (*Id.*). Defendant Bosco contends that she placed plaintiff in OMH observation to ensure that his mental health needs were being appropriately addressed, not because of any retaliatory motivation regarding plaintiff's prior complaints. (Bosco Decl. ¶ 25).[29] She acknowledges that, following further observation and interviews by other OMH staff, it was determined that "plaintiff was no longer in need of Mental Health Services and he was discharged" back to the SHU on or about December 3, 2007. (Bosco Decl. ¶ 39 & Dkt. No. 134–1 at 28–41).[30]

[29]    Defendant Bosco appears to acknowledge that plaintiff made prior complaints about OMH's failure to prevent mental health patients from creating disruptive and unsanitary conditions in the Clinton SHU. She stated that, while it was not unusual for her to receive complaints from inmates, to the extent plaintiff was complaining about matters within her area of responsibility, "nothing in Mr. Phillip's complaint demonstrated real insight worthy of any particular note." (Bosco Decl. ¶¶ 17–23).

[30]    Plaintiff was moved to a second OMH observation cell on December 2, 2007, after three days of confinement in the first cell about which he complained. He was transferred back to the SHU on December 3rd. (Internal Movement History, Dkt. No. 133–8 at 2).

Defendant Bosco has stated that she did not direct that plaintiff be assigned to any particular observation cell in the OMH, and that she was not directly responsible for his continuing observations while he was in OMH. (Bosco Decl. ¶¶ 41–42). She stated that she had no responsibility for the day-to-day conditions of the observation cells, and that she relied on other OMH and DOCCS staff "to assess and address plaintiff's needs while house in an OBS cell ." (Bosco Decl. ¶¶ 22, 42). As noted above, plaintiff complained about the conditions in his observation cell to OMH/DOCCS staff other than defendants Bosco and Allan, and he acknowledged that he was "not sure" that Chief Bosco had any responsibility for the condition of those cells. (Pl.'s Dep. at 85).

### a. Retaliation Claim

The undisputed facts in the record establish that the suicidal ideations referenced in plaintiff's letter and his failure to cooperate with his mental health assessment provided a clear, non-retaliatory basis for defendant Allan to make the referral to OMH and for defendant Bosco to order plaintiff to be held over the weekend for observation. Whether or not plaintiff's letter reflected sincere thoughts of suicide, the DOCCS/OHM staff would have been derelict in their duties to ignore the evidence that plaintiff might resort to self-harm. Even if either defendant harbored any retaliatory motives—and plaintiff's conclusory allegations are extremely thin in that regard[31]—his First Amendment claims fail because no reasonable fact finder would conclude that the defendants would not have taken the same actions based on the indications that plaintiff presented a suicide risk. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone); *Watson v. Wright,* 9:08–CV–62 (NAM/ATB), 2011 WL 4527789, at *11–12 (N.D.N.Y. Aug. 4, 2011) (the defendant physician provided rational, medically-based reasons for stopping plaintiff's medication; even if plaintiff had made a showing of retaliatory or discriminatory motive, defendants would avoid liability under section 1983 because they have demonstrated that they would have made the same treatment decision, even in the absence of the allegedly improper motivation) (Report—Recommendation), *adopted,* 2011 WL 4528931 (N.D.N.Y. Sept. 28, 2011). The retaliation claim against defendant Allan would also be subject to dismissal on the independent ground that he lacked the responsibility or authority to make the medical determination that plaintiff should be admitted for OMH observation.[32]

31    Plaintiff's conclusory and general allegations that defendants Allan and Bosco conspired to retaliate against him are insufficient to support a viable Section 1983 claim. A civil rights conspiracy must be proven with specificity, as bare claims of illegal agreement, supported only by allegations of conduct easily explained as individual action, are insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 662 (2009). *See also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

32    *See, e.g., McQuilkin v. Central New York Psychiatric Center,* 9:08–CV–975 (TJM/DEP), 2010 WL 3765847, at *15 (N.D.N.Y. Aug. 27, 2010)* (plaintiff's claim that he was transferred to a psychiatric facility, in retaliation for serving a notice of summons on the prison superintendent, fails because the record reflects that the transfer decision was made by OHM care providers following an evaluation of plaintiff's mental status) (Report–Recommendation), *adopted,* 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010). *See also Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) (because they lack the authority to intervene in medical decisions, the failure of non-doctors at a prison to intercede in the medical treatment of an inmate is not unreasonable and supports summary judgment on qualified immunity grounds).

**b. Conditions–of–Confinement Claim**

**\*27** With respect to plaintiff's Eighth Amendment claims regarding the conditions in his observation cell, defendants Allan or Bosco both allege that they had neither control over, nor responsibility for, the conditions of plaintiff's confinement during the weekend he spent in the OMH. Plaintiff acknowledges that he interacted with OHM/DOCCS staff other than the named defendants with respect to the conditions in his OMH cell, and he provides no evidence of Lt. Allan or Chief Bosco's personal involvement. Accordingly, this court recommends that plaintiff's possible Eighth Amendment claim regarding his OMH incarceration

for three days be dismissed. *See, e.g., Green v. Bauvi,* 792 F.Supp. 928, 941–942 (S.D.N.Y.1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions); *Gonzales v. Carpenter,* 9:08–CV–629 (LEK/ATB), 2011 WL 768990, at *5 (N.D.N.Y. Jan. 3, 2011) (in the absence of any factual allegations that the defendant correctional officer had any control over the conditions in the OMH satellite unit in another facility, the 1983 claims against him based on plaintiff's confinement there should be dismissed for lack of personal involvement) (Report–Recommendation), *adopted,* 2011 WL 767546 (N .D.N.Y. Feb. 25, 2011).

**2. Cell Transfers Within the SHU**

Plaintiff alleges that defendants Uhler and Allan subjected him to "excessive cell moves" within the Clinton SHU "based on retaliatory harassment." These cell transfers resulted in plaintiff's confinement in filthy and unsanitary cells, previously occupied by mentally ill inmates who "made it a point to splash 'feces' about the cell" or cells "in proximity to seriously mentally ill who created an atmosphere of continuous noise and unsanitary living conditions." (2d Am.Compl.¶¶ 32, 39).

The Second Amended Complaint specifically references the December 26, 2007 transfer of plaintiff from an "open cell" to a "shielded cell" on a company "used for assaultive and disruptive inmates ....*" (2d Am.Compl.¶ 32). Plaintiff claims that defendant Uhler explained the transfer by telling him: "I'd say Lt. Allan doesn't care for what your [sic] writing in your letters, but don't quote me on it." (*Id.*). The Second Amended Complaint also points to a "retaliatory" cell transfer by defendant Uhler, on or about June 19, 2008, that placed plaintiff in a filthy cell (# 3) previously occupied by a mentally ill inmate. (2d Am.Compl.¶ 40). Prior to this transfer, plaintiff admittedly provoked a verbal confrontation with a neighboring, mentally ill inmate and then "exploded abrasively verbally towards defendant [Uhler] until he left the company." Shortly thereafter, plaintiff claims, a correction officer told him he was moving and said: "You know better than to speak to the captain that way." (*Id.*).

Over the two and one-half years between the time of his arrival at Clinton and the date on which he filed the Second Amended Complaint,[33] plaintiff was moved a total of nine times between nine different SHU cells. (Allan Decl. ¶ 55; Internal Movement History, Dkt. No. 133–8 at 2). Defendants

Uhler and Allan contend that plaintiff was periodically moved between SHU cells in an effort to address the serious security risk that he posed and to interdict his antisocial behaviors. (Uhler Decl. ¶¶ 30–32, 34, 36–39, Dkt. No. 133–14; Allan Decl. ¶¶ 45, 48, 50–51). As Lt. Allan explained, DOCCS' policy to move SHU inmates

33    Plaintiff has acknowledged that as the relevant time frame relating to his claims of excessive cell moves. (Pl.'s Dep. at 86).

**\*28** enhances security of the prison by trying to limit the opportunities of inmates in a particular cell location from forming alliances with the immediately neighboring inmates, by limiting the opportunity of an inmate to become so familiar with a particular cell as to develop and attempt an escape, by limiting the opportunity of an inmate to manipulate fixtures and other features of the cell to create and secret contraband including weapons, by interfering with the inmates' ability to have a steady supply from [sic] contraband, by limiting the ability of the inmate to supply contraband to other inmates, by providing additional opportunities for staff to discover contraband, by congregating inmates who need additional supervision in areas of enhanced security and observation, and by allowing staff to utilize the variety of security features which are available in differing cells.
(Allan Decl. ¶ 51). The determination of the particular cell to which a SHU inmate will be reassigned, and who his neighboring inmates may be, are usually strongly influenced by the availability of cell space; and a cell transfer of one inmate often requires that other inmates be moved at the same time. (5/6/2008 Uhler Mem. to Artus, Dkt. No. 139–5 at 57; 7/20/200[8] Uhler Mem. to Artus, Dkt. No. 139–5 at 37; Pl.'s Dep. at 109).

In explaining the specific concerns that prompted plaintiff's periodic cell transfers, the defendants point to plaintiff's prior history of escapes and the commission of homicide and other violent crimes, as summarized above, which provided the basis for his confinement in administrative segregation. (Allan Decl. ¶¶ 12–22). They also describe plaintiff's checkered disciplinary history at Clinton, which included numerous incidents of threats to assault and kill staff; [34] verbal harassment of other inmates and staff; intentionally damaging or tampering with cell doors and locks; [35] possession of contraband, including weapons, paper clips (which plaintiff claims he can use to escape from restraints), and materials used to surreptitiously exchange items between inmates in different cells; and violating prison rules by using mail to harass and threaten others, and to solicit personal advice about a DOCCS employee. (Allan Decl. ¶¶ 25–38, 42–43 & Exs. C–F, Dkt. Nos. 133–4–134–7; Uhler Decl. ¶¶ 31, 35–38).

34    Plaintiff was transferred to a new cell on February 18, 2009, the same day he was charged with throwing a food tray at a correction officer and threatening to throw feces at him. (Allan Decl. ¶ 30 & Ex. F, Dkt. No. 133–7). According to Capt. Uhler, plaintiff was, in some instances, transferred to cells "which had security features which would limit his ability to tamper with cell doors, and would allow, among other things, Plexiglas shields to be put in place in an effort to limit his ability to assault staff with food, urine and feces, which plaintiff would often threaten to do and reportedly did from time to time." (Uhler Decl. ¶ 36).

35    Defendant Allan alleges that plaintiff's November 10, 2008 transfer resulted from damage to the door in his cell and the need to move plaintiff so it could be repaired. (Allan Decl. ¶ 28–29 & Dkt. No. 133–3 at 63–69).

In contemporaneous internal responses to plaintiff's complaints, defendant Uhler explains the reasoning behind the two cell transfers that plaintiff specifically discusses in the Second Amended Complaint. In a May 6, 2008 Memorandum to Clinton Superintendent Artus, Capt. Uhler states that plaintiff was moved to 1 Company, 1 Cell on December 26, 2007, because he was caught attempting to smuggle mail out of the facility through another inmate, which resulted in a guilty disposition on a misbehavior report. (Dkt. No. 139–5 at 57; *see also* Allan Decl., Ex. D, Dkt. No. 133–5). In a July 20, 2008 Memorandum, [36] Capt. Uhler informs Sup. Artus that plaintiff's June 19, 2008 transfer from SHU 9 cell to SHU 3 cell "was clearly based on security reasons" because inmate Phillips was a "high escape risk" and it is "appropriate to periodically move such inmate[ ] due to his history." (Dkt. No. 139–5 at 37).

36    This memorandum is dated "7/20/07, but it is clear from the context of the document that it was created in 2008.

**\*29** During his deposition, plaintiff acknowledged that some of his cell movements likely related to his damaging the doors or tampering with the locks to his cells (Pl.'s Dep. at 88,

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 804 of 830

95–97, 104–105); his possession of "weapons" or materials used to exchange items with inmates in other cells (Pl.'s Dep. at 88–91); and his threat to kill Lt. Allan and other threats and verbal outbursts directed at staff (Pl.'s Dep. at 110, 114, 116–18). Plaintiff claims, however, that, in causing his periodic transfers between SHU cells, defendants Uhler and Allan acted with a retaliatory motive because of the frequent complaints and grievances he filed. Plaintiff did, in fact, file numerous grievances and complaints during his tenure at Clinton, and Lt. Allan and Capt. Uhler were sometimes the subjects or recipients of those grievances and/ or were periodically involved in responding to them. (*See, e.g.,* Pl.'s 1/11/2008 Ltr. to Uhler, Dkt. No. 139–5 at 55–56; Pl.'s 1/17/2008 Ltr. to Uhler, Dkt. No. 139–5 at 51–54; Pl.'s 1/23/2008 Ltr. to Uhler, Dkt. No. 139–5 at 48–50; 2/7/2008 Uhler Mem. to Phillips, Dkt. No. 139–5 at 46; Pl.'s 4/14/2008 Grievance, Dkt. No. 139–5 at 8–13; Pl.'s 4/23/2008 Ltr. to Uhler, Dkt. No. 139–5 at 62–64; 5/19/2008 revised Uhler Mem. to Phillips, Dkt. No. 139–5 at 34; Pl.'s 7/9/2008 Ltr. to Fischer, Dkt. No. 139–5 at 41–44; 7/22/2008 Allan Mem. to DSS Racette, Dkt. No. 139–4 at 111; 7/27/200[8] Uhler Mem. to Artus, Dkt. No. 139–5 at 37; Pl.'s 11/10/2008 Grievance, Dkt. No. 139–5 at 14–19; 11/20/2008 Allan Mem. to Uhler, Dkt. No. 133–3 at 66; 2/3/2009 Uhler Mem. to Artus, Dkt. No. 139–5 at 36).

Starting in September 2007, plaintiff frequently filed grievances and complaints that he was housed in SHU near mentally ill patients who allegedly created constant noise and disturbances and who generated a terrible stench because of their poor personal hygiene and their tendency to smear feces about their cells. Pl.'s 9/6/2007 Grievance, Dkt. No. 133–14 at 38–41; Pl.'s 10/9/2007 Grievance, Dkt. No. 133–14 at 49–52; Pl.'s 4/10/2008 Ltr. to Artus, Dkt. No. 139–5 at 26–28; Pl.'s 4/11/2008 Ltr. to LeClaire, Dkt. No. 139–5 at 29–31; Pl.'s 4/23/2008 Ltr. to Uhler, Dkt. No. 139–5 at 62–64; Pl.'s 7/9/2008 Ltr. to Fischer, Dkt. No. 139–5 at 41–44; Pl.'s 9/23/2008 Ltr. to LaValley, Dkt. No. 139–6 at 137–39). Capt. Uhler and Lt. Allan were involved in investigating some of plaintiff's specific grievances about the unsanitary conditions in and around his SHU cell and contended that remedial action had been taken or that plaintiff's complaints were unfounded. (Uhler Decl. ¶¶ 14, 18–19, 23–25 & Ex. B, Dkt. No. 133–14 at 38–73; 5/19/2008 r evised Uhler Mem. to Phillips, Dkt. No. 139–5 at 34; 7/20/200[8] Uhler Mem. to Artus, Dkt. No. 139–5 at 37; Allan Decl. ¶¶ 67– 70). Plaintiff contends that the defendants' responses to his complaints were often completely inadequate. For example, after plaintiff complained that a neighboring inmate created

a sickening smell by smearing feces in his cell, the staff responded by hosing down the cell, but plaintiff claims that the staff left fecal matter in the corridor which was not removed for another two days, despite frequent complaints. (Pl.'s 10/9/2007 Grievance, Dkt. No. 133–14 at 50).

**\*30** Defendants Allan acknowledges that he has supervisory responsibility with respect to the Clinton SHU, and Capt. Uhler has stated that he made daily rounds of the SHU. (Allan Decl. ¶ 5; 5/6/2008 Uhler Mem. to Artus, Dkt. No. 139– 5 at 57; 5/19/08 Uhler revised Mem. to Phillips, Dkt. No. 139–5 at 34). However, these defendants contend that they reasonably relied on subordinate staff to ensure the day-to-day cleanliness of SHU cells and were not personally involved in, or responsible for, any unsanitary or other adverse conditions that plaintiff may have been exposed to. (Uhler Decl. ¶¶ 12– 13; Allan Decl. ¶¶ 65–66, 71–72).

Plaintiff acknowledged that Lt. Allan and Capt. Uhler delegated responsibility to subordinate staff to clean cells, but stated that Lt. Allan was informed about whether cells were cleaned. (Pl.'s Dep. at 100–101). Although Clinton SHU inmates were not provided opportunities to periodically clean their cells when plaintiff first arrived, they were allowed to do so following plaintiff's September 6, 2007 grievance, and were then offered cleaning supplies three times per week. (Pl.'s Dep. at 101–102). [37] Plaintiff acknowledged that the cleanliness of the SHU company, as opposed to individual cells, improved somewhat thereafter. (Pl.'s Dep. at 102). Plaintiff was provided an opportunity to thoroughly clean each new cell to which he was moved, and, as long as he had soap and shampoo, he cleaned his cell daily. (Pl.'s Dep. at 101, 103).

[37]     The response to plaintiff's September 6, 2007 grievance corroborates his position that SHU inmates were given regular opportunities to clean their cells only after he complained. (Dkt. No. 133– 14 at 41, 42).

However, plaintiff alleges that, notwithstanding DOCCS' claims that SHU cells are cleaned before an inmate is transferred in, each cell to which he was moved after leaving his first SHU cell was "filthy" and/or "disgusting," and sometimes unsanitary and smeared with human waste. (Pl.'s Dep. at 101; Pl.'s Aff. ¶ 106; Pl .'s Mem. of Law at 28). As noted above, the Second Amended Complaint (¶ 40) alleges that, on June 19, 2008, plaintiff was transferred to a "filthy" cell previously occupied by a mental health inmate. (*See*

*also* Pl.'s 7/9/2008 Ltr. to Fischer, Dkt. No. 139–5 at 41–44). Plaintiff specifically alleges that he was moved, on November 10, 2008, into # 13 Cell, which was "splattered" with feces from ceiling to floor and had a toilet "caked" with feces, notwithstanding the claim that the "third man" on the SHU staff cleaned the cell. (Pl.'s 11/10/2008 Grievance, Dkt. No. 133–3 at 63–68). [38] In his March 8, 2009 grievance, plaintiff renewed his complaint that the DOCCS staff was not cleaning the company, as claimed, and the company had a stench from unwashed bodies and fruit flies. (Dkt. No. 133–14 at 68–73).

[38] Plaintiff's September 6, 2007 and October 9, 2007 grievances complained of the stench from cell # 13 when it was occupied by a "mental health inmate" who purportedly defecated in the corner of his cell and smeared feces on the walls. (Dkt. No. 133–14 at 38–41, 49–52).

### a. Retaliation Claim

The facts in the record clearly establish that defendants Uhler and Allan had a strong, legitimate penological basis for periodically transferring plaintiff between different SHU cells. [39] In many instances, plaintiff concedes that particular cell transfers resulted from specific instances of his misconduct or anti-social behavior, which would not constitute protected activity under the First Amendment.

[39] The court will assume, as Judge Scullin did, that a cell transfer within the same SHU unit can constitute "adverse action" for the purposes of a retaliation claim. Particularly in light of the fact that plaintiff alleges that he was transferred to cells that were, unlike his first SHU cell, filthy and unsanitary, that appears to be a reasonable assumption. *Phillips v. Roy,* 2011 WL 3847265, at *11 (*citing Holmes v. Grant,* 03 Civ. 3426, 2006 WL 851753, at *15 (S.D.N.Y. Mar. 31, 2006) (a transfer to SHU, which the plaintiff alleged to be noisy and unhygenic, could serve as the basis for a retaliation claim).

**\*31** Clearly, during the relevant time period that plaintiff was being transferred among SHU cells, plaintiff also engaged in protected conduct, such as filing grievances and written complaints. However, while the fact that protected activity was close in time to an adverse action can establish a causal connection that suggests retaliation, such circumstantial evidence of retaliation, without more, is insufficient to survive summary judgment. *See, e.g., Roseboro*

*v. Gillespie,* 791 F.Supp.2d 353, 370–71 (S.D.N.Y.2011) (collecting cases). For a prolific author of grievances and complaints like this plaintiff, relying solely on the temporal link between a protected communication and an adverse action to establish causation would make every adverse action by prison officials, no matter how strongly supported by penological justification, an act of retaliation. Given that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration," *Bennett v. Goord,* 343 F.3d at 137, inferences of retaliation must have less tenuous factual support.

Plaintiff makes but one factual allegation that, in his mind, suggests a causal link between truly protected speech and a SHU cell transfer, on December 26, 2007: he claims that, when plaintiff inquired why he was being moved, Capt. Uhler stated: "I'd say Lt. Allan doesn't care for what your [sic] writing in your letters ...." (2d Am.Compl.¶ 32). However, as documented above, the December 26, 2007 transfer immediately followed the issuance of a misbehavior report against plaintiff for attempting to kite a letter to another DOCCS inmate, which disciplinary charge was later sustained at a hearing. (Dkt. No. 139–5 at 57; *see also* Allan Decl., Ex. D, Dkt. No. 133–5). That violation followed another disciplinary infraction in October 2007 involving an outgoing letter written by plaintiff which included threats, harassment, and solicitation of violent conduct. (Allan Decl. ¶ 25 & Ex. C, Dkt. No. 133–4). Given that Lt. Allan supervised the mail watch of plaintiff's correspondence, Capt. Uhler's reference to what plaintiff was "writing in his letters" clearly refers to plaintiff's violation of prison correspondence rules, not letters he wrote complaining about prison conditions. [40] Plaintiff's disciplinary infractions involving personal correspondence clearly do not constitute protected activity and would provide a clear, non-retaliatory reason to move plaintiff to another cell. Moreover, as the Second Amended Complaint notes (at ¶ 32), the December 26, 2007 transfer moved plaintiff into a "shielded" cell with an additional security feature, which would be penologically justified given the strong evidence that plaintiff presented a serious security threat. (*See* Uhler Decl. ¶ 36).

[40] It should also be noted, based on plaintiff's various grievances and complaints and the DOCCS responses to them, referenced above, that, although plaintiff had submitted several grievances before his December 2007 transfer, his flurry of letters of complaint to various DOCCS officials did

not start until January 2008. It is also clear that, while Lt. Allan was primarily involved in the mail watch of plaintiff, he played a much less active role than Capt. Uhler in responding to plaintiff's various grievances and complaints, which further demonstrates that Capt. Uhler's reference to Lt. Allan's reaction to plaintiff's letters related to plaintiff's abusive outgoing personal correspondence, not letters of complaint to DOCCS.

Based on the current record, this court concludes that, even if the defendants harbored some retaliatory motives, no reasonable fact finder would conclude that the defendants would not have made the cell transfers based on the security risk posed by the plaintiff and/or his particular misconduct. Accordingly, this court recommends that plaintiff's retaliation claim against defendants Uhler and Allan be dismissed. *See Bennett v. Goord,* 343 F.3d at 137 (DOCS defendants may avoid liability on a section 1983 retaliation claim if they demonstrate that they would have taken the same adverse action against the plaintiff even if he had not engaged in protected conduct) (citing *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. at 287).

### b. Conditions–of–Confinement Claim

**\*32** As noted, defendants Uhler and Allan have moved to dismiss the Eighth Amendment claim against them on the basis that they were not personally involved with respect to the condition of plaintiff's SHU confinement because they reasonably relied on subordinate staff to maintain the SHU unit in a sanitary and otherwise constitutionally adequate manner. (Defs.' Mem. of Law at 32). The defendants do not argue that no rational fact finder could conclude that plaintiff could otherwise satisfy the objective and subjective components of his conditions-of-confinement claim.[41]

[41]    There would appear to be material issues of fact with respect to each prong of the Eighth Amendment analysis. Transferring plaintiff to SHU cells that were smeared with human feces or where he was subjected to the smell of feces from neighboring cells, could qualify as creating a substantial risk of harm to the plaintiff's health. *See, e.g., Samms v. Fischer,* 9:10–CV–0349 (GTS/GHL), 2011 WL 3876528, at \*14 (N.D.N.Y. Mar. 25, 2011) (plaintiff's allegations that there were "human feces smeared all over the rec cages" over a period of several months and that he

had to "smell and breath[e] in the atrocious odor of feces being thrown" are sufficient to plausibly suggest that plaintiff was subjected to unconstitutional conditions of confinement) (*citing Gaston v. Coughlin,* 249 F.3d 156, 166 (2d Cir.2001) (finding that triable issue of fact existed where prisoner alleged that he was, *inter alia,* exposed, for several days, to human feces directly in front of his cell) (Report–Recommendation), *adopted,* 2011 WL 3876522 (N.D.N.Y. Aug. 31, 2011). The defendants' declarations suggest that they responded appropriately when the plaintiff complained about unsanitary and disruptive conditions in the SHU, but plaintiff asserts that the unsanitary conditions persisted and recurred despite repeated complaints. That would create an issue of fact as to whether the defendants acted with "deliberate indifference," which would also preclude summary judgment, including on the grounds of claimed qualified immunity.

The court concludes that, at a minimum, there are material issues of fact as to whether defendants Uhler and Allan were personally involved with respect to the objectionable conditions of plaintiff's SHU confinement at Clinton. As discussed above, Capt. Uhler and Lt. Allan were clearly aware of and involved in addressing many of plaintiff's frequent complaint about the conditions of his confinement. By virtue of making frequent rounds in the SHU and/or follow-up communications with plaintiff, they were in a position to learn whether offensive or unsanitary conditions were, in fact, adequately addressed by their subordinate staff. The factual dispute between the defendants and the plaintiff as to whether the allegedly unconstitutional conditions of confinement persisted or recurred creates an issue of fact as to whether Capt. Uhler and Lt. Allan were personally involved in that they "failed to remedy the wrong" or were "grossly negligent in managing subordinates who caused the unlawful condition[s]." *Williams v. Smith,* 781 F.2d at 323–24. *See, e.g., Gaston v. Coughlin,* 249 F.3d 156, 166 (2d Cir.2001) (plaintiff's statement that the defendants had actual knowledge of the inhumane conditions to which he was subjected in SHU—which we were not conclusory because it was premised on the assertion that those men "made daily rounds" of SHU—should have led the district court to deny summary judgment with respect to plaintiff's Eighth Amendment claim). Accordingly, this court recommends that the motion for summary judgment be denied with respect to plaintiff's conditions-of-confinement claim against defendants Uhler and Allan.

## VII. *Motion for Appointment of Counsel*

Plaintiff has filed a fourth motion for appointment of counsel in this action. (Dkt. No. 140). Senior District Judge Scullin, Magistrate Judge Peebles, and this court have each denied a previous motion for appointment of counsel by plaintiff at various stages of the litigation. (Dkt.Nos.7, 11, 130). Each prior order has reviewed the relevant legal standards for appointment of counsel to indigent plaintiffs and concluded both that this action is not unduly complex and that plaintiff has shown that he has been able to effectively litigate this action. Plaintiff has continued to demonstrate the ability to effectively litigate this action in connection with the pending motion for summary judgment.

**\*33** My last order denied plaintiff's motion for appointment of counsel "without prejudice to renew at the time of the trial in this matter." (Dkt. No. 130 at 5). If, after Judge Scullin's review of this court's recommendations, some of plaintiff's claims survive for a trial, this court will reconsider appointing counsel to represent plaintiff.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt.Nos.133–135) be **DENIED IN PART,** with respect to (a) the Eighth Amendment excessive force claim against defendants LeBel and Doyle and the failure-to-protect claim against defendant Marinaccio (First, Second, and Third Causes of Action) and (b) the Eighth Amendment conditions-of-confinement claim against defendants Allan and Uhler relating to the transfers of plaintiff among various SHU cells (Nineteenth and Twenty–Sixth Causes of Action), and it is further

**RECOMMENDED,** that defendants' motion for summary judgment be **GRANTED IN PART,** in that the remaining claims in the Second Amended Complaint against the remaining defendants [42] be **DISMISSED,** and it is further

[42] As discussed above, this court is recommending dismissal of the following claims in the Second Amended Complaint that had survived defendants' prior motion to dismiss: (a) the Eighth Amendment excessive force and failure to protect claims against defendant Kirkpatrick (First and Second Causes of Action); (b) the due process claim against the estate of Curtis Drown (Fourth Cause of Action); (c) the claim alleging the denial of religious services against defendant Racette (Seventh Cause of Action); (d) an Eighth Amendment medical indifference claim against defendants LeCuyer and Lashway (Tenth Cause of Action); (e) the Eighth Amendment conditions-of-confinement and First Amendment retaliation claims against defendants Allan and Bosco relating to plaintiff's confinement in an OMH observation cell for three days (Fifteenth Cause of Action); and (f) the First Amendment retaliation claims against defendants Allan and Uhler relating to transfers of plaintiff among various SHU cells (Nineteenth and Twenty–Sixth Causes of Action).

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 140) is denied without prejudice to renewal following the decision of Senior U.S. District Judge Scullin with respect to this Report–Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1024667

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 808 of 830

Tripathy v. Brotz, Not Reported in Fed. Supp. (2023)

2023 WL 4032831

2023 WL 4032831
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Sanjay TRIPATHY, Plaintiff,

v.

Ryan BROTZ, et al., Defendants.

Case # 6:22-cv-06469-FPG

|

Signed June 15, 2023

**Attorneys and Law Firms**

Sanjay Tripathy, Morrisville, NC, Pro Se.

Heather Lynn McKay, New York State Attorney General's
Office Department of Law, Rochester, NY, Neil Shevlin,
Michael James Keane, New York State Office of the Attorney
General, New York, NY, for Defendants.

DECISION AND ORDER

FRANK P. GERACI, JR., United States District Judge

**INTRODUCTION**

 **\*1** Plaintiff Sanjay Tripathy, proceeding *pro se*, brings
claims under 42 U.S.C. §§ 1983 and 1985; the Religious
Land Use and Institutionalized Persons Act ("RLUIPA"),
42 U.S.C. § 2000cc; the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1961; and the
New York False Claims Act ("NYFCA"), State Finance
Law, §§ 187-194, against Anthony Annucci, Jeff McKoy,
New York Department of Corrections and Community
Services ("DOCCS") Deputy Commissioner of Programs,
and Brian McCallister, Director of the DOCCS Sex Offender
Counseling and Treatment Program ("SOCTP") and Dr. Ryan
Brotz, the SOCTP psychologist for Collins Correctional
Facility ("Collins").

Plaintiff was previously incarcerated at Fishkill Correctional
Facility and then transferred to Collins prior to being released
on his own recognizance on November 23, 2022 after
his conviction was vacated. Plaintiff alleges his statutory
and constitutional rights were violated by Defendants'
administration of the SOCTP at Collins, and Defendants

retaliated against him for bringing this lawsuit challenging the
program.

Before the Court is Defendants' motion to dismiss Plaintiff's
claims under Rule 12(b)(6) for failure to state a claim. For the
reasons set forth below, the motion to dismiss is GRANTED.

**BACKGROUND**

On May 30, 2018, a jury convicted Plaintiff of criminal sexual
act in the first degree, sexual abuse in the first degree, and
related offenses in New York State Supreme Court, New York
County, and the court thereafter sentenced him to seven years'
imprisonment. His conviction was affirmed by the Appellate
Division, First Department, and the Court of Appeals denied
leave to appeal. On November 22, 2022, Plaintiff's judgment
of conviction was vacated pursuant to CPL § 440.10 and
released on his own recognizance pending a new trial.

Plaintiff began this lawsuit in June 2021 while incarcerated
at the Fishkill Correctional Facility. Plaintiff was transferred
to Collins in October 2021, and in January 2022, Plaintiff
amended his complaint to name Dr. Brotz as a Defendant
in this action. According to Plaintiff, Dr. Brotz, the
psychologist responsible for administering the SOCTP
at Collins, repeatedly infringed plaintiff's statutory and
constitutional rights. Plaintiff alleges Dr. Brotz rejected his
requests to participate in the SOCTP without having to lie.
He also claims Dr. Brotz improperly "overrode" an initial
assessment that found Plaintiff belonged in a "low-risk" tier
of the SOCTP, and decided the nature of Plaintiff's crimes
instead warranted placement in the longer, "moderate-risk"
tier. Finally, Plaintiff contends Dr. Brotz retaliated against
him for objecting to her conduct via letters, grievances, and
the instant lawsuit, by charging Plaintiff with disciplinary
infractions.

Plaintiff seeks monetary damages, as well as a declaratory
judgment that Defendants violated his constitutional and
statutory rights.

**LEGAL STANDARD**

To survive a motion to dismiss, a complaint must plead
"enough facts to state a claim to relief that is plausible on its
face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007),
and "allow[ ] the court to draw the reasonable inference that

Tripathy v. Brotz, Not Reported in Fed. Supp. (2023)

2023 WL 4032831

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 809 of 830

the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When addressing a motion to dismiss, a district court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

### DISCUSSION

#### I. RLUIPA

**\*2** Plaintiff complains that his religious faith was substantially burdened by the Defendants during his participation in the SOCTP while incarcerated at Collins. As redress for this alleged infringement upon his religious exercise, Plaintiff brings a claim under RLUIPA seeking monetary damages against Defendants, as well as injunctive and declaratory relief.

A person's "transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006); *see* ECF No. 69. However, there are exceptional situations, where review would be required if "(1) the plaintiff [has] a reasonable expectation that [they] will be subject to the same challenged action again, and (2) the challenged conduct [is] of too short a duration to be fully litigated before its cessation." *Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 395 (2d Cir. 2022).

Plaintiff was released from DOCCS custody as of November 23, 2022, and therefore, his claims for injunctive and declaratory relief are moot. Further, since Plaintiff does not allege that he anticipates being subjected to SOCTP again in the future, [1] there is no "demonstrated probability of recurrence." *Id.* Accordingly, Plaintiff's claims for injunctive and declaratory relief are moot without exception.

[1]    Although Plaintiff awaits a new trial, he maintains his innocence and confidence that he will be exonerated. Accordingly, an assertion that he would be subject to SOCTP anew would be inconsistent with the position he maintains regarding his innocence.

Moreover, "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) (citing *Washington v. Gonyea*, 731 F.3d 143, 145–46 (2d Cir. 2013) (per curiam)); *see also Sossamon v. Texas*, 563 U.S. 277, 293 (2011). Plaintiff's claims for monetary damages are, therefore, not cognizable.

Because Plaintiff's claims for injunctive and declaratory relief under RLUIPA are moot without exception and Plaintiff's claims for monetary damages are not cognizable, all of Plaintiff's claims under RLUIPA are dismissed.

#### II. Free Exercise

Plaintiff claims to be a "life-long Hindu" who believes that one of "Hinduisms core tenets ... is to neither lie, provide untrue facts, commit perjury or falsity ... in conduct of one's life, interactions and spiritual journey." ECF No. 52 at 12. Plaintiff alleges that his Hindu faith was substantially burdened during his participation in SOCTP because SOCTP required Plaintiff to:

> "openly and honestly discuss the behavior that resulted in [his] incarceration and referral to the program, demonstrate acceptance of responsibility for the conduct that resulted in [his] criminal conviction, and demonstrate an understanding of [his] sexual offending behavior and cycle of abuse."

*Id.* at 13 (quoting letter response from Defendant McKoy regarding requirements of the SOCTP). Plaintiff alleges that these program requirements substantially burden his Hindu faith because he is "an innocent man illegally incarcerated," ECF No. 52 at 1, and "accept[ing] responsibility for the (alleged) sexual assault is clearly a lie (untrue fact, falsity, perjury)." *Id.* at 14.

Arising from these facts, Plaintiff brings claims against Defendants for monetary damages as well as injunctive and declaratory relief under the Free Exercise clause of the First Amendment. As discussed, *supra*, as a consequence of Plaintiff's release from DOCCS custody, Plaintiff's equitable claims are moot. To the extent he seeks prospective injunctive relief if he is convicted anew following the new trial, such a claim is unripe for determination because Plaintiff may not be returned to Collins to participate in the SOCTP with these Defendants. Plaintiff's claims would not evade review as he could file a new claim should he be returned to a correctional facility in the future. The Court will, therefore, only consider the claim for monetary damages against Defendants in their individual capacities. [2]

2023 WL 4032831

2  Plaintiff also brings claims for monetary damages against Defendants in their official capacities, but those claims are not cognizable because the Eleventh Amendment precludes suits against state officials in their official capacities. *Davis v. New York*, 316 F.3d 93, 101–02 (2d Cir. 2002).

**\*3** To state a free exercise claim under the First Amendment, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006). "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," although "the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.*

At this stage of the litigation, where Defendants have challenged, under Rule 12(b)(6), Plaintiff's pleading of his free exercise claims, the Court need not address whether Defendants may be able to make an adequate showing of a "legitimate penological interest" for their alleged conduct. *Lloyd v. City of New York*, 43 F. Supp. 3d 254, 264 (S.D.N.Y. 2014) ("This being a motion to dismiss, Defendants have not answered, and so have not yet articulated any "legitimate penological interest" or "compelling state interest" that would justify the alleged "substantial burden" on Plaintiffs' sincerely held religious beliefs under the Free Exercise Clause."). Rather, the Court need only consider Defendants' contention that, on its face, the Amended Complaint does not sufficiently plead that Defendants imposed a "substantial burden" on Plaintiff's exercise of his Hindu faith.

### A. Substantial Burden

A substantial burden on religious exercise exists "when an inmate is required to choose between following the precepts of her religion and forfeiting benefits on the one hand, and abandoning one of the precepts of her religion ... on the other hand," in order to obtain the benefits. *Smith v. Goord*, 541 F. App'x 133, 134 (2d Cir. 2013) (summary order). In other words, a "substantial burden" need not involve the prohibition of religious practice (as in, for example, prohibiting attendance at a religious service). Rather, coercive conduct that, directly or indirectly, tends to force the individual to restrict the practice of his religion may well be sufficient. *See, e.g., Westchester Day Sch.*, 504 F.3d 338, 348 (2d Cir. 2007) (noting that a substantial burden will be found where, by denying benefits, "the state puts undue pressure on the adherents [of a religious belief] to alter their behavior

and to violate their beliefs in order to obtain government benefits") (citing *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 709 (1981)); *accord Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996).

Since, according to Plaintiff "accept[ing] responsibility for the (alleged) sexual assault," would be lying, and lying violates his religious beliefs, he was faced with the choosing between: (1) following his religion—not lying—and losing "benefits ... including good time credits (go home earliest release date of 5/15/2024), lowest possible SORA registration level with minimal parole supervision conditions, and avoidance of potential civil confinement," on the one hand, ECF No. 52 at 13, and (2) abandoning the precepts of his religion in order to obtain the benefits of SOCTP on the other hand. Accordingly, Plaintiff has sufficiently alleged a substantial burden on his religious exercise.

### B. Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal [pursuant to Rule 12(b)(6)] before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

**\*4** "In making this determination, we consider Supreme Court and Second Circuit precedent as it existed at the time of the challenged conduct." *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (per curiam). The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken," *Pearson*, 555 U.S. at 244.

It is not "clearly established," either in the Second Circuit or elsewhere, that the "acceptance of responsibility" requirement of the SOCTP violates Plaintiff's right to free exercise of religion. Other circuits have found that similarly situated defendants are entitled to qualified immunity for similar free exercise claims related to inmate sexual offender treatment programs. *See Hydrick v. Hunter*, 500 F.3d 978,

Tripathy v. Brotz, Not Reported in Fed. Supp. (2023)

2023 WL 4032831

992 (9th Cir. 2007), *judgment vacated on other grounds*, *Hunter v. Hydrick*, 556 U.S. 1256 (2009) ("To the extent that the claim relies on a First Amendment right not to participate in treatment sessions, the Defendants have qualified immunity, because the law on this point is not clearly established."); *Aruanno v. Spagnuolo*, 292 F. App'x. 184, 187, 2008 WL 2746229, *2 (3d Cir. 2008) ("[E]ven if we were to conclude that Aruanno had a right to refrain from disclosing his past sexual history and we have not so concluded, we could not hold that it is clearly established under the First Amendment [right to refrain from speaking], and that it was one of which defendants should have been aware."). Similarly, another court in this district also found that defendants facing identical claims were entitled to qualified immunity. *See Bush v. Goord*, No. 03-CV-759S, 2009 WL 790358, at *9 (W.D.N.Y. Mar. 25, 2009). Accordingly, because Plaintiff's free exercise claim is not clearly established under Second Circuit or Supreme Court precedent, Defendants here are entitled to qualified immunity on Plaintiff's free exercise claim. Accordingly, Plaintiff's free exercise claims are dismissed.

### III. Due Process

Plaintiff alleges that his procedural and substantive due process rights have been violated as a result of Defendants' decision to place him in the "moderate-risk SOCTP" rather than the "low-risk [SOCTP]." ECF No. 52 at 14. Plaintiff was placed in the moderate-risk SOCTP following a recommendation from Dr. Brotz. Plaintiff alleges that this risk determination was improper because Dr. Brotz increased his risk-level by relying on information in Plaintiff's Presentence Investigation Report, which Plaintiff disputes as incorrect. ECF No. 52 at 14-23. As a result of this due process violation, Plaintiff's SOCTP participation would last 12 months, instead of 6 months. *Id.* at 14.

### A. Procedural Due Process Claim

The Fourteenth Amendment [3] prohibits the government from depriving citizens of life, liberty or property without due process of law. *See e.g., Wilkinson v. Austin*, 545 U.S. 209 (2005). To state a claim for procedural due process under the Fourteenth Amendment, Plaintiff must demonstrate "(1) that Defendants deprived him of a cognizable interest in 'life, liberty, or property,' (2) without affording him constitutionally sufficient process." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017).

[3]  Plaintiff brings his procedural due process claim under both the Fifth and Fourteenth Amendments, but the Fifth Amendment Due Process Clause applies only to the federal government, and not to state or municipal governments. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law.").

**\*5** Plaintiff's objection to the process employed in deciding to place him in the moderate-risk SOCTP does not assert any deprivation of a liberty interest. Rather, Plaintiff merely objects to the length of time that he must participate in the moderate-risk SOCTP, as opposed to the low-risk SOCTP, in order to obtain the benefits of SOCTP, including good time credits and conditions of parole supervision.

As a matter of first principles, inmates have no constitutional right to participate in prison programs which might expedite release. *Abed v. Armstrong*, 209 F.3d 63, 67 (2d Cir. 2000) (where good time credit is a discretionary matter, inmate has no liberty interest in the opportunity to earn good time credit); *see* N.Y. Correct. Law § 803 (outlining New York's discretionary good time credit program). Because inmates do not have a constitutional right to participate in programs that award good time credits, inmates cannot have a constitutional right to participate in one such program over another.

Additionally, according to Plaintiff, his earliest possible release date would have been May 15, 2024. ECF No. 52 at 13. Meanwhile, his participation in the moderate-risk SOCTP was scheduled to be completed sometime between July 31 and October 31, 2022. *Id.* at 9. Therefore, even if Plaintiff had asserted a liberty interest, no additional time would have been added to his term of imprisonment as a result of his participation in the longer SOCTP.

Accordingly, because Plaintiff does not have a protected liberty interest in participating in any SOCTP and his participation in the longer program did not extend the length of his sentence, Plaintiff has not demonstrated a deprivation of a liberty interest and his due process claim relating to the decision to place him in the moderate-risk SOCTP is dismissed.

Tripathy v. Brotz, Not Reported in Fed. Supp. (2023)

2023 WL 4032831

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 812 of 830

### B. Substantive Due Process Claim

To demonstrate a violation of his substantive due process rights, Plaintiff must "identify the constitutional right at stake," and then "must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1087 (2d Cir. 2021) (quotation omitted).

Plaintiff asserts a constitutional right in obtaining liberty without being forced to participate in SOCTP. ECF No. 52 at 13. In other words, Plaintiff argues that he should be able to obtain good time credits that entitle him to parole without having to participate in the SOCTP. However, "prisoners do not have a protected liberty interest in parole where the relevant statutory scheme endows prison authorities with discretion over the decision whether to grant it." *Edwards v. Goord*, 362 F. App'x 195, 196 (2d Cir. 2010) (summary order) (citing *Greenholtz v. Inmates of Nebraska Penal and Corr. Complex*, 442 U.S. 1, 7 (1979); *Barna v. Travis*, 239 F.3d 169, 171 (2d Cir. 2001)). Under New York law, good time credits "may be granted for ... progress and achievement in an assigned treatment program," but "may [also] be withheld, forfeited or canceled in whole or in part for ... failure to perform properly in the duties or program assigned." N.Y. Correct. Law § 803 (emphasis added). Thus, the award of good time credits that Plaintiff seeks was discretionary and not a constitutional right.

Because Plaintiff has not identified a constitutional right that was at stake, Plaintiff has not demonstrated a violation of his substantive due process rights. This claim is dismissed.

### IV. Retaliation

**\*6** Prisoner retaliation claims are approached "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

Plaintiff alleges that Defendants have retaliated against him because he filed the present lawsuit. He alleges the following six instances of retaliation: (1) receipt of an Inmate Counseling Notification from Dr. Brotz on December 30, 2022;[4] (2) receipt of an Inmate Misbehavior Report from

Dr. Brotz on April 4, 2022;[5] (3) being subjected to a search of his cell on April 11, 2022; (4) having his cell moved involuntarily from D4 to D3 on April 19, 2022;[6] (5) receipt of a Behavioral Contract on May 6, 2022; and (6) that prison officials destroyed his grievance related to the April 4th Inmate Misbehavior Report.

| 4 | Inmate Counseling Notification at ECF No. 52-6 at 2. Grievance Denial, *Id.* at 11. |
|---|---|

| 5 | ECF No. 52-6 at 13. Plaintiff filed a grievance related thereto at ECF No. 52-6 at 14-16 (COL-0132-22). Plaintiff's grievance was dismissed at ECF No. 52-6 at 29 pursuant to Directive 440 Section 701.5(b)(4)(i)(c)(4) and 701.3(e)(2) ("an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable"). Following an investigation, Plaintiff was found not guilty of the charged activity in the disciplinary ticket, rendering the disciplinary action not grievable. Plaintiff filed another grievance relating to the dismissal of the underlying grievance, and the response was the same at ECF No. 52-6 at 31. |
|---|---|

| 6 | ECF No. 52-6 at 36. |
|---|---|

To state a retaliation claim, a prisoner must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Fabricio v. Annucci*, 790 F. App'x 308, 311 (2d Cir. 2019) (summary order) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

Alleged adverse actions must be sufficiently adverse to "deter a similarly situated individual of ordinary firmness from exercising [his] constitutional rights," *Fabricio*, 790 F. App'x at 311 (quoting *Davis*, 320 F.3d at 353). However, "[p]risoners may be required to tolerate more than ... average citizens, before a retaliatory action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001) *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). To sufficiently allege a causal connection, Plaintiff's allegations must support an inference that the protected conduct was "a substantial or motivating factor for the adverse actions taken by prison officials." *Dorsey*, 468 F. App'x at 27 (quoting *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)).

**Tripathy v. Brotz, Not Reported in Fed. Supp. (2023)**

2023 WL 4032831

In addressing the causal connection requirement, a court may consider the temporal proximity between the protected conduct and the alleged retaliatory act. *See Edwards v. Horn*, 2012 WL 760172, *17 (S.D.N.Y. 2012). However, "the temporal proximity must be very close," in order to support an inference of causality. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (collecting cases that demonstrate that a 3-month period between the protected activity and the adverse action is not close enough to infer causality).

**\*7** The right to file a lawsuit is constitutionally protected, therefore, Plaintiff easily meets the first prong of the test with respect to each alleged act of retaliation. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ("The right to petition government for redress of grievances—in both judicial and administrative forums—is among the most precious of the liberties safeguarded by the Bill of Rights."). The Court will, therefore, proceed in analyzing whether each instance of alleged retaliation includes an adverse action and whether Plaintiff has sufficiently alleged a causal connection between his protected speech and the alleged adverse action.

**A. Inmate Counseling Notification.**

"Counseling sessions and counseling memos that do not place the employee in an 'active disciplinary process' do not constitute adverse employment actions 'as a matter of law.' " *Stallworth v. New York*, No. 16-CV-03059, 2017 WL 4355897, at *19 (S.D.N.Y. July 27, 2017), report and recommendation adopted, No. 16CIV3059, 2017 WL 4342148 (S.D.N.Y. Sept. 28, 2017) (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011)). Although this alleged retaliation happened in the context of a prison and not employment, prisoners are expected "to tolerate more than ... average citizens, before a retaliatory action taken against them is considered adverse." *Dawes*, 239 F.3d at 493. Therefore, if a counseling memo in the employment context does not constitute an adverse action, it certainly cannot constitute an adverse action in the prison context. Like *Stallworth*, the Inmate Counseling Notification that Plaintiff complains of here did not initiate an active disciplinary process, so it cannot constitute an adverse action.

Even if the Inmate Counseling Notification did constitute an adverse action, Plaintiff has not sufficiently alleged a causal connection because he does not allege facts that suggest that his lawsuit was a substantial motivating factor in Dr. Brotz's decision to issue the Inmate Counseling Notification. On the face of the counseling notification that Plaintiff attaches to

his Amended Complaint, Dr. Brotz explained that the Plaintiff was told not to use Dr. Brotz's first name citing Public Officers Law 87(2)(f), but Plaintiff did so anyway. ECF No. 52-6 at 2. Therefore, on the record before this Court, it appears that a substantial motivating factor for issuing the counseling notification was Plaintiff's own insubordination.

While the counseling notification and the amendment of the lawsuit to name Dr. Brotz as a defendant are close in time, the counseling notification was issued first. The counseling memo was issued December 22, 2021, and then Plaintiff added Dr. Brotz as a defendant on January 3, 2022. Where the alleged adverse action takes place prior to the protected speech, a causal connection is not sufficiently alleged. *See Marrero v. Kirkpatrick*, No. 08-CV-6237, 2012 WL 2685143, at *5 (W.D.N.Y. July 6, 2012) ("[T]he counseling memo ... was issued to Plaintiff *prior to his filing the first formal grievance* .... Thus, Plaintiff has not shown a causal connection between the grievances he filed and the October 15th counseling memo."). Accordingly, Plaintiff has not sufficiently alleged a causal connection between his protected speech and the inmate counseling memo.

**B. Discipline Ticket.**

A misbehavior report issued in retaliation for an inmate's exercise of a protected activity may constitute an adverse action. *See Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under [Section] 1983."). Nevertheless, Plaintiff does not allege any facts from which an inference of causality could be made. Plaintiff's only argument is that these adverse actions took place after he filed his lawsuit and he believes that the Defendants were trying to punish him for vindicating his rights. However, "[t]o infer causation from the very fact that one activity preceded another, however, is insufficient here to adequately plead retaliatory intent." *Edwards v. Horn*, No. 10 CIV. 6194, 2012 WL 760172, at *17 (S.D.N.Y. Mar. 8, 2012). While temporal proximity may give rise to circumstantial evidence of causality, "the temporal proximity must be very close." *Breeden*, 532 U.S. at 273. Here, the timing of the adverse action is not sufficiently proximate to the protected activity. The discipline ticket was issued on April 4, 2022, more than three months after Dr. Brotz was added as a Defendant to the lawsuit and nearly 10 months after the lawsuit was originally filed in June 2021.

2023 WL 4032831

**C. Dorm Transfer**.

**\*8** The transfer of a prisoner is not considered an adverse action unless it results in the prisoner being subjected to more onerous conditions. *See Coleman v. Sutton*, 530 F. Supp. 2d 451, 453 (W.D.N.Y. 2008) (prisoner failed to state a retaliation claim where he did not allege that conditions into which he was transferred were more onerous than his original placement). Here, Plaintiff only alleges that he was moved from D4 to D3, but does not allege that he was subject to more onerous conditions in D3. Accordingly, this transfer that Plaintiff complains of is not an adverse action.

**D. Cell Search.**

The one instance that Plaintiff's cell was searched is not an adverse action. *See Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) ("allegations that [defendant] ordered or otherwise conducted two searches of plaintiff's cell and two searches of his person over a six-month period are insufficient to show adverse action."). Moreover, the contention that the search was ordered by Dr. Brotz is speculative as Plaintiff asserts nothing more than his suspicion of Dr. Brotz's involvement without any actual facts. Finally, in this claim, Plaintiff also asserts in speculative and conclusory fashion that he believes his legal papers were "potentially copied." ECF No. 52 at 24. Such allegations do not rise to the level of an adverse action because Plaintiff has not alleged that as a result of this search his "efforts to pursue a nonfrivolous claim" were frustrated. *Collins v. Goord*, 581 F. Supp. 2d 536, 573 (S.D.N.Y. 2008). On the contrary, Plaintiff could not plausibly allege that his efforts to pursue his claims have been frustrated because Plaintiff has multiple lawsuits pending before this Court and he frequently files voluminous letters to amend and litigate his allegations. The search of Plaintiff's cell was, therefore, not an adverse action.

**E. Behavioral Contract**.

Like the Inmate Counseling Notification, the Behavioral Contract did not place plaintiff in an active disciplinary process and therefore cannot constitute an adverse action. *See Stallworth*, No. 16CV03059, 2017 WL 4355897, at \*19. The Behavioral Contract also suffers from the same temporal infirmities as the other alleged adverse actions—it was issued on June 6, 2022, six months after Dr. Brotz was added to the lawsuit. Plaintiff also does not allege any other facts showing that the lawsuit was a substantial motivating factor in Dr. Brotz's choice to issue the Behavioral Contract. Rather, on the face of the Behavioral Contract, it was issued in the

normal course as a part of his participation in the SOCTP. ECF No. 60-1 at 5 (*Dr. Brotz's Response to Behavior Contract Grievance*, "Behavioral Contracts, like other interventions, are designed to act as interventions; specifically, a way to assist participants in getting back on track when they are struggling in a particular area."). For these reasons, the Behavioral Contract was not an adverse action and was not causally related to Plaintiff's protected speech.

**F. Destroying Grievances**.

Plaintiff's allegation regarding grievances being destroyed is implausible on its face and frivolous. To support this claim, Plaintiff refers to the grievance he submitted regarding Dr. Brotz's disciplinary ticket relating to the assistance he provided to a fellow inmate to file a FOIL request. ECF No. 60-1 at 21. The relevant documentation related to this alleged adverse action shows that the disciplinary ticket at issue was resolved in Plaintiff's favor on April 5, 2022. [7] On April 14, 2022, Plaintiff was then notified that his grievance based on the disciplinary ticket was dismissed pursuant to Directive 440 Sections 701.5(b)(4)(i)(c)(4) and 701.3(e)(2) ("an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable"); ECF No. 52-6 at 29. Plaintiff appealed the dismissal on April 15, 2022, and the dismissal was upheld. ECF No. 52-6 at 31. Following the denial of his appeal, on April 18, 2022, Plaintiff filed a new grievance alleging that his grievance tickets were being improperly destroyed to protect Dr. Brotz. ECF No. 52-6 at 31. Plaintiff received a response to that grievance, which reiterated the reasons for dismissing the prior grievance. Plaintiff allegations are implausible on their face because he provides documentation that shows that his grievances are not being destroyed at all, but instead are being responded to and addressed repeatedly pursuant to official prison grievance policy.

7     ECF No. 52-6 at 25.

**\*9** In sum, Plaintiff's allegations of retaliation are meritless and frivolous. The Inmate Counseling Notification, the Dorm Transfer, the Cell Search, the Behavioral Contract are not adverse actions. The alleged destruction of Plaintiff's grievance did not occur. While the disciplinary ticket may be considered an adverse action, Plaintiff fails to allege any facts that could form the basis of a reasonable inference of causation, other than stating his strong suspicion of causation. Without more, where, as here, the plaintiff alleges the ultimate fact of retaliation in a conclusory and speculative manner, he fails to state a claim for retaliation. *Dorsey v. Fisher*, 468 F.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 815 of 830

Tripathy v. Brotz, Not Reported in Fed. Supp. (2023)

2023 WL 4032831

App'x 25, 27 (2d Cir. 2012) (summary order) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

Because Plaintiff fails to allege any adverse action, other than the discipline ticket, but also fails to sufficiently allege a causal connection between the discipline ticket and his protected speech, Plaintiff has not sufficiently alleged a plausible claim of retaliation. Accordingly, Plaintiff's claims of retaliation are dismissed.

### V. False Claims

Plaintiff argues that Defendants violated the New York False Claims Act ("NYFCA")[8] "when they created and used an unapproved document ... to override Petitioner into moderate risk." ECF No. 60 at 13. Because this override resulted in a longer program duration, Plaintiff contends that Defendants did so intentionally in order to obtain more money from the government to pay for the longer program. ECF No. 52 at 23.

[8]    Plaintiff does not specify whether he is relying on the federal FCA or the New York FCA, however, since the relevant government entity at issue is the State of New York Department of Corrections and Community Services which administers SOCTP, this Court has construed his claim under the New York FCA.

Because the NYFCA mirrors the federal False Claims Act ("FCA") in many respects, "it is appropriate to look toward federal law when interpreting the New York act." *United States v. Cath. Health Sys. of Long Island Inc.*, No. 12-CV-4425, 2017 WL 1239589, at *7 (E.D.N.Y. 2017). To state a claim under the federal FCA, the plaintiff must show "the defendants (1) made a claim, (2) to the government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. 2017) (summary order).

The statute NYFCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property ... that is presented to an officer, employee, or agent of the state or a local government." NY State Fin Section 188(1). The override decision at the center of Plaintiff's NYFCA claim involved analyzing Plaintiff's criminal risk to reoffend and resulted in a determination of which SOCTP program was most suitable to address those risks. Placing Plaintiff in the moderate-risk program did not result in any direct payment from the government's treasury. Therefore, this decision did not involve "any request or demand ... for

money or property." *Id.* Because the decision did not involve a request or demand for money or property, this decision was not a "claim" as defined in the statute. Since Plaintiff fails to allege any facts that Defendants made a "claim" and could not plausibly do so based on the facts alleged in the complaint, Plaintiff's claim under the NYFCA must be dismissed.

### VI. RICO

Plaintiff alleges that "Defendants colluded as an organization (DOCCS employees) and did it in a pattern over time (systemic overrides) and Petitioner (via money lost/ used by his family/friends business led to losses) borne financial losses demonstrating RICO violation (by DOCCS Defendants/Employees)." ECF No. 52 at 32.

**\*10** RICO provides a private cause of action for treble damages to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962 specifies the prohibited criminal activities. 18 U.S.C. § 1962(a)-(d). Each prohibited criminal activity requires alleging a "pattern of racketeering activity" or the "collection of unlawful debt." *Id.*

In order for a plaintiff to state a claim for damages under RICO, he must allege the violation of "criminal RICO," 18 U.S.C. § 1962. *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). In so doing, a plaintiff must allege the existence of seven constituent elements: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce." *Id.* (citing 18 U.S.C. § 1962(a)-(c)) (citations omitted).

Plaintiff's RICO claim misses the mark by many miles because he fails to allege a critical element of the criminal RICO violation—a pattern of "racketeering activity." Plaintiff's sole allegation of a predicate racketeering act that allegedly violated criminal RICO was Defendants decision to override his placement in the low-risk SOCTP and place him in the moderate-risk SOCTP. ECF No. 52 at 32. However, such an act does not fall within the statutory definition of a "racketeering activity," which requires that the act be indictable under an enumerated section of the United States Code or involve "murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance ... which is chargeable under State law ..." *See generally*, 18 U.S.C. § 1961.

2023 WL 4032831

A prison administrator's decision to override an inmate's placement in a treatment program is a far cry from any potential "racketeering activity." Further, Plaintiff also fails to sufficiently allege a "pattern." The override that he complains of only once, and a " 'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C.A. § 1961.

Because Plaintiff fails to allege that Defendants have engaged in a pattern of racketeering activity, Plaintiff's RICO claim must be dismissed.

### VII. CONSPIRACY

Plaintiff brings claims under both Sections 1985(3) and 1983 alleging that Defendants conspired to deprive him of his rights in two ways. First, he asserts that "(Defendants) engaged in conspiracy, collusion when they forced Petitioner to lie (provide untrue facts and admit to sexually offending behavior) in violation of his core and sincerely held religious beliefs." ECF No. 60 at 13. Next, he asserts that "they also engaged in a conspiracy when they deliberately, wrongly overrode Petitioner to Moderate (instead of risk) in systemic defraud of taxpayer funds." *Id.*

#### A. Section 1985 Conspiracy

A conspiracy claim under Section 1985(3) requires a plaintiff to allege: "1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n. 4 (2d Cir. 2006)). The conspiracy must also be "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007).

**\*11** Critically, Plaintiff fails to allege a class-based animus that motivated Defendants in the acts that they took toward him. Plaintiff asserts that he is Hindu and sincerely holds a religious belief that he cannot lie. However, merely asserting membership a particular class is insufficient to assert that Defendants were motivated by Plaintiff's membership in such class. *See Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999) (Ruling that, although, plaintiff "who is black, is a

member of a protected class" such assertion is not enough to "demonstrate that the officers selected their course of action because of his race.").

Because Plaintiff fails to allege that Defendants were motivated by a class-based discriminatory intent, Plaintiff's claim for conspiracy under Section 1985(3) must be dismissed.

#### B. Section 1983 Conspiracy

To state a claim for Section 1983 conspiracy, a plaintiff must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). A complaint that contains "only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights," or "diffuse and expansive allegations," is properly dismissed; to be viable, a complaint must allege "specific instances of misconduct." *Id.* at 325 (internal quotation marks omitted). A plaintiff is not required to list the place and date of defendants' meetings and the summary of their conversations when he pleads conspiracy, *see Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005), but at the very least the pleadings must present "specific facts tending to show agreement and concerted action." *Bacquie v. City of New York*, No. 99CIV.10951, 2000 WL 1051904, at *1 (S.D.N.Y. July 31, 2000). Without "a meeting of the minds, the independent acts of two or more wrongdoers do not amount to a conspiracy." *Fisk*, 401 F. Supp. 2d at 376.

Here, Plaintiff's complaint contains "only conclusory, vague, or general allegations." *Id.* The facts in Plaintiff's complaint amount to allegations of independent acts by the various Defendants. Respecting the override decision, Plaintiff states that it was "initiated by D-Brotz" and "approved by D-Mcallister." ECF No. 52 at 15. However, Plaintiff also alleges that it was D-Brotz's role in administering the program to make a recommendation and D-Mcallister's role in administering the program to approve and deny D-Brotz's recommendation. *Id.* At no point does he allege a conversation or agreement between these two Defendants. Essentially, Plaintiff has merely alleged that the Defendants were independently executing the responsibilities of their respective roles within the prison administration. Respecting

2023 WL 4032831

the alleged conspiracy to force Plaintiff to lie, he offers no facts whatsoever to support a claim of conspiracy.

Because Plaintiff fails to allege a meeting of the minds, his allegations respecting Defendants' independent acts do not amount to a conspiracy and his claim of a Section 1983 conspiracy is dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint, ECF. No. 77, is GRANTED. Plaintiff's Amended Complaint, ECF No. 52, is DISMISSED in its entirety. Plaintiff's motion to refer this case to a magistrate judge, ECF No. 83, is DENIED as moot.

**\*12** IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4032831

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4844792
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Graham B.C. ROMAN, Plaintiff,

v.

COUNTY OF CHESTER, et al., Defendants.

CIVIL ACTION NO. 23-1662-KSM
|
Filed November 20, 2024

**Attorneys and Law Firms**

Graham B.C. Roman, Bellefonte, PA, Pro Se.

David J. MacMain, Matthew R. Estberg, MacMain Leinhauser PC, West Chester, PA, for Defendants County of Chester, Ronald Phillips, Ocie Miller, Tim Mulrooney, Morgan L. Taylor, Peter Sergi, Matthew Taylor, Mark Di Orio, Deputy Warden Roberts.

John R. Ninosky, Marshall Dennehey, P.C., Camp Hill, PA, for Defendant Prime Care Inc.

Theresa Giamanco, Bennett Bricklin & Saltzburg LLC, Marlton, NJ, for Defendant Aramark Food Provider Inc.

---

**MEMORANDUM**

MARSTON, District Judge

**\*1** *Pro se* Plaintiff Graham B.C. Roman was held at Chester County Prison ("CCP") from August 21, 2021 through June 18, 2024 while he awaited trial and then sentencing on multiple charges for child sex offenses. *See Commonwealth v. Roman*, Nos. CP-15-CR-0003288-2021, CP-15-CR-003306-2021, Criminal Dockets (Chester Cnty. Ct. Comm. Pl.).[1] He brings claims under 42 U.S.C. § 1983 for violations of his First, Eighth, and Fourteenth Amendment rights against the County of Chester, multiple prison officials[2] (collectively, the "County Defendants"), PrimeCare Medical, Inc. (the prison's medical services provider), and Aramark Correctional Services, LLC[3] (the prison's food services provider). (*See* Doc. No. 17 at 4–8; Doc. No. 30 at 11.) The County Defendants and Aramark have each submitted a motion to dismiss Roman's Amended Complaint and Supplemental Complaint (collectively, "the Complaint")

pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. Nos. 101, 103.) Roman opposes those motions. (*See* Doc. No. 106.) For the reasons discussed below, the County Defendants' motion is granted in part and denied in part, and Aramark's motion is granted.

[1]    In December 2023, a jury found Roman guilty on many of those charges, and in April 2024, he was sentenced to between 10.5 and 21 years' incarceration. *See Commonwealth v. Roman*, Nos. CP-15-CR-003306-2021, CP-15-CR-003288-2021, Criminal Dockets (Chester Cnty. Ct. Comm. Pl.). Roman is currently confined at SCI Rockview.

[2]    The individual Defendants are: Warden Ronald Phillips; Deputy Warden Ocie Miller; Director Tim Mulrooney; Major Morgan L. Taylor; Captain Peter Sergi; Sergeant Matthew Taylor; Sergeant Mark Di Orio; Deputy Warden George Roberts.

[3]    Roman incorrectly identifies Aramark Correctional Services, LLC as "Aramark Food Provider Inc." in his pleadings. (*See* Doc. No. 103 at 1.)

**I. FACTUAL BACKGROUND**

Roman's Complaint is lengthy and somewhat difficult to follow. However, taking the allegations in the Complaint as true and viewing them liberally as the Court must, Roman alleges that while he was detained at CCP he was denied access to necessary medical care and CCP officials retaliated against him for submitting complaints and grievances. (Doc. No. 17 at 8.)

**A. Medical Care**

First, Roman argues that he was denied necessary dental and mental health care while at CCP.

**1. Dental Care**

Roman suffers from osteogenesis imperfecta, which is more commonly known as "brittle bone disease." *See* https://www.niams.nih.gov/health-topics/osteogenesis-imperfecta (last visited Apr. 23, 2024). It is a genetic disorder characterized by fragile bones that break easily. *Id.* According to Roman, his condition requires regular preventative and

corrective dental treatment "due to higher rate of decay" and "tooth chips." (Doc. No. 17 at 14.)

Roman claims he informed a PrimeCare employee of his condition during his intake exam on August 21, 2021 and told him that he had scheduled appointments for dental care before he reported to CCP, which would need to be rescheduled with the prison's dentist. (*Id.*; *see also id.* at 24.) According to Roman, the PrimeCare employee performing the exam responded that the prison's policy does "not allow the Dentist to correct or repair ... only extract or leave until released." (Doc. No. 17 at 14; *see also id.* at 24.) Roman claims extraction is not a viable option because he cannot "replace teeth due to bone weakness and prior jaw fractures." (*Id.* at 14.) Despite allegedly needing corrective care when he entered CCP, Roman claims that he "was given treatment" only "after 20+ months of delay" and significant suffering. (*Id.*; *see also id.* at 12 (alleging that he was "refused corrective action and proventitive [sic] action while housed as a pre-trial detainee for 19 months straight").)

 **\*2** Roman did finally see a dentist in April 2023. On April 26, 2023, he was examined and told that a prior dentist had "made [a] few mistakes." (*Id.* at 21.) When Roman asked the Primecare dentist why he was being denied "corrective and preventitive [sic] care over a period of 20 months with a genetic Bone Disability, [the dentist] could not explain except to say the policy [and] customs in place limit the[ ] options of care," in that dentists "are only approved to medicate or extract teeth." (*Id.* at 21.) The dentist also told him that unidentified "officers refused to escort [Roman] on April 19th when [the dentist initially] order[e]d a[n] appointment." (*Id.*) The next day, Roman saw the dentist again. The dentist explained that he had "reported the extream [sic] injur[ie]s due to 20 months delay" to CCP administration and told them that Roman "need[s] a specialist/surg[e]on to ... prevent any more damage and possibly extractions, root cannal [sic], cavity repair[.]" (*Id.*)

While CCP searched for a specialist, Roman was placed on a prescribed soft food diet beginning May 31, 2023. (Doc. No. 30 at 10; *id.* at 21.) Roman claims that Aramark, despite being aware of Roman's dietary needs, denied "his prescribed medical diet ... [for] NO reason, causing further injury to [his] teeth." (*Id.* at 7, 9–10, 14–15, 18, 21.)

## 2. **Mental Health Care**

In addition to suffering from osteogenesis imperfecta, Roman also claims that he suffers from "severe mental health disabilit[ies]" that "he has battled since the age of (13)." (Doc. No. 17 at 15.) According to Roman, he told this to the PrimeCare employee during his intake examination, but CCP officials nevertheless refused to house him "on the mental health block (M)" or to let him attend "appointments." (*Id.* at 24.)

### **B. Retaliation**

While at CCP, Roman filed numerous complaints against the correctional officers overseeing his confinement. Roman claims the County Defendants have retaliated against him for those complaints in that they used the prison's suicide prevention policy to sexually harass him, refused to escort him to necessary medical appointments, interfered with his attempts to file grievances, and repeatedly moved him from cell to cell for no penological purpose.

#### 1. **Suicide Prevention**

First, Roman claims that he was sexually harassed by Defendant Sergeant Mark DiOrio. At some unidentified time, Sergeant DiOrio instituted CCP's suicide prevention policy against Roman after "a[n] argument." (Doc. No. 17 at 10.) Roman alleges that even though he was "compliant," "nonaggressive," and told Sergeant DiOrio that he had "NO suicidal or homicidal thoughts," Sergeant DiOrio nevertheless "forced" him to go to medical. (*Id.* at 10, 15.) Per the prison's suicide prevention policy, Roman was required to change out of his clothes and into a "suicide smo[c]k," but according to Roman, the smock was "way to[o] small," and he was required to drape the smock "over [his] shoulder ... to cover [his] private parts." (*Id.* at 16.) He claims that Sergeant DiOrio watched him as he changed into the smock and that female prison staff were on the block during this time. (*Id.*) Roman alleges that he asked Sergeant DiOrio for permission to file a complaint under the Prison Rape Elimination Act ("PREA") related to the incident, but was "refused PREA access for over 2 hours until Sgt. Mark Diorio allowed it." (*Id.*) Roman was "released the next day after investigation proved [he] was not suicidal." (*Id.* at 16–17.)

#### 2. **Medical Escorts**

2024 WL 4844792

Next, Roman claims he was "refused medical/dental visits due to staff refusing to escort [him] to appointments due to classification status." (*Id.* at 23.) Roman also alleges that he "became a target for months" after filing the PREA complaint, in that Sergeant DiOrio "refused" to provide "medical escorts." (*Id.* at 17.) Also, as noted above, Roman alleges that on April 26, 2023, his dentist told him that unidentified "officers refused to escort [Roman] on April 19th when [the dentist initially] order[e]d a[n] appointment." (*Id.* at 21.)

### 3. Grievance Interference

**\*3** Third, Roman alleges that Defendant Sergeant Taylor interfered with Roman's "grievance requests and inmate request slips." (*Id.* at 17.) Roman claims he "made extensive reports to [CCP's] medical/mental health" department and the "security department" and "all defendants in administration," but "to no avail" because "the request slips" were never received. (*Id.*) Roman believes they were not received because Sergeant Taylor "screens[,] interferes, and returns" the grievances "with a[n] answer (NO)!" (*Id.*) Roman nevertheless concedes that he was able to appeal at least one grievance denial to Defendant Captain Sergi, who upheld the denial. (*Id.*; *see also id.* at 20, 31, 61.) And the documents attached to the Complaint show that at least two grievances were appealed to Defendant Warden Phillips, who similarly upheld the denials. (*Id.* at 36, 60–61.)

### 4. Cell Transfers

Last, Roman alleges that all the individual Defendants "were involved in a campaign of harassment towards" Roman, moving Roman from "cell to cell" as a punishment for his "many attempts to file a grievance" against unidentified officers. (*Id.* at 11.) Roman claims he was "moved (18) times in under (17) months" with "around 5 moves" due his "own actions," and the remaining 13 moves "based on provoked retaliation that [began on] 06/08/2022," when he filed his PREA complaint. (*Id.* at 18.) Roman claims there was "no penological security based reason" for the continued moves, and that it can "be assumed" the moves were meant to cause Roman to suffer "a mental break down." (*Id.* at 11.)

Roman discusses one instance in detail, alleging that he was moved five times over a three-day period in February 2023. On February 21, 2023, nondefendant "Sergeant Ramos"

moved Roman from cell 32 because it lacked "power [and] cable access" after having been damaged the previous day. (*Id.* at 19.) Sergeant Ramos also allegedly "emailed security over the fear [that Roman] was being targeted by" other officers, who were "using cell moves as punishment to expressing grievance issues involving Sgt. Taylor, Sgt. DiOrio." (*Id.*; *see also id.* at 33–34, 37–38.) The next day, February 22, Sergeant Taylor returned Roman to cell 32, telling Roman that he should not have gone "over [Sergeant Taylor's] head by being moved by a different Sgt. 'Ramos' " and that Roman "will learn [a] lesson now[.]" (*Id.* at 19.) Later that afternoon, Sergeant Ramos moved Roman back to the undamaged cell, and the next morning, February 23, Sergeant Taylor again ordered that Roman be returned to cell 32. (*Id.*) Allegedly, Sergeant Taylor asked Roman if he wanted to "keep playing games" and told Roman that "this is [Sergeant Taylor's] house" and "this is what happens when you go against him[.]" (*Id.* at 19–20.) The next shift, Sergeant Ramos again returned Roman to an undamaged cell and told Roman that security had been "informed to end this retaliation." (*Id.* at 20.)

## II. PROCEDURAL HISTORY

Roman filed this action on April 27, 2023. (Doc. No. 2.) On May 15, 2023, he filed an amended complaint (Doc. No. 17) against PrimeCare and all the County Defendants except Deputy Warden Roberts, and on June 23, 2023, he submitted what the Court has interpreted as a supplemental complaint (Doc. No. 30), which named Deputy Warden Roberts and Aramark as additional Defendants.

On August 23, 2023, the Court granted Roman's motion for appointment of counsel, referred this matter to the Court's Prisoner Civil Rights Panel, and stayed the action pending resolution of that referral. (Doc. No. 56.)[4] When no attorney volunteered to represent Roman, the Court lifted the stay on February 26, 2024. (Doc. No. 98.) One month later, the County Defendants and Aramark moved to dismiss the Complaint. (Doc. Nos. 101, 103.) PrimeCare did not join either motion and instead, filed an answer to the Complaint. (Doc. No. 102.)

---

[4]  While the case was stayed, the Court denied three motions for a temporary restraining order and/or a preliminary injunction filed by Roman. (Doc. Nos. 59, 86, 96.)

## III. STANDARD OF REVIEW

**\*4**  As noted above, the County Defendants and Aramark have moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). (*See* Doc. Nos. 101, 103.) "A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss under Rule 12(b)(6), a court must consider whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 556, 127 S.Ct. 1955). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555, 127 S.Ct. 1955.) "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). It is the defendant's burden to show that a complaint fails to state a claim. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). To determine whether a complaint filed by a *pro se* litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed, contains facts sufficient to state a plausible ... claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally).

Additionally, because Roman is proceeding *in forma pauperis*, the Court may independently screen his Complaint and dismiss improper claims pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). *See Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) ("To repeat, the statute requires a court to dismiss an IFP

complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim."). The standard under this screening provision is the same standard that governs a dismissal under Rule 12(b)(6). *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).

## IV. DISCUSSION

Roman's claims arise under 42 U.S.C. § 1983. [5] Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

42 U.S.C. § 1983. "[T]o state a claim under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law." *Jenkins v. Cordova*, Civ. No. 22-6482 (KM) (CLW), 2023 WL 3453635 \*4, 2023 U.S. Dist. LEXIS 84428 \*9 (D.N.J. May 15, 2023) (citing *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011)).

[5]   Roman's Complaint also references 37 Pa. Code § 95.223(4) (*see* Doc. No. 17 at 8), which requires state correctional institutions to have a "written local policy" that "permit[s] every inmate to make a request or submit a grievance to the prison administration, the judiciary or other proper authorities without censorship as to substance." Even assuming Roman has alleged a violation of § 95.223(4), that regulation does not create a private cause of action, nor is a violation of the regulation the proper subject of a civil rights action brought under § 1983. *See Yunik v. McVey*, Civil Action No. 08-1706, 2010 WL 4777623, at \*5 (W.D. Pa. Nov. 16, 2010) ("To the extent that Plaintiff seeks to sue Mr. Mangino for violations of state laws and rules, we find that such fails to state a claim under Section 1983 because in order to state a claim under Section

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 822 of 830

*1983*, the Plaintiff must allege a violation of his federal rights and not merely a violation of state law.").

**\*5** "In evaluating a § 1983 claim, courts must 'identify the exact contours of the underlying right said to have been violated' and 'determine whether the plaintiff has alleged a deprivation of a constitutional right at all.' " *Moore v. Luffey*, 767 F. App'x 335, 339 (3d Cir. 2019) (quoting *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015)). When a § 1983 claim is brought against an individual defendant, the court must "next determine whether the plaintiff has demonstrated the 'defendant's personal involvement in the alleged wrongs.' " *Id.* (quoting *Chavarriaga*, 806 F.3d at 222). When the claim is brought against a local government or municipality, however, the court cannot hold the municipality liable on "a vicarious liability theory rooted in *respondeat superior.*" *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding that local governments and municipalities are also considered persons under § 1983). Instead, local governments and municipalities may be sued directly under § 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690, 98 S.Ct. 2018.

Here, Roman contends that Defendants are liable under § 1983 because they: (1) violated his Eighth and Fourteenth Amendment rights when they were deliberately indifferent to his serious medical needs, and (2) violated his First Amendment rights when they retaliated against him for filing a PREA complaint and multiple grievances. (*See* Doc. Nos. 17, 30.) The County Defendants and Aramark argue that Roman's § 1983 claims fail because he has not alleged constitutional violations, and in the alternative, he has not alleged facts to support a finding of individual or municipal liability. (Doc. Nos. 101, 103.)

**A. Deliberate Indifference to Serious Medical Needs**

First, Roman brings Eighth and Fourteenth Amendment claims for deliberate indifference to medical needs, which are based on Defendants delaying access to preventative and corrective dental care and failing to provide appropriate meals under Roman's prescribed soft food diet. (Doc. No. 17 at 12, 14, 21, 24; Doc. No. 30 at 7, 9–10, 14–15, 18, 21.) [6] , [7]

[6]    Roman also raises deliberate indifference claims against the County Defendants for the denial of mental health treatment, claiming that the County refused to house Roman on the "mental health block" and denied Roman's requests for mental health "appointments." (Doc. No. 17 at 15, 24.) The County Defendants do not address these claims in their motion, so the Court will allow them to proceed to discovery as against the County. The Court will, however, dismiss these claims as against the individual County Defendants because an independent review of the Complaint shows that Roman has not alleged that any individual was personally involved in the alleged denial of mental health treatment. *See Moore*, 767 F. App'x at 339.

[7]    In his opposition brief, Roman asserts that Defendants also failed to timely provide him with special shoes, which he argues were medically necessary. (Doc. No. 106 at 7.) The Court does not consider this issue because it is not raised in his Complaint. *See Pa. ex rel. Zimmerman v. PepsiCo., Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (explaining that a complaint may not be amended by a plaintiff's brief in opposition to a motion to dismiss); *Ernst v. Union Cnty. Conservation Dist.*, No. 21-1702, 2023 WL 6276698, at \*12 n.65 (M.D. Pa. Sept. 26, 2023) (same).

**1. Legal Standard**

Because Roman was a pretrial detainee while at CCP, his medical treatment claims are governed by the Fourteenth Amendment's Due Process Clause—which "protects pretrial detainees from 'any and all punishment' "—not the Eighth Amendment's prohibition on cruel and unusual punishment. *Happel v. Bishop*, 1:23-CV-13-SPB-RAL, 2024 WL 1508561, at \*10 (W.D. Pa. Feb. 22, 2024) (quoting *Montgomery v. Aparatis Dist. Co.*, 607 F. App'x 184, 187 (3d Cir. 2015)); *see also Hubbard v. Taylor*, 399 F.3d 150, 167 n.23 (3d Cir. 2005) (recognizing "distinction between pretrial detainees' protection from 'punishment' under the Fourteenth Amendment, on the one hand, and convicted inmates' protection from punishment that is 'cruel and unusual' under the Eighth Amendment, on the other"); *Montgomery v. Ray*, 145 F. App'x 738, 740 (3d Cir. 2005) ("While the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner, the proper standard for examining such claims is ... whether

the conditions of confinement (or here, inadequate medical treatment) amounted to punishment prior to an adjudication of guilt." (cleaned up)). Although the two standards are not identical, the Eighth Amendment analysis informs the Fourteenth Amendment analysis, serving "as a floor for due process inquiries into medical and non-medical conditions of pretrial detainees." *Montgomery*, 145 F. App'x at 740 (citing *Hubbard*, 399 F.3d at 165–67). "To state a claim under the Eighth Amendment, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials constituting deliberate indifference to that need." *Happel*, 2024 WL 1508561, at *10 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

 **\*6** Under the first prong, a "medical need is serious, ... if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation marks omitted). "The seriousness of an inmate's medical need may also be determined by reference to the effect of denying treatment." *Id.* When a denial or delay of adequate care results in the "unnecessary and wanton infliction of pain," *id.* (quoting *Estelle*, 429 U.S. at 103, 97 S.Ct. 285), or "causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious," *id.*

Under the second prong, an official acts with "deliberate indifference" when the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (deliberate indifference can be shown by a prison official "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed" (internal citations and quotation marks omitted)). This is a subjective inquiry. *See Moore*, 767 F. App'x at 340. Not every complaint of inadequate prison medical care rises to the level of deliberate indifference. *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023). Allegations of medical malpractice, negligence, and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *Hayes v. Gilmore*, 802 F. App'x 84, 88 (3d Cir. 2020). Nonetheless,

"prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier or less efficacious treatment' of the inmate's condition." *Spruill*, 372 F.3d at 228 (quoting *West v. Keve*, 571 F.3d 158, 162 (3d Cir. 1978)).

## 2. Delay in Dental Care

The Court begins with Roman's claim that the County Defendants were deliberately indifferent to his serious medical needs when they delayed access to preventative and corrective dental care for more than 20 months.

### a. Constitutional Violation

The County Defendants do not explicitly dispute that Roman suffered from a serious medical need, and the Court has no problem finding that Roman's need was "serious" when he saw the prison's dentist in April 2023. (*See* Doc. No. 17 at p. 23 (alleging that at that time, two teeth "were extracted ..., [t]hree other teeth have gone from cavity to broken and decaying including a front visible tooth at risk of needed extraction, multiple cavit[ie]s still exist" and Roman was enduring "extream [sic] pain, sensitivity, infection even after antibiotics are given").) [8] It is unclear, however, when Roman's injuries first developed. Roman alleges that when he entered CCP he told PrimeCare employees that he had scheduled appointments for dental care, but he does not explain the nature of those appointments or allege the nature of the injuries, if any, that he suffered at the time. (*Id.* at 14, 24.) [9] Nevertheless, given that Roman requested "corrective" treatment during his intake exam, submitted numerous requests for dental treatment in the months that followed, and ultimately suffered serious and substantial injuries to multiple teeth, the Court finds that Roman has sufficiently alleged a serious medical need for purposes of this motion.

[8]    The Court also has no trouble finding that the prison officials were not deliberately indifferent to Roman's serious medical need in April 2023 because the prison dentist provided immediate treatment while CCP administrators searched for a specialist.

Case 9:19-cv-00109-ECC-MJK    Document 410    Filed 02/21/25    Page 824 of 830

9    Although not in the body of his Complaint, Roman does state in a grievance attached to his Complaint that he "chipped [his] teeth a few weeks after being arrested." (Doc. No. 17 at 52.) But that alone does not necessarily show that he suffered from a serious medical need. *See Tormasi v. Hayman*, Civil Action No. 09-5780 (JAP), 2010 WL 716068, at *1 (D.N.J. Mar. 1, 2010) (dismissing the plaintiff's Eighth Amendment claims related to chipped tooth for those periods where the plaintiff "experienced no pain or bleeding," and where he "experienced minor bleeding and/or slight degree of pain"); *id.* at *2 (dismissing the plaintiff's claim related to the "preservation of Plaintiff's tooth" because it "facially fails to state a claim under the Eighth Amendment").

**\*7** Assuming that Roman did suffer from a serious medical need when he entered CCP on August 21, 2021, the County Defendants argue that they were not deliberately indifferent to that medical need because Roman "was seen by a dentist on April 26 and April 27, 2023." (Doc. No. 101 at 21.) But that treatment occurred more than 20 months after Roman entered the prison. As this Court previously explained (*see* Doc. No. 25 at 7 n.5), a substantial delay in treatment for non-medical reasons can itself rise to the level of deliberate indifference. *See, e.g., Monmouth Cnty. Corr. Institutional Inmates*, 834 F.2d at 346 ("[I]f necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." (cleaned up)); *Parkell v. Danberg*, 883 F.3d 313, 337 (3d Cir. 2016) (explaining that a correctional official is deliberately indifferent when they "delay[ ] necessary medical treatment based on a non-medical reason; or ... prevent[ ] a prisoner from receiving needed or recommended medical treatment" (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999))); *Harrison v. Barkley*, 219 F.3d 132, 137–38 (2d Cir. 2000) (finding deliberate indifference where the plaintiff "adduced evidence to show ... that his cavity was left untreated for one year").

Attempting to address the significant delay, the County Defendants assert that "from the time of his intake on August 29, 2021, until filing his Compliant [sic] on April 27, 2023, Plaintiff was seen by a dentist at CCP six (6) times." (Doc. No. 101 at 21.) They do not, however, provide any supporting documentation for this assertion, nor is it supported by the allegations in the Complaint, which this Court must accept as true in deciding the motions to dismiss. In other words, the Court must at this stage take as true Roman's allegations that he went 20 months without receiving any dental care.

Accordingly, the Court finds that Roman has alleged a plausible constitutional violation by the County in connection with the extended delay surrounding his dental treatment.

### b. Individual Liability

Next, the County Defendants argue that even if Roman has stated plausible constitutional violations, the Fourteenth Amendment claims should be dismissed as against the individual County Defendants because he has not alleged any individual's "personal involvement in the alleged wrongdoing." (Doc. No. 101 at 19 (quoting *Mincy*, 508 F. App'x at *103); *see also id.* at 22 ("Warden Phillips, Maj. Taylor, Deputy Warden Miller, Director Mulrooney, Capt. Sergi, and Deputy Warden Roberts have no personal involvement with Plaintiff ....").) The Court agrees that Roman has not alleged any facts from which the Court can infer any individual Defendant's personal involvement in the substantial delay of dental care. Although he claims CCP's dentist told him in April 2023 that unidentified "officers" failed to bring Roman to an appointment the dentist had scheduled the week prior, Roman has not attributed that failure to any named Defendant. Likewise, Roman states in conclusory terms that Sergeant DiOrio denied Roman medical escorts, but he does not allege when those denials occurred or otherwise tie Sergeant DiOrio's conduct to the lack of adequate dental care. Accordingly, the Court dismisses Roman's Fourteenth Amendment claims as against the individual Defendants. *See Moore*, 767 F. App'x at 339 (explaining that the plaintiff must allege "the 'defendant's personal involvement in the alleged wrongs' " (quoting *Chavarriaga*, 806 F.3d at 222)). The dismissal is, however, without prejudice, and Roman will be given an opportunity to amend his Complaint to the extent he can do so in good faith.

### c. Municipal Liability

The County Defendants similarly argue that Roman has failed to allege facts to support a finding of municipal liability under *Monell* because he has made only "vague references to policy," which "fall[ ] woefully short of the proof needed to support a *Monell* claim." (Doc. No. 101 at 24.) In the same breath, however, the County Defendants concede that Roman has identified an official CCP policy at the root of his dental injuries: "Plaintiff states that prison policy is to either extract an inmate's tooth or to treat the inmate for

pain until they are released." (*Id.*) Roman has tied this policy to his alleged constitutional violation, explaining that when he asked for corrective dental care, he was repeatedly told that it was not an option under the prison's extract or wait policy. (*See* Doc. No. 17 at 14, 24.) Neither waiting nor extracting was an appropriate course of treatment for Roman, however, because his injuries allegedly were not responding to antibiotic treatment and he suffers from osteogenesis imperfecta and cannot later replace teeth that are extracted. (*Id.* at 14.)

**\*8** The County Defendants argue that these allegations are nevertheless insufficient because the extract or wait policy is "a commonly used policy in prisons and jails throughout the country as they have limited resources and must allocate those resources to treat the maximum number of inmates." (Doc. No. 101 at 24.) But the County's justification for the extract or wait policy does not render it immune from suit when that policy results in a constitutional violation, nor does the fact that other prisons have adopted similar policies.

Last, the County Defendants argue that Roman's allegations are insufficient because he "has not and is unable to identify any patterns of similar constitutional violations against Chester County or CCP which would have put Defendants on notice that the current dental treatment policy was in violation of the [C]onstitution." (Doc. No. 101 at 25–26.) This confuses the "policy" prong of the *Monell* analysis with the "custom" prong. As explained above, a municipality may be held liable under § 1983 only "when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by them." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611). Put differently, a municipality "may not be held liable on a theory of vicarious liability rooted in respondeat superior," but it may be held liable "when the injury inflicted is permitted under its adopted policy or custom." *Mulholland v. County of Berks,* 706 F.3d 227, 237 (3d Cir. 2013) (citing *Beck,* 89 F.3d at 971). "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Mulholland,* 706 F.3d at 237 (quotation marks omitted). And a "course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well-settled as to virtually constitute law." *Id.* (quotation marks omitted). Allegations of knowledge and acquiescence are required only under the custom prong. *See*

*McTernan v. City of York,* 564 F.3d 636, 658–59 (3d Cir. 2009) (explaining that to allege an actionable municipal custom, the complaint must identify the custom with specificity and demonstrate "knowledge and acquiescence by the decisionmaker"); *Bielevicz v. Dubinon,* 915 F.2d 845, 851 (3d Cir. 1990) ("[T]o sustain a § 1983 action against the City, plaintiffs must simply establish a municipal custom coupled with causation—i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury."). Because Roman alleges that he suffered a constitutional injury as a result of CCP's official policy regarding dental treatment, he need not also allege knowledge and acquiescence.

Accordingly, the Court denies the County Defendants' motion to dismiss Roman's Fourteenth Amendment claim for delayed dental care as against the County.

### 3. Soft Food Diet

Roman also brings Fourteenth Amendment claims against Aramark, alleging that the company was deliberately indifferent to his serious medical needs when it failed to provide a soft food diet as prescribed by Roman's dentist, "causing further injury to [Roman's] teeth." (Doc. No. 30 at 7, 9–10, 14–15, 18, 21.)

#### a. Constitutional Violation

Aramark does not contest that Roman has alleged a serious medical need, in that his dentist prescribed a soft food diet. *See Talley v. Amarker,* No. CIV.A. 95-7284, 1996 WL 528867, at \*2 (E.D. Pa. Mar. 7, 1996) ("Plaintiff has alleged a serious medical need because he has alleged that his diet was medically prescribed."). Instead, Aramark argues that Roman's claim fails because Roman has not shown deliberate indifference, and more specifically, has failed to "assert any facts suggesting that an Aramark individual acted intentionally, delayed medical treatment for a non-medical reason, or prevented the Plaintiff from receiving medical treatment." (Doc. No. 103-2 at 9–10.) Liberally construing the allegations in the Complaint, the Court finds Roman has sufficiently alleged deliberate indifference.

**\*9** A food provider acts with deliberate indifference when it fails to provide a specific diet despite knowing that it

is medically required. *See Talley, 1996 WL 528867, at \*2* (finding the "plaintiff has alleged both serious medical needs and deliberate indifference" where he "alleged that Aramark failed to provide him with his diet over a period of six weeks, even though they were aware that it was medically required"); *Skelton v. Branganza, Civil No. 19-18597 (RMB-SAK), 2024 WL 939688, at \*7 (D.N.J. Mar. 4, 2024)* ("It is plausible that the Dietician Defendants were aware that the diets they designed, as alleged in the TAC, did not comply with medically prescribed diets for prisoners with diabetes and other conditions. Plaintiff's claims of deliberate indifference to a serious medical need can proceed against the Dietician Defendants.").

Here, Roman alleges that he was prescribed a soft food diet on May 31, 2023, and that as of June 19, 2023, when he signed his supplemental complaint, Aramark "continue[d] to provide meals that are against medical prescription." (Doc. No. 30 at 10; *id.* at 21 (copy of "Medical Diet Order Form," prescribing "Dental Soft Diet").) In addition, Roman attaches to his Complaint multiple request slips—directed to correctional officers, Aramark's Office, and Roman's dentist —which suggest Aramark was aware that Roman needed a "soft food diet." (*See id.* at 15 (June 17, 2023 grievance slip to "Aramark Office," asking the recipient to "[p]lease help end the delay of a medical based 'soft dental diet' that was prescribed by Dr. Zarkoski in order to prevent further injury"); *id.* at 16 (June 17, 2023 grievance slip alleging that "going on (18) days Ive [sic] been delayed my Dental Soft Diet which has left me vulnerable to injury").)

The Court finds these allegations sufficient at this stage to state a plausible constitutional violation.

### b. Municipal Liability

Aramark argues that even if Roman has stated a constitutional violation, his Fourteenth Amendment claim nevertheless fails because Roman has not alleged facts to satisfy *Monell.* (Doc. No. 103-2 at 6–9.) As a private company providing services to pretrial detainees pursuant to a municipal contract, Aramark stands in the same shoes as the municipality. *See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 583–84 (3d Cir. 2003)*; *Whitehurst v. Lackawanna County, CIVIL ACTION NO. 3:17-cv-00903, 2020 WL 6106616, at \*16 (M.D. Pa. Mar. 5, 2020)* (citing *Natale* for the proposition that "§ 1983 liability for constitutional violations based on a municipal entity's policies and customs has been extended to apply to

private companies providing prison medical services under contract"). Roman has not identified an Aramark policy or alleged any facts to suggest an Aramark custom was the cause of the delay of his soft food diet. Accordingly, Aramark's motion to dismiss is granted. Roman will, however, be given an opportunity to amend his Complaint to include such allegations if he can do so in good faith. If Roman chooses to amend his Complaint, he should be mindful of the Court's discussion of *Monell* throughout this Memorandum.

\* \* \*

In sum, Roman's Fourteenth Amendment claims against the County for the 20-month delay of necessary dental care and the denial of mental health care services may proceed. The Court dismisses without prejudice Roman's Fourteenth Amendment claims against the individual County Defendants and Aramark.

### B. Retaliation

In addition to his Fourteenth Amendment claims, Roman alleges that the County Defendants violated his First Amendment rights when they retaliated against him for filing grievances and a PREA complaint. To state a plausible First Amendment retaliation claim, a prisoner must allege: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action. *Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)*; *Coit v. Garman, 812 F. App'x 83, 86 (3d Cir. 2020)*. Roman has identified four allegedly adverse actions: (1) using the prison's suicide prevention policy to sexually harass him; (2) interfering with his ability to file additional grievances; (3) preventing him from attending medical appointments; and (4) moving him from cell to cell for no penological purpose. The Court considers whether Roman has stated a constitutional claim as to each action in turn.

### 1. Suicide Prevention

**\*10** First, Roman claims that he was sexually harassed by Defendant Sergeant Mark DiOrio when, at some unidentified time, Sergeant DiOrio instituted CCP's suicide prevention policy against Roman after "a[n] argument." (Doc. No. 17 at 10.) Roman alleges that even though he was "compliant,"

"nonaggressive," and told Sergeant DiOrio that he had "NO suicidal or homicidal thoughts," Sergeant DiOrio nevertheless "forced" him to go to a cell without "toilet paper [or] soap" and to change into a "suicide smo[c]k" that was too small while Sergeant DiOrio watched. (*Id.* at 10, 15–16.) According to Roman, Sergeant DiOrio was "attempt[ing] to ... punish[ ]" Roman "using a policy of suicide prevention." (*Id.* at 10; *see also id.* at 15 ("Defendants herein named throughout complaint have targeted plaintiff by using customs in place for suicide prevention to punish plaintiff ....").) Roman has not, however, tied this "punishment" to any constitutionally protected activity under the First Amendment. (*See id.* at 10, 15–16 (claiming that the policy was instituted because of an "argument").) As such, Roman has not alleged a plausible constitutional violation, and the Court must grant the County Defendants' motion to dismiss this claim. Roman will, however, be given leave to amend.

## 2. Medical Escorts

Next, Roman claims he has been denied medical visits "due to staff refusing to escort [him] to appointments." (Doc. No. 17 at 23; *see also id.* at 21 (alleging correctional officers "refused to escort" Roman to a dental appointment on April 19, 2023).) In one portion of his Complaint, Roman claims this refusal was "due to [his] classification status" (*id.* at 23), which does not implicate the First Amendment. *See Thomas v. Independence Township*, 463 U.S. 285, 295 (3d Cir. 2006) (finding "the plaintiffs have adequately pled First Amendment retaliation claims" where "the complaint alleges that the Individual Defendants have engaged in a campaign of harassment and intimidation against plaintiffs *for exercising their First Amendment rights*" (emphasis added)). In another portion of his Complaint, however, Roman claims that he "became a target" in the months after filing his PREA complaint, in that Sergeant DiOrio "refused" to provide "medical escorts." (*Id.* at 17.)

A prisoner's filing of a PREA complaint is constitutionally protected conduct. *See Robinson v. Palco*, No. 21-298, 2022 WL 3009746, at *3 (3d Cir. 2022) ("The misconducts, as well as the resulting sanctions, were explicitly issued in response to Robinson's filing of PREA complaints, which we have concluded 'implicates conduct protected by the First Amendment.' ") (quoting *Mitchell v. Horn*, 318 F.3d 523, 531 (3d Cir. 2003)). And at least one federal district court has found that interference with required medical appointments can rise to the level of an "adverse action." *See*

*Oliver v. Calderon*, Case No. 6:17-cv-1792-Orl-31TBS, 2019 WL 1254844, at *5 (M.D. Fla. Mar. 19, 2019) ("Plaintiff's allegations that Defendants prevented him from attending medical appointments and denied him medical treatment as a result of filing grievances, if proven true, support a First Amendment violation."). That leaves the third prong of the constitutional inquiry: causal connection.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Ruttle v. Brady*, No. 22-3000, 2023 WL 5554648, at *2 (3d Cir. Aug. 29, 2023) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). Roman filed his PREA complaint in early June 2022. (*See* Doc. No. 17 at 16 ("Recorded phone calls to Prea on 06/08/22").) Roman identifies only one date when he was denied a medical escort after that complaint was filed: April 19, 2023. (Doc. No. 17 at 21.) [10] A ten-month delay is not "unusually suggestive." *See Yu v. U.S. Dep't of Veterans Affairs*, 528 F. App'x 181, 185 (3d Cir. 2013) (defining "unusually suggestive" as "within a few days but no longer than a month"). Neither has Roman alleged a "pattern of antagonism" by Sergeant DiOrio, which "coupled with timing" could "establish a causal link." *Ruttle*, 2023 WL 5554648, at *2.

[10]   As noted above, Roman has not alleged that Sergeant DiOrio is the officer responsible for his missed dental appointment.

**\*11** Because Roman has not alleged a plausible constitutional violation, the Court grants the County Defendants' motion to dismiss this claim. Roman will, however, be given leave to amend.

## 3. Grievance Interference

Third, Roman alleges that Defendant Sergeant Taylor interfered with Roman's "grievance requests and inmate request slips." (Doc. No. 17 at 17.) Roman claims he "made extensive reports to [CCP's] medical/mental health" department and the "security department" and "all defendants in administration," but it was "to no avail" because "the request slips" were never received. (*Id.*) Roman believes they were not received by upper management because Sergeant Taylor "screens[,] interferes, and returns" the grievances

"with a[n] answer (NO)!" (*Id.*) Once again, Roman has not tied the alleged interference to any constitutionally protected activity under the First Amendment. And even if we viewed the initial filing of the grievances as the constitutionally protected activity, the denial of those grievances was "not an 'adverse action' for retaliation purposes. *Owens v. Coleman,* 629 F. App'x 163, 167 (3d Cir. 2015). Because Roman has not alleged a plausible constitutional violation, the Court grants the County Defendants' motion to dismiss this claim. Roman will, however, be given leave to amend.

### 4. Cell Transfers

Last, Roman alleges that all the individual Defendants "were involved in a campaign of harassment towards" Roman, moving Roman from "cell to cell" as a punishment for his "many attempts to file a grievance" against unidentified officers. (Doc. No. 17 at 11.) Specifically, Roman claims he was "moved (18) times in under (17) months" with 13 moves "based on provoked retaliation that [began on] 06/08/2022" when Roman filed his PREA complaint against Sergeant DiOrio. (*Id.* at 18.)[11] Grievances and informal oral complaints are protected conduct for purposes of a First Amendment retaliation claim. *See Watson v. Rozum,* 834 F.3d 417, 422 (3d Cir. 2016) (written grievances); *Mack v. Warden Loretto FCI,* 839 F.3d 286, 300 (3d Cir. 2016) (oral grievances). However, the Court cannot find that Roman's cell transfers, when viewed collectively or individually, constituted an adverse action.

[11]    In his opposition brief, Roman also asserts he was "involved in 'Jailhouse lawyer' aid to others at the time the retaliation began as well as complaints to multiple prison board members, local news papers and Disability Rights Pennsylvania Attorneys, right before Defendants ... began their active [c]ampaign of [h]arassment through non-stop cell transfers and harassment." (Doc. No. 106 at 15.) Because these allegations are not included in the Complaint, the Court does not consider them. *See Pa. ex rel. Zimmerman,* 836 F.2d at 181 (explaining that a complaint may not be amended by a plaintiff's brief in opposition to a motion to dismiss); *Ernst,* 2023 WL 6276698, at *12 n.65 (same).

Notably, Roman concedes that "around 5" of the transfers were justified by his "own actions." (*See* Doc. No. 17 at 18); *see also Dillard v. Talamantes,* Civil No. 1:15-CV-974, 2018 WL 1518565, at *11 (M.D. Pa. Mar. 28, 2018) ("Dillard speculates that defendant Nye moved him to a different cell for the sole purpose of harassing and punishing him. However, Dillard concedes that on at least one occasion, he in fact requested a cell change because he did not get along with his cellmate due to their age difference."). As to the remaining 13 transfers, Roman discusses only one set of transfers in detail, alleging that he was moved five times between February 21, 2023 and February 23, 2023, when Sergeant Taylor and nondefendant Sergeant Ramos moved Roman between cell 32—which lacked "cable access"—and other cells that had cable access. (Doc. No. 17 at 19.)

**\*12** "[U]nder some circumstances, a prison transfer may constitute an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Chruby v. Bearjar,* CIVIL ACTION NO. 3:17-cv-01631, 2018 WL 4537404, at *12 (M.D. Pa. Aug. 27, 2018). "For example, a transfer into administrative or restrictive confinement, a less desirable cell or location within the prison, or a dangerous cell block might represent an adverse action." *Lawson v. Crowther,* Civil Action No. 17-39 Erie, 2018 WL 6524380, at *3 (W.D. Pa. Oct. 30, 2018) (collecting cases); *see also Palmore v. Hornberger,* 813 F. App'x 68, 70 (3d Cir. 2020) ("[B]eing placed in lockdown, being moved to restricted housing, and being issued misconduct charges are more than '*de minimis*' adverse actions." (quoting *McKee,* 436 F.3d at 170)); *Dunbar v. Barone,* 487 F. App'x 721, 723 (3d Cir. 2012) ("In the prison context, ... the following actions were sufficient to establish adversity: *several months in disciplinary confinement*; denial of parole, financial penalties, and transfer to an institution whose distance made regular family visits impossible; and *placement in administrative segregation that severely limited access to the commissary, library, recreation, and rehabilitative programs.*") *Dunbar v. Barone,* 487 F. App'x 721, 723 (3d Cir. 2012) (emphases added). In such cases, the cell transfers "have a strong deterrent effect." *Dillard v. Talamantes,* CIVIL NO. 1:15-CV-974, 2018 WL 1518565, at *11 (M.D. Pa. Mar. 28, 2018); *see also Griffin v. Malisko,* No. 1:18-cv-01155, 2018 WL 5437743, at *3 (M.D. Pa. Oct. 29, 2018). In contrast, cell transfers that result in only "[t]emporary inconveniences ... do not meet this standard." *Griffin,* 2018 WL 5437743, at *3. "[W]hether a prisoner has met this prong of his retaliation claim will," however, "depend on the facts of the particular case." *Dillard,* 2018 WL 1518565, at *11.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    11

For example, the plaintiff in *Griffin* argued that his transfer to a new cell with a shower that produced "brown water" was an adverse action. *Id.* at *3 & n.1. The district court disagreed, finding that the plaintiff had not satisfied this element of his retaliation claim because "his transfer from one cellblock to another similar cellblock is insufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Id.* The court emphasized that the plaintiff had failed to "allege for how long the water was allegedly brown" and that it "was clear from the complaint that Plaintiff suffered no physical harm from the brown water" and was "only temporarily housed in this cell." *Id.*; *see also Owens*, 629 F. App'x at 167 ("Owens' mere assertion that Appellees retaliated against him by placing him in a cell with a faulty shower does not meet the[ ] elements" of a First Amendment retaliation claim.); *Dillard*, 2018 WL 1518565, at *11 ("Simply moving Dillard to a different cell, and failing to allow him to [reside] with the inmate of his choice in a cleaner, quieter cell, cannot be considered 'adverse actions' sufficient to deter a person of ordinary firmness from exercising his constitutional rights."); *Lawson v. Crowther*, Civil Action No. 17-39 Erie, 2018 WL 6524380, at *3 (W.D. Pa. Oct. 30, 2018) ("While transferring between equivalent cells within a short period of time may be an annoyance, the Court cannot conclude that it would deter a person of ordinary firmness from exercising his constitutional rights.").

Here, like the plaintiffs in *Griffin, Owens, Dillard*, and *Lawson*, Roman has not alleged that his cell transfers rise to the level of adverse actions. The only difference between cell 32 and Roman's preferred cell is that cell 32 lacked "cable access," meaning Roman could not use his "$300 TV" during the few hours that he was housed in that cell in February 2023. (Doc. No. 17 at 19.) [12] The denial of cable, especially for such a short period of time, is a *de minimis* consequence that does not rise to the level of an adverse action. *See Snider v. Alvarez*, CIVIL ACTION NO. 18-801, 2020 WL 6395499, at *18 (M.D. Pa. Nov. 2, 2020) (finding that "turning off [the prisoner's] cable-TV for two weeks" did not "meet the level of adverse action"); *cf. Newmones v. Ransom*, No. 1:21-CV-00276-RAL, 2022 WL 4536296, at *5 (W.D. Pa. Sept. 28, 2022) ("The deprivation of cleaning supplies, showers, and recreation are *de minimis* inconveniences and not adverse actions.").

[12]    In his opposition brief, Roman argues that he "has clearly proven he suffered some '[a]dverse [a]ction' at the hands of defendants when

plaintiff[']s belongings and legal material was damaged due to the excessive cell transfers and the belongings being thrown in the cell by defendants." (Doc. No. 106 at 17.) Again, these allegations are not included in the Complaint, so the Court does not consider them. *See Pa. ex rel. Zimmerman*, 836 F.2d at 181 (explaining that a complaint may not be amended by a plaintiff's brief in opposition to a motion to dismiss); *Ernst*, 2023 WL 6276698, at *12 n.65 (same).

**\*13** Because Roman has not alleged a plausible constitutional violation, the Court grants the County Defendants' motion to dismiss this claim. Roman will, however, be given leave to amend.

\* \* \*

Roman has not alleged any plausible claims of First Amendment retaliation. Accordingly, the County Defendants' motion to dismiss is granted as to his First Amendment claims with the understanding that Roman will be granted leave to amend.

### C. Punitive Damages

Last, the County seeks dismissal of Roman's request for punitive damages as against it, arguing that the Complaint "contain[s] no allegations that" the County was "motivated by an evil motive, [was] recklessly indifferent to Plaintiff's constitutional rights, or had any prior personal animosity towards Plaintiff." (Doc. No. 101 at 27.) "A jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Although the Court agrees Roman's allegations of intent are sparse, we find it more appropriate to address this issue at summary judgment. Accordingly, the County's request is denied, with the understanding that the County may, if warranted, seek dismissal of the punitive damages request after discovery.

### V. CONCLUSION

For the reasons discussed above, Roman's Fourteenth Amendment claims against the County survive to the extent Roman alleges CCP's policies resulted in delayed dental care and the denial of mental health care. The Court also declines

**Roman v. County of Chester, Slip Copy (2024)**

2024 WL 4844792

to strike Roman's request for punitive damages at this time. Roman's remaining claims against the County, all of his claims against the individual County Defendants, and his claim against Aramark are dismissed. Roman will, however, be given an opportunity to file an amended complaint to address the issues discussed in this Memorandum to the extent he can do so in good faith. Roman is warned that leave to amend is limited, and any new pleading should not exceed the scope of this Memorandum.

**All Citations**

Slip Copy, 2024 WL 4844792

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.